IMAGED

COURT OF COMMON PLEAS

BUTLER COUNTY, OHIO

STATE OF OHIO                              :        CASE NO. CR 83 12 0614

                Plaintiff                  :

vs.                                        :        MOTION TO INCREASE THE
                                                    BURDEN OF PROOF TO BEYOND
VON CLARK DAVIS                                     ALL DOUBT
                                                    FILED in Common Pleas Court
                Defendant BUTLER COUNTY, OHIO       :

                        MAR 27 1984 : :

        Now comes the defendant, by and through counsel, and hereby

                                EDWARD S. ROBB, CLERK

moves this Honorable Court to increase the burden of proof upon

the State of Ohio in the case at bar to "beyond all doubt", in

both the guilt and sentencing phases.  The defendant asserts that

his constitutionally guaranteed right to due process and

freedom from cruel and unusual punishment, guaranteed him by the

United States Constitution and the Ohio Constitution, will be

violated without this increase in the burden of proof.


                                        _Michael Shanks_
                                        MICHAEL SHANKS
                                        315 S. Monument Avenue, P. O. Box 687
                                        Hamilton, Ohio  45012
                                        Telephone:  (513) 868-7600

                                        _John A. Garretson_
                                        JOHN A. GARRETSON
                                        A/Legal Professional Association
                                        Attorneys for Defendant
                                        118 S. Second Street, P. O. Box 60
                                        Hamilton, Ohio  45012
                                        Telephone:  (513) 868-2074


64



### MEMORANDUM

> Death, in its finality, differs more from life imprisonment
> than a 100-year prison term differs from one of only a
> year or two.  Because of that qualitative difference,
> there is a corresponding difference in the need for
> <u>reliability</u> in the <u>determination that death is the</u>
> <u>appropriate punishment</u> in a given <u>case</u>.  (Emphasis added).

<u>Woodson v. North Carolina</u>, 428 U. S. 280, 305 (1976).

Insistence on reliability is a vital current in the Supreme Court's decisions in capital cases.  "Deciding Who Dies", Univ. of Pa. L. Rev. 129:1, 60 (November, 1980). In <u>Gardner v. Florida</u>, 430 U. S. 349, 356 (1977) the court vacated a death sentence because the trial judge, in imposing death, <u>might</u> have considered "material" not revealed to the defendant.  This possibility was unacceptable cause it permitted the risk of caprice in the decision.

Mandatory sentencing was abolished in <u>Woodson</u> and <u>Roberts v. Louisiana</u>, 428 U. S. 325 (1976).  The individual had to be considered.  The capital penalty had to be appropriate to both the crime and the accused.

In <u>Lockett v. Ohio</u>, 438 U. S. 536 (1978), the Supreme Court struck down the previous Ohio statute as violative of the Eighth and Fourteenth Amendments because it unduly limited the admissibility of evidence in mitigation.  The court stated

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 190

IMAGED

that given the life and death decision necessary to a capital case, an individualized decision is essential. The sentencing body should have access to all information available to be considered as a mitigating factor. A subsequent decision, Green v. Georgia, 442 U. S. 95 (1979) invalidated an otherwise unobjectionable state hearsay rule in order to consider information Lockett made relevant.

The Supreme Court also reversed a sentence of death in Beck v. Alabama, 447 U. S. 625 (1980). The Alabama capital statute precluded jury instructions on a lesser included offense. The Supreme Court reversed, ruling that exclusion of the lesser included instruction inevitably enhanced the risk of unwarranted conviction. "As we have often stated, there is a significant constitutional difference between the death penalty and lesser punishment." Beck, p. 637.

This emphasis on reliability and certainty is a product of the unique decision that must be made in every capital case -- the choice of life or of death.
The Supreme Court has consistently emphasized

- 3 -

IMAGED

the "qualitative difference" of death as a punishment, stating that death "profoundly differs from all other penalties" and is "unique in its severity and irrevocability." Woodson at 305; Lockett at 605; accord, Gardner at 357; Gregg v. Georgia, 428 U. S. 153, 187 (1976). Many commentators suggest that the Supreme Court does indeed apply a more stringent standard in review of capital cases, to insure the reliability of the sentencing decision and members of the court have themselves made this clear. Justice O'Connor stated, concurring, in Eddings v. Oklahoma, _____ U. S. _____, 102 S. Ct. 869, 878 (1982): "Because sentences of death are qualitively different from prison sentences, this court has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake." (Emphasis added.) See also majority opinion in Beck, at 637, fn. 14. See also "The Impact of a Sliding Scale Approach to Due Process On Capital Punishment Litigation" 30 Syracus Law Rev., 675 (1979); "Cruel Punishment and Respect for Persons: Super Due Process for Death", 53 S. Cal. Law Rev., 1143; "More Process is Due the Capital Defendant", Professor Margery Koosed, Ohio Death Penalty Manual, III-B-1 to III-B-9 (1981).

Clearly, the Supreme Court will stringently evaluate guilt and sentence determination practices in capital cases, and if a procedure "enhances the risk of an unwarranted conviction," Beck, at 637 or sentence, it will be struck down, even though the same practice may be upheld in a non-capital case, Powell v. Alabama, 287 U. S. 45 (1932); cf. Betts v. Brady, 316 U. S. 455 (1942). Treating capital cases

- 4 -

IMAGED

differently is totally consistent with previous constitutional interpre-
tations. Historically the United States Supreme Court has noted that
"due process calls for such procedural protections as the situation
demands...[N]ot all situations calling for procedural safeguards call
for the same kind of procedure", Gardner at 358, n.9 quoting Morrissey
v. Brewer, 408 U. S. 471, 481 (1972).

The burden of proof imposed in the instant case should be proof
beyond all doubt. The jury should be instructed during both the guilt
phase and the sentencing phase that the law requires proof beyond all
doubt. Thus, a capital conviction cannot rest but upon proof beyond all
doubt of all of the elements. Death cannot be imposed as a penalty
except upon proof beyond all doubt of the element of the crime and
that the aggravating circumstances outweigh all matters in mitigation.

Proof beyond all doubt, a higher standard than proof beyond a
reasonable doubt, must be used as the standard of proof in a capital
case. The absolute need for reliability in both the guilt and the
penalty phases requires that the higher standard of proof be applied.
The irrevocability of the penalty requires absolute reliability. Absent
absolute reliability, the accused may be subjected to a sentence of
death in a manner violative of his Eighth and Fourteenth Amendment
rights.

The proof beyond a reasonable doubt standard has been constitutionally
required in criminal cases "to safeguard men from dubious and unjust
convictions," In Re Winship, 397 U. S. 358, 363 (1970), in recognition
that the "accused during a criminal prosecution has at stake interests
of immense importance, both because of the possibility that he may
lose his liberty upon conviction and because of the certainty that he

- 5 -

IMAGED

would be stigmatized by the conviction:" Id., and that this standard of proof commands "the respect and confidence of the community in applications of the criminal law." Id., at 364. (Emphasis added).

In Winship, the court was dealing with a juvenile facing a possible six years imprisonment, and thus discussed the matter of deprivation of liberty under the Fourteenth Amendment. Given the interests at stake in a capital case, i.e., the loss of life as opposed to liberty, and the necessity that the community "not be left in doubt whether innocent men are being condemned" Id. at 364 irretrievably, the assessment of interests would appear to favor in the guilt-determining process a standard for taking life which reduced the margin of error "as much as humanly possible," i.e., to that beyond all doubt. (Emphasis added). Article of Professor Koosed.

The reasonable doubt rule has been a part of American jurisprudence since the late 19th Century. See "A Re-Examination of the Development of the Beyond a Reasonable Doubt Rule", 55 Bost. Univ. L. Rev., 507 (1975). The reasonable doubt rule replaced a higher burden, the any doubt test. Courts instructed jurors that "your sense of justice, and your own feelings, will not allow you to convict the prisoner, unless your consciences are fully satisfied beyond all doubt of his guilt." Id. at 511. John Adams, as defense counsel in the Boston Massacre Trials in 1770, argued in closing:

> [T]he best rule in doubtful cases, is, rather the incline to acquittal than conviction and ....
> [w]here you are doubtful never act; that is, if you doubt of the prisoner's guilt, never declare him guilty; this is always the rule, especially in cases of life.

Rex v. Wemms, Id. 516 (Emphasis added).

IMAGED

That strain appears again and again -- emphasis on reliability is of overwhelming importance in a capital case. The Model Penal Code includes such a provision in Section 210.6:

> Sentence of Death for Murder:
> Further Proceedings to Determine Sentence.
>
> (1) Death Sentence Excluded. When a defendant is found guilty of murder, the Court shall impose sentence for a felony of the first degree [imprisonment] if it is satisfied that:
>
> . . .
>
> (f) although the evidence suffices to sustain the verdict, it does not foreclose all doubt respecting the defendant's guilt.

The words used are "all doubt", not merely "doubt" or "reasonable doubt." At least two states have implemented a procedure for excluding the death sentence akin to that of the Model Penal Code. Washington utilizes a mandatory special question of the guilt determining jury when it reconvenes as a sentencing body for purposes of determining the appropriate punishment. §10.94.020 (Wash. 1977). Once the jury has found an aggravating circumstance, and is "unanimously convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency, the jury is required to answer unanimously in the affirmative to the following: "Did the evidence presented at trial establish the guilt of the defendant with clear certainty?", or the death sentence may not be imposed. If in the affirmative, this finding, along with others, is reviewed for purposes of sufficiency in the Washington Supreme Court. §10.94.030 (3) (a) (Wash. 1977).

Georgia's procedure (§27-2537) for adequate appellate review of the sentence determination, strongly approved and noted by the United

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 195



States Supreme Court in <u>Gregg v. Georgia</u>, 428 U. S. 153, 167 (1976) and by Justices White, Burger, and Rehnquist concurring, at 211, is to require that the trial judge respond to a standard questionnaire. Among the six questions is "whether the evidence forecloses all doubt respecting the defendant's guilt." <u>Id</u>., at 211. The answer thereto will then assist in deciding whether to sustain the death penalty. Article of Professor Koosed.

Ohio law provides standard jury instructions of "reasonable doubt" and "proof beyond a reasonable doubt" as the applicable burden of proof in capital cases. §2901.05(D) Ohio Revised Code. Both definitions have been repeatedly challenged in the courts as inadequate. "...the restylizing has changed and distorted the former definitions to such an extent that the statutory definition of reasonable doubt requires little more than a preponderance of the evidence." <u>State v. Frost</u>, Case No. 77AP728, unreported decision of the Franklin County Court of Appeals (1978 Decision, p. 1088, 1101) (Judge Whiteside, dissenting). See, <u>Cross v. Ledford</u>, 161 Ohio St. 469 (1954); <u>Holland v. United States</u>, 348 U. S. 121 (1954); <u>Scurry v. United States</u>, 347 F.2d 468 (D.C. Cir. 1965) <u>cert</u>. denied 289 U. S. 883 (1967); <u>State v. Crenshaw</u>, 51 Ohio App.2d 63, 65 (1977); cf. <u>Dumbach v. Overburg</u>, No. C-2-79-821, (S.D. Ohio E.D., 1980) aff'd without opinion, Case No. 80-3453 (Sixth Cir., 1981) <u>cf</u>., <u>State v. Nabozny</u>, 54 Ohio St.2d 195 (1978); <u>State v. Senett</u>, 70 Ohio App.2d 171 (1980). The Ohio reasonable doubt instructions, subject as they are to challenge for inadequacy in non-capital cases, fail miserably in satisfying the requirement of reliability in a capital

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 196

IMAGED

case.

Two significant examples illustrate the problem of the "reasonable doubt" burden in capital cases. In State v. Miller, 49 Ohio St.2d 198 (1977), the defendant was sentenced to death solely upon fingerprint evidence that he had explained in an exculpatory manner. While a majority of the Ohio Supreme Court (5 members) concluded that "there was sufficient substantial evidence for the triers of fact to conclude that Miller was the criminal agent of the crimes charged," at 203, and therefore affirmed the conviction and sentence of death, two members of the Court dissented on the ground that the evidence did not exclude "every reasonable hypothesis except that of guilt," and went on to set forth several such hypotheses of innocence and listed other evidence inconsistent with Miller's guilt. The dissent stated that the majority's result was the "impos[ition of] the death penalty on evidence insufficient to sustain a conviction." Id. at 206. George Miller's death sentence was eventually commuted by the Lockett decision and actions of the Ohio Supreme Court subsequent thereto. If no such decision were rendered by the United States Supreme Court, however, Miller would (barring a pardon or commutation) have been executed. Article of Professor Koosed.

A second, more timely example is of even greater significance. In a capital case tried under the new law, State v. Herman Ray Rucker, No. 82-CR-018, Wayne County Court of Common Pleas, the jury attempted to reverse itself. After reaching a unanimous verdict on guilt, the jury returned for the sentencing hearing, heard the testimony, deliberated, and then asked the court for instruction as the jury was no longer in agreement as to the question of guilt. After instruction by the court

- 9 -


IMAGED

that they could only determine sentence at the second hearing, the jury opted for the least restrictive sentencing alternative, life with parole eligibility in 20 years.

In Miller and in Rucker, doubt existed as to guilt of the accused. Yet Miller received a death sentence affirmed on appeal, and Rucker, after an apparently agonizing jury decision, received a life sentence. Doubt as to guilt is absolutely untenable in a capital case. The accused's interest not merely in liberty, but in life, and the state's interest in justice are too vital to be infringed upon by doubt as to guilt. The compromise verdict of Beck v. Alabama, or the compromise sentence in Rucker exact too great a price from the accused and too heavy a blow to the public's faith in justice to be tolerated.

Therefore, the accused respectfully requests that the jury be instructed that the burden of proof borne by the State is proof beyond all doubt. If there is any doubt, that doubt is to be resolved in the accused's favor. Defendant's right to due process and protection from the imposition of cruel and unusual punishment, guaranteed him by the Eighth and Fourteenth Amendments to the United States Constitution and the Ohio Constitution require the State act in a capital case only in the absence of all doubt.

Attorneys for Defendant
MICHAEL SHANKS

JOHN A. GARRETSON



## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was hand-delivered to John F. Holcomb, Prosecuting Attorney, Butler County Court House, Hamilton, Ohio 45011, on the date the same was filed.

JOHN A. GARRETSON
Attorney for Defendant

- 11 -

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 199

IMAGED

COURT OF COMMON PLEAS

BUTLER COUNTY, OHIO

STATE OF OHIO                              :        CASE NO. CR 83 12 0614

              Plaintiff                    :

vs.                                        :        MOTION FOR PRETRIAL DISCLOSURE
                                                    OF THE PROSECUTING WITNESSES'
VON CLARK DAVIS            FILED In Common Plea WRITTEN OR RECORDED STATEMENTS
                          BUTLER COUNTY, OHIO
              Defendant

APR 27 1984 : :

EDWARD S. ROBB, JR.
CLERK

    Now comes the defendant, by and through counsel, and moves
the Court to order the State to deliver to the defendant the
written or recorded statements or summaries of the witnesses he
intends to call, at a reasonable time before the commencement of
the trial.  The defendant, under Rule 16, Ohio Rules of Criminal
Procedure, is absolutely entitled to receive these statements
at the conclusion of State's direct examination of the prosecution
witnesses.

    Delivery of the witnesses' statements at a time before trial
is necessary in order to allow counsel for the defendant to properly
prepare for cross-examination of the prosecuting witnesses, by
investigation, and, in order to avoid wasted time and expense at
trial.  Failure to order delivery of these statements before trial
would force the defendant to demand a recess at the conclusion of
the testimony of each prosecuting witness to provide time for the
defense  to examine their prior written or recorded statements.
The jury in a capital proceeding is already serving for a prolonged
period; this period should not be exacerbated by such recesses,
when the matter could be handled prior to trial.



IMAGED

Additionally, in that this is a capital prosecution, the realiability of the guilt, <u>Beck v. Alabama</u>, 447 U. S. 625, 637-638 (1980), and sentencing, <u>Lockett v. Ohio</u>, 438 U. S. 586 (1978) determinations is essential. The Supreme Court has stated more process is due the capital defendant in order to assure reliability. Under the Eighth and Fourteenth Amendment, and Article I, Sections 9 and 16 of the Ohio Constitution, the capital defendant must be fully assured a fair and adequate opportunity to defend against the State's charges. It will thus be very likely that substantial investigation will follow disclosure of witness' statements. The substantial delays which would be occasioned by such recesses for investigation will only serve to disrupt the presentation of evidence. This burden is unnecessary.

Further, disclosure of the witness' statements prior to trial may reveal evidence of a possible exculpatory nature, which the defense is entitled to under <u>Brady v. Maryland</u>, 373 U. S. 83 (1963), and several courts have held that disclosure of such information should be made prior to trial in order to permit adequate investigation. <u>U. S. v. Bonnano</u>, 430 F. 2d 1060 (2nd Cir.), cert den. 400 U. S. 964 (1970); <u>U. S. v. Elmore</u>, 423 F. 2d 775 (4th Cir., 1970); <u>U. S. v. Eley</u>, 335 F. Supp. 353 (N. D. Ga., 1972); <u>U. S. v. Five Persons</u>, 472 F. Supp. 64, 67 (D. N. J. 1979); <u>U. S. v. Pollaek</u>, 534 F. 2d 964 (D. C. Cir.), cert den 429 U. S. 924 (1976).

WHEREFORE, the defendant requests the Court to enter an order directing the State to deliver the statements of the

- 2 -

IMAGED

prosecuting witnesses to the defendant at a reasonable time before trial in the discretion of the Court.

_Michael Shanks_

MICHAEL SHANKS
315 S. Monument Avenue, P. O. Box 687
Hamilton, Ohio 45012
Telephone: (513) 868-7600

_John A. Garretson_

JOHN A. GARRETSON
A Legal Professional Association
Attorneys for Defendant
118 S. Second Street, P. O. Box 60
Hamilton, Ohio 45012
Telephone: (513) 868-2074

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was hand-delivered to John F. Holcomb, Prosecuting Attorney, Butler County Court House, Hamilton, Ohio 45011, on the date the same was filed.

_John A. Garretson_

JOHN A. GARRETSON
Attorney for Defendant

- 3 -

IMAGED

COURT OF COMMON PLEAS

BUTLER COUNTY, OHIO

STATE OF OHIO                    :        CASE NO. CR 83 12 0614

           Plaintiff             :

vs.                              :        MOTION TO COMPEL PROSECUTOR
                                          TO DISCLOSE DEATH PENALTY DATA
VON CLARK DAVIS                           FILED in Common Pleas Court
                                          BUTLER COUNTY, OHIO

           Defendant.            :        APR 27 1984

                                 : : : : : : :

     Now comes the defendant and through his attorneys, and
respectfully moves this Honorable Court for an order to the
Prosecuting Attorney to provide defense counsel a list of all
defendants in the entire history of the State of Ohio who have
been sentenced to death.  In addition, defendant requests a list
of all the defendants who have been indicted for capital offenses
under the re-enactment of Ohio's Death Penalty Statute as effect-
ive October 19, 1981, as well as the disposition of each and every
one of those indictments.  Defendant requests the following
information concerning each defendant in both lists as applicable:

     1.  Name, age, sex, and race of each defendant.

     2.  Synopsis of the facts of each case.

     3.  Case number and year of each conviction.

     4.  Whether the death penalty was actually imposed.

     5.  If the death penalty was imposed, the date and means
         of execution.

     6.  If the death penalty was not imposed, the reason in
         each case.

     7.  The county wherein each defendant was sentenced to
         death.

IMAGED

The reasons for the Motion for this order to the Prosecuting
Attorney are more fully explained in the Memorandum attached hereto.

MICHAEL SHANKS
315 S. Monument Avenue, P. O. Box 687
Hamilton, Ohio  45012
Telephone:  (513) 868-7600

JOHN A. GARRETSON
A Legal Professional Association
Attorneys for Defendant
118 S. Second Street, P. O. Box 60
Hamilton, Ohio  45012
Telephone:  (513) 868-2074

- 2 -



## MEMORANDUM IN SUPPORT

A.        Revised Code Section 2929.04 prescribes the criteria for imposing death or imprisonment for a capital offense.  Pursuant to subsection (B) thereof the trial jury is mandated to weigh against the aggravating circumstances proved beyond a reasonable doubt a number of mitigating factors.  Subsection (B)(7) provides for consideration of:

> Any other factors that are relevant to the issue
> of whether the offender should be sentenced to
> death.

It is clear that in considering whether to impose death the sentencing jury will need to have before it data on other capital offenses so that it may more accurately gauge the seriousness of the defendant's conduct and the relevant circumstances of the charged offense.  Data which reveals that in cases involving similar facts and circumstances juries were reluctant to impose death, is relevant to mitigation.  Indeed, the case of Lockett v. Ohio (1978), 438 U. S. 586, which struck down an earlier Ohio statute, former Section 2929.04 of the Revised Code, for failure to provide the sentencer with wide latitude in considering all relevant mitigating factors, warns that "to meet constitutional requirements, a death penalty statute must not preclude consideration of relevant mitigating factors." Id. at 608.  Thus, in order to avoid a construction of Section 2929.04(B)(7) which would render the statute unconstitutional under Lockett, supra, the requested data on all previous death penalty cases in Ohio should be given the defendant so that he may present such evidence to the sentencing jury pursuant to Section 2929.04(B).

- 3 -

IMAGED

B.      Revised Code Section 2929.05(A) provides for appellate review of a death sentence.  In addition to weighing the evidence presented before the sentencing jury, the appellate court, in determining whether the sentence of death is appropriate:

> shall consider whether the sentence is excessive or
> disproportionate to the penalty imposed in similar
> cases.

The statute gives the appellate courts the power to re-examine the nature and circumstances of the crime and to prevent the discriminatory and arbitrary imposition of the death penalty in a particular case.  In order to do this, it is necessary for the reviewing court to have before it all relevant data on prior capital cases and the particular circumstances under which death was actually imposed.  However, it is well-settled that a reviewing court is bound by the record and may not consider facts extraneous thereto, regardless of how such facts may be brought to the attention of the court.  State v. Cickelli (1962), 118 Ohio App. 87, 89-90.

> [T]his court, . . . can only notice matter inserted
> in the record.  It can not look at that which ought
> to have been, but which is not so inserted.

Baldwin v. State (1833), 6 Ohio 15, at 16.

The Eleventh Circuit is currently rehearing en banc the issue of whether appellate courts may rely on extra-record material in determining the relative excessiveness or appropriateness of the death penalty as imposed on particular individuals.  Ford v. Strickland, 676 F.2d 434 (11th Cir., 1982) reh. granted, en banc.  Two members of the United States Supreme Court have already expressed their views that this practice is unconstitutional.  Brown v. Wainwright, ____ U. S. ____,

- 4 -

IMAGED

102 S. ct. 542, 70 L. Ed. 2d 407, 408 (1981) (dissent from denial of certiorari, Jr. Marshall and Jr. Brennan).

Accordingly, in order for an appellate court to properly consider data regarding the death penalty imposed in similar cases, pursuant to Section 2929.05(A), it is necessary to make such data a part of the trial record.  Since this information is uniquely within the possession of the prosecutor, as the representative of the State of Ohio, defendant respectfully requests that he be ordered to provide it to the defendant.

MICHAEL SHANKS

JOHN A. GARRETSON
Attorneys for Defendant

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was hand-delivered to John F. Holcomb, Prosecuting Attorney, Butler County Court House, Hamilton, Ohio 45011, on the date the same was filed.

JOHN A. GARRETSON
Attorney for Defendant

- 5 -

IMAGED

COURT OF COMMON PLEAS

BUTLER COUNTY, OHIO

STATE OF OHIO                          CASE NO. CR 83 12 0614

            Plaintiff            :

vs.                    FILED In Common Pleas Court   MOTION TO COMPEL DISCLOSURE
                       BUTLER COUNTY, OHIO  OF PROSECUTING ATTORNEY'S
VON CLARK DAVIS                     :     JURY SELECTION DATA

                       APR 27 1984
            Defendant            :

                    EDWARD S. ROBB, JR. :
                            CLERK

        Now comes the defendant, by and through counsel, and res-

pectfully moves this Court for an order compelling the Prosecuting

Attorney to disclose to the defendant any information and data

compiled on prospective jurors in the instant case.

        The grounds for this Motion are as follows:

        1.  Disclosure of the requested data is necessary to guarantee
            the defendant's Due Process rights under the Fourteenth
            Amendment to the United States Constitution.  Disclosure
            will insure the reliability of the guilt-determining
            process and further engender respect for the dignity of
            all criminal defendants and insure the continued
            integrity and respect for the impartiality of the jury
            system.

        2.  Disclosure will preserve the defendant's right to a
            fair trial by an impartial jury as provided by the
            Sixth Amendment to the United States Constitution and
            made applicable to the states through the Fourteenth
            Amendment.  Inherent in the right to an impartial jury
            is the right to be tried before a jury which is not
            "prosecution minded", which reflects a cross-section
            of community values, and which will more effectively
            perform its fact finding functions.

        The above grounds are more fully set out in the accompany-

ing Memorandum.

                            Michael Shanks

                        MICHAEL SHANKS
                        315 S. Monument Avenue, P. O. Box 687
                        Hamilton, Ohio  45012
                        Telephone:  (513) 868-7600

67

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 208

IMAGED

JOHN A. GARRETSON
A Legal Professional Association
Attorneys for Defendant
118 S. Second Street, P. O. Box 60
Hamilton, Ohio 45012
Telephone:  (513) 868-2074

- 2 -

IMAGED

## MEMORANDUM IN SUPPORT

A.  Due Process

One of the most fundamental values imbedded in the Due Process Clause of the Fourteenth Amendment is the right to a fair trial, which represents the preservation of the reliability and efficacy of the guilt-determining process of the Anglo-American jurisprudential system.  The United States Supreme Court has derived a number of fair trial imperatives from the Due Process Clause, though they are not specified anywhere in the Constitution.  For example, the court has prohibited the knowing use of false or perjured testimony by the prosecution, Miller v. Pate (1967), 386 U. S. 1, and has required the prosecution to divulge evidence favorable to the accused, Brady v. Maryland (1963), 373 U. S. 83.

Similarly, Due Process demands that the defendant be tried before a jury which is not inherently prosecution minded, a situation which would clearly offend any sense of fundamental fairness and justice and thereby bring into serious question any determination of guilt.  The State, no less than the defendant, is interested in these values.  It, too, has the duty to insure the fairness of the criminal process, which is first and foremost concerned with the ascertainment of the truth. Although the State and defendant

IMAGED

occupy adversarial positions and represent at times, con-
flicting values, a criminal trial should be seen "... less
as an arena where two lawyer gladiators duel, with the
accused's fate hanging on the outcome and more as an inquiry
primarily directed toward the fair asertainment of truth."
People v. Johnson (1959), 356 Mich. 619, 621, 97 N.W.2d 739,
740.

These values and the function of the criminal trial are
thwarted when the prosecution is able to use information
regarding prospective jurors during voir dire which is not
available to the defense. The nature of this information
enables the prosecutor to subtly find jurors who are prosecutior
minded, and who may be more inclinded to convict.

The United States Supreme Court has recognized the
awesome information-gathering advantages of the state
prosecutorial system. Practices such as the gathering of
information regarding prospective jurors through means
available only to the State provide nonreciprocal benefits
to the state. As a result, the criminal defendant, parti-
cularly in the case of indigency, is unfairly disadvantaged.
The flexibility of the Due Process Clause would seem to
require that the prosecution share this crucial data with
the defendant:

> The adversary system of trial is hardly an end in
> itself; it is not yet a poker game in which players
> enjoy an absolute right always to conceal their
> cards until played. We find ample room in that
> system, at least as far as due process is

- 4 -

IMAGED

> Our sense of fundamental fairness requires
> placing defendant upon an equal footing by
> requiring disclosure of the prosecutor's
> investigatory report upon prospective jurors.
> Since jurors are so important to our system of
> criminal justice, nondisclosure of information
> upon which defendant may exercise preemptory
> challenges places a premium upon "gamesmanship"
> to the subversion of the trial's search for
> truth.

The court in <u>Losavio v. Mayber</u> (Colo. 1972), 496 P.2d 1032

reached a similar conclusion. Therein, the court noted that

though the public defender had no right of access to police

files containing information on prospective jurors, the

court concluded that the "requirements of fundamental

fairness and justice" dictate disclosure once that informa-

tion is obtained by the prosecuting attorney. Id. at 1035.

Thus, if the defendant is not provided with the prose-

cutor's data on prospective jurors, the due process guarantee

of a reliable guilt-determining process would be severely

jeopardized.

One final consideration of Due Process, which would be

furthered by disclosure of the requested data, is the

appearance of justice. The function of the jury is not only

to insure the reliability of the fact-finding process, but

also to secure community confidence in the system:

> Fairness of course requires an absence of actual
> bias in the trial of causes. But our system of law
> has always endeavored to prevent even the
> probability of unfairness....[T]o perform its high
> function in the best way "justice must satisfy the
> appearance of justice."
> <u>In re Murchison</u> (1955), 349 U. S. 133

- 5 -

IMAGED

To the extent the prosecutor is permitted to use information regarding prospective jurors without divulging the same to the defendant, there is, at the very least, the danger that this will give the appearance of bias. This Court must neutralize this danger, which is even greater in a prosecution where the death penalty is sought. By compelling disclosure of the data, this Court can protect the public confidence in the fairness of the criminal justice system and trial by jury, which is consistent with our democratic heritage. Taylor v. Louisiana (1975), 419 U. S. 522, 530.

B.  Sixth Amendment

Many of the above-identified values of Due Process overlap into the guarantees of the Sixth Amendment right to "a ... public trial, by an impartial jury of the State ...," which is made applicable to the states through the Fourteenth Amendment. Duncan v. Louisiana (1967), 391 U. S. 145.

This constitutional requirement of impartiality subsumes additional values. The United States Supreme Court has recognized that the jury has discretionary power, as representative of community values, to bend, mold, apply, or refuse to apply the law in any given case. Taylor, supra. This discretionary function has been viewed as necessary to prevent oppression by the government, either through prosecutorial overzealousness or judicial bias. In order to

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 213

IMAGED

protect this discretionary function and combat potential
governmental oppression, it is imperative that the jury
represent a cross-section of the community:

> We accept the fair cross-section requirement as
> fundamental to the jury trial guaranteed by the
> Sixth Amendment and are convinced that the
> requirement has solid foundation. The purpose of
> a jury is to guard against the exercise of
> arbitrary power- to make available the commonsense
> judgment of the community as a hedge against the
> overzealous or mistaken prosecutor and in prefer-
> ence to the professional or perhaps overconditioned
> or biased response of a judge.
> Taylor supra, at 530. See also, Duncan, supra at 155-156.

Where the prosecutor is able to utilize data regarding
prospective jurors which is not made available to the defendant,
the jury will be unable to perform its discretionary function
and guard against prosecutorial zeal. This advantage enables
the prosecutor to fashion a jury which is unfairly "prosecution
minded."

On a broader level, a jury which is chosen from a
cross-section of the community will more accurately and
fairly represent community values. The necessity of impanelling
jurors representative of community values and races was
noted in Taylor, supra, at 524 n. 7: "As long as there are
significant departues from the cross-sectional goal, biased
juries are the result-biased in the sense that they reflect
a slanted view of the community they are supposed to represent.'
Unless the prosecutor's data on prospective jurors is shared
with the defendant, the prosecutor will be capable of
impanelling a "slanted" jury.

IMAGED

Finally, and related to the Due Process argument, is the argument that a jury selected from a cross-section of the community will more fully protect both the defendant's and State's interest in accurate fact finding. To the extent that the jury represents a fair cross-section of the community it will better represent a broader range of perception and thus be better able to weigh all the subtle ramifications of the evidence. When the prosecution possesses information on prospective jurors not available to the defendant, it has a clear advantage, and voir dire manipulation is possible. As a result, the defendant would be deprived "of the kind of fact-finder to which he [is] constitutionally entitled." Taylor, supra, at 526.

C.   Work Product of Prosecutor

The work-product doctrine is inapplicable to defendant's request. According to the American Bar Association Project on Standards for Criminal Justice: Standards Relating to Discovery and Procedures Before Trial, Standard 2.6 (Approved Draft, 1970), work product is defined as follows:

> (a) Work product. Disclosure shall not be required of legal research or of records, correspondence, reports or memoranda to the extend they contain the opinions, theories, or conclusion of the prosecuting attorney or members of the legal staff.
> (Emphasis added)

The defendant is not requesting the "opinions, theories, or conclusions" of the prosecutor regarding prospective jurors. Rather, the defendant is specifically requesting that he be

- 8 -

IMAGED

furnished data, information, and reports which the prosecutor has relating to prospective jurors. Therefore, the work product doctrine is inapplicable.

However, should the prosecutor claim that part or all of the requested data contains work-product as defined by the above-quoted American Bar Association Standard, the Court could order an in camera inspection of the disputed data and pursuant to its powers under Crim. R. 16(E)(1), make any appropriate order or excise any protected material as it deems necessary. This solution was suggested in People v. Aldridge (1973), 47 Mich. App. 639, 204 N.W.2d 796, at 801.

