# POLICIES-A

0504

STATE OF OHIO



DEPARTMENT OF REHABILITATION
AND CORRECTION

| SUBJECT: | PAGE 1 OF 5 |
|---|---|
| Execution | SECTION: 001 NUMBER: 09 |
| RULE/CODE REFERENCE: | SUPERCEDES: |
| RELATED ACA STANDARDS: | EFFECTIVE DATE: March 30, 1994 |
| RELATED AUDIT STANDARDS: | APPROVED: Reginald A. Wilkinson |

I. **AUTHORITY**

Section 5120.01 of the Ohio Revised Code established the authority of the Director as the executive head of the Ohio Department of Rehabilitation and Correction.

RELATED AUTHORITY:

A. Section 2949.21 of the Ohio Revised Code establishes the responsibility of the county sheriff to deliver a condemned inmate to the Department of Rehabilitation and Correction.

B. Section 2949.22 of the Ohio Revised Code provides both electrocution and lethal injection as the forms of execution in Ohio. This section provides any person sentenced to death the option to elect lethal injection instead of electrocution as a form of execution and limits the period for electing lethal injection to one week prior to the date of execution. It establishes the responsibilities of the director to designate a penal institution where death sentences shall be executed and the warden of that institution or deputy warden of the institution in his absence to be prepared to carry out an execution on the day designated by the sentencing judge or court in the course of appellate of post conviction proceedings.

C. Section 2949.23 of the Ohio Revised Code establishes the authority of the sentencing judge to set the date of execution.

D. Section 2949.24 of the Ohio Revised Code establishes the responsibility of the warden or deputy warden to carry out a death sentence unless a suspension of execution has been granted and to return the death warrant to the clerk of courts with notice of completion of the sentence and form of execution.

**0505**

DRC 1361

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3827

SUBJECT:  Execution                                        PAGE ___ OF ___

E.  Section 2949.25 of the Ohio Revised Code establishes who may be present to witness an execution.

F.  Section 2949.26 of the Ohio Revised Code establishes procedures on the disposition of the body of an executed inmate.

## II.  PURPOSE

The purpose of this policy is to establish a process for carrying out executions that ensures compliance with Administrative Regulations 5120-9-12 and 5120-9-54 and Ohio State statutes.

## III.  APPLICABILITY

This policy applies to the wardens and staff of the reception centers, the institution(s) housing death row, Southern Ohio Correctional Facility and to all individuals involved in carrying out a court imposed death sentence.

## IV.  DEFINITIONS

DEATH HOUSE:  The designated building at the Southern Ohio Correctional Facility for housing condemned prisoners just prior to execution. The location where executions are carried out.

ELECTION OF MANNER OF EXECUTION FORM:  The ODR&C form provided to an inmate scheduled for execution on which the inmate records the written notices of election of either lethal injection or electrocution as a means of execution.

ELECTROCUTION:  The form of execution whereby a current of electricity of sufficient intensity to cause death, passes through the body of person sentenced to death.

EXECUTION TEAM:  A team of trained persons designated by the warden of the Southern Ohio Correctional Facility to assume control of the condemned prisoner just prior to the scheduled execution. This team is responsible for the execution and post execution procedures; to include preparing the method of execution and the prisoner.

DRC 1362

0506

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3828

| SUBJECT: Execution | PAGE ___ OF ___ |
|---|---|

LETHAL INJECTION: The form of execution whereby continuous intravenous injection of a lethal drug or a series of lethal drugs of a sufficient dosage to quickly and painlessly cause death is administered.

STAY: A suspension or postponement of a legal execution.

V. POLICY

It is the policy of the Ohio Department of Rehabilitation and Correction to carry out the death penalty as directed by the sentencing court and in the method elected by the condemned in accordance with state statutes. Execution shall be effected in a professional, humane, sensitive, and dignified manner.

VI. PROCEDURES

A. All offenders sentenced to death by a court of law will be transported to a reception center within the Ohio Department of Rehabilitation and Correction for initial processing. Upon completion of the reception process the offender will immediately be transferred to the designated institution for either male or female death row placements.

B. The condemned inmate will remain on death row until transferred to the death house at the Southern Ohio Correctional Facility for execution.

C. Upon receipt of a court scheduled execution, the Office of the Director, and the wardens of the institutions housing the death row inmate and the Southern Ohio Correctional Facility will be notified.

D. The warden of the institution housing death row will ensure that an inmate scheduled for execution is provided with an Election of Manner of Execution form no later than one week prior to the scheduled date of execution. A copy of the completed form indicating either electrocution or lethal injection as the elected form of execution shall be forwarded to the warden of the Southern Ohio Correctional Facility.

DRC 1362

**0507**

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3829

SUBJECT: Execution PAGE ___4___ OF ___5___

E. All executions will take place at the Southern Ohio Correctional Facility.

F. Barring a court ordered stay of execution or commutation by the Governor, the condemned inmate will be transferred to the death house at the Southern Ohio Correctional Facility no later than 24 hours from the scheduled date of execution.

G. The warden with the approval of the regional director will select an execution team. Members of the team will be sufficiently trained to assist in an execution.

H. In compliance with Administrative Regulation 5120-9-54, the warden of the Southern Ohio Correctional Facility will establish policy for conducting executions consistent with the laws of the State of Ohio and the Administrative Code.

I. In the event that a stay of execution is granted after the inmate has been transferred to the death house, the condemned inmate will be returned to death row.

J. Upon completion of execution procedures, a post-mortem examination of the inmate shall be made by the Scioto County Coroner or designee, or selected physician.

K. The warden of the Southern Ohio Correctional Facility will sign the death warrant recording the method of execution and verification that the death sentence has been carried out. The warden will then return the death warrant to the clerk of courts in the sentencing county with confirmation of the court's order.

L. The Director of the Department of Rehabilitation and Correction will notify the office of the Governor on the date and time that a court ordered execution has been carried out.

DRC 1362

0508

| SUBJECT: Execution | PAGE _____ OF _____ |

OHIO DEPARTMENT OF REHABILITATION AND CORRECTION

# ELECTION OF MANNER OF EXECUTION

Pursuant to OR&C 2949.22 (B) (1) any person sentenced to death may elect to be executed by lethal injection instead of by electrocution. The election shall be made no later than one week prior to the scheduled date of execution of the person, in writing and filed with the Department of Rehabilitation and Correction.

If a person sentenced to death does not timely file with the Department a written notice of election to be executed by lethal injection, the person's death sentence shall be executed by electrocution.

Accordingly, as a person sentenced to death under the laws of the State of Ohio, _____, and scheduled for execution on _____ _____, 19 _____, you are requested to indicate your election below and return this form to the Warden of the Southern Ohio Correctional Facility by _____, 19 _____.

    ☐  LETHAL INJECTION

    ☐  ELECTROCUTION

Neither a person's timely filing of a written notice of election under ORC #2949.22 (B) (1) not a person's failure to file or timely file a written notice of election under that division shall affect or waive any right of appeal or postconviction relief that may be available under the laws of this state or the United States relative to the conviction for which the sentence of death was imposed upon the person or relative to the imposition or execution of that sentence of death.

_____        _____
Inmate Signature                 Date

_____        _____
Witness                    Date

_____        _____
Witness                    Date

DRC2459 (3/94)

**0509**



STATE OF OHIO

DEPARTMENT OF REHABILITATION
AND CORRECTION

| SUBJECT: | PAGE ___1___ OF _7_ |
|---|---|
| Execution | SECTION: 001-<br>NUMBER:  09 |
| RULE/CODE REFERENCE: | SUPERCEDES:<br>001-09 dated 03/30/94 |
| RELATED ACA STANDARDS: | EFFECTIVE DATE:<br>April 12, 2001 |
| RELATED AUDIT STANDARDS: | APPROVED:<br>*RQWilliam* ᵣᵦ |

I.     **AUTHORITY**:

This policy is issued in compliance with Ohio Revised Code 5120.01 which delegates to the Director of the Department of Rehabilitation and Correction the authority to manage and direct the total operations of the Department and to establish such rules and regulations as he prescribes.

II.    **PURPOSE**:

The purpose of this policy is to establish guidelines for carrying out a court-ordered sentence of death.

III.   **APPLICABILITY**:

This policy applies to all individuals involved in carrying out a court-ordered death sentence in accordance with all applicable policies, administrative regulations and statutes.

IV.    **DEFINITIONS**:

As used in this policy, the following will apply:

1.     Execution Team: A team consisting of no less than twelve (12) members, designated by the Warden of the Southern Ohio Correctional Facility (SOCF). Their duties also include preparation and testing of equipment and carrying out pre- and post-execution activities.

2.     Critical Incident Debriefing Team: A group selected by the SOCF Warden available on the part of all persons involved.  A psychological debriefing process is available via DRC clinical staff and others to recognize stressors associated with executions and to work through them with affected staff as follows:
   - Worker's own experiences of the execution including reactions and perceptions.
   - Review any negative aspects and feelings.
   - Review any positive aspects and feelings.
   - Relationships-over workers and family.
   - Empathy (sharing) with others.

DRC 1361

0510

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3832

| SUBJECT: Execution | PAGE __2__ OF __7__ |

- Disengagement from execution experience.
- Integration of this experience into the professional work role for a positive future contribution to the overall team effort.

3.     Stay: A court-ordered suspension or postponement of a legal execution.

4.     Electrocution: Form of execution whereby a current of electricity of sufficient intensity to cause death passes through the body of a person sentenced to death.

5.     Lethal Injection: The form of execution whereby continuous intravenous injection of a series of lethal drugs of a sufficient dosage to cause death.

6.     Reprieve: The postponement of an execution.

7.     Brine: Water saturated with salt, used to soak the sponges that will be applied to the condemned prisoner's head and leg at the time of electrocution to ensure proper contact for the electric current.

## V.    POLICY:

ORC 2949.22 establishes the responsibility of the Director to designate a penal institution where death sentences shall be executed. The responsibility of carrying out the execution on the day designated by the Ohio Supreme Court is designated to the Warden of that institution or to the Deputy Warden in his or her absence. Further, ORC 2949 establishes two methods of execution: electrocution and lethal injection. This allows any person sentenced to death the option of to electing lethal injection or electrocution and limits the period for election to one week prior to the scheduled date of execution.

It is the policy of the Ohio Department of Rehabilitation to carry out the death penalty as directed by the Courts and in the method elected by the condemned in accordance with the above statute. All execution processes shall be performed in a professional, humane, sensitive and dignified manner.

## VI.    PROCEDURES:

1.     All offenders sentenced to death by a court of law will be transported to a reception center within the Ohio Department of Rehabilitation and Correction for initial processing. Upon completion of the reception process the offender will immediately be transferred to the designated institution: Mansfield Correctional Institution (MANCI) for male offenders or Ohio Reformatory for Women (ORW) for female offenders.

2.     All court-ordered executions shall be carried out at the Southern Ohio Correctional Facility (SOCF) at 9:00 p.m. on the scheduled execution date.

3.     Unless otherwise designated by the Director or designee, the condemned inmate will remain on death row until transferred to the Death House at SOCF for scheduled execution.

DRC 1362

**0511**

| SUBJECT: Execution | PAGE 3 OF 7 |
| --- | --- |

4. The Ohio Supreme Court shall designate the date of execution. Upon receipt of a scheduled execution date, the Warden of the institution housing the inmate shall notify the Director and the SOCF Warden.

5. Attendance at the execution is governed by Administrative Regulation 5120-9-54 and includes:

   - The Warden or acting Warden of the institution where the execution is to be conducted, and such number of correction officers or other persons as the Warden or Acting Warden thinks necessary to execute the death sentence.
   - The Sheriff of the county in which the prisoner was tried and convicted.
   - The Director of the Department of Rehabilitation and Correction, or his designee and any other person selected by the Director or his designee to ensure that the death sentence is carried out.
   - Such number of physicians of the institution where the execution is to be conducted and medical personnel as the Warden or acting Warden thinks necessary.
   - The prisoner may select one of the following persons: a DRC, minister-of-record, clergy, rabbi, priest, or regularly ordained, accredited, or licensed minister of an established and legally cognizable church, denomination or sect.
   - Three persons designated by the prisoner who are not confined in any state institution subject to the approval of the Warden or acting Warden based on security considerations.
   - Three persons designated by the immediate family of the victim, subject to the approval of the Warden or acting Warden based on security considerations.
   - Representatives of the news media as the Director or his designee authorizes which shall include, but not be limited to, at least one representative of the following: a newspaper; a television station; and a radio station.

6. The SOCF Warden shall establish procedures for conducting executions consistent with all applicable laws, administrative codes and DRC Policies. This will include the establishment of a communication system between the Governor's Office and the SOCF Command Center.

   a. Primary communications will be via a telephone line opened directly to the SOCF Command Center from the execution chamber. This line will be tested one (1) hour prior to the scheduled execution. Other than testing, this line will remain open.

   b. Secondary communications will be via cellular telephone.

   c. In the event that both the primary and secondary communications are inoperable, the execution will be delayed until communications are established.

DRC 1362

0512

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3834

| SUBJECT:  Execution | PAGE __4__ OF __7__ |
|---|---|

VI.    **PROCEDURE:**

1.    Approximately Thirty (30) Days Prior To The Scheduled Execution Date:

   a.    The MANCI or ORW Warden will notify the Director by memo, with copies going to the Regional Director, DRC Chief Counsel, Assistant Director, APA, OSP (Portsmouth and Jackson), and the Office of Victim Services.

   b.    The SOCF Execution Team will begin conducting training sessions no less than once per week until the scheduled date of execution.

2.    Approximately One Week Prior To The Scheduled Date Of Execution:

   a.    The Warden of the institution housing the death row inmate will ensure that the inmate is provided with an Election of Manner of Execution Form (DRC 2459). A copy of the completed form indicating either electrocution or lethal injection as the elected form of execution shall be forwarded to the Director, Assistant Director and SOCF Warden.

3.    Approximately Twenty-Four (24) Hours Prior To The Scheduled Execution:

   a.    The condemned prisoner will be transferred from Death Row and housed in the Death House at SOCF. The condemned inmate will be constantly monitored by at least three (3) members of the execution team. A log will be maintained including, but not limited to visitors, movement, mood changes, meals served, showers, telephone calls, etc.).

   b.    The SOCF staff psychologist will interview the prisoner periodically and submit written reports to the Warden. All inmate files shall be maintained in the Warden's office at SOCF.

   c.    All inmate files shall be maintained in the SOCF Warden's Office.

   d.    The Warden will establish a line of communication with DRC legal staff and the Attorney General's Office for notice of case status and/or other significant legal changes.

4.    The Following Events Will Take Place Upon Arrival At The Death House:

   a.    Once the condemned inmate is at SOCF, the Death House will be restricted to the following:
   Director and/or designee(s);
   Warden;
   Chief Public Information Officer(s);
   Institution Deputy Warden'
   Administrative Assistant to the Warden;
   Chaplain;
   Chief Electrician;
   Physician;
   Chief of Security;

DRC 1362

0513

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3835

| SUBJECT: Execution | PAGE 5 OF 7 |
|---|---|

Maintenance Superintendent;

Other persons as deemed necessary by the Warden.

b.  SOCF chaplains will make periodic visits to the condemned prisoner, if requested by the inmate.

c.  The Deputy Warden of Operations will assign security personnel to staff entrances, checkpoints and to assist the Ohio State Highway Patrol (OSHP).

d.  The condemned prisoner will be measured for clothing. Clothing will be equipped with Velcro fasteners in lieu of metal (if by electrocution).

e.  The Execution Team Leader will ensure that the prisoner's property is inventoried in front of the prisoner. The condemned prisoner will specify who is to receive his or her personal effects.

f.  The condemned prisoner will be allowed contact visits with family, friends and/or private clergy, as approved by the Warden, between the hours of 10:00 am and 12:00 noon on the day of the scheduled execution. Limited contact visits will be permitted between the hours of 1:00 pm and 7:00 pm.

g.  If manner of execution is electrocution, the institution electrician will thoroughly test all execution equipment. A record will be kept of test results; these tests will take place periodically until execution.

h.  All communication equipment will be tested, including primary and secondary communication with the Governor's Office.

i.  Key personnel will be briefed by the Warden, including medical and mental health, in order to allow intake information to be obtained.

j.  The condemned prisoner will specify in writing his/her request for funeral arrangements. This information shall be conveyed to the prisoner's family or others, as appropriate. The Execution Team Leader will be responsible for securing this information.

k.  The Warden will receive updates from security personnel and the OSHP on crowd control, demonstrations, pickets, etc.

l.  The Chief of Security will brief the Warden on the level of tension within the remainder of the prison population.

m.  The Warden will relay any out of the ordinary activity to the South Regional Director.

n.  The Execution Team will continue to drill/rehearse.

o.  The Execution Team Leader will ask the condemned inmate to identify his or her special meal request.

p.  The names of official witnesses/media witnesses will be supplied to the SOCF Warden, as outlined in Administrative Rule 5120-9-54, Attendance at Execution and DRC Policy 003-03.

5.  Approximately Eleven (11) Hours Prior To The Execution:

a.  All contact visits, upon the Warden's approval for a condemned inmate will be from the hours of 10:00 a.m. until 12:00 p.m. and limited to two (2) visitors at a time.

b.  All limited contact visits, upon the Warden's approval for a condemned inmate will be from the hours of 1:00 p.m. until 7:00 p.m. and limited to two (2) visitors at a time.

DRC 1362

**0514**

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3836

| SUBJECT:  Execution | PAGE__6__ OF __7. |
|---|---|

6.  **Approximately Six (6) Hours Prior To The Execution:**

   a.   The execution team will prepare the brine and soak sponges, if electrocution is the selected method.

   b.   The prisoner is served his/her special meal.

7.  **Approximately One (1) Hour Prior To The Execution:**

   a.   If the method of execution is electrocution, the execution team leader will supervise the shaving of the condemned prisoner's head and right leg.

   b.   The prisoner will be permitted to take a shower and dress in the appropriate clothing for the execution.

   c.   Official witnesses to the execution will report to the institution. The victim's witnesses will report to the Portsmouth Highway Patrol Post for escort to the institution by designated SOCF personnel.

8.  **Approximately Fifteen (15) Minutes Prior To The Execution:**

   a.   The SOCF Command Center will establish phone communication with the Governor's Office.  If there has been no stay or reprieve granted, this contact will be maintained until the execution has been carried out.

   b.   The party pronouncing death will report to the Execution Chamber.

9.  **The Following Will Occur Just Prior To The Execution:**

   a.   The DR&C Public Information Officer, or designee will be responsible for media witnesses from the holding area to the witness room prior to the condemned inmate being escorted into the execution chamber.

   b.   The Warden and Execution Team will escort the condemned prisoner to the execution chamber, after the death warrant has been read and media witnesses are in place.

   c.   The Execution Team will place the condemned prisoner in the chair or on the lethal injection bed.

   d.   If by electrocution, the execution team will secure the back, arm, forearm, lap, chest, and ankles.  The electrode will then be attached to the right leg by a member of the execution team.

   e.   If by lethal injection, the condemned prisoner will be placed on the bed and strapped down.  Intravenous injection tubes will then be inserted.

   f.   Victim witnesses and inmate family witnesses will be escorted to the death house separately by designated SOCF staff.

   g.   The Warden will give the condemned prisoner the opportunity to give his or her last statement.

DRC 1362

0515

| SUBJECT:  Execution | PAGE __7__ OF __7__ |
|---|---|

10. Execution:

    a.    If by electrocution, the execution team will place the sponges on the condemned prisoner's head, secure the headset and attach the electrode to the headset. The head cover will then be placed on the prisoner's head.

    b.    The Warden will give the signal to commence execution process.

    c.    The designated members of the execution team will then activate the execution cycle, either by electrocution or lethal injection.

    d.    Once the execution cycle is completed, the curtains will be drawn and the designated personnel will examine the body and pronounce the prisoner dead.

    e.    The curtains will be opened for the Warden will pronounce the time of death. Witnesses will be escorted from the Death House.

11. Post-Execution:

    a.    The Warden, or his designee, will notify the Director that the execution has been carried out.

    b.    The Execution Team will remove the deceased from the chair or injection bed, and place him or her on a gurney.

    c.    Disposition of the body will be in accordance with arrangements made prior to the execution at the prisoner's request.

    d.    The Warden will sign and return the death warrant to the court, indicating the execution has been carried out.

12. Debriefing:

    a.    The Warden will ensure that critical incident debriefings are available for the Execution Team/Staff participants' immediately following the execution.

    b.    Interviews will be accomplished by the critical incident debriefing team as established by CIM guidelines.



STATE OF OHIO

DEPARTMENT OF REHABILITATION
AND CORRECTION

| SUBJECT: | PAGE ___1___ OF ___8___ |
|---|---|
| **Execution** | SECTION: 001-<br>NUMBER:  09 |
| RULE/CODE REFERENCE: | SUPERCEDES:<br>001-09 dated 04/12/01 |
| RELATED ACA STANDARDS: | EFFECTIVE DATE:<br><br>**August 21, 2001** |
| RELATED AUDIT STANDARDS: | APPROVED: |

I. **AUTHORITY:**

This policy is issued in compliance with Ohio Revised Code 5120.01 which delegates to the Director of the Department of Rehabilitation and Correction the authority to manage and direct the total operations of the Department and to establish such rules and regulations as he prescribes.

II. **PURPOSE:**

The purpose of this policy is to establish guidelines for carrying out a court–ordered sentence of death.

III. **APPLICABILITY**

This policy applies to all individuals involved in carrying out a court-ordered death sentence in accordance with all applicable policies, administrative regulations and statutes.

IV. **DEFINITIONS:**

As used in this policy, the following will apply:

1. Execution Team: A team consisting of no less than twelve (12) members, designated by the Warden of the Southern Ohio Correctional Facility (SOCF). Their duties also include preparation and testing of equipment and carrying out pre- and post-execution activities.

2. Critical Incident Debriefing Team: A group selected by the SOCF Warden available to assist any persons involved. A psychological debriefing process is available via DRC clinical staff and others to recognize stressors associated with executions and to work through them with affected staff as follows:

   · Worker's own experiences of the execution including reactions and perceptions.
   · Review any negative aspects and feelings.
   · Review any positive aspects and feelings.
   · Relationships with workers and/or family.
   · Empathy (sharing) with others.
   · Disengagement from execution experience.

DRC 1361

0517

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3839

| SUBJECT: Execution | PAGE 2 OF 8 |
| --- | --- |

· Integration of this experience into the professional work role for a positive future contribution to the overall team effort.

3. Stay: A court-ordered suspension or postponement of a legal execution.

4. Electrocution: Form of execution whereby a current of electricity of sufficient intensity to cause death passes through the body of a person sentenced to death.

5. Lethal Injection: The form of execution whereby continuous intravenous injection of a series of lethal drugs of a sufficient dosage to cause death.

6. Reprieve: The postponement of an execution.

7. Brine: Water saturated with salt, used to soak the sponges that will be applied to the condemned prisoner's head and leg at the time of electrocution to ensure proper contact for the electric current.

V.    POLICY:

ORC 2949.22 establishes the responsibility of the Director to designate a penal institution where death sentences shall be executed. The responsibility of carrying out the execution on the day designated by the Ohio Supreme Court is designated to the Warden of that institution or to the Deputy Warden in his or her absence. Further, ORC 2949 establishes two methods of execution: electrocution and lethal injection. This allows any person sentenced to death the option of electing lethal injection or electrocution and limits the period for election to one week prior to the scheduled date of execution.

It is the policy of the Ohio Department of Rehabilitation and Correction to carry out the death penalty as directed by the Courts and in the method elected by the condemned in accordance with the above statute. All execution processes shall be performed in a professional, humane, sensitive and dignified manner.

VI.   PROCEDURES:

1. All offenders sentenced to death by a court of law will be transported to a reception center within the Ohio Department of Rehabilitation and Correction for initial processing. Upon completion of the reception process the offender will immediately be transferred to the designated institution: Mansfield Correctional Institution (MANCI) for male offenders or Ohio Reformatory for Women (ORW) for female offenders.

2. All court-ordered executions shall be carried out at the Southern Ohio Correctional Facility (SOCF) at 10:00 a.m. on the scheduled execution date.

3. Unless otherwise designated by the Director or designee, the condemned inmate will remain on death row until transferred to the Death House at SOCF for scheduled execution.

DRC 1362

0518

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3840

| SUBJECT: Execution | PAGE 3 OF 8 |
|---|---|

4. The Ohio Supreme Court shall designate the date of execution. Upon receipt of a scheduled execution date, the Warden of the institution housing the inmate shall notify the Director and the SOCF Warden.

5. Attendance at the execution is governed by Administrative Regulation 5120-9-54 and includes:

- The Warden or Acting Warden of the institution where the execution is to be conducted, and such number of correction officers or other persons as the Warden or Acting Warden thinks necessary to carry out the death sentence.
- The Sheriff of the county in which the prisoner was tried and convicted.
- The Director of the Department of Rehabilitation and Correction, or his designee and any other person selected by the Director or his designee to ensure that the death sentence is carried out.
- Such number of physicians of the institution where the execution is to be conducted and medical personnel as the Warden or Acting Warden thinks necessary.
- The prisoner may select one of the following persons: a DRC chaplain, minister-of-record, clergy, rabbi, priest, or regularly ordained, accredited, or licensed minister of an established and legally cognizable church, denomination or sect.
- Three persons designated by the prisoner who are not confined in any state institution subject to the approval of the Warden or Acting Warden based on security considerations.
- Three persons designated by the immediate family of the victim, subject to the approval of the Warden or Acting Warden based on security considerations.
- Representatives of the news media as the Director or his designee authorizes which shall include, but not be limited to, at least one representative of the following: a newspaper; a television station; and a radio station.

6. The SOCF Warden shall establish procedures for conducting executions consistent with all applicable laws, administrative codes and DRC policies. This will include the establishment of a communication system between the Governor's Office and the SOCF Command Center.

   a. Primary communications will be via a telephone line opened directly to the SOCF Command Center from the execution chamber. This line will be tested one (1) hour prior to the scheduled execution. Other than testing, this line will remain open.

   b. Secondary communications will be via cellular telephone.

   c. In the event that both the primary and secondary communications are inoperable, the execution will be delayed until communications are established.

0519

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3841

| SUBJECT: Execution | PAGE __4__ OF __8__ |
| --- | --- |

**VII.  PROCEDURE:**

1.  Approximately Thirty (30) Days Prior To The Scheduled Execution Date:

    a.  The MANCI or ORW Warden will notify the Director by memo, with copies going to the Regional Director, DRC Chief Counsel, Assistant Director, APA, OSP (Portsmouth and Jackson), and the Office of Victim Services.

    b.  The SOCF Execution Team will begin conducting training sessions no less than once per week until the scheduled date of execution.

2.  Approximately One Week Prior To The Scheduled Date Of Execution:

    a.  The Warden of the institution housing the death row inmate will insure that the inmate is provided with an Election of Manner of Execution Form (DRC 2459). A copy of the completed form indicating either electrocution or lethal injection as the selected form of execution shall be forwarded to the Director, Assistant Director and SOCF Warden.

3.  Approximately Twenty-Four (24) Hours Prior To The Scheduled Execution:

    a.  The condemned prisoner will be transferred from Death Row and housed in the Death House at SOCF. The condemned inmate will be constantly monitored by at least three (3) members of the execution team. A log will be maintained including, but not limited to visitors, movement, mood changes, meals served, showers, telephone calls, etc.

    b.  The SOCF staff psychologist will interview the prisoner periodically and submit written reports to the Warden. All inmate files shall be maintained in the Warden's office at SOCF.

    c.  The Warden will establish a line of communication with DRC legal staff and the Attorney General's Office for notice of case status and/or other significant legal changes.

4.  The Following Events Will Take Place Upon Arrival At The Death House:

    a.  Once the condemned inmate is at SOCF, the Death House will be restricted to the following:

        Director and/or designee(s);
        Warden;
        Chief Public Information Officer(s);
        Institution Deputy Warden;
        Administrative Assistant to the Warden;
        Chaplain;

DRC 1 362

**0520**

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3842

| SUBJECT: Execution | PAGE __5__ OF __8__ |
|---|---|

       Chief Electrician;
       Physician;
       Chief of Security;
       Maintenance Superintendent;
       Other persons as deemed necessary by the Warden.

b.    SOCF chaplains will make periodic visits to the condemned prisoner, if requested by the inmate.

c.    The Deputy Warden of Operations will assign security personnel to staff entrances, checkpoints and to assist the Ohio State Highway Patrol (OSHP).

d.    The condemned prisoner will be measured for clothing. Clothing will be equipped with Velcro fasteners in lieu of metal (if by electrocution).

e.    The Execution Team Leader will ensure that the prisoner's property is inventoried in front of the prisoner. The condemned prisoner will specify who is to receive his or her personal effects.

f.    The condemned prisoner will specify in writing his/her request for funeral arrangements. This information shall be conveyed to the prisoner's family or others, as appropriate. The Execution Team Leader will be responsible for securing this information.

g.    The Execution Team Leader will ask the condemned inmate to identify his or her last special meal request. The last meal will be served at approximately 4:00 p.m. the day prior to the scheduled execution.

h.    The condemned prisoner will be allowed contact visits with family, friends and/or private clergy, as approved by the Warden, between the hours of 4:30 p.m. and 7:30 p.m. on the day prior to the scheduled execution. Cell front visits will be permitted between the hours of 6:30 a.m. and 8:00 a.m. on the day of the scheduled execution. The attorney and spiritual advisor may continue to visit with the condemned until 8:45 a.m.

i.    If manner of execution is electrocution, the institution electrician will thoroughly test all execution equipment. A record will be kept of test results; these tests will take place periodically until execution.

j.    All communication equipment will be tested, including primary and secondary communication with the Governor's Office.

k.    Key personnel will be briefed by the Warden, including medical and mental health, in order to allow intake information to be obtained.

l.    The Warden will receive updates from security personnel and the OSHP on crowd control, demonstrations, pickets, etc.

DRC 1362

0521

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3843

| SUBJECT: Execution | PAGE 6 OF 8 |
|---|---|

m.  The Chief of Security will brief the Warden on the level of tension within the remainder of the prison population.

n.  The Warden will relay any out of the ordinary activity to the South Regional Director.

o.  The Execution Team will continue to drill/rehearse.

p.  The names of official witnesses/media witnesses will be supplied to the SOCF Warden, as outlined in Administrative Rule 5120-9-54, Attendance at Execution and DRC Policy 003-03.

5.  Approximately Six (6) Hours Prior To The Scheduled Execution:

a.  The execution team will prepare the brine and soak sponges, if electrocution is the selected method.

6.  Approximately One (1) Hour Prior To The Scheduled Execution:

a.  If the method of execution is electrocution, the execution team leader will supervise the shaving of the condemned prisoner's head and right leg.

b.  The prisoner will be permitted to take a shower and dress in the appropriate clothing for the execution.

c.  Attorney and spiritual advisor shall be permitted cell-front visitation with the condemned until 8:45 a.m.

d.  Official witnesses to the execution will report to the institution. The victim's witnesses will report to the Portsmouth Highway Patrol Post for escort to the institution by designated SOCF personnel.

7.  Approximately Fifteen (15) Minutes Prior To The Scheduled Execution:

a.  The SOCF Command Center will establish phone communication with the Governor's Office. If there has been no stay or reprieve granted, this contact will be maintained until the execution has been carried out.

b.  The party pronouncing death will report to the Execution Chamber.

8.  The Following Will Occur Just Prior To The Execution:

a.  The DRC Public Information Officer, or designee will be responsible for media witnesses from the holding area to the witness room prior to the condemned inmate being escorted into the execution chamber.

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3844

| SUBJECT: **Execution** | PAGE __7__ OF __8__ |
|---|---|

    b.   The Warden and Execution Team will escort the condemned prisoner to the execution chamber, after the death warrant has been read and media witnesses are in place.

    c.   The Execution Team will place the condemned prisoner in the chair or on the lethal injection bed.

    d.   If by electrocution, the execution team will secure the back, arm, forearm, lap, chest, and ankles. The electrode will then be attached to the right leg by a member of the execution team.

    e.   If by lethal injection, the condemned prisoner will be placed on the bed and strapped down. Intravenous injection tubes will then be inserted.

    f.   Victim witnesses and inmate family witnesses will be escorted to the death house separately by designated SOCF staff.

    g.   The Warden will give the condemned prisoner the opportunity to give his or her last statement.

9.   Execution:

    a.   If by electrocution, the execution team will place the sponges on the condemned prisoner's head, secure the headset and attach the electrode to the headset. The head cover will then be placed on the prisoner's head.

    c.   The Warden will give the signal to commence the execution process.

    d.   The designated members of the execution team will then activate the execution cycle, either by electrocution or lethal injection.

    e.   Once the execution cycle is completed (which includes a 5-minute waiting period following electrocution), the curtains will be drawn and the designated personnel will examine the body and pronounce the prisoner dead.

    f.   The curtains will be opened for the Warden to pronounce the time of death. Witnesses will be escorted from the Death House.

10.   Post-Execution:

    a.   The Warden, or his designee, will notify the Director that the execution has been carried out.

    b.   The Execution Team will remove the deceased from the chair or injection bed, and place him or her on a gurney.

DRC 1362

0523

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3845

| SUBJECT: Execution | PAGE 8 OF 8 |
| --- | --- |

    c.    Disposition of the body will be in accordance with arrangements made prior to the execution at the prisoner's request.

    d.    The Warden will sign and return the death warrant to the court, indicating the execution has been carried out.

11.    Debriefing:

    a.    The Warden will ensure that critical incident debriefings are available for the Execution Team and staff participants immediately following the execution.

    b.    The critical incident debriefing team will conduct interviews in accordance with CIM guidelines.

| | Subject:<br>**Execution** | Page __1__ of __8__ |
|---|---|---|
| **State of Ohio**<br><br>**Department of Rehabilitation<br>and Correction** | | Section: 001-<br>Number: 09 |
| | Rule/Code Reference: | Supercedes:<br>001-09 dated 8/21/01 |
| | Related ACA Standards: | Effective Date:<br>**September 11, 2001** |
| | Related Audit Standards: | Approved:<br>Reginald A. Wilkinson |

## I. AUTHORITY:

This policy is issued in compliance with Ohio Revised Code 5120.01 which delegates to the Director of the Department of Rehabilitation and Correction the authority to manage and direct the total operations of the Department and to establish such rules and regulations as he prescribes.

## II. PURPOSE:

The purpose of this policy is to establish guidelines for carrying out a court-ordered sentence of death.

## III. APPLICABILITY:

This policy applies to all individuals involved in carrying out a court-ordered death sentence in accordance with all applicable policies, administrative regulations and statutes.

## IV. DEFINITIONS:

As used in this policy, the following will apply:

1. Execution Team: A team consisting of no less than twelve (12) members, designated by the Warden of the Southern Ohio Correctional Facility (SOCF). Their duties also include preparation and testing of equipment and carrying out pre- and post-execution activities.

2. Critical Incident Debriefing Team: A group selected by the SOCF Warden available to assist any persons involved. A psychological debriefing process is available via DRC clinical staff and others to recognize stressors associated with executions and to work through them with affected staff as follows:

· Worker's own experiences of the execution including reactions and perceptions.
· Review any negative aspects and feelings.
· Review any positive aspects and feelings.
· Relationships with workers and/or family.
· Empathy (sharing) with others.
· Disengagement from execution experience.

Replicates DRC 1361 and 1362

0525

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3847

| SUBJECT: Execution | PAGE 2 OF 8 |
|---|---|

· Integration of this experience into the professional work role for a positive future contribution to the overall team effort.

3. Stay: A court-ordered suspension or postponement of a legal execution.

4. Electrocution: Form of execution whereby a current of electricity of sufficient intensity to cause death passes through the body of a person sentenced to death.

