IMAGED

### IN THE COURT OF COMMON PLEAS
### BUTLER COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff, | : | CA 2008 040111 |
| | : | Case No. CR 1983-12-0614 |
| vs. | : | |
| VON CLARK DAVIS | : | Judge Nastoff |
| Defendant. | : | ORAL ARGUMENT REQUESTED |

## VON CLARK DAVIS' MOTION FOR DISCLOSURE
## OF EXCULPATORY EVIDENCE

COMES NOW, Defendant Von Clark Davis, through undersigned counsel pursuant to the Fourteenth Amendment and *Brady v. Maryland* (1963), 373 U.S. 83, 86, moves this Court to order the prosecution to release all exculpatory evidence. Mr. Davis has attached a Memorandum of Law which he incorporates in this pleading.

Respectfully submitted,

RANDALL L. PORTER - 0005835
Assistant State Public Defender
Office of the Ohio Public Defender
8 East Long Street -11th Floor
Columbus, Ohio 43215
(614) 466-5394 (Voice)
(614) 644-0703 (Facsimile)
PorterR@OPD.state.OH.US

And



MELYNDA COOK-REICH - 0066695
REPPER, PAGAN, COOK, Ltd.
1501 First Avenue
Middletown, Ohio 45044
(513) 424-1823 (Voice)
(513) 424-3135 (Facsimile)
Mcook@bizcinci.rr.com

## MEMORANDUM OF LAW

### I.    INTRODUCTION

The prosecution has a constitutional obligation to disclose evidence favorable to the accused. *Brady v. Maryland* (1963), 373 U.S. 83, 86. The suppression of material exculpatory evidence violates a defendant's due process rights, irrespective of the good faith or bad faith of the prosecution. *Id.* at 87. Favorable evidence for *Brady* purposes includes both exculpatory and impeachment evidence. The suppression by the prosecution of favorable evidence results in constitutional error "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley* (1995), 514 U.S. 419, 433 (quoting *United States v. Bagley,* 473 U.S. 667, 682 (1985)). In *Kyles*, the United States Supreme Court emphasized that "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of

2

a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles v. Whitley* (1995), 514 U.S. at 434; *see also Strickler v. Greene* (1999), 527 U.S. 263, 264.

The Ohio Supreme Court recently addressed the types of evidence that could potentially be found to be exculpatory. *State v. Brown*, 115 Ohio St. 3d 55, 2007-Ohio-4837. The Court applied a broad all inclusive definition, "Admittedly, the statements contained in these reports are hearsay and might not be admissible. However, they are material, and even if the defense could not directly introduce them at trial, the state's failure to turn them over was highly prejudicial. The defense was deprived of the opportunity to call the original declarants at trial. They were also deprived of the ability to use the statements to cross-examine Donley when he testified at trial." *Id.* at p. 46. Therefore the prosecution may not limit its *Brady* search to admissible evidence.

**A.** ***The prosecution's duty of disclosure extends to the mitigation phase of a capital case.***

In *Brady v. Maryland,* the defendant had been sentenced to death. The prosecutor suppressed the statement of a co-defendant in which he had had admitted to committing the actual killing. *Id.* at 84. Brady, at his trial, had admitted to participating in the murder, but claimed that the co-defendant committed the actual killing. *Id.* The Supreme Court remanded the case for

3

retrial solely on the issue of punishment as a result of the prosecution's suppression of the co-defendant's statement. *Id.* at p. 90.

The United States Supreme Court has since revisited this issue. *Banks v. Dretke*, 540 U.S. 668, 701-703 (2004). The prosecutor therein suppressed evidence that one of its witnesses in the penalty phase had misrepresented his dealings with the police; including the 1) receipt of consideration, 2) conversations that he had with the investigating officers, and 3) the content of those conversation. *Id.* at 694. The Court granted penalty phase relief as a result of the prosecution's suppression of favorable evidence. *Id.* at 702-703.

**B. The prosecution's duty of disclosure extends to impeaching evidence.**

"Impeachment evidence...as well as exculpatory evidence, falls within the *Brady* rule." *United States v. Bagley* (1985), 473 U.S. 667, 676. This requirement of candor by the State encompasses information that bears upon the credibility of its witnesses as well as matters more directly material to guilt or innocence. *Napue v. Illinoisi* (1959), 360 U.S. 264, 269. The State has an affirmative duty to produce requested impeachment evidence that is favorable to the accused. *Castleberry v. Brigano* (6th Cir. 2003), 349 F.3d 286, 294. Because the prosecution is more likely than the defense to be aware of impeaching information as to its own witnesses, it is only fitting that this duty to disclose lies with the State. The disclosure of evidence favorable to the accused includes impeachment material that may affect government's witnesses, because such information is material to both guilt and punishment,

4

*United States v. Agurs* (1976), 427 U.S. 97, 113; *United States v. Bagley*, 473 U.S. at 676; *Kyles v. Whitley*, 514 at, 433. The government's duty to disclose impeaching information, of course, extends to the full range of permissible inquiry by defense counsel upon cross-examination. *United States v. Agurs* (1977), 427 U.S. 97, 106.

The United States Supreme Court has underscored the importance of the Defendant's right to exact a searching cross-examination of his/her accusers and the legitimacy of searching out possible biases, prejudices, and ulterior motives of the witness. *Davis v. Alaska* (1974), 415 U.S. 308, 316. Thus, the defense must be given wide latitude in discovery of matters related to impeachment, especially when a defendant's life is on the line.

## II. THE COURT SHOULD ORDER THE PROSECUTION TO PROVIDE ALL INFORMATION IN ITS ACTUAL OR CONSTRUCTIVE POSSESSION CONCERNING OTHER INDIVIDUALS WHO WERE POSSIBLY INVOLVED IN THE COMMISSION OF THE HOMICIDE.

At the first trial Mark Lovette and Wade Coleman testified that they were involved in the purchase of the weapon which they state theorized was the murder weapon. Mr. Davis testified that he believed that Silky Carr committed the murder. The investigating officers arrested Mr. Davis in Lexington Kentucky where he had traveled to try to locate Silky Carr.

The prosecution has a duty to provide defense counsel with information concerning other suspects in a case. *Jamison v. Collins* (6th Cir. 2002), 291 F.3d 380, 390; *Castlebarry v. Brigano* (6th Cir. 2003), 349 F.3d 286, 293; *State v. Brown*, 115 Ohio St. 3d 55, 2007-Ohio-4837, ¶ 50. This

5

duty extends to information concerning co-defendants who committed the offense in conjunction with the defendant. *Brady v. Maryland*, 373 U.S. at 86.

The Court, pursuant to *Brady*, should order the prosecution to provide defense counsel with all of the police reports in which memorialize the involvement of Mark Lovette, Wade Coleman Silky Carr or any other person in the commission of the homicide. The disclosure should not be limited to statements signed or adopted by those individuals. The Fourteenth Amendment does not contain any such limitation.

## III. THE COURT SHOULD ORDER THE PROSECUTION TO PROVIDE ALL FAVORABLE INFORMATION IN ITS ACTUAL OR CONSTRUCTIVE POSSESSION CONCERNING THOSE PERSONS WHO CLAIMED TO HAVE WITNESSED THE HOMICIDE.

Mr. Davis was convicted partially on the testimony of Mona Ridge, Cozette Massey, Reginald Denmark, and Anthony Ferguson who claimed to have witnessed the fatal shooting. Mark Lovette and Wade Coleman provided the remainder of the inculpatory testimony; they both claimed to have purchased a firearm for Mr. Davis on the day of the shooting. The prosecution is required to disclose that evidence that may be used to impeach the credibility of its witnesses. *Giles v. Maryland* (1967), 386 U.S. 66, 74. Pursuant to *Giles*, the Court should order that the prosecution to provide all favorable information as to Ridge, Massey, Denmark Ferguson, Lovette and Wade included, but not limited to the following:

1. The conviction and arrest records for all six individuals and any facts or allegations concerning criminal or other misconduct of those individuals that is not reflected in their criminal records including charges or

6

investigations either at the time of the offense, the first trial or the present. *See Ouimette v. Moran* (1st Cir. 1996), 942 F. 2d 1, 10; *United States v. Strifle* (9th Cir 1988), 851 F.2d 1197, 1202.

2. All consideration that the prosecution offered any of these six individuals or that they anticipate or will anticipate receiving as a result of their testimony at the grand jury, the first trial or the present time. *United States v. Bagley* (1985), 473 U.S. 667, 683; *Benn v. Lambert* (9th Cir. 2002), 283 F.3d 1040, 1056; *Killian v. Poole* (9th Cir. 2002), 282 F.3d 1204, 1210; *Singh v. Prunty* (9th Cir. 1998), 142 F.3d 1157, 1162;. This category includes "unwritten" or tacit promises and understandings, or the offer of other inducements to a witness to obtain his cooperation and testimony against the accused. *Giglio v. United States* (1972), 405 U.S. 150, 154.

3. All offers of immunity that the prosecution offered any of the six individuals with regard to the present offense or any other offense. *Kelley v. Singletary* (S.D. Fla. 2002), 222 F. Supp 2d 1357, 1364.

4. Any matter that might cause any of the six individuals to have colored or now present his or her testimony in favor of the prosecution out of fear or in self-preservation. This category includes information relating to the individual's possible vulnerability to prosecution, parole or probation revocation, or other sanctions by the prosecution. *Davis v. Alaska* (1974), 415 U.S. 308, 316; *United States v. Minsky* (6th Cir. 1992), 963 F.2d 870, 873.

5. All inconsistent statements made by any of the six individuals. *Kyles v. Whitley*, 514 U.S. at 444; *Jamison v. Collin*, 291 F.3d at, 389; *Boss v.*

7

*Pierce,* (7th Cir. 2001), 263 F.3d 734, 735; *United States v. Minsky,* 963 F.2d at 870. This includes the  grand jury testimony of the six individuals. See *United States v. Campagnuolo* (5th Cir. 1979), 592 F.2d 852; *United States v. Azzarelli Construction Company* (E.D. Ill. 1978), 459 F. Supp. 146, 153; *United States v. Brighton Building Maintenance Company* (N.D. Ill.), 435 F. Supp. 222  *aff'd* 598 F.2d 1101 (7th Cir. 1979).

6.    All information concerning any psychiatric or other mental history that any of the six individuals suffered from prior to or at the time of the offenses, the first trial or the present. *Chavis v. North Carolina* (4th Cir. 1980), 637 F.2d 213, 225; *United States v. Society of Independent Gasoline Marketers* (4th Cir. 1979), 624 F.2d 461, 469; *United States v. McFarland* (2nd Cir. 1966), 371 F.2d 701, 705.

7.    All information that concerning any of the six individual's addiction or dependence upon narcotic, other illegal drugs or alcohol prior to and at the time of the offense, the first trial or since the first trial. *Wilson v. United States* (1914), 232 U.S. 563, 568; *United States v. Kinard* (D.C. Cir. 1972), 465 F.2d 566, 570-74.

8.    All information that any of the six individuals has made prior unfounded accusations. *Benn v. Lambert,* 283 F.3d at 1054-5; *Carriger v. Stewart,* 132 F.3d at 479.

9.    All reports that do not contain all of the information to which the six individuals testified at the grand jury or at trial. *Jones v. Jago* (6th Cir. 1978), 575 F. 2d 1164, 1169.

8

10.   All information that any of the six individuals had or has a motive to testify against Mr. Davis. *Castleberry v. Brigano*, 349 F. 3d at 293; *United States v. Strifler,* 851 F.2d at 1202.

11.   All information concerning whether any of the six individuals had or has s a financial need that might explain his or her testimony, *Id.*

12.   All information concerning whether any of the six individuals has a history of lying or being inaccurate in their statements, *Id.*

13.   All information concerning whether any of the six individuals has a history of not being able to distinguish fact from fiction, *United States v. Lindstrom* (11th Cir. 1983), 698 F.2d 1154, 1166.

14.   All information concerning whether any of the individuals have committed any misconduct since providing their initial statements to the investigating officers, *Benn v. Lambert*, 283 F. 3d at 1054.

Consequently the Court should order the prosecution to disclose all of all the information which impeaches any of the six individuals.

## V.   THE COURT SHOULD ORDER THAT THE PROSECUTION TO PROVIDE ALL INFORMATION IN ITS ACTUAL OR CONSTRUCTIVE POSSESSION CONCERNING VON CLARK DAVIS' EMOTIONAL, MENTAL AND PHYSICAL CONDITION AT THE TIME OF THE OFFENSE.

Mr. Davis' mental and physical state are relevant to the issues at the time of the offense. *Brown v. Crosby* (S.D. Fla. 2003), 249 F. Supp 2d 285, 1314; *United States v. Brown* (D. Oregon 2004), 347 F. Supp. 2d 920, 923-4; *People v. Breggs* (Ill. 2004), 209 N.E.2d 472, 486-489; *Commonwealth v. Hilton,* 823 N.E.2d 383, 393 (Mass. 2005).  The prosecution's duty of disclosure

9

extends to relevant psychological information.  *East v. Johnson*  (5th Cir. 1997),

123 F.3d 235, 238-239; *Bailey v. Rae* (9th Cir. 2003), 339 F.3d 1107, 1114.

The Court should order the prosecution to disclose all information

in its possession concerning any impairment, no matter how slight, from which

Mr. Davis suffered at the time of the offense.

## VI.    CONCLUSION:  THE COURT SHOULD ORDER THE DISCLOSURE OF ALL INFORMATION IDENTIFIED HEREIN

In this pleading, Mr. Davis has identified information, if disclosed,

that would be favorable, both cumulatively and individually. The Court should

required the prosecution to provide not only material exculpatory evidence but

all favorable evidence in its possession.

WHEREFORE, Von Clark requests that the Court order the prosecution

disclose all relevant information identified herein.

Respectfully submitted,

RANDALL L. PORTER - 0005835
Assistant State Public Defender
Office of the Ohio Public Defender
8 East Long Street -11th Floor
Columbus, Ohio  43215
(614) 466-5394 (Voice)
(614) 644-0703 (Facsimile)
PorterR@OPD.state.OH.US

And

MELYNDA COOK-REICH - 0066596
REPPER, PAGAN, COOK, Ltd.
1501 First Avenue
Middletown, Ohio 45044

10

(513) 424-1823 (Voice)
(513) 424-3135 (Facsimile)
Mcook@bizcinci.rr.com

COUNSEL FOR VON CLARK DAVIS

## CERTIFICATE OF SERVICE

I hereby certify that ~~a~~ *two* true cop~~y~~*ies* of the foregoing *Von Clark Davis'*

*Motion For Disclosure Of Favorable Evidence* was forwarded by ~~first-class,~~ *hand delivery*

~~postage prepaid U.S. Mail~~ to Daniel G. Eichel, First Assistant Butler County

Prosecuting Attorney, and Michael A. Oster, Jr. Assistant Butler County

Prosecuting Attorney at the Government Services Center, 315 High Street,

Hamilton, Ohio 45011 on this 26th day of May, 2008.

RANDALL L. PORTER
COUNSEL FOR VON CLARK DAVIS

#216284

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 4014

IN THE COURT OF COMMON PLEAS
BUTLER COUNTY, OHIO

STATE OF OHIO,                              :

     Plaintiff-Respondent,           :          Case No. CR 1983-12-0614

vs.                                         :

VON CLARK DAVIS                             :          Judge Nastoff

     Defendant-Petitioner.           :

---

## VON CLARK DAVIS'S MOTION TO REQUIRE A SEALED COPY OF THE PROSECUTION'S FILE BE MADE PART OF THE RECORD

---

        COMES NOW, Defendant Von Clark Davis, through undersigned

counsel who moves the Court to order the prosecution to file a sealed copy of its

file with the Clerk of Court'. Mr. Davis has attached a memorandum of law which

he incorporates in this pleading.

        Respectfully submitted,

RANDALL L. PORTER - 0005835
Assistant State Public Defender
Office of the Ohio Public Defender
8 East Long Street - 11th Floor
Columbus, Ohio 43215
(614) 466-5394 (Voice)
(614) 644-0703 (Facsimile)
PorterR@OPD.state.OH.US

And

MELYNDA COOK-REICH – 0066596

REPPER, PAGAN, COOK, Ltd.
1501 First Avenue
Middletown, Ohio 45044
(513) 424-1823 (Voice)
(513) 424-3135 (Facsimile)
Mcook@bizcinci.rr.com

## MEMORANDUM IN SUPPORT

It is clearly established law that the prosecuting attorney is required
to disclose to the defendant evidence that, if suppressed, would deprive the
defendant of a fair trial.  This includes exculpatory as well as impeachment
evidence.  *Brady v. Maryland* (1963), 373 U.S. 83, 87; *United States v. Bagley*
(1985), 473 U.S. 667, 675-76.  If the suppressed evidence is material, in that it
undermines confidence in the outcome of the trial, Constitutional error occurs
and the conviction must be reversed.  *Bagley*, 473 U.S. at 678.  *See also State v.*
*Johnston*  (1988), 39 Ohio St. 3d 48, 62-53, 529 N.E.2d 898.  Materiality is
determined by considering the suppressed evidence collectively in light of all the
other evidence; not by viewing each item of evidence in isolation.  *Kyles v.*
*Whitley*, (1995) 514 U.S. 419, 436.

Mr. Davis has filed motions to require the prosecution to provide him
with impeachment and exculpatory information. In addition, he has filed with the
Court a motion to require the investigating agencies to provide copies of their
entire files to the prosecution attorney. The instant Motion is a corollary to those

2

other pleadings, designed to ensure complete disclosure of all information to which Mr. Davis.

There currently exists no mechanism to guarantee that the prosecution meets its duty of disclosure. Defense counsel is not permitted to assist the prosecution in its review of the relevant law enforcement files. The prosecution most likely has little to no training and experience in the identification of favorable evidence. In addition, the prosecution is not aware of the details of Mr. Davis's proposed sentencing presentation, and therefore, lacks a basis of knowledge from which to make its decisions concerning what constitutes favorable evidences. The prosecution's failure to provide defense counsel with favorable evidence results in a violation of the Fourteenth Amendment regardless of the intentions of the prosecution. *Brady v. Maryland*, 373 U.S. at 87 ("the suppression of evidence favorable to the accused upon requests violates due process where the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution.")

The utility of the entrance of such an order can be seen in the recent Ohio Supreme Court case, *State v. Brown,* 115 Ohio St. 3d 55, 2007-Ohio-4837. The Ohio Supreme Court therein reversed the defendant's conviction for capital murder in part because the prosecution had suppressed favorable evidence contained in police reports. *Id.* at ¶¶ 43-50. The Ohio Supreme Court's finding of constitutional error was only made possible because a sealed copy of the prosecution's file had been made part of the record. *Id.* at ¶42. The present

3

motion in essence requests only that Mr. Davis be afforded the same quality of appellate review as Mr. Brown.

WHEREFORE, Von Clark Davis requests the Court to order that a sealed copy of the prosecution's file, including all relevant files of the investigatory agencies, be made part of the record.

Respectfully submitted,

RANDALL L. PORTER - 0005835
Assistant State Public Defender
Office of the Ohio Public Defender
8 East Long Street -11th Floor
Columbus, Ohio 43215
(614) 466-5394 (Voice)
(614) 644-0703 (Facsimile)
PorterR@OPD.state.OH.US

And

MELYNDA COOK-REICH - 0066596
REPPER, PAGAN, COOK, Ltd.
1501 First Avenue
Middletown, Ohio 45044
(513) 424-1823 (Voice)
(513) 424-3135 (Facsimile)
Mcook@bizcinci.rr.com

## CERTIFICATE OF SERVICE

I hereby certify that a true copies of the foregoing *Von Clark Davis's Motion To Require A Sealed Copy Of The Prosecution's File Be Made Part Of The Record* was forwarded by first-class U.S. Mail, postage prepaid to Daniel G. Eichel, First Assistant Butler County Prosecuting Attorney, and Michael A. Oster, Jr. Assistant Butler County Prosecuting Attorney at the Government Services Center, 315 High Street, Hamilton, Ohio 45011 on this 27th day of May, 2008.

COUNSEL FOR VON CLARK DAVIS

4



### IN THE COURT OF COMMON PLEAS
### BUTLER COUNTY, OHIO

STATE OF OHIO,          :

     Plaintiff,          :          Case No. CR 1983-12-0614

vs.          :

VON CLARK DAVIS          :          Judge Nastoff

     Defendant.          :          ORAL ARGUMENT REQUESTED

---

## VON CLARK DAVIS' MOTION TO DISMISS
## THE CAPITAL SPECIFICATION CONTAINED IN INDICTMENT

---

COMES NOW, Defendant Von Clark Davis, through undersigned counsel moves the Court to dismiss the capital specification. Mr. Davis has attached a memorandum of law which he incorporates in this pleading.

Respectfully submitted,

RANDALL L. PORTER – 0005835
Assistant State Public Defender
Office of the Ohio Public Defender
8 East Long Street -11th Floor
Columbus, Ohio 43215
(614) 466-5394 (Voice)
(614) 644-0703 (Facsimile)
PorterR@OPD.state.OH.US

And

MELYNDA COOK-REICH - 0066596
REPPER, PAGAN, COOK, Ltd.
1501 First Avenue
Middletown, Ohio 45044

(513) 424-1823 (Voice)
(513) 424-3135 (Facsimile)
Mcook@bizcinci.rr.com

## MEMORANDUM  OF LAW

The Eighth Amendment to the United States Constitution and Article I, Section 9 of the Ohio Constitution prohibit the infliction of cruel and unusual punishment.  The Eighth Amendment's protections are applicable to the states through the Fourteenth Amendment.  *Robinson v. California* (1962), 370 U.S. 660.  Punishment that is "excessive" constitutes cruel and unusual punishment.  *Coker v. Georgia*  (1977), 433 U.S. 584.   The principle of governmental respect for human dignity constitutes the applicable guideline to for resolving Eighth Amendment challenges.  *See Furman v. Georgia* (1972), 408 U.S. 238  (Brennan, J., concurring); *Rhodes v. Chapman*  (1981), 452 U.S. 337, 361; *Trop v. Dulles*  (1958), 356 U.S. 86.

### A.    Arbitrary and unequal punishment

The  Fourteenth  Amendment's  guarantee  of  equal  protection requires similar treatment of similarly situated persons.  This right extends to the protection against cruel and unusual punishment.  *Furman*, 408 U.S. at 249 (Douglas, J., concurring).  A death penalty imposed in violation of the Equal Protection Clause constitutes a cruel and unusual punishment.  *Id.*  Any arbitrary use of the death penalty offends the Eighth Amendment.  *Id.*

Ohio's capital punishment scheme allows the death penalty to be

2

imposed in an arbitrary and discriminatory manner in violation of *Furman* and its progeny. Prosecutor have virtually uncontrolled indictment discretion which allows the arbitrary and discriminatory imposition of the death penalty. Mandatory death penalty statutes were deemed fatally flawed because did not contain standards for the imposition of a death sentence.. *Woodson v. North Carolina* (1976), 428 U.S. 280. The uncontrolled discretion in the hands of the prosecuting attorneys also violates this mandate.

Ohio's system imposes death in a racially discriminatory manner. African Americans and those who kill Caucasian victims are much more likely to receive the death penalty. While African-Americans comprise less than twenty percent of Ohio's population, approximately half of Ohio's death row are composed of African-Americans. (*See* Death Penalty Proportionality Statistics, maintained by the Office of the Ohio Public Defender, as of Dec. 2, 2005, *available at* http://www.opd.ohio.gov/dp/dp_prosta.pdf). While few Caucasians are sentenced to death for killing African-Americans, over forty African-Americans on Ohio's death row were convicted of killing a Caucasian. Ohio's statistical disparity is consistent with national statistics. The General Accounting Office found that victim's race was influential at all stages, but most influential in the area of prosecutorial discretion in determining which cases the death penalty was sought and subsequently went to trial. "Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities," U.S. General Accounting Office, Report to Senate and House Committees on the Judiciary (February 1990).

3

The Ohio courts have not evaluated the implications of the racial disparities in death penalty prosecutions. While the General Assembly established a disparity appeals practice in post-conviction that may encourage the Ohio Supreme Court to adopt a rule requiring tracking the offender's race, Ohio Rev. Code Ann. § 2953.21(A)(2), no rule has been adopted. Further, this practice does not track the victim's race and does not apply to crimes committed prior to July 1, 1996. In short, Ohio law fails to provide sufficient protections against racial discrimination in the death penalty process.

Due process prohibits the taking of life unless the state can show a legitimate and compelling state interest. *Commonwealth v. O'Neal II* (Mass. 1975), 339 N.E.2d 676, 678 (Tauro, C.J., concurring); *Utah v. Pierre* (Utah 1977), 572 P.2d 1338 (Maughan, J., concurring and dissenting). Moreover, where fundamental rights are involved personal liberties cannot be broadly stifled "when the end can be more narrowly achieved." *Shelton v. Tucker* (1960), 364 U.S. 479. The United States Supreme Court has recognized that the fundamental right to "life" deserves the highest protection possible under the Fourteenth Amendment's protection of "life, liberty and property." *Ohio Adult Parole Authority v. Woodard* (1998), 523 U.S. 272 (five justices recognizing a distinct, continuing, "life" interest protected by the Due Process Clause in capital cases). Death is different; for that reason more process is due, not less. *See Lockett v. Ohio* (1978), 438 U.S. 586; *Woodson v. North Carolina* (1976), 428 U.S. 280. To imperil this protected, fundamental life interest, the State must show that it employs the "least restrictive means" to achieve a "compelling

4

governmental end." *O'Neal*, 339 N.E.2d at 678.

Despite the conducting of exhaustive research, there is no convincing evidence that the death penalty is a greater deterrent than a lesser punishment. "In fact, the most convincing studies point in the opposite direction." *Id.* at 682. The studies in Ohio have failed to demonstrate that the death penalty has any deterrent effect. Over twenty years ago, a study spanning fifty years of executions in Ohio found no evidence that executions have any discernible negative effect on homicide rates. OHIO LEGISL. SERV. COMM'N., CAPITAL PUNISHMENT (1961). *See also* William C. Bailey, *The Deterrent Effect of the Death Penalty for Murder in Ohio. A Time-Series Analysis*, 28 CLEVE. ST. L. REV. 51, 68, 70 (1979). The Supreme Court of Ohio has not addressed the issue of lack of evidence supporting deterrence.

Several more recent studies and articles demonstrate executions bring about higher murder rates; apparently executions dehumanize persons, brutalize and desensitize society to killing, and allow persons to think of killing as an accepted and expedient means of solving problems. John K. Cochran, Mitchell B. Chamlin, and Mark Seth, *Deterrence or Brutalization? An Impact Assessment of Oklahoma's Return to Capital Punishment*, Criminology 32:107 (1994); Sam Howe Verhovek, *With Practice, Texas is the Execution Leader*, N.Y. TIMES, September 5, 1993, at 6E; Ronald J. Tabak and J. Mark Lane, *The Execution of Injustice: A Cost and Lack-of-Benefit Analysis of the Death Penalty*, 23 Loyola L.A. L. Rev. 59, 114-125 (1989); *see also* William C. Bailey and Ruth D. Peterson, *Murder, Capital Punishment and Deterrence: A Review of the*

*Evidence and an Examination of Police Killings*, 50 J. Soc. Issues 53, 57 (1994).

The second purported justification for the death penalty, incapacitation of the offender, can be achieved by restraint, a less restrictive means than the taking of human life. Retribution cannot serve as the compelling state interest justifying capital punishment because there is no evidence that a less onerous penalty would not equally satisfy the public's outrage and its desire for punishment. *See O'Neal II*, 339 N.E.2d at 686-7. The State's possible reliance on retribution as a justification for the death penalty is further weakened by the imminent threat that the irreversible deprivation of life may befall an innocent or less culpable person. Because the State has failed to meet "its heavy burden of demonstrating that, in pursuing its legitimate objectives, it has chosen means which do not unnecessarily impinge on the fundamental constitutional right to life," death as a punishment must be rejected as violative of due process. *O'Neal II*, 339 N.E.2d at 688.

The death penalty is neither the least restrictive nor an effective means of deterrence. Both incapacitation of the offender and retribution can be effectively served by less restrictive means. Society's interests do not justify the death penalty.

**B.    Unreliable sentencing procedures**

The Due Process and Equal Protection Clauses prohibit arbitrary and capricious procedures in the state's application of capital punishment. *Gregg v. Georgia* (1976), 428 U.S. 153, 188, 193-95; *Furman*, 408 U.S. at 255,

274. The State of Ohio's statutory scheme does not meet those requirements. The statute does not require the state to prove the absence of any mitigating factors or that death is the only appropriate penalty.

The language "that the aggravating circumstances...outweigh the mitigating factors" invites arbitrary and capricious jury decisions. "Outweigh" connotes reliance on the lesser standard of proof by a preponderance of the evidence. The statute requires only that the sentencing body be convinced beyond a reasonable doubt that the aggravating circumstances were marginally greater than the mitigating factors. This creates an unacceptable risk of arbitrary or capricious sentencing.

Additionally, the mitigating circumstances are vague. The jury must be given "specific and detailed guidance" and be provided with "clear and objective standards" for their sentencing discretion to be adequately channeled. *Gregg; Godfrey v. Georgia* (1980), 446 U.S. 420. In the State of Ohio the weight to be assigned to a given factor are within the individual decision-maker's discretion. *State v. Fox* (1994), 69 Ohio St. 3d 183, 193, 631 N.E.2d 124, 132. The affording of this unbridled discretion to juries leads to arbitrary and capricious sentences. The Ohio scheme creates a risk that the jury, with its unbridled discretion may not consider constitutionally relevant mitigating factors such as 1) youth or childhood abuse (*Eddings v. Oklahoma* (1982), 455 U.S. 104), 2) mental disease or defect (*Penry v. Lynaugh* (1989), 492 U.S. 302 *overruled by Atkins v. Virginia* (2002), 536 U.S. 304 (persons with mental retardation cannot be sentenced to death)), 3) level of involvement in the crime

7

(*Enmund v. Florida* (1982), 458 U.S. 782), or 4) lack of criminal history (*Delo v. Lashley* (1993), 507 U.S. 272).  While the federal constitution permits the states with leeway to fashion their own capital scheme, *see Johnson v. Texas* (1993), 509 U.S. 350, Ohio's capital scheme fails to provide adequate guidelines to sentencers, and to assure against arbitrary, capricious, and discriminatory results.

Empirical evidence is developing in Ohio and around the country that, under commonly used penalty phase jury instructions, juries do not understand their responsibilities and apply inaccurate standards for decision. *See* Susie Cho, Comment, *Capital Confusion: The Effect of Jury Instructions on the Decision To Impose Death*, 85 J. CRIM. L. & CRIMINOLOGY 532, 549-557 (1994), and findings of Hans Zeisel discussed in *Free v. Peters* (7th Cir. 1993), 12 F.3d 700.  This confusion violates the Federal and State Constitutions.  Because of these deficiencies, Ohio's statutory scheme does not meet the requirements of *Furman* and its progeny.

**C.    Induced ineffective assistance of counsel and denial of an impartial jury**

Ohio's capital statutory scheme provides for a sentencing recommendation by the same jury which also determined the defendant's guilt. This procedure violates the defendant's rights to effective assistance of counsel and to a fair trial before an impartial jury as guaranteed by the State and Federal Constitutions.

Ohio's bifurcated capital trial process with the same jury violates

8

the defendant's right to effective assistance of counsel as guaranteed under the Sixth and Fourteenth Amendments; *McMann v. Richardson* (1970), 397 U.S. 759, 771, n. 14; *Powell v. Alabama* (1932), 287 U.S. 45, 47; Ohio Const. art. I §§ 10 and 16; *State v. Hester* (1976), 45 Ohio St. 2d 71, 341 N.E.2d 304.

First, under the operation of the current statute, if counsel argues a defense which the jury rejects in the trial phase, the defendant has little to no credibility in the sentencing phase. By invoking the defendant's right to strenuously argue for innocence in the first phase, a loss for the defense in the first phase means that counsel will have significantly reduced the credibility desperately needed to successfully argue for a life sentence.

The legislature should have eliminated this constitutional dilemma by providing for two separate juries, the first for determining guilt and the second for determining punishment. At the second trial the prosecuting attorney would be allowed to re-present the evidence supporting the aggravating circumstance(s). This proposed order of trial would eliminate the impairment of the right to have a defense presented through effective assistance of counsel. The State essentially has "prevented (counsel) from assisting the accused during a critical stage of the proceeding." *United States v. Cronic* (1984), 466 U.S. 648, 659, n.25.

