'90 FEB 7 PM 2 28

CLERK OF COURTS
EDWARD S. ROBB, JR.

CA 89-09-123

STATE OF OHIO

VS.

VON CLARK DAVIS

TRANSCRIPT OF TESTIMONY

FILED in Court of Appeals
BUTLER COUNTY, OHIO
FEB 7 1990
EDWARD S. ROBB, JR.
CLERK

90-2524

I CERTIFY THE WITHIN TO BE A
TRUE COPY OF THE ORIGINAL FILED
2-7-1990

MARY L. SWAIN
Butler County Clerk of Courts
_____ Deputy

FILED
MAR 0 5 1991
MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

| | | |
|---|---|---|
| STATE OF OHIO | *   * | Case Nos. 83-CR-A-3539 |
| Plaintiff | * | 83-CR-A-3565 |
| vs. | * | In the Municipal Court of |
| VON CLARK DAVIS | * | the City of Hamilton, Ohio |
| Defendant | * | TRANSCRIPT OF TESTIMONY |

ACTING JUDGE BERT C. IMFELD, Presiding

APPEARANCES:

    For the State of Ohio:             Gerald L. Pater
    For the Defendant, Von Clark Davis:  Mike Shanks

CHARGES:

    Aggravated Murder, Viol Sec. 2903.01 Revised Code
    Having Weapon While Under Disability, Viol. Sec. 2923.13(A-2)

December 21, 1983             10:00 A.M.

INDEX TO WITNESSES

| FOR THE STATE: | DIRECT | CROSS |
|---|---|---|
| Anthony Ferguson | 1 | 4 |
| Ron Wells | 26 | 28 |

MR. PATER: Von Clark Davis. Mike you want a separation? This is Case No. 83-CR-A-3539, State of Ohio versus Von Clark Davis, charged with Aggravated Murder contrary to 2903.01 of the Revised Code, 83-CR-A-3565, State of Ohio versus Von Clark Davis, charged with Having Weapon while Under Disability. We're here for purposes of preliminary hearing in each case, Your Honor. Mr. Davis is represented by Mike Shanks.

COURT: Has either side moved for a separation of witnesses, or do you want --

MR. SHANKS: We're gonna move for a separation at this time.

WITNESSES SWORN:

ANTHONY FERGUSON, Being Duly Sworn, testified as follows:

DIRECT EXAMINATION BY GERALD PATER, FOR THE STATE OF OHIO:

Q   State your name please?

A   Anthony Ferguson.

Q   Mr. Ferguson, on or about the 12th of December of this year did you have occassion to see Suzette Butler and Von Clark Davis?

A   Yes.

Q   And where was it that you saw them Sir?

A   Inside the American Legion.

Q   And where is that located?

A   Uh, Central Avenue.

Q   Here in Hamilton, Butler County, State of Ohio?

A    Yes.

Q    And would you relate to the Court, please, if you had occassion to see them outside the American Legion at any point in time?

A    Yes I did.

Q    And about what time was this, Sir?

A    Uh, between seven and seven-thirty.

Q    In the evening, or in the morning?

A    In the evening.

Q    You want to tell us, please, what your observations of them were at that point in time?

A    Well, I was standing over on the corner of, uh, Walnut and Central waiting on a friend of mine to come out the Island. And, uh, I seen Suzette and this man here --

Q    You're referring to the defendant, Mr. Davis?

A    Yes.

Q    Go ahead.

A    I seen them come out of the Legion and as soon as they walked out the door he turned around and he shot her. And as she fell on the ground he shot her some more.

Q    How many times did you see him shoot her, Sir?

A    I guess about three or four times.

Q    O.K.  Now how far are you from them at the time you

3.

observed this?

A    I'd say bout forty feet, forty, forty-five feet.

Q    Was there anything obstructing your view of what you saw?

A    No.

Q    What, you say he shot her once?

A    He shot her once and when she fell he shot her some more.

Q    She fell to the ground?

A    Yes.

Q    How far was he from her when he shot her the first time?

A    About two feet.

Q    And how far was he from her when he shot her the remaining number of times?

A    Right up on her.

Q    Could you tell in what direction, what portion of her body was that she was shot?

A    In the face.

Q    Of
/All the rounds or just the first one, or which one?

A    I seen fire, flame from the gun come out and it hit her right in the forehead area.

Q    O.K. And what about, when the other shots were fired could you tell what portion of her body they were aimed at?

A    No, I wasn't paying that too much attention.

Q What, what did you do after you observed all this happening?

A Well after I seen him shoot her he looked up and he looked around and then he turned around and walked away.

Q Do you know, could you tell what happened to the weapon?

A Nope.

Q What kind, do you know what kind of weapon it was that he was using?

A A hand gun.

Q And this all happened here in Hamilton, Butler County, State of Ohio?

A Yes Sir.

MR. PATER: I don't have any other questions for this witness, Your Honor.

CROSS EXAMINATION BY MIKE SHANKS, ATTORNEY FOR THE DEFENDANT:

Q Mr. Ferguson, you say you were in the, uh, Legion that night?

A Yes.

Q What time did you get there?

A I got to the Legion I guess about six, six-thirty.

Q Where had you been prior to the time you went to the Legion?

A Home.

5.

Q  Were you drinking at the Legion?

A  Yeah, I had one drink.

Q  One drink. So between six, six-thirty and you say this happened around seven, seven-thirty, you had one drink?

A  Yes.

Q  I believe you testified you saw Mr. Davis and Suzette Butler inside the Legion, is that right?

A  Yeah, I saw them inside the Legion also.

Q  Did you observe anything unusual about the conduct inside the Legion?

A  Yeah.

Q  Did you hear Suzette Butler threaten Mr. Davis while you were inside the Legion?

A  No.

Q  Did you hear any loud or commotions or arguments inside the Legion?

A  No, the only thing I heard really inside the Legion was, uh, the juke box and some, a couple people, he walked up to the bar and she walked up to the bar with him, he buying her a drink, they're, uh --

Q  O.K. Go ahead.

A  About the time he buy her the drink seemed like he said something toward, to the effect of 'I'm going to

6.

kill you', or something, I, I really don't know what he said because it was, like I said the juke box was playing.

Q  So if I understand your testimony you, uh, you observed them, they were having no difficulty that you could see. He walked up to buy her a drink at the bar and you heard Mr. Davis tell Suzette Butler 'I'm going to kill you'?

A  I said I believe I heard him say that.

Q  He just, did you say anything to anybody when you heard this statement?

A  No. (inaudible)

Q  Where were you standing, how far away from some of these individuals were you, inside the Legion now, when you heard this statement?

A  I was at one end of the bar, I was at the, uh, far end of the bar.

Q  In terms of feet, ten feet away?

A  Uh, terms of feet, I'd say about fifteen feet.

Q  And how many other people were in the Legion at that time?

A  Uh, there were a few in there.

Q  Jim Boy Bryant there?

A  Who?

Q  Jim Boy Bryant.

A I don't know.

Q Do you know Jim Boy Bryant?

A Uhh, yeah.

Q Was Mona Aldridge there?

A Mona Aldridge?

Q Yes.

A Yes she was there.

Q Where was she seated or where was she standing when this happened?

A Uhh, I'd say, I can't really say where she was seated at.

Q And did you --

A I had been, I had been talking to Mona earlier that night and, uh, then my friend and I decided, he wanted to go over to the Island, and we got up and left.

Q I see. Who was this friend that wanted to go to the Island?

A Thomas (cannot understand last name).

Q I see. And he was in the Legion with you at that, when all this happened, is that correct?

A Yes, right.

Q Now you were at the bar approximately fifteen feet away, you don't see anything unusual about these individuals, what drew your attention to Mr. Davis when

he walked up to buy the drink anyway?

A    Nothing drew my attention (inaudible).

Q    What were you, were you having a conversation with any-
     body at the time?

A    Yeah, with Thomas.

Q    Alright.  Other people in between you, where you were
     standing and where Mr. Davis purchased this drink?

A    No.

Q    No.  Was the juke box playing?

A    Yes.

Q    Where is the juke box in relation to where you were
     standing, or sitting, or whatever, when this conversation
     took place, where is the juke box?

A    Right behind me.

Q    Right behind you.  So you're within five foot of the
     juke box, is that right?

A    Unhuh.

Q    And it's playing fairly loud, is that right?

A    Well it was playing, I'm not going to say it was playing
     fairly loud.

Q    O.K.  It was in a normal tone that --

A    Yeah, it was a normal tone.

Q    And you're having conversation with another gentleman

and you see Mr. Davis, from fifteen feet away, walk up to
the bar and make a statement 'I'm going to kill you'?

A   I said I believe he made that statement, I didn't say
he did make that statement.

Q   Well, what makes you believe that he did?

A   For the simple fact that I heard something that had to
deal with killing, J.K. I can't say that he ever said
'I'm going to kill you' but I heard the word kill in there.

Q   Alright. So is it possible that you heard her say to
him 'I'm going to kill you'?

A   Yeah it's possible. (inaudible).

Q   What you're saying it's possible Suzette Butler used
that word?

A   Yes, it's possible she said it (inaudible).

Q   Now after they purchased this drink they go back down
and sit down?

A   I really don't know because me and Thomas got up and
decided to leave.

Q   At that point in time?

A   At that point in time.

Q   Did it concern you whatsoever this, this conversation
about killing somebody?

A   I didn't, didn't concern me at all.

Q I see. So you got up to leave, is this, is this about seven o'clock?

A It's about seven, seven-ten, somewhere in there, yes.

Q You walk out from the Legion at that time, is that right?

A (inaudible).

Q Where did you go after that?

A Well, we were, uh, planning on going home, Thomas said over he wanted to go/to the Island for a (inaudible), so I said "O.K. I'll stay here on the corner and wait on you", so he went on over to the Island.

Q Do I understand that you, while your friend was in the Island you stood on the corner, corner --

A I stood on the corner of Walnut and Central.

Q That would be the corner catacorner from the Legion, is that correct?

A Yeah.

Q Across the street from the Legion.

A No, (inaudible) where the Legion is. Right in front of the, uh, building used to be the old laundry mat.

Q Unhuh. That's where you stood?

A That's where I stood.

Q And your friend walked over to the Island?

A Yeah.

Q   Did he ask you to go with him?

A   No.

Q   Alright. You just thought, how long was he going to stay in the Island?

A   Well, uh, I think he stayed in about ten, fifteen minutes.

Q   How long had you been standing on the corner when you say Mr. Davis and Suzette Butler come out?

A   Not long at all, about ten minutes.

Q   I see. Were you standing, by the way, was it dark out that night? At that time?

A   Yeah it was night time.

Q   O.K. And what was the weather, do you recall?

A   Well /It was sorta clear, night stars were in the air.

Q   Was it warm, cold?

A   Medium.

Q   You were just standing there, was there any reason why you couldn't go to the Island (inaudible)?

A   No there's no reason why except I don't go there.

Q   Oh. alright, now, uh, was there any traffic on the road at that time? Talking about Central Avenue, right?

A   There's always traffic on Central Avenue.

Q   Cars going back and forth?

A   Right.

17.

Q   Did anybody else come out of the Legion before Mr. Davis and Miss Butler came out?

A   Not that I recall.

Q   You're saying did or didn't, you just don't remember?

A   I don't remember when they come out or not, no.

Q   What was it that drew your attention to Mr. Davis and Mrs., Miss Butler?  When they came out?  Were they yelling?

A   No.

Q   Well --

A   What drew my attention was when they stepped out the door he turned around and shot her.

Q   Were you watching the door when they stepped out?

A   No I wasn't watching the door.

Q   Did you actually see the door open and these individuals walk out?

A   Well let me put it this way, when the, when the door to the Legion opened you could hear the door open, u.h. and, uh, I'm always in/a sorta nervous type person when a door opens I jump a little.

Q   Alright.  So if I understand you're forty, forty-five feet away, you hear the door and you jump?

A   I, well, let me put it this way, I'm not exactly forty-five feet away.

Q   How far are you?

A   I, I'm, I'm a little less than forty-five feet.

Q   Well, why don't you (inaudible), tell me how it was?

A   I said approximately forty-five feet.

Q   Thirty-five?

A   Approximately, thirty-five, somewhere between there, I can't be exact because I didn't count the number of feet.

Q   Well I understand that your' standing right in front of the laundry mat, is that right?

A   That's right.

Q   So you heard this door open, what kind of noise did it make, what, what drew your attention to it?

