| STATE OF OHIO, | : | State of Ohio, Butler County |
|---|---|---|
| Plaintiff | : | Court of Common Pleas |
| vs. | : | Case No.  CR83-12-0614, CR84-03-0%{ |
| VON CLARK DAVIS | : | TRANSCRIPT OF PROCEEDINGS INDEX |
| Defendant | : | |

: : : : : : :

BRUNNER, J.

| STATE WITNESSES | D | C | RD | RC |
|---|---|---|---|---|
| 1. Dr. Richard Burkhardt | 12 | 21 | | |
| 2. Det. Ron Wells | 24 | 32 | | |
| 3. Ronald Dye | 41 | 48 | 58 | |
| 4. Mark Lovette | 58 | 64 | | |
| 5. Wade Coleman | 78 | 86 | | |
| 6. Phyllis Becker | 89 | 91 | | |
| 7. Ron Williams | 93 | 97 | | |
| 8. Mona Aldridge | 103 | 110 | 133 | |
| 9. Cozette Massey | 134 | 141 | | |
| 10. Reginald Denmark | 165 | 170 | | |
| 11. Richard Carpenter | 201 | 204 | | |

FILED Court of Appeals
BUTLER COUNTY, OHIO

SEP 1 7 1984

[stamp]

| STATES EXHIBITS | Introduced | Accepted |
|---|---|---|
| 1. Four Bullets | 11 | 211 |
| 2. Four PMC Shells | 28 | " |
| 3. Photo of Victim | 26 | 212 |
| 4. " " " | " | " |

BUTLER COU
PROSECUTING A

SEP 1 7 :
RECEI






xx

| STATE'S EXHIBITS | Intro. | Accepted |
|---|---|---|
| 5. Photo of victim | 26 | 212 |
| 6. " " " | " | " |
| 7. " " " | " | " |
| 8. " " " | " | " |
| 9. " " " | " | " |
| 10. Photo of shell | " | " |
| 11. " " " | 27 | " |
| 12. " " " | . | " |
| 13. " " " | " | " |
| 14. Photo of Victim | " | N/A |
| 15. " " " | 15 | 213 |
| 16. Photo of car | 31 | " |
| 17. " " " | " | " |
| 18. " " " | " | " |
| 19. Photo of victim | " | " |
| 20. Slide of victim | N/I | N/A |
| 21. Auto Title | 31 | 213 |
| 22. Receipt | 94 | 214 |
| 23. Entry | 208 | " |
| 24. Entry | " | " |
| 25. HPD Gun Reg. Form | 91 | " |
| 26. Photo of scene | 25 | " |
| 27. Police Report | N/I | N/A |
| 28. HPD | 202 | N/A |





xxx

| STATE'S EXHIBITS | Intro. | Admited. |
|---|---|---|
| 29. HPD | 202 | N/A |
| 30. Guilty Plea Entry | 208 | 214 |
| 31. RPD Report | 239 | 341 |

ALL EXHIBITS CONTAINED IN AN ENVELOPE GIVEN TO THE CLERK OF THE BUTLER COUNTY, COURTS.

| DEFENDANT'S WITNESSES | D | C | RD | RC |
|---|---|---|---|---|
| 1. Pt. Essex Shepherd | 235 | 239 | 244 | |
| 2. Pt. John Hill | 244 | | | |
| 3. Tony Ferguson | 247 | 274 | 278 | |
| 4. Elbert Avery | 280 | | | |
| 5. Von Clark Davis | 285 | 313 | | |
| 6. Shelba Robertson | 337 | | | |

| JOINT EXHIBITS | | Introduced | Admitted |
|---|---|---|---|
| 1. Statement-M. Lovett | | 77 | 78 |
| 2. " Mona Aldridge | | 132 | 215 |
| 3. " Cozette Massey | | 162 | " |
| 4. " Reginald Denmark | | 199 | " |



1v



| STATE OF OHIO | : | State of Ohio, Butler County |
| Plaintiff | : | Court of Common Pleas |
| vs. | : | Case No.   CR83-12-0614 |
| | | CA84-06-0071 |
| VON CLARK DAVIS | : | |
| | | INDEX TO MITIGATION HEARING |
| Defendant | : | |
| | : | |

: : : : :

BRUEWER, J.

| DEFENDANT'S WITNESSES | D | C | RD | RC |
|---|---|---|---|---|
| 1. John Bohlen | 379 | | | |
| 2. Charles Tipton | 384 | | | |
| 3. Alister Tipton | 388 | | | |
| 4. Dr. Roger Fisher | 394 | 490 | 405 | 407 |

| STATES WITNESSES | D | C | RD | RC |
|---|---|---|---|---|
| 1. Det. James Schmitz | 408 | 111 | | |
| 2. Det. Dick Carpenter | 412 | 415 | | |



| | | |
|---|---|---|
| STATE OF OHIO | : | State of Ohio, Butler County |
| Plaintiff | : | Court of Common Pleas |
| vs. | : | Case No.  CR83-012-0614 |
| VON CLARK DAVIS | : | <u>TRANSCRIPT OF PROCEEDINGS</u> |
| Defendant | : | |
| | : | |

: : : : : :

BRUEWER, J.

APPEARANCES:

JOHN F. HOLCOMB,and MICHAEL SAGE, Prosecuting
Attorneys, for the State of Ohio.

MICHAEL SHANKS and JACK GARRETSON, Attorneys at Law,
for the Defendant, Von Clark Davis.

*     *     *     *     *     *     *     *     *

BE IT REMEMBERED, that at the April Term, A.D., 1984,
of the Court of Common Pleas, Butler County, Ohio, to wit:
May 9, 1984, the Honorable Henry J. Bruewer, Judge presiding
this cause came on for trial, to a three-judge panel, upon
the indictment heretofore returned herein, to which the
Defendant in open court on the 14th day of January, 1984,
entered his plea of not guilty.

2

By the Court: Is this matter ready to proceed?

Mr. Holcomb: Yes your Honor, ready for the State.

Mr. Shanks: We're ready on behalf of the Defendant.

By the Court: Alright. The first order of business....
WE'd like to hear some opening statements.

Mr. Holcomb: May it please the Court, before we get
that far, we'd like to bring a matter to the Court's attention.
The Defense has a motion in limine pending which has not
been ruled on yet, it's my understanding, with regard to
the Hamilton Police Department reports of December 10, 1983,
one of which was made at 00:45 o'clock and the other one which
was made at at 20:10 o'clock. Both reports which were made
by the decedent in this case which indicated that ah...

By the Court: Just a minute. In regards to these
it was discussed at some previous ah, hearings on this matter
that those matters would be ruled on at the time that they
were...the parties were brought in to testify at which time
we would take it into context of the overall evidence
to see if that was admissible and we'll rule on it at that
time. We're not going to rule on it at this time.

Mr. Holcomb: Oh, alright...alright.

Mr. Garretson: That was our understanding, your
Honor.

Mr. Holcomb: Okay, now....

3

Judge Bruewer: And you didn't know that.

Judge Stitsinger/ That's alright.

Mr. Holcomb: Next, if your Honor, please I'd...I have a voir dire question or two that I'would like to ask the panel as a whole.

By the Court: Does Defense have any objection?

Mr. Shanks: No sir.

By the Court: Are you aware of the question.

Mr. HOlcomb: No, I don't know how they could be, I haven't communicated it to them.

By the Court: Well, in the...well ask it.

Mr. Holcomb: I imagine they can object if they don't like it.

By the Court: WE're waiting on them right now.

(An inaudible discussion is held between the Judges)

Mr. Shanks: Your Honor, we're a little surprised by the Prosecution's request and it really isn't...

Mr. Holcomb: I don't know why, I just told him a minute ago if he didn't do it, I would.

Mr. Garretson: Well...

Mr. Shanks: Well a minute ago we were surprised by the prosecution's request and now that he's actually done it we're more surprised and at this point in time it really is hard for us to ascertain whether we should object or not

4

not knowing the basis of the nature of the questions he intends to ask.

Ah, so I would ah, say this, that at this point in time since we' don't know the nature of the question and the basis for asking these questions, we're going to have to object.

By the Court: Why don't you go ahead and ask the question and then if you want to make an objection at that time, go ahead.

Mr. Holcomb: Thank you. May it please the Court. Here is my question which I'll ask to the panel as a whole, apologizing in advance for having to ask it but the last time the situation came up, the case lasted ten years, cost the tax payers a half a million dollars and the case isn't over yet.

This is the question. Have any of you had any private conversations or conferences with either of the attorneys for the Defendant, where the Prosecutor or an Assistant Prosecutor was not present, in which you directly or indirectly made representations or opinion as to any point of law whereas to the ultimate disposition of this case, Judge Moser?

Judge Moser: No.

Mr. Holcomb: Judge Bruewer?

Judge Bruewer: I can say no.

5

Mr. Holcomb: Judge Stitsinger?

Judge Stitsinger: No.

Mr. Holcomb: I apologize for having to ask but I had a duty to do it, and I thank you.

By the Court: Are you ready to proceed with this?

Mr. Holcomb: We're satisfied with the panel and we're ready to proceed.

By the Court= Oh your are .... how about ah...are you ready to procced?

Mr. Garretson: There is a pending motion for View of the Scene and I, we really-since it's a panel I don't suppose there's much debate about when that occurs?

By the Court: We talked a little bit in chambers about that and we thought maybe it'd be better if we heard an opening statement and then visited the scene. We...

Mr. Shanks: That's fine.

Mr. Sage: Your Honor, if it please the Court. Mr. Holcomb, lawyers for the Defendant. I'd like to start my opening statement by reading to you the Bill of Particulars which is derived from the Indictment.

It essentially states that "The evidence in this case will prove that on or about the 12th day of December, 1983, this Defendant, Von Clark Davis, purposely and with prior calculation and design, caused the death of Suzette Butler,



6

by shooting her four times in the head, with a firearm, outside of the American Legion Hall at 727 Central Avenue, in the City of Hamilton, Butler County, State of Ohio, in violation of the Ohio Revised Code, entitled Aggravated Murder, with the specification that prior to this said Aggravated Murder Convicted by this defendant, the Defendant was convicted on April 20 of 1971, of Murder in the Second Degree, an essential element of which was the purposeful killing of another, to wit: Ernestine Davis, contrary to 2901.05 of the Ohio Revised Code, as it existed in 1971, in the Court of Common Pleas, Butler County, State of /Ohio, Case No. #21655; and with the further specification, that the Defendant, Von Clark Davis, had a firearm on or about his person or under his control while committing the said offense of Aggravated Murder, as specified in 2929.71 of the Ohio Revised Code."

Count Two would be that "On or about the 12th day of December of 1983, this Defendant, Von Clark Davis, knowing had, carried and used a firearm, specifically, a .25 caliber pistol, in the shooting death of Suzette Butler, in the City of Hamilton, Butler County, Ohio, at which time the Defendant, Von Clark Davis, had previously been convicted of felonies of violence, to wit: Shooting with the Intent to Wound, Contrary to 2901.23 of the Ohio Revised Code, on



7

April 10, 1970, in case number #20938, in the Common Pleas
Court of Butler County, and also he had previously been
convicted of Murder in the Second Degree, contrary to 2901.05
of the Ohio Revised Code, on April 20, 1971, in the above-
mentioned case, 21655." And

And that the Defendant had not been released from
such disability as provided in the Ohio Revised Code, which
offense is a felony, entitled Having a Weapon While Under
Disability.

Specifically, that the facts in this case will be
that on December 12, 1983, outside of the American Legion
Hall, in the City of Hamilton, Butler County, Ohio, which
is 727 Central Avenue, the Police and the Coroner responded
to a call of a shooting death, approximately 7:30 p.m.
The evidence will be at that time that the Coronerrpronounced
the body of Suzette Butler as being dead at the scene, and
that at that time the Coroner removed her body to the
County Morgue.

The evidence will be that the police found at the
scene four shell casings, and also, subsequent to that act,
the post-mortum conducted by the County Coroner and the
Pathologist it would be their opinion that Suzette Butler
died of four gunshot wounds to the head.

The evidence will be that the four bullets removed
from the head of Suzette Butler were .25 caliber automatic



8

bullets that they were all shot by the same gun and that
the rifling specifications corresponds to a .25 caliber
semi-automatic pistol made by Raven Arms, and that, as I
indicated to you before that the casings that were found
were all of what/called a PMC, which is a manufacturer.

Now, the evidence will also indicate that earlier
in the day on December 12, 1983, at approximately 1:40 a.m.,
this Defendant had another individual by the name of Mark
Lovett go to Gill's Pawn Shop in the City of Hamilton,
where this Defendant had Mark Lovett purchase a .25 caliber
Raven Pistol for him and again, remember that in terms of
the opinion of the BCI expert.

Subsequently, he returned...this Defendant,or the
witness to Gabe's Cafe where he had picked him up, subsequently
came back on two occasions and had this witness Mark Lovett
go out and buy bullets for the gun which he had previously
purchased. The evidence will be that later on in the
afternoon he picked him up from Gabes, took him down to
the Butler County Gun Shop which is located on Dixie Highway
and had him purchase with ten dollars given to him by the
Defendant, a box of PMC bullets, which again, match the
shell casings found at the scene.

The evidence will be that the gun purchased matched
the caliber and type of gun used in the murder, and the



9

bullets recovered match the caliber ah, type and manufacturer
bought at the Butler County Gun.

Now, as far as eyewitness testimony, the testimony
will be that at approximately 5:30 p.m. that evening, Suzette
Butler, the victim, arrived at the American Legion Hall
located on Central Avenue, at that point she was there with
several of her friends and approx...she left at one point,
took one of her...her daughter home, came back approximately
quarter till seven she arrived, shortly thereafter, the
Defendant, Von Clark Davis, also known as Red Davis, came in
they engaged in a conversation over a period of time and
subsequent to that, the two of them left to go outside.
The evidence will be at that point, that the victim had
her purse with her, however, she left her drink, I believe
cigarettes and coat inside the bar.

A friend of hers sense that there was some problems
seen the two of them leave, she walked to the door and
cracked it slightly and looked out. At that point, she
witnessed the Defendent , Red Davis or Von Clark Davis,
have a gun in his hand, talking or discussing matters over
with the victim, Suzette Butler,  In the Course of that
argument, she will testify, she in fact, saw Red Davis, or
Von Clark Davis, raise the gun to the victim's head, at that
point, sensing that there was imminent danger, she'll
testify that she retreated, went to call the police or

10

help out.

There will also be eyewitnesses from people who said they also saw the argument outside the bar who then saw Von Clark Davis fire four shots into the head of Suzette Butler, obviously causing her death. The evidence will be that he shot her once, that she bent over, that she continued to fall but he shot her several more times. The last shot he literally bent, virtually put the gun to her head, squeezed the last round off, fired it virtually point within range.

The evidence will be that he did this with prior calculation and design, and he purposely caused the death of Suzette Butler. As to the charge of Weapons While Under Disability, he obviously had a .25 caliber pistol, which we believe the evidence will verify by the bullets recovered and that this gun was the basis of Having a Weapon Under Disability and the evidence will be by way of certified entries of conviction and also by the police officers that were involved in the case that he was involved and convicted in 1970 with Shooting with the Intent to Wound of an Ernestine DAvis, his wife at the time, and that on April, 1971, he was convicted of Murder in the Second Degree here in Butler County, for purposely causing the death of his wife at that time, Ernestine Butler.

Thank you very much.



VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
STATE COURT TRANSCRIPTS - Page 117

11

Mr. Shanks: Your Honors, at this time we would, on behalf of Mr. Davis, ask the panel to allow us to reserve our opening statement at the start of Defense's case.

By the Court: Alright.

I guess at this time, we'll adjourn to visit the scene, alright.

AND THEREUPON, Court was recessed, whereupon, after viewing the scene, Court was reconvened and the following transpired:

Mr. Shanks: Your Honors, before we start with testimony, there are a couple of matters we'd like to bring to the Court's attention briefly.

One...at this time we are moving for a Separation of Witnesses. I'm not aware of any witnesses in here but we would ask for a formal order of separation at this time.

By the Court: Alright, it'll be granted, any witnesses in the Courtroom, any of your witnesses, Mr. Holcomb?

Mr. Holcomb: Not that I know of...well...no...we' don't have any here.

By the Court: Alright...you keep us apprised and we'll make sure they don't get in.

Mr. Shanks: Without further argument, and ah, citing prior case authority that we submitted, we would be renewing our motion to ah...for separate trial as to Count One

and Count Two, and to bifurcate the trial, as previously
filed in a written motion, but because of the three-judge
panel and the way we're proceeding now, we would be renewing
that for the record.

By the Court: (Discussion held between judges)
That motion will be overruled.

Mr. Shanks: Thank you.

Mr. Holcomb: Dr. Burkhardt.

DR. BURKHARDT, called on behalf of the Prosecution,
having first been duly sworn , testified as follows:

DIRECT EXAMINATION - By Mr. Holcomb

Q.  Sir, would you state your name, please?

A.  Richard P. Burkhardt.

Q.  And what is your profession?

A.  I'm a physician.

Q.  And what is your elected office?

A.  Butler County Coroner.

Q.  How long have you been the Butler County Coroner
for the record?

A.  Four years and five months.

Q.  Okay, Dr. Burkhardt, I'll direct your attention
to December 12, 1983, at approximately 8:00 p.m., and I'll
ask if you had occasion to go/the vicinity of the
American Legion at 727 Central Avenue, Hamilton, Butler





13

County, Ohio.

A. Yes, I did.

Q. And ah, as you arrived at that location, I'll ask
if you had occasion to view the body of one who was ah,
identified to you as Suzette Butler?

A. Yes I did.

Q. And what was her condition at that time that
you saw her?

A. She was dead?

Q. Okay, now, Dr. Burkhardt, I'll ask whether or not
the next day, December 13, 1983, you had occasion to
perform an autopsy or have one performed in your presence
and under your supervision, an autopsy of the body of
Suzette Butler?

A. Yes we did.

Q. Okay, ah, could you tell the Court, what the
findings were upon examination at autopsy?

A. UPon examination of Suzette Butler's body, we
found four gunshot wounds of entrance into the leftside
of the head.

Q. Now, I'll ask whether or not you caused a
photograph to be taken of those entrance wounds?

A. Yes we did.

Q. Okay. I'm going to show you what has been marked



14

for State's Exhibit #19 for Identification, and I'm going
to ask if that is one of the photographs you had prepared?

A. Yes that is.

Q. I'll ask whether or not it is/true and accurate
representation of the matters portrayed therein, in other
words, does it accurately show the ah, way she looked
at that time?

A. Yes.

Q. Okay. Go ahead with your findings?

A. Okay, can I refer to my notes about the entrance
wounds?

Q. Sure.

A. Okay, we described these as wounds #1,#2 and #3
and #4, though we donnot know the actual order in which the
wounds were inflicted.

Bullet Wound #1 was one-half inch anterior to the left
ear and this demonstrated..,this wound demonstrated stipling.

Q. Could you tell the Court what stipling is for the
record?

A. Yes, Stipling is punctate marks on the skin from
burning gun powder.

Q. Did you have occasion to cause a photograph to
be prepared which shows the stipling?

A. Yes.

15

Q.  Just one second.....I'm going to show you what
has been marked State's Exhibit for Identification, #15,
and I'll ask you what that is Doctor?

A.  This is a picture of the left side of Suzette
Butler's head and face, showing two bullet wounds of entrance,
one of which is the one I have just described around the
entrance wound.

Q. Now, would you kindly step down here please and
show the Court , now let's walk up here...-.show the Court
what you are referring to as "stipling"?

A.  Okay, stipling are these punctate marks around
the periphery of the wound of entrance, these little dot-like
marks caused by burning gun powder, known as stipling.

Q.  Alright. take your seat...thank you....

Now, as you have described the presence of stipling
around that particular wound, what does that indicate to you?

A.  Ah, this stipling indicates ah, the...that the
muzzle distance to the skin is close-range.

Q.  Alright, ah, okay, go ahead with your findings.

A.  Okay, bullet sound #2, entered the left ear,
that is also pictured on that second exhibit.  This ah...

Q.  Could you indicate please...not the numbers....

A.  Okay, Bullet Wound #1 - Anterior to the left ear,
Bullet Wound #2 actually in the ear, this bullet wound

does not exhibit Stipling.  Bullet Wound #3 is behind the
left ear.

Q.  Okay.

A.  Uhm, the bullet wound...the bullet from the Bullet
Wound #2 was recovered in the right lateral ventricle of the
                          trans-
brain so it traversed the left side of the brain and ended up
in the right side of the brain.

Uhm, Bullet Wound #3 is the one...one and a half inch
behind the left ear, this also did not exhibit stipling, ah,
and it passed into the bone of the skull in the base of the
skull on the right side of the skull, having transversed
the left side of the brain.

There was a fourth bullet in the posterior parietal
scalp, up in this area here, that went through the skin but
did not enter the skull but caused a depressed skull fracture,
but did not actually enter into the brain.

Q.  Okay, just in layman's terms, ah, she had three ....

A.  Three clustered around the left ear.

Q.  ...around the left ear and one in the back of the
head?

A.  One in the back of the head which did not enter
into the brain.

Q.  Based on your...based on your findings and your
examinations, and your education, training, skill and
experience as a physician, and as Coroner, I'll ask whether



17

or not you have an opinion within a reasonable, medical

certainty, as to the cause of Death of Suzette Butler?

A. I do.

Q. And what is that opinion Doctor?

A. My opinion is that Suzette Butler died of

multiple gunshot wounds to the head.

Q. Okay. Now, I will ask whether or not at Autopsy

you had occasion to remove bullets or slugs from her head?

A. Yes we did.

Q. Okay, I;m going to show you Doctor, what has

been marked State's Exhibit for Identification #1, and I"m

going to ask if you can identify those items.

A. These are the little cases that we put the bullets

in as we recovered them from Autopsy and labeled them

as such.

Q. Okay, maybe we can open that now but we'll kept

it as one exhibit.

A. Okay...They're all sealed with ah...do you want

to нopen each one them...okay...

Q. Yeah, maybe you'd better.

A. They're all taped.

Q. You want to operate on it...with my mike...

A. Okay. This is #4, so that would be the bullet

from the back of the head.....pretty good knife.

Q. Thank you.





18

A. Okay, do you want all the other ones opened?

Q. Yes, if you would please.

A. Okay. We've got to be careful we don't get them mixed up now.

Q. Let's just throw the paper away, okay......

A. Okay this is Bullet #3 from ah, behind the ear... do you want to see the top of this...okay....(Prosecutor makes inaudible comment)....Okay...that was ...the other bullet....if I slip and cut my finger than you'll know why I didn't go into Surgery....

Q. Turn in a Worker's Comp. claim.

A. Another bullet...

By the Court: What's the number on that one?

A. That's the second bullet. But the...the bullets are numbered individually.

Q. Two...

A. Two, yeah....

Q. You should have #4,3 and 2.

A. And here's #1. This is the bullet from...in front of the left ear.

Q. Doctor, was each one of these slugs placed in a container and marked by you, initialled by you, as you removed it from the body?

A. Yes.



Q. And I'll ask whether or not you turned those over to Det. Wells of the Hamilton Police Department at the autopsy?

A. Ah...no. We took them to the Coroner's Office and then turned them over to Det. Wells there.

Q. Okay, ah, Doctor, were you able to visually determine what caliber slugs those were?

A. No.

Q. Okay. Based on your...well, let me ask you this. Have ah...in your years as Coroner, have you had occasion to examine other gunshot wounds which exhibited the effects of stipling?

