IN THE COURT OF APPEALS OF BUTLER COUNTY, OHIO

1

2  THE STATE OF OHIO          :

3       Appellee            :

4  vs.                      :    Case No.  CA89-09-0123

5  VON CLARK DAVIS          :

6       Appellant           :    HEARING ON ALL MOTIONS

7                           :

8                           :

9                           APPEARANCES:

10                              Mr. Daniel Eichel
                               Assistant Prosecutor
11                              For the Appellee

12

13                                   -and-

14

15    **90-2524**              Mr. John Garretson
                               Mr. Michael Shanks
16                             Attorneys at law
                               For the Appellant

17

18    FILED

19    MAR 05 1991

20    MARCIA J. MENGEL, CLERK
      SUPREME COURT OF OHIO

21

22                                        EDWARD S. ROBB, JR.
                                                CLERK
23

24

25                                    I CERTIFY THE WITHIN TO BE A
   JUDGE HENRY J. BRUEWER           TRUE COPY OF THE ORIGINAL FILED
   JUDGE JOHN R. MOSER                          11-17    1989
   JUDGE WILLIAM R. STITSINGER      MARY L. SWAIN
                                    Butler County Clerk of Courts
                                                        Deputy



1

1

2

3          BE IT REMEMBERED that on the 31st day of

4    July, 1989, the following motions were heard in this case

5    as follows:

6          MR. EICHEL:  For the record, Your Honor,

7    this is State of Ohio vs. Von Clark Davis, case number

8    CR83-12-0614, before the court pursuant to the  mandate of

9    the  Supreme  Court of Ohio mandating a...remand  for  the

10   reconsideration  of whether the aggravating  circumstances

11   outweigh  the  mitigating  circumstances...paraphrase  the

12   mandate of the court.

13          Present in the courtroom are the defendant,

14   present are two of his counsel, Mr.  Evans, I believe is

15   not here, but Mr. Garretson and Mr. Shanks are here.

16          JUDGE STITSINGER:  Well, Mr. Evans only

17   represents the defendant on appeal.

18          MR. EICHEL:  Oh.

19          JUDGE STITSINGER:  He was not counsel in

20   the trial of this case.

21          MR. EICHEL:  That's correct.

22          MR. SHANKS:  That's correct.

23          JUDGE STITSINGER:  Ok.

24          JUDGE BRUEWER:  We've got a number of

25

2

1  motions  that you people have filed  and...any  particular

2  way you want to hear them?

3  　　　　MR.  SHANKS:  No,  Your  Honor,  we're

4  willing...

5  　　　　BY THE COURT:  Well, who...

6  　　　　MR. SHANKS:  ...we're willing to deal with

7  any one that you want to discuss first.

8  　　　　MR. BRUEWER:  Well, why don't you go ahead

9  and  start with whichever one you want and we'll listen to

10  you.

11  　　　　MR. SHANKS:  Judge, I think one of the

12  easier ones to take care of, as this court knows, that a

13  lot  of  times...especially in capital cases,  there are  a

14  number  of  appellate  issues that have  been  decided  by

15  various courts for  the State of Ohio but have yet to been

16  ruled...be ruled  upon by Federal level courts  and  it's

17  important for us in representing Mr.  Davis,  or any other

18  person  so situated,  to keep the record clear in  and  of

19  itself.  There  are a number of pretrials in the  instant

20  case  filed on behalf of Mr.  Davis...challenges the death

21  penalty,  among  others.  We would,  rather than  restate

22  those in full prior to this sentencing, challenging as the

23  sentencing  statutory...the  constitutionality  of  the

24  sentencing  scheme,  etc.,  ask that any of those  motions

25  that are applicable be renewed by the motion we have filed

　　to renew them without the necessity of restating those  in

3

their  entirety and...and refiling those.  We would think that...that is done solely to protect the record for appeal and to make sure that the court is aware of those motions prior to resentencing, so that it is an issue  that can be reviewed at a subsequent time.

JUDGE BRUEWER:  Well, in that regard we'll note your request and overruled it.

MR. SHANKS:  Alright.  Your Honor, one other...

JUDGE BRUEWER:  I mean, as to each... each and every one of those.

MR. SHANKS:  Ok.

JUDGE BRUEWER:  I'm assuming those are the same motions you filed in the original...

MR. SHANKS:  That's exactly what...

JUDGE BRUEWER:  ...original action...

MR. SHANKS:  Yes, sir.

JUDGE BRUEWER:  ...and our actions will be the same in this one as it was in the other ones.

MR. SHANKS:  I have...on behalf of Mr. Davis, with the advice and consent of Mr. Garretson and Mr. Evans, filed a motion which the substance is...which the substance is to allow us to introduce at the resentencing any information or evidence which would allow this panel to come to the proper decision required by law as to what sentence is appropriate in this case.  It is

4

1   our intention, pursuant to this motion, to introduce

2   evidence that was not available to us at the prior

3   hearing. Specifically, and...and so there's no surprise

4   here and I'm sure that the prosecutor's aware, Mr. Davis

5   has been incarcerated since his conviction, somewhat close

6   to five years now, if I call. We have a volume of

7   evidence which we think the panel should know as to his

8   conduct during this period of incarceration, what he's done

9   with himself while he's been on death row, the manner in

10  which he's conducted himself, from individuals who have

11  first hand knowledge and experience with him. We

12  also...one of the motions Mr. Garretson filed was to allow

13  us to have psychological....another psychological

14  evaluation in effect updated at this point in time. We

15  believe that that evidence, even though it's evidence that

16  is...would take into consideration events that happened

17  subsequent to the original convictions, subsequent to the

18  initial sentencing day, pursuant to the authority that I

19  cited, is both appropriate and relevant and...and we think

20  in this particular case, clearly admissible. This is a

21  very delicate situation, one that's never been faced by

22  any three judge panel that I'm aware of in the State of

23  Ohio and we think that we're on solid ground by requesting

24  our...our ability to put on any evidence...no matter what

25  the time reference of that evidence, that would assist

    this panel in making a determination as to whether the

5

1   aggravating    circumstances    outweigh...outweigh    the

2   mitigating factors.   We'd ask this court, on the authority

3   cited in that memorandum, to allow us to do that.

4              MR. EICHEL   Your Honor, on this...this

5   point, it's unusual for the prosecution to have two

6   opinions  on an issue and I do have two opinions on  this.

7   I believe as a matter of State law and pursuant  to the

8   remand  of the Supreme Court of Ohio...they have  remanded

9   this  case  back to the point at which the  Supreme  Court

10  held  that there was error made in the case.   That's  the

11  usual  rule on remand,  that a case goes back to the point

12  in which time the...the appellate court has held the error

13  occurred.  So as a matter of State law I would say we...we

14  come  back to a time subsequent to the taking of  evidence

15  in the penalty phase.   That's as a matter of State law and

16  that's one...one opinion.

17             On  the  other  hand,  I've  reviewed  the

18  Supreme  Court  decisions,   particularly  two  decisions,

19  Skipper  vs.  South Carolina, in which a death sentence was

20  reversed due to the trial judges ruling in the first trial

21  that  evidence,  such as what they're proposing to  admit,

22  was excluded.  In essence, they...they had jailers who were

23  going  to testify that there had been no incidents of  bad

24  behavior by the defendant as a prisoner in the jail  while

25  he  was awaiting his first trial.   The prosecutor in that

    case made the argument that the evidence was  accumulative

6

of the evidence that was presented. The Supreme Court didn't buy that argument, they said that it was enough...the evidence was probative enough that it...if it had an effect on the jury's recommendation decision...that it was going to be ruled, in a death penalty case, prejudicial error, not to allow the admission of that evidence. And the court...in essence, they said they could not say that that evidence could...could have or could not have swayed the jury's decision on the recommendation of death.

The other case is Franklin vs. Lynaugh in 1988. The Supreme Court upheld a Texas death sentence in which it was the third time around for the defendant's trial. Again, that case is in a different posture than this case and there was...there was a trial reversal, trial reversal, and a third trial and it was all...they were...these were all three retrials. There was never a conviction affirmed and it wasn't like this case is, back here after the conviction and remand solely for the sentence. But in Franklin vs. Lionel the Supreme Court upheld a sentence where the defendant was allowed to present this post...evidence that he was a good prisoner on death row while awaiting his third trial. He was tried in '75 and convicted and the third trial came along in 1980. They admitted the evidence, such as what the defense wants to present in this case.

7

1          Looking at these cases...it's my considered

2    judgment, after reading them, that perhaps the ruling of

3    this court should be in partial agreement with the

4    defense, that they should be allowed to present

5    evidence...limit it to evidence that was not available at

6    the time of the first hearing, that is, the evidence such

7    as good behavior. On the other hand, I think the court

8    has already heard all the evidence and the basic opinion

9    of this court, other than...other than the consideration

10   of aggravating circumstances, the basic opinion of this

11   court was not reversed as to what they...what this three

12   judge panel found in mitigation. I don't think that the

13   defense has to represent a day of testimony that was

14   already heard by this court. I think the evidence that's

15   in this...the trial court's opinion the first time around

16   in mitigation doesn't have to be presented again. By the

17   same token...we're in the same posture that we were at

18   that time, that the aggravating circumstance in this case

19   has been proven beyond a reasonable doubt and the State

20   doesn't have any need to present any further evidence. In

21   fact, probably except that...except that it may be in

22   rebuttal, we...the State can't present any aggravating

23   evidence in addition to what we've already presented in

24   this case.

25          So...I said a lot of words, but basically

     my...my considered judgment is to...if it's err, to err on

8

1   the side of discretion in the defendant's behalf and allow

2   them to present this evidence subsequent...that occurred

3   subsequent to the date of his conviction in 1984. I

4   believe that's what they're proposing to do and I'm not

5   aware of any...any further evidence other than what I

6   speak.

7       MR. SHANKS: We are willing to come to

8   some agreement if...if that's what we can do, that the

9   prior evidence submitted on behalf of the prosecution and

10  the defendant, accepting...that was acceptable and...and

11  appropriate at the time, doesn't have to be resubmitted

12  and then we could focus at...at this hearing as to the

13  evidence we wish to present for subsequent good acts,

14  etc., that we think relate to the mitigating factors.

15  That would save us a day of...of testimony and the

16  evidence would be the same...up till that point in time.

17  So we're willing to proceed as to that issue...from our

18  point of view...without the necessity of the prosecutor

19  putting on the evidence of aggravating circumstances

20  again, also putting on the evidence of mitigating

21  circumstances up to the time of the conviction and

22  sentence and the focusing solely on his conduct prior to

23  that. We're not talking about a lot, by the way, we're

24  talking about...things that go right to the point of how

25  he's conducted himself and what type of person he's been

    the last five years.

9

1      JUDGE MOSER: Mr. Eichel, what case is it
2  that you feel that...somewhat justifies their position?
3  Or at least makes you wary of a contrary position?
4      MR. EICHEL: It's...there are two cases,
5  Skipper vs. South Carolina, it was a 1986 case that
6  reversed the death sentence...where the trial court
7  refused to allow a jailer to testify of good behavior that
8  he had months before the trial. That's...
9      JUDGE MOSER: But that was before the
10  original trial.
11      MR. EICHEL: The original trial.
12      JUDGE STITSINGER: Umhum.
13      JUDGE MOSER: But you have nothing...
14      MR. EICHEL: The other case was a third
15  trial. It was, again, a retrial, so they started from
16  scratch, a clean slate.
17      JUDGE MOSER: Right, it starts over.
18      MR. EICHEL: Yeah. It wasn't a...a remand
19  like this one is and the Supreme Court was specific and
20  said we remand solely for consideration whether the
21  remaining aggravating circumstance is sufficient to
22  outweigh the mitigating factors that the court has
23  already heard. So it's a tough...tough issue.
24      JUDGE STITSINGER: And in that case they
25  allowed his conduct while incarceration from the first two
trials.

10

1    MR. EICHEL: Yes. In the...in that case

2  the...there was a stipulation by the prosecution that he

3  was a good prisoner from 1975 till 1980.

4    JUDGE MOSER: I...

5    MR. EICHEL: I'm not sure if they presented

6  any additional evidence beyond the stipulation.

7    JUDGE MOSER: I got the impresssion from

8  the Supreme Court of Ohio that they were simply telling us

9  to again reflect upon the trial as it took place and

10  the evidence as we received it to determine whether those

11  aggravating circumstances proved beyond a reasonable

12  doubt outweighed anything in mitigation thereof as it

13  existed then. I got that impresssion that that's what we

14  were being told.

15    JUDGE BRUEWER: And the cases that you

16  present don't really say the opposite of that.

17    MR. EICHEL: No, they don't, they're...

18  they're not a case on remand.

19    MR. GARRETSON: Can I be heard on that

20  point just for a moment? The only...the only thing that

21  occurs to me is that no matter what the Supreme Court says

22  about the ability to remand a case because there happens

23  to be the same three judge panel available. The three

24  judge panel does not come at this resentence with the same

25  frame of mind as you might have had at that point, just as

none of us could, because we've had five years of

11

experience pass between then and now and the only thing
we're asking is...take into...you know, you may come at it
from a little bit different perspective, well, so does the
defendant and, that is, that he's been on death row for
five years and there is some evidence available and we've
talked to the people, we've got them subpoenaed, and
they're...they're willing to testify, they're people that
are the head of death row there, the captain in charge of
death row and people such as that, as to what his conduct
has been...not...not just as a prisoner, but issues beyond
that. In his...the fact that he's employed as the clerk
for death row and...and been entrusted with a lot of
responsibility and...and some things that I think the
court, in coming at it with a new perspective,
could...could take into account from the defendant's
perspective. Your Honor, I'm talking about testimony
that's going to take more than a...a couple of hours to
present and in view of the fact that the remand says you
can consider all possible sentencing alternatives and that
they say that this three judge panel, since it's still
around to consider it, I think still from a new
perspective it doesn't hurt to have this additional
evidence.

        (Discussion between the three judges,
nothing audible enough to transcribe.)

        MR. GARRETSON: 476, U.S. 1.

12

(More discussion among the judges, nothing audible.)

JUDGE BRUEWER: Ok. We've come to a conclusion on that motion and we're going to deny...deny the motion. We feel we should stay with what was in the record at the time and what it comprises at that time.

MR. GARRETSON: Ok, let me...so that I know what to tell these gentlemen then from Lucasville, rather than have them actually come here under subpoena, which they have received the subpoenas, I have talked to them...and rather...rather then formally bring them into the courtroom and start to try to present the evidence, you're telling us that you would not permit that evidence and therefore I can contact these people and tell them not to appear under the subpoena...is that true?

JUDGE BRUEWER: That's correct.

MR. GARRETSON: Alright, can I proffer then...should I proffer it now or...or at the hearing?

JUDGE BRUEWER: Well, we're hearing the motions now. You do it at the hearing.

MR. GARRETSON: Ok, thank you.

JUDGE BRUEWER: By the way, that should take care of your other motion for a psychological examination...

MR. SHANKS: Yes...yes, Judge. The only thing would be left, I think...maybe Mr. Garretson has

13

1  one more, because we have a motion to withdraw the jury waiver

2  and...and  a...kind  of  a...a  parallel  motion,  which

3  would...basically  filed  by Mr.  Evans on behalf  of  Mr.

4  Davis,  saying  that  to resentence him now  is  a  denial

5  of equal  protection and...and double jeopardy.  But the

6  jury  waiver...withdraw the jury waiver is based  in  part

7  upon  the  fact  that...as  Mr.  Evans has  noted  in  his

8  motion...

9              JUDGE BRUEWER:  That's the original jury

10 waiver...

11             MR. SHANKS:  Yes, sir.

12             JUDGE BRUEWER:  ...signed back then.

13             MR.  SHANKS:  Yes, sir...yes, sir.  Because

14 of the circumstances we're in right now...if we would have

15 known  that  that  was a possibility,  and  he  cited  the

16 RUPPERT  case  as  being an example,  it may have  had  an

17 effect  which  would have had us in a...go to a  trial  by

18 jury  rather than a three judge panel.

19             JUDGE STITSINGER:  In other words, what you

20 want is a jury to hear the mitigation phase?

21             MR. SHANKS:  We'd like to start all over

22 again, Judge, if we possibly could.

23             JUDGE STITSINGER:  What?

24             MR. SHANKS:  We'd like to start all over

25 again if we possibly could.

             JUDGE STITSINGER:  Well, how can you do

14

1 that? The conviction has been upheld.

2 　　　　MR. SHANKS: It's a difficult situation,

3 what we really want to do is protect the record from all

4 possible angles since...probably neither you or I or

5 anyone else in this room is going to be the final

6 arbitrator of all this.

7 　　　　JUDGE BRUEWER: Well, do you want to rule

8 on that motion for us?

9 　　　　MR. SHANKS: I think I just need to have

10 something uttered so I...I can write it in the proper box

11 what we're going to do.

12 　　　　JUDGE BRUEWER: Ok. I think you have a

13 motion that's kind of reverse of that, is that correct?

14 　　　　MR. EICHEL: Yes, Your Honor, we have a

15 motion to strike their...what was filed, captioned,

16 "Withdrawal of Jury Waiver". We believe it's untimely in

17 the posture of this case.

18 　　　　JUDGE BRUEWER: Alright, we'll overrule

19 your motion and grant...I mean, overrule the defense

20 motion and grant the prosecutor's motion.

21 　　　　MR. SHANKS: Then, Judge, I think the only

22 one left is, from Mr. Evans, is the motion to...to, in

23 effect, sentence Mr. Davis to life on the basis of the

24 fact that to go ahead with the resentencing is a denial of

25 equal protection, double jeopardy, and that was captioned

in the written document.

15

1      JUDGE BRUEWER:   Do I understand that

2  motion?

3      JUDGE MOSER: Well, I think that would have

4  to be reserved for the hearing, the mitigation hearing for

5  Friday.

6      JUDGE STITSINGER:   That's what the

7  hearing's going to be about, isn't it?

8      MR. SHANKS: Yes, Your Honor. What...what

9  we...what Mr. Evans is arguing in this case is and

10 basically it says that to have us go through the hearing

11 right now in effect would be a denial of equal protection

12 since...but for the fact this is a three judge panel, this

13 would have been a jury that would have sentenced Mr. Davis

14 to death. The reversal of finding an error in the

15 sentencing phase would have automatically instituted the

16 sentence of life in prison. Mr. Evans, on behalf of Mr.

17 Davis, myself and Mr. Garretson, has argued that to allow

18 Mr. Davis to be put in...in effect in jeopardy again to

19 face the death penalty is unequal protection since a

20 person who has chosen a jury would not be in the same

21 situation and it's a denial of equal protection...contrary

22 to the statutes and the Constitution of the State of Ohio

23 and the United States of America and it also constitutes

24 double jeopardy and we needed to do that by written motion

25 so the record is clear. Obviously the Supreme Court has

   already ruled on that issue. We're not silly or we

16

1   wouldn't be here, but these are things that needed to be

2   clarified for the record so that there's no waiver argued

3   some place down the...in the Federal Courts.

4          JUDGE BRUEWER: Now is this in conjuction

5   with a motion that I think is...that we haven't talked

6   about and, that is, objecting to the panel?