In sum, disclosure of data concerning prospective jurors by the prosecuting attorney is necessary to protect the defendant's due process rights, which are concerned with the reliability and efficacy of the guilt-determining process and in addition, with the appearance of fairness and justice. Furthermore, the Sixth Amendment demands that the defendant be tried by an impartial jury. This can be achieved only if the jury is truly representative of a cross-section of the community, which will protect the inherent right of jury discretion, protect against prosecutorial and judicial overzealousness and bias, and more truly represent community values. It will also greatly contribute to a more accurate fact-finding process. The requested data falls outside any purported work product of the prosecuting attorney. In the event of such a claim, this Court has the power to conduct

- 9 -

IMAGED

an in camera inspection and make any appropriate order.

Finally, the above constitutional considerations take on greater importance in a capital punishment case. Pursuant to the provision contained in Section 2929.03 of the Revised Code of Ohio, a bifurcated process is employed whereby the same jury which determines guilt also determines whether the death penalty should be imposed. Thus, unlike other offenses, whereby the jury is concerned only with determining guilt, voir dire in a capital case becomes extremely crucial since counsel must question prospective jurors on the issue of capital punishment. Counsel are faced with a complex and difficult task. To any extent the prosecution has superior information which the defendant cannot obtain, the former could subtly "pack" the venire with jurors who would be more willing to find not only guilt, but to impose death. It is crucial, therefore, that from an information standpoint both parties be on an equal footing.

WHEREFORE, for the foregoing reasons, defendant respectfully moves this Court to grant the Motion.

_Michael Shanks_

MICHAEL SHANKS

_John A. Garretson_

JOHN A. GARRETSON
Attorneys for Defendant

- 10 -

## CERTIFICATE OF SERVICE

IMAGED

I hereby certify that a copy of the foregoing was hand-delivered to John F. Holcomb, Prosecuting Attorney, Butler County Court House, Hamilton, Ohio 45011, on the date the same was filed.

JOHN A. GARRETSON
Attorney for Defendant

- 11 -

IMAGED

COURT OF COMMON PLEAS

BUTLER COUNTY, OHIO

STATE OF OHIO                    :      CASE NO. CR 83 12 0614

            Plaintiff            :

vs.                              :      MOTION TO REQUIRE PROSECUTOR
                                        TO STATE REASON FOR EXERCISING
VON CLARK DAVIS                  :      PEREMPTORY CHALLENGES

FILED In Common Pleas Court
BUTLER COUNTY, OHIO

    Defendant  APR 27 1984       :

                    : :     : :
            EDWARD S. ROBB, JR.
                     CLERK

        The defendant, by and through counsel, moves this Court

for an order directing the prosecutor to state the reasons on

the record when he exercises peremptory challenges at jury

selection.  The defendant is entitled to a fair and impartial

jury chosen from a representative cross-section of the community

under both United States and State Constitutions.  Without

forcing the prosecutor to state the reason for his challenges,

it is impossible for this Court, or any other, to determine whether

the prosecutor is excusing jurors because of age, sex, race,

economic or political reasons.

        Failure to require this would violate the defendant's right

to due process and to a fair trial as guaranteed under Federal

and State Constitutions.


                                    _Michael Shanks_
                                    MICHAEL SHANKS
                                    315 S. Monument Avenue, P. O. Box 687
                                    Hamilton, Ohio  45012
                                    Telephone:  (513) 868-7600

                                    _John A. Garretson_
                                    JOHN A. GARRETSON
                                    A Legal Professional Association
                                    Attorneys for Defendant
                                    118 S. Second Street, P. O. Box 60
                                    Hamilton, Ohio  45012
                                    Telephone:  (513) 868-2074

68



MEMORANDUM

The defendant herein has a right to a jury drawn from a representative cross-section of the community as guaranteed by Article I, Sections 5 and 10 and Article II, Section 26 of the Ohio Constitution and the Sixth and Fourteenth Amendments to the United States Constitution.  If the state were to utilize its peremptory challenges to systematically exclude a cognizable group from the jury, it would engage in discrimination and thereby deprive the accused of his constitutional right to a jury composed of a representative cross-section of the community.

One need not be a member of the excluded group in order to complain of a violation of the representative cross-section rule. Peters v. Kiff (1972), 407 U. S. 943; Taylor v. Louisiana (1975), 419 U. S. 522; and Duren v. Missouri (1979), 439 U. S. 357, 359 n. 1.

The fact that "tokens" may be left upon the jury does insulate the state's action from constitutional prohibition:

> "Systematic and affirmative racial exclusion of available Black jurors by the State which results in only one Black being seated as a juror is no less constitutionally prohibited than the same procedure which results in the total exclusion of Blacks.  We are not unmindful that some attorneys may leave a token Black on the jury after they are assured that there are no more Blacks available to be seated. This type of practice does not lessen the unconstitutionality of the State's initial exclusion of Blacks from the jury solely because they were Blacks." People v. Payne (Ill. App. 1982), 31 Cr. L. Rptr. 2229, 2230 (emphasis added).

- 2 -

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 220

IMAGED

The State, whether acting through the prosecuting attorney or the trial judge, may not commit acts of discrimination.  The improper use of peremptory challenges bars a person from jury service just as effectively as de jure or de facto methods used to restrain or hinder jury service on the basis of race.  Any action of the State to exclude a cognizable group from the jury would violate defendant's right to an impartial jury and a fair trial as protected by the Sixth and Fourteenth Amendments to the United States Constitution, as well as Article I, Sections 5 and 10 and Article II, Section 26 of the Ohic Constitution.

An accused's right in a state proceeding to an impartial jury under the Sixth Amendment now gives him a constitutional right to a jury drawn from a representative cross-section of the community.  Taylor v. Louisiana (1975), 419 U. S. 522, 528-530.  Whether applied to a grand or petit jury, the State may not act affirmatively to frustrate this right by systematically excluding blacks from jury service solely because they are black.  People v. Payne (Ill. App. 1982), 31 Cr. L. Rptr. 2229.  While a peremptory challenge may be exercised for reason of a specific bias, which reasons cut across many segments of society, it may not, consistent with constitutional principles, be exercised for reason of bias against a group.

- 3 -



The defendant does not claim an entitlement to a petit jury that proportionately represents every group in the community, but he does claim a constitutional right to a petit jury that is as near an approximation of the ideal cross-section of the community as the process of random draw will permit. When an entire group is challenged peremptorily on the basis of group bias alone, the primary purpose of the representative cross-section requirement, that is, to achieve overall impartiality, is frustrated. See Commonwealth v. Soares (Mass. 1981), 387 N. E. 2d 449, 512. The jury becomes dominated by the conscious or unconscious prejudices of the majority. People v. Wheeler (Cal. 1978), 583 P. 2d 748, 22 Cal. 3d,258 276. Moreover, the constitution itself is demeaned when a fundamental personal right is declared and, at the same time, it is virtually impossible for an aggrieved citizen to exercise that right.

By way of implementing the rights to a fair trial and to a trial by an impartial jury composed of a representative cross-section of the community, the Fourteenth Amendment mandates that the government may not act in an arbitrary, capricious, or irrational manner. Accordingly, the government may not discriminate or take any action on the basis of race. Cf. Ward v. Village of Monroeville (1972), 409 U. S. 57.

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 222

IMAGED

This obligation applies directly to the representatives of the government, the prosecuting attorney and the trial judge, in a trial. For example, since "(t)he duty of the prosecuting attorney is to seek justice, not merely to convict," ABA Standards, The Prosecuting Function, 1.1(C) (1974).

> "(w)hen a prosecutor excludes Blacks solely because they are Blacks, he is not primarily seeking justice. He is only seeking to convict. This is a clear vio lation of professional duty." People v. Payne, supra at 2229.

Indeed, the right to a jury of one's peers has been recognized as a means of protection against "overzealous prosecutors." Duncan v. Louisiana (1968), 391 U. S. 145, 156.

Further, the trial judge has an obligation not only to see that justice is done, but that it is seen to be done. "A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Canon 2(A) of the Code of Judicial Conduct. Public confidence in the fairness of the criminal justice system and community participation in that system are crucial to its

IMAGED

successful operation as well as being by-products of the representative cross-section rule.

At the same time, the Ohio Constitution, at Article I, Sections 5 and 10, independently insures the right to trial by an impartial jury of the county in which the offense is alleged to have been committed. Moreover, Article II, Section 26 of the Ohio Constitution, also insures that "All laws . . . shall have a uniform operation throughout the State . . ." This section has been applied directly to the right of trial by jury. Silverman v. Hays (1899), 59 Ohio St. 582 (Syllabus 1). Taken together, the provisions of the Ohio Constitution entitles a state defendant to an impartial jury of his peers which has not been selected by means of unequal operation of the law. A racial classification is not a reasonable basis by which the State can opt to exclude a juror.

Against this constitutional entitlement to a fair and impartial jury drawn from a representative cross-section of the community is weighed the statutory procedure of peremptory challenges. While the defendant had a right at common law to the exercise of peremptory challenges, the prosecutor did not. A. Ginger, Jury Selection in Criminal Trials, Section 12.1 (1975). The Ohio Constitution, giving the right to a jury trial constitutional significance, adopted the right of jury trial as it existed at common law. E.g., Hagany v. Cohnen (1876), 29 Ohio St. 82, 84; Mason v. State, ex rel. McCay (1898), 58 Ohio St. 30, 55. It necessarily follows that the defendant's right to the exercise of peremptory challenges is part and parcel of the right to a jury trial. However, whatever authority there is for the State's exercise of a peremptory challenge is merely statutory.

- 6 -



There are two conclusions to be drawn from this analysis. First, since it is statutorily based and in derogation of the common law, the State's exercise of a peremptory challenge must be narrowly construed. Second, to the extent that there is any conflict between the accused's constitutional right under the United States and Ohio Constitutions versus this mere statutory privilege, clearly the constitutional rights of the accused must prevail.

Accordingly, the trial court should require the prosecuting attorney to demonstrate that blacks were not being systematically excluded from jury service solely because they were black. The burden properly falls to the State to establish that there was no constitutional violation. If the State fails to meet its burden, the entire jury venire should be dismissed and the voir dire process begun again with a new venire.

These principles and conclusions are not altered upon consideration of Swain v. Alabama (1965), 380 U. S. 202. In Swain, the Supreme Court held that the striking of blacks from the jury in that state court trial did not violate the equal protection clause of the Fourteenth Amendment of the United States Constitution. In the years since Swain was decided, the Supreme Court has held that the Sixth Amendment of the United States Constitution as it relates to jury trials applies to state criminal trials. Duncan v. Louisiana (1968), 391 U. S. 145. Further, it was not until 1975 that the Supreme Court recognized the representative cross-section requirement as fundamental to the right to a jury trial guaranteed by the Sixth Amendment. Taylor v. Louisiana

IMAGED

(1975), 419 U. S. 522.  It is significant that the Taylor court focused upon the Sixth Amendment right of the individual defendant in that particular trial, as opposed to the focus upon the equal protection rights of the black race to participate in the jury system in a particular jurisdiction which was necessary to the decision of the Swain court.  Other recent United States Supreme Court opinions infer that the challenge allowed in Swain may be too limited.  See e. g., Rose v. Mitchell (1979), 443 U. S. 545; Castenado v. Partida (1977), 430 U. S. 482; Peters v. Kiff (1972), 407 U. S. 493.

Accordingly, the Prosecutor should be required to state, for the record, the basis for each peremptory challenge that he exercises against a potential juror who is black.  This is the only procedure that will insure that the State does not engage in prohibited discrimination and, at the same time, provide the defendant with a representative jury as guaranteed under the Ohio and United States Constitutions.

_Michael Shanks_
MICHAEL SHANKS

_John A. Garretson_
JOHN A. GARRETSON
Attorneys for Defendant

- 8 -

IMAGED

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was hand-delivered to John F. Holcomb, Prosecuting Attorney, Butler County Court House, Hamilton, Ohio 45011, on the date the same was filed.

_____
JOHN A. GARRETSON
Attorney for Defendant

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 227

IMAGED

COURT OF COMMON PLEAS

BUTLER COUNTY, OHIO

STATE OF OHIO                          :        CASE NO. CR 83 12 0614

                Plaintiff             :

vs.                    FILED In Common Pleas Court   MOTION FOR LEAVE TO FILE
                       BUTLER COUNTY, OHIO  ADDITIONAL MOTIONS AND FOR
                                            LEAVE TO SUPPLEMENT THE MEMO-
VON CLARK DAVIS                       :     RANDA IN SUPPORT OF THOSE
                       APR 27 1984  MOTIONS ALREADY FILED
                Defendant             :

                    EDWARD S. ROBB, JR.:
                          CLERK

        Now comes the defendant, by and through his counsel, and
respectfully moves this Honorable Court for leave to file additional
Motions beyond the ordered time for said motions if the need for
said motions should arise.  Defendant further requests leave to
file supplemental memoranda on those motions already filed up to
the time of hearing on said motions.  The reasons for this request
are more fully set out in the Memorandum attached hereto and
made a part hereof.

                                    _Michael Shanks_
                                    MICHAEL SHANKS
                                    315 S. Monument Avenue, P. O. Box 687
                                    Hamilton, Ohio  45012
                                    Telephone:  (513) 868-7600

                                    _John A. Garretson_
                                    JOHN A. GARRETSON
                                    A Legal Professional Association
                                    Attorneys for Defendant
                                    113 S. Second Street, P. O. Box 60
                                    Hamilton, Ohio  45012
                                    Telephone:  (513) 868-2074

69

IMAGED

## MEMORANDUM IN SUPPORT

The defendant is charged with Aggravated Murder with speci-
fications.  If convicted, defendant faces the possibility of
facing the death penalty as punishment.

The United States Supreme Court has recognized that death
penalty cases differ from all other cases, and that traditionally,
more due process is to be accorded to the accused in death penalty
cases than in ordinary criminal cases.  Woodson v. North Carolina
(1976), 428 U. S. 280; Lockett v. Ohio (1978), 438 U. S. 536 and
Britt v. Alabama (1980), 447 U. S. 625.

The United States Supreme Court has also noted that
"due process calls for such procedural protections as the situation
demands . . . [N]ot all situations calling for procedural safe-
guards call for the same kind of procedure".  Gardner v. Florida
1977, 430 U. S. 349, 358, n. 9 quoting Morissey v. Brewer (1972),
408 U. S. 471, 481.  Here defendant is requesting leave to file
additional motions after the deadline for filing motions, if the need
should arise.  Counsel for defendant request such leave if and
only if the need for additional motions to protect the defendant's
rights should arise, whether from factual developments or from
rulings by this honorable court on other motions filed.

For the same reasons, defendant requests leave to file
supplementary memoranda in support of any of the previously
filed motions, should the need arise, whether from factual
developments or rulings of this or other courts.

WHEREFORE, defendant requests that this honorable court
grant his request for leave to file additional motions as needed

- 2 -

IMAGED

beyond the motion deadline, and for leave to supplement memoranda in support of said motions.

MICHAEL SHANKS

JOHN A. GARRETSON
Attorneys for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was hand-delivered to John F. Holcomb, Prosecuting Attorney, Butler County Court House, Hamilton, Ohio 45011, on the date the same was filed.

JOHN A. GARRETSON
Attorney for Defendant

- 3 -


IMAGED

COURT OF COMMON PLEAS

BUTLER COUNTY, OHIO

STATE OF OHIO          :          CASE NO. CR 83 12 0614

          Plaintiff          :

vs.          **FILED in Common Pleas Court**          MOTION FOR ALL MOTIONS
             **BUTLER COUNTY, OHIO**          <u>TO BE HEARD ON THE RECORD</u>

VON CLARK DAVIS          :

          Defendant **AUR 2 7 1984**          :

        **EDWARD S. ROBB, JR.** :  :  :
            **CLERK**

Now comes the defendant, by and through counsel, and

respectfully moves that ALL motions, whether oral or written,

be heard on the record prior to a disposition by this Court.

                          *Michael Shanks*
               MICHAEL SHANKS
               315 South Monument Avenue, P. O. Box 687
               Hamilton, Ohio  45012
               Telephone:  (513) 868-7600

                     *John A. Garretson*
               JOHN A. GARRETSON
               A Legal Professional Association
               Attorneys for Defendant
               118 S. Second Street, P. O. Box 60
               Hamilton, Ohio  45012
               Telephone:  (513) 868-2074

<u>MEMORANDUM</u>

Defendant has been charged with a capital offense.  A

case of such magnitude demands that all Motions and all legal

proceedings of any nature be heard on the record.

The availability of counsel is necessary to fundamental

fairness.  <u>Powell v. Alabama</u>, 287 U. S. 45 (1932); <u>Hamilton v.</u>

7B

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 231

IMAGED

Alabama, 368 U. S. 52 (1961); Gideon v. Wainwright, 372 U. S. 335 (1963).  It is clear that an indigent criminal defendant is entitled to be effectively represented by appointed counsel at all critical stages of the proceedings against him.

In order for counsel to effectively represent defendant, it is necessary to place all of the issues in this case on the record by way of argument as well as by written motion.

Therefore, defendant requests oral hearings with respect to all Motions raised in this case.


MICHAEL SHANKS

JOHN A. GARRETSON
Attorneys for Defendant


CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was hand-delivered to John F. Holcomb, Prosecuting Attorney, Butler County Court House, Hamilton, Ohio 45011, on the date the same was filed.


JOHN A. GARRETSON
Attorney for Defendant

- 2 -

IMAGED

COURT OF COMMON PLEAS

BUTLER COUNTY, OHIO

STATE OF OHIO                    :     CASE NO. CR 83 12 0614

          Plaintiff         :

vs.                              :     MOTION FOR SEQUESTRATION OF
                                       JURORS FOR DURATION OF TRIAL
VON CLARK DAVIS                  :

          Defendant         :

FILED In Common Pleas Court
BUTLER COUNTY, OHIO

APR 27 1984

EDWARD S. ROBB, JR.
CLERK

     Now comes the defendant, by and through his attorneys,
and moves this Honorable Court to order the sequestration of the
jury panel throughout the proceedings in said case and that they
shall not be allowed to communicate with anyone except the
court or the bailiff and all such communications shall be reported
to the attorneys for the defendant.

                              *Michael Shanks*
                              MICHAEL SHANKS
                              315 S. Monument Avenue, P. O. Box 687
                              Hamilton, Ohio 45012
                              Telephone:  (513) 868-7600

                              *John A Garretson*
                              JOHN A. GARRETSON
                              A Legal Professional Association
                              Attorneys for Defendant
                              118 S. Second Street, P. O. Box 60
                              Hamilton, Ohio 45012
                              Telephone:  (513) 868-2074

71

## MEMORANDUM IN SUPPORT

 IMAGED

Before submission of a case to the jury, the court, upon its own motion or the motion of a party, may sequester the jury. Crim. R. 24(G)(1); Section 2945.31 of the Revised Code of Ohio. It is well established that the decision to sequester a jury is clearly within the sound discretion of the trial court. Parker v. State, 18 Ohio St. 88 (1868); State v. Osborne, 49 Ohio St. 2d 135 (1976), vacated on other grounds 438 U. S. 911. The discretion of the court with respect to allowing separation of the jury should, especially in trials for capital offenses, be exercised with the utmost caution. Any doubt as to the propriety of permitting the jury to separate should be resolved against granting such permission.

Defendant submits that the extensive publicity which attended his arrest, indictment, and pre-trial motions certainly will increase during his trial. Unless sequestered, the jury will be tainted by the pervasive newspaper, radio, and television reports of matters prejudicial to defendant which will never be presented at trial. Specifically, the jury will be exposed to media reports of defendant's previous record and the fact that he had been released on parole shortly prior to the alleged crime.

The Supreme Court of the United States has recognized that sequestration of the jury is an effective manner to assure that publicity during the trial does not impinge upon the fair trial of the accused. Sheppard v. Maxwell, 384 U. S. 333 (1966), and that sequestration also "enhances the likelihood of dissipating the impact of pretrial publicity and emphasizes the elements

- 2 -

IMAGED

of the jurors' oaths." Nebraska Press Ass'n. v. Stuart, 427 U. S. 539, 564 (1976). Defendant submits that the circumstances of his case require that the trial court implement the extraordinary measure of sequestration of the jury throughout the guilt and penalty phase of the trial.

Admonitions to the jury not to read newspaper articles or listen to radio and television news reports about the case will not be effective. The pervasive media coverage will overpower the jurors' intention to comply with the court's admonishment. The danger of inadvertent tainting of a juror is too great to allow separation of the jury.

In addition, an individual's participation in a case of this magnitude and duration will become well known to the juror's family, friends and colleagues. Despite admonitions by the court, there will be great pressures from the family, friends and col-leagues to discuss the case and its progress. Because of the notoriety of the instant case within this county, many people will have preconceived notions as to guilt or innocence which they will attempt to pass on to the jurors. The risk of the jurors being tainted by outside influences, whether well-intentioned or not, is increased severalfold because of this notoriety. In order to insure that the defendant is tried by a fair and impartial jury and to protect the jurors from undue community pressures, it is necessary to sequester the jury throughout the guilt and penalty phase of the trial.

The Fourteenth Amendment to the United States Constitution states in part: "...nor shall any State deprive any person of

- 3 -

IMAGED



life, liberty, or property, without due process of law...".
The sequence of the words "life, liberty, or property" is not
coincidental.  The drafters of this amendment were purposely
ordering the priority of these fundamental interests.  When a
defendant is being tried for a capital offense, his life is
placed in jeopardy.  Accordingly, a higher level of due process
must be afforded the defendant on trial for a capital offense than
that required in the trial of a non-capital offense.  Woodson v.
North Carolina (1976), 428 U. S. 280, 305; Beck v. Alabama (1980),
447 U. S. 625.

Therefore, defendant's right to a fair trial as guaranteed
by the due process clause of the Fourteenth Amendment to the
United States Constitution can only be protected by the seques-
tration of the jury.

Defendant respectfully requests that court grant this Motion
for Sequestration of the Jury.

MICHAEL SHANKS

JOHN A. GARRETSON
Attorneys for Defendant

- 4 -

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 236

IMAGED

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was hand-delivered to John F. Holcomb, Prosecuting Attorney, Butler County Court House, Hamilton, Ohio 45011, on the date the same was filed.

JOHN A.GARRETSON
Attorney for Defendant

- 5 -

IMAGED

COURT OF COMMON PLEAS

BUTLER COUNTY, OHIO

STATE OF OHIO                    :         CASE NO.  CR 83 12 0614

        Plaintiff       :         FURTHER MOTION TO PROHIBIT DEATH
                                           QUALIFICATION OF JURY:  IN THE
vs.                                        ALTERNATIVE TO SEAT SEPARATE
                                :          JURIES DURING THE GUILT AND PENALTY
VON CLARK DAVIS                            PHASES OF TRIAL AND SUPPLEMENTAL
                                :          MEMORANDUM THEREON
        Defendant

FILED In Common Pleas C...
BUTLER COUNTY, OH...

APR 27 1984

EDWARD S. ROBB, JR.
CLERK

Now comes the defendant, by and through counsel, and moves

this Honorable Court in limine to prohibit any questioning of

prospective jurors by the Prosecuting Attorney and Defense Counsel

concerning their attitudes toward the death penalty and to refrain

from engaging in the inquiry itself for the reasons set forth in the

accompanying memorandum of law.  Alternatively, the defendant requests

that two separate juries be empaneled:  one for the guilt phase

and a separate jury for the penalty phase if needed.

MICHAEL SHANKS
315 S. Monument Avenue, P. O. Box 687
Hamilton, Ohio  45012
Telephone:  (513) 868-7600

JOHN A. GARRETSON
A Legal Professional Association
Attorneys for Defendant
118 S. Second Street, P. O. Box 60
Hamilton, Ohio  45012
Telephone:  (513) 868-2074

72

IMAGED

## SUPPLEMENTAL MEMORANDUM IN SUPPORT

It is an established principle of law that a criminal defendant's rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and Article I, Section 10, of the Ohio Constitution are violated if the trier of fact is predisposed to convict. In 1927, the Supreme Court struck down as violative of due process an Ohio prohibition statute which authorized mayors to recover twelve dollars as costs for convictions attained in the mayor's courts, even absent a showing of prejudice. The Court has also implicated a due process concern in cases involving pervasive pre-trial publicity, given the possibility that the jurors will not confine their deliberations solely to the law and facts presented in a given case. The Court stated in Estes v. Texas, 381 U. S. 532, 542-543 (1965):

> "it is true that in most cases involving claims of due process deprivations we require a showing of identifiable prejudice to the accused. Nevertheless, at times a procedure employed by the state involves such a probability that prejudice will result that it is deemed inherently lacking in due process."
> (Emphasis added)

This sentiment was echoed in Sheppard v. Maxwell, 384 U. S. 333, 362 (1966):

> "Due process requires that the accused receive a trial by an impartial jury free from outside influences. Given . . . the difficulty of effacing prejudicial publicity from the minds of jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused. And appellate tribunals have the duty to make an independent evaluation of the circumstances."

- 2 -

The defendant's rights to due process of law are, therefore, implicated when the voir dire is conducted in such a manner that the resulting jury is less than impartial with respect to guilt. Witherspoon v. Illinois, 391 U. S. 510, 520 (1968). A state criminal defendant is denied his right to an impartial jury under the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution when the jury selected fails to fairly represent a cross-section of the local community. Duncan v. Louisiana, 391 U. S. 145 (1968) (extending Sixth Amendment right to impartial jury to the states); Taylor v. Louisiana, 419 U. S. 522 (1975) (systematic exclusion of women from criminal juries violates defendant's Sixth Amendment rights); See also pre-Duncan development of the concept: Strauder v. West Virginia, 100 U. S. 303 (1880) (Exclusion of blacks from jury panels violates equal protection); Hernandez v. Texas, 347 U. S. 475 (1954) (exclusion of Mexican-Americans violates equal protection).

- 3 -

IMAGED

I.

CULLING THE JURY OF DEATH PENALTY OPPONENTS
RESULTS IN A JURY WHICH IS MORE PRONE TO CONVICT
THE DEFENDANT AND IS THEREFORE NOT IMPARTIAL.

Ohio's death penalty law provides for a trial bifurcated on the guilt and penalty stages. Sentencing is irrelevant to the guilt determination. Gregg v. Georgia, 428 U. S. 153 (1976). In fact, the reason the United States Supreme Court imposed the guilt/penalty bifurcation requirement (which the Ohio law has incorporated, see R. C. §2929.03) was to insulate the jury during the guilt determination phase from irrelevant and prejudicial considerations which arise during the penalty phase. The failure to so separate and insulate the jury results in a violation of the Eighth Amendment's prohibition. Gregg (supra).

What a potential juror thinks or feels about the death penalty is, from the legal point of view, wholly irrelevant to his qualification to sit during the guilt determination phase of the trial. However, there are numerous psychological and sociological studies indicating a close correlation between an individuals' moral, ethical or religious attitudes about the death penalty and his impartiality in determining the fundamental issue of guilt or innocence:

> The uncontradicted evidence presented by the defendant
> . . . demonstrates that persons opposed to capital
> punishment have for many years constituted a substantial
> percentage of our population. Moreover, the narrower
> class of those whose opposition to the death penalty

- 4 -

IMAGED

> would prevent their consideration . . . of its
> imposition has also comprised a substantial minority of
> the population.  The evidence further shows that these
> persons generally exhibit attitudinal characteristics
> markedly different from those shared by people who favor
> the death penalty as an instrument of the criminal law.
> All of the available data suggest that persons who are
> strongly opposed to capital punishment tend also to be
> less authoritarian, more liberal in their political
> attitudes, less punitive in their legal attitudes, and
> less likely to endorse "discrimination against minority
> groups, restrictions on civil liberties, and violence for
> achieving social goals" than persons who favor the death
> penalty.

> State v. Avery, 299 N. C. 126, 143, 144; 261 S. E. 2d 803,
> 813-14 (1980)  (Exum, J., dissenting, footnotes omitted)

In 1968, the Witherspoon majority determined that a jury from which
all veniremen with any quantum of conscientious scruples against the
death penalty were excluded violated the defendant's right to due process
of law.  See Winrick, Prosecutorial Preemptory Challenge Practices In
Capital Cases:  An Empirical Study and a Constitutional Analysis,
81 Mich. L. Rev. 1, 40 n. 118 and accompanying text (1982).  The Court
specifically considered, but left undecided, petitioner's contention
that a death qualified jury may be unconstitutionally conviction prone,
citing the paucity of empirical research then available.  Witherspoon,
391 U. S. at 520, n. 18.

Since that decision, empirical studies have consistently found that
a death qualified jury is more conviction prone than the raw pool of
veniremen or the population at large.  The evaluation of these studies
have been charted and commented upon in Hovey v. Superior Court of
Alameda County, 28 Cal. 3d 1, 168 Cal. Rptr. 128, 616 P.2d 1301 (1980)
and Grigsby v. Mabry, ____ F. Supp. ___, 33 Crim. L. Rep. 2477,
[No. PB-C-78-32 (E. D. Ark., filed August 5, 1983) (hereinafter referred
to as Grigsby III)].

- 5 -

IMAGED

Hovey, supra, is the leading state court decision which considers the mandate of Witherspoon in light of empirical evidence relative to the conviction proneness of death qualified juries.  One expert witness testifying for the defense concluded that the empirical evidence "indicates that the departure from representativeness created by the process of restricting juries in capital cases to [Witherspoon] qualified jurors only may have important negative consequences for defendants in death penalty trials."  28 Cal. 3d at 39, excerpting Ellsworth et al., Juror Attitudes and Conviction Proneness:  The Relationship between Attitudes towards the Death Penalty and Predisposition to Convict (1979, pre pub. draft at p.7) hereinafter, the Ellsworth Conviction-Proneness Study).  One of two expert witnesses called by the prosecution, Dr. Gerald Shure, commented upon the Ellsworth Conviction-Proneness Study:

> ". . . the evidence presented suggests that in fact a death-qualified juror is likely to be more biased in certain respects. . . ."  28 Cal. 3d at 42.

The Ellsworth Conviction-Proneness Study, however, was eventually dismissed by the Hovey court because the study did not contemplate the exclusion of those jurors who would automatically vote for the death penalty in a capital case.  This "ADP" group, required by statute to be excluded in California, 28 Cal. 3d at 63-64 n. 110, presumably cannot be excluded under the Witherspoon rationale.  28 Cal. 3d at 63.  Automatic death penalty jurors may also be challenged for cause in Ohio, by judicial construction.  State v. Anderson, 30 Ohio St.2d 66, 70 n. 2 (1972).
Hovey concluded that

> Therefore, until further research is done which makes it possible to draw reliable conclusions about the nonneutrality of "California death-qualified" juries in California, this court does not have a sufficient evidentiary basis on which to bottom a

- 6 -

IMAGED

constitutional holding under Witherspoon and Ballew
[v. Georgia, 435 U.S. 223, 55 L. Ed.2d 234 (1978);
misdemeanor criminal conviction by five person jury
violative of Sixth and Fourteenth Amendments].
28 Cal. 3d at 68. (Emphasis added).

The further research called for by Hovey which would have compelled
a constitutional violation in the use of death-qualified juries in the
guilt phase of trial (empirical evidence which accurately reflects the
composition of California, Ohio (see Anderson, supra), and Arkansas
(Grigsby III, ____ F. Supp. ___. slip op. at 56) juries by excluding
the ADP jurors as well as the Witherspoon excludibles at the penalty
phase of trial) was exhaustively considered and accepted in Grigsby III.
At the outset, Grigsby III noted the underlying inconsistency in accept-
ing the conviction proneness of ADP jurors while challenging the correla-
tion between juror's attitudes toward the death penalty and their
tendency to convict or acquit at the guilt stage of a capital trial.
Grigsby III, ____ F. Supp. ___, slip op. at 58. The following comment
in Hovey on the decision in Adams v. Texas, 448 U.S. 38, 65 L. Ed. 2d
581 (1980) (invalidating under Witherspoon the Texas statute regulating
challenges for cause for excluding an unconstitutionally large proportion
of the venire in a capital case) implicitly questions the soundness of
excluding at the guilt phase of trial those veniremen who may constitu-
tionally be eliminated from the penalty determination:

Witherspoon established that a constitutionally neutral
jury is one drawn from a pool which includes (in appropriate
proportion) all segments of the community of fair and
impartial adults. A jury from which a segment of that
community has been excluded (or is underrepresented) does
not become constitutionally neutral because an opposing
segment is also excluded. The concept of constitutional
neutrality contemplates jury diversity, and the reasons
for jury diversity include more than simply counterbalancing

- 7 -

IMAGED

opposing viewpoints.  Thus, there appears to have been no reason for the Adams court to resort to speculation as to the relative sizes of the "eye for an eye" and "scrupled" groups.  Texas' argument was unsound on a more fundamental level."  28 Cal. 2d at 66 n. 113 (citations omitted, emphasis in Hovey).

The Supreme Court in Witherspoon suggested that future capital defendants might attempt to prove that death-qualified juries were "less than neutral with respect to guilt."  391 U. S. at 518.  The habeas corpus petitioners in Grigsby III presented evidence, accepted as conclusory by the court, that

> ". . . the number of those who would automatically vote for the death penalty in Arkansas and nationwide is negligible when compared to the number of those who would never under any circumstances vote for the death penalty.  Therefore to give a defendant the right to challenge and remove ADP's contributes only to the appearance of fairness.  In fact, so long as WE's [Witherspoon excludibles] are excluded from the guilt innocence phase of the trial, the guilty-proneness of the resulting jury remains, to the great disadvantage of defendants."  (Grigsby III, ____ F. Supp. ____, 33 Crim. L. Rep. at 2478, slip op. at 62).