5. Lethal Injection: The form of execution whereby continuous intravenous injection of a series of lethal drugs of a sufficient dosage to cause death.

6. Reprieve: The postponement of an execution.

7. Brine: Water saturated with salt, used to soak the sponges that will be applied to the condemned prisoner's head and leg at the time of electrocution to ensure proper contact for the electric current.

## V. POLICY:

ORC 2949.22 establishes the responsibility of the Director to designate a penal institution where death sentences shall be executed. The responsibility of carrying out the execution on ie day designated by the Ohio Supreme Court is designated to the Warden of that institution or to the Deputy Warden in his or her absence. Further, ORC 2949 establishes two methods of execution; electrocution and lethal injection. This allows any person sentenced to death the option of electing lethal injection or electrocution and limits the period for election to one week prior to the scheduled date of execution.

It is the policy of the Ohio Department of Rehabilitation and Correction to carry out the death penalty as directed by the Courts and in the method elected by the condemned in accordance with the above statute. All execution processes shall be performed in a professional, humane, sensitive and dignified manner.

## VI. PROCEDURES:

1. All offenders sentenced to death by a court of law will be transported to a reception center within the Ohio Department of Rehabilitation and Correction for initial processing. Upon completion of the reception process the offender will immediately be transferred to the designated institution: Mansfield Correctional Institution (MANCI) for male offenders or Ohio Reformatory for Women (ORW) for female offenders.

2. All court-ordered executions shall be carried out at the Southern Ohio Correctional Facility (SOCF) at 10:00 a.m. on the scheduled execution date.

3. Unless otherwise designated by the Director or designee, the condemned inmate will remain on death row until transferred to the Death House at SOCF for scheduled execution.

Replicates DRC 1361 and 1362

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3848

| SUBJECT: Execution | PAGE 3 OF 8 |
|---|---|

4. The Ohio Supreme Court shall designate the date of execution. Upon receipt of a scheduled execution date, the Warden of the institution housing the inmate shall notify the Director and the SOCF Warden

5. Attendance at the execution is governed by Administrative Regulation 5120-9-54 and includes:

- The Warden or Acting Warden of the institution where the execution is to be conducted, and such number of correction officers or other persons as the Warden or Acting Warden thinks necessary to carry out the death sentence.
- The Sheriff of the county in which the prisoner was tried and convicted.
- The Director of the Department of Rehabilitation and Correction, or his designee and any other person selected by the Director or his designee to ensure that the death sentence is carried out.
- Such number of physicians of the institution where the execution is to be conducted and medical personnel as the Warden or Acting Warden thinks necessary.
- The prisoner may select one of the following persons: a DRC chaplain; minister-of-record, clergy, rabbi, priest, or regularly ordained, accredited, or licensed minister of an established and legally cognizable church, denomination or sect.
- Three persons designated by the prisoner who are not confined in any state institution subject to the approval of the Warden or Acting Warden based on security considerations.
- Three persons designated by the immediate family of the victim, subject to the approval of the Warden or Acting Warden based on security considerations.
- Representatives of the news media as the Director or his designee authorizes which shall include, but not be limited to, at least one representative of the following: a newspaper; a television station; and a radio station.

6. The SOCF Warden shall establish procedures for conducting executions consistent with all applicable laws, administrative codes and DRC policies. This will include the establishment of a communication system between the Governor's Office and the SOCF Command Center.

a. Primary communications will be via a telephone line opened directly to the SOCF Command Center from the execution chamber. This line will be tested one (1) hour prior to the scheduled execution. Other than testing, this line will remain open.

b. Secondary communications will be via cellular telephone.

c. In the event that both the primary and secondary communications are inoperable, the execution will be delayed until communications are established.

VII. PROCEDURE:

Replicates DRC 1361 and 1362

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3849

| SUBJECT: Execution | PAGE 4 OF 8 |
|---|---|

1. Approximately Thirty (30) Days Prior To The Scheduled Execution Date:

   a. The MANCI or ORW Warden will notify the Director by memo, with copies going to the Regional Director, DRC Chief Counsel, Assistant Director, APA, OSP (Portsmouth and Jackson), and the Office of Victim Services.

   b. The SOCF Execution Team will begin conducting training sessions no less than once per week until the scheduled date of execution.

2. Approximately One Week Prior To The Scheduled Date Of Execution:

   a. The Warden of the institution housing the death row inmate will insure that the inmate is provided with an Election of Manner of Execution Form (DRC 2459). A copy of the completed form indicating either electrocution or lethal injection as the selected form of execution shall be forwarded to the Director, Assistant Director and SOCF Warden.

3. Approximately Twenty-Four (24) Hours Prior To The Scheduled Execution:

   a. The condemned prisoner will be transferred from Death Row and housed in the Death House at SOCF. The condemned inmate will be constantly monitored by at least three (3) members of the execution team. A log will be maintained including, but not limited to visitors, movement, mood changes, meals served, showers, telephone calls, etc

   b. The SOCF staff psychologist will interview the prisoner periodically and submit written reports to the Warden. All inmate files shall be maintained in the Warden's office at SOCF.

   c. The Warden will establish a line of communication with DRC legal staff and the Attorney General's Office for notice of case status and/or other significant legal changes.

4. The Following Events Will Take Place Upon Arrival At The Death House:

   a. Once the condemned inmate is at SOCF, the Death House will be restricted to the following: Director and/or designee(s);

   Warden;
   Chief Public Information Officer(s);
   Institution Deputy Warden;
   Administrative Assistant to the Warden;
   Chaplain;
   Chief Electrician;
   Physician;
   Chief of Security;

Replicates DRC 1361 and 1362

0528

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3850

| SUBJECT: Execution | PAGE 5 OF 8 |
| --- | --- |

Maintenance Superintendent;
Other persons as deemed necessary by the Warden.

b. SOCF chaplains will make periodic visits to the condemned prisoner, if requested by the inmate.

c. The Deputy Warden of Operations will assign security personnel to staff entrances, checkpoints and to assist the Ohio State Highway Patrol (OSHP).

d. The condemned prisoner will be measured for clothing. Clothing will be equipped with Velcro fasteners in lieu of metal (if by electrocution).

e. The Execution Team Leader will ensure that the prisoner's property is inventoried in front of the prisoner. The condemned prisoner will specify who is to receive his or her personal effects.

f. The condemned prisoner will specify in writing his/her request for funeral arrangements. This information shall be conveyed to the prisoner's family or others, as appropriate. The Execution Team Leader will be responsible for securing this information.

g. The Execution Team Leader will ask the condemned inmate to identify his or her last special meal request. The last meal will be served at approximately 4:00 p.m. the day prior to the scheduled execution.

h. The condemned prisoner will be allowed contact visits with family, friends and/or private clergy, as approved by the Warden, between the hours of 4:30 p.m. and 7:30 p.m. on the day prior to the scheduled execution. Cell front visits will be permitted between the hours of 6:30 a.m. and 8:00 a.m. on the day of the scheduled execution. The attorney and spiritual advisor may continue to visit with the condemned until 8:45 a.m

i. If manner of execution is electrocution, the institution electrician will thoroughly test all execution equipment. A record will be kept of test results; these tests will take place periodically until execution.

j. All communication equipment will be tested, including primary and secondary communication with the Governor's Office.

k. Key personnel will be briefed by the Warden, including medical and mental health, in order to allow intake information to be obtained.

l. The Warden will receive updates from security personnel and the OSHP on crowd control, demonstrations, pickets, etc.

m. The Chief of Security will brief the Warden on the level of tension within the remainder of the prison population.

Replicates DRC 1361 and 1362

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3851

| SUBJECT: **Execution** | PAGE 6 OF 8 |
|---|---|

   n. The Warden will relay any out of the ordinary activity to the South Regional Director.

   o. The Execution Team will continue to drill/rehearse.

   p. The names of official witnesses/media witnesses will be supplied to the SOCF Warden, as outlined in Administrative Rule 5120-9-54, Attendance at Execution and DRC Policy 003-03.

5. Approximately Six (6) Hours Prior To The Scheduled Execution:

   a. The execution team will prepare the brine and soak sponges, if electrocution is the selected method.

6. Approximately One (1) Hour Prior To The Scheduled Execution:

   a. If the method of execution is electrocution, the execution team leader will supervise the shaving of the condemned prisoner's head and right leg.

   b. The prisoner will be permitted to take a shower and dress in the appropriate clothing for the execution.

   c. Official witnesses to the execution will report to the institution. The victim's witnesses will report to the Portsmouth Highway Patrol Post for escort to the institution by designated SOCF personnel.

7. Approximately Fifteen (15) Minutes Prior To The Scheduled Execution:

   a. The SOCF Command Center will establish phone communication with the Governor's Office. If there has been no stay or reprieve granted, this contact will be maintained until the execution has been carried out.

   b. The party pronouncing death will report to the Execution Chamber.

8. The Following Will Occur Just Prior To The Execution:

   a. The DRC Public Information Officer, or designee will be responsible for media witnesses from the holding area to the witness room prior to the condemned inmate being escorted into the execution chamber.

   b. The Warden and Execution Team will escort the condemned prisoner to the execution chamber, after the death warrant has been read and media witnesses are in place.

Replicates DRC 1361 and 1362

**0530**

| SUBJECT: Execution | PAGE 7 OF 8 |
| --- | --- |

c. The Execution Team will place the condemned prisoner in the chair or on the lethal injection bed.

d. If by electrocution, the execution team will secure the back, arm, forearm, lap, chest, and ankles. The electrode will then be attached to the right leg by a member of the execution team.

e. If by lethal injection, the condemned prisoner will be placed on the bed and strapped down. Intravenous injection tubes will then be inserted.

f. Victim witnesses and inmate family witnesses will be escorted to the death house separately by designated SOCF staff.

g. The Warden will ask the condemned prisoner if he has any last words. If the prisoner has a last statement, he will be allowed to make it while the witnesses are present in the adjacent viewing chambers, who will be able to see him and hear him via microphone. There will be no restriction on the content of the condemned prisoner's statement. There will be no unreasonable restriction on the duration of the prisoner's last statement.

9. Execution:

a. If by electrocution, the execution team will place the sponges on the condemned prisoner's head, secure the headset and attach the electrode to the headset. The head cover will then be placed on the prisoner's head.

b. The Warden will give the signal to commence the execution process.

c. The designated members of the execution team will then activate the execution cycle, either by electrocution or lethal injection.

d. Once the execution cycle is completed (which includes a 5-minute waiting period following electrocution), the curtains will be drawn and the designated personnel will examine the body and pronounce the prisoner dead.

e. The curtains will be opened for the Warden to pronounce the time of death. Witnesses will be escorted from the Death House.

10. Post-Execution:

a. The Warden, or his designee, will notify the Director that the execution has been carried out.

Replicates DRC 1361 and 1362

0531

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3853

| SUBJECT: Execution | PAGE 8 OF 8 |
| --- | --- |

    b.  The Execution Team will remove the deceased from the chair or injection bed, and place him or her on a gurney.

    c.  Disposition of the body will be in accordance with arrangements made prior to the execution at the prisoner's request.

    d.  The Warden will sign and return the death warrant to the court, indicating the execution has been carried out.

11. <u>Debriefing</u>:

    a.  The Warden will ensure that critical incident debriefings are available for the Execution Team and staff participants immediately following the execution.

    b.  The critical incident debriefing team will conduct interviews in accordance with CIM guidelines.

Replicates DRC 1361 and 1362

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3854

State of Ohio



**Department of Rehabilitation
and Correction**

| Subject:<br>**Execution** | Page _1_ of _7_ |
| --- | --- |
| | Section: 001–<br>Number: 09 |
| Rule/Code Reference: | Supercedes:<br>001-09 dated 9/11/01 |
| Related ACA Standards: | Effective Date:<br>**November 21, 2001** |
| Related Audit Standards: | Approved: |

## I. AUTHORITY:

This policy is issued in compliance with Ohio Revised Code 5120.01 which delegates to the Director of the Department of Rehabilitation and Correction the authority to manage and direct the total operations of the Department and to establish such rules and regulations as he prescribes.

## II. PURPOSE:

The purpose of this policy is to establish guidelines for carrying out a court-ordered sentence of death.

## III. APPLICABILITY:

This policy applies to all individuals involved in carrying out a court-ordered death sentence in accordance with all applicable policies, administrative regulations and statutes.

## IV. DEFINITIONS:

As used in this policy, the following will apply:

1. Execution Team: A team consisting of no less than twelve (12) members, designated by the Warden of the Southern Ohio Correctional Facility (SOCF). Their duties also include preparation and testing of equipment and carrying out pre- and post-execution activities.

2. Critical Incident Debriefing Team: A group selected by the SOCF Warden available to assist any persons involved. A psychological debriefing process is available via DRC clinical staff and others to recognize stressors associated with executions and to work through them with affected staff as follows:

· Worker's own experiences of the execution including reactions and perceptions.
· Review any negative aspects and feelings.
· Review any positive aspects and feelings.
· Relationships with workers and/or family.

Replicates DRC 1361 and 1362

0533

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3855

| SUBJECT: Execution | PAGE 2 OF 7 |
|---|---|

· Empathy (sharing) with others.
· Disengagement from execution experience.
· Integration of this experience into the professional work role for a positive future contribution to the overall team effort.

3. Stay: A court-ordered suspension or postponement of a legal execution.

4. Lethal Injection: The form of execution whereby continuous intravenous injection of a series of lethal drugs of a sufficient dosage to cause death.

5. Reprieve: The postponement of an execution.

V. POLICY:

Establishes the responsibility of the Director to designate a penal institution where death sentences shall be executed. The responsibility of carrying out the execution on the day designated by the Ohio Supreme Court is designated to the Warden of that institution or to the Deputy Warden in his or her absence.

It is the policy of the Ohio Department of Rehabilitation and Correction to carry out the death penalty as directed by the Courts. All execution processes shall be performed in a professional, humane, sensitive and dignified manner.

VI. PROCEDURES:

1. All offenders sentenced to death by a court of law will be transported to a reception center within the Ohio Department of Rehabilitation and Correction for initial processing. Upon completion of the reception process the offender will immediately be transferred to the designated institution: Mansfield Correctional Institution (MANCI) for male offenders or Ohio Reformatory for Women (ORW) for female offenders.

2. All court-ordered executions shall be carried out at the Southern Ohio Correctional Facility (SOCF) at 10:00 a.m. on the scheduled execution date.

3. Unless otherwise designated by the Director or designee, the condemned inmate will remain on death row until transferred to the Death House at SOCF for scheduled execution.

4. The Ohio Supreme Court shall designate the date of execution. Upon receipt of a scheduled execution date, the Warden of the institution housing the inmate shall notify the Director and the SOCF Warden.

5. Attendance at the execution is governed by Administrative Regulation 5120-9-54 and includes:

Replicates DRC 1361 and 1362

0534

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3856

| SUBJECT: Execution | PAGE 3 OF 7 |
|---|---|

- The Warden or Acting Warden of the institution where the execution is to be conducted, and such number of correction officers or other persons as the Warden or Acting Warden thinks necessary to carry out the death sentence.
- The Sheriff of the county in which the prisoner was tried and convicted.
- The Director of the Department of Rehabilitation and Correction, or his designee and any other person selected by the Director or his designee to ensure that the death sentence is carried out.
- Such number of physicians of the institution where the execution is to be conducted and medical personnel as the Warden or Acting Warden thinks necessary.
- The prisoner may select one of the following persons: a DRC chaplain, minister-of-record, clergy, rabbi, priest, or regularly ordained, accredited, or licensed minister of an established and legally cognizable church, denomination or sect.
- Three persons designated by the prisoner who are not confined in any state institution subject to the approval of the Warden or Acting Warden based on security considerations.
- Three persons designated by the immediate family of the victim, subject to the approval of the Warden or Acting Warden based on security considerations.
- Representatives of the news media as the Director or his designee authorizes which shall include, but not be limited to, at least one representative of the following: a newspaper; a television station; and a radio station.

6. The SOCF Warden shall establish procedures for conducting executions consistent with all applicable laws, administrative codes and DRC policies. This will include the establishment of a communication system between the Governor's Office and the SOCF Command Center.

a. Primary communications will be via a telephone line opened directly to the SOCF Command Center from the execution chamber. This line will be tested one (1) hour prior to the scheduled execution. Other than testing, this line will remain open.

b. Secondary communications will be via cellular telephone.

c. In the event that both the primary and secondary communications are inoperable, the execution will be delayed until communications are established.

## VII. PROCEDURES:

1. Approximately Thirty (30) Days Prior To The Scheduled Execution Date:

a. The MANCI or ORW Warden will notify the Director by memo, with copies going to the Regional Director, DRC Chief Counsel, Assistant Director, APA, OSP (Portsmouth and Jackson), and the Office of Victim Services.

b. The SOCF Execution Team will begin conducting training sessions no less than once per week until the scheduled date of execution.

Replicates DRC 1361 and 1362

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3857

| SUBJECT: Execution | PAGE 4 OF 7 |
|---|---|

2. Approximately Twenty-Four (24) Hours Prior To The Scheduled Execution:

    a. The condemned prisoner will be transferred from Death Row and housed in the Death House at SOCF. The condemned inmate will be constantly monitored by at least three (3) members of the execution team. A log will be maintained including, but not limited to visitors, movement, mood changes, meals served, showers, telephone calls, etc

    b. The SOCF staff psychologist will interview the prisoner periodically and submit written reports to the Warden. All inmate files shall be maintained in the Warden's office at SOCF.

    c. The Warden will establish a line of communication with DRC legal staff and the Attorney General's Office for notice of case status and/or other significant legal changes.

3. The Following Events Will Take Place Upon Arrival At The Death House:

    a. Once the condemned inmate is at SOCF, the Death House will be restricted to the following: Director and/or designee(s);

        Warden;
        Chief Public Information Officer(s);
        Institution Deputy Warden;
        Administrative Assistant to the Warden;
        Chaplain;
        Physician;
        Chief of Security;
        Maintenance Superintendent;
        Other persons as deemed necessary by the Warden.

    b. SOCF chaplains will make periodic visits to the condemned prisoner, if requested by the inmate.

    c. The Deputy Warden of Operations will assign security personnel to staff entrances, checkpoints and to assist the Ohio State Highway Patrol (OSHP).

    d. The Execution Team Leader will ensure that the prisoner's property is inventoried in front of the prisoner. The condemned prisoner will specify who is to receive his or her personal effects.

Replicates DRC 1361 and 1362

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3858

| SUBJECT: Execution | PAGE 5 OF 7 |
|---|---|

e. The condemned prisoner will specify in writing his/her request for funeral arrangements. This information shall be conveyed to the prisoner's family or others, as appropriate. The Execution Team Leader will be responsible for securing this information.

f. The Execution Team Leader will ask the condemned inmate to identify his or her last special meal request. The last meal will be served at approximately 4:00 p.m. the day prior to the scheduled execution.

g. The condemned prisoner will be allowed contact visits with family, friends and/or private clergy, as approved by the Warden, between the hours of 4:30 p.m. and 7:30 p.m. on the day prior to the scheduled execution. Cell front visits will be permitted between the hours of 6:30 a.m. and 8:00 a.m. on the day of the scheduled execution. The attorney and spiritual advisor may continue to visit with the condemned until 8:45 a.m.

h. All communication equipment will be tested, including primary and secondary communication with the Governor's Office.

i. Key personnel will be briefed by the Warden, including medical and mental health, in order to allow intake information to be obtained.

j. The Warden will receive updates from security personnel and the OSHP on crowd control, demonstrations, pickets, etc.

k. The Chief of Security will brief the Warden on the level of tension within the remainder of the prison population.

l. The Warden will relay any out of the ordinary activity to the South Regional Director.

m. The Execution Team will continue to drill/rehearse.

n. The names of official witnesses/media witnesses will be supplied to the SOCF Warden, as outlined in Administrative Rule 5120-9-54, Attendance at Execution and DRC Policy 003-03.

4. Approximately One (1) Hour Prior To The Scheduled Execution:

a. The prisoner will be permitted to take a shower and dress in the appropriate clothing for the execution.

b. Official witnesses to the execution will report to the institution. The victim's witnesses will report to the Portsmouth Highway Patrol Post for escort to the institution by designated SOCF personnel.

Replicates DRC 1361 and 1362

0537

| SUBJECT: Execution | PAGE 6 OF 7 |
|---|---|

5. Approximately Fifteen (15) Minutes Prior To The Scheduled Execution:

    a. The SOCF Command Center will establish phone communication with the Governor's Office. If there has been no stay or reprieve granted, this contact will be maintained until the execution has been carried out.

    b. The party pronouncing death will report to the Execution Chamber.

6. The Following Will Occur Just Prior To The Execution:

    a. The DRC Public Information Officer, or designee will be responsible for media witnesses from the holding area to the witness room prior to the condemned inmate being escorted into the execution chamber.

    b. The Warden and Execution Team will escort the condemned prisoner to the execution chamber, after the death warrant has been read and media witnesses are in place.

    c. The Execution Team will place the condemned prisoner on the lethal injection bed, secure straps and intravenous injection tubes will then be inserted.

    d. Victim witnesses and inmate family witnesses will be escorted to the death house separately by designated SOCF staff.

    e. The Warden will ask the condemned prisoner if he has any last words. If the prisoner has a last statement, he will be allowed to make it while the witnesses are present in the adjacent viewing chambers, who will be able to see him and hear him via microphone. There will be no restriction on the content of the condemned prisoner's statement. There will be no unreasonable restriction on the duration of the prisoner's last statement.

7. Execution:

    a. The Warden will give the signal to commence the execution process.

    b. The designated members of the execution team will then activate the execution cycle.

    c. Once the execution cycle is completed, the curtains will be drawn and the designated personnel will examine the body and pronounce the prisoner dead.

    d. The curtains will be opened for the Warden to pronounce the time of death. Witnesses will be escorted from the Death House.

Replicates DRC 1361 and 1362

**0538**

| SUBJECT: Execution | PAGE 7 OF 7 |
|---|---|

8. Post-Execution:

    a. The Warden, or his designee, will notify the Director that the execution has been carried out.

    b. The Execution Team will remove the deceased from the chair or injection bed, and place him or her on a gurney.

    c. Disposition of the body will be in accordance with arrangements made prior to the execution at the prisoner's request.

    d. The Warden will sign and return the death warrant to the court, indicating the execution has been carried out.

9. Debriefing:

    a. The Warden will ensure that critical incident debriefings are available for the Execution Team and staff participants immediately following the execution.

    b. The critical incident debriefing team will conduct interviews in accordance with CIM guidelines.

Replicates DRC 1361 and 1362

0539

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3861

STATE OF OHIO



DEPARTMENT OF REHABILITATION
AND CORRECTION

| SUBJECT:<br>**Execution** | PAGE ___1___ OF ___7___ . |
| --- | --- |
| | SECTION: 001<br>NUMBER: 09 |
| RULE/CODE REFERENCE:<br>ORC 2949.22 | SUPERCEDES:<br>11/21/01 |
| RELATED ACA STANDARDS: | EFFECTIVE DATE:<br>**July 17, 2003** |
| RELATED AUDIT STANDARDS: | APPROVED: |

### I. AUTHORITY

This policy is issued in compliance with Ohio Revised Code 5120.01 which delegates to the Director of the Ohio Department of Rehabilitation and Correction the authority to manage and direct the total operations of the Department and to establish such rules and regulations as the Director prescribes.

### II. PURPOSE

The purpose of this policy is to establish guidelines for carrying out a court-ordered sentence of death.

### III. APPLICABILITY

This policy applies to all individuals involved in carrying out a court-ordered death sentence in accordance with all applicable policies, administrative regulations and statutes.

### IV. DEFINITIONS

As used in this policy, the following will apply:

**Execution Team**: A team consisting of no less than twelve (12) members, designated by the Warden of the Southern Ohio Correctional Facility (SOCF). Their duties also include preparation and testing of equipment and carrying out pre- and post-execution activities.

**Critical Incident Debriefing Team**: A group selected by the SOCF Warden available to assist any persons involved in the execution process. A psychological debriefing process is available via DRC clinical staff and others to recognize stressors associated with executions and to work through them with affected staff as follows:

- Worker's own experiences of the execution including reactions and perceptions.
- Review any negative aspects and feelings.
- Review any positive aspects and feelings.
- Relationships with workers and/or family.
- Empathy (sharing) with others.
- Disengagement from execution experience.

DRC 1361

0540

| SUBJECT: Execution | PAGE __2__ OF __7__ |
|---|---|

- Integration of this experience into the professional work role for a positive future contribution to the overall team effort.

**Stay**: A court-ordered suspension or postponement of a legal execution.

**Lethal Injection**: The form of execution whereby continuous intravenous injection of a series of lethal drugs of a sufficient dosage is administered to cause death.

**Reprieve**: The postponement of an execution.

## V. POLICY

It is the policy of the Ohio Department of Rehabilitation and Correction to carry out the death penalty as directed by Ohio Courts of Law. All execution processes shall be performed in a professional, humane, sensitive and dignified manner.

It is the responsibility of the Director to designate a penal institution where death sentences shall be executed. The Warden of that facility, or Deputy Warden in the absence of the Warden, is responsible for carrying out the death sentence on the date established by the Ohio Supreme Court.

## VI. PROCEDURES

A. General Guidelines

1. All offenders sentenced to death by a court of law will be transported to a reception center within the Ohio Department of Rehabilitation and Correction for initial processing. Upon completion of the reception process the offender will immediately be transferred to the designated institution: Mansfield Correctional Institution (MANCI) for male offenders or Ohio Reformatory for Women (ORW) for female offenders.

2. All court-ordered executions shall be carried out at the Southern Ohio Correctional Facility (SOCF) at 10:00 a.m. on the scheduled execution date.

3. Unless otherwise designated by the Director or designee, the condemned inmate will remain on death row until transferred to the Death House at SOCF for scheduled execution.

4. The Ohio Supreme Court shall designate the date of execution. Upon receipt of a scheduled execution date, the Warden of the institution housing the inmate shall notify the Director and the SOCF Warden.

5. Attendance at the execution is governed by Administrative Regulation 5120-9-54 and includes:

DRC 1382

0541

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3863

| SUBJECT: **Execution** | PAGE __3__ OF __7__ |
| --- | --- |

- The Warden or Acting Warden of the institution where the execution is to be conducted, and such number of correction officers or other persons as the Warden or Acting Warden thinks necessary to carry out the death sentence.
- The Sheriff of the county in which the prisoner was tried and convicted.
- The Director of the Department of Rehabilitation and Correction, or his designee and any other person selected by the Director or his designee to ensure that the death sentence is carried out.
- Such number of physicians of the institution where the execution is to be conducted and medical personnel as the Warden or Acting Warden thinks necessary.
- The prisoner may select one of the following persons: a DRC chaplain, minister-of-record, clergy, rabbi, priest, imam, or regularly ordained, accredited, or licensed minister of an established and legally cognizable church, denomination or sect.
- Three persons designated by the prisoner who are not confined in any state institution subject to the approval of the Warden or Acting Warden based on security considerations.
- Three persons designated by the immediate family of the victim, subject to the approval of the Warden or Acting Warden based on security considerations, as detailed in Department Policy 212-06, Victim Involvement in the Execution Process.
- Representatives of the news media as the Director or his designee authorizes which shall include, but not be limited to, at least one representative of the following: a newspaper; a television station; and a radio station.

6. The SOCF Warden shall establish procedures for conducting executions consistent with all applicable laws, administrative codes and DRC policies. This will include the establishment of a communication system between the Governor's Office and the SOCF Command Center.

   a. Primary communications will be via a telephone line opened directly to the SOCF Command Center from the execution chamber. This line will be tested one (1) hour prior to the scheduled execution. Other than testing, this line will remain open.

   b. Secondary communications will be via cellular telephone.

   c. In the event that both the primary and secondary communications are inoperable, the execution will be delayed until communications are established.

B. Execution Procedures

1. Approximately thirty (30) days prior to the scheduled execution date:

   a. The MANCI or ORW Warden will notify the Director by memo, with copies going to the Regional Director, DRC Chief Counsel, Assistant Director, APA,

DRC 1362

0542

| SUBJECT:  **Execution** | PAGE __4__ OF __7__ |
|---|---|

Ohio State Highway Patrol (Portsmouth and Jackson), and the Office of Victim Services.

    b.  The SOCF Execution Team will begin conducting training sessions no less than once per week until the scheduled date of execution.

2.  Approximately seven (7) days prior to the execution:

    a.  The MANCI or ORW Warden will have the Execution Information Release (DRC 1808) completed by the condemned prisoner.  This information will verify information on the condemned prisoner, visitors, witnesses, spiritual advisor, attorney, requested witness, property, and funeral arrangements.

    b.  The names of official witnesses/media witnesses will be supplied to the SOCF Warden, as outlined in Administrative Rule 5120-9-54, Attendance at Execution and DRC Policy 003-03.

    c.  The names and relationships of the victim's witnesses will be supplied to the SOCF Warden.

3.  Approximately twenty-four (24) hours prior to the scheduled execution:

    a.  The condemned prisoner will be transferred from Death Row and housed in the Death House at SOCF.  The condemned inmate will be constantly monitored by at least three (3) members of the execution team.  A log will be maintained including, but not limited to, visitors, movement, mood changes, meals served, showers, telephone calls, etc.

    b.  The SOCF staff psychologist will interview the prisoner periodically and submit written reports to the Warden.  All inmate files shall be maintained in the Warden's office at SOCF.

    c.  The Warden will establish a line of communication with DRC legal staff and the Attorney General's Office for notice of case status and/or other significant legal changes.

4.  The following events will take place upon arrival at the Death House:

    a.  Once the condemned inmate is at SOCF, the Death House will be restricted to the following:

Director and/or designee(s)
Warden
Chief Public Information Officer(s)
Institution Deputy Warden
Administrative Assistant to the Warden
Chaplain

DRC 1362

0543

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3865

| SUBJECT: Execution | PAGE __5__ OF __7__ |
|---|---|

Physician
Chief of Security
Maintenance Superintendent
Any other person as deemed necessary by the Warden.

b. SOCF chaplains will make periodic visits to the condemned prisoner, if requested by the inmate.

c. The Deputy Warden of Operations will assign security personnel to staff entrances, checkpoints and to assist the Ohio State Highway Patrol (OSHP).

d. The Execution Team Leader will ensure that the prisoner's property is inventoried in front of the prisoner. The condemned prisoner will have previously, per paragraph 2, specified who is to receive his or her personal effects.

e. The condemned prisoner will, per paragraph 2, specify in writing his/her request for funeral arrangements.

f. The Execution Team Leader will ask the condemned inmate to identify his or her last special meal request. The last meal will be served at approximately 4:00 p.m. the day prior to the scheduled execution.

g. The condemned prisoner will be allowed contact visits with family, friends and/or private clergy, as approved by the Warden, between the hours of 4:30 p.m. and 7:30 p.m. on the day prior to the scheduled execution. Cell front visits will be permitted between the hours of 6:30 a.m. and 8:00 a.m. on the day of the scheduled execution. The attorney and spiritual advisor may continue to visit with the condemned until 8:45 a.m.

h. All communication equipment will be tested, including primary and secondary communication with the Governor's Office.

i. Key personnel will be briefed by the Warden, including medical and mental health, in order to allow intake information to be obtained.

j. The Warden will receive updates from security personnel and the OSHP on crowd control, demonstrations, pickets, etc.

k. The Chief of Security will brief the Warden on the level of tension within the remainder of the prison population.

l. The Warden will relay any out of the ordinary activity to the South Regional Director.

m. The Execution Team will continue to drill/rehearse.

DRC 1362

0544

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3866

| SUBJECT: Execution | PAGE __6__ OF __7__ |
|---|---|

5. Approximately one (1) hour prior to the scheduled execution:

    a. The prisoner will be permitted to take a shower and dress in the appropriate clothing for the execution.

    b. Official witnesses to the execution will report to the institution. The victim's witnesses will report to the Portsmouth Highway Patrol Post for escort to the institution by designated SOCF personnel.

6. Approximately fifteen (15) minutes prior to the scheduled execution:

    a. The DRC Public Information Officer, or designee will be responsible for media witnesses from the holding area to the witness room prior to the condemned inmate being escorted into the execution chamber.

    b. The Warden and Execution Team will escort the condemned prisoner to the execution chamber, after the death warrant has been read and media witnesses are in place.

    c. The Execution Team will place the condemned prisoner on the lethal injection bed, secure straps and the intravenous injection tubes will then be inserted.

    d. Victim witnesses and inmate family witnesses will be escorted to the death house separately by designated SOCF staff.

    e. The Warden will ask the condemned prisoner if he has any last words. If the prisoner has a last statement, he will be allowed to make it while the witnesses are present in the adjacent viewing chambers, and are able to see him and hear him via microphone. There will be no restriction on the content of the condemned prisoner's statement and no unreasonable restriction on the duration of the prisoner's last statement.

7. Execution:

    a. The Warden will give the signal to commence the execution process.

    b. The designated members of the execution team will then activate the execution cycle.

    c. Once the execution cycle is completed, the curtains will be drawn and the designated personnel will examine the body and pronounce the prisoner dead.

    d. The curtains will be opened for the Warden to pronounce the time of death. Witnesses will be escorted from the Death House.

8. Post-Execution:

DRC 1362

0545

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3867

| SUBJECT:  **Execution** | PAGE __7__  OF __7__ |
|---|---|

    a.  The Warden, or his designee, will notify the Director that the execution has been carried out.

    b.  The Execution Team will remove the deceased from the execution bed, and place him or her on a gurney.

    c.  Disposition of the body will be in accordance with arrangements made prior to the execution at the prisoner's request.

    d.  The Warden will sign and return the death warrant to the court, indicating the execution has been carried out.

9.  Debriefing:

    a.  The Warden will ensure that critical incident debriefings are available for the Execution Team and staff participants immediately following the execution.

    b.  The critical incident debriefing team will conduct interview in accordance with CIM guidelines.

## VI.  MONITORING AND EVALUATION

This policy shall be reviewed annually and updated as needed.

DRC 1808 (7/03)

DRC 1362

0546

STATE OF OHIO

DEPARTMENT OF REHABILITATION
AND CORRECTION

| SUBJECT:<br>**Execution** | PAGE ___1___ OF ___9___ |
|---|---|
| | NUMBER: 01-COM-11 |
| RULE/CODE REFERENCE:<br>ORC 2949.22 | SUPERCEDES:<br>001-09 dated 07/17/03 |
| RELATED ACA STANDARDS: | EFFECTIVE DATE:<br>**January 8, 2004** |
| RELATED AUDIT STANDARDS: | APPROVED: |

## I. AUTHORITY

This policy is issued in compliance with Ohio Revised Code 5120.01 which delegates to the Director of the Ohio Department of Rehabilitation and Correction the authority to manage and direct the total operations of the Department and to establish such rules and regulations as the Director prescribes.

## II. PURPOSE

The purpose of this policy is to establish guidelines for carrying out a court-ordered sentence of death.

## III. APPLICABILITY

This policy applies to all individuals involved in carrying out a court-ordered death sentence in accordance with all applicable policies, administrative regulations and statutes.

## IV. DEFINITIONS

As used in this policy, the following will apply:

**Execution Team:** A team consisting of no less than twelve (12) members, designated by the Warden of the Southern Ohio Correctional Facility (SOCF). Their duties also include preparation and testing of equipment and carrying out pre- and post-execution activities.

**Critical Incident Debriefing Team:** A group selected by the SOCF Warden available to assist any persons involved in the execution process. A psychological debriefing process is available via DRC clinical staff and others to recognize stressors associated with executions and to work through them with affected staff as follows:

- Worker's own experiences of the execution including reactions and perceptions.
- Review any negative aspects and feelings.
- Review any positive aspects and feelings.
- Relationships with workers and/or family.
- Empathy (sharing) with others.
- Disengagement from execution experience.