Extensive voir dire on the subject of the death penalty before the trial phase places the defendant in the untenable position of providing the jury with the impression that guilt is a foregone conclusion. "Death qualification" of prospective jurors "[denies the accused a trial by a jury representative of a

9

cross-section of the community…it creates juries that are conviction prone."
*Grigsby v. Mabry* (E.D. Ark. 1983), 569 F. Supp. 1273, aff'd, (8th Cir. 1985)758
F.2d 226, *rev'd by Lockhart v. McCree* (1986), 476 U.S. 162

      Although the United States Supreme Court in *McCree*
subsequently reversed the Eighth Circuit, then Justice Rehnquist did not deny
that the death-qualification process results in that is jury more likely to
convict. *Id.* at 173. Rather, the Court found that "Witherspoon Excludables"
do not constitute a cognizable group for the purpose of a "fair cross-section"
analysis. *Id.* at 174. The Court held "[W]e will assume for the purposes of this
opinion that the studies are both methodologically valid and adequate to
establish that 'death qualification' in fact produces juries somewhat more
'conviction-prone' than 'non-death-qualified' juries. We hold, nonetheless, that
the Constitution does not prohibit the states from 'death qualifying' juries in
capital cases." *Id.* at 173.

      This identical issue is raised herein on both federal and
independent state constitutional grounds. The Ohio Constitution guarantees a
capitally-charged defendant the right to an impartial jury during the culpability
phase and one composed of a fair cross-section of the community under Article
I, Sections 5, 10, and 16. Where a jury is not representative of the fair cross-
section of the community as constitutionally required, it is clear that such a
jury cannot be considered fair and impartial with respect to the issue of the
innocence of defendants in capital cases. *Id.* at 172.

      The Supreme Court of Ohio has not addressed this issue in the

10

context of the independent State constitutional grounds herein asserted.  That Court's decision in *State v. Jenkins*, cited *Keeten v. Garrison*, 742 F.2d 129 (4th Cir. 1984), for the proposition that a criminal defendant "feels entitled to a jury more likely to acquit rather than an impartial jury." *Jenkins*, 15 Ohio St. 3d at 188, 473 N.E.2d 264, 287, citing *Keeten*, 742 F.2d at 134.  This language in *Keeten* was discredited by Justice Rehnquist in *Lockhart*.  *Keeten* did not constitute an accurate statement of what the scientific research in this area had established.  Non-death-qualified juries are impartial.  To hold otherwise, one must then assert that the normal jury in the ordinary criminal trial is acquittal-prone.  This obviously absurd position is the necessary logical result of the ratio decondendi of *Keeten*.  However, *Lockhart* clearly rejected this and held that while the death-qualification process does result in a conviction-prone jury, that fact does not offend the federal constitution. The Ohio Supreme Court's decision in *State v. Zuern* (1987), 32 Ohio St. 3d 56, 63, 512 N.E.2d 585, 592, relied simply on *Lockhart* and failed to address the state's constitutional protections to a fair and impartial jury pursuant to Article I, Sections 5, 10, and 16.

The state's claim that it has an interest in having a single jury for both phases of the trial and that this should surmount the defendant's right to a fair and impartial trial phase jury is also belied by the Attorney General's efforts in the Ohio legislature (H.B. 585 and S.B. 258, introduced early 1996, codified at O.R.C. § 2929.06) to require that a second jury be selected for purposes of resentencing trials when a capital defendant's death sentence is

11

overturned on appeal.  This two-jury practice for resentencing purposes, which the Attorney General and State Legislature accepted as workable and inexpensive, flies in the face of the state's earlier protestations against a two-jury practice in a capital case. No Ohio court has yet considered the impact that the State's contradictory positions have on the fairness of the present capital scheme.

This highly prejudicial situation renders defense counsel's assistance to the accused ineffective.  Defense counsel must choose between either engaging in sufficient voir dire on the death penalty and risking appearing to concede the issue of guilt; or forego voir dire on the death penalty issue and risk empanelling jurors whose undetected bias toward the death penalty would render them unfit to sit on the jury. *State v. McClellan* (1967), 12 Ohio App. 2d 204, 232 N.E.2d 414.  Both choices are constitutionally unacceptable to a defendant facing death as a possible punishment.

The defendant has an absolute right to an impartial jury under the Sixth Amendment.  *Sheppard v. Maxwell* (1966), 384 U.S. 333.  A sentencing hearing is part of the criminal prosecution, *Mempa v. Rhay* (1967), 389 U.S. 128. Therefore, as a federal constitutional matter, a criminal defendant has the right to an impartial jury at his sentencing hearing.  Ohio also guarantees a criminal defendant the right to an impartial jury pursuant to Article I, § 10 of the Ohio Constitution.

Ohio's bifurcated trial procedure wherein a single jury hears and decides both the guilt and penalty phases of trial violates the defendant's rights

12

to an impartial jury. Once a jury has found a defendant guilty of aggravated murder, a very high probability exists that jury has bias and animosity towards the defendant. Under Ohio's death penalty statutory scheme, an intolerable risk exists that a defendant's life may be put in the hands of a hostile venire, which in effect creates uncertainty in the reliability of the determination reached. Such a risk cannot be tolerated in a capital case. *Beck v. Alabama* (1980), 447 U.S. 625, 638. Therefore, the Ohio's statutory scheme is unconstitutional.

**D.    Lack of individualized sentencing**

The Ohio death penalty statutes are unconstitutional because they require proof of aggravating circumstances in the trial phase of the proceeding. The Supreme Court of the United States has approved schemes that bifurcate the consideration of aggravating circumstances from the determination of guilt. Those schemes provide an individualized determination and narrow the category of defendants eligible for the death penalty. *See Zant v. Stephens* (1983), 462 U.S. 862; *Barclay v. Florida* (1983), 463 U.S. 939.

The jury must be free to determine whether death is the appropriate punishment for a defendant. Requiring proof of the aggravating circumstances simultaneously with proof of guilt effectively prohibits a sufficiently individualized determination in sentencing. *See Woodson,* 428 U.S. at 961. This is especially prejudicial because this is accomplished without consideration of any mitigating factors.

**E.    Defendant's right to a jury is burdened**

13

The Ohio scheme is unconstitutional because it imposes an impermissible risk of death on capital defendants who choose to exercise their right to a jury trial. A defendant who pleads guilty or no contest benefits from a trial judge's discretion to dismiss the specifications "in the interest of justice." Ohio R. Crim. P. 11(C)(3). Accordingly, the capital indictment may be dismissed regardless of mitigating circumstances. There is no corresponding provision for a capital defendant who elects to proceed to trial before a jury.

Justice Blackmun found this discrepancy to be constitutional error. *Lockett v. Ohio* (1978), 438 U.S. 586, 617 (Blackmun, J., concurring). This disparity violates *United States v. Jackson* (1968), 390 U.S. 570 and needlessly burdens the defendant's exercise of his right to a trial by jury.

**F.    Mandatory submission of reports and evaluations**

Ohio's capital statutes are unconstitutional because they require submission of the pre-sentence investigation report and the mental evaluation to the jury or judge once requested by a capital defendant. O.R.C. § 2929.03(D)(1). This mandatory submission prevents defense counsel from giving effective assistance and prevents the defendant from effectively presenting his case in mitigation.

**G.    The definition of mitigating factors in Ohio Rev. Code Ann. § 2929.04(B)(7) violates the reliability component of the Eighth Amendment**

The statutory scheme permits a defendant to proffer "any other factors that are relevant to the issue of whether the offender should be

14

sentenced to *death*." O.R.C. § 2929.04(B)(7) (emphasis added). The court's charge and the definition in O.R.C. § 2929.04(B)(7) are unconstitutional. Both permit the sentencer to convert (B)(7) mitigation evidence into reasons for imposing death.

The Eighth Amendment requires that the class of death eligible offenders be narrowly and rationally guided by state law. *McCleskey v. Kemp* (1987), 481 U.S. 279, 305. In Ohio, the factors that make a defendant death-eligible are listed in O.R.C. § 2929.04(A). The (B)(7) definition eviscerates the narrowing achieved by O.R.C. § 2929.04(A) because it literally invites the sentencer to consider any factor relevant to imposing death. That language creates a "reasonable likelihood" that the sentencer will view proffered (B)(7) mitigation as a nonstatutory aggravator, rather than a nonstatutory mitigator. evidence that weighs against a death sentence. *See Stringer v. Black* (1992), 503 U.S. 222, 231-235; *Boyde v. California* (1990), 494 U.S. 370, 380-81.

The (B)(7) definition also precludes the jury from giving mitigating evidence its full consideration and effect. The intent was to allow the jury to consider all relevant evidence supporting a life sentence. *See Lockett v. Ohio*, 438 U.S. 586; *see also* O.R.C. § 2929.04(C). Poor wording frustrates the that intent. The definition shifts the focus of the (B)(7) mitigating evidence to reasons to impose a death sentence. To satisfy the Eighth Amendment, each actor in the capital sentencing scheme must be able to give consideration and full mitigating effect to all relevant mitigating evidence offered by the defendant. *Penry v. Lynaugh*, 492 U.S. 302 *overruled on other grounds by Atkins v. Virginia*

15

(2002), 536 U.S. 304 (persons with mental retardation may not be sentenced to death); *Eddings v. Oklahoma*, 455 U.S. 104; *Lockett*, 438 U.S. 586. *See Graham v. Collins* (1993), 506 U.S. 461, 510 (Souter, J. dissenting). The B(7) factor, precludes this consideration.

**H.   Ohio Rev. Code Ann. § 2929.04(A)(7) is constitutionally invalid when used to aggravate Ohio Rev. Code Ann. § 2903.01(B) aggravated murder**

"[T]o avoid [the] constitutional flaw of [vagueness and over breadth under the Eighth Amendment], an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence of a defendant as compared to others found guilty of (aggravated) murder." *Zant v. Stephens* (1983), 462 U.S. 862, 877. Ohio's statutory scheme fails to meet this constitutional requirement because O.R.C. § 2929.04(A)(7) fails to genuinely narrow the class of individuals eligible for the death penalty.

Ohio Rev. Code Ann. § 2903.01(B) defines the category of felony-murderers.   If any factor listed in O.R.C. § 2929.04(A) is specified in the indictment and proved beyond a reasonable doubt the defendant becomes eligible for the death penalty. O.R.C. §§ 2929.02(A) and 2929.03.

The scheme is unconstitutional because the O.R.C. § 2929.04(A)(7) aggravating circumstance merely repeats, as an aggravating circumstance, factors that elevate murder to aggravated felony-murde. O.R.C. § 2929.04(A)(7) repeats the definition of felony-murder as alleged, which automatically qualifies the defendant for the death penalty. O.R.C. § 2929.04(A)(7) does not reasonably

16

justify the imposition of a more severe sentence on felony-murderers. The aggravating circumstance must therefore fail. *Zant*, 462 U.S. at 877.

As compared to other aggravated murderers, the felony-murderer is treated more severely. Each O.R.C. § 2929.04(A) circumstance, when used in connection with O.R.C. § 2903.01(A), adds an additional measure of culpability to an offender such that society arguably should be permitted to punish him more severely with death. But the aggravated murder defendant alleged to have killed during the course of a felony is automatically eligible for the death penalty—not a single additional proof of fact is necessary.

The killer who kills with prior calculation and design is treated less severely, which is nonsensical because his blameworthiness or moral guilt is higher, and the argued ability to deter is less. From a retributive stance, this is the most culpable of mental states. Philip D. Zelikow, Comment, *The Constitutionality of Imposing the Death Penalty for Felony Murder* (1978), 15 HOUS. L. REV. 356, 375.

Felony-murder also fails to reasonably justify the death sentence because the Supreme Court of Ohio has interpreted O.R.C. § 2929.04(A)(7) as not requiring that intent to commit a felony precede the murder. *State v. Williams* (1996), 74 Ohio St. 3d 569, 660 N.E.2d 724, syl. 2. The asserted state interest in treating felony-murder as deserving of greater punishment is to deter the commission of felonies in which individuals may die. Generally courts have required that the killing result from an act done in furtherance of the felonious purpose. *Id.* (referencing the Model Penal Code). Without such a

17

limitation, no state interest justifies a stiffer punishment. The Ohio Suprme Court has discarded the only arguable reasonable justification for the death sentence to be imposed on such individuals, a position that engenders constitutional violations. *Zant v. Stephens* (1983), 462 U.S. 862. Further, the Supreme Court of Ohio's current position is inconsistent with previous cases, thus creating the likelihood of arbitrary and inconsistent applications of the death penalty. *See e.g. State v. Rojas* (1992), 64 Ohio St. 3d 131, 592 N.E.2d 1376.

Equal protection of the law requires that legislative classifications be supported by, at least, a reasonable relationship to legitimate State interests. *Skinner v. Oklahoma* (1941), 316 U.S. 535. The State has arbitrarily selected one class of murderers who may be subjected to the death penalty automatically. This statutory scheme is inconsistent with the purported state interests. The most brutal, cold-blooded and premeditated murderers do not fall within the types of murder that are automatically eligible for the death penalty. There is no rational basis or any State interest for this distinction and its application is arbitrary and capricious.

## I. Ohio Rev. Code Ann. §§ 2929.03(D)(1) and 2929.04 are unconstitutionally vague

Ohio Rev. Code Ann. § 2929.03(D)(1)'s reference to "the nature and circumstances of the aggravating circumstance" incorporates the nature and circumstances of the offense into the factors to be weighed in favor of death. The nature and circumstances of an offense are, however, statutory mitigating factors. O.R.C. § 2929.04(B). O.R.C. § 2929.03(D)(1) makes Ohio's death

18

penalty weighing scheme unconstitutionally vague because it gives the sentencer discretion to weigh a statutory mitigating factor as an aggravator.

To avoid arbitrariness in capital sentencing, states must limit and channel the sentencer's discretion with clear and specific guidance. *Lewis v. Jeffers* (1990), 497 U.S. 764, 774; *Maynard v. Cartwright* (1988), 486 U.S. 356, 362. A vague aggravating circumstance fails to give that guidance. *Walton v. Arizona* (1990), 497 U.S. 639, 653; *Godfrey*, 446 U.S. at 428. Moreover, a vague aggravating circumstance is unconstitutional whether it is an eligibility or selection factor. *Tuilaepa v. California* (1994), 512 U.S. 967. The aggravating circumstances in O.R.C. §§ 2929.04(A)(1)-(8) are both.

O.R.C. § 2929.04(B) tells the sentencer that the nature and circumstances of the offense are selection factors in mitigation. *State v. Wogenstahl* (1996), 75 Ohio St. 3d 344, 356, 662 N.E.2d 311, 321-22. However, the clarity and specificity of O.R.C. § 2929.04(B) is eviscerated by O.R.C. § 2929.03(D)(1); selection factors that are strictly mitigating become part and parcel of the aggravating circumstance.

Despite wide latitude, Ohio has carefully circumscribed its selection factors into mutually exclusive categories. *See* O.R.C. §§ 2929.04(A) and (B); *Wogenstahl*, 75 Ohio St. 3d at 356, 662 N.E.2d at 321-22. O.R.C. § 2929.03(D)(1) makes O.R.C. § 2929.04(B) vague because it incorporates the nature and circumstances of an offense into the aggravating circumstances. The sentencer cannot reconcile this incorporation. As a result of O.R.C. § 2929.03(D)(1), the "nature and circumstances" of any offense become "too

19

vague" to guide the jury in its weighing or selection process. *See Walton*, 497 U.S. at 654.

Ohio Rev. Code Ann. § 2929.03(D)(1) is also unconstitutional on its face because it makes the selection factors in aggravation in O.R.C. §§ 2929.04(A)(1)-(8) "too vague." *See Walton*, 497 U.S. at 654. O.R.C. §§ 2929.04(A)(1)-(8) gives clear guidance as to the selection factors that may be weighed against the defendant's mitigation. However, O.R.C. § 2929.03(D)(1) eviscerates the narrowing achieved. By referring to the "nature and circumstances of the aggravating circumstance," O.R.C. § 2929.03(D)(1) gives the sentencer "open-ended discretion" to impose the death penalty. *See Maynard*, 486 U.S. at 362. That reference allows the sentencer to impose death based on (A)(1)-(8) plus any other fact in evidence arising from the nature and circumstances of the offense that the sentencer considers aggravating. This eliminates the guided discretion provided by O.R.C. § 2929.04(A). *See Stringer*, 503 U.S. at 232.

**J.    Inadequate proportionality and appropriateness review**

Ohio Revised Code Ann. §§ 2929.021 and 2929.03 require data be reported to the courts of appeals and to the Supreme Court of Ohio. The information is inadequate because O.R.C. § 2929.021 requires only minimal information on cases in which the defendant received a sentence of less than. Additional data is necessary to make an adequate comparison in these cases.

Adequate appellate review is one of the preconditions to the constitutionality of a state death penalty system. *Zant*, 462 U.S. at 879; *Pulley*

*v. Harris* (1984), 465 U.S. 37. The standard for review is one of careful scrutiny. *Zant*, 462 U.S. at 884-85. Review must be based on a comparison of similar cases and ultimately must focus on the character of the individual and the circumstances of the crime. *Id.*

Ohio's statutes' failure to require the jury or three-judge panel recommending life imprisonment to identify the mitigating factors undercuts adequate appellate review. Without this information, no significant comparison of cases is possible. Without a significant comparison of cases, there can be no meaningful appellate review.

The comparison method is also constitutionally flawed. Review of cases where the death penalty was imposed satisfies the proportionality review required by O.R.C. § 2929.05(A). *State v. Steffen* (1987), 31 Ohio St. 3d 111, 509 N.E.2d 383, syl. 1. However, this prevents a fair proportionality review. There is no meaningful manner to distinguish capital defendants who deserve the death penalty from those who do not.

The Supreme Court of Ohio, in conducting its proportionality review, only considers other cases in which a sentence of death was imposed. *State v. Zuern* (1987), 32 Ohio St. 3d 56, 64-65, 512 N.E.2d 585, 593-594; *State v. Steffen* (1987), 31 Ohio St. 3d 111, 509 N.E.2d 383; *State v. Stumpf* (1987), 32 Ohio St. 3d 95, 512 N.E.2d 598. The Court disavows any ability to assure equal treatment of all capital defendants. *Zuern*, 32 Ohio St. 3d at 64, 512 N.E.2d at 593. While it acknowledges "[t]he purpose of a proportionality review is therefore to insure that the death penalty is not imposed in a random

21

freakish, arbitrary or capricious manner," the Court's present review provides no means of achieving this. *Id.*

The Court claims "Ohio's system well documents why particular murderers receive the death sentence, which has removed the vestiges of arbitrariness." *Id.* at 64, 65, 512 N.E.2d at 594. However, he Ohio Supreme Court never considers life sentence opinions even when they are presented to them by the capital defendant/appellant. *See Stumpf*, 32 Ohio St. 3d at 106-107, 512 N.E.2d at 609-610. The Court simply states it need not consider these, then does not. *Id.*

The Supreme Court of Ohio has been unwilling to undertake meaningful review of issues other than proportionality in capital cases. *State v. Poindexter* (1988), 36 Ohio St. 3d 1, 520 N.E.2d 568. The Court therein determined that it need not give any consideration to errors raised by a capital appellant. The Court held that when issues of law in capital cases have been considered and decided by the Court and are raised again in a subsequent capital case, the Court will summarily dispose of the issues in all following cases.

In *State v. Spisak* (1988), 36 Ohio St. 3d 80, 521 N.E.2d 800, the Court demonstrated the extent to which it applies the *Poindexter* ban on review. Upon being presented with a brief containing sixty-four (64) propositions of law and exceeding four hundred ninety-four (494) pages, the court refused to review practically all of these errors and filed a four and one-half page opinion. *Id.* at 82, 521 N.E.2d at 802.

22

In Ohio, the right to meaningful appellate review has been reduced to the right of having no review at all under *Poindexter* and *Spisak*. The constitutional requirement of meaningful appellate review recognized by *Zant*, *Pulley*, and *Barclay*, is flagrantly violated by the Ohio courts. Under present Ohio "review" standards, capital appellants may raise errors, but by doing so they open themselves to criticism for seeking review. The only "guarantee" under present review standards is that Ohio courts can ignore the appellate errors raised. This situation is constitutionally intolerable.

The Ohio Supreme Court's statement that the system "well documents" why a death sentence is imposed could not be more wrong. So far as one can discern, all these collected documents reflecting why many persons received life sentences are laying in totally ignored files in the clerk's office. The Supreme Court of Ohio has no notion of whether the death case before them represents a departure from a common practice of life sentencing on the same facts since they refuse to consider their "collected documents."

The Eighth Amendment is violated if there is "a significant risk of arbitrary sentencing" that is unchecked. *McCleskey v. Kemp* (1987), 481 U.S. 279. In *McCleskey*, the Court required "rationality in the system" and approved Georgia's practice of reviewing the proportionality of sentences as achieving "a reasonable level of proportionality" among the class of eligible defendants. *Id.* 481 U.S. at 298. Georgia reviews life sentences, and actively compares life and death sentences. *Zant*, 462 U.S. at 879.

The Ohio Supreme Court's appropriateness analysis is also

23

constitutionally infirm for yet another reason. O.R.C. § 2929.05(A) requires appellate courts to determine the appropriateness of the death penalty in each case. The statute directs affirmance only where the court is persuaded that the aggravating circumstances outweigh the mitigating factors and that death is the appropriate sentence. *Id.* The Court has not followed these dictates. The appropriateness review conducted is very cursory. It does not "rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not." *Spaziano v. Florida* (1984), 468 U.S. 447, 460.

The cursory appropriateness review also violates the capital defendant's due process rights as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution. The General Assembly provided capital appellants with the statutory right of proportionality review. When a state acts with significant discretion, it must act in accordance with the Due Process Clause. *Evitts v. Lucey* (1985), 469 U.S. 387, 401. The review the Ohio Supreme Court currently uses violates this constitutional mandate.

## K.  Mandatory death penalty and failure to require appropriateness analysis

The Ohio death penalty statutory scheme precludes a mercy option, either in the absence of mitigation or when the aggravating circumstances "outweigh" the mitigating factors. The statutes mandate that death shall be imposed. O.R.C. §§ 2929.03, 2929.04. The sentencing authority is impermissibly limited in its ability to return a life verdict by this provision.

24

In *Gregg*, the United States Supreme Court stated that "nothing" in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution. 428 U.S. at 199. *Gregg* held only that, "in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." *Id.* *Gregg* requires the state to establish, according to constitutionally sufficient criteria of aggravation and constitutionally mandated procures, that capital punishment is appropriate for the defendant. Nothing requires the state to execute defendants for whom such a finding is made. Indeed the Georgia statute, approved in *Gregg* as being consistent with *Furman*, permits the jury to make a binding recommendation of mercy even though the jury did not find any mitigating circumstances. *Fleming v. Georgia* (Ga. 1977), 240 S.E.2d 37; *Hayes v. Georgia* (Ga. 1981), 282 S.E.2d 208. Subsequent to *Lockett*, the Fifth and Eleventh Circuits repeatedly reviewed and remanded cases for error in the jury instructions when the trial court failed to clearly instruct the jury that they had the option to return a life sentence even if the aggravating circumstances outweighed mitigation. *Chenault v. Stynchcombe* (5th Cir. 1978), 581 F.2d 444; *Spivey v. Zant* (5th Cir. 1981), 661 F.2d 464; *Goodwin v. Balkcom* (11th Cir. 1981), 684 F.2d 794; *Westbrooke v. Zant* (11th Cir. 1983), 704 F.2d 1487; *Tucker v. Zant* (11th Cir. 1984), 724 F.2d 882; *Gray v. Lucas* (5th Cir. 1982), 677 F.2d 1086; *Prejean v. Blackburn* (D. La. 1983), 570 F.

25

Supp. 985.

Capital sentencing that is constitutionally individualized requires a mercy option. An individualized sentencing decision requires that the sentencer possess the power to choose mercy and to determine that death is not the appropriate penalty for this defendant for this crime. The jury is free to "determine whether death is the appropriate punishment." *Barclay v. Florida*, 463 U.S. at 950.

Absent the mercy option, the defendant faces a death verdict resulting from *Lockett*-type statute, i.e., a statute that mandated a death verdict in the absence of one of three specific mitigating factors. Under current Ohio law, the sentencer lacks the option of finding a life sentence appropriate because when the sentencer determines that the aggravating circumstances outweigh the mitigating factors "it shall impose a sentence of death on the offender." O.R.C. § 2929.03(D)(3). A non-mandatory statutory scheme that affords the jury the discretion to recommend mercy in any case "avoids the risk that the death penalty will be imposed in spite of factors 'too intangible to write into a statute' which may call for a less severe penalty, and avoidance of this risk is constitutionally necessary." *Conner v. Georgia* (Ga. 1983), 303 S.E.2d 266, 274. Other state courts have also required a determination of "appropriateness" beyond mere weighing of aggravating circumstances and mitigating factors. *California v. Brown* (Cal. 1985), 726 P.2d 516, *rev'd on other grounds* (1987), 479 U.S. 538.

The most recent case from the United States Supreme Court

respecting the need for consideration of mercy is *California v. Brown* (1987), 479 U.S. 538, 543, wherein the court repeated "the Eighth Amendment's need for reliability in the determination that death is the appropriate punishment in a specific case." In *Brown*, the Court agreed that jurors may be cautioned against reliance on "extraneous emotional factors," and that it was proper to instruct the jurors to disregard "mere sympathy." *Id.* This instruction referred to the sort of sympathy that would be totally divorced from the evidence adduced during the penalty phase. The Court's analysis clearly approved and mandated that jurors be permitted to consider mercy, i.e., sympathy tethered to or engendered by the penalty phase evidence.

The Ohio statute does not permit an appropriateness determination; a death sentence is mandated after a mere weighing. While the Supreme Court of Ohio has claimed that a "jury is not precluded from extending mercy to a defendant," *State v. Zuern* (1987), 32 Ohio St. 3d 56, 64, 512 N.E.2d 585, 593, Ohio jurors are not in fact informed of this capability. In fact, the Supreme Court of Ohio has permitted penalty phase jury instructions in direct contradiction to this extension of mercy capability. The Ohio "no-sympathy" instructions to juries do not in any way distinguish between "mere" sympathy (untethered), and sympathy tied to the evidence presented in penalty phase, and therefore commit the very violation of the Eighth Amendment which the California instruction narrowly avoided. While the Supreme Court of Ohio claims extending mercy is permissible in Ohio, and acknowledges that "[s]entencing discretion is an absolute requirement of any constitutionally

27

acceptable capital punishment statute," *Id.* at 65, 512 N.E.2d at 594, there is in fact no such indication on the statute's face, and no state court assurance that jurors are so informed.

**L.     Ohio's "beyond a reasonable doubt" standard is infirm**

1.     The statutes fail to require proof beyond all doubt as to guilt that aggravating circumstances outweigh mitigating factors, and the appropriateness of death as a punishment before the death sentence may be imposed.

The burden of proof required for capital cases should be proof beyond all doubt.  The jury should be instructed during both phases that the law requires proof beyond all doubt of all the required elements.  Most importantly, death cannot be imposed as a penalty except upon proof beyond all doubt of both the crime itself and the fact that the aggravating circumstances outweigh the mitigating factors.

Insistence on reliability in guilt and sentencing determination is a vital issue in the United States Supreme Court's capital decisions.  This emphasis on the need for reliability and certainty is a product of the unique decision that must be made in every capital case—the choice of life or death. The Supreme Court has consistently emphasized the "qualitative difference" of death as a punishment, stating that "death profoundly differs from all other penalties" and is "unique in its severity and irrevocability."  *Woodson*, 428 U.S. at 305; *Lockett,* 438 U.S. at 605; *Gardner v. Florida* (1977), 430 U.S. 349; *Gregg*, 428 U.S. at 187.

The proof beyond a reasonable doubt standard is required in

28

criminal cases "to safeguard men from dubious and unjust convictions." *In re Winship* (1970), 397 U.S. 358, 363. The petitioner in *Winship* was a juvenile facing a possible six years imprisonment. Crucial to the Court's decision was its assessment of the importance of the defendant's right not to be deprived of his liberty. Proof beyond a reasonable doubt was demanded in recognition that "the accused during a criminal prosecution has at stake interests of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the convictions." *Id.* Only this standard of proof adequately commanded "the respect and confidence of the community in applications of the criminal law." *Id.* at 364.

In a capital case, far more than liberty and stigmatization are at issue. The defendant's interest in life must be placed on the scales. Only then can an appropriate balancing of the interests be performed; only then can one know whether the "situation demands" a particular procedural safeguard. Given the magnitude of the interests at stake in a capital case and the necessity that the community "not be left in doubt whether innocent men are being condemned" a standard which reduces the margin of error "as much as humanly possible," is required. *Id.; Eddings*, 455 U.S. at 878; *Ohio Adult Parole Authority v. Woodard* (1998), 523 U.S. 272 (five justices recognizing a distinct, continuing, "life" interest protected by the Due Process Clause in capital cases).

The American Law Institute's Model Penal Code, cited by the

29

United States Supreme Court as a statute "capable of meeting constitutional concerns," adopts the beyond-all-doubt standard at the sentencing phase. *See Gregg v. Georgia* (1976), 428 U.S. 153, 191-195. The Model Penal Code mandates a life sentence if the trial judge believes that "although the evidence suffices to sustain the verdict, it does not foreclose all doubt respecting the defendant's guilt." Model Penal Code § 210.6(1)(f). If the trial judge has any doubt of the defendant's guilt, life imprisonment is automatically imposed without a sentencing hearing.

2.   <u>Ohio's definition of proof "beyond a reasonable doubt" results in a burden of proof insufficiently stringent to meet the higher reliability requirement in capital cases at the guilt phase, and this has not been cured by appellate courts in their review of convictions or death sentences.</u>

The standard jury instructions defining "reasonable doubt" and "proof beyond a reasonable doubt" are the applicable burden of proof in capital cases. O.R.C. § 2901.05(D). However, Ohio's definition articulates a burden of proof by a preponderance of the evidence; thus unconstitutionally diluting a defendant's rights to a fair trial. *See Cross v. Ledford* (1954), 161 Ohio St. 469, 120 N.E.2d 118; *Holland v. United States* (1954), 348 U.S. 121; *Scurry v. United States* (D.C. Cir. 1965), 347 F.2d 468, 470 ([I]mportant affairs is the traditional test for clear and convincing evidence...The jury...is prohibited from convicting unless it can say beyond a reasonable doubt that defendant is guilty as charged...To equate the two in the juror's mind is to deny the defendant the benefit of a reasonable doubt.). *State v. Crenshaw* (1977), 51 Ohio App. 2d 63, 65, 366 N.E.2d 84, 84-85; *cf. State v. Nabozny* (1978), 54 Ohio St. 2d 195, 375

30

N.E.2d 784, *vacated on other grounds, Nabozny v. Ohio* (1978), 439 U.S. 811; *State v. Seneff* (1980), 70 Ohio App. 2d 171, 435 N.E.2d 680.

The Ohio reasonable doubt instructions fail to satisfy the requirement of reliability in a capital case. Even in *Winship*, when considering the reasonable doubt standard, the Court stated that the fact finder must be convinced of guilt "with utmost certainty," and that the court must impress on the trier of fact the necessity of reaching a subjective state of certitude. *Winship*, 397 U.S. at 363, 364. Ohio's definition of a reasonable doubt is inadequate to meet even these standards.

3.   The Ohio death penalty statutes fail to require that the jury consider as a mitigating factor pursuant to Ohio Rev. Code Ann. § 2929.04(B) that the evidence fails to preclude all doubt as to the Defendant's guilt.

The language of O.R.C. § 2929.04(D)(2) contemplates a balancing process focusing upon the mitigating factors present in the case as compared to the offender's "guilt" with respect to the aggravating specifications. In determining the appropriateness of the death penalty, the fact that the evidence presented failed to foreclose all doubt as to guilt must be considered as a relevant mitigating factor. "The jury should have before it not only the prosecution's unilateral account of the offense but the defense version as well. The jury should be afforded the opportunity to see the whole picture...." *California v. Terry* (Cal. 1964), 390 P.2d 381 *overruled on other grounds by People v. Laino* (2004), 87 P.3d 27. Although the United Supreme Court recently determined in *Oregon v. Guzek* (2006), 126 S. Ct. 1226, that the Eighth Amendment does not require a states to permit "residual doubt"

31

evidence at mitigation hearings, consistent with the arguments raised in the previous subsections, Ohio's failure to set the standard of proof at beyond all doubt violates the constitutional rights of the defendant. The failure to require jury consideration of the fact that the evidence does not foreclose all doubt as to guilt violates the constitutional standards established for the imposition of the death penalty.

**M.    Lethal injection is cruel and unusual punishment**

Ohio Rev. Code Ann. § 2949.22 authorizes execution by lethal injection. Ohio's methods, modes, and procedures for lethal injection violate the constitutional prohibition against cruel and unusual punishment by effectively torturing the condemned person to death by first cloaking them with a chemical veil that masks the fact that the persons is suffering the agony of suffocation and cardiac arrest. U.S. Const. amend. VIII; Ohio Const. art. I § 9.

**N.    Sentencing an individual to death in violation of treaties to which the United States of America is a signatory violates the Supremacy Clause of the United States Constitution**

International law binds each of the states that comprise the United States. Ohio is bound by international law whether based upon treaty or in custom. Because the Ohio death penalty scheme violates international law, Mr. Davis cannot be subjected to the possibility of the death penalty.