A   There was a squeak.

Q   Squeak.

A   What he did, well he draw my attention, the only, what drew my attention to him when I heard the first shot.

Q   Alright.

A   I looked.

Q   That's what I'm trying to get at.  So you really didn't see Mr. Davis or Miss Butler come down the stair or walk out the door, isn't that a fact?

A   Well they wouldn't came downstairs anyway.

Q   You didn't see them come out the door?

14.

A   No I didn't see them come out the door.

Q   And you don't know how long they were standing there, isn't it a fact, before this first shot?

A   I really don't know how long they were standing there.

Q   And you don't know from what you observed whether Miss Davis, er Mr. Davis was threatened by Miss Butler before you observed this shot, is that correct?

A   Yes Sir.

Q   And you don't know whether Miss Butler had a pistol in her hand before you looked over that way, isn't that correct?

A   No, I don't know whether she had one before I looked over there, I know she didn't have one when I looked over there.

Q   And you don't know, isn't it a fact, whether she reached in her purse to get a pistol?

A   Sir, I didn't see her with a purse.

Q   So first thing you hear is a gun shot?

A   Yes.

Q   And as you indicated before you're a nervous person, is that right?

A   That's right.

Q   And it scared you a bit?

Q  Right.

Q  And then you look around and what do you see, when you first look around now you've heard this gun shot, what did you see?

A  I saw Suzette falling.

Q  You actually saw her while she was standing up, falling down?

A  I actually saw her while she was in the process of falling down.

Q  But you didn't see the first gun shot?

A  No I didn't see the first gun shot, no I didn't.

Q  Alright. Now you didn't see what, what was in her hand when she was, when she was shot, right?

A  No I didn't.

Q  How was she dressed that night?

A  Uh, she had on a pair of slacks and sweater and a shirt.

Q  Did she have a coat on?

A  She may or may not have, I didn't see her with a coat on.

Q  What about Mr. Davis, how was he dressed?

A  Uh, a pair of slacks and jacket, without a shirt.

Q  What color jacket?

A  Uh, I believe his jacket was yellow or light tan, to that effect.

Q. windbreaker type jacket or a coat?

A. I don't know, I think it was a regular type jacket, I don't know if it was a sport jacket or, sport jacket or something of that nature.

Q. I don't understand, when this f'cer gun shot went/and off you were, you noticed this, uh, occurrence, how were they standing, in relation to you? Were they standing face to face, one of them in front of you with the other one blocked out, uh, (inaudible).

A. He was   (changed tape here) you,

Q. So/there was plenty of light and you could see Mr. Davis without any trouble, is that right?

A. Right.

Q. Do you know Mr. Davis personally?

A. No.

Q. Did you know him before this evening?

A. No.

Q. So the only way that you can identify Mr. Davis as being the individual involved in this is from what you observed that night from the time the first shot went off?

A. From what I seen.

Q. Did he walk past you after he walked away?

A. No he didn't walk past me.

·7.

Q   Which way did he go?

A   Uh, he turned and walked towards the street, as if he
    was crossing the street going towards Chestnut.

Q   Where did he go after that?

A   I don't know.

Q   What did you do?

A   Did the same likely thing, uh.

Q   Where did you run to?

A   Where did I run to?

Q   Unhuh.

A   I went over towards the Island.

Q   Toward the Island.

A   I went to the, I went in the opposite direction in which
    he went.

Q   Did you go call the Police?

A   No I didn't call the Police.

Q   Alright. Call the Life Squad?

A   No I didn't.

Q   Call the Fire Department?

    MR. PATER:  I object, Your Honor, I think this is ir-
                relevant.

    (voice from the audience here)

    COURT:  Please no more comments from the audience.
            Objection will be sustained.

Did you see a pistol in Mr. Davis' hand?

A    I sure, I seen something in his hand, I'm not going to definitely say I saw a pistol.

Q    I want you --

A    Cause you'll probably ask what kind and I couldn't tell you.

Q    I want you to describe what you saw.

A    Describe what I saw.  I saw a barrel.

Q    Was it a barrel like in a, a revolver?

A    (inaudible, cough here).

Q    Revolver type, or automatic or what?

A    I don't know whether it was an automatic or a revolver?  I know he had a gun in his hand.

Q    How do you know that?

A    Because people don't die from a BB, you know.

Q    You're saying the only way you know he had a gun was because the lady's dead.  Is that right?

A    No, I'm saying the only way I know /the man had a gun was/cause after the lady hit the ground I seen fire come out of the barrel of it.

Q    Now let's get into that.  After she hit the ground what did you do?  After the first shot and she hit the ground what did you do?

had did I do?

Yes Sir.

I decided to stay out, out of sight.

Did you turn around to run away at that time?

No, I ducked behind the light, the light pole was sitting there on the corner.

Q   After this first shot you, you didn't stand there and stare you ducked behind the telephone pole, is that right?

Right, right.

Q   And how long did it take before these other shots went off?

A couple of seconds.

Q   And how long did it take you to get to the telephone pole?

A   A couple of seconds.

Q   So isn't it true that while you were going to the tele-pole is when these other shots happened?

A   Yeah I guess so.

Q   You said you, you testified just a minute ago that you actually saw Mr. Davis shoot at her while she was on the ground. Is that true?

A   Yeah, that's true.

Q   So you were watching him while you were going to the telephone pole?

A    That's right.

Q    Alright. Where was the telephone pole (inaudible)?

A    Oh, I'd say it's about, uh, half a foot from where the,
     uh, (inaudible).

Q    And you stood behind that, right?

A    Yes, (inaudible) fromscreen (inaudible).

Q    Now as best you can why don't you describe Mr. Davis'
     action as you observed after the first shot went off?

A    After the first shot?

Q    Yes.

A    I seen Suzette fall to the ground, I seen Mr. Davis
     bend over her, or not maybe bend over but he stretched
     his arm out and I seen the fire coming out of his
           again.

Q    Umhuh. And where was the gun pointed at that time?

A    At her body.

Q    At her body.

A    Well, let, let me get you the specific on her body,
     at her head.

Q    How, and you observed that from where you were?

A    Yeah.

Q    And after he fired these, however many shots it was,
     you indicated three or four times, what did you

observe Mr. Davis in next?

He looked up, looked around, turned around and walked away.

Did he look toward you?

Uh, he looked toward the telephone pole.

He didn't see you, right?

No.

Q When was the first time you reported to the Police that you were a witness to this shooting?

While they were, uh, right after they had roped off the area.

You stayed there until the Police came?

No I didn't stay there.

You came back?

Yeah.

And the Officer asked you if you observed this, is that it?

No, uh, I, I leave, see I came back and I seen my Father up there, he had stopped to see what was going on, and, uh, him and I were getting ready to go and he said "It's a shame, (inaudible), tell the Officers and I told him.

And when the Police Officers asked what you saw, did you tell them that you actually saw the shooting?

I didn't tell them anything not ... they bring me uptown.

They brung you uptown, and they asked you what you saw, did you tell them you actual ... saw the shooting?

Yes.

And that you actually witnessed the firing of the pistol?

I actually did, just the five --

Alright. But you told them.

Right.

Did you tell them you knew the man who was involved in the shooting?

No I didn't tell them I knew the man that was involved in the shooting.

Did you describe him?

Describe the man involved in the shooting?

To the Police Officer?

Do what?

Did you describe the man who was involved in the shooting to the Police Officer when you talked to them at the Police Station?

I told the Police that this guy that I had heard people saying his name was Red, but I know, you know, that his name, you know, all I know was his nick name was Red, I never knew the man's real name.

You didn't answer my question. Did you describe him to the Police that night?

No, I didn't describe what he had -- if that's what you mean.

Did you see anybody else outside the Legion at the time of this shooting?

Uh, I really didn't turn around to look and see if there was anybody else.

Any cars stop at the traffic light right then?

No there wasn't no cars at the traffic light.

You're certain of that?

No I'm not.

Anybody else walk up and down the street on either side watching, that you saw?

(Inaudible).

After the shooting, this man walking away, did you look around to see if anybody -/ ·witness·this? else happened to

No. I had first of all in my mind that was to protect myself.

Before the shooting did you hear Suzette Butler say anything to Mr. Davis?

Before the shooting, no --

Talking about outside now.

I wasn't paying any attention.

and you didn't hear any arguments or loud noises or yelling or screaming?

The only loud noise I heard was the gun go off. I did hear a scream but I don't know where the scream came from.

Mr. Ferguson if you'd just witnessed a person being shot four times in the head from no further than thirty feet away why --

Here you go saying thirty feet away, I said approximately thirty-five, forty-five feet, I didn't specifically say thirty feet away.

If you'd just witnessed a person being shot in the head four times, from some distance, why is it you didn't go call the Police?

MR. PATER: I object, Your Honor.

MR. SHANKS: It goes to his state.

COURT: No, I think it's sustained. He says he took off in the other direction and I can't say that I blame him.

Q  How long were you at the scene of the shooting before you approached the Police and let them know that you witnessed it?

A  You mean how long after I come back?

Q    Yes.

A    About a half minute to a minute.

Q    I see. How long were you gone away from it? (inaudible).

A    Oh, I'd say about, uh, five, maybe ten minutes. I'd
     guess that'd be around seven-thirty, seven-thirty five,
     somewhere around there.

Q    Mr. Ferguson, have you been, uh, convicted of a State or
     Federal offense involving moral terpitude?

A    Moral terpitude which is what?

Q    **You tell me.**

     MR. PATER: I object, Your Honor.

         COURT: He don't have to tell you. You know that.

Q    Have you ever been convicted of a State or Federal offense
     a felony involving moral purposes?

A    You tell me what moral perpitude is and I might answer
     that.

Q    Have you ever been convicted of a State or Federal crime?

A    No I've not, Sir.

     MR. PATER: I object, Your Honor.

A    Yeah, I've been, I have, uh, --

     MR. PATER: I object, Your Honor, and ask --

         COURT: Wait a minute.

     MR. PATER: the objection be ruled upon before the

26.

witness answers the question.

COURT: (cannot understand) how to answer that question property Mr. Shanks.

MR. SHANKS: I ask the question property, Your Honor, if he refuses to answer I would ask the Court --

COURT: Well he says he don't understand what moral perpitude is, is what I understood him to say and if you tell him what moral perpitude is he can answer the question. Is this right, is that what you said?

A Yes.

Q Have you ever been convicted of a theft offense (inaudible)?

A Yes. Grand larceny.

Q Have you ever been convicted of any other felony?

A B & E

MR. PATER: I object, Your Honor.

COURT: Sustained.

MR. SHANKS: (inaudible).

COURT: Please?

MR. SHANKS: Thank you, Mr. Ferguson, no further questions.

MR. PATER: No re-direct, Your Honor, you can step down Mr. Fegruson.

RON WELLS, Being Duly Sworn, testified as follows:

DIRECT EXAMINATION BY GERALD PATER, FOR THE STATE OF OHIO:

Q Officer, would you please state your name and occupation?

A Det. Ron Wells, uh, Police Office for the City of Hamilton, Ohio.

Q   How long have you been so employed, Det. Wells?

A   Twenty-one years.

Q   And would you relate to the Court please what happened
on or about the, uh, 16th of December which ultimately
led to your signing this Having Weapon While Under Dis-
ability charge?

A   On, uh, December 12th, uh, 1983, I was notified at my
home to report to the Headquarters of the Hamilton Police
Department to assist in the investigation of a shooting
which happened at 727 Central Avenue, and, uh, on my
arrival at the scene there which is front of the, uh,
American Legion, uh, there was a, uh, body of a, uh,
young female laying in front of the door approximately,
uh, (cough here, cannot understand) feet east of the, uh,
entrance of the, uh, the, uh, American Legion there. Uh,
at the scene was Dr. Burkhardt, the Coroner, his assistant
Tom Marsh, and, uh, members of the Hamilton Life Squad
Fire Deparment and, uh, other Police Officers. Uh,
Paulette Butler, the mother of Suzette Butler the deceased,
the victim in this matter, uh, gave a statement to the
Police and identified the body. Uh, I took some photo-
graphs of the scene and, uh, I found four empty cartridge
cases from a 25 caliber pistol lying on the sidewalk about

the, uh, body. Uh, we collected these and we interviewed
some witnesses inside the, uh, American Legion itself, uh,
the, uh, had a name of a suspect in this matter which was,
uh, Von Clark Davis. We attempted to locate this subject,
uh, in the area around Hamilton, failed to do so, we
signed the warrant that night, uh, in front of, uh,
Judge Dolan for Aggravated Murder against/Victor Von
Davis, er, er Von Clark Davis. And, uh, the next day I
also signed a warrant on, uh, Mr., uh, it wasn't the
next day it was a few days later I signed another warrant
on him for Weapons while Under Disabilty.