A. Yes.

Q. Ah...In this case, considering as you have exhibited here that slugs of this particular size were found within the wound itself, and based on your education, training, skill and experience as a physician, and as Coroner, do you have an opinion within a reasonable scientific certainty, as to the distance the muzzle was from the head of the decendent, at the time the projectile was fired which produced the stipling in the one case?

A. Yes.

Q. And what's that opinion?

A. You're talking about Bullet Wound #1 now?

Q. That showed the stipling?



20

A. The one that showed the stipling...okay, this is a close range wound and depending on the gun and the load, would be within four to twenty inches to produce stipling.

Because of the relatively tight pattern of the stipling it would probably be closer than 20 inches, but for an accurate determination, the gun would have to be test-fired to produce that pattern, with the same ammunition.

Q. Alright...okay...Now, did you have occasion to determine the alcohol level of the blood of the victim?

A. Yes.

Q. And what was that?

A. The alcohol was .025.

Q. Okay, now you don't mean 25% you mean 2½/

A. Weah, .025.

Q. Okay.

A. Okay.

Q. In a...in a person of her ah....in a person of her weight and build and size and everything, how many drinks would that indicate to you?

A. One or two beers.

Q. Okay, did you have occasion to do a drug screen on the decedent?

A. Yes we did.

Q. And what were the results of that?

A. The drug screen showed caffiene and nicotine.

21

Q. Okay. Your witness.

CROSS EXAMINATION - By Mr. Shanks

Q. Good morning Doctor.

A. Good morning.

Q. Doctor, as part of the autopsy, I believe that when a person is taken for an autopsy, his or her personal effects sometimes accompanies that person, is that correct?

A. That's correct.

Q. Alright, and in this case, specifically, Suzette Butler's personal effects were taken and examined and I believe you have some of those with you today, is that correct?

A. I have a list.

Q. Alright, is it not true that in her personal effects, a small amount of marijuana was found?

A. Ah, in her purse was a partially burned ah, what appeared to marijuana cigarette.

Q. Alright, and some papers, cigarette...

A. And some cigarette papers.

Q. But none showed up in the drug screen done pursuant to the autopsy, is that right?

A. No marijana showed up in that drug screen.

Q. Now, we have talked about...you have talked about with the prosecutor the stipling effect of gunshot wound #1, as you have labeled it, ah, is that right?

A. Yes.

Q. And you've indicated to us that even though you're not an expert in ballistics, your experience is such that you were able to tell us to a reasonable degree of scientific certainty, that this was a close wound?

A. Yes.

Q. A minimum of four inches and a maximum of twenty probably closer/in this case, because of the close pattern of stipling,?

A. Yes.

Q. Alright, if I recall, after reading the ...I believe, the pathology report and possibly even the autopsy report, gun shot wound #1 did not actually penetrate her skull, is that correct?

A. No, gunshot wound #1 did, gunshot wound #4, the one in the back did not.

Q. Isn't it true that one of the gunshot wounds, the one that had the stipling, the one we're talking about now, gun shot wound #1, passed through the frontal bones of her face and did not penetrate into the cranial bone?

A. That's true.

Q. Alright, and that's the one we're talking about, the one...

A. Yes.

Q. Alright.

A. But it was recovered...the bullet was recovered

23

above her soft pallet.

Q. In her mouth?

A. Yes, above her mouth.

Q. Okay. Well, what that indicates to me, and correct me if I'm wrong, is that this wound that was shot as close as four inches and maybe a little bit further away, missed, in effect, ah, didn't go into her brain?

A. It did not go into her brain?

Q. Do you have any explanation for that? Medically speaking...-did it...

A. I don't know....

Q. Did the autopsy indicate it ricocheted off a portion of her skull or something like that?

A. No it was...if it hits the facial bones, it was actually a very difficult bullet to recover because/it location, going through the facial bones, sinuses and ending up above the soft pallet.

We'd have to destroy her face at autopsy to tract the pathway of the bullet.

Q. Well, it is true, is it not that what we have in regard to gunshot wound #1 is a gunshot wound, with the gun being placed very close to this person's head, possibly even as close as this, being fired and the bullet sometime... somehow winding up in her mouth, around the front of her face?



24

A. Above her mouth, above her soft pallet.

Q. Above her mouth.

A. If you're saying that it missed because it didn't go into the brain, yes, but it still hit the person.

Q. Alright, thank you Doctor, we have no further questions.

By the Court: Anymore direct?

Mr. Holcomb: Thank you Doctor.

By the Court: You're excused.

Mr.Garretson: Thank you Doctor.

Mr. Sage: Detective Ron Wells.

DET. RON WELLS, called on behalf of the State of Ohio, having first been duly sworn, testified as follows:

DIRECT EXAMINATION - By Mr. Sage

Q. Sir, for the record, would you state your name and occupation?

A. Det. Ron Wells, police officer for the City of Hamilton, Ohio.

Q. Okay, how long haveyou been a police officer.

A. 21 years.

Q. How long have you been a detective?

A. Eleven.

Q. I'd like to direct your attention to December 12, 1983, on that occasion did you have occasion to investigate a shooting which occurred at 727 Central Avenue, in the



25

City of Hamilton, Butler County, State of Ohio?

A. Yes sir.

Q. Okay, and I'd like you to describe to the Court when you responded and what you did upon your initial response to the scene?

A. Well, I was notified at my home to report that night, approximately 7:40 p.m. on December the 12th, and ah, went to headquarters first and I met with Lieutenant Reed, and then Lieutenant Reed and I went to the scene at 727 Central ah, it's the ... Louis Whitaker American Legion Post,#520, and ah, about six feet outside the door there was a body of a young black girl, ah, laying on the pavement. At the scene was Dr. Burkhardt, his assistant, Tom Marsh, other policemen, firemen and life squad, ah, JOurnal News reporter and a photographer.

It was determined that the girl had been shot, ah, approximately three to four times in the left side of her head. She was...her head was facing in a northerly direction and her feet was towards the south on Central Avenue.

Q. Detective, let me hand you a photograph which has been marked State's Exhibit #26 for identification and ask you if you can identify that photograph?

A. That's the ah, that would be the body of Suzette Butler, ah, at ah, in front of the American Legion Post, on 727 Central Avenue.





Q. Okay, and let me show you a group of photographs State's Exhibit for Identification #3,4,5,6,7,8 and 9, and ask you if you can identify these photographs?

Mr. Garretson: #3 through #9?

Q. Yes.

By the Court: What was the first number?

Q. #3...oh, the large photograph?

By the Court: Yeah.

Bailiff: #26.

Q. #26.

A. These are also photographs taken at the scene of Suzette Butler, there at 727 Central Avenue.

Q. Do those photographs fairly and accurately and correctly portray Suzette Butler as she appeared on the evening of December 12, 1983?

A. Yes sir, they do.

Q. Okay. Now, at the scene, what type of investigation did you perform at that point?

A. I also took some photographs and ah...with a 35 milimeter camera and ah, I searched the scene in the immediate area and found four spent .25 caliber cartridge cases.

Q. Okay, Let me show you what's been marked as State's Exhibit #10 for Identification and ask you first of





27

all if you can identify that photograph?

A. That's the photograph of a cartridge case there on the sidewalk at the scene of the incident.

Q. Okay, and State's Exhibit #11 for Identification?

A. That's another photograph of another cartridge case.

Q. State's Exhibit #12 for Identification?

A. That's another cartridge case....

Q. State's Exhibit #13?

A. That's another cartridge case.

Q. And do each of those photographs portray a separate cartridge found at the scene?

A. Yes sir they do.

Q. Do all those photographs fairly, accurately and correctly portray the scene as it was on December 12, 1983?

A. Yes sir.

Q. Would you step down and show the Court, point out to the Court where the cartridges are in those photographs ....(unclear)...you don't have to step down....

By the Court: Keep your voice up will you Ron.

A. Right there...and there....and there...and there.

Q. After photographing the cartridges, did you have an occasion to collect the cartridges?

A. Ah yes sir, I did.



Q. Okay, let me hand you what's been marked State's

Exhibit 2 for identification and ask you first of all, if can describe what that is?

A. THese are the four PCM cartridge cases, which I found at the scene of the incident, at 727 Central Avenue.

Q. Okay, you indicated what type of cartridge were they?

A. .25 caliber.

Q. Okay, and what was the manufacturer?

A. PC....a PMC.

Mr. Garretson: Your Honor, for/the record, we object purposes of to the Officer identifying the manufacturer. I think he can testify what was marked on the shell casings...

By the Court: Be overruled. We'll take his testimony as what was marked on them.

Q. Did you collect those and place them in the f vile?

By the Court: What was the answer, I never heard the answer?

A. Yes sir.

By the Court: (inaudible comment)

Q. Alright, okay. Did you conduct any further investigation at the seene at that time?

A. One inside the ah, the Legion Post and ah, interviewing the patrons inside the bar. I think I talked





29

to about seven of them.

Q. Now subsequently on the next day, on December 13, 1983, did you have an occasion to be present at an autopsy conducted by or under the supervision and control of Dr. Burkhardt?

A. Yes sir, I did.

Q. Okay, and as a result of the autopsy, were you given certain pieces of evidence by Dr. Burkhardt, then or subsequently to that occasion?

A. Right, on the ah...it'd be the 13th of December, Det.Gross and I went to Mercy Hospital morgue and they performed an autopsy on Suzette Butler and removed four coppered jacketed bullets from the area of her head, and these were given to me by Dr. Burkhardt and also the clothes that she was wearing at the time and hat, I brought those back to headquarters, ah, after they were marked by either Dr. Burkhardt or Tom Marsh, one or the other marked them.

Q. Okay.

A. And I brought these back to police headquarters and placed them in our property room.

Q. Let me hand you what's been marked as State's Exhibit #1 for Identification and ask you if you can identify those items?

Yeah, these are the four bullets that was removed from Mrs...from Miss Suzette Butler's body at the Mercy





30

Morgue and then later given to me by Dr. Burkhardt.

Q. Now referring to State's Exhibits #1 and #2, were these items under your supervision and control from the time you received them til the date of trial?

A. Ah, they were taken to the BCI lab in London, Ohio.

Q. Okay, now let me ask...who took them to BCI?

A. ...during that time.....I'll have to look at the report....

Q. Well let me....

A. I don't remember who took them up there...it might have been me. I'd have to look at the report to find out.

Q. Okay, and ah, after BCI completed their investigation, and worked with them, were they subsequently...who subsequently collected them and brought them back from BCI?

A. I brought them back.

Q. Okay, and were they under your supervision and control from the time you brought them back, up to the time that you turned them over to the prosecutor, prior to trial?

A. Yes sir, they were.

Q. Now....Let me show you what's been marked State's Exhibit #27 and ask you, first of all, if you can identify that document?

A. Yes sir, that's the submission sheet that I typed up, listing the four jacketed slugs and the four .25 caliber cartridge cases, that were sent up there to BCI.





31

Q. And does that document refresh your recollection as to who submitted the bullets to, the bullets and the shell casings, State's Exhibits #1 and #2, to BCI?

A. No, there's another...there's another one that they filled out that the ah, which indicates who brought it up there.

Q. Okay. now, subsequent to those occasions, did you have occasions to go to Louisville, Kentucky...or Lexington, Kentucky?

A. Yes sir, I did.

Q. Okay, and what was occasion of going to Lexington, Kentucky?

A. That was on ah, December the 15th, uhm, Detective Gross and I went down to Lexington Kentucky, and searched a car at ah...was left down there at a motel by Von Clark Davis.

Q. Let me show you...hand you what's been marked State's Exhibit #16,#17 and #18 for Identification and ask you, first of all, if you can identify those photographs?

A. Alright, these are the photographs that Det. Gross and I took of the 1976, Pontiac, Ohio License ███████, which was registered to Von Clark Davis.

Q. Okay, (Prosecutors hold discussion about exhibits)

Let me hand you what's been marked State's Exhibit #21 for Identification and ask you if you can identify





32

that?

A. Ah, this is a certified copy of the title of the '67 Pontiac registered to Von Clark Davis.

Q. And did you have an occasion to compare the vehicle identification number reflected in the certified copy of the title with the automobile portrayed in the previously identified photographs of the car?

A. Yes sir we did.

Q. Okay, and what was the result of the comparison?

A. They were both the same numbers.

Q. Okay, now, as a result of your investigation, subsequent to your investigation, have you ever been able to locate the gun used in the homicide of Suzette Butler?

A. No sir, we haven't.

Q. No further questions.

CROSS EXAMINATION - By Mr. Garretson

Q. Det. Wells, is it correct to say that you basically have been charge of this investigation as far as the Hamilton Police Department?

A. <u>Basically</u>, yes sir.

Q. Alright, and ah, as a result of your investigation, are you aware of the time that the Hamilton Police Department received the first call concerning this incident?

A. Ah, the report indicates I think indicates about 7:20 p.m., December the 12th.



33

Q. But the first call was received?

A. Right.

Q. Alright, and you were ah, called around 7:40, at home, to come in on the investigation?

A. Approximately, about that time.

Q. Alright, now, when you arrived at the scene, what other officers from the police department were present when you arrived at the scene?

A. Sergeant Story was there, and I don't recall who else was all there.

Q. Were there any other detectives or plain clothes officers there present when you arrived at the scene?

A. No.

Q. Okay, now, who took the pictures that have previously been identified here of the...of Suzette Butler, on the sidewalk, did you take these color photographs yourself?

A. No, I did not.

Q. But you did take these color photographs?

A. No, those were taken by Tom Marsh.

Q. Oh, Tom MArsh took all of these photographs, is that correct?

A. I'm sure he did, yes sir.

Q. Who took the black and white photos?

A. That was the Journal News photographer.

34

Q. Okay.

By the Court: Mr. Wells, would you keep your voice up just a little bit.

A. Yes.Q

Q. You say you also took pictures that evening?

A. I took a few, yes sir.

Q. Alright, now, when you arrived at the scene, ah, did you immediately begin to talk to any perspective witnesses in this matter?

A. Ah, well, after I collected the cartridge cases and looked at the body and then took a few photographs myself, then I went inside the bar and talked to anybody that might have seen it.

Q. Alright, who all did you talk to if you recall, that evening?

A. I've got a list of them,but I don't know who all there were.

Q. Do you have your list with you?

A. It's in that jacket over there.

Q. Jacket...what do you mean by jacket?

A. The one that Det. Gross has with him.

Q. Is there any objection to him retrieving that list?

By the Court: Why don't you just hand it to him.

Q. After reviewing the list that you know have before

you, can you tell us who you would have talked to at the
scene that evening?

A.   Inside the bar, I talked to a John Hendricks,
I talked to an Andrew Jackson, I talked to Mark K. Carter
a John Carter, George Phelps, ah, Charles Roberts and a
John Liberette (sounds like).

Q.   Alright, were those people ah, patron of the bar
located there?

A.   Yes sir.

Q.   What if anything did they tell you concerning....

A.   Ah, John Hendricks, he said that he just knew
both subjects...

Mr. Holcomb:   Objects

By the Court:   We'll sustain the objection.

Q.   Alright, ah, did you personally speak with
Anthony Furgeson on the evening of this incident?

A.   No, I did not.

Q.   Was Tony Ferguson, Anthony Ferguson at the
scene when you arrived at the scene?

A.   Not that I can recall.

Q.   Okay, and you know who Tony Ferguson is, right?

A.   Yes, uh-uhm.

Q.   Okay, was he inside the bar when you interviewed
the people that you've just listed?

36

A. Not that I can recall.

Q. Was any other of the Hamilton Police Detectives interviewing witnesses at the same time or were you essentially coordinating the interviews?

A. Oh, there was probably some other detectives in there at the time.

Q. Alright...did...

A. I think ah...

Q. ...did they talk to any other persons different than the list that you have there?

A. Probably, there was...

Q. But to your knowledge, Anthony Ferguson was not present at the scene or in the bar, when you arrived and then talked to the people in the bar?

A. That's true.

Q. Did you...on that evening, did you take any written statements from any witnesesses?

By the Court: What was your answer?

A. To which answer?

By the Court: To that question.

A. Which question.

Q. Did you take any written statements from any witnesses that evening?

A. I don't think we did, that evening, we just talked to people.



37

Q. Alright, again, if you'd keep your voice up please.

A. Okay.

Q. Ah, were any witnesses taken to the Hamilton Police Headquarters to be interviewed?

A. Ah, I think there was some there, I didn't see them, but I think there was some there....ah, was interviewed when I arrived at the station, ah, I think Mona Aldridge was ah, down in the Youth Aid Department being interviewed at that time.

Q. Alright, and do you know who interviewed her?

A. Ah, could have been ah, Det. Weisbrodt and maybe Cox or maybe Det. Logsdon.

Q. Now, ah, as a result of your investigation at the scene that evening, in discussing this matter with the witnesses, did you ascertain whether Suzette Butler had left any of her personal belongings or clothing in the bar?

A. There was a coat/was left in the bar, that wa belonged to her.

Q. A coat?

A. Uh-uhm.

Q. Is that coat here today, in evidence, or has that been returned?

A. I don't know whether it's in evidence but I think it's here today.



38

Q. Alright, what type of coat is it?

A. Uhm, I don't know, it was a jacket-type of coat.

Q. Alright, what was the weather like on that...on December the 12th, if you recall?

A. Well, it was a clear night and it was...it was cold, it wasn't freezing.

Q. Alright, you were dressed in an overcoat and sports coat?

A. I had a topcoat on.

Q. Alright, ah, did you investigation reveal whether Suzette Butler left a pack of cigarettes in the bar?

A. Ah...I don't...I think there was...either right where she was sitting or in her coat, I think there was a pack of cig...left there, but I'm not sure.

Q. Alright, did you investigation reveal whether Suzette Butler left a drink in the bar that she had not consumed?

A. I don't recall.

Q. Alright, did you speak to the barmaid, the bar-tender?

A. That night I believe I did.

Q. Alright, do you know what....withdraw that. At any time subsequent to the night this occurred, did you personally have an occasion to interview Anthony Ferguson?

A. I talked to him and there was...

39

Q.  To interview him for a statement?

A.  There was a statement taken from him but I didn't take it.

Q.  Alright, were you present when the statement was taken?

A.  No.

Q.  Alright, that statement was reduced to writing?

A.  Yes sir.

Q.  The ah, shell casings that you picked up and also photographed, were those copper jacketed, is that correct?

A.  They're brass cases.

Q.  Brass?

A.  Right.

Q.  Okay, can I have just one moment...(Defense counsel has an inaudible conversation).....

You refer to a report received by the Hamilton Police Department at 7:20 correct?

A.  I believe that was the right time that the...that it was received, and then I think they arrived at 7:29, or it might have been received at 7:29, the report, they recorded it at 7:20, but it's one of those two.

Q.  Alright, is some type of written record kept by the Hamilton Police Department when they receive a call of a shooting incident?



A. Yes sir.

Q. Do you have that with you today?

A. It should be on the report.

Q. On which report?

A. On the initial shooting report that was taken by Officer Shepherd.

Q. Alright, do you have that here today?

A. We have a copy of it.

Q. Ah, do you know who called the Hamilton POlice Department did the person identify themselves?

Mr. Holcomb: Objection. That'd call for hearsay.

By the Court: Well, sustain the objection.

Q. Through your investigations, have you become aware of the person who first called the Hamilton Police Department to report this incident?

Mr. Holcomb: Same objections...same reason.

By the Court: You can answer.

A. I don't know who made the first report...call.

Q. Alright, do you...has your investigation revealed whether the call was received from the American Legion Post or some other place?

A. I know ah, a witness ran into the bar and said something to the effect that there had been a shooting, call the police....I assume it was made at the bar.

Q. Do you know whether the name of the person who





41

called would be on the police report of the shooting incident.
concerning the initial call?

      Mr. Holcomb: I object to that.

      By the Court: You can answer it.

      A. I don't believe so.

      Q. That's all the questions I have, thank you.

      Mr. Sage: I don't believe we have any redirect.

      By the Court: You're excused.

      Mr. Holcomb: Ronald Dye.

      By the Court: Who'd you call next?

      Mr. Holcomb: Ronald Dye, from BCI.

      RONALD DYE, called on behalf of the State of Ohio,
having first been duly sworn, testified as follows:

      DIRECT EXAMINATION - By Mr. Holcomb

      Q. Sir would you state your name please?

      A. Ronald W. Dye.

      Q. And what's your profession?

      A. I'm a criminalist with the Ohio Bureau of Criminal
Identification and Investigation.

      Q. For the record, would you tell us what a criminalist
does?

      A. A criminalist is a general term and it includes
several people within the laboratory. My specific area is
the firearms-tool marks section of the laboratory. Other

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
STATE COURT TRANSCRIPTS - Page 148

areas of the laboratory we call...include microanalyst, drug chemist, latant fingerprint examiners and document examiners. The group of us all together are called criminalists.

Q. Mr. Dye, would you tell us what your...in a brief way, what your education, training and experience has been?

A. I received a Bachelor of Science degree from Ohio University in Forensic Chemistry, also did a internship with the/Ohio Columbus, Police Crime Lab, ah, however, the bulk of my training was received at the laboratory under the supervision of the Chief Examiner, of our section.

Q. Who?

A. Ah, Thomas Nicholson.

Q. Alright. Ah, how long have you been with BCI, did you indicate?

A. A little over three years.

Q. HAve you testified as an expert witness, as a criminalist, in trials in Courts in this State?

A. Yes I have.

Q. On how many occasions, would you guess?

A. Approximately 20 times.

Q. Okay, now, I'm going to show you what has been marked State's Exhibit for Identification #1, which consists of four metal containers, and I'm going to ask if you've had occasion to...first I'll ask if you can identify them, then I'm going to ask if you had occasion to examine them?





43

Q. Feel free to open them up.

A. Yes I can identify them.

Q. And what are they?

A. Ah, State's Exhibit #1, four metal canisters containing four fired .25 auto caliber copper jacketed bullets.

Q. Okay, now, did you have occasion to conduct an examination of those slugs?

A. Yes I did.

Q. Could you tell us what your examination revealed to you as a criminalist.

A. Okay, first of all, we examined the bullets microscopically for any trace evidence, after we note this, we then examine them for the presence of being fired, which is what we're looking for here is the presence of rifling. What we do in this case, is we count the number of lands and grooves which were registered on the bullet and also then, determine the direction of twists, the direction of twists on a gun can be either left or right, and by looking at the bullets we can determine the twist of the gun. And after we have done this, we...it depends on the evidence that is submitted, we usually try to match this back with the test bullets fired from the gun or determine whether or not all bullets were fired by the same gun.



Q. Now what did your examination reveal in this case?

A. My examination of these bullets revealed that all four of them were...had six lands and six grooves, with a left hand twist.

Q. Alright. Now, from your examination, of each of these slugs, and based on your education, training, skill and experience, I will ask whether or not you have an opinion within a reasonable scientific certainty, as to whether or not, all four of these slugs were fired from the same weapon?

A. Yes I do have an opinion.

Q. And what's that opinion sir?

A. It's my opinion, that all four of the fired bullets were fired by the same firearm.

Q. Alright, now, Mr. Dye, ah, because of the particular number of lands and grooves, ah, caused by the rifling of the firearm's barrel, as you have related to us, I'm going to ask if you can tell this panel of Judges, from what type weapon those slugs were fired, ah, manufacturer?

A. Upon examining the bullets as I mentioned, ah, they all had six lands and six grooves, with a left hand twist and by measuring the width of these lands and/grooves, and comparison of our files as well as the FBI files, the only two types of firearms that I could come up with

45

that these two...these four bullets could have been fired

from is the Raven Arms Company or an Astra (sounds like).