7          MR. SHANKS: It's...it's...no, it's not

8   really, Judge, obviously it can be read in conjuction with

9   that, it would...it would be an offshoot of that. I was

10  going to let Mr. Garretson speak to that more clearly, but

11  one of the things that Mr. Garretson alluded to and that

12  we've always been concerned about is...is that the Supreme

13  Court has in effect said we can all go back to where we

14  were five years ago and just hear this thing again and we

15  really don't believe that. We don't believe that it is

16  the same panel even though it's the same three human

17  beings up there. We don't think it...that we can go back

18  to five years ago and I think that...I'll let Mr.

19  Garretson argue that in...in more detail, but that is a

20  similar offshoot, but basically Mr. Evan's motion goes to

21  the constitutionality of just rehearing this

22  thing...compared to what a jury would have to do.

23         JUDGE BRUEWER: Well, in relation to your

24  motion there, we'll overrule the motion.

25         MR. SHANKS: Thank you.

           JUDGE BRUEWER: Now do...

17

MR. GARRETSON: It was my...my understanding that you...that the court already entered an order overruling the motion to object to the...this panel hearing the case, at least in part, on the branch of the motion that would say that this panel couldn't be reconstituted because Judge Bruewer was now a Judge of Probate Court. It's my understanding the court's already had a ruling on that issue by written order.

JUDGE STITSINGER: Well, I sent you a copy of that, didn't you get it?

MR. SHANKS: Yeah.

MR. GARRETSON: Yeah, that's what I mean.

JUDGE STITSINGER: Under the Rules of Superintendent.

MR. GARRETSON: I understand...that you've already overruled the motion. You had asked...what...there was another motion. I think you've already overruled that by order and...

JUDGE STITSINGER: No.

MR. GARRETSON: Alright, the second branch...

JUDGE STITSINGER: The order just assigns Judge Bruewer to sit on this panel.

MR. GARRETSON: Correct. And we...we still...the basis of the objection is...is the same thing that Mr. Shanks basically just talked about. First of

18

1   all, the fact that...an objection to any three judge panel

2   rehearing the case, you've already ruled on that. And,

3   secondly, objection to this particular panel because Judge

4   Bruewer is...is part of Probate Court at this point.

5       JUDGE BRUEWER: Ok. Unless you want to argue

6   it longer, we're going to overrule it.

7       MR. GARRETSON: No. The...the last

8   question I have is then with respect to the motion for

9   psycho...further psychological evaluations. The court's

10  overruled that and therefore I need not present Dr. Fisher

11  again, who had an appointment to see Mr. Davis.

12      JUDGE BRUEWER: Once again, you can proffer

13  that if there's such a...

14      MR. GARRETSON: Alright.

15      JUDGE BRUEWER: Any type...type of evidence

16  that we've overruled and it's...and you want to proffer

17  it that's your...

18      MR. GARRETSON: Well, am...am...

19      JUDGE BRUEWER: ...that's your...

20      MR. GARRETSON: ...am I correct in saying

21  that...when we say there's going to be a hearing Friday,

22  my understanding based upon all these rulings then there's

23  not going to be any further evidence permitted of any

24  nature.

25      JUDGE BRUEWER: It's going to be what's

in the record.

19

MR. GARRETSON:  It'll simply be what's already on the record from the standpoint of what was presented at the mitigation hearing in the past.

JUDGE MOSER:  Arguments of counsel.

MR. EICHEL:  It's my correct understanding there will be arguments then?

JUDGE MOSER: Yeah.

JUDGE BRUEWER:  Umhum.

JUDGE MOSER:  Arguments of counsel and proffering.

MR. GARRETSON:  Ok.

JUDGE BRUEWER:  Anything further before this panel?

MR. EICHEL:  We have nothing further, Your Honor.

JUDGE BRUEWER:  Go off the record.

(Record stopped)

* * * * * * * * * * * * * * * * * * * * * * * * * * *

C E R T I F I C A T E

I, Shirley Roesch, Assistant Court Reporter, Butler County Common Pleas Court, do hereby certify that the foregoing 19 pages is a true and accurate transcript of the hearing in this matter as transcribed by me to the best of my ability from courtroom tapes.

Shirley Roesch



IN THE COURT OF APPEALS OF BUTLER COUNTY, OHIO

THE STATE OF OHIO

  Appellee

vs.

VON CLARK DAVIS

  Appellant

Case No. CA89-09-0123

TRANSCRIPT OF HEARING
and
COURT'S DECISION

APPEARANCES:

90-2524

Mr. Daniel Eichel
Assistant Prosecutor
For the Appellee

-and-

FILED

MAR 0 6 1991

MARCIA J. MENGEL, CLERK
SUPREME COURT OF OHIO

Mr. John Garretson
Mr. Michael Shanks
Attorneys at law
For the Appellant

FILED in Court of Appeals

I CERTIFY THE WITHIN TO BE A
TRUE COPY OF THE ORIGINAL FILED

MARY L. SWAIN
Butler County Clerk of Courts

JUDGE HENRY J. BRUEWER
JUDGE JOHN R. MOSER
JUDGE WILLIAM R. STITSINGER

1

BE IT REMEMBERED that on the 4th day of August, 1989, the following came on for hearing before a three judge panel.

JUDGE BRUEWER: I guess we're back on this case, it's case number CR83-12-0614. It's the State of Ohio vs. Von Clark Davis and I guess we're here at the...to go forward with whatever's going to be presented here this morning in relation to the directives from the Supreme Court. Is the prosecutor ready here?

MR. EICHEL: We are, Your Honor.

JUDGE BRUEWER: Is the defense ready?

MR. GARRETSON: Yes, Your Honor. We would...first of all, I realize we had a hearing Monday and the court made certain rulings at that time, we would renew, for purposes of the record, any of the motions that were filed prior to the original trial, which the court has obviously made rulings previous to this time, as well as the motions we filed on Monday or...or filed and heard on Monday. We do renew specifically the motion that we wanted to present additional testimony. It is our understanding the court has ruled we cannot present that testimony, but that we would be permitted to proffer the testimony into the record. We'll do that however the court wants us to do that.

JUDGE BRUEWER: They can do that now,

2

1
2 can't they? You can do that prior to argument if you want
3 to, you can go ahead right now.
4      MR. GARRETSON: Alright. Pursuant to the
5 instructions from the court at the hearing on Monday I did
6 not have the actual witnesses appear pursuant to the
7 subpoenas that we had previously issued. However, I did
8 speak over the phone with the three individuals that we
9 had subpoenaed, as well as Dr. Fisher. Specifically I
10 spoke with Sgt. Gordy Pullman, who is the Assistant Unit
11 Manager of death row, and we would like...
12      JUDGE STITSINGER: Excuse me a minute.
13 What you're proferring is anything that you wanted to say
14 post trial.
15      MR. GARRETSON: Yes, sir.
16      JUDGE STITSINGER: After 198...when did
17 we hear this?
18      MR. GARRETSON: 198...May of 1984 was the
19 original sentence date.
20      JUDGE STITSINGER: Ok. What you want to
21 proffer is evidence after that.
22      MR. GARRETSON: That's true.
23      JUDGE STITSINGER: Alright.
24      MR. GARRETSON: Because obviously the...
25 the three people I will indicate here shortly wouldn't
have known Von Davis prior to that time. They...they are
three persons who work for the Ohio Department of

3

1

2 Corrections at Lucasville on death row.  Specifically I'd

3 like to proffer...and...and it's difficult, as the court

4 knows, to...to summarize and proffer and it is our

5 position that the live testimony of these witnesses would

6 be very persuasive and perhaps make a difference in the

7 court's determination, but nonetheless we will proffer

8 their testimony.

9   Sgt. Gordy Pullman, who's the Assistant

10 Unit Manager of death row, I believe, would testify, based

11 upon my conversations with him, that there are two

12 classifications on death row of prisoners, an A and a B

13 classification.  The A classification being persons who

14 have not have disciplinary or conduct problems and who are

15 permitted certain privileges that the other prisoners are

16 not and that Von Davis, or "Red", as they refer to him as

17 his nickname, is not only one of the A prisoners...but

18 also is the clerk for death row for the unit manager.  I

19 believe the gentleman would testify that Red Davis started

20 out as the clerk, what they called the "block clerk",

21 which was first block clerk that they had or the first

22 time they let somebody on death row be outside their cell

23 and actually work within the confines of the prison, and

24 that from there he was promoted to the unit manager clerk,

25 or the death row clerk, and he...as a matter of fact, is

on a payroll from the State of Ohio, meager as it might

be, he's actually paid to work as a clerk for death row.

4

He would testify that Red has given them no problems whatsoever, that he has been well mannered. When groups are brought in by the warden to tour death row that Red helps conducts the tours. That this system of having inmates on death row work gives a new system and that Red was somewhat of an experiment and had he not worked out they may well have not have the system they now have in place. He indicates that he has presented no problems to other inmates or to the security personnel of the institution and has never had any conduct write-ups, and I...and I wrote down a quote that Sgt. Pullman said, "he wishes all the inmates were like Red and they'd have no problems".

The...I spoke with Capt. Oscar McGraw, who is the Unit Manager of death row, and he indicated many of the same things that Sgt. Pullman did, except that Red apparently works directly for him and that he was promoted to the unit manager clerk in October of 1988 and, to use his words, "he's done an excellent job ever since". He indicates he has a positive attitude, a pleasant personality, he has more freedom, so to speak, than the rest of the prisoners as he in...actually in the office, working in the office, during the entire day as the unit manger secretary and, as indicated, he actually is on payroll. He indicated to me that he is trusted and trusted to the extent that he's trusted with the documents

5

and paperwork that some through there...through death row. He indicated also that he had had no write-ups or conduct problems whatsoever.

I also spoke with a Herb Wendler, who is the case manager for Von Davis, a social worker within the institution. He indicated that Red was cooperative and courteous and conducted himself properly, that he was always well groomed and well dressed. He indicated that Von had as much trust as any person on death row could have within their institution as a matter of system. He indicated he was dependable and had presented no problems either to staff or the inmates and that he had no conduct write-up since his time in the institution.

These are the witnesses, in addition to Dr. Fisher, who would have presented a psychological update based upon his meetings with Von Davis.

That's the areas that we wish...wish to proffer. And procedurally we...we have a question. We are assuming from the court's ruling that the only thing that will be presented would be the argument of counsel, which I assume would proceed...the State would be first, we would be second, and then the State would rebut in turn or...or perhaps maybe the State would only go last, I...however.

JUDGE BRUEWER:  That's correct.

MR. GARRETSON:  And prior to making a

6

1  decision the court would also ask Mr. Davis if he has

2  anything to state to the court.

3      JUDGE BRUEWER: We would let him make a

4  statement.

5      MR. GARRETSON: Alright. Then we're...

6  we're prepared to proceed with...with the case, Your

7  Honor. Thank you.

8      JUDGE BRUEWER: Mr. Eichel, are you ready?

9      MR. EICHEL: Yes, Your Honor.

10     JUDGE BRUEWER: Anything, Stits?

11     JUDGE STITSINGER: No.

12     (Discussion between the judges, nothing

13  audible enough to transcribe.)

14     MR. EICHEL: May it please the court,

15  counsel for the defendant. Once again we are privileged

16  to appear before this three judge panel sitting today by

17  the mandate of the Ohio Supreme Court to decide one and

18  only one issue...and that is...in the words of the Supreme

19  Court, solely to determine whether the aggravating

20  circumstance of which the defendant, Von Clark Davis, was

21  found guilty outweighs the aggra...the mitigating factors

22  presented by him.

23     I assume by these arguments that...that

24  these arguments are properly directed to that issue and

25  that tissue only, not to the propriety of whether there

should be a death penalty, but the purpose of my argument

7

is to assist you in this weighing process...to assign to both sides of this equation, both sides of the scales, the proper weight that these factors deserve, the proper weight that these factors are entitled.

As Your Honors have told countless juries, hundreds of juries, in the collective 35, perhaps, years of experience on the bench...it is not the quantity of the evidence but the quality of the evidence that determines its weight. Unlike other cases where judges or juries in capital cases have not verbalized before their thoughts prior to these oral arguments...in this case we're on remand, so we know precisely what we are weighing. We, as counsel, know precisely Your Honors will weigh. That is, that there is one aggravated...aggravating circumstance in the case, that the defendant was convicted of woefully killing Ernestine Davis, his wife, on December 30, 1970. In other words, the aggravating circumstance is that the defendant has not once, but twice, been convicted or purposely killing another.

We also know this court's opinion, filed June 11, 1984, listed four factors in mitigation here. On reflection, Your Honors, we'll see that the quality of the evidence, the quality of these factors, is such that they carry very little weight in mitigation and that they are only of marginal relevance to whether this defendant, a repeat offender, should be sentenced to death.

  — 

8

As my fellow prosecutor, former prosecutor Mr. Sage, put it in this case the first time it was heard...the mere existence of a mitigating factor in and of itself is not he basis for giving a life sentence. The factor...the mitigating factor in the balance has to outweigh the aggravating circumstance.

To outweigh means to be more important than. And when you come right down to it, the issue in this case is the answer to this question. Is anything you heard in this case in mitigation of...of the...of the defendant's mitigation evidence, is there anything more important in this case than the fact that Von Clark Davis is a repeat offender? I submit it's the most significant thing in this defendant's history, character or background...that Your Honors can consider.

We consider the aggravating circumstance in this case. The evidence which was admitted at...at trial pursuant to that aggravating circumstance on that issue, that the defendant was convicted of killing Ernestine Davis on December 30, 1970, by inflicting 27 stab wounds to her chest, her stomach and to her hands and elbows. And the reason he gave, that he'd been made...made a fool of by her by buying Christmas toys and then made a fool of afterwards.

And we only consider that aggravating circumstance now because he killed again. He killed

9

Suzette Butler again by shooting her five times...in the head. And the record reflects for...for no reason, for nothing but the sheer fact that he was angry with her. As counsel, Mr. Holcomb, put it at the first trial, not in hot blood but in cold blood.

The aggravating circumstance in this case, repeat killing, recognizes a special danger demonstrated by an individual who purposely and repeatedly kills another, purposely and repeatedly disregard the safety, personal integrity and human worth of others. To quote a Harvard Law Review article...entitled "Making the Punishment Fit the Crime", which is what the purpose of this hearing is. That article says "there is a widely held view that those who present the strongest case for the severe measures of incapacitation", meaning the death penalty, "are not murderers as a group, their offenses are often situational, but rather those who have repeatedly engaged in violent combat of behavior. A well demonstrated propensity for life endangering behavior has thought to provide a more solid basis for infliction of the most severe measures of incapacitation than does the fortuity of a single homicidal incident." We have that well demonstrated propensity for violence in this case. So that's the aggravating circumstance that we weigh in this case.

On the other side, what do we have? As the

10

court has listed, four factors, but in consideration of those four factors...none of those exemplify the...the six other statutory enumerated mitigating factors, B(1) thru B(6) of 2929.04. So they must fall within the B(7) category, the catch all category, as being somehow relevant to the imposition of the sentence of death.

The first of these listed by the court was the defendant's positive prison record, the reason he was let out on parole in 1981, only to commit aggravated murder in 1983. How much weight can we assign that positive prison record?

The United States Supreme Court in Skipper vs. South Carolina said that the positive criminal record, positive prison record...may be relevant to mitigation of the death sentence if it bears on the issue of future...future dangerousness. What we have here...the defendant repeating after this positive criminal record, positive...positive prison record, being a repeat offender says just the opposite. It doesn't bear on his future dangerousness, we know what his future dangerous was in 1983.

Consider this, the same people who in 1981 looked at this evidence before this positive record, the parole board, made a prediction in 1981 that Von Clark Davis was, and I quote the record, "a minimal risk to persons and property". How wrong they were in December of 1983 in the situation of Suzette Butler. And coupled with

11

what I'll talk about later, the fourth category, coupled with what the psychologist said, that the defendant has an explosive personality disorder, it's hard to say that this defendant is not too dangerous, that we can predict that he's not too dangerous.

Your Honors, also in that first category listed that he adjusted well in prison, he got his high school GED, and he got his dental technician training. Does this mitigate the crime of aggravated murder in this case? What did the defendant do with this dental technician degree? Well, he...he used it to make up the Silky Car defense in the case. He said that Silky Car was, this phantom, was trading dental equipment for the gun. So that's how he used his dental technician training, to try to...add to some kind of credibility that this court found lacking already.

The court listed two other things, good family relationship and that he maintained partial employment in 1981 through 1983 while on release...on parole from prison. I only have this to say. How much weight do you give that? Many people have good family relationships, many people have bad family relationships. How does either one weigh that much in the situation of an aggravated murder of a repeat offender? How much...how much does it weigh against repeat offender? How it is relevant to whether he deserves the death sentence for a

12

repeat killing?

The fourth and final item that the court listed was that the defendant was found to have a compulsive or explosive personality disorder. Now that's the label that the psychologist would put on it. Psychologist would put a label on anybody. Like...I once read a report that person who likes to file frivolous law suits had a litigious personality disorder. It means he liked to file law suits. I guess all of us lawyers have that personality disorder, I guess, but here it's...Mr. Holcomb sometimes talks about...to juries about lawyer talk and here we're talking about psychology talk. This is...this is a psychology label for just a plain angry man who can act out on his anger. Killers usually are plain, angry men, especially unmitigated killers.

But what's most important in this record, in the testimony of Dr. Fisher, is where he candidly admitted, and it's at page 404 of the transcript on cross examination by Mr. Holcomb, that the defendant was at all times, quote, "free of any emotional disease or defect of the mind". This defendant has no mental disease or defect of the mind. So that forecloses the issue that there was any mental disease or defect of the mind that caused him to lack substantial capacity to refrain from committing the act or substantial capacity to appreciate the wrongfulness of it. This is a man that set out to do

13

1
2    what he did and did it. He fully appreciated the
3    wrongfulness of the act and that's evidenced by the...the
4    covert way in which he purchased the gun. It's evidenced
5    by the preplanning in this case and it's evidenced by his
6    flight to Kentucky thereafter...and it's evidenced by his
7    complete denial.
8            I believe the statute at this conjunction
9    of the case, the deliberation stage, requires that the
10   court, three judge panel...or if it were a jury, the three
11   judge panel shall consider the nature and circumstances of
12   the offense to glean from it whether there's any
13   mitigating factor present and there is none in this case.
14   As I said, we have a very angry man who set out to kill
15   his victim, having been convicted previously of purposely
16   killing another. Under these circumstances and the slight
17   marginal weight, that the mitigating evidence that was
18   presented in this case, slight mitigating evidence, shows
19   death is the only appropriate punishment in this case.
20           MR. GARRETSON: Mr. Eichel, gentlemen, Your
21   Honors. As...as the court is aware, we've had the
22   opportunity to argue this case on a prior occasion and I
23   know that all of us have had the chance to review the
24   transcript, so I don't intend to restate the argument I've
25   presented at an earlier time.
             I...I think if we look at the dictate from
     the Supreme Court as to what the duty of this court

14

is...we...we certainly cannot ignore the fact that it was remanded to a three judge panel to determine whether Von Davis should live or die. Now they didn't remand it to a computer and they didn't remand it where somebody would check off on a box and say there is a aggravating factor of a prior conviction and therefore he gets the death penalty. That's not what they did. That's not what the entire nature of our...our death penalty statute or any death penalty statute in this country would envision is some mechanical process whereby we get out a set of Toledo scales and try to weigh an aggravating factor against mitigating factors. It's not mechanical. It's decision made by men.