The empirical fact of the matter is that culling from the jury all Witherspoon excludable death penalty opponents results in a panel which is prosecution prone.  H. Zeisel, Some Data On Juror Attitudes Toward Capital Punishment (1968); Goldberg, Towards Expansion Of Witherspoon: Capital Scruples, Jury Bias, and the Use of Psychological Data To Raise Legal Presumptions, 5 Harv. Civ. Rights--Civ. L. Rev. 53 (1970); Bronson, On the Conviction Proneness and Representativeness of the Death-Qualified Jury: An Empirical Study of Colorado Venire-men, 42 U. Colo. L. Rev. 1 (1970); Jurow, New Data on the Effect of the "Death Qualified" Jury on the Guilt Determination Process, 84 Harv. L. Rev. 567 (1971).

This is an empirically verifiable fact.  There exist scientifically

- 8 -

IMAGED

accepted and judicially cognizable testing methods that can be utilized in this county relative to the entire population of potential veniremen for the case at bar. If the Court believes or opposing counsel suggests that there exists a fundamental difference between the populations tested in the above cited studies and the population of potential jurors in this county, counsel for the defense stands ready to employ appropriate experts to perform the necessary tests and requests herewith prior court authorization to employ said expert at County expense, pursuant to Section 2929.024 of the Revised Code of Ohio, and a hearing at which to present this evidence and further argue the point.

## II.

### CULLING THE PANEL OF DEATH PENALTY OPPONENTS RESULTS IN A JURY WHICH IS NOT DRAWN FROM A FAIR CROSS-SECTION OF THE COMMUNITY.

A defendant's constitutional right to have his guilt determined by a jury drawn from a fair and representative cross-section of the community is violated when a distinct group of persons is systematically excluded from the panel. Taylor, 419 U. S. at 526-527. See also Witherspoon, 391 U. S. at 524 (Douglas, J., dissenting). The Sixth and Fourteenth Amendment provisions for an impartial jury in a criminal prosecution guarantee the presence of a fair cross-section of the community in the venire from which jurors are eventually selected. Taylor, 419 U. S. at 530.

Persons opposed to the death penalty constitute a distinct and recognizable group in American society. Witherspoon, 391 U. S. at 520 n.16. The subset of this group who can be excluded from the panel on the basis of Witherspoon also constitute a distinct group. Spinkellink

- 9 -

IMAGED

v. Wainwright, 578 F.2d 582, 597 (5th Cir., 1978). This group of people exists in the population of potential veniremen in the community. Death qualifying the panel results in the systematic exclusion of these persons from the jury ultimately selected. While such exclusion may or may not be justified during the penalty phase of the trial, their exclusion during voir dire, ipso facto, results in the underrepresentation of a distinct group during the guilt determination phase of the trial.

It has been held that a prima facie violation of the fair cross-section requirement is established when three elements are shown:

1. The persons excluded from the jury selection process constitute a distinct group in the community.

2. This group is underrepresented in relation to the number of persons in the community.

3. The underrepresentation is caused by the systematic exclusion of this group during the jury selection process.

   Duren v. Missouri, 439 U. S. 357, 364 (1979).

Death qualification of the jury insures that the second and third parts of the Duren test are satisfied and a prima facie constitutional violation will be present before the Court even instructs the jury in the penalty phase.

The court in Grigsby III outlined the consequences of a prima facie showing of disproportionality:

> Once the challenging party establishes a prima facie case under Duren, the state must justify the procedure used. As stated in Duren the state must show that "a significant state interest . . . [is] manifestly and primarily advanced by those aspects of the jury - selection process. . . that result in the disproportionate exclusion of a distinctive group." 439 U. S. at 367-68. And, as previously pointed out, once a

- 10 -



> violation of the fair cross-section requirement has been
> established, prejudice to the defendant is presumed."
> Grigsby III, _____ F. Supp. at _____, slip op. at 13.
> (Emphasis added)

One commentator has defined the framework in which to view the state's

interest in death qualifying a guilt-phase capital jury as follows:

> The reach of the Court's holdings in Taylor and Duren
> extend to every criminal trial. The state's interests
> in qualifying prospective jurors on the penalty issue in
> a capital case undoubtedly places some limitations on a
> capital defendant's fair-cross-section rights. The manner
> in which any limitations are imposed must be approached from
> the premise that a capital defendant has a fundamental right to
> be tried by a fair cross-section of his community, rather than
> from the premise that a state has a fundamental right to impanel
> a single set of jurors in a capital case. Since the states do
> not presently have that right, the courts should accommodate
> the 'states' legitimate interests in a manner which least restricts
> the constitutional rights of a capital defendant.

> Colussi, The Unconstitutionality of Death Qualifying A Jury Prior
> to the Determination of Guilt: The Fair Cross Section Requirement
> In Capital Cases, 15 Creighton Law Review 595, 614 (1982).

A related argument to the claim that there is not a fair cross-

section of the community is the empirical fact that death qualification

leads to juries in which blacks and women are disproportionately excluded

See Grigsby III, _____ F. Supp. at _____ and ___, 33 Crim. L. Rep. at

2477, slip op. at 15 and 34-35; and Hovey, 28 Cal.3d at 54-57. Since

the death qualification process impacts more heavily on blacks and

women, no further showing of disproportionality is necessary.

This Court should not countenance a Constitutional violation when a

simple order could prevent it from occuring. The prosecution must be

required to show a compelling state interest which justifies the infringe

of defendant's fair cross-section right during the guilt determination

phase of the trial. While the State does have an interest in a jury

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 248

IMAGED

that could impose a death penalty, the state must demonstrate
a significant and compelling interest in having exactly the
same jurors determine this defendant's guilt.  The United
States Supreme Court has not held that the state has such
an interest in either Taylor or Adams v. Texas, 448 U. S. 38 (1980).
The simplest and most obvious order that could be made in order
to prevent error of a constitutional magnitude would be to
prohibit any and all questions relating to the venireman's personal
feelings about the death penalty.  Alternatively, this Court should
order that the guilt and penalty phases be tried to separate
juries, with only the penalty jury being death qualified.  This
procedure would  be of the type envisioned by the Supreme Court
in Witherspoon, wherein it questioned

> whether the state's interest in submitting the penalty
> issue to a jury capable of imposing capital punishment
> may be vindicated at the expense of the defendant's
> interest in a completely fair determination of guilt or
> innocence -- given the possibility of accommodating
> both interests by means of a bifurcated trial, using
> one jury to decide guilt and another to fix punishment.
> 391 U. S. at 520 n. 18.

WHEREFORE, defendant prays this Court order that no ques-
tioning concerning the jurors' attitudes about the death penalty
shall be permitted during voir dire.  In the alternative, defen-
dant requests that the Court impanel a non-death qualified
jury to try the guilt issue.  Should a penalty verdict be
required to be rendered, this Court should impanel a separate

- 12 -

jury, which has been constitutionally death-qualifed so that
it may consider the ranges of penalties required by law.

_Michael Shanks_
MICHAEL SHANKS

_John A. Garretson_
JOHN A. GARRETSON
Attorneys for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was hand-
delivered to John F. Holcomb, Prosecuting Attorney, Butler County
Court House, Hamilton, Ohio 45011, on the date the same was filed.

_John A. Garretson_
JOHN A. GARRETSON
Attorney for Defendant

- 13 -

IMAGED

COURT OF COMMON PLEAS

BUTLER COUNTY, OHIO

STATE OF OHIO                    :      CASE NO. CR  83 12 0614

        Plaintiff              :

vs.                              :      FURTHER MEMORANDUM IN SUPPORT
        **FILED In Common Pleas Cour**OF DISCLOSURE OF GRAND
        **BUTLER COUNTY, OHIO** JURY TESTIMONY
VON CLARK DAVIS

        Defendant  APR 27 1984

             :  :  :  :  :  :  :
        **EDWARD S. ROBB, JR.**
            **CLERK**
    Section 2929.04(A) of the Revised Code of Ohio precludes the

imposition of a death sentence unless aggravated murder and one

or more of eight aggravating circumstances are proved beyond a

reasonable doubt. If none of the aggravating circumstances charged

are proved, the jury will be relieved of its duty to deliberate

on a penalty. The concept of death qualification voir dire evolves

from the state's interest in seating a jury that can consider the

range of penalties provided by law, including death. Death

qualification , in turn, results in a trial jury that is unduly

prone to convict, fails to represent a fair cross-section of

the population, and underrepresents minorities and women.

    Defendant has filed a concurrent motion with this Court,

which, if granted, would require the prosecutor to show probable

cause to this Court that at least one of the aggravating circum-

stances charged will be proved at trial beyond a reasonable

doubt. This probable cause showing must be made before death

qualification of the jury can take place. The aggravating

73

IMAGED

circumstances charged were the subject of grand jury testimony in this case. Defendant asserts that his interest in avoiding unnecessary death qualification voir dire represents a "particularized need" to compel disclosure of the grand jury testimony. As demonstrated in the accompanying motions to prohibit death qualifications and to show probable cause, a death qualified jury is substantially more likely to convict at the guilt phase than an ordinary jury. See Grigsby III. To avoid the necessity of death qualifying the jury, it is imperative that the Grand Jury evidence be disclosed to determine if there is probable cause that one or more of the aggravating specifications will be proven at trial.

The Ohio Supreme Court considered the appropriate procedure to be followed by the trial court when the defendant seeks disclosure of grand jury testimony in State v. Greer, 66 Ohio St. 2d 139 (1981). In Greer, the court held that

> Crim. R. 6(E) would require the trial court, upon proper motion, to consider the basis of the particularized need advanced by the defendant. This may be accomplished by an in camera inspection of the grand jury minutes by the trial court assisted by counsel. Next, we conclude that there is soundness in the procedure to be followed by the trial court as set forth in Dennis [v. United States, 384 U. S. 855 (1966)] to the effect that once the particularized need for the grand jury material is shown, the necessity of preserving grand jury secrecy is lessened, largely because the witness, in testifying at trial, has given up any anonymity he might have had and has made public testimony being sought. Under such circumstances, . . . we conclude that all relevant portions of the transcript should be produced, with the trial court deleting extraneous matters, and issuing protective orders where necessary.

66 Ohio St. 2d at 150-151 (Emphasis added).

The Court in Greer cited State v. Laskey, 21 Ohio St. 2d 187,

- 2 -

IMAGED

191 (1970), isolating a situation in which a pretrial motion for grand jury testimony might be granted:

> Generally, proceedings before a grand jury are secret and an accused is not entitled to inspect grand jury minutes before trial for the purpose of preparation or for purposes of discovery in general. This rule is relaxed only when the ends of justice require it, such as when the defense shows a particularized need exists for the minutes which outweighs the policy of secrecy. (Citations omitted).

In the instant case, defendant seeks to avoid the damaging practice of death qualification voir dire by rebutting the prosecutors' contention that at least one of the aggravating circumstances charged will be proved at trial. The only means by which defense counsel can meaningfully rebut this contention is by a complete disclosure of the grand jury transcripts.

WHEREFORE, defendant prays that this Court compel disclosure of the grand jury transcripts in the above captioned capital case.

_Michael Shanks_
MICHAEL SHANKS
315. S. Monument Ave., P. O. Box 687
Hamilton, Ohio 45012

_John A. Garretson_
JOHN A. GARRETSON
Attorneys for Defendant

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was hand-delivered to John F. Holcomb, Prosecuting Attorney, Butler County Court House, Hamilton, Ohio 45011, on the date the same was filed.

_John A. Garretson_
JOHN A. GARRETSON
Attorney for Defendant

- 3 -



IMAGED

COURT OF COMMON PLEAS

BUTLER COUNTY, OHIO

STATE OF OHIO                    :    CASE NO. CR 83 12 0614

                  Plaintiff     :

vs.                             :    MOTION FOR INDIVIDUAL

VON CLARK DAVIS                      SEQUESTERED VOIR DIRE

                  Defendant     :

            :  :  :  :  :

    Now comes defendant, by and through his attorney, and moves
this court for an order permitting the defense and prosecution to
undertake individual voir dire of prospective members of the jury
outside the presence and hearing of other members of the venire.

    This motion is made to prevent the questions asked of pros-
pective jurors and any answer given from prejudicing or influencing
other members of the panel.


                                    MICHAEL SHANKS
                                    315 S. Monument Avenue, P. O. Box 687
                                    Hamilton, Ohio  45012
                                    Telephone:  (513) 868-7600


                                    JOHN A. GARRETSON
                                    A Legal Professional Association
                                    Attorneys for Defendant
                                    118 S. Second Street, P. O. Box 60
                                    Hamilton, Ohio  45012
                                    Telephone:  (513) 868-2074

74

IMAGED

## MEMORANDUM IN SUPPORT

The trial court is afforded great latitude and discretion in structuring the method in which voir dire will be conducted. Rosales-Lopez v. United States, _____ U. S. _____, 101 S. Ct. 1629, 1634 (1981); R. C. §2945.27; Crim. R. 24. Regardless of the method selected, the voir dire should be directed to determine whether, for any reason, a juror has a bias of mind in favor or against either party such that his impartiality as to guilt would be impaired. State v. Ellis, 98 Ohio St. 27 (1918). In order to structure voir dire in a manner best designed to achieve the objective of eliminating biased individuals from the jury, attention should be focused on the conditions under which questions are asked, who asks them, and the nature of the questions.

The exceptional circumstances of the death qualification phase of the voir dire requires that it be done individually and in sequestration. The peril of biasing jurors concomitant with conducting the voir dire other than individually and in seques- tration is great. McCorquedale v. Balkom, 705 F. 2d 1553 (11th Cir. 1983). Professor Winick has concluded:

> Prolonged discussion of the death penalty at voir dire
> suggests to prospective jurors that the defendant's guilt
> is presumed by attorneys and the judge, desensitizes jurors
> to the possibility of imposing the death penalty, communi-
> cates the law's disapproval of death penalty opposition,
> increases the acceptability of pro death penalty attitudes,
> and increases the likelihood that the jurors will convict
> and their willingness to vote for the death penalty.
> 81 Mich. L. Rev. 1-98, Nov. 1982.

To minimize these potentially prejudicial effects, voir dire questions of a capital venireperson should be performed outside the presence of other prospective jurors. This mode of

- 2 -

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 255

IMAGED

voir dire has been adopted by the California Supreme Court.

Hovey v. Superior Court, 28 Cal. 3d 1, 616 P. 2d 1301 (1981).

Further, the necessity of individually questioning jurors
in death penalty cases concerning their Witherspoon qualifications
is mandated by the United States Constitution.  McCorquedale v. Balkom,
705 F. 2d at 1560:

> "A trial court must determine that the juror understands the
> difficult distinction between possessing a personal opinion
> regarding capital punishment and the ability to subordinate
> that view in order to perform his duty as a juror.  In order
> to ascertain that a juror understands this distinction, we
> hold that a trial court must require a thorough and inform-
> ative questioning of each juror.[18]
>
> 18.  The requirement that a trial judge determine a
> juror's understanding of the Witherspoon inquiry is
> similar to the requirement of Rule 11 of the Federal
> Rules of Criminal Procedure that a court, before accepting
> a plea of guilty, "address the defendant personally in
> open court and inform him of and determine that he under-
> stands [certain rights to which he is entitled]."
> Fed. R. Crim. P. 11 (1983).  Interpreting Rule 11,
> the court in Mack v. United States, 635 F. 2d 20
> (1st Cir. 1980), stated:
>
> Although the district court informed Mack of the charges,
> it did not determine that the defendant understood
> the nature of the charges.  Simply informing a defendant
> of the charges does not "establish on the record that the
> court personally determined that the defendant under-
> stood the charges." United States v. Wetterlin, 583 F. 2d
> at 350 n. 6.  Furthermore "[r]outine questioning or
> a single response by the defendant that he understands
> [the nature] of the charge is insufficient," Woodward v.
> United States, 426 F. 2d 959, 962 (3d Cir. 1970).
> The court should "engage in extensive an interchange as
> necessary to assure itself and any subsequent reader of
> the transcript that the defendant does indeed fully
> understand the charges." United States v. Coronado,
> 554 F. 2d at 173.
> 635 F. 2d at 26.

A death sentence was reversed by the Eleventh Circuit Court of

Appeals in McCorquedale because there had been inadequate question-

ing and inadequate responses concerning the death penalty.  The

- 3 -

IMAGED

court indicated that the trial judge must determine that each and every jury that is excused understands what he is saying about the death penalty.  Any excusals without such a determination are grounds for reversal.

The most efficient way to determine that a juror fully understands the questioning on Witherspoon issues is to permit extensive examination on the subject by the defense counsel and the prosecutor.  Through this questioning, more personal and direct answers on this sensitive issue will be forthcoming.  The difficulty of group questioning and the way it inhibits the responses of individual jurors was also recognized by the Eleventh Circuit in McCorquedale v. Balkom, supra at 1559:

> The fact that the jurors were questioned as a group compounds the chances for misunderstanding.  The individual is not able to request further explanation or indicate that he does not understand the question.  (footnote omitted).

To avoid the confusion and the possibility that any potential juror does not understand the questions and may be qualified under Witherspoon, the preferred method of voir dire is individual and sequestered.

Additionally, individual sequestered voir dire effectively eliminates the possibility of group influence.  Persons called for jury service in any large district find themselves in a novel situation and are susceptible to the psychological phenomenon of group influence.  Individuals are included or excluded upon the basis of their answers.  If a venireperson wants to be excused from jury service and he is in a group voir dire, he can quickly learn which grounds for exclusion are honored by the court.  The more

- 4 -

IMAGED

potentially dangerous person who wants to be on the jury for his or her own reasons, can equally quickly determine what answers are deemed appropriate and tailor his or her responses to enhance the probability that he will be accepted.

Furthermore, individual sequestered voir dire will aid counsel in deciding to exercise peremptory challenges. Individual voir dire provides more useful information concerning the venireperson because both the questions and the responses tend to be more individualized. When interviewing individuals in a group, there is a tendency for the questioners to repeat the same pattern of questions; in an individual examination, the prospective juror's responses lead to narrowly focused questions which are more useful in uncovering biases. Likewise, a venireperson's answers are more likely to disclose their own beliefs in an individual interview since they cannot give knowingly the same or similar answers to questions as those who preceded them.

In an individual voir dire situation, counsel can ask individualized questions of the venireperson without fear of embarrassing a potential juror in front of their peers. As Mary Timothy, foreperson of the jury in the Angela Davis case, has written:

> Jurors have a right to privacy. They have a right to a private voir dire. Only the basic questions of name, residence in county, citizenship should be asked in public. The press has no need to know anything about a juror beyond that. There is no need for any of the other jurors to know any more about their fellows, unless the information is given voluntarily. All the other questions should be asked in private conference with only the judge, the attorneys, the defendant and the court reporter present.
>
> There would be doubt advantage: The personal privacy of the individual would be protected and the juror being questioned would feel freer to disclose any problems he or she might have.
> Jury Woman, p. 306 (1974, Empty Press).

- 5 -

IMAGED

Answers to such individualized questions may fall short of an actual admission of bias. This does not mean that they are unimportant to counsel exercising his peremptory challenges. Quite to the contrary. This fact has been recognized for over a decade by the federal courts.

> "...an answer which falls short of an admission of bias may nevertheless aid counsel in deciding to exercise a peremptory challenge. The Supreme Court has stated that the peremptory challenge, although not required in the Constitution, is 'one of the most important of the rights secured to the accused', and that '[t]he denial or impairment of the right is reversible error without a showing of prejudice.' Swain v. Alabama (1965), 380 U. S. 202, 219. The peremptory challenge is provided in the federal system by Federal Rule of Criminal Procedure 24(b).
>
> "If this right is not to be an empty one, the defendants must upon request be permitted sufficient inquiry into the background and attitudes of the jurors to enable them to exercise intilligently their peremptory challenges." U. S. v. Dellinger, 472 F. 2d 340, 368 (Fifth Cir., 1972).
>
> See also U. S. v. Esquer, 459 F. 2d 431, 434 (Seventh Cir., 1972); Spells v. U. S., 263 F. 2d 609, 611 (Fifth Cir., 1959).

Counsel does not argue that this extraordinary voir dire procedure be used in every criminal case. Capital cases are, however, qualitatively different. Clearly, different standards must be used to guide the court's discretion when the state seeks to terminate the life of the defendant. It is the position of the defendant that the court should grant this motion because individual voir dire sequestration is best designed to achieve the objective of eliminating biased jurors.

There is ample precedent for defendant's right to individual sequestered voir dire.

Under the Ohio Death Penalty statutes enacted in 1981, the use of this mode of sequestered voir dire has been the standard. See, State v. Jenkins (Cuyahoga Cty. 1982); State v. Rucker

IMAGED

(Wayne Cty. 1982); State v. Kiser (Ross Cty. 1982); State v. Glenn (partial) (Mahoning Cty. - tried in Portage Cty.); State v. Rogers (Lucas Cty.); State v. Thompson (Licking Cty.); State v. Steffen (Hamilton Cty.); State v. Mullins (partial) (Ashland Cty.); State v. Fields (Cuyahoga Cty.); State v. Fellows (Trumbull Cty.); State v. Penix (Clark Cty.); State v. Maurer (partial) (Stark Cty.); State v. Ray Edward Williams (Cuyahoga Cty.); State v. Spisak (Cuyahoga Cty.); and State v. Byrd (Hamilton Cty.).

WHEREFORE, defendant prays this court grant the Motion in all particulars or, in the alternative, set the matter for a hearing, that counsel might present evidence and further argument in support of their position.

MICHAEL SHANKS

JOHN A. GARRETSON
Attorneys for Defendant


CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was hand-delivered to John F. Holcomb, Prosecuting Attorney, Butler County Court House, Hamilton, Ohio, on the date the same was filed.

JOHN A. GARRETSON
Attorney for Defendant


- 7 -

IMAGED

COURT OF COMMON PLEAS

BUTLER COUNTY, OHIO

STATE OF OHIO                    :      CASE NO.  CR 83 12 0614

            Plaintiff           .

vs.                             FILED In Common Pleas Court
                                BUTLER COUNTY, OHIO  MOTION TO INSULATE

VON CLARK DAVIS                  :      THE VENIRE AND JURY

            Defendant           APR 27 1984

                                :

                                EDWARD. S. ROBB, JR.
                                      CLERK

        Now comes the defendant, by and through counsel, and

moves this Court to issue an order prohibiting the publication

of the names, addresses, and telephone numbers of members of

the venire to be drawn and of the jurors once selected herein.

The defendant further requests a hearing be scheduled on this

Motion.

                          _Michael Shanks_

                          MICHAEL SHANKS
                          315 South Monument Avenue, P. O. Box 687
                          Hamilton, Ohio  45012
                          Telephone:  (513) 868-7600


                          _John A. Garretson_

                          JOHN A. GARRETSON
                          A Legal Professional Association
                          Attorneys for Defendant
                          118 S. Second Street, P. O. Box 60
                          Hamilton, Ohio  45012
                          Telephone:  (513) 868-2074

75

IMAGED

MEMORANDUM IN SUPPORT

INSULATION OF THE VENIRE AND JURY

Counsel for the defense represents to this Court that there exists a clear and present danger of jury contamination which would be brought about by the publication of the names, addresses, and telephone numbers of potential jurors in this case.  This is a case involving the death penalty that has attracted a great deal of media attention.  Because of the highly inflammatory nature of this case, release of this information to the community would result in contemination of the venire which could not be cured through <u>voir</u> <u>dire</u> no matter how vigorously it is undertaken.  The media in other counties have demonstrated that they will publish such information.

Butler County has a population of about 200,000. Local print and electronic media reach a substantial majority of that figure on a daily basis.  In addition, other print media from counties contiguous to this county have given substantial coverage to this case.  Given the all pervasive access the media have to the population of potential jurors in this case, counsel asserts that these orders are reasonable and necessary prophylactic measures that will ensure an impartial jury, and consequently a fair trial.

- 2 -

IMAGED

A.

## DUE PROCESS CONSIDERATIONS
## RECOMMEND INSULATION

Failure of a state court to grant the right of a criminal defendant to be tried by an impartial jury constitutes a denial of due process in violation of the Fourteenth Amendment of the United States Constitution. Irvin v. Dowd, 366 U. S. 717 (1961). Similarly, the grant of due process under Article I, Section 16 of the Ohio Constitution is violated. The Court elaborated on the connection between the due process requirement of an impartial jury and pretrial publicity in Sheppard v. Maxwell 384 U. S. 333 (1966). The Court stated that due process requires that the accused receive a trial by an impartial jury free from outside influences. It went on to state that, given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of jurors, trial courts must take strong measures to insure that the balance is never weighed against the accused.

- 3 -

IMAGED

In light of the clear and present danger of jury contamination in this case, restraint on the publication of the names, addresses, and telephone numbers of jurors and potential jurors is an effective means to ensure an impartial jury, and therefore a fair trial in accordance with due process considerations.  Simultaneously, insulation of the venire and jury does not unduly limit the First Amendment right to freedom of the press.

B.

### THIS COURT HAS AUTHORITY TO ISSUE THIS ORDER UNDER THE PROPER CIRCUMSTANCES

The freedom of the press protected by the First Amendment is not absolute. New York Times Co. v. U. S., 403 U. S. 713 (1971); Organization for a Better Austin v. Keefe, 402 U. S. 415 (1971); Near v. Minnesota ex rel. Olson, 283 U. S. 697 (1931).

C.

### PUBLICATION OF INFORMATION WITHOUT NEWSVALUE DOES NOT CONSTITUTE PROTECTED SPEECH WARRANTING FIRST AMENDMENT PROTECTION

Obviously, there are many types of information a reporter may gain in open court that he or she would not be authorized to publish.  In a prosecution for pandering obscenity, the media could not publish the State's exhibits with impunity when same had been found to be obscene.  Even as the individual's right of free speech has real and practical limitations, so too must there be rational restraints placed upon the media when the fairness of a criminal trial would otherwise be jeopardized.

IMAGED

An individual is not at liberty to shout "fire" in a crowded auditorium because, in so doing, the constitutional rights of others may be trampled. Schenk v. U. S., 249 U. S. 47 (1919); Gitlow v. New York, 268 U. S. 652; Near v. Minnesota, supra.

It is the position of the defense that when the media seek to publish the names, addresses, telephone numbers of jurors or potential jurors, it has taken itself out of the ambit of protected speech and moved into the area where the judiciary may regulate the activity upon a showing of a rational nexus between the valid interest and the targeted conduct. The valid interest in the case at bar is the defendant's right to a fair and impartial jury in the trial for his life. The targeted conduct will effect that interest. The publication of such information is a virtual call to action of a misguided and uninformed portion of the community. It is an invitation for them to call up members of the jury and express their opinions about the case.

In this case, there is no newsvalue to this information. A juror's telephone number can be of no legitimate concern to the electorate. This is no more within the realm of protected speech than the use of "fighting words", Chaplinsky v. New Hampshire, 315 U. S. 568 (1942), or the interference with recruiting during a time of war, Schenk v. U. S., supra.

D.

THE GUIDELINES ESTABLISHED BY NEBRASKA
PRESS ASSOCIATION v. STUART AND RECENTLY
REAFFIRMED BY THE OHIO SUPREME COURT IN
STATE EX REL. CHILLICOTHE GAZETTE v. COURT
OF COMMON PLEAS REQUIRE THAT THIS COURT HOLD
AN EVIDENTIARY HEARING ON THIS ISSUE PRIOR
TO ISSUING THE ORDER

Nebraska Press Assn v. Stuart, 427 U. S. 539 (1976), requires that

- 5 -

IMAGED

the trial court weigh the evidence adduced by the proponent of the order

so as to determine whether, as Learned Hand put it:

> ...the gravity of the 'evil', discounted by its
> improbability, justifies such invasion of free
> speech as is necessary to avoid the danger.
> United States v. Dennis, 183 F.2d 201, 212 (CA2,
> 1950) aff'd 341 U.S. 494, 95 L.Ed. 1137, 71 S.
> Ct. 857 (1951)

In making this determination, the trial court must hold a hearing and

make evidentiary findings on three issues:

(a)  the nature and extent of pretrial news coverage

(b)  whether other measures would be likely to
     mitigate the effects of unrestrained pretrial
     publicity

(c)  how effectively a restraining order would operate
     to prevent the threatened danger.
     Nebraska Press, supra at 562.

Counsel for the defense hereby requests this Court set a hearing on

this matter and allow such presentation of evidence.  This motion

further requests the appointment of a social psychologist to assist the

defense in developing evidence on this issue.  Obviously, such evidence

can only be adduced through the use of expert testimony concerning the

demography and social behavior of the  Butler County Community and media

access thereto.

The Supreme Court of Montana has dealt with this precise issue in a

very important and highly relevant case.  State of Montana, ex rel.

Daniel Paul Smith v. District Court (1982), 654 P.2d 982.  That Court

made the following suggestion at 988:

> In determining whether a 'clear and present danger'
> exists the Court suggests that the following facts
> might be considered:  (1) empirical evidence regard-
> ing the percentage of general population who read
> newspapers or who listen to other forms of media;

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 266

IMAGED

(2)  statistics regarding the percentage of media readers/listeners who read or follow homicide or criminal stories; and (3) expert psychological testimony regarding the capacity of an individual to disregard pretrial publicity, which might include tainted evidence, when making an objective deter- mination of the facts upon completion of a trial. (Emphasis added)

Counsel is willing to make the necessary arrangements forthwith to employ said expert in an attempt to meet the burden of proof for the requested orders.  The defense lacks only the funds to employ the expert.

E.

### STATUTORY AND CONSTITUTIONAL SUPPORT EXISTS FOR APPOINMENT OF AN EXPERT PSYCHOLOGIST OR SOCIOLOGIST

Statutory support for appointment of an expert to testify on the issue outlined by the Montana Supreme Court is found in Section 2929.024 of the Revised Code of Ohio which provides in part that

If the court determines that the defendant is indigent and that . . . experts . . . are reasonably necessary for the proper representation of a defendant charged with aggravated murder at trial . . . the court shall authorize the defendant's counsel to obtain the necessary services for the defendant.  . . .

The statute goes on to state that the court shall grant the funds to employ the expert.

While it is true that the statute does not specifically provide for appointment at pretrial hearings, such services are nonetheless "reasonably necessary for the proper representation" of a defendant on trial for his life.  The defense carries the evidentiary burden at pretrial hearings to establish insulation.  The effect of rulings made at pretrial have as serious an effect upon the final determination of guilt as rulings made during trial.  The statute implicitly recognizes that an indigent

- 7 -

IMAGED

defendant should be provided at all times with the reasonably necessary means of obtaining proper representation. The decision of the Supreme Court of Montana illustrates that appointment in the circumstances of the case at bar is vitally necessary to the proper representation of a death-penalty defendant.

The goal of the statute is to ensure a fair trial independent of a defendant's economic status. This goal pertains to pretrial hearings as much as to trial itself. An arbitrary limitation based strictly upon statutory language, standing alone and without reference to its underlying purpose, should not thwart this goal. The statute should be construed to apply at pretrial hearings as well as at trial.

The appointment of an expert witness also receives support from the Sixth Amendment and Fourteenth Amendment of the United States Constitution and Article I, Section 10 of the Ohio Constitution right to have compulsory process for obtaining witnesses in the defendant's favor. As the Supreme Court stated in Washington v. Texas, 388 U. S. 14 (1967),

> The right to offer the testimony of witnesses, . . . is . . . the right to present a defense . . . [A]n accused . . . has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

If a death-penalty defendant is denied presentation of a necessary witness merely for the reason that he cannot afford one, he is in effect deprived of the right to establish a defense on the issue which is to be testified to. Here defendant seeks to establish through an expert witness the need for insulation of the venire and jury so that an impartial fact-finder can be preserved. The testimony of an expert

- 8 -

IMAGED

sociologist or psychologist on the issue of the capacity of an individual to disregard pretrial publicity when making an objective determination of the facts is relevant, material, and necessary to the defense. Where an impartial fact-finder is not certain, the defendant's ability to establish a defense is threatened. Reasonable steps should be taken to ensure that this fundamental element of due process is maintained. As the Montana court has shown, the appointment of the expert sociologist or psychologist is such a reasonable step.

The Fifth Amendment and Fourteenth Amendment of the United States Constitution and Article I, Section 16 of the Ohio Constitution guarantees of due process also support appointment for other reasons. The defense is required to meet an evidentiary burden on the issue of insulation of the venire and jury. It would be incongruous with the guarantees of due process to impose this burden on the defendant and simultaneously to deny him the means of meeting this burden merely because of his economic status. Expert psychological or sociological testimony is necessary in order for the defense to meet the Nebraska Press Assn. burden. Without the aid of such testimony it would be impossible for the defense to produce objective and comprehensive evidence of the sort required to meet its burden. If an expert were not appointed, the burden on the defense would be insurmountable, and the imposition of a burden that by its very nature is impossible to meet violates due process.

Due process requires a fair opportunity to be heard, New York Cent. Rd. Co. v. Public Utilities Comm'n., 157 Ohio St. 257, 105 N. E.2d 410 (1952), a meaningful hearing, Gilday v. Board of Elections, 472 F.2d

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 269



214 (6th Cir. 1972), and a hearing in which ample opportunity is afforded to all parties to make, by evidence and argument, a showing fairly adequate to establish the propriety, from the standpoint of justice and law, of the step asked to be taken.  State ex rel. Wright v. Morrison, 80 Ohio App. 135, 75 N. E.2d 106 (1947).