DRC 1381

0547

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3869

| SUBJECT: Execution | PAGE 2 OF 9 |
|---|---|

- Integration of this experience into the professional work role for a positive future contribution to the overall team effort.

**Stay:** A court-ordered suspension or postponement of a legal execution.

**Lethal Injection:** The form of execution whereby continuous intravenous injection of a series of lethal drugs of a sufficient dosage is administered to cause death.

**Reprieve:** The postponement of an execution.

V.   POLICY

It is the policy of the Ohio Department of Rehabilitation and Correction to carry out the death penalty as directed by Ohio Courts of Law. All execution processes shall be performed in a professional, humane, sensitive and dignified manner.

It is the responsibility of the Director to designate a penal institution where death sentences shall be executed. The Warden of that facility, or Deputy Warden in the absence of the Warden, is responsible for carrying out the death sentence on the date established by the Ohio Supreme Court.

VI.   PROCEDURES

A. General Guidelines

1. All offenders sentenced to death by a court of law will be transported to a reception center within the Ohio Department of Rehabilitation and Correction for initial processing. Upon completion of the reception process the offender will immediately be transferred to the designated institution: Mansfield Correctional Institution (MANCI) for male offenders or Ohio Reformatory for Women (ORW) for female offenders.

2. All court-ordered executions shall be carried out at the Southern Ohio Correctional Facility (SOCF) at 10:00 a.m. on the scheduled execution date.

3. Unless otherwise designated by the Director or designee, the condemned inmate will remain on death row until transferred to the Death House at SOCF for scheduled execution.

4. The Ohio Supreme Court shall designate the date of execution. Upon receipt of a scheduled execution date, the Warden of the institution housing the inmate shall notify the Director and the SOCF Warden.

5. Attendance at the execution is governed by Administrative Regulation 5120-9-54 and includes:

DRC 1362

0548

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3870

| SUBJECT: Execution | PAGE __3__ OF __9__ |
|---|---|

- The Warden or Acting Warden of the institution where the execution is to be conducted, and such number of correction officers or other persons as the Warden or Acting Warden thinks necessary to carry out the death sentence.
- The Sheriff of the county in which the prisoner was tried and convicted.
- The Director of the Department of Rehabilitation and Correction, or his designee and any other person selected by the Director or his designee to ensure that the death sentence is carried out.
- Such number of physicians of the institution where the execution is to be conducted and medical personnel as the Warden or Acting Warden thinks necessary.
- The prisoner may select one of the following persons: a DRC chaplain, minister-of-record, clergy, rabbi, priest, imam, or regularly ordained, accredited, or licensed minister of an established and legally cognizable church, denomination or sect.
- Three persons designated by the prisoner who are not confined in any state institution subject to the approval of the Warden or Acting Warden based on security considerations.
- Three persons designated by the immediate family of the victim, subject to the approval of the Warden or Acting Warden based on security considerations, as detailed in Department Policy 212-06, Victim Involvement in the Execution Process.
- Representatives of the news media as the Director or his designee authorizes which shall include, but not be limited to, at least one representative of the following: a newspaper; a television station; and a radio station.

6. The SOCF Warden shall establish procedures for conducting executions consistent with all applicable laws, administrative codes and DRC policies. This will include the establishment of a communication system between the Governor's Office and the SOCF Command Center.

   a. Primary communications will be via a telephone line opened directly to the SOCF Command Center from the execution chamber. This line will be tested one (1) hour prior to the scheduled execution. Other than testing, this line will remain open.

   b. Secondary communications will be via cellular telephone.

   c. In the event that both the primary and secondary communications are inoperable, the execution will be delayed until communications are established.

B. Execution Procedures

1. Approximately thirty (30) days prior to the scheduled execution date:

   a. The MANCI or ORW Warden will notify the Director by memo, with copies going to the Regional Director, DRC Chief Counsel, Assistant Director, APA,

DRC 1362

| SUBJECT: Execution | PAGE __4__ OF __9__ |
|---|---|

Ohio State Highway Patrol (Portsmouth and Jackson), and the Office of Victim Services.

b. The SOCF Execution Team will begin conducting training sessions no less than once per week until the scheduled date of execution.

2. Approximately seven (7) days prior to the execution:

a. The MANCI or ORW Warden will have the Execution Information Release (DRC 1808) completed by the condemned prisoner. This information will verify information on the condemned prisoner, visitors, witnesses, spiritual advisor, attorney, requested witness, property, and funeral arrangements.

b. The names of official witnesses/media witnesses will be supplied to the SOCF Warden, as outlined in Administrative Rule 5120-9-54, Attendance at Execution and DRC Policy 003-03.

c. The names and relationships of the victim's witnesses will be supplied to the SOCF Warden.

3. Approximately twenty-four (24) hours prior to the scheduled execution:

a. The condemned prisoner will be transferred from Death Row and housed in the Death House at SOCF. The condemned inmate will be constantly monitored by at least three (3) members of the execution team. A log will be maintained including, but not limited to, visitors, movement, mood changes, meals served, showers, telephone calls, etc.

b. The SOCF staff psychologist will interview the prisoner periodically and submit written reports to the Warden. All inmate files shall be maintained in the Warden's office at SOCF.

c. The Warden will establish a line of communication with DRC legal staff and the Attorney General's Office for notice of case status and/or other significant legal changes.

4. The following events will take place upon arrival at the Death House:

a. Once the condemned inmate is at SOCF, the Death House will be restricted to the following:

Director and/or designee(s)
Warden
Chief Public Information Officer(s)
Institution Deputy Warden
Administrative Assistant to the Warden
Chaplain

DRC 1362

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3872

| SUBJECT: Execution | PAGE __5__ OF __9__ |
|---|---|

Physician
Chief of Security
Maintenance Superintendent
Any other person as deemed necessary by the Warden.

b.  SOCF chaplains will make periodic visits to the condemned prisoner, if requested by the inmate.

c.  The Deputy Warden of Operations will assign security personnel to staff entrances, checkpoints and to assist the Ohio State Highway Patrol (OSHP).

d.  The Execution Team Leader will ensure that the prisoner's property is inventoried in front of the prisoner. The condemned prisoner will have previously, per paragraph 2, specified who is to receive his or her personal effects.

e.  The condemned prisoner will, per paragraph 2, specify in writing his/her request for funeral arrangements.

f.  The Execution Team Leader will ask the condemned inmate to identify his or her last special meal request. The last meal will be served at approximately 4:00 p.m. the day prior to the scheduled execution.

g.  The condemned prisoner will be allowed contact visits with family, friends and/or private clergy, as approved by the Warden, between the hours of 4:30 p.m. and 7:30 p.m. on the day prior to the scheduled execution. Cell front visits will be permitted between the hours of 6:30 a.m. and 8:00 a.m. on the day of the scheduled execution. The attorney and spiritual advisor may continue to visit with the condemned until 8:45 a.m.

h.  All communication equipment will be tested, including primary and secondary communication with the Governor's Office.

i.  Key personnel will be briefed by the Warden, including medical and mental health, in order to allow intake information to be obtained.

j.  The Warden will receive updates from security personnel and the OSHP on crowd control, demonstrations, pickets, etc.

k.  The Chief of Security will brief the Warden on the level of tension within the remainder of the prison population.

l.  The Warden will relay any out of the ordinary activity to the South Regional Director.

m. The Execution Team will continue to drill/rehearse.

DRC 1362

0551

| SUBJECT: **Execution** | PAGE ___6___ OF ___9___ |

5. These procedures shall be followed concerning the medications used in the execution.

    a.   Upon notification to the Warden of a firm execution date, a person qualified under Ohio law to administer medications shall order a quantity of the following drugs in a timely manner from the institution's licensed pharmacist: thiopental sodium, pancuronium bromide and potassium chloride. A sufficient quantity shall be ordered as a contingency against the contamination or other inadvertent loss of any of the drugs.

    Prior to the execution and upon arrival of the inmate at the institution, a medical review of the inmate shall be conducted to establish any unique factors which may impact the manner in which the execution team carries out the execution.

    b.  On the day of the execution, the person qualified under Ohio law to administer medications shall take possession of the drugs thiopental sodium, pancuronium bromide and potassium chloride from the institution pharmacy, and shall document possession of the drugs by signing a receipt or log. The person qualified under Ohio law to administer medications shall deliver the drugs to the death house. The person qualified under Ohio law to administer medications shall, in the presence of a witness, give possession of the drugs to a person qualified to prepare intravenous injections. This transfer shall be documented by a receipt signed by these three parties. The person qualified under Ohio law to administer medications shall notify the command center upon the delivery of drugs and the command center shall log the time of delivery, the quantity, name and type of drugs delivered.

    c.  The drugs shall be prepared for injection by a person qualified under Ohio law to administer and prepare drugs for intravenous injections. The preparation of the drugs shall be monitored by a similarly qualified witness who shall independently verify the preparation and dosage of the drugs. When the drugs are prepared, the command center shall be notified and the time of the preparation recorded. The command center shall also record what drugs were prepared, the quantity, name and dosage of the prepared drugs.

    d.  The drugs shall be prepared as follows:[1]

    i.    Two grams of Thiopental Sodium prepared with 25 mg/cc concentration for a total of 80cc which are placed in two syringes labeled "one" and "two."

    ii.   A third syringe is prepared with 20cc of saline used as a flush and labeled as syringe "three."

    iii.  100 mg of Pancuronium Bromide is prepared with 2mg/ml concentration for a total of 50cc which is placed into two 25cc syringes labeled "four" and "five."

---

[1]  Depending upon the form and concentration of drugs delivered, it may be necessary to modify the preparation of syringes. In the event of any modification for any reason, a qualified witness shall review any modifications and the command center shall be notified and any changes recorded.

DRC 1362

0552

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3874

| SUBJECT: Execution | PAGE __7__ OF __9__ |
|---|---|

iv.   A syringe is prepared with 20cc of saline used as a flush and marked as syringe "six."

v.    100 milliequivalents of Potassium Chloride are prepared with 2 meq/cc concentration for a total of 50cc. The preparation is placed in a syringe labeled "seven."

vi.   A syringe is prepared with 20 cc of saline used as a flush and marked as syringe "eight."

e.   The arm veins near the joint between the upper and lower arm will be utilized as the preferred site for the injection. In the event that the execution team is unable to prepare the inmate's veins at the preferred site to receive the intravenous dose of drugs, a qualified medical person authorized to administer intravenous drugs shall use an alternative site to deliver the drugs as they may be authorized by law.

Upon the Warden's signal, the injections shall be administered in the order described above by a person qualified under Ohio law to administer intravenous injections. The start and finish time of each syringe shall be reported to the command center and recorded in a log.

f.   Upon completion of the injections, the curtain shall be drawn and the vital signs examined by a person qualified to determine the physical status of the inmate. After the time of death has been determined, the curtain shall be withdrawn and the time of death announced to the witnesses.

6.   Approximately one (1) hour prior to the scheduled execution:

a.   The prisoner will be permitted to take a shower and dress in the appropriate clothing for the execution.

b.   Official witnesses to the execution will report to the institution. The victim's witnesses will report to the Portsmouth Highway Patrol Post for escort to the institution by designated SOCF personnel.

7.   Approximately fifteen (15) minutes prior to the scheduled execution:

a   The DRC Public Information Officer, or designee will be responsible for media witnesses from the holding area to the witness room prior to the condemned inmate being escorted into the execution chamber.

b.   The Warden and Execution Team will escort the condemned prisoner to the execution chamber, after the death warrant has been read and media witnesses are in place.

DRC 1362

0553

| SUBJECT: Execution | PAGE 8 OF 9 |
|---|---|

c.  The Execution Team will place the condemned prisoner on the lethal injection bed, secure straps and the intravenous injection tubes will then be inserted.

d.  Victim witnesses and inmate family witnesses will be escorted to the death house separately by designated SOCF staff.

e.  The Warden will ask the condemned prisoner if he has any last words.  If the prisoner has a last statement, he will be allowed to make it while the witnesses are present in the adjacent viewing chambers, and are able to see him and hear him via microphone.  There will be no restriction on the content of the condemned prisoner's statement and no unreasonable restriction on the duration of the prisoner's last statement.

8.  Execution:

a.  The Warden will give the signal to commence the execution process.

b.  The designated members of the execution team will then activate the execution cycle.

c.  Once the execution cycle is completed, the curtains will be drawn and the designated personnel will examine the body and pronounce the prisoner dead.

d.  The curtains will be opened for the Warden to pronounce the time of death.  Witnesses will be escorted from the Death House.

9.  Post-Execution:

a.  The Warden, or his designee, will notify the Director that the execution has been carried out.

b.  The Execution Team will remove the deceased from the execution bed, and place him or her on a gurney.

c.  Disposition of the body will be in accordance with arrangements made prior to the execution at the prisoner's request.

d.  The Warden will sign and return the death warrant to the court, indicating the execution has been carried out.

10.  Debriefing:

a.  The Warden will ensure that critical incident debriefings are available for the Execution Team and staff participants immediately following the execution.

b.  The critical incident debriefing team will conduct interview in accordance with CIM guidelines.

DRC 1362

0554

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3876

| SUBJECT:  Execution | PAGE___9___ OF ___9___ |
|---|---|

DRC 1808 (7/03)

DRC 1362

**0555**

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3877

STATE OF OHIO

DEPARTMENT OF REHABILITATION
AND CORRECTION

| SUBJECT:<br>**Execution** | PAGE ___1___ OF ___9___ |
|---|---|
| | NUMBER: 01-COM-11 |
| RULE/CODE REFERENCE:<br>ORC 2949.22 | SUPERCEDES:<br>01-COM-11 dated 01/08/2004 |
| RELATED ACA STANDARDS: | EFFECTIVE DATE:<br>July 10, 2006 |
| RELATED AUDIT STANDARDS: | APPROVED:<br>*Terry J Collins* |

**I.  AUTHORITY**

This policy is issued in compliance with Ohio Revised Code 5120.01 which delegates to the Director of the Ohio Department of Rehabilitation and Correction the authority to manage and direct the total operations of the Department and to establish such rules and regulations as the Director prescribes.

**II.  PURPOSE**

The purpose of this policy is to establish guidelines for carrying out a court-ordered sentence of death.

**III.  APPLICABILITY**

This policy applies to all individuals involved in carrying out a court-ordered death sentence in accordance with all applicable policies, administrative regulations and statutes.

**IV.  DEFINITIONS**

As used in this policy, the following will apply:

Execution Team:  A team consisting of no less than twelve (12) members, designated by the Warden of the Southern Ohio Correctional Facility (SOCF).  Their duties also include preparation and testing of equipment and carrying out pre- and post-execution activities.

Critical Incident Debriefing Team:  A group selected by the SOCF Warden available to assist any persons involved in the execution process.  A psychological debriefing process is available via DRC clinical staff and others to recognize stressors associated with executions and to work through them with affected staff as follows:

* Worker's own experiences of the execution including reactions and perceptions.
* Review any negative aspects and feelings.

DRC 1361

0556

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3878

| SUBJECT: Execution | PAGE  2   OF  9 |
|---|---|

- Review any positive aspects and feelings.
- Relationships with workers and/or family.
- Empathy (sharing) with others.
- Disengagement from execution experience.
- Integration of this experience into the professional work role for a positive future contribution to the overall team effort.

Stay:  A court-ordered suspension or postponement of a legal execution.

Lethal Injection:  The form of execution whereby a continuous intravenous injection of a series of drugs in sufficient dosages is administered to cause death.

Reprieve:  The postponement of an execution.

V.    **POLICY**

It is the policy of the Ohio Department of Rehabilitation and Correction to carry out the death penalty as directed by Ohio Courts of Law.  All execution processes shall be performed in a professional, humane, sensitive and dignified manner.

It is the responsibility of the Director to designate a penal institution where death sentences shall be executed.  The Warden of that facility, or Deputy Warden in the absence of the Warden, is responsible for carrying out the death sentence on the date established by the Ohio Supreme Court.

VI.    **PROCEDURES**

A. General Guidelines

1.  All offenders sentenced to death by a court of law will be transported to a reception center within the Ohio Department of Rehabilitation and Correction for initial processing.  Upon completion of the reception process the offender will immediately be transferred to the designated institution:  Mansfield Correctional Institution (MANCI) or Ohio State Penitentiary (OSP) for male offenders or Ohio Reformatory for Women (ORW) for female offenders.

2.  All court-ordered executions shall be carried out at the Southern Ohio Correctional Facility (SOCF) at 10:00 a.m. on the scheduled execution date.

3.  Unless otherwise designated by the Director or designee, the condemned inmate will remain on death row until transferred to the Death House at SOCF for scheduled execution.

4.  The Ohio Supreme Court shall designate the date of execution.  Upon receipt of a scheduled execution date, the Warden of the institution housing the inmate shall notify the Director and the SOCF Warden.

DRC 1362

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3879

| SUBJECT: Execution | PAGE 3 OF 9 |
|---|---|

5. Attendance at the execution is governed by the Ohio Revised Code, section 2949.25 and includes:

- The Warden or Acting Warden of the institution where the execution is to be conducted, and such number of correction officers or other persons as the Warden or Acting Warden thinks necessary to carry out the death sentence.
- The Sheriff of the county in which the prisoner was tried and convicted.
- The Director of the Department of Rehabilitation and Correction, or his designee and any other person selected by the Director or his designee to ensure that the death sentence is carried out.
- Such number of physicians of the institution where the execution is to be conducted and medical personnel as the Warden or Acting Warden thinks necessary.
- The prisoner may select one of the following persons: a DRC chaplain, minister-of-record, clergy, rabbi, priest, imam, or regularly ordained, accredited, or licensed minister of an established and legally cognizable church, denomination or sect, subject to the approval of the Warden.
- Three persons designated by the prisoner who are not confined in any state institution subject to the approval of the Warden or Acting Warden based on security considerations.
- Three persons designated by the immediate family of the victim, subject to the approval of the Warden or Acting Warden based on security considerations, as detailed in Department Policy 03-OVS-06, Victim Involvement in the Execution Process.
- Representatives of the news media as the Director or his designee authorizes which shall include at least one representative of the following: a newspaper; a television station; and a radio station.

6. The SOCF Warden shall establish procedures for conducting executions consistent with all applicable laws, administrative codes and DRC policies. This will include the establishment of a communication system between the Governor's Office and the SOCF Command Center.

a. Primary communications will be via a telephone line opened directly to the SOCF Command Center from the execution chamber. This line will be tested one (1) hour prior to the scheduled execution. Other than testing, this line will remain open.

b. Secondary communications will be via cellular telephone.

c. In the event that both the primary and secondary communications are inoperable, the execution will be delayed until communications are established.

DRC 1362

0558

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3880

| SUBJECT: **Execution** | PAGE __4__ OF __9__ |
|---|---|

B. Execution Procedures

1. Approximately thirty (30) days prior to the scheduled execution date:

   a. The MANCI, OSP or ORW Warden will notify the Director by memo, with copies going to the Regional Director, DRC Chief Counsel, Assistant Director, APA, Ohio State Highway Patrol (Portsmouth and Jackson), and the Office of Victim Services.

   b. The SOCF Execution Team will begin conducting training sessions no less than once per week until the scheduled date of execution.

2. Approximately seven (7) days prior to the execution:

   a. The MANCI, OSP or ORW Warden will have the Execution Information Release (DRC 1808) completed by the condemned prisoner. This information will verify information on the condemned prisoner, visitors, witnesses, spiritual advisor, attorney, requested witness, property, and funeral arrangements.

   b. The names of official witnesses/media witnesses will be supplied to the SOCF Warden, as outlined in this Policy.

   c. The names and relationships of the victim's witnesses will be supplied to the SOCF Warden.

3. Approximately twenty-four (24) hours prior to the scheduled execution:

   a. The condemned prisoner will be transferred from Death Row and housed in the Death House at SOCF. The condemned inmate will be constantly monitored by at least three (3) members of the execution team. A log will be maintained including, but not limited to, visitors, movement, mood changes, meals served, showers, telephone calls, etc.

   b. The SOCF staff psychologist will interview the prisoner periodically and submit progress reports to the Warden. All inmate files shall be maintained in the Warden's office at SOCF.

   c. The Warden will establish a line of communication with DRC legal staff and the Attorney General's Office for notice of case status and/or other significant legal changes.

4. The following events will take place upon arrival at the Death House:

   a. Once the condemned inmate is at SOCF, the Death House will be restricted to the following:

DRC 1362

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3881

| SUBJECT: **Execution** | PAGE __5__ OF __9__ |
|---|---|

Director and/or designee(s)
Warden
Chief Public Information Officer(s)
Institution Deputy Warden
Administrative Assistant to the Warden
Chaplain
Physician
Chief of Security
Maintenance Superintendent
Any other person as deemed necessary by the Warden.

b. Every possible effort shall be made to anticipate and plan for foreseeable difficulties in establishing and maintaining the intravenous (IV) lines. The condemned prisoner shall be evaluated by appropriately trained staff on the day of arrival at the institution, to evaluate the prisoner's veins and plan for the insertion of the IV lines. This evaluation shall include a "hands-on" examination as well as a review of the medical chart. At a minimum, the inmate shall be evaluated upon arrival, later that evening at a time to be determined by the warden, and on the following morning prior to nine a.m. Potential problems shall be noted and discussed, and potential solutions considered, in advance of the execution.

c. SOCF chaplains will make periodic visits to the condemned prisoner, if requested by the inmate.

d. The Deputy Warden of Operations will assign security personnel to staff entrances, checkpoints and to assist the Ohio State Highway Patrol (OSHP).

e. The Execution Team Leader will ensure that the prisoner's property is inventoried in front of the prisoner. The condemned prisoner will have previously, per paragraph 2, specified who is to receive his or her personal effects.

f. The condemned prisoner will, per paragraph 2, specify in writing his/her request for funeral arrangements.

g. The Execution Team Leader will ask the condemned inmate to identify his or her last special meal request. The last meal will be served at approximately 4:00 p.m. the day prior to the scheduled execution.

h. The condemned prisoner will be allowed contact visits with family, friends and/or private clergy, as approved by the Warden, between the hours of 4:30 p.m. and 7:30 p.m. on the day prior to the scheduled execution. Cell front visits will be permitted between the hours of 6:30 a.m. and 8:00 a.m. on the day of the scheduled execution. The attorney and spiritual advisor may continue to visit with the condemned until 8:45 a.m.

DRC 1382

0560

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3882

| SUBJECT: Execution | PAGE __6__ OF __9__ |
|---|---|

    i.  All communication equipment will be tested, including primary and secondary communication with the Governor's Office.

    j.  Key personnel will be briefed by the Warden, including medical and mental health, in order to allow intake information to be obtained.

    k.  The Warden will receive updates from security personnel and the OSHP on crowd control, demonstrations, pickets, etc.

    l.  The Chief of Security will brief the Warden on the level of tension within the remainder of the prison population.

    m.  The Warden will relay any out of the ordinary activity to the South Regional Director.

    n.  The Execution Team will continue to drill/rehearse.

5.  These procedures shall be followed concerning the medications used in the execution.

    a.  Upon notification to the Warden of a firm execution date, a person qualified under Ohio law to administer medications shall order a quantity of the following drugs in a timely manner from the institution's licensed pharmacist: thiopental sodium, pancuronium bromide and potassium chloride. A sufficient quantity shall be ordered as a contingency against the contamination or other inadvertent loss of any of the drugs.

       Prior to the execution and upon arrival of the inmate at the institution, a medical review of the inmate shall be conducted to establish any unique factors which may impact the manner in which the execution team carries out the execution. This evaluation shall include a "hands-on" examination as well as a review of the medical chart. Potential problems shall be noted and discussed, and potential solutions considered, in advance of the execution.

    b.  On the day of the execution, the person qualified under Ohio law to administer medications shall take possession of the drugs thiopental sodium, pancuronium bromide and potassium chloride from the institution pharmacy, and shall document possession of the drugs by signing a receipt or log. The person qualified under Ohio law to administer medications shall deliver the drugs to the death house.

       The person qualified under Ohio law to administer medications shall, in the presence of a witness, give possession of the drugs to a person qualified to prepare intravenous injections. This transfer shall be documented by a receipt signed by these three parties. The person qualified under Ohio law to administer medications shall notify the command center upon the delivery of drugs and the command center shall log the time of delivery, the quantity, name and type of drugs delivered.

    c.  The drugs shall be prepared for injection by a person qualified under Ohio law to administer and prepare drugs for intravenous injections. The preparation of the drugs

DRC 1362

0561

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3883

| SUBJECT: Execution | PAGE 7 OF 9 |
|---|---|

shall be monitored by a similarly qualified witness who shall independently verify the preparation and dosage of the drugs. When the drugs are prepared, the command center shall be notified and the time of the preparation recorded. The command center shall also record what drugs were prepared, the quantity, name and dosage of the prepared drugs.

d. The execution team shall make every effort to establish IV sites in two locations, and they shall take the amount of time necessary when pursuing this objective. This step shall be accomplished in the holding cell, and the staff shall utilize heparin locks to create the sites and keep them open. The team shall test the viability of the IV site with a small amount of saline, to be flushed through the heparin lock.

e. Once the inmate has been escorted to the chamber, a low-pressure saline drip shall be connected to the IV sites.

f. The drugs shall be prepared as follows:[1]

    i. Two grams of Thiopental Sodium prepared with 25 mg/cc concentration for a total of 80cc which are placed in two syringes labeled "one" and "two."

    ii. 100 mg of Pancuronium Bromide is prepared with 2mg/ml concentration for a total of 50cc which is placed into two 25cc syringes labeled "three" and "four."

    iii. 100 milliequivalents of Potassium Chloride are prepared with 2 meq/cc concentration for a total of 50cc. The preparation is placed in a syringe labeled "five."

g. The arm veins near the joint between the upper and lower arm will be utilized as the preferred site for the injection. In the event that the execution team is unable to prepare the inmate's veins at the preferred site to receive the intravenous dose of drugs, a qualified medical person authorized to administer intravenous drugs shall use an alternative site to deliver the drugs as they may be authorized by law.

6. Approximately one (1) hour prior to the scheduled execution:

a. The prisoner will be permitted to take a shower and dress in the appropriate clothing for the execution.

b. Official witnesses to the execution will report to the institution. The victim's witnesses will report to the Portsmouth Highway Patrol Post for escort to the institution by designated SOCF personnel.

---

[1] Depending upon the form and concentration of drugs delivered, it may be necessary to modify the preparation of syringes. In the event of any modification for any reason, a qualified witness shall review any modifications and the command center shall be notified and any changes recorded.
DRC 1362

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3884

| SUBJECT: Execution | PAGE __8__ OF __9__ |
|---|---|

7. Approximately fifteen (15) minutes prior to the scheduled execution:

    a. The warden shall read the death warrant to the condemned prisoner.

    b. All authorized witness groups will be escorted to the death house separately by designated staff.

8. Execution:

    a. The Warden and Execution Team will escort the condemned prisoner to the execution chamber, place the condemned prisoner on the lethal injection bed, secure the straps and insert the intravenous injection tubes.

    b. The Warden will ask the condemned prisoner if he has any last words. If the prisoner has a last statement, he will be allowed to make it while the witnesses are present in the adjacent viewing chambers, and are able to see him and hear him via microphone. There will be no restriction on the content of the condemned prisoner's statement and no unreasonable restriction on the duration of the prisoner's last statement.

    c. Upon the Warden's signal, the injections shall be administered in the order described above by a person qualified under Ohio law to administer intravenous injections. The start and finish time of each syringe shall be reported to the command center and recorded in a log. The low-pressure saline drip shall be allowed to flush saline through the lines for at least sixty seconds between syringes two and three, between syringes four and five, and again after syringe five.

    d. The execution team leader and the warden shall observe the inmate's IV sites for signs of infiltration throughout the time that the drugs are being administered to the inmate. In the event that both IV sites become compromised, the team shall take such time as may be necessary to establish a viable IV site.

    e. Once the execution cycle is completed, the curtains will be drawn and the designated personnel will examine the body and pronounce the prisoner dead.

    f. The curtains will be opened for the Warden to pronounce the time of death. Witnesses will be escorted from the Death House.

9. Post-Execution:

    a. The Warden, or his designee, will notify the Director that the execution has been carried out.

    b. The Execution Team will remove the deceased from the execution bed, and place him or her on a gurney.

DRC 1362

0563

| SUBJECT:  **Execution** | PAGE  9  OF  9 |

      c.   Disposition of the body will be in accordance with arrangements made prior to the execution at the prisoner's request.

      d.   The Warden will sign and return the death warrant to the court, indicating the execution has been carried out.

10.  Debriefing:

      a.   The Warden will ensure that critical incident debriefings are available for the Execution Team and staff participants immediately following the execution.

      b.   The critical incident debriefing team will conduct interview in accordance with CIM guidelines.

ATTACHMENTS:

DRC 1808 Execution Information Release

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3886

STATE OF OHIO

DEPARTMENT OF REHABILITATION
AND CORRECTION

| SUBJECT:<br>**Execution** | PAGE __1__ OF __9__ |
| | NUMBER: 01-COM-11 |
| RULE/CODE REFERENCE:<br>ORC 2949.22 | SUPERCEDES:<br>01-COM-11 dated 07/10/06 |
| RELATED ACA STANDARDS: | EFFECTIVE DATE:<br>October 11, 2006 |
| RELATED AUDIT STANDARDS: | APPROVED:<br>*Terry J. Collins* |

### I.   AUTHORITY

This policy is issued in compliance with Ohio Revised Code 5120.01 which delegates to the Director of the Ohio Department of Rehabilitation and Correction the authority to manage and direct the total operations of the Department and to establish such rules and regulations as the Director prescribes.

### II.   PURPOSE

The purpose of this policy is to establish guidelines for carrying out a court-ordered sentence of death.

### III.   APPLICABILITY

This policy applies to all individuals involved in carrying out a court-ordered death sentence in accordance with all applicable policies, administrative regulations and statutes.

### IV.   DEFINITIONS

As used in this policy, the following will apply:

Execution Team:  A team consisting of no less than twelve (12) members, designated by the Warden of the Southern Ohio Correctional Facility (SOCF) and the Religious Services Administrator.  Their duties also include preparation and testing of equipment carrying out pre- and post-execution activities; and counseling with the inmate.

Critical Incident Debriefing Team:  A group selected by the SOCF Warden, and including the Religious Services Administrator available to assist any persons involved in the execution process.  A psychological debriefing process is available via DRC clinical staff and others to recognize stressors associated with executions and to work through them with affected staff as follows:

DRC 1361

0565

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3887

| SUBJECT: **Execution** | PAGE  2  OF  9 |
|---|---|

- Worker's own experiences of the execution including reactions and perceptions.
- Review any negative aspects and feelings.
- Review any positive aspects and feelings.
- Relationships with workers and/or family.
- Empathy (sharing) with others.
- Disengagement from execution experience.
- Integration of this experience into the professional work role for a positive future contribution to the overall team effort.
- Exploring Religious Convictions and feelings.

Stay: A court-ordered suspension or postponement of a legal execution.

Lethal Injection: The form of execution whereby a continuous intravenous injection of a series of drugs in sufficient dosages is administered to cause death.

Reprieve: The postponement of an execution.

V. **POLICY**

It is the policy of the Ohio Department of Rehabilitation and Correction to carry out the death penalty as directed by Ohio Courts of Law. All execution processes shall be performed in a professional, humane, sensitive and dignified manner.

It is the responsibility of the Director to designate a penal institution where death sentences shall be executed. The Warden of that facility, or Deputy Warden in the absence of the Warden, is responsible for carrying out the death sentence on the date established by the Ohio Supreme Court.

VI. **PROCEDURES**

A. General Guidelines

1. All offenders sentenced to death by a court of law will be transported to a reception center within the Ohio Department of Rehabilitation and Correction for initial processing. Upon completion of the reception process the offender will immediately be transferred to the designated institution: Mansfield Correctional Institution (MANCI) or Ohio State Penitentiary (OSP) for male offenders or Ohio Reformatory for Women (ORW) for female offenders.

2. All court-ordered executions shall be carried out at the Southern Ohio Correctional Facility (SOCF) at 10:00 a.m. on the scheduled execution date.

3. Unless otherwise designated by the Director or designee, the condemned inmate will remain on death row until transferred to the Death House at SOCF for scheduled execution.

DRC 1362

0566

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3888

| SUBJECT: **Execution** | PAGE __3__ OF __9__ |

4. The Ohio Supreme Court shall designate the date of execution. Upon receipt of a scheduled execution date, the Warden of the institution housing the inmate shall notify the Director, the Religious Services Administrator and the SOCF Warden.

5. Attendance at the execution is governed by the Ohio Revised Code, section 2949.25 and includes:

   - The Warden or Acting Warden of the institution where the execution is to be conducted, and such number of correction officers or other persons as the Warden or Acting Warden thinks necessary to carry out the death sentence.
   - The Sheriff of the county in which the prisoner was tried and convicted.
   - The Director of the Department of Rehabilitation and Correction, or his designee and any other person selected by the Director or his designee to ensure that the death sentence is carried out.
   - Such number of physicians of the institution where the execution is to be conducted and medical personnel as the Warden or Acting Warden thinks necessary.
   - The prisoner may select one of the following persons: the Religious Services Administrator, minister-of-record, clergy, rabbi, priest, imam, or regularly ordained, accredited, or licensed minister of an established and legally cognizable church, denomination or sect, subject to the approval of the Warden.
   - Three persons designated by the prisoner who are not confined in any state institution subject to the approval of the Warden or Acting Warden based on security considerations.
   - Three persons designated by the immediate family of the victim, subject to the approval of the Warden or Acting Warden based on security considerations, as detailed in Department Policy 03-OVS-06, Victim Involvement in the Execution Process.
   - Representatives of the news media as the Director or his designee authorizes which shall include at least one representative of the following: a newspaper; a television station; and a radio station.

6. The SOCF Warden shall establish procedures for conducting executions consistent with all applicable laws, administrative codes and DRC policies. This will include the establishment of a communication system between the Governor's Office and the SOCF Command Center.

   a. Primary communications will be via a telephone line opened directly to the SOCF Command Center from the execution chamber. This line will be tested one (1) hour prior to the scheduled execution. Other than testing, this line will remain open.

   b. Secondary communications will be via cellular telephone.

   c. In the event that both the primary and secondary communications are inoperable, the execution will be delayed until communications are established.

DRC 1362

**0567**

| SUBJECT: **Execution** | PAGE __4__ OF _9_ |
|---|---|

B. Execution Procedures

1. Approximately thirty (30) days prior to the scheduled execution date:

   a. The MANCI, OSP or ORW Warden will notify the Director by memo, with copies going to the Regional Director, DRC Chief Counsel, Assistant Director, APA, Ohio State Highway Patrol (Portsmouth and Jackson), and the Office of Victim Services.

   b. The SOCF Execution Team will begin conducting training sessions no less than once per week until the scheduled date of execution.

   c. The Religious Service s Administrator (RSA) shall make contact with the inmate to establish counseling and family contact information

2. Approximately seven (7) days prior to the execution:

   a. The MANCI, OSP or ORW Warden will have the Execution Information Release (DRC 1808) completed by the condemned prisoner. This information will verify information on the condemned prisoner, visitors, witnesses, spiritual advisor, attorney, requested witness, property, and funeral arrangements.

   b. The names of official witnesses/media witnesses will be supplied to the SOCF Warden, as outlined in this Policy.

   c. The names and relationships of the victim's witnesses will be supplied to the SOCF Warden.

   d. The RSA will provide family information from inmate to warden at SOCF

3. Approximately twenty-four (24) hours prior to the scheduled execution:

   a. The condemned prisoner will be transferred from Death Row and housed in the Death House at SOCF. The condemned inmate will be constantly monitored by at least three (3) members of the execution team. A log will be maintained including, but not limited to, visitors, movement, mood changes, meals served, showers, telephone calls, etc.

   b. The SOCF staff psychologist will interview the prisoner periodically and submit progress reports to the Warden. All inmate files shall be maintained in the Warden's office at SOCF.

   c. The Warden will establish a line of communication with DRC legal staff and the Attorney General's Office for notice of case status and/or other significant legal changes.