**1.    International law binds the State of Ohio**

"International law is a part of our law[.]" *The Paquete Habana* (1900), 75 U.S. 677, 700. A treaty made by the United States is the supreme law of the land. U.S. Const. art. VI. Where state law conflicts with international

32

law, it is the state law that must yield. *See Zschernig v. Miller* (1968), 389 U.S. 429, 440; *Clark v. Allen* (1947), 331 U.S. 503, 508; *United States v. Pink* (1942), 315 U.S. 203, 230; *Kansas v. Colorado* (1907), 206 U.S. 46, 48. *The Paquete Habana*, 175 U.S. at 700; *The Nereide* (1815), 13 U.S. (9 Cranch) 388, 422; *Asakura v. City of Seattle* (1924), 265 U.S. 332, 341. In fact, international law creates remediable rights for United States citizens. *Filartiga v. Pena-Irala* (2nd Cir. 1980), 630 F.2d 876; *Forti v. Suarez-Mason* (N.D. Cal. 1987), 672 F. Supp. 1531.

### 2.    Ohio's obligations under charters, treaties, and conventions

The United States' membership and participation in the United Nations and the Organization of American States creates obligations on all fifty states. Through the U.N. Charter, the United States committed itself to promote and encourage respect for human rights and fundamental freedoms. Art. 1(3). The United States bound itself to promote human rights in cooperation with the United Nations. Art. 55-56. The United States again proclaimed the fundamental rights of the individual when it became a member of the Organization of American States. OAS Charter, Art. 3.

The United Nations has sought to achieve its goal of promoting human rights and fundamental freedoms through the creation of numerous treaties and conventions. The United States has ratified several of these including: the International Covenant on Civil and Political Rights (ICCPR), the International Convention on the Elimination of All Forms of Racial Discrimination (ICERD), and the Convention against Torture and Other Cruel,

33

Inhuman or Degrading Treatment or Punishment (CAT). The ratification of these treaties by the United States expressed its willingness to be bound by these treaties. Pursuant to the Supremacy Clause, the ICCPR, the ICERD, and the CAT are the supreme laws of the land. As such, the United States must fulfill the obligations incurred through ratification. Former President Clinton reiterated the United States' need to fulfill its obligations under these conventions when he issued Executive Order 13107. In pertinent part, the Executive Order states:

> By the authority vested in me as President by the Constitution and the laws of the United States of America, and bearing in mind the obligations of the United States pursuant to the International Covenant on Civil and Political Rights (ICCPR), the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT), the Convention on the Elimination on All Forms of Racial Discrimination (CERD), and other relevant treaties concerned with the protection and promotion of human rights to which the United States is now or may become a party in the future, it is hereby ordered as follows:
>
> Section 1. Implementation of Human Rights Obligations.
>
> (a) It shall be the policy and practice of the Government of the United States, being committed to the protection and promotion of human rights and fundamental freedoms, fully to respect and implement its obligations under the international human rights treaties to which it is a party, including the ICCPR, the CAT, and the CERD.

Ohio is not fulfilling the United States' obligations under these conventions. Rather, Ohio's death penalty scheme violates each convention's requirements and thus must yield to the requirements of international law.

34

*See* discussion *infra* Subsection 1.

### a. Ohio's statutory scheme violates the ICCPR's and ICERD's guarantees of equal protection and due process

Both the ICCPR and the ICERD guarantee equal protection of the law. ICCPR Art. 2(1), 3, 14, 26; ICERD Art. 5(a). The ICCPR further guarantees due process via Articles 9 and 14, which includes numerous considerations including: a fair hearing (Art. 14(1)), an independent and impartial tribunal (Art. 14(1), the presumption of innocence (Art. 14(2)), adequate time and facilities for the preparation of a defense (Art. 14(3)(a)), legal assistance (Art. 14(3)(d)), the opportunity to call and question witnesses (Art. 14(3)(e)), the protection against self-incrimination (Art. 14(3)(g)), and the protection against double jeopardy (Art. 14(7)). However, Ohio's statutory scheme fails to provide equal protection and due process to capital defendants as contemplated by the ICCPR and the ICERD.

Ohio's statutory scheme denies equal protection and due process in several ways. It allows for arbitrary and unequal treatment in punishment. *See* discussion *supra* Section A. Ohio's sentencing procedures are unreliable. *See* discussion *supra* Section B. Ohio's statutory scheme fails to provide individualized sentencing. *See* discussion *supra* Section C. Ohio's statutory scheme burdens a defendant's right to a jury. *See* discussion *supra* Section D. Ohio's requirement of mandatory submission of reports and evaluations precludes effective assistance of counsel. *See* discussion *supra* Section E. O.R.C. § 2929.04(B)(7) arbitrarily selects certain defendants who may be

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 4053

automatically eligible for death upon conviction. *See* discussion *supra* Section F. Ohio's proportionality and appropriateness review is wholly inadequate. *See* discussion *supra* Section I. As a result, Ohio's statutory scheme violates the ICCPR's and the ICERD's guarantees of equal protection and due process. This is a direct violation of international law and of the Supremacy Clause of the United States Constitution.

  **b.**   **Ohio's statutory scheme violates the ICCPR's protection against arbitrary execution**

  The ICCPR speaks explicitly to the use of the death penalty. The ICCPR guarantees the right to life and provides that there shall be no arbitrary deprivation of life. Art. 6(1). It allows the imposition of the death penalty only for the most serious offenses. Art. 6(2). Juveniles and pregnant women are protected from the death penalty. Art. 6(5). Moreover, the ICCPR contemplates the abolition of the death penalty. Art. 6(6).

  However, several aspects of Ohio's statutory scheme allow for the arbitrary deprivation of life. Punishment is arbitrary and unequal. *See* discussion *supra* Section A. Ohio's sentencing procedures are unreliable. *See* discussion *supra* Section B. Ohio's statutory scheme lacks individualized sentencing. *See* discussion *supra* Section C. Ohio's statutory definition of the (B)(7) mitigator renders sentencing unreliable. *See* discussion *supra* Section F. The (A)(7) aggravator maximizes the risk of arbitrary and capricious action by singling one class of murders who may be eligible automatically for the death penalty. *See* discussion *supra* Section G. The vagueness of O.R.C. §§

2929.03(D)(1) and 2929.04 similarly render sentencing arbitrary and unreliable.  *See* discussion *infra* Section H.  Ohio's proportionality and appropriateness reviews fail to distinguish those who deserve death from those who do not.  *See* discussion *supra* Section I.  As a result, executions in Ohio result in the arbitrary deprivation of life and thus violate the ICCPR's death penalty protections.  This is a direct violation of international law and a violation of the Supremacy Clause of the United States Constitution.

**c.  Ohio's statutory scheme violates the ICERD's protections against race discrimination.**

The ICERD requires that each state take affirmative steps to end race discrimination at all levels.  Art. 2.  It requires specific action and does not allow states to sit idly by when confronted with practices that are racially discriminatory.  However, Ohio's statutory scheme imposes the death penalty in a racially discriminatory manner.  *See* discussion *supra* Section A.  A scheme that sentences African Americans and those who kill Caucasian victims more frequently and which disproportionately sentences African-Americans to death is in violation of the ICERD.  Ohio's failure to rectify this discrimination is a direct violation of international law and of the Supremacy Clause of the United States Constitution.

**d.  Ohio's statutory scheme violates the ICCPR's and the CAT's prohibitions against cruel, inhuman or degrading punishment**

The ICCPR prohibits subjecting any person to torture or to cruel, inhuman, or degrading treatment or punishment.  Art. 7.  Similarly, the CAT requires that states take action to prevent torture, which includes any act by

37

which severe mental or physical main is intentionally inflicted on a person for the purpose of punishing him for an act committed. *See* Art. 1-2. As administered, Ohio's death penalty inflicts unnecessary pain and suffering, *see* discussion *supra* Section J, in violation of both the ICCPR and the CAT. Thus, there is a violation of international law and the Supremacy Clause of the United States Constitution.

### e. Ohio's obligations under the ICCPR, the ICERD, and the CAT are not limited by the reservations and conditions placed on these conventions by the Senate.

While conditions, reservations, and understandings accompanied the United States' ratifications of the ICCPR, the ICERD, and the CAT, those conditions, reservations, and understandings cannot stand for two reasons. Article 2 Section 2 of the United States Constitution provides for the advice and consent of two-thirds of the Senate when a treaty is adopted. However, the United States Constitution makes no provision for the Senate to modify, condition, or make reservations. The Senate is not given the power to determine what aspects of the treaty the United States will and will not follow. Their role is to simply advise and consent. The Senate's inclusion of conditions and reservations in treaties goes beyond that role of advice and consent. The Senate picks and chooses which items of a treaty will bind the United States and which will not. This is the equivalent of the line-item veto, which is unconstitutional. *Clinton v. City of New York* (1998), 524 U.S. 417, 438. The United States Supreme Court specifically spoke to the enumeration of the president's powers in the Constitution in finding that the president did not

38

possess the power to issue line item vetoes. *Id*. If it is not listed, then the President lacks the power to do it. *See id*. Similarly, the Constitution does not give the power to the Senate to make conditions and reservations, picking and choosing what aspects of a treaty will become law. Thus, the Senate lacks the power to do just that. Therefore, any conditions or reservations made by the Senate are unconstitutional. *See Id*.

The Vienna Convention on the Law of Treaties further restricts the Senate's imposition of reservations. It permits reservations unless: they are prohibited by the treaty, the treaty provides that only specified reservations, not including the reservation in question, may be made, or the reservation is incompatible with the object and purpose of the treat. Art. 19(a)-(c). The ICCPR specifically precludes derogation of Articles 6-8, 11, 15-16, and 18. Pursuant to the Vienna Convention, the United States' reservations to these articles are invalid under the language of the treaty. *See Id*. Further, it is the purpose of the ICCPR to protect the right to life and any reservation inconsistent with that purpose violates the Vienna Convention. Thus, United States' reservations cannot stand under the Vienna Convention as well.

### f.  Ohio's obligations under the ICCPR are not limited by the Senate's declaration that it is not self-executing

The Senate indicated that the ICCPR is not self-executing. However, the question of whether a treaty is self-executing is left to the judiciary. *Frolova v. Union of Soviet Socialist Republics* (7th Cir. 1985), 761 F.2d 370 (citing RESTATEMENT (SECOND) OF FOREIGN RELATIONS LAW OF THE UNITED

39

STATES, Sec. 154(1) (1965)). It is the function of the courts to say what the law is. *See Marbury v. Madison* (1803), 5 U.S. 137.

Further, requiring the passage of legislation to implement a treaty necessarily implicates the participation of the House of Representatives. By requiring legislation to implement a treaty, the House can effectively veto the treaty by refusing to pass the necessary legislation. However, Article 2, Section 2 excludes the House of Representatives from the treaty process. Therefore, declaring a treaty to be not self-executing gives power to the House of Representatives not contemplated by the United States Constitution. Thus, any declaration that a treaty is not self-executing is unconstitutional. *See Clinton*, 417 U.S. at 438.

### 3.    Ohio's obligations under customary international law

International law is not merely discerned in treaties, conventions and covenants. International law "may be ascertained by consulting the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decision recognizing and enforcing that law." *United States v. Smith* (1820), 18 U.S. (5 Wheat.) 153, 160-61. Regardless of the source "international law is a part of our law[.]" *The Paquete Habana*, 75 U.S. at 700.

The Universal Declaration of Human Rights (DHR) has been recognized as binding international law by the judiciary and commentators. The DHR "no longer fits into the dichotomy of 'binding treaty' against 'non-binding pronouncement,' but is rather an authoritative statement of the

40

international community." *Filartiga*, 630 F.2d at 883 (internal citations omitted); see also WILLIAM A. SCHABAS, THE DEATH PENALTY AS CRUEL TREATMENT AND TORTURE: CAPITAL PUNISHMENT CHALLENGED IN THE WORLD'S COURTS (1996).

The DHR guarantees equal protection and due process (Art. 1, 2, 7, 11), recognizes the right to life (Art. 3), prohibits the use of torture or cruel, inhuman or degrading punishment (Art. 5) and is largely reminiscent of the ICCPR. Each of the guarantees found in the DHR are violated by Ohio's statutory scheme. *See* discussion *supra* Sections K(2)(a)-(c). Thus, Ohio's statutory scheme violates customary international law as codified in the DHR and cannot stand.

However, the DHR is not alone in its codification of customary international law. Courts should look to "the works of jurists, writing professedly on public law; or by the general usage and practice of nations; or by judicial decision recognizing and enforcing that law" in ascertaining international law. 18 U.S. (5 Wheat.) at 160-61. Ohio should be cognizant of the fact that its statutory scheme violates numerous declarations and conventions drafted and adopted by the United Nations and the Organization of American States, which may because of the sheer number of countries that subscribe to them, codify customary international law. *See Id.* Included among these are:

1. The American Convention on Human Rights, drafted by the Organization of American States and entered into force in 1978. It provides numerous human rights guarantees, including: equal protection (Art. 1, 24),

41

the right to life and precludes the arbitrary deprivation of life (Art. 4(1)), allows for the imposition of the death penalty only for the most serious crimes (Art. 4(2)), prohibits re-establishing the death penalty once abolished (Art. 4(3)), prohibits torture, cruel, inhuman or degrading punishment (Art. 5(2)), and guarantees the right to a fair trial (Art. 8).

2. The United Nations Declaration on the Elimination of All Forms of Racial Discrimination proclaimed by U.N. General Assembly resolution 1904 (XVIII) in 1963. It prohibits racial discrimination and requires that states take affirmative action in ending racial discrimination.

3. The American Declaration of the Rights and Duties of Man adopted by the Ninth International Conference of American States in 1948. It includes numerous human rights guarantees, including: the right to life (Art. 1), equality before the law (Art. 2), the right to a fair trial (Art. 16), and due process (Art. 26).

4. Declaration on the Protection of All Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment adopted by the U.N. General Assembly in Resolution 3452 (XXX) in 1975. It prohibits torture, defined to include severe mental or physical pain intentionally inflicted by or at the instigation of a public official for a purpose included punishing him for an act he has committed, and requires that the states take action to prevent such actions. Art. 1, 4.

5. Safeguards Guaranteeing Protection of the Rights of Those Facing the Death Penalty adopted by the U.N. Economic and Social Council in

42

Resolution 1984/50 in 1984.  it provides numerous protections to those facing

the death penalty, including: permitting capital punishment for only the most

serious crimes, with the scope not going beyond intentional crimes with lethal

or other extremely grave consequences (1), requiring that guilt be proved so as

to leave no room for an alternative explanation of the facts (4), due process,

and the carrying out of the death penalty so as to inflict the minimum possible

suffering (9).

6.    The Second Optional Protocol to the ICCPR, aiming at the abolition

of the death penalty, adopted and proclaimed by the U.N. General Assembly in

Resolution 44/128 in 1989.  This prohibits execution (Art. 1(1)) and requires

that states abolish the death penalty (Art. 1(2)).

These documents were drafted by the people *Smith* contemplates

and are subscribed to by a substantial segment of the world.  As such they are

binding on the United States as customary international law.  A comparison of

the Sections A-J clearly demonstrates that Ohio's statutory scheme is in

violation of customary international law.


**O.  Conclusion**

The State of Ohio's death penalty scheme fails to ensure that

arbitrary and discriminatory imposition of the death penalty will not occur.

The procedures actually promote the imposition of the death penalty and, thus,

are  constitutionally  intolerable.  O.R.C. §§ 2903.01, 2929.02, 2929.021,

2929.022, 2929.023, 2929.03, 2929.04, and 2929.05 violate the Fifth, Sixth,

43

Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 9, 10, and 16 of the Ohio Constitution.  Furthermore, subjecting the Von Clark Davis to the prospect of capital punishment violates international law and the Supremacy Clause of the United States Constitution.

For the foregoing reasons, Von Clark Davis moves this Court for an order dismissing that portion of the aggravated murder indictment which elevates the potential penalty from life imprisonment to death.

Respectfully submitted,

RANDALL L. PORTER - 0005835
Assistant State Public Defender
Office of the Ohio Public Defender
8 East Long Street -11th Floor
Columbus, Ohio  43215
(614) 466-5394 (Voice)
(614) 644-0703 (Facsimile)
PorterR@OPD.state.OH.US

And

MELYNDA COOK-REICH - 0066526
REPPER, PAGAN, COOK, Ltd.
1501 First Avenue
Middletown, Ohio 45044
(513) 424-1823 (Voice)
(513) 424-3135 (Facsimile)
Mcook@bizcinci.rr.com

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing *Von Clark Davis'*
*Motion To Dismiss The Capital Specification Contained In The Indictment* was
forwarded by first-class, postage prepaid U.S. Mail to Daniel G. Eichel, First

44

Assistant Butler County Prosecuting Attorney, and Michael A. Oster, Jr.
Assistant Butler County Prosecuting Attorney at the Government Services
Center, 315 High Street, Hamilton, Ohio  45011 on this  27th day of May,
2008.

COUNSEL FOR  VON CLARK DAVIS

45

CA 2008 09 0111

IMAGED

**STATE OF OHIO** : **CASE NO. CR1983-12-0614**

**Plaintiff** 28 PM 1:0?: **STATE OF OHIO, COUNTY OF BUTLER**
**COURT OF COMMON PLEAS**
vs. : **(Nastoff, J.)**

**VON CLARK DAVIS** :

**Defendant** : **STATE'S MOTION FOR A CONTINUANCE**
**AND AN EXTENSION OF TIME TO FILE**
: **MOTIONS/MEMORANDA IN RESPONSE TO**
**DEFENDANT'S MOTIONS FILED 5/27/2008**

: : : : : : : : :

Now comes the Prosecuting Attorney, and moves the Court for an order **(1)** extending the

time by a period not to exceed ten (10) days, or until June 26, 2008, for filing the State's motions

and/or responsive memoranda in opposition to the Defendant's motions filed herein on May 27,

2008, and **(2)** vacating and continuing the June 26, 2008 hearing date. As grounds therefor, the

Prosecuting Attorney says:

(a) that the Defendant by motion was granted a ten-day extension to file his motions on May 27,

2008 (previously scheduled to be due on May 16, 2008), and counsel for Defendant

expressly does not oppose a similar extension to be granted to the State (per p. 1 of the

Defendant's May 16, 2008 motion);

(b) that in the Defendant's interlocutory appeal now pending from the March 31, 2008 entry of

this Court, the Butler County Court of Appeals has required both parties to file memoranda

due this Friday, May 30, 2008, concerning whether that entry is not a final appealable

order, over which that court lacks appellate jurisdiction; and

(c) that one of the undersigned counsel for the State is currently on extended leave through June

10, 2008, due to recent birth in the family.

The Court's order scheduling a hearing on motions for June 26, 2008, should also be vacated due

to these extensions, as the Court would need adequate time prior to the hearing to review the

volumes of written material submitted by the parties. A mid-July hearing date will allow proper

review without unduly affecting the current re-sentencing date of August 25, 2008.

OFFICE OF
PROSECUTING ATTORNEY
BUTLER COUNTY, OHIO

ROBIN PIPER
PROSECUTING ATTORNEY

GOVERNMENT SERVICES CENTER
315 HIGH ST. - 11TH FLOOR
P.O. BOX 515
HAMILTON, OHIO 45012

Page 1

211

constitutional requirement that the prosecution make a complete a detailed accounting to the

defense of all investigatory work on a case.' " *Agurs*, *id.* at 109, citing *Moore v. Illinois* (1972),

408 U.S. 786, 795. The prosecution is fully aware of the defendant's right to a fair trial under the

Due Process Clause of the Fifth Amendment, and the State's obligation under *Brady v. Maryland*

(1963), 373 U.S. 83, and his continuing obligation to divulge exculpatory evidence; Defendant's

claim that the prosecution might withhold exculpatory evidence from the defense is purely

speculative, *Hanna*, id.

   Wherefore, the Defendant's motion should be denied.

                          Respectfully submitted,

                          **ROBIN N. PIPER  (0023205)**
                          **Butler County Prosecuting Attorney**


                          **DANIEL G. EICHEL  (0008259)**
                          **First Assistant Prosecuting Attorney**


                          Michael A. Oster Jr. (by DGE)
                          **MICHAEL A. OSTER, JR.  (0076491)**
                          **Assistant Prosecuting Attorney**
                          Government Services Center
                          315 High Street, 11th Floor
                          Hamilton, Ohio 45012-0515
                          Telephone: (513) 887-3474


                    **CERTIFICATE OF SERVICE**

   This is to certify that a copy of the foregoing Memorandum has been sent by ordinary U.S. mail
to Attorneys for Defendant: Randall L. Porter, 8 East Long Street, 11th Floor, Columbus, OH 43215,
and Melynda W. Cook-Reich, 1501 First Avenue, Middletown, OH 45044, on this 28th day of May,
2008.


                          **DANIEL G. EICHEL  (0008259)**
                          **First Assistant Prosecuting Attorney**


         Page 2

CA 2008 04 0111    IMAGED

STATE OF OHIO                    :    CASE NO.  CR1983-12-0614

                  Plaintiff     :    STATE OF OHIO, COUNTY OF BUTLER
                                     COURT OF COMMON PLEAS
vs.                                  (Nastoff, J.)
                                :
VON CLARK DAVIS                      **STATE'S MEMORANDUN IN OPPOSITION**
                                :    **TO DEFENDANT'S MOTION TO REQUIRE**
                  Defendant          **A SEALED COPY OF THE PROSECUTOR'S**
                                :    **FILE TO BE MADE PART OF THE RECORD**

: : : : : : : : :

Now comes the Prosecuting Attorney, and in opposition to the Defendant's motion for an

order requiring that a copy of the prosecutor's file be made, turned over to the Clerk of Courts and

sealed for appellate review, says that the Court should deny such motion.

A trial court is not required to examine the prosecutor's file to determine the prosecutor's

truthfulness or seal the prosecutor's file for purposes of appellate review. ***State v. Frazier***, 115

Ohio St.3d 139, 2007-Ohio-5048, at ¶¶122-123; ***State v. Hanna***, 95 Ohio St.3d 285,

2002-Ohio-2221 at ¶60.  A trial court is not required to examine or seal the prosecutor's file

based on speculation that the prosecutor might have withheld exculpatory evidence. ***Frazier***, at

¶123, citing ***State v. Hancock***, 108 Ohio St.3d 57, 2006-Ohio-160 at ¶64, and ***Hanna***, at ¶60;

***State v. Chinn*** (1999), 85 Ohio St.3d 548, 569; and ***State v. Williams*** (1995), 73 Ohio St.3d

153, 172.  See, also, the Twelfth District's decision in ***State v. Craft***, 149 Ohio App.3d 176,

2002-Ohio-4481, ¶23 ("the prosecutor's decision on disclosure is final," id., quoting

***Pennsylvania v. Ritchie*** (1987), 480 U.S. 39, 59, 107 S.Ct. 989; "[t]hus, the prosecution, not

the trial judge, ordinarily bears the duty of examining documents for potential ***Brady*** material." id.,

citing ***State v. Lawson*** (1992), 64 Ohio St.3d 336, 343).

Defendant's motion is "backed by neither law nor effective argument," see ***State v. Evans***

(1992), 62 Ohio St.3d 231, 251.  Indeed, his motion is contrary to ***United States v. Agurs***

(1976), 427 U.S. 97, where the United States Supreme Court determined that "there is 'no

OFFICE OF
PROSECUTING ATTORNEY
BUTLER COUNTY, OHIO

ROBIN PIPER
PROSECUTING ATTORNEY

GOVERNMENT SERVICES CENTER
315 HIGH ST - 11TH FLOOR
P.O. BOX 515
HAMILTON, OHIO 45012



Wherefore, the Court should **(1)** grant an extension of time for filing the State's motions and/or responsive memoranda in opposition to the Defendant's motions filed herein on May 27, 2008, by a period not to exceed ten (10) days, or until June 26, 2008; and **(2)** vacate the June 26, 2008 hearing date and continue said hearing to a date certain in mid-July 2008.

Respectfully submitted,

**ROBIN N. PIPER  (0023205)**
**Butler County Prosecuting Attorney**

**DANIEL G. EICHEL  (0008259)**
**First Assistant Prosecuting Attorney**

**MICHAEL A. OSTER, JR.  (0076491)**
**Assistant Prosecuting Attorney**
Government Services Center
315 High Street, 11th Floor
Hamilton, Ohio 45012-0515
Telephone: (513) 887-3474

### CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing Memorandum has been sent by ordinary U.S. mail to Attorneys for Defendant: Randall L. Porter, 8 East Long Street, 11th Floor, Columbus, OH 43215, and Melynda W. Cook-Reich, 1501 First Avenue, Middletown, OH 45044, on this 28th day of May, 2008.

**DANIEL G. EICHEL  (0008259)**
**First Assistant Prosecuting Attorney**

Page 2

**IN THE COURT OF COMMON PLEAS**
**BUTLER COUNTY, OHIO**

STATE OF OHIO,            :

     Plaintiff-Respondent,    :    Case No. CR 1983-12-0614

vs.                       :    **Judge Nastoff**

VON CLARK DAVIS       :    **EVIDENTIARY HEARING REQUESTED**

     Defendant-Petitioner.    :

*CA 2008 09 0111* (handwritten)

---

## VON CLARK DAVIS' MOTION
## TO SUPPRESS PRETRIAL AND TRIAL IDENTIFICATIONS

---

COMES NOW, Defendant Von Clark Davis, through undersigned counsel who moves the Court to suppress all pretrial and trial identifications provided by witnesses who were exposed to unduly suggestive pretrial identification procedures. Mr. Davis has attached a memorandum of law that he incorporates in this pleading.

Respectfully submitted,


Respectfully submitted,

*Randall L. Porter* (signature)   (men telephone any)

RANDALL L. PORTER - 0005835
Assistant State Public Defender
Office of the Ohio Public Defender
8 East Long Street -11th Floor
Columbus, Ohio 43215
(614) 466-5394 (Voice)



**Repper, Pagan, Cook, Ltd.**
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135



(213) (handwritten, circled)

(614) 644-0703 (Facsimile)
PorterR@OPD.state.OH.US

And

MELYNDA COOK-REICH - 0066596
REPPER, PAGAN, COOK, Ltd.
1501 First Avenue
Middletown, Ohio 45044
(513) 424-1823 (Voice)
(513) 424-3135 (Facsimile)
Mcook@bizcinci.rr.com

## MEMORANDUM IN SUPPORT

Mr. Davis was convicted partially on the testimony of Mona Ridge, Cozette Massey, Reginald Denmark, and Anthony Ferguson who claimed to have witnessed the fatal shooting. Mark Lovette and Wade Coleman provided the remainder of the inculpatory testimony; they both claimed to have purchased a firearm for Mr. Davis on the day of the shooting. At the 1984 trial, all six individuals in the courtroom identified Mr. Davis as the individual who they witnessed either plan or commit the murder. Two of the individuals testified that the investigating officers had shown them a single photograph of Mr. Davis and asked them if that was the individual who committed the shooting.

Cozette Massey testified that the officers prior to trial showed her a single photograph and asked her to identify Mr. Davis:

Q.      And you were shown photographs of ...why don't you tell me what happened when you went down there [to the police station]?



Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

2

A.   Well, they asked me what happened and I told them I gave them a statement and then afterwards they showed me the photograph of them sitting in the bar, you know, and they asked me, and they/said, was them the two, and I said yeah, I seen .. and I identified her and then I identified him.

Q.   olright [sic]... so, when you went down/to [sic] the police department shortly after this happed and sometime around a week or so, the only photograph they/showed you was the photograph of the girl who was shot, Suzette, with Mr. Davis, is that correct?

A.   Uh-uhm.

Q.   And they asked you if that was him?

A.   Uh-uhm.

Q.   You said yes?

A.   Uh-uhm.

[Tr. 155-156].

Anthony Ferguson testified that the investigating officers employed a similar identification procedure during the course of interviewing him:

Q.   Okay now, you know this defendant, you know, Red Davis?

A.   I don't know him personally, I know of him.

Q.   You know who he is seem him around?

A.   Ah... that was the first night [the evening of the murder] I had seen him.

Q.   Well, how did know that's who it was then?



Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

3

A.    I didn't. the officers showed me a picture and asked if this was the man that had pulled the trigger and I told then yes.

Q.    Even though you didn't know him, had you seen him before?

A.    I don't remember, I may have.

[Tr. 277].

The testimony from the 1984 trial does not reflect whether the investigating officers employed the same or a similar identification procedures when interviewing the other witnesses who provided in court identification of Mr. Davis. However, it can be reasonably concluded that the same procedures were employed because the officers, the offense and the time frame was the same.

Pretrial identifications of a defendant are only admissible if the prosecution can prove that the identification procedures comport with due process and are not so unduly suggestive as to give rise to a substantial likelihood of misidentification. *Neil v. Biggers*, 409 U.S. 188, 196 (1972); *Stovall v. Denno* (1967), 388 U.S. 293, 302 .  In determining whether an identification procedure comports with due process, a reviewing court must apply a "totality of the circumstances" test.  *Manson v. Brathwaite* (1977), 432 U.S. 98, 113-114.

If an identification procedure does not comport with due process, the pretrial identification is not admissible. If the state employs unduly suggestive identification procedures, all subsequent in-court identifications arising there from are inadmissible as "fruit of the poisonous tree" unless the

Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

4

state can show that the in-court identification is based upon factors independent of the unduly suggestive identification procedures. *United States v. Wade* (1967), 388 U.S. 218, 239-240. The use of one photograph array was suggestive in the present case.

WHEREFORE, Mr. Davis requests that the Court set this matter for an evidentiary at the conclusion of which it suppress the pretrial and trial identifications made by those witness who were exposed to unduly suggestive procedures.

Respectfully submitted,

Randall L. Porter *mcu telephone authorize*

RANDALL L. PORTER - 0005835
Assistant State Public Defender
Office of the Ohio Public Defender
8 East Long Street - 11th Floor
Columbus, Ohio 43215
(614) 466-5394 (Voice)
(614) 644-0703 (Facsimile)
PorterR@OPD.state.OH.US

And

Melynda Cook-Reich

MELYNDA COOK-REICH - 0066596
REPPER, PAGAN, COOK, Ltd.
1501 First Avenue
Middletown, Ohio 45044
(513) 424-1823 (Voice)
(513) 424-3135 (Facsimile)
Mcook@bizcinci.rr.com



Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

5

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing *Von Clark Davis'*
*Motion To Suppress Pretrial And Trial Identifications* was forwarded by Hand
Delivery and/or first-class, postage prepaid U.S. Mail to Daniel G. Eichel,
First Assistant Butler County Prosecuting Attorney, and Michael A. Oster, Jr.
Assistant Butler County Prosecuting Attorney at the Government Services
Center, 315 High Street, Hamilton, Ohio  45011 on this  28th day of May,
2008.

COUNSEL FOR  VON CLARK DAVIS



**Repper, Pagan,
Cook, Ltd.**
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

6



**IN THE COURT OF COMMON PLEAS**
**BUTLER COUNTY, OHIO**

STATE OF OHIO,                              :

      Plaintiff,                        :        Case No. CR 1983-12-0614

vs.                                        :

VON CLARK DAVIS                            :        **Judge Nastoff**

      Defendant.                        :        **ORAL ARGUMENT REQUESTED**

---

## VON CLARK DAVIS' LIMITED DEMAND FOR DISCOVERY

COMES NOW, Defendant Von Clark Davis by and through counsel requests that the prosecuting attorney provide the following discovery as required by Ohio R. Crim. P. 16(B)(1)(a)(b) and (f), the Fifth and Fourteenth Amendments of the U.S. Constitution, and Article I, Sections 10 and 16 of the Ohio Constitution:

1.    Any relevant written or recorded statement or statements, or copies thereof, made by Defendant or co-defendant; any written summaries of any oral statements, or copies thereof, made by Defendant or co-defendant to a prosecuting attorney or a law enforcement officer which are available to or within the possession, custody, or control of the State, the existence of which are known or may by the exercise of due diligence become known, to the prosecuting attorney; and recorded testimony of Defendant or co-defendant before a grand jury.

    This request includes summary reports and interview memoranda made by government agents merely setting forth the substance of the remarks made by Von Clark Davis. *See*



Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135



*United States v. Johnson* (2nd Cir. 1975), 525 F.2d 999, 1004.

Ohio Crim R. 16(B)(1)(a)

2.  A copy of Von Clark Davis' prior criminal record, if any, which is available to or within the possession, custody, or control of the State.

Ohio R. Crim. P. 16(B)(1)(b).

6.  All evidence known, or which may become known, to the prosecuting attorney favorable to Von Clark Davis and material either to guilt or punishment.