Q  O.K. And what was the basis for that complaint?

A  He was convicted back in 1971 of, uh, Second Degree
Murder, incarcerated.

Q  O.K. And the entries that I have here that you've given
me that Mr. Shanks and Mr. Davis are looking at now re-
flect that conviction?

A  That's right.

Q  Thank you.

   MR. PATER: I don't have any other questions for Det.
   Wells, Your Honor.

CROSS EXAMINATION BY MIKE SHANKS, ATTORNEY FOR THE DEFENDANT:

Q  Det. Wells, what time was it you received the call to

29.

respond to the American Legion?

A   Uh, it was somewhere around probably seven, forty-five.

Q   Did you arrive approximately that time or some time before that?

A   No, it was after, probably a little after eight o'clock before I got there

Q   Can you describe to the best of your recollection what the weather conditions were? Temperature wise? Whether it was raining or whatever?

A   Well it wasn't raining it was, it was cold enough for me to wear a topcoat to be dressed warmly. Uh, other than that it was a clear night.

Q   You, you, uh, observed the body at the, at the scene of the shooting?

A   Yes I did.

Q   Can you tell me, uh, how the body was placed as far as what direction her head was laying in relationship to the, to the building if you want to, or in relationship to the street out there?

A   Well, it was, it was fairly parallel at the, with the sidewalk.

Q   Her head laying in a northenly direction or southern?

A   Right. Only it was more or less ~~going~~ northerly, her feet was

30.

probably pointing toward the South.

Q   How was, how was the body dressed?  (inaudible).

A   She had a sweater and blue jeans on.

Q   Any coat or jacket?

A   She wasn't wearing a coat or jacket outside.

Q   Uh, were you able to ascertain whether she had a coat or jacket inside the, uh, --

A   Yes there was a coat inside.

Q   She'd, she'd/walked outside and left her jacket inside, is that correct?

A   Apparently.

Q   Was her purse also inside or was it outside with the body?

A   No the purse was with the body.

Q   Was there any weapons, did you physically examine the contents of the purse?

A   No I didn't.

Q   Are you familiar with the contents of the purse?

A   No Sir.

Q   Do you know if any weapons were found in her purse or around her body?

A   As far as I, as far as I know there was no weapons found.

Q   Was there any other pistol found at the scene other than a 25 caliber pistol?

The only thing was found at the scene was a 25 caliber cartridge cases.

Yes. No weapons to your knowledge was found at the scene or were there any weapons in her purse? To the best of your knowledge?

A   That's true.

Alright. Is her jacket (inaudible) do you know if there were any weapons in her jacket?

A   No, there was no jacket,/no weapons in her jacket.
                      uh,

Q   Did you speak to the gentlemen who just testified, Mr. Ferguson?

A   That night?

Q   Yes.

A   No sir I didn't.

Q   Have you ever interviewed him regards this shooting?

A   Uh, yes I did.

Q   Was he able to describe the individual who?

A   Well, he, he said he knowed him, had seen him around, he said he's not acquainted with him, buthe knew whohe was.

Q   Did you ask him how the individual was dressed that evening?  Did you ask Mr. Ferguson?

A   No, I didn't, that evening I didn't talk to him that evening at all.

32.

Q   Subsequent to that evening though, have you had an opportunity to talk to Mr. Ferguson, have him make a statement as to what he observed?

A   Well he already made a statement that night and, uh, only time I had contact with him was reference his appearance being here in Court.

Q   Alright. Did he tell you where he was standing the night of the shooting? What did he tell you?

A   He said he was standing down there by the, uh, the laundry mat right next door to the --

Q   In terms of feet, do you have an opinion as to how many feet away?

A   Oh yes, it's approximately, I'd say, if I can remember correctly maybe fifty foot (inaudible).

Q   What were the, you were there approximately seven, forty-five I think you said, what was the traffic like on Central avenue at that time of the evening?

A   It was light.

Q   Alright.

A   Wasn't very much traffic.

Q   Are there any street lights on the corner near the scene of this crime?

A   I would probably say yes but I, I don't recall which

corner they're on.

Q    To the left of your recollection being you're out there
that night, how can you describe the lighting? As to
whether it was bright, plum?

A    There was a lot of light out there, there was no problem,
I think there's, there's some light right outside the
Legion.

Q    Umhuh. To the best of your recollection as to where the
body was laying, the lights outside the Legion was/illumi-
nating that area?

A    (inaudible).

Q    Was any other physical evidence found whatsoever at the
scene? Relative to the shooting?

A    None other than the cartridges.

Q    Alright. Has any weapon been recovered by the Hamilton
Police Department that's suspected of being involved in
this shooting?

A    No Sir.

Q    Officer Wells, has any other individual indicated that
they saw Mr. Davis possess a firearm?

A    Yes.

Q    Who is that?
                          Mona Aldridge
A    Uh, one of the ~~(inaudible)~~ and a Mark Lovett and a Wade Combs

Q   Mona Bridge, Mark Lovett known as Hoppy Lovett, is that
    his nick name, is that the gentleman?

A   Yeah.

Q   And Wade Combs?

A   Umhuh.

Q   Did they describe the type of firearm he was to possess?

MR. PATER:    I object, Your Honor, I think this is all
              hearsay testimony and not admissible.

COURT:    Well this is true,-it is hearsay.

MR. SHANKS:   We're gonna have the weapons under disability
              charge now and, uh, the other gentleman
              really hasn't been able to identify Mr.
              Davis having a firearm, he indicated he saw
              a shot.

COURT:    He indicated he saw a barrel pointed at her
          head and fire coming out.

Q   Did you observe the wounds to the body?

A   Yes Sir I did.

Q   And where were the wounds on the body?

A   There was one near the back of the head, there was, uh,
    three more right around the, uh, left ear.

Q   Did you, uh, were you physically present at the autopsy?

A   Yes Sir, I was.

Q   Are you aware if there was any strippling?

A   Yes Sir there was.

Q   On all four shots?

Just on one shot.

Mr. Wells, to your knowledge has Mr. Davis made any state-
ments to any member of the Hamilton Police Department
                                  we're
regarding the, any of the charges/here in Court today on?
(inaudible).

MR. SHANKS: Thank you Officer. No further questions.

MR. PATER: There's a stipulation between Counsel for
purposes of preliminary hearing, Your Honor,
that Suzette Butler did die as a result of
the wounds she received on the night in
question. This would only be for preliminary
hearing purposes, Your Honor.

MR. SHANKS: That's to save the special point, I mean I
understand that I will be --

MR. PATER: And once the autopsy is completed we will
provide a copy of it to Mr. Shanks. We
request these matters be bound over to the
Common Pleas Court, Your Honor, for consider-
ation by the Grand Jury.

COURT: So ordered. Continue the same bond.

MR. SHANKS: Your Honor, we're going to have to address
the Court on the bond, there has been no bond
set on this matter. Judge Dolan indicated
he would discuss bond at the time of pre-
liminary hearing. Mr. Davis has been, is now
being held without bond. Uh, we realize this
is a very serious matter but I would ask the
Court to consider setting a bond. Uh, Mr.
Davis --

MR. PATER: We're opposed to any bonds being set, Your
Honor.

COURT: At this stage as long as Judge Dolan has not
set it and the type of action it is, I'm not
going to set one. I will order that he be
continued to be held.

36.

CERTIFICATION

I, Jewel Thompson, hereby certify that I transcribed from tape the testimony in the trial of this case, and that the foregoing Transcript of such testimony and evidence constitutes all of the evidence and testimony received in said cause, and that the foregoing is a true and correct copy of said action.

*Jewel Thompson*
Jewel Thompson



3/1/90

IN THE COURT OF APPEALS OF BUTLER COUNTY, OHIO

'90 MAR 1st PM 8 12

STATE OF OHIO

    Appellee    :    Case No. Butler CA89-09-123
                      CR83B12H0615

vs.            :

VON CLARK DAVIS    :    TRANSCRIPT OF ARRAIGNMENT

    Appellant    :    January 13, 1984

APPEARANCES:

    Mr. Daniel Eichel
    Assistant Prosecutor
    For the State of Ohio

    -and-

    Mr. Hugh Holbrock
    Mr. Michael Shanks
    Attorneys at law
    For the defendant
    Von Clark Davis

**90-2524**

FILED

MAR 05 1991

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

I CERTIFY THE WITHIN TO BE A
TRUE COPY OF THE ORIGINAL FILED

MARY L. SWAIN
Butler County/Clerk of Courts

Judge William R. Stitsinger
Judge presiding

1

JANUARY 13, 1984.

BY THE COURT: Let the record show this is arraignment for those persons indicted by the Butler County Grand Jury, January Term, January Session, 1984. Alright, you can call the first case.

MR. EICHEL: Thank you, Your Honor, members of this session that are in jail.

(Cases called prior to Von Clark Davis)

MR. EICHEL: Case number CR83-12-0614, the State of Ohio vs. Von Clark Davis. The charges are aggravated murder with specifications, No. 1 and No. 2, having weapons under disability in Count Two of the indictment. Your Honor, we...since this is a capital case we request that the indictment be read.

BY THE COURT: Alright, read the indictment, Mr. Robb...or Joe.

CLERK: (reading) The Jurors of the Grand Jury of the State of Ohio, within and for the body of the County aforesaid, under oath, in the name and by the authority of the State of Ohio, do find and present that on or about the 12th day of December, 1983, at Butler County, Ohio, VON CLARK DAVIS did

COUNT ONE

2

1

2    purposely, and with prior calculation and design, cause the

3    death of Suzette Butler, in violation of Ohio Revised Code

4    Title AGGRAVATED MURDER, Section 2903.01 (A) and against

5    the peace and dignity of the State of Ohio.

6    SPECIFICATION 1: The Grand Jurors further find and specify

7    that prior to the offense at bar in Count One of this

8    indictment that said VON CLARK DAVIS was convicted of

9    murder in the second degree, contrary to Section 2901.5 of

10   the Ohio Revised Code on April 20, 1971, in the Court of

11   Common Pleas of Butler County, Ohio, case number 21655, an

12   essential element of which was a purposeful...purposeful

13   killing of another as specified in Section 2929.04 (A)(5)

14   of the Ohio Revised Code.

15   SPECIFICATION 2: The Grand Jurors further find and

16   specify that VON CLARK DAVIS had a firearm on or about his

17   person or under his control while committing the offense

18   at bar in Count One of this indictment as specified in

19   Section 2921...9.71 of the Ohio Revised Code.

20                    COUNT TWO

21   On or about the 12th day of December, 1983, and at Butler

22   County, Ohio, VON CLARK DAVIS did knowingly acquire, have,

23   carry or use a firearm, to wit: a .25 caliber pistol.

24   This said VON CLARK DAVIS having previously been convicted

25   of felonies of violence, to wit: shooting with intent to

3

1
2   wound, contrary to Section 2901.23 of the Ohio Revised
3   Code, on April 10, 1970, in case number 20938, Common
4   Pleas Court of Butler County, Ohio, and murder in the
5   second degree, contrary to Section 2901.05 of the Ohio
6   Revised Code, on April 20, 1971, in case number 21655,
7   Common Pleas Court of Butler County, Ohio, and the said
8   VON CLARK DAVIS was not relieved of such disability as
9   provided in Section 2923.14 of the Ohio Revised Code,
10  which offense is a felony of the fourth degree,
11  in violation of the Ohio Revised Code Title HAVING WEAPONS
12  WHILE UNDER DISABILITY, Section 2923.13 (A)(2), and against
13  the peace and dignity of the State of Ohio.
14          MR. SHANKS: The plea is not guilty to both
15  charges as read, Your Honor. Mr. Davis is 37 years old.
16          BY THE COURT: 37?
17          MR. SHANKS: Yes. Do I understand...
18          BY THE COURT: Alright, Mr. Holbrock and
19  Mr. Shanks, this case is set for February 15th, Judge
20  Bruewer's courtroom.
21          MR. HOLBROCK: Thank you, Your Honor.
22          BY THE COURT: Alright.
23          MR. SHANKS: Thank you, Your Honor.
24          (Next case called for arraignment)
25          * * * * * * * * * * * * * * * *

C E R T I F I C A T E

    I, Shirley Roesch, Assistant Court Reporter, Court of Common Pleas, Butler County, Ohio, do hereby certify that the foregoing 3 pages are a true and accurate transcript of the arraignment of Von Clark Davis as transcribed by me to the best of my ability from courtroom tapes.