Q. Okay, now...

Mr. Garretson: excuse me, what was the second?

Q. Raven or Astra. Like Astro, only with an "a".

Mr. Garretson: Thank you.

Q. Mr. Dye, I"m going to show you what's been

marked State's Exhibit for Identification #2, and I'm going

to ask if you can identify the contents of that container?

A. Yes I can.

Q. And what are they?

A. State's Exhibit #2 contains four fired .25 auto

caliber cartridge cases of PMC brand.

Q. Alright, now, Mr. Dye, I'll ask if you had occasion

to conduct an examination or inspection of those cartridge

casings?

A. Yes I did.

Q. Now, as a result of that examination, and inspection

which you madeof those casings and based upon your education,

training, skill and experience as a criminalist, I'll ask

if you have an opinion within a reasonable scientific

certainty, as to whether or not all four of those casings

had been chambered in the barrel of the same weapon?

A. Ah, yes I do.

Q. And what's that opinion, sir?

A. Ah, it's my opinion that all four of fired cartridge cases were inchambered...at least chambered by the same firearm.

Q. Now,...I'm going to show you what's been marked State's Exhibit for Identification #19....

Mr. Garretson: (unclear)...

Q. #19.

Q. And I'm going to ask if you had occasion to examine that photograph before?

A. Yes I have.

Q. And I'll ask if ah, you had occasion to measure the diameter of that stipling pattern that you see in that photograph?

A. Yes I did.

Q. Okay, then I'll ask if you had occasion to test-fire a Raven Model P-25, .25 caliber semi-automatic pistol?

A. Yes I did.

Q. Okay, based upon your education, training, skill and experience as a criminalist, and based upon your measurements and the photograph in question which show the stipling on the decedent, and based upon your results of the testfiring of this weapon, I will ask whether or not, you have an opinion, within a reasonable, scientific certainty, as to

47

the distance between the muzzle of the weapon and the target, required to produce a stipling pattern of the same appearance in diameter as as that in the State's Exhibit photograph, do you have such an opinion?

A. Yes I do.

Q. And what is that opinion as to distance?

Mr. Shanks: Objection.

Q. Oh, if the Court please, I....I want to add something.

By the Court: Okay, go ahead.

Q. Just in case it's a basis for the objection, I will assure the Court that we will connect a Raven Model B-25 which is one of the things I asked him to assume with this case.

Mr. Shanks: If the Court wishes me to go into a further basis your HOnor, at this point in time, there's not been a proper foundation as far as we're concerned, to allow this person to testify as to a scientific test and his measurements of that scientific test, we do not know the way that test was performed, whether or not it was performed in circumstances similar to the circumstance of the shooting, also,, we believe we have testimony from Dr. Burkhardt which would indicate that the type of load, the particular gun, et cetera, all affect that type of stipling. We think that



48

there's notproper basis.

Mr. Holcomb: I believe that goes to weight rather than admissiblity.

(Discussion between judges)

By the Court: Be overruled.

Q. Well, what's that distance sir?

A. Assuming that the pattern that's depicted by the photograph is that of the gunshot wound, it would be my opinion that the muzzle, to target distance was greater than two inches but less than six inches.

Q. Thank you very much. Your witness.

CROSS EXAMINATION - By Mr. Shanks

Q. Mr. Dye, do I understand that your training at the University of Cincinnati was as a chemist, is that correct?

A. My training was at Ohio University.

Q. Ohio University.

A. No, it was not as a chemist, it was as a forensic chemist.

Q. Okay, and what is a forensic chemist?

A. A forensic chemist is really a misnomer for my field, it really deals, it should have been like forensic scientist, it deals with drug chemistry, microbiology, as in serology typing blood, and micro and trace evidence and it deals with firearms, and gets into some latent prints.



In such it's a more or less, a forensic science degree.

Q. Okay, is it fair to say that ah, the focus of that education was on forensic chemistry, though, and not necessarily on firearm training and ballistics and that type of...

A. The major emphasis was on chemistry, that's correct.

Q. Now, I believe that you've indicated to the prosecutor that you had a chance to examine a number of the exhibits? Is that right?

A. That's correct.

Q. And that after examination of, for example, State's Exhibit #1 which I believe are the bullets, is that correct?

A. That's correct.

Q. You were able to determine they were copper jacketed, is that right?

A. THat's correct.

Q. What's copper jacket...what's a copper jacketed bullet? Mr. Dye?

A. Ah, there's no lead exposed, it's completely covered by...except for the base, but ah...the bullets are surrounded by a copper jacket.

Q. Is that a common type of projectile?

A. In .25s yes.

Q. Alright, is there a purpose for that?



50

A. Ah, yes, for automatics you can't use lead bullets because you have a tendency for them to jam when they automatically reload, if the lead bullets are too soft, they have a tendency to jam again, so that's why you use the copper jacket.

Q. Is the copper jacketed bullet more expensive than say a standard lead bullet?

A. It would depend on what caliber you're talking about.

Q. I believe you've indicated that your tests of these, I'm talking about Stat'es Exhibit #1 now, that would be for a Joint Exhibit of four bullets removed, given to you for examination, that they were fired from a pistol a .25 caliber pistol, since they are .25 caliber, is that correct?

A. That's correct.

Q. Which had six lands and six grooves, left hand twists?

A. That's correct.

Q. And I believe further that you've indicated that your research has told you that in your research, only two manufacturers manufacture a .25 caliber weapon with that description, barrel description, is that correct?

A. With the particular measurements, the lands and grooves, that's correct.





61

Q. Alright, and what were those measurements, do you recall? Do you know those specifications?

A. It's in the neighborhood of like land width .051 inches and a groove width of .072 inches.

Q. And how do you do you determine that?

A. Do you want me to go through the exact procedure that we use?

Q. Yeah.

A. We have a microscope which is known as a comparison microscope, ah, this microscope is used for making comparison between two bullets, two cartridge cases, or whatever. What it has is two stages that allows you to put two objects on it, at different times and view them through a common eye piece and the way we measure these lands and grooves is place a bullet on one stage and a micrometer on the other stage and by high enough magnification we can actually measure the width of these lands and grooves using this micrometer, up to the nearest thousandeth of an inch.

Q. So if I can summarize, you basically put it under a microscope, blow it up, measure what you see, is that right?

A. That's right.

Q. Alright, and these bullets ah,and almost everyone of them are slightly deformed and that's not unusual, is that correct?





52

A. Ah, I believe the nose are slightly deformed.

Q. Alright, and this deformity, they're not...well, you would say that none of them are as round as they were when they were initially manufacturered, even the rear part, is that fair to say?

A. Ah...

Q. You may look at them if you need to.

A. Ah, there was some deformed but I don't think there's ah, enough deformity to change the width of the lands and grooves if that's what you're getting at.

Q. Well...is that what I'm getting at?

A. I don't know.

Q. Isn't that a possibility though that a deformity in a bullet can in fact change what you see when you look under/microsdope?

A. Insome cases, but not these four, no.

Q. Oh, I see.

Q. How do you know that?

A. Because the bullets are not that well...are not that damaged.

Q. Isn't it a fact that this is in effect, an opinion of yours that you had to come to as an examiner of these, there's no scientific measurement, that's your opinion, after you look and see what you see?



53

A. Ah, as far as I'm concerned, it's a scientific finding that I'm required to express in a form of an opinion.

Q. Alright, scientific finding that you make after your visual examination of the bullets?

A. That's correct.

Q. Alright, you've indicated to the Prosecution staff by way of report, that in fact, Raven Arms makes a weapon that has these characteristics as you described, as well as Astra?

A. That's right.

Q. I believe also in that report you indicated/the to Prosecutor that there are other possibilities may exist?

A. That's correct.

Q. Alright, so you're not telling this panel right now that as you sit there, that only two manufacturers make, manufacture a weapon that would, when fired produced those characteristics?

A. What I'm saying/that through our files as well as is the FBI files, the only two guns that I could find was the Astra and the Raven. There are hundreds of other guns that might be manufactured that no one knows about, basement guns and ah, but there's no way that we can testify that these are the only two guns because there are several that probably the FBI as well as us have never ran across, you



54

know, there's ...the possibility exists that they may be
out there, however, we've never ran across them, nor has the
FBI.

Q. Now, Astra is a fairly well known manufactuer
of handguns is that correct?

A. It's a common.

Q. Alright, and they....do you have any idea how many
of those handguns they, for example, .25 caliber, Astra may
make a year?

A. No.

Q. You would say the number is substantial?

A. I have no idea.

Q. Alright, how about Ravens, how many .25 caliber
Ravens are manufactured a year, do you have any idea?

A. No I don't.

Q. With these characteristics? This land and groove
chanracteristic, six lands, |six grooves, left had dtwist
with the same width measurements that you've indicated as
common to that manufacturer?

A. No I don't.

Q. Do you have any idea how many of those are sold
in Butler County, in the course of even a year?

A. No I don't.

Q. Is a Raven, a .25 caliber Raven, a rare handgun?

A. No it is not.



55

Q. In fact, it's a common handgun, isn't it true?

A. It's common amoung who are you....

Q. It's a relative...it's a relatively inexpensive automatic weapon with a low price that is common to gun shops, pawn shops, marketed widely, is that correct?

A. I've never went out pricing the gun but it's my understanding that it is a relatively inexpensive gun.

Q. And it is true that you have never seen nor have you tested a firearm that fired these bullets?

A. That's correct.

Q. The testing that you've indicated to the Court produced this two to six unches, were made with another Raven that you presumed to be the same or similar to the one who fired these bullets, is that correct?

A. If the gun...repeat the question again, I'm not...

Q. The test that you performed to be able to come in and tell this panel, that this stipling pattern indicates a wound distance of two to six inches, was performed with another pistol that you're presuming to have the same characteristics as the one that fired that actual bullet?

A. That's correct.

Q. Do I understand your testimony is that all four of those bullets came from the same .25 automatic?

A. That's correct.



56

Q. But you're not saying that it came from a .25 caliber Raven are you?

A. I.m saying that's one of the possibilities.

Q. The answer is no, you're not saying that, is that correct?

A. It's one of the possibilities.

Q. Do I understand also that you're saying all four of those cartridges were chambered in the same weapon?

A. That's correct.

Q. But they weren't fired necessarily from the same weapon?

A. I could not determine whether or not they were all fired by the same firearm.

Q. Why not?

A. A lack of individual registered characteristics.

Q. What do you mean by that?

A. Well when a cartridge case is fired, you have characteristics registered by the firing pin as well as the breech of the firearm. And upon examining these four cartridge cases microscopically, I couldn't find enough matching characteristics to positively say that they were fired by the same firearm.

Q. So if I understand your testimony, as you sit there, they're saying that all these at one time or another were chambered into the same weapon, but you couldn't find





57

enough evidence to say, <sub>w</sub>to a reasonable degree of scientific certainty, that they were fired by the same weapon?

A    That's correct.

Q.    But they do have, each one of them does have firingpin marks on them is that correct?

A.    They've got firing pin impressions on them.

Q.    Impressions, and you were able to microscopically examine those impressions just as you did the casings for the chambering effect, is that correct?

A.    That's correct.

Q.    And you had all the tools available to you to do that test as well as, that were available for the other test is that correct?

A.    That's correct.

Q.    In spite of that you can't say that they were fired from the same gun?

A.    Based on the fact that there's a lack of registered individual characteristics.

Q.    I did note one tquestion that ah, the Prosecutor didn't ask...can you tell me, Mr. Dye, as a criminalogist, as an expert in firearms, as a person with special training of all the micrscopes and other tools available to you, to make these determinations, whether you can say to a reasonable degree of scientific certainty that these bullets





came out of these casings?

A. No you cannot.

q. No further questions.

REDIRECT EXAMINATION - By Mr. Holcomb

Q. Mr. Dye, you wouldn't be able to say that unless you had the gun, would you?

A. As far as I know, there's no way to actually link the bullet back to the cartridge case.

Q. Thank you very much.

Mr. Shanks: Nothing further.

By the Court: You're excused. Thank you.

Mr. Sage: The State will call Mark Lovette.

MARK LOVETTE, called on behalf of the State of Ohio, having first been duly sworn, testified as follows:

DIRECT EXAMINATION - By Mr. Sage

Q. Mark, can you state your name and where you live?

A. Mark Lovette.

Q. Where do you live Mark?

A. ██████████████

Q. Okay, now, I'd like to turn your attention to the December 12, 1983, the day that Suzette Butler died, do you remember that date?

A. Yeah.

Q. Okay, I'd like to direct your attention to the afternoon, preceding her death. Did you have an occasion





59

at that time to be in Gabe's Bar, Babe's Tavern?

A. Yeah...yeah.

Q. Okay, I'd like you to describe to the Court, these gentlemen here, ah, what happened that afternoon?

A. Well, I was in there drinking me a couple of beers, and so ah, til these other guys came in and got me and said somebody wants you, so ah, so I went out there in the car, and so ah, he asked me, he said, would I do him a favor...

Q. When you say he asked you, who are you talking about?

A. Red.

Q. When you say Red, for the purposes of the record, indicate who he is?

A. Yeah.

Q. Okay, why don't you point him out. Is he the gentleman dressed in the black pinstriped suit inbetween the two attorneys here?

A. Yeah.

Q. Your Honor, I"d like the Court to reflect the identification of the Defendant.

Okay, what did he say to you when you got into the car?

A. He asked me to do some business for him...said he'd pay me, said me, said will I do him a favor, so we come up here, we rode up here to the place, the Gun Shop....

Q. Do you know the name of it?



60

A. No.

Q. Do you know where it's located at?

A. Yeah.

Q. Where at?

A. It's on Second...on Second Street, over there... we parked over there by the Bank and so he gave me the money, $40.00 dollars the first time, it I didn't have enough, so I...

Q. Did you go in.-.what were the instructions when you went into the Pawn Shop?

A. So I...well...well, I went in there, so Red asked me, he said will you make a deal, it'll be $50.00 dollars, so I went in there with $40.00 and I didn't have enough, so I went back out.

Q. Okay, now what...did the Defendant tell you what he wanted you to buy with the money?

A. Ah, okay, he gave me $50.00, so I went...in the car, so I went back in and then I got the gun, then I came back to the car, then the gun, and (unclear) and the receipt, so he dropped me off at Gabes so..-

Q. Okay, do you remember what type of gun it was?

A. No.

Q. Okay, what did you do after you bought...after you bought the gun and you gave it to the Defendant?

A. Well, he dropped me off back to Gabes, where he



61

he found me at.

Q. Okay, what happened next?

A. At about five or ten minutes he came back again and ask me to do another favor.

Q. Okay, what'd he tell you?

A. Well the other guy who came and got me the last time, so, we went out here to Kmart and I got the bullets that ah...so I had to sign my name and everything, so uhm, my driver's license and everything.

Q. What was the name of the store at that time?

A. Ah, this was the second time.

Q. Okay, where did you go?

A. Kmart.

Q. Okay, who gave you the money to purchase the bullets

A. Red.

Q. Okay, and who did you give the bullets to?

A. Red.

Q. Okay, what did you do after you have him the bullets?

A. Got back into the car.

Q. Okay, and where did you go again.

A. He drop me back out to Gabes again.



Q. Okay, and what happened after that?

A. And he came and got me again.

62

Q. What did you do then?

A. Went in Fairfield and we got some shells.

Q. And do you remember what the name of the place was?

A. No.

Q. So you got some more shells, what specifically did you do?

A. I went in there gave them the money, he didn't give me no receipt, he said, "Hey man,"...(unclear)...

Q. Who gave you again, on that occasion, the money to purchase more bullets?

A. Ah....

Q. Who gave you the money on the...

A. Oh, Red.

Q. Okay, and who did you give the bullets to that you purchased in Fairfield?

A. Red...

Q. To who?

A. Red.

Q. Okay, now, the place that you bought the second set of bullets, was this a Kmart store or was it a gun shop or what, do you remember?

A. A gun shop.

Q. Okay, now, you indicated that there was a third

63

person in the car, do you know what his name is?

A.  No.

Q.  Can you describe him?

A.  Yeah.

Q.  Okay, go ahead and describe him?

A.  He's a fat guy, bald headed.

Q.  Okay, have you ever seen him before then?

A.  No.

Q.  Can you describe the kind of car that Red was..
or the Defendant was driving that day?

A.  Yeah.

Q.  Okay, what don't you describe it.

A.  It's a yellow Pontiac.

Q.  I'll show you three photographs, State's Exhibit
#16, 17 and 18, and ask you to look at these photographs
Mark and ask you is that the car the Defendant was driving?

A.  Yeah.

Q.  That day?

A.  Yeah.

Q.  Okay.  Now, did Mr. Davis indicate to you why
he was purchasing the gun and bullets at that occasion?

A.  I don't know what he wanted for, I just did it,
for him, he gave me the money, said he'd pay me, that's all
I know.

Q.  Okay, were you ever paid any money for it?





64

A. He gave me ten dollars, he said he'd pay me $50.00 later, and I ain't seen him since.

Q. Now, after you got finished buy the guns at the Fairfield Gun Shop, where did he take you?

A. He dropped me back off...

Q. Where'd he drop you off at?

A. Orop me off by my aunt's house the last time.

Q. Okay, and what time of the day/was it that he finished his third trip?

A. I don't know.

Q. Afternoon, early evening, if you recall?

A. I think it was afternoon.

Q. No further questions. No further questions, your Honor.....

CROSS EXAMINATION - By Mr. Shanks

Q. Mr. Lovette, do I understand that when you were at Gabes at the day of this shooting, is that right, the 12th of December?

By the Court: You'll have to answer, don't shake your head, you'll have to answer.

A. Yeah, I don't know nothing about no shooting, or nothing, all I know is I give them the gun and that's it, that's all I know.

Q. Alright, now, we're going to go into that a little bit at a time and see what we can find out.



65

A. Okay.

something like that,
Q. You were there about 12:00 , 1:00 o'clock,/when a/third man, came in and asked for you?

A. The third man was the other guy, he was the last one that came and got me.

Q. Alright, so Mr. DAvis didn't come in and ask for you to do him a favor, another guy did, right?

A. Yeah.

Q. Was this this heavy-set bald headed guy?

A. Yeah.

Q. If I told you his name, would have remember?

A. No.

Q. Have you ever heard of a fellow named Jabo?

A. Yeah.

Q. Is that him?

A. Yeah.

Q. Yes or no.

A. Yeah.

Q. Do you know his last...if I told you his last name would you remember?

A. M.mmm..

Q. So, Jabo, the man you know to be called Jabo, a heavy set bald headed guy, come into Gabes and asked you if you would do him a favor?

A. Yeah.....no.

66

Q. Right....what did he say to you?

A. No. He didn't say nothing to me.

Mr. HOlcomb: Well, I object...wait a minute...I object. That's hearsay, as to what Jabo said.

Q. Your Honor, we're not asking for it for the truth of its content but because it caused this man to do something, and the purpose is what was said to cause this man to do something.

By the Court: He can answer.

Q. What did he say to you, this Jabo?

A. He didn't say nothing to me.

Q. You just walked outside when he came into the door?

A    A. No.

Q. Well how was it that you decided to go outside with him Mr. Lovette.

A. What are you talking about?

Q. I'm talking about Jabo, the man that came in and got you at Gabes.....

A. Well, I was in there drinking a beer, you dig?

Q. Right, right.

A. And Jabo was back in the back, I'm minding my own business drinking my beer, you understand?

Q. Yeah...I understand.

A. Okay, so like I said, you know, that's the way it





67

was.

Q. How was that, somebody come up and ask you, to do..for you to do them a favor? No....

A. Not Jabo.

Q. Oh, it wasn't Jabo?

A. No.

Q. Alright, it was another individual, right? Did Mr. Davis come into the bar and ask you to do him a favor?

A. I just got finished telling you that bald headed guy, he must have asked him send him for me. He was still out in the car.

Q. There's a bald headed guy but it wasn't Jabo?

A. What did I just get finished telling you, I said, man, it wasn't nothing but three of us, okay, me, him and the other guy.

Q. Now, this other guy, he was the one that asked you to do a favor?

A. Right.

Q. Alright, he asked you to come outside,/right? ^is that

A. I got into the car.

Q. You had never met Mr. Davis before then, is that right?

A. I'd seen him before....

Q. Alright.

A. Just like I'd see you walking down the street, I





68

know you when I see you, but I don't know your name.

Q. So you get in the car and you go up to Gills?

A. Yeah.

Q. Who told you, if anybody, that they wanted you to buy a gun?

A. Well, he just asked me to do him a favor...

Q. Who's he?

A. Red.

Q. When did he ask you that?

A. I don't know when, all I know is like I said, you know he asked me to do a favor, he just give me the money, I went in there and got my driver's license in there, and I did it to uhm,....(unclear)...

Q. So you go into Gills because somebody asked to buy a ....did they tell you what kind of gun they wanted?

A. No.

Q. Any gun, right?

A. Yeah.

Q. And they gave you $40.00 dollars to go in there and buy any gun you could, right?

A. And they had 'nough....

Q. Alright, did they tell you they wanted a .25 caliber?

A. . I don't know, all I know is that it's an automatic, that's all I know.





Q. An automatic. So you went back out and who handed you this money?

A. Red.

Q. Are you sure of that?

A. Yep.

Q. And this...where was...

A. I didn't have no money...

Q. Who didn't have any money?

A. Me...and (unclear)...you know.

Q. There was another person in the car, is that right?

A. Yeah.

Q. Where was this other person sitting in the car?

A. On the right side.

Q. Where the passenger sits up in front, right?

A. Whatever.

Q. You're certain this other person didn't give you the $40.00 dollars, is that right?

A. Red handed me forty dollars and I went back to the car cause I didn't have enough, he gave me $50.00 and that was it.

Q. This other person do it? And then when you came out, who did you give the gun to?

A. Red.

Q. And it was in a box in a bag, I guess, is





70

that right?

A. In a box.

Q. In a box, and you said you'd give it to him, was Mr. Davis driving this ear?

A. Yeah.

Q. Alright, well did you lay the box on the seat, on the dash, did you put it in his hand, what did you do?

A. I don't know what, I just did it to him, that's all I know, cause I was sitting in the back.

Q. Are you sure you handed it to him?

A. Yeah, I handed it to him.

Q. Alright, you didn't give it to the passenger?

A. No.

Q. What did they do with the gun?

A. You ask him, I don't know, I just give it to him.

Q. You didn't see it from that point on, is that right? You didn't see it laying/the seat, or on the dash or anything like that?

A. I just...all I know I just give it to him, okay?

Q. Then you went on back to Gills...or excused me, back to Gabes.

A. Back to Gabes.

Q. Back to Gabes, right?

A. Yeah.





Q. How long had you been in Gabes by the way, before you went up to get this gun for him?

A. I'd been in there ever since 6:00 o'clock this morning.

Q. Alright, and ah, were you playing pool?

A. Say what?

Q. Were you playing pool in there?

A. No...you can't...(unclear), you don't shoot no pool in no Gabes man, I go in there and drink my beers play my record and enjoy myself, and mind my business and leave everybody else alone, you understand that?

Q. Alright, so you went in there...alright, so you went in there...yeah...yeah....

A. Okay.

Q. You went in there to drink beer, right?

A. Yeah.

Q. From 6:00 o'clock til 12:00, right, that's what you did, from 6:00 o'clock to 12:00?

A. Well...whatever.

Q. Fine, how many did you have?

A. Two.

Q. Two....in a period of six hours you had two beers, is that right?

By the Court: You'll have to answer.