Now we...I...I don't think we can discount as quickly as the State would want us to the mitigating factors that you found to be present. I don't think it is fair to say that we can simply discount the fact that you found on a prior occasion...that he had a good prison record, had not created problems, had gone in with a 9th grade education and come out with a college degree, you had made those findings. And why would that be important? Well, I think...I think that finding speaks very loudly because he presents no further danger or problem when incarcerated. He clearly, through his original incarceration and through the last five years...not only presents no danger or further problem when incarcerated,

15

but unfortunately...for him...the only time he seems to be able to avoid that problem of his explosive disorder is when he is confined with external controls. And we all know...let's...let's dispel one thing right now. Life in prison in this case is life in prison. This isn't Sirhan Sirhan and this isn't some other popular...or...or well known criminal who might get out at some point, this isn't Charles Manson. This is Red Davis, 43 years old, who at a...a very minimum...at a very minimum, would serve the next 40 years in prison and there is no way that life does not mean life for him. So if he...if he is not the prisoner, for instance, that has killed in prison or been violent in prison...is there a need to kill him? That's really what we're talking about. Is there a need to kill him.

(Someone responds "Yes".)

MR. GARRETSON: You know, I would appeciate it if I don't get any more comments from the back, I'm trying to argue this case and if you want to make comments...make them out in the hall. I'm being interrupted every few sentences and I don't need that.

JUDGE BRUEWER: Mr...Orville...

BAILIFF: Yes.

JUDGE BRUEWER: ...would you sit over there and the next time anybody makes any kind of a move, that person will be evicted?

16

1    BAILIFF: I sure will.

2    JUDGE BRUEWER: Any kind of noise you'll

3  be...I mean, this is a courtroom and it's not a...a place

4  where we're going to listen to somebody else other than

5  the attorneys. We might understand why you're here and

6  why you would like to make some remarks...but we won't

7  permit them. Understand? That goes to everybody. I

8  might be looking in one direction, but that goes to

9  everybody. Alright.

10   MR. GARRETSON: Now...thank you, Your

11  Honor. What more important factor in this equation, if

12  you will, that you face is there than there is not a need

13  to kill this man? And I do think it's an important factor

14  that you found that he does have a compulsive personality

15  disorder or explosive disorder...because it does define

16  the missing link in the chain in Red Davis's life...that

17  at one end of the chain is a man who can function and can

18  be contributory to his setting that he finds himself in

19  and, on the other hand, a man who can commit two heinous

20  acts. It does tell us that there is a link that misses in

21  the chain in his life and I think that is an important

22  factor and it can't be dispelled or...or ignored when you

23  do the weighing process.

24   Now...now obviously there has been a

25  terrible act without excuse, without justification, that

has been committed and just as obviously Von Davis has

17

committed on a prior occasion a heinous act or we wouldn't be here, we recognize that...and there really is no excuse or justification to his acts. Perhaps psychologically there is an explanation and I think the court found that...as to the extreme dichotomies in this man's personality. On the one hand he commits these two terrible acts...and on the other hand he's a model prisoner, who in that controlled setting seems to thrive. And that was true in first prison term and it's even more true in the last five years, but he has committed a murder for which he's now in this court before you and he has committed a murder before and there is no excuse and there is no justification.

But that's not the end of the story and that's not the end of this case and it should not be the end of Von Davis's life. If the fact that he's committed murder not once, but twice, were the end of the story...the law would not have three learned judges decide life or death. And it is easy, if not popular, to say, well, he got a break once and now he wants a break again. But that also misses the point. Is it really a break to tell Von Davis you must spend the rest of your living days behind bars, behind...what Mr. Shanks and I have seen on a number of occasions when we visited Mr. Davis over the last five years at Lucasville, behind a field of boulders and a 20 foot fence with razor wire and then another 20

18

foot fence with razor wire and guards with machine guns? Is it really/break that Von Davis knows he will never again be outside the walls of Lucasville and will always be confined with a never ending mix of Ohio's worse and most offensive people? Is it really a break for him to know that for him life in prison really means life in prison?

I think the only issue that's being decided today is not whether Von Davis will die while still confined at Lucasville, the only issue is when will he die in prison. I think what we're really here to talk about and...and why we have either juries or a panel of three experienced judges decide a case is to consider compassion for our fellow man and judicial courage. Now somehow in this world of life by headlines and thirty second spots... they're developed into distorted concept that compassion and judicial courage are oil and water. Somehow the exercise of one has been construed to be mutually exclusive of the other. In my humble opinion nothing could be further from the truth. Having true compassion and understanding for the frailities of our fellow man is the highest form of judicial courage. It might be politically expedient or help feed all of our collective egos to be macho and (unclear) to every situation and say the person deserves the max and don't give him a break and he ought to die. But I think when any of our lives are

19

held up to measure at the end...compassion and courage will be measured together and not separately.

I know from past experience that this very panel, as a panel and as three honorable men, has had compassion in the context of judicial courage. And I know that at times the short run headline barometer has fallen into storm over the very exercise of true judicial courage. But I also said then, and I say again, to see three judges exercise compassion and the courage of their convictions, even in the face of politically expedient criticism, makes me proud to be part of our system.

Now the dissent in this case in the Supreme Court Justice Douglas says that you're not the same...the same three judge panel...and I think that's true enough, even though we both...or all of us know that the majority, of course, said this panel is to rehear the issue. But Justice Douglas is obviously right when he says this is not the same three judge panel, just as none of us our the same, including Red Davis is not the same as he was five years ago. In the five plus years there have been hundreds, if not thousands, of cases heard by this court. There have been murder cases. And how is it that we avoid, if you look at the statistics on the death penalty, how is it that we avoid the fact that there have been nearly 500 indictments, death penalty indictments, and yet there are only 85 persons on death row? How is it that we

20

avoid the freakish or arbitrary application of the death penalty? It's because we have three judges, in this case, or juries, who decide those issues. And...and more importantly, you're...you cannot be the same panel or the same people because everyone's perspective change...changes. Is there still a compelling reason to kill Red Davis? As he sits out his life in Lucasville in maximum security...is there really a compelling reason that he must die sooner in prison than later in prison? He is no longer a risk and never will be to those inside or outside of prison. There really is a cycle of violence in not just our State or our Country, but the entire world. And, you know, maybe we can't effect the commencement of that cycle, the acts which bring such people as Red Davis into the system, but we can bring an end to the cycle which answers violence with violence and death with death. Let it not be the lesson learned that violence should beget violence and violent death should be answered with violent death. In current events we see that such an answer begs the question. Hostages are taken and held so that other hostages can be taken and held, but the ultimate result is more violence and more death.

Now I realize a heinous crime was committed and a precious life was taken without reason or excuse, but not one drop of Suzette Butler's precious blood will be infused into her body by electrocuting Red Davis and

21

not one heartbeat or breath of life will be regenerated by burning the life out of Red Davis. Now as we all go on with our lives and live from day to day, which all of us...which may be all of us can hope for, and with full recognition that Red Davis entirely created this situation in which he is now found...let us none us go forward with the death of another of our fellow men on our minds. As Jesus, himself, seemed intent upon breaking the cycle of violence he said..."you have heard the commandment, an eye for an eye, a tooth for a tooth, but what I say to you is offer no resistance to injury. When a person strikes you on the right cheek turn and offer him the other." Thus he broke the cycle that answers violence with violence.

Our history in this country is replete with the continuous cycle of violent acts being answered by violent reaction. And where has this taken us as a country or as a world? Continuance violence and increased violence and death, it is not the answer. I suppose from the first cave man that clubbed another cave man in retribution to the terrorist who most recently killed an innocent American...violence and death, although a popular and attractive reaction in the short run to such atrocities, has lead in the long run to nothing but escalating and uncontrolled violence and death. We cannot control many of the initiating acts in the cycle of

22

1

2 violence...but we can demonstrate the answer is not an eye

3 for eye. It did not work then...and it does not work now.

4 As the gospel proclaims, and perhaps no better than to Red

5 Davis...even the most hardened sinner is a person to be

6 redeemed rather than destroyed. Thus, the Pope even

7 forgave his would be assassin.

8 Von Davis, Red Davis, is a human being.

9 The Red Davis that Mike Shanks and I have come to know is

10 not so many pages in a law book, he's not 38 Ohio State

11 3d, 361, he's not a technicality or a mere formality, he's

12 an intelligent, (unclear) and I believe a likeable person

13 who can contribute within the setting in which he is

14 confined. I hope that you can see him as a human being

15 and see him with compassion and true judicial courage.

16 Thank you.

17 MR. SHANKS: Your Honors, in all honesty,

18 there's absolutely nothing I can add to Mr. Garretson's

19 argument in this case except to hopefully make sure that

20 the focus is exactly as Mr. Garretson left it. Red Davis

21 is not to me case number CR83-12-0614. Von is the son of

22 two people who I have known for a long time and...and

23 thoroughly like and admire. He is the brother of friends

24 of mine and he's been my personal friend for 20 years.

25 He's not a case number. He's not this document here that

represents the events that finds us in court today. He is

a human being and all the attributes that Mr. Garretson

23

spoke about. I just want to stress that this court's

consideration should be to Von Clark Davis, the human

being, not to case number 83-12-0614.

    MR. EICHEL: Your Honors, once again...

we're not here to decide whether the legislature was

right.

    JUDGE: (Comment unclear)

    (Discussion among judges, nothing audible)

    JUDGE BRUEWER: You want to approach the

bench please?

    AND THEREUPON counsel approached the bench

and the following discussion was out of the hearing of the

jury:

    JUDGE BRUEWER: We figured if your client's

going to make a statement...he should make it now and then

at least give the prosecutor a chance to talk about it.

    MR. GARRETSON: That's fair enough.

    JUDGE BRUEWER: So you might find out if he

wants to make a statement or not.

    MR. GARRETSON: Alright. Where do you

want him to make that from?

    JUDGE BRUEWER: Oh, wherever it's

comfortable, but I would suggest either from the podium

or...

    JUDGE MOSER: Wherever he feels he's...

    (Pause)

24

1

2          JUDGE MOSER:  Say let the record...

3          JUDGE BRUEWER:   Let the record reflect

4   at  this  time  that  the defendant is  going  to  make  a

5   statement.  Is that correct, Mr. Davis?

6          MR. DAVIS:  Yes, sir.

7          JUDGE BRUEWER:  Alright.

8          MR. DAVIS:  Your Honor, I...I have no wish

9   to  present  any long drawn  out,  pompous  (unclear).   I

10  address you out of shame and definite remorse and complete

11  respect for the bench.

12          MR. GARRETSON:  They can't hear you.

13          MR. DAVIS:  Standing before you and the

14  public   under   these circumstances dispels all the  dreams

15  and goals I set as a child.  I dreamed of being successful

16  and with that success...making my parents proud, my family

17  proud, my community proud and this city.  Ironically...all

18  the  resources were  there,  loving  parents,  exceptional

19  brothers and sisters,  good friends and the opportunities.

20  I  can't pity myself,  nor can I complain...because I blew

21  my chances.  Your Honor, somewhere along the way Von Davis

22  shifted,  lost control,  lacked prudence and  subsequently

23  ended  up  being  labeled  as  one  of  societies  ominous

24  disgrace.   At  no time can I look in the mirror  and  not

25  recall from the shame...realizing the tremendous amount of

    grief  and pain others have suffered as a result of  these

    charges,   the  victim's family,  my family,  society  and

25

those concerned. God knows this is not my dreams in here. I stand here in total disarray, humbly remorseful. All that's been said and written...I guess I deserved it. I put very little worth on my life right now, but, however, I feel that I can be a contribution, however small, to someone somewhere. The previous judicious...judicious decision you have made I find no grounds to object or challenge. Had I been in your place I probably would have rendered the same decision to Von Davis. I only ask today that you spare my parents, my brothers and sisters, my friends and all those concerned, any more grief. I'm not asking for freedom, I'm simply asking for my life. Thank you.

JUDGE BRUEWER: Mr. Eichel.

MR. EICHEL: If Your Honors please, we are not here to decide...to decide whether the legislature was right or wrong in enacting the death penalty statute, so most of what Mr. Garretson had said really isn't your consideration. Theologians on both sides have found suppport. There is New Testament language, in the book of Romans particularly, that says the murderer, a person who strikes with an instrument of iron, shall suffer death by the laws of man. We are here to execute the laws of man. With compassion, yes, with...with judicial courage, yes...but with following the law that requires that weighing, that determination whether the aggravating

26

circumstance outweighs the mitigating factors.

Now I have heard in a...in a context of a debate between chief counsel for the public defenders office and Justice Douglas...as a moderator and a prosecutor as the...the opposite to the public defender. In that debate I heard the public defenders office criticize the Supreme Court's record. At that time, it was a year ago, the Supreme Court had never reversed a death sentence on the weight of the evidence. Now last month they did so. I think it's interesting and instructive to look at that case, State vs. Lawrence, to decide and to see what four out...out of the seven, four...it was a four to three decision, but four of those justices found that the evidence was of a quality sufficient to out...outweigh a double killing. And that's what we have in this case, a double killing...separated in time by thirteen years, but nevertheless under the same sub section of the law...a double killing, a repeat offender, someone who had thirteen years between them to think about whether he should be deterred or not, but in State vs. Lawrence the four justices of the majority found there was some provocation on the part of the victim...of one of the two victims, coupled with a mental status known as "post traumatic stress syndrome", this fellow was a Vietnam veteran and he had this ability...this mental defect which affected the defendant's ability to refrain from

27

responding to what the Supreme Court said was clearly insufficient to be self defense and was clearly insufficient to even merit a voluntary manslaughter instruction, but it was nevertheless a mitigating circumstance of provocation.

The thing about that case is to compare it with this case there is no provocation. This victim, as Mr. Garretson says, there was no excuse for this crime, there was no justification. It's not the end of the story to say that he was a repeat offender, but you have to weigh it, weigh the significant fact that he is a repeat offender and weigh how much weight you give to the mitigation that they...they presented in this case. There is no mental defect in this case that made this defendant either unable to refrain or lack a substantial capacity, as the...the statute says, to refrain from committing the murder of Suzette Butler. What quality do you give to the fact that a psychologist can put the label "very angry, young man...very angry man" here or the label "compulsive, explosive personality disorder", a man that can act out on his anger?

What weight do you give the good prison record? Well, you can call it a missing link in his life, something that...that...that...the fact that he has a problem with women as a missing link. There are no women in prison either. So is this defendant's crime less

28

significant just because he has this problem with killing women? The rapist killer could have the same argument, that he's a model prisoner as long as no women are around. And the absurdity of that idea just...needs no further explanation.

This is not an innocent hostage situation...no need to say no more about that. And this defendant knew in 1983, when he committed this crime, he knew what the insides of those stone walls and iron bars that Mr. Garretson...were like, Mr. Garretson talks about, he knew that. He knew it from 1971 until 1981 and he knew it in 1983. The issue is not whether it would deter Mr. Garretson having seen the insides of those walls and bars, the fact is it...that fact that he is a repeat offender did not deter Von Clark Davis.

In closing we submit that the capital punishment in this case is the appropriate sanction from the aspect of deterrence, from aspect of retribu...retribution, which is legally recognized, but when we speak of deterrence...the Supreme Court had this to say, there are carefully contemplated murders, such as murder for hire, where the possible penalty of death may well enter...may well enter into the cold calculus that precedes the decision to act. And there are some categories of murder, such as murder by a life prisoner, where other sanctions may not be adequate. I submit that

29

1
2  in that category is the person who has had life, has been
3  paroled and kills again and that's Von Clark Davis.
4          Going back to my earlier argument...and
5  which sums up this case, the best way to look at it...is
6  there anything mitigating in the nature and circumstances
7  of the crime?  And there is none.  Is there any mitigating
8  in the history, character and background of this offender?
9  The only significant thing in this case about the history
10  and character and background of this offender is that he
11  did commit prior murder and that's the aggravating
12  circumstance.  The most and the only significant
13  thing...is the defendant killed...killed once and has
14  killed again and lacks any reason, any excuse, and lacks
15  any mitigating factor that would outweigh that aggravating
16  circumstance.  Thank you very much.
17          (Discussion among judges, nothing audible)
18          JUDGE BRUEWER:  Alright, for the record,
19  the court wants to make the statement that each of us has
20  read the entire record or transcript of the record of the
21  pre...of the previous hearing and we'll take this...we'll
22  begin our deliberations and...report back here on Monday,
23  it'll be Monday morning, and...whatever time you'll be
24  noticed, it'll be sometime in the morning.  Does that
25  create a problem for any counsel here?
          MR. SHANKS:  No, Your Honor.
          JUDGE BRUEWER:  Alright, we'll see you all

30

that time.

AND THEREUPON court adjourned.

*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

31

August 7, 1989

AND THEREUPON the following record was made in open court:

JUDGE BRUEWER: Well, we're back on this matter that we started deliberations on last Friday. As most of you know, we did consider and start deliberations on Friday morning. We broke off and individually considered this until this morning and we continued our deliberations since then...and we've come to the conclusion, after considering all the evidence, and we unanimously find that the aggravating circumstances...or circumstance has been proved beyond a reasonable doubt and further find by proof beyond a reasonable doubt that the aggravating circumstance outweighs the mitigating circumstances and therefore find that you're guilty, Mr. Davis, and subject to the death penalty.

Do you want to bring your client up here please?

AND THEREUPON counsel and the defendant approached the bench.

JUDGE BRUEWER: Does counsel or the defendant have anything to say before we pass sentence here?

MR. GARRETSON: No.

JUDGE BRUEWER: Mr. Davis?

MR. DAVIS: (No response)

32

1           JUDGE BRUEWER: Well, accordingly we find

2   that you have to be put to death, sir, and we set a date

3   of December 4th...'89 and it'll be in accordance with the

4   statutes for the State of Ohio. You understand also that

5   there's an automatic appeal here and any records that are

6   needed will be made available to you.

7           Anything further?

8           MR. GARRETSON: We would ask...ask at the

9   appropriate time for a stay pending the appeal in the

10  matter and...

11          JUDGE BRUEWER: Well, that's with the Court

12  of Appeals, as you understand. Anything? Mr. Shanks?

13          MR. SHANKS: No, sir.

14          JUDGE BRUEWER: The prosecutor?

15          MR. EICHEL: No, Your Honor.

16          (Comment by someone, unclear)

17          JUDGE BRUEWER: Well, you make your

18  application on appeal if there's going to be a counsel

19  appointed. Alright.

20          AND THEREUPON court adjourned.

21  * * * * * * * * * * * * * * * * * * * * * * * * *

22

23

24

25

C E R T I F I C A T E

I, Shirley Roesch, Assistant Court Reporter, Butler County Common Pleas Court, do hereby certify that the foregoing 32 pages is a true and accurate transcript of the hearing in this matter as transcribed by me to the best of my ability from courtroom tapes.