In the case at bar expert testimony must be given if the defense is to meet its burden.  Expert testimony is available on the critical factual issues involved in insulation.  Denial of appointment would make a fair, meaningful hearing impossible.  Without appointment, the defendant would be denied ample opportunity to make a fairly adequate showing of the propriety of insulation from the standpoint of justice.  Without the appointment of an expert witness in this case, the motion of due process will be radically weakened.

Equal protection considerations of the Fourteenth and Fifth Amendments to the United States Constitution and Article I, Section 2 and Article II, Section 26 of the Ohio Constitution suggest the propriety of appointment of an expert sociologist and/or psychologist in this case.  In Griffin v. Illinois, 351 U. S. 12 (1956), the plurality opinion noted that there can be no equal justice where the kind of trial one gets depends on the amount of money he has.  While Griffin dealt specifically with the conditioning of appellate review on the availability of a trial transcript, the principle embodied by the Court's statement is essential to a viable and meaningful constitutional principle of equal protection.  Equal justice is threatened in the situation where the impartiality of the fact-finder could vary according to the economic status of the defendant and his consequent ability to provide expert testimony on an issue directly determinative of that impartiality.

- 10 -

IMAGED

It may be true that equal protection does not require absolute equality or precisely equal advantages, but the state must assure the indigent defendant an adequate opportunity to present his claims fairly. Ross v. Moffitt, 417 U. S. 600 (1974). Defendant here does not seek all possible advantages, but only the opportunity to present crucial evidence necessary to the fair determination of the issue of insulation.

Finally, the Sixth and Fourteenth Amendment of the United States Constitution and Article I, Section 10 of the Ohio Constitution right to the effective assistance of counsel supports the defendant's plea for the appointment of an expert witness. It has been recognized that a court order restricting counsel from fully assisting his client may result in a denial of effective assistance. Geders v. United States, 425 U. S. 80 (1976). While the facts of Geders vary from those of the case at bar, the underlying principle is sound. Court orders restricting counsel from fully assisting his client by not providing for appointment of essential witnesses would prevent counsel from meeting the Ohio effective assistance standard of "fair trial" established in State v. Hester, 45 Ohio St.2d 71, 341 N. E.2d 304 (1976). Counsel should be permitted to call witnesses who alone can give critically relevant and material evidence on issues that go directly to ensuring a fair trial by preserving the impartiality of the fact-finder.

The Montana court in State ex rel. Smith v. District Court (1982) 654 P.2d 982, also said that empirical evidence regarding the percentage of general population who read newspapers or who listen to other forms of media, and statistics regarding the percentage of media readers/listeners



who read or follow homicide or criminal cases are also areas of inquirty needed to entertain a motion of this kind.

The defendant contemplates in conjunction with calling an expert sociologist/psychologist, calling representatives of the various print media that service the area to testify as to the statistical breakdowns outlined.

Since it is the defendant's burden to show affirmatively that the hearing should be closed, the defendant respectfully requests the assistance of the named expert.

MICHAEL SHANKS

JOHN A. GARRETSON
Attorneys for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served upon John F. Holcomb, Prosecuting Attorney, Butler County Court House, Hamilton, Ohio 45011, on the date the same was filed.

JOHN A. GARRETSON
Attorney for Defendant

- 12 -



COURT OF COMMON PLEAS

BUTLER COUNTY, OHIO

STATE OF OHIO                  :        CASE NO. CR 83 12 0614

        Plaintiff              :

vs.                   **FILED In Common Pleas Court** MOTION TO DISMISS
                      **BUTLER COUNTY, OHIO**

VON CLARK DAVIS                :

        Defendant     APR 27 1984

                      **EDWARD S. ROBB, JR.** :
                            **CLERK**

        Now comes the defendant, by and through his counsel, and

moves the Court to dismiss the Indictment against the defendant

or, if the Court refuses to dismiss the Indictment, to dismiss

the Death Penalty Specifications against the defendant on the

grounds set forth below.

                            _Michael Shanks_
                            _____
                            MICHAEL SHANKS
                            315 S. Monument Ave., P. O. Box 687
                            Hamilton, Ohio  45012
                            Telephone:  (513) 868-7600

                            _John A. Garretson_
                            _____
                            JOHN A. GARRETSON
                            A Legal Professional Association
                            Attorneys for Defendant
                            118 S. Second Street, P. O. Box 60
                            Hamilton, Ohio  45012
                            Telephone:  (513) 868-2074

76



I.     THE DEATH PENALTY AUTHORIZED BY SECTIONS 2903.01,
       2929.02, 2929.021, 2929.022, 2929.023, 2929.03,
       2929.04 AND 2929.05 OF THE REVISED CODE OF OHIO
       DEPRIVES CAPITALLY-CHARGED DEFENDANTS OF THEIR
       LIVES WITHOUT DUE PROCESS OF LAW, IN VIOLATION
       OF ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION
       AND THE FOURTEENTH AMENDMENT TO THE UNITED STATES
       CONSTITUTION.                                              1

II.    SECTIONS 2929.03 AND 2929.04 OF THE OHIO REVISED
       CODE VIOLATE UNITED STATES CONSTITUTION,
       AMENDMENT VIII AND OHIO CONSTITUTION ARTICLE I,
       SECTION 9 PROHIBITION AGAINST THE INFLICTION OF
       CRUEL AND UNUSUAL PUNISHMENT.                              9

III.   THE DEATH PENALTY IS ARBITRARILY AND FREAKISHLY
       INFLICTED, CONSTITUTING A DENIAL OF EQUAL
       PROTECTION OF THE LAWS UNDER THE EIGHTH AND
       FOURTEENTH AMENDMENTS TO THE UNITED STATES
       CONSTITUTION AND ARTICLE I, SECTIONS 9 AND 16
       OF THE OHIO CONSTITUTION.                                 13

IV.    SECTIONS 2929.02, 2929.022, 2929.03, 2929.04
       AND 2929.05 OF THE REVISED CODE OF OHIO
       DEPRIVE THE CAPITALLY-CHARGED DEFENDANT OF
       DUE PROCESS OF LAW UNDER THE FOURTEENTH
       AMENDMENT AND ARTICLE I, SECTION 16, AND
       CONSTITUTE CRUEL AND UNUSUAL PUNISHMENT
       UNDER THE EIGHTH AMENDMENT AND ARTICLE I,
       SECTION 9, AS THESE PROVISIONS PERMIT
       IMPOSITION OF THE DEATH PENALTY ON A LESS
       THAN ADEQUATE SHOWING OF GUILT AND THE
       APPROPRIATENESS OF THE DEATH PENALTY.                     38

V.     SECTIONS 2903.01, 2929.022, 2929.03, 2929.04 AND
       2929.05 OF THE REVISED CODE OF OHIO VIOLATE THE
       EIGHTH AMENDMENT PROHIBITION AGAINST CRUEL AND
       UNUSUAL PUNISHMENT AND FOURTEENTH AMENDMENT DUE
       PROCESS AND EQUAL PROTECTION CLAUSES OF THE UNITED
       STATES CONSTITUTION AND ARTICLE I, SECTIONS 9 AND
       16 OF THE OHIO CONSTITUTION BY REQUIRING PROOF OF
       AGGRAVATING CIRCUMSTANCES IN THE GUILT STAGE OF
       DEATH PENALTY DELIBERATIONS.                              47

IMAGED

VI.    SECTIONS 2929.022, 2929.03, AND 2929.04 VIOLATE
       DEFENDANT'S RIGHTS TO EFFECTIVE ASSISTANCE OF
       COUNSEL AND TO TRIAL BEFORE AN IMPARTIAL JURY,
       AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMEND-
       MENTS TO THE UNITED STATES CONSTITUTION, ARTICLE
       I, SECTION 10 OF THE OHIO CONSTITUTION, AND
       ARTICLE I, SECTIONS 16 OF THE OHIO CONSTITUTION.                    57

VII.   SECTIONS 2929.022, 2929.03 AND 2929.04 OF THE
       REVISED CODE OF OHIO, AND OHIO CRIM. R. 11(C)(3)
       PLACE AN UNCONSTITUTIONAL BURDEN ON THE DEFENDANT'S
       RIGHT TO A TRIAL BY JURY UNDER THE SIXTH AND
       FOURTEENTH AMENDMENTS TO THE UNITED STATES
       CONSTITUTION AND ARTICLE I, SECTION 10 OF THE
       OHIO CONSTITUTION.                                                  64

VIII.  SECTION 2945.25(C) OF THE REVISED CODE OF OHIO
       VIOLATES THE DEFENDANT'S RIGHT TO AN IMPARTIAL
       JURY ON THE DETERMINATION OF GUILT, AS GUARANTEED
       BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE
       UNITED STATES CONSTITUTION AND ARTICLE I, SECTION
       10 OF THE OHIO CONSTITUTION.                                       69

IX.    SECTIONS 2929.03, 2929.04, 2929.05 OF THE REVISED
       CODE OF OHIO VIOLATE THE EIGHTH AND FOURTEENTH
       AMENDMENTS TO THE UNITED STATES CONSTITUTION AND
       ARTICLE I, SECTIONS 9 AND 16 OF THE OHIO
       CONSTITUTION.                                                      71

X.     SECTIONS 2929.03, 2929.04 AND 2929.05 OF THE
       REVISED CODE OF OHIO VIOLATE THE EIGHTH AND
       FOURTEENTH AMENDMENTS TO THE UNITED STATES
       CONSTITUTION AND ARTICLE I, SECTIONS 9 AND 16
       OF THE OHIO CONSTITUTION BY FAILING TO PROVIDE
       THE SENTENCING AUTHORITY WITH AN OPTION TO
       CHOOSE A LIFE SENTENCE WHEN THERE ARE AGGRA-
       VATING CIRCUMSTANCES AND NO MITIGATING
       CIRCUMSTANCES.                                                     89

XI.    THE DEATH PENALTY AUTHORIZED BY SECTIONS
       2929.02, 2929.022, 2929.03 AND 2929.04 OF THE
       REVISED CODE OF OHIO VIOLATES THE CRUEL AND
       UNUSUAL PUNISHMENT PROVISIONS AND DUE PROCESS
       CLAUSES OF THE STATE AND FEDERAL CONSTITUTIONS
       BECAUSE SEVERAL OF THE AGGRAVATING CIRCUMSTANCES
       SET FORTH IN SECTION 2929.04(A) ARE OVERBROAD AND
       VAGUE AND FAIL TO REASONABLY JUSTIFY THE
       IMPOSITION OF A MORE SEVERE SENTENCE.                              92

       CONCLUSION                                                         94

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 275

IMAGED

REVISED
MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS

I.   THE DEATH PENALTY AUTHORIZED BY SECTIONS 2903.01,
     2929.02, 2929.021, 2929.022, 2929.023, 2929.03,
     2929.04 and 2929.05 OF THE REVISED CODE OF OHIO
     DEPRIVES CAPITALLY-CHARGED DEFENDANTS OF THEIR LIVES
     WITHOUT DUE PROCESS OF LAW, IN VIOLATION OF
     ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION AND
     THE FOURTEENTH AMENDMENT TO THE UNITED STATES
     CONSTITUTION.

A.   THE STATE MUST DEMONSTRATE A COMPELLING STATE
     INTEREST IN APPLICATION OF THE DEATH PENALTY

The right to life is a constitutionally protected fundamental

right, Commonwealth v. O'Neal, 367 Mass. 440, 327 N.E.2d 662, 668

(1975), cf. Roe v. Wade, 410 U. S. 113, 156-157 (1973), rehearing denied,

410 U. S. 959 (1973); Johnson v. Zerbst, 304 U. S. 458, 462 (1938); Yick

Wo v. Hopkins, 118 U. S. 356, 370 (1886).  The enjoyment of life is also

explictly guaranteed as an "inalienable right" in Ohio Constitution,

Article I, Section 1.  "Aside from its prominent place in the due process

clause itself, the right to life is the basis for all other rights, and

in the absence of life other rights do not exist."  Commonwealth v.

O'Neal, supra, at 668.  Thus, the right to life "encompas[ses] . . .

'the right to have rights,'", Commonwealth v. O'Neal, 369 Mass. 242, 339

N.E.2d 676, 678 (1975) (Tauro, C.J. concurring) [hereinafter O'Neal II].

"An executed person" not only is deprived of his life, but "has indeed

'lost the right to have rights'".  Furman v. Georgia, 408 U. S. 238, 290

(1972) (Brennan J. concurring).

1

IMAGED

Accordingly, due process guarantees prohibit the destruction of life unless the state can show a legitimate and compelling state interest. Commonwealth v. O'Neal, 327 N.E.2d at 668; O'Neal II, 339 N.E.2d at 678 (Tauro, C. J. concurring); State v. Pierre, 572 P.2d 1338, 1357 (Utah, 1977) (Maughan, J. concurring and dissenting). Moreover, when fundamental rights are involved, due process requires that "Even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle personal liberties when the end can be more narrowly achieved." Shelton v. Tucker, 364 U. S. 479, 488 (1960); State v. Dixon, 283 So.2d 1, 21 (Ervin, J. dissenting) (1973); Pierre, 572 P.2d at 1357. Therefore, "in order for the state to allow the taking of life by legislative mandate, it must demonstrate that such action is the least restrictive means toward furtherance of . . . [the] compelling governmental end." Commonwealth v. O'Neal, 327 N. E.2d at 668.

The societal interests commonly advanced to justify capital punishment are, as the United States Supreme Court noted in Gregg v. Georgia, 428 U. S. 153 (1976), "deterrence of capital crimes by prospective offenders", "incapacitation of dangerous criminals and the consequent prevention of crimes that they may otherwise commit in the future", and "retribution". Id. at 183, and n. 28. Examining these possible justifications, the Court in Gregg concluded the death penalty was sustainable and not in violation of the Eighth Amendment, "in the absence of more convincing evidence that the infliction of death as a punishment for murder is . . . without justification", Id. at 187, and "so totally without penological justification that it results in the gratuitous

infliction of suffering" Id. at 183. The Court in Gregg, however was

not presented with and so did not decide whether capital punishment is

the least restrictive means for achieving the purported societal interests.

### B. THE DEATH PENALTY DOES NOT DETER OTHERS

In looking at the question of whether the death penalty serves as a

deterrent, a number of studies have indicated that the death penalty is

not superior to lesser punishments. See, Glasser, Capital Punishment -

Deterrent or Stimulus to Murder? Our Unexamined Deaths and Penalties,

10 U. Tol. L. Rev. 317 (1979); Bailey, Deterrent Effect of the Death

Penalty for Murder in Ohio, 28 Clev. St. L. Rev. 51 (1979); and Bowers

and Pierce, The Illusion of Deterrence in Isaac Ehrlich's Research on

Capital Punishment, 85 Yale L. J. 187 (1975). Jurisdictions having the

death penalty do not have lower rates of criminal homicide than those

states which have no death penalty. Sellin, Capital Punishment, 1965,

at 135-138. Abolition of the death penalty does not result in an increase

in homicide rates. Id., at 122-24. Reinstitution of the death penalty

after a period of abolition does not result in a decreased rate of

criminal homicide. Id. The rate of murder of policemen is not greater

in abolition states than in those having the death penalty. Sellin,

Does the Death Penalty Protect Municipal Police?, in Bedau, The Death

Penalty in America, 1964, at 284-301; see Campion, Does the Death

Penalty Protect State Police?, in Bedau, supra note 1, at 301-315.

Capital punishment, rather than deterring murder, may actually

3

induce it. There is substantial evidence that persons of warped mentality and with suicidal motives may have committed murder so that they would be executed. West, "Psychiatric Reflections on the Death Penalty", 45 Amer J. Orthopsychiatry 689 (1975); Solomon, "Capital Punishment as Suicide and Murder", 45 Amer J. Orthopsychiatry 701 (1975); Assn. of the Bar of the City of New York, Committee on Civil Rights, "The Death Penalty: It Should be Abolished" (1977). See also Krivosha, Copple, McDonough, "A Historical and Philosophical Look at the Death Penalty -- Does it Serve Society's Needs?", 16 Creighton L. Rev. 1, 20-22, 46 (1982).

Defendant recognizes that the state has a valid interest in protecting its citizens from murder and in deterring murder. This court's inquiry must look beyond those vital interests to determine whether the means chosen, use of the death penalty as punishment, is compelled as the least restrictive means available to further these ends. In order to strike the proper balance this court must determine whether the state's interests can be effectively served by means which do not impair fundamental constitutional rights - specifically the right to life - to the extent that the death penalty does.

Regarding deterrence, "the question to be considered is not simply whether capital punishment is a deterrent, but whether it is a better deterrent than life imprisonment," Furman, 408 U. S. at 346-347 (Marshall, J., concurring). "Despite the most exhaustive research by noted experts in the field, there is simply no convincing evidence that the death penalty is a deterrent superior to lesser punishments. In fact, the most convincing studies point in the opposite direction." Commonwealth v. O'Neal, 339 N.E.2d 676, at 682, 683-85 (Mass. 1975). See, e.g.,

4

IMAGED

W. Bowers, Execution in America, (Lexington, Mass., D.C. Heath Co.,
1974); Forst, The Deterrent Effect of Capital Punishment: A Cross-State
Analysis of the 1960's, 61 MINN. L. REV. 743 (1977); Zeisel, The Deterrent
Effect of Capital Punishment: Facts v. Faith, SUP. CT. REV. (1976);
Bowers & Pierce, 85 YALE L.J. 187 (1975); Glasser, Capital Punishment -
Deterrent or Stimulus to Murder? Our Unexamined Deaths and Penalties,
10 U. TOL. L. REV. 317 (1979). Based on the available studies and other
material cited there is no firm indication that capital punishment acts
as a superior deterrent to homicide than other available punishments.

Studies in Ohio, more particularly, have similarly failed to show
any deterrent effect by imposition of the death penalty. Over twenty
years ago, a study spanning 50 years of executions in the State of Ohio
found no evidence that executions have any discernible negative effect
on homicide rates. Ohio Legisl. Serv. Comm'n., Capital Punishment
(1961). A more recent study of the period from 1910 to 1962 (the last
execution in the state was in 1963) concludes:

> The evidence for Ohio provides no support for the
> argument that the certainty of the death penalty
> provides an effective deterrent to homicide. Rather,
> execution rates and homicide rates prove to be largely
> independent factors, with offense rates being a response
> to the changing demographic characteristics and
> socioeconomic conditions of the state. Accordingly
> . . . Ohio's experience with capital punishment during
> [its] last six decades does not support retentionist
> arguments based upon deterrence . . . Ohio's experience
> with capital punishment provides no justification for
> re-instating the death penalty as an effective means of
> dealing with the state's murder problem.

Bailey, "The Deterrent Effect of the Death Penalty for Murder in Ohio:
A Time-Series Analysis", supra, at 68, 70.

5



Thus the only examinations of Ohio's experience with the death penalty agree that no deterrent effect has been demonstrated. Therefore, this court should be unable to find that the state has a compelling state interest in deterrence which cannot adequately be served by other less restrictive means of punishment.

C. INCAPACITATION OF THE OFFENDER CAN BE THE
EFFECTIVE MEANS LESS RESTRICTIVE THAN DEATH

The second purported justification for the death penalty, that of incapacitation of the offender, can be achieved by restraint, a less restrictive means than obliteration of human life.

> [I]f a criminal convicted of a capital crime poses
> a danger to society, effective administration of
> the state's pardon and parole laws can delay or
> deny his release from prison, and techniques of
> isolation can eliminate or minimize the danger while
> he remains confined.
> Furman v. Georgia, 408 U. S. 238, 300-301 (1972)
> (Brennan, J., concurring).

See also Bedau, supra, note 1, at 395-405. In fact, "lesser alternatives, such as imprisonment, are accepted by society in cases where the risk of repetition would seem to be substantial. . . . the dangerous psychopath who is found not guilty by reason of insanity is not executed . . . [he is] instead contained." Assn. of the Bar of the City of New York, supra.

Ohio's provision for life imprisonment in a maximum security facility with no chance of parole for twenty to thirty years, R.C. §2929.02, should surely suffice:

> Murderers in general have been shown to be among
> the least recidivistic of offenders. . . . Once
> released from prison . . . convicted murderers have

6

a very low rate of reconviction for any criminal
offenses, let alone murder.  Packer, The Limits of
the Criminal Sanction, 52, 53 (1968).

In the Eighteenth and Nineteenth Centuries, prior to the creation

of an effective prison system, the death penalty was considered necessary

to protect society.  See Bedau, "The Courts, the Constitution, and

Capital Punishment", 1968 Utah L. Rev. 201, 232.  However, now:

> Nationally there is substantial information to show
> that murderers can be incarcerated and paroled with
> safety, and that there is no discernible difference
> in this regard between those who are found guilty of
> one rather than another kind of criminal homicide.
> Bedau, Death Sentences in New Jersey, 1907-1960,
> 19 Rutgers L. Rev. 1, 47 (1964).

Therefore, the state cannot convince this Court that the death

penalty is necessary as the best means of protecting society from murders.

This interest can be adequately served by less onerous means.

D.   THERE IS NO SHOWING THAT RETRIBUTION, IF IT
     IS TO BE CONSIDERED, CANNOT BE EQUALLY
     SATISFIED BY A LESS ONEROUS PENALTY.

Retribution cannot serve as the compelling state interest justifying

capital punishment because there is no evidence that a less onerous

penalty would not equally satisfy the public's outrage and its desire

for punishment.  See O'Neal II, 339 N.E.2d at 686-7.  "There is no

evidence that there is more vigilante justice of lynch law in those

states which do not have capital punishment than in those states which

do."  W. Bowers Executions in America (1974), at 40; Assn. of the Bar of

the City of New York, supra.  It is clear that:

> [G]rading punishments according to the severity of
> the crime does not require that the upper limit of

7

severity be the death penalty.  Bedau, The Death Penalty in America, 268 (Rev. ed. 1967).

In addition, "it is incompatible with the dignity of an enlightened society to attempt to justify the taking of life [merely] for purposes of vengeance." People v. Anderson, 6 Cal.3d 628, 651, 100 Cal. Rptr. 152, 168, 493 P.2d 880, 896, cert. den. 406 U. S. 958 (1972).  While in some views retribution may be a permissible aspect of punishment, it "is no longer the dominant objective of the criminal law", Williams v. New York, 337 U. S. 241, 248 (1949), and it cannot act as the sole justification for a particular penalty.

Furthermore, "[t]hose who advocate the death penalty only because they regard it as a just or well-deserved retribution for crime, or atonement for taking a human life, would probably be unwilling to defend the execution of an innocent person", yet "erroneous convictions are inevitable, and beyond correction in the light of newly discovered evidence when a capital sentence has been executed." Model Penal Code, Comments to §201.6 [210.6] in Tent. Draft No. 9, at p. 64-65.  As the Model Penal Code Comments state, and few, if any would or could disagree.

> Human justice can never be infallible, no matter how conscientiously courts operate, there still exists a possibility that an innocent person may, due to a combination of circumstances that defeat justice, be sentenced to death and even executed.

On the basis of the irrevocability of this ultimate sanction, the concurrent fallibility of our system of criminal justice, and the adverse influence on the administration of it, (see Model Penal Code [Official Draft] Comments to §210.6, at 114 (1980)) many persons would abolish the death penalty altogether.  The State's possible reliance on retribution

8

as a justification for the death penalty is thus further weakened by the real threat that the irreversible deprivation of life may befall an innocent person.

### E. CONCLUSION

The failure of the state to meet "its heavy burden of demonstrating that, in pursuing its legitimate objectives, it has chosen means which do not unnecessarily impinge on the fundamental constitutional right to life," O'Neal, II, supra, 339 N. E.2d, at 686, requires rejection of the death penalty as a punishment as it is violative of due process. The State of Ohio is obliged to show that the availability of the death penalty contributes more to the achievement of a legitimate State purpose than the availability in like cases of the penalty of life imprisonment, Opinion of the Justices, 372 Mass. 912, 917, 364 N. E.2d 184 (1977), to satisfy due process, and it fails in this endeavor.

II. SECTIONS 2929.03 and 2929.04 OF THE OHIO REVISED CODE VIOLATE UNITED STATES CONSTITUTION, AMENDMENT VIII AND OHIO CONSTITUTION ARTICLE I, SECTION 9 PROHIBITION AGAINST THE INFLICTION OF CRUEL AND UNUSUAL PUNISHMENT.

The primary purpose of the Cruel and Unusual Punishment Clause is that "punishment may not be more severe than is necessary to serve the legitimate interests of the State," Furman, supra, at 359-360 (Marshall, J., concurring).

Necessarily every punishment contains an element of cruelty. A convicted defendant who is deprived of his freedom and imprisoned will

9

feel society has been cruel. However, society tolerates that degree of cruelty when it is necessary to serve its legitimate needs. However, when the level of cruelty is disproportionate to the crime, and consequently does not serve the needs of society, a court will find the punishment to be too cruel and, thus cruel within the term of art in the cruel and unusual punishment clauses. See Robinson v. California, 370 U. S. 660, 666-67 (1962), Weems v. United States, 217 U. S. 349, 368, 381 (1910).

In Coker v. Georgia, 433 U. S. 584, 592 (1977), the United States Supreme Court stated:

> A punishment is "excessive" and unconstitutional if it (1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the needless imposition of pain and suffering or (2) is grossly out of proportion to the severity of the crime. A punishment might fail the test on either ground.

As has been presented earlier, there is no evidence to demonstrate a deterrent effect, particularly in Ohio, from imposition of the death penalty. Although the United States Supreme Court determined in Gregg v. Georgia, 428 U. S. 153 (1976) that the goals of incapacitation and retribution were appropriate concerns of punishment, this determination has been repeatedly criticized by two members of that Court, Justices Brennan and Marshall, and by many other individuals as well, on the basis of the arguments earlier presented herein.

Further, the Ohio Supreme Court is free to interpret its own constitutional provisions, even if identical in wording to that of the federal provision, in a manner more protective of individual rights, see Oregon

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 285

v. Hass, 420 U. S. 714, 719, n. 4 (1975); Brennan, "State Constitutions on the Protection of Individual Rights", 90 Harv. L. Rev. 489, 502 (1977), and has already chosen to do so in interpreting another provision. State v. Gallagher, 46 Ohio St.2d 225, 348 N. E.2d 336 (1976). As studies in Ohio have concluded that no deterrent effect is achieved by imposition of this penalty, it makes "no measurable contribution" to the goal of punishment, and should be condemned as a needless infliction of human suffering.

Capital punishment, because it involves the taking of life, is qualitatively different from other punishments. Furman, supra, at 287 (Brennan, J., concurring). "The penalty of death differs from all other forms of criminal punishment, not in degree but in kind." Furman, supra, at 306 (Stewart, J., concurring). "[I]n assessing the cruelty of capital punishment . . . we are not concerned only with the 'mere extinguishment of life' . . . but with the total impact of capital punishment from the pronouncement of judgment of death through the execution itself, both on the individual and on the society which sanctions its use." People v. Anderson, 6 Cal.3d 628, 656, 100 Cal. Rept. 152, 164, 493 P.2d 880, 892 (1972), cert. denied sub. nom. California v. Anderson, 406 U. S. 958 (1972).

The actual physical and psychological pain of execution itself is immeasurable. However, there is a conflict of opinion regarding whether or not electrocution produces instantaneous loss of consciousness. One observer concluded, "I do not believe that anyone killed by electrocution dies instantly, no matter how weak the subject may be." Comment, The

11

Death Penalty Cases, 56 CALIF. L. REV. 1268, 1339 (1968), quoting Prof.
Rota in SCOTT, THE HISTORY OF CAPITAL PUNISHMENT 219 (1950). Justice
Brennan wrote, "Although our information is not conclusive, it appears
that there is no method available that guarantees an immediate and
painless death." Furman, supra, at 287 (Brennan, J., concurring). The
recent execution of John Evans in Alabama required three (3) separate
thirty (30) second jolts of electricity over a fourteen (14) minute
period before Evans was pronounced dead. This is rather grisly support
for the contention that death is not instantaneous. See Exhibit attached
hereto and made a part hereof.

A convicted felon suffers extreme mental and physical anguish in
anticipation of his execution. "The tremendous mental strain of insecurity
approaching a foreordained death is unique to the condemned man." Note,
Mental Suffering under Sentence of Death: A Cruel and Unusual Punishment,
57 IOWA L. REV. 814, 830 (1972).

In order to uphold the constitutionality of punishment which inflicts
such suffering and absolutely extinguishes all rights, the State of Ohio
must advance a substantial justification to demonstrate that the death
penalty is not disproportionate or unnecessary and is not, therefore
cruel in a constitutional sense. See People v. Anderson, supra. See
also, Furman, 408 U. S. at 331-32 (Marshall, J., concurring), Rudolph v.
Alabama, 375 U. S. 889, 891 (1963) (Goldberg, J., dissenting). Defendant
contends the required showing is that of a compelling state interest.
The State of Ohio must demonstrate to this court that imposition of the
death penalty under the new Ohio statute serves a compelling state
interest and that its use is the least restrictive means toward furtherance

of a permissible goal. As was hereinbefore mentioned, any societal

interests can be achieved by a less drastic means than death. The death

penalty authorized by Sections 2929.02, 2929.022, 2929.03 and 2929.04

therefore constitutes cruel and unusual punishment and should be condemned

as violative of the Eighth Amendment to the United States Constitution

and Article I, Section 9 of the Ohio Constitution.

> III.     THE DEATH PENALTY IS ARBITRARILY AND
> FREAKISHLY INFLICTED, CONSTITUTING A
> DENIAL OF EQUAL PROTECTION OF THE LAWS
> UNDER THE EIGHTH AND FOURTEENTH
> AMENDMENTS TO THE UNITED STATES
> CONSTITUTION AND ARTICLE I, SECTIONS
> 9 AND 16 OF THE OHIO CONSTITUTION.

> A.   PAST EXPERIENCE IN THE NATION AND OHIO ESTABLISHES
> A PATTERN OF ARBITRARY AND DISCRIMINATORY
> APPLICATION OF THE DEATH PENALTY.

The pattern of arbitrary and capricious applications of the death

penalty was quite apparent to members of the court in Furman v. Georgia,

408 U. S. 238 (1972), as Mr. Justice Brennan, concurring, at 293,

stated:

> . . . when a country of over 200 million people
> inflicts an unusually severe punishment no more
> than 50 times a year, the inference is strong
> that the punishment is not being regularly and
> fairly applied. To dispel it would indeed require
> a clear showing of non-arbitrary infliction.

Of course, no such showing was, or could be made. See Bowers and Pierce,

Arbitrariness and Discrimination in post-Furman Capital Statutes, Crime

and Delinquency, 563, 575-587, October, 1980, Greenberg, Capital

Punishment As A System, 91 YALE L.J. 908 (1982).

13

The court in Gregg v. Georgia, 428 U. S. 153 (1976), and its companion cases adopted the view that if sentencing discretion was adequately guided by specific and detailed standards, and adequate appellate review was provided, the death penalty could be imposed in a non-arbitrary and non-capricious fashion. Four years after Furman, the Court had affirmed the capital sentencing statutes which had been established in Georgia, Florida, and Texas, as being constitutionally sufficient "on their face" to meet these objectives. Gregg, 428 U. S. at 198 (plurality opinion); Proffitt v. Florida, 428 U. S. 242, 253 (1976) (plurality opinion).

However, a recent statistical study of all persons sentenced to death in Georgia, Ohio, and Florida (from 1973-1976), and Texas (from 1974-1976), representing approximately seventy per cent of the people on the nation's post-Furman death row in 1976, concluded that:

> . . . differential treatment by race of offender and victim has been shown to persist post-Furman to a degree comparable in magnitude and pattern to the pre-Furman period. It is not that the new statutes have failed to eliminate all or most of these racial differences; it is rather, that they have failed to alter in any substantial way the cumulative pattern of differential treatment by race that was present under the now unconstitutional pre-Furman capital statutes.

Bowers and Pierce, supra, at 629.

In particular, "black killers and the killers of whites [were found to be] substantially more likely than others to receive a death sentence" in all four states with the "race of victim tend[ing] to overshadow race of offender as a basis for differential treatment." Id., at 595.

Ohio's experience with application of the death penalty was no

14

different than in Georgia, Florida or Texas, (although the chances of a
death sentence were greater overall than in the other three states, most
likely because of our quasi-mandatory law, later struck down in Lockett
v. Ohio, 438 U. S. 596 (1978). Of 173 blacks who killed whites in Ohio
from 1973-1976, forty-four (25.4%) received the death penalty. Yet, of
forty-seven whites who killed blacks, none received the death penalty.
Id., Table 2, at 594. In all, thirty per cent of those who killed
whites received the death penalty, while only 1.7% of those who killed
blacks received similar punishment. Id. This may be even more intri-
guing when one considers the statute was quasi-mandatory -- how could
one obey it and reach such disparity, unless the judges and prosecutors
(the sentencing and charging decision-makers) were rendering discrimi-
natory decisions?

Under Ohio's current law this pattern is not significantly changed.
Of the first thirteen persons sentence to death, nine were convicted of
killing whites. One (1) was convicted of killing a black police officer,
One (1) was convicted of killing two blacks and a white. Two (2) were
convicted of killing blacks.