DRC 1362

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3890

| SUBJECT: **Execution** | PAGE 5 OF 9 |
|---|---|

    d. The RSA will provide counseling and spiritual support unless the inmate requests not to have contact.

    e. Beginning with his arrival at SOCF, the inmate will not be forced to meet with non-staff visitors that he does not wish to see.

4. The following events will take place upon arrival at the Death House:

    a. Once the condemned inmate is at SOCF, the Death House will be restricted to the following:

        Director and/or designee(s)
        Warden
        Chief Public Information Officer(s)
        Institution Deputy Warden
        Administrative Assistant to the Warden
        Chaplain
        Physician
        Chief of Security
        Maintenance Superintendent
        Any other person as deemed necessary by the Warden.

    b. Every possible effort shall be made to anticipate and plan for foreseeable difficulties in establishing and maintaining the intravenous (IV) lines. The condemned prisoner shall be evaluated by appropriately trained staff on the day of arrival at the institution, to evaluate the prisoner's veins and plan for the insertion of the IV lines. This evaluation shall include a "hands-on" examination as well as a review of the medical chart. At a minimum, the inmate shall be evaluated upon arrival, later that evening at a time to be determined by the warden, and on the following morning prior to nine a.m. Potential problems shall be noted and discussed, and potential solutions considered, in advance of the execution.

    c. SOCF chaplains will make periodic visits to the condemned prisoner, if requested by the inmate.

    d. The Deputy Warden of Operations will assign security personnel to staff entrances, checkpoints and to assist the Ohio State Highway Patrol (OSHP).

    e. The Execution Team Leader will ensure that the prisoner's property is inventoried in front of the prisoner. The condemned prisoner will have previously, per paragraph 2, specified who is to receive his or her personal effects.

    f. The condemned prisoner will, per paragraph 2, specify in writing his/her request for funeral arrangements.

DRC 1362

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3891

| SUBJECT: Execution | PAGE __6__ OF __9__ |
|---|---|

g. The Execution Team Leader will ask the condemned inmate to identify his or her last special meal request. The last meal will be served at approximately 4:00 p.m. the day prior to the scheduled execution.

h. The condemned prisoner will be allowed contact visits with family, friends and/or private clergy, as approved by the Warden, between the hours of 4:30 p.m. and 7:30 p.m. on the day prior to the scheduled execution. Cell front visits will be permitted between the hours of 6:30 a.m. and 8:00 a.m. on the day of the scheduled execution. The attorney and spiritual advisor may continue to visit with the condemned until 8:45 a.m.

i. All communication equipment will be tested, including primary and secondary communication with the Governor's Office.

j. Key personnel will be briefed by the Warden, including medical and mental health, in order to allow intake information to be obtained.

k. The Warden will receive updates from security personnel and the OSHP on crowd control, demonstrations, pickets, etc.

l. The Chief of Security will brief the Warden on the level of tension within the remainder of the prison population.

m. The Warden will relay any out of the ordinary activity to the South Regional Director.

n. The Execution Team will continue to drill/rehearse.

5. These procedures shall be followed concerning the medications used in the execution.

a. Upon notification to the Warden of a firm execution date, a person qualified under Ohio law to administer medications shall order a quantity of the following drugs in a timely manner from the institution's licensed pharmacist: thiopental sodium, pancuronium bromide and potassium chloride. A sufficient quantity shall be ordered as a contingency against the contamination or other inadvertent loss of any of the drugs.

Prior to the execution and upon arrival of the inmate at the institution, a medical review of the inmate shall be conducted to establish any unique factors which may impact the manner in which the execution team carries out the execution. This evaluation shall include a "hands-on" examination as well as a review of the medical chart. Potential problems shall be noted and discussed, and potential solutions considered, in advance of the execution.

b. On the day of the execution, the person qualified under Ohio law to administer medications shall take possession of the drugs thiopental sodium, pancuronium bromide and potassium chloride from the institution pharmacy, and shall document possession of the drugs by signing a receipt or log. The

DRC 1362

0570

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3892

| SUBJECT: **Execution** | PAGE __7__ OF __9__ |
|---|---|

person qualified under Ohio law to administer medications shall deliver the drugs to the death house.

The person qualified under Ohio law to administer medications shall, in the presence of a witness, give possession of the drugs to a person qualified to prepare intravenous injections. This transfer shall be documented by a receipt signed by these three parties. The person qualified under Ohio law to administer medications shall notify the command center upon the delivery of drugs and the command center shall log the time of delivery, the quantity, name and type of drugs delivered.

c. The drugs shall be prepared for injection by a person qualified under Ohio law to administer and prepare drugs for intravenous injections. The preparation of the drugs shall be monitored by a similarly qualified witness who shall independently verify the preparation and dosage of the drugs. When the drugs are prepared, the command center shall be notified and the time of the preparation recorded. The command center shall also record what drugs were prepared, the quantity, name and dosage of the prepared drugs.

d. The execution team shall make every effort to establish IV sites in two locations, and they shall take the amount of time necessary when pursuing this objective. This step shall be accomplished in the holding cell, and the staff shall utilize heparin locks to create the sites and keep them open.. The team shall test the viability of the IV site with a small amount of saline, to be flushed through the heparin lock.

e. Once the inmate has been escorted to the chamber, a low-pressure saline drip shall be connected to the IV sites.

f. The drugs shall be prepared as follows:[1]

    i. Two grams of Thiopental Sodium prepared with 25 mg/cc concentration for a total of 80cc which are placed in two syringes labeled "one" and "two."

    ii. 100 mg of Pancuronium Bromide is prepared with 2mg/ml concentration for a total of 50cc which is placed into two 25cc syringes labeled "three" and "four."

    iii. 100 milliequivalents of Potassium Chloride are prepared with 2 meq/cc concentration for a total of 50cc. The preparation is placed in a syringe labeled "five."

g. The arm veins near the joint between the upper and lower arm will be utilized as the preferred site for the injection. In the event that the execution team is unable to prepare the inmate's veins at the preferred site to receive the

---

[1] Depending upon the form and concentration of drugs delivered, it may be necessary to modify the preparation of syringes. In the event of any modification for any reason, a qualified witness shall review any modifications and the command center shall be notified and any changes recorded.
DRC 1362

0571

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3893

| SUBJECT: **Execution** | PAGE __8__ OF __9__ |
|---|---|

intravenous dose of drugs, a qualified medical person authorized to administer intravenous drugs shall use an alternative site to deliver the drugs as they may be authorized by law.

6. Approximately one (1) hour prior to the scheduled execution:

   a. The prisoner will be permitted to take a shower and dress in the appropriate clothing for the execution.

   b. Official witnesses to the execution will report to the institution. The victim's witnesses will report to the Portsmouth Highway Patrol Post for escort to the institution by designated SOCF personnel.

   c. The RSA will be present to counsel and provide spiritual support to the inmate and staff.

7. Approximately fifteen (15) minutes prior to the scheduled execution:

   a. The warden shall read the death warrant to the condemned prisoner.

   b. All authorized witness groups will be escorted to the death house separately by designated staff.

8. Execution:

   a. The Warden and Execution Team will escort the condemned prisoner to the execution chamber, place the condemned prisoner on the lethal injection bed, secure the straps and insert the intravenous injection tubes.

   b. The Warden will ask the condemned prisoner if he has any last words. If the prisoner has a last statement, he will be allowed to make it while the witnesses are present in the adjacent viewing chambers, and are able to see him and hear him via microphone. There will be no restriction on the content of the condemned prisoner's statement and no unreasonable restriction on the duration of the prisoner's last statement.

   c. Upon the Warden's signal, the injections shall be administered in the order described above by a person qualified under Ohio law to administer intravenous injections. The start and finish time of each syringe shall be reported to the command center and recorded in a log. The low-pressure saline drip shall be allowed to flush saline through the lines for at least sixty seconds between syringes two and three, between syringes four and five, and again after syringe five.

   d. The execution team leader and the warden shall observe the inmate's IV sites for signs of infiltration throughout the time that the drugs are being administered to the inmate. In the event that both IV sites become

DRC 1362

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3894

| SUBJECT: **Execution** | PAGE ___9___ OF __9__ |
|---|---|

compromised, the team shall take such time as may be necessary to establish a viable IV site.

    e. The RSA or the inmate's Spiritual Advisor will anoint the body of the inmate if requested by the inmate.

    f. The RSA will coordinate the burial of the inmate's body with local chaplains if the inmate's family does not want the body.

9. Post-Execution:

    a. The Warden, or his designee, will notify the Director that the execution has been carried out.

    b. The Execution Team will remove the deceased from the execution bed, and place him or her on a gurney.

    c. Disposition of the body will be in accordance with arrangements made prior to the execution at the prisoner's request.

    d. The Warden will sign and return the death warrant to the court, indicating the execution has been carried out.

10. Debriefing:

    a. The Warden will ensure that critical incident debriefings are available for the Execution Team and staff participants immediately following the execution.

    b. The critical incident debriefing team will conduct interview in accordance with CIM guidelines.

    c. The RSA will be available for debriefing for the staff and the family of the inmate

ATTACHMENTS:

DRC 1808 Execution Information Release

DRC 1362

0573

# POLICIES-B

0574

# Ohio Department of Rehabilitation and Correction
# Office of Correctional Health Care

| | |
|---|---|
| **Protocol:** | Pharmacy Definitions |
| **Number:** | E-1 |

**Policy Reference:** 68-MED-11

| **Responsibility:** | Pharmacists | Staff Nurses | Staff Physicians |
|---|---|---|---|
| | Medical Directors | Health Care Administrators | |

**DRC Medical Director:**                           **Institution Medical Director:**

Scott Savage, D.O.                                                                      Date

**Signature Date:** 8/18/06

**Effective Date:** 12/4/06

**I.   Purpose:**

The purpose of this protocol is to establish pharmacy definitions that are consistent with Ohio Revised Code and Ohio Administrative Code within Department of Rehabilitation and Correction institutions.

**II.   Exceptions:**

None

**III.   Directive:**

The following definitions shall apply with respect to pharmacists, pharmacies, or pharmacy operations:

1. **One (1) Month:** For the purposes of calculating duration of medication, thirty (30) days each month.

2. **Adulterated Drug:** A drug which is beyond the expiration date as stated by the manufacturer, packer, or distributor in its labeling or if it is not stored or dispensed according to the requirements of the federal act as indicated in the product labeling.

3. **After Hours Drug Cabinet:** Cabinet or storage area for contingency drugs.

Pharmacy Definitions
Original issue date: 12/10/01
Rev. date: (rev. date): 12/4/06

Page 1 of 4

0575

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3897

4. **Automatic Stop Orders:** A practice whereby a prescribed drug order is discontinued automatically after a specified duration as designated by protocol.

5. **Compounding:** The preparation, mixing, assembling, packaging, and labeling of drugs pursuant to a prescription or in anticipation of a prescription.

6. **Contingency Drug Cabinet:** Cabinet or storage area for contingency drugs.

7. **Contingency Drugs:** Those drugs which may be required to meet the therapeutic needs of inpatients when a licensed pharmacist is not available and personally in full and actual charge of the institutional pharmacy.

8. **Controlled Substance:** A drug, substance, or immediate precursor included in schedule I, II, III, IV, or V of the Federal Controlled Substance Act.

9. **Dangerous Drug:** A drug that may be dispensed only upon a prescription, as restricted by federal or state law.

10. **Dispensing:** The final association of a drug with a particular patient pursuant to the prescription, drug order, or other lawful order of a prescriber and the professional judgement of and the responsibility for: interpreting, preparing, compounding, labeling, and packaging a specific drug.

11. **DRC Drug Formulary:** a list of standardized medications that may be prescribed and dispensed for inmates without prior authorization by the bureau of medical services medical director or bureau of mental health services clinical director.  Also see protocol B-5, Pharmacy Dispensing and Distribution Operations.

12. **Drug:** Any article, other than food or a device, intended to affect the structure or function of the body, or for use in diagnosis, cure, mitigation, treatment, or prevention of disease in humans or animals.

13. **Emergency Drug:** A drug that is required to meet the immediate therapeutic needs of inpatients in order to sustain life in an emergency crisis.

14. **Emergency Drug/Crash Cart:** Drugs secured within a designated area that have been pre-approved by the Pharmacy and Therapeutics Committee for use in emergencies.

15. **Inmate Drug Profile:** An inmate data record that includes demographic information, pertinent historical information, and the record of drug therapy.

16. **Inpatient:** Any person who receives drugs for use while within the institutional facility.

17. **Inpatient Prescription:** A written, electronic, or oral order for a drug to be dispensed for use in treating an inpatient.

18. **Institutional Facility:** A facility licensed by the Ohio State Board of Pharmacy and the Ohio Department of Rehabilitation and Correction at which medical care is provided on site and a medical record documenting episodes of care, including medications ordered and administered, is maintained.

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3898

19. **Interpret Prescriptions:** The professional judgement of a pharmacist when reviewing a prescription order of a prescriber for a patient.

20. **Licensed or Registered:** As pertaining to pharmacists or pharmacies, means that an individual or facility has met initial qualifications for registration and licensure with the state board of pharmacy and, if they are still actively practicing pharmacy or distributing drugs, have complied with annual renewal procedures.

21. **Non-Formulary Medication:** A medication not listed by the DRC Drug Formulary. These medications require prior authorization from the Bureau of Medical Services Medical Director or Bureau of Mental Health Services Clinical Director prior to prescribing or dispensing to patients.

22. **Outpatient:** Any person who receives drugs for use outside of the institutional facility.

23. **Over the Counter Medication:** Drugs not requiring prescriptions for lawful distribution.

24. **Personal Supervision:** A pharmacist shall be physically present in the pharmacy and provide personal review and approval of all professional pharmaceutical activities.

25. **Pharmacist:** An individual who holds a current pharmacist identification card pursuant to section 4729.08 or section 4729.09, or section 4729.12 of the Revised Code.

26. **Person:** Any individual, partnership, association, limited liability company, or corporation, the state, any political subdivision of the state, and any district, department, or agency of the state or its political subdivisions.

27. **Pharmacy & Therapeutics Committee:** An interdisciplinary professional group formed to address procedural, clinical, and therapeutic issues related to the provision of pharmaceutical care.

28. **Pharmacy:** Except when used in a context referring to the practice of pharmacy, means any area, room, rooms, place of business, department, or portion of any of the foregoing where the practice of pharmacy is conducted.

29. **Pharmacy Consultant:** An experienced pharmacist who coordinates DRC Pharmacy and Therapeutics Committee activity and chairs the committee.

30. **Pharmacy Formulary:** The list of drugs, promulgated by the DRC Pharmacy and Therapeutics Committee, that are made available for treatment of inmate clinical conditions.

31. **Positive Identification:** A method of identifying an individual who prescribes, administers, or dispenses a dangerous drug whereby a physical means of identification is used.

32. **Practice of Pharmacy:** Providing pharmacist care requiring specialized knowledge, judgement, and skill derived from the principles of biological. chemical, behavioral. social, pharmaceutical and clinical sciences including the following:

    a. Interpreting prescriptions

Pharmacy Definitions
Original Issue date: 12/10/01
Rev. date: (rev. date) 12/01/05; 12/4/06

0577

b. Compounding or dispensing drugs and related devices

c. Counseling individuals regarding their drug therapy, recommending related devices, assisting drug selection for treatment of common diseases and injuries, providing instruction in proper use of drugs and appliances

d. Performing drug regimen reviews with individuals by discussing all of the drugs that the individual is taking and explaining the interactions of the drugs

e. Performing drug utilization reviews with prescribers when the pharmacist determines that an individual with a prescription has a drug regimen that warrants additional discussion with the prescriber

f. Advising an individual and the health care professionals treating an individual with regard to the individual's drug therapy.

30. **Prescriber:** An individual who is authorized by law to prescribe drugs or dangerous drugs or drug therapy related devices in the course of the individual's professional practice.

31. **Prescription:** a written, electronic, or oral order for drugs or combinations or mixtures of drugs to be used by a particular individual, issued by a prescriber.

32. **Medication Protocol:** A definitive set of treatment guidelines that include definitive orders for drugs and their specified dosages, authorized by a prescriber and approved by the state board of pharmacy to be used by licensed health care professionals when providing limited medical services to individuals when the services of a prescriber are not immediately available or when administering biologicals or vaccines to individuals for the purpose of preventing diseases.

33. **Responsible Pharmacist:** The pharmacist whose name appears on the terminal distributor of dangerous drugs license for a pharmacy and is responsible for the practice of pharmacy including but not limited to supervision and control of dangerous drugs, adequate safeguards, and maintaining all required drug records.

34. **Telephone Orders/Verbal Orders:** A medical order for medication or treatment that is issued verbally from an authorized prescriber to a Registered Nurse or Pharmacist.

35. **Terminal Distributor of Dangerous Drugs:** A person who has possession, custody or control of dangerous drugs for any purpose other than for that person's own use and consumption, and includes pharmacies, hospitals, facilities, and all other persons who procure dangerous drugs for distribution by or under the supervision of a pharmacist.

Pharmacy Definitions
Original Issue date: 12/10/01
Rev. date: (rev. date) 12/01/05; 12/4/06

0578

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3900

# Ohio Department of Rehabilitation and Correction
# Office of Correctional Health Care

| | | |
|---|---|---|
| Protocol: | Pharmacy Administrative Operations | |
| Number: | E-2 | |
| | Policy Reference: | 68-MED-11 |
| | Related ACA Standard: | 3-4341 |

Replaces: E-2 Responsible Pharmacist, E-3 Position Descriptions, E-4 Pharmacy Security, E-5 Key Control, E-6 Minimum Standards, E-11 Pharmacy Records, E-28 Institutional Pharmacy and Therapeutics Committee, E-29 ODRC Pharmacy and Therapeutics Committee, E-30 Pharmacy Unit Inspections

| Responsibility: | Pharmacists | Staff Nurses | Staff Physicians |
|---|---|---|---|
| | Medical Directors | Health Care Administrators | |

**DRC Medical Director:**                                    **Institution Medical Director:**

Scott Savage, D.O.                                                                          Date

Signature Date:  8/18/06

Effective Date:  12/4/06

## I.    Purpose:

The purpose of this protocol is to establish requirements and standards for pharmacy administrative operations within the Department of Rehabilitation and Correction.

## II.    Exceptions:

None

## III.    Directive:

### A. Licensure: [replaces E-2]

1. Each institutional pharmacy shall be directed by a Registered Pharmacist who holds a current identification card to practice pharmacy in Ohio, and shall be the pharmacist-in-charge pursuant to section 4729.27 of the Revised Code and the responsible pharmacist pursuant to rule 4729-5-11 of the Ohio Administrative Code.

2. Each institutional responsible pharmacist shall sign and maintain the facility pharmacy Terminal Distributor of Dangerous Drugs license and

Pharmacy Administrative Operations
Original issue date: 12/4/06
Rev date:

Page 1 of 4

0579

ensure compliance with all relevant accreditation standards, agency policies or protocols, federal and state laws including 4729-17-02 (Pharmacist-in-charge of an institutional pharmacy) Ohio Administrative Code.

3. Each institutional responsible pharmacist shall be responsible for the maintenance of all records required by state or federal law to be kept at the licensed location, of the acquisition, use, distribution, and disposition of all drugs.

4. In the event a pharmacist ceases to be the Responsible Pharmacist, that pharmacist shall file appropriate written notice with the Ohio State Board of Pharmacy within 30 days and complete an inventory of controlled substances to be maintained in the pharmacy.

**B. Minimum Standards: [replaces E-6]**

1. Each institutional pharmacy library shall include current Drug Laws of Ohio, telephone number of a poison control center, ODRC Pharmacy Services Protocol Manual, and other references necessary to conduct pharmacy in a manner in the best interest of the patients served.

2. Drug inventory, fixtures, and space shall be commensurate with the scope of pharmacy services provided and be well-lighted, well-ventilated rooms in a clean and sanitary area.

**C. Pharmacy Security and Key Control: [replaces E-4, E-5, E-26]**

1. All areas occupied by an institutional pharmacy shall be capable of being secured by key, or other effective mechanism, so as to prevent access by unauthorized personnel.

2. In the absence of a licensed pharmacist, all areas occupied by an institutional pharmacy shall be secured so as to prevent access by unauthorized personnel.

3. The pharmacist–in-charge shall develop and implement methods that will detect and deter the diversion and/or adulteration of drugs.

4. Institutional administrative, security, and pharmacy personnel shall implement appropriate institutional procedures restricting issuing keys accessing the pharmacy to pharmacists only.

5. Issuing pharmacy keys to anyone other than a pharmacist and/or emergency entry into the pharmacy by anyone other than a pharmacist is not permissible at anytime for any reason other than to rescue persons inside the pharmacy in the event of crisis or disaster.

6. Institutional administrative, security, and pharmacy personnel shall implement appropriate institutional procedures restricting security testing

Pharmacy Administrative Operations
Original issue date: 12/4/06
Rev Date:

0580

of emergency pharmacy keys to occur during the times that a pharmacist is present in the pharmacy.

7. Inmate workers shall not work in the pharmacy or medication storage areas under any circumstances.

### D. Pharmacy Records: [replaces E-11]

The following records shall be maintained for a period of three years in a readily retrievable manner pursuant to section 4729.37 of the Revised Code:

1. A record of all drugs purchased, the quantity received, and the name, address, and wholesale distributor registration number of the person from whom the drugs were purchased.

2. All drug orders and records relating to the practice of pharmacy.

3. A record of all drugs compounded or repackaged for use only within the institution.

4. A record of the distribution of dangerous drugs to other areas of the institution for administration or use as floor stock.

### E. Unit Inspections: [replaces E-30]

1. Each institutional Responsible Pharmacist shall maintain records, for a period of at least three years from the date of last entry, documenting inspection of medication storage areas or units located outside of the pharmacy, to occur no less frequently than each month.

2. Inspection records should include identification of the person performing the inspection, the date of the inspection, relevant comments and evaluation or assessment of the following:

   a. Security

   b. Cleanlines s

   c. Organization

   d. L ighting

   e. Refrigeration

   f. Labeling

   g. Pr esence of adulterated medications

   h. Acc ountability

3. Each Responsible Pharmacist shall devise, recommend, and implement, in conjunction with the appropriate agency or institutional administrators or staff, any corrective action necessary in order to remedy problem areas identified through unit inspection performance.

Pharmacy Administrative Operations
Original issue date: 12/4/06
Rev Date:

0581

F.  **Pharmacy and Therapeutics Committee: [replaces E-28 and E-29]**

1.  ODRC shall provide a forum to address all issues relevant to the provision of pharmacy services and;

    a.  Shall convene meetings no less frequently than every two months.

    b.  Membership shall minimally consist of the Bureau of Medical Services Medical Director (chairperson), Bureau of Mental Health Services Chief Clinical Officer, two institution pharmacists, two institution physicians, one institution psychiatrist, one Health Care Administrator, Pharmacy Consultant

    c.  Membership shall be assigned by the committee chairperson or by the ODRC Director/designee.

    d.  Responsibilities shall include monitoring drug utilization, development of a standardized drug formulary, participation in pharmacy policy and protocol development, establishing and maintaining Pharmacy Services protocols as required, and providing a standard and uniform method of delivery of appropriate pharmaceutical services within ODRC.

    e.  A quorum of the ODRC Pharmacy and Therapeutics committee shall consist of a simple majority of the membership

2.  Each institutional Responsible Pharmacist shall organize and chair an institutional Pharmacy and Therapeutics Committee.

    a.  Which shall meet no less frequently than each quarter.

    b.  Pharmacy and Therapeutics Committee membership shall be determined by the Responsible Pharmacist, in consultation with the Health Care Administrator and Medical Director, and shall minimally include a pharmacist, the Health Care Administrator (or designee) a nurse, and a physician.

    c.  Each meeting agenda is not limited to, but shall address, the following topics:

        i.  Development and implementation of institutional procedures necessary for provision of appropriate pharmaceutical care

        ii.  Presentation and discussion of relevant medication prescribing, dispensing, administration, and educational monitoring activities

        iii.  Presentation and discussion of reported adverse drug reactions and medication errors

        iv.  Drug utilization and formulary adherence

        v.  Other topics as necessary in order to improve quality or cost effectiveness of pharmaceutical services

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3904

# Ohio Department of Rehabilitation and Correction
## Office of Correctional Health Care

| Protocol: | Pharmacy Inventory Management Operations |
|---|---|
| Number: | E-3 |

Policy Reference:   68-MED-11

Related ACA Standard: 3-4341

Replaces: E-7 Medication Procurement, E-8 Contingency Drug Cabinet, E-9 Emergency Medication Procurement, E-10 Pharmacy Storage, E-12 Controlled Substance Accountability, E-13 Loss or Theft of Dangerous Drugs, E-14 Adulterated Drug Disposal

| Responsibility: | Pharmacists | Staff Nurses | Staff Physicians |
|---|---|---|---|
| | Health Care Administrators | Medical Directors | |

**DRC Medical Director:**

Scott Savage, D.O.

**Institution Medical Director:**

_____   Date

Signature Date: 8/18/06

Effective Date: 12/4/06

### I. Purpose:

The purpose of this protocol is to establish requirements and standards for pharmacy inventory management operations within the Department of Rehabilitation and Correction.

### II. Exceptions:

None

### III. Directive:

**A. Medication Procurement [replaces E-7 and E-9]**

1. The Ohio Department of Mental Health, Office of Support Services, Pharmacy Service Center shall serve as the primary source for procurement of pharmaceuticals and medical supplies.

2. Alternate sources such as local retail pharmacies, hospitals, or drug wholesalers may be used to procure necessary pharmaceuticals or medical supplies in the event that the Pharmacy Service Center is unable to provide the necessary items within the required time period.

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3905

3. Emergency Medication Procurement

    a. Each Responsible Pharmacist, in consultation with the Health Care Administrator, shall establish and maintain proper and appropriate methods of emergency medication procurement from local sources in the event that emergency medications are required and the pharmacy is closed.

    b. The Responsible Pharmacist shall identify appropriate local sources for emergency procurement and/or establish methods whereby institutional healthcare personnel may contact the pharmacist in emergency situations when the pharmacy is closed.

    c. The Responsible Pharmacist shall establish appropriate written procedures for use by authorized health care personnel in the event emergency medications require procurement when the pharmacy is closed

    d. The Responsible Pharmacist shall maintain for a period of three years from the date of procurement, records documenting emergency medication procurement when the pharmacy is closed, to include at least the following information:

        i. The date of procurement,

        ii. The medication source name and address,

        iii. The name of the authorized person procuring emergency medication,

        iv. The name of the medication prescriber,

        v. The name and number of the patient,

        vi. The medication name, strength, quantity, and

        vii. The cost of the medication.

B. Medication Storage [replaces E-10]

    1. The Responsible Pharmacist shall establish proper methods for appropriate storage of institutional medications in conformance with manufacturer's labeling and/or USP requirements.

    2. The Responsible Pharmacist shall ensure that medications requiring refrigeration shall be kept in a refrigerator that provides adequate safety and security for medications.

Pharmacy Inventory Management Operations
Original issue date: 12/04/06

0584

3. No items other than medications shall be stored in a refrigerator used for medication storage.

4. A refrigerator used for medication storage shall be equipped with an approved control thermometer with alarm or a control thermometer and daily log for documenting refrigerator temperatures.

5. Adulterated medication storage

   a. To prevent their use, adulterated drugs shall be stored in a separate and secure area apart from the storage of drugs used for dispensing and administration.

   b. Adulterated drugs shall be stored no longer than one year from the date of adulteration or expiration.

## C. Disposal of Drugs [replaces E-14]

1. Pharmacy staff may dispose of drugs other than controlled substances using Certificate of Drug Destruction form DMH-0254 to record disposal.

2. Pharmacists may dispose of drugs that are controlled substances upon maintenance of appropriate records and written permission of the state board of pharmacy pursuant to provisions of 4729-9-06 (Disposal of dangerous drugs which are controlled substances) Ohio Administrative Code.

## D. Reporting Theft or Loss of Medication [replaces E-13]

1. Each institutional Responsible Pharmacist shall immediately notify the institutional Health Care Administrator and Warden of any theft or unaccounted loss of federally controlled substances upon discovery of such theft or loss.

2. Pursuant to provisions of Ohio Administrative Code 4729-9-15 (**Report of theft or loss of dangerous drugs, controlled substances, and drug documents**) significant loss or theft shall be reported to the following:

   a. The state board of pharmacy, by telephone immediately upon discovery of the theft or significant loss

   b. If a controlled substance, the drug enforcement administration (DEA) pursuant to section 1301.76(b), Code of Federal Regulations

   c. Law enforcement authorities pursuant to section 2921.22 of the Ohio Revised Code

3. Controlled substance thefts must be reported by using the federal DEA report form whether or not the controlled substances are subsequently recovered and/or the responsible parties are identified and action taken against them. A copy of the federal form regarding such theft or loss shall be filed with the state board of pharmacy within thirty days following the discovery of such theft or loss.

Pharmacy Inventory Management Operations
Original issue date: 12/04/06

0585

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3907

4. Immediately upon discovery of any theft or loss of official written order forms for schedule II drugs, each Responsible Pharmacist shall notify the state board of pharmacy and law enforcement authorities, and the DEA pursuant to section 1305.12(b), Code of Federal Regulations

E. **Contingency Drug Cabinet [replaces E-8]**

1. Each institutional Responsible Pharmacist may establish and maintain a Contingency Drug Cabinet located outside of the institutional pharmacy in order to fulfill institutional pharmaceutical requirements.

2. Each institutional Responsible Pharmacist shall ensure that Contingency Drug Cabinets meet all provisions of 4729-17-03 (**Security and control of drugs in an institutional facility**) of the Ohio Administrative Code.

3. Each institutional Responsible Pharmacist shall:

   a. Designate those who may obtain access to the drug supply

   b. Determine, in conjunction with the appropriate interdisciplinary committees, the drugs that are to be included in the contingency drug supply

   c. Ensure that such drugs are properly labeled and packaged in sufficient quantities to provide drug therapy during the period when the institutional pharmacy is not open

   d. Provide controls adequate to prevent diversion of the drugs, and institute recordkeeping procedures to account adequately for the drugs when used and who obtained the drugs from the drug supply

   e. Perform and document inspection of the contingency drug inventory to assure proper utilization and replacement of the drug supply no less frequently than monthly

F. **Controlled Substance and Needle Accountability [replaces E-12]**

1. Each institutional Responsible Pharmacist shall develop and maintain a safe and secure method of storage, distribution, and disposal of controlled substances, needles with syringes, and needles.

2. Historic perpetual pharmacy inventory records will be maintained, for a period of at least three years, of each controlled substance, needle with syringe, needle, scalpel or other controlled sharp instruments received or dispensed by the pharmacy. This shall include needles that are supplied with certain medications as supplied and packaged by the manufacturer (i.e. Epipen, Lovenox, Risperdal Consta, etc).

3. A shift reconciliation count, performed at each shift change by on-going and off-going shift nurses is required for all controlled substances, needles with syringes, and needles stored outside the pharmacy. Reconciliation shall include physical counts of controlled substances; physical counts of needles with syringes, and needles, verification of proof of use logs,

inspection of packaging integrity, and positive identification of persons performing the reconciliation.

4. Reconciliation discrepancies shall immediately be reported to the Responsible Pharmacist, Health Care Administrator, and Shift Captain. Quality Assurance and incident reports per institutional directive shall also be completed

5. Reconciliation records and proof of use logs must be maintained for 3 years from the date of last entry.

6. Each needle with syringe, and needle shall be disposed of in an approved safety container.

7. The pharmacist will audit reconciliation counts when performing periodic unit inspections no less frequently than monthly.

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3909

# Ohio Department of Rehabilitation and Correction
## Office of Correctional Health Care

| | |
|---|---|
| Protocol: | Pharmacy Distribution And Dispensing Operations |
| Number: | E-4 |

Policy Reference:     68-MED-11

Related ACA Standard: 3-4341

Replaces: E-15 Floor Stock Distribution, E-16 Drug Orders, E-17 Telephone and Verbal Orders, E-18 Patient Profiles, E19 Prospective Drug Utilization Review, E-20 Patient Counseling, E-21 Prescription Labeling, E-22 Blister Packaging for Medications, E-23 Self Carry Medications, E-24 Automatic Stop Orders, E-27 Experimental or Investigational Dugs

Responsibility:     Pharmacists          Staff Nurses       Staff Physicians
                    Health Care Administrators    Medical Directors

DRC Medical Director:                          Institution Medical Director:

Scott Savage, D.O.                                    Date

Signature Date: 8/18/06

Effective Date: 12/4/06

## I. Purpose:

The purpose of this protocol is to establish requirements and standards for pharmacy distribution and dispensing operations within the Department of Rehabilitation and Correction.

## II. Exceptions:

None

## III. Directive:

### A. Floor Stock Distribution:

1. Each Responsible Pharmacist shall develop and implement written policies and procedures for maintaining supplies of dangerous drugs as floor stock stored in patient care areas. The policies and procedures shall:

   a. Provide for a limited quantity of dangerous drugs to be maintained at any one location.

   b. Provide for the proper security, storage and labeling of all such drugs.

Pharmacy Distribution and Dispensing Operations
Original issue date: 12/04/06

0588

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3910

c. Provide for routine inspection of the dangerous drug supply.

d. Pr ovide adequate recordkeeping procedures to document the disposition of drugs from the supply.

2. Each Responsible Pharmacist shall maintain records of distribution of dangerous drugs from the pharmacy to other areas of the institution including:

a. The name, strength, dosage form, and amount of the drug distributed,

b. T he area receiving the drug,

c. The date distributed,

d. Po sitive identification of the individual receiving the drug if it is a controlled substance, and

e. Administration record, completed by the area receiving the dangerous drug.

## B. Drug Orders

1. A pharmacist shall dispense drugs for inpatients or outpatients pursuant to an original patient-specific order issued by a physician or other provider authorized by law to prescribe medication.

2. It shall be the responsibility of the prescribing physician or advanced care provider to thoroughly evaluate each order before renewing it.

3. Psychotropic medications are ordered only when indicated and only as one aspect of the inmate's treatment plan. This area is fully addressed in DRC policy 67-MNH-07, Psychotropic Medication.

4. All orders shall include, but are not limited to, at least the following:

a. Name and ODRC number of the patient,

b. Name, strength, and dosage form of the drug,

c. Directions for use, including route of administration,

d. Date and time prescribed,

e. Positive identification of the prescriber, and

f. Duration or quantity.

5. Verbal and telephone orders

a. A Registered Nurse or Registered Pharmacist may accept a telephone or verbal order from a physician, within the physician's scope of practice, for a medication or medical supply.

b. T he person accepting a telephone or verbal order from a physician shall record the order on the physician's order sheet. The following information must be recorded:

Pharmacy Distribution and Dispensing Operations
Original issue date: 12/4/06

0589

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3911

    i.      Date and time the order was received,

    ii.     The fact that the order is a verbal or telephone order,

    iii.    Physician's name,

    iv.    Name and number of the patient,

    v.     Medication name, strength, and dosage,

    vi.    Directions for use, administration frequency and route,

    vii.   Medication quantity or duration of the order, and

    viii.  Signature of nurse or pharmacist receiving the order.

g. The person accepting a telephone or verbal order shall read the order back to the issuing physician for confirmation.

h. A physician shall countersign the telephone or verbal order within seventy-two hours or upon the next institutional visit, whichever occurs first.