In light of the particularity requirement set forth in *United States v. Agurs* (1976), 427 U.S. 97, 106 Von Clark Davis hereby specifically requests the following:

a.  Prior felony and misdemeanor convictions and/or juvenile adjudications for all witnesses expected to be called by the government;

b.  Specific incidents of misconduct, "bad acts," by all witnesses expected to be called by the government, whether such conduct resulted in a criminal conviction;

c.  Any and all consideration the government has held out to a witness to encourage that witness's cooperation with the government.  This request includes, but is not limited to: grants or promises of immunity; confirmed or tentative plea bargaining; monetary compensation; assistance in avoiding prosecution in other jurisdictions; omission from being named in an indictment or as an unindicted co-conspirator; any other considerations, regardless of their nature, granted, promised, suggested, or implied, which contemplate lenience or preferential treatment in exchange for cooperation with the government;

d.  The existence of pending criminal charges, either felony, misdemeanor, or juvenile, as well as parole or probation status of any and all witnesses the government expects to call;

e.  The disclosure of the any line-up or show-up procedures or photographic arrays conducted in the investigation of the case; and the time, date, place, and



**Repper, Pagan, Cook, Ltd.**
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

2

all participants in these proceedings, as well as the particular law enforcement agency conducting same;

f. The results of any line-up, show-up, or photographic identification proceedings conducted by law enforcement agencies, as well as all descriptions given by witnesses regarding the identification of Von Clark Davis or any other alleged perpetrators;

g. Statements or summaries of statements from government witnesses and individuals the government does not intend to call as witnesses, obtained by law enforcement agencies that include references to Von Clark Davis' lack of involvement concerning the commission of each alleged offense;

h. The disclosure of the psychiatric background of all witnesses the government expects to call at trial;

i. Any information tending to show that other persons, excluding the accused, were or could have been involved in the crime;

j. Any statements of witnesses that conflict either internally or with another statement of the same witness;

k. The names and addresses of any individuals who were considered at any time as possible suspects and the evidence that led to this conclusion;

l. Any statement of any witness or other individual that presents or indicates doubt as to the identity of the accused or any element of the charge;

m. Any polygraph tests that raise some doubt as to any State witness's credibility; and,

n. Any evidence, information, or material of any kind that does or could mitigate the punishment meted out to Von Clark Davis, including but not limited to matters pertaining to the differences between the culpability of co-defendants with respect to the criminal acts with which they have been charged.

Ohio R. Crim. P. 16(B)(1)(f).

Von Clark Davis requests the prosecution to check all relevant files including material physically located in the files of the police conducting the



Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

investigation, and to interview all agents of the government involved in the investigation to determine whether any of the discovery materials requested above exist. *Kyles v. Whitley* (1995), 514 U.S. 419, 437, 115 S.Ct. 1555, 1567 ("the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police").

A complete response to this demand for discovery is all the more critical here because this is a capital case. Von Clark Davis is entitled to the discovery as requested herein so as to protect the rights guaranteed to a criminal defendant by the Ohio and Federal Constitutions. These rights include the constitutional guarantees to effective assistance of counsel, due process of law, equal protection of the law, confrontation of the State's evidence, and freedom from cruel and unusual punishment. U.S. Const. amends. V, VI, VIII, and XIV; Ohio Const. art. I, §§ 1, 2, 5, 10, 16, and 20. Ohio has established Ohio R. Crim. P. 16 to effectuate these constitutional rights.

WHEREFORE, Von Clark requests that the prosecutor to provide the specific discovery requested herein.

Respectfully submitted,

Randall Porter

RANDALL L. PORTER - 0005835
Assistant State Public Defender
Office of the Ohio Public Defender
8 East Long Street -11th Floor

Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

4

Columbus, Ohio 43215
(614) 466-5394 (Voice)
(614) 644-0703 (Facsimile)
PorterR@OPD.state.OH.US

And

*Melynda Cook Pen*

MELYNDA COOK-REICH - 0066596
REPPER, PAGAN, COOK, Ltd.
1501 First Avenue
Middletown, Ohio 45044
(513) 424-1823 (Voice)
(513) 424-3135 (Facsimile)
Mcook@bizcinci.rr.com


## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing *Von Clark Davis'*
*Limited Demand For Discovery* was forwarded by first-class, postage prepaid
U.S. Mail to Daniel G. Eichel, First Assistant Butler County Prosecuting
Attorney, and Michael A. Oster, Jr. Assistant Butler County Prosecuting
Attorney at the Government Services Center, 315 High Street, Hamilton, Ohio
45011 on this 30 th day of May, 2008. Hand Delivery

*Melynda Cook Pen*
COUNSEL FOR VON CLARK DAVIS

**Repper, Pagan,
Cook, Ltd.**
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 4078



IN THE COURT OF COMMON PLEAS
BUTLER COUNTY, OHIO

STATE OF OHIO,                          :

      Plaintiff,                   :          Case No. CR 1983-12-0614

vs.                                     :

VON CLARK DAVIS                         :          Judge Nastoff

      Defendant.                   :          ORAL ARGUMENT REQUESTED

---

## VON CLARK DAVIS' MOTION FOR PRE-TRIAL DISCLOSURE OF POLICE REPORTS AND WITNESS STATEMENTS

---

      COMES NOW, Defendant Von Clark Davis by and through counsel who moves this Court to order the prosecution to disclose, prior to trial all police reports concerning the instant offense and the prior murder, as well as the prior statements made by its witnesses. Von Clark Davis has attached a memorandum of law which he incorporates in this pleading.

Respectfully submitted,

Randall Porter

RANDALL L. PORTER - 0005835
Assistant State Public Defender
Office of the Ohio Public Defender
8 East Long Street -11th Floor
Columbus, Ohio 43215
(614) 466-5394 (Voice)
(614) 644-0703 (Facsimile)
PorterR@OPD.state.OH.US

Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

And

MELYNDA COOK-REICH - 0066596
REPPER, PAGAN, COOK, Ltd.
1501 First Avenue
Middletown, Ohio 45044
(513) 424-1823 (Voice)
(513) 424-3135 (Facsimile)
Mcook@bizcinci.rr.com

## MEMORANDUM OF LAW

Mr. Davis has the right to inspect the pretrial statements of each of the prosecution witnesses, "[u]pon completion of a witness' direct examination at trial, the court on motion of the defendant shall conduct an in camera inspection of the witness' written or recorded statement with the defense attorney and prosecuting attorney present and participating...". Crim R. 16(B)(1)(g). While the goal of the rule is laudable, its implementation can be cumbersome if the Court requires defense counsel to wait until after the direct examination of each witness to conduct their initial review of the witness statements.

First defense counsel must absorb the details in what can be lengthy statements for purposes of citing the Court to any inconsistencies. This is especially onerous, if not impossible, where the prior statements at issue consist of written summaries of audio and/or video taped statements. Second, defense counsel must then take the portions of the statements which the Court found to be conflicting and weave them into cross examination.



Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

2

Placing these extreme time pressures on defense counsel to accomplish these tasks only invites ineffectiveness claims when appellate counsel is subsequently permitted unlimited time to peruse the witness statements for the existence of inconsistencies which trial counsel failed to raise with the Court or use effectively during cross examination.

The procedure outlined in Crim R. 16(B)(1)(g) also creates an unwieldy procedure for the Court and jury. Defense counsel will repeatedly interrupt the proceedings with requests for bars or recesses necessitated by the 16(B)(1)(g) procedure. At the end of each witness the Court must place the proceedings on hold while counsel reviews the statements in question and the jury either remains seated in the box or is excused. There will be dispute whether counsel has had sufficient time to review the statements and whether portions of the statements conflict with the testimony of the witness. In addition, counsel can be expected to move for 1) mistrials if exculpatory material was not divulged prior to trial and 2) continuances to develop information contained in the pretrial statements for purposes of cross examination of the witness.

To avoid these logistical issues and to avoid later claims of ineffective assistance of counsel as to the disclosure issue, the Court should order the prosecution to disclose the pretrial statements of the witnesses prior to trial. If defense counsel receives disclosure of the statements in advance of the witnesses' testimony, the *in camera* inspection process created by 16(B)(1)(g) will, at a minimum, be completed faster. In some instances it may



Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

eliminate delay altogether — if the witnesses testify in accordance with their prior statements, defense counsel need not interrupt the proceedings with a post-direct request to inspect the statements.

The Court "has authority to enter pretrial orders regarding discovery." *State, ex. rel Corrigan v. Griffin* (1984), 14 Ohio St.3d 26, 27. The Court's discretion extends to ordering "[d]iscovery beyond what the rules require." *State v. Landrum* (1990), 53 Ohio St.3d 107, 119 (citing *Lighttiser*, 18 Ohio St.3d at 235). *See, also, State v. Laskey* (1970), 21 Ohio St.2d 187, 192 ("It is also well settled that the allowance or overruling of various discovery motions in a criminal case rests within the sound discretion of the trial court, and only in cases of clear abuse will that discretion be disturbed upon review.") (overruled on other grounds); *State ex rel. Jackman v. Court of Common Pleas of Cuyahoga Cty.* (1967), 9 Ohio St.2d 159, 167-68 (judges in criminal cases have the same discretion over discovery as judges in civil cases); *State v. Simmons* (1993), 87 Ohio App.3d 290, 292 ("The language of Crim.R. 16 does not suggest that the rule was intended to be an all-encompassing declaration of the entire scope of permissible pretrial discovery. However, it is generally accepted that it is within the trial court's discretion to grant any discovery beyond the scope of that required by Crim.R. 16."). The Ohio Supreme Court has thrice ruled that trial courts have discretion in criminal cases in crafting discovery orders.

In 1984 the Cuyahoga County Prosecutor sought a writ of prohibition against Cuyahoga Common Pleas Court Juge Griffin regarding a



Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

discovery dispute. *State, ex. rel Corrigan v. Griffin* (1984), 14 Ohio St.3d at 26. While the Court's decision does not identify with any specificity the discovery in dispute, the opinion does state that defense counsel sought "discovery of information in the prosecutor's file" and "[u]ltimately, on March 14, 1983, appellee [Judge Griffin] order the prosecutor to turn over to the defense the requested material with certain exceptions." *Id.* at 26. While the Ohio Supreme Court ruled that the prosecution had an adequate remedy at law, the Court observed that "[t]he trial court has authority to enter pretrial orders regarding discovery. Crim R. 16." *Id.* at p. 27.

One year later the issue was again before the Court, this time with respect to the pretrial disclosure of witness statements in a capital case. *State ex rel Lighttiser v. Spahr* (1985), 18 Ohio St. 3d 234. In that case "[i]n response to Diehl's motion for discovery, Judge Spahr entered an order granting certain discovery including the pretrial disclosure of all written statements made by any person who was a potential witness at Diehl's trial." *Id.* at 234. While the Court dismissed the action because the prosecution had an adequate remedy at law, the Ohio Supreme Court again observed "[t]he trial court has authority to enter pretrial orders regarding discovery." *Id.* at 235.

Within the last year the pretrial disclosure issue was again before the Court but in the form of a broader pretrial discovery order that required the prosecution to disclose all of the police reports as well as the witness statements.. *State, ex rel Mason v. Burnside*, 117 Ohio St. 3d 1, 2007-Ohio-

Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

5

6754. While the he Court did not specifically address the discovery issue because it again declared that the prosecution had an adequate remedy at law, the Court held "It is unquestioned that "courts have broad discretion over discovery matters." *State ex rel. Citizens for Open, Responsive & Accountable Govt. v. Register, 116 Ohio St.3d 88, 2007 Ohio 5542, 876 N.E.2d 913, P 18.* Given the discretionary authority vested in Judge Burnside in discovery matters, 'an extraordinary writ will not issue to control her judicial discretion, even if that discretion is abused.'" *Id.* at ¶ 11. (citations omitted).

WHEREFORE Von Clark Davis requests the Court to exercise its discretion and order that the Butler County Prosecutor's Office, prior to trial, either release all police reports and witness statements concerning both the homicides, or in alternative release the pretrial statements of all individuals who either it intends to call at trial or whose prior testimony it intends to attempt to submit as evidence.

Respectfully submitted,

RANDALL L. PORTER - 0005835
Assistant State Public Defender
Office of the Ohio Public Defender
8 East Long Street -11th Floor
Columbus, Ohio 43215
(614) 466-5394 (Voice)
(614) 644-0703 (Facsimile)
PorterR@OPD.state.OH.US

And

MELYNDA COOK-REICH - 0066596
REPPER, PAGAN, COOK, Ltd.

Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

6

1501 First Avenue
Middletown, Ohio 45044
(513) 424-1823 (Voice)
(513) 424-3135 (Facsimile)
Mcook@bizcinci.rr.com

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing *Von Clark Davis'*
*Motion To Suppress Pretrial And Trial Identifications* was forwarded by first-
class, postage prepaid U.S. Mail to Daniel G. Eichel, First Assistant Butler
County Prosecuting Attorney, and Michael A. Oster, Jr. Assistant Butler
County Prosecuting Attorney at the Government Services Center, 315 High
Street, Hamilton, Ohio 45011 on this 30th day of May, 2008. HAnd Delivery.

COUNSEL FOR VON CLARK DAVIS



Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

7



## IN THE COURT OF COMMON PLEAS
## BUTLER COUNTY, OHIO

STATE OF OHIO,                          :

    Plaintiff,                          :           Case No. CR 1983-12-0614

vs.                                     :

VON CLARK DAVIS                         :           Judge Nastoff

    Defendant.                          :           ORAL ARGUMENT REQUESTED

---

## VON CLARK DAVIS' MOTION TO COMPEL LAW ENFORCEMENT OFFICIALS TO PROVIDE THE PROSECUTING ATTORNEY WITH ALL THE INFORMATION ACQUIRED DURING THE COURSE OF THEIR INVESTIGATION

---

    COMES NOW, Defendant Von Clark Davis by and through counsel who respectfully moves this Court to order all law enforcement officials to provide the prosecuting attorney with all information obtained during the course of the investigations of which Mr. Davis is on trial and has been convicted. Mr. Davis has attached a memorandum of law which he incorporates in this motion.

Respectfully submitted,

Randall L. Porter

RANDALL L. PORTER - 0005835
Assistant State Public Defender
Office of the Ohio Public Defender

Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 4086

8 East Long Street -11th Floor
Columbus, Ohio 43215
(614) 466-5394 (Voice)
(614) 644-0703 (Facsimile)
PorterR@OPD.state.OH.US

And

MELYNDA COOK-REICH - 0066596
REPPER, PAGAN, COOK, Ltd.
1501 First Avenue
Middletown, Ohio 45044
(513) 424-1823 (Voice)
(513) 424-3135 (Facsimile)
Mcook@bizcinci.rr.com

## MEMORANDUM OF LAW

Von Clark Davis, in other pleadings, has moved the prosecution to provide discovery pursuant to Crim R. 16 and the Fourteenth Amendment. Those motions reference information contained in the law enforcement agencies' files, as well as the prosecution's files. Thus for the prosecution to respond adequately to these motions, it must have access to all of the relevant files of the law enforcement agencies involved in the investigation of the offense for which Mr. Davis is on trial and the offense that serves as the factual predicate for the sole aggravating circumstance.

The knowledge of the prosecuting attorney's agents is imputed to the prosecution. *Youngblood v. West Virginia* (2006), 547 U.S. 867, 870; *Giglio v. United States* (1972), 405 U.S. 150, 154. "The individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the



Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

2

government's behalf in the case, including the police." *Kyles v. Whitley* (1995), 514 U.S. 419, 438. The prosecution violates its duty of disclosure " when the government fails to turn over even evidence that is 'known only to police investigators and not to the prosecutor.'" *Youngblood*, 547 U.S. at 508 (footnote omitted).

The perils of the law enforcement agencies not being required to turn over its investigative files to the prosecution is exemplified in two Ohio capital cases. A unanimous Sixth Circuit reversed a capital conviction and death sentence arising from Hamilton County because the homicide unit of the Cincinnati Police Department had not provided its entire file to the Hamilton County Prosecutor's Office. *Jamison v. Collins*, 291 F. 2d 380, 383 (6th Cir. 2002) (This was, however, due to the CPD's [Cincinnati Police Department] practice of "homicide booking," in which the CPD would gather inculpatory material into a homicide book that was then sent to the prosecutors; exculpatory material was excluded from the homicide book. As a result, the prosecutor never became aware of exculpatory evidence, and did not disclose it as required by *Brady v. Maryland*...").[1] In another Ohio capital case the Brown

County Sheriff's Department is now claiming that it misplaced its entire investigative homicide file. *Lindsey v. Bradshaw*. S.D. Ohio Case No. 1:30 cv 00702. [Exhibit A, p. 8].



Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

---

[1] The prosecution never retried Mr. Jamison. He was the one-hundred-twenty-second person in this country to be found innocent after being sentenced to death.

3

The Court should issue an order requiring all law enforcement officials and agencies, as that term is defined in O.R.C. § 2901.01(A)(11)(a)-(m), provide the Butler County Prosecutor with all information they have pertaining to the above-captioned case, as well as the prior murder case, which is the base for the capital specification. The Court should direct the officials not exercise any independent editorial control or censorship over what they provide the prosecuting attorney. This motion is a necessary corollary to Mr. Davis' other discovery motions.

The annals of criminal cases sadly reveal the all-too-common situation where counsel for both parties in a criminal case were surprised to learn after the trial that police officers harbored information that they never disclosed. *See, e.g., Giglio,* 405 U.S. at 154. *See, generally United States ex rel. Smith v. Fairman,* 769 F.2d 386, 391-92 (7th Cir. 1985); *Barbee v. Warden* (4th Cir. 1964), 331 F.2d 842, 846. This is a risk that cannot be countenanced in a capital case, and one that can be guarded against were this Court to grant this motion. This cautious step is constitutionally mandated in a capital case where discovery errors cannot be remedied if the defendant has been executed.

WHEREFORE, Von Clark Davis moves the Court to grant this motion and order that all law enforcement individuals and agencies provide the Butler County Prosecutor with all information that they have developed regardless of the means and admissibility concerning the homicide for which Mr. Davis is on trial and the homicide for which he was previously convicted.



Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

4

Respectfully submitted,

RANDALL L. PORTER - 0005835
Assistant State Public Defender
Office of the Ohio Public Defender
8 East Long Street -11th Floor
Columbus, Ohio 43215
(614) 466-5394 (Voice)
(614) 644-0703 (Facsimile)
PorterR@OPD.state.OH.US

And

MELYNDA COOK-REICH - 0066596
REPPER, PAGAN, COOK, Ltd.
1501 First Avenue
Middletown, Ohio 45044
(513) 424-1823 (Voice)
(513) 424-3135 (Facsimile)
Mcook@bizcinci.rr.com


COUNSEL FOR VON CLARK DAVIS



**Repper, Pagan,
Cook, Ltd.**
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

5

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing *Von Clark Davis'* Motion To Compel Law Enforcement Officials To Provide The Prosecuting Attorney With All The Information Acquired During The Course Of Their Investigation was forwarded by first-class, postage prepaid U.S. Mail to Daniel G. Eichel, First Assistant Butler County Prosecuting Attorney, and Michael A. Oster, Jr. Assistant Butler County Prosecuting Attorney at the Government Services Center, 315 High Street, Hamilton, Ohio  45011 on this 30th day of May, 2008. Hand Delivery

_____
COUNSEL FOR  VON CLARK DAVIS



**Repper, Pagan,
Cook, Ltd.**
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

6

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

CARL G. LINDSEY,

    Petitioner,

    v.

MARGARET BRADSHAW, Warden,

    Respondent.

Case No. 1:03cv702
JUDGE SARGUS
Magistrate Judge Abel

## OPINION AND ORDER

Petitioner, a prisoner sentenced to death by the State of Ohio, has pending before this Court a habeas corpus action pursuant to 28 U.S.C. §2254. This matter is before the Court upon petitioner's motion for discovery, (doc. no. 44), respondent's memorandum in opposition, (doc. no. 46), and petitioner's reply, (doc. no. 47).

### I. Introduction

Petitioner seeks to conduct discovery regarding his second, fifth and eighth grounds for relief. Specifically, petitioner alleges that the State withheld material evidence with which he could have impeached the State's chief witness, Kathy Kerr, and that his trial attorneys were ineffective during both the culpability and mitigation phases of his trial. Petitioner now seeks to conduct depositions of his trial counsel, his defense investigator, the Brown County Prosecuting Attorney and his investigator, as well as certain Brown County Sheriff's employees. Petitioner also seeks access to all notes and files concerning his case that are in the possession of the defense investigator.



EXHIBIT
A

Respondent has agreed to many of the discovery requests made by petitioner but opposes the discovery requests set forth in petitioner's motion. Respondent argues that petitioner has failed to establish good cause for the discovery that he requests and that the requested discovery will not yield any new information regarding petitioner's claims.

## II. Facts

The Supreme Court of Ohio summarized the facts supporting petitioner Lindsey's conviction for aggravated murder as follows:

> In the early morning hours of February 10, 1997, appellant, Carl Lindsey, was at Slammers Bar near Mt. Orab along with Kathy Kerr, Kenny Swinford, A.J. Cox, and Joy Hoop, one of the bar owners. According to the testimony at trial, Joy had wanted her husband, Donald Ray "Whitey" Hoop, dead, and that night appellant told her "he would do him in." Joy then handed a small gun to appellant, and appellant left the bar. Kathy Kerr also decided to leave the bar at that point, but heard a banging noise. As she left she saw Whitey lying on the ground, covered with blood, and appellant standing by the door. According to investigators, Whitey had been shot once in the face while seated inside his vehicle. He apparently then left his vehicle and remained in the parking lot where he was shot again in the forehead. Upon seeing Whitey on the ground, Kerr immediately left for her home, which was only a few hundred feet away. Appellant followed her in his pickup truck, and she allowed him into her trailer to take a shower.

> At approximately the same time that these events were occurring, Brown County Deputy Sheriff Buddy Moore was on patrol and passed Slammers Bar. He noticed and was suspicious of a pickup truck in the parking lot and followed it from the bar south to the Kerr residence. A couple minutes later, he received a police dispatch that a shooting had been reported at Slammers and headed back toward the bar. On the way, Moore noticed a car pass him at a high speed going south. When he arrived at Slammers, he found Whitey Hoop's body lying in the parking lot. When backup arrived, Moore instructed a state trooper to go to Kerr's trailer, look for the pickup, and make sure that no one left the premises. Moore also left for Kerr's trailer.

> When Moore arrived at the Kerr residence, he found appellant in the bathroom, soaking his clothes in a tub full of red-tinted water. He also found a box of .22 caliber ammunition on the sink. At that point, Moore took appellant into custody. Upon a search of the premises, police seized from the Kerr trailer

2

appellant's wallet, the ammunition, the clothing in the tub, and a .22 caliber
Jennings semiautomatic pistol, which they discovered behind the bathroom door.
They also found and seized Whitey's wallet, which was in a wastebasket in the
bathroom.  When discovered, Whitey's wallet was empty, although an
acquaintance of Whitey's testified that Whitey habitually carried about $1,000
with him.  Police also found $1,257 in appellant's wallet, although he had been
laid off in late December 1996.

The crime laboratory tested the bloodstains on the items seized by police
and found the stains on appellant's jacket, jeans, boot, truck console,
steering-wheel cover, driver's seat, driver's-side door, and door handle all to be
consistent with Whitey's blood.  One of the stains on the Jennings .22 pistol was
also consistent with Whitey's blood.

Appellant was indicted on two counts of aggravated murder, one under
R.C. 2903.01(A) (prior calculation and design) and one under R.C. 2903.01(B)
(felony-murder), each count carrying a death specification for felony-murder
(R.C. 2929.04[A][7] ) and the first count also carrying a specification for murder
for hire (R.C. 2929.03[A][2] ).  He was also indicted on one theft count and two
aggravated robbery counts.  At the close of the evidence, the trial court granted
appellant's Crim.R. 29 motion for judgment of acquittal on the murder-for-hire
specification.  A jury then found appellant guilty on all counts and all remaining
specifications and, after a penalty hearing, recommended death.  The trial judge
merged the two aggravated murder counts and imposed the death sentence.

*State v. Lindsey*, 87 Ohio State 3d 479, 479-80 (2000).

In his post-conviction petition, petitioner alleged claims both that he was denied the

effective assistance of trial counsel and that the prosecutor concealed material evidence and

suborned perjury.  He requested leave to pursue discovery to more fully develop the factual basis

for the constitutional violations that entitled him to relief; and he requested an evidentiary

hearing pursuant to O.R.C. § 2953.21 after discovery was conducted.  On September 28, 1998,

petitioner filed a motion for leave of court to conduct discovery.  In the alternative, he requested

an order requiring disclosure of specific enumerated items, including a copy of the Brown

County Sheriff's file assembled in conjunction with the death of Donald Hoop.  He sought leave

to depose Brown County Prosecutor Thomas Grennan, the Brown County Sheriff and any and all

subordinates who had dealings with Kathy Kerr between January 1, 1997 and September 21,

3

1998, the Records Custodian for the Brown County Sheriff, and his trial attorneys, Bruce Wallace and Scott Gusweiler.  On January 15, 2002, all of these requests were denied by the Brown County Court of Common Pleas in an order denying the postconviction petition. Petitioner timely appealed the denial of his petition to the Ohio Twelfth Appellate District Court of Appeals.  On February 24, 2003, the Court of Appeals affirmed the trial Court's denial of postconviction relief.  On July 2, 2003, the Supreme Court of Ohio denied petitioner's motion for leave to appeal.

### III.  Standard of Review

The discovery processes contained in the Federal Rules of Civil Procedure do not apply across the board in habeas corpus actions.  "A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v Gramley*, 520 U.S. 899, 904 (1997).  In *Harris v. Nelson*, 394 U.S. 286, 295 (1969), the United States Supreme Court held that the "broad discovery provisions" of the Federal Rules of Civil Procedure did not apply in habeas corpus proceedings.  As a result of the holding in *Harris*, the Rules Governing Section 2254 Cases In United States District Courts were promulgated in 1976.

Specifically, Rule 6(a) provides--

> A party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise.

Under this "good cause" standard, a district court should grant leave to conduct discovery in habeas corpus proceedings only "'where specific allegations before the court show reason to believe that the petitioner may, if the facts are more fully developed, be able to demonstrate that

4

he is ... entitled to relief....'" *Bracy*, 520 U.S. at 908-909 (quoting *Harris*, 394 U.S. at 300). *See also Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001), *cert. denied*, 537 U.S. 831 (2002).

The purpose of the proposed discovery is to obtain evidence that petitioner could offer at an evidentiary hearing in this Court to support his claims that the prosecutor committed *Brady* violations and that his trial attorneys denied him the effective assistance of counsel. The availability of an evidentiary hearing is controlled by 28 U.S.C. § 2254(e), which provides, in relevant part:

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that --
> (A) the claim relies on--
>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was presently unavailable; or,
>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and,
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense.

In *Williams v. Taylor*, 529 U.S. 420, 431 (2000), the United States Supreme Court held that the first question was whether the factual basis for a claim was developed in state court. If not, the court must determine whether the petitioner "failed to develop the factual basis of [his] claim" within the meaning of § 2254(e)(2). *Id.* 529 U.S. at 432. A petitioner has "failed to develop" the factual basis for his claim only when "there is a lack of diligence or some greater fault" attributable to him or his attorney. *Id.* The test is not whether the facts were developed in the state court postconviction proceeding but whether the petitioner was diligent in his efforts to discover the facts supporting his claim. *Id.* at 435.

5

III. Discussion

A. Exculpatory Evidence

In his second claim for relief, petitioner alleges that the State withheld material impeachment evidence and suborned perjured testimony in violation of his due process rights. Specifically, petitioner argues that the State granted testimonial immunity to Kathy Kerr, a key witness for the State, and failed to disclose that grant of immunity during petitioner's trial. Petitioner alleges that despite several motions and requests by defense counsel that the State turn over all exculpatory evidence, this information was not revealed until the trial of petitioner's co-defendant, several months after petitioner was convicted and sentenced to death. Petitioner also alleges that the State failed to disclose to defense counsel that it had paid for Kerr's hotel room during petitioner's trial. Petitioner now seeks additional information relevant to his claim that the State withheld material evidence that prevented the jury in his case from fully assessing the credibility and veracity of Kathy Kerr as she testified regarding the night that Donald Hoop was killed. Petitioner argues that access to the prosecutor and the individuals investigating the case on behalf of the State is necessary in order for him to further develop the factual basis of his *Brady* claim.

In connection with these allegations, petitioner seeks the production of documents and the deposition of several individuals. First, petitioner seeks to depose Thomas Grennan, the Brown County Prosecuting Attorney, and Robert Gifford, investigator for the Brown County Prosecutor's Office, regarding conversations, interviews, interrogations, and any other written or oral communications with Kathy Kerr, as well as the purported grant of immunity and promise to pay for Kerr's hotel room during petitioner's trial. Next, petitioner seeks to depose Deputy

6

Buddy Moore, Detective John Fetters, and Detective Forest Coburn, all of the Brown County

Sheriff's Office, regarding their respective roles in the investigation into the death of Donald

Hoop, as well as their conversations, interviews, interrogations and any other written or oral

communications with Kathy Kerr. Finally, petitioner requests a deposition of the records

custodian of the Brown County Sheriff's Office concerning the location of any and all files

containing information regarding the investigation into the death of Donald Hoop.

In order to determine whether petitioner is entitled to conduct discovery on this claim, the

Court initially must identify the essential elements of this claim. *See Bracy*, 520 U.S. at 904.

The rule in *Brady* requires the government "to turn over evidence in its possession that is both

favorable to the accused and material to guilt or punishment." *Pennsylvania v. Ritchie*, 480 U.S.

39, 57 (1987). In *Giglio v. United States*, 405 U.S. 150, 154 (1972), the Supreme Court went on

to hold that the *Brady* rule includes evidence that might impeach the credibility of state

witnesses. Materiality is determined by asking "whether the *Brady* violation undermines

confidence in the verdict, because there is a reasonable probability that there would have been a

different result had the evidence been disclosed." *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998),

*cert. denied*, 528 U.S. 842 (1999). Petitioner need not prove these elements; rather, he must

show that if the facts are developed through the discovery he seeks, he could prove a *Brady*

violation and would be entitled to relief. *See Harris, supra*, 394 U.S. at 299.

Respondent argues that petitioner has failed to show how the documents provided to him

by respondent in discovery give rise to a need for the depositions he seeks. She further argues

that the overwhelming physical and circumstantial evidence pointing to Lindsey as the killer of

Whitey Hoop demonstrates that the proposed discovery will not establish a constitutional

7

violation.

In the instant matter, the Court is satisfied that petitioner has demonstrated that he diligently sought to develop the factual basis for his claims in the Ohio courts and that there is good cause for his request to take depositions. The discovery sought by petitioner relates to the specific allegations of *Brady* violations raised in his Petition. Petitioner's requests are narrowly focused on the circumstances surrounding the testimony of Kathy Kerr and his opportunity to conduct an adequate cross-examination of her. The Court finds that such depositions are necessary in order for petitioner to conduct an adequate inquiry into the circumstances surrounding the purported grant of immunity, the offer to pay for accommodations, and the withholding of that information by the State. The Court will not pre-judge whether the evidence obtained through the proposed discovery will ultimately support petitioner's constitutional claims. He has made a sufficient showing of a constitutional violation to entitle him to the discovery requested.

Petitioner also seeks access to all case files in the possession of the Brown County Sheriff's Office pertaining to its investigation into the death of Donald Hoop. With respect to this request, petitioner acknowledges that respondent has agreed to provide these law enforcement files but has been unable to locate them. Accordingly, petitioner seeks to depose the records custodian of the Brown County Sheriff's Office concerning the whereabouts of any such files. For good cause shown, petitioner is entitled to depose the records custodian.

8

### B. Ineffective Assistance of Counsel

Petitioner seeks to conduct discovery on the allegations of ineffective assistance of trial counsel set forth in his fifth and eighth grounds for relief. In his fifth ground for relief, petitioner argues that his attorneys performed unreasonably and to his prejudice during the culpability phase of his trial. Petitioner argues that his trial counsel waived the opportunity to question and rehabilitate potential jurors who voiced opposition to the death penalty, failed to conduct any cross-examination of A.J. Cox, a critical State's witness whom the trial court specifically found to have given prior inconsistent statements, and failed to adequately cross-examine the coroner regarding his qualifications or lack thereof. (*Amended Petition*, doc. no 38, at pp. 8-12).

In his eighth ground for relief, petitioner argues that his attorneys performed unreasonably and to his prejudice by failing to present effective mitigation evidence during the sentencing phase of his trial. Petitioner argues that his counsel presented only four mitigation witnesses and that no psychological, toxicological, substance abuse, or cultural mitigation evidence was presented. Petitioner also argues that counsel failed to conduct a proper mitigation investigation. Specifically, petitioner claims that trial counsel made the following errors:

A. Failed to find and present effective evidence of petitioner's extensive history of drug and alcohol abuse.

B. Failed to find and present effective evidence from family and friends regarding physical, emotional, and sexual abuse.

C. Failed to find and present effective evidence from a toxicologist.

D. Failed to find and present effective evidence from a cultural mitigation specialist.

E. Failed to engage and utilize an effective mitigation specialist to prepare for mitigation.

(*Petition*, doc. no. 9, at ¶¶ 148-185, except paragraphs 171-176). Petitioner asserts that several

9

witnesses who were willing to testify on his behalf were never contacted by defense counsel or the mitigation investigator.