*Shirley Roesch*

| STATE OF OHIO | : | State of Ohio, Butler County |
|---|---|---|
| Plaintiff | : | Court of Common Pleas |
| vs. | : | Case No. CR83-12-0614 |
| VON CLARK DAVIS | : | TRANSCRIPT OF MOTIONS |
| Defendant | : | |

: : : : :

BRUEWER, J.

### APPEARANCES:

MICHAEL SAGE and DANIEL G. EICHEL, Assistant Prose-
cuting Attorneys, for the State of Ohio.

MICHAEL SHANKS AND JOHN A. GARRETSON, Attorneys at
Law, for the Defendant, Von Clark Davis.

\*  \*  \*  \*  \*  \*  \*  \*  \*

BE IT REMEMBERED, that at the September Term A.D.,
1984, of the Court of Common Pleas, Butler County, Ohio, to
wit: February 15, 1984, the Honorable Henry J. Bruewer,
Judge presiding, this cause came on to be heard upon the
motions filed in this case.

444

2

Mr. Sage: Your Honor, if it please the Court, this is Case Number CR83-12-0614, State of Ohio verses Von Clark Davis, Your Honor, before the Court on a series of motions filed by the Defendant.

Mr. Shanks: I'm prepared to go ahead your Honor.... Your Honor, I will be brief because of each motion has been supplied with a memorandum supporting the motion and I tried to state the position of Mr. Davis and myself very (unclear) in those motions.

Initially, I would point to the Court that one of the motions is a motion to severe...excuse me, a motion for change of venue and in this regard I have subpeonaed members of the news media ah, duces tecum the reports ex cetera that they have filed and prepared in this case, with an effort to show that there has been extensive pretrial publicity.

As the...in regard to a pre-motion conference with the Prosecutor and myself, the Court had indicated that, and the Prosecution's Office had indicated also, that it would be sufficient to have affidavits and materials submitted by the news media itself and we could accept those documents in lieu of the actual testimony of the people subpeonaed. I have in my hand three returns, one from the Journal News ah, with an attachment of...as to the stories run on Mr. Davis, one from the Cincinnati Post and one from the Cincinnati Enquirer.

445

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
STATE COURT TRANSCRIPTS - Page 46

3

Ah, I've shown these articles to Counsel for the State of Ohio and ah, we are willing to submit these and look...view them without further discussion. I would only state that what they do establish in my opinion, is the fact that there has been extensive pretrial publicity and this all ties in to some of the motions that we have filed.

The concern I have goes more than just a pretrial publicity, but I would ask the Court to look at all the newspapers articles filed, to notes that almost every single article refers to a prior conviction of Aggravated Murder on behalf of Mr. Davis. And I think that will tie in to some other points here.

By the Court: Why don't you submit them as an exhibit in this motion.

Mr. Eichel: If your Honor please, I have no objections to them being a State...or a Defense Exhibit in this case and in lieu of the testimony. This is something that we've done in the past in regard to similar type motions and...

By the Court: They can be one exhibit.

Mr. Shanks: Okay.....There was a telephone call to me from a MR. Wolf (sounds like) from Channel 12 News, he indicated to me that they would be here today with a similar document and it hasn't arrived.

By the Court: Well, whatever else you want to supplement it'll go in.

446

4

Mr. Shanks: ALright, I will first show it to the
State and then ah,it will be hopefully the same thing however
very explicit as to what will be accepted.

By the Court: Alright.

Mr. Shanks: So with that, all these have been marked
as Defendant's Exhibit A, and at the present time, they
contain the three affidavits , ones with attachments. I'd
only ask the Court to read the articles to verify that the
large majority of the articles contain specific mention to
prior convictions.

Your Honor, and in that regard, I will continue, I
have filed a Motion to Bifurcate the trial and a Motion in
Limine combination, as well as, a Motion to Sever counts
one and two. Those are pretty much, I guess, coordinated
motions, even though they speak to other...to specifics in
the Indictment.

The arguement on the Motion to Bifurcate the Trial
is fairly straight forward. Mr. Davis is presently charged
with Aggravated Murder with Specifications that he was
convicted of a prior purposeful killing. It is strongly
urged on his behalf that any jury impaneled in this case
be kept away from any evidence whatsoever, voir dire through
the end of the trial, as to a prior conviction of Mr. Davis
for Aggravated Murder.

The memorandum in support does cite the reasonings

4417

5

pur-
and the logic which/port to reasonings.

My concern is basically this, your Honor,  We're here
to try the allegations of the death of Suzette Butler, which
occasion which happened not very long ago here in Butler County.
We are not here to try Mr. Davis on his past.  I think in all...
as in a practical manner, it would be very hard for any juror
to sit here and be fair to Von Davis, and listen to the
allegations of a pri-....purposeful killing.  An element of
this offense is that the Prosecution now has/in the indictment
                                            it
Which goes to the enhancement of punishment and remain fair
and impartial as to whether or not the State has shown beyond
a reasonable doubt all the allegations which will be necessary
to establish the conviction of Aggravated Murder, as to
Suzette Butler.

When we're here on such a serious charge as....especially
on
/such a serious charge, one in which the death penalty is a
possibility, I think the Court should  bend over backwards to
protect Mr. Davis to make sure he gets a fair trial.  As this
Court well knows he gets one shot at it, he gets one trial
and that's all he deserves, but he deserves a fair one.
And I would ask the Court to consider everything that I have
                                                  to
indicated in my Motion to Bifurcate, to go/fact that it
is all asked to protect Mr. Davis to make sure that the
allegations as to this purposeful killing are true and fairly

448

6

tried by an impartial jury which is the foundation of the
criminal justice system which we have in this State and in the
United States.

In that regard, the motion to bifurcate also contains
a Motion in Limine which in effect would limit the prosecution
from being able to introduce evidence at all as to the prior
killing. That is coordinated with a motion to sever Counts
1 and Count 2. By recall, without bringing the Indictment
up here, Count Two indicates that Mr. Davis has been charged
with Possession of a Weapon Under Disability. It obviously
is related to this offense because it is concerned with the
possession of a firearm which...the allegations are, was used
in the Aggravated Murder, even though they were I think
closely related in Time, the proof is not necessarily the
same proof that would be used in Count One, plus, your Honor,
I would say that obviously the sole reason that the prosecution
in all honesty wishes to use Count Two, is to be able to
again reiterate the fact that he is under disability and that
disability is a conviction of Aggravated Murder, and the other
conviction Mr. Davis faced...I think it was Shooting with the
Intent to Wound, to show that he is a bad person and that
this type of person deserves to have all the punishment
the jury can ah, heep upon him, and it's really not related to
the death and the allegations of Aggravated Murder ah,

449

7

directly.

I think, again, when we're looking at the possibility of the death sentence being imposed for the underlying offense of Aggravated Murder, the Court should bend over backwards to make sure that that specification, that Count is tried separate and apart from any other evidence which would taint the jury's mind make it virtually impossible for even a fair person to sit there and not prejudge Von Davis, and that's what my concern is.

What I ask this Court to do on those motions is to have a jury come in, not be aware of any of the prior facts, they'll listen to the evidence as coming from that witness stand, they'll listen to the evidence the prosecution present, they'll listen to the evidence the defense presents and make a determination as to whether Mr. Davis is guilty or not guilty of that offense, separate and apart from all the bad things he's done in the past, all the things he's been convicted of in the past and all the bad allegations that the prosecution can through in which would taint the jury's mind.

I think that's a fairly straight forward request and we ask the Court to seriously consider that.

In support of that, we ask to have this trial changed as far as venue. I know the Court's position on this and I ask the Court to strongly consider the fact that because there

-150

8

has been pretrial publicity of the nature that we've complained about, that it's going to be very hard if not impossible to handle the Jury, that has not heard of this matter or have some inkling that the man sitting here is out on parole for Murder, and I know that it's difficult for Jury when asked in voir dire to look somebody in the fact and say well, I-I can't put that out of my mind and your Honor, I'll be honest with you, it's very hard for any defense attorney or a prosecution ah, a prosecutorial attorney, to get a response that is the true feeling of an individual because on Voir dire it is my opinion that these people want to say things that make them appear/fair and honest and it may not be the truth. They're not deliberately lying, but it's the pressure to-to in effect express that you're a fair person as such that it's very hard to evaluate the responses made in voir dire.

Again, I stress we're talking about a situation where the death penalty is a very real possibility here. I think the Court when faced with the circumstance of the type of pre-trial publicity we have in this case, with the allegations of prior convictions of murder with the allegations of being out on parole for murder with the community concept that people are getting let loose and committing other crimes, I think that weighs very heavy against Mr. Davis getting a fair trial. I'm asking the Court to strongly consider

451

(9

THE Motion for Change of Venue as well as the other motions filed.

And finally, your Honor, in summary. I've asked the Court to allow me to inspect the Grand Jury transcripts even though I realize there are some provisions in the Criminal Rule at an appropriate if we feel like there has been misstatements by a witness.

There have been supplied to Defense counsel a list of several names, most of these people having testified at Grand Jury. Probably the most important one that I wish to see as far as what he told the Grand Jury is a Mr. Tony Furgeson, Anthony Furgeson.

Mr. Furgeson, it has come to my attention, has a bad history of not telling the truth, and Mr. Furgeson has testified at the preliminary hearing as to what he saw ah, on the date in question, ah, as far as the facts as to the aggravated murder. It has come to my attention that Mr. Furgeson has told a story somewhat different in Grand Jury and I believe that in preparation of a defense on the charge as serious as this one, is very much a handicap to require me to wait until Mr. Furgeson testifies then file a motion for the Court to inspect the Grand Jury transcripts and then report whether he finds any inconsistencies.

I believe that a proper way to appear on behalf of

452

Mr. Davis is to have me...the opportunity to find Mr. Ferguson's
testimony in the Grand Jury transcripts and others, and
find out  and find out whether or not there has been any
strong inconsistencies so I can prepare Mr. Davis' defense
the appropriate way.

Since we're talking about...again...a situation where
the State is seeking the death penalty, I think that is the
fair way to treat it. In my motion I've cited specific
reasons why there is no need for protection of the Grand Jury
and secrecy of the Grand Jury transcripts at this time. I"ve
asked the Court to strongly consider the fact that we're
talking about Mr. Davis receiving a fair trial, that there
is no reason to keep the Grand Jury transcripts from me and
that I should be as the attorney for Mr. Davis, allowed to
inspect the testimony of witnesses who are going to be called
to testify at trial to find out whether there has been
inconsistencies in the prior testimony.

I'd ask the Court strongly to consider that and to
rule in my favor.

Mr. Eichel:  May it please the  Court.  Mr. Sage and
I have made a division of labor on this motion taking into
account that there are basically four types of motions
pending. I'm going to handle two and Mr. Sage will handle two.

With regard to the Motion for Change of Venue, we've

453

11

been before the Court many times on this type of motion ah, and the allegations that I've just heard made by Mr. Shanks, I think insult the very basis our system of jurisprudence rests and that is that in a democracy, twelve honest citizens can truly try and true deliverance make of the case between the State of Ohio and this Defendant. That's what we say in every case and we rely on that voir dire, that's the basis of our system, the voir dire that people will speak the truth.

He just said that/that they're not going to do that. I...I respectfully think that they do. All that aside the law in...the law in the State of Ohio is that the best test of this type of motion is on voir dire, whether the Jurors can put anything that they might have heard and we're...just by putting these newspaper articles the law of Ohio, State v. Laskey and State v. Fairbanks, and other Cases cited in the memorandum, say that the best test is to wait for the voir dire, and if any news article is read by a juror, what is his opinion. Can he put that out of his mind and realize the facts of the case are only tried in the Courtroom and not in the newspaper.

                                              it
Venue is strictly statutory in OHio/provides that Venue shall be in the County where the case occurred and that's where we are. Venue should be changed only if it appears that a fair trial cannot be given by that Jury ah,

454

12

in this County. There have been cases, in my opinion, far far more ah, more pervasive publicity in Cincinnati, in State v. Laskey, as when I as a child was growing up learning about Mr. Laskey, and there were a series of eight or nine rapes occuring then and he was arrested for one, tried and convicted. He made a motion for change of venue and ah, I recall that publicity well being here in Hamilton at the age of nine...eight or nine. The Court said that that case did not create the publicity required under this rule for change of venue.