Q. Yes?

72

A. Yep.

Q. So, when you went back to Gabes, after leaving Gills, did you have a third beer then?

A. No.

Q. No. So how long did you stay at Gabes before they came and got you the second time?

A. Not too long.

Q. A half an hour, an hour?

A. Maybe an hour or two.

Q. Alright, a little while. Then I understand there was a trip down to Kmart, is that right?
Yeah. Q.
A./=The same two people in the car?

Q. Yeah.

Q. As went to you with Gills?

A. Yeah.

Q. Who gave you the money to buy the bullets at Kmart?

A. Red.

Q. Sure of that?

A. Yeah.

Q. The other person didn't hand you the money?

A. Ut-uh.

Q. Came back out, who did you hand the bullets to?

A. Red.

Q. Are you sure of that?





73

A.  Yeah.

Q.  What was this other person doing all this time, just sitting there?

A.  Yeah...(unclear)...after I got all this...this all together, after I got all this, he drop me off, okay, I see where...hyou know he just drop me on off, you can do what you want to.

Q.  But they come back and get you again, right?

A.  Naw.

Q.  No?

A.  After the third time, that was it.

Q.  After that you didn't want to have anything more to do with them, is that right?

A.  Third time...that was it.

Q.  And I understand that you told Mr. Holcomb that Red promised you $50.00 dollars if you 'd (unclear)...

A.  $60.00 dollars.

Q.  $60.00 dollars?

A.  He gave me $10.00 and I ain't seen the $50.00 later, and after that happened, there...(unclear), you know, I was watching TV and it showed him shot the gun, I saw it on the...yeah, I went up there, you know, the same day it happened, went up there to talk to the detective.

Q.  You went up there on your own?

A.  Yeah, the heck I didn't.



VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
STATE COURT TRANSCRIPTS - Page 180

74

Q.  Did you write a written statement out?

A.  Yeah.

Q.  Did you testify at the preliminary hearing?
Have you ever testified in this case before?

A.  No.

Q.  Your Honor, may we approach the bench?

AND THEREUPON, Counsel approached the bench, and
the following conversation was held?

Mr. Shanks:  Criminal Rule 16 allows us to request
the Court to examine any written statements made for any
possible inconsistences ah, which would aid us in cross
examination, not that we're aware that he has done that,
we would ask the Court to do that.

I can continue and we can break for lunch and then
have him recalled.

Judge Moser:  Do you have a written statement?

Mr. Sage:  Yes sir.

By the Court:  We'll take a look at it.

Mr. Shanks:  Alright.

By the Court:  (inaudible)

Mr. Sage:  Your Honor, we don't mind, it'll just take
a second, it's just a two page statement, it'll just take
a second.

Mr. Holcomb:  If it please the Court, if it'll save
any time, we don't have any objection to letting counsel



inspect those statements and we have no objection if they
you know, want to stipulate them into evidence, it makes
no difference to us.

Mr. Shanks: It's two separate ones Judge.

By the Court: Here's the other one. Why don't we
just take about a five minute and then we'll come back
and we'll finish with this witness.

Mr. Shanks: Sure...alright.

AND THEREUPON, Court was recessed for five minutes,
whereupon, Court reconvened and the following transpired:

Q. Mr. Lovette, you indicated to me in your earlier
testimony that you had gone to the police station shortly
after you had found out about this shooting and they took
a written statement from you and you signed that statement,
is that correct?

A. What you saying now?

Q. You went to the police station after you found
out about the shooting and you told them about things that
you've described here today and to this court, is that
correct?

A. Yeah.

Q. Alright, and isn't it true that...and that was
to be fair to you, that was the next day, that was December
13th, is that right, do you remember that?



A. That was the same day, that wasn't no third....that was the same day, it was later on that night.

Q. Okay, isn't it a fact that you told the police contrary to what you told this panel of judges, that it was REd Davis, who came into the bar first to ask you to do him a favor?

A. No I didn't say that...I didn't say that...don't try to screw my mind up...you heard what I said.

Q. Did you tell the police this, Mr. Lovette, "this morning at 9:00 a.m. I was sitting at the bar in Gabes, when Red Davis walked up to me, he asked me if I would do him a favor and I told him yeah" did you tell the police that?

By the Court: You have to answer.

A. That's the same thing , just like/I tell you to tell somebody else, that's the same thing.

Q. You told the police, either the same day or/next day, that it was Mr. Davis who came in and asked for the favor is that right?

A. Yeah.

Q. You told this Court though it was another man?

A. Na.....

Q. You also told this Court is was about 1:00 o'clock, you told the police it was 9:00 o'clock? Isn't that true?

A. That' was later on that night, I don't know what time it was...I just went up there, I don't know what time

77

of day it was. I went up there...just...I just did the right thing, I just went up there...I just did, you know, I didn't want to lie about it....you know...

Q. It is a fact, is it not that at no time that you were going back and forth like you've testified to,.....

A. I didn't look at no time, I just you know...you understand?

Q. Isn't it true Mr. Lovette, that when you were with Mr. Davis and this other individual who you don't recall right now, who it was that nobody ever talked about shooting anybody at any time?

A. No.....

(Discussion held between Judges......)

Q. Your Honor, Mr. Holcomb has indicated that they have no objections in having these witness' statements marked and introduced into evidence and we would concur in that, and with the Court's permission and Mr. Holcomb has not changed his mind, we would ask that these be marked as Joint Exhibit .....

Mr. Holcomb: Not only that we'd be happy to stipulate that all the witness' statements in the case can go into evidence, make it as quick as possible.

Mr. Shanks: If we can see them on an individual basis ahead of time, it's possible we can resolve that issue.

By the Court: Well, as far as this one, if there's



78

no objection, it'll be introduced and made part of the record.

Mr. Holcomb:  This one or any of them,your Honor.

Mr. Garretson:  If we could get copies of them and then we'll view them and then inform the Court.

By the Court:  Well just...we'll just do this one, if you want to stipulate lateron, you can come in and do that.

Mr. Holcomb:  Alright, thankkyou your Honor.

By the Court:  Anything further of this witness?

Mr. Sage:  We have no redirect your Honor, if they're finished with their....

By the Court:  Are you finished with this witness?

Mr. Shanks:  Yes your Honor.

By the Court:  You're excused...And with that we'll take a break until whatever time...what time do you want to get backhere.  1:00 o'clock too soon?

Mr. Holcomb:  That's fine.

By the Court:  1:00 o'clock, too soon...we'll well we'll be here.

AND THEREUPON, Court was recessed for the noon hour, whereupon, Court was reconvened and the following transpired:

WADE COLEMAN, called on behalf of the State of Ohio, having first been duly sworn, testified as follows:

DIRECT EXAMINATION - By Mr. Sage

Q.  Sir, would you state your name?



79

A. Yes, Wade Coleman.

Q. And where do you live, Mr. Coleman?

A. ███████████████

Q. Okay, are you related to the Defendant here, Von Clark Davis.

A. Yes, we're cousins.

Q. Okay, this is the gentleman sitting in between the two attorneys.

A. Yes.

Q. Okay, now, I'd like to turn your attention to the date that Suzette Butler was killed which is December 12, 1983, are you familiar with that date?

A. Yes.

Q. Okay, and I'd like you to turn your attention to the approximately noon of that date and ask you if you had an occasion to be with Mr. Davis, that day?

A. At the time of the shooting you mean?

Q. No, earlier that day?

A. Oh, yes.

Q. Okay, now I'd like to just take you back to ah, approximately noon time and ask you where you were and what you were doing at that time?

A. Well, I was at home when he came to my house.

Q. Okay.

A. To pick me up.



80

Q. Where'd you go?

A. Well, we rode around for a minute drinking and so on. Well, we went down to Gabes and picked up Poppa, well, Mark whatever.

Q. When you say, Poppa, do you know his last name?

A. No.

Q. Did you say his first name was Mark?

A. I imagine so, yeah.

Q. Okay, you're familiar with the gentleman who just testified?

A. Not really, no.

Q. Well, anyway, you went to Gabes and what happened?

A. Well, ah, he went in and picked up Poppa, we rode uptown, ahm, off of High Street by the Alley there, and ah, he gave Poppa some money, Poppa went in and bought the gun and he came back out.

Q. Do you know where...you say he bought a gun, do you know where he went to buy a gun?

A. Gibbs...Bibbs or whatever that place is, I'm not...

Q. Okay, do you know ah, what street that's located on?

A. Third, I believe.

Q. Okay, and you indicated that he gave him some money who's he now?

A. Red....Mon rather.

Q. Okay, that's the gentleman sitting here right?

A. Right.

Q. Okay, and do you know how much money he gave him?

A. Uhm, not truthfully, no ah, not really no.

Q. Okay, you gave him the money and what happened next?

A. WEll, Poppa went in and got the gun, a .25 automatic, came back out, Ton looked at it, you know, slide it under the chair, ah, the ah, car seat there, and went on. At the time they didn't have the bullets for the shell there, the gun there, and ah, we rode out to Kmart and they bought some bullets there, but the bullets there didn't fit very well so ah, we took Poppa, well we went back, dropped him off...

Q. Well, let me ask you this, prior to ah, after you purchased the bullets at Kmart, what did you do with Poppa?

A. We took him back down to Gabes.

Q. Okay, and after that, did you have an occasion to go back to Gabes and pick Poppa back up?

A. Yes, cause the bullets wouldn't fit the gun, didn't fit the cartridge, whatever.

Q. Okay, and ah, when did you...what time did you pick him up, if you remember?

A. Truthfully, I don't know....really remember.



82

                                    in
        Q.  Well/terms of, was it early, late or in the middle
of the afternoon?

        A.  It was afternoon.

        Q.  Do you know what approximately what time it was?

        A.  No.

        Q.  You picked Poppa up, do you remember where you
took him then after you picked him up?

        A.  Well ah, we picked him up the second time there
and went down to Butler County ah, place on Route #4, they
had the shells for the gun there.                           y

        Q.  So you went to Butler County, what would be...is
that the name of the store?

        A.  It's Butler...ah, something, I don't really know.

        Q.  Okay, do you remember where that's located at?

        A.  There's some big tire bells, I think it's down
from there.

        Q.  Okay, what did you do when you got there?

        A.  Well went in, ahm...

        Q.  Who went in?

        A.  Me and Poppa.

        Q.  Okay.

        A.  Well, we went in you know and the guy, the gun
and the shells from Kmarts, they were the correct shells
but he didn't know how to put them in the cartridge right,
so the guy showed how to put them in the cartridge. So, that





83

was that, we bought them and went on.

    Q. Now, you say you bought it, did you buy anything
at Butler County?

    A. The shells.

    Q. Okay, are these in addition to the shells
which were previously bought at Kmart?

    A. No we had to take them back.

    Q. Okay,

    A. Cause they didn't fit very properly.

    Q. Okay, did you buy new shells at Butler County
Gun?

    A. Yes, for the shells...

    Q. Okay, who gave you the money to purchase the
bullets.

    A. I didn't purchase them.

    Q. Okay, who provided the money to purchase the
bullets if you remember?

    A. Von.

    Q. Who did he give the money to?

    A. Poppa.

    Q. Did Poppa purchase the bullets in your presence?

    A. Yes.

    Q. And you indicated to me previously that the
bullets were placed in the....clip.



84

A. The gun...well, whatever...

Q. Okay, in the store?

A. No...well, in the store, the guy you know, he showed us the ...he clipped one in there, and showed us how and then he took it out and slide in there...and, well Von, after that, you know, he knew how to do it.

Q. Well, after you came out of the store did you what did Poppa do with the bullets?

A. Well, he gave them to Von.

Q. What did Von do with the ah./well, we drove off and ah, that was just that you know.

Q. Okay, well in your presence did he load the clip up?

A. Yes, about four or five bullets.

Q. Okay, and did he put the clip inside the gun?

A. Yes.

Q. What did he do with the gun, if you recall?

A. Then he slid it back under the seat and went on.

Q. Okay, now what kind of car was he driving that day?

A. I imagine it was a Bonneville, Catalina, Cadillac a, Pontiac Catalina.

Q. Let me show you three photographs, State's Exhibits #16,17 and 18, and ask you if this is the car that Von Davis was driving that day?

A. Yes...yes.



Q. Okay, and after that occasion where did...when did he drop you off?

A. Oh, about 3:00, 3:30, in front of my house.

Q. And was that the last time you saw him that day?

A. Yes.

Q. I have no further questions......Did Mr.Davis have an occasion to discuss with you why he dneeded to have a gun?

A. No more than he wanted for protection.

Q. Okay. Did his girlfriend's name, Suzette Butler come up in any conversation concerning the gun?

A. Well, no more than ah, he wanted/protection...
it for
some guy and Sue was after something I really don't know.

Q. Well, was there a conversation concerning Suzette Butler and the gun?

A. No.

Q. Okay, did he indicate to you specifically what he was going to use the gun for?

A. No.

Q. No further questions.

Mr. Garretson: YOur Honor, ah, similar to...or, your HOnors, similar to our request in the last witness who testified if in fact there's a statement made, written statement made to the police, we'd like an in camera inspection, unless



you want to use the same procedure.

Mr. Holcomb:  We have no objection to turning it over
and we're willing to stipulate it, can go into evidence.

(Discussion held between Judges.......)

Mr. Garretson:  We're ready to proceed.

CROSS EXAMINATION - By Mr. Garretson

Q.  ARe you nervous here today, you've been breathing
heavily.

A.  Of course.

Q.  Okay, have you talked to anyone before you came in
here today, did you talk to the police officers or anyone
just out in the hallway?

A.  Ah, I talked to a Det. Mike something, I don't
know really...

Q.  Oh, so that it's clear, ah, Red Davis, he's a
distance cousin, right?

A.  Correct?

Q.  One thing is clear he never told you or he never
told Poppa Lovette, in your presence, keep your mouth shut
about this or don't tell anybody that we did this, he never
said anything like that did he?

A.  No.

Q.  And he never told you he was planning on using this
gun that day or anything like that, did he?

A.  No.



87

Q. Red, that day, wasn't worked up or excited or angry or anything else was he?

A. He seemed pretty fine.

Q. The two of you did have something to drink that day?

A. Yes.

Q. What were you drinking?

A. We had a little beer and wine.

Q. Okay, and when you first went to Gabes, ah, when Mr. Lovette became involved, this Poppa Lovette, was there somebody else who was with you, a heavy set bald person?

A. No. It was just the three of us.

Q. Alright. Was there a heavy set bald person that went in to Gabes to get Poppa Lovette or was it just you and Red went in to Gabes?

A. Von went and got him at first.

Q. Okay. Nobody else was involved, right?

A. No, of course, I don't know.

Q. Did you go into Gabes with Von the first instance, the first time?

A. No.

By the Court: Was there an answer to that question?

Q. I believe he did.

By the Court: What was your answer to that question?

A. Could you repeat the question please?





88

Q. Did you go into Gabes with Von?

A. Oh, no...no.

Q. Alright, did you go direct to Kmart from uptown where Lovette bought the gun?

A. Yes.

Q. Did you go into Kmart with Lovette?

A. Yes.

Q. Von Davis did not go in, correct?

A. No.

Q. When you got the gun at Gills, when Lovette got the gun, did he just bring out a gun or was it in a bag or was it in a ....

A. It was in a square box.

Q. Alright, was it also in a bag or just this box?

A. No, just a box.

Q. Now, who was sitting where in this car?

A. Well, Red was the driver, I was sitting in the passenger's dside and Poppa...well, Lovette, was in the back.

Q. Alright, when Lovette came out of the Gills, isn't it true that he just put that gun up on the front seat?

A. No....no...no.

Q. Did he put it under the back wseat?

A. No, no, he handed it to him and he looked at the gun and then he slide it under the front seat, his side of the seat.



89

Q. NOw, when you came back from Kmart and you dropped off Lovette at Gabes again?

A. Yes.

Q. When you went back to this Butler County Gun Shop down in Fairfield, did you take the gun into the gun shop or did you just take a clip in to this gun shop?

A. Just the clip.

Q. Alright, where was the gun at that point?

A. Ah, I really don't know, at the time it was up under the seat, it might have been laying under the seat, I don't know.

Q- Ah, Just a moment....(Talks with counsel.....)

By the Court: Hand gun should be...(unclear)...

Q. That's all the questions we have.

By the Court: Any redirect here?

Mr. Sage: No redirect your Honor.

By the Court: You're excused, thank you.

Mr. Holcomb: Phyllis Becker.

PHYLLIS BECKER, Called on behalf of the State of Ohio, having first been duly sworn, testified as follows:

DIRECT EXAMINATION - By Mr. Holcomb

Q. Ma'am, would you state your name please?

A. Phyllis Becker.

Q. And what's your address please?

A. ███████████████, Cincinnati, Ohio.

90

Q. And what's your business or occupation?

A. I'm a clerk at Gills Loans, at 11 South Third Street.

Q. Were you so employed on December 12, 1983?

A. Yes sir.

Q. I will ask whether or not in connection with ah, your employment at Gills, you have occasion to be the custodian of certain business records that are kept pursuant to law, at that location?

A. Yes sir.

Q. And specifically, I'm referring to a form that required to be kept by those in your business concerning firearms and weapons sales for the City of Hamilton, Ohio, specifically, for the police department, are you in charge of those?

A. Yes sir.

Q. Okay, now, I'm going to direct your attention to December the 12th, 1983, at 1:40 p.m., and I'll ask if you had the occasion to prepare a form for one Mark Lovett?

A. Yes sir.

Q. Signifying that a purchase of the firearm by him, is that correct?

A. Yes sir.

Q. Okay, now, do you have that with you?

A. Yes I do.



91

Q. Mrs. Becker, I'm going to show you what has been marked State's Exhibit for Identification #25.

A. Yes sir.

Q. And I'm going to ask you to tell the Court what that is?

A. This is a Firearm and Weapons Sale Report from December 12, 1983, at 1:40 p.m., for a Raven P25 automatic to a Mark Lovett at 922 Vidourek, in Hamilton, Ohio.

Q. Did he sign it?

A. Yes sir.

Q. And did you sign it?

A. Yes.

Q. And does it accurately reflect that transaction?

A. Yes sir.

Q. Okay, thank you very much. Your witness.

CROSS EXAMINATION - By Mr. Garretson

Q. Did you fill out this form that's been marked as State's Exhibit #25 in your own handwriting?

A. Most of it, yes.

Q. What part of it is your handwriting and what of it is not?

A. This is my boss, the description of what he was wearing is my boss and his phone number. The rest of it, the description of the gun and and things is mine. We worked



92

together on this.
                    What
                Q./Part of this, if any, did Mark Lovett,....

        A. He just signs this form.

        Q. Just signed it?

        A. Yes.

        Q. Did he show you any identification?

        A. Yes there was an Ohio Driver's License, I have
the number.

        Q. Okay, did you ask him to fill out any part of it?
Any part of this form?

        A. Not on this form, no sir, the only thing they do
on this one is sign.

        Q. Is there some other form you have that they fill
out?

        A. There's a Federal form that he filled out?

        Q. Do you have that?

        A. No sir, I don't have that with me.

        Q. Okay, did you send that in?

        A. That stays with the store, that is not sent in
to the Police Department, that's kept in our records.

        Q. What information is kept on that form?

        A. The same as what's on here.

        Q. Except...

        A. That's the one that he writes that he is not under
indictment, he has not ever been in prison, he is not an

93

addict, he answers those questions on that form.

Q. Alright, was this a new or used weapon?

A. To my knowledge, this was a new weapon.

Q. What model or make was the weapon?

A. It was a Raven P25 semi-automatic.

Q. Now, ah, is that an inexpensive hand gun?

A. We sell them for $49.50.

Q. Alright, are there a great number of those sold?

A. A great number? That's a popular handgun for people to keep around the house.

Q. It's a common selling item at Gills?

A. Yes sir.

Q. Do you sell other brands of guns besides Ravens?

A. Yes sir.

Q. What other brands do you sell? A lot?

A. Colt, Smith & Wesson, Ruger, Targa, Beretta, do you want them all......ah, all of them....RG....

Q. You, ah, at no time did you see ah, the Defendant who's sitting here today in your store that day, correct?

A. I couldn't identify him, no.

Q. That's all the questions we have.

Mr. Holcomb: Thank you very much ma'am.

Mr. Sage: Ron Williams........

RON WILLIAMS , called on behalf of the State of Ohio, having first been duly sworn, testified as follows:

DIRECT EXAMINATION By Mr. Sage



94

Q. Sir, can you state your name and occupation?

A. Ron Williams, work at a gun shop on 4830 Dixie Highway.

Q. What is the name of that gun shop?

A. Butler County Gun.

Q. Was the name of the gun shop on December 12, 1983, Butler County Gun also?

A. Yes it was.

Q. Okay, I'd like to turn your attention to the afternoon hours of December 12, 1983, and ask you if you had an occasion to make a sale, if you can recall to anybody, let me help you...let me show you what's been marked State's Exhibits#22 for Identification...

A. Okay.

Q. And ask you if you can recall the sale of ah, the item listed in the ah, receipt?

A. Yes I do.

Q. Okay, why don't you describe to the Court the transaction that occurred and as you recall it?

A. Okay, I'd say between 2:30 and 3:30 in the afternoon, two guys came into the place of business, brought me in an instruction sheet, to a gun that was...and asked me what kind of bullets went in it. I looked at the instruction sheet and they had the clip of the gun with them, they

95

did not have the gun. Uhm, I looked at: the instruction
booklet and it said MP25 Raven, a Raven Model 25, MP.

Q. Okay.

A. I told them it was a .25 automatic. They said
do you have any shells for it I said yes I....yes I do, and
ah, ask me how much it was and I told them I said it was
$9.00 plus tax, he said okay, ah,....I think I remember him
looking at the other guy and asking him like he had a couple of
dollars, cause I don't think they had enough money to get it,
and the other guy gave him a couple of dollars, cause I don't
think they had enough money to get it and the other guy gave
him a couple of dollars, he said, okay, I'll take it.

I said okay, took out the shells, showed them that it
was the right one for the gun, you know, it showed it on the end
of the box that it was a .25 automatic shells. Ah...let's see...
and then I took the...I took the things I make receipts out
on and said, is that...you know, will that be all and they
said yeah, and so I said, that'll be $9.00 plus takes it's
45¢ on 9.00, it's $9.45. He said okay, and I took the money
and I wrote him the receipt, gave him the white copy, kept
this copy, ah...at the time the mistake was on my part ah,
on the registration of the bullets I just started in the
business, you know, I just started working there , I hadn't
been working there but about a month or two and I did not



96

know...well I did know that you had to register some bullets but I didn't know it was the .25s because you don't have to register the .22s, which I know now.

Q. Okay.

A. And I said, you know ,/thanks alot and they walked out the door.

they said

Q. Now, does the sales slip which you have as marked as a State's Exhbit, reflect the manufacturer, caliber and type of ammunition provided?

A. Yes it does.

Q. Okay, what does it state?

A. Ah, one box PMC .25 automatic Auto..well, it says Auto which is automatic.

Q. Okay, now, can you describe the two individuals who came into your store?

A. Ah, the one guy, the one guy that did most the talking and handed me the instruction booklet and he handed me you know the instruction sheet to the gun, was a short guy at...he had curly ah, hair and the other guy was a heavyset guy, not...he didn't do much talking, you know, he stood, kind of stood behind the other guy, he didn't do much at all.