_Shirley Roesch_

IN THE COURT OF COMMON PLEAS
BUTLER COUNTY, OHIO

STATE OF OHIO          *    Case Nos. CR83-12-0614

    Plaintiff            *

vs.                   *

VON CLARK DAVIS          *    TRANSCRIPT OF POST
                           CONVICTION RELIEF HEARING
    Defendant            *

                       *    *

FILED IN COMMON PLEAS COURT
BUTLER COUNTY OHIO

JAN 30 1995

T. MARK BADEN
CLERK

APPEARANCES:

    On behalf of State:

         Mr. Daniel Eichel
         Assistant Butler County Prosecutor
         216 Society Bank Building
         Hamilton, Ohio 45011

    On behalf of the Defendant:

         Miss Joann M. Jolstad
         Chief Appellate Counsel of
         Death Row Division
            and
         Miss Linda E. Prucha
         Assistant State Public Defender
         8 E. Long St., 11th Floor
         Columbus, Ohio 43215-2998

      BE IT REMEMBERED, that at the January Term,

A.D., 1995, of the Court of Common Pleas, Butler County, Ohio,

to wit: January 11th, 1995, this cause came on to be heard

on an evidentiary hearing regarding the 19th cause of action

on the petition to vacate or set aside the sentence in this

case and on the post conviction relief as follows:

# I N D E X  T O  W I T N E S S E S

## (For the defendant)

Name                                          Page

Von Clark Davis

   Direct examination by Miss Prucha            4
   Cross examination by Mr. Eichel             10
   Redirect examination by Miss Prucha         21

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
STATE COURT TRANSCRIPTS - Page 608

I N D E X   T O   W I T N E S S E S

(For the State of Ohio)

Name                                                    Page

Judge William R. Stitsinger (retired)

    Direct examination by Mr. Eichel                    23
    Cross examination by Miss Jolstad                   28
    Redirect examination by Mr. Eichel                  39

Judge John R. Moser

    Direct examination by Mr. Eichel                    40
    Cross examination by Miss Jolstad                   46

I N D E X  T O  E X H I B I T S

(For the Defendant)

| Exhibit | Intro. | Rec. |
|---|---|---|
| A. Complaint for Foreclosure | 15 | 22 |
| B. Judgment Entry and Decree for Foreclosure | 16 | 22 |

Note - Above exhibits filed with original transcript in Clerks Office.

I N D E X  T O  E X H I B I T S

(For the State of Ohio)

| Exhibit | Intro. | Rec. |
|---|---|---|
| 1. Affidavit (Ex. N from Post Conviction Relief hearing) | 18 | 52 |
| 2. Jury waiver and election of three judge panel | 20 | 52 |

Note - Above exhibits filed with original transcript in Clerks Office.

2

BY THE COURT: Ok, this is case number CR83-12-0614, State of Ohio v. Von Clark Davis. The reason for this hearing today is an evidentiary hearing regarding the 19th cause of action on the --- the petition to vacate or set aside the sentence in this case and on the petition for post conviction relief. Ok.

Present for the prosecution, presenting the case for the prosecution will be Oan Eichel from the prosecutor's office and from the --- the defendant --- let the record reflect that the defendant Von Clark Davis is present and would we introduce the defense counsel please --- for the record.

MISS JOLSTAD: Joann Jolstad of State Public Defender's office and Linda Prucha from the State Public Defense office.

BY THE COURT: Alright. This is your motion. Who will be presenting the --- the --- the evidence?

MISS JOLSTAD: Your Honor, Miss Prucha will be presenting Mr. Davis.

BY THE COURT: Ok.

MISS JOLSTAD: Before we begin I would like to register an objection for the record that this court failed to grant us an evidentiary hearing on our other cause of action. We did have a hearing before this court in June and I would rest on the arguments we made there and ask the

court to reconsider its decision on not giving us an evidentiary hearing on the other claims.

BY THE COURT: Ok. I think the court --- the court has found that res judicata does apply on all of the other causes of action and, therefore, the court has already answered that, I think, and we'll note your objection.

MISS JOLSTAD: Thank you, Your Honor.

BY THE COURT: Are you ready to proceed?

MISS PRUCHA: Yes, Your Honor.

BY THE COURT: Ok.

MISS PRUCHA: If we could call Von Clark Davis.

BY THE COURT: Von Clark Davis. Ok, Mr. Davis please.

MISS PRUCHA: Your Honor ---

MR. EICHEL: May it --- well, go ahead, you beat me, go ahead first.

MISS PRUCHA: Your Honor, before we begin, if we could ask for a separation of witnesses before we start the question.

BY THE COURT: Ok, there's been a separation of witnesses requested and the court will grant that. Anyone who is going to testify in this case will please remain out in the witness room.

MR. EICHEL: That's what I was going to bring up.

4

BY THE COURT: Good morning, Mr. Davis.

MR. DAVIS: Good morning, sir.

VON CLARK DAVIS, defendant, having first been
duly sworn, testified as follows:

### DIRECT EXAMINATION - MISS PRUCHA

Q. Could you tell us your name please?

A. Von Davis.

Q. And what is your age?

A. 48.

Q. Where are you currently residing?

A. Southern Ohio Correctional Facility, Death Row.

Q. Ok. And why are you on death row?

A. Conviction of murder.

Q. How long have you been on death row?

A. Since 1984.

Q. Ok. In 1969 were you married to Ernestine Davis?

A. Yes, I was.

Q. Did you purchase a house at that time with your wife
Ernestine Davis?

A. Yes, I did.

Q. When did you buy the house?

A. 1969.

BY THE COURT: Could --- could --- can I ask
this please? Mike, would you go up /move the podium down
here so Mr. Davis doesn't have to keep --- running back and

5

forth? We'll move the podium. (Pause, moving podium)

        **BY THE COURT**: Right there is fine, right --- that's fine, right there is good. That'll make it a little bit more convenient, I think.

Q.    Ok, when you bought the house with your wife Ernestine did you fill out forms in order  obtain --- in order to obtain the mortgage on the house?

A.    Yes, we did.

Q.    Ok, what information about your background were you asked to provide on the forms?

A.    In general, finances, employment history, etc.

Q.    Where was the house located?

A.    

Q.    And how long did you live in the house?

A.    Roughly, 6 months, 6, 7 months.

Q.    Ok. Did you stop making payments on the house at some time?

A.    Yes, I did.

Q.    Once you stopped making the payments did someone contact you to make a payment plan?

A.    Not to my knowledge.

Q.    Ok, were fore --- were foreclosure proceedings started against you?

A.    Assumingly, yes, umhum.

Q.    Do you know when?

6

A.    1970, I believe.

Q.    Did you receive any notice of the foreclosure action?

A.    Not to my knowledge.

Q.    Ok.  Were you notified to appear at a hearing on the foreclosure?

A.    No.

Q.    Do you remember appearing at a hearing on the foreclosure?

A.    No, I don't.

Q.    Did you know at the time who the attorneys for the mortgage company were?

A.    No, I don't.

Q.    Did you ever see the attorneys that were handling the foreclosure?

A.    No.

Q.    Did you ever talk to the attorneys?

A.    No.

Q.    Why did you stop making payments on the house?

A.    Due to the separation of our marriage and --- which left me rather --- rather distraught and I just discontinued the payments.

Q.    Had you been separated for Ernestine Davis before you bought the house?

A.    Yes.

Q.    Had Ernestine Davis filed for divorce from you?

A.    Yes, she did.

Q.    Were you charged in 1969 with shooting with intent to wound Ernestine Davis?

A.    Yes, I was.

Q.    In 1971 were you charged with the murder of your wife Ernestine Davis?

A.    Yes, I was.

Q.    Did you plead guilty to that charge?

A.    Yes, I did.

Q.    Was one of the specifications at your capital trial in 1984 the prior murder of Ernestine Davis?

A.    Yes, it was.

Q.    At your trial in 1984 --- when you appeared before the court for the hearing on your jury waiver, who was present at that hearing?

A.    Judge Bruewer and my attorneys.

Q.    Ok. At the hearing who questioned you about your jury waiver?

A.    Judge Bruewer.

Q.    Did he tell you at that time that the other judges on the three judge panel would be Judges Moser and Judge Stitsinger?

A.    Yes, he did.

Q.    Did you recognize their names at that time?

A.    No, I didn't.

8

Q.     Were you --- when did you first see the three judge panel?

A.     The day of my trial.

Q.     Ok, had you ever seen them before that time?

A.     No, I hadn't.

Q.     Did Judges Stitsinger and Moser ever discuss your jury waiver with you at the time of your trial?

A.     No.

Q.     Did Judges Stitsinger and Moser tell you at any time in 1984 at your trial --- or in 1989 at your resentencing hearing, that they had been the attorneys who handled the foreclosure for the mortgage company?

A.     No.

Q.     Did Judge Bruewer ever discuss with you, either in 1984 at your trial or at your resentencing hearing in 1989, the foreclosure action?

A.     No.

Q.     Did your attorneys at the time of your capital trial in 1984 discuss the fore --- foreclosure action with you?

A.     Pardon?

Q.     Did your attorneys in 1984 or in 1989, at your re-sentencing hearing, discuss the foreclosure with you?

A.     Oh, no --- no.

Q.     When did you first learn that two of the judge on the three judge panel at your capital trial were the

attorneys who represented the mortgage company on the foreclosure of your house?

A. It was late 1993 --- through the information of my --- my attorneys.

Q. Ok.

A. During my post conviction appeals.

Q. Ok. Is this something that you would have wanted to know before you made your decision to waive a jury trial in 1984?

A. Yeah, I'm --- I'm sure I would have, yes.

Q. If you had known that the attorneys who foreclosed on your house were going to sit as judges on your three judge panel at your capital trial would you have wanted them to sit on your panel or would you have wanted a jury?

A. I would have preferred --- preferred a jury.

Q. Ok, why would you have not wanted Judges Stitsinger and Moser to sit on your three judge panel?

A. I probably would have been under the --- the --- the assumption they would have --- I wouldn't have gotten a fair trial, a fair decision.

Q. Ok. Did you know at the time of your capital trial that once you signed the jury waiver and had the hearing that you could still withdraw your waiver and have a jury trial?

A. No.

Q.    Did you know you had the absolute right to withdraw your jury waiver for any reason at any time prior to trial?

A.    No.

Q.    Do you understand that now?

A.    Yes.

Q.    If you had been told about your absolute right to revoke your jury waiver, and after that waiver you learned about Judges Moser and Stitsinger being involved with the foreclosure action, would you have withdrawn your jury waiver and had your trial to a jury?

A.    I think I would have, yes.

        MISS PRUCHA: Your Honor, could I have just a moment to talk with co-counsel?

        BY THE COURT: Umhum.

        MISS PRUCHA: We have no further questions, Your Honor.

        BY THE COURT: Cross examination, Mr. Eichel.

        MR. EICHEL: Thank you, Your Honor.

        CROSS EXAMINATION - MR. EICHEL

Q.    Mr. Davis, what was your address in 1969, in the early months of --- that year, before you bought the house --- you're talking about?

A.    Prior to that we --- we had a home at ███████

███████

11

Q. Ok. And in ---

A. And my parents were █████████████

Q. Ok. So within a block --- is that right, or ---

A. No, that's --- no, that's quite a distance apart.

Q. Ok, but in the --- in the same vicinity of town?

A. No.

Q. No?

A. No.

Q. Well --- then you said you bought the house on

S. ████████████ --

A. Right.

Q. --- number ████ is that right?

A. ████ yes, sir.

Q. And that was in April of 1969, is that right?

A. I believe that's correct.

Q. Now at some point in time there was a separation of your marriage?

A. Yes.

Q. And that occurred before you quit making the payments which you --- according to your direct testimony, was 6 or 7 months later after the purchase of the house?

A. Yes.

Q. Who moved out?

A. She did.

Q. She did?

12

A.    Yes.

Q.    And you stayed at the ▮▮▮▮▮▮ address?

A.    Yes, I did.

Q.    Then in 1969 --- there was an occurrence which led
to your conviction in April of 1970 ---

A.    Yeah.

Q.    --- of the offense of assault with intent to wound,
is that ---

A.    Yes, there was.

Q.    --- correct? Was that in December of 1969 when the
occurrence happened that led to your conviction?

A.    I'm not exactly sure --- it was somewhere within
that --- that time period.

Q.    Ok.

A.    But I'm not exactly sure.

Q.    Were you arrested at the ▮▮▮▮▮▮ address?

A.    No, I was --- I believe I was arrested on the ▮▮▮▮
--- ▮▮▮▮▮▮ address?

Q.    Where your parents live?

A.    Where her parents live.

Q.    Her parents.

A.    I'm --- I'm --- I'm --- I'm --- I'm --- I'm not
certain, but I --- I think that's what it is.

Q.    And where did the --- did the occurrence occur?

A.    It's occur --- it occurred at her parents address.

Q. So the same place you were arrested is where the ---

A. I'm --- I'm --- I'm pretty certain --- yeah.

Q. The act which led to your conviction?

A. Right.

Q. After that you were re --- residing at the Butler County Jail, is that correct, for a period of time?

A. Yes.

Q. And in April of 1970 you were convicted of assault with intent to wound in Judge Cramer's courtroom, is that correct?

A. That is correct.

Q. And where did you go from there, were you --- did you go to prison or halfway house or were you put on probation after that?

A. I received, I think, a 5 year probation ---

Q. Ok.

A. --- as a result of that, shooting with the intent to ---

Q. And that was in April of 1970. Where did --- where did you live at that time --- upon your release and --- from jail and placement on probation?

A. Probably ███████████████

Q. Which is your parents address?

A. Right.

Q. Ok. Did you ever return to ███████████

14

A.    Yes, I did.

Q.    And when was that?

A.    On several occasions.

Q.    That being the residence of Ernestine?

A.    No, that being --- that's --- that was the residence of Ernestine and I ---

Q.    Ok.

A.    --- the ███████████████

Q.    In other --- in other words, you're --- let me correct or get you --- see if I understand you correctly. Did you --- after your conviction, again live with her as husband and wife?

A.    No --- no.

Q.    You did ---

A.    She didn't --- she moved out of the --- out of the house and ---

Q.    So she never lived there again?

A.    No, no.

Q.    You lived there after you were put on pro --- probation for ---

A.    Yes.

Q.    --- for a/time. Then according to the documents --- attached to your post conviction petition, you lived there at the time that the foreclosure action was brought?

A.    I wasn't living there, no, because I had --- I had

--- I had abandoned --- really abandoned the home, I guess ---

Q.    Nobody lived there?

A.    Nobody lived there.

Q.    And that being May of 1970?

A.    It could have been, yes.

Q.    Ok.

        MR. EICHEL:  Do you have the document on which you're relying?

            MISS PRUCHA:  The foreclosure documents?

            MR. EICHEL:  Right.

            MISS PRUCHA:  Yeah.

            MR. EICHEL:  Would --- would you object if I marked these as defense exhibits --- A and B?

            MISS PRUCHA:  Not at all.

            MR. EICHEL:  Alright.

Q.    Mr. Davis, I'll show you what's been marked as State's exhibit --- or defense exhibit for identification A and ask if this is not the foreclosure document that --- you relied upon in your post conviction action --- wherein it states that Judges Stitsinger and Moser were attorneys for plaintiff ---

A.    Umhum.

Q.    --- plaintiff being Federal National Mortgage Association ---

1(

A.    Federal National.

Q.    --- against Von Davis, Ernestine Davis, Mark Wendell, Auditor Tilton?

A.    Umhum.

Q.    This is it?

A.    Yes, it is.

Q.    And --- ok, according to this it was filed January 5th, 1970. The --- the official record of the --- the court petition was --- was filed January 5th ---

A.    Umhum.

Q.    --- not May 5th, as I earlier stated.

A.    No.

Q.    Next, directing your attention, is to defendant's exhibit B. This appears to be the judgment entry and decree of foreclosure in this same case --- filed March 23rd, 1970, a 3 page document --- signed by Judge Fiehrer. Is that what you're --- the documents you're relying on?

A.    Yes, yes, umhum.

Q.    Ok. According to your testimony you were in the Butler County Jail at the time of the filing of this --- as well as the time of the --- entry of the judgment --- January through March?

A.    I'm not absolutely certain on that.

Q.    What I'm talking is the period of time while your --- your criminal case was pending ---

A.      Umhum.

Q.      --- that resulted in your --- your April 1970
conviction.

A.      Yeah.

Q.      You're not certain whether you were in or out of
jail before conviction on that assault charge?

A.      On the assault charge?  No, I wasn't in jail on ---
on it, I don't think, on the assault charge.

Q.      So --- so  you were on bond?

A.      I'm --- I'm pretty sure, yes --- yeah.

Q.      Ok.  Now if your foreclosure action was complete in
March of 1970, how it is you --- that you --- have testified
that you went back and lived in that house?

A.      I was living in it all the time after she left, I was
in it from --- you know, periodically, you know, maybe a day
or two,  3 days,  you know,  gone,  just would leave --- stay
someplace else.

Q.      The  --- I  mean,  directing --- the period of  time
after the foreclosure was entered in March of 1970?

A.      I'm  --- I'm  not certain on the  dates  you're  ---
you're  directing  at and my memory's not  that  clear,  you
know, to ---

Q.      Ok.  Now State's exhibit #1 that I've marked for
identification  for this hearing --- your exhibit N from the
post conviction relief ---- sir,  this is your affidavit  of

Von Clark Davis in which you stated that you didn't know
that Judge Moser's --- Judges Moser or Stitisinger were the
attorneys for the mortgage company until approximately ---

A.    Right.

Q.    --- 2 months before the date of this affidavit, being
17th September of 1993?

A.    Yeah, yeah.

Q.    That's because you didn't participate in the default
judgment.  The mor --- the mortgage was taken by default,
was it not?

A.    I did not participate, that is correct?

Q.    Is this the one and only time you've ever had a
house ---

A.    It is.

Q.    --- where the mortgage was foreclosed?

A.    It is.

Q.    And even you didn't know --- the attorneys for the
other side?

A.    No, I didn't.

Q.    You had no attorney?

A.    No, I didn't.

Q.    And according to your testimony you were never served
with the petition for foreclosure?

A.    Not to my knowledge.

Q.    Mr. Davis, you filed another affidavit in this post

conviction petition wherein say --- stated ---

A.    Excuse me.

Q.    --- that the reason you waived a jury and elected to be tried by a three judge panel was because you didn't want a jury to hear the fact of your prior conviction for murder?

**MISS JOLSTAD:** I'm going to object to that question, Your Honor.

**BY THE COURT:** What?

**MISS JOLSTAD:** This court refused to grant us an evidentiary hearing on the claim that that affidavit is associated with, so we've not been permitted to adduce any evidence on that particular claim.

**BY THE COURT:** Well, I think it's proper cross examination though.

**MISS JOLSTAD:** This court has precluded us from introducing any evidence on that cause of action and the affidavit.

**BY THE COURT:** No, I --- I think --- I think --- I think this goes to the testimony of the defendant here at this particular hearing that we've had so far, his --- his direct testimony. You can cross examine on that about prior affidavit. Overruled.