As one long-time authority on the death penalty has put it:

> The conclusion is inescapable that the death penalty
> is reserved for those who kill whites, because the
> criminal justice systems in these states simply do
> not put the same value on the life of a black person
> as it does on the life of a white.

Statement of Dr. Hugo A. Bedau, "To Establish Rational Criteria for the
Imposition of Capital Punishment: Hearings on S. 1382 Before the Subcomm.
on Administrative Practice and Procedure of the Senate Judiciary Committee,"
9th Cong., 2nd Sess. 25 (1978). Other authorities also question the

15

success of the post-Furman statutes "in reducing the discretion which leads to a disproportionate number of non-white offenders being sentenced to death." M. Reidel, Discrimination in the Imposition of the Death Penalty: A Comparison of the Characteristics of Offenders Sentenced Pre-Furman and Post-Furman, 49 Temple L.Q. 261, 282 (1976).

These studies establish that past experience with death penalty laws in this state and others is fraught with discrimination. Considering that Ohio's new capital sentencing provisions are patterned after those studied, and that Ohio's own experience is that of racially-discriminatory application of the death penalty within a quasi-mandatory scheme, it would appear that such arbitrariness and discrimination will inevitably persist under a statute which gives even freer consideration of sentence to the trier of fact.

    B.    ARBITRARY AND CAPRICIOUS APPLICATIONS OF THE DEATH PENALTY WILL PERSIST BECAUSE OF THE UNCONTROLLED DISCRETION OF THE PROSECUTOR.

    1.    Constitutional Constraint on Discretion.

The Eighth Amendment, as construed in Furman, does not merely forbid the vesting of unbridled discretion in the capital jury, it forbids any arbitrary imposition of capital punishment, whatever the source or mechanism of the arbitrariness, and no matter what particular form the action may take. See Gregg, 428 U. S. at 188; Woodson v. North Carolina, 428 U. S. 280, 303 (1976); Roberts v. Louisiana, 428 U. S. 325, 344 (1976).

The actual implementation of the death penalty under the new Revised

16

Code provisions inevitably involves the exercise of a broad range of uncontrolled discretion by prosecuting attorneys. As long ago as 1931, the Wickersham Commission reported that "[t]he Prosecutor [is] the real arbiter of what laws shall be enforced and against whom . . ." National Commission on Law Observance and Enforcement, Report on Prosecution, 19 [1931]. Since that time, the discretion exercised by other authorities (police in charging, judges in sentencing) "[has] contracted [while the discretionary powers] of prosecutors [has] expanded," "concentrat[ing] [even] more discretion in an office that already is unique in its unfettered power." Vorenberg, Decent Restraint of Prosecutorial Power, 94 Harv. L. Rev. 1521, 1522, 1573 (1981).

"[Discretion] must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." Gregg, 428 U. S. at 189. Yet, the prosecutor has acquired "virtually unlimited control over charging [,] inconsistent with a system of criminal procedure fair to defendants and to the public." Vorenburg, supra, 1 at 1525. Extensive studies demonstrate this discretion in choosing individuals to prosecute and what offenses to charge them with is fraught with the risk of, and in actuality, results in, invidious, arbitrary discrimination. See J. Ely, Democracy and Distrust, 97, 177 (1980).

This virtually unlimited discretion over charging decisions also fosters an improper individualized determination of the appropriateness of the death sentence. Recent Supreme Court cases stress that once a defendant becomes eligible for the death penalty, there must be an individualized determination of whether he should be sentenced to death.

17

Zant v. Stephens, ___ U. S. ___, 103 S. Ct. 2733, 2743-2744 (1983);
Barclay v. Florida, ___ U. S. ___, 103 S. Ct. 3418, 3428 (1983).
It is equally important for there to be a consistent individualized
determination of death penalty eligibility through constraints on the
indictment process. In Ohio, however, no such fair and consistent
determination is made. Whether or not one is charged under a death
penalty specification is largely a function of where a defendant is
charged, not of the circumstances of the crime and the character of the
individual. Cuyahoga County, containing only 14% of the population of
Ohio has handed down 60% of Ohio's death penalty indictments.

Furthermore, no independent review of the propriety of the charging
decision is conducted. No judicial body considers the appropriateness
of charging decisions. Yet in Zant and Barclay the Supreme Court has
emphasized the importance of meaningful appellate review in death
penalty cases. Appellate review at the charging stage has as fundamental
an effect on the defendant's rights as review of the sentencing decision.
Ohio provides no such guarantee of the defendant's rights, however, and
prosecutors are free to charge as they please, without constraint.

A three judge panel of the Lucas County Court of Common Pleas
addressed this question of the unbridled discretion of the prosecutor
and stated that the prosecutor should present all of his evidence to the
Grand Jury for its determination on whether to charge a death penalty
specification:

> We believe it should be mandatory that prosecutors
> apprise a grand jury considering an aggravated
> murder case, where there is a possibility of a

18

death sentence, of any standard or criteria that
may be established either by rule or legislation.
Moreover, along with such instruction, a
prosecutor should be required to present any and
all evidence that he may have in his possession
that may have an effect on the decision of the
Grand Jury as to whether to charge a specification
to the count of aggravated murder.

It is this Court's opinion that a procedure
as suggested herein, or one similar thereto,
would dampen the claim of "selective prosecution
in capital cases and relieve the courts of count-
less hours in reading, hearing and deciding motions
addressed to that question. State v. Grosjean
(Lucas Cty. Common Pleas No. CR-82-6155) (1983).

In effect, Ohio's system is so designed as to permit a prosecutor
to side-step procedural safeguards of recent Supreme Court decisions by
allowing arbitrary charging decisions that work unfairness on defendants
before the safeguards which apply at trial begin to operate.

2.  Non-Application of Constraints in Ohio

In Ohio, only two constraints, extremely rarely, if ever, applied,
exist on this discretion.  The equal protection clause of the federal
(and state) constitution will not preclude the "conscious exercise of
some selectivity in enforcement," but will bar selectivity if the
defendant meets his "heavy burden" of showing "intentional or purposeful
discrimination" on the basis of "impermissible considerations [such] as
race, religion, or the desire to prevent his exercise of constitutional
rights." State v. Flynt, 63 Ohio St.2d 132, 134 (1980), citing Snowden
v. Hughes, 321 U. S. 1, 8 (1944) and other cases.  Problems of proof of
this nature are considerable, see Vorenberg, supra, at 1539-1542.

19

IMAGED

Another option is Section 309.05 of the Revised Code of Ohio which provides for removal of a prosecutor for "willful and wanton neglect or gross misconduct." No other controls appear to be applied to the exercise of prosecutorial discretion in this state. See State v. Hopkins, 69 Ohio St.2d 80, 84 (1982) (J. Holmes and W. Brown concurring in the judgment of conviction, despite a "sincere belief that this case presents an instance of prosecutorial overkill, a circumstance which should not be furthered by our law enforcement officials.").

Counsel contends that this minimal review of prosecutorial discretion, in the context of the capital sentencing statutes, will inevitably lead to capricious and arbitrary decisions in charging. This is the expectation held for enforcement of death penalty statutes across the country generally. See C. Black, Capital Punishment: The Inevitability of Caprice and Mistake (1974); Zimring, Eigen & O'Malley, Punishing Homicide in Philadelphia Perspectives on the Death Penalty, 43 U. Chi. L. Rev. 227 (1976); Note, Discretion and the Constitutionality of the New Death Penalty Statutes, 87 Harv. L. Rev. 1690 (1974); Note, Capital Punishment Statutes After Furman, 35 Ohio St. L. Rev. 651 (1974).

As earlier noted, "the presence of differential treatment by race" in Ohio's post-Furman application of the death penalty "is unmistakable." Bowers and Pierce, supra, at 597. Unfortunately, due to the invalidation of the sentencing scheme by the Lockett decision, the Bowers and Pierce study did not proceed further regarding Ohio to determine whether this differential treatment could be the results of legally relevant differences in the kinds of crimes committed by and against blacks and whites. Id., at 596-597. However, the further studies of Texas, Florida, and Georgia

with similar patterns of differential treatment determined that the arbitrariness of race was not attributable to legally relevant differences in the crimes committed, Id., at 629-632, and there is no reason to believe Ohio's experience would differ, particularly when the statistical disparity is considered in the context of what was later deemed to be a quasi-mandatory death sentencing statute. While the Bowers and Pierce study may possibly be inadequate to meet the heavy burden to show deliberate intentional discrimination on the basis of race existed in Ohio for traditional equal protection purposes, it certainly raises a substantial risk that arbitrary and capricious application of the death penalty has existed in the past and will occur in the future in this state.

   B.   Specific Ohio Statutory Provisions Increasing Discretion

   Further, a substantial risk of arbitrary and capricious application of the death penalty inheres in the structure of Ohio's criminal homicide statutes, and the virtually unreviewed and unreviewable charging decisions made within it. There are several aspects of the criminal homicide statutes which offer overly great potential for discretionary decision-making by the prosecutor, and which, in turn, may be abused.

   One may look first at Section 2929.04 of the Revised Code of Ohio setting forth aggravating circumstances. As is discussed further in Section III (A) of this Motion, the aggravating circumstance of aggra-vated murder in the course of kidnapping Section 2929.04(A)(7) of the Revised Code of Ohio is constitutionally overbroad as it could reasonably apply to any purposeful killing. "Purposely causing the death of another," is, however, all that is required for murder under Section 2903.02 of the

21

Revised Code of Ohio.  A prosecutor faced with a fact situation indicating a purposeful killing and wishing to charge for the mental state and act is thus totally free to choose among three different levels of homicide charges:  (1) murder, under Section 2903.02 of the Revised Code of Ohio (carrying an indefinite penalty of fifteen years to life, Section 2929.02(B) of the Revised Code of Ohio, and capable of diminution by Section 2967.19 of the Revised Code of Ohio; (2) aggravated murder under Section 2903.01(B) of the Revised Code of Ohio (felony murder) without specification of the kidnapping [carrying a penalty of life imprisonment with parole eligibility after serving twenty years of imprisonment, Section 2923.03(A) of the Revised Code of Ohio, and capable of diminution by Section 2967.19 of the Revised Code of Ohio]; or (3) aggravated murder under Section 2903.01(B) of the Revised Code of Ohio with specifications of kidnapping under Section 2929.04(A)(7) of the Revised Code of Ohio [carrying a penalty of death, or life imprisonment for twenty or thirty full years, not subject to diminution by Section 2967.19 of the Revised Code of Ohio, Section 2967.23(D) and (E) of the Revised Code of Ohio.]

A particular prosecutor could choose, on the basis of one set of facts, to charge on simple murder, while on the same facts, another could choose aggravated murder with the kidnapping specification, and there is no guidance or control over this decision.

Another related point of difficulty is the ability of the prosecutor to choose between aggravated murder under Section 2903.01(B) of the Revised Code of Ohio, with an automatically available felony-murder specification, needing no further facts under Section 2929.04(A)(7), and

22

a charge of involuntary manslaughter under Section 2903.04(A) of the
Revised Code of Ohio.  Involuntary manslaughter requires "causing the
death of another as a proximate result of the offender's committing or
attempting to commit a felony", and any set of facts which could yield
probable cause for a Section 2903.01(B) of the Revised Code of Ohio
aggravated (felony) murder prosecution would equally yield probable
cause for a Section 2903.04(A) of the Revised Code of Ohio prosecution.
Although the aggravated (felony) murder provision requires a particular
mental state and specifies certain felonies, there is no bar to (or
control over) a prosecutor's decision to charge on the more generalized

manslaughter offense, though purpose and a specified felony
are also present.  See Section 2901.22(E) and Section 2901.21(A) of
the Revised Code of Ohio.

Similarly, the prosecutor could choose to prosecute for murder
under Section 2903.02 of the Revised Code of Ohio "purposely causing the
death of another", although the facts were present to find "prior calculation
and design" under aggravated murder, Section 2903.01(A) of the Revised
Code of Ohio, and even specifications under Section 2929.04(A) of the
Revised Code of Ohio as well.

Again, an effect of the statutory system is to increase this unbridled
discretion and allow the prosecutor to avoid the procedural safeguards of
a consistent, individualized determination based on the character of the
defendant and the circumstances of the case and of meaningful appellate
review.  The uncircumscribed discretion of the prosecutor in charging
before trial dissipates the effect of these safeguards once they do apply
at trial.



4. Economic Discretion

The Ohio legislature apparently recognized another aspect of discretion was inherent in its capital sentencing legislation. In June, 1981, State Senator Richard Finan, principal senate sponsor of the death penalty bill, addressed a meeting of the Ohio Common Pleas Judges Association. Senator Finan commented that, because of the complexity and expense of administering the act, the new law should be reserved for relatively few exceptional cases. Clearly, the intent of some legislators is that the act will be selectively enforced by prosecutors, who are expected to reconcile expenses of administration with the needs of the public. See National Advisory Commission, The Courts, Section 1.1 (1973). It would appear that wealthier counties or those in which administrative difficulties can be overcome or alleviated will prosecute a greater proportion of death penalty cases, while other counties will allow similar offenses to be processed in a non-capital manner. This has led to disparate geographical distribution of capital prosecutions without legitimate relation to the culpability of the offender. Figures on Death Penalty indictments indicate that of the first 186 indictments, 110 were from Cuyahoga County. Although Cuyahoga County is the largest county in the state, it is clear that neither 60% of the people, nor 60% of the murders occur there. In fact, only 14% of the state's population resides in Cuyahoga County. Underlining this disparity is that of the thirteen death sentences to date, five are from Cuyahoga County.

5. Conclusion

The consequence of this unfettered prosecutorial discretion is that different prosecuting attorneys may well utilize different standards in

24

deciding whether to initiate capital or non-capital prosecutions and
whether to multiply the likelihood of a death verdict. Without any
guidance whatsoever, a particular prosecutor is free to make the decision
whether aggravating circumstances will or will not be charged in a case
in which the evidence may warrant finding them. He may, in fact, "without
violating [his] . . . trust or any statutory policy . . . refuse to
[seek] . . . the death penalty no matter what the circumstances of the
crime." Furman, 408 U. S. at 314 (concurring opinion of Mr. Justice
White).

As with the death penalty statutes struck down in Furman, it is not
necessary to conclude that capital sentencing statutes will be intentional-
ly administered "with an evil eye and unequal hand," Yick Wo v. Hopkins,
118 U. S. 356, 373-374 (1886). The point rather is that their implementat
is necessarily and unavoidably arbitrary, see Black, Charles, Capital
Punishment: The Inevitability of Caprice and Mistake (1974); Greenberg,
Capital Punishment As A System, 91 YALE L. J. 908 (1982), since no standar
exist to regularize the exercise of discretion. Some defendants will
not be charged with a capital offense, while other defendants, probably
guilty of similar conduct, are prosecuted for non-capital offenses.

Although the charging decision is quite literally the difference
between life and death, that decision is a completely uncontrolled,
discretionary choice of the prosecuting attorney fraught with arbitrarines
and the potential for vindictiveness, and therefore the present capital
sentencing scheme violates the Eighth and Fourteenth Amendments, as well
as the state constitution.

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 300

C. SECTION 2929.03 OF THE REVISED CODE OF OHIO FAILS TO PROVIDE A MEANINGFUL BASIS FOR DISTINGUISHING BETWEEN LIFE AND DEATH SENTENCES, AS IT DOES NOT EXPLICITLY REQUIRE THE JURY, WHEN IT RECOMMENDS LIFE IMPRISONMENT, TO SPECIFY THE MITIGATING CIRCUMSTANCES FOUND, OR TO IDENTIFY ITS REASONS FOR SUCH SENTENCE.

The Court of Appeals and the Ohio Supreme Court are statutorily, under Section 2929.05(A) of the Revised Code of Ohio, and constitutionally, under the Eighth and Fourteenth Amendments, and Article I, Sections 9 and 16, required to determine whether a particular sentence of death is excessive or disproportionate to that imposed in similar cases:

"[the proportionality review] serves as a check against the random or arbitrary imposition of the death penalty."

State, supra, at 204.

While Ohio's capital sentencing provisions require collection of certain data relating to capital cases to facilitate this review, i.e., the entire records of cases in which the death penalty is imposed, Section 2929.03 G) of the Revised Code of Ohio, and information as to each capital indictment, [including name of defendant, court, date of capital indictment, disposition (by plea, dismissal, or trial), and sentence imposed] Section 2929.021 of the Revised Code of Ohio, there is a fundamental omission in the collection scheme. This flaw arises from the failure of the jury when recommending life imprisonment to identify the mitigating factors found to exist, and why these outweigh the aggravating factors.

Whenever a sentence of death is imposed, i.e., after a jury's recommendation of same and upon the trial judge's own determination that

the sentence is proper, or upon the panel of three judge's determina-

tion, the judge or the panel is required to:

> state in a separate opinion its specific findings as
> to the existence of any of the mitigating factors set
> forth in [R.C. 2929.04], the existence of any other
> mitigating factors, the aggravating circumstances that
> the offender was found guilty of committing, and the
> reasons why the aggravating circumstances the offender
> was found guilty of committing were sufficient to
> outweigh the mitigating factors.  R.C. §2929.03(F).

A similar opinion is prepared by the court or panel when it imposes

life, identifying and explaining why the mitigating circumstances out-

weighed the aggravating factors.  Section 2929.03(F) of the Revised Code

of Ohio.  These opinions must be forwarded to the Court of Appeals and

to the Ohio Supreme Court for the judgment in the case to be final.

Section 2929.03(F) of the Revised Code of Ohio.

Information as to cases in which life imprisonment was imposed

after a capital sentencing hearing is essential for the reviewing Courts

to carry out their responsibility of assuring that excessive, dispro-

portionate sentences of death are not imposed.  Baldus, Pulaski, Woodworth

and Kyle, "Identifying Comparatively Excessive Sentences of Death:  A

Quantitative Approach", 33 Stan. L. Rev. 1, 7, n. 15 (1980); Woodson,

supra, at 316 (Justice Rehnquist, dissenting); and McCaskill v. State,

344 So.2d 1276, 1280 (Fla., 1977).

However, as the jury's recommendation of life is binding, and no

similar opinion is required to be prepared by the jurors setting forth

the mitigating factors found and the reasons why one outweighed the

other, there is no means of accurately comparing a case in which a

binding jury life recommendation is made to that in which a death

sentence is imposed.

While a finding of aggravation is necessarily made and specified by the jury in the guilt phase, this finding cannot substitute for the life recommendation of the jury as it cannot serve to distinguish among death-eligible defendants or explain why some of them are sentenced to the extreme penalty while others are not.

Under the Ohio jury sentencing scheme, no mitigating factor which is relevant to that life or death decision-making process is required to be identified or specified by the jury in its decision imposing life or death. The jury may be basing its decision on a mitigating factor specified in Section 2929.04(B) of the Revised Code of Ohio, or may be basing its decision on a non-enumerated but "relevant" mitigating circumstance under Section 2929.04(B)(7) of the Revised Code of Ohio, or may be basing its decision on the fact that the defendant is a wealthy, white, Anglo-Saxon, Protestant. The reviewing courts will have no way of discerning the basis for their decision and no means of determining that a particular death penalty is disproportionate because juries tend to be lenient when a particular set of facts are present, since there will be no factual accounting for the jury's decision. The jury's reasons for choosing a sentence of life are unstated, opaque, and unfathomable -- a situation of unbridled discretion intolerably similar to that existing under pre-Furman laws.

A requirement that the jury act in formulating or ascribing reasons for its decision requires the jury to focus and guide its thinking, precisely the aim of Gregg and Woodson. Juries are surely capable of such action: "[I] see no reason to believe that juries are not capable

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 303

of explaining, in simple, but possibly perceptive terms, what facts they have found and what reasons they consider sufficient to take or grant a human life". McGautha v. California, 402 U. S. 183, 311 (1971) (J. Brennan, dissenting).

In Eddings v. Oklahoma, ____ U. S. ____, 102 S. Ct. 869, 874 (1982), the Court stated that the Constitution mandated both "measured, consistent application [of the death penalty] and fairness to the accused", and again that "capital punishment [must] be imposed fairly, and with reasonable consistency, or not at all". (Emphasis added). These aims of consistency and fairness cannot be achieved within the present Ohio capital sentencing scheme. With A identification and specification of reasons, arbitrary and capricious decisions are masked by jury secrecy and the general effect of a binding life recommendation. Efforts of appellate courts to compare a binding life recommendation decision with a death decision in another case are futile and meaningless without written findings from the jury as to their life decisions.

The Supreme Court implicitly recognized the existence of a necessary relation between written findings and meaningful appellate review in Proffitt v. Florida, 428 U. S., at 250-1. Without written findings, no basis for meaningful appellate review exists. The Court in Zant v. Stephens found that independent appellate review comparing similar cases where the death penalty was imposed and, significantly, where it was not imposed was one of the essential reasons why Georgia's statutory death penalty scheme was constitutional. 103 S. Ct., at 2744, 2745. Yet in Ohio no comparison of cases is possible where the jury imposes a life sentence because there are no written findings to serve as a

basis for comparison. Since no meaningful comparison of such cases is possible, no meaningful appellate review can be undertaken. Consequently, Ohio loses this procedural safeguard essential to the constitutionality of its death penalty scheme.

An opinion setting forth the mitigating factors found and the reasons why these outweighed the aggravating circumstances may be required to be prepared by the judge after a jury recommendation of life. This is based on a statutory interpretation that Section 2929.03(D)(1) of the Revised Code of Ohio states "the court shall impose the [life] sentence recommended by the jury" upon that recommendation, and that Section 2929.03(F) of the Revised Code of Ohio requires that "the court or panel, when it imposes life imprisonment under [Section 2929.03(D) of the Revised Code of Ohio] prepare an opinion. Even if such an opinion is prepared by the judge, however, counsel questions its adequacy as an alternative. Although the judge will have been present to hear the testimony and to observe the demeanor of the witnesses, he can only hypothesize or speculate as to why the jury came to its life sentence recommendation. He is not present during deliberations, the jury is not required to explain its verdict to him, and thus his "opinion" is likely to be mere guesswork. This opinion is inadequate to assure meaningful rational distinctions between cases. Furthermore, it deprives the sentencing process of jury input as arguably extenuating or mitigating circumstances since the judge may omit recitation of a factor significant to the jury's decision. The jury must be required to provide an accurate description of its decision-making process but the Ohio statute does not allow for this protection.

IMAGED

D. SECTIONS 2929.03, 2929.04 and 2929.05 OF THE REVISED
CODE OF OHIO VIOLATE THE EIGHTH AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION AND
ARTICLE I, SECTIONS 9 AND 16 OF THE OHIO CONSTITUTION
BY FAILING TO REQUIRE THE JURY TO DECIDE THE
APPPOPRIATENESS OF THE DEATH PENALTY.

Under Section 2929.05 of the Revised Code of Ohio, courts affirming

a death sentence in Ohio are required to find that death is the only

appropriate remedy. The original sentencer has no such requirement.

A finding of appropriateness is constitutionally required. Coker

v. Georgia, 433 U. S. 584 (1977), in Coker, the Court stated, at 592,

that the death penalty is unconstitutional "if it makes no measurable

contribution to acceptable goals of punishment." The death penalty is

unconstitutional if, in a particular case, it is not the only penalty

that will appropriately serve the state's punishment goals.

The Court consistently refers to the "need for reliability in the

determination that death is the appropriate punishment in a given case."

Woodson v. North Carolina, 428 U. S. 280, 305 (1976) (emphasis added,)

Lockett v. Ohio, 438 U. S. 586, 604 (1978), Zant v. Stephens, ___ U. S.

___, 103 S. Ct., at 2747, Barclay v. Florida, ___ U. S. ___, 103 S. Ct

3418, 3430 (1983) (J. Stevens with J. Powell, concurring in the judgment)

California v. Ramos, ___ U. S. ___, 103 S. Ct. 346, 3456 (1983).

Merely concluding that the aggravating circumstances outweigh those

in mitigation may be inadequate, as a jury might still conclude that "a

comparison of the aggravating factors with the totality of the mitigating

factors leaves it in doubt as to the proper penalty," i.e., in doubt as

to whether death is the appropriate punishment in a specific case.

81

Smith v. North Carolina, ___ U. S. ___, 103 S. Ct. 474, 74 L. Ed.2d
622, 623 (J. Stevens, dissenting from denial of certiorari).

Whether the "ultimate penalty is warranted," Proffitt v. Florida,
4238 U. S. 242, 253 (1976) (emphasis added), must at times be considered
by the jury in a manner analytically separate from the legislature's
choice as to the significance of particular facts, labeled as aggravating
circumstances.  The jury, and sentencing judges, "maintain a link between
contemporary community values and the penal system." Gregg v. Georgia,
428 U. S. 153, 190 (1976).

Thus, one of the constitutionally required functions of a death
penalty scheme is that the aggravating circumstances "reasonably
justify the imposition of a more severe sentence on the defendant
compared to others found guilty of [aggravated] murder." Zant v.
Stephens, ___ U. S. ___, 103 S. Ct., at 2743. An opportunity for
the jury to find the death penalty inappropriate when "statutory
aggravating circumstances exist, and arguably outweigh . . . mitigating
circumstances, but the [aggravating circumstances] are insufficiently
weighty to support the ultimate penalty" "helps to fulfill [this]
constitutionally required function." Barclay v. Florida, ___ U. S. ___,
103 S. Ct., at 3431-3432, and n.7 (J. Stevens, with J. Powell, concurring
in the judgment).  See also Barclay, at 3426 and n.12 (plurality opinion
discussion of Lewis v. State, 398 So.2d 432 (Fla., 1981)).  Thus, a jury's
"opposition to a particular aggravating circumstance is a legitimate
consideration for imposing a life sentence, [as it] represent[s] factors
which may call for a less severe penalty. Lockett v. Ohio, 428 U. S. 586,
605 (1978)." "[The Ohio statute cannot be interpreted] to in effect

32

instruct the sentencer to ignore" this fact calling for a less severe penalty. Ledewitz, "The Requirement of Death: Mandatory Language in the Pennsylvania Death Penalty Statute", 21 Duq. L. Rev. 103, 139-140, 1982). When an aggravating factor is present and no facts in mitigation are presented, for example, even though the aggravating factors outweigh the mitigating factors the sentencing body "must [still] determine whether the aggravating circumstances . . . are of such value, weight, importance, consequence, or significance as to be sufficiently substantial to call for the imposition of the death penalty." State v. McDougall, 301 S.E.2d ___, ___ (N.C. Sup. Ct., 1983). See also State v. Watson, 423 So. 2d ___, ___ (La. Sup. Ct., 1982), King v. Mississippi, ___ U. S. ___, 33 Crim. L. Rep. ___ (U. S. May 2, 1983) (J. Marshall, dissenting from the denial of certiorari), Note, "Capital Punishment in Ohio, 31 Cleve. St. L. Rev. 405, 410-411 (1982).

In jurisdictions without a requirement of balancing of aggravating and mitigating factors, a determination of the propriety of the death sentence is made by broad discretion being given the sentencer. See Spinky v. Zant, 661 F.2d 464 (5th Cir., 1981), and cases cited therein.

The jury must be free to determine whether or not death is the appropriate punishment. Barclay v. Florida, 103 S. Ct. at 3424, quoting California v. Ramos, ___ U. S. ___, 103 S. Ct. 3446, 3456 (1983). The jury must make this decision and must make it in a fashion that will allow it to be reviewed objectively at the appellate level. Due process requires that the same standards apply at both levels. Arbitrary decisions are likely at the appellate level if courts make assumptions as to what the sentencer considered.

The original sentencer must make a finding that the death penalty is appropriate in a particular case to allow appellate courts the objective determination of the grounds of such a finding. Arbitrary decisions will result where such an original finding must be made on appeal.

Therefore, the sentencer must be required to state findings that the death penalty is the appropriate penalty where found, or alternatively, the statutory procedure in Ohio for the imposition of such penalty must be found constitutionally infirm in failing to assure that death is the only appropriate punishment.

E.   SECTIONS 2929.021, 2929.03 AND 2929.05 OF THE REVISED CODE OF OHIO FAIL TO ASSURE ADEQUATE APPELLATE ANALYSIS OF EXCESSIVENESS AND DIS-PROPORTIONALITY OF DEATH SENTENCES, AND THUS VIOLATE THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTIONS 9 AND 16 OF THE OHIO CONSTITUTION.

The Revised Code of Ohio, through Sections 2929.021 and 2929.03, apparently requires reporting of some data to the Court of Appeals and the Ohio Supreme Court although as discussed above, there is a critical omission of a written life or death recommendation report from the jury. Counsel also has substantial doubts as to the adequacy of the information received after guilty pleas to lesser offenses, or after charge reductions at trial. Section 2929.021 of the Revised Code of Ohio presents only minimal information on these cases, and there is no assurance that further information will be required by the Clerk of the Supreme Court.

34

Much more data is necessary to make an adequate comparison in these and other instances. For an example of other information to be collected, see State v. White, 395 A.2d 1082, 1094, n. 8, and Appendix B at 1100-1106 (Del. 1978).

The question then arises as to whether this information will be used by the Courts, and how the expected comparative evaluation is to be carried out, and what documentation there will be of such evaluation, if performed, and whether counsel will have had access to the data for purposes of argument or challenges to its accuracy.

Section 2929.05 of the Revised Code of Ohio states simply:

[T]he Court of Appeals and the Supreme Court shall determine whether the sentence of death is appropriate. In determining whether the sentence of death is appropriate, the Court of Appeals and the Supreme Court shall consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases.

There is no specific mandate that the Courts actually consider all of the data of which other provisions require collection, and which are essential to a disproportionality inquiry. The courts must "take [their] review responsibilities seriously", Gregg, supra, at 205, and actually engage in a comparative analysis. Recent Supreme Court cases indicate that the standard for review is one of careful scrutiny. Zant v. Stephens, 103 S. Ct., at 2747; Barclay v. Florida, 103 S. Ct., at 3428. Review must be based on the comparison of similar cases, Zant, at 2744, 2750, and must ultimately focus on the character of the individual and the circumstances of the crime. Meaningful comparison is possible only if all data in the record is considered.

There has been considerable criticism of the evaluation actually

engaged in by those state Supreme Courts studied, including Georgia, the subject of the Gregg cite above. See Dix, "Appellate Review of the Decision to Impose Death," 68 Geo. L. J. 97, 158-160 (1979), and Baldus, supra, at 5-6, n. 13. Ohio did not take such responsibility seriously in the past, see Comment, "The Constitutionality of Ohio's Death Penalty," 38 Ohio St. L. J. 617, 656-657 (1977), although it recognized a constitutional duty at that time to engage in a disproportionality inquiry. This uncertainty as to how the Courts will actually use the data received creates a risk of arbitrary and capricious application of the death penalty. Ohio's death penalty scheme is unconstitutional without the guarantee of meaningful appellate review, a procedural safeguard necessary to the constitutionality of a death penalty system. Zant, ___ U.S. Ct., at 2744.

A related reason for this uncertainty is that the statute does not provide for, nor has the Ohio Supreme Court yet, to counsel's knowledge, arranged for employment of the resources (personnel, data collection and retrieval systems) to adequately catalogue, compile, and summarize the requisite data for this comparative evaluation. "Given the number of relevant factors, and the complexity of their interrelation, selecting similar cases becomes a monumental task whose size makes quantitative treatment particularly appropriate". Baldus, supra at 4. Yet it is still unclear if adequate administrative resources have been allocated to carry out this monumental task, and thus, the question arises whether it will be carried out at all. See White, supra, at 1094-1095.

There is also no statutory requirement that the Courts identify the types of cases considered, the particular cases considered, or submit written findings comparing these cases. The defense must be given

36

notice as to which factors the Court deems permissible and uses in comparison, so as to adequately form an argument as to why a particular sentence is disproportionate. See generally Morgan v. United States, 304 U. S. 1 (1938); Gonzales v. United States, 348 U. S. 407 (1955); Willner v. Committee on Character and Fitness, 373 U. S. 96 (1963).

The Ohio statutes also fail to assure that the first group of death sentences reaching the Court will be reviewed only when an adequate comparative base is obtained. Rather than delaying review of this issue, see, e.g. N. Car. Code §15A-2000(d)(2), the statute assures accelerated review. Section 2929.05(B) of the Revised Code of Ohio. Accelerated review is incompatible with the careful scrutiny required by Zant and Barclay. A careful comparison of cases can be made only if there is an adequate factual basis for comparison. Only by delaying review can a sufficient data base accrue.

Finally, there is no indication in the statute as to whether appellate defense counsel will have access to the data, so as to seek for and argue that particular cases are similar to that at bar, and the sentence is thus disproportionate. This access is essential, Baldus, supra at 69, Dix, supra at 160 and 123, on the basis of: (1) due process [for a fair and adequate opportunity to litigate the issues, Chambers v. Mississippi, 410 U. S. 484 (1973), Gardner v. Florida, 430 U. S. 349 (1977) [for an adequate opportunity to challenge the accuracy of the data, and rebut it]; (2) equal protection [for indigent defendant's right to assistance, Griffin v. Illinois, 351 U. S. 12 (1956)]; and (3) the Fourteenth Amendment right to effective assistance of counsel on an appeal of right. [See Jones v. Barnes, 103 S. Ct. 3308]

As the Ohio statutes are quite incomplete in these tracking aspects, there is a substantial risk that the constitutionally required dispro- portionality analysis will not, in fact, occur, and that sentences of death will thus be arbitrarily and capriciously imposed.