## C. Automatic Stop Orders

1. **Prescribers must specify duration or quantity for all medication orders.** There are clinically defined or administrative policy limits to the length of drug therapy for all medications that provide an opportunity for prescribing practitioners to evaluate the clinical effectiveness of medication(s). Following the evaluation period the prescribing practitioner may:

   a. Discontinue the drug due to clinical resolution of the condition;

   b. Discontinue the drug due to clinical failure of the treatment regimen; and

   c. Continue the drug due to clinical progress but absence of desired clinical resolution of the condition.

2. The following drugs may be ordered by the prescribing practitioner for a specified quantity and/or period of time beyond the designated length of therapy, as clinical evaluation deems necessary. This evaluation must be clearly noted and justified in the Interdisciplinary Progress Note by the prescribing practitioner.

   | | |
   |---|---|
   | a. Ketorolac (oral dosage forms) | 5 days |
   | b. Control led Substances | 14 days |
   | c. Tramadol | 14 days |
   | d. Clonazepam | not to exceed 6 weeks |
   | e. Phenobarbital | not to exceed 6 weeks |
   | f. Anti-tubercular – Latent Infection Treatment | 9 months |

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3912

3. The maximum stop date for medications prescribed by mental health practitioners shall be 90 days.

4. The maximum stop date for medications prescribed by medical practitioners shall be 180 days

### D. Experimental or Investigational Drugs

1. Experimental or investigational drugs may only be administered when these medications may be the only option to treat a medical condition and with the written approval of the DRC Bureau of Medical Services Medical Director and the DRC Human Subjects Review Committee.

   a. Written application to the Bureau of Medical Services Medical Director and the DRC Human Subjects Review Committee for use of experimental or investigational drugs must include:

      i. Justification for use, and

      ii. Informed consent statement signed by the inmate.

   b. Contents of the informed consent statement must have prior approval of the Bureau of Medical Services Medical Director.

   c. Application for approval to use experimental or investigational drugs must be submitted to the Human Subjects Research Review Committee in accordance with DRC policy 114-02, Human Subjects Research Policy.

   d. The application for using experimental or investigational drugs, signed informed consent statement, and written response of the Bureau of Medical Services Medical Director and the Human Subjects Research Committee allowing such administration will be maintained in the pharmacy and in the patient's medical record.

2. Close contact should be maintained between the manufacturer of the drug and the institutional pharmacist regarding dispensing, distribution, accounting of, administration of, and disposal of any experimental or investigational drug.

### E. Patient Profiles

1. Each institutional pharmacy shall maintain a patient profile system providing immediate retrieval of information regarding patients who have received prescriptions from the pharmacy.

2. The patient profile shall be maintained for a period of at least one year from the date of the last entry in the profile record.

3. The dispensing pharmacist shall ensure that a reasonable effort has been made to obtain, record, and maintain at least the following records:

   a. Patient data record consisting of:

      i. Patient name and DRC number,

Pharmacy Distribution and Dispensing Operations
Original issue date: 12/4/06

0591

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3913

    ii.  Patient date of birth,

    iii.  Any known drug allergies or previous drug reactions,

    iv.  History of chronic conditions or disease states,

    v.  Other drugs, nutritional supplements, and non-prescription drugs used routinely, and

    vi.  Pharmacist's comments relevant to the patient's drug therapy or other information peculiar to the patient or drug.

  b. Patient drug   therapy record of prescriptions filled at the pharmacy within the last twelve months consisting of:

    i.  Name and strength of the drug,

    ii.  Prescription number,

    iii.  Quantity dispensed,

    iv.  Date dispensed, and

    v.  Name of the /prescriber.

## F.  Prospective Drug Utilization Review

In compliance with provisions of 4729-5-20 (Prospective drug utilization review) Ohio Administrative Code:

1.  Prior to dispensing any prescription, a pharmacist shall review the patient profile for the purpose of identifying:

    a.  Over-utilization or under-utilization,

    b. T  herapeutic duplication,

    c.  Drug-disease state contraindications,

    d. Drug   -drug interactions,

    e.  Incorrect drug dosage,

    f.  Drug-allergy interactions,

    g. Abuse/m  isuse,

    h. Inappr  opriate duration of drug treatment, and

    i.  Documented food-nutritional supplements-drug interaction.

2.  Upon recognizing any of the above, a pharmacist, using professional judgment, shall take appropriate steps to avoid or resolve the potential problem. These steps may include consulting with the prescriber and/or counseling the patient.

3.  Prospective drug utilization review shall be performed using predetermined standards consistent with, but not limited to, any of the following:

Pharmacy Distribution and Dispensing Operations
Original issue date: 12/4/06

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3914

      a.  Peer-reviewed medical literature, and

      b.Am  erican hospital formulary service drug information,

      c.  United States pharmacopoeia drug information, or

      d.Am  erican Medical Association evaluations.

## G. Patient Medication Counseling

1. A pharmacist or pharmacist's designee shall personally offer to counsel the patient whenever any outpatient prescription, new or refill, is dispensed for use outside of the institutional facility.  If the patient is not physically present, a written offer to counsel, including the pharmacy hours and phone number, shall accompany the prescription.

2. A pharmacist is not required to counsel inpatients of an institutional facility nor outpatients who refuse or do not respond to the offer to counsel.

3. The pharmacy shall maintain records documenting provision of counseling or refusal of an offer to counsel, for a period at least three years from the date of service or refusal.

4. A pharmacist or pharmacist's designee shall counsel the outpatient.  Such counseling may include, but is not limited to:

   a.  The name and description of the drug;

   b.Th  e dosage form, dose, route of administration, and duration of drug therapy;

   c.  The intended use of the drug and the expected action;

   d.Special d  irections and precautions for preparation, administration, and use;

   e.  Common adverse effects or interactions and therapeutic contraindications that may occur, including possible methods to avoid them, and the action to take if they occur;

   f.  Techniques for self-monitoring drug therapy;

   g.Pr  oper storage;

   h.Pr  escription refill information;

   i.  Action to be taken in the event of a missed dose; and

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3915

      j. The pharmacist's comments relevant to the individual's drug therapy, including other information peculiar to the specific patient or drug.

## H. Prescription Labeling

1. Inpatient prescriptions dispensed for use inside the institutional facility and not in the possession of the ultimate user shall comply with provisions of 4729-17-10 (**Labeling of prescriptions for patients of an institutional facility**) Ohio Revised Code, such that the drugs shall be dispensed in blister card packaging, to which is affixed a label containing at least the following information:

   a. Identification of the dispensing pharmacy,

   b. The patient's name,

   c. The non proprietary and/or proprietary name of the drug, and

   d. The strength, expressed in the metric system whenever possible.

2. Multiple drugs and/or multiple strengths may be dispensed in the same container only upon compliance with all conditions as specified by provisions of 4729-17-10-(A), (3) Ohio Revised Code.

3. Prescriptions dispensed whereby the drug is in the possession of the ultimate user (self carry) and outpatient prescriptions dispensed for use outside the institutional facility and shall comply with provisions of 4729-5-16 (**Labeling of drugs dispensed on prescription**) and 4729-17-11 (**Labeling of prescriptions for outpatients**) Ohio Administrative Code, such that labeling is affixed to the prescription container and includes:

   a. The name of the patient for whom the drug is prescribed;

   b. The name of the prescriber;

   c. Directions for use of the drug;

   d. The date of dispensing;

   e. Any cautions which federal or state law may require;

   f. The serial number of the prescription;

   g. The proprietary name, if any, or the generic name and name of the distributor of the drug dispensed; and the strength, if more than one strength of the drug is marketed. The dispensing pharmacist may omit the name and strength of the drug only if the prescriber specifically requests omission in writing;

   h. The quantity of the drug dispensed;

   i. At least the prescription number and name of the patient if the prescription container is too small to bear a complete prescription label, and dispensed in a larger container bearing a complete prescription label; and

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3916

j. The label bearing only the prescription number and patient name does not need to be applied to any product whose function would be impaired by such a label.

### I. Blister Packaging for Nurse Administration

1. Blister packaging shall be prepared in accordance with requirements of 4729-9-20 (**Drugs repackaged by a pharmacy**) Ohio Administrative Code.

2. Blister packaging and nurse administration is required for the following drugs:

   a. All psychotropic medications (antipsychotic, antidepressant, mood stabilizing, anxiolytic, or stimulant drugs);

   b. Federally   controlled substances;

   c. Tramadol;

   d. Gaba  pentin;

   e. Antitubercular medications;

   f. Warfarin; and

   g. Me  dications prescribed for inmates found guilty of **Misuse of Authorized Medication** rule infraction.

3. Blister packaging and nurse administration may be required for other medications or inmates as deemed necessary by consultation among, or at the discretion of institutional medical, nursing, and pharmacy staff.

4. Blister packaging for medications, unless otherwise requiring blister packaging, is not required for inmates under administrative control, local control, or special security status.

### J. Self Carry Medications

1. Prescribed oral or topical medications not otherwise requiring nurse administration may by dispensed and issued to inmates on a self carry basis at the discretion of medical and pharmacy staff.

2. Medication self-carry privileges may be revoked based on evidence of medication hoarding, selling, or misuse.

### K. Prescription dispensing

1. Newly prescribed medications shall be dispensed within 24 hours of the time the prescription is received by the pharmacy with the exception of:

   a. Prescriptions that require stocking,

   b. Pr  escriptions that require clarification prior to implementation,

    c.  Prescriptions that require intervention, or

    d.Pr   escriptions that require approval by the bureau of medical services medical director or bureau of mental health services clinical director prior to dispensing.

2.  The pharmacist shall notify the nursing staff if a prescription cannot be filled within 24 hours.

3.  Every month pharmacy staff shall be responsible for reporting to the institution health care administrator number of prescriptions not dispensed within 24 hours of the time the prescriptions were received and the reason the prescriptions were not filled within 24 hours.

0596

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3918

# POLICIES-C

0597

STATE OF OHIO

DEPARTMENT OF REHABILITATION
AND CORRECTION

| SUBJECT:<br>Crime Victims | PAGE 1 of 6 |
| --- | --- |
| | SECTION: 03-OVS-01 |
| RULE/CODE REFERENCE:<br>ORC 5149.101 | SUPERCEDES:<br>212-01 Effective 12/28/01 |
| RELATED ACA STANDARDS:<br>4-4393-1 | EFFECTIVE DATE:<br>November 22, 2004 |
| RELATED AUDIT STANDARDS: | APPROVED:<br>*Reginald A. Wilkinson* |

I. **AUTHORITY**

This policy is issued in compliance with Ohio Revised Code 5120.01, which delegates to the Director of the Ohio Department of Rehabilitation and Correction the authority to manage and direct the total operations of the Department and to establish such rules and regulations as the Director prescribes.

II. **PURPOSE**

The purpose of this policy is to set forth a policy for the Ohio Department of Rehabilitation and Correction relating to crime victims.

III. **APPLICABILITY**

This policy applies to all employees of DRC, specifically to the staff of the Office of Victim Services and Victim Coordinators within the Institutions and Adult Parole Authority (APA) Offices.

IV. **DEFINITIONS**

A. **Adult Parole Authority (APA) Fugitive Section:** The Section of the APA responsible for entering and maintaining all fugitive warrants.

B. **Full Board Hearing:** Pursuant to Ohio Revised Code 5149.101, a hearing before the full Parole Board during which victims, inmate representatives, and local law enforcement, judges, and prosecutors may testify.

C. **Institutional Panel Hearing:** A release consideration hearing wherein an inmate personally appears before a Parole Board panel for the purpose of the review and evaluation of available information and an assessment as to whether to release the inmate to community supervision.

D. **Ohio Council on Victims Justice:** DRC Advisory Board composed of victim service providers, law enforcement, victims, and other stake holders, appointed by the Director to advise DRC on victim issues.

DRC 1361

0598

| SUBJECT: Crime Victims | PAGE  2 of 6 |
|---|---|

E. <u>Victim</u>: A person who has been directly or indirectly impacted by a criminal act committed by an offender.

F. <u>Victim Advocate</u>: A staff member of OVS whose job is to assist victims of offenders under the jurisdiction of DRC.

G. <u>Victim Coordinator</u>:  A staff member of one of DRC's institutions or APA offices appointed to specialize in victim services in addition to his/her regular duties.

H. <u>Victim Notification Section:</u> Section within the OVS which handles registration and notification of victims regarding the status of the offenders for whom they are registered.

I. <u>Victim Offender Dialogue</u>: A program that provides victims of a violent crime the opportunity for a structured, face-to-face meeting with the offender(s) of their crime in a secure, safe environment, in order to facilitate a healing and recovery process, per DRC Policy #03-OVS-01, Victim Offender Dialogue. Dialogue also focuses on the harm done to the victim and the offender's responsibility in the reparation of that harm.

J. <u>Victim Impact Panels</u>: Presentations by one or more victims sharing their experiences for the purpose of allowing the audience to better understand victimization and to become aware of the long-term impact of crime on victims.

K. <u>Victim Awareness Classes:</u> Classes offered within the institution and APA offices in which offenders participate to better understand the impact that crime has on victims.

V. <u>POLICY</u>

It is the policy of the Ohio Department of Rehabilitation and Correction to ensure that victims are treated with respect and sensitivity, and that they are informed and considered in decisions related to their offenders' liberty.  DRC shall support local, State and Federal efforts which promote victims' rights and the development of victim services programs.  DRC's Office of Victim Services shall provide crisis intervention, support and advocacy for victims of crime and their families throughout the correctional process.

VI. <u>PROCEDURE</u>

A. <u>Victim Notification:</u> OVS operates the Department's victim notification system.
The names of victims who request so in writing are entered into the notification system to receive notice of upcoming parole hearings, inmate escapes and subsequent return to custody, inmate deaths, releases from prison to community supervision, and pending executions. Upon notification by an institution's Records Office, OVS also notifies victims when an inmate leaves the institution for court hearings, funerals, etc., Victims will also be notified of the outcome of any release consideration hearings conducted by the Parole Board. Victims are not notified when the offender transfers institutions.

DRC 1382

0599

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3921

| SUBJECT: Crime Victims | PAGE 3 of 6 |
| --- | --- |

B. **Victim Input Into Decision Making:** Once victims have received notice of an inmate's pending Parole Board hearing or release, they may share information with the Parole Board in the following manner:

1. **Victim Conference Day:** Through the OVS, the victim may schedule an appointment for Victim Conference Day, for an in-person or telephone conference with a Parole Board member or Hearing Officer, to share his/her concerns about the potential release of the inmate. Victim Conference Day is held prior to the Institution Panel Hearing.

2. **Direct Submission of Materials to Parole Board:** At any time, victims are encouraged to submit relevant materials to the Parole Board, including video/audio tapes, photographs, letters, certificates, etc. These materials are kept on file in the OVS and forwarded to the Parole Board for use during its deliberations regarding the inmate's release consideration hearing.

3. **Full Board Hearing:** When a Parole Board panel has made a recommendation for the release of an inmate, per Senate Bill 2, the OVS may petition the Board to conduct a Full Board Hearing. If the petition is accepted, the victim or his/her representative, and/or the prosecutor from the county in which the indictment against the offender was found, members of any law enforcement that assisted in the prosecution of the offense, and the judge or his/her successor from the Common Pleas court who imposed the sentence are invited to the hearing to make a presentation regarding the impact of the crime. While the offender is not present at the hearing, he/she does have representation.

4. **Violation Hearing:** When an offender appears at a hearing regarding violation of parole, the victim is encouraged to be present and give testimony.

C. **Victim Searches:** It is the responsibility of the OVS to attempt to locate crime victims who are not registered with the victim notification system in the following circumstances:

1. If an inmate escapes from prison, OVS will make every effort to locate and notify the victim. If the victim is located, he/she will also be notified when the inmate is returned to custody.

2. When OVS has received notice from the APA Fugitive Section that an offender has absconded from community supervision, OVS will attempt to locate the victims of certain endangering offenses as outlined in Policy 501-13, Violator at Large, to warn them of the offender's status.

3. When the Parole Board requests victim information to assist in decision making.

When victim searches are necessary, the OVS shall explore such avenues as phone directory assistance, community victim assistance programs, prosecutors' offices, and the internet.

D. **Public Information:**

DRC 1362

**0600**

| SUBJECT: Crime Victims | PAGE 4 of 6 |
|---|---|

1. Educational Presentations: - Staff of OVS are actively involved in public speaking. Through public forums, seminars, workshops, training sessions, and radio and television interviews, OVS provides education regarding victims issues and services provided by OVS to victim advocacy groups, state and local public and private agencies, and the public at large.

2. Dissemination of Information - The OVS disseminates information to victim advocacy groups, state and local public and private agencies, and the public at large. Some methods for disseminating this information are as follows:

   a. Informational pamphlets outlining the functions of OVS and listing other victim services available throughout the State.

   b. A toll free number through which victims and/or their representatives may call OVS requesting information.

   c. Mass mailings to advocacy groups.

   d. Videos on such topics as functions of the Office of Victim Services, Life in Prison, Life under Supervision, and Victim Offender Dialogue.

E. Technical Assistance: Upon request, OVS will provide technical assistance to other areas of DRC, state and local agencies, local advocacy groups, and others when available. Types of technical assistance include, but are not limited to, the following:

   a. Pre-service and in-service victim sensitivity training to DRC employees as requested.

   b. Assistance to agencies developing their own policies and procedures.

   c. Assistance in developing crisis intervention strategies for state and local agencies.

   d. Assistance to agencies developing their own Victim Offender Dialogue and Victim Awareness Programs.

F. Crisis Intervention: Various points throughout the corrections process may create a crisis for victims. OVS staff intervene by providing emotional support and referrals for victims whenever requested.

   a. Victims who are experiencing harassment or intimidation from inmates in prison or offenders under supervision in the community often request assistance. OVS, in conjunction with its Victim Coordinators, facilitates the resolution of these problems by working with either institutional or APA staff.

   b. Victims who have received a threat or are otherwise fearful of an offender about to be released may call the OVS for assistance. OVS staff work with community victim advocates or other resources to help the victim develop a safety plan.

DRC 1382

0601

| SUBJECT: Crime Victims | PAGE 5 of 6 |
| --- | --- |

G. **Linkages:** OVS is a link between DRC and other state and community
   victim services providers. As such, the OVS is the focal point and liaison for all areas of DRC
   concerning victim issues. The following are some established linkages in which DRC is involved:

   a. The Office of Victim Services maintains a strong working relationship with the Attorney
      General's Crime Victim Section, THE OHIO DEPARTMENT OF HEALTH and the Victim
      Services Office at the Ohio Department of Youth Services to ensure effective, coordinated
      statewide services for victims of crime.

   b. Ohio's 88 counties are divided among the Office's Victim Advocates who provide information
      and support to victims, as well as coordinate efforts with local victim services and criminal
      justice agencies. One advocate coordinates the Victim Awareness Program and the another the
      Victim Officer Dialogue Program, in addition to working in their assigned counties.

   c. Each institution and APA Regional office shall have in place a Victim Coordinator. Some of the
      duties of these Coordinators, in addition to their normal duties, include serving as a liaison
      between OVS and their institution or APA office, providing in-service victim training, and
      providing information and referrals as appropriate to victims regarding institutional and
      community issues. Coordinators meet with OVS staff on a quarterly basis.

   d. The Council on Victims Justice, created by Executive Order 96-03 and appointed by the DRC
      Director, is composed primarily of professionals from the criminal justice and victim services
      fields. The Council meets quarterly and advises OVS and DRC on victim issues.

   e. OVS staff members serve as members and advisors on committees for a number of state agencies
      and associations, including, but not limited to the Ohio Department of Youth Services, Office of
      the Attorney General, Ohio Supreme Court, Office of Criminal Justice Services,
      OhioVictim/Witness Association, Mothers Against Drunk Driving, and Parents of Murdered
      Children.

   f. The Community Justice Victims Council is part of the Department's Community Justice
      Initiative, and includes both Department and community members. The Council advises the
      Department on such victims issues as victim-sensitive offender dialogue, inmate visitation, etc.

H. **Victim Offender Dialogue:** Victims can request that the OVS
   initiate victim offender dialogue, per DRC Policy #212-02, Victim Offender Dialogue. The OVS
   will review these requests, in coordination with the warden (if offender is incarcerated) or DPCS
   regional administrator (if offender on parole). Both the OVS and the warden or DPCS regional
   administrator shall approve these dialogues, ensuring that it is appropriate for both the victim and
   the offender. Trained mediators will facilitate the process.

I. **Executions:** Should a surviving family member of a homicide victim wish to witness the execution
   of the offender, staff of OVS would support the family member throughout this process. Surviving
   families may designate up to three witnesses, per DRC Policy 03-OVS-06

DRC-1362

0602

| SUBJECT: Crime Victims | PAGE 6 of 6 |
|---|---|

**VII.** **CONFIDENTIALITY**

PER ORC 5120.60G, INFORMATION PROVIDED TO OVS BY VICTIMS OR A VICTIM REPRESENTATIVE SHALL BE CONFIDENTIAL AND NOT CONSIDERED PUBLIC RECORD.

Except as provided by a law of this state or the united states, the department and the officers of its institutions shall keep confidential and accessible only to its employees, except by the consent of the department or the order of a judge or a court of record, the following:

A. Information from or about specific crime victims; or information about who might be registered with victim notification; and

B. Any information obtained by the department, its employees or agents during the course of the victim offender dialogue process. the department is not bound to confidentiality if a threat of physical harm is made or additional crimes are admitted to during the course of the victim offender dialogue process.

DRC 1362

0603

| | SUBJECT: | PAGE 1 of 4 |
|---|---|---|
| STATE OF OHIO | Victim Involvement in the Execution Process | SECTION: 03-OVS-06 NUMBER: |
| | RULE/CODE REFERENCE: | SUPERCEDES: 212-06 dated 7/17/03 |
| | RELATED ACA STANDARDS: | EFFECTIVE DATE: November 22, 2004 |
| DEPARTMENT OF REHABILITATION AND CORRECTION | RELATED AUDIT STANDARDS: | APPROVED: *Reginald A. Wilkinson* |

## I. AUTHORITY

This policy is issued in compliance with Ohio Revised Code §5120.01 which delegates to the Director of the Department of Rehabilitation and Correction authority to manage and direct the total operations of the Department and to establish such rules and regulations as the Director prescribes.

## II. PURPOSE

To establish procedures that provide for the involvement of survivors of victims of death row inmates during the process of implementing the death penalty.

## III. APPLICABILITY

This policy applies to all DRC staff who might be involved in the execution of an inmate and/or crime survivors of victims of capital crimes.

## IV. DEFINITIONS

A. **Closed Circuit Viewing:** Alternative method of viewing executions in a location separate and apart from the death house witness areas, involving closed circuit television connection from the death chamber to another location staged for viewing. At no time are these procedures videotaped or electronically broadcast beyond the perimeter of the prison grounds.

B. **Office of Victim Services (OVS):** Oversees the implementation of programs, procedures, and policies to ensure that the rights of crime victims of offender's under the jurisdiction of DRC are enforced. OVS also provides educational services to department staff as well as the community regarding crime victims.

C. **Crime Victim:** A person who has been directly or indirectly impacted by a criminal act committed by an offender.

D. **Immediate Family of the Victim(s):** For purposes of this policy, "close relative" or "immediate family" of the victim is defined as the following:

DRC 1361

**0604**

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3926

| SUBJECT: VICTIM INVOLVEMENT IN THE EXECUTION PROCESS | PAGE 2 of 4 |
|---|---|

    1. The spouse of the victim at the time of the victim's death;

    2. The parent or stepparent of the deceased victim;

    3. An adult brother, sister, child or stepchild of the deceased victim;

    4. Another individual with a close relationship to the deceased victim, approved by the Director or his/her designee.

    E.    **Victim Witnesses:** Those individuals, designated by the immediate family of the victim(s) who witness the execution.

## V.   POLICY

It is the policy of the Department of Rehabilitation and Correction (DRC) to keep the relatives of the victim(s) apprised of all procedures and actions related to the imposition of the death sentence, if they request such participation.

## VI.   PROCEDURE

    A. This includes notification by the OVS of the offender's application for Pardon or Clemency at the time of the application, and pending hearing to review such application. Notice of any hearing shall be given to any requesting victim or survivor within 21 days prior to the hearing. Regardless of the opinion of the victim(s) family members have regarding the death penalty, and what outcome they are seeking, OVS shall work with them as requested to insure that their voices are heard throughout the clemency process

    B. OVS shall be notified of scheduled or pending executions approximately 30 days prior to the scheduled execution date, in accordance with policy 001-09 (Execution). If there are no close relatives of the deceased victim(s) in the confidential victim notification database, OVS shall review the offender's file in an attempt to locate a close relative of the deceased victim(s).

    C. Per Administrative Regulation 5120-9-54 and DRC Policy 001-09, no more than three witnesses for the execution may be designated by the victim's family. The OVS shall be responsible for processing requests to witness an execution from the close relatives of the deceased victim(s) and work in conjunction with the Warden at SOCF to approve the final witness list. It is the responsibility of the close relatives to notify the OVS of address or name changes. The victim witnesses may bring additional support persons with them on the day of the execution. These support persons will remain in the designated waiting area for victim representatives and do not witness the execution.

    D. If the person(s) requesting to witness an execution is not a close relative of the deceased victim(s), did not have a close relationship to the deceased, or the deceased is not the victim of the instant offense, or the individual has not been designated by a close relative of the deceased victim, OVS shall inform them that they are not permitted to witness the execution.

    E. In the event there were other homicides that were not prosecuted, the surviving family members of those victims may be permitted by the warden to view the execution via closed circuit. The warden

DRC 1362

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3927

| SUBJECT: VICTIM INVOLVEMENT IN THE EXECUTION PROCESS | PAGE 3 of 4 |
|---|---|

shall consider the nature of the crime and other relevant information pertaining to the case in order to make this decision.

F.  In the event there were multiple victims for which the death sentence was given, there may be special consideration granted by the warden to permit participation as witnesses. Each family permitted to view an execution for multiple death sentences would be permitted to designate up to three witnesses, but only a maximum of 6 victim witnesses will be permitted in the actual viewing area of the death house. The remaining witnesses shall witness via closed circuit viewing.

G.  OVS shall notify close relatives that a stay of execution is always possible, which would void the pending execution date.

H.  The OVS shall meet with the attending relatives/witnesses to discuss their role and expectations for the day of the execution. The OVS shall make available to designated victim witnesses resources that may assist them in preparation to enter the SOCF facility and view the execution. (ie: "Execution Chamber Tour" video), policies or other information regarding the execution process.

I.  In compliance with Policy 001-09, at least seven days prior to the scheduled execution, the OVS shall provide the names of the three designated victim witnesses and any attending family members who will accompany the witnesses to the prison, to the SOCF Warden, the public information office, and other DRC staff needing this information. Included in this information is the name of any OVS staff who will be accompanying the victim and other attending relatives/witnesses to the prison during the execution.

J.  On the day of the execution, the attending relatives/witnesses shall meet at a pre-determined location outside the prison and travel together to the institution one hour prior to the scheduled execution. There will be a special parking space designated for attending relatives/witnesses. The Victim Coordinator at the institution will assist with the escorting, along with OVS staff, of any victim witnesses or attending relatives while they are inside the institution.

K.  The family should be made aware of any death penalty opponents who might be on the grounds or outside the fence conducting protests. DRC staff should take all precautions to ensure that the attending relatives are not harassed or intimidated.

L.  Once inside the institution, the attending relatives/witnesses shall be taken to a pre-determined waiting area separate from the media and offender family witnesses.

M.  The OVS will, upon the request of the relatives, and with approval of the DRC public information office, assist the relatives in their contacts with the media. If OVS is contacted by representatives of the media requesting contact with the victim's family, OVS staff shall inform the DRC public information office and contact the victim's family informing them of the request. OVS shall not be directly involved in a media interview on behalf of the victim's family, representing them or their opinion about the case. If the relatives do not wish to speak with the media, DRC staff shall inform the media, at least while they are at the prison. Those wishing to speak with the media should be allowed to do so in the designated media briefing area arranged by DRC the day of the execution.

DRC 1362

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3928

| SUBJECT: VICTIM INVOLVEMENT IN THE EXECUTION PROCESS | PAGE 4 of 4 |
|---|---|

OVS staff shall have the right to end any media interviews at any time with DRC public information office assistance.

N. In the event that the surviving family members of the victim(s) do not choose to witness the execution, the staff of OVS shall continue to provide support services to the family as requested.

**SPECIAL CONDITIONS:**

In an emergency situation or extended disruption of normal institutional operation, any provision or section of this policy may be suspended by the Director or his/her designee for a set period of time.

DRC 1382

STATE OF OHIO



DEPARTMENT OF REHABILITATION
AND CORRECTION

| SUBJECT: Reception Admission Procedures Female Death Row Inmates | PAGE 1 OF 1 |
| --- | --- |
| | NUMBER: 52-RCP-03 |
| RULE/CODE REFERENCE: | SUPERSEDES: 301-03 dated 07/12/2000 |
| RELATED ACA STANDARDS: 3-4272 and 3-4273 | EFFECTIVE DATE: June 23, 2003 |
| RELATED AUDIT STANDARDS: | APPROVED: *Reginald A. Wilkinson* |

I. **AUTHORITY**

This policy is issued in compliance with Ohio Revised Code 5120.01 which delegates to the Director of the Department of Rehabilitation and Correction the authority to manage and direct the total operations of the Department and to establish such rules and regulations as the Director prescribes.

II. **PURPOSE**

The purpose of this policy is to establish standard admission procedures regulating the acceptance and initial processing of female death row inmates at the Ohio Reformatory for Women.

III. **APPLICABILITY**

This policy applied to all employees of the Ohio Department of Rehabilitation and Correction; specifically to those employees at the Ohio Reformatory for Women. The policy also applies to those female inmates sentenced to death under Ohio law.

IV. **DEFINITIONS**

**Death Row Inmate:** All female inmates sentenced to death under Ohio law.

**Death Row:** A housing area at the Ohio Reformatory for Women that has been designated by the Director of the Department of Rehabilitation and Correction to house female inmates who are committed to the Department with a sentence of death.

V. **POLICY**

It is the policy of the Ohio Department of Rehabilitation and Correction to provide secure housing for all female offenders sentenced to death under Ohio law. All such inmates shall be confined at the Ohio Reformatory for Women while awaiting execution of their sentence.

DRC 1361 (rev 4/01)

0608

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3930

| SUBJECT: Reception Procedures: Female Death Row Inmates | PAGE __2__ OF __2__ |
|---|---|

**VI.    PROCEDURE**

    A.    Female offenders sentenced to death shall be received and confined at the Ohio Reformatory for Women. The Warden shall immediately be notified upon the inmate's arrival at the facility.

    B.    Records Office staff and/or the Warden's designee shall personally review the commitment paperwork to determine the inmate's appropriate commitment status. The Ohio Reformatory for Women will issue an institutional number to the inmate.

    C.    The death row inmate shall be segregated and escorted through the reception program by the Reception Security Supervisor. The Reception Process will be followed in accordance with the procedures outlined in Department Policy 301-01, Reception Admission Procedures.

    D.    After the death row inmate has completed processing, the inmate will be admitted to an area designated for Death Row at the Ohio Reformatory for Women. The cell assignment will be made to the unit housing death row inmates.

DRC 1362

0609

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3931

STATE OF OHIO

DEPARTMENT OF REHABILITATION
AND CORRECTION

| SUBJECT: RECEPTION ADMISSION PROCEDURES: MALE DEATH ROW INMATES | PAGE __1__ OF __3__ |
| | NUMBER: 52-RCP-02 |
| RULE/CODE REFERENCE: | SUPERSEDES: 52-RCP-02 Dated: 7/12/00 |
| RELATED ACA STANDARDS: 4-42852 AND 3-4286 | EFFECTIVE DATE: May 5, 2006 |
| RELATED AUDIT STANDARDS: | APPROVED: *Reginald A. Wilkinson* |

I.   **AUTHORITY**

This policy is issued in compliance with Ohio Revised Code §120.01 which delegates to the Director of the Department of Rehabilitation and Correction the authority to manage and direct the total operations of the Department and to establish such rules and regulations as the Director prescribes.

II.  **PURPOSE**

The purpose of this policy is to establish standard admission procedures regulating the acceptance and initial processing of male death row inmates at either the Correctional Reception Center or the Lorain Correctional Institution.

III. **APPLICABILITY**

This policy applies to all employees of the Department of Rehabilitation and Correction (DRC), specifically to employees at the Correctional Reception Center (CRC) and the Lorain Correctional Institution (LORCI). This policy also applies to those male inmates sentenced to death under Ohio law.

IV.  **DEFINITIONS**

A.   Death Row Inmate – All male inmates sentenced to death under Ohio law.

B.   Death Row – A housing area at the OHIO STATE PENITENTIARY (OSP) that has been designated by the Director of the Department of Rehabilitation and Correction (DRC) to house male inmates who are committed to DRC with a sentence of death.

V.   **POLICY**

The Correctional Reception Center (CRC) and the Lorain Correctional Institution (LorCI) shall serve as the reception centers for all males committed to DRC with a sentence of death under Ohio law.

DRC 1361 (rev 08/03)

0610

| SUBJECT: RECEPTION ADMISSION PROCEDURES: MALE DEATH ROW INMATES | PAGE __2__ OF __3__ |
|---|---|

## VI.  PROCEDURES

A.   Prior to transport, counties should notify the Warden and Record Office of the date of transport of a death row inmate. The Reception Security Supervisor or Shift Supervisor should immediately notify the Warden's Office and the Reception Coordinator at either CRC or LorCI when a death row inmate is received.

B.   The Records Office Staff or the Warden's designee shall personally review the commitment papers to ensure they are certified, valid and accurate. The inmate shall also be assigned an institutional number.

C.   The Warden's Office at OSP will be notified by the Warden's Office at either CRC or LorCI of the pending transportation of a death row inmate. All transportation and transfer arrangements will be coordinated through the respective Warden's Offices. The Bureau of Classification will be notified, and an Administrative Transfer Request Form (DRC2003) will be completed and approved by the Bureau of Classification.

D.   All inmate personal property will be inspected for contraband. Items determined to be contraband will be processed in accordance with DRC Policy 310-SEC-43, Handling and Disposition of Property. All other personal items shall be handled and processed in accordance with DRC policy 61-PRP-01, Inmate Personal Property.

E.   The Reception Security Supervisor or Shift Supervisor will notify the Medical Department of the death row inmate's arrival in order that a medical examination in accordance with DRC Policy 52-RCP-06, Reception Intake and Medical Screening, can be conducted. The Medial Department shall also conduct DNA testing in accordance with DRC Policy 52-RCP-05, DNA Sample.

F.   The Reception Security Supervisor or Shift Supervisor will notify the Mental Health Department in order to conduct an initial mental health screening in accordance with DRC Policy 67-MNH-03, Mental Health Evaluation.

G.   The death row inmate shall be escorted through the reception process by the Reception Security Supervisor, in accordance with the procedure outlined in DRC Policy 52-RCP-01, Reception Admission Procedures.

H.   The death row inmate will complete identification functions in accordance with DRC POLICY 52-RCP-01, Reception Admission Procedures.

I    The death row inmate shall be dressed in clothing assigned for transportation to OSP and will be issued shoes and underwear from clothing issue. Transfers to OSP will occur within 24 hours after arrival at CRC or LORCI.

J    The Reception Security Supervisor or his/her designee will notify the respective warden's Office when the death row inmate has completed processing and in route to OSP.