Petitioner seeks to depose his trial attorneys, Bruce Wallace and Scott Gusweiler, as well as James Crates, the defense mitigation investigator. Petitioner also seeks to issue a *subpoena duces tecum* to Mr. Crates for production of all case files, documents, and notes in his possession pertaining to petitioner's case. Petitioner asserts that although he has access to his trial file, that file lacks any documentation pertaining to the mitigation investigation, including notes of witnesses interviewed, records requested and/or reviewed, notes of witness preparation or notes of any discussions or consultations with experts. Furthermore, petitioner contends that James Crates has been unresponsive to petitioner's repeated requests to have access to the documents, notes and files maintained by Mr. Crates in connection with his mitigation investigation. Petitioner believes that reviewing these files and questioning defense counsel and Mr. Crates about the scope of the mitigation investigation, the preparation of the mitigation case, and the strategies and tactics employed by trial counsel during both the culpability and sentencing phases may lead petitioner to additional evidence supporting his claims of ineffective assistance of counsel. (Doc. no. 44, at pp.13-14).

In order to determine whether petitioner is entitled to conduct discovery on his ineffective assistance of counsel claims, the Court must identify the essential elements of such claims. *Bracy*, 520 U.S. at 904. The standard for reviewing a claim of ineffective assistance of counsel is twofold:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that deficient performance prejudiced the

10

defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). With respect to the first prong of the

*Strickland* test, the Court notes that, "[b]ecause of the difficulties inherent in making the

evaluation, a court must indulge a strong presumption that counsel's conduct falls within the

wide range of reasonable professional assistance." *Id.* at 689.

To establish the second prong of the *Strickland* test, *i.e.*, prejudice, a petitioner must

demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the

proceedings would have been different. *Id.* at 694. "A reasonable probability is a probability

sufficient to undermine confidence in the outcome." *Id.* Because petitioner must satisfy both

prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, should the Court

determine that petitioner has failed to satisfy one prong, it need not consider the other. *Id.* at

697. Again, petitioner need not prove these elements; rather, he must show that if the facts are

developed through the discovery he seeks, he could prove a *Strickland* violation and would be

entitled to relief. *See Harris, supra*, 394 U.S. at 299.

Inherent in counsel's responsibilities is the duty to investigate. "[C]ounsel has a duty to

make reasonable investigations or to make a reasonable decision that makes particular

investigations unnecessary." *Strickland, supra*, 466 U.S. at 691; *Sims v. Livesay*, 970 F.2d 1575,

1580-81 (6th Cir. 1992); *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994)(failure

to investigate, especially as to key evidence, must be supported by a reasoned and deliberate

determination that investigation was not warranted); *Workman v. Tate*, 957 F.2d 1339, 1345-46

(6th Cir. 1992)(reasonable investigation was lacking, so counsel's performance was deficient).

The importance of competent representation during the penalty phase of a capital trial cannot be

11

understated, especially with respect to the duty to investigate, since, as a practical matter, all that stands between a defendant who has been convicted of a capital specification and death is whatever mitigation evidence he or she can muster. *Mapes v. Coyle*, 171 F.3d 408, 426 (6th Cir. 1999).

> [C]ertainly, trial counsel must commit a serious error to be judged unconstitutionally ineffective. However, when a client faces the prospect of being put to death unless counsel obtains and presents something in mitigation, minimal standards require some investigation.

*Id.*

In determining whether a particular act or omission on the part of counsel was outside the wide range of professional norms, this Court must accord a high measure of deference to counsel's decisions. *Strickland*, 466 U.S. at 681; *see also White v. McAninch*, 235 F.3d 988, 994-95 (6th Cir. 2000). Of course, a "strategic" or "tactical" decision is not automatically insulated from review, if it does not appear that the decision was supported by sufficient investigation.

> The determination as to whether counsel's trial strategy amounts to ineffective assistance of counsel should be made with respect to the thoroughness of the pretrial investigation that counsel conducted. The more thorough the investigation, the more deference the trial strategy receives, while strategic decisions made after incomplete investigation receive less....

*White v. McAninch*, 235 F.3d at 995-96 (citing *Strickland*, 466 U.S. at 690-91). *See also Wiggins v. Smith, supra*, 123 S.Ct. at 2535.

In determining whether petitioner can satisfy the "good cause" standard for conducting discovery, it stands to reason that the Court must also take into account the findings of the state courts regarding the issues on which petitioner seeks to conduct discovery. To satisfy the "good cause" standard for discovery, petitioner must demonstrate that the facts, if more fully

12

developed, would entitle him to relief. Under the standard of review set forth in 28 U.S.C. §2254(d), petitioner would not be entitled to relief on his trial counsel ineffectiveness claims unless it appears that the state courts' rulings were contrary to or involved an unreasonable application of Supreme Court precedent, or that the state courts' factual findings were unreasonable based on the evidence presented.

In an attempt to demonstrate good cause for his discovery requests, petitioner argues that there exist important and relevant questions for trial counsel about the work performed, decisions made, and counsel's qualifications and experience to handle capital cases. Respondent argues that petitioner raised these ineffective assistance of trial counsel claims on direct appeal and/or the postconviction proceedings, and the Supreme Court of Ohio made a detailed analysis of them. It concluded that his trial attorneys were in the best position to determine trial strategy.

Upon careful review, this Court is persuaded that petitioner has demonstrated good cause to conduct discovery on his claims of ineffective assistance of trial counsel. Initially, the Court notes that the record contains no affidavits or post-trial testimony from trial counsel about their actions and omissions during trial. Information about counsel's decisions, actions, and omissions is uniquely in the possession of counsel and not typically available from any other source besides counsel. Although some of the ineffective assistance of trial counsel claims were raised on direct appeal, petitioner's argument is that facts not of record support his claims. He attempted to obtain discovery on them in the postconviction action, but his requests for discovery were denied. Thus, petitioner is entitled to depose trial attorneys Bruce Wallace and Scott Gusweiler, as well as defense investigator, James Crates. Petitioner is also entitled to issue a *subpoena duces tecum* to Mr. Crates for production of all case files, documents, and notes in

13

his possession pertaining to petitioner's case.

### III. Conclusion

For the foregoing reasons, the Court GRANTS petitioner's motion for discovery.  The

Court finds that petitioner has satisfied the good cause standard set forth in Habeas Corpus Rule

6 to conduct the following discovery:

1. Petitioner is entitled to depose Thomas Grennan, the Brown County Prosecuting Attorney, and Robert Gifford, investigator for the Brown County Prosecutor's Office, regarding conversations, interviews, interrogations, and any other written or oral communications with Kathy Kerr, as well as the purported grant of immunity and promise to pay for Kerr's hotel room during petitioner's trial;

2. Petitioner is entitled to depose Deputy Buddy Moore, Detective John Fetters, and Detective Forest Coburn regarding their respective roles in the investigation into the death of Donald Hoop as well as their conversations, interviews, interrogations and any other written or oral communications with Kathy Kerr;

3. Petitioner is entitled to depose the records custodian of the Brown County Sheriff's Office concerning the location of any and all files containing information regarding the investigation into the death of Donald Hoop; and

4. Petitioner is entitled to depose trial attorneys Bruce Wallace and Scott Gusweiler as well as defense investigator James Crates, and petitioner is entitled to issue a *subpoena duces tecum* to Mr. Crates for the production of all case files, documents, notes and the like in his possession pertaining to petitioner's case.

Although the Court finds that discovery is warranted in this case, the Court will not

permit prolonged, unlimited discovery.  Because the discovery requests granted by this Court

will consist only of the gathering of records and a few depositions, petitioner is granted three (3)

months from the date of this Order to conduct the discovery set forth in this order.

**IT IS SO ORDERED.**

3 - 29-2006

EDMUND A. SARGUS, JR.
**United States District Judge**

14

CA08-04-0111

IMAGED

COURT OF COMMON PLEAS
BUTLER COUNTY, OHIO

2008 JUN -4 AM 10: 35

| | |
|---|---|
| STATE OF OHIO | CASE NO. CR1983-12-0614 |
| Plaintiff | NASTOFF, J. |
| vs. | ENTRY FOR TRANSPORT |
| VON CLARK DAVIS | June 12, 2008 |
| Defendant | |

It appears to the Court that **Von Clark Davis**, Inmate No. A179828, is confined at the Ohio State Penitentiary.

It further appears to the Court that a **Scheduling Conference** iin the above captioned matter is set for **June 12, 2008 at 3:00 PM** in the Butler County Court of Common Pleas, before the **Honorable Andrew Nastoff.**

**IT IS THEREFORE, ORDERED** that the Warden of the **Ohio State Penitentiary** cause said defendant to be released to the Sheriff of Butler County, Ohio, for the purpose of attending said hearing in Butler County, Ohio, and said defendant shall be held in the custody of the Sheriff of Butler County, Ohio, until the completion of said hearing and upon the completion of said hearing, said defendant shall be returned to the institution unless otherwise Ordered by this Court.

APPROVED AS TO FORM:                          ENTER

ROBIN PIPER
PROSECUTING ATTORNEY
BUTLER COUNTY, OHIO

                                                     NASTOFF, J.

**INSTRUCTIONS TO THE CLERK: PLEASE CERTIFY TWO COPIES**

DGE/
June 4, 2008

217

COURT OF COMMON PLEAS
BUTLER COUNTY, OHIO

STATE OF OHIO                          2008 JUN 13  PM 2:42   Case No. CR _83 - 12 - 0614_

    Plaintiff                          CINDY CARPENTER
                             BUTLER COUNTY Judge _Nastoff_
vs.                                    CLERK OF COURTS : *Amended*

_Von Clark Davis_                     : **PRETRIAL ORDER**

                                   :

    Defendant(s)                       :

                     ******************
This matter came before this Court this _12th_ day of _June_ , 20_08_,

and the following orders and deadlines were established, and shall be the order of the Court:

_____  PLEA or TRIAL SETTING is set for _____ at _____ m.
              _Re-sentencing_
_____  ~~DISPOSITION~~ is set for _12/15/08  4days_ at _9A_ m.

_____  TRIAL is to commence on _____ at _____ m.
            _All_
  ✓    MOTION _Pre-Sentencing hrg_ shall be filed by _6/27/08_ _State's Response_
      and shall be heard on _8/27/08_ at _9A_ m.  _by 7/24/08_

_____  OTHER HEARING is set for _____ at _____ m.

_____  BILL OF PARTICULARS
      Defendant's motion to be filed by _____
      Prosecutor's response to be filed by _____

_____  DISCOVERY
      Defendant's motion to be filed by _____
      Prosecutor's response to be filed by _____
      Prosecutor's motion to be filed by _____
      Defendant's response to be filed by _____

BOND IS REVOKED/SET _Δ counsel consents to above Re-sentencing_
CAPIAS TO ISSUE _hearing schedule_

                             **SO ORDERED:**

_____        _____
Defense Counsel                  Judge

_____        _____
Defendant                        Prosecutor

FILED in Common Pleas Court
BUTLER COUNTY, OHIO

JUN 13 2008

CINDY CARPENTER
CLERK OF COURTS

**IN THE COURT OF COMMON PLEAS**
**BUTLER COUNTY, OHIO**

STATE OF OHIO,                        :

    Plaintiff,                         :    **Case No. CR 1983-12-0614**

    vs.                                :

    **VON CLARK DAVIS**                 :    **Judge Daniel Andrew Nastoff**

    Defendant. –                       :    **EVIDENTIARY HEARING REQUESTED**

FILED in BUTLER CO.
COURT OF APPEALS

JUN 13 2008

CINDY CARPENTER
CLERK OF COURTS

---

**VON CLARK DAVIS'**
**FIRST NOTICE OF ADDITIONAL AUTHORITY**

---

    On May 27, 2008, Mr. Davis filed a pleading entitled "Motion To Preclude Imposition Of The Death Penalty Because Ohio's Lethal Injection Constitutes Cruel And Unusual Punishment." Mr. Davis submits the attached decision in *State v. Rivera, et al.* Lorain C.P. Nos. 40CR065960 and 05CR068067 (Judgment Entry, June 10, 2008) in support of his May 27, 2008 motion.

                   Respectfully submitted,

                   *Randall L. Porter*

                   RANDALL L. PORTER - 0005835
                   Assistant State Public Defender
                   Office of the Ohio Public Defender
                   8 East Long Street -11th Floor
                   Columbus, Ohio 43215
                   (614) 466-5394 (Voice)
                   (614) 644-0703 (Facsimile)
                   PorterR@OPD.state.OH.US

                   And

218

MELYNDA COOK-REICH – 0066596
REPPER, PAGAN, COOK, Ltd.
1501 First Avenue
Middleton, Ohio 45042
(513) 424-1823 (Voice)
(513) 424-3155 (Facsimile)
Mcook@bizcinci.rr.com

COUNSEL FOR VON CLARK DAVIS

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing *Von Clark Davis'*
*First Notice Of Additional Authority* was emailed and sent via U.S. Regular Mail
to Daniel G. Eichel, First Assistant Butler County Prosecuting Attorney, and
Michael A. Oster, Jr. Assistant Butler County Prosecuting Attorney at the
Government Services Center, 315 High Street, Hamilton, Ohio 45011 on this
13th of June, 2008.

COUNSEL FOR VON CLARK DAVIS

JUN-10-2008 12:09 From:CLERK OF COURT CRIM

# LORAIN COUNTY COURT OF COMMON PLEAS
## LORAIN COUNTY, OHIO

FILED
LORAIN COUNTY

2008 JUN 10 A 9:41

CLERK OF COMMON PLEAS
RON NABAKOWSKI

**RON NABAKOWSKI, Clerk**
**JOURNAL ENTRY**
**James M Burge, Judge**

Date _June 10, 2008_

Case No. 04CR065940
05CR068067

STATE OF OHIO
Plaintiff

LORAIN COUNTY PROSECUTOR
Plaintiff's Attorney

VS

RUBEN O. RIVERA
RONALD MCCLOUD
Defendant

KREIG J BRUSNAHAN
DANIEL WIGHTMAN
Defendant's Attorney    (440) 930-2600

## JUDGMENT ENTRY

### The Case

These causes came on to be heard upon the motion filed by each defendant, challenging the Ohio lethal injection protocol as constituting cruel and unusual punishment, proscribed by the Eighth Amendment to the United States Constitution and by Section 9, Article 1 of the Ohio Constitution.

Defendants argue further that the Ohio lethal injection protocol violates the very statute which mandates that executions in Ohio be carried out by lethal injection, R.C.2949.22. Defendants claim that the three-drug protocol currently approved for use by the Ohio Department of Rehabilitation and Correction violates R.C.2949.22 because the drugs used create an unnecessary risk that the condemned will experience an agonizing and painful death. Defendants argue that the use of this protocol is contrary to the language of the statute, which mandates that the method of lethal injection cause death "quickly and painlessly." Defendants maintain that the use of this three-drug protocol arbitrarily abrogates the condemned person's statutorily created, substantive right to expect and to suffer a painless execution.

The state of Ohio has responded that the current lethal injection protocol conforms to the statute because death is caused quickly, and unless an error is made in conducting the execution, which the state claims is extremely unlikely the drugs used will cause a painless death.

The court conducted hearings over two days and heard expert testimony from the defense (Mark Heath, M.D.) and from the state (Mark Dershwitz, M.D.). After reviewing the reports of the physicians, together with other written materials submitted with each

1

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 4111



JUN-10-2008 12:09 From:CLERK OF COURT CRIM

report, and after evaluating the testimony provided by each physician, the court makes the following findings of fact, draws the following conclusions of law, and enters its judgment accordingly.

<u>Findings of Fact</u>

1.  The state of Ohio uses a three-drug lethal injection protocol consisting of sodium thiopental, pancuronium bromide and potassium chloride, administered in the above order, as follows:

    A.   sodium thiopental: 40 cc;
    B.   sodium thiopental: 40 cc;
    C.   saline flush: 20 cc;
    D.   pancuronium bromide: 25 cc;
    E.   pancuronium bromide: 25 cc;
    F.   saline flush: 20 cc;
    G.   potassium chloride: 50 cc;
    H.   saline flush: 20 cc.

2.  The properties of the above drugs produce the following results:

    A.   sodium thiopental – anesthetic;
    B.   pancuronium bromide – paralytic;
    C.   potassium chloride – cardiac arrest.

3.  The issue of whether an execution is painless arises, in part, from the use of pancuronium bromide, which will render the condemned person unable to breath, move, or communicate:

    "...it does not affect our ability to think, or to feel, or to hear, or anything, any of the senses, or any of our intellectual processes, or consciousness. So a person who's given pancuronium...would be wide awake, and - - but looking at them, you would - - they would look like they were peacefully asleep...But they would, after a time, experience intense desire to breathe. It would be like trying to hold one's breathe. And they wouldn't be able to draw a breath, and they would suffocate." (Heath, Tr. 72)

    "Pancuronium also would kill a person, but again, it would be excruciating. I wouldn't really call it painful, because I don't think being unable to breathe exactly causes pain. When we hold our breath it's clearly agonizing, but I wouldn't use the word "pain" to describe that. But clearly, an agonizing death would occur." (Heath, Tr. 75)

2

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 4112

JUN-10-2009 12:09 From:CLERK OF COURT CRIM

4.    The second drug in the lethal injection protocol with properties which cause pain is potassium chloride. The reason is that before stopping the heart,

"it gets in contact with nerve fibers, it activates the nerve fibers to the maximal extent possible, and so it will activate pain fibers to the maximal extent that they can be activated. And so concentrated potassium causes excruciating pain in the veins as it travels up the arms and through the chest." (Heath, Tr. 73)

5.    Based upon the foregoing, and upon the agreement of the expert witnesses presented by each party, the court finds that pancuronium bromide and potassium chloride will cause an agonizing or an excruciatingly painful death, if the condemned person is not sufficiently anesthetized by the delivery of an adequate dosage of sodium thiopental.

6.    The following causes will compromise the delivery of an adequate dosage of sodium thiopental:

A.    the useful life of the drug has expired;
B.    the drug is not properly mixed in an aqueous solution;
C.    the incorrect syringe is selected;
D.    a retrograde injection may occur where the drug backs up into the tubing and deposits in the I.V. bag;
E.    the tubing may leak;
F.    the I.V. catheter may be improperly inserted into a vein, or into the soft issue;
G.    the I.V. catheter, though properly inserted into a vein, may migrate out of the vein;
H.    the vein injected may perforate, rupture, or otherwise leak.

7.    The court fines further that:

A.    It is impossible to determine the condemned person's depth of anesthesia before administering the agonizing or painful drugs, in that medical equipment supply companies will not sell medical equipment to measure depth of anesthesia for the purpose of carrying out an execution;

B.    Physicians will not participate in the execution process, a fact which results in the use of paraprofessionals to mix the drugs, prepare the syringes, run the I.V. lines, insert the heparin lock (catheter) and inject the drugs; and,

3

JUN-10-2008 12:09 From:CLERK OF COURT CRIM

C.   The warden of the institution is required to determine whether the condemned person is sufficiently anesthetized before the pancuronium bromide and the potassium chloride are delivered, and the warden is not able to fulfill his duty without specialized medical equipment.

8.   The experts testifying for each party agreed, and the court finds that mistakes are made in the delivery of anesthesia, even in the clinical setting, resulting in approximately 30,000 patients per year regaining consciousness during surgery, a circumstance which, due to the use of paralytic drugs, is not perceptible until the procedure is completed.

9.   The court finds further that the occurrence of the potential errors listed in finding no. 6, *supra*, in either a clinical setting or during an execution, is not quantifiable and, hence, is not predicable.

10.  Circumstantial evidence exists that some condemned prisoners have suffered a painful death, due to a flawed lethal injection; however, the occurrence of suffering cannot be known, as post-execution debriefing of the condemned person is not possible.

#### Conclusions of Fact

1.   Pancuronium bromide prevents contortion or grotesque movement by the condemned person during the delivery of the potassium chloride, which also prevents visual trauma to the execution witnesses should the level of anesthesia not be sufficient to mask the body's reaction to pain. Pancuronium is not necessary to cause death by lethal injection.

2.   Potassium chloride hastens death by stopping the heart almost immediately. Potassium chloride is not necessary to cause death by lethal injection.

3.   The dosage of sodium thiopental used in Ohio executions (2 grams) is sufficient to cause death if properly administered, though death would not normally occur as quickly as when potassium chloride is used to stop the heart.

4.   If pancuronium bromide and potassium chloride are eliminated from the lethal injection protocol, a sufficient dosage of sodium thiopental will cause death rapidly and without the possibility causing pain to the condemned.

4

JUN-10-2008 12:11 From:CLERK OF COURT CRIN

A.    Executions have been conducted where autopsy results showed that cardiac arrest and death have occurred after the administration of sodium thiopental, but before the delivery of pancuronium bromide and potassium chloride.

B.    In California, a massive dose (five grams) of sodium thiopental are used in the lethal injection protocol.

## Conclusions of Law

1.    Capital punishment is not per se cruel and unusual punishment, prohibited by the Eighth Amendment to the United States Constitution and by Section 1, Article 9 of the Ohio Constitution. Gregg v. Georgia (1976), 428 U.S. 153,187 (FN5.); State v. Jenkins (1984), 15 Ohio St. 3d 164, 167-169.

2.    Capital punishment administered by lethal injection is not per se cruel and unusual punishment, prohibited by the Eighth Amendment to the United States Constitution and by Section 1, Article 9 of the Ohio Constitution. Baze v. Rees (2008), 128 S. Ct. 1520, 1537-1538.

3.    The Ohio statute authorizing the administration of capital punishment by lethal injection, R.C.2949.22, provides, in relevant part, as follows:

      "(A) Except as provided in division (C) of this section, a death sentence shall be executed by causing the application to the person, upon whom the sentence was imposed, of *a lethal injection of a drug or combination of drugs of sufficient dosage to quickly and painlessly cause death.* The application of the drug or combination of drugs shall be continued until the person is dead..." (emphasis supplied)

4.    The purpose of division (A), *supra,* is to provide the condemned person with an execution which is "quick" and "painless;" and the legislature's use of the word, "shall," when qualifying the state's duty to provide a quick and painless death signifies that the duty is mandatory.

5.    When the duty of the state to the individual is mandatory, a property interest is created in the benefit conferred upon the individual, i.e. "Property interests...are created and their dimensions are defined by existing *rules* or understandings that *stem from an independent source such as state law rules*...that secure certain benefits and that support claims of entitlement to those benefits." Board of Regents of State Colleges v. Roth (1972), 408 U.S. 564, 577 (emphasis supplied).

5

JUN-10-2008 12:12 From:CLERK OF COURT CRIM

6.     If a duty from the state to a person is mandated by statute, then the person to whom the duty is owed has a substantive, property right to the performance of that duty by the state, which may not be "arbitrarily abrogated." Wolf v. McDonnell (1974), 418 U.S. 539, 557.

7.     The court holds that the use of two drugs in the lethal injection protocol (pancuronium bromide and potassium chloride) creates an unnecessary and arbitrary risk that the condemned will experience an agonizing and painful death. Thus, the right of the accused to the expectation and suffering of a painless death, as mandated by R.C.2949.22(A), is "arbitrarily abrogated."

8.     The court holds further that the words, "quickly and painlessly," must be defined according to the rules of grammar and common usage, and that these words must be read together, in order to accomplish the purpose of the General Assembly in enacting the statute, i.e. to enact a death penalty statute which provides for an execution which is painless to the condemned. R.C.1.42, 1.47.

9.     The parties have agreed and the court holds that the word, "painless," is a superlative which cannot be qualified and which means "without pain."

10.     The word, "quickly," is an adverb that always modifies a verb, in this case, the infinitive form of the verb, "to be." It describes the rate at which an action is done. Thus, the meaning of the word, "quickly," is relative to the activity described: to pay a bill "quickly" could mean, "by return mail;" to respond to an emergency "quickly," could mean, "immediately." Hence, the word "quickly" in common parlance means, "rapidly enough to complete an act, and no longer."

11.     Therefore, the court holds that when the General Assembly, chose the word, "quickly," together with the word, "painlessly," in directing that death by lethal injection be carried out "quickly and painlessly," the legislative intent was that the word, "quickly," mean, "rapidly enough to complete a painless execution, but no longer."

12.     This holding, supra, is consistent with the legislature intent that the death penalty in Ohio be imposed without pain to the condemned, the person for whose benefit the statute was enacted, but that the procedure not be prolonged, a circumstance that has been associated with protracted suffering.

13.     Further, because statutes defining penalties must be construed strictly against the state and liberally in favor of the accused (condemned), the court holds that any interest the state may have, if it has such an interest,

6

JUN-10-2008 12:12 From:CLERK OF COURT CRIM

in conducting an execution "quickly," i.e. with a sense of immediacy, is outweighed by the substantive, property interest of the condemned person in suffering a painless death. R.C.2901.04(A).

14.   Thus, because the Ohio lethal injection protocol includes two drugs (pancuronium bromide and potassium chloride) which are not necessary to cause death and which create an unnecessary risk of causing an agonizing or an excruciatingly painful death, the inclusion of these drugs in the lethal injection protocol is inconsistent with the intent of the General Assembly in enacting R.C.2949.22, and violates the duty of the Department of Rehabilitation and Correction, mandated by R.C.2949.22, to ensure the statutory right of the condemned person to an execution without pain, *and to an expectancy that his execution will be painless.*

15.   As distinguished from this case, the Kentucky lethal injection statute has no mandate that an execution be painless, Ky. Rev. Stat. Ann. §431.220(1) (a). Thus, the analysis of that statute, having been conducted under the Eighth Amendment "cruel and unusual" standard, is not applicable here because "...the [U.S.] Constitution does not demand the avoidance of all risk of pain in carrying out executions." Baze, supra, 128 S. Ct. at 1529. In contrast, the court holds that R.C.2949.22 demands the avoidance of any unnecessary risk of pain, and, as well, any unnecessary expectation by the condemned person that his execution may be agonizing, or excruciatingly painful.

16.   The purpose of R.C.2949.22 is to insure that the condemned person suffer only the loss of his life, and no more.

17.   The mandatory duty to insure a painless execution is not satisfied by the use of a lethal injection protocol which is painless, assuming no human or mechanical failures in conducting the execution.

18.   The use of pancuronium bromide and potassium chloride is ostensibly permitted because R.C.2949.22 permits "a lethal injection of a drug or combination of drugs."

19.   However, as set forth *supra*, the facts established by the evidence, together with the opinions expressed by the experts called to testify by each party, compel the conclusion of fact that a single massive dose of sodium thiopental or another barbiturate or narcotic drug will cause certain death, reasonably quickly, and with no risk of abrogating the substantive right of the condemned person to expect and be afforded the painless death, mandated by R.C.2949.22.

7

JUN-10-2008 12:13 From:CLERK OF COURT CRIM

## Analysis

1.     The court begins its analysis of R.C.2949.22 with the presumption of its compliance with the United States and Ohio Constitutions, and that the entire statute is intended to be effective. R.C.1.47(A),(B). However, the court holds that the phrase, "or combination of drugs," ostensibly permits the use of substances which, *de facto*, create an unnecessary risk of causing an agonizing or an excruciatingly painful death.

2.     This language offends the purpose of the legislature in enacting R.C.4929.22, and thus, deprives the condemned person of the substantive right to expect and to suffer an execution without the risk of suffering an agonizing or excruciatingly painful death.

3.     The court holds, therefore, that the legislature's use of the phrase, "or combination of drugs," has proximately resulted in the arbitrary abrogation of a statutory and substantive right of the condemned person, in a violation of the Fifth and Fourteenth Amendments to the United Constitution and Section 16, Article 1 of the Ohio Constitution (due process clause).

## Remedy

1.     R.C.1.50, however, allows the court to sever from a statute that language which the court finds to be constitutionally offensive, if the statute can be given effect without the offending language.  Geiger v. Geiger (1927), 117 Ohio St. 451, 466.

2.     The court finds that R.C.2949.22 can be given effect without the constitutionally offense language, and further, that severance is appropriate. State v. Foster (206), 109 Ohio St. 3d. 1, 37-41.

3.     Thus, the court holds that the words, "or a combination of drugs," may be severed from R.C.2949.22; that the severance will result in a one-drug lethal injection protocol under R.C.2949.22; that a one-drug lethal injection protocol will require the use of an anesthetic drug, only; and, that the use of a one-drug protocol will cause death to the condemned person "rapidly," i.e. in an amount of time sufficient to cause death, without the unnecessary risk of causing an agonizing or excruciatingly painful death, or of causing the condemned person the anxiety of anticipating a painful death.

8

JUN-10-2009 12:13 From:CLERK OF COURT CRIM

## Holding

4.    Therefore, the holds that severance of the words, "or combination of drugs," from R.C.2949.22 is necessary to carry out the intent of the legislature and thus, to cure the constitutional infirmity.

## ORDER

Accordingly, it is ordered that the words, 'or combination of drugs," be severed from R.C.2949.22; that the Ohio Department of Rehabilitation and Correction eliminate the use of pancuronium bromide and potassium chloride from the lethal injection protocol; and, if defendants herein are convicted and sentenced to death by lethal injection, that the protocol employ the use of a lethal injection of a single, anesthetic drug.

It is so ordered.

Honorable Judge James M. Burge

9

FILED BUTLER CO.
COURT OF APPEALS

FILED BUTLER CO.
COURT OF APPEALS

CINDY CARPENTER
CLERK OF COURTS

JUN 13 2008

CINDY CARPENTER
CLERK OF COURTS

Repper, Pagan, Cook, Ltd
Attorneys and Counselors at Law
1501 First Avenue
Middletown, OH  45044
513-424-1823
fax # 513-424-3135

In Common Pleas Court
BUTLER COUNTY, OHIO

# Fax

JUN 13 2008

CINDY CARPENTER
CLERK OF COURTS

| To: | Butler County Clerk of Courts | From: | Melynda Cook-Reich |
|-----|-------------------------------|-------|--------------------|
| Fax: | 887-3966 | Date: | June 13, 2008 |
| Phone: | | Pages: | 13 |
| Re: | State v. Von Clark Davis | CC: | |

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

• Comments:

*THIS MESSAGE AND ACCOMPANYING DOCUMENTS ARE INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH THEY ARE ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE RECEIVER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY WARNED THAT ANY DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.*

From the desk of...
Ashley Streck
Legal Assistant



IN THE COURT OF COMMON PLEAS
BUTLER COUNTY, OHIO

STATE OF OHIO,

Plaintiff,

vs.

VON CLARK DAVIS,

Defendant.

FILED in Common Pleas Court
BUTLER COUNTY, OHIO

JUN 27 2008

CINDY CARPENTER
CLERK OF COURTS

:

: Case No. CR 1983-12-0614

:

: Judge Daniel Andrew Nastoff

:

: EVIDENTIARY HEARING REQUESTED

:

: Pleading L

---

## VON CLARK DAVIS' MEMORANDUM CONCERNING HIS RIGHT TO A JURY TRIAL WITH RESPECT TO RESENTENCING

---

In 1984 a three judge panel sentenced Von Clark Davis ("Mr. Davis") to death. For the reasons that will be documented herein, Mr. Davis is entitled to have a jury for purposes of his re-sentencing hearing. Whatever rights Mr. Davis may have waived in 1984, he did not waive his Sixth Amendment right to a jury trial as the right had not yet been recognized. Furthermore, there exist serious questions concerning the validity of the waiver that he did enter in 1984, at least with respect to the sentencing phase of his capital case.

I. **MR. DAVIS DID NOT WAIVE HIS SIXTH AMENDMENT RIGHT TO A JURY TRIAL WITH RESPECT TO THE CAPITAL SPECIFICATION AND THE WEIGHING OF AGGRAVATING CIRCUMSTANCES VERSUS MITIGATING FACTORS.**

Since 1999, the United State Supreme Court has decided a series of decisions in which it held that sentencing procedures in criminal cases,



Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135



both capital and non-capital, must operate within the limits of the Fifth, Sixth, and Fourteenth Amendments. Each decision built on its predecessors and brought greater clarity to the requirements imposed by these constitutional provisions.

**A. The Supreme Court since 1999 has expanded the right to a jury trial in non-capital cases.**

In *Jones v. United States, 526 U.S. 227 (1999)*, the Court held that the Fifth Amendment's Due Process Clause and the Sixth Amendment's notice and jury trial guarantees require that "any fact (other than prior conviction) that increases the maximum penalty for a federal crime must be charged in an indictment, submitted to a jury, and proved beyond a reasonable doubt." *526 U.S. at 243 n.6.* In *Jones* the Court interpreted the federal car jacking statute in which the penalty was dependent upon the severity of injury that the victim sustained. *Id.* at 229. The Court concluded that the question concerning the seriousness of the injury was exclusively an issue for the jury to decide and not the trial judge at the time of sentencing. *Id.* at 251-252.