In State verses Collins, in Michigan, there's another case of a similar type of spree going on, where the Defendant was charged with only one of a series of eight similar rapes. I know about this case, because my sister lives in Ann Arbor in the area where it happened and she knew all about this, but they...the Court in this case said that voir dire afforded the best test and the 6th Circuit Court of Appeals affirmed the...refused to disturb the conviction on a federal habeas corpus, raising this issue of change of venue,.lack of fair trial.

In that case ah, publicity was pervasive, over... overwhelming. IN the case at bar, I submit that the articles that are submitted to the Court go back as far as 1970 ah, certainly a jury in 1984 has no inkling what those 1970...

455

13

1970 articles concerned. I saw a few articles from 1981
that I didn't know existed and I figure myself as fairly
well read. I didn't even know that the...being in the
Prosecutor's Office at the time, I didn't even know that
Mr. Bressler had filed a motion for a new trial, from the
1970 conviction.

So, it's...taking these articles at face value they
mean virtually nothing until you get that Jury in the box
and ask them and in this case uhm, I believe it was discussed
in pretrial, not being there, I believe it was discussed
that individual voir dire would be afforded in this case. I
see no ah, I see that as a discretionary means to alleviate
any taint by asking one single juror and if that Juror
responds "Yes, I've read the articles yes I know....ah, this
and this and this from the articles...." can you put that
out of your mind...no I can't and excuse that juror and go
on to the next one. That removes the taint that that one
juror's utterances would have on the entire panel.

Individual voir dire, I believe is properly in order
in this case.

Aside from the Change of Venue, the other matter
that I chose to argue is the Motion to Dismiss and Inspect
Grand Jury Transcripts, and it appears that this defendant
in this motion is saying that he's entitled to this in every


456

14

case, ah, it explicitedly says so in the memorandum. The rules...Rule 6 specifically, regarding Grand Jury control this and case law controls this as stated in my memorandum, it's not required.unless there's an overriding basis shown. Unless there's a particularized need as the case law says for the inspection of the grand jury transcripts.

Now the Defense has made some allegations about a Mr. Ferguson, ah, I submit those allegations are not supported by any facts, but even if they were fact, the criminal rules provide that only after Mr. Ferguson testifies in the trial of this matter, would inspection be entitled.

There is no such thing as a motion to dismiss an indictment for lack of sufficient evidence. The Supreme Court has twice ruled on that very point. The Supreme Court of the United States. The Supreme Court of Ohio has ruled that only upon a specific reason, only if the accused presents specific reasons/for suspecting errors in the Grand Jury proceedings and thus to demonstrate your particularized need, his motion should be denied.

Grand Jury proceedings are secret, the accused is not entitled to inspection except upon a showing that his particularized need outweighs the need for secrecy.

The memorandum that's been filed in this case is ah, I've seen this memorandum filed by this office at least a

457

15

half a dozen times in various cases in Common Pleas Court. This time when it was filed, apparently prior to this ah, this typing of this memorandum, it had been filed in Federal Bistrict Court and they even include typographical errors referring to the U.S. DIstrict Attorney ah, and some statements made by U.S. District Attorney.

Now, the U.S. District Attorney and the FBI are not involved in this case, ah, I recognize then as being typographical errors, but it speaks of the fact that this motion is just more repetitive stuff that's never been granted... never been granted in any Court that I know of, so, it's a basisless and baseless, groundless and I think it should be overruled. ......Mr. Sage.

Mr. Sage; Your HOnor, if it please the Court, Counsel for Defendant, Mr. Eichel. Your Honor, I'd like to address the issue first of all, the MOtion to Sever and the Motion to Bifurcate, I think they probably intertwined and therefore, we have to probably deal with them at the same time.

Your Honor, obviously Rule 8 of the Criminal Rule provide for a joinder of offenses ah, especially when they involve the same accurate transaction or counterpart of this course of criminal conduct.

If the Court would read this Bill of Pariculars in this case, your Honor, they would realize that, first of all,

458

16

as to the counts of the element of the Prior Murder Conviction
is an element of both the first count and the second count
                    you know,
so, therefore,/it's not as if you can separate those two
from each other.  Both of them are elements of the
crime and there facts which have to be proven beyond a
reasonable doubt.

      Equally important your Honor is that Count Two of
the Indictment which is the Weapons Under Disability charge,
is the result of this same act which is part of the act which
makes up the Count One, in other words , the act too is
the act of having a handgun and using it in the death of
Suzette Butler, obviously murder in count...Aggravated Murder
with Specifications in Count One deals with this same act
or transaction, you know, the mere fact that he had/ the gun at
the time  that he was alleged to have murdered Suzette
Butler is the...is Count Two,  and the acts themselves are
so intertwined as to be, I think, inseparable, ah, your
HOnor, and I guess again, the law is very clear, State v.
Robert, State v. Torres which is cited on our memorandum,
                    says
your Honor, so/that there must be an affirmative showing of
prejudice and I think the Court has to distinquish prejudice
and there's prejudice.  Obviously, any evidence which
tends that this defendant shot and murdered somebody is
going to be prejudicial to him. Obviously that's the mere...

459

obviously that's going to have an adverse effect on his
personal freedom but that's prejudicial, but that's not
prejudicial to the point of exclusion, and the same thing
is true here as his prior convictions, your Honor, it is
obviously prejudicial to them insofar as it obviously doesn't
help his safety and wellbeing, but it's obviously an
element of the crime and it has to be proven.

I suspect your HOnor, you could take these points and
take them to the point of absurdity, you could say, well,
what we'll do is we'll have the first stage of the trial,
we'll have a trial only on the issue of the Aggravated
Murder of Suzette Butler and if he's found guilty of that,
then we'll have a trial on the Weapons Under Disability part.
And then we'll have a third trial, or third bifurcate or
not trifurcated stage, as to whether he had a prior murder
conviction in 1971, that would be the third stage of the
trial then we could have a death penalty phase, so we're
asking the jury to have four separate deliberations, and we
could take this to the point of absurdity, your Honor.

The point of it is, that the State of Ohio is very
much within the rules following this and we're not, we're
not asking anything unusual here, the Court's have said
in State v. Gordon, it says..."within the jury's power to
hear and receive evidence of a prior conviction in the way

460

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
STATE COURT TRANSCRIPTS - Page 61

the same in a one stage trial...." that's been the law
of the Supreme Court of Ohio for a long time your Honor.
We see that all the time in other trials, ahm...I guess what
bothers the State of Ohio in this particular case and I
think Mr. Eichel made allusions to this your Honor, is
somehow there's this pervading feeling from the Defense/that
somehow a jury is incapable of making a fair choice, that
somehow a jury is incapable of listening to the Court's
decisions, a jury is incapable of setting aside ah, evidence
from one particular point and only weighing it in another
point. I mean, they give a jury no...they give a jury no
credit, and/it bothers the State of Ohio because I think
it's the cornerstone of our justice system your Honor, because
                                                      even
again, you know, even if you get to the point that.../if
you would concede that the jury has a prior knowledge of
the Aggravated Murder or the Murder, the 1971 Murder, if
every juror came in and said we know about that...that still
isn't sufficient grounds to change venue, the issue really
goes beyond that, it's can the Jury set aside that issue
and conduct a fair and impartial trial and that's always
been the issue and that's as Dan...Mr. Eichel alluded to,
your Honor, that's really the issue of what here. And
obviously these are issues which should be decided on voir
dire, but I think the State of Ohio has a right to present

461

19

the trial in a fair way, obviously we're very constrained
by the rules of evidence, obviously we're very concerned
ourselves, about setting up some kind of procedural error
in the case and we're not interested in doing that your
Honor, but I think that if you read the case law, not only
the State of Ohio, but in the Twelveth District, it's very
clear your Honor, that ah, that the rules provide for.it,
these cases are so intertwined they deal with the prior acts...
Count One and Two are...arise out of the same transaction
and again, in both cases the prior murder is an element of
the crime that the State of Ohio has to prove beyond a
reasonable doubt, and I think that ah, that a Jury is
capable of doing it, they have a history of jury system,
and I don't/think that this any particular unique case in
which we have to ah, so far not really bend over backwards,
but really to turn our backs on a jury system and give them
no credit.

Thank you.

By the Court: Do you want to respond to this.

Mr. Shanks: Yes, your Honor, just briefly.

Your Honor, I have to strongly disagree with Mr. Sage
in when he says the prior murder specification is an element
of the crime. The crime here that Mr. Davis is charged
with, the reason we're here today, is he's charged with the

462

20

Aggravated Murder of Suzette Butler. The fact that he has
been convicted of a prior murder is not an element of the
offense of whether or not he shot Suzette Butler, he committed
an aggravated murder. It's a specification, a specification de-
noted as such, but the State has to prove to incure and enhance
punishment. It is not related directly whatsoever to the
events that took place this year in Butler County Ohio, or
last year. It is specification which goes to whether or not
there can be enhance punishment, it's not an element of
the offense and it's not accurate to say it must be proven
beyond a reasonable doubt as an element of the offense. It
must be proven beyond a reasonable doubt if they wish to
have a possibility of a death penalty, but it doesn't go to
whether or not on that day in question, there was a...with
prior calculation and design, the aggravated murder of Suzette
Butler.

        I think the Court should take that into consideration
and that Mr. Garretson just told me and I think it's very
apropos.

        The problem in this case is that they can cite all
kinds of other cases and say well that's not...that's not a
dilemma that the Jury can separate that from their mind.
The point is, the aggravated circumstances are particular to
these facts, that is, that the possibility of the Jury using

463

this as a like and similar offense, is so great that it's very hard I think for the Court and for us, and even for the prosecution to sit there and say, well, they'll be able to exclude that. It's a prior murder offense, this specification is a prior murder offense, a prior murder offense which was a very violent crime, obviously goes to whether or not there's enhanced punishment, but the danger/is that it's so close to the allegations of this offense that the jury is going to automatically say "Well it's a like and similiar..." it's going to used like and similar, and I can guarantee you it's going to be argued, in closing arguements, as much as they can, to show that this is a like and similar offense.

I ask the Court to strongly consider that there's just no curative instruction that can be given that would put that out of a jury's mind.

Briefly, and I'll be....on one other thing...he says that to bifurcate this trial and to go into three stages is absurd, that's...it's never absurd when you're trying to protect the rights of a person charged with a serious offense, there's nothing absurd about that. And I don't think the Court would so rule.

In regard to discovery and the grand jury transcripts, ah, he says that we haven't shown a particularized need. Well, the memorandum does speak...we filed a memorandum

464

before, but that doesn't mean it doesn't apply in this case.

We believe we have shown a particularized need and I'm going to speak to Mr. Ferguson directly. I believe I can show, if given a copy if given a copy of the grand jury transcripts that Tony Ferguson, Anthony Ferguson, is an unmitigated liar and everybody knows that and Tony Ferguson has a felony record which will strong question his truth and voracity ah, or his ability to speak truthfully and strongly question his prior testimony at preliminary hearing and strongly question his testimony in this case, and Tony Ferguson is an alleged eyeball witness to this event and for the Court's purposes, it is my understanding after hearing Mr. Ferguson at preliminary hearing, that he's going to say that he was standing within a few feet and saw this whole thing.

I believe that the grand jury transcripts, if I'm allowed to review those with Mr. Garretson, will establish that he told a different story at grand jury, compared to what he's told at preliminary hearing. And do you know why it's a particularized need, because as this Court knows, I don't have access to the NCIC computer and I don't have access to criminal records of all the people in Butler County and I don't have access to Tony Ferguson's criminal record. The only people in this courtroom that does, are sitting right there and when I filed discovery in a motion for dis-

23

covery, they gave it to me and in the block of felony records
of the perspective witness, they put in "To be provided
later."

Well, it may..they may be , but I don't know why
they haven't been provided now because it's been going on
for a long time, they've known Mr. Ferguson for a long time
and I'm standing here arguing this motion with the under-
standing that Mr. Ferguson has some prior criminal involvement
but not knowing what that is. And they're saying I don't
have a particularized need to find out what his past
character is and what is statements to the grand jury were.