Q. Okay....now,you've been up in the courtroom today, have you seen those...either one of those two individuals present?



97

A. I've seen one of them.
                    one
Q. Okay, which/was that?

A. Ah, the guy with the hat on.

Q. Okay, and was that the sho...

A. He had a red jacket.

Q. And that was the individual who previously testified in here earlier?

A. Ah, I imagine...yeah, I think I've seen him come in here.

Q. Okay, he would be the short or the tall one?

A. The short one.

Q. Okay...wait a second your Honor.....No further questions, your Honor.

CROSS EXAMINATION   By Mr. Shanks

Q. Mr. Williams, you've indicated to us in your testimony that you've had been employed at the gun shop for a couple of months prior to this sale, is that correct?

A. Yeah, I don't know exactly when I started without going back .

Q. And ah..-.can you tell me when the first time you were contacted by a police officer or a member of a police agency or anybody, regarding the sale that's reflected in State's Exhibit #22, the receipt?

A. Uhm...I would guess it was about a week later maybe.



98

Q.  And had you worked the intervening period of days at the store, subsequent to this sale before you were contacted, you weren't on vacation or anything were you?

A.  No.

Q.  Alright,

A.  But we are closed on Wednesday, and that's the middle of the week, so...and I don't work Saturdays, I just work Monday, Tuesday, Thursday and Friday.

Q.  Alright...alright.  How many sales did you have on December 12th, do you have any idea?

A.  No.

Q.  How many people came into your shop, do you have any idea?

A.  Ah, let's see...I don't know...there's no way of knowing that.

Q.  Alright, how about December/14,15,16...can you recall any of those days specifically?

A.  Not really.

Q.  Do you remember seeing me down on your shop on one of those days?

A.  No, but there was one other guy ah, out there, which I think he's a lawyer who has...it's been about a month ago, I did buy a gun off him and I recognize him.

Q.  So what I"m saying is, you don't recall everybody that comes in and out of your shop, right?

99



A.  No, I'm not saying that.

Q.  Well, when the police contacted you about a week after this, how was it that you were able to recall that specific transaction?

A.  Because I...we didn't have many ammunition sales. You know, that's not what our main line of business is.

Q . So it was one of ah, very few ammunition sales that you had made that week?

A.  No, I wouldn't say very few, ah, you don't get a whole lot of calls for a .25 automatic, you know.

Q.  Have you ever seen Mr. Davis in there...store?

A.  No, I don't think I have.

Q.  Now, you've indicated that you believed...to the prosecutor you that you had seen one of those individuals who were there that day,
/that day, one of those individuals involved in the purchase
                                    automatic
of these .25 caliber/shells , reflected by this receipt here in the courthouse, is that correct?

A.  That's right.

Q . Are you certain of that, are you certain it's the same guy?

A.  Yeah,

Q.  But you didn't see the other guy?

A.  I..well, I seen him, I didn't pay no attention to him, he was standing in the background and he wasn't saying

100

a word.

Q. I'm talking about today, you didn't see the other guy?

A. No.

Q. Alright, you're certain of that, too?

A. I'm not real certain cause I can't say for certain because ah..., like I say, you know, I didn't pay much to him.

Q. Alright, but this other guy, he had to help the one buy the shells, right, and he had to give a couple more dollars or something like that?

A. UYeah he took it out of his pocket and handed it to him.

Q. Okay, so he had to walk up to you and you had a opportunity to observe him as clearly as....

A. No, he turned around...directly behind him and took the money sir.

Q. These PMC .25 automatics, is that an unusual shell?

A. No.

Q. Anything special about that cartridge at all?

A. No, other than it should be outlawed.

Q. Why do you say that?

A. It's...it's...since it's/.25 automatic is senseless.

senseless.

Q. Well, we're not going to get into the relative merits of firearms but you would be fair enough to tell us that this is a common pistol shell?

A. Fine....yes...now, now that I know it is.

Q. Alright...in fact, you're...Butler County Gun is not the only outlet in this area that sells those I'm sure, is that correct...do you know that?

A. Uhm, I don't go to other stores and look for them no, but I wouldn't think so.

Q. Do you know what PMC stands for?

A. Ah, I did, but I forgot.

Q. These people who came in to buy those bullets that day, did you...now you're...your gun store faces Dixie Highway right?

A. Right.

Q. Right next to a pony keg right there on the right hand side as you look out the window?

A. Right...right.

Q. And people come up and park right in front/your store, is that correct?

A. Not necessarily.

Q. Alright, but there's a parking lot right there and you have a window and there's a window in your door and you can look and see in the parking lot?

A. Yeah, there's a big picture window in the front.

10:

Q. Did you see this..these individuals that you described, drive up that day?

A. No I didn't.

Q. You didn't see what kind of car they were in?

A. No I didn't.

Q. Did you see them walk out the door?

A. Yes I did.

Q. Where'd they walk to?

A. Walked past the ponykeg.

Q. Past the ponykeg?

A. Walked out the door, turned right, and walked that way.

Q. Alright, did you watch them leave?

A. No, I watched them go out the door and turn that way.

Q. Anything unusual at all, their appearance and demeanor or anything, called your attention to them specifically? Or make you remember them over any other customer?

A. Other than the .25 caliber bullets I sold that day.

Q. Was that the first time you ever sold .25 caliber bullets?

A. At that time it was.

Q. When you say at that time, you mean, on December 12, 1983, is the first time you ever made a transaction like that?

103

A. Yeah.

Q. Now, these people who came in, by the way, they had clip and an instruction sheet, is that right...booklet for a Raven?

A. Right.

Q . Does your store sell Ravens?

A. Not any more.

Q. Did you then?

A. I don't think we had any one in the shop at the time.

Q. Alright, but you had in the past, I presume?

A. Yes.

Q. So you were familiar with this type of gun?

A. Not at the time.  LIke I said, I just started in the business, I remember a Raven laying there, because it's the cheapest gun you can buy.

Q. Thank you, no further questions.

Mr. Sage: No redirect.

By the Court: Alright, you're excused. Thank you.

A. Thank you.

Mr. Sage: Mona Aldridge

MONA ALDRIDGE, called on behalf of the State of Ohio, having first been duly sworn, testified as follows:

DIRECT EXAMINATION - By Mr. Sage

Q. Mona can you state your name and where you reside?



104

A. Mona Aldridge, ███████████, Hamilton, Ohio.

Q. And were you formally a friend of Suzette Butlers?

A. Yes.

Q. Okay, and I'd like you to turn your attention to December 12, 1983, the day that Suzette Butler was killed. I want to ask you, did you have occasion to be with Suzette Butler that day?

A. Yes, I did.

Q. Now...

By the Court: Excuse me, I didn't get her name?

Q. Mona Aldridge....you have to speak up. Did you have an occasion to be with her that day?

A. Yes.

Q. Okay and approximately when was the first time you saw her that day?

A. I saw her that morning.

Q. Okay, and where was...what was the occasion for seeing her in the morning?

A. We went shopping together.

Q. Okay, and were you with her for the rest of the day?

A. After we went shopping, she went home to pick up her daughter.

Q. Okay.

A. And ah, I seen her later on.

Q. Now, you're going to have to speak up again.





105

A. Okay.

Q. Did you get back with her later on that day?

A. Yes.

Q. Where did you get back together at?

A. At the American Legion.

Q. At approximately what time did you meet with her at the American Legion?

A. About 4:00.

Q. Okay, and was any one with her at that time?

A. Her daughter, Facia (not sure of spelling)

Q. How long did you spend at the American Legion?

A. That day?

Q. Yeah, after you returned to the Legion with her//

A. With her...she stayed about...about an hour or so.

Q. Okay, what did she do at that time?

A. She took her daughter to get something to eat and we took her daughter to the babysitter.

Q. She has a daughter, how old is the daughter if you know?

A. Ten years old.

Q. Now, did she return after dropping the daughter off?

A. Yes.

Q. Can you relay approximately what time, if you recall?



A. About 5:00 - 5:30.

Q. Okay,, and subsequent to that occasion, did Von Clark Davis come into the Legion?

A. Yes.

Q. Okay, approximately how long after that did he come in, do you recall?

A. He came in/five minutes after she came in.
   about

Q. Okay, now is Mr. Davis present in the Courtroom?

A. Yes.

Q. Would you point him out for the record please?

A. Ah, he's sitting right there.

Q. Okay, can you describe what he has on?

A. Ah, black jacket and black pants, yellow shirt.

Q. Okay, what did he do when he entered the Legion?

A. He went up to Suzette and was talking to her, I don't know what they was talking about.

Q. Where were you at this time?

A. I was sitting at the bar.

Q. Okay, now, did you have an occasion to go over with them at any time, and have an conversation with them?

A. I was at the table with them.

Q. And while you were sitting there, what was the nature of that conversation?

A. They wasn't talking. I mean, I was talking.

Q. I'm sorry, can you go over that again?

107

A. Me, I was talking, he wasn't talking.

Q. What was he doing?

A. Just sitting there looking.

Q. Looking at what?

A. Us, I guess.

Q. And ah, how long did you sit with Suzette and ah, Mr. Davis?

A. Before she went outside?

Q. Yeah?

A. About five minutes.

Q. Okay, what happened, did you get up and leave at that point after....

A. No, I turned around and was talking to somebody else.

Q. Were you still present, were you still...

A. Yeah, I was sitting at the time, I just turned around and was talking to someone else behind me.

Q. Okay, what happened when you turned around and started talking to somebody else?

A. Ah, they got up and walked out the door.

Q. Do you recall anything being said at that point between the two of them?

A. No, she just told me she'd be right ah, back.

Q. Okay, now, where she was sitting, did she have any personal articles?



108

A.  She had a drink and her cigarettes and her jacket.

Q.  Okay, and when she got up and left what happened to those items?

A.  She told me to watch them for her.

Q.  Okay, then what happened next?

A.  She goes out the door with him and...about two or three minutes, I decided I would get up and check on her because she had told me earlier she didn't want to go outside with him by herself.

Q.  Okay, and did she...

Mr. Garretson:  Your Honor, we object.

Mr.Shanks:  We object and ask that it be stricken.

Mr. Garretson:  Not responsive and hearsay.

By the Court:  We'll strike it, it'll be stricken.

Q.  Okay, you indicated you went to the door, okay, what did you see at that point?

A.  I seen Mr. Davis with a gun pointed towards her head.

Q.  Okay, you said "pointed towards her head", can you use your hand and illustrate?

A.  Yes...

Q.  Why don't you use me as an example and indicate how Mr. Davis was standing?

A.  Kind of like this../about this close.

Q.  Okay...was this...how far apart were they?



A. Same distance we'are almost.

Q. Approximately three or four foot?

A. YEah.

Q. Where were the located in relationship to the front door of the American Legion?

A. Like on the side, like almost like back in the corner, but not in the corner, they was standing like in front of the corner, to the side.

Q. Okay, now when you saw Mr.Davis pointing a handgun at Suzette Butler's head, did you hear any conversation?

A. No, cause I panided and turned around and went back in.

Q. What happened immediately thereafter?

A. By the time I got back in, someone ran in behind me and said she had got shot.

Q. Okay, do you know who that person is?

A. I think it was Joanne Miles (sounds like) and a couple more people that ran in behind her.

Q. Okay, did you recognize any of them?

A. No, I don't.

Q. Let me show you what I've marked State's Exhibit #27 and ask you, is that the approximate position that ah, Suzette Butler was standing when you observed her outside?

A. Yes, right in here.

Q. Okay, and using this as an illustration, can you



point out exactly where Mr. Davis would have been standing?

A.  Right there.

Q.  Okay.  One second.......(Plaintiff's attorneys hold inaudible conversation)...Monaa after the individuals ran in shortly after you looked out the window, ah, did you call the police?

A.  Someone else called the police.

Q.  Okay, are you aware of who that person was?

A.  No...no, cause I couldn't make it back to the bar before that happened.

Q.  Approximately what was the time between the time that you looked out the door and saw Mr.Davis with a gun pointed to the head of Suzette Butler and the time that the other people came through the door?

A.  About 60 seconds, a minute and a half.

Q.  Okay, no further...no further questions.

CROSS EXAMINATION - By Mr. Garretson

Q.  Ma'am, you say that ah, it was about a minute and a half after you saw Mr. Davis pointing this gun at Suzette before Jordanna Miles came into the bar and said "She's been shot", correct...you'll have answer (unclear)...

A.  Yes.

Q.  Okay.  during that minute and a half did you scream or yell or run and call the police?

A.  I was making it back towards the phone.

111

Q. Okay, did you run?

A. No, I didn't run.

Q. You walked?

A. I walked.

Q. Did you yell to anyone in the bar, "He's got a gun Red's got a gun" anything like that?

A. No, I didn't.

Q. Did you say anything to anybody?

A. No. I didn't say nothing to no one.

Q. You just saw a man with a gun pointed and you said absolutely nothing to anybody and it was a minute and a half before anybody  comes in to alert anyone to any trouble is that what you're telling us, that's correct?

A. Uh-uhm....

By the Court:  You'll have to answer rather than..

A. Yes.

Q. Alright, now, you were a close friend of Suzette correct?

A. Yes.

Q. How long had you known her?

A. Practically all my life.

Q. Alright, when you saw her earlier in the day, how long were you together?

A. We went shopping together a couple of hours.

Q. Where did you go shopping?

112

A. Tri-County.

Q. Okay, who drove?

A. She drove.

Q. Okay, did you come directly back from Tri-County to the American Legion?

A. No, she dropped me off at home.

Q. Alright did she tell you she was planning on going to the Legion or anything later?

A. No.

Q. It was just coincidence that the two of you happened to be there.....you have to answer?

A. Yeah.

Q. Alright. What time did you get to the American Legion that afternoon?

A. I was there about 3:00.

Q. Okay, was Sue already there?

A. No, she was not there.

Q. What time did she arrive at the Legion if you know?

A. About 4:00.

Q. Did she have her daughter with her at that time?

A. Yes she did.

Q. And you say she was there for an hour and a half or so?

A. Yes.

Q. And what happened during that hour and a half?

A. Played pinball.

Q. You and Sue did?

A. Her and her daughter did.

Q. Her and her daughter, how old is the daughter?

A. Ten years old, I don't know her exact age, I think she's around ten.

Q. Okay....Now, during that hour and a half time, was Von Davis there at the Legion at that time? _during_

A. He could have been, I wasn't paying attention at that time.

Q. Okay...but you wouldn't dispute the fact that he was there earlier in the afternoon, correct?

A. No...no I wouldn't cause I wasn't...I couldn't.

Q. You weren't necessarily with Suzette Butler that whole time were you?

A. No, I was at the bar sitting, while she was playing pinball, I don't know who came in and who went out...

Q. Okay, you weren't necessarily paying attention to everything Suzette Butler was doing?

A. No I was not.

Q. Were you talking to somebody there at the bar?

A. Yeah, somebody.

Q. Who were you talking to?

A. I can't remember.



114

Q. Barmaid or somebody sitting next to you?

A. Yeah, somebody sitting next to me.

Q. Okay, how did you get to the Legion that day?

A. I walked.

Q. Okay, do you know how Suzette got to the Legion that day?

A. She drove.

Q. Now, what time did Suzette leave the Legion to take her daughter home?

A. Approximately about 5:00 o'clock, between 5:15 and 5:30.

Q. Alright, did she indicate to you where she was taking her daughter?

A. No she did not.

Q. Did she even talk to you before she left?

A. Yeah, she said she was taking her daughter to get something to eat and then she was going to drop her off.

Q. Did she indicate whether she was going to return or not?

A. Yeah, she said she was going to be back.

Q. Okay, now, do you know what time Suzette Butler returned to the American Legion that night?

A. About 6:30 approximately, 6:00-6:30.

Q. You'd say an hour to an hour and a half?

A. Yes...





115

Q. ...after she had left?

A. Yes.

Q. Did...who were you talking to or who were you with during that hour, hour and a half time that Suzette Butler was gone?

A. Ah, Angela Smiley.

Q. Alright, were you drinking anything from the time you got there around 3:00 until this time when it was 6:00 or 6:30?

A. Yes, 1 drank a beer.

Q. One beer?

A. Couple of beers.

Q. Okay, were you drinking any mixed drinks?

A. No.

Q. Now, isn't it true that when Suzette Butler came back at 6:00 or 6:30, whatever time it was, that Red Davis was already at the Legion?

A. No, that's not true, he came in after she came in.

Q. Alright, how do you know that?

A. I seen him when he walked through the door.

Q. Alright, how many people total were in the bar then at about 6:00 or 6:30 whenever, when you saw Red walked in the door, how many people total were there?

A. I have no idea, I wasn't even counting, I really



116

don't know how many people was there.

Q. Well, let's try to approximate...more than five more than twenty?

A. Fifteen...twenty.

Q. Alright, people were listening to music on the jukebox correct?

A. Yes.

Q. Alright, and people were talking to each other, some people were playing pinball?

A. Yes.

Q. Okay, it's a fairly large room, is it not?

A. Yes.

Q. So, it's safe to say that you didn't necessarily see everybody or hear what everybody was saying, there was a lot of noise, conversation, the jukebox that type of thing correct?

A. Yes.

Q. Now, was there a time when you and Suzette Butler were sitting at a table with Von Davis?

A. Yes it was.

Q. Now how long after Von Davis came in the bar would that have been?

A. Ah...let me see....I really don't know, I have no idea....I can just guess....

Q. Half an hour?



117

A.  Yeah, well a half hour.

Q.  Okay, originally when Von Davis came in did you notice where he walked to, did he walk up and get a drink initially?

A.  Yes he walked up to the bar.

Q.  Alright, he didn't necessarily walk right up to Suzette, he walked up to the bar and ordered a drink?

A.  No, she was standing at the end of the bar so
                right
he walked/up next to her.
                At the end closest
Q.  /To the door or in farthest away from the door?

A.  Ah, farthest away from the door.

Q.  Okay, at that time did you see Anthony Ferguson in the bar?

A.  Yes, I was talking to him, yes.

Q.  You know who he is, correct?

A.  Uhm-uhm.

Q.  You were at the other end of the bar correct?

A.  Yes.

Q.  Estimate in feet how far you would have been from where Von Davis was located with Suzette standing at the bar talking and where you and Anthony Ferguson were talking...25 feet?

A.  About fifteen.

Q.  Alright, well let's estimate...is it as far as you and I are apart?



118

A. Yes, about that far....a little bit farther...

Q. A little farther...back to about here?

A. All the way back.

Q. Okay, so all the way back to this railing perhaps?

A. Yeah...(unclear)...

Q. So perhaps 30-35 feet?

A. Yeah.

Q. Would that be correct?

A. Yes....

Q. And in the meantime there were several people obviously seated at far between where you and Tony Ferguson were seated correct?

A. Yes.

Q. Do you know/Ferguson?
   Tony

A. Not personally.

Q. Alright, do you know who he is?

A. Yes.

Q. Alright, have you ever met him before this night?

A. Yes.

Q. Okay...you obviously could not hear what Red Davis and Suzette were talking about at the other end of the bar Just as they could hear what you were saying, correct?

A. Yeah...right.

Q. There was too much other noise?

119

A.  Yes.

Q.  There were no, that you saw, arguments between Red Davis and Suzette, that occurred in that bar, correct?

A.  No, not that I saw.

Q.  Okay  no harsh words?

A.  No.

Q.  No shoving or pushing?

A.  No.

Q.  Alright.

A.  After this happened an hour or so after they were at the other end of the bar, all of you sat down at a table, correct?

A.  No, they sat down first and I went and sat with them.

Q.  Okay, did anyone else sit at that table with ~~about~~

A.  ~~No, not anyone else sit at that table with you.~~

Q.  So, it was just the three of you, or was there anyone else who came up at any point and sat down with you?

A.  No, not that I recall, no.

Q.  Okay. And ah  Red Davis had a drink there at the table with him?

A.  I don't know...I wasn't...I/know if he had a
drink or/he didn't.
                         don't (above "know")
         if (below "wasn't")

Q.  Did you have a drink at the table?



120

A. Yes, I had a beer.

Q. Did Suzette have a drink at the table?

A. Yes.

Q. Do you know what she was drinking?

A. Cavasier.

Q. Okay, now, during...let me ask you this...how long did the three of you sit at that table, if you know?

A. About five ten minutes.

Q. Alright, now isn't it true that when Red Davis got up, that he walked out towards the door first and Suzette followed him.

A. They was walking together, he was like in front of her.

Q. He was in front of her, and she had turn/around -ed and told you, I'm going to go outside and to watch her stuff correct...

A. Yes...to watch her stuff....

Q. ....Red was already heading for the door, correct?

A. I can't say he was heading for the door, he had stopped and she told me to watch her purse, to make sure she was following behind him.

Q. She was following ahead of her, correct?

A. Yes, in front of her.

Q. And when they got up to leave there wasn't any yelling and shouting or anything of that nature?





121

Correct?

A. Not that I know of.

Q. And no no harsh words between the two of them?

A. Not that I know of....I couldn't hear.

Q. Suzette, ah, when she left to go out the door, did she leave her purse in the bar?

A. No, she took it with her.

Q. Alright, what did she want you to watch inside the bar?

A. Her jacket and her drink.

Q. Alright, did she have a pack of cigarettes laying on the table also?

A. She could have.

Q. Alright, anything else you're aware of?

A. No.

Q. How was Red Davis dressed, when he left the bar, if you know?

A. He had on a coat, a dark colored coat.

Q. He had on a...it was cold out and he had on a coat right?

A. Coat.

Q. Now, was there anyone else that you recall being in the bar specifically when Suzette and Red Davis left up at the bar other than...well, let me ask you this. When did





122

you stop talking with Anthony Ferguson?

    A. I talked to him about five or ten minutes....it was a lo....

    Q. Did he leave or was he still there?

    A. I have no idea what he did.

    Q. You don't have any idea what he did?

    A. Uht-uh.

    Q. Who else that you know was there at the bar when you were sitting at the table with Red Davis and Suzette butler.

    A. The bar maid, was working...

    Q. What's her name?

    A. Vicky Moodey.

    Q. Alright, who else?

    A. Her mother was sitting there, Mary Moodey. That's all I can remember...(unclear)...

    Q. Do you remember any men being present?

    A. Any men?

    Q. Yes.

    A. There was some men present, I can't think of the names right off hand.

    Q. Do you remember Elwood Avery being present?

    A. No.

    Q. Do you know who he is?

    A. No.





123

Q. Okay, is it safe to say that you didn't neces-sarily sit there and list down the names of everybody in the bar, right?

A. Yes.

Q. Okay. Now, it is correct to say that after Suzette and Red left, it was several minutes before you say you got up to go look at the door, correct?

A. Yes.

Q. There are two doors, an inside door and an outside door there at the Legion correct?

A. Yes.

Q. Did you go through the inside door and push open the outside door and look out?

A. Did I go through the inside door?

Q. Yes? Did you open the inside door and then come to the outside door and push it....

A. You have to open the inside door to get out to the outside door.

Q. Alright, did you actually open the outside door?

A. Yes, ah, yes.

Q. Alright, did you open it and walk out?

A. No, I peeked out.

Q. And did you say anything to anyone?

A. No.

Q. How far open did you open the door?



124

A. About that much.

Q. Indicating two inches?

A. About that much.

Q. Three inches?

A. Enough to see out of, enough to get a....

Q. Did you put your head out or...

A. No, I did not put my head out.

Q. Now, on this photograph marked State's Exhibit #26, did you indicate to the prosecutor that Red Davis was standing closer to this brick wall or closer to the bottom of the photograph?