Q.    Is --- is that not your --- your prior affidavit in this case that you --- the reason you waived a jury is to let ---

A.     That is one of my affidavits, yes.

Q.     Ok.  Now you stated in your direct testimony,  and it's clear in the record, is it not, that you were expressly told  by  Judge  Bruewer  verbally  and  in  writing  when  you waived  a  jury  ---  that at --- at the time  of  your  jury waiver  you were expressly told who the three  judges  would be,  that  being  Judge  Bruewer,  Judge  Moser  and  Judge Stitsinger?

A.     That is correct.

Q.     And directing your attention to the jury waiver and election  of a three judge panel filed in this  case,  which has  been marked herein as State's exhibit #2 for this  post conviction relief hearing,  document filed May 8th,  199 --- 1984 bearing your --- your signature, Von C. Davis, lays out the  fact that the three judge panel would be consisting  of Judges Henry J.  Bruewer,  William R. Stitsinger and John R. Moser  --- and  this is likewise signed by  your  attorneys Michael D. Shanks and John A. Garretson?

A.     Umhum.

Q.     Entered on the record by Judge Henry J. Bruewer?

A.     Umhum.

Q.     This is something you did and a document you  signed at the time of your jury waiver.

        BY THE COURT:  I think you'd better put it in the form of a question.

21

Q.    Is this not your signature on this document?

A.    This is my signature, yes, it is.

Q.    And were you not advised expressly that Judges Bruewer and Stitsinger and Moser would be the three judge panel?

A.    I was advised, yes.

Q.    And in your --- 1989 unsworn statement before that three judge panel, directing your attention to page 25 of the transcript of hearing of court's decision, did you not state in an unsworn statement before the judges --- "the previous judicious --- judicious decision you have made I find no grounds to object or challenge. Had I been in your place I probably would have rendered the same decision to Von Davis"?

A.    I vaguely recall that testimony, yes.

Q.    And throughout proceedings in 1984 and 1989, up until approximately July of 1993, you, yourself, have no recollection of --- or any indication of the mortgage proceedings as having any bearing whatsoever on your murder case?

A.    No, I didn't.

Q.    Thank you.

            **BY THE COURT**: Redirect?

            **REDIRECT EXAMINATION - MISS PRUCHA**

Q.    After you were convicted and put on probabtion of the

shooting with intent to wound --- where did you go to live?

A.     It --- it would have to have been ████████████

or --- or ████████████

Q.     Ok.

     **MISS PRUCHA**: I have no further questions, Your Honor.

     **BY THE COURT**: Recross, Mr. Eichel?

     **MR. EICHEL**: Nothing further, Your Honor.

     **BY THE COURT**: Mr. Davis, if you'll resume your seat, sir.

     **MR. DAVIS**: Thank you.

     **MISS JOLSTAD**: At this time, Your Honor, we have no further witnesses. We would like to move for admission defense exhibits A and B that the prosecutor earlier marked.

     **MR. EICHEL**: We have no objection of that.

     **BY THE COURT**: They'll be admitted.

     **MR. EICHEL**: Your Honor, at this time ---

     **BY THE COURT**: Does the --- does the prosecution wish to present any evidence?

     **MR. EICHEL**: Yes, Your Honor, the testimony of Judge --- retired Judge Stitsinger. He's here present and ready to proceed.

     **BY THE COURT**: Good morning, sir. Good morning.

     **JUDGE STITSINGER**: Good morning.

     **WILLIAM R. STITSINGER**, called on behalf of

23

the State of Ohio, having first been duly sworn, testified
as follows:

### DIRECT EXAMINATION - MR. EICHEL

Q.    Good morning, Your Honor. Will you please state your
name, sir?

A.    William R. Stitsinger.

Q.    What is your profession, sir?

A.    Well, I'm a retired Common Pleas Judge from Butler
County, sometimes sitting now by assignment.

Q.    And what is the occupation that you've engaged in for
approximately half of a century?

A.    Well --- do you mean a --- a lawyer?

Q.    That's it.

A.    Ok.

Q.    When were you ad --- what year were you
admitted to the bar?

A.    1942.

Q.    So that's put you at more than 50 years as a lawyer
and judge?

A.    That's correct.

Q.    As you stated, you are retired today, but
occasionally sit by assignment?

A.    That's correct.

Q.    What elective offices have you held in your lifetime?

A.    I was elected to county commissioner for 2 terms and

elected to the Common Pleas Court 2 terms.

Q.    Alright.   Two terms of the judgeship of the Common Pleas bench would be 12 years, would --- would that be correct?  I mean, if I'm wrong, between February of 1979 through February of 1991?

A.    That is correct.

Q.    And your 2 terms as county commissioner --- approximately in the late '60's ---

A.    I was elected in 1960 and served '61 through '68.

Q.    Alright.

A.    1961.

Q.    In the --- in the course of your career as an attorney did you have occasion to act as counsel for the defense in a capital murder case?

A.    Yes, I did.

Q.    Is it fair to say that you were never a prosecutor on --- on a criminal case?

A.    I never prosecuted any criminal cases, to my know-ledge, I don't think.

Q.    Ok.

A.    Well --- I guess that's right, yeah.

Q.    You could have possibly been an acting prosecutor some way or another, but ---

A.    I was just trying to think, I don't --- I don't recall any.

25

Q.    Ok.  But during the course of your career you
participated in many --- many cases as a defense attorney?

A.    Oh, yes.

Q.    I want to direct your attention to the year 1969,
1970 and several years thereafter and ask if you recall
being an attorney for the Federal National Mortgage ---
Mortgage Association ---

A.    Yes, that's true.

Q.    --- central offices Washington, D.C.?

A.    That's correct.

Q.    Can you explain how that came about --- how you
become the attorney for them?

A.    Judge Moser asked me if I would serve as co-counsel
with him and do the work.  He got the appointment through
the Republican party, as I remember it --- out of Washington
and I agreed to do --- to bring foreclosure actions, yes.

Q.    Ok.  That --- that --- that particular time, was that
in the early --- in the Nix --- Nixon administrations and
Ford administration?

A.    Well, if that's who was president at that time.

Q.    Ok.  And as a Republican yourself --- you were
retired as county commissioner at that time, this is what
you did?

A.    Well, I don't remember the exact dates, but I might
have been out of the county commissioners office, I don't

26

know, I can't remember those dates.

Q.   Ok, that's fair.  About how many foreclosure actions did you participate in?

A.   That's a good question.  I never counted them, but I would judge over 200 to 300.

Q.   Alright.  And was there anything in particular that you remembered about any given foreclosure action, the parties, the --- circumstances or anything of that nature?

A.   I don't remember any of the cases in particular, no.

Q.   Alright.  And let me ask, who did all the work?

A.   I did.

Q.   And did you have a fee spliting arrangement with Judge Moser?

A.   That's correct.

Q.   And, of course, he --- neither you nor he were judge at the time?

A.   No, we were not.

Q.   Ok.  Let me show you what's been marked here as State's exhibit --- or defendant's exhibits A and B.  First, what is defendant's exhibit A --- if you can tell us?

A.   That's a complaint, Federal National Mortgage Association v. Von Davis, et al --- complaint --- petition, we called them in those days, for foreclosure.

Q.   Now turn to page --- I'm not sure if they're numbered, but the page bearing what appears to be your

signature, William R. Stitsinger. Is that your signature?

A. It is.

Q. And do you know whether or not John R. Moser's signature --- the signature appearing to be John R. Moser is or is not his?

A. I don't know. I don't recognize his signature.

Q. When you did these foreclosure actions, you said you did all the work, did Judge Moser do anything regarding work, did he ever see the petitions or sign them or --- go to court on the cases or (inaudible)?

A. He didn't go to court on the cases. Whether he signed these or not I can't remember.

Q. Alright. Defendant's exhibit B --- I'll show you what appears to be a --- default judgment in this case. Is that correct?

A. Well, it's a judgment entry in decree of foreclosure. Whether it's default or not I don't know.

Q. Ok. Do you have any recollection today of a filing of this action in 1970?

A. None whatsoever until I got subpoenaed here.

Q. And is it fair to say that in 1984 and 1989 you had no recollection in --- of an involvement in any way, shape or form with Von Davis before this?

A. None whatsoever.

Q. And you were one of the judges in 1984 and 1989

involved in the decisions made in this case --- Von Clark
Davis' criminal action?

A.    I was.

Q.    Did your participation as Federal National Mortgage
Association attorney play any part in your decision of
conviction or sentence in the case of Von Clark Davis?

A.    None whatsoever.

Q.    Thank you very much.

        BY THE COURT:  Cross examination please.
Since we have a different attorney conducting the cross
examination please introduce yourself for the record.  Ok?

        MISS JOLSTAD:  Joann Jolstad representing Von
Clark Davis.

        CROSS EXAMINATION - MISS JOLSTAD

Q.    Good morning, Judge.

A.    Good morning.

Q.    Could you please tell me how long were you an
attorney before you took the bench --- how many years?

A.    From 1942 to 1979.

Q.    So about 37 years.

A.    About.

Q.    What kind of practice did you have as an attorney
before you took the bench?

A.    A general practice.

Q.    And were you ever in practice with anyone?

29

A. Yes.

Q. Who were you in practice with?

A. I was in partnership with Condo, Walsh --- Gilbert Condo and Herbert A. Walsh and later Vincent Walsh.

Q. Were you ever in practice with either of the judges on Von Clark Davis' capital trial, Judges Bruewer or Judge Moser?

A. Moser was in our office when he first came to the bar, but he was there --- I don't know how long and then he went on his own.

Q. So do you know how many years approximately he was there?

A. I really don't remember, but I'd say a couple of years, maybe not that long, I'm not sure.

Q. Ok. You've testified here today that you did represent Federal National Mortgage Association in --- in this particular foreclosure action. Did you do anything for Federal National Mortgage other than foreclosures?

A. No.

Q. And you've testified that you did approximately 200 to 300 foreclosure actions. Do you know how many of those were for Federal National Mortgage Association?

A. All of them.

Q. All of them? Ok. In a typical foreclosure action what kind of information would you have been provided in

order to litigate the case?

A.    We were sent documents from --- Federal National Mortgage Association indicating the --- mortgagor, the payments, etc., and the default --- and told to bring the action.

Q.    Would you have been provided any background information that was, for example, filled out at the time of the mortgage?

A.    No.

Q.    Would you have been provided any background information at all on the particular people involved in the foreclosure?

A.    Usually what we did was to notify the mortgagor that there was going to be a foreclosure unless they brought their account current.

Q.    And --- and how would that contact occur, would you contact ---

A.    By mail.

Q.    By mail. Do you remember what type of information you were provided in this particular case for the foreclosure?

A.    No.

Q.    To your knowledge, was there any investigation conducted about Von or Ernestine Davis for this foreclosure, if you remember?

3¡

A.    I don't recall.

Q.    Did you personally conduct any investigations in the foreclosure actions?

A.    Well, what do you mean by that?

A.    You've testified that you would contact them. Would you do any background investigation or anything else other than contacting them?

A.    No.

Q.    While you were involved in the foreclosure action at issue today were you aware that Von Davis had been charged with shooting with intent to wound his wife?

A.    No, I did not know.

Q.    Were you aware that his wife had instituted divorce proceedings against him at that time?

A.    When we --- before we ever file a foreclosure we always check the records --- in the clerks office to see about other judgments or any actions that might be pending and so forth, and all the records in the recorder's office, in the auditor's office and so forth, to bring all the lien holders in together. Whether we did --- whether I did that I don't have any special recollection, but I probably did.

Q.    And would the records collections have also --- would have involved criminal records too, you would have done a search the criminal --- of the criminal docket too?

A.    No.

Q.      You've testified that you would be responsible for contacting the particular participants by letter.  Do you remember doing that in this particular case?

A.      I don't recall.

Q.      Did you ever have any responsibility to try and contact the parties involved to make payment plans or try to rectify the arrearage ---

A.      Yes, I did ---

Q.      --- would that be your responsibility?

A.      --- I did that in some cases, yeah.

Q.      Do you remember if you did that in this case?

A.      I don't remember.

Q.      Would Von or Ernestine Davis ever have appeared personally in your office for the foreclosure?

A.      Not to my knowledge.

Q.      After the petition for foreclosure was filed would the court have conducted a hearing?

A.      Oh, yes.

Q.      And would the parties have been notified of the hearing?

A.      As far as I know, I don't know.

Q.      Do you remember the hearing in this particular case?

A.      No.

Q.      So you would not remember who would have --- who was present at the hearing.   Would you have been present as the

33

attorney at the hearing?

A. Would I have been present?

Q. Umhum.

A. Yes. At that time you must exhibit the documents
to the court.

Q. And then how would the parties have been notified
of the result of the foreclosure?

A. Well, before a sale is held there has to be an
ad in the newspaper in the legal section notifying the
defendants the date and place of sale and time.

Q. So other than the newspaper ad, would there have been
any personal contact or notification to the parties?

A. No.

Q. And so you would not have been responsible for
notifying them of what the disposition was?

A. No.

Q. Do you remember anything about the sale of this
home for the foreclosure?

A. No, ma'am.

Q. Would you have participated in that?

A. Would I ---

Q. The ---

A. In the sale?

Q. Umhum.

A. Yes. Most times the mortgage holder, the plaintiff,

would bid in the amount due and upaid on the mortgage ---
unless a buyer would buy it for more than the appraised
value.

Q.    And ---

A.    And --- and then if --- if that would not be enough
to cover the indebtedness due --- on behalf of the
plaintiff I may up the bid to see if it would bring enough
to cover the amount due.

Q.    Do you have recollection if the sale in this case
was sufficient to cover the amount due?

A.    No.

Q.    When did your representation --- when would your
representation have concluded on this particular foreclosure
action?

A.    When would it have conclude.

Q.    Concluded. When would you have terminated your
representation on this particular foreclosure?

A.    After the sheriff made the deed --- to whomever, I
don't know who --- if anybody bought his property at the
sale or not. Then that would have been forwarded. If there
was money coming from the sheriff --- from the sale of the
property, it would have been forwarded to the Federal
National Mortgage Association.

Q.    And that would have terminated your representation
in the case. Did you inform Von Davis at the time of his

capital trial or his resentencing in 1989 that you had represented the Federal National Mortgage Association that had foreclosed on his home?

A.    No.

Q.    You've testified today that you really didn't remember your representation in the case at the time of his capital trial. If you had remembered would you have disclosed that to him at the time of his trial?

        MR. EICHEL: Objection, speculation.

        BY THE COURT : No, you can answer that.

A.    I don't know --- because I didn't even remember it.

Q.    And --- and --- and I'm asking you to assume, if you had remembered in 1984, at the time of his capital trial, would you have disclosed that to him?

A.    As I said, I don't know.

        MISS JOLSTAD: Can I ask the witness to please answer yes or no?

        BY THE COURT: I think he has answered, he said he didn't know.

Q.    So your response is, no, you would not have told him?

A.    I told you I don't know what I would have done. Did you go down to my office and find --- and look the files up?

Q.    They were ---

A.    Didn't you call me on the phone?

Q.    Yes, I did, Your Honor.

A.    Are they down there?

Q.    Your --- Mr. Walsh was looking for the files and he has not contacted me, so I don't think he found them. You testified today that you took the bench in 1979, is that correct?

A.    Correct.

Q.    At that time, in 1979, did you recuse yourself from cases where you had been involved previously as an attorney?

A.    Did I ever --- I --- I --- I'd say perhaps, but I can't recall any.

Q.    Ok. What if one of the litigants had requested your recusal because of your activity as an attorney, would you have recused yourself?

A.    Yes.

Q.    At the time you were on the bench did the Butler County judges have any interal operating rules or procedures for recusals?

A.    I don't know, but it would be determined by judicial ethics.

Q.    And did you have your own personal guidelines about when you'd recuse yourself?

A.    Of course.

Q.    And can you generally state what those were, did you have any general rules?

A.    If I had known the people involved and --- or had

represented them I would have recused myself.

Q.     Did you participate in 1984 in the jury waiver for
Von Clark Davis, were you present when he waived his right
to jury trial?

A.     I don't know. I don't ---

Q.     Did you ever ---

A.     I don't think I was the presiding judge in that case,
but I --- I'm not sure.

Q.     To your knowledge, did you ever discuss Von Clark
Davis' jury waiver with him at that time?

A.     I don't believe so.

Q.     Did you discuss his jury waiver with his attorneys
at the time --- Jack Garretson or Michael Shanks?

A.     It's a possibility, but I'm not sure.

Q.     Do you personally know what he was told at his jury
waiver hearing?

A.     Beg your pardon?

Q.     Do you personally know what he was told at this jury
waiver hearing today?

A.     Do I?  No.

Q.     Have you reviewed any documents for your testimony
today?

A.     Have I what?

Q.     Reviewed any documents for your testimony today?

A.     Have I reviewed any?

Q.    Umhum.

A.    Just this complaint and decree --- or petition
and decree.

Q.    Judge, have you presided over any capital trials
other than Von Clark Davis'?

A.    Yes.

Q.    Based upon your prior judicial experience, what
do you believe a capital defendant should be told at the
time of his jury waiver?

A.    That he has a right to a trial by jury. He has the
right to waive that and --- knowingly and intelligently and
he has a right to a three judge panel to hear the case and
--- that a jury verdict must be unanimous.  Of course, that
he has the right not to testify --- and his --- if he does
not testify, that cannot be used against him.  I don't
(inaudible).

Q.    Thank you. Once a capital defendant waives his right
to jury trial does he have the right to revoke that waiver
up until the time that trial starts?

A.    I think so.

Q.    So given that fact, if Von had been --- Von Davis had
been informed of your representation after he waived his
jury trial, but before trial started, he would have had the
absolute right to withdraw that jury waiver, isn't that
correct?

A.    I believe so, in my opinion, yes.

Q.    Thank you very much, Judge.

      BY THE COURT:  Mr. Eichel, recross --- or redirect rather.

      MR. EICHEL:  Yes, Your Honor.

### REDIRECT EXAMINATION - MR. EICHEL

Q.    Your Honor, in regard to anything that was said by you between Mr. Shanks and Mr. Garretson, if it had been said, would have been on the record in the --- in the trial, would it not?

A.    I would assume so, yes.

Q.    Alright.  And ---

      MR. EICHEL:  Page 4 of the trial transcript.

Q.    I'm going to ask if at the very start, before the trial began and when the three judges took the bench, yourself, Judge Moser and Judge Bruewer presiding, Mr. Holcomb asked you this question and it said --- this is the question, "Have any of you" --- addressing the --- the entire panel, "Have any of you had any private conversations or conferences with either of the attorneys for the defendant where the prosecutor and assistant prosecutor was not present in which you directly or indirectly made representations or opinion as to any point of law whereas to the ultimate disposition of this case?  Judge Moser?"  Judge Moser's answer, "No."  "MR. HOLCOMB:  Judge Bruewer?"  Judge

Bruewer's answer, "I can say, no." "MR. HOLCOMB: Judge
Stitsinger?" Your answer, "JUDGE STITSINGER: No." Do you
recall that exchange?

A.    No.

Q.    Ok.  If the record indicates that --- the record
speaks --- speaks for itself?

A.    Correct.

Q.    Thank you very much.

          MR. EICHEL: Thank you, Your Honor.