For all the reasons stated above, the Ohio capital sentencing provisions cannot withstand federal and state constitutional attack. There is a substantial risk of arbitrary and capricious imposition of the death penalty.

> II.  SECTIONS 2929.02, 2929.022, 2929.03, 2929.04
> AND 2929.05 OF THE REVISED CODE OF OHIO
> DEPRIVE THE CAPITALLY-CHARGED DEFENDANT OF
> DUE PROCESS OF LAW UNDER THE FOURTEENTH
> AMENDMENT AND ARTICLE I, SECTION 16, AND
> CONSTITUTE CRUEL AND UNUSUAL PUNISHMENT
> UNDER THE EIGHTH AMENDMENT AND ARTICLE I,
> SECTION 9, AS THESE PROVISIONS PERMIT
> IMPOSITION OF THE DEATH PENALTY ON A LESS
> THAN ADEQUATE SHOWING OF GUILT AND THE
> APPROPRIATENESS OF THE DEATH PENALTY.

In capital cases, the United States Supreme Court requires a greater degree of reliability in the conviction than in non-capital cases and that death is actually the appropriate sentence.

Traditionally "more" process has been afforded in death penalty cases because of the finality of the punishment.  Particularly, in Woodson v. North Carolina, 428 U. S. 305 (1976), the Court stated:

> Death, in its finality, differs more from life
> imprisonment than a 100-year prison term differs
> from one of only a year or two.  Because of that
> difference, there is a corresponding difference
> in the need for reliability in the determination
> that death is the appropriate punishment in a
> given case.   (Emphasis added.)

Similarly, in Lockett v. Ohio, 438 U. S. 586, 604 (1978), the court

38

called for "a greater degree of reliability when the sentence of death is imposed."

Most recently, the court has extended the need for greater reliability in capital cases to the guilt-determining process. In Beck v. Alabama, 447 U. S. 625 (1980), the Court struck down an Alabama statute which precluded instruction on lesser-included offenses in capital cases. The Court stated the statute:

> . . . would seem inevitably to enhance the risk of an unwarranted conviction.
>
> Such a risk cannot be tolerated in a case in which the defendant's life is at stake. * * * [W]e have invalidated procedural rules that tend to diminish the reliability of the sentencing determination. The same reasoning must apply to rules that diminish the reliability of the guilt determination. Beck, 447 U. S. at 637-638. (Emphasis added.)

Clearly, the Supreme Court will stringently evaluate guilt and sentencing practices in capital cases to determine if these meet the heightened need for reliability required by the due process clause. If a procedure "enhances the risk of an unwarranted conviction," it will be struck down, even though the same practice may be upheld in a non-capital case. See Id., fn. 14. In the following sections, specific arguments will be set forth regarding the inadequacies of the Ohio statutes.

1. Proof Beyond All Doubt is Required for Conviction

The proof beyond a reasonable doubt standard has been constitutionally required in criminal cases "to safeguard many from dubious and unjust convictions." In Re Winship, 397 U. S. 358, 363 (1970). This requirement exists because the "accused during a criminal prosecution has at stake interests of immense importance, both because of the possibility

30

that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction." Id. This standard of proof commands "the respect and confidence of the community in application of the criminal law." Id., at 364 (Emphasis added.) In Winship, the court was dealing with a juvenile facing a possible six years imprisonment and thus discussed the matter of deprivation of liberty under the Fourteenth Amendment due process clause and the need for proof beyond a reasonable doubt to reduce the margin of error in the guilt-determining process.

Given the interests at stake in a capital case, i.e., the loss of life as opposed to liberty (see Woodson earlier), and the necessity that the community "not be left in doubt whether innocent men are being condemned" (id.) irretrievably, the assessment of interests would appear to favor in the guilt-determining process a standard for taking life which reduced the margin of error "as much as humanly possible," i.e., to that beyond all doubt.

2. Ohio's Proof Beyond a Reasonable Doubt Standard

This proof beyond all doubt standard is essential in Ohio as Section 2901.05(D) of the Revised Code of Ohio is itself an insufficient definition for the present proof beyond a reasonable doubt standard. Our own proof beyond a reasonable doubt definition is constitutionally inadequate. Section 2901.05(D) of the Revised Code of Ohio reads as follows:

"Reasonable doubt" is present when the jurors after they have carefully considered and compared all the evidence, cannot say they are firmly convinced of

the truth of the charge.  It is a doubt based on reason and common sense.  Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt.  'Proof beyond a reasonable doubt' is proof of such a character that an ordinary person would be willing to rely and act upon it in the most important of his own affairs. (Emphasis added.)

Reasonable doubt had been previously defined in Section 2945.04 of the Revised Code of Ohio as follows:

. . . it is not a mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt.  It is the state of the case which, after the entire comparison and consideration of all the evidence leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction to moral certainty of the truth of the charge. (Emphasis added.)

Under the present statute, proof beyond a reasonable doubt is such proof that an ordinary person would be willing to rely and act upon it in his own most important affairs.  This willing-to-act definition of proof beyond a reasonable doubt has been generally rejected as stated in Scurry v. United States, 347 F.2d 468 (D.C. Cir., 1965), cert. den., 389 U. S. 883 (1967):

Being convinced beyond a reasonable doubt cannot be equated with being willing-to-act, ...in the more weighty and important matters of your own affairs. A prudent person called upon to act in an important business or family matter would certainly weigh the often neatly balanced considerations and risks tending in both directions.  But, in making and acting on a judgment after doing so, such a person would not necessarily be convinced beyond a reasonable doubt that he made the right judgment.  Human experience, unfortunately, is to the contrary.

The jury, on the other hand, is prohibited from

> convicting unless it can say beyond a reasonable doubt
> that defendant is guilty as charged. Thus, there is
> a substantial difference between a juror's verdict of
> guilt beyond a reasonable doubt and a person making
> a judgment in a matter of personal importance to him.
> To equate the two in the juror's mind is to deny the
> defendant the benefit of a reasonable doubt.

Scurry, 347 F.2d at 470 (Emphasis added.)

The present definition of "reasonable doubt" reduces the test for

the presence of reasonable doubt from an "abiding conviction to a moral

certainty" to a present firm conviction. This definition may fall below

the heavy constitutional standard required in a criminal procedure. It

is remarkably similar to the definition for "clear and convincing

evidence" provided by the Ohio Supreme Court in Cross v. Ledford,

161 Ohio St. 469, 477, 120 N.E.2d 118 (1954):

> Clear and convincing evidence is that measure or
> degree of proof which will produce in the mind of
> the trier of facts a firm belief or conviction
> as to the allegations sought to be established.
> It is intermediate, being more than a mere prepon-
> derance, but not to the extent of sure certainty
> as is required beyond a reasonable doubt as in
> criminal cases. (Emphasis added.)

The effect of the current Section 2901.05(D) of the Revised Code of

Ohio has been cogently analyzed in State v. Crenshaw, 51 Ohio App.2d 63

(1977). The Montgomery County Court of Appeals examined the changes

created by the new statute in altering the test for reasonable doubt

from a "moral certainty" to a "present firm conviction." The court

stated at p. 65:

> The changes in the substance of the definition of
> reasonable doubt reduce the degree of certainty
> required and eliminate the implication of a stead-
> fast certainty or conviction. The changes are not
> mere semantics or philosophical differences. They
> are significant. This significance lends itself to

a unique advantage to the state in its argument to
the jury and a disadvantage to the accused.
...(I)mportant affairs is the traditional test for
clear and convincing evidence, as required to set
aside important written instruments. A standard
based upon the "most important affairs of the average
juror" is lower than "an abiding conviction to moral
certainty" and reflects adversely upon the accused.

Winship described the standard in a manner which may conflict with
Ohio's present definition. There, the court noted the standard was to
be one which convinced the factfinder of guilt "with utmost certainty,"
at 364) and "impressed on the trier of fact the necessity of reaching a
subjective state of certitude," Id., at 363. Emphasis added.) Also,
... stated it would be a denial of due process if a person could
... guilty and criminally punished on the strength of the same
... as would suffice in a civil case." Id. at 363. Given the
utmost similarity of the Ohio definition in Section 2901.03 of the
Revised Code of Ohio to that of clear and convincing evidence, the Ohio
statute is constitutionally defective.

The Ohio Supreme Court considered this matter in State v. Nabozny,
54 Ohio St. 195 (1978) and concluded that the definition was not an
unconstitutional dilution of the State's requirement to prove guilt
beyond a reasonable doubt. The court relied on the need to provide
uniformity within the state courts (the definition is mandatory reading
in jury instructions) and the inherent difficulty it perceived in
defining the concept of reasonable doubt, as well as an argument that
the definition was similar to one utilized in Holland v. U. S., 348
U. S. 121, 140 (1954). However, the Scurry case reveals the problems in
attempted reliance on Holland, and although benefits are certainly

43

derived from a uniform mandated instruction, the definition chosen and provided in Section 2901.05 of the Revised Code of Ohio arguably fails to pass federal constitutional muster.

Recently the Sixth Circuit found, in a non-capital case, that the Ohio definitional instructions must be taken as a whole, and "although we may disapprove of the 'willing to act' language, . . .the instructions here, when taken as a whole, adequately convey the concept of reasonable doubt to the jury." Thomas v. Arn, 704 F.2d 865, 859 (6th Cir., 1983). Given the Supreme Court's mandate of greater reliability in capital cases, the Thomas decision cannot foreclose this constitutional contention.

As noted, when considering the guilt of an individual of a capital offense which may, in turn, subject him to the electric chair, reliability of the verdict is essential. Reliability cannot be assured utilizing Ohio's definition of proof beyond a reasonable doubt.

3. Proof Beyond All Doubt as to Guilt is Necessary Before the Death Sentence May Be Imposed

The Model Penal Code establishes an exclusion of the death penalty when the evidence does not meet a proof beyond all doubt standard (analogous to Ohio's treatment of age below eighteen) in Section 210.6:

Sentence of Death for Murder:
Further Proceedings to Determine Sentence

(1) Death Sentence Excluded. When a defendant is found guilty of murder, the Court shall impose sentence for a felony of the first degree if it is satisfied that. . .

   (f) although the evidence suffices to sustain the verdict, it does not foreclose all doubt respecting the defendant's guilt.

The comments to Section 210.6 make clear its purpose: "Where doubt of guilt remains, the opportunity to reverse a conviction on the basis of new evidence must be preserved, and a sentence of death is obviously inconsistent with that goal." Official Draft, at 134 (1980).

In one of the Court's most recent decisions involving the death penalty, the Court's newest member reaffirmed the Court's commitment to greater reliability in these cases:

> [the] Court has gone to extraordinary measures to insure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as humanly possible, that the sentence was not imposed out of whim, passion, prejudice or mistake.
>
> Eddings v. Oklahoma, 102 S. Ct. 869, 879 (1982) (O'Connor, J., concurring) (Emphasis added.)

When Ohio's definition of proof beyond a reasonable doubt, which is purportedly designed to assure such reliability, is itself under attack for being constitutionally inadequate, a procedural safeguard such as the Model Penal Code Section 210.6(1)(f) is particularly necessary and an effective, extraordinary measure to insure that an innocent individual is not executed.

At least two states have implemented a procedure for excluding the death sentence akin to that of the Model Penal Code. Washington utilizes a mandatory special question of the guilt determining jury when it reconvenes as a sentencing body for purposes of determining the appropriate punishment. Section 10.94.020 (Wash. 1977). Once the jury has found an aggravating circumstance and is "unanimously convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency," the jury is required to answer unanimously in the

affirmative the following: "Did the evidence presented at trial establish the guilt of the defendant with clear certainty?" If in the affirmative, this finding, along with others, is reviewed for purpose of sufficiency in the Washington Supreme Court. Section 10.94.030(3) (Wash., 1977). Georgia's procedure (Section 27-2537) for adequate appellate review of the sentence determination, strongly approved and noted by the United States Supreme Court in Gregg v. Georgia, 428 U. S. 153, 167 (1976) and by Justices White, Burger, and Rehnquist concurring at 211, is to require that the trial judge respond to a standard questionnaire. Among the six questions is "whether the evidence forecl s all doubt respecting the defendant's guilt." Id., at 211. The answer thereto will then assist in deciding whether to sustain the death penalty (although it may not be mandatory).

Enhanced reliability in the guilt and sentencing determinations necessitates the existence of proof beyond all doubt as to the guilt the accused.

> 4. At a minimum, the fact that the evidence does not foreclose all doubt as to guilt must be considered by the sentencing authority as a relevant mitigating factor; yet it is not specified in Section 2929.04(B) of the Revised Code of Ohio.

Under Section 2929.04(B)(7) of the Revised Code of Ohio, the sentencing authority is to consider "any other factors that are relevant to the issue of whether the defendant should be sentenced to death." The United States Supreme Court clearly believes possible innocence is relevant factor, if not controlling, as discussed above. Defense couns

46

contends that, at the least, evidence as to this factor must be assured
admission at the penalty phase of defendant's trial, People v. Terry,
61 Cal. 2d 137, 37 Cal. Rptr. 605, 395 P. 2d 381 (1967). Specific
instructions must be given to the jury that this is a relevant mitigating
factor. Spivey v. Zant, 661 F.2d 464, 471 (5th Cir., 1981). Failure to
do so will mandate vacating any death penalty which may, in the future,
be imposed on this defendant.

V. SECTIONS 2903.01, 2929.022, 2929.03, 2929.04 AND
2929.05 OF THE REVISED CODE OF OHIO VIOLATE THE
EIGHTH AMENDMENT PROHIBITION AGAINST CRUEL AND
UNUSUAL PUNISHMENT AND FOURTEENTH AMENDMENT DUE
PROCESS AND EQUAL PROTECTION CLAUSES OF THE UNITED
STATES CONSTITUTION AND ARTICLE I, SECTIONS 9 AND
16 OF THE OHIO CONSTITUTION BY REQUIRING PROOF OF
MITIGATING CIRCUMSTANCES IN THE GUILT STAGE OF
DEATH PENALTY DELIBERATIONS.

A. Ohio's Bifurcated Procedure

As with the majority of the states after Furman v. Georgia, 419
U. S. 238 (1972), Ohio's statutory framework for the imposition of the
death penalty upon a capitally-charged defendant mandates a two-stage
bifurcated process. Gillers, Deciding Who Dies, 129, 29 U. Penn. L.
Rev. 1, 101, (1980). The initial trial or guilt-determining stage of
the proceedings requires the jury (or judicial panel if the jury is
waived) to find proof of the defendant's guilt of aggravated murder and
one or more aggravated circumstances in order to proceed with capital
punishment. Section 2929.03 of the Revised Code of Ohio; Section
2929.022(A)(1) of the Revised Code of Ohio. At the second, or sentencing,
stage, the jury (unless waived) is then required to weigh the mitigating
factors which the defendant, who has the burden of going forward, has

47

presented. Sections 2929.022 and 2929.03 of the Revised Code of Ohio. The jury must determine whether the aggravated circumstances the offender was previously found guilty of committing (necessarily proved beyond a reasonable doubt at the trial stage) are sufficient to outweigh the mitigating circumstances, if any, before imposing death as a sentence. Section 2929.03(D) and Section 2929.04(B) of the Revised Code of Ohio.

Ohio's statutory procedure mandating the finding of aggravating factors at the initial trial stage, is, however, unlike the majority of state statutory procedures since Furman, and results in death penalty application in violation of the Eighth and Fourteenth Amendments and provisions of the Ohio Constitution.

1. Constitutional Limitations

The imposition of the death penalty is qualitatively different from any other sanction in our system of criminal justice. Furman v. Georgia, 408 U. S. 238 (1972); Gregg v. Georgia, 428 U. S. 153, 188 (1976). Although the death penalty has been found not to be unconstitutional per se, the cruel and unusual punishment provision of the Eighth Amendment and the due process and equal protection provisions of the Fourteenth Amendment require that the imposition of the death penalty, due to its qualitative difference from any other punishment, "be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." Gregg, 428 U. S. at 189. Sentencing procedures must, therefore, assure that the decision to impose death "be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." Id., 428 U. S. at 199 (Emphasis added.)

As the Supreme Court in Woodson v. North Carolina, 428 U. S. 280

(1976) stated in discussing the sentencing authority:

> This Court has previously recognized that "[f]or
> the determination of sentences, justice generally
> requires consideration of more than the particular acts
> by which the crime was committed and that there be taken
> into account the circumstances of the offense together
> with the character and propensities of the offender."
> Pennsylvania ex rel. Sullivan v. Ashe, 302 U. S. 51, 55
> (1937).  Consideration of both the offender and offense
> in order to arrive at a just and appropriate sentence
> has been viewed as a progressive and humanizing
> development.  See Williams v. New York, 337 U. S., at 247-
> 249; Furman v. Georgia, 408 U. S. at 402-403 (Burger, C.J.,
> dissenting.* * * [I]n capital cases the fundamental
> respect for humanity underlying the Eighth Amendment, see
> Trop v. Dulles, 356 U. S., at 100 (plurality opinion)
> requires consideration of the character and . . .
> the circumstances of the particular offense as a
> constitutionally indispensable part of the process of
> inflicting the penalty of death.   Emphasis added.)
> Id., at 304.

In sentencing then, "'What is important ... is an individualized deter-

mination on the basis of the character of the individual and the circum-

stances of the crime.'"  Barclay v. Florida, 103 S. Ct., at 3428,

quoting Zant v. Stephens, 103 S. Ct., at 2743-2744 (emphasis in original).

The use by a statutory death penalty scheme of statutory aggravating

factors is likewise limited to ensure constitutional result.  "[S]tatutory

aggravating circumstances play a constitutionally necessary function at

the stage of legislative definition: they circumscribe the class of

persons eligible for the death penalty."  Zant, 103 S. Ct., at 2743.

3.   Unconstitutional Effect of Ohio's Procedure

As a result of Furman, it is clear that jury sentencing resulting

in the imposition of the death penalty without objective standards to

49

direct the jury and make rationally reviewable the process for imposing death is unconstitutionally infirm. Failure to allow the jury to focus upon particularized considerations of the defendant's character along with circumstances of the occurrence without objective standards also violates these constitutional mandates. Woodson, 428 U. S. at 303-305. Although a bifurcated jury procedure is ideally suited to resolving issues of guilt separately from sentencing considerations, the procedure should be "one in which the question of sentence is not considered until the determination of guilt is made. . ." Gregg, 428 U. S. at 190-191.

Ohio's procedure requiring that the jury find aggravating circumstances beyond a reasonable doubt at the trial stage without the contemporaneous examination and balancing of mitigating circumstances capable of prescribing imposition of the death penalty violates the Eighth and Fourteenth Amendments as well as Sections 9 and 16 of Article I of the Ohio Constitution. Ohio's procedure is constitutionally infirm in effectively directing a trial-stage sentence of death, only to be set aside by a sentencing-stage jury after reconsideration of its decision in an arbitrary and unguided fashion. This difficulty was demonstrated in State v. Herman Rucker, Wayne County Court of Common Pleas, No. 82-CR-051, where the jury at the conclusion of the penalty phase expressed to the Judge that the jurors were no longer unanimous on the issue of guilt. Having found guilt once, however, the Judge stated that they were bound to agree on a sentence. They agreed on life with 20 years, the minimum.

Ohio's procedure effectively mandates imposition of death at the trial stage, by virtue of the jury's verdict of guilt and finding beyond



a reasonable doubt of the presence of aggravating circumstances. The trial stage determination of guilt without the presence of mitigating proof results in a process imposing the death penalty "that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense..." Woodson, 428 U. S. at 304; Eddings v. Oklahoma, ___ U. S. ___, 102 S. Ct. 869, 875 (1982). Ohio's procedure fails to implement a process of guided jury discretion that considers "...the circumstances of the offense together with the character and propensities of the offender" Pennsylvania ex rel. Sullivan v. Ashe, 302 U. S. 51, 55 (1937) as a "...constitutionally indispensable part of the process of inflicting the penalty of death." Woodson, 428 U. S. at 304. The failure to consider the circumstances of the offense and the character of the defendant thus violates the constitutional requirement of an adequate individualized determination stressed so heavily by the Court in Zant and Barclay.

Further bias and prejudice to the jury determination of sentence is created by their consideration at this stage of aggravating factors which do not genuinely narrow the class of eligible aggravated murders.

Zant and Barclay impose a constitutional requirement that aggravating circumstances must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify imposition of a more severe sentence on a defendant compared to others found guilty of [aggravated] murder. The word 'aggravated' is properly added to these phrases. In Georgia, a defendant is convicted of "murder" and then aggravating circumstances are considered to narrow this class. Zant, at 2737, 2739-

2740. In Texas, a defendant is convicted of "capital murder", and then three questions, Tex Code Crim. Proc. Ann. § 37.071 (reprinted in Barefoot v. Estelle, ___ U. S. ___, 103 S. Ct. 3383, 3389, n.1 (1983) are asked which "serve much the same purpose as" statutory aggravating circumstances. Zant, at 2742, n.13. Thus, the Court's reference to "murder" in those phrases was not intended to be satisfied by, for instance, the distinction between murder and aggravated murder in Ohio. Ohio's scheme fails to meet this constitutional requirement because aggravating circumstances under Section 2929.04(A)(7) of the Revised Code of Ohio do not narrow the class of those eligible for the death penalty.

Section 2903.01(B) of the Revised Code of Ohio defines the category of felony murderers as anyone who:

> ... purposefully cause[s] the death of another while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson or arson, aggravated robbery or robbery, aggravated burglary or burglary, or escape.

If any one of the aggravating factors listed in Section 2929.04(A) is specified in the indictment and proved beyond a reasonable doubt, the defendant becomes eligible for the death penalty. Sections 2929.02(A) and 2929.03 of the Revised Code of Ohio.

What makes this scheme unconstitutional is the fact that certain aggravating circumstances as specified in Section 2929.04 merely repeat as aggravating circumstances the factors that distinguish felony murder from murder. In effect, there is no narrowing of the felony murder

52

category of aggravated murderers who are principal offenders in the commission of the aggravated murder who are eligible for the death penalty. Merely by being aggravated murderers under Section 2903.01(B) they become immediately eligible for the death penalty. This specifically contravenes the Court's rulings in Zant and Barclay.

These cases unmistakably lead to the conclusion that Ohio's scheme is unconstitutional. To pass constitutional muster, the scheme must provide for a "categorical narrowing at the definition stage." Zant, 103 S. Ct., at 2744. "[A]n aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of [aggravated] murder." Zant, 103 S. Ct., at 2742-3. Aggravating circumstances must create an "inherent restraint on the arbitrary and capricious infliction of the death sentence," by avoiding a scheme where a "person of ordinary sensibility could find that almost every murder fit the stated criteria." Zant, 103 S. Ct., at 2743, quoting Godfrey v. Georgia, 446 U. S. 420, 428-9. A statutory system must be compatible with these rules in order to achieve the constitutionally necessary restraint on the discretion of the sentencing body which minimizes the risk of arbitrary and capricious action.

Ohio's system is not compatible with these rules. Any person of ordinary sensibility could find that every felony murder fit the stated criteria. No categorical narrowing of those principals who are felony-murderers is made. Further, the aggravating circumstance of Section

2929.04(A)(7) of the Revised Code of Ohio does not reasonably justify the imposition of a more severe sentence on felony murderers as compared to other aggravated murderers. The aggravating circumstance of Section 2929.04(A)(7) merely repeats the definition of felony murder committed by a principal offender, qualifying that entire category for the death penalty automatically. The result is an unbounded discretion of the sentencing body that maximizes the risk of arbitrary and capricious action.

By requiring jurors to hear proof of aggravating factors, some of which is not distinguish those most culpable and deserving of death, then require a finding of their existence beyond a reasonable doubt, and exclude comparative evidence of mitigation until a separate proceeding, the State additionally creates a presumptive bias in favor of these non-narrowing aggravating circumstances prior to the beginning of any sentencing hearing. The result of this trial finding will confuse jurors in the sentencing hearing on the role aggravating circumstances play in their deliberations, creating a feeling in jurors of inability to discard or de-emphasize the weight of aggravating factors relative to mitigating factors. "Since the members of a jury will have little, if any, previous experience in sentencing, they are unlikely to be skilled in dealing with the information they are given." Gregg, 428 U. S. at 192. Concluding an exhaustive deliberative process at the trial's end with a guilt finding as to aggravating circumstances, each member of the jury "could fairly conclude that he or she was required to place special emphasis on the existence of statutory aggravating circumstances,"

54

Zant v. Stephens, ___ U. S. ___ , 102 S. Ct. 1856, 1864 (per curiam)
(Marshall, J., dissenting) (1982) in any further hearing.  Although the
jury in sentencing is told it is to engage in a "weighing" process, the
jury is precluded from doing so by the statute because the weighing
process "is not simply a matter of counting the number of aggravating
and mitigating circumstances and striking a balance [but] a reasoned
judgment to be exercised in the light of the totality of the circum-
stances."  Giles v. State, 549 S. W.2d 479 (Ark. S.C. (en banc) 1977).
The presumptive bias will lead to an unfair individualized determination.
Ohio's statutory procedure is constitutionally infirm in directing a
sentence of death more likely based upon "caprice or emotion" due to a
bias in favor of aggravating factors rather than upon reason in examin-
ing and weighing mitigating against aggravating factors. Cf., Godfrey v.
Georgia, 446 U. S. 420, 432 (1980); Gardner v. Florida, 430 U. S. 349,
358 (1977).

4.  Ohio's Minority Position

Ohio's statutory procedure mandating the finding of aggravating
factors at the initial trial stage of the proceeding is unlike the
majority of state statutory procedures since Furman.  The majority of
state procedures direct that such a finding take place in the second or
sentencing stage where the determination of the existence of and balanc-
ing of aggravating and mitigating factors is to occur.  Indiana, for
example, requires that aggravating factors be listed on a separate page
of the indictment from that listing the capital offense or Class A
felony, the page to be provided the jury upon a finding of guilt as the

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 330

capital offense.  Indiana Code Ann. Section 35-50-2-9.  Both Florida
and Georgia separate the consideration of statutory aggravating
circumstances from the determination of guilt.  Fla. Stat. §921.141(1),
Ga. Code Ann. §27-2503(c).  The difference between these and the Ohio
procedure is significant.  The Supreme Court approved of the Georgia and
Florida schemes because of their ability to provide for an individualized
determination and to narrow the category of defendants eligible for the
death penalty.  Ohio's scheme cannot provide for these constitutional
safeguards.

Ohio's statutory provision allowing a defendant to choose to have
evidence of the aggravating circumstance of prior felony killing under
Section 2929.04 A) 5. of the Revised Code of Ohio presented to the judge
at a sentencing hearing rather than at the trial stage before a jury
illustrates the defects of the procedure provided for all other aggravat-
ing circumstances.  Section 2929.022 of the Revised Code of Ohio.
Although Section 2929.022 of the Revised Code of Ohio is arguably present
in Ohio's statutory scheme to protect the defendant from prejudicial
inference of guilt as to the charged crime presented at trial, the
statutory provision would be unnecessary in a state where proof of
aggravating factors is relegated to the sentencing hearing.

Ohio's present statutory procedure for imposing death does not
provide specific objective standards to "guide [the jury's] sentencing
deliberations, such as those provided in the Model Penal Code, which
catalogs 'the main circumstances of aggravation and of mitigation that
should be weighed and weighed against each other' by the jury."  Zant,

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 331

102 S. Ct. at 1861 (per curiam) (Marshall, J. dissenting), quoting Gregg

v. Georgia, 428 U. S. at 193. [Emphasis by the Court.]

5.   Summary

Ohio's procedure requiring that the jury find aggravating circum-
stances beyond a reasonable doubt at the trial stage without the con-
current examination and balancing of mitigating circumstances capable of
proscribing imposition of the death penalty violates the Eighth and
Fourteenth Amendments as well as Sections 9 and 16 of Article I of the
Ohio Constitution.

VI.   SECTIONS 2929.022, 2929.03, and 2929.04 VIOLATE
DEFENDANT'S RIGHTS TO EFFECTIVE ASSISTANCE OF
COUNSEL AND TO TRIAL BEFORE AN IMPARTIAL JURY,
AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMEND-
MENTS TO THE UNITED STATES CONSTITUTION, ARTICLE
I, SECTION 10 OF THE OHIO CONSTITUTION, AND
ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.

The above-cited statutory sections, which provide for sentencing

before the same jury or panel of judges which determined the facts at

trial and found a defendant guilty in a death penalty case, violate a

defendant's rights to effective assistance of counsel and a fair trial

before an impartial jury, as guaranteed by the Sixth and Fourteenth

Amendments to the U. S. Constitution.

A.   Denial of Effective Assistance of Counsel

It is a well settled principal of constitutional law that when an

accused has a right to counsel in a criminal proceeding, as in the

57

case at bar, he is further entitled to have effective assistance of
counsel under the Sixth and Fourteenth Amendments to the United States
Constitution. McMann v. Richardson, 397 U. S. 759, 771 n. 14 (1970),
Reece v. Georgia, 350 U. S. 85, 90 (1955). Powell v. Alabama, 237 U. S.
45, 57 (1932). In Ohio a right to effective assistance of counsel is
similarly recognized as a state constitutional right under the Ohio
Constitution Article I, Sections 10 and 16. In this regard see State v.
Hester, 45 Ohio St.2d 71 (1976) where the Ohio Supreme Court held the
right of effective assistance of counsel to be a state constitutional
right requiring counsel's performance to result in a "fair trial and
substantial justice."

The recently enacted Ohio Statute providing for the death penalty
for certain Aggravated Murders provides for a bifurcated trial. The
first portion of the trial is to determine the defendant's guilt. The
second stage applies only after the defendant has been found guilty. The
purpose of the second stage is to determine whether the defendant is to
be sentenced to death or to life imprisonment with 20 or 30 years before
parole eligibility. The statute requires both stages to be heard and
decided by the same jury. Implicit in the two stage process is the
conflict between the death penalty statute and the aforementioned consti-
tutional principles guaranteeing effective assistance of counsel.

A simple example demonstrates how a bifurcated proceeding with the
same jury at both stages can unconstitutionally interfere with counsel's
representation of an accused indicted under Ohio's death penalty statute.
Assuming for the purpose of example that defense counsel in viewing the

58

facts of the case feels that there is a close identification issue and that is his best defense. However, with Ohio's bifurcated trial procedure defense counsel would have to weigh whether or not to vigorously pursue this defense. The reason is that if counsel pursues this defense and loses at the guilt determining stage he is at the same time destroying the defendant's credibility for the sentencing stage of the trial. In essence a guilty finding by the jury necessarily carries with it the conclusion that the defense was not telling the truth at the trial. The defendant has argued he was not at the scene of the crime and the jury, by finding him guilty, has determined that, in fact, he was at the scene of the crime. The defendant's credibility at the sentencing stage has been destroyed by his counsel's pursuit of the defense of alibi.

If counsel vigorously pursues an alibi defense, no matter how meritorious, he may be rationally precluded from arguing mitigating factors at the sentencing hearing. The defense cannot rationally argue in the first stage that the defendant was not present at the scene of the crime and then turn around at the sentencing hearing and argue mitigating factors: for instance, what of a defendant with a reasonable alibi and with severe psychiatric problems (although not enough to amount to an insanity defense). Does the attorney proceed with the alibi defense or not? If the alibi does not succeed the attorney must argue at the mitigation hearing that although he said earlier that his client was not at the scene of the murder, he is now saying that if he was there he should be spared since he was suffering from psychiatric problems. The lawyer in this example would, in effect, be saying my

client did not do this but it he did do it, he was crazy. Again in this example the attorney would have to consider abandoning a potential defense for fear of losing at trial and then having no credibility at the mitigating hearing. This is certainly to the defendant's prejudice.

This situation is constitutionally impermissible, as Ohio's death penalty statute will force defense counsel in many cases to abandon viable defenses at the guilt determining stage for fear of prejudicing his client at the sentencing stage.

The legislature should have eliminated this problem by providing for two separate juries, the first for determining guilt and the second for determining punishment. At the second trial the prosecutor would be allowed to reiterate the specific evidence of aggravating circumstances. This method of handling the trials would eliminate the impairment of the right to have a defense presented with the effective assistance of counsel.

There is another related problem with the bifurcated trial utilizing the same jury in both stages which affects the defendant's right to effective assistance of counsel. Inasmuch as the prosecution will engage in extensive voir dire on the subject of opposition to the death penalty seeking to challenge for cause those prospective jurors whose opposition to the death penalty would absolutely preclude them from fairly deciding guilt or punishment under Witherspoon v. Illinois, 391 U. S. 510 (1968), rehearing den. 393 U. S. 898 (1968), defense counsel, as effective counsel, may likewise feel professionally required to engage in such voir dire. While such voir dire by defense counsel may be necessary it would place defense counsel in the untenable position of

60

appearing to the jury to feel his case is poor on the merits and thus
preoccupied with the possibility of death itself. [As Grigsby v.
Mabry, ____ F. Supp. ___, 33 Cr L 24744 (S. Ct., Ark., Aug. 5, 1983)
indicates, the death qualification process itself prejudices the
defendant as it creates the belief on the part of the jury that he is
guilty. See Section VII below.]