DRC 1362

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3933

| SUBJECT: RECEPTION ADMISSION PROCEDURES: MALE DEATH ROW INMATES | PAGE __3__ OF __3__ |
|---|---|

K.    The CRC or LORCI Warden or designee will notify OSP of the estimated time of arrival of the death row inmate. Details of the inmate's status will be provided to the OSP warden at that time.

L.    The death row inmate's master file, including relevant medical and mental health information, shall accompany the inmate to OSP. The Record Office staff at either CRC or LORCI will fax a copy of the front of the master file to the Record Office at OSP prior to the inmate's arrival for death row placement.

DRC 1362

0612

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3934

STATE OF OHIO



DEPARTMENT OF REHABILITATION
AND CORRECTION

| SUBJECT:<br>RECEPTION ADMISSION<br>PROCEDURES: DEATH ROW<br>INMATES | PAGE ___1___ OF __3__ |
| --- | --- |
| | NUMBER: 52-RCP-02 |
| RULE/CODE REFERENCE: | SUPERSEDES:<br>52-RCP-02 dated 5/5/2006 |
| RELATED ACA STANDARDS: | EFFECTIVE DATE:<br>November 28, 2007 |
| RELATED AUDIT STANDARDS: | APPROVED:<br>*Terry J. Collins* |

## I.  AUTHORITY

This policy is issued in compliance with Ohio Revised Code 5120.01 which delegates to the Director of
the Department of Rehabilitation and Correction the authority to manage and direct the total operations
of the Department and to establish such rules and regulations as the Director prescribes.

## II.  PURPOSE

The purpose of this policy is to establish standard admission procedures regulating the acceptance and
initial processing of death row inmates at the Correctional Reception Center (CRC), the Lorain
Correctional Institution (LORCI), or the Ohio Reformatory for Women (ORW), and to establish standard
procedures regulating the initial transfer of male death row inmates from either CRC or LORCI to the
Ohio State Penitentiary (OSP) or the Mansfield Correctional Institution (MANCI).

## III.  APPLICABILITY

This policy applies to all employees of the Department of Rehabilitation and Correction (DRC),
specifically to employees at CRC, LORCI, and ORW.  This policy also applies to those inmates
sentenced to death under Ohio law.

## IV.  DEFINITIONS

Death Row Inmate – All inmates sentenced to death under Ohio law.

Death Row – (1) A housing area at OSP that has been designated by the Director of the Department of
Rehabilitation and Correction to house male inmates who are committed to the Department with a
sentence of death; (2) A housing area at MANCI that has been designated by the Director of the
Department of Rehabilitation and Correction to house male inmates who are committed to the
Department with a sentence of death who are determined to be seriously mentally ill, pursuant to the
criteria set forth in the Department's Bureau of Mental Health's Standard Operating Procedure Number
2, or whose medical needs are inconsistent with assignment to OSP, pursuant to the Department Policy
68-MED-13, Medical Classification; or (3)  A housing area at ORW that has been designated by the
Director of the Department of Rehabilitation and Correction to house female inmates who are committed
to the Department with a sentence of death.  Death Row is also a reference to a housing status for inmates
sentenced to death; it is not a security classification.

DRC 1361 (rev 08/03)

**0613**

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3935

| SUBJECT: Reception Admission Procedures: Male Death Row Inmates | PAGE __2__ OF __3__ |
|---|---|

## V.  POLICY

CRC and LORCI shall serve as the reception centers for all males committed to the Department of Rehabilitation and Correction with a sentence of death under Ohio law.  ORW shall serve as the reception center for all females committed to the Department of Rehabilitation and Correction with a sentence of death under Ohio law.

## VI.  PROCEDURES

### A.  ACCEPTANCE AND INITIAL PROCESSING OF DEATH ROW INMATES.

1. Prior to transport, counties should notify the Warden and Record Office of the date of transport of a death row inmate. The Reception Security Supervisor or Shift Supervisor should immediately notify the Warden's Office and the Reception Coordinator at CRC, LORCI, or ORW when a death row inmate is received.

2. The Records Office Staff or the Warden's designee shall personally review the commitment papers to ensure they are certified, valid and accurate. The inmate shall also be assigned an institutional number.

3. All inmate personal property will be inspected for contraband. Items determined to be contraband will be processed in accordance with DRC Policy 310-SEC-43, Handling and Disposition of Property. All other personal items shall be handled and processed in accordance with DRC policy 61-PRP-01, Inmate Personal Property.

4. The Reception Coordinator or Shift Supervisor will notify the Medical Department of the death row inmate's arrival in order that a medical examination in accordance with DRC Policy 52-RCP-06, Reception Intake and Medical Screening, can be conducted. The Medical Department shall also conduct DNA testing in accordance with DRC Policy 52-RCP-05, DNA Sample.

5. The Reception Coordinator or Shift Supervisor will notify the Mental Health Department in order to conduct an initial mental health screening in accordance with DRC Policy 67-MNH-03, Mental Health Evaluation.

6. The death row inmate shall be escorted through the reception process by the Reception Coordinator or Shift Supervisor, in accordance with the procedure outlined in DRC Policy 52-RCP-01, Reception Admission Procedures.

7. The death row inmate will complete identification functions in accordance with DRC policy 52-RCP-01, Reception Admission Procedures. The Death Row Inmate will not be assigned a security classification, but will be designated as "Death Row" status.

### B.  TRANSFER OF MALE DEATH ROW INMATES.

1. The Warden's Office at either OSP or MANCI will be notified by the Warden's Office at either CRC or LORCI of the pending transportation of a death row inmate. All transportation and transfer arrangements will be coordinated through the respective Warden's Offices. The

DRC 1362

**0614**

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3936

| SUBJECT: Reception Admission Procedures: Male Death Row Inmates | PAGE 3 OF 3 |
| --- | --- |

Bureau of Classification will be notified, and an Administrative Transfer Request Form (DRC2003) will be completed and approved by the Bureau of Classification.

2. The death row inmate shall be dressed in clothing assigned for transportation to OSP or MANCI and will be issued shoes and underwear from clothing issue. Transfers to OSP or MANCI will NOT occur prior to completion of the mental health screening referenced above.

3. The Bureau of Classification will notify the respective warden's Office when the death row inmate has completed processing and in route to OSP or MANCI.

4. The CRC or LORCI Warden or designee will notify OSP or MANCI of the estimated time of arrival of the death row inmate. Details of the inmate's status will be provided to the OSP or MANCI Warden at that time.

5. The death row inmate's master file, including relevant medical and mental health information, shall accompany the inmate to OSP or MANCI. The Record Office staff at either CRC or LORCI will fax a copy of the front of the master file to the Record Office at OSP or MANCI prior to the inmate's arrival for death row placement.

DRC 1362

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3937

# CORRESPONDENCE

0616



Governor Ted Strickland
Riffe Center, 30th Floor
77 South High Street
Columbus, OH 43215-6108

Director Terry Collins
Ohio Department of Rehabilitation
and Corrections
1050 Freeway Drive North
Columbus, Ohio 43229

Warden Edwin C. Voorhies, Jr.
Southern Ohio Correctional Facility
1724 St. Rt. 728
P.O. Box 45699
Lucasville, Ohio 45699

AMERICAN CIVIL
LIBERTIES UNION
OF OHIO FOUNDATION
4506 CHESTER AVENUE
CLEVELAND, OH 44103-3621
T/216.472.2220
F/216.472.2210
WWW.ACLUOHIO.ORG
contact@acluohio.org

SHARES

May 31, 2007

RE:     *Public Records Request*

Dear Sir or Madam:

The nearly two-hour long execution of Christopher Newton on May 24, 2007, raised many questions about Ohio's execution procedures. Those procedures were purportedly revised following the hour-and-a-half-long execution of Joseph Clark on May 2, 2007. Yet the procedures did not provide a trouble-free execution for Mr. Newton, and they are the subject of the ongoing lawsuit *Cooey v. Strickland*. And still, Ohio continues to execute despite growing public concern over the methods we utilize.

Reports that it took the Newton execution staff 90 minutes to establish intravenous shunts, that Newton was visibly convulsing during the injection phase, and that it took 20 minutes rather than 8-10 minutes for the chemical cocktail to end Newton's life all raise serious questions about the execution procedures followed on May 24, 2007.

Therefore, pursuant to the Ohio Public Records Act, Revised Code §149.43, we hereby request copies of the following public documents:

- A copy of the Southern Ohio Correctional Facility execution log from the May 24, 2007, execution of Christopher Newton.

- The Southern Ohio Correctional Facility broadcasts a closed circuit video feed of the intubation phase from the inmate's holding cell into the main witness viewing room. We request a copy of that video feed for Newton. If no such recordings are kept, please provide whatever written reports exist documenting the protocol for and attempts to place the IV lines and shunts in Newton.

0617



* A list of the ODRC personnel who oversaw the May 24, 2007, execution of Christopher Newton. Also, a list (such as a *curriculum vitae*) of any training in medical procedure for each member of the execution staff identified above, and records of the medical training that each has received.

* A copy of the current ODRC execution procedures and protocols, including but not limited to:
  o review of the inmate's prior medical records,
  o any assessment of the inmate's current medical condition,
  o intubation procedures,
  o procedures for what the execution team should do if they encounter difficulty or problems with intubation, and
  o the dosage instructions for each of the three chemicals used in lethal injection – the sedative, paralytic, and killing drug.

* A copy of the pre-execution medical evaluation and medical records review of Newton conducted by prison medical staff.

* The autopsy report, if an autopsy of Christopher Newton was conducted.

AMERICAN CIVIL
LIBERTIES UNION
OF OHIO FOUNDATION
4506 CHESTER AVENUE
CLEVELAND, OH 44103-3621
T/216.472.2220
F/216.472.2210
WWW.ACLUOHIO.ORG
contact@acluohio.org

The American Civil Liberties Union of Ohio Foundation, Inc. will pay reasonable postage and copying costs associated with the fulfillment of this request. Please notify me in advance if the cost of fulfilling this request is expected to exceed one hundred dollars ($100.00).

I look forward to receiving your prompt reply. Please contact us if there are any questions pertaining to this request.

Sincerely,

Jeffrey M. Gamso, Legal Director
American Civil Liberties Union of Ohio Foundation, Inc.

Phone: (216) 472-2220
Fax: (216) 472-2210
Email: contact@acluohio.org

 **Ohio Department of Rehabilitation and Correction**

1050 Freeway Drive North
Columbus, Ohio 43229

Ted Strickland, Governor      www.drc.state.oh.us      Terry J. Collins, Director

Jeffrey Gamso, Legal Director          June 6, 2007
American Civil Liberties Union of Ohio Foundation
4506 Chester Avenue
Cleveland, Ohio 44103-3621

Re: Your letter dated May 31, 2007

Dear Mr. Gamso:

     I am responding to the above referenced letter on behalf of Director Collins and Warden Voorhies. There you make a public records request for the following information: a copy of the May 24th execution log for inmate Christopher Newton; a copy of the closed circuit video feed of the intubation phase of the execution procedure; written reports that document the protocol for and attempts to place IV lines and shunts in Mr. Newton; a list of personnel who oversaw the execution and a list of medical training that any received; a copy of the current ODRC execution procedure and protocol; a copy of the pre-execution medical evaluation and medical records review of Mr. Newton conducted by prison medical staff; and an autopsy report.

     I am enclosing a copy of the execution log. Please be advised that the Department considers this an inmate record that falls outside the scope of the public record statute pursuant to section 5120.21 of the revised code. Nonetheless, the Director has authorized its release in the public interest. I am also providing a copy of the Department's execution policy

     No recordings are made of the closed circuit video feed. There are no documents responsive to your request for reports on attempts to place IV lines and shunts in Mr. Newton. We do not release the identities of personnel who participate in the conduct of an execution. Inmate medical records are outside the scope of public records law pursuant to section 5120.21 of the revised code. The Department does not possess an autopsy report.

Very Truly Yours,

Vincent Lagana
Legal Counsel

Copies: Director
     Warden, SOCF
     Corrections Litigation



June 18, 2007

Vincent Lagana, Legal Counsel
Ohio Department of Rehabilitation and Correction
1050 Freeway Drive North
Columbus, OH 43229

Re: Your letter dated June 6, 2007

Dear Mr. Lagana:

AMERICAN CIVIL
LIBERTIES UNION
OF OHIO FOUNDATION
4506 CHESTER AVENUE
CLEVELAND, OH 44103-3621
T/216.472.2220
F/216.472.2210
WWW.ACLUOHIO.ORG
contact@acluohio.org


SHARES

Thank you for your prompt response to our public records request dated May 31, 2007 and for the documents you enclosed.

I am writing to inquire about the reason for your decision to withhold the *curriculum vitae* and list of training in any medical procedures each member of the execution staff may have and records thereof. In your letter you did not provide us with a reason for doing so, or a citation to the relevant portion of the Ohio Revised Code justifying the denial.

I am aware that releasing documents that would reveal family and residential information and information that would cause a substantial risk to the individuals is exempt from being released. However, it is my opinion the names of the individuals involved in the Newton execution are not exempt. Conley v. Correctional Reception Ctr., 141 Ohio App. 3d 412, 751 N.E. 2d 528 (Ohio App. 4 Dist., 2001).

Furthermore, in the event the *curriculum vitae* or list of training in medical procedures that the personnel who carried out Christopher Newton's executions contain exempted information, I ask that you redact that information and submit the remainder of those documents to us. State ex. rel. Outlet Communications, Incl. v. Lancaster Police Dept., 38 Ohio St.3d 324, 528 N.E.2d 175 (Ohio 1988); State ex. rel. Dispatch Printing Co. v. Wells, 18 Ohio St.3d 382, 481 N.E.2d 632 (Ohio 1985).

Pursuant to the Ohio Public Records Act, Revised Code § 149.43, we hereby request again that you send:

A list of the ODRC personnel who oversaw the May 25, 2007 execution of Christopher Newton and a list (such as a *curriculum vitae*) of any training in medical procedures for each member of the execution staff identified above and records of the medical training that each has received.

0620

The American Civil Liberties Union of Ohio Foundation, Inc. will pay reasonable postage and copying costs associated with the fulfillment of this request. Please notify me in advance if you expect the cost of fulfilling this request to exceed one hundred dollars ($100.00).

Once again I look forward to receiving your prompt reply. Please contact us if you have any questions pertaining to this request.

Sincerely,

Jeffrey M. Gamso
Legal Director

**0621**



# Ohio Department of Rehabilitation and Correction

1050 Freeway Drive North
Columbus, Ohio 43229

Ted Strickland, Governor          www.drc.state.oh.us          Terry J. Collins, Director

Jeffrey Gamso, Legal Director                    June 29, 2007
American Civil Liberties Union of Ohio Foundation
4506 Chester Avenue
Cleveland, Ohio 44103-3621

Re: Your letter dated June 18, 2007

Dear Mr. Gamso:

I am responding to the above referenced letter. It is a follow up to a records request you made on May 31st and to which I replied on June 6th. Among other things you requested on May 31st was a list of ODRC staff that oversaw Christopher Newton's execution, and a list of any medical training each member of the team may have received. In my reply, I indicated that the Department does not release the identities of team members. I did not specifically address the issue of individual training because I tied it to the identity request.

You now reiterate your request and furnish citations which you believe present a legal basis for the provision of the information. Although you do not ask that I do so, you mention that I did not provide a reason for our refusal, or a citation to the Ohio Revised Code justifying the denial. Please be advised that the Department does not reveal the identities of the execution team in order to protect them from harassment and physical harm. I appreciate you furnishing case law that you believe supports your position; however, I do not think this correspondence is the appropriate forum to engage in a conversation over the legal considerations involved here.

Very Truly Yours,

Vincent Lagana
Legal Counsel

Copies: Director
Chief Counsel
Corrections Litigation
Warden, SOCF

**0622**



*arbogast 344405*

# Ohio Department of Rehabilitation and Correction

1050 Freeway Drive North
Columbus, Ohio 43229

Ted Strickland, Governor       www.drc.state.oh.us       Terry J. Collins, Director

Kreig J. Brusnahan Esq.                        June 6, 2007
158-A Lear Road
Avon Lake, Ohio 44012

Re: Subpoena - State of Ohio v. Ruben Rivera, Case No. 04CR065940

Dear Mr. Brusnahan:

      I am responding on behalf of Director Collins to the above referenced subpoena. I am forwarding copies of the current and previous execution policies, the timelines for all executions conducted since 1999, a review of execution procedures, correspondence on the subject sent to Governor Taft, incident reports relating to the Clark execution, and policies that address death row inmates or contain references to some aspect of an execution. They are being sent via DHL, overnight delivery. Please be advised that the Department considers the timelines inmate records outside the scope of public record law pursuant to section 5120.21 of the revised code, and I ask that you handle them accordingly.

      As we discussed, the demands for documents in the subpoena are numerous and very broad. You ask for documents that relate in any way to seventeen different subject areas. I received the subpoena on Friday June 1st. You demanded they be produced by Thursday June 7th. In this regard I have requested assistance of the Corrections Litigation Section of the Ohio Attorney General's Office in transmitting objections to the court. I understand they have discussed the matter with you, and that this package will suffice for the purposes of the Thursday hearing.

Sincerely,

Vincent Lagana
Legal Counsel

Copy: Director
       Chief Counsel
       Corrections Litigation

0623

PLEASE TYPE OR PRINT — ONE FORM PER PERSON

# Lorain County Common Pleas Court

STATE OF OHIO
                    PLAINTIFF

VS.

RUBEN RIVERA
                    DEFENDANT

PRECIPE, SUBPOENA AND SHERIFF'S RETURN

CASE NO. 04CR065940

LEGAL SERVICES
JUN - 1 2007
O.R.C.

Attorney KREIG J. BRUSNAHAN

Atty. for DEFENDANT

PHONE (440) 930-2600

TO: Name and Address

Terry J. Collins, Director

Ohio Department of Rehabilitation & Correction

1050 Freeway Drive, North

Columbus, OH 43229

SUBPOENA DUCES TECUM

PLEASE DELIVER THE REQUESTED DOCUMENTS
ON THE ATTACHED PAGES IN EITHER PAPER
OR ELECTRONIC FORMAT TO THE
UNDERSIGNED ON OR BEFORE THE HEARING
DATE LISTED BELOW, IN LIEU OF YOUR
APPEARANCE

YOU ARE HEREBY COMMANDED to appear before the Court of Common Pleas within and for the

said County of Lorain on the _____ 7th _____ day of _____ June _____, 20 07 , at

_____ 9 _____ o'clock A M., Courtroom # 705 , and so from day to day until dis-

charged, to testify as a witness on behalf of _____ Defendant Ruben Rivera _____

PLEASE REPORT TO THE CLERK OF COURTS OFFICE, SECOND FLOOR, ROOM 210, LORAIN
COUNTY COURT HOUSE, 308 SECOND STREET, ELYRIA, OHIO.

If you have any questions concerning this subpoena contact the attorney whose name and phone
number are listed above.

WITNESS my signature and the seal of said Court at Elyria,

Ohio, this _____ 1st _____ day of _____ June _____, 20 07

RON NABAKOWSKI
Clerk of the Court of Common Pleas
Lorain County, Ohio

By: _Isabel Rosario_
                    Deputy Clerk

WHITE—TO WITNESS
YELLOW—PROCESS SERVER'S RETURN

0624

Terry Collins and/or The Ohio Department of Rehabilitation and Corrections are directed to produce the documents specified below by June 7, 2007, to Attorney Kreig J. Brusnahan, 158-A Lear Road, Avon Lake, OH 44012. The term ODRC as used herein refers to The Ohio Department of Rehabilitation and Corrections.

## DOCUMENTS DEMANDED

1. All documents with reference to any and all policies, procedures, and guidelines related in any way to any or all aspects of the lethal injection procedures and protocol. By propounding certain more specific document demands herein, Defendant in no way intends to limit the fact that he is seeking all documents that bear in any way whatsoever on any and all aspects of the ODRC's (acting individually, separately, or though agents) execution procedures, protocols, and/or methods, whether the responsive documents were generated during your tenure or your predecessors' tenure.

2. All documents related in any way to any or all aspects of the process by which ODRC chose the initial lethal injection execution procedures and protocols used in Ohio, including but not limited to (a) the drugs used; (b) the sequence and dosages in which the drugs are administered; (c) the person or persons involved in making the decision(s); (d) how the decision was made; (e) why it was made; and (f) when it was made.

3. All documents with reference to any and all policies, procedures, and guidelines related in any way to every aspect of the personnel employed, engaged, and/or relied upon to carry out a lethal injection, including but not limited to (a) the number of persons involved; (b) the duties assigned to each person; (c) the qualifications, expertise, and training required for the different personnel performing any and all tasks involved in the lethal injection procedure; and (d) any procedure, protocol, or process whether mandatory or discretionary – undertaken after an

**0625**

execution takes place, including but not limited to de-briefings, counseling, scheduling, etc.

4. All documents related in any way to any or all aspects of the process by which ODRC proposed changes to, considered changes to, or implemented changes to any and all aspects of the lethal injection execution procedures and protocols, starting from the time the initial procedures and/or protocols were adopted to the present, including but not limited to any documents generated in response to a specific execution. For example, any changes or modifications undertaken, or other documents generated, as a result of difficulties encountered with gaining intravenous access during the execution of Wilford Berry, Joseph Clark, Christopher Newton or other executed persons; and any documents related to the decision to change from the practice of inserting drug-delivery equipment into the condemned person's body after the person is strapped to the execution table, to the practice of inserting drug-delivery equipment into the condemned person's body before the person is taken into the execution chamber and strapped to the table.

5. All documents related in any way to any or all aspects of the process by which ODRC keeps records of each execution carried out in Ohio since January 1, 1999, including but not limited to copies of notes taken by ODRC or their agents starting from the time a condemned inmate is taken into custody at the Southern Ohio Correctional Facility (S.O.C.F.) and ending at whatever point in time the note taking and record keeping ceases upon completion of an execution. This request includes but is not limited to any 'after action' summaries and records generated by ODRC or agent for ODRC, which records may not be deemed "contemporaneously" generated during ODRC's execution protocol. For example, this request targets, but is not limited to, (1) the contemporaneous notes taken and records generated by the corrections officers assigned to the "death house" area where the condemned inmate is housed during the last hours of his life; (2) the contemporaneous notes taken and records generated by ODRC and/or their agents who are assigned to the control center (which may not be the exact name ODRC use to refer to this function) that is established for executions and (3) the contemporaneous notes taken and records generated by the personnel ODRC or their agents assign to stay with representatives of the condemned inmate and representatives of the victim(s) when they arrive at S.O.C.F. for an execution.

0626

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3948

6. All documents related in any way to any or all aspects of the process by which ODRC or their agents and/or employees reviewed, summarized, described, "de-briefed," filed reports for the file and/or for their superiors after any or all executions carried out in Ohio by means of lethal injection.

7. All documents with reference to any and all policies, procedures and guidelines related in any way to every aspect of all activities or procedures, medical or otherwise, initiated prior to and upon the condemned person's arrival at the Southern Ohio Correctional Facility at Lucasville and thereafter, including but not limited to (a) the timing and/or sequence of events that start when ODRC initiate their execution procedures (including but not limited to moving the condemned person from one part to another part of the Mansfield Correctional Institution); (b) any medication or drug, prescription or non-prescription, administered to or offered to the condemned person, which medication is not itself designed to cause the condemned person's death (e.g., tranquilizers, sedatives, anxiety related medication, sleep-inducing medication, nausea related medication, laxatives, etc.); (c) procedures designed to give the condemned person the opportunity to have contact with family members, attorneys, spiritual advisors, execution team members, etc.; and (d) the limitations on and definition of the types and numbers of witnesses permitted to view the execution, including all documents pertaining to any exceptions to the presumption rules governing witnesses to an execution (e.g., the procedures employed to accommodate witnesses to Alton Coleman's execution; any procedures employed or available for times when a person not related by blood or law wants to witness for the victim(s)).

8. All documents with reference to any and all policies, procedures and guidelines related in any way to any aspect of all invasive or non-invasive procedures, medical or otherwise, that are either performed or prepared in advance for use during the lethal injection procedures at the Southern Ohio Correctional Facility at Lucasville, including but not limited to documents pertaining to how members of the execution team should respond if the condemned person physically resists any aspect of the execution process.

0627

9. All documents with reference to any and all policies, procedures and guidelines related in any way to any aspect of (a) the methods for selecting, obtaining, storing, mixing, and labeling the drugs used to cause the condemned person's death; (b) the qualifications and expertise required for the person who will be determining the concentration and dosage of each drug to give; (c) the criteria that shall be used in exercising this discretion; and (d) the sequence by which the drug or drugs used shall be administered to cause the condemned person's death.

10. All documents with reference to any and all policies, procedures, and guidelines related in any way to any or all aspects descriptive of the equipment used in the lethal injection procedures and protocols, including but not limited to (a) the intravenous tubing, three-way valve, saline solution, needles, and any other lethal injection apparatus and/or equipment that has been or might be used (e.g., equipment that would be used if the intravenous equipment cannot be used to deliver the lethal drugs into the condemned person's body); (b) the specifications of the equipment used in the lethal injection procedures and protocols; (c) the person(s) who have the responsibility and/or discretion to select the lethal injection equipment; (d) the criteria or basis upon which decisions are or were made to select certain equipment for use during ODRC's lethal injection procedures and protocols; and (e) the training and/or expertise of the person(s) who made and/or who make decisions related to the equipment used in ODRC's lethal injection procedures or protocols.

11. All documents with reference to any and all policies, procedures, and guidelines related in any way to any or all aspects of (a) the manner in which the intravenous tubing, three-way valve, saline solution, and other lethal injection apparatus and/or equipment shall be modified and/or fixed in the event it malfunctions during the execution process; (b) the qualifications and expertise required of the person who shall have the responsibility and/or discretion to decide to attempt such a corrective action; and (c) the criteria that is used in exercising this discretion.

0628

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3950

12. All documents with reference to any and all policies, procedures, and guidelines related in any way to any or all aspects of the manner in which a device of any kind shall be inserted into a condemned person's body for the delivery of the lethal drug, including but not limited to equipment used for intravenous access and any alternatives that have been or may be relied upon in the event that intravenous access is not possible or successful.

13. All documents with reference to any and all policies, procedures, and guidelines related in any way to any or all aspects of (a) the qualifications and expertise required for the person who is given the responsibility and/or discretion to decide when efforts at inserting the intravenous catheters should be abandoned in favor of some other procedure; and (b) all documents with reference to any and all policies, procedures, and guidelines related in any way to any or all aspects of the manner in which the condition of the condemned person will be monitored to confirm that proceeding to the next or different procedure for delivering the lethal drugs into the condemned person's body would not cause the condemned person to experience pain as a result of the change in the procedure employed to cause the condemned person's death.

14. All documents with reference to any and all policies, procedures, and guidelines related in any way to any or all aspects of (a) the qualifications and expertise required of the person who is given the responsibility and/or discretion to order a change from any aspect of the established and/or presumptive lethal-injection procedures or protocols to different and/or modified lethal-injection procedures or protocols if such a change is deemed necessary for any reason to successfully cause the condemned person's death; (b) the criteria that shall be used in exercising this discretion; and (c) steps to take to avoid and/or to monitor any pain experienced by the condemned person as a result of any change in the lethal-injection procedures or protocols.

15. All documents with reference to any and all policies, procedures and guidelines related in any way to any or all aspects of (a) the qualifications and expertise required of the person who is given the responsibility and discretion to ensure that appropriate procedures are followed in response to any unanticipated problems or

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3951

events arising during the lethal injection procedure, and (b) the criteria that shall be used in exercising this discretion.

16. All documents with reference to any and all policies, procedures and guidelines related in any way to any or all aspects of (a) the manner in which a monitoring system (e.g., a device to monitor heart beat, pulse, breathing, brain waves, etc.) shall be installed and utilized to monitor the condemned person's bodily functions in such a way as to ensure that the condemned person is deeply sedated while dying; and (b) the qualifications and expertise required for the person who operates this equipment. If no such monitoring equipment is or ever has been utilized, then produce any and all documents related in any way to any activity related to the consideration of using such equipment and/or the decision not to use such equipment.

17. All documents with reference to any and all policies, procedures, protocols, and/or guidelines related in any way to ODRC's lethal injection procedures and/or protocols, which documents were not otherwise covered by any other demand herein for documents.

0630

## SUMMARY OF QUALIFICATIONS, CERTIFICATIONS
## AND EXPERIENCE FOR EXECUTION TEAM MEMBERS

This Court's orders of June 20, 2007, July 24, 2007, and November 1, 2007, in part, direct the Ohio Department of Rehabilitation and Correction (ODRC) and its Director, Terry Collins, to produce to the Court documents listing "job qualifications, certifications, training and experience required of persons who participate in any way in the preparation and carrying out of the lethal injection process." Judge Burge is sensitive to ODRC's and Director Collins' concerns about producing any documents relating to the background, qualifications, certification, and training of execution team members that could lead to the discovery of their identities. Judge Burge has also stated that ODRC and Director Collins are not required to create any documents in order to respond to the Court's orders. There is no single document, however, that lists all the positions, certifications and qualifications for the execution team members. This document has been created in order to address any of these issues that may not be addressed in the documents that are being produced. The purpose of this document is to summarize the qualifications, certifications and experience of the execution team members to assist the Court.

The qualifications for the execution team members are that they must be in good standing and all team members must agree that the applicant should be a team member. The selection criteria for team members are outlined in the Protocol for the SOCF Execution Team (Bates stamp #0002-0003) and the Lethal Injection Protocol Survey Responses (Bates stamp #0477-0485). All team members participate in regular training sessions as set forth in DRC Policy 01-COM-11 (Bates stamp #00547-0555), as documented in the various memoranda concerning that training (Bates stamp #0565-

**0631**

0573). All team members have also participated in execution team advanced training (Bates stamp #0081-A), training concerning working with victims in the execution process (Bates stamp #0082-0092), and training concerning intravenous injections for the execution process (Bates stamp #0097-0165).

The execution team for the Ohio Department of Rehabilitation and Correction currently consists of sixteen (16) members. Three (3) team members have medical training. Those team members are qualified and certified under Ohio law to prepare and administer intravenous drugs, and/or qualified to start an IV. Those three (3) team members have over twenty (20) years experience in the medical profession. Two of those team members are certified as emergency medical technicians.

The length of time each member has been on the execution team and the number of executions in which each team member has participated is as follows:

| Team member #1 | 2 years | 10 executions |
|---|---|---|
| Team member #2 | 6 years | 25 executions |
| Team member #3 | 8 years | 26 executions |
| Team member #4 | 6 years | 25 executions |
| Team member #5 | 16 years | 26 executions |
| Team member #6 | 4 years | 21 executions |
| Team member #7 | 1 year | 2 executions |
| Team member #8 | .5 year | 0 executions |
| Team member #9 | 1 year | 5 executions |
| Team member #10 | 1 year | 2 executions |
| Team member #11 | 1 year | 5 executions |
| Team member #12 | 2 years | 10 executions |
| Team member #13 | 5 years | 22 executions |
| Team member #14 | 1 year | 2 executions |
| Team member #15 | 3 years | 18 executions |
| Team member #16 | 8 years | 26 executions |

0632

## DECLARATION OF MARK J.S. HEATH, M.D.

The undersigned, Mark, J.S. Heath, M.D., being of lawful age, states the following:

### I. Introduction and Qualifications

1.      I am an Assistant Professor of Clinical Anesthesiology at Columbia University in New York City.  I received my Medical Doctorate degree from the University of North Carolina at Chapel Hill in 1986 and completed residency and fellowship training in Anesthesiology in 1992 at Columbia University Medical Center.  I am Board Certified in Anesthesiology, and am licensed to practice medicine in New York State.  My work consists of approximately equal parts of performing clinical anesthesiology (specializing in cardiothoracic anesthesiology), teaching residents, fellows, and medical students, and managing a neuroscience laboratory.  As a result of my training and research I am familiar with the use and proficient in the use and pharmacology of the chemicals used to perform lethal injection.  I am qualified to do animal research at Columbia University and am familiar with the American Veterinary Medical Association's guidelines for animal research and animal euthanasia.

2.      Over the past several years as a result of concerns about the mechanics of lethal injection as practiced in the United States, I have performed many hundreds of hours of research into the techniques that are used during this procedure.  I have testified as an expert medical witness regarding lethal injection in courts in California, Missouri, Maryland, Tennessee, Georgia, Kentucky, Virginia, Oklahoma, Florida, and Indiana in the following cases:  *Morales v. Tilton*, Nos. 06-219-JF-RS, C-06-926-JF-RS (N.D. Cal.); *Taylor v. Crawford*, No. 05-4173-CV-C-FJG (W.D. Mo.); *Patton v. Jones*, No. 06-CV-00591-F (W.D. Okla.); *Evans v. Saar*, 06-CV-00149-BEL (D. Md.); *Baker v. Saar*, No. WDQ-05-3207 (D. Md.); *Reid v. Johnson*, No. 3:03CV1039 (E.D. Va.); *Abdur'Rahman v. Bredesden*, No. 02-2336-III (Davidson County Chancery Ct., Ky.); *Commonwealth v. Lamb*, CR05032887-00 (Rockingham County Cir. Ct., Ky.), *State v. Nathaniel Code*, No. 138860 (1st Judicial District Court of La. for Caddo Parish); and *Timberlake (Intervenor Woods) v. Donahue*, No. 06-cv-01859-KLY-WTL (S.D. Ind.)  I have also filed affidavits or declarations that have been reviewed by courts in the above states and also in Pennsylvania, New York, Alabama, North Carolina, South Carolina, Ohio, Texas, Missouri, Connecticut, Arkansas, Delaware, Nevada, Mississippi, and Montana, and by the United States Supreme Court.

3.      I have reviewed the execution protocols and autopsy data (when available) from each of the above referenced states and the federal government.  Additionally, I have reviewed execution protocols and/or autopsy data from Connecticut, Idaho, Oregon, and Arizona.

4.      As a result of the discovery process in other litigation, I have participated in inspections of the execution facilities in Maryland, Missouri, California, Delaware, North Carolina, Texas, Alabama, Connecticut, and the Federal Execution Facility in Terre Haute, Indiana.  During court



EXHIBIT
2

proceedings, I have heard testimony from prison wardens who are responsible for conducting executions by lethal injection.

5.     I have testified before the Nebraska Senate Judiciary Committee regarding proposed legislation to adopt lethal injection. I have testified before the Pennsylvania Senate Judiciary Committee regarding proposed legislation to prohibit the use of pancuronium bromide or other neuromuscular blockers in Pennsylvania's lethal injection protocol, and have testified before the Maryland House and Senate Judiciary Committees regarding legislation on the administrative procedures that govern the creation of lethal injection protocols. I have also testified before the South Dakota House Committee on State Affairs regarding proposed legislation to amend the lethal injection statute. Most recently, I testified before the Florida Governor's Commission on Administration of Lethal Injection as part of the Commission's review of the method in which lethal injection protocols are administered by the Florida Department of Corrections.

6.     My research regarding lethal injection has involved extensive conversations with recognized experts in the fields of anesthesiology, toxicology and forensic pathology, and correspondence with Drs. Jay Chapman and Stanley Deutsch, the physicians responsible for introducing lethal injection as a method of execution in Oklahoma.

7.     My qualifications are further detailed in my curriculum vitae, a copy of which is attached hereto as Exhibit 1 and incorporated herein.

8.     I hold all opinions expressed in this declaration to a reasonable degree of medical certainty unless otherwise specifically noted.