In *Apprendi v. New Jersey, 530 U.S. 466 (2000)*, the Court extended the constitutional principle announced in *Jones* to state court sentencing: "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. In that case the defendant was convicted of possession of a firearm



Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

2

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 4122

which carried a maximum penalty of ten years later. At the time of sentencing the trial judge found that the crime has been motivated by racial animus, which permitted the court to double the maximum sentence. The trial judge imposed a sentence of twelve years. The Court found that the defendant's sentence violated his right to a jury trial because the New Jersey statute "threatened Apprendi with certain pains if he unlawfully possessed a weapon and with additional pains if he selected victims with a purpose to intimidate them because of their race." *Id.* at 476.

Four years later the United States revisited the right to a jury trial in the context of state court sentencing procedures. *Blakely v. Washington* (2004), 542 U.S. 961. In that case the state sentencing scheme prescribed a range of sentences for the commission of the offense in issue. The scheme limited the power of the judge to impose an upper level sentence on that range. He could only impose such a sentence if he made certain findings. The state attempted to distinguish *Apprendi* by arguing that there existed only a single statutory range for the offense. The Supreme Court rejected this argument. It refined and applied *Apprendi's* rule, defining "statutory maximum" in an indeterminate sentencing scheme as "the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Id.* at 303. It "is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings." *Id.* at 303-304. To the extent a judge sentences above the statutory maximum, based



Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

3

on facts not found by a jury (or conceded by the defendant), "the judge exceeds his proper authority." *Id.* at 304.

A year later the United States Supreme Court reaffirmed its *Apprendi* and *Blakely* decisions. *United States vs. Booker* (2005), 543 U.S. 220. The majority opinion concluded "[a]ccordingly, we reaffirm our holding in *Apprendi.* Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt. *Id.* at 244.

In same year the United States Supreme Court limited the evidence that a court can consider when imposing sentence without the benefit of a jury. *Shepard vs. United States* (2005), 544 U.S. 13. The district court in that case had to make a factual determination whether the defendant's four prior convictions for burglary involved the illegal entrance of a building, ship, vessel or vehicle. The defendant never denied that all four prior offenses involved the entry of a building. The Supreme Court rejected the government's suggestion that the district court could look to the police reports of the prior offenses to determine whether the defendant's prior offenses had involved a building, ship, vessel or vehicle. The Court concluded, "the sentencing judge considering the ACCA enhancement would (on the Government's view) make a disputed finding of fact about what the defendant and state judge must have understood as the factual basis of the prior plea, and the dispute raises the concern underlying *Jones* and



Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3155

4

*Apprendi*; the Sixth and Fourteenth Amendments guarantee a jury standing between a defendant and the power of the state, and they guarantee a jury's finding of any disputed fact essential to increase the ceiling of a potential sentence." *Id.* at 25.

**B.  The Supreme Court in 2002 expanded the Sixth Amendment right to a jury trial in capital cases.**

In 1980, the Supreme Court addressed a constitutional challenge to the State of Arizona's death penalty scheme. *Walton v. Arizona* (1990), 497 U.S. 639. The scheme then in existence placed the burden on the trial judge, as opposed to the jury, to determine the existence of the aggravating circumstances. *Id.* at 645. Walton raised a Sixth Amendment challenge, claiming that only the jury could determine the existence of the aggravating and mitigating circumstances. *Id.* at 648. The Supreme Court rejected this claim, "Any argument that the Constitution requires that a jury impose a sentence of death or make the findings prerequisite to imposition of such a sentence has been soundly rejected by prior decisions of this Court." *Id.* at 647, (citation omitted). The Court reasoned that "under Arizona's capital sentencing scheme, the judge's finding of any particular aggravating does not 'convict' a defendant (i.e. require the death penalty), and the failure to find any particular aggravating circumstance does not 'acquit' a defendant (i.e. preclude the death penalty)." *Id.* at 648

Twelve years later the Supreme Court revisited the issue. *Ring v. Arizona* (2002), 479 U.S. 639. The Court therein reached the opposite conclusion, "*Apprendi's* reasoning is irreconcilable with *Walton's* holding in



Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

5

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 4125

Ub/Z//ZUU0   14.40                                    (FAX)                          F.UU//UI/

this regard, and today we overrule *Walton* in relevant part. Capital defendants, no less than noncapital defendants, we conclude, are entitled to a jury determination of any fact on which the legislature conditions an increase in the maximum penalty." *Id.* at 589. The Court explained that if death penalty eligibility is based on a factual determination, a jury must find that fact beyond a reasonable doubt. *Id.* at 602, (citing *Apprendi v. New Jersey*, 530 U.S. at 482-83). The Court made it clear that it is the "effect" of the factual finding, rather than its label. *Id.* The Court concluded "[b]ecause Arizona's enumerated aggravating factors operate 'as the of an element of a greater offense,' *Apprendi*, 530 U.S. 494, n. 19, the Sixth Amendment requires that they be found by a jury." *Id.* at 609.

Two years later the Supreme Court examined its holding in *Ring* to determine whether it should be retroactively applied. *Schriro v. Summerlin* (2004), 542 U.S. 348. The parties agreed that that Court's holding in *Ring* that the Sixth Amendment guaranteed a defendant to a jury determination as to the existence of aggravating specifications constituted a new rule of law. *Id.* at 351.

**C.    Mr. Davis did not waive a then non-existent Sixth Amendment right to a jury trial.**

It is clear that Mr. Davis presently has a Sixth Amendment right to a jury trial with respect to the capital specification. It is equally clear that right did not exist at the time of his original trial. *Davis v. Coyle* (6th Cir. 2007), 475 F. 3d 761, 779-80. A defendant to knowingly and intelligently



Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45014
Phone: 513.424.1823
FAX: 513.424.3135

6

waive a right must have knowledge of that right. *Brady vs. United States* (1970), 397 U.S. 742, 748 (criminal defendant must have sufficient awareness of the relevant circumstances and like consequences of waiver); *Duncan v. Louisiana* (1968), 391 U.S. 145, 156 (consequence of jury waiver is foregoing common sense judgment of a jury to the more tutored by perhaps less sympathetic reaction of a judge). In this case because Mr. Jackson Sixth Amendment right did not exist at the time of his initial trial, he did not waive that right prior to proceeding with a three judge panel in 1984.

## II. MR. DAVIS DID NOT WAIVE HIS STATUTORY RIGHT TO A JURY TRIAL WITH RESPECT TO THE CAPITAL SPECIFICATION AND THE WEIGHING OF AGGRAVATING CIRCUMSTANCES VERSUS MITIGATING FACTORS.

The State of Ohio's statutory scheme that was in existence in 1983 and 1984 regarding capital punishment gave Mr. Davis a right to have a jury decide, by proof beyond a reasonable as to this existence of the aggravating circumstances and whether the aggravating circumstances outweighed the mitigating factors. R.C. §2929.03(C)(2)(b).

## A. A defendant's waiver of his right to a jury trial must be knowingly and intelligently evidenced.

The right to jury trial in criminal cases may be waived, but there must be no doubt that any waiver thereof is made knowingly, intelligently, and voluntarily. *Patton vs. United States* (1930), 281 U.S. 276, 312-313; *Adams vs. United States ex rel. McCann* (1942), 317 U.S. 269, 275, 277-78. Courts indulge every reasonable presumption against the



Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

7

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 4127

06/27/2008   14:51                    (FAX)                    P.009/017

waiver of fundamental constitutional rights and should not presume acquiescence in the loss of fundamental rights. *Johnson vs. Zerbst* (1938), 304 U.S. 458, 464. In Ohio, "[e]very reasonable presumption should be made against the waiver..." *Simmons vs. State*, 75 Ohio St. 346 (1905); *See also* Ohio Const., Art. I, §5 ("Right to Trial By Jury Shall Be Inviolate" in All Criminal Cases).

When an accused wishes to waive his right to a jury trial, a trial court must thoroughly analyze with the defendant what the jury waiver means. Specifically, the Constitution demands "the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the [waiver] connotes and its consequence". *Boykin vs. Alabama* (1964), 395 U.S. 238, 243-44. As stated by the Supreme Court: "...[T]he duty of the trial court in that regard is not to be discharged as a mere matter of rote, but with sound and advised discretion, with an eye to avoid unreasonable and undue departures from that mode of trial or from any of the essential elements thereof, and *with a caution increasing in degree as the offenses dealt with increase in gravity.*" *Patton vs. United States*, 281 U.S. at 312-13 (emphasis added).

**B.   Mr. Davis did not knowingly and intelligently waive his statutory right to a jury trial.**

The trial court conducted a hearing with Mr. Davis prior to the first trial. The colloquy concerning the waiver comprised four pages, all of



Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

8

06/27/2008    14.55                              (FAX)                      P.010/017

which is reproduced below. Other than the an oblique reference raised by

defense counsel, the trial court failed to address with Mr. Davis his right to

a jury trial with respect to his sentence:

AND THEREUPON, on the 8th day of May, 1984, the following

Election of a Three Judge Panel was put on record in open Court as follows:

By the Court: Mr. Davis, you're brought over here today because of

some information that your attorney passed on to the Court, wherein, you

indicated to them and they indicated to me that you want to waive your

right to have this matter tried by a jury of twelve people and submit it to a-

panel of three judges?

| | |
|---|---|
| Mr. Davis: | That is correct. |
| By the Court: | Is that correct? |
| Mr. Davis: | That is correct. |

By the Court:      And in that regard, did you execute this form- it seems to
bear your signature?

| | |
|---|---|
| Mr. Davis: | Yes it is. |
| By the Court: | And before you signed it, you read it? |
| Mr. Davis: | Read it, uh-uhm. |
| By the Court: | And your attorneys explained it to you? |
| Mr. Davis: | Yes, they did. |

By the Court:      Now you understand that when you do this, that
the panel of judges will hear the evidence and make a decision on the
matter and you're giving up your right to have twelve people make that
decision.  Now, all twelve of those people would have to be convinced of your
guilt or not guilty, either way, and all twelve of them would have to be
convinced/before they could sign a verdict one way or the other. Do you
want to give up your right to have twelve people make this decision?



Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

9

A.                          Yes I do.

By the Court:          Now, you know the same burden of proof is on the State whether you go to the jury or to the jury, I mean, or to the jury or to the Court, a panel of three judges. I mean, the three judges would have to listen to the evidence and be convinced beyond a reasonable doubt of your guilt or innocence, before they could make a finding and all three of the Judges would have to be unanimous in that finding do you understand?

Mr. Davis:              Yes I do.

By the Court:          Is anybody forcing you to do what you're doing here today?

   Mr. Davis:           No one.

   By the Court,        You do this of your own free will?

   Mr. Davis:           My own free will, *yes* I did.

By the Court:          You understand that this is a death penalty case and the same... the Court,.. I mean, the three judge panel, have to make that same determination ah, in the event they get that far?

   Davis:               Yes...yes I do.

By the Court:          Any reasons that you know of why you shouldn't...you don't want to do this, I mean, is there any reason that you....

Mr. Davis:              No, I can't find any reason *why* wouldn't want to right now, no.

By the Court:          Does the Prosecution have anything you want to say here?

Mr. Sage:              Your Honor, do you think you should...it'd be proper to go over, rather it's required for a Court to be unanimous in it's verdict?

By the Court:          I just indicated that to him.

Mr. Sage:              Oh, I"m...okay, I'm sorry.



Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

10

Mr. Eichel:          Your honor, it's our understanding that the Court must be unanimous in it's verdict as to guilt and Punishment also and a majority of the and can rule on all other matters pertaining to evidence as provided in the Statute.

By the Court:          Do you understand what he's saying?

Mr. Davis:          Yes, uh-uhm.

By the Court:          He's saying that the majority that the Court could rule on evidence and findings of fact, but the ultimate conclusion *of your* guilt or innocence would have to be determine by unanimous vote of all the three judges.

Mr. Garretson:          As well/the penalty phase obviously if it ever got to that.

By the Court:          And it goes to all phases except as to the rulings on the evidence and findings of fact. Well, if nobody else has anything further to say we'll have three tomorrow, judges will be here, you know who they are, and they're in this form here. It'll be myself and Judge Moser and Judge Stitsinger.

Mr. Davis:          Yes ... .

By the Court:          So we'll see you then.

Mr. Davis:          Thank you.

[Tr. 58-61]

The Court never informed Mr. Davis that he had a statutory right to have the jury decide his sentence. The closest the Court came was when it informed Mr. Davis that the three judge panel would have to be unanimous with respect to their sentencing verdict. The manner in which the Court phrased that statement was more of a comparison as to rulings on evidentiary issues which would be made by a simple majority as opposed to verdicts which must be unanimous.



Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1301 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

11

The Court in its colloquy referenced a form that Mr. Davis had executed prior to the hearing concerning his jury waiver. The three paragraph form provided with his respect to the rights that he was waiving:

I am waiving said trial by jury, and making this election to be tried by a court composed of three judges, with full knowledge of my right under the Constitution of the United States and of Ohio to a trial by a jury consisting of twelve jurors, whose verdict must be unanimous; with full knowledge of the consequences of such waiver and election under the laws of the State of Ohio; and without any compulsion, undue influence, promises or inducements of any kind made to me by anyone.

[Exhibit A]

The form contained no reference to the statutory right to a jury trial for purposes of sentencing. The form referenced the federal and state constitutions, but did not reference the relevant statute that was the source of the right that he was waiving. Before a defendant can intelligently waive his right to a jury, he must be given the basic information that he has a right to a jury to decide his sentence. *Brady vs. United States*, 397 U.S. at 748; *Duncan v. Louisiana*, 391 U.S. at 156.  In this case the Court never provided Mr. Davis with that basic information.

## III    FORMER TRIAL COUNSEL DID NOT PROVIDE MR. DAVIS WITH ALL OF THE RELEVANT INFORMANT CONCERNING HIS JURY WAIVER.

Counsel must provide a criminal defendant with accurate advice concerning the entry of a guilty plea. *Sparks v. Sowders* (6th Cir. 1988), 852 F.2d 882, 885; *Warner v. United States* (6th Cir. 1992), 975 F.2d 1207, 1214; *Magna v. Hofbauer* (6th Cir. 2001), 263 F.3d 542, 549; *Lyons v. Jackson* (6th Cir. 2002), 299 F.3d 588, 593-594; *Miller v. Straub* (6th Cir.



Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

12

2002), 299 F.3d 570, 575-576. The same analysis applies to incorrect or incomplete information with respect to jury waivers. Defense counsel's duty to consult with the client and to provide complete and accurate information is "paramount" when the client has to decide to forego a personal right such as pleading guilty or waiving a jury. *Miller v. Straub*, 299 F.3d at 580; *Lyons v. Jackson*, 299 F.3d at 580. This Court in both cases stressed that when personal rights are involved, counsel must insure that the defendant's decision is as informed as possible. In both cases, this Court concluded that "failing to consider, let alone notify the client of a factor that could negate the entire benefit of the guilty plea [or this case a jury waiver]) is not within the range of professional norms." *Id.*

As will be documented at the evidentiary hearing, defense counsel provided Mr. Davis with incomplete advice. As a result, Mr. Davis' jury waiver did not knowingly and intelligently enter his jury waiver.

### III.  CONCLUSION: THIS COURT SHOULD HOLD MR. DAVIS'S PRIOR JURY WAIVER AS INEFFECTIVE WITH RESPECT TO THESE PROCEEDINGS.

Mr. Davis did not waive his Sixth Amendment right to a jury trial. It did not exist at the time of the 1984 proceedings. Mr. Davis did not waive his statutory right with respect to sentencing because the trial court's colloquy focused on the trial phase and not the mitigation phase.

Accordingly, this Court should permit Mr. Davis to exercise both his constitutional and statutory right in these proceedings to a jury trial. Mr.



Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

13

Respectfully submitted,

RANDALL L. PORTER - 0005835
Assistant State Public Defender
8 East Long Street -11th Floor
Columbus, Ohio 43215
(614) 466-5394 (Voice)
(614) 644-0703 (Facsimile)
PorterR@OPD.state.OH.US

And

MELYNDA COOK-REICH - 0066596
REPPER, PAGAN, COOK, Ltd.
1501 First Avenue
Middletown, Ohio 45042
(513) 424-1823 (Voice)
(513) 424-3135 (Facsimile)
Mcook@bizcinci.rr.com

COUNSEL FOR VON CLARK DAVIS



Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

14

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 4134

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing *Von Clark Davis'*
*Memorandum Concerning His Right To A Jury Trial With Respect To*
*Resentencing Von Clark Davis' First Notice Of Additional Authority* was hand
delivered to Daniel G. Eichel, First Assistant Butler County Prosecuting
Attorney, and Michael A. Oster, Jr. Assistant Butler County Prosecuting
Attorney at the Government Services Center, 315 High Street, Hamilton,
Ohio 45011 on this 27th of June, 2008.

COUNSEL FOR VON CLARK DAVIS



Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

15

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 4135

06/27/2008   15:02                                (FAX)                          P.017/017

STATE OF OHIO              :    CASE NO. CRB3-12-0614

              Plaintiff    :    IN THE COURT OF COMMON PLEAS
                                STATE OF OHIO, BUTLER COUNTY
vs.                        FILED In Somebody Filed's Court
VON CLARK DAVIS            BUTLER COUNTY, OHIO    JURY WAIVER AND ELECTION OF
                           m p Y B                THREE-JUDGE PANEL
                           Defendant  1994:

              EDWARD C. ROBB, JR.
        I, Von Clark Davis, defendant in the above cause, appearing in open

court this 8th day of May, 1984, with my attorneys, Michael D. Shanks and John A.

Garretson, do hereby voluntarily waive my right to trial by jury and elect to be

tried by a court to be composed of three judges, consisting of Judges Henry J.

Bruewar, William R. Stitsinger, and John R. Moser, all the same being the

elected judges of the General Division of the Court of Common Pleas of Butler

County who are engaged in the trial of criminal cases, pursuant to Ohio Revised

Code Section 2945.06.

        I am waiving said trial by jury, and making this election to be tried

by a court composed of three judges, with full knowledge of my right under the

Consitution of the United States and of Ohio to a trial by a jury consisting

of twelve jurors, whose verdict must be unanimous; with full knowledge of the

consequences of such waiver and election under the laws of the State of Ohio;

and without any compulsion, undue influence, promises or inducements of any

kind made to me by anyone.

        I further state that I have received the advice and counsel of my

attorneys, with which I am satisfied, and being fully advised by them do hereby

make this waiver and election of my own free will and accord.

                                                    _____
                                                    VON CLARK DAVIS

WITNESSES:

_____
MICHAEL D. SHANKS
Attorney for Defendant

_____
JOHN A. GARRETSON
Attorney for Defendant

                        This jury waiver and election to be tried by a three-judge panel is
hereby accepted and entered upon the journal of this Court.
                                            E N T E R

                                            _____
                                            BRUEWER, J.

06/27/2008    14:43                              (FAX)                    P.001/017



Repper, Pagan, Cook, Ltd.
Attorneys and Counselors at Law
1501 First Avenue
Middletown, OH 45044
513-424-1823
fax # 513-424-3135



| To: | Butler County Clerk | From: | Melynda Cook-Reich |
|---|---|---|---|
| Fax: | 887-3966 | Date: | June 27, 2008 |
| Phone: | | Pages: | 17 |
| Re: | State of Ohio v. Von Clark Davis | CC: | |
| | Case No. Cr 1983-12-0614 | | |

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

•Comments:

*THIS MESSAGE AND ACCOMPANYING DOCUMENTS ARE INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR
ENTITY TO WHICH THEY ARE ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL,
AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE RECEIVER OF THIS MESSAGE IS NOT THE
INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE
INTENDED RECIPIENT, YOU ARE HEREBY WARNED THAT ANY DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS
COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE
NOTIFY US IMMEDIATELY BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS
VIA THE U.S. POSTAL SERVICE. THANK YOU.*

From the desk of...
Ashley Streck
Legal Assistant

06/27/2008    15:04                              (FAX)                              P.002/007

IN THE COURT OF COMMON PLEAS
BUTLER COUNTY, OHIO

STATE OF OHIO,                    :

Plaintiff-Respondent,          :    Case No. CR 1983-12-0614
FILED in Common Pleas Court
BUTLER COUNTY, OHIO

vs.                                  :    Judge Daniel Andrew Nastoff

JUN 27 2008

VON CLARK DAVIS, CINDY CARPENTER EVIDENTIARY HEARING REQUESTED
CLERK OF COURTS

Defendant-Petitioner.       :    Pleading K

---

## VON CLARK DAVIS' MOTION
## TO SUPPRESS PRETRIAL AND TRIAL IDENTIFICATIONS

Von Clark Davis moves the Court to suppress all pretrial and trial
identifications provided by witnesses who were exposed to unduly
suggestive pretrial identification procedures. Mr. Davis has attached a
memorandum of law that he incorporates in this pleading.

Respectfully submitted,

Randall Porter  [MCN]  telephone authorized

RANDALL L. PORTER - 0005835
Assistant State Public Defender
Office of the Ohio Public Defender
8 East Long Street - 11th Floor
Columbus, Ohio 43215
(614) 466-5394 (Voice)
(614) 644-0703 (Facsimile)
PorterR@OPD.state.OH.US

And

Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.421.3135



MELYNDA COOK-REICH - 0066596
REPPER, PAGAN, COOK, Ltd.
1501 First Avenue
Middletown, Ohio 45042
(513) 424-1823 (Voice)
(513) 424-3135 (Facsimile)
Mcook@bizcinci.rr.com

COUNSEL FOR VON CLARK DAVIS

### MEMORANDUM IN SUPPORT

Mr. Davis was convicted partially on the testimony of Mona Ridge, Cozette Massey, Reginald Denmark, and Anthony Ferguson who claimed to have witnessed the fatal shooting. Mark Lovette and Wade Coleman provided the remainder of the inculpatory testimony; they both claimed to have purchased a firearm for Mr. Davis on the day of the shooting. At the 1984 trial, all six individuals in the courtroom identified Mr. Davis as the individual who they witnessed either plan or commit the murder. Two of the individuals testified that the investigating officers had shown them a single photograph of Mr. Davis and asked them if that was the individual who committed the shooting.

Cozette Massey testified that the officers prior to trial showed her a single photograph and asked her to identify Mr. Davis:

Q. And you were shown photographs of ...why don't you tell me what happened when you went down there [to the police station]?

A. Well, they asked me what happened and I told them I gave them a statement and then afterwards they showed me the photograph of them



Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

2

sitting in the bar, you know, and they asked me, and they/said, was them the two, and I said yeah, I seen .. and I identified her and then I identified him.

Q. olright [sic]... so, when you went down/to [sic] the police department shortly after this happed and sometime around a week or so, the only photograph they/showed you was the photograph of the girl who was shot, Suzette, with Mr. Davis, is that correct?

A.                Uh-uhm.

Q.      And they asked you if that was him?

A.                Uh-uhm.

Q.               You said yes?

A.                Uh-uhm.

[Tr. 155-156].

Anthony Ferguson testified that the investigating officers employed a similar identification procedure during the course of interviewing him:

Q.Okay now, you know this defendant, you know, Red Davis?

A.    I don't know him personally, I know of him.

Q.      You know who he is seem him around?

A.Ah... that was the first night [the evening of the murder] I had seen him.

Q.    Well, how did know that's who it was then?

A.I didn't. the officers showed me a picture and asked if this was the man that had pulled the trigger and I told then yes.



Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

3

Q. Even though you didn't know him, had you seen him before?

A.    I don't remember, I may have.

[Tr. 277].

The testimony from the 1984 trial does not reflect whether the investigating officers employed the same or a similar identification procedures when interviewing the other witnesses who provided in court identification of Mr. Davis. However, it can be reasonably concluded that the same procedures were employed because the officers, the offense and the time frame was the same.

Pretrial identifications of a defendant are only admissible if the prosecution can prove that the identification procedures comport with due process and are not so unduly suggestive as to give rise to a substantial likelihood of misidentification. *Neil v. Biggers*, 409 U.S. 188, 196 (1972); *Stovall v. Denno* (1967), 388 U.S. 293, 302 . In determining whether an identification procedure comports with due process, a reviewing court must apply a "totality of the circumstances" test. *Manson v. Brathwaite* (1977), 432 U.S. 98, 113-114.

If an identification procedure does not comport with due process, the pretrial identification is not admissible. If the state employs unduly suggestive identification procedures, all subsequent in-court identifications arising there from are inadmissible as "fruit of the poisonous tree" unless the state can show that the in-court identification is based upon factors independent of the unduly suggestive identification procedures. *United*



Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

4

*States v. Wade* (1967), 388 U.S. 218, 239-240. The use of one photograph array was suggestive in the present case.

WHEREFORE, Mr. Davis requests that the Court set this matter for an evidentiary at the conclusion of which it suppress the pretrial and trial identifications made by those witness who were exposed to unduly suggestive procedures.

Respectfully submitted,

RANDALL L. PORTER - 0005835
Assistant State Public Defender
Office of the Ohio Public Defender
8 East Long Street - 11th Floor
Columbus, Ohio 43215
(614) 466-5394 (Voice)
(614) 644-0703 (Facsimile)
PorterR@OPD.state.OH.US

And

MELYNDA COOK-REICH - 0066596
REPPER, PAGAN, COOK, Ltd.
1501 First Avenue
Middleton, Ohio 45042
(513) 424-1823 (Voice)
(513) 424-3155 (Facsimile)
Mcook@bizcinci.rr.com

COUNSEL FOR VON CLARK DAVIS



Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513-424-1823
FAX: 513-424-3155

5

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing *Von Clark Davis'*
*Motion To Suppress Pretrial And Trial Identifications* was forwarded by first-
class, postage prepaid U.S. Mail to Daniel G. Eichel, First Assistant Butler
County Prosecuting Attorney, and Michael A. Oster, Jr. Assistant Butler
County Prosecuting Attorney at the Government Services Center, 315 High
Street, Hamilton, Ohio 45011 on this 27th day of June, 2008.

COUNSEL FOR VON CLARK DAVIS



Repper, Pagan,
Cook, Ltd.
Attorneys at Law
1501 First Avenue
Middletown, OH 45044
Phone: 513.424.1823
FAX: 513.424.3135

6



Repper, Pagan, Cook, Ltd.
Attorneys and Counselors at Law
1501 First Avenue
Middletown, OH 45044
513-424-1823
fax # 513-424-3135



# Fax

| To: | Butler County Clerk | From: | Melynda Cook-Reich |
|---|---|---|---|
| Fax: | 887-3966 | Date: | June 27, 2008 |
| Phone: | | Pages: | 7 |
| Re: | State of Ohio v. Von Clark Davis | CC: | |
| | Case No. Cr 1983-12-0614 | | |

☐ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

•Comments:

*THIS MESSAGE AND ACCOMPANYING DOCUMENTS ARE INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH THEY ARE ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. IF THE RECEIVER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY WARNED THAT ANY DISSEMINATION, DISTRIBUTION, OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE, AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.*

From the desk of...
Ashley Streck
Legal Assistant

IN THE COURT OF COMMON PLEAS
BUTLER COUNTY, OHIO

STATE OF OHIO,                       :

     Plaintiff,                    :   Case No. CR 1983-12-0614

vs.                                  :   Judge Daniel Andrew Nastoff

VON CLARK DAVIS                      :   ORAL ARGUMENT REQUESTED

     Defendant.                    :   PLEADING N

---

## VON CLARK DAVIS' MOTION
## FOR FUNDING TO RETAIN DR. MARK HEATH, M.D.

---

     Von Clark Davis moves this Court to authorize reasonable and necessary funding from him to retain the services of Dr. Mark Heath or a similarly qualified expert. Mr. Davis has attached a memorandum of law which he incorporates in this pleading.

Respectfully submitted,

OFFICE OF
THE OHIO PUBLIC DEFENDER

RANDALL L. PORTER - 0005835
Assistant State Public Defender

Office of the Ohio Public Defender
8 East Long Street - 11th Floor
Columbus, Ohio 43215
(614) 466-5394 (Voice)
(614) 644-0703 (Facsimile)

PorterR@OPD.state.OH.US

And

MELYNDA COOK-REICH / 0060596

REPPER, PAGAN, COOK, Ltd.
1501 First Avenue
Middleton, Ohio 45042
(513) 424-1823 (Voice)
(513) 424-3155 (Facsimile)
Mcook@bizcinci.rr.com

COUNSEL FOR VON CLARK DAVIS

## MEMORANDUM OF LAW

On May 27, 2008, Von Clark Davis ("Mr. Davis) filed a motion challenging the State of Ohio's system for administering lethal injection. Mr. Davis requested an evidentiary hearing as to the facts supporting the motion. On June 13, 2008 Mr. Davis filed a notice of additional authority in support of his earlier motion challenging lethal injection. In that notice he cited this Court to the June 10, 2008 entry of the Lorain County Common Please Court finding that Ohio's method for administrating lethal injection violated the Fifth and Fourteenth Amendment and R.C. 2949.22

## I.  DR. MARK HEATH IS A QUALIFIED EXPERT IN THIS AREA.

If this Court grants Mr. Davis an evidentiary hearing on the motion challenging lethal injection, he will need to retain an expert to testify concerning the lethal injection process. He desires to retain Dr. Mark Heath, who testified in the Lorain County case. Dr. Heath is a qualified expert. [Exhibit

2

A]. in addition he has already critiqued the State of Ohio's lethal injection system. [Exhibit B]. Dr. Heath's familiarity with the process will reduce the number of hours that he will have to spend in preparation for testifying. Mr. Davis, at the oral argument on this motion, will submit a fee schedule for Dr. Heath.

## II.  VON CLARK. DAVIS IS ENTITLED TO ALL REASONABLY, NECESSARY ASSISTANCE.

Numerous constitutional and statutory provisions are implicated in the indigent defendant's right to assistance. The Sixth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution, guarantee the Accused the right to necessary funding. This Court has found Mr. Davis to be indigent. Therefore, he is entitled to the protections afforded by the relevant constitutional and statutory provisions which guarantee an indigent defendant appropriate funding to mount a defense.

### A. The Fourteenth Amendment guarantees Mr. Davis access to funding to defend his life.

The right to assistance is mandated by both the equal protection and due process clauses of the Fourteenth Amendment. "The State must, as a matter of equal protection, provide indigent prisoners with the basic tools of an adequate defense or appeal, when these tools are available for a price to other prisoners." *Britt v. North Carolina* (1971), 404 U.S. 226, 227. The Supreme Court "has long recognized that when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure

3

that the defendant has a fair opportunity to present his defense. This elementary principle, grounded in significant part on the Fourteenth Amendment's due process guarantee of fundamental fairness is derived from the belief that justice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake." *Ake v. Oklahoma* (1985), 470 U.S. 68, 76.

Both equal protection and due process emphasize the central aim of our entire judicial system -- all people charged with crime must, so far as the law is concerned, "stand on an equality before the bar of justice in every American court." *Griffin v. Illinois* (1965), 351 U.S. 12, 17 (plurality opinion; Black, J.) (quoting *Chambers v. Florida* (1940), 309 U.S. 227, 241). *See also, Smith v. Bennett* (1961), 365 U.S. 708, 714 ["the Fourteenth Amendment weights the interests of rich and poor criminals in equal scale, and its hand extends as far to each"].

Preventing an accused from having access to an expert witness based on his inability to pay is discrimination based on poverty and a denial of equal protection and due process of the law. "There can be no equal justice where the kind of trial a man gets depends on the amount of money he has." *Griffin v. Illinois,,* 351 U.S. at 19. Similarly, a state statute that does not providing counsel to indigent defendants charged with a felony in non-capital cases constitutes a denial of due process of law, "reason and reflection require us to recognize that in our adversary system of criminal justice, any person

4

haled into court, who is too poor to hire a lawyer, cannot be assured a fair trial, unless counsel is provided for him. *Gideon v. Wainwright* (1963), 372 U.S. 335, 344.

The United States Supreme Court has continued to extend this reasoning into other related areas where the indigent have found themselves on an unequal footing: e.g. *Argersinger v. Hamlin* (1972), 407 U.S. 25, 36-37 (indigent entitled to counsel for misdemeanor and petty offenses); *Williams v. Oklahoma City* (1969), 395 U.S. 458, 460 (indigent entitled to transcript to enable appeal of a municipal ordinance); *Gardner v. California* (1967), 393 U.S. 367, 370-371 (indigent entitled to a transcript of an evidentiary hearing in a *habeas corpus* proceeding, for use in making a *de novo* application to a higher court); *Eskridge v. Washington State Board of Prison Terms and Paroles* (1958), 357 U.S. 214, 216 ("conclusion of the trial judge that there was no reversible error in the trial cannot be an adequate substitute for the right to full appellate review available to all defendants in [State] who can afford the expense of a transcript"); Roberts v. La Vallee (1967), 389 U.S. 40, 42 (indigent entitled to a copy of the transcript of a preliminary hearing); *Draper v. Washington* (1963), 372 U.S. 487, 499 (the conclusion of the trial judge that an indigent's appeal is frivolous is not an inadequate substitute for the full appellate review available to non-indigent's in [the State], when the effect of that finding is to prevent an appellate examination based upon a sufficiently complete record of the trial proceedings"); *Smith v. Bennett* (1961), 365 U.S. 708, 713 (conditioning a collateral attack upon a conviction on payment of a filing fee); *Burns v. Ohio*

5

(1959), 360 U.S. 252, 258 (conditioning direct appeal of a conviction on payment of a filing fee).