All I ask the Court to do is review the memorandum
filed, honest weigh and balance whether or not there is a
particularized need shown, weigh and balance whether or not
the secrecy requirement applies to deny me, on Mr. Davis'
behalf, the opportunity to read Mr. Ferguson's testimony.

Thank you.

By the Court: Alright.

Mr. Shanks: Oh, one other thing. there was little
argument made as to my motion in limine to prevent the
                        from
prosecution /  delving into attitudes as (unclear)...I'm
willing to submit that to the Court, the...if the Court
wishes to hear argument on that, I did cite case authority
in support of that, and I'm not trying to cut anybody off

24

from responding...

By the Court: WEll, if anybody wants to address that, that's under the <u>Witherspoon</u> case or...

Mr. Shanks: Yes your Honor.

Mr. Sage: Your Honor, I would like to address that very briefly.....

Your Honor, the first thing I'd ask/the Court to consider is that <u>Witherspoon</u> is a 1968 case and a careful reading of <u>Witherspoon</u> your Honor,the Supreme Court of the United States didn't say that...didn't exclude the death qualification, they simply gave parameters in which it has to be asked your Honor. It says, "We simply cannot conclude either on the basis of the record now before us of the matter of judicial notice that the exclusion of jurors opposed to capital punishment results in an unrepresented jury on the issue of guilt or sub...substantially increases the risk of conviction...." That's the Witherspoon Supreme Court, your Honor.

A lot of people particularly now, that the Ohio has a death penalty case, likes to drag out <u>Witherspoon</u> and say well <u>Witherspoon</u> excludes death qualification. Well, Witherspoon does not your Honor, the Supreme Court specifically says it doesn't and I think it's a misstatement of <u>Witherspoon</u> to in fact say that it does your Honor.

In addition your Honor, it's obviously 2945.25(C)

467

25

of the Ohio Revised Code, it speaks directly to the issue of death qualification, I'd like to point out to the Court that State v. Lockett went to the Supreme Court and that issue was raised, the death qualification/was raised in State v. Lockett and that was upheld and ironically, and Mr. Eichel was the one who found this case and he cites it in his memorandum is the case of Spinkellink v. Wainright, John Spinkellink your Honor, the first man who was electrocuted in the United States against his own will raised the death qualification issue as a federal constitutional issue. And the ah, Court of Appeals in Florida, the Federal Court of Appeals down there had no problem at all with the death qualification issue and I want to submit to the Court that the Florida procedure as far as/to bifurcate a trial and that sort of stuff is identical to Ohio's death qualification procedure and in consideration of the death penalty your HOnor.

The only other thing your Honor, I would like to say is that as far as the issue of the grand jury is, I would like to know exactly what this man is allegedly suppose to have said at the grand jury. I"m just very curious to know that and the sources for that your Honor/and if he'd like to address that, I'd be more than willing to hear exactly what he's alleged to have said.

468

26

Mr. Shanks: If they have no problem with that, all I have to do is show them the transcripts and we'll get that issue off the priority...(unclear)...

Mr. Sage: I just want to hear what he's suppose to have said, your Honor...I mean...if he wants to make the allegation, I just want him to say so.

By the Court: Well...we can be....we'll meet that down the road as far as that particular issue.

The only motion I'm going to rule on today will be the Motion to Change Venue, we're going to overrule that. The rest of them I'll take under advisement based on what... I want to look a little further at the memo...at your individual memoranda.

Mr. Shanks: Your Honor, I only ask to be allowed to renew my motion for Change of Venue if appropriate at some time...

By the Court: Well, I think if it develops at the time we try to pick a jury here, sure.

Mr. Shanks: Fine.

By the Court: Okay.

AND THEREUPON, on the 23rd of February, 1984, the following motion was made in open court, as follows:

Mr. Sage: Your Honor, the next case is CR83-12-0614, State of Ohio v. Von Clark Davis, your Honor. At this time your Honor, the State of Ohio and the Defense attorneys

27

your Honor, I believe, would aggree to a trial date which
was a result of a pretrial meeting we had yesterday, for
May 9, 1984, conditioned upon the fact that the Defendant
would be willing to waive any speedy trial provision in
open court, Your Honor.

By the Court: Have you discussed this May 9th trial
date with your client?

Mr. Shanks: Yes sir....yes your Honor, Mr. Garretson
and myself met with Mr. Davis this morning and ah...regarding
the aspects of a speedy trial, I've also spoke to him about
this briefly in the jail.

He is understanding that there is a trial date set
now for May 9, 1984, which is outside the time provisions
provided in the Ohio REvised Code. He does understand that
he has a right to demand a speedy trial/and that would be set
sometime before March 8th I believe, 1984. We have counseled
him as to our advice and the effects of his waiver. He
has indicated that he understands the law in that regard and
is willing to and wishes to, waive his right to a speedy
trial and have the matter set for May 9, 1984, for trial.

By the Court: What do you want to tell me about this?

Mr. Davis: I fully understand what is taking place
here as far as speedy trial and ah, and I'm willing to give
up my right to a speedy trial.

470

28

By the Court: You know that the State has the obli-
gation of bringing your case to trial within 90 days,
you know that?

Mr. Davis: Absolutely.

By the Court: And ah, do you say that 90 days would
be up on....

Mr. Shanks: I was basing on a date that was...

Mr. Garretson: It was March 12th.

Mr. Shanks: It was somewhere around that time, it's
rapidly approaching right now.

Mr. Eichel: March 12th, your Honor.

Mr. Shanks: It's not up at this point in time, but
ah...

Mr. Sage: Of course your Honor, the matter was set
for pretrial motions pending before the Court which I think
toll anyway, the 90 days. Of course, there is a holder
on this individual as a result of other criminal conduct
but still, the State of Ohio would still be willing to
proceed within 90 days, if in fact the Court would find
that necessary.

By the Court: We only want you to be aware that you
have a right to have this matter heard as speedily as can
be heard and using that March 12, or thereabouts date, would
be the let's say, the latest date for you.

Mr. Davis: Certainly...uh-uhm.....

471

By the Court: Do you want to give up that right to have the matter heard say within the time limits of... until March 12th?

Mr. Davis: I'd rather give up that right.

By the Court: And in that regard we're setting the case for May 9th and I guess there can't be any objections on that?

Mr. Shanks: No.

Mr. Sage: No sir.

By the Court: Alright, let the record show that the matter will be heard and set for trial on May 9th and whatever entries have to be prepared in regards to a jury panel, you might as well get that ready.

Mr. Sage: Yes sir, your Honor.

By the Court: Okay.

Mr. Garretson: Thank you your Honor.

AND THEREUPON, on the 19th of April, 1984, the following was put on record in open Court:

By the Court: Alright for the record this is Criminal case, CR83-12-0614, State of Ohio v. Von Clark Davis, we call this hearing today primarily to bring everybody up to date in regards to the jury list, or jury panel that was pulled in this case and to bring the...everybody up to date with those people that the Court for one reason or

472

30

another has excused from that panel. The record should show
that we did meet in chambers at which time we set out to
the attorneys representing the Defendant and the Prosecutor,
those people who have been excused from this jury list.
And the Court on the record is just going to read the numbers
of those jurors who have been excused, and I guess we'll put
the names in for ...to keep the record just a little clearer.

On the A List, Juror #2 - Kathy Scott, Juror #7 -
Sandra McDonough; #9 - John Miller; #10 - Rollan C. Ferguson;
#12 - Rita Chamberlain; #14 - Virginia Smith, #18 - Mary
Litherland; .....I think maybe to make the record a little
more...I'll go back over that and put down the excuses that
we have, we might as well make the record complete.

To get back to #2 - Kathy Scott, is..she was a
previous juror and did not want to serve; Sandra McDonough,
#7 - OUt of the Country; #9 - John Miller he works as a
supervisor and could not get off; #10 - Rollan Ferguson he
was not found, no service; #12 - Rita Chamberlain had a
doctor's excuse; #14 - Virginia Smith - we have nothing
stated here why she was excused; #18 - Mary Litherland was
excused and there's nothing indicating why.

#20 - Clara Mohr is not found; #23 Susan Evans was
excused because her kids were small and no babysitter;
#25 - Linda Colwell was excused she's in college in Kansas;

473

31

#27 - Davis Stewart will be out of town ah, during that period for business. #28 - Florence Hoover has been a juror in the area court and did not want to serve. #30 - Karen Roberts was not found, #31 - Janet Scipel is a teacher and had exams; #32 - Patricia Repyneck was excused for medical reasons; #38 - Jonathon Wabrick was a student; #41 - Kay Robinson excused because she's pregnant and is due to deliver; #44 - Marie Fox was not found; #53 - Dorothy Vornheder ah, she is a supervisor and cannot get off; #54 - Nena Black, indicated it was against her religion to be a juror; #56 - is a Miami University student and will be taking exams; #57 - Ida Peck, not found; #59 - Jeri Williams, not found; #60 Betty Mahany is a nurse and cannot get off work. #61 - Anthony Mislovish on...will be on vacation; #63 - Gayle Weber is not found; #64- Barbara Allen has a doctor's excuse; #67 - Wendle Howland is a deputy sheriff; #68 - Debra Perry not found; #69 - Clinton Murphy - not found and #74 - David Ripberger, not found. Now, that's on the A List.

On the B List ah, #3 - Keith Maddock, is...was not a registered voter, ah, that's at his...that's what he tells us;

Mr. Garretson: That's why...what I was wondering.

By the Court: We didn't check that by the way. Ah... Deborah Mitchell, #B-11, there's no excuse on the record here; B-12, Allen Cardin is out of town; B-14, Holly McQuillan,

4174

is a student and has exams; #16 - James Bryant is not found; #17 - Barbara Moore, we have no notation of an excuse; #21- Gary Hatton not found; #23 - Mary Singhoffer has a heart problem; #24 - Winnifred Akers was no eh, indication why she was excused; #27 - Robert Hamm, no indication of why the excuse; and #28 - Lucille Smith no indication of why the excuse was given; #32 - Robert Howkins was not found; #34 - Shirley Kollstedt has young children and cannot get a babysitter; #35 - Ernestine Johnson not found; #38 - Martha Hudgens there's no indication why she was excused; #42 - Joseph Lewis not found; #43 - Raymond Mingua works second shift and cannot serve; so that's the list of the Juror's that the Court has excused and ah, if there's any comments from anybody concerning those excuses they should be made at this time.

    Mr. Shanks: Your Honor, all...only ask the Court if it is not true that we're going to have another jury venire sent out ah, in the amount of 175?

    By the Court: There's an additional jury list that was compiled yesterday and an entry going on as soon as it's prepared to serve those jurors and there'll be 75 more selected.

    Mr. Shanks: ALright, and then Mr. Garretson and I will be given a copy of that list, as soon as feasibly

475

possible.

By the Court: That...the copy of that list will be made available to you as soon as it's prepared, it more than likely is prepared already, but ah...but other than that we want to make sure on the record, who we have excused.

Mr. Garretson: Can I ask a question, Your Honor.

Any of those that ah, there's no indication on the Court's record, ah, why they were excused, may I inquire did the Court, meaning the Judge itself, actually talk to these people or is it ah..would it have been a member of the staff...

By the Court: For the record, and we're not intending to keep anything from the record, it has been the policy here and, that if somebody calls and has an excuse, that either my bailiff under instructions from me or myself if I talk to him to the Juror or my secretary, feels that it's substantial, they make the excuse. Our problem has been in this case, that we didn't write down those excuses early on, and so what they are...I'm sure they were legitimate, or we wouldn't have excused them, but I don't know what they are so I couldn't put them in the record.

So, in the future, we've already covered that, so we'll know what they are in the future,

Anything further, this morning for the record?

476

34

Mr. Sage: NO sir, your Honor.

By the Court: Alright, that will take care of it.

AND THEREUPON, on May 2, 1984, the following pretrial motions by the Defense were put on record in open court as follows:

Mr. Sage: Your Honor, if it please the Court this is Case No. CR83-12-0614, State of Ohio v. Von Clark Davis, before the Court on Defendant's motions.

By the Court: Alright, is the Defendant ready to go ahead with these motions?

Mr. Shanks: Yes your Honor, we're ready.

By the Court: Alright, any particular order you're going to go on them?

Mr. Shanks: AH, no particular order, does the Court have a copy of the Prosecutor's...

By the Court: Yeah, if you want to we could follow that...if you wanted to.

Mr. Shanks: Fine....what I have in my hand is a filed stamped copy and I think I left...I'll switch with you....