A. He was somewhere....

Q. Do you understand my question?

A. No I don't understand the question.

Q. Well, the prosecutor, I believe you indicated some area here...

A. Right here...right in there, right around...

Q. Right in this area closer to the brick wall here?

A. Yeah, closer to that wall then that wall over there.

Q. Alright. Now, which of these doors is it that you looked out of?

A. That door.

Q. Alright...was anyone else near those doors inside the bar when you went to look out?





125

A. I wasn't really paying attention.

Q. Did you talk to anyone inside the bar before you went to look out the door?

A. Yes I was, I was sitting there talking.

Q. With who?

A. I can't remember his name....just a friend...someone who's...(unclear)...

Q. Now, how long did you look out this door before you turned and went back into the bar?

A. About one second.

Q. Okay, so you just took a very quick glance and went back in?

A. I took a good look, I took a quick look and went back in.

Q. Did you hear anything being said between Red Davis and Suzette Butler?

A. No, I didn't hear...I didn't hear nothing.

Q. You heard no words between the two of them?

A. I heard no words.

Q. When you ran back into the bar did you hear any gun shots?

A. No, I didn't hear no gun shots at all..cause the music was on, it was loud.

Q. NOw, did you...did you walk or did you run back into the bar did you....





126

A. I walked with a fast pace.

Q. And you've already testified you didn't say anything to anyone at all, correct?

A. No...no.

Q. And it was according to your testimony, a minute and a half later before somebody came in the door...

A. Within a minute...within 60 seconds...

Q. Alright, and in the meantime, you hadn't yelled for anyone to go get help, call the police, anything like that?

A. No, because it happened too quick.

Q. Okay, you didn't say anything to yell at Red Davis when you say you saw him with this gun did you?

A. No, I didn't say nothing to him.

Q. Who was the first person to come into the bar after you went back in?

A. Jordonna Miles, she came in.

Q. Is that the same as Jordonna Southern?

A. Yes...

Q. What did she say when she came in?

A. She said somebody just got shot.

Q. Do you know who called the police?

A. No, I don't.

Q. Who was the first person you personally talked to after you came back into the bar?





127

A. I didn't talk to no one...I was trying to wait to use the phone...I was trying to get to the phone....I didn't talk to no one.

Q. Well, did you have to wait to use it, was there somebody using the phone?

A. Yes, someone was on the phone.

Q. So you just politely waited there until they got off?

A. No, I didn't wait that long, because by the time I got back by the phone, someone was on the phone, that's when she gran and said somebody has just got shot.

Q. Now, you know Tony Ferguson, he didn't come running in the bar did he?

A. I have no idea....ah...I have no idea who ran into the bar after then.

Q. Did you talk to the police about this matter?

A. About what matter?

Q. About the matter you're testifying here today about.

A. Yes I did.

Q. Did you give them a written statement?

A. Yes I did.

Q. Same procedure....at no time inside the bar, did you see Red Davis with a gun did you?

A. No, I didn't.



128

Mr. Holcomb: I'd like for the Court to inspect it first.

Mr. Garretson: To let the record reflect that the Court's reviewing a written statement of Mona Aldridge.

MR. Holcomb: That's correct. We have no objection to the Court turning this over to the gentlemen for the Defense and of course we would stipulate it can go into evidence, if that's your wish.

Mr. Garretson: Okay after we review it.

Mr. Holcomb: Sure, whatever.

Mr. Garretson: Thank you.......agreeable to this going into evidence.

Mr. Holcomb: Sure.

Q. Ma'am, do you remember when you talked to th Det. Weisbrodt and Det. Logsdon at the Police Department on the same night that this happened?

A. Yes.

Q. And they asked...they sat down, the very day it happened, the very evening it happened and talked to you about the matter, didn't they?

A. What...about what matter....you mean after it happened?

Q. About...about what you saw after it happened?

A. Yes...okay.

Q. Okay, and at that time, you told them that you

129

saw Red Davis and Suzette outside arguing?

A.  YNo I did not.  I did not say that.

Q.  You didn't tell them that?

A.  No/

Q.  Okay.  Isn't it fair to say that your recollection about the case, about what happened, what you saw, would be better on the very day it happened then it would be here some several months later, isn't that true?

A.  No, I would say it would be better now.

Q.  Better now than then?

A.  It would be better now than then.

Q.  Okay.

By the Court:  Well, show it to her.

Q.  Is this your signature here at the bottom of this written document that ah,has at the top "Division of Police, Hamilton, Statement of Witness"..."I, Mona Aldridge..." et cetera....Is that your signature?

A.  Uh-uhm.

Q.  Now, did you type this up or did they type it up?

A.  They typed it up.

Q.  As they talked to you?

A.  As they,...I guess as they was talking to me, they typed it up, they...

Q.  Well,/certainly they didn't make this up did they, you're not saying that?

130

A. No, I'm not saying they made it up.

Q. Okay, well they...they took information, they would talk about the thing and then type something up, and then they'd talk some more, and then they'd type it up again, right?

A. Talk about her...yes.

Q. And they weren't telling you what happened , you were telling them what happened, correct?

A. Yes

Q. Okay, now when it says that ah, ... Suzette and Red got up and walked outside the American Legion Bar, I went to the front door and saw them arguing on the sidewalk, right outside the Legion. Red had a gun in his hand."

A. No, I didn't say they was arguing...I didn't see them arguing.

Q. Okay, so you didn't tell the police that, even though they wrote it down before they was not arguing .

A. Even though they wrote it down they was not arguing.

Q. You told them they were not arguing?

A. Yes I told them they wasn't arguing.

Q. Very specifically said they weren't arguing the only thing I saw was pointing the gun...and so the police just put this in there?

A. Yes...evidently.



131

Q. Okay....ah, I want you to look at the end of the statement and it also says...."When Red was arguing with Suzette he pointed the gun at her head..." Did you tell them that?

A. They asked...no...they asked how did he look...did he look,mad or did he look happy...I said he had, you know, a confused look on his face, like he was made, like he might have been arguing, I didn't say that he was arguing I didn't even know wha....

Q. Okay, could you actually see this person's face or did you just look at the gun in this one second look you took at it?

A. I really just looked at the gun, I seen his face a little...it was dark.

Q. It was dark?

A. Yeah....I seen his face, I didn't see..I didn't hear no words...

Q. Okay, now, you did read this though before you signed it?

A. I probably so...I probably did....I probably did read it.

Q. I mean, you wouldn't sign something you didn't read?

A. I probably would have...at that time, I probably would have.





132

Q. Okay, but it says here you're giving this statement of your own free will and concerning the shooting of Suzette Butler, which occurred and then it gives all the information there, right?

A. Right.

Q. And no question, the police are the ones who talked to you about the matter, these two detectives?

A. Yes, detectives...yes.

Q. Okay...could we have that marked ah..I don't know how you'll mark that...

Bailiff: Mark as Joint Exhibit #2.

Q. Okay.

Mr. Holcomb: What about this one of Mr. Coleman, did you want that one/too?
                    marked

Mr. Garretson: No that's alright.

Mr. Holcomb: Okay.

Q. Red Davis and Suzette Butler were not arguing in the bar, correct?

A. No, not that I know of.

Q. Okay. And it was several minutes before you got up to go look out this door?

A. Yes it was.

Q. Isn't it true that what you saw when you looked out the door was an arm and a gun and Suzette?

A. And his face..I seen his face...I seen him.



133

Q. You saw who's face?

A. Red's...I seen him.

Q. Was he looking at you?
A. No.
Q./ Was Suzette looking at you?

A. No.

Q. Was she looking at the street or looking at him?

A. I can't remember...I can't remember how she was looking, I can't remember...I can't remember how...how she was looking.

Q. Did you know where Red Davis was looking?

A. He was looking at her.

Q. But you don't know whether she was looking at him or not?

A. No.

Q. And you never heard any gunshots?

A. No, I was back inside the Legion and the music was real loud.

Q. That's all the questions, thank you.

Mr. Sage: Very briefly, your Honor.

REDIRECT EXAMINATION - By Mr. Sage

Q. This morning you testified that you saw them leave, both of them leave together, and went outside and then you went outside and took a look, is that correct?

A. Yes.

Q. Can you explain to the Court why you felt it



134

was necessary for you to go out there and take that look?

A. Because earlier that day, she had told me that...

Mr. Garretson: I object, your Honor.

By the Court: We'll sustain the objection.

Q. Let me ask you this Suzette...or Mona....Were you best friends or close friends with Suzette Butler?

A. We was best friends.

Q. Okay, and had you had conversations with Suzette Butler concerning Mr. Davis?

A. Yes we had.

Mr. Garretson: I...

Q. Okay, and let me ask you this, of your own knowledge, do you know if she was afraid of Red Davis or not?

Mr. Garretson: Well, I object your Honor-.

A. Yeah, she was.

By the Court: HOld off...(Discussion held between judges....)

Mr. Garretson: Your Honor, we'll withdraw the question.

MR. Garretson: We have no further questions, your Honor.

By the Court: Okay, you're excused.

Mr. Sage: We'll call Cozette Massey.

COZETTE MASSEY, called on behalf of the State of Ohio, having first been duly sworn, testified as follows:



139



QIRECT EXAMINATION - By Mr. Sage

Q. Ma'am, can you state your name and where you live?

A. Ah, Cozette Massey. I live at ███████████

███████

Q. Okay, and ah, are you married or do you live with anybody?

A. No.

Q. Okay, now. I'd like to turn your attention to December 12, 1983, okay, do you recall that evening?

A. Yes I do.

Q. I'll ask you on that evening if you were with anybody?

A. Yes I was.

Q. Okay, you'll have to speak up louder.

A. Yes I was.

Q. Who were you with?

A. My boyfriend, Reginald Denmark.

Q. Okay, and where were you at?

A. We was at my apartment at first and then he decided we should take a walk and ah, said okay , we was going to look at the Christmas lights and go see what we was going to get each other for Christmas. So we was walking..we went down Long Street to Central.

Q. Okay, before you did that do you recall what time approximately you left your apartment?

A.   Ah, about 7:15 or...between 7:15 and 7:30.

Q

Q.   Okay, go ahead.

A.   Okay, we was walking down Central and we usually
cross the street but we didn't, cause we was going to cross
just before we got to the Island, but we didn't, we said we'd
                        there
wait until we got down/by the Legion.  Okay, so we was walking
on and I seen two people standing out in front of the Legion
talking, you know...

Q.   Now, which side were you on the Legion side of
the Street?

A.   Yes I was.

Q.   Okay, go ahead.

A.   And they was talking ...you know, they didn't look
like they was arguing to me...okay, so then ah, I heard two...
I heard two shots, sounds like a cap gun or something, and I
looked up and I seen just, you know, them two people standing
there and I heard her say...she...I seen her, she put her
hands up to her face and she said, "OH, no,"...like that,
and I said, "Look Reggie", I said, they're playing, right..
he said, "No, they' ain't playing, that's for real."  And
I said, uht-uh, he said, yes it is.
                        that's when
So then, when I./I was still  looking as we was talking,
         and she said                        okay,
and she was,/oh, no,  and so the guy shot again,/and she was
falling down on the ground, he shot again, after she was down
he bent down and shot her in the head, it was about a couple





137

inches from her head, and he shot her again.

Q.  OKay, now, at the time you saw that, how far were you from them?

A.  Okay, you know that abandoned building, next to the Legion?

Q.  Uh-uhm.

A.  Okay, you know that little bench that's out there, I was about right there.

Q.  Okay...okay, using me as an approximation, were you closer than where I am to you or further away?

A.  Ah, just about right..there...yeah.

Q.  Okay, and did you have an opportunity to see the ah, man who was doing the shooting?

A.  Yes I did, uh-huh.

Q.  Okay, is he present in the courtroom?

A.  Yes he is.

Q.  For the purpose of the record, can you indicate who he...where he is at and who he is?

A.  He's in the middle right there, at that table.

Q.  And is the man I'm pointing to?

A.  Yes.

Q.  Your Honor, I'd like the record again reflect the identification of the Defendant in the matter.

What happened next, then?

A.  Well, Reggie was...okay..he..okay, when he shot



the last time, he didn't see us, okay, after he shot the last time, he looked up, and he still had the gun in his hand and he looked us dead in the face, I never will forget the way how he looked at me and then he just put his gun in his pocket and walked on across the street and got in his car and drove away.

Q.   Okay, do you recall what kind of car he was driving?

A.   All I know it was a yellow car.

Q.   Let me show you three photographs, marked State's Exhibit #16,17 and 18, and ask you to examine these carefully and ask you if you can identify that as being the car that he got into?

A.   Yes.

Q.   Now, in turning your attention to the shooting itself, can you recall approximately how many shots were fired?

A. There was five...I heard five shots.

Q.   Okay, and you indicated that ah, she fell after the first shot is that correct, or started to fall?

A.   Well, okay..she was shot twice before she realized it...okay, when she realized she was shot, okay...that's when she said "Oh, no," and that's when she was falling down to the ground and he was steady shooting her as she was falling.

Q.   Okay, now again, I'd like you to step down if you could and using the floor, indicate the actions that

139

Mr. Davis did when he shot her the last time?

A.  OH, okay.

Q.  Okay, just indicate how he was standing over her and indicate how he shot her?

A.  He...he was just like this.

Q.  Okay,...go ahead and resume...and, again, based on your observation, how far was he holding the gun from her head when he fired the last shot?

A.  About this far.

Q.  And how...

A.  I can...I can/see  still  it, you know, it was this far...

Q.  Okay, how far is that far?

A.  About two, three inches.

Q.  Okay, ..

Judge Moser:  Counsel, let's get the distance on the record between you and the witness, I think we made reference to that before.

Q.  Okay, can you make estimates if at all possible what the distance between you and me would be?

A.  You can step back a little bit farther then what you...come up...you step back to far....

Q.  Okay...

A.  Okay...it was about seven-eight feet, you know, no more than seven or eight....

Q.  Seven or eight feet?



140

A. Yeah.

Q. No further questions, your Honor.

CROSS EXAMINATION - By Mr. Shanks

Q. Cozette Massey?

A. Yes.

Q. Miss Massey, I believe you indicated to Mr. Sage that you were...at your house with your boyfriend that night, this would be December 12th?

A. Uh-uhmmm.

Q. Alright, and that you were going up to look at the Christmas lights?

A. Yes, Christmas lights and go..we was going to go to Elder Beerman and what..he was going to see...see what we was going to get each ffor (other) Christmas, that's all.

Q. And you live on ███████████, correct?

A. Yes.

Q. And you was on your way up to Elder Beerman, is that right?

A. Yes.

Q. Elder Beerman's on Second Street, is that right?

A. Yes.

Q. How come you didn't walk straight up Second Street?

A. We usually would and I don't know why we didn't, we just went up Long Street.

Q. So December...it was kind of cool out that night,

141

it was December and it was winter?

A. Yes...no, it wasn't cold...

Q. It wasn't cold?

A. That's why we went out and took a walk because it was a nice day.

Q. Alright, so, this night in particular, out of the ordinary, you decided to walk up Long and then up Central and then back down High Street or whatever, to get to Elder Beerman, is that right?

A. Right...right.

Q. Was there any particular discussion with Mr. Denmark or yourself as to why you took that path?

A. No...we just couldn't figure out why we went that way, cause we...after we..after that happened we said we usually go down Second Street, we couldn't...you know...I don't know...you know, we just decided to go that way.

Q. Alright...so, for no reason at all on December 12th you're on your way to Elder Beerman but you're walking two blocks out of your way, east, to get there, right?

A. Well, it's still the same distance, you know... we was just walking, we was looking at Christmas lights, you know...

Q. Alright...well, there's no Klights on Central Avenue isn't that right?

A. No lights on Central....



142

Q. Christmas lights...and you were going on Central Avenue to look at Christmas...

A. We were looking at the houses, you know, when people have their houses decorated.

Q. Okay, so you were walking on the same side of Central as the Island, is that right?

A. Right...no, no not the same side as the Island...

Q. As the Legion?

A. Right.

Q. Alright, and how long had you been on Central when you saw all this?

A. It don't take but a couple of minutes to walk down Central.

Q. No, I'm talking in terms of distance, did you walk on Central for a block, how long had you been walking on Central, how many blocks?

A. I could tell you from Long Street, okay, until you got to the Legion...okay..

Q. It'd be about five or six blocks, right?

A. Right.

Q. You were walking along the west side of Central, the same side that the Legion is on?

A. Right.

Q. And it's about what time, now, if you can remember?

A. About 7:15 - 7:30...in between there.



143

Q. Any reason why you can remember that time specifically?

A. Cause we was looking at Mash on TV, it was during intermission, and we just left.

Q. While Mash was on?

A. While Mash was on.

Q. Were you walking in a normal rate of speed, slowly?

A. You know just...you know, just walking, you know...

Q. Just you two?

A. Yeah, just us two.

Q. Now, you're walking up...how many other people were standing on Central as you passed that night? Anybody?

A. Well, there was some people on the side of the Island, okay, facing ah, what's that street, Fourth Street I think it is...they was on that side of the Island and that's about all I seen, I mean, that's the only people I see, because that was strange you know, because, there wasn't anybody out there, you know, was nobody out on the street or nothing.

Q. Do you know a gentleman named Tony Ferguson?

A. I don't know him personally, no.

Q. Do you know him when you see him?

A. Ah...no I can't...yeah, now I do, you know, since I found out who he was.

Q. Did you see Tony Ferguson on Central Avenue that

144

night?

A. No I didn't.

Q. Specifically, did you see Tony Ferguson in front of the (unclear) that you testified you were in front of that night?

A. Did I see him there?

Q. Yes?

A. Not that I recall.

Q. Well, if he had been standing there, you would have seen him right?

A. Yeah, if he had been standing there...yeah.

Q. Now, you're walking up there with your boyfriend and you're just talking and having a good time?

A. Yeah, ah-ahm.

Q. And you see a cople of people standing in front of the Legion?

A. Right.

W. And what...how far from the Legion were you, in terms of distance, when you first notice these two people?

A. We were just crossing the street as you get to the Legion, to...you know that street right there, okay, we was crossing that street there.

Q. So you're walking, going up town, on the sidewalk

A. Yes....

Q. And you're looking up the street and you see,



145

two people seeing there...

A. Right.

Q. ...but nothing unusual about it?

A. No.

Q. Alright, did you hear any yelling or screaming at that time?

A. No.

Q. Did you hear any cussing, threatening, arguing of any type?

A. No.

Q. Alright, so, you're not gawking at these people you're not staring at them because they're not doing anything unusual, right?

A. Right.

Q. Okay. Now, where was..you saw one of these people... one pof these persons that you've identified as standing in front of the Legion, was a female, right?

A. Right.

Q. What did she have on that you remember?

A. Well, I knew that she had on some jeans, she had on like a burgundy sweater , and she had her coat and her hat over her arm...

Q. Had a coat over her arm.

A. Uh-uhm.

Q. Do you remember that specifically?





146

A.  Yes I do.

Q.  Okay, you're as certain of that as everything else you've testified to?

A.  That's right.

Q.  Then she was standing on the sidewalk facing you?

A.  No, she wasn't facing the me, she was facing the Legion.

Q.  Facing the legion?

A.  Yes.

Q.  Okay, so if you were at the door at the Legion where you're sitting right now, she would be standing looking at the door right?

A.  Right.

Q.  And this gentleman, this other fellow that you said was talking to her in a normal manner, where was he standing?

A.  Uh-uhm...by the..you know that little brick wall?

Q.  Yeah.

A.  He was standing right there.

Q.  And you're talking about the brick wall that's to the left of the Legion door?

A.  Uh-uhm.

Q.  Alright.

A.  And she was facing him...right there....

Q.  Alright.



147

A.  And she was facing him right there.

Q.  Alright, so he would...be standing like this
is that
facing her,/right?

A.  Yes....

Q.  This is the door of the Legion?

A.  No, okay...this is wall here, right?

Q.  Uh-uhm.

A.  Okay, he's standing there and she was standing
there right there in front of him.

Q.  I want to show you what's been marked as State's
Exhibit #26, and ask if you can identify that scene right there?

A.  Yes I can.

Q.  And what is that?

A.  That's Suzette there.

Q.  Did you know her personally?

A.  No I didn't.

Q.  But in this picture there's a wall that has the
number #727 on it, is that the wall that you described that
you saw this gentleman standing on it?

A.  Right.

Q.  olright, and next to the wall, is it not true,
is this laundry building which you talked about standing in
front, is that correct?

A.  That's right.

Q.  Alright, and you've indicated to this court now,



148

that you're ah, walking up this street and you're not to the
laundry building yet, but you see a gentleman standing by
a wall that's hidden by the laundry building, isn't that a
fact?

A. He was standing there, I saw both of them there.

Q. How could you do that ma'am, how could you see
him if he's standing by this wall and this wall extends out
past the sidewalk, how did you see him?

A. Well, you could see him...

Mr. Sage: I'll object your Honor, he's being
argumentative now with the witness.

By the Court: You can answer.

Q. How could you see him?

A. Well I saw him, okay.

Q. You just saw him?

A. Yes I did.

Q. Did he jump out on the sidewalk before he fired
these shots?

A. What do you mean "jump out"?

Q. Did he get...did he jump out in your path of
travel before he fired these shots?

A. No he didn't.

Q. He stood right there where you said he was when
you first were approaching this area, right?

A. Okay, you look and you see that wall?



149

Q. Yes ma'am.

A. Okay, some people standing there, you can still see them down the street.

Q. You can?

A. Yes you can.

Q. How close to the wall was he?

A. He...okay, he is, okay, I think he is a step out about a foot from the wall.

Q. A foot from the wall? Did you watch him the whole time you were walking up on this?

A. Yes I did.

Q. Why?

A. It surprised me, you know, I didn't know...I had never seen nothing like that before.

Q. I'm talking about...now before...before you heard a gunshot, before you saw a gun, before you saw the shooting, were you looking at those people?

A. Uhmmmm...not really, no, cause we...I didn't pay them no attention, you know.

Q. Then what was the first thing that made you notice them, specifically?

A. I heard two shots.

Q. You heard two shots, and where were you looking when you first heard two shots?

A. I was looking in front of me.

150

Q. When you looked up after the two shots were
fired tell me exactly what you saw?

A. Okay, I heard two shots, sound like a capgun, right,
okay, I seen it then okay, cause-cause I seen his hand, but
I did...when he first, at first, I didn't see the gun then,
okay, he shot her, okay, he shot her both times, she didn't
even know it, okay, she put her hands up to her head, and
said "Oh, no," okay, and then...that's when I turned to Reggie
and said, they playing, you know, cause I didn't know, you
know, I had never seen nothing like that, okay.,.I said, they
playing right, and he said no, they're not playing, that's
for real, okay, that's when he was going down, and he shot her
then, when she fell down he shot her, then after she was
down, he got down and shot her....okay.

Q. Let me ask you something. He standing with his
back to the Legion door, is that correctq

A. Yes.

Q. Facing her and she is standing, facing the Legion
door, is that correct?

A. Uh-uhm.

Q. So, if you were walking up to her, you were seeing
this side of her head, this side of her body, is that right?

A. Yes.

Q. And you saw this hand pointed straight at her face
I presume, is that right?



151

A. Well, he was shot...he looked at me he was shooting, while I thought she had got it in the stomach, that's where she grabbed.

Q. Looked...when you saw this hand with the gun, it looked to you like he was shotting wild?

A. Because he was, you know, it slooked like he was shooting down, you know, okay, looked like, that's what it looked like to me.