          BY THE COURT: Recross?

          MISS JOLSTAD: Nothing further, Your Honor.

          BY THE COURT: Judge Stitsinger, thank you for
being with us, sir.  Thank you for being with us, you're
excused now.

          JUDGE STITSINGER: I'm excused?

          BY THE COURT: You're excused now, yes, sir.

          JUDGE STITSINGER: Well, thank you, Judge.

          BY THE COURT: Appreciate you being here.

          MR. EICHEL: Your Honor, we call His Honor,
Judge Moser.

          BY THE COURT: Good morning, Judge Moser.

          JUDGE MOSER: Good morning

          MR. EICHEL: Good morning, Your Honor.

          JOHN R. MOSER, called on behalf of the State
of Ohio, having first been duly sworn, testified as follows:

41

## DIRECT EXAMINATION - MR. EICHEL

Q.    Sir, would you please state your name?

A.    John Moser.

Q.    What is your profession, sir?

A.    Judge, Court of Common Pleas of Butler County.

Q.    And are you also a licensed attorney in the State of Ohio?

A.    I am.

Q.    And were you licensed in 1953?

A.    I was.

Q.    That puts it at 41 years that you've been an attorney and judge?

A.    Right.

Q.    Is it correct that you became a judge of the Common Pleas Court in 1978?

A.    '79.

Q.    '79 --- putting it at 17 years?

A.    16 years.

Q.    16. If I knew math I'd be a doctor.

A.    Ok.

Q.    I want to direct your attention to --- the late '60's, the early '70's --- 1970's, and ask if you --- as a result of being the Republican party chairman in Butler County you became associated with the Federal National Mortgage --- Mortgage Association as its attorney?

42

A.    I was, yes.

Q.    Could you explain how that works --- how it works?

A.    It was simply that foreclosure work --- generally was forwarded to me for disposition and I --- I don't know whether it came through the attorney general's office or the governor's office, I honestly don't remember.

Q.    Ok. And for what period of time do you know, if --- if you know, how long did that last --- that association?

A.    Really not too long. It took a long time to develop, as I recall --- and I would say probably the association lasted a couple of years, three at the most, I think.

Q.    Alright. Did you have any --- yourself, have any direct contact with the cases involving foreclosures?

A.    No, I received the files, looked at them and I think in most cases there may have been some exceptions where I personally handled them. I took them down to Bill Stitsinger, who I had formerly been associated with in the practice of law, and he handled the work.

Q.    Alright. At that --- at this period of time, 1969, 1970, where --- where were your offices?

A.    My offices were in Dollar Federal Building at Third and High and Bill Stitsinger's office was on Front and Ludlow.

Q.    At 301 S. Front?

A.    Right.

43

Q.    And he was in with Condo, Walsh?

A.    That's right.

Q.    In an association of lawyers there?

A.    Right.

Q.    Were you in an association of lawyers, firm or otherwise?

A.    I at --- I was with Henry Bruewer and Henry Masana and I don't recall if at that time it was Bob Meyers or not, but we were all in association with each other and it probably was over that time and Stitsinger was in a true partnership with Condo, Walsh & Stitsinger,

Q.    Ok, your's was not a true partnership?

A.    No.

Q.    It didn't involve fee spliting or ---

A.    No.

Q.    --- anything of that --- by that sort.  When you would, as you've said, take the case over to Judge Stitsinger, or Bill Stitsinger at that time --- did you have a fee splitting arrangement with him?

A.    Yes, we did.

Q.    And after you turned the file over to him what --- if anything, did you do, did --- did you do any direct work in the case?

A.    No, I might have on some, but --- generally speaking --- I did not.  Initially we looked at them together until

we both learned how to do them because neither one of us had much experience in foreclosures and I had none at all, Stitsinger had had some, and he did it, but I really didn't have any contact with the case itself, but Bill handled most of it.

Q.    Alright. I'm going to direct your attention to defense exhibit --- defendant's exhibit, on this motion, A and ask if you recognize that?

A.    Now do I --- do you --- are you asking me whether I know what it is or do I recognize it from having had previous ---

Q.    Actually both questions.

A.    Well, yes, I know what it is.

Q.    Alright.

A.    It's a petition in foreclosure. Whether I have any --- recognize it or any recollection, no, I don't. And I'll comment --- and I'll volunteer, whereas my signature appears on it, I authorized Bill Stitsinger to put my signature on these rather than bring them over to the office, which was half a dozen blocks away, and I authorized him and that's probably an authorized signature by Bill Stitsinger, not my signature.

Q.    Ok. Then looking at that --- anyone that's familiar with your signature knows it's not your signature?

A.    True.

45

Q.    Having had no direct contact with these cases, did you have any contact with this case in particular?

A.    None whatsoever.

Q.    Is it fair to say that in 1984 and in 1989, when you were part of a three judge panel in the criminal case of State v. Von Clark Davis --- you had no knowledge or recollection of that foreclosure action in 1970?

A.    Absolutely none.

Q.    If you had any such recollection or had it brought --- been brought to your attention --- would that have played any part in your decision or --- on conviction or sentence in this case?

A.    Well, (1) had I known about it --- I would have called it to the attention of everyone involved and, secondly, had I participated in a panel knowing about it --- it would have probably invoked compassion, not prejudice. No one has prejudice against a defendant in foreclosure, you have compassion for those individuals. I don't think a lawyer enjoys foreclosure work, he does it for a living, but it certainly invokes compassion. You --- no one likes to take houses away and homes away from individuals.

Q.    Ok. The fact that it had --- you had no knowledge of it in that sense then --- it's fair to say that it's --- the fact of his existence in 1970 played absolutely no part?

A.    It couldn't have, I didn't know about it.

Q.    Thank you very much.

         BY THE COURT:   Cross examination.

         CROSS EXAMINATION - MISS JOLSTAD

Q.    Good morning, Judge.

A.    Good morning.

Q.    I have just a few questions for you.  How long were
you an attorney before you took the bench?

A.    '53 to '79.

Q.    And what type of practice did you have?

A.    General practice.

Q.    And you've testified about your practice with Judge
Stitsinger.  Were you in practice with anyone else  during
that time?

A.    I was in --- I wasn't even an associate with Condo,
Walsh  &  Stitsinger,  it  was a type of --- where  a  young
lawyer comes in and gets free rent.  I was there for about 3
years.  Subsequent to that time? I was in the practice with
Henry  Bruewer,  Henry Masana,  Bob Meyers and, for my  later
years, Mike Masana.

Q.    How many cases involving foreclosures did you
litigate as an attorney?

A.    Do you call filing litigating?

Q.    Yes.

A.    That I pers ---

Q.    Where you were --- you were counsel on the case.

47

A.    Are you including these cases that I forwarded to
Judge Stitsinger or to ---

Q.    Yes, I am, yes.

A.    --- or to Bill Stitsinger?

Q.    Yes.

A.    Oh, I don't know, I'm sure it was --- boy, this is
purely a guess, but it didn't seem to me to be over 25, 35,
someplace in that range.

Q.    You testified earlier that you would review the files
with Judge Stitsinger ---

A.    No, I reviewed them before I sent them down there.

Q.    Could --- could you tell me what kind of information
would be --- have been contained in those files?

A.    A  copy of the mortgage and note --- and a letter  to
--- any  statement of the --- the loan statement as  to  the
arrearage, that's about it --- and a letter.

Q.    Would there have been any information provided to
you  that was filled out at the time of the mortgage by  the
parties?

A.    Not that I can recall, no.

Q.    You testified that your representation in the
mortgage actions basically concluded when you turned the
file over to Judge Stitsinger --- Attorney Stitsinger at the
time ---

A.    Pretty much.

Q.     --- so you never conducted any investigation or had
any  responsibility for contacting any of the parties in the
foreclosure actions?

A.     No.

Q.     You    never    appeared    in    court    on    any    of    the
foreclosures?

A.     No.

Q.     Did you ever participate in any of the sheriff's
sales?

A.     No.

Q.     So I'm assuming that you never had any contact with
either  Von  or  Ernestine  Davis  during  the    foreclosure
proceedings in this case?

A.     No.

Q.     You testified that you took the bench in 1979.  At
that  time  did  you recuse yourself from  cases  where  you
previously had been an attorney or had some contact with the
case as an attorney?

A.     Well, I'm sure I did, I can't recall any.

Q.     What if one of the litigants had requested your
recusal  because of your prior contact with the case,  would
you have recused yourself from the case?

A.     In most instances --- but that's a generality and all
--

Q.     Umhum.

49

A.    --- there's an old saying, all generalities are false, including this one.

Q.    During your time on the bench are there internal rules or operating procedures under which the Butler County judges have decided to recuse themself from cases?

A.    No, I think it's a matter of personal discretion.

Q.    And do you have any personal rules that you strictly adhere to in recusing yourself?

A.    Not that you can delineate, each one is --- you have to judge it on the basis of the facts. I've had very, very few requests to recuse myself, you know, maybe --- maybe 3 in --- in 19 --- 16 years on the bench.

Q.    Did you ever discuss Von Clark Davis' jury waiver with him at any time, either in 1984 at the time of his capital trial, or in 1984 at the resentencing?

A.    Did I ever discuss it with him personally?

Q.    Umhum.

A.    I don't recall, but --- I --- I just recall so very little about the case.

Q.    Do you recall if you discussed it with his attorneys?

A.    No, I don't recall specifically.

Q.    Did you ever discuss the jury waiver with the other judges on the panel?

A.    There's no way I can recall what I discussed.

Q.    Do you personally know what Von Clark Davis was told

at this jury waiver hearing?

A.   No, I don't recall.

Q.   Did you review any documents today before your testimony?

A.   None.

Q.   Judge, have you presided over capital trials in this county?

A.   Yes.

Q.   How many?

A.   About 5 or 6.

Q.   And based on your prior experience, what do you believe a capital defendant should be told at the time of his jury waiver?

A.   Your --- was that prior question as to whether I presided over bench trials on capital cases or including jury?

Q.   Both.

A.   Ok, then that includes 5 or 6.

Q.   And based upon that experience, what do you believe a capital defendant should be told at the time of his jury waiver --- or her jury waiver?

A.   That he has a right to a trial of 12 jurors, that --- explain the penalty to him in a capital case and that he has a right to have 12 jurors determine the facts and that they must be convinced beyond a reasonable doubt of his guilt and

explain the fact that he's not only waiving a jury with respect to the facts of the case, but as to punishment and that the same rules apply on both parts of the case.

Q.    Once a capital defendant waives his right to jury trial --- he or she has the right to revoke that waiver up until the time trial starts, isn't that correct?

A.    Yes.

Q.    So given that fact, if Von Davis, and he did waive his jury trial, found out about your representation prior to the start of trial he would have had the absolute right to withdraw that jury waiver, isn't that correct?

A.    For --- for that reason or any other reason or for no reason.

Q.    Thank you, Your Honor.

         MISS JOLSTAD: I have no further questions.

         BY THE COURT: Redirect, Mr. Eichel?

         MR. EICHEL: No, Your Honor.

         BY THE COURT: Judge, thank you for being with us, sir.

         MR. EICHEL: Thank you.

         JUDGE MOSER: Thank you.

         BY THE COURT: Mr. Eichel.

         MR. EICHEL: We have nothing further, Your Honor. We would ask the court to receive in evidence what's been identified as State's exhibits #1 and #2.

52

BY THE COURT:  Any objection?

MISS JOLSTAD:  No objection, Your Honor.

BY THE COURT:  Ok, they'll be accepted.

MR. EICHEL:  I believe that's everything.

BY THE COURT: Is there rebuttal?

MISS JOLSTAD:  No, Your Honor.

BY THE COURT:  Ok, we've closed the evidence?

MISS JOLSTAD:  Yes, Your Honor.

BY THE COURT:  Ok.  Does counsel wish to argue the case or wish to submit memo?

MISS JOLSTAD:  Your Honor, we would prefer to submit a post evidentiary hearing brief --- if that's acceptable to the court.

BY THE COURT:  It's acceptable to the court. When do you ---

MISS JOLSTAD:  I --- I would request that we have the opportunity to have the transcript of the hearing before we submit the brief.

BY THE COURT:  Ok, arrange --- you'll arrange that here today.

MISS JOLSTAD:  Ok.

BY THE COURT:  Ok.

MISS JOLSTAD:  And then we can have the brief within a week, two weeks, whatever is acceptable to

53

the court once we have the transcript.

BY THE COURT: Ok, we should have the transcript by --- I would suspect we'll have the transcript done within --- two weeks. I would anticipate that the --- the transcript will be done by the --- February 3rd or thereabouts, so why don't we take two weeks after that, to the 17th or --- defense --- it's called a petitioner's brief. And, Mr. Eichel, two weeks after that is sufficient for you?

MR. EICHEL: I believe so, yes.

BY THE COURT: By the 3rd of March?

MR. EICHEL: Yes.

BY THE COURT: The respondent's brief --- and for rebuttal --- can we get that in by the --- 15th of March?

MISS JOLSTAD: Yes, Your Honor.

BY THE COURT: I'll review it all and then make a determination at that time.

MISS JOLSTAD: Thank you very much, Your Honor.

MR. EICHEL: Thank you, Your Honor.

BY THE COURT: Ok, thank you very much.

[Transcript concluded]

54

# C E R T I F I C A T E

I, Shirley Roesch, do hereby certify that the foregoing 53 pages ( 58 total) constitute a true and complete transcript of the hearing in this cause as recorded by electronic means, and transcribed therefrom into typewritten pages by me, to the best of my education, training and experience.

*Shirley Roesch*

SHIRLEY ROESCH
Assistant Court Reporter
Butler County Common Pleas Court

1

COURT OF COMMON PLEAS

BUTLER COUNTY, OHIO

------------------------------------------

STATE OF OHIO,

    Plaintiff,         Case No. CR-1983-12-0614

                      CA 09-10-263

    vs.           HONORABLE ANDREW NASTOFF

                        IMAGED

VON CLARK DAVIS,

    Defendant.

------------------------------------------

MOTION HEARING

TRANSCRIPT OF PROCEEDINGS

December 3, 2007

- - -

JILL M. CUTTER, RPR
(513) 785-6596

FILED BUTLER CO.
COURT OF APPEALS

JAN 08 2010

CINDY CARPENTER
CLERK OF COURTS

ORIGINAL

(15)