    This impossible situation imposed on defense counsel by the Ohio
procedure again renders his assistance to the accused ineffective.
Under Ohio's statutes defense counsel must choose between engaging in
sufficient voir dire on the death penalty issue and risking the appearance
to the jury of a surrender on the guilt issue, or foregoing voir dire on
the death penalty issue and risking the empaneling of a jury with jurors
who have a bias towards the death penalty and are clearly unfit to sit
on the jury. State v. McClellan, 12 Ohio App.2d 204, 232 N.E.2d 214,
(1967). Both choices created by the statute are obviously constitutionally
unsatisfactory to the defendant facing death. Again, counsel's assistance
is rendered ineffective by this procedure and thus, the statute must
fall under both the Ohio and Federal Constitutions.

    A further feature of the Ohio death penalty statute which renders
counsel's assistance ineffective is that provision in Section 2929.03 of
the Revised Code of Ohio that allows the defendant to request a mental
examination prior to sentencing. A close reading of this provision
reveals that once the examination is requested by the defendant, the
court is obligated to order such examination, and the results are then
made automatically available to all the parties, the judge, and the

61

jury. The defect in this provision lies in the fact that once the defendant has requested the examination, presumably with the hope that the results will be in mitigation of the offense, defense counsel has absolutely no control over the distribution of the results to the jury, regardless of whether or not the results are in favor of or against the client's best interests. The end result is that defense counsel must play a blind guessing-game when requesting the examination and has no way to prevent the jury from reviewing the results if they are adverse to his client's interests or suffer from procedural irregularities. Without any right to review the results of the examination prior to distribution to the jury, defense counsel is unable to effectively serve the best interests of his clients, a duty of constitutional proportion. For this reason, Section 2929.03 of the Revised Code of Ohio must be struck down as an unconstitutional burden on the defendant's right to effective assistance of counsel as guaranteed in the Federal and Ohio Constitutions.

B.    Denial of an Impartial Jury

It is clear that a defendant in a criminal prosecution has an absolute right to an impartial jury under the Sixth Amendment to the United States Constitution. Shepard v. Maxwell, 384 U. S. 333 (1966). A sentencing hearing is part of a criminal prosecution, Mempa v. Rhay, 389 U. S. 128 (1967), and therefore as a federal constitutional matter a criminal defendant has the right to an impartial jury at the sentencing hearing. Ohio, likewise, guarantees a criminal defendant the right to an impartial jury under Article I, Section 10 of the Ohio Constitution.

Cooper v. State, 16 Ohio St. 328 (1865).  This constitutional right to
an impartial jury has been construed to mean a jury which is of an
impartial frame of mind at the beginning of the trial . . ."A juror who
is impartial is one who is not biased in favor of one party more than
another, who is indifferent, unprejudiced, and disinterested".  Durham
v. State, 182 Tenn. 577, 188 S.W.2d 555, 558 (1945).

Ohio's bifurcated trial procedure wherein a single jury hears and
decides both stages offends the constitutional notions of the rights to
an impartial jury at the sentencing hearing.  Once a jury has found the
defendant guilty there is a very high probability that jury bias and
animosity towards the defendant will exist at the sentencing hearing,
the existence of which would be a basis for challenge for cause during
voir dire at the start of the trial. See Section 2945.25 of the Revised
Code of Ohio.  Furthermore if the defense has pursued an alibi defense
at the trial and lost on that defense the jury will be in a poor position
to take an unbiased attitude towards the defendants credibility at the
sentencing hearing. What creates a problem of constitutional proportion
is the fact that at the sentencing hearing the defendant is required to
prove facts demonstrating the existence of mitigating factors in order
to save his own life.  Counsel for defendant can think of no other
situation where an impartial jury is more crucial as in the case where
the sentencing hearing will result in a life or death decision.  Under
the Ohio death penalty statute there exists an intolerable risk that
the defendant's life would be put in the hands of a hostile tribunal and
therefore the statute must be struck down as an unconstitutional viola-
tion of the defendant's right to an impartial jury under the Sixth and

Fourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

> VII. SECTIONS 2929.022, 2929.03 AND 2929.04 OF THE REVISED CODE OF OHIO, AND OHIO CRIM. R. 11(C)(3) PLACE AN UNCONSTITUTIONAL BURDEN ON THE DEFENDANTS RIGHT TO A TRIAL BY JURY UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION.

Under the Ohio death penalty statutory framework an accused indicted under the statute has two initial choices. Assuming a close issue of identification as the basis for a possible alibi defense for purposes of example, the defendant may choose to demand a trial by jury. If the defendant pursues the alibi defense at the trial and loses, i.e. is found guilty of the offense and specifications, the defendant is put in a most disadvantageous position. At the sentencing hearing he will no doubt suffer a loss of credibility due to his posture at the trial and furthermore he may face a hostile and biased jury due to events at guilt stage of the trial. Against this backdrop the defendant will have to prove mitigating facts in order to save his own life. Having exercised his constitutional right to a jury trial the defendant finds himself in a poor position to save his own life.

These choices faced by the defendant are the result of an unconstitutional burden being placed on the defendant's Federal and Ohio constitutional right to trial by jury and his right against compelled self incrimination by the Ohio death penalty statutes. In United States v. Jackson, 390 U. S. 570 (1968) the United States Supreme Court declared unconstitutional a statute which it found unnecessarily and needlessly encouraged guilty pleas. In that case the pertinent statute provided that an accused

indicted under the death penalty statute could be sentenced to death by a jury but only to a mandatory life sentence by a judge if the defendant plead guilty to the charge. The court found the statute to be unconstitutional because it needlessly encouraged the defendant to waive his right to trial by jury and his privilege against self incrimination by pleading guilty in order to avoid the risk of death. The Ohio death penalty statute operates in much the same manner, i.e. a guilty plea greatly increases the defendant's chance to prove mitigating facts and thus save his own life.

The Ohio death penalty statute will in many cases encourage guilty pleas and thus encourage waiver of the right to a trial by jury and the privilege against self incrimination. In the Jackson case the Supreme Court articulated the crucial test on whether or not this chilling of an exercise of a constitutional right rises to an unconstitutional level. The Court stated that the crucial question is whether or not this chilling effect is unnecessary or needlessly encourages guilty pleas and thus a waiver of rights, the "chilling effect". Thus the test centers around the necessity of such a situation. The Ohio death penalty statute does in fact unnecessarily and needlessly encourage guilty pleas. The State of Ohio could very easily have provided for a separate jury at the sentencing stage which would have eliminated the defendant's dilemma if he chose to contest the issue of guilt. But, as the Ohio statute now stands the defendant might very well be ill advised to contest the issue of guilt for fear of alienating the jury at the sentencing stage. This unnecessary encouragement to plead guilty renders the Ohio statute unconstitutional.

65

The constitutional problem in the Jackson case is not confined to the situation where the defendant can absolutely escape the possibility of death by waiving his Constitutional rights. The Supreme Court has expressly avoided the conclusion that the Jackson rationale is confined to such a situation. Corbitt v. New Jersey, 439 U. S. 212, 217 (1973). Therefore the Courts scrutiny of this problem should focus on the necessity in Ohio of placing the defendant in a position that encourages him to waive constitutional rights.

A crucial feature of the Ohio statute is the nature of the pressure brought to bear on the defendant to waive his rights. In many cases the pressure is, in fact, a greatly increased chance of being put to death if the defendant chooses to assert his rights to a jury and privilege against self incrimination. The Supreme Court has recognized that the risk of death is a unique pressure much different than mere imprisonment for a longer or shorter term depending on the defendant's choice between pleading guilty or not. Corbitt, supra, at 217. The possibility of the death penalty is "unique in its severity and irrevocability" Gregg v. Georgia, 428 U. S. 155, 189 (1976) and therefore must be recognized as an extraordinary impetus for the defendant to waive his right to a trial by jury and privilege against self-incrimination in a situation where the risk would be significantly lower if he plead guilty at the outset. A separate jury for sentencing could have been provided for in the Ohio Statute, therefore the chilling of the defendant's rights is unnecessary and the Ohio Statute must fall as unconstitutional under the rationale of the Jackson case.

66

Needless pressure is also placed on the defendant to plead guilty as a result of Ohio Crim. R. 11(C)(3). Section 2929.02 of the Revised Code of Ohio was amended in 1978 to provide that whoever "pleads guilty to, or pleads no contest and is found guilty of aggravating murder" shall be sentenced in accordance with the new law, as are those who are convicted after trial. This was apparently an attempt to answer the concerns expressed by Justice Blackmun, concurring in Lockett v. Ohio, 438 U. S. 586, at 618, that the "disparity between a defendant's prospects" as to sentence when pleading guilty and proceeding to trial. See Note, "The Death Penalty and Guilty Pleas Ohio Rule 11(C)(3) -- A Constitutional Dilemma", 5 Ohio N. L. Rev. 687 (1978). However, the disparity Justice Blackmun spoke of was occasioned by Ohio Crim. R. 11 (C)(3), which is still in effect, and still needlessly encourages guilty pleas.

Under Ohio Crim. R. 11(C)(3), "if the [aggravated murder] indictment contains one or more specifications, and a plea of guilty or no contest to the charge is accepted, the court may dismiss the specifications and impose sentence accordingly, in the interests of justice."

Whether this provision created an impermissible burden on the defendant's exercise of his rights to plead not guilty was not addressed by the Court majority in Lockett due to its reversal of the death sentence on other grounds. Lockett, at 608 n.16. Justice Blackmun, however, would have reversed the sentence, as it was impermissibly burdensome, due to the disparity "that a defendant can plead not guilty only by enduring a semi-mandatory, rather than a purely discretionary, capital sentencing provision." Id., at 619. The Ohio Supreme Court had rejected the alleged constitutional violation in State v Wiend,

67

5 Ohio St.2d 224, 364 N.E. 2d 224 (1977) and State v. Jackson, 50 Ohio St.2d 253, 364 N.E. 2d 236 (1977), and State v. Nabozny, 54 Ohio St.2d 195, 375 N.E. 2d 784 (1978). See Note, 5 Ohio N. L. Rev.

Ohio's present sentencing statute is not quite as semi-mandatory as the previous law, in that greater consideration is given to mitigating factors. However, the sentencing judge or judges are not given unbridled discretion to simply disregard the aggravating factors "in the interests of justice." They are ordered to consider them, and to balance these when imposing a sentence. They are required, by Section 2929.04(D)(2) of the Revised Code of Ohio on its face to impose the death sentence if the aggravating factors outweigh those in mitigation. Thus if a defendant has few or no mitigating circumstances, he is strongly encouraged to plead guilty and move for dismissal of the specifications. This inducement to plead guilty and to waive all one's constitutional rights at the trial in order to obtain a purely discretionary capital sentencing decision is needless. The Supreme Court of Ohio could restrict the circumstances when the interests of justice would permit dismissal of specifications to only those instances where a life sentence would have been ordered by the trial court based on the statutory sentencing scheme, but it has refused to acknowledge that any constitutionally improper disparity exists. As the present statutes and rules create an unnecessary encouragement to waive State and Federal constitutional rights, this renders the Ohio capital sentencing scheme unconstitutional.

VIII.    SECTION 2945.25(C)OF THE REVISED CODE OF
         OHIO VIOLATES THE DEFENDANT'S RIGHT TO AN
         IMPARTIAL JURY ON THE DETERMINATION OF
         GUILT, AS GUARANTEED BY THE SIXTH AND
         FOURTEENTH AMENDMENTS TO THE UNITED
         STATES CONSTITUTION AND ARTICLE I, SECTION
         10 OF THE OHIO CONSTITUTION.

Section 2945.25(C) of the Revised Code of Ohio provides for the

challenge for cause in a death penalty case of any juror who "unequivocally

states that under no circumstances will he follow the instructions of a

trial judge and consider fairly the imposition of a sentence of death in

a particular case." Section 2945.25(C) of the Revised Code of Ohio.

No similar provision granting a challenge for cause for any juror irrevo-

cably committed to the application of the death penalty upon proof of

aggravated murder with specifications even where evidence of mitigation

is present is stated in the amendments to Section 2945.25 of the Revised

Code of Ohio under the death penalty provisions.

The failure to provide this clear alternative challenge for cause

to the defendant clearly deprives him of his right to an impartial jury

under the Sixth and Fourteenth Amendments and the Ohio Constitution in

that it reduces his available peremptory challenges to attempt to assure

juror fairness disproportionately to the State.  In addition, it makes

more likely the exclusion of jurors opposed to the death penalty,

resulting in a death-qualified jury more likely to be conviction-prone

and prosecution-biased.  Death-qualifying jurors, and excluding those

with objections to the death penalty, offends the Sixth Amendment's right

to fair-cross-section in the guilty-determining process, and produces

conviction-prone juries.  Grigsby v. Mabry, ____ F. Supp. ____, 33 Crim. L.

Rep. 2477 (Aug. 8, 1983).  Studies show those excluded under Witherspoon

69

"share an amalgam of interrelated attitudes toward the criminal justice system which is distinct from that possessed by "death qualified" jurors." Id. A death-qualified jury, studies show, "is composed of a group of persons who are uncommonly predisposed to favor the prosecution." Id., at 2478. "One consistent and inevitable result of the death qualification process is the disproportionate exclusion of blacks and women." Id. at 2477. Even the fact that persons who would automatically vote for death can also be excluded in Arkansas did not neutralize the guilt-proneness, as there are far fewer of these persons than there are Witherspoon excludables. Id. at 2478. Of course in Ohio, no exclusion of automatic death penalty jurors is statutorily permitted, and thus the jury imposition is even further skewed to convict.

According to Grigsby, the state's interest in efficiency and cost-saving is insubstantial, and is outweighed by the defendant's right to a representative and non-guilt-prone jury in the guilt phase. Id., at 2478-2479. The Grigsby court finds the proper procedure to be "completely bifurcated trials in capital cases -- with one jury to determine the guilt-innocence of the defendant and another jury to determine the penalty if the defendant is convicted." Id., at 2478.

As a result, the defendant is constitutionally entitled to exercise challenges for cause for anyone irrevocably committed to death as a penalty for aggravated murder, or a finding of unconstitutionality as to the present system of juror selection. As the court recognized in State v. McClellan, 12 Ohio App.2d 204, 207 (1967), "under the law of Ohio, a juror with a bias in favor of capital punishment is just as unfit to serve on a jury as one who will refuse to vote for the death penalty, if properly convinced the evidence warrant such a vote."

70

IX.   SECTIONS 2929.03, 2929.04, 2929.05 OF THE
      REVISED CODE OF OHIO VIOLATE THE EIGHTH AND
      FOURTEENTH AMENDMENTS TO THE UNITED STATES
      CONSTITUTION AND ARTICLE I, SECTIONS 9 AND
      16 OF THE OHIO CONSTITUTION.

A.   Sections 2929.03, 2929.04 of the Revised Code of Ohio
     violate the Eighth and Fourteenth Amendments to the
     United States Constitution by failing to provide
     adequate guidelines for deliberation, leaving the jury
     without proper guidance in balancing the aggravating
     and mitigating circumstances.

1.   Absence of a Standard Beyond Weight.

Section 2929.03(D)(2) of the Revised Code of Ohio provides in

part:

> Upon consideration of the relevant evidence raised
> at trial, the testimony, other evidence, statement of
> the offender, arguments of counsel, and, if applicable,
> the reports submitted pursuant to Division (D)(1) of
> this section, the trial jury, if the offender was tried
> by a jury, shall determine whether the aggravating cir-
> cumstances are sufficient to outweigh the mitigating
> factors present in the case.  If the trial jury unani-
> mously finds, by proof beyond a reasonable doubt, that
> the aggravating circumstances the offender was found
> guilty of committing outweigh the mitigating factors,
> the trial jury shall recommend that the sentence of
> death be imposed on the offense.

The language contained in the above section and throughout the

death penalty statute, see Section 2923.03(D)(1) and (B)(2) of the

Revised Code of Ohio specifically "that the aggravating circumstances .

. . outweigh the mitigating factors" violates the Eighth and Fourteenth

Amendments to the United States Constitution and Article I, Sections 9

and 16 of the Ohio Constitution.  The weight standard permeating this

statute invites arbitrary and capricious jury decisions.  These constitu-

71

tional guarantees require that the aggravating circumstances must more than merely "outweigh" the mitigating factors to result in imposition of the death penalty.

The statutes fail to control the decision making process. See Thomas J. Gilloon, Capital Punishment and the Burden of Proof: The Sentencing Decision, 17 CALIF. WEST. L. REV. 316, 349 (1981). The use of the term "outweigh" preserves reliance on a lesser standard of proof. That standard is proof by a preponderance of the evidence. The statute requires only that the sentencing body be convinced beyond a reasonable doubt that the aggravating factors were marginally greater than the mitigating factors. In that instance, a perceived marginal difference in weight between aggravating and mitigating would result in execution. Such a sentencing scheme is constitutionally defective because it creates an unacceptable risk of arbitrary or capricious sentencing. As the Ohio provisions do not explicitly provide for merciful discretion on the part of the trier of fact, See e.g. Spivey v. Zant, 661 F. 2d 464, 471 (5th Cir., 1981); Gregg v. Georgia, 428 U. S. 153, 197 (1976); and Briley v. Commonwealth, 273 S. E.2d 48 (Va., 1980), and the death penalty appears to be mandatory once the criteria are established, it is particularly important that the scales be more heavily weighted toward death.

2. Beyond a Reasonable Doubt Standard

The legislature did include the words "proof beyond a reasonable doubt" in an apparent attempt to require greater certainty in this weighing. But the statutory standard does remain "outweigh."

In an early version of the death penalty bill, the death penalty

7 2

was precluded unless aggravation substantially outweighed mitigation.
The final version deleted substantially.  Defendant contends that under
the Eighth and Fourteenth Amendment standards of common decency, people
should not be put to death unless the scale tips substantially in favor
of death.

To insure that an individual is not executed unless the balance
absolutely requires death, the higher standard of proof must be applied.
Justice Stewart in Woodson v. North Carolina, 428 U. S. 280, 306 n. 32
(1975) wrote of the "need for reliability in the determination that
death is the appropriate punishment in a specific case."  He insisted on
a higher degree of reliability in capital punishment cases than that
required in the noncapital sentencing situation, singling out the
"qualitative difference between the death penalty and all other forms of
punishment."  Gilloon at 335.  The penalty is irrevocable, therefore the
highest standard of law must be applied to insure that the sentencing
decision is not arbitrary.

In In re Winship, 397 U. S. 358 (1970), the Supreme Court recognized
the value of the reasonable doubt standard as a method to reduce the
risk of error or arbitrariness.  See Gilloon, supra, at 341.  Although
traditionally applied to factual determinations, proof beyond a reasonable
doubt has been extended to a variety of adversarial determinations not
strictly concerned with criminal guilt or innocence. Gilloon, supra, at
345.  The constitutional guarantee of due process has been interpreted
to require proof beyond a reasonable doubt in juvenile proceedings, In
re Gault, 387 U. S. 1 (1967); criminal commitment proceedings, In re

73

Burnick, 14 Cal.2d 306, 121 Cal. Rptr. 488, 535 P.2d 352 (1975), and in some criminal sentencing procedures, Jurek v. Texas, 428 U. S. 262 (1976), Gilloon, supra, at 347. Certainly in a matter of such import, the verdict of life or death, the accused is constitutionally entitled to a decision made pursuant to the highest legal standard for judgment. Again this is absolutely essential because the jurors have no merciful discretion. Therefore to meet constitutional standards the state's burden must be to prove beyond a reasonable doubt that there are no mitigating factors to warrant leniency.

Failure of the legislature to require proof by the highest legal standard violates defendant's protection against cruel and unusual punishment and his due process guarantees enunciated in the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 9 and 16 of the Ohio Constitution.

3.   Lack of Objective Standard

In addition, the Eighth and Fourteenth Amendments and Article I, Sections 9 and 16 of the Ohio Constitution render the comparison of mitigating and aggravating circumstances arbitrary and capricious and violates the standards enunciated in Furman v Georgia, 408 U. S. 238 (1972).

In Furman, the Supreme Court held that the penalty of death may not be imposed under sentencing procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner. "[T]hat discretion must be suitably directed and limited so as

74

to minimize the risk of wholly arbitrary and capricious action." Gregg, supra, at 189.

The Supreme Court in Gregg ruled that Georgia's death penalty statute was constitutional because it provided for some channeling of the jury's discretion. Subsequently, in Godfrey v. Georgia, 446 U. S. 420 (1980), the Supreme Court reversed a conviction imposed pursuant to that statute, finding in that case that the death penalty was not constitutionally imposed. The standard imposed in Godfrey, which authorized imposition of the death penalty if the murder was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim," was deemed too vague to avoid arbitrariness. In Coker v. Georgia, 433 U. S. 584 (1977) another death penalty sentence was reversed because the penalty was disproportionate to the crime of rape. While the remaining structure of Georgia's death penalty scheme has been approved as constitutional in Zant, it achieves this status through the operation of three safeguards-- the categorical narrowing at the definition stage of eligibility for the death sentence, an individualized determination of suitability of death, and adequate appellate review at the selection stage. Zant, 103 S. Ct., at 2744.

The structure of Georgia's system is significantly different from that of Ohio, however, in that Georgia does not provide for the weighing of aggravating and mitigating circumstances in reaching a sentencing decision. In Zant the Court noted this significance by denying the expression of any opinion

75

...concerning the possible significance of a holding
that a particular aggravating circumstance is "invalid"
under a statutory scheme in which the judge or jury
is specifically instructed to weigh statutory aggrava-
ting and mitigating circumstances in exercising its
discretion whether to impose the death penalty.
103 S. Ct., at 2750.

Florida, like Ohio, provides for a statutory weighing procedure.
Florida's system was found constitutional despite the lack of an
objective standard and the broad sentencing discretion in its weighing
procedure in Barclay. The Court made clear that such broad discretion
is compatible with the Eighth and Fourteenth Amendments because Florida
provided specific safeguards that adequately channel discretion. First,
the function of the finding of an aggravating circumstance in Florida
is to limit the class of defendants eligible for the death penalty.
103 S. Ct. 3425. Second, the weighing procedure provides for an indivi-
dualized determination. 103 S. Ct., at 3428, 3431. Third, there is a
system of appellate review to avoid arbitrariness and to assure propor-
tionality. 103 S. Ct., at 3436. Fourth, Florida has a considerable
body of case law that directs the operation of the weighing procedure.
103 S. Ct., at 3426 and 3427.

The Court in Jurek v. Texas, 428 U. S. 262 (1976) also found that
specific standards for balancing aggravating against mitigating cir-
cumstances are not constitutionally required where the state narrows
the categories of murder eligible for the death penalty. Ohio has none
of these crucial safeguards to temper the broad discretion it allows in
its death penalty scheme.

Ohio's new death penalty statute with its provisions for a bifurcated

76

determination of guilt and penalty and a "weighing" of aggravating and mitigating factors, is constitutionally defective because it fails to simultaneously satisfy the guiding principles of Furman and Gregg.  It does not, and cannot satisfy the two dictates -- that the death penalty be applied only when it is imposed in a non-capricious manner and when it is imposed it must be on an individual basis, with "the degree of respect due the uniqueness of the individual.

Sufficient individualized determination in sentencing is not possible in Ohio for several reasons.  The jury must be free to determine whether death is the appropriate punishment for a defendant. Ohio's statutes, however, do not specifically provide for this determination; either it is unconstitutionally prohibited or the statute is so vague as to deny the jury this duty to consider whether death is the appropriate penalty.  In either case the determination of appropriateness is so jeopardized as to make the necessary individualized determination virtually impossible.

The trial stage determination of guilt simultaneous with findings of aggravating circumstances without consideration of mitigating factors results in a process that creates a presumptive bias in favor of aggravating circumstances prior to the beginning of any sentencing hearing.  Any such bias precludes a fair individualized determination.

The vagueness of the statutory definitions of what constitutes a mitigating circumstance prevents a consistent individualized determination of appropriate sentencing.  Without consistent application of mitigating circumstances there can be no state-wide consistency in the process of individualized determinations.

Unlike Florida, Ohio has no body of case law to direct the operation of its weighing procedure consequently, this Judge's or jury's unguided decision-making allows each sentencing body in each capital case to apply the weighing process as they believe it is to be applied. The result is that each trial will use a weighing procedure unique to that trial. Uniformity in the sentencing procedure will be impossible.

Adequate appellate review is similarly impossible in Ohio. If a comprehensive and consistent individualized determination cannot be made at sentencing it is difficult to conceive that appellate review, being one step further removed from first-hand information, could be an adequate means of avoiding arbitrariness and of assuring proportionality.

Adequate review is also undercut by the failure of the Ohio statutes to require the jury sentencing to life imprisonment to identify the mitigating factors found to exist and why these outweigh the aggravating factors. Without this information no significant comparison of cases is possible since no written findings exist to serve as a basis for comparison. Without a significant comparison of cases there can be no meaningful appellate review. Careful scrutiny in the comparison of cases is possible only if a sufficient data base exists. There must be as much information regarding as many cases as possible in order for a comparison to be accurate and significant--to provide a relevant basis for distinguishing cases and appropriate penalties from each other. Yet Ohio's system provides for procedures which are incompatible with the relevant comparison of cases. Both speeding review and requiring only minimal information in written findings at sentencing detract from the relevant comparison of cases.

78

Ohio's record of review in the past further demonstrates the strong likelihood that appellate review will not adequately ensure against arbitrariness and disproportionality. Further, the most commonly charged aggravating circumstance of Section 2929.04(A)(7) of the Revised Code of Ohio does not narrow the class of felony murderers eligible for the death penalty. For this reason this aggravating circumstance is invalid under Zant, Barclay and Jurek. This invalidity presents this court with the situation which Zant refused to decide but for which both Zant and Barclay provide the basis for solution.

Under these cases broad discretion was legitimate only if the state death penalty scheme maintained the inherent safeguards of a categorical narrowing at the definition stage, an individualized determination and meaningful appellate review.

Accordingly as other safeguards do not exist in Ohio, in order for Ohio's system to conceivably meet the Gregg and Furman tests of proportionality, Ohio must provide for an objective standard that adequately directs and limits the discretion of the sentencing body.

The present Ohio death penalty statute is unconstitutional because it creates a substantial risk of arbitrariness or caprice. The jury is left to weigh factors in aggravation and mitigation by guesswork. This statute does not provide sufficient guidance to a jury to satisy the guided discretion that the Supreme Court requires.

B.   THE MITIGATING CIRCUMSTANCES IN SECTION
     2919.04(B)(1), (2), (3), (4), (5) AND (6)
     OF THE REVISED CODE OF OHIO ARE VAGUE.

As noted earlier, the jury must be given "specific and detailed

79

guidance" and be provided with "clear and objective standards" for their
sentencing discretion to be adequately channelled, according to Gregg
and Godfrey, supra. Without such guidance, a pattern of arbitrary and
capricious sentencing like that found unconstitutional in Furman could
occur. The mitigating circumstances stated in Section 2929.04(B) of the
Revised Code of Ohio are so vague in terminology that there is a "sub-
stantial risk that sentencing authorities will inflict the death penalty
in an arbitrary and diversified manner." State v. White, 395 A.2d 1082,
1091 (Del. S. Ct. 1978).

While specific and detailed guidance is not always necessary,
Ohio's death penalty scheme lacks the procedural safeguards that provide
the approval for exercising greater discretion. Perhaps the most critical
of these safeguards is a comprehensive individualized determination of
the suitability of the death sentence. A consistent individualized
determination is not possible in a scheme in which the statutes defining
mitigating circumstances are vague. Vagueness makes these circumstances
constantly subject to change in meaning. The transient nature of defini-
tion is inimical to consistent application.

Section 2929.04(B)(1) of the Revised Code of Ohio speaks of considera-
tion of whether the victim "induced or facilitated" the murder. This
factor is logically open to many varied interpretations--from a direct
request for death (such as in a mercy killing) to simple taunts or
dares. Facilitation, making easier the commission of the murder, may
include for some jurors or courts a victim who is armed or willingly
engaged in unlawful conduct. See State v. Robert Earl Hines, (unreported)
Case No. CA-634 (Ashland Cty. C. A., Feb. 25, 1977), while others may

80

strongly disagree. See Comment, "The Constitutionality of Ohio's Death Penalty", 38 Ohio St. L. J. 617, 636 (1977). Probably the most obvious meaning of "induced" would be "provoked". But if the sentencers were to use this meaning and find mitigation under Section 2929.04(B)(1) of the Revised Code of Ohio, it would cast serious doubt on the validity of the aggravated murder conviction. This is because a provoked murder is punishable merely as voluntary manslaughter under Section 2903.03 of the Revised Code of Ohio.

Too great a disparity in thought is present here. There are no definitions within the statute or in prior judicial interpretations. The language cannot be said to have a common and ordinary meaning sufficiently definitive to meet its usage in the context of the statute. See White, supra, at 1090.

Similar problems arise as to Section 2929.04(B)(2) of the Revised Code of Ohio. While duress and coercion have been given quite restrictive interpretation by the Ohio Supreme Court, see State v. Weind, 50 Ohio St.2d 224, 231, 364 N.E.2d 224 (1977), there is no judicial or other interpretation given to "strong provocation". Is this the equivalent of "serious provocation" in Section 2903.03 of the Revised Code of Ohio, or something less? When the statute speaks of "unlikely", is this to mean never, perhaps, sometimes? What degree of negative probability is expected here?

While Section 2929.04(B)(3) of the Revised Code of Ohio restates the Model Penal Code's provision for insanity, see M.P.C. §4.01, this has not always been viewed by courts and/or triers of fact as a model of

clarity, nor has it been given uniform interpretation. The definition of "substantial capacity" contained in Section 2929.04(B)(3) of the Revised Code of Ohio is far from clear and has caused difficulty in definition between a psychiatrist and the court in at least one penalty phase trial. See, Opinion of the Trial Judge in a Capital Case, State v. Drewey F. Kiser, Ross County, C.P. No. 82-CR-69.

"Youth of the offender" in Section 2929.04(B)(4) of the Revised Code of Ohio suffers from the same vagaries as did "elderly" victim in State v. White, supra at 1090-1091. The Delaware Court there struck down the pertinent aggravating circumstance as too vague to adequately guide the jury.

Correspondingly, "the lack of a significant history of prior criminal convictions and delinquent adjudications" appears indistinguisable from the "substantial history of serious assaultive criminal convictions" which the Georgia statute specified as an aggravating circumstance and the Georgia Supreme Court found to give "too wide a latitude of discretion to the jury." Arnold v. State, 236 Ga. 534, 224 S. E.2d 386, 391 (1976), cited with approval in Gregg, supra, at 166, n. 9. The fact that this unconstitutionally vague formulation is used here to define a mitigating rather than an aggravating circumstance makes no practical or legal difference. Here, the decision whether a defendant is to live or die is virtually unintelligible. One defendant may be spared, while another is condemned, solely on the basis of the argued, but possibly illusory, distinctions between their criminal records. Juries must differ as will courts or the public, on this matter. There is, thus, no meaningful basis for distinguishing one sentence from another.

82

The last specific mitigating factor, Section 2929.04(B)(6) of the Revised Code of Ohio, is similarly flawed. There is no definition of principal offender provided, and confusion as well as disparity may easily arise as to the meaning attached to the term. See Comment to Provisional 4 O.J.I. §503.01. The jury instructions that have been given on this issue are also far from being crystal clear. See, Charge of the Court Penalty Phase, State v. Randy Fellows, Trumbull County C.P. 82-CR-470.

After delineating specific mitigating circumstances, Section 2929.04(B)(7) of the Revised Code of Ohio contains a catchall clause that refers to "any other factors that are relevant to the issue of whether the defendant should be sentenced to death." Section 2929.04(C) of the Revised Code of Ohio then states that "the defendant shall be given great latitude in the presentation of evidence of the factors listed in division (B) of this section and of any other factors in mitigation of the imposition of the sentence of death." Section 2929.03(D)(1) of the Revised Code of Ohio contains an identical statement.

It is unclear, under the catchall clauses, whether the defendant may offer evidence of a lesser or imperfect version of one of the specifically listed mitigating circumstances. Eddings v. Oklahoma, _____ U.S. _____, 102 S. Ct. 869 (1982) states that if there is evidence that the defendant had a mental disease that contributed to the crime but that did not deprive the defendant of his sanity, such evidence must be considered, even though it might not be sufficient to establish the mitigating circumstance in Section 2929.04(B)(3) of the Revised Code of Ohio. The defendant's contributing mental condition is therefore mitigating whether or not it complies with the statutory standard, and

R 6

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 358

should therefore be admitted, but whether this is true with regard to other mitigating circumstances is very unclear.

The fact that the evidence does not foreclose all doubt as to guilt must be considered by the sentencing authority as a relevant mitigating factor, although it is not specified in Section 2929.04(B) of the Revised Code of Ohio. As judges may differ in whether they instruct on this issue, differing jury determinations may be expected.

In each instance, the statutory delineation of mitigating factors:

> "inject into the governmental wheel so much free play
> that in the practical course of its operation it is
> likely to function erratically--responsive to whim
> or discrimination unrelated to any specific determination
> of need by the responsible policy-making organs of
> society." Smith v. Goguen, 415 U. S. 566, 572-573
> (1974).