9.     In preparing this declaration, I have referred to and relied on:

          a.     My training and experience as a practicing physician and anesthesiologist;

          b.     My research into lethal injection, including media and witness accounts of executions, media accounts of legislative and governmental activities related to lethal injection, materials reviewed in litigation, scholarly articles about lethal injection, and the research and work that is involved in serving as an expert witness in the cases described above.

          c.     Documentation provided to me by attorney Jeffrey Gamso regarding the procedures and practices used by the Ohio Department of Rehabilitation and Correction (ODRC) and the Southern Ohio Correctional Facility (SOCF) to carry out executions by lethal injection. The material includes a set of documents bearing Bates stamps 0001 through 0632, a document that is contains "Survey Responses", and photographs and schematic diagrams of the execution facility. These documents contain many successive iterations of the lethal injection procedures and policies.

          d.     The American Veterinary Medical Association (AVMA) "AVMA Guidelines on Euthanasia" of June 2007; in particular its discussion of the

precautions that apply when using potassium as an intravenous euthanasia agent in animals. Also, I have relied upon my own research of Ohio's regulations regarding the use lethal injection in veterinary euthanasia, including Ohio Revised Code 4729.532.

## II.   Introductory comments on Ohio's lethal injection protocol and its deficiencies

10.   It is useful to think of the procedure of lethal injection as comprising the following four stages: (1) The first stage is achieving intravenous access. (2) The second stage is the administration of general anesthesia (sodium thiopental). (3) The third stage is the administration of a neuromuscular blocking agent that has a paralyzing effect to ensure the execution appears serene and peaceful (pancuronium bromide). (4) The fourth stage is the execution through the administration of potassium chloride, which kills the prisoner by stopping his heart. The application of this formalism to the process of lethal injection is discussed in a commentary in the Mayo Clinic Proceedings entitled "Revisiting Physician Involvement in Capital Punishment: Medical and Nonmedical aspects of Lethal Injection" (attached).

11.   Further, it is useful to highlight the two principal problems that can result in an inhumane execution: A) the obtaining of IV access, which when done improperly has resulted in painful mutilation in previous executions, and which requires demonstrated proficiency and skill, and B) failure to produce and maintain adequate general anesthesia so that the agonizing effects of pancuronium and potassium are not experienced by the prisoner. It is important to recognize that the discretionary use by the ODRC of pancuronium and potassium makes the anesthetic component of the procedure a matter of extreme importance.

12   The current ODRC protocol contains unacceptable deficiencies in both of these areas. The problematic features of the Ohio lethal injection protocol render it deficient with respect to minimum standards of safe care, deficient with respect to acceptable standards of veterinary care, deficient with respect to acceptable standards of medical care, and deficient with respect to the lethal injection practices of other states, as recognized by Courts, Committees, and Departments of Corrections.

13.   It is important to understand that lethal injection is performed on animal such as dogs and cats with great frequency, with reliability, and in ways that are humane. Thus, the problem with Ohio's lethal injection protocol is not that lethal injection is in itself necessarily inhumane, but rather that the manner in which Ohio currently plans to undertake lethal injection is gratuitously fraught with unnecessary and avoidable risk, principally because it deviates from acceptable and legal standards of veterinary euthanasia.

14.   As in other states, Ohio's method of execution by lethal injection involves the sequential administration of three separate drugs. The ODRC protocol specifies the drugs used for execution by lethal injection to be the following:

      a.   The intended dose of sodium thiopental is 2.0 grams, administered in a concentration of 25 milligrams (mg) per milliliter (ml).

b.    The intended dose of pancuronium is 100 milligrams (mg).

c.    The intended dose of potassium chloride 100 milliequivalents (mEq)

d.    Infusions of saline are also part of the process.

e.    The drugs, and intervening infusions of saline solution, are intended to be delivered serially, one after another.

f.    Of note, there is no description of the actual mechanics of the administration of the drugs, including the rate at which they should be injected. This is a departure from the written protocols of many other states, which describe in detail the intended mechanical steps to be taken during the sequence of injections. It is not clear to me whether the protocol that was provided to me is an incomplete version of the actual protocol or a complete version of a protocol that fails to describe this critical part of the overall process.

15.    There is no plan articulated for the contingency in which the IV team is unable to achieve IV access in the veins of the arms or other peripheral sites. This is a problem that has bedeviled executions in many states, including Ohio, and has required prisons to perform invasive procedures such as cut-downs and central line placement. No information is provided about who would perform such a procedure were it to be necessary.

16.    The ODRC does not monitor the condemned inmate to ensure that he or she has been adequately anesthetized for the administration of potassium chloride, an excruciatingly painful event. The observational roles provided by the personnel who are at the bedside are entirely inadequate to meaningfully and reasonably ensure that a surgical plane of anesthesia, which is required for the administration of potassium (see below), is established and maintained. .

17.    Based upon my review of the foregoing material and my knowledge of and experience in the field of anesthesiology, I have formed several conclusions with respect ODRC's protocol for carrying out lethal injections. These conclusions arise both from the details disclosed in the materials I have reviewed and available at this time and from medically relevant, logical inferences drawn from the details in those materials. My principal conclusions are as follows:

a.    The ODRC's failure to have appropriately qualified and trained personnel monitor the condemned inmate after the administration of thiopental to ensure that there has been no IV access issue and to assure that the inmate has reached an

appropriate plane of anesthesia prior to the administration of drugs which would cause suffering is contrary to all standards of practice for the administration of anesthetic drugs and creates a severe and unnecessary risk that the condemned will not be adequately anesthetized before experiencing asphyxiation and/or the pain of potassium chloride injection. This failure represents a critical and unacceptable departure from the standards of medical care and veterinary care, and falls below the lethal injection protocols of other states.

b. Pancuronium bromide (or any other similar neuromuscular blocking agent) serves no legitimate medical purpose during execution, and it will, with certainty, cause great suffering if administered to an inadequately anesthetized person. The inclusion of such an agent adds a severe and unnecessary risk of masking body movements that could signal condemned inmate distress during execution.

c. Potassium is not statutorily required as part of a Ohio lethal injection, it serves no legitimate medical purpose during execution, and it will, with certainty, cause great suffering if administered to an inadequately anesthetized person.

### III. Stages of Ohio's Lethal Injection Protocol

18. As described above, it useful to divide the procedure of lethal injection into four stages. The first stage is achieving intravenous access. The second stage is the administration of general anesthesia. The third stage is the administration of neuromuscular blocking agent that has a paralyzing effect to ensure the execution appears serene and peaceful. The fourth stage is the execution through the administration of potassium chloride, which kills the prisoner by stopping his heart. For purposes of this discussion about the risks of the execution process, it is helpful to consider the execution process in reverse order.

#### A. Potassium Chloride Causes Extreme Pain

19. I have reviewed execution logs and electrocardiogram ("EKG") strips from executions around the country. These data show clearly that in the great majority of cases the administration of potassium chloride disrupts the electrical signals in the heart, paralyzes the cardiac muscle, and causes death by cardiac arrest. In other words, condemned inmates are alive until killed by the administration of potassium chloride.

20. There is no medical dispute that intravenous injection of concentrated potassium chloride solution, such as that administered by the ODRC, causes excruciating pain. The vessel walls of veins are richly supplied with sensory nerve fibers that are highly sensitive to potassium ions. There exist other chemicals which can be used to stop the heart and which do not cause pain upon administration.

21. The ODRC has elected potassium chloride to cause cardiac arrest. Thus, the ODRC has exercised its discretion and chosen a means of causing death that causes extreme pain upon administration, instead of selecting available, equally effective yet essentially painless medications, for stopping the heart. In so doing, the ODRC has assumed the responsibility of ensuring, through all reasonable and feasible steps, that the prisoner is sufficiently anesthetized and cannot experience the pain of potassium chloride injection.

22    A living person who is to be intentionally subjected to the excruciating pain of potassium injection must be provided with adequate anesthesia. This imperative is of the same order as the imperative to provide adequate anesthesia for any person or any prisoner undergoing painful surgery. Given that the injection of potassium is a scheduled and premeditated event that is known without any doubt to be extraordinarily painful, it would be unconscionable and barbaric for potassium injection to take place without the provision of sufficient general anesthesia to ensure that the prisoner is rendered and maintained unconscious throughout the procedure, and it would be unconscionable to allow personnel who are not properly trained in the field of anesthesiology to attempt to provide or supervise this anesthetic care.

23.    Indeed, the need for proper medical anesthetic care before death by potassium chloride is so well understood that standards for animal euthanasia require that euthanasia by potassium chloride be performed only by one qualified to assess anesthetic depth:

> It is of utmost importance that personnel performing this technique [euthanasia by potassium chloride injection] are trained and knowledgeable in anesthetic techniques, and *are competent in assessing anesthetic depth* appropriate for administration of potassium chloride intravenously. *Administration of potassium chloride intravenously requires animals to be in a surgical plane of anesthesia characterized by loss of consciousness, loss of reflex muscle response, and loss of response to noxious stimuli.*

*2007 AVMA Guidelines on Euthanasia*, page 12(emphasis added)(see attached). As result of the ODRC's failure to assess anesthetic depth and its failure to provide personnel who are competent in assessing anesthetic depth, the ODRC protocol for executing humans is unacceptable for the euthanasia of animals.

### B.    Administration of Neuromuscular Blocking Agents Is Medically Unnecessary and Causes an Extreme Risk of Suffering

24.    The ODRC hopes to administer 100 milligrams of pancuronium bromide. Pancuronium bromide is one of a class of drugs called neuromuscular blocking agents. Such agents paralyze all voluntary muscles, but do not affect sensation, consciousness, cognition, or the ability to feel pain and suffocation. The effect of the pancuronium bromide is to render the muscles (including the diaphragm which moves to permit respiration) unable to contract. It does not affect the brain or sensory nerves.

25.    Clinically, the drug is used to ensure a patient is securely paralyzed so that surgical procedures can be performed without muscle contraction. Anesthetic drugs are administered before neuromuscular blocking agents so that the patient does not consciously experience the process of becoming paralyzed and losing the ability to breathe. Thus, in any clinical setting where a neuromuscular blocker is to be used, a patient is anesthetized and monitored to ensure anesthetic depth throughout the duration of neuromuscular blocker use. To assess anesthesia, a trained medical professional, either a physician anesthesiologist or a nurse anesthetist, provides close and vigilant monitoring of the patient, their vital signs, using various diagnostic indicators of anesthetic depth. The appropriate procedures for monitoring a patient undergoing anesthesia

and who is about to be administered a drug which masks the ability to convey distress are detailed in the American Society of Anesthesiology's recently published *Practice Advisory for Intraoperative Awareness and Brain Function Monitoring*, 104 Anesthesiology 847, 850-51 (Apr. 2006) (describing preoperative and intraoperative measures for gauging anesthetic depth, including close monitoring of sites of IV access). *See also ASA Standards for Basic Anesthetic Monitoring* (Oct. 25, 2005). ODRC's procedure, to the extent disclosed, indicates that, contrary to all medical practice, no one, let alone a properly trained individual, assesses anesthesia prior to the administration of pancuronium bromide.

26.    It is important to understand that pancuronium bromide does not cause unconsciousness in the way that an anesthetic drug does; rather, if administered alone, a lethal dose of pancuronium bromide would cause a condemned inmate to lose consciousness only after he or she had endured the excruciating experience of suffocation. It would totally immobilize the inmate by paralyzing all voluntary muscles and the diaphragm, causing the inmate to suffocate to death while experiencing an intense, conscious desire to inhale. Ultimately, consciousness would be lost, but it would not be lost as an immediate and direct result of the pancuronium bromide. Rather, the loss of consciousness would be due to suffocation, which would be preceded by the torment and agony caused by suffocation. This period of torturous suffocation would be expected to last at least several minutes and would only be relieved by the onset of suffocation-induced unconsciousness. The experience, in onset and duration and character, would be very similar to that of being suffocated by having one's nose and mouth blocked off. However, there would be the additional element of being unable to move or writhe or communicate the agony.

27.    Based on the information presently available, this type of problem has occurred in other states. But before commenting on specific executions, I think it is important to explain how assessing the degree of consciousness that may have been felt in an execution differs from assessing consciousness in a clinical context. In the clinical context, anesthesiologists closely monitor patients for signs of awareness, and conduct post-operative interviews to assess to what extent a patient may have consciously experienced any part of his or her surgical procedure. The American Society of Anesthesiologists has recently commented that "[i]ntraoperative awareness cannot be measured during the intraoperative phase of general anesthesia, because the recall component of awareness can only be determined postoperatively by obtaining information directly from the patient." *See Practice Advisory for Intraoperative Awareness and Brain Function Monitoring*, 104 Anesthesiology 847, 850 (Apr. 2006).

28.    Neither monitoring nor post-process interviews take place with an execution; we can therefore never know with absolute certainty the degree of consciousness felt in an execution. But, to the extent we can know, after the fact, we look for signs of intravenous access problems, physical reaction to the process, and postmortem blood concentrations of anesthetic drugs. Based on the information presently available, this information suggests terrible problems have occurred during some executions. For example, in the State of Oklahoma's execution of Loyd LaFevers in 2001, witnesses observed an infiltration (a problem with intravenous access) in the intravenous (IV) line delivering the anesthetic thiopental. This problem was confirmed by the Medical Examiner's office notes attached to Mr. LaFevers's autopsy file. Witnesses to Mr. LaFevers's execution observed movements that they described as convulsions or seizures lasting for many minutes. A similar problem appears to have occurred in the 2006 execution of Mr.

Angel Diaz in Florida which lasted 34 minutes. An autopsy of Mr. Diaz showed that the veins in each arm had through and through punctures showing that the IV lines were improperly seated in his veins and that he had chemical burns on both arms from what was most likely an infiltration of the drugs into his muscle tissue. During execution, observers report Mr. Diaz moved and tried to mouth words. Given the sequence of drugs he was administered, the only drug that could have caused chemical burns would be thiopental. It is virtually certain that there was a deep failure to achieve the goal of a smooth execution, that something went disastrously wrong with the administration of the drugs, that the executioners were slow to confront and address the problems with the IV drug delivery and catheters, and that Mr. Diaz did not experience the sort of rapid humane death that is the intended result of the lethal injection procedure. These kinds of inadequate anesthesia experiences have resulted from the completely avoidable problem of poorly designed protocols for the delivery of anesthetic drugs, and the gratuitous inclusion of neuromuscular blocking agents like pancuronium bromide, which I will discuss in full below.

29.    When thiopental is not properly administered in a dose sufficient to cause loss of consciousness for the duration of the execution procedure, it is my opinion held to a reasonable degree of medical certainty, that the use of paralytic drugs such as pancuronium or pancuronium bromide will cause conscious paralysis, suffocation, and the excruciating pain of the intravenous injection of concentrated potassium chloride, such as Mr. LaFevers and Mr. Diaz likely experienced.

30.    There is no legitimate reason for including pancuronium bromide in the execution process and assuming the foregoing risks. Because potassium chloride causes death in executions by lethal injection, there is no rational place in the protocol for pancuronium bromide; the drug simply serves no function in the execution process. Its inclusion, therefore, only adds risk, with no medical benefit.

31.    Because of the concerns enumerated above, medical practitioners eschew the use of neuromuscular blocking agents in circumstances similar to that of executions, end of life care:

> NMBAs [neuromuscular blocking agents] possess no sedative or analgesic activity and can provide no comfort to the patient when they are administered at the time of withdrawal of life support. Clinicians cannot plausibly maintain that their intention in administering these agents in these circumstances is to benefit the patient. Indeed, unless the patient is also treated with adequate sedation and analgesia, the NMBAs may *mask the signs of acute air hunger* associated with ventilator withdrawal, *leaving the patient to endure the agony of suffocation in silence and isolation*. Although it is true that families may be distressed while observing a dying family member, the best way to relieve their suffering is by reassuring them of the patient's comfort through the use of adequate sedation and analgesia.
>
> * * *
>
> As a general rule, therefore, *pharmacologic paralysis should be avoided at the end of life*.

Robert D. Truog et al., *Recommendations for end-of-life care in the intensive care unit: The Ethics Committee of the Society of Critical Care Medicine*, 29(12) CRIT. CARE MED. 2332, 2345 (2001) (emphasis added).

32.    Indeed, even the creator of the original "triple drug" lethal injection protocol, Dr. Jay Chapman, now questions whether his initial contribution warrants reconsideration in light of the problems that have been brought to light nationwide.  In a CNN article placed online on April 30, 2007 Dr. Chapman is quoted as saying "It may be time to change it," Chapman said in a recent interview. "There are many problems that can arise ... given the concerns people are raising with the protocol it should be re-examined."  Regarding the pancuronium, the article states "When asked why he included the asphyxiation drug in his formula, Chapman answered, "It's a good question. If I were doing it now, I would probably eliminate it." http://www.cnn.com/2007/HEALTH/04/30/lethal.injection/index.html

33.    Additionally, the ODRC lethal injection protocol provides no information about the timing of the injections.  A problem encountered in other states is that unless the timing is carefully planned, movements that might be caused by potassium will occur before pancuronium has had time to cause paralysis.  Given that the ODRC has not taken steps to establish a regime for properly timing the injections, the risks of pancuronium are assumed without any clear reason to believe it will achieve its stated purpose of preventing movement (which, as described above, is not in the first place a legitimate purpose).

   C.    Problems with the Use and Administration of General Anesthesia.

      1.    The ODRC's Administration of General Anesthesia Fails to Adhere to a Minimum Standard of Care

34.    Because of the potential for an excruciating death created by the use of potassium chloride and the risk of conscious asphyxiation created by the use of the pancuronium bromide, it is necessary to induce and maintain a deep plane of anesthesia.  The circumstances and environment under which anesthesia is to be induced and maintained in an Ohio execution create, needlessly, a significant risk that inmates will suffer. It is my opinion, stated to a reasonable degree of medical certainty, that the lethal injection procedures selected by the ODRC subject condemned inmates to an increased and unnecessary risk of experiencing excruciating pain in the course of execution.

35.    Presumably, because of the ODRC's awareness of the potential for excruciating pain evoked by potassium, the protocol plans for the provision of general anesthesia by the inclusion of thiopental. When successfully delivered into the circulation in sufficient quantities, thiopental causes sufficient depression of the nervous system to permit excruciatingly painful procedures to be performed without causing discomfort or distress. Failure to successfully deliver into the circulation a sufficient dose of thiopental would result in a failure to achieve adequate anesthetic depth and thus failure to block the excruciating pain.

36.    The ODRC's procedures do not comply with the medical standard of care for inducing and maintaining anesthesia prior to and during a painful procedure. Likewise, the ODRC's

procedures are not compliant with the guidelines set forth by the American Veterinary Medical Association for the euthanasia of animals

### 2. The Dangers of Using Thiopental as an Anesthetic

37. Thiopental is an ultrashort-acting barbiturate that is intended to be delivered intravenously to induce anesthesia. In typical clinical doses, the drug has both a quick onset and **short duration**, although its duration of action as an anesthetic is dose dependant.

38. When anesthesiologists use thiopental, we do so for the purposes of temporarily anesthetizing patients for sufficient time to intubate the trachea and institute mechanical support of ventilation and respiration. Once this has been achieved, additional drugs are administered to maintain a "surgical depth" or "surgical plane" of anesthesia (i.e., a level of anesthesia deep enough to ensure that a surgical patient feels no pain and is unconscious). The medical utility of thiopental derives from its ultrashort-acting properties: if unanticipated obstacles hinder or prevent successful intubation, patients will likely quickly regain consciousness and resume ventilation and respiration on their own.

39. The benefits of thiopental in the operating room engender serious risks in the execution chamber. The duration of unconsciousness provided by thiopental is dose-dependent. If the intended amount of thiopental fails to reaches the condemned inmate's brain (as can occur as a result of an infiltration, leakage, mixing error, or other causes), and the condemned inmate receives a near surgical dose of thiopental, the duration of narcosis will be brief and the inmate could reawaken during the execution process. Then, a condemned inmate in Ohio would suffer the same fate that apparently befell Mr. Angel Diaz in Florida who was intended to receive a 5 gram dose of thiopental, but who did not, and then apparently experienced a conscious or semi-conscious response to the execution process.

40. Of note, the Ohio veterinary regulations regarding euthanasia require the use of pentobarbital. (Pentobarbital should not be confused with Pentothal/thiopental; they are different drugs with different durations of action). This vastly reduces the risk of the anesthetic wearing off prematurely.

41. Many foreseeable situations exist in which human or technical errors could result in the failure to successfully administer the intended dose. The ODRC's procedure both fosters these potential problems and fails to provide adequate mechanism for recognizing these problems, and it does these things needlessly and without legitimate reason.

### 3. Drug Administration Problems

42. Examples of problems that could occur (and which have occurred in executions) that could prevent the proper administration of thiopental include, but are not limited to, the following:

> a. **Errors in Drug Preparation.** Thiopental is delivered in powdered form and must be mixed into an aqueous solution prior to administration. This preparation requires the correct application of pharmaceutical knowledge and familiarity with terminology and abbreviations. Calculations are also required, particularly if the

protocol requires the use of a concentration of drug that differs from that which is normally used. Recently drug preparation problems were revealed in the State of Missouri, which was using a board-certified physician to prepare drugs. *See* Excerpts of Transcript of June 12, 2006 Bench Trial, at 30-39, *Taylor v. Crawford*, No. 05-4173-CV-C-FJG (W.D. Mo.).

b.  **Error in Labeling of Syringes.** It is of paramount importance that the drugs in an execution be given in the correct order. If the drugs are mislabeled, it greatly increases the chances the drugs will not administered in the correct order. \

c.  **Error in Selecting the Correct Syringe.** As presently configured, the ODRC protocol uses the serial injection of fluid from 5 syringes. With that number of syringes it would be easy to make a mistake in selecting the correct syringe. Medication errors are widespread within the clinical arena, and it is recognized by all health care professionals that the most important step in preventing medication errors is the acceptance of the fact that they can and do occur. In the context of lethal injection it is equally important to recognize the possibility of medication errors, particularly given the gratuitous use of pancuronium and potassium. The proposed ODRC procedures do not recognize the possibility of error. The proper way to detect error during the induction of general anesthesia is to assess anesthetic depth and thereby ensure that the drugs have exerted their intended and predicted effects.

d.  **Error in Correctly Injecting the Drug into the Intravenous Line.** If the syringe holding the drug is turned in the wrong direction, a retrograde injection of the drug into the IV fluid bag rather than into the inmate will result. Even experienced anesthesiologists sometimes make this error, and the probability of this error occurring is greatly increased in the hands of inexperienced personnel.

e.  **The IV Tubing May Leak.** An "IV setup" consists of multiple components that are assembled by hand prior to use. If the drugs are not at the bedside, which they are not in Ohio, but are instead in a different room then it will be impossible to maintain visual surveillance of the full extent of IV tubing so that such leaks may be detected. The configuration of the death chamber and the relative positions of the executioners and the inmate in Ohio will hinder or preclude such surveillance, thereby risking a failure to detect a leak. Leaking IV lines have been noted in executions in other states. The induction of general anesthesia in the medical context, and I believe in the veterinary context, is always a "bedside procedure"; it is never conducted by the administration of drugs in tubing in one room that then is intended to travel into the body of a person in another room.

f.  **Incorrect Insertion of the Catheter.** If the catheter is not properly placed in a vein, the thiopental will enter the tissue surrounding the vein but will not be delivered to the central nervous system and will not render the inmate unconscious. This condition, known as infiltration, occurs with regularity in the clinical setting. Recognition of infiltration requires continued surveillance of the IV site during the injection, and that surveillance should be performed so as to

permit correlation between visual observation and tactile feedback from the plunger of the syringe. One cannot reliably monitor for the presence of infiltration through a window from another room. There have been occasions where departments of correction have failed to recognize infiltrations during execution. In Oklahoma an infiltration in the catheter delivering the anesthetic thiopental was reported (followed by condemned inmate convulsions). Another such occurrence has been reported during the Florida execution of Angel Diaz. These occurrences appear to have directly contributed to the condemned inmates' conscious experience of the execution process.

g. **Migration of the Catheter.** Even if properly inserted, the catheter tip may move or migrate, so that at the time of injection it is not within the vein. This would result in infiltration, and therefore a failure to deliver the drug to the inmate's circulation and failure to render the inmate unconscious.

h. **Perforation or Rupture or Leakage of the Vein.** During the insertion of the catheter, the wall of the vein can be perforated or weakened, so that during the injection some or all of the drug leaves the vein and enters the surrounding tissue. The likelihood of rupture occurring is increased if too much pressure is applied to the plunger of the syringe during injection, because a high pressure injection results in a high velocity jet of drug in the vein that can penetrate or tear the vessel wall. Recently, during the Clark execution, the personnel failed to recognize that the condemned's veins had "collapsed" until the inmate himself notified them that the procedure had gone awry.



i. **Excessive Pressure on the Syringe Plunger.** Even without damage or perforation of the vein during insertion of the catheter, excessive pressure on the syringe plunger during injection can result in tearing, rupture, and leakage of the vein due to the high velocity jet that exits the tip of the catheter. Should this occur, the drug would not enter the circulation and would therefore fail to render the inmate unconscious. The ODRC protocol provides no meaningful instructions about the rate or speed of injections, meaning that there are no instructions to prevent the lay executioners from pushing the syringe plungers in a manner that injures the vein and causes failed delivery of some or all of the thiopental dose.

j. **Securing the Catheter.** After insertion, catheters must be properly secured by the use of tape, adhesive material, or suture. Movement by the inmate, even if restrained by straps, or traction on the IV tubing may result in the dislodging of the catheter.

k. **Failure to Properly Loosen or Remove the Tourniquet or position restraining straps.** A tourniquet is used to assist in insertion of an IV catheter. Failure to remove such tourniquets from the arm or leg after placement of the IV catheter will delay or inhibit the delivery of the drugs by the circulation to the central nervous system. This may cause a failure of the thiopental to render and maintain the inmate in a state of unconsciousness..Restraining straps may act as tourniquets and thereby impede or inhibit the delivery of drugs by the circulation to the

central nervous system. This may cause a failure of the thiopental to render and maintain the inmate in a state of unconsciousness. Even if the IV is checked for "free flow" of the intravenous fluid prior to commencing injection, a small movement within the restraints on the part of the inmate could compress the vein and result in impaired delivery of the drug. It has been noted in at least one execution by lethal injection that the straps hindered the flow of drugs. *See* Editorial, *Witnesses to a Botched Execution*, St. Louis Post-Dispatch, at 6B (May 8, 1995).

43.     These types of drug administration problems are not uncommon in the practice of medicine. A number of medical publications detail exactly these types of administration issues. For example, the National Academy of Sciences Institute on Medicine has published the report of the Committee on Identifying and Preventing Medication Errors, which details the rates of drug preparation and administration errors in hospital setting and concludes "[e]rrors in the administration of IV medications appear to be particularly prevalent." Preventing Medication Errors: Quality Chasm Series 325-60 (Philip Aspden, Julie Wolcott, J. Lyle Bootman, Linda R. Cronenwett, Eds. 2006); *id.* at 351. Likewise a recent study shows that "drug-related errors occur in one out of five doses given to patients in hospitals." *See* Bowdle, T. A., *Drug Administration Errors from the ASA [Am. Soc. Anesthesiologists] Closed Claims Project*, 67(6) ASA Newsletter, 11-13 (2003). This study recognizes that neuromuscular blockers have been administered to awake patients and to those who have had inadequate doses of general anesthetic. *Id.*

44     The ODRC documentation recognizes that contingencies need to be planned for, however, it does not describe how any of the myriad contingencies that can and do arise during the induction of general anesthesia would be detected and corrected during the conduct of a lethal injection procedure.

45.     In the practice of medicine, preventing pain and/or death as a result of these common drug administration problems is achieved by having persons in attendance who have the training and skill to recognize problems when they occur and the training and skill to avert the negative consequences of the problems when they arise.

4.     The Need for Adequate Training in Administering Anesthesia

46.     Because of these foreseeable problems in administering anesthesia, in Ohio and elsewhere in the United States, the provision of anesthetic care is performed only by personnel with advanced training in the medical subspecialty of Anesthesiology. The establishment of a surgical plane of anesthesia is a complex task which can only reliably be performed by individuals who have completed the extensive requisite training to permit them to provide anesthesia services. *See Practice Advisory for Intraoperative Awareness and Brain Function Monitoring*, 104 Anesthesiology 847, 859 Appendix 1 (Apr. 2006) (recommending the use of "multiple modalities to monitor depth of anesthesia"). If the individual providing anesthesia care is inadequately trained or experienced, the risk of these complications is enormously increased. The President of the American Society of Anesthesiologists, writing about lethal injection, recently stated that "the only way to assure [a surgical plane of anesthesia] would be to have an anesthesiologist prepare and administer the drugs, carefully observe the inmate and all pertinent

monitors, and finally to integrate all this information." Orin F. Guidry, M.D., *Message from the President: Observations Regarding Lethal Injection* (June 30, 2006).

47.    In Ohio and elsewhere in the United States, general anesthesia is administered by physicians who have completed residency training in the specialty of Anesthesiology, and by nurses who have undergone the requisite training to become Certified Registered Nurse Anesthetists (CRNAs). Physicians and nurses who have not completed the requisite training to become anesthesiologists or CRNAs are not permitted to provide general anesthesia.

48.    In my opinion, individuals providing general anesthesia in the Ohio prison should not be held to a different or lower standard than is set forth for individuals providing general anesthesia in any other setting in Ohio. Specifically, the individuals providing general anesthesia within Ohio's prisons, should possess the experience and proficiency of anesthesiologists and/or CRNAs. Conversely, a physician who is not an anesthesiologist or a nurse who is not a CRNA or any person who lacks the requisite training and credentials should not be permitted to provide general anesthesia within Ohio's prisons (or anywhere else in Ohio or the United States).

49.    There is no evidence, at this time, that any person on the ODRC's injection team has any training in administering anesthesia, or, if personnel are given training, what that training might be. This raises critical questions about the degree to which condemned inmates risk suffering excruciating pain during the lethal injection procedure. The great majority of nurses are not trained in the use of ultrashort-acting barbiturates; indeed, this class of drugs is essentially only used by a very select group of nurses who have obtained significant experience in intensive care units and as nurse anesthetists. Very few EMTs are trained or experienced in the use of ultrashort-acting barbiturates and/or pancuronium.  Of the three medical personnel who are described as participating in lethal injection procedures in Ohio, 2 are EMTs and the medical background of the third is unknown.  There is no evidence that the third medical person has any meaningful experience in the establishment, maintenance, and assessment of a surgical plane of anesthesia. Based on my medical training and experience, and based upon my research of lethal injection procedures and practices, inadequacies in these areas elevate the risk that the lethal injection procedure will cause the condemned to suffer excruciating pain during the execution process. Failure to require that the injection team have training equivalent to that of an anesthesiologist or a CRNA compounds the risk that inmates will suffer excruciating pain during their executions.

50.    In addition to apparently lacking the training necessary to perform a lethal injection, the ODRC's protocol imposes conditions that exacerbate the foreseeable risks of improper anesthesia administration described above, and fails to provide any procedures for dealing with these risks. Perhaps most disturbingly, the protocol makes no mention of the need for effective monitoring of the inmate's condition or whether he is anesthetized and unconscious. After IV lines are inserted and the execution begins, it appears that the injection team will be in a different room from the prisoner, and thus will not have the ability to properly monitor the IV delivery system and catheter sites as they would if they were at "the bedside". Accepted medical practice, however, dictates that trained personnel are physically situated so that they can monitor the IV lines and the flow of anesthesia into the veins through visual and tactile observation and examination. The apparent lack of any qualified personnel present in the chamber during the execution thwarts the execution personnel from taking the standard and necessary measures to



reasonably ensure that the thiopental is properly flowing into the inmate and that he is properly anesthetized prior to the administration of the pancuronium bromide and potassium. In recognition of this concern, other states have taken steps to place personnel with medical backgrounds actually within the execution chamber for the purpose of properly monitoring the IV delivery system during the injection process.

51.    In my opinion, having a properly equipped, trained, and credentialed individual examine the inmate after the administration of the thiopental (but prior to, during, and after the administration of pancuronium, until the prisoner is pronounced dead) to verify that the inmate is completely unconscious would substantially mitigate the danger that the inmate will suffer excruciating pain during his execution. This is the standard of care, and in many states the law, set forth for dogs and cats and other household pets when they are subjected to euthanasia by potassium injection. Yet the ODRC protocol does not apparently provide for such verification during the execution of humans.

52.    Indeed, it appears that departments of correction around the country are now agreeing that some assessment of anesthetic depth is required to ensure a humane execution. As a result of my participation in lethal injection litigations around the country I have become aware that the State of Indiana and the State of Florida now concede that some attempt at measuring or assessing anesthetic depth should be performed. Additionally, in Missouri, a federal district judge has ordered that an appropriately qualified person assess anesthetic depth. While Judge Fogel in California has not, to my understanding, issued a final decision regarding the evidence presented to him, it is clear from his written discussion of the case that he recognizes that the use of drugs that cause great pain or suffering (such as pancuronium and potassium) places a heightened burden on the execution team and the state to properly monitor and maintain adequate anesthetic depth.

D.    Establishing IV access

53.    The first step in the lethal injection process is creating effective intravenous access for drug delivery. The subsequent administration of the anesthetic drugs can only be successful if IV access is properly achieved. But the ODRC has put in place a protocol that exacerbates the risk that IV access will not be adequately achieved. There have been problems in other states, most notably the Diaz execution in Florida, wherein the personal professional qualifications of the personnel providing IV access had not been subjected to adequate scrutiny.

54.    Despite its best attempts, ODRC has twice in recent years encountered extreme difficulty in obtaining peripheral IV access. Unlike other states, Ohio does not appear too have a plan in place to deal with the need for a cut-down or central line procedure. This is a glaring deficiency. Further, it is unclear whether the personnel who are currently participating in lethal injection procedures in Ohio have the necessary training and experience to perform central line placement and cut-downs.

55.    It is my opinion that, to reasonably minimize the risk of severe and unnecessary suffering during the ODRC's execution by lethal injection using the drugs thiopental, pancuronium, and potassium, there must be: proper procedures that are clear and consistent; qualified personnel to ensure that anesthesia has been achieved prior to the administration of pancuronium bromide and

potassium chloride; qualified personnel to select chemicals and dosages, set up and load the syringes, insert the IV catheter, and perform the other tasks required by such procedures; and adequate inspection and testing of the equipment and apparatus by qualified personnel. The ODRC's procedures for implementing lethal injection, to the extent that they have been made available, provide for none of the above.

IV.    Assessment of the ODRC lethal injection protocol.

56.    Overall, evaluation of the proposed ODRC lethal injection procedures reveals several problematic themes:

a. – The absence of qualified personnel to supervise the use of the high-risk drugs pancuronium and potassium. Other states recognize their need to rely upon physicians to oversee the administration of pancuronium and potassium. By contrast, Ohio does not provide for a physician or adequately trained person to be physically present at the bedside to assess anesthetic depth when pancuronium and potassium are administered and therefore cannot offer any protection.

b. –The use of pancuronium confers high risk of torturous death, which prevents the detection by witnesses and execution personnel of inadequate anesthesia, and which is speciously justified by a need to prevent witnesses seeing movement when no such steps are taken for electrocution and/or gas in Ohio or other states.

c. – The absence of any articulated recognition that the establishment and maintenance of a surgical plane of anesthesia is essential for the non-cruel completion of the execution procedure. There appear to be no provisions for the participation of personnel who are capable of monitoring anesthetic depth, and there are no directives in the written protocol that would instruct such personnel, if they were present, to actually undertake a meaningful assessment of anesthetic depth. Further, the equipment that is necessary to meaningfully assess anesthetic depth appears not to be present or to be deployed. Other states, and courts, and committees, have recognized that given the use of torture-causing drugs such as pancuronium and potassium, it is essential that meaningful and effective steps be in place to ensure that adequate anesthesia is established and maintained.

d. – IV access – as described above, there is no "back-up" plan for achieving IV access if the IV team is unable to successfully place catheters within the veins of the arms. Other states provide for such plans, and in this regard Ohio falls below the standards set by other states when performing execution lethal injection.