In *Ake v. Oklahoma*, the United States Supreme Court held that, when an indigent criminal defendant demonstrates that his sanity at the time of the offense is to be a significant factor at trial, the state "must at a minimum assure the defendant access to a competent psychologist who will conduct appropriate examinations and assist in the evaluation, preparation and presentation of the defense at trial." *Id.* at 83. The Supreme Court's holding in *Ake* has since been expanded and extended beyond psychiatric assistance, to include other types of assistance. *Terry v. Rees* (6th Cir. 1993), 985 F.2d 283, 285 (independent pathologist); *Starr v. Lockhart* (8th Cir. 1994), 23 F.3d 1280, 1288 (mental health expert for purposes of mitigation and not insanity); *Little v. Armontrout* (8th Cir. 1987), 835 F.2d 1240, 1244-45 (hypnotist); *Dunn v. Roberts* (10th Cir. 1992), 963 F.2d 308, 313 (expert on battered woman's syndrome).

## B. The Sixth Amendment right to counsel guarantees Mr. Davis access to funding to defend his life.

Fundamental Fairness requires that an accused receive the assistance of counsel at all critical stages of a criminal prosecution. Recognizing the importance of counsel to safeguard constitutional rights, the United States Supreme Court repeatedly has held that an indigent unable to afford his own lawyer is entitled to representation at the expense of the state. *Argersinger v. Hamlin (1972)*, 407 U.S. 25, 36-37; *Gideon v. Wainwright* (1963),

6

372 U.S. 335, 344; *Johnson v. Zerbs* (1963), 304 U.S. 458, 463 *(1938); Powell v. Alabama* (1932), 287 U.S. 45. "That government hires lawyers to prosecute and defendants who have the money hire lawyers to defend are the strongest indications of the wide-spread belief that lawyers in criminal courts are necessities, not luxuries." *Gideon v. Wainwright,* 372 U.S. at 344.

The Sixth and Fourteenth Amendment guarantee of a right to the assistance of counsel is based on counsel's critical role in ensuring that the fact-finding process of a trial is reliable and that the adversarial system produces just results. For this reason, the Sixth Amendment's guarantee of counsel is a guarantee of *effective* assistance of counsel. *United States v. Cronic* (1984), 466 U.S. 648, 654; *Strickland v. Washington* (1984), 466 U.S. 668, 686; *McMann v. Richardson* (1970), 397 U.S. 759, 771 n.14; *Powell v. Alabama, supra, 287 U.S. at 57-58, 71.* Effectiveness is evaluated with an eye toward its purpose -- ensuring a fair trial through proper functioning of the adversarial process. *Strickland v. Washington,* 466 U.S. at 686. Absent "proper functioning of the adversarial process, the trial cannot be relied on as having produced a just result." *Id.*

The United States Supreme Court has recognized that the right to effective assistance of counsel may be denied by external constraints on defense counsel that impede counsel's ability to function adequately in the adversarial process. That is, the right to "effective assistance" requires not only the provision of competent counsel, but also the maintenance of conditions that permit counsel to perform his job. *See, e.g., Geders v. United States*

7

(1976), 425 U.S. 80, 86-91 (trial court may not order defendant to refrain from talking with lawyer during overnight recess); *Herring v. New York* (1975), 422 U.S. 853, 862-63 (trial judge may not deny defense counsel opportunity for summation); *Brooks v. Tennessee* (1972), 406 U.S. 605, 613 (state may not restrict counsel's choice of when to put defendant on stand).

There has always been a relationship between the availability of experts and the level of representation that counsel provides. The critical role that experts play in criminal cases is illustrated by the expenditure of funds and other resources for state forensic laboratories, investigative services, and other technical or scientific services to establish the state's factual case in criminal trials. "Governments, both state and federal, quite properly spend vast sums of money to establish machinery to try defendants accused of crime." *Gideon v. Wainwright, 372 U.S. at 344.*

"*Counsel has a duty to make reasonable investigations* or to make a reasonable decision that makes particular investigations unnecessary." *Strickland v. Washington*, 466 U.S. at 691. (Emphasis supplied.) There is no difference in effect between an attorney failing to investigate an obvious line of defense, and an attorney being unable to investigate or develop that defense because the indigent defendant has no money to employ necessary experts. In either event, the defendant has not had "the assistance necessary to justify reliance on the outcome of the proceeding." *Id.* at 691-92.

8

**C.  The Sixth Amendment right to compulsory process and confrontation guarantees Mr. Davis access to funding to defend his life.**

Expert assistance at or before a criminal trial is essential to the development of material facts.  The Supreme Court long has interpreted the Due Process Clause of the Fourteenth Amendment as requiring that "criminal defendants be afforded a meaningful opportunity to present a complete defense." *California v. Trombetta* (1984), 467 U.S. 479, 485.  In addition to requiring the effective assistance of counsel under the Sixth and Fourteenth Amendments, fundamental fairness requires that a criminal defendant and his counsel not be precluded from developing evidence that may result in acquittal.

The United States Supreme Court has ruled in many different contexts that a criminal defendant must be afforded the opportunity to develop the facts of his case.  *Washington v. Texas* (1967), 388 U.S. 14, 18-19. In that case the Court invalidated a state rule that prevented the defendant's alleged co-participant in the crime from testifying at trial. The Court stated ""The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies.  Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense.  This right is a fundamental element of due process of law." *Id. at* 19.

9

In *Chambers v. Mississippi* (1973), 410 U.S. 284, the United States Supreme Court found that a state's common law "voucher" and hearsay rules had a combined to deprive a defendant of testimony that was important to his defense.  Pointing out the importance to the defendant of cross-examining the key witness in his case, which the state "voucher" rule prevented him from doing, the Court stated that the dilution or denial of the right to confront and cross-examine calls into question the ultimate "integrity of the fact finding process." *410 U.S. at 295* (quoting *Berger v. California* (1969), 393 U.S. 314, 315). The Court ruled that the denial of such critical evidence resulted in a deprivation of due process.  "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. at 302.

In *United States v. Valenzuela-Bernal* (1982), 458 U.S. 858, the Court considered whether the deportation of illegal alien witnesses deprived a defendant of his Sixth Amendment right to obtain witnesses in his favor.  The Court held that there was no deprivation of constitutional rights because the defendant had not shown how their testimony would have been material and favorable to the defense.  In discussing the showing of materiality required, the Court recognized that in some cases a defendant may be unable to say *how* a witness will testify, "[b]ut the events to which a witness might testify, and the relevance of those events to the crime charged, may well demonstrate either the presence or absence of the required materiality." *Id.* at 871. Despite finding no constitutional violation in the specific facts before it, the Court reaffirmed the

10

principle of *Washington v. Texas, supra,* that a defendant is entitled under the Due Process Clause to present witnesses to establish his defense. The *Valenzuela-Bernal* Court further defined the principle as the right to obtain "testimony [that] would have been *relevant* and *material,* and . . . *vital* to the defense." *458 U.S. at 867 (quoting Washington v. Texas, 388 U.S. at 16).*

An accused has a constitutional right under the Sixth Amendment "to be confronted by the witnesses against him." This right embraces the correlative right of counsel to effectively cross-examine such witness. See, *United States v. Barracota* (S.D.N.Y. 1942), 45 F. Supp. 38. Preparation for an effective cross-examination requires full knowledge of the case. Defense counsel can only obtain this knowledge after consultation with an expert whose training and knowledge is in the same field as the issue in dispute.

## D. R.C. 2929.024 guarantees Mr. Davis access to funding to defend his life.

The Ohio Legislature has recognized that the ability of the defense counsel to provide the accused with adequate representation is highly dependent upon the availability of expert assistance in trial preparation. Ohio Rev. Code Ann. § 2929.024 provides for the appropriation of funds for expert assistance in capital cases:

> If the court determines that the defendant is indigent and that investigation services, experts, and other services are reasonably necessary for the proper representation of a defendant charged with aggravated murder at trial or at the sentencing hearing, the court shall authorize the defendant's counsel to obtain the necessary services for the defendant, and shall order

11

that payment for the fees and expenses for the necessary services.

*See also*, C.P. Sup. R. 20 § IV(D). Expert services are "reasonably necessary" when (1) essential to the proper representation of the defendant, and (2) an available alternative would not serve the same function. *State v. Jenkins* (1984), 15 Ohio St. 3d 164.

## III. FOR UNDERSIGNED COUNSEL TO MEET THE PREVAILING STANDARDS OF PRACTICE, THE COURT MUST APPOINT A MEDICAL EXPERT WITH SUFFICIENT EXPERTISE

The United States Supreme Court has long referred to the American Bar Association standards as guides to determine what is reasonable in a capital case. *Strickland v. Washington* (1984), 466 U.S. 668, 688; *Williams v. Taylor* (2000), 529 U.S. 362, 396; *Wiggins v. Smith* (2003), 539 U.S. 510, 524; *Rompilla v. Beard* (2005), 545 U.S. 374, 375.

The 2003 ABA guidelines require counsel to assemble a defense team which contains "at least one mitigation specialist, one fact investigator, at least on member qualified by training to and experience to screen individuals for the presence of mental or psychological disorders and impairments, and *any other members needed to provide high quality legal representation*." 2003 ABA Guideline for Appointment and Performance of Counsel in Death Penalty Cases 10.4(C)(2)(a)-(c) (emphasis). *See also* Guideline 4.1. This rationale for the defense team be composed of individuals with wide ranging talents becomes evident when the team's duties are described elsewhere in the ABA guidelines. The team has "an obligation to conduct a thorough and independent

12

investigation relating to the issues of both guilt and punishment." 2003 ABA Guideline 10.7(A).

Defense counsel in a capita case should 'receive the assistance of all expert, investigative and, other ancillary professional services reasonably necessary or appropriate to provide high quality legal representation at every stage of the proceeding." 2003 ABA Guideline 4.1. The appellate courts have reversed convictions and sentences when an the defendant has not had the benefit of a reasonable and necessary experts. Driscoll v. Delo, 71 F.3d 701 (8th Cir. 1995) (serologist);  *Combs v. Coyle*, 205 F.3d 269 (6th Cir.) (addiction expert); *Helton v. Secretary of Department of Corrections*, 233 F. 3d 1322 (11th Cir. 2000) (pathologist); *Lindstadt v. Keane*, 239 F. 3d 191 (2nd Cir. 2001) (medical expert); *Miller v. Anderson* 255 F. 3d 455, 459 (7th Cir. 2001)(hair analysis, DNA, tread mark, and foot print experts); *Pavel v. Hollins*, 261 F. 3d 210, 224-225 (2nd Cir. 2001) (physician and therapist); *Brown v. Sternes*, 304 F.3d 677, (7th Cir. 2002)(mental health expert with respect to issues involving competency and insanity); *Paine v. Massie*, 339 F. 3d 1194 (10th Cir. 2003) (battered wife expert); *Steidl v. Walls*, 267 F. Supp. 2d 919 (C.D. Ill., 2003) (knife expert); *Soffar v. Dretke*, 368 F. 3d 441 (5th Cir., 2004) (ballistics expert); *Draughon v. Dretke*, 427 F.3d 286 (5th Cir. 2005) (ballistics expert); *Dugas v. Coplan*, 428 F. 3d 317 (1st Cir., 2005) (arson expert); *Bell v. Miller*, 500 F.3d 149 (2nd Cir., 2007)(medical expert).

Defense counsel in a capital case are charged with the responsibility of considering "all legal claims potentially available" and

thoroughly investigating the basis for each potential claim before reaching a conclusion as to whether it should be asserted." 2003 ABA Standards for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.8(A)(1) and (2). Undersigned have determined that a challenge to lethal injection is both available and appropriate in this case. Undersigned counsel, having made that decision, are required to "present the claim as forcefully as possible, tailor the presentation to the particular facts and circumstances in the client's case and the applicable law in the particular jurisdiction; and ensure that a full record is made of all legal proceedings in connection with the claim." *Id.* at Guideline 10.8(B)(1) and (2). Undersigned counsel require the appointment of a qualified expert "to present the claim as forcefully as possible [and] tailor the presentation to the particular facts." With the appointment of such an expert, undersigned counsel will have failed to meet prevailing standard of practice contained in Guideline 10.8

**IV.   CONCLUSION: THIS COURT SHOULD PROVIDE FUNDING FOR A TRAINED MEDICAL EXPERT.**

Given the recent decision of the Lorain County Common Pleas Court in *State v. Rivera, et al,* Lorain C. P. Nos. 04CR065960 and 05CR068067, there are serious constitutional and statutory questions concerning Ohio's present protocol for the administration of lethal injection. Judge Burge found that the protocol violates both R.C. 2949.22 and the Fourteenth Amendment (as opposed to the Eighth Amendment). While Mr. Davis has preserved the legal issue, he now requires funding for the retention of a qualified expert to present and the factual issue.

14

For the reasons set forth herein and any other reason that may be apparent on the face of the record, Von Clark Davis requests this Court to authorize funding for him to retain Dr. Mark Heath or another expert who posses the expertise and qualifications of Dr. Heath.

Respectfully submitted,

OFFICE OF
THE OHIO PUBLIC DEFENDER

RANDALL L. PORTER - 0005835
Assistant State Public Defender

Office of the Ohio Public Defender
8 East Long Street -11th Floor
Columbus, Ohio  43215
(614) 466-5394 (Voice)
(614) 644-0703 (Facsimile)
PorterR@OPD.state.OH.US

And

MELYNDA COOK-REICH - 0066596

REPPER, PAGAN, COOK, Ltd.
1501 First Avenue
Middleton, Ohio 45042
(513) 424-1823 (Voice)
(513) 424-3155 (Facsimile)
Mcook@bizcinci.rr.com

COUNSEL FOR VON CLARK DAVIS

15

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing *Von Clark Davis' Motion For Funding To Retain Dr. Mark Heath, M.D.* was hand delivered to Daniel G. Eichel, First Assistant Butler County Prosecuting Attorney, and Michael A. Oster, Jr. Assistant Butler County Prosecuting Attorney by leaving two copies at the Government Services Center, 315 High Street, Hamilton, Ohio 45011 on this 30th day of June, 2008.

_____
COUNSEL FOR VON CLARK DAVIS

16

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
APPENDIX - Page 4160

<u>Curriculum Vitae</u>

1)   Date of preparation:   March 10, 2006

2)   Name:                        Mark J. S. Heath

     Birth date:               ████████████
     Birthplace:               New York, NY
     Citizenship:              United States, United Kingdom

3)   Academic Training:

                              Harvard University                         B.A., Biology,
1983

                              University of North Carolina, Chapel Hill    M.D., 1987

                              Medical License                            New York:
177101-1

     4)    Traineeship:

     1987 – 1988   Internship, Internal Medicine, George Washington University
Hospital,
                   Washington, DC.

     1988 – 1991   Residency, Anesthesiology, Columbia College of Physicians and
                   Surgeons, New York, NY

     1991 – 1993   Fellowship, Anesthesiology, Columbia College of Physicians and
                   Surgeons, New York, NY

5)   Board Qualification:

                   Diplomate, American Board of Anesthesiology, October 1991.
                   Diplomate National Board of Echocardiography Perioperative
                              Transesophageal Echocardiography
2005. (PTEeXAM 2001).

6)   Military Service:          None

7)   Professional Organizations:

                   International Anesthesia Research Society

8)   Academic Appointments:

                   1993 – 2002      Assistant Professor of Anesthesiology,
                                    Columbia University, New York, NY



|  | 2002 - present | Assistant Professor of Clinical Anesthesiology, Columbia University, New York, NY |

9)    Hospital/Clinical Appointments:

|  | 1993 – present | Assistant Attending Anesthesiologist, Presbyterian Hospital, New York, NY. |

10)    Honors:

Magna cum laude, Harvard University
Alpha Omega Alpha, University of North Carolina at Chapel Hill
First Prize, New York State Society of Anesthesiologists Resident Presentations, 1991

11)    Fellowship and Grant Support:

Foundation for Anesthesia Education and Research, Research Starter Grant Award, Principal Investigator, funding 7/92 - 7/93, $15,000.

Foundation for Anesthesia Education and Research Young Investigator Award, Principal Investigator, funding 7/93 - 7/96, $70,000.

NIH    KO8 "Inducible knockout of the NK1 receptor"
Principal Investigator, KO8 funding 12/98 - 11/02, $431,947 over three years
(no-cost extension to continue through 11/30/2002)

NIH    RO1 "Tachykinin regulation of anxiety and stress responses"

Principal Investigator, funding 9/1/2002 – 8/30/2007 $1,287,000 over 5 years

12)    Departmental and University Committees:

Research Allocation Panel (1996 – 2001)
Institutional Review Board (Alternate Boards 1-2, full member Board 3) (2003 - present)

13)    Teaching:

Lecturer and clinical teacher: Anesthesiology Residency Program, Columbia University and Presbyterian Hospital, New York, NY

Advanced Cardiac Life Support Training

*Anesthetic considerations of LVAD implantation.* Recurrent lecture at Columbia University LVAD implantation course.

Invited Lecturer:

*NK1 receptor functions in pain and neural develooment,* Cornell University December 1994

*Anxiety, stress, and the NK1 receptor,* University of Chicago, Department of Anesthesia and Critical Care, July 2000

*Anesthetic Considerations of LVAD Implantation,* University of Chicago, Department of Anesthesia and Critical Care, July 2000

*NK1 receptor function in stress and anxiety,* St. John's University Department of Medicinal Chemistry, March 2002

*Making a brave mouse (and making a mouse brave),* Mt.Sinai School of Medicine, May 2002

*Problems with anesthesia during lethal injection procedures,* Geneva, Switzerland. Duke University School of Law Conference, "International Law, Human Rights, and the Death Penalty: Towards an International Understanding of the Fundamental Principles of Just Punishment", July 2002.

*NK1 receptor function in stress and anxiety,* Visiting Professor, NYU School of Medicine, New York, New York. October 2002.

*Anesthetic Depth, Paralysis, and other medical problems with lethal injecton protocols: evidence and concerns,* Federal Capital Habeas Unit Annual Conference, Jacksonville, Florida. May 2004.

*Medical Scrutinyof Lethal Injection Procedures.* National Association for the Advancement of Colored People Capital Defender Conference, Airlie Conference Center, Warrenton, Virginia. July 2004.

*Medical Scrutinyof Lethal Injection Procedures.* National Association for the Advancement of Colored People Capital Defender Conference, Airlie Conference Center, Warrenton, Virginia. July 2005.

*Medical Scrutinyof Lethal Injection Procedures.* National Association for the Advancement of Colored People Capital Defender Conference, Airlie Conference Center, Warrenton, Virginia. July 2006.

*Medical Scrutinyof Lethal Injection Procedures  Advanced Criminal Law Seminar 2005, Fordham University School of Law,* March 2005

*Medical Scrutinyof Lethal Injection Procedures  Advanced Criminal Law Seminar 2005, Fordham University School of Law, January  2007*

*Anesthetic considerations of LVAD implantation.  Recurrent lecture at Columbia University LVAD implantation course.*

14)    Grant Review Committees:    None

15)    Publications:

<u>Original peer reviewed articles</u>

**Heath, M. J. S.**, Stanski DR, Pounder DJ. Inadequate Anesthesia in Lethal Injection for Execution. Lancet, 366(9491) 1073-4, correspondence. 2005

\*    Santarelli, L., Gobbi, G., Debs, P.C., Sibille, E. L., Blier, P., Hen, R., **Heath, M.J.S.** (2001). Genetic and pharmacological disruption of neurokinin 1 receptor function decreases anxiety-related behaviors and increases serotonergic function. <u>Proc. Nat. Acad. Sci.</u>, 98(4), 1912 – 1917.

\*    King, T.E. ^, **Heath M. J. S**^., Debs, P, Davis, MB, Hen, R, Barr, G. (2000). The development of nociceptive responses in neurokinin-1 receptor knockout mice. Neuroreport.;11(3), 587-91    ^ authors contributed equally to this work

\*    **Heath, M. J. S.**, Lints, T., Lee, C. J., Dodd, J. (1995). Functional expression of the tachykinin NK1 receptor by floor plate cells in the embryonic rat spinal cord and brainstem. <u>Journal of Physiology</u> 486.1, 139 -148.

\*    **Heath, M. J. S.**, Womack M. D., MacDermott, A. B. (1994). Subsance P elevates intracellular calcium in both neurons and glial cells from the dorsal horn of the spinal cord. <u>Journal of Neurophysiology</u> 72(3), 1192 - 1197.

McGehee, D. S., **Heath, M. J. S.**, Gelber, S., DeVay, P., Role, L.W. (1995) Nicotine enhancement of fast excitatory synaptic transmission in the CNS by presynaptic receptors. <u>Science</u> 269, 1692 - 1696.

Morales D, Madigan J, Cullinane S, Chen J, **Heath, M. J. S.**, Oz M, Oliver JA, Landry DW. (1999). Reversal by vasopressin of intractable hypotension in the late phase of hemorrhagic shock. Circulation. Jul 20;100(3):226-9.

LoTurco, J. J., Owens, D. F., **Heath, M. J. S.**, Davis, M. B. E., Krigstein, A. R. (1995). GABA and glutamate depolarize cortical progenitor cells and inhibit DNA synthesis. <u>Neuron</u> 15, 1287 - 1298.

Kyrozis A., Goldstein P. A., **Heath, M. J. S.**, MacDermott, A. B. (1995). Calcium entry through a subpopulation of AMPA receptors desensitized neighboring NMDA receptors in rat dorsal horn neurons. <u>Journal of Physiology</u> 485.2, 373 - 381.

McGehee, D.S., Aldersberg, M. , Liu, K.-P., Hsuing, S., **Heath, M.J.S.** , Tamir, H. (1997). Mechanism of extracellular Ca$^{2+}$-receptor stimulated hormone release from sheep thyroid parafolicular cells. <u>Journal of Physiology</u>: 502,1, 31 - 44.

Kao, J., Houck, K., Fan, Y., Haehnel, I., Ligutti, S. K., Kayton, M. L., Grikscheit, T., Chabot, J., Nowygrod, R., Greenberg, S., Kuang, W.J., Leung, D. W., Hayward, J. R., Kisiel, W., **Heath, M. J. S.**, Brett, J., Stern, D. (1994). Characterization of a novel tumor-derived cytokine. <u>Journal of Biological Chemistry</u> 269, 25106 - 25119.



Heath, M.J.S., Davis, M., Santarelli L., Hen H. (2002). Expression of Substance P and NK1 Receptor in the Murine Locus Coeruleus and Dorsal Raphe Nucleus. Anesthesia and Analgesia 93; S-212

Heath, M.J.S., Davis, M., Santarelli L., Hen H. (2002). Expression of Substance P and NK1 Receptor in the Murine Locus Coeruleus and Dorsal Raphe Nucleus. Anesthesia and Analgesia 93; S-212.

Heath, M.J.S., Santarelli L, Hen H. (2001) The NK1 receptor is necessary for the stress-evoked expression of c-Fos in the paraventricular nucleus of the hypothalamus. Anesthesia and Analgesia 92; S233.

Heath, M.J.S., Santarelli L, Debs P, Hen H. (2000). Reduced anxiety and stress responses in mice lacking the NK1 receptor. Anesthesiology 93: 3A A-755.

Heath, M.J.S., King, T., Debs, P.C., Davis M., Hen R., Barr G. (2000). NK1 receptor gene disruption alters the development of nociception. Anesthesia and Analgesia; 90; S315.

Heath, M.J.S., Lee, J.H., Debs, P.C., Davis, M. (1997). Delineation of spinal cord glial subpopulations expressing the NK1 receptor. Anesthesiology; 87; 3A; A639.

Heath, M.J.S., MacDermott A.B. (1992). Substance P elevates intracellular calcium in dorsal horn cells with neuronal and glial properties. Society for Neuroscience Abstracts; 18; 123.1.

Heath, M.J.S., Lee C.J., Dodd J. (1994). Ontogeny of NK1 receptor-like immunoreactivity in the rat spinal cord. Society for Neuroscience Abstracts; 20; 115.16.

Heath, M.J.S., Berman M.F. (1991) Isoflurane modulation of calcium channel currents in spinal cord dorsal horn neurons. Anesthesiology 75; 3A; A1037.

## DECLARATION OF MARK J.S. HEATH, M.D.

The undersigned, Mark, J.S. Heath, M.D., being of lawful age, states the following:

### I. Introduction and Qualifications

1.      I am an Assistant Professor of Clinical Anesthesiology at Columbia University in New York City. I received my Medical Doctorate degree from the University of North Carolina at Chapel Hill in 1986 and completed residency and fellowship training in Anesthesiology in 1992 at Columbia University Medical Center. I am Board Certified in Anesthesiology, and am licensed to practice medicine in New York State. My work consists of approximately equal parts of performing clinical anesthesiology (specializing in cardiothoracic anesthesiology), teaching residents, fellows, and medical students, and managing a neuroscience laboratory. As a result of my training and research I am familiar with and proficient in the use and pharmacology of the chemicals used to perform lethal injection. I am qualified to do animal research at Columbia University and am familiar with the American Veterinary Medical Association's guidelines for animal research and animal euthanasia.

2.      Over the past several years as a result of concerns about the mechanics of lethal injection as practiced in the United States, I have performed many hundreds of hours of research into the techniques that are used during this procedure. I have testified as an expert medical witness regarding lethal injection in courts in California, Missouri, Maryland, Tennessee, Georgia, Kentucky, Virginia, Oklahoma, Florida, and Indiana in the following cases: *Morales v. Tilton*, Nos. 06-219-JF-RS, C-06-926-JF-RS (N.D. Cal.); *Taylor v. Crawford*, No. 05-4173-CV-C-FJG (W.D. Mo.); *Patton v. Jones*, No. 06-CV-00591-F (W.D. Okla.); *Evans v. Saar*, 06-CV-00149-BEL (D. Md.); *Baker v. Saar*, No. WDQ-05-3207 (D. Md.); *Reid v. Johnson*, No. 3:03CV1039 (E.D. Va.); *Abdur'Rahman v. Bredesden*, No. 02-2336-III (Davidson County Chancery Ct., Ky.); *Commonwealth v. Lamb*, CR05032887-00 (Rockingham County Cir. Ct., Ky.), *State v. Nathaniel Code*, No. 138860 (1st Judicial District Court of La. for Caddo Parish); and *Timberlake (Intervenor Woods) v. Donahue*, No. 06-cv-01859-KLY-WTL (S.D. Ind.) I have also filed affidavits or declarations that have been reviewed by courts in the above states and also in Pennsylvania, New York, Alabama, North Carolina, South Carolina, Ohio, Texas, Missouri, Connecticut, Arkansas, Delaware, Nevada, Mississippi, and Montana, and by the United States Supreme Court.

3.      I have reviewed the execution protocols and autopsy data (when available) from each of the above referenced states and the federal government. Additionally, I have reviewed execution protocols and/or autopsy data from Connecticut, Idaho, Oregon, and Arizona.

4.      As a result of the discovery process in other litigation, I have participated in inspections of the execution facilities in Maryland, Missouri, California, Delaware, North Carolina, Texas, Alabama, Connecticut, and the Federal Execution Facility in Terre Haute, Indiana. During court



EXHIBIT

B

proceedings, I have heard testimony from prison wardens who are responsible for conducting executions by lethal injection.

5.     I have testified before the Nebraska Senate Judiciary Committee regarding proposed legislation to adopt lethal injection. I have testified before the Pennsylvania Senate Judiciary Committee regarding proposed legislation to prohibit the use of pancuronium bromide or other neuromuscular blockers in Pennsylvania's lethal injection protocol, and have testified before the Maryland House and Senate Judiciary Committees regarding legislation on the administrative procedures that govern the creation of lethal injection protocols. I have also testified before the South Dakota House Committee on State Affairs regarding proposed legislation to amend the lethal injection statute. Most recently, I testified before the Florida Governor's Commission on Administration of Lethal Injection as part of the Commission's review of the method in which lethal injection protocols are administered by the Florida Department of Corrections.

6.     My research regarding lethal injection has involved extensive conversations with recognized experts in the fields of anesthesiology, toxicology and forensic pathology, and correspondence with Drs. Jay Chapman and Stanley Deutsch, the physicians responsible for introducing lethal injection as a method of execution in Oklahoma.

7.     My qualifications are further detailed in my curriculum vitae, a copy of which is attached hereto as Exhibit 1 and incorporated herein.

8.     I hold all opinions expressed in this declaration to a reasonable degree of medical certainty unless otherwise specifically noted.

9.     In preparing this declaration, I have referred to and relied on:

        a.     My training and experience as a practicing physician and anesthesiologist;

        b.     My research into lethal injection, including media and witness accounts of executions, media accounts of legislative and governmental activities related to lethal injection, materials reviewed in litigation, scholarly articles about lethal injection, and the research and work that is involved in serving as an expert witness in the cases described above.

        c.     Documentation provided to me by attorney Jeffrey Gamso regarding the procedures and practices used by the Ohio Department of Rehabilitation and Correction (ODRC) and the Southern Ohio Correctional Facility (SOCF) to carry out executions by lethal injection. The material includes a set of documents bearing Bates stamps 0001 through 0632, a document that is contains "Survey Responses", and photographs and schematic diagrams of the execution facility. These documents contain many successive iterations of the lethal injection procedures and policies.

        d.     The American Veterinary Medical Association (AVMA) "AVMA Guidelines on Euthanasia" of June 2007; in particular its discussion of the

precautions that apply when using potassium as an intravenous euthanasia agent in animals. Also, I have relied upon my own research of Ohio's regulations regarding the use lethal injection in veterinary euthanasia, including Ohio Revised Code 4729.532.

II.  Introductory comments on Ohio's lethal injection protocol and its deficiencies

10.    It is useful to think of the procedure of lethal injection as comprising the following four stages: (1) The first stage is achieving intravenous access.  (2) The second stage is the administration of general anesthesia (sodium thiopental).  (3) The third stage is the administration of a neuromuscular blocking agent that has a paralyzing effect to ensure the execution appears serene and peaceful (pancuronium bromide).  (4) The fourth stage is the execution through the administration of potassium chloride, which kills the prisoner by stopping his heart.  The application of this formalism to the process of lethal injection is discussed in a commentary in the Mayo Clinic Proceedings entitled "Revisiting Physician Involvement in Capital Punishment: Medical and Nonmedical aspects of Lethal Injection" (attached).

11.    Further, it is useful to highlight the two principal problems that can result in an inhumane execution: A) the obtaining of IV access, which when done improperly has resulted in painful mutilation in previous executions, and which requires demonstrated proficiency and skill, and B) failure to produce and maintain adequate general anesthesia so that the agonizing effects of pancuronium and potassium are not experienced by the prisoner.  It is important to recognize that the discretionary use by the ODRC of pancuronium and potassium makes the anesthetic component of the procedure a matter of extreme importance.

12    The current ODRC protocol contains unacceptable deficiencies in both of these areas. The problematic features of the Ohio lethal injection protocol render it deficient with respect to minimum standards of safe care, deficient with respect to acceptable standards of veterinary care, deficient with respect to acceptable standards of medical care, and deficient with respect to the lethal injection practices of other states, as recognized by Courts, Committees, and Departments of Corrections.

13.    It is important to understand that lethal injection is performed on animal such as dogs and cats with great frequency, with reliability, and in ways that are humane.  Thus, the problem with Ohio's lethal injection protocol is not that lethal injection is in itself necessarily inhumane, but rather that the manner in which Ohio currently plans to undertake lethal injection is gratuitously fraught with unnecessary and avoidable risk, principally because it deviates from acceptable and legal standards of veterinary euthanasia.

14.    As in other states, Ohio's method of execution by lethal injection involves the sequential administration of three separate drugs.  The ODRC protocol specifies the drugs used for execution by lethal injection to be the following:

> a.      The intended dose of sodium thiopental is 2.0 grams, administered in a concentration of 25 milligrams (mg) per milliliter (ml).



    b.    The intended dose of pancuronium is 100 milligrams (mg).

    c.    The intended dose of potassium chloride 100 milliequivalents (mEq)

    d.    Infusions of saline are also part of the process.

    e.    The drugs, and intervening infusions of saline solution, are intended to be delivered serially, one after another.

    f.    Of note, there is no description of the actual mechanics of the administration of the drugs, including the rate at which they should be injected. This is a departure from the written protocols of many other states, which describe in detail the intended mechanical steps to be taken during the sequence of injections. It is not clear to me whether the protocol that was provided to me is an incomplete version of the actual protocol or a complete version of a protocol that fails to describe this critical part of the overall process.

15.    There is no plan articulated for the contingency in which the IV team is unable to achieve IV access in the veins of the arms or other peripheral sites. This is a problem that has bedeviled executions in many states, including Ohio, and has required prisons to perform invasive procedures such as cut-downs and central line placement. No information is provided about who would perform such a procedure were it to be necessary.