We also ask that Mr. Garretson be allowed to expound on any reasoning that would assist the Court.

Your Honor, we have several motions filed as this Court well knows, some of them have been filed for a substantial period of time, some of them have been filed fairly recently.

477

There are a couple of the more recent motions , I would like
to go into and I think ah, we're going to jump out of order
and speak to you first....my Motion in Limine was filed on
April 30, 1984, This is in response to an amended discovery
that we received from the prosecution's office, from the
Prosecutor's Office, recently, and the Motion in Limine is
directed to two police reports which they had at that time
provided Mr. Garretson and myself ....

By the Court: If you wanted to cut that discussion,
is there...anything filed in regards to .... from the Prose-
cutor's Office on that?

Mr. Eichel: Your Honor we just received that yesterday,

Mr. Sage: We're prepared to respond to it orally
your Honor if you want me to proceed....

By the Court: I would like to reserve the ruling on
that anyhow. I"m aware of the motion and if you would just
submit it.

Mr. Shanks: We're willing to submit it your Honor,
I've stated the reasons clearly enough in my memorandum
and the Court has...

By the Court: A[right, I just...I'm aware of your
....why don't you reply to it in some...not in an oral fashion
but....

Mr. Sage: Well, your...well the only thing I want to
call out your Honor, I think it's premature to even rule

478

on it until it's proffered under the.-.because you have to consider the context on which it's going to be offered.  Mr....  It's being objected to as a hearsay, we submit that, you know, it may not be offered as an exception to the hearsay rule.

By the Court:  All motions in limine are subject to how they fall in the context of trial, at least the Twelveth one District has advised me of that on/other occasion  so where I had ruled in limine and I think in one of your cases...

Mr. Shanks:  (Unclear)...

By the Court:  Well, it was one of the...they said I had prejudged some facts that I wasn't aware of, I didn't know I was aware of them.

Mr. Shanks:  Of course, this Court knows that we're concerned about trying this case on the facts of this case and we've made a substantial effort ...

By the Court:  On that motion, why don't you submit it based on your memorandum and any memorandum that the Prosecution puts in and we'll rule on that at the proper time.

Mr. Shanks:  WE're willing to do that your Honor.

Mr. Sage:  We just want to...

By the Court:  We'll without a ruling at this time, and rule on it at that time., I mean, at the time, at the

479

37

trial date.

   Mr. Garretson: And of course, reserving then our right
                     then
to supplement based upon the facts/in evidence, et cetera.

   Mr. Shanks: Now, your Honor, you may want to get on
the record that we have filed on election pursuant to
Revised Code 2929.022 ah, and that we've asked in that
election (talk) to have a trial judge determine the ah...

   By the Court: I think that election speaks for itself.

   Mr. Shanks: Yes sir.

   Mr. Sage: Your Honor, on that point, I think, just
like in any type...since he's waiving part of his right to
a jury trial, I think the Defendant has to appear in open
court and make a written waiver and an oral waiver, just
cause he's waiving part of his right to a jury trial and I
think for that reason, to protect the Court and the State
of Ohio,...

   By the Court: Well, why don't we...why don't we go
ahead and do that in a formal fashion and if you'll prepare
such an election form...

   Mr. Sage: Okay.

   By the Court: ....we'll do that. I think it'd be
for everybody's protection.

   Mr. Shanks: We have no objection to that.

   By the Court: Alright.

   Mr. Sage: Okay, just so they understand that hah,

480

38

what he's waiving is part of his right for a Jury trial in this case.

Mr. Eichel: It must be done in writing.

By the Court: Then why don't you prepare something that...

Mr. Sage: Okay.

Mr. Shanks: Your Honor, by...also by way of discovery we have filed a motion to compel pretrial disclosures of Prosecuting witnesses' written report and statements and our investigation of this incident, Mr. Garretson and I have spoken to several individuals who are potential witnesses for the Prosecution and they've all indicated to us that the police officers have taken written statements of not all, but substantially all, have taken written statements from these individuals and more than likely the Prosecution has these written statements or at least has them under their control, via the police officers. It is important to us that we have copies of these written statements of witnesses they're intending to introduce, for true reasons as we indicated in our memorandum. One - we're going to get them anyway under Rule 16 at some point in time if they do have these people testify and two - there's a strong possibility that there's evidence in there under the Brady case which would be beneficial for Mr. Davis. We ask this Court to allow us a chance to review those statements since

481

these people are going to testify and I can see nothing in
the rules that say we cannot have it. I would ask the
Court to Rule on that specifically because these are important
to us and we would like to have them as soon as possible
so we may be ready when trial date comes, to properly
cross examine these potential witnesses.

Your Honor, we also filed...

Mr. Sage: Do you want to deal with that specific....

By the Court: Why don't we deal with them individually
as you're going down them.

Mr. Sage: I think that the memorandum deals
specifically with that your Honor. The rules of evidence are
quite specific that the State of Ohio is not under no
obligation, nor can the Court compel us to over...to hand
over a written statement of a potential witnesses your Honor,
it's only proper under the rules of evidence, or under the
Criminal Rule 16 after they testify and then the Court
can then conduct an in-camera inspection to see if in fact
there is any inconsistent statements. That's the purpose of
the rule your Honor, the fact that we take...may or may not
take support in the written statements of potential witnesses
ah, is never been discoverable...it is not discoverable in
the rules of discovery, this case is bound by the same rules
of discovery and rules of evidence and criminal rules in

40

any other cases bound by your Honor, and I think Mr. Shanks
own admission is that they've had an opportunity to talk to
these people, ah, had an opportunity to examine them obviously
and some of them, out of detail, I just don't see why this
case should fall out of any other case, I just think again,
as far as Brady material goes your Honor, the prosecution
the prosecution is very aware of the implications of Brady
and we obviously feel like you know we made all disclosures
necessary under the Brady material exception and obviously
if we made...failed to do so, we do so at our own jeopardy
we understand that, ah, and I just don't see why it's
appropriate in this particular case. There's no...as a
matter of fact your Honor, there's no basis for the Court
to compel us to do that so we strongly object to it and
we'd be more than willing to provide at the proper time
for an in-camera inspection by the Court.

Mr. Shanks: Your Honor, what Mr. Sage has failed to
acknowledge to this Court is that this is a death penalty
case. They're seeking to execute Von Clark Davis, the man
sitting over/there. Under the undisputed case law on such
cases, all rules are construed very strickly in favor of
Mr. Davis because of the extreme punishment that's possible
here. We're asking this court to give us witness statements
where there's nothing in a rule or a case law that says we're

483

41

not entitled to them or can't have them, additionally in all
the years I've been doing this type of thing, I've never had
the Prosecution give me "Evidence favorable to the innocence
of the accused."  I think I"m entitled to it under the
Rule.

What I'm asking this Court to do is give us the
opportunity, Mr. Garretson and myself to view those written
statements and decide on behalf of Mr.Davis whether there's
evidence favorable to his defense in those statements.  I
cannot see any...any way, shape or form where that would
prejudice the prosecution one bit and it may, in all honesty
help Mr. Davis' case. I think we're talking about the severe
penalty that's the fair and appropriate thing to do and I
think that's the correct thing to do under the law, and we
strongly urge the Court to allow us to have this conference.

Mr. Eichel:  Your Honor...

By the Court:  We're going to follow the Rule on 16
at this time.

Now, Mr. Shanks; if you could stay in the order of
on the...this prosecution memorandum, I'd appreciate it.

Mr. Shanks:  Some of these your Honor, we're willing
to submit and without further argument....I'm just looking
at the ones we're ....

By the Court:  Well why don't you just indicate which

484

ones you're going to submit and then we'll get....

Mr. Shanks: Okay...Your Honor, in regard to the prosecution list, we're willing to submit the motion to dismiss, which was...#1 on the list, the second, on the Motion for Pretrial Hearing, ah, that's been ruled on and actually we have had the assistence of the Court in all those matters and we were once submitted as indicated.

The Motion for Notice of Prospective Three-Judge Panel this Court knows what we wish in that regard is some information as to who a prospective three-judge panel would..-what the panel would consist of, what judges, so we can inform Mr. Davis of that fact and have him make the (unclear)...

By the Court: For the record, you know the three judges would be the ones that are here in the General Division, it would be Judge Stitsinger, Judge Moser and myself.

Mr. Garretson: Thank you.

Mr. Shanks: The fifth Motion, the Motion to Insulate the Venire and Jury from the Media, we believe we have substantial case law and authority and the memoranda speaks specifically of that and we're going to submit that also.

The Sixth Motion, the Motion for Individual Sequested Voir Dire, we have discussed that at a prior motion hearing. It is my understanding at this point in time and the Court can correct me if I'm wrong, that more than likely what we

485

44

Ruling on a Number of Peremptory Challenges Mr. Garretson
has prepared a very well-reasoned memorandum in that and I
would ask the Court to read that closely. We think it is
important on behalf of Mr. Davis that we have the number of
peremptory challenges that we think is authorized by the case
law which would be up to 24, actually, there is case authority
for up to 23 in this kind of case.

We think that based on the severe punishment potential
,we would ask the Court to favorably consider that on behalf
of Mr. Davis.

Mr. Eichel: If your HOnor please. I don't know if
we're going to be able to respond to all of these, he's
making arguments at this point in time, I'd like to state
that the only case on record is State v. Ruppert. Under
the/law stating that the peremptory challenge/is six
for each side, that's holding that the statute giving 12 is
unconstitutional. Now the number 24 must have come out of
the air from Defense counsel or some people in Columbus
or Cleveland because there's no case law in Ohio on that
point.

Mr. Garretson: It's not a matter of case law Judge,
that the prior death penalty statute allowed 23 peremptory
challenges, that's where the number came from.

By the Court: Alright, we'll rule on that.. As it

487

45

stands right now, my inclination is to stay with the statute
as it is right now.

Mr. Eichel: The statute meaning 12?

By the Court: 12-12.

Mr. Shanks ꞉ Your Honor, Mr. Garretson and I believe
that the rest of the motions can be submitted on the record.
I would like to speak to...one motion we do have pending
to Require Motion Hearing. That would be the combination of
the Motion in Limine and the Motion to Sever. The Court has
to my knowledge, yet to rule on whether or not there's going
to be a separate trial as to Count One and Count Two of the
Indictment.

We believe that since we've filed the election to
have this Court determine the specification as provided in
Revised Code 2929.022, that even strengthens our motion to
sever Counts One and Two and our reason behind the Motion
in Limine as to prohibit the Prosecution from introducing
------the evidence of the prior conviction for second degree
murder. We'd ask the Court to consider that in ruling on
those prior motions we have filed.

Mr. Garretson: Can I be heard on that briefly,
your Honor...on the issue of Severance and the Motion in...
I realize that it's...

By the Court - Be my guest.

Mr.Garretson: I realize it's not just a Motion in

488

46

Limine we're talking about here, we/talking about...  (are)

By the Court: I think the Limine motion kind of... watered itself down by your election so ah...

Mr. Garretson: Alright, well I understand that, but none the less, in our opinion the Prosecution, by bringing a two count indictment is trying to get through the side door what the legislature very clearly in 2929.022 has prohibited through the front door. The election discussed is limited the specification set forth in'A-5, the prior conviction.

It's obvious that the legislature had a great concern about......it's obious that legislature must have had a very deep concern about the effect of testimony concerning a prior conviction upon the trier of the fact of the guilt or innocence phase. Why else would they carve out a totally distinct and independent election only applying/that particular  (to) specification.

I think the Court....it doesn't take any great leap in faith to understand they've got a very real concern that... when we're seeking the death penalty you have to build in the extra protections entitled of the Defendant and we think once that election is made, then it very clearly, by the the terms of the Statute itself indicates that there should be no other testimony about any prior conviction.

The argument set forth by the Prosecution ah, makes

489

48

we're doing something "through the back door" we're not,
we're just doing what the Legislature has decided is a
crime in Ohio, which is charging this man with two crimes.

First of all, it was the Grand Jury and not the
                              who was the one
Prosecutor's Office who/brought, your Honor, but the syllabus
says, and this is very important, it says "Criminal 8(A)
governs the joinder of offenses. The law favors joinder
for public policy reasons , such as to conserve judicial
economy and prosecutorial time to conserve public funds by
avoiding duplication in hearing multiple trials, to diminish
the inconvenience of the public authorities and witnesses,
to promptly bring to trial those accused of a crime and to
minimize the possibility of incongruous results that can
occur in success of trial before a different jury.