Q. So you don't know where she was shot when you heard these first two shots?

A. No, I didn't, I thought she was shot in the stomach.

Q. Okay, but one thing is for sure, you looked up and saw them facing each other?

A. Yes, uh-uhm.

Q. Alright, are you positive of that?

A. Facing each other?

Q. Yes.

A. Like she was standing right there in front of him and he was right here, okay...

Q. Uhm...yeah...she was...she was...

A. They were talking.

Q. Facing each other?

A. Right.

Q. And you heard two shots and she grabbed her face?

A. Right.





152

Q. Like this?

A. Uh-uhm, just like this.

Q. And she started to go down?

A. Right.

Q. And then you were watching him very closely at that time, right?

A. Yeah.

Q. And what'd he do?

A. He kept shooting her.

Q. He didn't move?

A. Oh well, when she...was...after she was down, he walked around her and came up to her and shot her in the head, just like you know, he was making sure that she was getting up...wasn't going to get up, you know.

Q. He kept shooting her as she was falling down.

A. That's right.

Q. You kept walking towards them is that right?

A. Well I thought, you know, I just stopped dead in my steps you know...

Q. Didn't duck down, didn't run away?

A. No cause he would have shot me.

Q. Did you see anybody hiding...you know there's a telephone pole right in front of that laundry building, with a big yellow box on it, w think it's a traffic box, did you see anybody hiding behind that telephone pole?





163

A. No.

Q. So, you stopped dead in your tracks , you saw her fall down, saw him kept shooting and then he walked around and shot her once again?

A. He walked up to her head, yes.

Q. And at this point in time you're pretty close to him right?

A. Yeah, and I thought he was going to shoot me.

Q. Are you closer than I am to you right now?

A. Yeah, we had...yeah, I was closer than that.

Q. Closer?

A. Back...back...okay, just about like that.

Q. So, you got a good look at the person?

A. Yes I did.

Q Alright, he saw you too?

A. Yes I did...yes he did.

Q. Did he?

A. He just stopped and looked at us, you know, well, but I thought he was going to shoot me, honest I did, but he didn't, he just...

Q. What did this man have on, that you saw?

A. I couldn't see his clothes, but I know he had on a biege coat.
Biege coat...
Q. /Why couldn't you see his clothes?

A. Well, I wasn't apaying too much of attention

154

to it, you know.

Q. You talked to the police after this happened, I'm sure?

A. Right after it happened?

Q. Yes madam.

A. I stated what happened buy I didn't give my name.

Q. You didn't give your name?

A. Nô, cause I was scared.

Q. (unclear)...did you tell the police what this man'looked like that you saw do this?

A. No, I just...I see his face, right, you know, they didn't ask me really...they just asked me who I was, and I told them I didn't know.

Q. Didn't know, did you tell them you could identify him again if you saw him again?

A. Yes I could.

Q. Did you tell them that (unclear)?

A. They didn't ask me.

Q. Did you tell him how tall he was?

A. No, I didn't.

Q. Tell them how much he weighed?

A. No, I didn't.

Q. Did you tell them what kind of clothes he had on?

A. I told them he had on a biege coat.





155

Q. Did you tell them about him driving away in a yellow car?

A. Yes I did.

Q. You didn't give them your name?

A. No.

Q. Did you tell the police you actually witnessed this?

A. Yeah, I told them I saw it...yeah.

Q. At any time, subsequent to what you say you witnessed today, did you go down to the police department and were you shown photographs of anyone?

A. Yes.

Q. And how long after the shooting did that happen?

A. I can't say cause I don't remember.

Q. Would it be more than a week?

A. Maybe.

Q. But less than a month?

A. Yeah, yeah...uh-uh.

Q. And you were shown photographs of...why don't you tell me what happened when you went down there?

A. Well, they asked me what happened and I told them I gave them my statement and then afterwards they showed me the photograph of them two sitting in the bar, you know, and they asked me, and they said, was them the two, and I said yeah, I seen..and/identified her and/then I identified him.





156

Q. olright...so, when you went down to the police department shortly after this happened sometime around a week or so, the only photograph they showed you was the photograph of the girl who was shot, Suzette, with Mr. Davis, is that correct?

A. Uh-uhm.

Q. And they asked you if that was him?

A. Uh-uhm.

Q. You said yes?

A. Uh-uhm.

Q. Who were the detectives if you recall, who were with you that day when they took your statement and showed you the photographs?

A. I forget their names.

Q. Did you write out a written statement?

A. No, I didn't write it, they typed it up.

Q. May I ask the Court to, unless they object to our seeing in, examine it....

Mr. Holcomb: No, I want the Court to examine it. ......Your Honors weh have no objection to counsel being given the statements we'd be glad to stipulate it into evidence, if that's their wish.

Q. Ms. Massey, now you've indicated that after you saw this, the man looked you in the face, walked across the street, got in the car and left, what did you do then, you



157

and your boyfriend?

A.  Well, he reached down to touch her and I told him
don't touch her, you know, and we went on inside the bar
and ask them, you know, could somebody call the police or
the fire department cause this guy just shot this girl, you
know, and I said, she could be dead, would somebody call the
police, and everybody just stood there and looked at us,
and then I yelled again, I said, would somebody please call
the police, cause she could be dead, would somebody please
move, and that's when they...the guy behind the bar came out
and touched her and said she still had a pulse, you know, and
then later, you know, she had died, and that's when the fire
department and stuff came.

Q.  And you stood there and waited until the police
and the fire department came that day, is that right?

A.  Yes I did.

Q.  Alright, how long did you stand there while
they were all taping off the area, and doing all the things
that they do, taking pictures, et cetera...how long did
you remain there?

A.  It seemed like to me about an hour.

Q.  During that hour of time, how many police officers
were...did you see on the scene, if you recall?

A.  What...I can't...about four or five...I don't know.
Two or three, four or five...I don't know.



158

Q. Which one of those police officers did you go up to and explain to them what you had seen?

A. I don't know exactly his name, I think it was Officer Hill, if it was him or the other one, I don't know. I don't know their names.

Q. Q. ANd when did you do that ma'am?

A. When he asked...after he came up, he asked us what we seen, I told him yeah, and he asked what my name, I told him, I wasn't given my name, he said, just back off the scene and that's what I did.

Q. Officer Hill came up to you and ask you if you had seen anything?

A. Uh-uhm.

Q. What did you tell him?

A. I told him I did. I told him what I just got finished telling you.

Q. And then he said, what's your name, and then you said...

A. No, I'm not giving my name.

Q. So he just told you to back away.

A. Uh-uh.

Q. Nobody came to talk to you later that night, about the shooting?

A. No.



Q. How was it you got the police station to make this



159

statement...taken.

A. Well they left the card...you know, left the card
in my mailbox and I went on up, and gave my statement.

Q. And that was four days afterwards, is that correct?

A. I can't tell you how many days it was.

Q. Now, it's true that the first time, according to
your testimony that you can remember seeing Mr. Davis is, as
you said it, standing out in front of the Legion, the night of
the shooting, is that right?

A. Yes.

Q. The next time that you see Mr. Davis is in a
photograph sitting with the victim, is that correct?

A. Yes.

Q. Then the next time you see Mr. Davis is when he's
coming across the street with the police handcuffed or sitting
between his attorneys there in this courtroom, is that correct?

A. Uh-uhm.

Q. At any time, after you witnessed this shooting,
did you describe to a police officer what this man looked like?

A. No.

Q. No?

A. Oh, yeah, he asked me, did he...they asked me did
he have a mustache and a beard, and I said yes he had a bushy
mustache but, just like a shadow of a beard.

Q. Shadow of a beard?



160

A. Yeah.

Q. Shorter than it is right now, is that right?

A. It's a little bit shorter, yeah.

Q. A little bit shorter?

A. It's about the same/it is now, yeah.
                              as

Q. Alright, now, ..(unclear)...look at him close...
the beard that night was about the same as it is now?

A. No, It was a little bit lighter...yeah, it wasn't
that heavy, no.

Q. But he definitely had a beard that night?

A. Yeah,

Q. The person you saw definitely had a beard that
night?

A. Yeah...like he had been...like two or three days,
he had shaved about two or three days, about two or three days
hair growth on it.

Q. Did you ever tell the police how tall he was?

A. No, I didn't.

Q. This gun that you saw, what did it look like?

A. It looked like...it was a little black gun.

Q. Just a couple more questions, in your statement to
the police you/indicated to them that after this shooting
              had
the man looked at you while you were across the street?
......the objection be shown.......

A. When I was across the street?

161

Q. He misunderstood you?

A. Yes, cause I wasn't across the street.

Q. Where were you when this man that you said shot Suzette Butler, looked?

A. On the same side of the street as the Legion was on.

Q. And you were in front of/this ah, laundry building?

A. Abandoned laundry....

Q. Alright, and near this telephone pole that sits right in front of there?

A. I-I just go by the bench, okay.

Q. Where was your boyfriend?

A. Right...right next to me.

Q. Who was on the side by the street? Who was on the inside by the building, do you remember?

A. I always walk on the inside and he walks/the outside.

Q. Do you know Mona Aldridge?

A. I had see her before but I didn't exactly know her by name.

Q. You talked to her about this shooting haven't you?

A. Have I talked to her about it?

Q. Yes ma'am.

A. Well...not exactly, no. She just...but that night, you know, when I seen her, she just asked me who was the girl, I told her, I didn't know, did she have on certain clothes





162

and I told her yeah, she had on kind of like a top, and that's about all, you know.

     Q.  Mona Aldridge asked you who the girl was who was shot that night?  Is that what you're telling us?

     A.  She was...she wanted...yeah, she wanted to know who, exactly who she was and I told her I didn't know for sure you know, cause I didn't know...I had never seen her before.

     Q.  You had never seen Suzette before?

     A.  No, I hadn't.

     Q.  Isn't it a fact that your boyfriend, Reginald Denmark used to date Suzette's sister?

     A.  Hey, I don't know.

     Q.  Your Honor, we'll have, with the Prosecutor's permission, the written statement of Cozette Massey marked by agreement enter as a joint exhibit?

     Mr. Holcomb:  Sure.

     By the Court:  And Mr. Shanks, I'd appreciate it if you'd keep your voice up or at least stay near that microphone.

     Q.  Yes sir, one final question.  The person that you saw, do the shooting that night, did that person have a hat on of any kind?

     A.  No.

     Q.  No further questions.

     Mr. Sage:  We have no redirect, your Honor.



163

By the Court: Okay, you're excused, and we'll take a little bit of time, maybe ten minutes or so.

AND THEREUPON, Court was recessed for ten minutes, whereupon, Court was reconvened and the following transpired:

Mr. Garretson: Defense would like to make a motion to strike the in-court identification made by the last witness Cozette Massey, ah, and suppress that identification for the reason that it was influenced inpermissibly by her being shown a picture, not only a single picture but particularly a picture, the defendant with the victim which goes beyond just merely showing a person a single picture...is this the person....but a direct link by being shown a picture of the defendant with the victim which even more inpermissibly plants in that person's mind that it must be the right person, and the only time she says she's seen the individual is being brought over here in handcuffs and it's the Defendant's position that this in-court identification should be stricken because it's been inpermissibly by impermissibly suggestive procedures used by the police department. She did not come forward the evening this occurred, some four or five days later, apparently she comes to the police department and is shown this one single picture, not an array of pictures from which to chose, or anything of that nature.

Mr. Holcomb: Ah, I don't know about this ah, imperceptively influence business, but I don't see anything wrong





164

with the police procedure that was followed in this case.

I'm not so sure that she was just shown one photo-
graph, I think that's something that maybe should be inquired
into,or could have been inquired into. Perhaps a motion
could have been filed or ah, you know maybe they could have
interviewed the witness or something I don't know , they were
given her name.

Be that as it may, I think an légitimate and valid
in-court identification was made . and as you know, that's what
the test is. If the witness can testify that they are identify-
ing the witness in Court, off of what they're seeing in court,
then I believe that's permissible and I think that's what
happened in this case, even tothe extend that she saidshe
thought his beard might have been a little bit lighter than
it is now. So, I really don't see anything wrong with that
but be that as it may, I think the next witness will probably
clear it up.

        (Discussion held between judges)

        By the Court: We're going to overrule your motion.
We feel that the...at best, the argument would go to the
wieght of her testimony.

        Mr. Holcomb: May it please the Court. We'll call
Reginald Denmark.



165

B       REGINALD DENMARK, called on behalf of the State of Ohio,
having first been duly sworn, testified as follows:

DIRECT EXAMINATION - By Mr. Holcomb

Q.  State your name sir.

A.  Ah, Reginald Antoine Denmark.

Q.  And where do you live, please?

A.  

Q.  In Hamilton, Ohio?

A.  Uh-uhm.

Q.  And how long have you lived there sir?

A.  The first of the year.

Q.  Okay, now, I'm going to direct your attention to
December 12, 1983, and I'm going to ask if you had occasion to
be with Cozette Massey on that evening?

A.  I did.

Q.  And I'll ask whether or not at that time or now
ah, you were a friend of hers, or she was your girlfriend or
you had a relationship with her at that time?

A.  I did.

Q.  And I'll ask whether or not on that date and on
that evening, you had occasion to be with her?

A.  I was.

Q.  Specifically, I'm going to direct your attention
to 7:22 p.m., on December 12, 1983 on Central Avenue,
Hamilton, Ohio in the vicinity of the American Legion there,





166

at that time
at 727, did you have an ooccasion to be there/with Cozette?

A. I was.

Q. Now, tell these judges, if you would please, in your own words, what you saw happened at that time and place, just tell it in your own words?

A. Well, we left the house about 7:15, 7:16, you know, we had left the house 7:15, 7:16, you know...

Q. Now was that on ███████████████?

A. Yeah.

Q. And what's that number?

A. ████████████████

Q. Now, just so that I understand this, you know, when we're downtown here and we look down South Second Street, it looks like it goes in a straight line, but it doesn't does it. When it gets down past the square it makes a left hand turn, right? South Second Street?does, is that true?

Mr. Garretson: We object to the form of the state... (unclear) we object to the form of the question.

A. I don't live down that way...

By the Court: We...(unclear)...

Q. Well, where's ████████████████?

A. It's an apartment complex right there on the corner of ah, Knightsbridge and...do you know where the lights at...okay, right there.

Q. Yeah...

A. It's not the first building, it's the building



167

that sits back.

    Q. I know that, but I'm asking you whether or not if straight you go/down South Second Street, you have to go down and the street curves before it gets to where you stay?

    A. Explain that again please?

    Q. Well, skip it.

    MR. Garretson: Does that mean you're withdrawing the question?

    Q. Yeah, skip it, that means I withdraw it.

    Mr. Garretson: OKAY.

    Q. Ah, you're yon Central Avenue now, with Cozette?

    A. Ah-uh.

    Q. At 722. Alright, now tell these judges in your own words what you saw and what you heard?

    A. Okay, we was walking and ah, I don't know, we seen a man and a woman up in front standing in front of the Legion. You know, the girl was standing towards the outside near the light. You know they were...the Legion has an angle in it, okay, and then come maybe three or four feet and light comes down. Okay, now they were standing right there. Okay,now, he was towards the side of the building but he didn't have his back up against the wall. She was on the outside, on the street side. ANd it just llook like ten to me that they were having a normal conversation, you know,



168

and we was looking and the next thing we knew, you know,
shots rang out, you know, I had seen him.....I mean, I had seen
him reach and grab, it was a gun, I mean, I don't know what
kind it was, but I could see the barrel and I heard about...

Q.  What was he doing with it?

A.  Well, he pulled it out and he shot about...I know
I heard two shots and then she hollered, or said something,
then as  she fell he shot her again, then when she was on the
ground he shot her again, you know, he bent down over her,
you know, bent his knee and put the gun by her head and fired
it, you know by this time...

Q.  Shot again.

A.  Pardon?

Q.  And he shot again?

A.  Right, and by this time we were on the other side
of the street, you know, we were on the side of the Legion
we were by the park benches and he looked down at us, and he
stood up, put his piece away, and stepped over the body, then
he walked over around the car, walked on across the street
got into a car ah....I don't know where Bob Leeves was at,
he was parked on that side, I don't know if it was the first
slot  he pulled out of or the second slot, but he got into a
yellow car, I think it was a Pontiac.

Q.  Alright, now, whereabouts were you when this
shooting was taken place?



169

A. Wasn't far.

Q. How far...from you to me?

A. No, it's...we were close.

Q. How close?

A. Maybe 30 feet.

Q. 30 feet?

A. Maybe 20. I'd say from that corner to where they found her when the police came.

Q. Alright, now, when you say he all the way through the...who were you referring to?

a. Von Clark Davis.

Q. Is he in this courtroom today?

A. Yes he is.

Q. Would you point him out please?

A. Right there.

Q. let the record indicate, show that the witness has indicated the defendant. Now, let me ask you this, do you know Von Clark Davis?prior to the time this happened, did you know him?

A. Not personally no.

Q. Well, I mean, did you know who he was?

A. Yeah, I seen him around.

Q. For how long had you seen him around and known that that was Red Davis?





170

A. I don't know, maybe six or seven months.

Q. Okay, since before this happened?

A. Uh-uhm.

Q. Okay, so that when you saw what you saw, you said that's Red Davis?

A. Yeah, I mean, I knew him by Red, I didn't know him by Von Clark, but I knew him by Red.

Q. Okay, so there was never any doubt about who it is, right?

A. Right.

Q. Okay, now, I'm going to show you State's Exhibit for Identification #18, 17 and 16, okay?

A. Okay, now, I didn't see the front, all I seen was the tailend, because I have a Pontiac and it looked similar to that.

Q. Okay, now, let's/look at the tail end , okay, take a State's Exhibit for Identification #17?

A. Yeah, that looks like the car he used.

Q. Alright. Your witness.

CROSS EXAMINATION - By Mr. Garretson

Q. Did you give a written statement to the police?

A. Not to the police no, well, I mean, they...they came after us 'more or less, you know, they knocked around on the door and after a while we got tired of it, and we went up there.





171

Q. You just didn't want to get involved, but you got tired of it?

Well we had tol...

A. /No, we told him right/then and there and the guy asked for my name, and I said, no, I'm not going to give you my name, I'll tell/you what's happened, he said...well, get on back there, so we just...fade on back into the crowd.

Q. Okay, just faded on back in the crowd, never told them that you just happened to be the two eye witnesses to

                                                        that,
the shooting, just didn't bother to tell them/right?

A. Well, we told them.

Q. Rnd they just said, well, just get on back in the crowd.

A. When they asked for our name...okay, I didn't want to give them my name.

Q. Was that before/or after you told them that you were eyewitnesses to a shooting?

A. We never told them that we were eyewitnesses.

Q. Well,what'd you tell them?

A  All we said was we seen it.

Q. Alright you told them, we seen it....

A. Yeah, we v/seen it.

                  they
Q. And/still said get on back to the crowd, we don't have any use for you?

A. No, they wanted to know our names.



172

Q. Okay, then they said get back in the crowd after you said, I'm not given you my name?

A. No,...we said we weren't going to give our name, and they said, well, get on back.

Q. Okay, so nobody got your name that night, nobody interviewed you, right?

A. Not that night...

Q. ...when did you go to the police department and give a written statement?

A. I don't know a couple of days. Well, we didn't... one reason why we didn't want our names to be told or go up there was because they hadn't captured him yet.

Q. Alright, when did you go up to the police department?

A. After they caught him.

Q. Alright, and did you give a written statement then?

A. Uh-uhm.

Q. We'd ask for the in-camera inspection.

Holcomb:
Mr./If the Court inspect it first...your Honor, we have no objection to Counsel being given the witness's statement. We stipulate it's admission into evidence if that's his wish.

Judge Stitsinger: Alright, Mr. Garretson.

(Discussion held between judges........)

Q. Now where do you live?

A. What do you mean?





173

Q.  Where do you live sir, what's the address?

A.  Where...right now?

Q.  Yes?

A.  ███.

Q.  ███?

A.  ████████.

Q.  Is that where you lived on December 12, 1983?

A.  No.

Q.  Where'd you live then?

A.  ███.

Q.  ███ what?

A.  ████████████.

Q.  Now, where were you and Cozette walking to?

A.  Ah, we was going to ah, walk around , you know, look at the lights, we were suppose to walk up town, lwindow shop, you know, look at the windows, the lights, you know, it was the hosiday season.

Q.  Alright, you were walking where, Elder Beerman?

A.  We never reached a destination.

Q.  Okay, but you didn't decide on where you were going to go, you were just going to take a walk?

A.  Uh-uh.

Q.  And ah, is there a particular reason that you chose the route that you chose as opposed to walking straight down South Second Street?



174

A.  Just wanted to take a walk.

Q.  Alright, what route did you take, how did you get from where you live  to ████████████  ..by the way, did Cozette live there with you at the time?

A.  No, it was her apartment?

Q.  That was her apartment?

A.  Yeah.

Q.  Did you live there with her at that time?

A.  Oh, off and on.

Q.  Okay, is she your wife or girlfriend?

A.  Girlfriend.

Q.  Okay, do you live together at ████████████ now?

A.  Uh-uhm.  Sometimes.

Q.  Alright.  What route did you take to get to Central Avenue, ah, near the Legion?

A.  Well, we came out of ████, we went out the back door, there's a little fence, we walked around the fence around the little path and then we walked straight up Long, crossed over the street, and we just turned the corner and was walking down.

Q.  Turned left on to Central Avenue?

A.  Uh-uhm.

Q.  Alright, now, where were you when you first saw





175

these two individuals outside of the American Legion.  How
far down Central Avenue from the Legion were you?

A.  When we first seen them?

Q.  Yes?

A.  Well, we had seen ...uhm, I mean, I've got to
think cause there's a lot aah, trees hanging in the way....
there's a lot of trees hanging in the way so I got to remember.

Q.  Uh-uh?

A.  Cause I know we got past the first light...I'll say
about 40-50 feet away from the Legion...I mean, from the Island.
KNow  where the Island's at...the Island's across the street.

Q.  Yes, well the Island is actually caddycorner,
so to speak, it's about half a block down from the Legion,
sisn't it?

A.  I don't know about all that.  I know the Island
is on ah, well they've got a traffic light right there, okay,
and the Island sets off the corner.

Q.  Okay, and you were...on which side of Central
Avenue, the same side as the Legion was on or the side that
the Island was on?

A.  The side that the Legion is on.

Q.  And you were back about parallel  with the Island
when you first saw these two people?

A.  Well, we were almost up on the Island, okay, now.
Before you come to the Island, there's a corner...I think it's





176

Washington, a street called Washington.

Q. Alright...

A. Probably seen them from there, you know, we didn't pay too much attention to them then cause you know we were in a conversation then.

Q. Alright, but you saw them from Washington?

A. About around in there.

Q. Okay, and then there's another block until you get to Walnut, right?

A. If that's the street after Washington.

Q= Okay, there's a street right there next to that building that boarded up that apparently was a laundromat, that's Walnut, right?

A. I don't know.

Q. Alright, but anyway, you had to cross that street also before you...ah, before you get/the Legion, correct?
to

A. No, cause when you cross the street, and past the laundromat you're at the Legion.

Q. Well I understand that, but you were on the other side of this street, next to the Laundromat back about where the Island was before you saw these two people, right?

A. No, I wasn't on that side of the street, I was on the side of the street of the Legion.

Q. I understand that. Now, did..isn't it correct that you described the ah, position of these two people as



177

the man was almost up against this wall, this angle wall there
next to the Legion...

    A. No, I didn't say he was up against the angle wall,
I said well the wall angles out and he was standing right
there...

    Q. Ah-ah...ah-ah...

    A. ....there's a light that comes down and he wasn't
standing right about there.

    Q. Ah-ah...was he standing at the end of the wall or
up near the door of the Legion?

    A. No we was closer to the...like...he wasn't on the
sidewalk...

    Q. Alright.

    A. And he wasn't up against the door, he was right
there in the light, if you were walking down the street, you
could see him.