2

```
 1   APPEARANCES:

 2

 3        On behalf of the plaintiff:

 4             MICHAEL A. OSTER, JR., ESQ.
               Assistant Butler County Prosecuting Attorney
 5             11th Floor
               315 High Street
 6             Hamilton, Ohio 45011

 7

 8        On behalf of the defendant:

 9

10             RANDALL PORTER, ESQ.
               Assistant State Public Defender
11             250 East Broad Street
               Suite 1400
12             Columbus, Ohio 43215

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    Transcript of Proceedings

2    Afternoon Session

3    - - - - - - - - -

4    THE COURT: We're on record in State of Ohio vs.

5    Von Clark Davis. This is CR1983-12-0614. We are here,

6    for lack of a better term, a status report. I will

7    indicate for the record that Mr. Davis appears in

8    person with counsel. It's Randall Porter, correct?

9    MR. PORTER: That is correct, Your Honor.

10    THE COURT: All right. And previously Lawrence

11    Komp appeared on behalf of Mr. Davis, but is apparently

12    not going to be joining us today. That is also

13    correct?

14    MR. PORTER: That is correct, Your Honor.

15    THE COURT: And then on behalf of the State of

16    Ohio, Mike Oster appears. And previously we had Mr.

17    Eichel and he had warned us that he would probably not

18    be present today, so we are slimming down.

19    There were a few matters that we wanted to take up

20    today. First and for most, we wanted to get Mr. Davis

21    here so that he could participate. Last time without

22    Mr. Davis here, we couldn't deal with anything

23    substantive. Rather we tried to address some

24    administrative issues, which we have set over for

25    today. And we do now have Mr. Davis here.

01:27PM

01:27PM

JILL M. CUTTER, RPR
(513) 785-6596

4

1    Among the issues that I recall being of concern

2    last time, number one, was the time requirements set by

3    the Federal District Court by which to have the

4    resentencing hearing of Mr. Davis completed by, which

5    was 180 days from July 19th originally.  You had the

6    date figured as what, Mr. Oster?

7        MR. OSTER:  I believe it was January 15th, 2007.

8        THE COURT:  I have received a document from Mr.

9    Porter that I will talk about in a minute that may

10   address that, but that was one issue and we will talk          01:27PM

11   about that more in a moment.

12       The second issue of concern was the representation

13   for Mr. Davis.  Mr. Porter has been appointed by the

14   Supreme Court and is a Rule 20 certified attorney, who

15   is eligible to have been appointed to represent Mr.

16   Davis.  Mr. Komp has a long history of having

17   represented Mr. Davis, and I assume that he has

18   established a relationship or a rapport with Mr. Davis;

19   however, he is not Rule 20 certified by the State of

20   Ohio as we speak.  So I wanted to look into that           01:27PM

21   matter further, and I have done some research in that

22   regard; maybe counsel has too, and we can put our heads

23   together on that.  But those were the two primary

24   issues.

25       And then I did some further research just looking

JILL M. CUTTER, RPR
(513) 785-6596

5

1    into the issue of the method by which any panels,

2    anything like that would be reconstituted and so I

3    believe I at least have some idea of how we would go

4    about doing that.  But again, I would be looking

5    forward to further input from counsel.

6         First, the time issue.  I have received a notice

7    of filing by Von Clark Davis, filed on his behalf by

8    Randall Porter, who as I indicated earlier is present

9    in court; has filed this date, December 3rd, 2007.

10   And it appears to be a copy of an order that was signed      01:27PM

11   by Judge Graham of the United States District Court for

12   the Southern District of Ohio Eastern Division and it

13   indicates that the deadline for compliance with the

14   writ in this case is extended for a period of 180 days.

15        Mr. Porter, obviously you have seen it because you

16   filed it.  Mr. Oster, have you seen this document?

17        MR. OSTER:  Just today, Your Honor.

18        THE COURT:  All right.  And tell me about it, Mr.

19   Porter.

20        MR. PORTER:  I believe the document was the          01:27PM

21   process of negotiations between Mr. Komp and the Office

22   of the Ohio Attorney General, specifically, Charles

23   Willie.  Mr. Willie prepared the document.  It was

24   submitted to Judge Graham.  There was some concern by

25   the Court about the language in the order, and that is

6

1     a little bit the reason for the delay, an order only

2     being issued last week.  It's my opinion that the order

3     entered by Judge Graham satisfies the concerns with

4     respect to time.  I understand that is ultimately the

5     Court's resolution and not mine, but it would be my

6     opinion that it extends the time by 180 days.

7         THE COURT:  So I guess my interpretation of that

8     would be that it extends the original deadline, which

9     would have been, if January 15th is the correct date,

10    180 days from January 15th, as opposed to 180 days from

11    November 22nd, which was the date that this was signed.

12        MR. PORTER:  That would be my understanding, Your

13    Honor.

14        THE COURT:  And the language, because it says the

15    deadline for compliance with the writ is extended.

16    Okay.

17        Mr. Oster, do you have any comment or did you wish

18    to weigh in with regard to this issue?

19        MR. OSTER:  Like I said, Your Honor, I have just

20    received this today.  I would, first of all, agree with

21    the general reading of the Court.  Obviously as we are

22    looking at this and worrying about time deadlines, we

23    would prefer not to even push this extended 180 days,

24    so hopefully the issue of whether it's from

25    November 27th or whether it's from January 15th won't

01:27PM

01:27PM

7

1    be a necessary issue, but we would prefer if held to

2    it, to go with the earlier just to make sure that it

3    would be 180 from November 27th.

4         The only other thing I would like to put on the

5    record immediately in regard to the timing, and

6    possibly get a further understanding, I believe the

7    Court earlier said that we had 180 days to actually

8    have the new hearing.  It was the State's position --

9         THE COURT:  To begin it.

10        MR. OSTER:  The actual order said granting a new    01:27PM

11   sentencing hearing was 180 days.  If there is a

12   different reading by the Court, the State would

13   obviously want to address that issue.  But the State

14   was originally reading the writ was conditional upon

15   the granting of a new sentencing hearing, not

16   necessarily the full commission of that.

17        THE COURT:  Well, I didn't read -- I went back and

18   read the decision and I didn't see where it appears

19   that I had much of a choice as to whether I was going

20   to grant the new sentencing hearing.  It appears that   01:27PM

21   that has, in fact, been the order.  But are you

22   indicating that I need to sign an entry indicating that

23   we are going to have a three-judge panel hearing or

24   however we are going to proceed?

25        MR. OSTER:  The State's position in looking at

1    what the Southern District Eastern Division Judge

2    Graham in his first entry, which came on in July 19th,

3    specifically stated the writ of habeas corpus is

4    granted conditioned upon the State of Ohio within 180

5    days of the date of this order granting petitioner a

6    new sentencing hearing. So the State, while the State

7    has no issue with moving along in this case, obviously

8    the State would be very concerned about getting an

9    actual entry from this Court with a statement that

10   there will be a new sentencing hearing that this Court        01:27PM

11   has assumed jurisdiction again on the case pursuant to

12   the Sixth Circuit's order and the -- well, the Sixth

13   Circuit's decision and the actual granting of that for

14   the District Court. The State would urge the Court to

15   put an entry on saying that is has assumed jurisdiction

16   pursuant to those decisions and that it is along the

17   line of that, granting therein a new sentencing hearing

18   or mitigation hearing.

19        THE COURT: Mr. Porter, do you have any

20   disagreement with that? It sounds to me like it would        01:27PM

21   certainly at a minimum be prudent, if not necessary, to

22   put on an entry suggested by the prosecutor. Do you

23   have any objection to proceeding in that manner?

24        MR. PORTER: I have no objection to that. Two

25   things, first is maybe the parties have left the Court

9

1    out in the cold on this one.  Maybe we are in a

2    position of having both of us have a copy of the

3    original order by Judge Graham.

4         THE COURT:  I think I have it as well.

5         MR. PORTER:  Okay.  I have no objection to the

6    Court putting on the order.  I think it raises a query

7    then.  If the Court puts on the order, has it, in fact,

8    satisfied the original order in the subsequent order,

9    and at that point we have satisfied the six-month time

10   period.                                              01:27PM

11        THE COURT:  All right.  Well, so if we grant the

12   new hearing and hold it within that, then we have

13   certainly not had any issue in that regard.  So I

14   guess that will be my aspiration anyway in this case.

15   Does counsel have any thoughts?  I mean, certainly

16   we're not dealing with any speedy trial issues since

17   this is remanded for sentencing purposes.

18        I know there is some case law that sentencing

19   needs to take place within a reasonable period of time

20   and it has been interpreted in varying ways, but other  01:27PM

21   than the dates set by the US District Court here, does

22   counsel have an opinion as to what other time frames

23   would be guiding our ability here?  And the reason I am

24   taking this up is we have some other housekeeping

25   issues to deal with after this, but once we get into

JILL M. CUTTER, RPR
(513) 785-6596

10

1  the meat of this, I am assuming that there are going to

2  be some motions from the defense, the type that the

3  Court would typically see in capital litigation those

4  that pertain to the mitigation phase.  And, you know, I

5  am not sure what they might be, but I would expect

6  perhaps appointment of an expert, various things like

7  that that would take some time I imagine on your end

8  for them to be able to put together what you would need

9  to put together for purposes of proceeding with that

10  hearing.  Am I wrong in my assumption there, Mr.                01:27PM

11  Porter?

12      MR. PORTER:  No, you are correct, Your Honor.

13      THE COURT:  So I guess my next question is if we

14  set a date within those time frames, but Mr. Davis

15  after having consulted with you and other counsel, have

16  determined that you wish to have more time, I am

17  assuming that the defense would, upon their motion,

18  that would be able to extend that time.

19      MR. PORTER:  And that is my understanding.  In

20  fact, the Court was three steps ahead of me.  I was         01:27PM

21  going to suggest that I would confer with Mr. Davis

22  today and see if a time waiver could not be entered

23  into.

24      THE COURT:  Okay.  And that might be worth doing.

25  The next issue on -- is there anything more you want to

JILL M. CUTTER, RPR
(513) 785-6596

11

1    say on this right now then?

2         MR. OSTER:  I don't believe so.  About the only

3    thing I would say is obviously if we are going to enter

4    time waivers and everything else, it would probably be

5    a problem for the Court to have that entry taken

6    jurisdiction of the case before accepting a time waiver

7    on it.

8         THE COURT:  Sure.  I agree.  All right.  Before

9    we do any of that, we should probably make sure that

10   all of the attorneys that are going to be on the case      01:27PM

11   assisting Mr. Davis are actually on the case.

12        The research that the Court has done since we were

13   here last time, would seem to indicate that I do not

14   have authority to make the decision as to whether Mr.

15   Komp would satisfy the exceptional circumstances that

16   are laid out under Rule 20 Roman Numeral II(c).  It

17   appears to me that if an attorney is not otherwise

18   certified, the attorney may be certified as lead

19   counsel or co-counsel if it can be demonstrated to the

20   satisfaction of the committee that competent              01:27PM

21   representation will be provided to the defendant and so

22   determining the committee may consider the following,

23   and it lists the factors.  So it would appear to me

24   that it is not my call as to whether Mr. Komp can

25   continue or be appointed I should say on this matter,

12

1    but rather it would be the Supreme Court or the

2    committee on the appointment of counsel for indigent

3    defendants in capital cases.  So my suggestion would be

4    our court manager, Mary Swain, is often the one who

5    communicates with the Supreme Court for appointment of

6    counsel in capital litigation.  I spoke to her and she

7    indicated that she would be willing to draft a letter

8    on behalf of Mr. Komp asking that he be appointed; that

9    in the past, we have submitted letters like that on

10   behalf of attorneys seeking certification.  I can't          01:27PM

11   tell you in the past those requests have been denied.

12   However, we could do that on behalf of Mr. Komp.

13        My preference, quite frankly, would be to error on

14   the side of caution and appoint one of our Rule 20

15   certified attorneys in Butler County to act as

16   co-counsel with yourself, Mr. Porter, and then if Mr.

17   Komp wants to volunteer his time and assist in a manner

18   where he is not appointed, then that would certainly be

19   between him and Mr. Davis and you all if you wanted to

20   do that.  Or in the meantime, we could also seek to          01:27PM

21   have him appointed for this case as well.  But I would

22   prefer that we go ahead and appoint one of our local

23   attorneys to act as your co-counsel on the case, and

24   then rather than be held up waiting to find out what

25   they are going do about Mr. Komp, whether that I would

1    approve him or not approve him.  Mr. Porter?

2        MR. PORTER:  Mr. Komp and I had a lengthy

3    telephone conversation I believe it was on Thursday of

4    last week.  And he has reached the same conclusion.

5    Once again, the Court is three steps ahead of the

6    defense.   Mr. Komp -- we will continue to have some

7    contact with Mr. Davis, what we would ask that the

8    Court appoint local counsel.   That being said, I

9    currently have two other capital cases pending in this

10   county.                                                 01:27PM

11       THE COURT:  Well, welcome.  So do I.

12      MR. PORTER:  And it wasn't meant to be bragging or

13   anything.

14       THE COURT:  I didn't take it that way.

15      MR. PORTER:  And the other cases are in the

16   post-judgment phase.  There are certain possibilities

17   of conflicts based upon who the Court would appoint and

18   I am certainly not trying to usurp the Court's ability

19   to appoint.  I know that is a sacred area with judges.

20   I would request the opportunity, since it only goes to    01:27PM

21   the appointment issue, is to meet briefly ex-parte with

22   the Court to identify possible conflicts.  I don't want

23   to do it in the open record.  I have ongoing litigation

24   with the Ohio Attorney General's Office.  I gather it

25   sometimes may return to Butler County.  So I would

1   agree with the Court and would ask the Court's

2   permission just to meet very briefly in an ex-parte

3   manner. We would gladly do it on the record. It's

4   just an appointment issue and I have never -- it's

5   never been my position or the office's position to air

6   appointment issues in open Court.

7       THE COURT: Well, why don't -- perhaps if we go

8   ahead and get the name from our court manager who would

9   be likely next up to be appointed then it may moot the

10  issue depending on who it is. And at that point if

11  you feel there is an issue, I can address granting your

12  ex-parte -- your request for an ex-parte hearing which

13  i would anticipate granting for that limited purpose.

14      MR. PORTER: Thank you.

15      THE COURT: Mr. Oster, do you have anything n

16  regard to that issue?

17      MR. OSTER: Not in regard to that issue, Your

18  Honor. The State would have agreed with the Court n

19  the reading of Rule 20 that the Court was without

20  jurisdiction to do that. I would have been the

21  committee. The only thing the State would put on the

22  record, I wasn't quite sure from the defense if the

23  ex-parte would include the State, just be off the

24  record or would be a complete ex-parte conversation

25  with just the judge and the defense.

01:27PM

1      THE COURT:  My understanding was the request would

2   be that it would be on the record, but just with the

3   defense and the Judge for the limited issue of

4   revealing, what if, any conflicts may exist that would

5   affect who the Court could appoint as co-counsel given

6   their other litigation that they are involved in and it

7   would go no further than that limited issue.

8      MR. OSTER:  Okay.  Thank you.

9      THE COURT:  Am I correct in that?

10     MR. PORTER:  That is correct, Your Honor.  Thank     01:27PM

11  you.

12     THE COURT:  What other issues -- Mr. Oster, I am

13  going to give you an opportunity, what other issues

14  besides addressing the time issue, with also giving

15  them an opportunity to talk about the possibility of

16  waiving time before we conclude the hearing today, the

17  appointment of counsel issue, what other issue were you

18  hoping to be able to address and make some progress on

19  today if any, Mr. Oster?

20     MR. OSTER:  I think one of the issues we would be     01:27PM

21  looking at is the procedure we would like to use, get a

22  date to set the pulling or however the Court -- the

23  Court addressed that earlier in this hearing that it

24  had researched some of the ways to impanel the three

25  judges.   We would like to expedite that as soon as we

16

1    could.   Obviously, it would probably be more proper to

2    have second chair counsel appointed for that purpose,

3    but the State, as soon as it could be reasonably be

4    done that second chair is appointed would like to come

5    back into the Court and go through that procedure as

6    soon as we can.  And obviously then get the granting of

7    that jurisdictional, we will have a hearing motion.

8    And I apologize for the language I used there, but

9    don't know how the Court will title it yet.   Outside

10   of that, I don't know if Mr. Porter would be prepared      01:27PM

11   to look at a brief type of schedule as to when he would

12   want to do this or if he is definitely set on a waiver

13   of time in this case, but the State would like to

14   expedite as much as we could getting things detailed

15   and getting time limits locked down.  Obviously, a big

16   concern for the State of Ohio in any type of case,

17   especially this type of case, would be the time issue.

18   While I have said that a number of times, we can't

19   stress that enough, that we are critically concerned

20   about that.                                                01:27PM

21        THE COURT:  All right.   Just to give the record

22   eyes as far as what my research has indicated with

23   regard to reconstituting a three-judge panel in this

24   case so that you can be heard on that, obviously the

25   extensive lapse in time between the defendant's

1    original trial and the resentencing, and now, a second

2    resentencing before this Court, it's made it impossible

3    to reconstitute the original three-judge panel that

4    heard this case.  It's not possible to, and I am

5    trying to recall who all the three judges were

6    initially, but I believe at least one was Judge

7    Stitsinger.  And if memory serves, Judge Stitsinger has

8    passed.  Was it Judge Brewer and Judge Moser?

9        THE DEFENDANT:  That was Judge Brewer and Judge

10   Moser.                                                    01:27PM

11       THE COURT:  Both of them have been retired for

12   substantial periods of time at this point.  And I do

13   not believe would be available for such a process.  So

14   the Court cannot find a statute or rule that would

15   guide the Court in its efforts to form a new

16   three-judge panel and there are also did not appear to

17   be any binding case law mentioning how Courts have

18   proceeded when faced with this type of situation.

19       However, we did find individual cases where

20   factors such as death, retirement or conflicts          01:27PM

21   prevented the reconstitution of an original three-judge

22   panel and in those cases, across the board, it's been

23   approved if the Court formed the three-judge panel by

24   using a random draw.  So it appears that you do not go

25   back and try to find the judges who have succeeded the

1     original three judges and appoint those judges.  That

2     appears to me that it would be a random draw with

3     obviously myself presiding on this, but a random draw

4     to give the order of the other judges that would

5     appear.  I also think that one issue that we should

6     raise, it would be my guess, for lack of a better term,

7     that Judge Sage should probably be removed from that

8     list since he was one of the prosecuting attorneys on

9     the original case.  It certainly appears to me, I think

10     he would certainly raise it and I am sure the defense    01:27PM

11     could certainly raise the inappropriateness of having

12     one of the original prosecutors on the case sitting on

13     a reconstituted three-judge panel.  So what my

14     preference would be when the time comes, is we would do

15     a random draw the way we do in each capital case  with

16     Judge Sage's name being removed from that and proceed

17     in that manner.   Mr. Oster?

18         MR. OSTER:  Your Honor, in the brief amount of

19     research the State has been able to do and in the cases

20     that the State has been able to look at and some of    01:27PM

21     them do have issues relating to a three-judge panel and

22     reading a number of capital cases, it seems to be the

23     position that the State has come across is that if

24     death or something has occurred to prevent that it

25     becomes a random draw through the county.

1       The State obviously would not object to Judge

2   Sage's name being taken out as we are well aware that

3   he was one of the original prosecutors.   So from what

4   the Court has detailed, the State of Ohio would offer

5   no objection to that procedure.

6       THE COURT:  Before I ask for your input, Mr.

7   Porter, I just wanted to indicate for the record, the

8   cases that I reviewed specifically, one was a case out

9   of the 6th Circuit, *Dye*, D-Y-E, *vs. Hofbauer*, 111, it

10  looks like federal appendix 363.  That is a 2004 6th

11  Circuit case regarding the retirement of Judge Jones.

12  And then there was a 9th District case, *Narten vs.*

13  *Eyman*, 460 F 2nd 184, which is a 9th Circuit, 1972

14  decision, where they approved or spoke approvingly of a

15  judge having been selected by lot in place of a

16  deceased judge.   So those were the cases that I was

17  referencing.   Mr. Porter, did you have any input on

18  that particular issue above and beyond what has already

19  be said?

20      MR. PORTER:  I think at this point from the

21  defense's perspective it would be premature since I

22  don't have a second chair.  I think it would be

23  something that me making a statement and leaving out

24  second chair would not be in the spirit of team

25  defense.

01:27PM

01:27PM

JILL M. CUTTER, RPR
(513) 785-6596

20

1    And secondly, I know the Court is well aware and I

2    would anticipate that there would be a challenge to the

3    jury waiver that has been entered in this case

4    previously based upon the 6th Circuit opinion.

5        THE COURT: Fair enough. Yes, I did read that

6    language in there and figured that that may be an

7    issue, among others, that we would be dealing with

8    doing.

9        All right. With that being said, then, we need to

10   set another hearing date now in order to get co-counsel          01:27PM

11   on board at a minimum. And we probably need to know

12   where Mr. Davis stands on time issues before we set

13   that hearing even. So why don't we take, if counsel

14   is okay with this, about a five or 10 minute break, so

15   that you have an opportunity to talk to Mr. Davis

16   specifically about the time limitations that we are

17   dealing under and what his preference is with the

18   benefit of your advice and proceeding in that regard.

19   And then we will come back out and once we have been

20   able to resolve that issue, we can then schedule our          01:27PM

21   next hearing. I could put on the order to have counsel

22   appointed and get the information from Ms. Swain as to

23   who appears to be next up on the list to determine

24   whether there is any issue with you, Mr. Porter. Does

25   that reasonable counsel?

JILL M. CUTTER, RPR
(513) 785-6596

21

1    MR. PORTER:  As I understand, the next hearing

2    will be somewhat limited, Your Honor.  And it's a long

3    drive to and from Youngstown and --

4    THE COURT:  I'm from there, so I am very familiar

5    with the drive.

6    MR. PORTER:  I did not say anything negative about

7    it.  Rather than the back and forth and your all's

8    deputies expending a lot of resources, I could make

9    myself available for a hearing maybe in 48 hours.  We

10   could get the next hearing done and then Mr. Davis          01:27PM

11   could go back and --

12   THE COURT:  Unfortunately, the Court is

13   unavailable as of close of business tomorrow for the

14   rest of the week.  But we can still do something early

15   next week or I don't think we could put it together for

16   tomorrow; maybe we could.  But either way, yes, I see

17   us getting together early.  We can schedule this in

18   either before we start our trial on Monday, or again in

19   the middle or at the end of the day next Monday or

20   Tuesday.  And we could have Mr. Davis remain here so       01:27PM

21   that you could consult with him more easily perhaps

22   and also like you said, just to save the wear and tear

23   on everybody involved of kind of the lengthy travel

24   that is involved in that situation.  I don't have a

25   problem with that.  Given that that is kind of a

JILL M. CUTTER, RPR
(513) 785-6596

22

1    general time frame, why don't we go ahead and give you

2    a moment to talk to Mr. Davis and then you can let us

3    know, generally, how you wish to proceed with regard to

4    time.

5        MR. PORTER:  Thank you, Your Honor.

6        THE COURT:  All right.  We will be in recess for a

7    few moments.

8        (Recess taken at this time.)

9        THE COURT:  We're back on record in State of Ohio

10   vs. Von Clark Davis, CR83-12-0614.  All counsel that    01:27PM

11   were here previously, are again present along with Mr.

12   Davis as well.  Mr. Porter, have you had an

13   opportunity to discuss that issue with Mr. Davis to

14   your satisfaction?

15       MR. PORTER:  I have, Your Honor.  And we have

16   discussed the matter and Mr. Davis is willing to waive

17   any speedy trial rights he has pursuant to state

18   statute or state rule to the extent that they would be

19   concurrent with the order entered in by Judge Graham.

20       THE COURT:  All right.  Do you think any US        01:27PM

21   constitutional time limits are relevant?  Did you leave

22   that out intentionally or did you  --

23       MR. PORTER:  I did not.  Likewise, he would waive

24   under *Parker vs. Megillin*.  My understanding is that is

25   probably the only on thing that is controlling him at

JILL M. CUTTER, RPR
(513) 785-6596

1    that point.  He would waive that, Your Honor.

2        THE COURT:  All right.  I want to talk to Mr.

3    Davis a little more about that.  But I guess before

4    that -- you can be seated for one more moment -- before

5    that, I guess the issue is -- certainly isn't speedy

6    trial rights as we normally deal with them again, since

7    we are in a sentencing mode, so any written entry I

8    think probably should just refer to whether Mr. Davis

9    is willing to waive any and all time requirements that

10   may apply to this hearing or this type of hearing                    01:27PM

11   unless counsel has specific research, like you said,

12   that would indicate that there is a specific statute or

13   a specific case that controls.

14       But with that being said, Mr. Davis, you can

15   remain seated.  Can you hear me okay?

16       THE DEFENDANT:  Yes.  Yes, I can, sir.

17       THE COURT:  Okay.  The 6th Circuit Court of

18   Appeals as I am sure you are aware has remanded your

19   case back through the District Court to our Court to

20   have a new sentencing hearing in your case.  The                     01:27PM

21   federal judge that sent it back originally, said that I

22   guess the terminology -- and let me get it again to

23   make sure that I am using the appropriate terminology

24   -- granted a writ of habeas corpus conditioned upon the

25   State of Ohio within 180 days of the date of this order

1    granting petitioner a new sentencing hearing.  So that

2    was calculated to be January 15th that this Court had

3    to grant you a new sentencing hearing.  Since that

4    time, that judge has gone back and extended that by 180

5    days and I don't know the specific date, but I am

6    assuming that that would take us out to about a

7    mid-July time frame if it's from the 15th of January,

8    or a -- what would that be?  I guess an end of May time

9    frame if it is construed as being from the end of

10   November.   But nonetheless, there are time                    01:27PM

11   requirements that are indicated in this order under

12   which it could be construed that we have to act in

13   order to have this new sentencing hearing or at least

14   have it granted so that you can proceed.

15        My understanding is that your attorney has

16   discussed with you the various time requirements that

17   may apply in this case; is that correct?

18        THE DEFENDANT:  That is correct.

19        THE COURT:  All right.  And that he has discussed

20   with you whether you would be willing to waive or give    01:27PM

21   up those rights to allow, I guess, more flexibility in

22   terms of scheduling the events that are going to take

23   place in this hearing .  And I assume that some of

24   those will be motion practice because your attorney has

25   already indicated that once he has consulted with

25

1    co-counsel on the case, that he intends to file certain

2    motions on your behalf that will have to be heard and

3    ultimately there will have to be a resentencing hearing

4    of some nature that takes place.  And so, Mr. Davis, I

5    guess my question to you is:  Do you feel that you have

6    had an adequate enough opportunity to discuss these

7    issues with Mr. Porter regarding the time requirements

8    in this case?

9         THE DEFENDANT:  Yes, I have.  I am comfortable

10   with it.                                                01:27PM

11        THE COURT:  All right.  And do you feel -- and

12   your attorney has indicated that you are willing to

13   waive or give up those rights to allow, I guess, us to

14   be able to operate without having a deadline looming

15   over our head?

16        THE DEFENDANT:  Yes, sir.

17        THE COURT:  Is that your understanding?

18        THE DEFENDANT:  Yes, it is.

19        THE COURT:  Okay.  All right.  Is there any

20   further questioning that the State would ask the Court   01:27PM

21   to engage in?

22        MR. OSTER:  About the only thing is, Your Honor, I

23   think I remember this from the other hearing maybe just

24   make sure that Mr. Davis is not under the influence or

25   is properly taken some medications, no coercion or

JILL M. CUTTER, RPR
(513) 785-6596

26

1    promises have been given to him.

2        THE COURT:  Rule 11 type questions.

3        MR. OSTER:  Yes, the only other thing too is

4    obviously a second attorney has not been appointed.

5    Just want to make sure that he is waiving the fact that

6    a second attorney --

7        THE COURT:  Well, and I also intend to readdress

8    it when there is another attorney on there and just

9    assure when you have had the opportunity to talk to

10   both of them that we are still of this mind.                    01:27PM

11       Mr. Davis, I guess I should ask, first of all, are

12   you able to read, write, and understand the English

13   language?

14       THE DEFENDANT:  Yes, I am, sir.

15       THE COURT:  All right.  Have you been able to

16   understand what has been taking place in this hearing

17   so far today?

18       THE DEFENDANT:  Yes, I am.

19       THE COURT:  All right.  Are you currently -- do         01:27PM

20   you currently have any drugs or alcohol, or any

21   prescription medications, anything in your system that

22   would affect your ability to understand what is going

23   on in this hearing?

24       THE DEFENDANT:  No, sir.

25       THE COURT:  All right.  And Mr. Porter, in your

27

1    interactions with Mr. Davis, have you been able to

2    engage in meaningful conversations, and does he appear

3    to be able to deal with issues in a competent manner?

4         MR. PORTER:  He has, Your Honor.

5         THE COURT:  All right.   And Mr. Davis, in

6    addressing this time issue, are you giving up or

7    waiving any time requirements in this case knowingly,

8    intentionally, intelligently, and voluntarily, sir?

9         THE DEFENDANT:  Yes, I am.

10        THE COURT:  I will accept that.  What I would ask,    01:27PM

11   I don't think our usual speedy trial form would apply

12   in this case, so not to put any additional burdens on

13   counsel, but what I would ask is if counsel could get

14   together and provide a form simply indicating that we

15   have had this hearing, and Mr. Davis has been advised

16   of the time requirements that would govern this hearing

17   and that he waives any and all time requirements that

18   would apply and have it signed by Davis and counsel

19   maybe approved as to form by the State and a place for

20   me to sign.  And what I would anticipate doing is      01:27PM

21   taking that issue up at the very next hearing as well.

22   That way we will have had two opportunities to discuss

23   it and I would be in a position to then sign the

24   prepared form at the next hearing and hopefully at that

25   hearing there would also be co-counsel present so that

28

1  if there is any issue with regard to making sure that

2  he has had the advice of both of his counsel, we can

3  address that as well.  Does that sound reasonable?

4      MR. PORTER:  Yes, Your Honor.

5      MR. OSTER:  Yes, Your Honor.

6      MR. PORTER:  Can I have just a moment to confer

7  with my client, please, Your Honor?

8      THE COURT:  Yes.

9      MR. PORTER:  When we originally talked about

10  rescheduling the hearing, I forgot a conflict I have          01:27PM

11  next Monday.  I am supposed to be out on the west coast

12  with my daughter watching the Spice Girls, so I would

13  be amenable -- the Court mentioned there might be some

14  possibility about doing the hearing tomorrow.  If the

15  Court could work that in, I have an 11:00 doctor's

16  appointment, but could come back whenever.

17      THE COURT:  What is your schedule like tomorrow,

18  Mr. Oster?

19      MR. OSTER:  I can make myself available.

20      THE COURT:  Okay.                                        01:27PM

21      MR. PORTER:  I am sorry for the inconvenience for

22  the Court.

23      THE COURT:  I'm just thinking for maximum time,

24  because there is going to be some reaction time here

25  involved.  I would think we would have to do something

JILL M. CUTTER, RPR
(513) 785-6596

1    in the afternoon as opposed to the morning.

2        MR. OSTER: If I may, Your Honor, obviously as

3    well whoever is going to be appointed as second counsel

4    I know Your Honor talked about maybe talking with Ms.

5    Swain seeing who the next person would be.

6        THE COURT: Well, I have the first two names here.

7        MR. OSTER: Maybe something before we stop we

8    should -- the State would at least put forward the

9    proposition that maybe we -- whoever that would be we

10   try to make sure --                                    01:27PM

11       THE COURT: Contact them?

12       MR. OSTER: Yes, because, unfortunately if we come

13   back tomorrow and there still isn't second counsel, we

14   maybe faced with the same difficulties as we stand here

15   today.

16       THE COURT: All right. Mr. Porter, if I were to

17   read off two names to you, would you without

18   compromising any issues you have, would you be able to

19   just say yes we need a hearing, no, we don't need an

20   ex -- parte hearing?                                    01:27PM

21       MR. PORTER: I would rather not do it that way,

22   Your Honor.

23       THE COURT: Okay. All right.

24       MR. PORTER: If the Court would like, I can

25   approach the bench if that would make life easier.

JILL M. CUTTER, RPR
(513) 785-6596

30

1      THE COURT:  Any objection to that?

2      MR. OSTER:  No objection, Your Honor.

3      THE COURT:  Okay.  Why don't you approach.

4      (The following was held at the bench between the

5   Court and Mr. Porter outside the hearing of parties

6   present in the courtroom:)

7      THE COURT:  The record will reflect that I am at

8   sidebar with counsel Mr. Porter outside the hearing of

9   the State's representative.  The attorneys that would

10   be anticipated would be first Gregory Howard.          01:27PM

11      MR. PORTER:  He has involvement in the other two

12   capital cases that I have in this Court and I have

13   ineffectiveness claims against him and my real concern

14   is nothing against Mr. Howard, but then, one client

15   says well why you agreed to work with someone else that

16   you have an ineffectiveness claim with, or well Mr.

17   Davis could raise that issue and I'd just rather not go

18   there.

19      THE COURT:  Okay.  The other individual referenced

20   here is David Brewer.                                   01:27PM

21      MR. PORTER:  I do not know Mr. Brewer.

22      THE COURT:  And I know that in the event that for

23   some reason Mr. Brewer would be unavailable the other

24   attorneys that we have that are Rule 20 certified are

25   Melynda Cook-Reich, Christopher Pagan, and newly Rule

31

1    20 certified David Washington.

2       MR. PORTER:  I probably have the similar conflict

3    with Mr. Pagan.  Again, it is nothing against Mr.

4    Pagan, Your Honor.  It just puts me in a very awkward

5    position with all three clients.

6       THE COURT:  They do the most capital litigation in

7    this county, so I would figure they would have the

8    greatest likelihood of having issues involved.  So any

9    one other than Mr. Howard or Mr. Pagan that I have

10   mentioned you would not have a conflict with?        01:27PM

11      MR. PORTER:  I would not have a conflict with --

12      THE COURT:  Brewer, Cook-Reich, or Washington?

13      MR. PORTER:  And again, I don't want to interfere

14   with the Court's area, there could be some reasons that

15   an appointment of a woman attorney would be beneficial

16   to Mr. Davis.

17      THE COURT:  Okay.  The only concern that I would

18   want to indicate to you, is that Ms. Cook-Reich is

19   partners with Mr. Pagan.  If that causes -- I don't

20   know if that would.                                 01:27PM

21      MR. PORTER:  I don't think that is going to cause

22   -- we could certainly ask Mr. Davis for a waiver.

23      THE COURT:  Okay.  All right.  I will take a

24   look at those issues.  I believe Ms. Cook-Reich might

25   have even been present here when we were here last time

JILL M. CUTTER, RPR
(513) 785-6596

32