Constitutionally such provisions must fall.

The mitigating circumstances enumerated in the Ohio statute fail to provide specific and detailed guidance, the requisite clear and objective standards for decision-making absent a certainty of meaningful appellate review, a categorical narrowing of the class of defendants eligible for the death sentence, and a comprehensive individualized determination of the suitability of the sentence. Ohio provides none of these safeguards, however, and therefore specificity is required. A jury attempting to define the language contained in these provisions will tread precariously on thin ice, since both case law and statutory interpretations do not offer assistance. This is a serious constitutional infirmity.

Not only is Section 2929.04(B)(7) unclear as to what should and should not be considered as a mitigating factor, but when given as a jury instruction in its statutory form, (See, Charge of the lower court,

84

Penalty Phase, State v. Drewey F. Kiser, Ross County, C.P. 82-CR-69.)
It also permits the jury to consider non-statutory aggravating circum-
stances in its deliberations on whether to sentence the defendant to
death. Clearly, where the jury is permitted to consider non-statutory
aggravating circumstances during the mitigation phase of the trial and
is at no time required to explain how it determined that the aggravating
specifications outweighed the mitigating factors, there are no clear and
objective standards that provide specific detailed guidance in the
sentencing scheme as is constitutionally required. Gregg v. Georgia,
428 U. S. 157 (1976), Profitt v. Florida, 428 U. S. 242 at 251 (1976).
Further, this prevents a rational review of the process that results in
the Death sentence. Woodson v. North Carolina, 428 U. S. 280, 303
(1976). Because this provision opens up consideration of anything to
the jury without ensuring a comprehensive individualized determination
and because there is no rational method to review the determination, the
statute is unconstitutional.

    C.   SECTIONS 2929.03, 2929.04 and 2929.05 OF THE REVISED
         CODE OF OHIO VIOLATE THE EIGHTH AND FOURTEENTH
         AMENDMENTS TO THE UNITED STATES CONSTITUTION AND
         ARTICLE I, SECTIONS 9 AND 16 OF THE OHIO CONSTITUTION
         IN FAILING TO ALLOCATE PROPERLY THE BURDEN OF PROOF
         FOR EXISTENCE OF MITIGATING FACTORS.

    1.   Ohio Burden of Proof on Mitigation

Section 2929.03(D)(1) of the Revised Code of Ohio provides that the
defendant has the burden of going forward with the evidence of mitigation.
The statute fails to allocate the burden of proof as to the existence of
mitigating factors. This leaves the jury with no guidance, particularly

85

if the evidence as to a particular mitigating circumstance is equally
balanced. Arbitrary decisions will result from the vague scheme that
now exists.

    2.   Beyond a Reasonable Doubt Standard

    The State of Ohio should have the burden of proving the absence of
mitigating factors beyond a reasonable doubt. This will prevent arbitrary
decisions in close cases. The defendant cannot be obliged to bear the
burden of proving the existence of mitigating factors. If the defendant
were so required, then in a case in which the evidence relating to
mitigation was equally balanced, the jury would have to find that there
were no mitigating circumstances. Aggravation would thus outweigh
mitigation, and the jury would have to impose the death sentence even
though it was as likely as not that there were mitigating circumstances.
This is contrary to the requirements of the constitution insofar as it
mandates respect for humanity and the greater need for reliability as to
the appropriateness of the death penalty. See Woodson v. North Carolina,
28 U. S. 280, 305 (1976); Lockett, supra, at 604; and Mullaney v.
Wilbur, 421 U. S. 684, 697-701, 703-704 (1975).

    Placing the burden of proving the absence of mitigating factors on
the prosecution will also prevent what has been called "state-administered
suicide," Godfrey, supra, at 439.

    3.   State-Sanctioned Suicide

    Under the present statutory scheme, the State may participate in
aiding a capitally-charged defendant, desirous of being executed despite

86

existence of mitigating factors, in receiving the death penalty.  There
are at least two reasons why such a defendant may want to die.  The most
obvious is that death may understandably be preferable to a long prison
term.  (That was the reason given by a recently-executed Virginia man for
forsaking review of his sentence.)  Another reason is that the murderer
may truly feel that death is what he deserves for the crime he committed.
Death is not the proper penalty in either case.  If death is preferable
to the convicted murderer, then clearly the death penalty fails as a
deterrent.  If he feels he deserves to die for what he had done, then he
is repenting and could probably be rehabilitated.

Two examples illustrate how the statute allows state-administered
suicide.  First, Section 2929.03 of the Revised Code of Ohio puts the
burden of raising the matter of age on the defendant.  A person under
eighteen is exempt from the death penalty as long as he raises the issue
of age.  The statute presumably does not preclude the execution of a
child who does not want to raise the issue of age, but would rather
suffer the death penalty.  The State has undertaken to pursue death
penalty charges in a number of cases where the defendant is under eighteen
at the time of the incident.  See, State v. DeMorris Dillard, Cuyahoga
County, No. 176128; State v. Bradley E. Porter, Franklin County, No. 83-
CR-03765, State v. Fred Joseph, Jr., Trumbull County, C.P. No. 83-CR-37.
Secondly, Section 2929.03(D)(1) of the Revised Code of Ohio puts the
burden of going forward with evidence of mitigating factors on the
defendant.  A particular defendant may have many items of mitigation in
his favor, but if he declines to raise them, the death penalty is given.
Statutorily, the sentencing authority apparently has no choice:  it

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 362

must weigh the aggravating circumstance(s) already established against the absence of mitigation. Thus, two men with the same background can commit the same murder and be sentenced to grossly different penalties, merely because one has the will to live and the other doesn't. Such a sentencing scheme operates arbitrarily and capriciously in violation of equal protection and due process clauses. See Greenberg, Capital Punishment As A System, 91 Yale L. J. 908 (1982), also Lenhard v. Wolff, 444 U. S. 807 (1979) where the defendant was permitted to present no evidence of mitigation despite readiness of stand by counsel to do so. Justice Marshall (dissenting) pointed out that:

> We can have no assurance that the death sentence would have been imposed if the sentencing tribunal had engaged in the careful weighing process that was held to be constitutionally required in Gregg v. Georgia and its progeny. This Court's toleration of the death penalty has depended on its assumption that the penalty will be imposed only after painstaking review of aggravating and mitigating factors. In this case, that assumption has proved demonstrably false. Instead, the Court has permitted the state's mechanism of execution to be triggered by an entirely arbitrary factor: the defendant's decision to acquiesce in his own death. In my view, the procedure the Court approves today amounts to nothing less than state-administered suicide. . . . (Emphasis added.)

Lenhard, supra, at 815. See also Gilmore v. Utah, 429 U. S. 1012 (1976).

Justice Stevens in his concurring opinion in Barclay maintained that both Lockett v. Ohio and Eddings v. Oklahoma condemn any procedure in which evidence of mitigation has no weight at all. 103 S. Ct., at 3430. Yet in the above circumstances, this is precisely the case in Ohio. The statutory procedure does not compel introduction of mitigating evidence, in effect, Ohio's scheme prevents this evidence from carrying any weight at all.

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 363

D.  SECTIONS 2929.03, 2929.04 AND 2929.05 OF THE
    REVISED CODE OF OHIO VIOLATE THE EIGHTH AND
    FOURTEENTH AMENDMENTS TO THE UNITED STATES
    CONSTITUTION AND ARTICLE I, SECTIONS 9 AND 16
    OF THE OHIO CONSTITUTION IN ALLOWING THE
    IMPOSITION OF THE DEATH PENALTY IN THE PRESENCE
    OF MITIGATING CIRCUMSTANCES.

Sections 2929.03, 2929.04 and 2929.05 of the Revised Code of Ohio
violate the due process and the cruel and unusual punishment provisions
of the state and federal constitutions, in that they may permit imposition
of the death penalty when mitigating factors are present. Whenever
mitigating factors are present, it is unconstitutional to impose the
death penalty, because where any reason exists to spare a human life,
common decency and basic notions of justice preclude its imposition.

X.  SECTIONS 2929.03, 2929.04 AND 2929.05 OF THE
    REVISED CODE OF OHIO VIOLATE THE EIGHTH AND
    FOURTEENTH AMENDMENTS TO THE UNITED STATES
    CONSTITUION AND ARTICLE I SECTIONS 9 AND 16
    OF THE OHIO CONSTITUTION BY FAILING TO PROVIDE
    THE SENTENCING AUTHORITY WITH AN OPTION TO
    CHOOSE A LIFE SENTENCE WHEN THERE ARE AGGRA -
    VATING CIRCUMSTANCES AND NO MITIGATING
    CIRCUMSTANCES.

The Georgia death sentencing statutes, similar to that in Ohio,
have been construed to require the trial court to charge the jury that
if they find the existence of an aggravating circumstance, but do not
find any mitigating circumstance, they may nevertheless return a life
sentence. Presnell v. State, 241 Ga. 49 (1978), see also Gregg v.
Georgia, 428 U. S. 153, 197 (1976) (plurality opinion). The capitally
convicted defendant is entitled to a charge providing a life option,
Chenault v. Stynchcombe, 581 F.2d 441, 448 (5th Cir., 1978); Washington
v. Watkins, 655 F.2d 1346, 1374 and fn. 54, 1376 and 57 (5th Cir. 1981);
Spivey v. Zant, 661 F.2d 464, 470-471 (5th Cir., 1981), but Ohio's

89

provisions do not appear to allow the jury this opportunity.

The failure to allow the jury this life option is implicitly contramandated by language in Barclay v. Florida, in which the Court stated that the jury is free to "...determine whether or not death is the appropriate punishment." ____ U. S. ____, 103 S. Ct., at 3424, (1983), quoting California v. Ramos, ____ U. S. ____, 103 S. Ct., at 3446, 3456 (1983). "Juries maintain a link between contemporary community values and the penal system" Gregg, at 190. While aggravating factors are present, and no mitigating ones, the sentencing body "must still determine whether the aggravating circumstances are of such value, weight, importance, consequence, or significance as to be sufficiently substantial to call for the imposition of the death penalty." State v. McDougall, 301 S. E.2d 308, 324-328 N. C., 1983. See also State v Watson, 423 So.2d 1130 (La., 1983), King v. Mississippi, ____ U. S. ____, 33 Crim. L. Rep. 4039 (May 2, 1983) (J. Marshall, dissenting from the denial of certiorari.)

The language of the statute is dangerously vague with respect to this issue; it creates an ambiguity that threatens to prevent the defendant from pursuing all constitutionally proper means to save his life.

But, if the indictment charges the defendant with felony murder, no new or additional aggravating circumstances are required to make it capitally triable. Thus the statute fails to genuinely narrow the class of aggravated felony murderers eligible for the death penalty as required by Zant. All that is required is that the charge of felony murder be re-alleged as it has been in this case.

In addition, Sections 2929.04(A)(7) and 2903.01(B) of the Revised

90

Code of Ohio are identical, with respect to the principal offender.
An aggravating specification which merely repeats the requirements for
aggravated murder is overbroad, as it fails to assign any additional
facts so as to isolate a more heinous aggravated murder offense or to
narrow the class of aggravated murderers eligible for the death penalty.

The result is that one charged with felony murder finds himself
charged with a capital offense when the principal in a cold-blooded pre-
meditated murder does not. This further offends Zant, as no reasonable
justification exists for a more severe sentence for the felony murder
than the prior calculation and design murder.

The state has arbitrarily selected one class of murderers who may
be subject to the death penalty. The scheme, in fact, apparent in the
death penalty statutes, is inconsistent with the purported state interests.
The most brutal, cold-blooded and premeditated murders do not fall
within the types of murder that are eligible for the death penalty.
Surely, if deterrence is a state objective, then this type of killing
would be a prime target. Yet, this type of murder is excluded from the
group that are subject to the death penalty. There is no rational basis
and no compelling state interest for this distinction and its application
is arbitrary and capricious.

Such grossly disparate treatment is unjustified and violates the
defendant's due process, protection from cruel and unusual punishment,
and equal protection rights guaranteed under the Fourteenth and Eighth
Amendments to the United States Constitution and Article I, Sections 2,
9, and 16 of the Ohio Constitution. The result of allowing the defendant to

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 366

be capitally charged under these circumstances is the doubling of the
aggravating factors which in turn, results in due process, equal pro-
tection, cruel and unusual punishment, and double jeopardy violations
contrary to the Constitution of the United States and Ohio.

The implications of this bootstrapping are apparent when the jury
must weigh the aggravating and mitigating circumstances. The boot-
strapping effect which is allowed by the death penalty statutes results
in invidious discrimination in conflict with the mandate of Skinner v.
Oklahoma, 316 U. S. 535 (1941). By failing to circumscribe the class
eligible for the death sentence as required by Zant, the statutes allow
the arbitrary and capricious exercise of the sentencing body's discretion
that Furman prohibits.

> XI. THE DEATH PENALTY AUTHORIZED BY SECTIONS
> 2929.02, 2929.022, 2929.03 AND 2929.04
> OF THE REVISED CODE OF OHIO VIOLATES THE
> CRUEL AND UNUSUAL PUNISHMENT PROVISIONS
> AND DUE PROCESS CLAUSES OF THE STATE AND
> FEDERAL CONSTITUTIONS BECAUSE SEVERAL OF
> THE AGGRAVATING CIRCUMSTANCES SET FORTH
> IN SECTION 2929.04(A) ARE OVERBROAD AND
> VAGUE AND FAIL TO REASONABLY JUSTIFY
> THE IMPOSITION OF A MORE SEVERE SENTENCE.

Overbreadth and vagueness, if present in a capital sentencing
statute, will fatally undermine the statute's validity. The United
States Supreme Court requires that a state channel the sentencer's
discretion "by clear and objective standards," Gregg v. Georgia, 428
U. S. 153, 198 (1976), that provide "specific and detailed guidance,"
Proffitt v. Florida, 428 U. S. 242, 253 (1976) and that "make rationally
reviewable the process for imposing a sentence of death." Woodson v.

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 367

North Carolina, 428 U. S. 280, 303 (1976). In Godfrey v. Georgia, 446 U. S. 420, 428-429, 433 (1980), the Court vacated a death sentence because an arbitrary and capricious infliction of the death penalty had occurred in application of one of Georgia's aggravating circumstances:

> ...[a] person of ordinary sensibility could fairly characterize almost every murder as "outrageously or wantonly vile, horrible and inhuman", [so] [t]here is no principled way to distinguish this case in which the death penalty was imposed, from the many cases in which it was not.

Due to overbreadth of the aggravating circumstances, Godfrey's sentence was vacated. A similar result will obtain if the standard for imposition of death are so vague that they cannot be considered "clear and objective" or "provide specific and detailed guidance" to the sentencing authority.

Further, in Zant v. Stephens, _____ U. S. _____, 103 S. Ct. 2733, 2742-2743 (1983), the Court stated: "To avoid[the Furman] constitutional flaw, an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of [aggravated] murder."

Several of the aggravating and mitigating factors in Section 2929.04(A) and 2929.04(B) of the Revised Code of Ohio are fatally flawed in these respects on a facial basis, as well as applied to the facts herein.

## CONCLUSION

Based upon the foregoing arguments, counsel for defendant respectfully requests this Honorable Court to declare Ohio's Death Penalty Statutes unconstitutional under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 8, 9, 10, and 16 of the Ohio Constitution, and to dismiss the Indictment against the defendant, or failing dismissal of the Indictment, to dismiss the Death Penalty Specifications against the defendant.

MICHAEL SHANKS

JOHN A. GARRETSON
Attorneys for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was hand-delivered to John F. Holcomb, Prosecuting Attorney, Butler County Court House, Hamilton, Ohio 45011, on the date the same was filed.

JOHN A. GARRETSON
Attorney for Defendant

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 369

IMAGED

STATE OF OHIO                          :        CASE NO.  CR83-12-0614

          Plaintiff   **FILED In Common Pleas Court**        STATE OF OHIO
                      **BUTLER COUNTY, OHIO**               COUNTY OF BUTLER
VS                                              COURT OF COMMON PLEAS

VON CLARK DAVIS        **APR 27 1984** :        SUPPLEMENTAL DISCOVERY

          Defendant   **EDWARD S. ROBB, JR.**
          : : : : : : : : : : : :CLERK: : : : : : : : : : : :

          Now comes John F. Holcomb, Prosecuting Attorney, and provides as

Supplemental Discovery, the following:

          C.  Documents and Tangible Objects, Criminal Rule 16(B)(1)(c):

          Certified copy of automobile title for 1976 Pontiac Catalina (copy

attached.

          D.  Reports of Examinations or Tests, Criminal Rule 16(B)(1)(d);

          B.C.I. Report dated April 19, 1984.

          E.  Witnesses Names and Addresses, Criminal Rule 16(B)(1)(e):

          Shelley Robertson,                          Hamilton, Ohio

                                        JOHN F. HOLCOMB
                                        PROSECUTING ATTORNEY
                                        BUTLER COUNTY, OHIO

                                        BY



                                        MICHAEL J. SAGE
                                        ASSISTANT PROSECUTING ATTORNEY
                                        BUTLER COUNTY, OHIO
                                        Butler County Court House
                                        P.O. Box 515
                                        Hamilton, Ohio  45012
                                        Telephone:  (513) 867-5722


                          CERTIFICATE OF SERVICE

          This is to certify that a copy of the foregoing Supplemental Discovery

was mailed by U.S. ordinary mail to Michael D. Shanks, Attorney for Defendant,

315 South Monument Avenue, Hamilton, Ohio, 45011, this 27th day of April, 1984.



                                        MICHAEL J. SAGE
                                        ASSISTANT PROSECUTING ATTORNEY
                                        BUTLER COUNTY, OHIO

OFFICE OF
PROSECUTING ATTORNEY
BUTLER COUNTY, OHIO
JOHN F. HOLCOMB
PROSECUTING ATTORNEY

BUTLER COUNTY
COURTHOUSE
P. O. BOX 515
HAMILTON, OHIO 45012

76



Clk. 312

BARRETT BROTHERS, PUBLISHERS, SPRINGFIELD, OHIO

# Precipe for Subpena---In State Case

FILED

IMAGED

THE STATE OF OHIO

*vs.*

*Plaintiff* } '84 APR 26 PM 3 No. CR83-12-0614

**COMMON PLEAS COURT**

VON CLARK DAVIS

*Defendant*

*To the Clerk:—Issued subpena for*

**RESIDENCE**

*1*    James Bryant ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*2*    FILED In Common Pleas Court Hamilton, Ohio 45011

*3*    BUTLER COUNTY, OHIO

*4*    APR 30 1984

*5*

*6*    EDWARD S. ROBB, JR.
           CLERK

*7*

*8*

*9*

*10*

*to appear as witnesses in above named case, on* Tuesday, May 8 *A. D. 19 84 ,*

*at* 9:00 *o'clock* A. *M. Required on behalf of the* Defendant

*Att'y for the* Defendant

COURT OF COMMON PLEAS

BUTLER COUNTY, OHIO

STATE OF OHIO                    :              CASE NO. CR83-12-0614

                Plaintiff :

  -vs-                              :              MOTION IN LIMINE

VON CLARK DAVIS                   : FILED In Common Pleas Court
                                   BUTLER COUNTY, OHIO
          Defendant :

: : : : : : : : APR 10 1984

Now comes Defendant, Von Clark Davis, by and through his
attorneys, John Garretson and Michael D. Shanks, and moves the
Court for an order in limine prohibiting the Prosecution to
introduce into evidence or to discuss at trial in any manner two
(2) police reports, attached hereto and marked as Exhibits A and
B, which the Prosecution has given to Defendant by virtue of
discovery indicating their intention to introduce said material
at trial.

### M E M O R A N D U M

In the present case, the Prosecution has recently in an
Amended Discovery provided defense counsel with copies of two
(2) police reports, Exhibit A and B herein, which the Prosecution
intends to introduce at trial. In substance, the police reports
were taken from the victim of the shooting in the present case,
Suzette Butler, and indicate that Ms. Butler "believes" that
the Defendant, Von Davis, may have thrown a rock through her
window or attempted to burglarize her residence shortly before
the shooting, the focus of the present case. However, the Ohio
Rules of Evidence specifically exclude such documents from
admissability. Specifically Rule 803 (8) speaks about reports,

HOLBROCK, JONSON,
BRESSLER & HOUSER
ATTORNEYS AT LAW
HOLBROCK-JONSON
BUILDING
315 S MONUMENT AVENUE
P. O. BOX 687
HAMILTON, OHIO 45012

*79*

MAGEI

records, statement of public officers and agencies but further goes on to exclude "in criminal cases, matters observed by police officers and other law enforcement personnel unless offered by the Defendant . . ." Moreover, the police reports, which defense counsel wishes to exclude from trial for all purposes, are blatant heresay from a dead person and would be offered by the Prosecution to prove the truth of their content, depriving defense counsel from an opportunity to cross examine the witness as to the basis of her "beliefs and information". Additionally, the police reports are naked allegations that an individual in this case, Suzette Butler, suffered property damage or attempted theft loss and it was suspected that the perpetrator was the Defendant, Mr. Davis. Clearly, the Prosecution wishes to introduce these reports to show that Ms. Butler had some fear of retribution from Defendant. However, such evidence in the present form is totally inadmissable and depries defense counsel the opportunity to fully examine the naked allegations contained in the written reports. Accordingly, it is sespectfully requested by defendant that the Prosecution be prohibited qrom introducing or discussing in any manner the police reports attached hereto at the trial in the present case.

> HOLBROCK, JONSON, BRESSLER & HOUSER
> Attorneys for Defendant
> 315 South Monument Avenue
> P. O. Box 687
> Hamilton, Ohio) 45012
> Telephone: 868-7600

> BY _____
> Michael D. Shanks

HOLBROCK, JONSON,
BRESSLER & HOUSER
ATTORNEYS AT LAW
HOLBROCK-JONSON
BUILDING
315 S. MONUMENT AVENUE
P. O. BOX 687
HAMILTON, OHIO 45012

GREVEY, GREEN & GARRETSON
Attorneys for Defendant
118 South Second Street
Hamilton, Ohio 45011
Telephone: 868-2074

BY _John Garretson_
John Garretson

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion and
Memorandum was forwarded by ordinary U. S. Mail to Mr. John
Holcomb, Prosecuting Attorney, Butler County Courthouse, Second
Floor, Hamilton, Ohio 45011 this the 30th day of April, 1984.

BY _____
Michael D. Shanks

BY _____
John Garretson

HOLBROCK, JONSON,
BRESSLER & HOUSER
ATTORNEYS AT LAW
HOLBROCK-JONSON
BUILDING
115 S MONUMENT AVENUE
P. O. BOX 687
HAMILTON, OHIO 45012

EXHIBIT "A"

BUTLER SUZETTE R. 9 2 8

IMAGED

12-10-83 045 — HAMILTON Ohio 45013

12-10-83 046 — F B NONE —

NO

SUZETTE R. BUTLER 1

☐ LARCENY FROM AUTO ☐ AUTO ACCESSORIES ☐ FROM ANY COIN OPERATED DEVICE OR MACHINE ☐ LARCENY FROM PERSON ☐ FROM BUILDING ☐ SHOPLIFTING ☐ BICYCLE ☐ OTHER THEFT

20 PROPERTY DAMAGED ☐ AUTO ☐ LANDSCAPING ☐ MAIL BOXES ☐ A WDOW ☐ CONST. SITES ☐ EQUIP. ☐ LIGHTS ☐ MISC. PRV. PRTY. ☐ BRD. OF ED. ☐ RESIDENCE ☐ OTHER (SPECIFY)

AMOUNT OF THEFT $ 300.00
AMOUNT OF DAMAGES NONE

21 PERSON WHO DISCOVERED CRIME IF VICTIM WRITE VICTIM: VICTIM FB DVA

22 WITNESSES: NONE

23 TOOL OR WEAPON USED: KEY

24 TYPE OF LOCATION WHERE OCCURRED: ☐ STREET ☐ PARKING LOT ☒ OTHER HOUSE

29 PROPERTY TAKEN: ☒ JEWELRY $ 300.00

31 ☑ 1 m B 36 VON CLARK EX-BOYFRIEND

MRS. BUTLER REPORTS she CAME home AND discovered SOMEONE ENTER her home AND had THE T.V., RADIO, JEWELRY BOX AND A JAR OF PENNIES SACKED UP READY TO TAKE OUT OF THE home. MRS. BUTLER STATED A yellow gold sapphire RING WITH A diamond is missing. MRS. BUTLER ALSO Stated THE ABOUE SUBJECT AND HANK STOKES m-B-20 WAS observed By her, when she CAME home And she believe the

R. Shelley P.O. 108                S. Cook Sgt 312

BREAKING & ENTERING

IMAGED

9 | 2 | 8

ARE THE ONES THAT GOT INTO HER HOME. VON CLARK
WAS HER boyFRIEND AND SHE THREW him OUT ON
12-7-83. She bELiEvES hE hAd A KEy mAdE.
MRS. BUTLER STATEd shE will Sign OUT
WARRANTS.

EXHIBIT "B"

AT 12.10.83 2000       Butler, Suzette

IMAGED 9 2 8

HAMILTON OHio  45013

AT 12.10.83 2010    F B        NONE

SUZETTE BUTLER        F  B      -        1

HAMILTON, OHio 45013

Property Damaged: YES    ☒ WINDOW    AMOUNT OF DAMAGES $30.00

PERSON: ViCTiM

WITNESSES: ViCTiM

TOOL OR WEAPON USED: RoCK

TYPE OF LOCATION: ☒ 2 STORY FRAME HOUSE

UNUSUAL CHARACTERISTICS: NONE

1  M  B  35  VON CLARK DAVIS

Ms. BUTLER REPORTS SOMEONE THREW A ROCK THRU A
WINDOW IN THE REAR OF HER HOME. SHE WAS AT HOME
AT THE TIME AND SUSPECTS THE ABOVE SUBJECT, AN EX-BOYFRIEND,
WHO SHE CAUGHT BREAKING INTO HER HOUSE FRIDAY NIGHT.
SHE IS AFRAID OF RETALIATION FROM HIM IF SHE PROSECUTES
IN EITHER OFFENSE.

Gary Thompson PO 197                    C Furmon Sgt. 301

IMAGE

COURT OF COMMON PLEAS

BUTLER COUNTY, OHIO

STATE OF OHIO                    :        CASE NO. CR83-12-0614

    Plaintiff :

-vs-                             :        MOTION FOR EXPERT SERVICES

VON CLARK DAVIS          FILED in Common Pleas Court
                         BUTLER COUNTY, OHIO

    Defendant : 1984

    : : : : : : : : : : :

EDWARD S. ROBB, JR. CLERK

Pursuant to Ohio Revised Code Section 2929.024, Defendant,

Von Clark Davis, by and through his attorneys, John Garretson

and Michael D. Shanks, moves the Court for an order authorizing

defense counsel to obtain expert psychological/psychiatric

services to assist defense counsel in its representations of

Defendant.  Counsel states to the Court that examination of

Defendant by Butler County Forensic Center and Dr. Roger Fisher

are reasonably proper for the necessary for the proper represen-

tation of Defendant, Von Clark Davis.  Counsel for Defendant

further states that an order should be granted requiring payment

of fees and expenses for these services to be made in the same

manner as payment for appointed counsel is made pursuant to

Chapter 120 of the Ohio Revised Code.

                          Respectfully submitted,

99 - 0252

                          HOLBROCK, JONSON, BRESSLER & HOUSER
                          Attorneys for Defendant
                          315 South Monument Avenue
                          P. O. Box 687

HOLBROCK, JONSON,                    Hamilton, Ohio  45012
BRESSLER & HOUSER                    Telephone:  868-7600
ATTORNEYS AT LAW
HOLBROCK-JONSON
BUILDING
315 S. MONUMENT AVENUE
P. O. BOX 687                        BY _____
HAMILTON, OHIO 45012                     Michael D. Shanks

FILED

MAR 0 5 1999

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

MAGH

GREVEY, GREEN & GARRETSON
Attorneys for Defendant
118 South Second Street
Hamilton, Ohio 45011
Telephone: 868-2074

BY _____
John Garretson

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion was
forwarded by ordinary U. S. Mail to Mr. John Holcomb, Prosecuting
Attorney, Butler County Courthouse, Second Floor, Hamilton,
Ohio 45011 this the 30th day of April, 1984.

BY _____
Michael D. Shanks

BY _____
John Garretson

HOLBROOK, JONSON,
BRESSLER & HOUSER
ATTORNEYS AT LAW
HOLBROOK--JONSON
BUILDING
315 S. MONUMENT AVENUE
P. O. BOX 687
HAMILTON, OHIO 45012

COURT OF COMMON PLEAS     IMAGED

BUTLER COUNTY, OHIO

STATE OF OHIO         :      CASE NO. CR83-12-0614

      Plaintiff :

   -vs-                  :      O R D E R

VON CLARK DAVIS    FILED (n Common) Pleas Court
              BUTLER COUNTY, OHIO

      Defendant :   APR 34 1984

    : : : : : : : : : : :

    Upon application of Motion of defense counsel, the Court finds
that it is reasonably necessary for the examination of Defendant
by Dr. Roger Fisher of the Butler County Forensic Center.

    WHEREFORE, IT IS ORDERED:

    that the defendant be examined by Dr. Roger Fisher of the
Butler County Forensic Center and any costs incurred in this
examination be paid in a manner provided pursuant to Chapter 120
of the Ohio Revised Code.

                 "ENTER"

                 JUDGE

HOLBROCK, JONSON, BRESSLER & HOUSER ATTORNEYS AT LAW HOLBROCK-JONSON BUILDING 315 S. MONUMENT AVENUE P.O. BOX 687 HAMILTON, OHIO 45012

378   380

FILED In Common Pleas Court
BUTLER COUNTY, OHIO

IMAGED APR 30 1984

EDWARD S. ROBB, JR.
CLERK

COURT OF COMMON PLEAS

BUTLER COUNTY, OHIO

STATE OF OHIO              :    CASE No. 83 12 0614

      Plaintiff       :

vs.                        :    MOTION FOR ORDER
                                RELEASING RECORDS
VON CLARK DAVIS            :

      Defendant        :

: : ::: : :

Now comes the defendant, by and through his counsel, and moves the Court for an order ordering the Department of Rehabilitation and Corrections and the Adult Parole Authority to release to the defendant's counsel any and all records of the defendant's incarceration and subsequent release on parole for the reasons set forth below.

*Michael Shanks*
MICHAEL SHANKS
315 S. Monument Avenue, P. O. Box 687
Hamilton, Ohio 45012
Telephone: (513) 868-7600

*John A. Garretson*
JOHN A. GARRETSON
A Legal Professional Association
Attorneys for Defendant
118 S. Second Street, P. O. Box 60
Hamilton, Ohio 45012
Telephone: (513) 868-2074

IMAGED

## MEMORANDUM

The defendant herein is charged with aggravated murder with a specification, and the State of Ohio is thereby seeking the death penalty. In preparation for possibly having to present evidence at a mitigation sentencing hearing if the defendant were found guilty at a previous trial, the defendant's counsel is in need and is entitled to present records concerning the defendant's conduct while incarcerated on the charges he was previously convicted of and his records while being on parole.

MICHAEL SHANKS

JOHN A. GARRETSON
Attorneys for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was sent by regular U. S. Mail to John F. Holcomb, Prosecuting Attorney, Butler County Court House, Hamilton, Ohio 45011, on the date the same was filed.

JOHN A. GARRETSON
Attorney for Defendant

- 2 -

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 382

HOWE

RATE OF ½ PER MONTH WHICH IS AN ANNUAL
PERCENTAGE RATE OF 24% ON ANY PREVIOUS
DISTRIBUTING COMPANY BALANCE NOT PAID WITHIN 30 DAYS.

**INVOICE**

223 Court Street/P.O. Box 9
Hamilton, Ohio 45012
phone (513) 863-3393

| INVOICE NO. | 32766 |
|---|---|

TO  Grevey, Green & Garretson

118 South 2nd. St. P.O. Box 60

Hamilton, Ohio  45012

INVOICE DATE  April 30, 1984

SHIPPED TO

| OUR ORDER NO | YOUR ORDER NO | SALESMAN | TERMS | SHIPPED VIA | PPD OR COLL |
|---|---|---|---|---|---|
| X | | | Net 30 Days | We deliver | |

| QUANTITY | DESCRIPTION | PRICE | AMOUNT |
|---|---|---|---|
| | Davis | | |
| 6 ea. | Copies of 192 pages 8½x11  20# White | | 115 20 |
| 1152 | Sheets Collated | | 10 94 |
| 108 | Sets stapled | | 2 16 |
| ea. | Binder clips | | 1 20 |
| | Total | | 129 50 |

Available from GRAYARC CO., INC. Brooklyn, NY  11232

ORIGINAL

| JOHN A. (JACK) GARRETSON | | 2824 |
|---|---|---|
| A LEGAL PROFESSIONAL ASSOCIATION | | |
| ATTORNEY-AT-LAW | | |
| 118 S. SECOND ST. | | |
| HAMILTON, OHIO  45011 | May 8   19 84 | 56-95/422 |

PAY TO THE ORDER OF  Howe Distributing Company   $ --129.50--

-----One Hundred Twenty Nine------------and 50/100------- DOLLARS

Society
BANK  P.O. BOX 387
of Southern Ohio  HAMILTON, OHIO 4011

FOR  Invoice 32766 (Davis)