VI.    Conclusions.

Based on my research into methods of lethal injection used by various states and the federal government, and based on my training and experience as a medical doctor specializing in anesthesiology, it is my opinion stated to a reasonable degree of medical certainty that, given the apparent absence of a central role for a properly trained professional in ODRC's execution procedure, the characteristics of the drugs or chemicals used, the failure to understand how the drugs in question act in the body, the failure to properly account for foreseeable risks, the design of a drug delivery system that exacerbates rather than ameliorates the risk, the ODRC has created an execution protocol that does little to nothing to assure they will reliability achieve humane executions by lethal injection.

This declaration was, of necessity, prepared with limited information.  It appears that the lethal injection procedures provided to me are incomplete, as they do not describe how the injections should be delivered. I reserve the right to revise my opinion if warranted by new information.

I declare under the laws of the United States and under penalty of perjury that the foregoing is true and correct.

DATED this 14th day of February, 2008.

Mark J.S. Heath, M.D.

Curriculum Vitae

1)    Date of preparation:  March 10, 2006

2)    Name:        Mark J. S. Heath

      Birth date:
      Birthplace:        New York, NY
      Citizenship:       United States, United Kingdom

3)    Academic Training:

                  Harvard University                                    B.A., Biology,
1983

                  University of North Carolina, Chapel Hill            M.D., 1987

                  Medical License                                      New York:
177101-1

      4)    Traineeship:

      1987 – 1988   Internship, Internal Medicine, George Washington University
Hospital,
                  Washington, DC.

      1988 – 1991   Residency, Anesthesiology, Columbia College of Physicians  and
                  Surgeons, New York, NY

      1991 – 1993   Fellowship, Anesthesiology, Columbia College of Physicians  and
                  Surgeons, New York, NY

5)    Board Qualification:

                  Diplomate, American Board of Anesthesiology, October 1991.
                  Diplomate National Board of Echocardiography Perioperative
                                    Transesophageal Echocardiography
2005. (PTEeXAM 2001).

6)    Military Service:           None

7)    Professional Organizations:

                  International Anesthesia Research Society

8)    Academic Appointments:

            1993 – 2002        Assistant Professor of Anesthesiology,
                               Columbia University, New York, NY

| | | |
|---|---|---|
| 2002 - present | | Assistant Professor of Clinical Anesthesiology, Columbia University, New York, NY |

9) Hospital/Clinical Appointments:

| | | |
|---|---|---|
| 1993 – present | | Assistant Attending Anesthesiologist, Presbyterian Hospital, New York, NY. |

10) Honors:

Magna cum laude, Harvard University
Alpha Omega Alpha, University of North Carolina at Chapel Hill
First Prize, New York State Society of Anesthesiologists Resident Presentations, 1991

11) Fellowship and Grant Support:

Foundation for Anesthesia Education and Research, Research Starter Grant Award, Principal Investigator, funding 7/92 - 7/93, $15,000.

Foundation for Anesthesia Education and Research Young Investigator Award, Principal Investigator, funding 7/93 - 7/96, $70,000.

NIH   KO8 "Inducible knockout of the NK1 receptor"
Principal Investigator, KO8 funding 12/98 - 11/02,
$431,947 over three years
(no-cost extension to continue through 11/30/2002)

NIH   RO1 "Tachykinin regulation of anxiety and stress responses"

Principal Investigator, funding 9/1/2002 – 8/30/2007
$1,287,000 over 5 years

12) Departmental and University Committees:

Research Allocation Panel (1996 – 2001)
Institutional Review Board (Alternate Boards 1-2, full member Board 3) (2003 - present)

13) Teaching:

Lecturer and clinical teacher: Anesthesiology Residency Program, Columbia University and Presbyterian Hospital, New York, NY

Advanced Cardiac Life Support Training

*Anesthetic considerations of LVAD implantation.* Recurrent lecture at Columbia University LVAD implantation course.

Invited Lecturer:

*NK1 receptor functions in pain and neural development*, Cornell University December 1994

*Anxiety, stress, and the NK1 receptor*, University of Chicago, Department of Anesthesia and Critical Care, July 2000

*Anesthetic Considerations of LVAD Implantation*, University of Chicago, Department of Anesthesia and Critical Care, July 2000

*NK1 receptor function in stress and anxiety*, St. John's University Department of Medicinal Chemistry, March 2002

*Making a brave mouse (and making a mouse brave)*, Mt. Sinai School of Medicine, May 2002

*Problems with anesthesia during lethal injection procedures*, Geneva, Switzerland. Duke University School of Law Conference, "International Law, Human Rights, and the Death Penalty: Towards an International Understanding of the Fundamental Principles of Just Punishment", July 2002.

*NK1 receptor function in stress and anxiety*, Visiting Professor, NYU School of Medicine, New York, New York. October 2002.

*Anesthetic Depth, Paralysis, and other medical problems with lethal injecton protocols: evidence and concerns*, Federal Capital Habeas Unit Annual Conference, Jacksonville, Florida. May 2004.

*Medical Scrutinyof Lethal Injection Procedures*. National Association for the Advancement of Colored People Capital Defender Conference, Airlie Conference Center, Warrenton, Virginia. July 2004.

*Medical Scrutinyof Lethal Injection Procedures*. National Association for the Advancement of Colored People Capital Defender Conference, Airlie Conference Center, Warrenton, Virginia. July 2005.

*Medical Scrutinyof Lethal Injection Procedures*. National Association for the Advancement of Colored People Capital Defender Conference, Airlie Conference Center, Warrenton, Virginia. July 2006.

*Medical Scrutinyof Lethal Injection Procedures Advanced Criminal Law Seminar 2005, Fordham University School of Law*, March 2005

*Medical Scrutiny of Lethal Injection Procedures  Advanced Criminal Law Seminar 2005, Fordham University School of Law, January  2007*

*Anesthetic considerations of LVAD implantation.*  Recurrent lecture at Columbia University LVAD implantation course.

14)    Grant Review Committees:    None

15) Publications:

Original peer reviewed articles

**Heath, M. J. S.**, Stanski DR, Pounder DJ. Inadequate Anesthesia in Lethal Injection for Execution. Lancet, 366(9491) 1073-4, correspondence. 2005

\* Santarelli, L., Gobbi, G., Debs, P.C., Sibille, E. L., Blier, P., Hen, R., **Heath, M.J.S.** (2001). Genetic and pharmacological disruption of neurokinin 1 receptor function decreases anxiety-related behaviors and increases serotonergic function. Proc. Nat. Acad. Sci., 98(4), 1912 – 1917.

\* King, T.E. ᵃ, **Heath M. J. S**ᵇ., Debs, P, Davis, MB, Hen, R, Barr, G. (2000). The development of nociceptive responses in neurokinin-1 receptor knockout mice. Neuroreport.;11(3), 587-91   ᵟ authors contributed equally to this work

\* **Heath, M. J. S.**, Lints, T., Lee, C. J., Dodd, J. (1995). Functional expression of the tachykinin NK$_1$ receptor by floor plate cells in the embryonic rat spinal cord and brainstem. **Journal of Physiology** 486.1, 139 -148.

\* **Heath, M. J. S.**, Womack M. D., MacDermott, A. B. (1994). Subsance P elevates intracellular calcium in both neurons and glial cells from the dorsal horn of the spinal cord. **Journal of Neurophysiology** 72(3), 1192 - 1197.

McGehee, D. S., **Heath, M. J. S.**, Gelber, S., DeVay, P., Role, L.W. (1995) Nicotine enhancement of fast excitatory synaptic transmission in the CNS by presynaptic receptors. **Science** 269, 1692 - 1696.

Morales D, Madigan J, Cullinane S, Chen J, **Heath, M. J. S.**, Oz M, Oliver JA, Landry DW. (1999). Reversal by vasopressin of intractable hypotension in the late phase of hemorrhagic shock. Circulation. Jul 20;100(3):226-9.

LoTurco, J. J., Owens, D. F., **Heath, M. J. S.**, Davis, M. B. E., Krigstein, A. R. (1995). GABA and glutamate depolarize cortical progenitor cells and inhibit DNA synthesis. **Neuron** 15, 1287 - 1298.

Kyrozis A., Goldstein P. A., **Heath, M. J. S.**, MacDermott, A. B. (1995). Calcium entry through a subpopulation of AMPA receptors desensitized neighboring NMDA receptors in rat dorsal horn neurons. **Journal of Physiology** 485.2, 373 - 381.

McGehee, D.S., Aldersberg, M. , Liu, K.-P., Hsuing, S., **Heath, M.J.S.** , Tamir, H. (1997). Mechanism of extracellular Ca²⁺-receptor stimulated hormone release from sheep thyroid parafolicular cells. **Journal of Physiology**: 502,1, 31 - 44.

Kao, J., Houck, K., Fan, Y., Haehnel, I., Ligutti, S. K., Kayton, M. L., Grikscheit, T., Chabot, J., Nowygrod, R., Greenberg, S., Kuang, W.J., Leung, D. W., Hayward, J. R., Kisiel, W., **Heath, M. J. S.**, Brett, J., Stern, D. (1994). Characterization of a novel tumor-derived cytokine. **Journal of Biological Chemistry** 269, 25106 - 25119.

Dodd, J., Jahr, C.E., Hamilton, P.N., **Heath, M.J.S.**, Matthew, W.D., Jessell, T.M. (1983). Cytochemical and physiological properties of sensory and dorsal horn neurons that transmit cutaneous sensation. <u>Cold Spring Harbor Symposia of Quantitative Biology</u> 48, 685 -695.

Pinsky, D.J., Naka, Y., Liao, H., Oz, M. O., Wagner, D. D., Mayadas, T. N., Johnson, R. C., Hynes, R. O., **Heath, M.J.S.**, Lawson, C.A., Stern, D.M. Hypoxia-induced exocytosis of endothelial cell Weibel-Palade bodies. <u>Journal of Clinical Investigation</u> 97(2), 493 - 500.

<u>Case reports</u>           none

<u>Review, chapters, editorials</u>

\*      **Heath, M. J. S.,** Dickstein, M. L. (2000). Perioperative management of the left ventricular assist device recipient. Prog Cardiovasc Dis.;43(1):47-54.

\*      Dickstein, M.L., Mets B, **Heath** M.J.S. (2000). Anesthetic considerations during left ventricular assist device implantation. Cardiac Assist Devices pp 63 – 74.

\*      **Heath, M. J. S.** and Hen, R. (1995). Genetic insights into serotonin function. <u>Current Biology</u> 5.9, 997 -999.

\*      **Heath, M.J.S.**, Mathews D (1990). Care of the Organ Donor. <u>Anesthesiology Report</u> 3, 344-348.

\*      **Heath, M. J. S.,** Basic physiology and pharmacology of the central synapse. (1998) <u>Anesthesiology Clinics of North America</u> 15(3), 473 – 485.

<u>Abstracts</u>

**Heath, M.J.S.,** Analysis of EKG recordings from executions by lethal injection. Canadian Society of Anesthesiology Winter Meeting, February 2006.

**Heath, M.J.S.,** Analysis of postmortem thiopental in prisoners executed by lethal injection IARS Congress 2005.

**Heath, M.J.S.,** Davis, M., Santarelli L., Hen H. (2002). Gene targeting of the NK1 receptor blocks stress-evoked induction of c-Fos in the murine locus coeruleus. IARS American-Japan Congress A-15.

**Heath, M.J.S.,** Davis, M., Santarelli L., Hen H. (2002). Gene targeting of the NK1 receptor blocks stress-evoked induction of c-Fos in the murine locus coeruleus. Anesthesiology 95:A-811.



**Heath, M.J.S.,** Davis, M., Santarelli L., Hen H. (2002). Expression of Substance P and NK1 Receptor in the Murine Locus Coeruleus and Dorsal Raphe Nucleus. Anesthesia and Analgesia 93; S-212

**Heath, M.J.S.,** Davis, M., Santarelli L., Hen H. (2002). Expression of Substance P and NK1 Receptor in the Murine Locus Coeruleus and Dorsal Raphe Nucleus. Anesthesia and Analgesia 93; S-212.

**Heath, M.J.S.,** Santarelli L, Hen H. (2001) The NK1 receptor is necessary for the stress-evoked expression of c-Fos in the paraventricular nucleus of the hypothalamus. Anesthesia and Analgesia 92; S233.

**Heath, M.J.S.,** Santarelli L, Debs P, Hen H. (2000). Reduced anxiety and stress responses in mice lacking the NK1 receptor. Anesthesiology 93: 3A A-755.

**Heath, M.J.S.,** King, T., Debs, P.C., Davis M., Hen R., Barr G. (2000). NK1 receptor gene disruption alters the development of nociception. Anesthesia and Analgesia; 90; S315.

**Heath, M.J.S.,** Lee, J.H., Debs, P.C., Davis, M. (1997). Delineation of spinal cord glial subpopulations expressing the NK1 receptor. Anesthesiology; 87; 3A; A639.

**Heath, M.J.S.,** MacDermott A.B. (1992). Substance P elevates intracellular calcium in dorsal horn cells with neuronal and glial properties. Society for Neuroscience Abstracts; 18; 123.1.

**Heath, M.J.S.,** Lee C.J., Dodd J. (1994). Ontogeny of NK1 receptor-like immunoreactivity in the rat spinal cord. Society for Neuroscience Abstracts; 20; 115.16.

**Heath, M.J.S.,** Berman M.F. (1991) Isoflurane modulation of calcium channel currents in spinal cord dorsal horn neurons. Anesthesiology 75; 3A; A1037.

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JACK E. ALDERMAN,　　　　　　　 )
　　　　　　　　　　　　　　　　　 )
　　　　Plaintiff,　　　　　　　　 )
　　　　　　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　　　 )
v.　　　　　　　　　　　　　　　　 )　　Civil Action No.
　　　　　　　　　　　　　　　　　 )　　1:07-CV-1474-BBM
JAMES E. DONALD, in his capacity as　 )
Commissioner of the Georgia Department )
of Corrections;  HILTON HALL,　　　 )
in his capacity as Warden, Georgia　　 )
Diagnostic and Classification Prison;　 )
DOES 1-50, UNKNOWN　　　　　　 )
EXECUTIONERS, in their capacities　　 )
as employees and/or agents of the　　　 )
Georgia Department of Corrections.　　 )
　　　　　　　　　　　　　　　　　 )
　　　　Defendants.　　　　　　　　 )

## DECLARATION ROBERT K. LOWE, ESQ. REGARDING
## THE EXECUTION OF CHRISTOPHER NEWTON

I, Robert K. Lowe, Esq., declare that:

　　　1.　　My name is Robert K. Lowe, and I have been a licensed Ohio

attorney since 2000.  I currently serve as an Assistant State Public Defender for

the Office of the Ohio Public Defender in the death penalty section, and I have

held that position since July 2001.



EXHIBIT
3

2.    During my tenure as Assistant State Public Defender, my office has continually represented Christopher Newton during his direct appeal to the Ohio Supreme Court. It was in my capacity as Mr. Newton's counsel that I witnessed his execution on May 24, 2007 at the Southern Ohio Correctional Facility.

3.    As one of the witnesses, the following occurred for Mr. Newton's execution:

a.    The media was taken into the death house (J-Block of Southern Ohio Correctional Facility) about 8-10 minutes before 10:00 a.m.

b.    The victim's witnesses, three prosecutors from Richland County, were taken into the death house about 5 minutes before 10:00 a.m.

c.    Mr. Newton's witnesses, including myself were taken into the death house about 2 minutes before 10:00 a.m.

d.    All witnesses were in place and seated at about 10:01 a.m.

e.    At 10:03 a.m. the video prompter came on and the "medical team" started to put the locks into Mr. Newton's arms. There was at least one person on each side. Mr. Newton was in the holding cell on a bed.

f.    The lock was inserted and taped down on the left arm. This was achieved on the third or fourth attempt, after 22 minutes. An IV line

2                                                    NYA 855692.1

was attached to Mr. Newton to keep the vein open.  The IV bag hung over his head (could not see what it was attached to).

g.    As for the right arm, it took approximately an hour and fifteen minutes to insert the lock.

h.    At approximately 10:35 a.m. I asked if Greg Trout was in the area and asked to speak with him or Mr. Newton due to the length of time finding a vein.  I was not permitted to speak to Mr. Newton. However, a few minutes later, I was asked to leave the witness area to talk with Greg Trout.  Mr. Trout informed me that there was no time table to find a vein and that the "team" was told to take their time to find a viable vein.  I inquired about cutting down and was informed that they had not even come close to thinking that that was required.

i.    At 10:40 a.m. the "medical team" did look at the right leg as an option to access a vein, no "pricks" were attempted in the leg. After a couple of minutes looking, the "medical team" went back to the right arm.

j.    At 10:48 a.m. the "medical team" started looking at the right arm and right leg.

k.    At 10:57 a.m. the "medical team" left.  They returned at 11:00 a.m. with a new tray of medical items.

3

NYA 355692.1

l.      At 11:05 a.m. Mr. Newton got up and left the view of the

video prompter. I was pulled out of the witness area and Greg Trout

informed me that Mr. Newton asked and was permitted to use the

restroom due to the bag of fluids being pumped into Mr. Newton to keep

the left vein open.

m.      After Mr. Newton went to the restroom, the "team" searched

for a vein while he sat on the bed. At 11:22 a.m. Mr. Newton laid back

down on his bed. After searching for a vein for a short period of time,

Mr. Newton laid there with the "team" just looking at Mr. Newton.

n.      At about 11:30 a.m. I was pulled out of the witness room

again. I was told that they had found a second vein but it was running

really slow – but running continuously. They were going to move Mr.

Newton slowly into the chamber and proceed with the execution. I was

informed that if there was failure, that the curtain would be closed and

Mr. Newton moved onto a gurney and taken back to the holding cell in

order to search for a vein under the camera with the video prompter

turned back on.

o.      At about 11:33 a.m., Mr. Newton walked into the execution

chamber. He was strapped onto the execution table at 11:34 a.m. One of

the guards (grey shirt) who was strapping Mr. Newton's left arm had

shaky hands.

4

p.   At 11:36 a.m., Mr. Newton was given his opportunity to make a statement. Warden Voorhies stood to Mr. Newton's right with a white shirt guard (head of the execution team—introduced himself as that during Wednesday's visit) at Mr. Newton's head. These two remained in the execution chamber during the execution.

q.   For several minutes after his statement, Mr. Newton was still talking and laughing with the guard and Warden Voorhies.

r.   After Mr. Newton stopped talking, there was a short time period and then movement was observed. At one point, the guard looked at Warden Voorhies with a bewildered or confused look. Mr. Newton's chest/stomach moved about 8-10 times and his chin was moving in jittery manner.

s.   At 11:45 a.m. Mr. Newton's chest made one movement.

t.   The curtain was drawn at 11:51 a.m.

u.   The curtain was re-opened and death was pronounced at 11:53 a.m.

v.   The witnesses were escorted out of the death house with the media first, then Mr. Newton's witnesses, and then the victim's witnesses.

I declare under penalty of perjury that the foregoing is true and correct.

NYA 853692.1

Dated: August 15, 2007

By: _____

Robert K. Lowe, Esquire

6

NYA 555692.1

970

## KENTUCKY STATE PENITENTIARY

### VISITING SCHEDULE FOR DEATH ROW INMATE

### PRE-EXECUTION (DEATH WATCH)

**ATTORNEYS/PARALEGALS**                                        REVISED 12/14/2004

DAILY                    ███ TO ███        CONTACT

24-HOUR ACCESS IN EVENT OF EMERGENCIES

**PERSONAL VISITORS**

DAILY BY APPOINTMENT             ███ TO ███        CONTACT

DAY OF SCHEDULED EXECUTION       ███ TO ███        CONTACT

**MINISTERS**

MONDAY THROUGH FRIDAY            ███ TO ███

INSTITUTIONAL CHAPLAIN           ███ TO ███

**NEWS MEDIA**

MONDAY THROUGH FRIDAY            ███ TO ███        CONTACT

BY SPECIAL ARRANGEMENTS ONLY

**VISITATION GUIDELINES**

ANY ITEM BROUGHT IN BY ATTORNEYS/PARALEGALS, MINISTERS, OR NEWS MEDIA SUCH AS, BUT NOT LIMITED TO, CASSETTES, WIRELESS MIKES, BOOKS, OR MAIL MUST BE APPROVED IN ADVANCE BY THE WARDEN. NO ITEMS WILL BE ALLOWED IN BY PERSONAL VISITORS.

1.      VISITS WILL BE CONDUCTED AT A DESIGNATED LOCATION.

2.      NO MORE THAN FOUR VISITORS AT A TIME.

3.      THE WARDEN RESERVES THE RIGHT TO DENY ACCESS TO THE INSTITUTION, ANY VISITOR OR PERSON, HE DEEMS A RISK TO THE SECURITY OF THE INSTITUTION.



EXHIBIT

4

REVISED 12/14/2004

PRE-EXECUTION MEDICAL ACTIONS CHECKLIST

ACTIONS TAKEN AFTER RECEIVING EXECUTION ORDER

| ACTIONS | RESPONSIBILITY | COMPLETED/DATE/TIME |
|---|---|---|
| 1. Notify Department of Corrections ▮▮▮▮▮▮and ▮▮▮▮▮▮ ▮▮▮▮▮ of receipt of Governor's Death Warrant (immediately). | | |
| 2. Begin a special section of condemned's medical record for all medical actions (X – 14 days). | | |
| 3. Nurse visits and checks on the condemned each shift, seven days a week, using the special medical section to record contacts and observations (X - 14 days). | | |

971

PRE-EXECUTION MEDICAL ACTIONS CHECKLIST
ACTIONS TAKEN AFTER RECEIVING EXECUTION ORDER
PAGE 2 of 4

REVISED 12/14/2004

| ACTIONS | RESPONSIBILITY | COMPLETED/DATE/TIME |
|---|---|---|

4. ██████ personally observes and evaluates the condemned five (5) days per week, Monday through Friday (X - 14 days).

5. Place the ██████'s documentation in the permanent record immediately after personal contact.

6. Department of Corrections ██████ or his designee reviews and initials nursing documentation in #3 daily (X - 14 days).

7. ██████ reviews nursing and doctor's documentation weekly.

972

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3987

PRE-EXECUTION MEDICAL ACTIONS CHECKLIST
ACTIONS TAKEN AFTER RECEIVING EXECUTION ORDER
PAGE 3 of 4                                              REVISED 12/14/2004

ACTIONS                    RESPONSIBILITY          COMPLETED/DATE/TIME

8.   Physical examination is completed by the

     ███████████ or his designee

     no later than seven (7) days prior to

     execution.                   _____   _____

9.   Place the physical in the permanent

     medical record upon completion.   _____   _____

10.  ███████ evaluation is completed

     by ███████ no later than seven

     (7) days prior to execution.   _____   _____

11.  Place the psychiatric interview and

     psychiatric evaluation in the permanent

     medical record and send copies to the

     Warden.                        _____   _____

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3988

PRE-EXECUTION MEDICAL ACTIONS CHECKLIST
ACTIONS TAKEN AFTER RECEIVING EXECUTION ORDER
PAGE 4 of 4                                                            REVISED 12/14/2004

| ACTIONS | RESPONSIBILITY | COMPLETED/DATE/TIME |
|---|---|---|
| 12. ██████████ or his designee personally observes and evaluates the condemned's medical condition weekly. | | |
| 13. Place the ██████████ or his designee notes in the permanent record immediately after personal contact. | | |
| 14. Notify all medical staff to immediately notify the Warden, ██████████ ████ or designee, and ████ ██████████ of any change in the inmate's medical or psychiatric condition. | | |

974

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3989

THE EXECUTION
LETHAL INJECTION

REVISED 12/14/2004

| SEQUENCE OF EVENTS | RESPONSIBILITY | COMPLETED/DATE/TIME |
|---|---|---|
| 1. At ███ the Warden orders the condemned escorted to the execution chamber and strapped to the gurney. | _____ | _____ |
| 2. The IV team members will be the members of the execution team who site and insert the IV lines. | _____ | _____ |
| 3. The team enters the chamber and runs the IV lines to the condemned inmate, site and insert one (1) primary IV line and one (1) backup IV line in a location deemed suitable by the team members. | _____ | _____ |
| 4. The insertion site of preference shall be the following order: arms, hands, ankles and/or feet, neck. | _____ | _____ |

975

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3990

**THE EXECUTION: LETHAL INJECTION**
Page 2 of 9

REVISED 12/14/2004

SEQUENCE OF EVENTS                    RESPONSIBILITY              COMPLETED/DATE/TIME

5. To best assure that a needle is inserted
   properly into a vein, the IV team members
   should look for the presence of blood
   in the valve of the sited needle.

6. If the IV team cannot secure one (1) or
   more sites within one (1) hour, the Governor's
   Office shall be contacted by the Commissioner
   and a request shall be made that the execution
   be scheduled for a later date.

7. The team will start a saline flow.

8. The team will securely connect the
   electrodes of the cardiac monitor to the
   inmate and ensure the equipment is
   functioning.

976

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3991

THE EXECUTION: LETHAL INJECTION
Page 3 of 9

REVISED 12/14/2004

| SEQUENCE OF EVENTS | RESPONSIBILITY | COMPLETED/DATE/TIME |
|---|---|---|
| 9. The team will then move to the hallway and stand by. | _____ | _____ |
| 10. The team leader will recheck all restraints and determine they are secure and so advise the Warden. | _____ | _____ |
| 11. The Warden will confirm that all is ready. | _____ | _____ |
| 12. The Warden will make one final check with the attorneys stationed outside the chamber. | _____ | _____ |
| 13. The Deputy Warden will open the curtain and turn on the microphone. | _____ | _____ |

977

THE EXECUTION: LETHAL INJECTION
Page 4 of 9

REVISED 12/14/2004

| SEQUENCE OF EVENTS | RESPONSIBILITY | COMPLETED/DATE/TIME |
|---|---|---|

14.  The Warden states, "At this time

we will carry out the legal execution

of _____ (condemned name)."       _____       _____

15.  The Warden asks the condemned if he

wants to make a final statement

(two (2) minutes allowed).       _____       _____

16.  Upon the Warden's order to "proceed"

and the microphone turned off, a designated

team member will begin a rapid flow of lethal

chemicals in the following order:

1)    Sodium Thiopental (3 gm.)

NOTE:  If it appears to the Warden

That the condemned is not unconscious

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3993

978

THE EXECUTION: LETHAL INJECTION
Page 5 of 9

REVISED 12/14/2004

| SEQUENCE OF EVENTS | RESPONSIBILITY | COMPLETED/DATE/TIME |
|---|---|---|

within 60 seconds to his command to "proceed", the Warden shall stop the flow of Sodium Thiopental in the primary site and order that the backup IV be used with a new flow of Sodium Thiopental.

2) Saline (25 mg.)

3) Pancuronium Bromide (50 mg)

4) Saline 25 (mg)

5) Potassium Chloride (240 meq). _____ _____

17. A designated team member will begin a stopwatch once the lethal injections are complete. If the heart monitor does

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3994

THE EXECUTION: LETHAL INJECTION
Page 6 of 9

REVISED 12/14/2004

SEQUENCE OF EVENTS                    RESPONSIBILITY                    COMPLETED/DATE/TIME

not indicate a flat line after ten (10)

minutes and if during that time the physician

and coroner are not able to pronounce death,

the Warden will order a second set of lethal

chemicals to be administered (Sodium

Thiopental, Pancuronium Bormide, and

Potassium Chloride).  This process will

continue until death has occurred.                _____          _____

18.    A designated team member will observe

the heart monitor and advise the

physician of cessation of

electrical activity of the heart.                 _____          _____

086

THE EXECUTION: LETHAL INJECTION
Page 7 of 9

REVISED 12/14/2004

| SEQUENCE OF EVENTS | RESPONSIBILITY | COMPLETED/DATE/TIME |
|---|---|---|

19. The curtains shall be drawn when the Physician and coroner enter the chamber and confirm death by checking the condemned's pulse and pupils and so advise the Warden.

20. The curtain will then be opened. The Warden turns on the microphone and states: "At approximately ___ p.m. the execution of _____ was carried out in accordance with the laws of the Commonwealth of Kentucky".

21. The microphone is turned off and the curtains will be drawn.

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 3996

THE EXECUTION: LETHAL INJECTION
Page 8 of 9

REVISED 12/14/2004

| SEQUENCE OF EVENTS | RESPONSIBILITY | COMPLETED/DATE/TIME |
|---|---|---|
| 22. The witnesses are escorted out of the witness room, first the media, inmate's witnesses, and then the victim's witnesses. | _____ | _____ |
| 23. The team will prepare the body for departure. | _____ | _____ |
| 24. Release body per prior arrangements. | _____ | _____ |
| 25. Funeral director completes death certificate. | _____ | _____ |
| 26. Not more than one (1) day after execution, the Warden shall return the copy of the judgment of the court pronouncing the death sentence, of the manner, time and place of its execution. | _____ | _____ |

986

THE EXECUTION:  LETHAL INJECTION
Page 9 of 9

REVISED 12/14/2004

| SEQUENCE OF EVENTS | RESPONSIBILITY | COMPLETED/DATE/TIME |
|---|---|---|
| 27. Close out inmate account during next business day. | | |
| 28. Contact individual designated to receive condemned's personal property for pick up of property the next business day. | | |
| 29. Compile all documents pertaining to Execution and place in inmate file. | | |

988

984

## EXECUTION TEAM QUALIFICATIONS

1. The following people with at least one year of professional experience may be on the IV team:

   a)   Certified Medical Assistant, or

   b)   Phlebotomist, or

   c)   Emergency Medical Technician, or

   d)   Paramedic, or

   e)   Military Corpsman

2. Prior to participating in an actual execution, the member of the IV team must have participated in at least two (2) practices.

3. Members of the IV team must remain certified in their profession and must fulfill any continuing education requirements in their profession.

4. The execution team shall practice at least ten (10) times during the course of one (1) calendar year.

5. Each practice shall include a complete walk through of an execution including the siting of two (2) IVs into a volunteer.

6. Execution team members, excluding IV team members, must have participated in a minimum of two (2) practices prior to participating in an actual execution.

985

## STABALIZATION PROCEDURE AFTER THE EXECUTION HAS COMMENCED

1.   In the event that a stay is issued after the execution has commenced, the execution team
     will stand down and medical staff on site will attempt to stabilize the condemned with the
     below listed equipment and personnel.

   A.   The Warden will arrange for an ambulance and staff to be present on institutional
        property.

   B.   A medical crash cart and defibrillator shall be located in the execution building.

STATE OF OHIO                    :     CASE NO.  CR83-12-0614

          Plaintiff              :     STATE OF OHIO
                                       COUNTY OF BUTLER
vs                               :     COURT OF COMMON PLEAS

VON CLARK DAVIS                        JUDGMENT OF CONVICTION ENTRY
                                       AND WRIT FOR THE EXECUTION
          Defendant                    OF THE DEATH PENALTY

: : : : : : : : : : : : : : : : : : : : : : : : : : :

          This 29th day of May, 1984 the defendant came before the Court

personally and with his counsel, Michael D. Shanks and John A. Garretson, and

the Indictment, plea, trial, and verdict of the Three Judge Panel on the

issue of Guilt and Specification being as set forth in the previous Entry of

the Court, which are expressly included herein by reference,

          And the Court having considered all facts and circumstances in

aggravation and mitigation as set forth in Sections 2929.03-2929.04,

          Coming now to the imposition of sentence, pursuant to Rule 32(A)(1) of

the Ohio Rules of Criminal Procedure, the Court afforded counsel an opportunity

to speak on behalf of the defendant, and the Court addressed the defendant

personally and asked him if he wished to make a statement in his own behalf or

present any information in mitigation of punishment, and nothing being said by

defendant as to why sentence should not now be pronounced,

          IT IS ORDERED as to Count One of the Indictment that the Butler

County Sheriff shall, within thirty (30) days hereof, in a private manner,

convey the defendant to the Southern Ohio Correctional Facility at Lucasville,

Ohio, where such prisoner shall be received by the Warden and kept until the

day designated for his execution in the manner and form prescribed by law.

          IT IS FURTHER ORDERED as to Count One of the Indictment that the

defendant, Von Clark Davis, on the 1st day of October, 1984, within the walls

of the Southern Ohio Correctional Facility at Lucasville, Ohio, shall be

electrocuted by causing a current of electricity of sufficient intensity to

cause the death to pass through the body of the said defendant, the application

of such current to be continued until the said defendant is dead.

          The Warden of the Southern Ohio Correctional Facility at Lucasville

IT IS FURTHER ORDERED as to the second Specification contained in Count One of the Indictment that the defendant be confined in the Southern Ohio Correctional Facility at Lucasville, Ohio for a term of actual incarceration of three (3) years imposed pursuant to Section 2929.71 of the Ohio Revised Code, to be served prior to and consecutively with any other term of imprisonment imposed herein.

IT IS FURTHER ORDERED as to Count Two of the Indictment that the defendant be confined in the Southern Ohio Correctional Facility at Lucasville, Ohio, for a definite term of one and one-half (1-1/2) years.

IT IS FURTHER ORDERED that the defendant shall pay the costs of prosecution herein.

FILED In Common Pleas Court
BUTLER COUNTY, OHIO

MAY 4 1984

EDWARD S. ROBB, JR.
CLERK

E N T E R

HENRY J. BRUEWER, PRESIDING JUDGE

WILLIAM R. STITSINGER, JUDGE

JOHN R. MOSER, JUDGE

APPROVED:

JOHN F. HOLCOMB
PROSECUTING ATTORNEY
BUTLER COUNTY, OHIO

Form OPD-E-205

GARRETT BROTHERS, PUBLISHERS, SPRINGFIELD, OHIO

# CLERK'S TRANSCRIPT FEE FOR AN INDIGENT DEFENDANT

Revised Code 2301.24-25

In the ___COMMON PLEAS___ Court of ___BUTLER___ County

STATE OF OHIO,
CITY OF ___Hamilton___

Plaintiff

CASE NO. ___CR83-12-0614___

vs.

ATTORNEY(S) FOR THE DEFENDANT:

___VON CLARK DAVIS___

Mike Shanks and Jack Garretson

Indigent Defendant

I, the Clerk of Courts, hereby certify that ___Teresa L. Bayer___
the official stenographer of said court is entitled to the following fees for making transcript(s) of
___all motions, trial proceedings and mitigation hearing___

___EDWARD S. ROBB, JR. CLERK OF COURTS___    ___9-25-84___
Clerk's Signature                                        Date

(a) _____ Transcript ordered by the court, used by the judge (100% reimbursed by the state criminal cost program).

(b) __X__ Transcript ordered by the court, used by the Prosecutor (100% reimbursed by the state criminal cost program).

(c) _____ Transcript ordered by the court, used by the Defendant or the Defendant's attorney (50% reimbursed by the state Assigned Counsel Program).

(d) _____ Transcript ordered by the court, for an appeal (50% reimbursed by the state Assigned Counsel Program).

Transcript of __502__ pages or folio at the rate of __1.50__ per page or folio, - $753.00. Additional
transcript of the same at the rate of __.75__ per page or folio - $376.50 for a total of $1129.50.

The court finds that the transcript set forth on said statement is in fact, ordered for use in the case
of an indigent person.

Judge's Signature and Typed Beneath
JUDGE HENRY J. BRUEWER

The County Auditor in executing this certificate attests that the transcript was a true and accurate expense of said county's court.

_____
County Auditor's Signature

Check Number: _____

Check Date: _____

County Number: _____

Form Prescribed by Ohio Public Defender Commission