16.    The ODRC does not monitor the condemned inmate to ensure that he or she has been adequately anesthetized for the administration of potassium chloride, an excruciatingly painful event. The observational roles provided by the personnel who are at the bedside are entirely inadequate to meaningfully and reasonably ensure that a surgical plane of anesthesia, which is required for the administration of potassium (see below), is established and maintained. .

17.    Based upon my review of the foregoing material and my knowledge of and experience in the field of anesthesiology, I have formed several conclusions with respect ODRC's protocol for carrying out lethal injections. These conclusions arise both from the details disclosed in the materials I have reviewed and available at this time and from medically relevant, logical inferences drawn from the details in those materials. My principal conclusions are as follows:

    a.    The ODRC's failure to have appropriately qualified and trained personnel monitor the condemned inmate after the administration of thiopental to ensure that there has been no IV access issue and to assure that the inmate has reached an

appropriate plane of anesthesia prior to the administration of drugs which would cause suffering is contrary to all standards of practice for the administration of anesthetic drugs and creates a severe and unnecessary risk that the condemned will not be adequately anesthetized before experiencing asphyxiation and/or the pain of potassium chloride injection. This failure represents a critical and unacceptable departure from the standards of medical care and veterinary care, and falls below the lethal injection protocols of other states.

b. Pancuronium bromide (or any other similar neuromuscular blocking agent) serves no legitimate medical purpose during execution, and it will, with certainty, cause great suffering if administered to an inadequately anesthetized person. The inclusion of such an agent adds a severe and unnecessary risk of masking body movements that could signal condemned inmate distress during execution.

c. Potassium is not statutorily required as part of a Ohio lethal injection, it serves no legitimate medical purpose during execution, and it will, with certainty, cause great suffering if administered to an inadequately anesthetized person.

### III. Stages of Ohio's Lethal Injection Protocol

18.   As described above, it useful to divide the procedure of lethal injection into four stages. The first stage is achieving intravenous access. The second stage is the administration of general anesthesia. The third stage is the administration of neuromuscular blocking agent that has a paralyzing effect to ensure the execution appears serene and peaceful. The fourth stage is the execution through the administration of potassium chloride, which kills the prisoner by stopping his heart. For purposes of this discussion about the risks of the execution process, it is helpful to consider the execution process in reverse order.

A.   **Potassium Chloride Causes Extreme Pain**

19.   I have reviewed execution logs and electrocardiogram ("EKG") strips from executions around the country. These data show clearly that in the great majority of cases the administration of potassium chloride disrupts the electrical signals in the heart, paralyzes the cardiac muscle, and causes death by cardiac arrest. In other words, condemned inmates are alive until killed by the administration of potassium chloride.

20.   There is no medical dispute that intravenous injection of concentrated potassium chloride solution, such as that administered by the ODRC, causes excruciating pain. The vessel walls of veins are richly supplied with sensory nerve fibers that are highly sensitive to potassium ions. There exist other chemicals which can be used to stop the heart and which do not cause pain upon administration.

21.   The ODRC has elected potassium chloride to cause cardiac arrest. Thus, the ODRC has exercised its discretion and chosen a means of causing death that causes extreme pain upon administration, instead of selecting available, equally effective yet essentially painless medications, for stopping the heart. In so doing, the ODRC has assumed the responsibility of ensuring, through all reasonable and feasible steps, that the prisoner is sufficiently anesthetized and cannot experience the pain of potassium chloride injection.

22.     A living person who is to be intentionally subjected to the excruciating pain of potassium injection must be provided with adequate anesthesia. This imperative is of the same order as the imperative to provide adequate anesthesia for any person or any prisoner undergoing painful surgery. Given that the injection of potassium is a scheduled and premeditated event that is known without any doubt to be extraordinarily painful, it would be unconscionable and barbaric for potassium injection to take place without the provision of sufficient general anesthesia to ensure that the prisoner is rendered and maintained unconscious throughout the procedure, and it would be unconscionable to allow personnel who are not properly trained in the field of anesthesiology to attempt to provide or supervise this anesthetic care.

23.     Indeed, the need for proper medical anesthetic care before death by potassium chloride is so well understood that standards for animal euthanasia require that euthanasia by potassium chloride be performed only by one qualified to assess anesthetic depth:

> It is of utmost importance that personnel performing this technique [euthanasia by potassium chloride injection] are trained and knowledgeable in anesthetic techniques, and *are competent in assessing anesthetic depth* appropriate for administration of potassium chloride intravenously. *Administration of potassium chloride intravenously requires animals to be in a surgical plane of anesthesia characterized by loss of consciousness, loss of reflex muscle response, and loss of response to noxious stimuli.*

*2007 AVMA Guidelines on Euthanasia*, page 12(emphasis added)(see attached).  As result of the ODRC's failure to assess anesthetic depth and its failure to provide personnel who are competent in assessing anesthetic depth, the ODRC protocol for executing humans is unacceptable for the euthanasia of animals.

### B.     Administration of Neuromuscular Blocking Agents Is Medically Unnecessary and Causes an Extreme Risk of Suffering

24.     The ODRC hopes to administer 100 milligrams of pancuronium bromide. Pancuronium bromide is one of a class of drugs called neuromuscular blocking agents. Such agents paralyze all voluntary muscles, but do not affect sensation, consciousness, cognition, or the ability to feel pain and suffocation. The effect of the pancuronium bromide is to render the muscles (including the diaphragm which moves to permit respiration) unable to contract. It does not affect the brain or sensory nerves.

25.     Clinically, the drug is used to ensure a patient is securely paralyzed so that surgical procedures can be performed without muscle contraction. Anesthetic drugs are administered before neuromuscular blocking agents so that the patient does not consciously experience the process of becoming paralyzed and losing the ability to breathe. Thus, in any clinical setting where a neuromuscular blocker is to be used, a patient is anesthetized and monitored to ensure anesthetic depth throughout the duration of neuromuscular blocker use. To assess anesthesia, a trained medical professional, either a physician anesthesiologist or a nurse anesthetist, provides close and vigilant monitoring of the patient, their vital signs, using various diagnostic indicators of anesthetic depth. The appropriate procedures for monitoring a patient undergoing anesthesia

and who is about to be administered a drug which masks the ability to convey distress are detailed in the American Society of Anesthesiology's recently published *Practice Advisory for Intraoperative Awareness and Brain Function Monitoring*, 104 Anesthesiology 847, 850-51 (Apr. 2006) (describing preoperative and intraoperative measures for gauging anesthetic depth, including close monitoring of sites of IV access). *See also ASA Standards for Basic Anesthetic Monitoring* (Oct. 25, 2005). ODRC's procedure, to the extent disclosed, indicates that, contrary to all medical practice, no one, let alone a properly trained individual, assesses anesthesia prior to the administration of pancuronium bromide.

26.    It is important to understand that pancuronium bromide does not cause unconsciousness in the way that an anesthetic drug does; rather, if administered alone, a lethal dose of pancuronium bromide would cause a condemned inmate to lose consciousness only after he or she had endured the excruciating experience of suffocation. It would totally immobilize the inmate by paralyzing all voluntary muscles and the diaphragm, causing the inmate to suffocate to death while experiencing an intense, conscious desire to inhale. Ultimately, consciousness would be lost, but it would not be lost as an immediate and direct result of the pancuronium bromide. Rather, the loss of consciousness would be due to suffocation, which would be preceded by the torment and agony caused by suffocation. This period of torturous suffocation would be expected to last at least several minutes and would only be relieved by the onset of suffocation-induced unconsciousness. The experience, in onset and duration and character, would be very similar to that of being suffocated by having one's nose and mouth blocked off. However, there would be the additional element of being unable to move or writhe or communicate the agony.

27.    Based on the information presently available, this type of problem has occurred in other states. But before commenting on specific executions, I think it is important to explain how assessing the degree of consciousness that may have been felt in an execution differs from assessing consciousness in a clinical context. In the clinical context, anesthesiologists closely monitor patients for signs of awareness, and conduct post-operative interviews to assess to what extent a patient may have consciously experienced any part of his or her surgical procedure. The American Society of Anesthesiologists has recently commented that "[i]ntraoperative awareness cannot be measured during the intraoperative phase of general anesthesia, because the recall component of awareness can only be determined postoperatively by obtaining information directly from the patient." *See Practice Advisory for Intraoperative Awareness and Brain Function Monitoring*, 104 Anesthesiology 847, 850 (Apr. 2006).

28.    Neither monitoring nor post-process interviews take place with an execution; we can therefore never know with absolute certainty the degree of consciousness felt in an execution. But, to the extent we can know, after the fact, we look for signs of intravenous access problems, physical reaction to the process, and postmortem blood concentrations of anesthetic drugs. Based on the information presently available, this information suggests terrible problems have occurred during some executions. For example, in the State of Oklahoma's execution of Loyd LaFevers in 2001, witnesses observed an infiltration (a problem with intravenous access) in the intravenous (IV) line delivering the anesthetic thiopental. This problem was confirmed by the Medical Examiner's office notes attached to Mr. LaFevers's autopsy file. Witnesses to Mr. LaFevers's execution observed movements that they described as convulsions or seizures lasting for many minutes. A similar problem appears to have occurred in the 2006 execution of Mr.

Angel Diaz in Florida which lasted 34 minutes. An autopsy of Mr. Diaz showed that the veins in each arm had through and through punctures showing that the IV lines were improperly seated in his veins and that he had chemical burns on both arms from what was most likely an infiltration of the drugs into his muscle tissue. During execution, observers report Mr. Diaz moved and tried to mouth words. Given the sequence of drugs he was administered, the only drug that could have caused chemical burns would be thiopental. It is virtually certain that there was a deep failure to achieve the goal of a smooth execution, that something went disastrously wrong with the administration of the drugs, that the executioners were slow to confront and address the problems with the IV drug delivery and catheters, and that Mr. Diaz did not experience the sort of rapid humane death that is the intended result of the lethal injection procedure. These kinds of inadequate anesthesia experiences have resulted from the completely avoidable problem of poorly designed protocols for the delivery of anesthetic drugs, and the gratuitous inclusion of neuromuscular blocking agents like pancuronium bromide, which I will discuss in full below.

29.    When thiopental is not properly administered in a dose sufficient to cause loss of consciousness for the duration of the execution procedure, it is my opinion held to a reasonable degree of medical certainty, that the use of paralytic drugs such as pancuronium or pancuronium bromide will cause conscious paralysis, suffocation, and the excruciating pain of the intravenous injection of concentrated potassium chloride, such as Mr. LaFevers and Mr. Diaz likely experienced.

30.    There is no legitimate reason for including pancuronium bromide in the execution process and assuming the foregoing risks. Because potassium chloride causes death in executions by lethal injection, there is no rational place in the protocol for pancuronium bromide; the drug simply serves no function in the execution process. Its inclusion, therefore, only adds risk, with no medical benefit.

31.    Because of the concerns enumerated above, medical practitioners eschew the use of neuromuscular blocking agents in circumstances similar to that of executions, end of life care:

> NMBAs [neuromuscular blocking agents] possess no sedative or analgesic activity and can provide no comfort to the patient when they are administered at the time of withdrawal of life support. Clinicians cannot plausibly maintain that their intention in administering these agents in these circumstances is to benefit the patient. Indeed, unless the patient is also treated with adequate sedation and analgesia, the NMBAs may *mask the signs of acute air hunger* associated with ventilator withdrawal, *leaving the patient to endure the agony of suffocation in silence and isolation.* Although it is true that families may be distressed while observing a dying family member, the best way to relieve their suffering is by reassuring them of the patient's comfort through the use of adequate sedation and analgesia.
> * * *
> As a general rule, therefore, *pharmacologic paralysis should be avoided at the end of life.*

Robert D. Truog et al., *Recommendations for end-of-life care in the intensive care unit: The Ethics Committee of the Society of Critical Care Medicine*, 29(12) CRIT. CARE MED. 2332, 2345 (2001) (emphasis added).

32.     Indeed, even the creator of the original "triple drug" lethal injection protocol, Dr. Jay Chapman, now questions whether his initial contribution warrants reconsideration in light of the problems that have been brought to light nationwide.  In a CNN article placed online on April 30, 2007 Dr. Chapman is quoted as saying "It may be time to change it," Chapman said in a recent interview. "There are many problems that can arise ... given the concerns people are raising with the protocol it should be re-examined."  Regarding the pancuronium, the article states "When asked why he included the asphyxiation drug in his formula, Chapman answered, "It's a good question. If I were doing it now, I would probably eliminate it." http://www.cnn.com/2007/HEALTH/04/30/lethal.injection/index.html

33.     Additionally, the ODRC lethal injection protocol provides no information about the timing of the injections.  A problem encountered in other states is that unless the timing is carefully planned, movements that might be caused by potassium will occur before pancuronium has had time to cause paralysis.  Given that the ODRC has not taken steps to establish a regime for properly timing the injections, the risks of pancuronium are assumed without any clear reason to believe it will achieve its stated purpose of preventing movement (which, as described above, is not in the first place a legitimate purpose).

C.     Problems with the Use and Administration of General Anesthesia.

1.     The ODRC's Administration of General Anesthesia Fails to Adhere to a Minimum Standard of Care

34.     Because of the potential for an excruciating death created by the use of potassium chloride and the risk of conscious asphyxiation created by the use of the pancuronium bromide, it is necessary to induce and maintain a deep plane of anesthesia. The circumstances and environment under which anesthesia is to be induced and maintained in an Ohio execution create, needlessly, a significant risk that inmates will suffer. It is my opinion, stated to a reasonable degree of medical certainty, that the lethal injection procedures selected by the ODRC subject condemned inmates to an increased and unnecessary risk of experiencing excruciating pain in the course of execution.

35.     Presumably, because of the ODRC's awareness of the potential for excruciating pain evoked by potassium, the protocol plans for the provision of general anesthesia by the inclusion of thiopental. When successfully delivered into the circulation in sufficient quantities, thiopental causes sufficient depression of the nervous system to permit excruciatingly painful procedures to be performed without causing discomfort or distress. Failure to successfully deliver into the circulation a sufficient dose of thiopental would result in a failure to achieve adequate anesthetic depth and thus failure to block the excruciating pain.

36.     The ODRC's procedures do not comply with the medical standard of care for inducing and maintaining anesthesia prior to and during a painful procedure. Likewise, the ODRC's

procedures are not compliant with the guidelines set forth by the American Veterinary Medical Association for the euthanasia of animals

### 2. The Dangers of Using Thiopental as an Anesthetic

37.     Thiopental is an ultrashort-acting barbiturate that is intended to be delivered intravenously to induce anesthesia. In typical clinical doses, the drug has both a quick onset and short duration, although its duration of action as an anesthetic is dose dependant.

38.     When anesthesiologists use thiopental, we do so for the purposes of temporarily anesthetizing patients for sufficient time to intubate the trachea and institute mechanical support of ventilation and respiration. Once this has been achieved, additional drugs are administered to maintain a "surgical depth" or "surgical plane" of anesthesia (i.e., a level of anesthesia deep enough to ensure that a surgical patient feels no pain and is unconscious). The medical utility of thiopental derives from its ultrashort-acting properties: if unanticipated obstacles hinder or prevent successful intubation, patients will likely quickly regain consciousness and resume ventilation and respiration on their own.

39.     The benefits of thiopental in the operating room engender serious risks in the execution chamber. The duration of unconsciousness provided by thiopental is dose-dependent. If the intended amount of thiopental fails to reaches the condemned inmate's brain (as can occur as a result of an infiltration, leakage, mixing error, or other causes), and the condemned inmate receives a near surgical dose of thiopental, the duration of narcosis will be brief and the inmate could reawaken during the execution process. Then, a condemned inmate in Ohio would suffer the same fate that apparently befell Mr. Angel Diaz in Florida who was intended to receive a 5 gram dose of thiopental, but who did not, and then apparently experienced a conscious or semi-conscious response to the execution process.

40.     Of note, the Ohio veterinary regulations regarding euthanasia require the use of pentobarbital. (Pentobarbital should not be confused with Pentothal/thiopental; they are different drugs with different durations of action). This vastly reduces the risk of the anesthetic wearing off prematurely.

41.     Many foreseeable situations exist in which human or technical errors could result in the failure to successfully administer the intended dose. The ODRC's procedure both fosters these potential problems and fails to provide adequate mechanism for recognizing these problems, and it does these things needlessly and without legitimate reason.

### 3. Drug Administration Problems

42.     Examples of problems that could occur (and which have occurred in executions) that could prevent the proper administration of thiopental include, but are not limited to, the following:

> a.  **Errors in Drug Preparation.** Thiopental is delivered in powdered form and must be mixed into an aqueous solution prior to administration. This preparation requires the correct application of pharmaceutical knowledge and familiarity with terminology and abbreviations. Calculations are also required, particularly if the



protocol requires the use of a concentration of drug that differs from that which is normally used. Recently drug preparation problems were revealed in the State of Missouri, which was using a board-certified physician to prepare drugs. *See* Excerpts of Transcript of June 12, 2006 Bench Trial, at 30-39, *Taylor v. Crawford*, No. 05-4173-CV-C-FJG (W.D. Mo.).

b.  **Error in Labeling of Syringes.** It is of paramount importance that the drugs in an execution be given in the correct order. If the drugs are mislabeled, it greatly increases the chances the drugs will not administered in the correct order. \

c.  **Error in Selecting the Correct Syringe.** As presently configured, the ODRC protocol uses the serial injection of fluid from 5 syringes. With that number of syringes it would be easy to make a mistake in selecting the correct syringe. Medication errors are widespread within the clinical arena, and it is recognized by all health care professionals that the most important step in preventing medication errors is the acceptance of the fact that they can and do occur. In the context of lethal injection it is equally important to recognize the possibility of medication errors, particularly given the gratuitous use of pancuronium and potassium. The proposed ODRC procedures do not recognize the possibility of error. The proper way to detect error during the induction of general anesthesia is to assess anesthetic depth and thereby ensure that the drugs have exerted their intended and predicted effects.

d.  **Error in Correctly Injecting the Drug into the Intravenous Line.** If the syringe holding the drug is turned in the wrong direction, a retrograde injection of the drug into the IV fluid bag rather than into the inmate will result. Even experienced anesthesiologists sometimes make this error, and the probability of this error occurring is greatly increased in the hands of inexperienced personnel.

e.  **The IV Tubing May Leak.** An "IV setup" consists of multiple components that are assembled by hand prior to use. If the drugs are not at the bedside, which they are not in Ohio, but are instead in a different room then it will be impossible to maintain visual surveillance of the full extent of IV tubing so that such leaks may be detected. The configuration of the death chamber and the relative positions of the executioners and the inmate in Ohio will hinder or preclude such surveillance, thereby risking a failure to detect a leak. Leaking IV lines have been noted in executions in other states. The induction of general anesthesia in the medical context, and I believe in the veterinary context, is always a "bedside procedure"; it is never conducted by the administration of drugs in tubing in one room that then is intended to travel into the body of a person in another room.

f.  **Incorrect Insertion of the Catheter.** If the catheter is not properly placed in a vein, the thiopental will enter the tissue surrounding the vein but will not be delivered to the central nervous system and will not render the inmate unconscious. This condition, known as infiltration, occurs with regularity in the clinical setting. Recognition of infiltration requires continued surveillance of the IV site during the injection, and that surveillance should be performed so as to

permit correlation between visual observation and tactile feedback from the plunger of the syringe. One cannot reliably monitor for the presence of infiltration through a window from another room. There have been occasions where departments of correction have failed to recognize infiltrations during execution. In Oklahoma an infiltration in the catheter delivering the anesthetic thiopental was reported (followed by condemned inmate convulsions). Another such occurrence has been reported during the Florida execution of Angel Diaz. These occurrences appear to have directly contributed to the condemned inmates' conscious experience of the execution process.

g.  **Migration of the Catheter.** Even if properly inserted, the catheter tip may move or migrate, so that at the time of injection it is not within the vein. This would result in infiltration, and therefore a failure to deliver the drug to the inmate's circulation and failure to render the inmate unconscious.

h.  **Perforation or Rupture or Leakage of the Vein.** During the insertion of the catheter, the wall of the vein can be perforated or weakened, so that during the injection some or all of the drug leaves the vein and enters the surrounding tissue. The likelihood of rupture occurring is increased if too much pressure is applied to the plunger of the syringe during injection, because a high pressure injection results in a high velocity jet of drug in the vein that can penetrate or tear the vessel wall. Recently, during the Clark execution, the personnel failed to recognize that the condemned's veins had "collapsed" until the inmate himself notified them that the procedure had gone awry.



i.  **Excessive Pressure on the Syringe Plunger.** Even without damage or perforation of the vein during insertion of the catheter, excessive pressure on the syringe plunger during injection can result in tearing, rupture, and leakage of the vein due to the high velocity jet that exits the tip of the catheter. Should this occur, the drug would not enter the circulation and would therefore fail to render the inmate unconscious. The ODRC protocol provides no meaningful instructions about the rate or speed of injections, meaning that there are no instructions to prevent the lay executioners from pushing the syringe plungers in a manner that injures the vein and causes failed delivery of some or all of the thiopental dose.

j.  **Securing the Catheter.** After insertion, catheters must be properly secured by the use of tape, adhesive material, or suture. Movement by the inmate, even if restrained by straps, or traction on the IV tubing may result in the dislodging of the catheter.

k.  **Failure to Properly Loosen or Remove the Tourniquet or position restraining straps.** A tourniquet is used to assist in insertion of an IV catheter. Failure to remove such tourniquets from the arm or leg after placement of the IV catheter will delay or inhibit the delivery of the drugs by the circulation to the central nervous system. This may cause a failure of the thiopental to render and maintain the inmate in a state of unconsciousness. Restraining straps may act as tourniquets and thereby impede or inhibit the delivery of drugs by the circulation to the

central nervous system. This may cause a failure of the thiopental to render and maintain the inmate in a state of unconsciousness. Even if the IV is checked for "free flow" of the intravenous fluid prior to commencing injection, a small movement within the restraints on the part of the inmate could compress the vein and result in impaired delivery of the drug. It has been noted in at least one execution by lethal injection that the straps hindered the flow of drugs. *See* Editorial, *Witnesses to a Botched Execution*, ST. LOUIS POST-DISPATCH, at 6B (May 8, 1995).

43.   These types of drug administration problems are not uncommon in the practice of medicine. A number of medical publications detail exactly these types of administration issues. For example, the National Academy of Sciences Institute on Medicine has published the report of the Committee on Identifying and Preventing Medication Errors, which details the rates of drug preparation and administration errors in hospital setting and concludes "[e]rrors in the administration of IV medications appear to be particularly prevalent." PREVENTING MEDICATION ERRORS: QUALITY CHASM SERIES 325-60 (Philip Aspden, Julie Wolcott, J. Lyle Bootman, Linda R. Cronenwett, Eds. 2006); *id.* at 351. Likewise a recent study shows that "drug-related errors occur in one out of five doses given to patients in hospitals." *See* Bowdle, T. A., *Drug Administration Errors from the ASA [Am. Soc. Anesthesiologists] Closed Claims Project*, 67(6) ASA NEWSLETTER, 11-13 (2003). This study recognizes that neuromuscular blockers have been administered to awake patients and to those who have had inadequate doses of general anesthetic. *Id.*

44   The ODRC documentation recognizes that contingencies need to be planned for, however, it does not describe how any of the myriad contingencies that can and do arise during the induction of general anesthesia would be detected and corrected during the conduct of a lethal injection procedure.

45.   In the practice of medicine, preventing pain and/or death as a result of these common drug administration problems is achieved by having persons in attendance who have the training and skill to recognize problems when they occur and the training and skill to avert the negative consequences of the problems when they arise.

4.   The Need for Adequate Training in Administering Anesthesia

46.   Because of these foreseeable problems in administering anesthesia, in Ohio and elsewhere in the United States, the provision of anesthetic care is performed only by personnel with advanced training in the medical subspecialty of Anesthesiology. The establishment of a surgical plane of anesthesia is a complex task which can only reliably be performed by individuals who have completed the extensive requisite training to permit them to provide anesthesia services. *See Practice Advisory for Intraoperative Awareness and Brain Function Monitoring*, 104 Anesthesiology 847, 859 Appendix 1 (Apr. 2006) (recommending the use of "multiple modalities to monitor depth of anesthesia"). If the individual providing anesthesia care is inadequately trained or experienced, the risk of these complications is enormously increased. The President of the American Society of Anesthesiologists, writing about lethal injection, recently stated that "the only way to assure [a surgical plane of anesthesia] would be to have an anesthesiologist prepare and administer the drugs, carefully observe the inmate and all pertinent

monitors, and finally to integrate all this information." Orin F. Guidry, M.D., *Message from the President: Observations Regarding Lethal Injection* (June 30, 2006).

47.    In Ohio and elsewhere in the United States, general anesthesia is administered by physicians who have completed residency training in the specialty of Anesthesiology, and by nurses who have undergone the requisite training to become Certified Registered Nurse Anesthetists (CRNAs). Physicians and nurses who have not completed the requisite training to become anesthesiologists or CRNAs are not permitted to provide general anesthesia.

48.    In my opinion, individuals providing general anesthesia in the Ohio prison should not be held to a different or lower standard than is set forth for individuals providing general anesthesia in any other setting in Ohio. Specifically, the individuals providing general anesthesia within Ohio's prisons, should possess the experience and proficiency of anesthesiologists and/or CRNAs. Conversely, a physician who is not an anesthesiologist or a nurse who is not a CRNA or any person who lacks the requisite training and credentials should not be permitted to provide general anesthesia within Ohio's prisons (or anywhere else in Ohio or the United States).

49.    There is no evidence, at this time, that any person on the ODRC's injection team has any training in administering anesthesia, or, if personnel are given training, what that training might be. This raises critical questions about the degree to which condemned inmates risk suffering excruciating pain during the lethal injection procedure. The great majority of nurses are not trained in the use of ultrashort-acting barbiturates; indeed, this class of drugs is essentially only used by a very select group of nurses who have obtained significant experience in intensive care units and as nurse anesthetists. Very few EMTs are trained or experienced in the use of ultrashort-acting barbiturates and/or pancuronium.  Of the three medical personnel who are described as participating in lethal injection procedures in Ohio, 2 are EMTs and the medical background of the third is unknown.  There is no evidence that the third medical person has any meaningful experience in the establishment, maintenance, and assessment of a surgical plane of anesthesia. Based on my medical training and experience, and based upon my research of lethal injection procedures and practices, inadequacies in these areas elevate the risk that the lethal injection procedure will cause the condemned to suffer excruciating pain during the execution process. Failure to require that the injection team have training equivalent to that of an anesthesiologist or a CRNA compounds the risk that inmates will suffer excruciating pain during their executions.

50.    In addition to apparently lacking the training necessary to perform a lethal injection, the ODRC's protocol imposes conditions that exacerbate the foreseeable risks of improper anesthesia administration described above, and fails to provide any procedures for dealing with these risks. Perhaps most disturbingly, the protocol makes no mention of the need for effective monitoring of the inmate's condition or whether he is anesthetized and unconscious. After IV lines are inserted and the execution begins, it appears that the injection team will be in a different room from the prisoner, and thus will not have the ability to properly monitor the IV delivery system and catheter sites as they would if they were at "the bedside". Accepted medical practice, however, dictates that trained personnel are physically situated so that they can monitor the IV lines and the flow of anesthesia into the veins through visual and tactile observation and examination. The apparent lack of any qualified personnel present in the chamber during the execution thwarts the execution personnel from taking the standard and necessary measures to

reasonably ensure that the thiopental is properly flowing into the inmate and that he is properly anesthetized prior to the administration of the pancuronium bromide and potassium. In recognition of this concern, other states have taken steps to place personnel with medical backgrounds actually within the execution chamber for the purpose of properly monitoring the IV delivery system during the injection process.

51.     In my opinion, having a properly equipped, trained, and credentialed individual examine the inmate after the administration of the thiopental (but prior to, during, and after the administration of pancuronium, until the prisoner is pronounced dead) to verify that the inmate is completely unconscious would substantially mitigate the danger that the inmate will suffer excruciating pain during his execution. This is the standard of care, and in many states the law, set forth for dogs and cats and other household pets when they are subjected to euthanasia by potassium injection. Yet the ODRC protocol does not apparently provide for such verification during the execution of humans.

52.     Indeed, it appears that departments of correction around the country are now agreeing that some assessment of anesthetic depth is required to ensure a humane execution. As a result of my participation in lethal injection litigations around the country I have become aware that the State of Indiana and the State of Florida now concede that some attempt at measuring or assessing anesthetic depth should be performed. Additionally, in Missouri, a federal district judge has ordered that an appropriately qualified person assess anesthetic depth. While Judge Fogel in California has not, to my understanding, issued a final decision regarding the evidence presented to him, it is clear from his written discussion of the case that he recognizes that the use of drugs that cause great pain or suffering (such as pancuronium and potassium) places a heightened burden on the execution team and the state to properly monitor and maintain adequate anesthetic depth.

D.     Establishing IV access

53.     The first step in the lethal injection process is creating effective intravenous access for drug delivery. The subsequent administration of the anesthetic drugs can only be successful if IV access is properly achieved. But the ODRC has put in place a protocol that exacerbates the risk that IV access will not be adequately achieved. There have been problems in other states, most notably the Diaz execution in Florida, wherein the personal professional qualifications of the personnel providing IV access had not been subjected to adequate scrutiny.

54.     Despite its best attempts, ODRC has twice in recent years encountered extreme difficulty in obtaining peripheral IV access. Unlike other states, Ohio does not appear too have a plan in place to deal with the need for a cut-down or central line procedure. This is a glaring deficiency. Further, it is unclear whether the personnel who are currently participating in lethal injection procedures in Ohio have the necessary training and experience to perform central line placement and cut-downs.

55.     It is my opinion that, to reasonably minimize the risk of severe and unnecessary suffering during the ODRC's execution by lethal injection using the drugs thiopental, pancuronium, and potassium, there must be: proper procedures that are clear and consistent; qualified personnel to ensure that anesthesia has been achieved prior to the administration of pancuronium bromide and

potassium chloride; qualified personnel to select chemicals and dosages; set up and load the syringes, insert the IV catheter, and perform the other tasks required by such procedures; and adequate inspection and testing of the equipment and apparatus by qualified personnel. The ODRC's procedures for implementing lethal injection, to the extent that they have been made available, provide for none of the above.

IV.   **Assessment of the ODRC lethal injection protocol.**

56.    Overall, evaluation of the proposed ODRC lethal injection procedures reveals several problematic themes:

a. – The absence of qualified personnel to supervise the use of the high-risk drugs pancuronium and potassium. Other states recognize their need to rely upon physicians to oversee the administration of pancuronium and potassium. By contrast, Ohio does not provide for a physician or adequately trained person to be physically present at the bedside to assess anesthetic depth when pancuronium and potassium are administered and therefore cannot offer any protection.

b. –The use of pancuronium confers high risk of torturous death, which prevents the detection by witnesses and execution personnel of inadequate anesthesia, and which is speciously justified by a need to prevent witnesses seeing movement when no such steps are taken for electrocution and/or gas in Ohio or other states.

c. – The absence of any articulated recognition that the establishment and maintenance of a surgical plane of anesthesia is essential for the non-cruel completion of the execution procedure. There appear to be no provisions for the participation of personnel who are capable of monitoring anesthetic depth, and there are no directives in the written protocol that would instruct such personnel, if they were present, to actually undertake a meaningful assessment of anesthetic depth. Further, the equipment that is necessary to meaningfully assess anesthetic depth appears not to be present or to be deployed. Other states, and courts, and committees, have recognized that given the use of torture-causing drugs such as pancuronium and potassium, it is essential that meaningful and effective steps be in place to ensure that adequate anesthesia is established and maintained.

d. – IV access – as described above, there is no "back-up" plan for achieving IV access if the IV team is unable to successfully place catheters within the veins of the arms. Other states provide for such plans, and in this regard Ohio falls below the standards set by other states when performing execution lethal injection.

VI.    Conclusions.

Based on my research into methods of lethal injection used by various states and the federal government, and based on my training and experience as a medical doctor specializing in anesthesiology, it is my opinion stated to a reasonable degree of medical certainty that, given the apparent absence of a central role for a properly trained professional in ODRC's execution procedure, the characteristics of the drugs or chemicals used, the failure to understand how the drugs in question act in the body, the failure to properly account for foreseeable risks, the design of a drug delivery system that exacerbates rather than ameliorates the risk, the ODRC has created an execution protocol that does little to nothing to assure they will reliability achieve humane executions by lethal injection.

This declaration was, of necessity, prepared with limited information.  It appears that the lethal injection procedures provided to me are incomplete, as they do not describe how the injections should be delivered. I reserve the right to revise my opinion if warranted by new information.

I declare under the laws of the United States and under penalty of perjury that the foregoing is true and correct.

DATED this 14th day of February, 2008.


Mark J.S. Heath, M.D.