Your Honor, I think that obviously we're proper in
bringing these two cases together. And equally important
your Honor as part of this same case there's this presumption
somehow that a jury will be so prejudice by it that they're
not going to be able to follow the law. What it says here
is presumed that a/jury will obey the trial court's instruc-
tions and we agree that the introduction of a prior criminal
activity should be only introduced with limiting instructions.

But to me it seems like you know we have this double
set of standards, you know. Somehow we're suppose to have

491

49

the set of standards in this particular case just because it deals with a more serious penalty than a normal case, but it's just...it's just another criminal case, your Honor. There is no....the Ohio Legislature hasn't said that there's...that we will assess some kind of super rights to a case just because it deals with a more severe penalty than that which we normally had before.

More importantly than that...

By the Court: Well the Court's aware of that.

Mr. Sage: More importantly than that your Honor is the fact that simply because they've made an election not to proceed, doesn't mean the fact that we can't bring that under some ulterior theory of introduction of evidence. It could be brought in under any number of theories of admissibility of the prior murder,/if the Court would decide to decide that at a different date. WE just think that...you know, we want to go on record as strongly objecting to that (unclear)....

Mr. Garretson:May I make one brief comment in that regard?

By the Court: No I think...the Court pretty much I've done an awful lot of work in this case , I don't want to make any brags or anything, but the Court's pretty much aware of the pros and cons in regards to this and the other matters and my inclination right now and I say inclination because...things change in these areas pretty much but my

inclination is to overrule that motion, and to let that
second count stand.

If there's any change in that demeanor, you'll be
aware of it well in....well before, we'll say before the
first of the week, anyhow. I don't want any further discus-
sion on that though. I'm discussing that primarily with
myself right now.

Mr. Shanks: (unclear) you've indicated that you've
let the second count stand, but what about the Motion in
Limine as to the discussion of the prior conviction. That
may not, the fact that he's been convicted, is only important
for what...Carrying WEapons While Under Disability.

By the Court: Well let's assume that we grant the
motion then there's other areas that you have to file your
motion in and if your motion goes to those areas, I think
we're going to have to discuss that at the time that the
evidence is going to be proferred, I don't mean in the
courtroom, I mean prior to, I mean...

Mr. Shanks: Oh, I understand that. If the Court's
going to allow that in, I need to get with Mr.Garretson,
we may try to restrict that  for example in Opening and
Closing and other areas as you've indicated.

By the Court:  Well, I think those motions can be
handled at the time of trial and the Court will be lenient

51

to the Defense in that regard. You already know that.

Mr. Garretson: When the entry is prepared on this
hearing, your Honor, the Court, I assume, has not, by the
language you put it in necesaarily made a specific ruling
on the motion?

By the Court: As it stands right now, that motion
will be overruled.

Mr. Garretson: Okay.

By the Court: Now, is there anything further we want
to discuss here or does it...from the defendant's....if not,
I'll hear something from the Prosecution unless they want
to go ahead and submit it on the memorandums that have been
filed?

Mr. Garretson: Ah, one of the motions we've ah,
was filed April 30, for an order to the Adult Parole Authority,
to release...

By the Court: IN that regard, I have talked with
Mike Shanks, and told him....I haven't told the prosecution,
or the Prosecutors, I did call the Department and we'll
issue a subpena to that particular person that they told me
to issue it to and they said that the lead time on that might
be two or three days but we'll issue that sometime today or
tomorrow. So that will give us plenty of time for that.

Mr. Garretson: Thank you. Do you understand what

494

52

we're....

Mr. Eichel: Is that a...your Honor, please, is that going to be the Court's ah, subpena?

By the Court: Yeah, I might dictate something and send it downstairs or....

Mr. Eichel: Alright, so that both the defense and the prosecution will have equal access to that information.

By the Court: Oh sure...the indication was from them that they would answer the subpena and send it to the Court and then it would be up to the Court to decide who's to see it, and as far as I'm concerned in as much as it's the Defendant's motion, I'm assuming he's waiving any...his rights in regards to confidentiality there.

Mr. Garretson: well, the only thing that I would say there, your Honor, that frankly, the reason we need that is work product. Well...

By the Court: Well, if you want to then you issue the subpena, I don't...it doesn't make any difference to us...

Mr. Garretson: Well...okay...

By the Court: ...but the only way you're going to get it is by subpena, if you want us to issue it we'll issue it we'll issue it. If I get it...they're going to send it to the Court anyhow...they're not going to send it to you.

Mr. Garretson: Right...I know that...so I guess

495

54

Forensic Center.

Mr. Shanks: (unclear)...defense.

Mr. Eichel: He does wear two hats...and we want to...

By the Court: Well, I think we'll,,in this case it'll Be for the Defense.

Mr. Eichel: Okay, then are we going to have the Butler County Forensic Center or Dr. Roger Fisher appointed by the Entry?

By the Court: WEll the...I think the Entry...or the motion request is to have him appointed and not the Forensic...

Mr. Shanks: Yes, your HOnor....sometimes they have other people go over there and perform tests, et cetera....

Mr. Eichel: No it's...it says both...Well, here we go again, is he being hired in his public or his private capacity?

Mr. Shanks: He's being retained via that request under the authority stated therein to help assist us in representing Mr. Davis for the reason we discussed it in that pretrial. And it's for our purposes to assist Mr. Davis possibly down the road at some point where we'll be important. But he's being...we're asking that order be issued and it has been signed, allowing us to have Dr. Fisher who is...who happens to be the Director of the Forensic Center do this for us.

Mr. Sage: Well that's what we want to know, is he

497

being hired as the Director of the Forensic Center or as a
privately practicing psychologist?

MR. Garretson: Well I guess my question is, why do
we have to tell them?

Mr. Eichel: Because it's being Court ordered.

Mr. Garretson: Well but you see the statute....

By the Court: Well, and if it's Court ordered, I
guess that's sufficient.

Mr. Shanks: Yes sir.

By the Court: Alright, we already signed the entry
but it's strickly to the mitigation phase.

Now, is there anything further?

Mr. Eichel: We'll submit everything else on our
memorandum, I don't believe there's any other matter that's
not been spoken to before the Court at/this time.

By the Court: Alright, oh, just one other matter
that was brought up this morning in regards to that election,
when's the availability of you two fellas in regards to
coming over and making that election on the record after we
prepare some type of...

Mr. Shanks: I can do it Friday after about 10:00
o'clock.....

Mr. Garretson: This is an election we've already
filed but you want to....

495

56

By the Court: Yes, we want to formalize it.

Mr. Garretson: Oh, I understand.

I"m going to be here on the Gill case Friday Morning ah, after that would be alright.

Mr. Shanks: Can we come to Court Friday, as close to ten o'clock as possible...we have other...I have to be in Fairfield..

By the Court: Is that alright with your client?

Mr. Garretson: Can you be here Friday?

Mr. Shanks: We can make arrangements...he is (unclear)...

By the Court: Why don't we see if we can get that together and I'll help you with it...if you think...but basically just to...

Mr. Eichel: It'll look like just a jury waiver.

By the Court: Alright, we'll do it sometime say after ten o'clock Friday, somebody can be here, ah, whoever....

Okay, is that sufficient for this hearing this morning... okay. That's all.

AND THEREUPON, on the 4th day of May, 1984, the following Election of Jury, was put on record in open court as follows:

By the Court: Okay...do you want to bring your client up here please. This is criminal case CR83-12-0614, State of Ohio v. Von Clark Davis and Mr. Davis ah, I'm looking at a

L199

57

form apparently that bears your signature, is that correct?

Mr. Davis: That's correct.

By the Court: This form indicates to the Court that you're exercising an election that ah, provided by Statute whereby you're asking or you're electing to have the Court decide the aggravating circumstance in this case, is that your understanding?

Mr. Davis: This is correct, yes...that is correct.

By the Court: And in effect, what you're doing is saying to...that you want the Court to decide ah, in this case, I think it's prior offense...

Mr. Davis: Right.

By the Court: And that particular decision would have to be made by the Court after hearing some evidence and also after there'd be a decision by the Jury in this case, do you follow that?

Mr. Davis: Yes I do.

By the Court: Is that what you want to do here?

Mr. Davis: That's what I want to do.

By the Court: Nobody is pushing you in any direction here, you're doing this of your own free will?

Mr. Davis: No....yes I am.

By the Court: You've discussed this thoroughly with your attorneys?

Mr. Davis: With both attorneys.

By the Court: Alright, we'll permit the Election then. If you think an Entry should be in here, we'll put an Entry on.

Mr--Eichel: I think that Waiver is sufficient, your Honor.

By the Court: Alright, that's all we'll have this morning.

Mr. Garretson: Thank you your Honor.

AND THEREUPON, on the 8th day of May, 1984, the following Election of a Three Judge Panel was put on record in open Court as follows:

By the Court: Mr. Davis, you're brought over here today because of some information that your attorneys passed on to the Court, wherein, you indicated to them and they indicated to me that you want to waive your right to have this matter tried by a jury of twelve people and submit it to a panel of three judges?

Mr. Davis: That is correct.

By the Court: Is that correct?

Mr. Davis: That is correct.

By the Court: And in that regard, did you execute this form...it seems to bear your signature?

Mr. Davis: Yes it is.

501

59

By the Court: And before you signed it, you read it?

Mr. Davis: Read it, uh-uhm.

By the Court: And your attorneys explained it to you?

Mr. Davis: Yes, they did.

By the Court: Now you understand that when you do this, that the panel of judges will hear the evidence and make a decision on the matter and you're giving up your right to have twelve people make that decision. Now, all twelve of those people would have to be convinced of your guilt or not guilty, either way, and all twelve of them would have to be convinced before they could sign a verdict one way or the other. Do you want to give up your right to have twelve people make this decision?

A. Yes I do.

By the Court: Now, you know the same burden of proof is on the State whether you go to the jury or to the jury, I mean, or to the jury or to the Court, a panel of three judges. I mean, the three judges would have to listen to the evidence and be convinced beyond a reasonable doubt of your guilt or innocence, before they could make a finding and all three of the Judges would have to be unanimous in that finding do you understand?

Mr. Davis: Yes I do.

By the Court: Is anybody forcing you to do what



60

you're doing here today?

   Mr. Davis:  No one.

   By the Court,  You do this of your own free will?

   Mr. Davis:  My own free will, yes I did.

   By the Court:  You understand that this is a death penalty case and the same...the Court...I mean, the three judge panel, have to make that same determination ah, in the event they get that far?

   Mr. Davis:  Yes...yes I do.

   By the Court:  Any reasons that you know of why you shouldn't...you don't want to do this, I mean, is there any reason that you....

   Mr. Davis:  No, I can't find any reason why wouldn't want to right now, no.

   By the Court:  Does the Prosecution have anything/to you want
say here?

   Mr. Sage:  Your Honor, do you think you should...it'd be proper to go over, rather it's required for a Court to be unanimous in it's verdict?

   By the Court:  I just indicated that to him.

   Mr. Sage:  Oh, I"m...okay, I'm sorry.

   Mr. Eichel:  Your Honor, it's our understanding that the Court must be unanimous in it's verdict as to guilt and punishment also and a majority of the panel can rule on all

503

61

other matters pertaining to evidence as provided in the
Statute.

By the Court: Do you understand what he's saying?

Mr. Davis: Yes, uh-uhm.

By the Court: He's saying that the majority that the
Court could rule on evidence and findings of fact, but the
ultimate conclusion of your guilt or innocence would have to
be determine by unanimous vote of all the three judges.

Mr. Garretson: As well/the penalty phase obviously
if it ever got to that.

By the Court: And it goes to all phases except as to
the rulings on the evidence and findings of fact. Well,
if nobody else has anything further to say we'll have three
judges will be here, you know who they are, and they're
in this form here. It'll be myself and Judge Moser and
Judge Stitsinger.

Mr. Davis: Yes....

By the Court: So we'll see you then.

Mr. Davis: Thank you.

Mr. Sage: (unclear) ....visit the scene....

Mr.Eichel: We'll join in that motion...

Mr. Garretson: Yeah.

Mr. Sage: Are we going to do that before....that's
always done before opening statement.

62

Mr. Shanks:  No, it's not always, I think there is...
(unclear)...

By the Court:  WEll, that'll be the first ruling that
the three Judges will make in the morning.

(End of hearing........................)

505