    Q. Alright, well now, I'm going to show you what's
been marked as State exhibit #26, which is a photograph and
can you see this 727 there, that number?

    A. Uh-uhm.

    Q. You see this brick wall?

    A. Uh-uhm.

    Q. Was the man you've described as Von Davis, was he
standing with his back to that wall?

    A. Uht-uh, he was standing right over here....right



m   178

about here...he was standing right about here.

Q.  Right next to the door?

A.  No, he wasn't to the door...alright if you were to block this in, and bring this all..see how this line runs?

Q.  Uh-uhm.

A.  Okay, now this is a sharp corner here and it fades back...okay, now this line goes straight, and I think it was right about/here, and she was standing...

Q.  Are you saying that he was about right where...where she's laying now?

A.  Right where she's laying at...right, but they weren't inthe back...he wasn't up against the wall and he wasn't facing ... I can't say he was facing the door, but I know I could see him walking down the street.

Q.  Alright, now, you're aware that this wall here comes out even past where this brick.....

A.  Yeah, but he was standing where you could see.

Q.  Okay, he wasn't standing close enough?

A.  No he wasn't...

Q.  How far from the wall was he, as close as I am?

A.  No, I didn't say he was standing close...I said there's a (unclear) okay, like when you stand cause she was on the outside, right where her body was laying, if you stood her back up, okay...





179

Q. Alright, if she's standing back up where she is...

A. Okay, he was right...maybe a foot in front of...

Q. Is he closer to the wall or farther away?

A. No, he was right there in front of her.

Q. Alright was he...

A. Her back was to the sidewalk.

Q. Her back was to the sidewalk?

A. Right.

Q. And he...

A. And he was facing her.

Q. He was closer to the door then?

A. I don't know about all that, but I know he was standing right there.

Q. Okay, you're saying that he was standing closer...

A. He was standing where I could see him walking down the street.

Q. It's correct to say that if Suzette Butler were standing where she's laying, he is closer or ah, farther away than this sall with the 727 on it?

A. I don't know about all that but I know that you could see ...(unclear)...

Q. Well, I want you to know about all that?

A. Well, but I'm telling you he was standing right there because I could see him.

Q. Do you remember telling the police that he was



180

standing with his back almost/against the wall?
     up

    A.  Almost.

    Q.  How far...

    Mr. Holcomb:  Would you mark it for identification/if
                                             please
you're going to use it?

    Mr. Garretson:  (unclear)

    Q.  How far from this wall in feet was he, I'll be
Mr. Davis and this is the wall with 727...

    A.  I don't know, man, got to go back there and see...

    Q.  This is the wall with 727, was he this close...was
he this close- or was he all the way out here?

    A.  Well he wasn't no place near 727, now...

    Q.  You're saying he wasn't any...

    A.  He was over here by this door...okay.

    Q.  Okay, now he was next to this door, right?

    A.  Well as you were, wait a minute, you're trying to
confuse me...okay, he was right here, okay, there's a light
out there by the Legion, when the light comes...

    Q.  A street light?
         I don't know...
    A.  /No, it's not a street light, the Legion has a
light.

    Q.  Uh-uh.

    A.  Okay, and the light comes down and they were
standing right there in the light.

    Q.  Alright.



181

Q. How far from the door, that goes in to the front of the Legion were Mr. Davis and Suzette Butler, according to you?

A. Uhmm...I don't know...maybe four feet...five feet.

Q. Four feet?

A. Five feet, six feet...I don't know.

Q. Okay. Now, do you remember when you gave a statement to the police on December 16, 1983 at the Hamilton Police Headquarters?

A. Uh-uhm.

Q. Alright, and who did you give that statement to, do you remember who that was?

A. Uht-uh.

Q. Do you remember Det. Gross?

A. That's his name....

Q. The man sitting right here next to Mr. Holcomb, is that the man who took the statement from you?

A. Uh-uh.

Q. That is correct, the man with the blue tie on there?

A. Wait a minute now, there was another Dectective in there too, because they both came in there and one went...

Q. Alright, Det. Wells, a big, tall gentleman?

A. I don't know, see, I don't remember/the faces, cause it's been a while.

Q. Well, you don't remember these...these faces that





182

took this...

A. I know I went in there and took a statement.

Q. Alright, did you...is this your signature at the bottom here?

A. It is.

Q. Alright, and did you read this before you ah, signed it?

A. I did.

Q. As a matter of fact, you even made a couple of little changes here?

A. No, I told them and they ah...

Q. And they...in other words, you read through it and you said, wait a minute, add that right there...

A. Well....

Q. Wait a minute add this right here, correct?

A. No, I didn't say wait a minute add this right here....

Q. Well, you apparently told them to make some corrections?

A. Well, yeah, cause you know...

Q. Wasn't exactly what you said so there was some changes made, okay?

A. Right...(unclear)...

Q. Alright, now, do you read here where it says... "The girl's back was facing the street and the man's back was

183

almost against the building....??

A. Yeah, but not against the building.

Q. Okay, almost against the building, right?

A. Yeah, he was about...like I said, any where from three to six feet away.

Q. Okay.

A. You know that little space in there...

Q. And you say you saw them about a block away, you saw them standing in front of the Legion talking?  Right?

A. Well..yeah, to me it looked like they were talking, you know ylike you could see the head moves and, you know, mouth and what not...

Q. And this was ah, at what time of the day or night?

A. Ah,..left at 7:15, about 7:21..22...23..

Q. So, it only took you about five minutes to walk from where...

A. No, it took us about six-seven minutes.

Q. From Knightsbridge Drive and Second Street...

A. (unclear)...

Q. ...all the way up to Central and Walnut, took you five or six minutes to walk?

A. I guess you could say that.

Q. Okay, now, how do you know you left at 7:15?

A. Because I...Mash was on and I sat there and I looked at the first segment of Mash.



184

Q. Okay, it came on at 7:00 p.m., right?

A. Right, and then it went off...you know it was like a commercial break.

Q. Alright, first half was done so you left?

A. No, I just asked her, do you want to take a walk.

Q. Alright, and how many blocks would you say it is from South Second and Knightsbridge, ███████████ to where the American Legion is?

A. I would say...1..3..4...maybe 7-8.

Q. Ah, okay, was it dark out at 7:22, on December the 12, 1983?   Or was it dusk or was it light...

A. It was dark but you could see.

Q. Okay, now, ah, are you'r glasses prescription glasses?

A. No, their sunglasses.

Q. Okay, do you wear glasses?

A. No.

Q. Did you know Red Davis personally before this?

A. No.

Q. Did you date a girl named Kathy Davis?

A. When?

Q. In the year 1983?

A. 1983....I don't think so.

Q. Well, you wouldn't recall whether you dated that particular girl by a particular name or not?



185

A. Am I suppose to?

Q. /Please?

A. Am I suppose to?

Q. No, I'm just asking the question.

By the Court: Why don't you keep your voice up just a little bit for us three old men over here.

A. OH....1983, uh.

Q. Did you ever date a girl named Cathy Davis?

A. OH, a couple of years ago.

Q. Well, was Red Davis happen to date that same girl?

A. I don't know.

Q. You don't know. Is that what you're telling us, you don't know?

A. It's possible, you know, I mean...it's not my business.

Q. Okay. Did she happen to start dating him, right after she dated you?

A. I don't know, I went away.

Q. You went away, where'd you go?

A. Pick up some skills.

By the Court: Pick up some skills.

Q. What type of skills were you attempting to pick up?

A. On the job training skills, you know, construction, carpentry, and what not.

Q. So you're telling us ounder oath here that you don't



186

know anything about a girl you dated named Cathy Davis...

    A. Now, wait a minute, I didn't...I said it was a couple of years ago.

    Q. That in turn, Red Davis dated also, you don't know anything about him dating that  girl, it didn't upset you when it happened, right?

    A. Why should it?

    Q. Alright, so you do know it happened right?

    A. I don't know. That's his business, not mine.

    Q. Okay, you're telling us that you didn't even know that he dated her right?

    A. I could care less, you know, really.

    Q. Wouldn't upset you if he did? Right?

    A. No.

    Q. Could care less.

    A. I have no interest in it.

    Q. Okay, have you had any problems with Red Davis in the past?

    A. No.

    Q. Just know him to see him?

    A. Pardon?

    Q. You just knew him to see him pass on the street, you never met him?



    A. Well, I think once we went out to the Legion, me and Cozette did, and he sat by us, that's about it, you know.

187

Q. Okay, now, ah, when you saw this happening as you described it, to the Prosecutor, you said you saw Mr. Davis pull out a gun and shoot her, just like that, quick, correct, I mean, he didn't stand there and waive a gun around and talk to her or hold it to her and stand there straight, quickly, bang...right?

A. Uh-uhm.

Q. Okay, there wasn't any long period of time where he's standing there with a gun, right?

A. I don't know, he could of had it on...I mean, I know he had...well, I can't say that but...they were standing there talking when we walked down the street.

Q. But you said he pulled a gun out of his pocket and shot him, bang, just like that?

A. Cause he did....which he did.

Q. Okay, now, when this happened according to your testimony to the Prosecutor, you went on and crossed the street and got in front of the laundromat, correct?

A. We were still walking.

Q. You were still walking, and you're seeing a man shoot somebody and you just keep on walking right on up to them, right?

A. Well, we stopped...we stopped about on the last one.

Q. When did you stop when you finally got up as close as we are?



188

A. Oh, about by that bench.

Q. The bench at the...in front of the...

A. Old laundromat.

Q. Old Laundromat?

A. Uh-uhm, right about there when we stopped.

Q. But when you first heard the gunshot you were across the street?

A. Uh-uhm.

Q. And you kept on walking after you hear this gunshot, right?

A. Uh-uhm.

Q. You weren't afraid that you might get shot?

A. No, I thought it was a play,/ you know, I didn't think it was real.

Q. You didn't think it was real, you didn't tell Cozette it was for real?

A. Well she said to me, you know, cause when it first happened you know, kind of like shocking.

Q. What'd she say to you, what did Cozette say to you...are they playing around, is that what she said?

A. Yeah.

Q. What'd you tell her?

A. I said, no they ain't playing, them mother fuckers are for real.

Q. Alright, so you knew it was for real, and/yet you

Case: 2:16-cv-00495-SJD-MRM Doc #: 5-2 Filed: 08/08/16 Page: 193 of 207  PAGEID #: 7419



189

kept walking over toward them, right, you didn't think they were playing around like you just testified?

A. Well, like I said, I was/like in a state of shock you know, when you see something like that.

Q. Well, when you see something like that, isn't the first thing you do is stop, you don't keep walking right on across the street and say "Gee, I wonder what's going on." Right?

A. Curiosity.

Q. Okay, well, when you saw this man talking to this lady and pull this gun out, they were face to face, weren't they?

A. Pretty much, I mean, like they were standing you know...

Q. She had her back to the street and he had his back to the door, and they're looking at each other, right?

A. Right.

Q. It definitely wasn't a situation where if this is Suzette Butler standing here looking at you, he wasn't with his gun at the side of her head, they were looking at each other, right?

A. Right.

Q. Now, what did you do after you kept walking and see this man shooting somebody, what did you do?

A. I watched him leave and then we hussled up, you



VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
STATE COURT TRANSCRIPTS - Page 296



190

know took a fast trot up there, I bent down to touch the body
she told me, no don't touch her.

Q. Who told you?

A. Cozette did.

Q. Okay, did you go in the bar?

A. Yeah, we both went in the bar.

Q. Did you see anybody else get to that body before
you did?

A. No.

Q. Was there somebody that came running by you and
ran into the bar before you?

A. No.

Q. You and Cozette were the first ones to go in that
bar correct, after this shooting?

A. Correct.

Q. What did you say to the people when you ran into
that bar?

A. I told them somebody better call the ambulance
somebody out here got shot.

Q. Well did you say it in that tone or did you
scream?



A. Well, we...I don't know, we more or less were
jittery and nervous and we was trying to say it, I said it
once and the poeple just sat there and looked at us and
then Cozette hollered it out, you know, she was almost in

191

tears.

Q. Cozette said, "Somebody call the police" right?

A. Yeah. I mean, like they didn't believe us.

Q. Well, do you know who Mona Aldridge is?

A. Not personally, but I dknow her.

Q. You know...you've seen her?

A. I've seen her.

Q. Did she come up to you and say, "Yeah, I saw it, she had a gun on her" anything like that?

A. No.

Q. Did you see her in that bar that night?

A. Who Mona?

Q- Yes.

A. Yeah, she was sitting there.

Q. She was sitting down?

A. Yeah, where

Q. Where was she sitting?

A. The first table.

Q. As you went running in to say somebody's been shot, Mona Adlridge is sitting at the table?

A. Uh-uhm.

Q. Mona Aldridge isn't up on the phone calling the police is she?

A. No....I mean, didn't nobody move, you know, they just sat there, cause the music was blaring and I don't think



192

they heard the first time then we said it again, you know, everybody said "what" you know.

Q.  Did you know Jodanna Miles Southern?

A.  Who?  You mean, Jodanna MIles?

Q.  Yeah?

A.  Do I know her personally?

Q.  Do you know who she is?

A.  Not really, I mean, I've seen her around but I don't....

Q.  Alright, you don't know her as a personal friend but you know who she is?

A.  Off and on, you know.

Q.  Alright, did you see her come running in the bar before you or after you, or did you see her there at all?

A.  Well, she was in the bar when we came in.

Q.  She was already there?

A.  Uh-uhm.

Q.  Where was she, sitting down?

A.  At the table with Mona.

Q.  Okay,  They were at the first table as you went in, Jodanna and...

A.  Well when we come in there's a table...she they rearranged the place now, but there was a table right there...

Q.  Okay....

A.  Okay, they keep the tables back because they have



193

a little dance floor and over in the corner they have like where they would set up, they were going to have a DJ there that night.

Q. Alright, and Jodanna and Mona are sitting at the table talking to each other?

A. I guess.

Q. Alright, and definitely you were the first one to enter that bar, after the shooting, I mean, you were, according to you, from here to there, away from this shooting, I mean, you would have seen somebody run past this guy with a gun, or run past his body, right?

A. I didn't see nobody run by me.

Q. Okay, do you know Tony GFerguson?

A. Not personally.

Q. Do you know who he is?

A. By name.

Q. Alright, did you see Tony Ferguson right in that same area within a few feet of you?whenh this shooting took place?

A. No.

Q. Now, you say you were in front of this laundromat correct, this abandoned laundromat or closed laundremat, correct?



A. What do you mean, I was in front of it?

Q. Well, when you saw this shooting, you walked across



194

the street, came across this closed laundromat...

A.   No...I didn't say we was...I walked...we were already walking, okay...

Q.   Alright, well, you were already walking and...

A.   And we stopped and we got across.

Q.   Then you stopped there next to this bench in front of that laundromat, right?

A.   Yeah.

Q.   Did you see Tony Ferguson standing there within five feet of you?

A.   No.

Q.   Did you see Tony Ferguson standing next to a telephone pole there that has a big yellow box on it for traffic signals?

A.   Where?

Q.   Right there in front of that laundromat, right next to that bench you were stand-ing next to?

A.   No, didn't see nobody.

Q       Q.   Okay, didn't see Tony Ferguson at all?

A.   No.
            Did you
Q.   /See him at all anywhere that night?

A.   I don't know, cause I didn't...I wasn't really lookinggat the crowd.

Q.   Alright, now, how soon did the police get there after you ran into the bar and all these people were sitting





195

around and you tell them to tcall the police, how soon did
the police get there?

     A. Well, a guy came out and put something over her,
and a couple people had a chance to run up on her, I'd say
anywhere from four to seven minutes, in there....

     Q. Okay, did you stay right there at the scene?

     A. Yeah, just ah, standing there.

     Q. Alright, did the police come and say, "Did
anybody see this happen?"

     A. Yeah, we told them.

     Q. Alright, who did you talk to, what police officer,
do you know?

     A. I don't know, whoever was on duty that night.'

     Q. Alright, was it a white police officer or a
black police officer?

     A. There was two of them in a squad car, but it was
a black guy who asked.

     Q. And what'd you tell him?

     A. Well, he asked us, you know we told them what we
seen, that was all, we told him who done it.

     Q. Alright, you told him that you saw Red Davis
shoot Suzette Butler...you told him that night that you actually
saw it, right?

     A. I did.





196

Q. Okay, and what did he ask you then?

A. He asked for my name.

Q. Alright, did he ask Cozette for her name?

A. He did.

Q. And the two of you said you're not giving no names?

A. That's right.

Q. Alright, did you actually tell him that/Red Davis it was who shot Suzette?

A. I said his name was Red.

Q. Okay, and did...that was to an officer in uniform, right?

A. It was.

Q. Did any officer, a plain clothes officer or detective talk to you that night?

A. No.

Q. Alright, and you were told just to back on back in the crowd after you told....

A. Told us well you know, I guess cause we didn't want to give them what they wanted told us to get back, so we said okay.

Q. Okay, would you recognize that officer, if ah... if you saw him again, this black officer that you talked to?

A. I don't know they both looked the same to me.

Q. Which both?





197

A. Well, I mean, cause they're both about the same complexion, you know, so I...I don't really know.

Q. Was it a heavyset officer?

A. I don't know, like I said he was black. I wasn't paying no attention to the officers.

Mr. Garretson: If the Court please, I believe one of the officers is subpoenaed here today, at least, that was our information given on discovery and we'd like to have the officer brought in to the courtroom to see if this defendant can identify whether that was the officer or not...or this witness. It'd be Essex Shepherd.

Mr. HOlcomb: We have no objection to it...you know, he can look at the whole police department if he wants to.... I doubt if it will improve his memory...it might though.....

Q. Ah, Mr. Denmark, would you look at this officer in the uniform with the badge there is this the officer you talked to that night?

A. I don't know.

Q. Alright, thank you Mr...or Officer Shepherd.

At any time did you...have you dated Suzette Butler's sister?

A. She's got a sister?

Q. That's my question?

A. Does she have a sister?

Q. Yes, you dated her sister?





198

A. What's her name?

Q. Cindy Butler, did you date Cindy Butler?

A. No.

Q. Do you know who she is?

A. Not personally, no.

Q. I want to show you what's been marked as State's Exhibit #17. Can you identify that automobile?

A. I can.

Q. What was your answer?

A. I can.

Q. Alright, what automobile is that?

A. Pontiac.

Q. Alright, did you see that automobile on the night that you say this shooting occurred?

A. Uh-uhm.

Q. Where'd you see it?

A. That's what he used when he drove down the street.

Q. Okay. Now, how many days after ah, this incident, was it that you went to the police station to talk to Det. Gross and Wells about this matter?

A. I don't know, I think it was after they caught him.

Q. Alright and had you talked to any other police officer in the meantime?

A. No, I hadn't.



199

Q. And did you say that a police officer left his card at your address?

A. He did, I think it was Wells' card.

Q. Okay, and you then called them?

A. No we waited another day, I think, I don't know, we got tired of ah, staying in the house.

Q. No other questions, and if the Prosecutor still agrees , we'll have this go into evidence.

Mr. Holcomb: Sure.

By the Court: That's Joint Exhibit #3, I think,

Mr. Garretson: Ah, #4.

By the Court: #4.

Mr. HOlcomb: Thank you Mr. Denmark.

By the Court: You're excused then, thank you.

A. Shall I leave?

By the Court: Yeah, you may go.

A. I mean home?

By the Court: Yes. Do you have any additional witnesses this afternoon?

(Inaudible comment made)

Mr. Holcomb: We have some short ones.

By the Court: Well, I think we're going to break.

Mr. HOlcomb: Okay.

By the Court: We'll w/be back here in the morning at 9:00 o'clock.

200

ANDᚋTHEREUPON, Court was recessed for the day, whereupon, the following morning, May 10, 1984, Court was reconvened and the following transpired:

By the Court: Is the State ready to proceed here?

Mr. Holcomb: Yes your Honor.

Mr. Shanks ; Your Honor, we need to approach the bench ah, briefly...

AND THEREUPON, Counsel approached the bench, and the following transpired:

Mr. Shanks: Last night at 6:30, I became aware, after going over and speaking with him in the Butler County Jail, of a potential witness that is not listed in our discovery, his name is Michael Ingram. He is now a guest of the County. Ah, we...at this point in time, we are not necessarily going to call him, but there may be a situation develop that/heywould be called, in our case, in chief, ah, I was not aware that Mr. Ingram had any information or any knowledge about this case until I was informed yesterday that he wished to see h me.

I did go over there after the trial yesterday, did
for
speak to him/about ten minutes, ah, he indicated to me what he knew I told him I would contact Mr. Garretson, speak with Mr. Garretson in this regard and inform the Court of our délemma. There is a possibility that ah, after Mr. Davis has a chance to reflect upon this additional information,



201

and Mr. Garretson and I can think about the impact that we would call him. But we're necessarily saying that he would be called. But it is a potential that he would be called.

It obviously puts the prosecation staff at a disadvantage because they didn't know about it as well as I, but that's about the best I can do at this point in time.

Mr. Holcomb: Well we don't have any objection to that as long it doesn't get to be a babit.

Mr. Shanks: Well..as long as they don't do this to mecontinually.

By the Court: Alright...okay.

AND THEREUPON, Counsel left the bench and the following transpired:

Mr. Sage: The State calls Captain Richard Carpenter of the Hamilton Police Department.

RICHARD CARPENTER, called on behalf of the State of Ohio, having first been duly sworn, testified as follows:

DIRECT EXAMINATION - By Mr. Sage

Q. Captain, can you state your name and occupation?

A. Richard Carpenter, I'm a Captain with the City of Hamilton Police Department.

Q. Okay, and in your occupation as a Captain in the Police Department, are you a supervisor of records kept in the course of business for the City of Hamilton Police Department?





202

A. Yes I am.

Q. And are these prepared under your supervision and control?

A. Yes.

Q. Okay. Captain, let me hand you what has been marked State's Exhibit #29 and State's Exhibit #28 for Identification and ask you first of all if you can identify these documents?

A. Yes these are property damage report and a breaking an entering report of the Hamilton Police Department.

Q. Okay and ah, were these made at or near the time of the transaction or event?

A. They were...the report was taken on 12/10/83. Both reports....

Q. When was the other...

A. Both Reports were.

Q. Both reports were, okay, and did the investigating officer sign the report?

A. In each instance, Gary Thompson, Officer Thompson and Officer Robert Shelley signed the reports.

Q. Okay, and our these records a correct and accurate reflection of the investigation or of the record made at or near the time that they were made?

A. Yes.



Mr. Garretson: I object to that your Honor, I think it calls for...the nature of the question calls for this the record keeper in the police department to assume that, he said are they accurate of the nature of the events contained thereon. How would he know?

Mr. Sage: I said an accurate reflection of the record itself, I'll withdraw the question. Let me ask...

By the Court: Why don't you rephrase your question.

Mr. Sage: Okay.

Q. Are these records or reports, accurate and true copies of the record of the report itself?

A. Yes they are.

Q. Okay, and have there been any alterations or changes made of it since the time the report itself was taken?

A. No change.

Q. And does the records reflect what the reports are?

A. The records report that one of breaking and entering and the report the second one is a property damage report.

Q. And who do they involve?

Mr. Garretson: We object your Honor.

Mr. Holcomb: That's alright, let it alone, that's enough.

Mr. Sage: Okay, we'll withdraw the question.