```
 1   in Court if I remember correctly.   I think she was in
 2   the courtroom kind of waiting for another hearing.
 3        MR. PORTER:  And I thank the Court for taking into
 4   consideration the issues I have with the other clients
 5   in this matter.
 6        THE COURT:  We try to get it right.   We try hard
 7   anyway.
 8        (Bench conference concluded and hearing resumed in
 9   open court.)
10        THE COURT:  We have concluded the sidebar
11   conference and what I will do, if counsel is okay with
12   this, we will take a break.  I will see if I can locate
13   Ms. Swain.  It is almost over the lunch hour now, so
14   hopefully I will be able to locate her, and find out
15   who would be next up.
16        Now, routinely, our administrative judge is
17   actually who does the appointment in these cases.  That
18   would be Judge Spaeth.  Ms. Swain could tell me who
19   would be up or available for that appointment.  And it
20   appears in the discussions with Mr. Porter, that there
21   are potentially at least three counsel from our local
22   list who would be available to be appointed.  So it
23   looks like as long as we can do one of those three and
24   I will try to honor any comments made at sidebar, but
25   one of those three counsel, as long as one of those
```

01:27PM

01:27PM

JILL M. CUTTER, RPR
(513) 785-6596

1    three were appointed, there would not be any further

2    issue that would cause concern to defense counsel; is

3    that a fair statement?

4         MR. PORTER:  Thank you, Your Honor, yes.

5         THE COURT:  All right.  So not to extend this

6    unmercifully, or mercilessly, I should say, but would

7    counsel object to again, taking a recess.  Seeing if we

8    can find out who this is and check with a calendar and

9    then come back on and set a new hearing date?  If we

10   set something tomorrow, it would be nice to know                    01:27PM

11   whether that other attorney can actually be here.

12        MR. PORTER:  I have no problem waiting here.

13        MR. OSTER:  The State is here all day, Your Honor.

14        THE COURT:  Why don't we take a recess again while

15   I make that determination.

16        (Recess taken at this time.)

17        THE COURT:  We are back on record in CR83-12-0614.

18   Von Clark Davis again present with counsel, Randall

19   Porter.  And the State's representative, Michael Oster

20   again present.  Counsel, would you be available for              01:27PM

21   1:30 tomorrow afternoon?

22        MR. OSTER:  Yes, Your Honor.

23        MR. PORTER:  Yes, Your Honor.

24        THE COURT:  The administrative judge has approved

25   the appointment of Melynda Cook-Reich as co-counsel to

34

1    assist Mr. Porter.  And so she is available at 1:30

2    tomorrow afternoon.  So we will come back here tomorrow

3    both counsel will be here.  I don't know if would you

4    have a chance to put together some type of an entry

5    regarding the time issue.  Between now and then if you

6    could take a shot at it, I would certainly appreciate

7    it, see whether we would have something.  In the

8    meantime, we will see if we can come up with something

9    on our end as well that would fit the circumstances.

10   But at that point in time we ought to be able to          01:27PM

11   proceed a little deeper into the case with both counsel

12   being here tomorrow.

13        MR. PORTER:  Does the Court want the document

14   prepared as a waiver or as an entry?

15        THE COURT:  I think it should be a waiver that I

16   simply sign off on.

17        MR. PORTER:  And I assume Mr. Davis will also sign

18   off on it?

19        THE COURT:  Yes, I think the most important

20   signature will be Mr. Davis'.   Anything further then    01:27PM

21   that we need to take up for purposes of today's

22   hearing?

23        MR. PORTER:  We have nothing, Your Honor.

24        MR. OSTER:  Just in the interest of maybe helping

25   for tomorrow's hearing, are there any specific issues

35

1    the Court would like further research done on or that

2    the Court anticipates going into tomorrow so we can

3    maybe help at the hearing or be more informed?  I know

4    the Court wants to go into some more things.  I'm just

5    trying to clarify if there is anything that the Court

6    would definitely like to go into if we can help it.

7        THE COURT:  Well, I think that we need to finish

8    up the time issue.  I want to be able to deal with

9    that issue, and have that issue dealt with in full one

10   way or the other.  Beyond that, I am really -- once we        01:27PM

11   have the time issue dealt with, then I think that gives

12   us the flexibility to just see how things go tomorrow

13   as far as how much substantive input we can go into.

14   But I would not be against trying to schedule as much

15   as counsel is willing to schedule tomorrow.

16        Certainly, it won't be me standing in the way of

17   us scheduling as many matters as counsel wishes to do

18   so.  If we want to set deadlines by which certain

19   motions should be filed and response dates and a

20   hearing date for that, anything along those lines we        01:27PM

21   can be ready to do.  I guess what I would recommend is

22   that you bring your calendars both the rest of '07 and

23   '08 and be ready to schedule hearings.  All right.

24        MR. PORTER:  Thank you, Your Honor.

25        MR. OSTER:  The only other thing to put on the

JILL M. CUTTER, RPR
(513) 785-6596

36

1    record, I know the Court talked about speedy trial

2    whether or not resentencing applied.  In the noon

3    break, the State of Ohio was kind of going over that,

4    and we just put on the record, there is a case *State*

5    *vs. Lavelle*, that would actually be the second Joey

6    Lavelle case out of the 12th District where that issue

7    was raised whether someone upon remand of a sentence

8    had the right to a speedy remand of a sentence.  The

9    12th District did deal with that and said that there

10    was not that implicit right like there is for a speedy

11    trial; just to cite one case from the 12th District.

12    And then, I apologize to the Court, being an appellate

13    attorney and always worrying about the record, for

14    whatever it may be worth, to note at this point the

15    State of Ohio would note that just by happenstance I

16    believe in the first hearing that we are here on

17    November 5th, Ms. Cook-Reich was actually present in

18    the courtroom on different matter, but I believe she

19    was in the middle of a trial and I don't know what it

20    will be worth by just wanted to put that on the record

21    that by happenstance she did actually overhear and was

22    present in the courtroom for the first hearing

23    obviously again not for any particular purpose, but

24    just to note it on the record.

25        THE COURT:  I think I noted that to Mr. Porter

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
STATE COURT TRANSCRIPTS - Page 700

1    when you were at sidebar that I think -- I had the same

2    recollection.

3        MR. PORTER:  You did, Your Honor.

4        THE COURT:  That she was present here the last

5    time we were here.  But of course, Mr. Davis didn't

6    have the opportunity to meet her at that time.

7        MR. OSTER:  Again, Your Honor, unfortunately,

8    being an appellate person every now and then I like to

9    throw little nuggets on the record.

10       THE COURT:  I believe that the record should have    01:27PM

11   good vision.  With that being said, counsel, we will

12   reconvene tomorrow and be able to hopefully take a

13   meaningful next step forward.  My apologies for the

14   kind of growing pains we have gone through early on

15   here.   I think we have all been trying to feel our way

16   through this and try to make sure that we do this right

17   and in a fair manner, so counsel I appreciate your

18   indulgence and I look forward to working with you

19   further tomorrow.

20       MR. OSTER:  Thank you, Your Honor.  No apology    01:27PM

21   necessary.

22       THE COURT:  See you tomorrow afternoon.

23       (Hearing concluded at this time 1:25 p.m.)

24

25

JILL M. CUTTER, RPR
(513) 785-6596

38

```
 1
 2   STATE OF OHIO          )
 3                          )  SS.   REPORTER'S CERTIFICATE
 4   COUNTY OF BUTLER       )
 5            I, JILL M. CUTTER, RPR, an Official Court Reporter
 6   and Notary Public within the State of Ohio do hereby certify
 7   that the foregoing proceedings were taken in stenotype by me
 8   at the time and place herein set forth and thereafter reduced
 9   to typewritten form;
10            That the foregoing 37 pages constitutes a true and
11   accurate transcript of the proceedings held, all done to the
12   best of my skill and ability.
13            I further certify that I am not related to any of
14   the parties hereto, nor am I in any way interested in the
15   result of the action hereof.
16            IN WITNESS WHEREOF, I have hereunto set my hand at
17   Hamilton, Ohio, this 22 day of December, 2009.
18
19
20
21                                JILL M. CUTTER, RPR
                                  Official Court Reporter
22                                Butler County Common Pleas
                                  Hamilton, Ohio  45011
23
24
25
```

JILL M. CUTTER, RPR
(513) 785-6596