IMAGED

1

COURT OF COMMON PLEAS

BUTLER COUNTY, OHIO

------------------------------

STATE OF OHIO,

Plaintiff,

Case No. CR-1983-12-0614
CA-09-10-263

vs.

HONORABLE ANDREW NASTOFF
HONORABLE KEITH SPAETH
HONORABLE CHARLES PATER

FILED BUTLER CO.
COURT OF APPEALS

VON CLARK DAVIS,

Defendant.

JAN 08 2010

ORIGINAL

CINDY CARPENTER
CLERK OF COURT

------------------------------

- - -

MITIGATION HEARING

TRANSCRIPT OF PROCEEDINGS

September 8, 2009

VOLUME I

- - -

JILL M. CUTTER, RPR
(513) 785-6596

2

```
 1   APPEARANCES:

 2

 3        On behalf of the plaintiff:

 4             MICHAEL A. OSTER, JR., ESQ.
               Assistant Butler County Prosecuting Attorney
 5             11th Floor
               315 High Street
 6             Hamilton, Ohio 45011
                    and
 7             DANIEL G. EICHEL, ESQ.
               Assistant Butler County Prosecuting Attorney
 8             11th Floor
               315 High Street
 9             Hamilton, Ohio 45011

10        On behalf of the defendant:

11             MELYNDA COOK-REICH, ESQ.
               Repper, Pagan, Cook
12             1501 First Avenue
               Middletown, Ohio 45044
13                  and
               RANDALL PORTER, ESQ.
14             Assistant State Public Defender
               250 East Broad Street
15             Suite 1400
               Columbus, Ohio 43215

16

17

18

19

20

21

22

23

24

25
```

3

| | | |
|---|---|---|
| 1 | TRANSCRIPT OF PROCEEDINGS | |
| 2 | Tuesday, September 8, 2009 | |
| 3 | - - - - - - - - - | 10:26:14 |
| 4 | JUDGE NASTOFF: We are on record in State of Ohio | 10:26:14 |
| 5 | vs. Von Clark Davis. This is CR1983-12-0614. For the | 10:26:31 |
| 6 | record, present in court is the defendant, Von Clark | 10:26:36 |
| 7 | Davis appearing personally. He is accompanied by his | 10:26:42 |
| 8 | counsel, Randall Porter. | 10:26:45 |
| 9 | MR. PORTER: Good morning, Your Honor. | 10:26:48 |
| 10 | JUDGE NASTOFF: And Melynda Cook-Reich. Good | 10:26:49 |
| 11 | morning to you. | 10:26:51 |
| 12 | MS. COOK-REICH: Good morning, Your Honor. | 10:26:51 |
| 13 | JUDGE NASTOFF: Present on behalf of the State are | 10:26:53 |
| 14 | assistant prosecutors Dan Eichel. | 10:26:54 |
| 15 | MR. EICHEL: Good morning, Your Honor. | 10:26:57 |
| 16 | JUDGE NASTOFF: And Michael Oster. | 10:26:58 |
| 17 | MR. OSTER: Good morning, Your Honor. | 10:27:00 |
| 18 | JUDGE NASTOFF: This case is before the Court | 10:27:01 |
| 19 | pursuant to an order granting conditional writ of | 10:27:03 |
| 20 | habeas corpus issued by US District Court Judge James | 10:27:07 |
| 21 | Graham of the Southern District of Ohio, in which he | 10:27:12 |
| 22 | ordered the State of Ohio to grant Mr. Davis a new | 10:27:14 |
| 23 | sentencing hearing. The original three-judge panel | 10:27:17 |
| 24 | that heard the original trial in 1984, and heard the | 10:27:20 |
| 25 | first resentencing hearing in 1989 consisted of Judges | 10:27:26 |

JILL M. CUTTER, RPR
(513) 785-6596

4

| | | |
|---|---|---|
| 1 | Brewer, Stitsinger and Moser.  Since none of those | 10:27:30 |
| 2 | three judges were still on the bench when this case was | 10:27:35 |
| 3 | sent back, a new three-judge panel has been selected | 10:27:38 |
| 4 | pursuant to Ohio Revised Code 2929.06 (B) and by random | 10:27:43 |
| 5 | draw as to the remaining judges on the panel. | 10:27:49 |
| 6 | Also I would note for the record, that pursuant to | 10:27:52 |
| 7 | Criminal Rule 25 (B) the new panel is to be appointed | 10:27:55 |
| 8 | by administrative judge.  The administrative judge for | 10:27:59 |
| 9 | our court is Judge Michael Sage.  Since he was a member | 10:28:03 |
| 10 | of the prosecution team in the original trial of this | 10:28:06 |
| 11 | action, he recused himself from any even ministerial | 10:28:10 |
| 12 | activity involved in this case.  Judge Patricia Oney | 10:28:18 |
| 13 | was appointed acting administrative judge and signed an | 10:28:21 |
| 14 | entry appointing myself, Andrew Nastoff, as the | 10:28:24 |
| 15 | presiding judge of this panel, and Judges Keith Spaeth | 10:28:28 |
| 16 | and Charles Pater have been appointed as the remaining | 10:28:31 |
| 17 | two judges consistent with that random draw earlier. | 10:28:34 |
| 18 | As set forth in Ohio Revised Code 2929.06 (B), | 10:28:38 |
| 19 | this panel is directed to follow the procedures set | 10:28:42 |
| 20 | forth in Division D of Ohio Revised Code 2929.03 and is | 10:28:45 |
| 21 | to apply the version of that statute in effect at the | 10:28:50 |
| 22 | time of the offense.  Accordingly, this panel takes | 10:28:53 |
| 23 | note that the defendant, Von Clark Davis, has been | 10:28:58 |
| 24 | convicted of aggravated murder in violation of Ohio | 10:29:02 |
| 25 | Revised Code 2903.01 (A).  And further has been found | 10:29:05 |

JILL M. CUTTER, RPR
(513) 785-6596

5

1　guilty beyond a reasonable doubt of the aggravating　10:29:10

2　circumstance of having been convicted of an offense, an　10:29:13

3　essential element of which was the purposeful killing　10:29:18

4　of another prior to the offense at bar in violation of　10:29:20

5　ORC 2929.04(A)5.　10:29:23

6　　　Now, pursuant to 2929.03(D)(1) this panel stands　10:29:28

7　ready to consider, at this new sentencing hearing, any　10:29:32

8　report prepared pursuant to that section, any evidence　10:29:36

9　raised at trial that is relevant to the aggravating　10:29:41

10　circumstance the offender was found guilty of　10:29:44

11　committing, or to any factors in mitigation of the　10:29:46

12　imposition of the sentence of death, to hear testimony　10:29:50

13　and other evidence that is relevant to the nature and　10:29:53

14　circumstances of the aggravating circumstance the　10:29:56

15　offender was found guilty of committing, the mitigating　10:29:59

16　factors set forth in Division B of Section 2929.04, and　10:30:03

17　any other factors in mitigation of the imposition of　10:30:08

18　the sentence of death.  And to hear the statement, if　10:30:11

19　any, of the offender, and the arguments, if any, of　10:30:14

20　counsel for the defense and prosecution that are　10:30:18

21　relevant to the penalty should it be imposed on the　10:30:20

22　offender.　10:30:23

23　　　With that being said, are there any matters that　10:30:23

24　we need to take up as we begin this process?  Counsel?　10:30:27

25　　　MS. COOK-REICH:  Your Honor, we have the pending　10:30:40

JILL M. CUTTER, RPR
(513) 785-6596

6

| | | |
|---|---|---|
| 1 | motion in limine that we have had several filings on | 10:30:42 |
| 2 | relative to asking for a prior hearing on the matter of | 10:30:45 |
| 3 | relevancy of witnesses and evidence we expect the | 10:30:49 |
| 4 | prosecutor to call. | 10:32:43 |
| 5 | JUDGE NASTOFF: All right. All right. Also, just | 10:32:43 |
| 6 | so the record is clear, not only have Judges Spaeth and | 10:32:43 |
| 7 | Pater been appointed on this panel, they are present in | 10:32:43 |
| 8 | court as a part of this panel as we proceed. | 10:32:43 |
| 9 | There has been a motion in limine filed, it was | 10:32:43 |
| 10 | dated May 8, 2009, wherein the defense seeks to limit | 10:32:44 |
| 11 | -- seeks an order limiting the prosecutor as to the | 10:32:44 |
| 12 | evidence of the prior 1971 murder conviction that can | 10:32:44 |
| 13 | be presented in this mitigation phase, or the | 10:32:44 |
| 14 | sentencing phase of the trial. They ask for an order | 10:32:44 |
| 15 | that the State of Ohio only be allowed to submit the | 10:32:44 |
| 16 | judgment entry of conviction and not additional | 10:32:44 |
| 17 | evidence. | 10:32:44 |
| 18 | Was there anything above and beyond what you | 10:32:44 |
| 19 | submitted in your written argumentation that you wish | 10:32:44 |
| 20 | to present to the panel on that issue? | 10:32:44 |
| 21 | MS. COOK-REICH: The only other thing that we did | 10:32:44 |
| 22 | not include in that written motion on May 8th, was the | 10:32:45 |
| 23 | copy of the Bill of Particulars, which we have located | 10:32:45 |
| 24 | in the case file. And I can certainly submit to the | 10:32:45 |
| 25 | Court, I assume you have it in your trial notebooks as | 10:32:45 |

JILL M. CUTTER, RPR
(513) 785-6596

7

| | | |
|---|---|---|
| 1 | part of the case, but it specifically states, and I | 10:32:45 |
| 2 | will quote, that prior to the said aggravated murder | 10:32:45 |
| 3 | committed by the defendant, Von Clark Davis, the | 10:32:45 |
| 4 | defendant was convicted on April 20, 1971, of murder in | 10:32:46 |
| 5 | the second degree, an essential element of which was | 10:32:46 |
| 6 | the purposeful killing of another, to wit: Ernestine | 10:32:46 |
| 7 | Davis, contrary to section 2901.05 of the Ohio Revised | 10:32:46 |
| 8 | Code in the Court of Common Pleas of Butler County, | 10:32:46 |
| 9 | Ohio, in case number, 21655 as specified in section | 10:32:46 |
| 10 | 2929.04 (A)(5) of the Ohio Revised Code. | 10:32:48 |
| 11 | It basically tracks the language of the indictment | 10:32:53 |
| 12 | adding in specifically the name of Ernestine Davis, but | 10:32:55 |
| 13 | did not provide any additional information. And we | 10:32:58 |
| 14 | would argue that simply the judgment conviction entry | 10:33:01 |
| 15 | is the only thing relevant to this proceeding, it | 10:33:03 |
| 16 | should be the only thing that the State is allowed to | 10:33:06 |
| 17 | present. I know in a prior case in Warren County, | 10:33:09 |
| 18 | where the specification was an (A)(5) specification, | 10:33:12 |
| 19 | State vs. Rocky Bartin, the State in that case, Warren | 10:33:17 |
| 20 | County prosecutor submitted only the judgment | 10:33:22 |
| 21 | conviction entry and the guilty plea in that case as | 10:33:24 |
| 22 | part of its case for the mitigation and nothing else. | 10:33:26 |
| 23 | And we would argue that to allow additional information | 10:33:30 |
| 24 | to be presented in this Court, beyond the specification | 10:33:34 |
| 25 | that has already been proven and found by the prior | 10:33:37 |

JILL M. CUTTER, RPR
(513) 785-6596

8

| | | |
|---|---|---|
| 1 | three-judge panel, would again be allowing admission of | 10:33:40 |
| 2 | non-statutory aggravating circumstances for which the | 10:33:43 |
| 3 | Ohio Supreme Court returned this case back to this | 10:33:46 |
| 4 | Court in 1988. | 10:33:50 |
| 5 | JUDGE NASTOFF: All right. And again, before I | 10:33:51 |
| 6 | turn to the State for any response, does the State have | 10:33:52 |
| 7 | any -- or pardon me, does the defense have any | 10:33:56 |
| 8 | authority, case law from the 12th District and other | 10:33:59 |
| 9 | appellate district, the Supreme Court if it is newer | 10:34:06 |
| 10 | case law, or federal case law, interpreting Ohio's | 10:34:09 |
| 11 | sentencing scheme which addresses the specific issue | 10:34:15 |
| 12 | that you are talking about with an (A)(5) | 10:34:20 |
| 13 | specification? | 10:34:24 |
| 14 | MS. COOK-REICH: Your Honor, we have cited in our | 10:34:24 |
| 15 | memorandum, Werkman vs. Bell, 160 F3d. 276, Sixth | 10:34:26 |
| 16 | Circuit decision in 1993. | 10:34:37 |
| 17 | THE COURT: All right. And do you have and -- | 10:34:37 |
| 18 | MS. COOK-REICH: I think the statutes are pretty | 10:34:38 |
| 19 | clear also in looking at the specifications statute | 10:34:40 |
| 20 | 2929.04(A)(5) as well as if you look specifically at | 10:34:44 |
| 21 | the decision by the Supreme Court in this case, State | 10:34:50 |
| 22 | v. Davis, 38 Ohio Supreme Court 3d. at pages 368, 369 | 10:34:53 |
| 23 | and this was in the Supreme Court's decision talking | 10:35:02 |
| 24 | about the admission -- I'm sorry, the written decision | 10:35:06 |
| 25 | by the panel relative to the aggravating circumstances | 10:35:09 |

1   and mitigating factors that they considered, and their          10:35:12

2   language specifically is, of those circumstances              10:35:14

3   enumerated in the statute, and they are speaking of the       10:35:16

4   statute 2929.04 (A), only the aggravating circumstance        10:35:21

5   described in RC 2929.04 (A)(5) is present in the trial        10:35:23

6   court's opinion.  Item 4 finds the, and then there's a        10:35:29

7   quotation mark, prior purposeful killing of his wife in       10:35:34

8   1970, end of quotation mark, to be an aggravating             10:35:36

9   circumstance.                                                 10:35:39

10      That decision I think is controlling in this case,        10:35:40

11  indicating that that circumstance has already been            10:35:44

12  proven and that is an aggravating circumstance that is        10:35:46

13  a statutory aggravating circumstance that was allowed         10:35:48

14  to be presented.                                              10:35:52

15      JUDGE NASTOFF:  All right.  Do you have an extra          10:35:52

16  copy of Werkman vs. Bell that you can provide?                10:35:53

17      MS. COOK-REICH:  I do not, Your Honor.  It is a           10:35:57

18  reported case.  I can certainly go to the law library         10:35:58

19  at break and --                                               10:36:03

20      JUDGE PATER:  And what is the substance of it?            10:36:03

21  What was the background?  What was the holding in that        10:36:05

22  case?                                                         10:36:07

23      MS. COOK-REICH:  The holding in that case, Your           10:36:08

24  Honor, is that relative to the non-statutory                  10:36:09

25  aggravating circumstances, admission of such                  10:36:12

10

1   non-statutory aggravating circumstances would result in          10:36:14
2   an unconstitutional trial and we would submit that to            10:36:16
3   allow evidence going to non-statutory aggravating                10:36:20
4   circumstances, would make this yet again the third               10:36:23
5   unconstitutional trial that this case would be visiting          10:36:26
6   and you will see this case again in ten more years back          10:36:29
7   on that one factor which the Ohio Supreme Court already          10:36:32
8   told you in 1988 could not be used.                              10:36:36
9       JUDGE NASTOFF:  But in <u>Werkman vs. Bell</u> does that     10:36:38
10  deal with an (A)(5) aggravating --                               10:36:41
11      MS. COOK-REICH:  It's a Tennessee case.  I didn't           10:36:44
12  think it was a State of Ohio case either, Your Honor.            10:36:47
13      JUDGE NASTOFF:  Okay.  All right.                            10:36:49
14      JUDGE PATER:  If I could interpose something here.          10:36:50
15  I don't think there is any question in this room among           10:36:53
16  anybody who has looked into these things whatsoever              10:36:57
17  that there in this case is one aggravating                       10:36:58
18  circumstance.  And that aggravating circumstance is              10:37:00
19  that in 1971 the defendant was found guilty of a crime          10:37:03
20  that involved the purposeful killing of another.  There         10:37:07
21  is no question about that.                                       10:37:11
22      This Court, I can tell you for all three of us, we          10:37:12
23  are not going to take into consideration any other               10:37:16
24  aggravating circumstance other than that.  But that is          10:37:20
25  not the issue.  That is not the problem.                         10:37:21

JILL M. CUTTER, RPR
(513) 785-6596

1   You spoke a minute ago about the statutes being    10:37:25
2   relatively clear. And I agree, but I agree from the    10:37:27
3   opposite perspective. If you look at the version of    10:37:31
4   2929.03 (D)(1) that existed at 1983, at the time of the    10:37:36
5   commission of this crime, it states as follows: And    10:37:45
6   this is the -- this is (D)(1), there are two paragraphs    10:37:49
7   within (D)(1). The first paragraph is very long.    10:37:54
8   About half of the way through that paragraph, I am    10:37:57
9   going to quote in part, the Court shall hear testimony    10:38:01
10   and other evidence that is relevant to the nature and    10:38:09
11   circumstances of the aggravating circumstance.    10:38:16
12   The statute very clearly says that this Court is    10:38:23
13   going to hear testimony and evidence that is relevant    10:38:27
14   in our particular case to the nature and circumstances    10:38:34
15   of the first murder. How else can you interpret that?    10:38:37
16   And it seems when you go through the State Supreme    10:38:44
17   Court's decisions in recent years, especially Gumm,    10:38:48
18   Wogenstahl and Newton, you find the Supreme Court    10:38:52
19   saying very clearly, I think, that just what the    10:38:55
20   statute says, that the Court shall hear those things.    10:39:00
21   The Court certainly doesn't talk about any status    10:39:06
22   offenses, doesn't use that kind of terminology    10:39:09
23   whatsoever. The Supreme Court, our Supreme Court says    10:39:12
24   we shall hear these things, and even go beyond that and    10:39:16
25   saying it is ludicrous to interpret this statute in    10:39:20

12

1  such a way as to say that the Court will only take     10:39:24

2  cognizance of the fact that there was a previous       10:39:28

3  conviction or the fact that a person was in detention  10:39:32

4  when the person committed the murder at question in the 10:39:36

5  current case.                                          10:39:41

6      The Court says it is ludicrous just to look at     10:39:42

7  that abstractly.  In the Newton case especially, you've 10:39:45

8  got a what might be called by some a status type of an 10:39:49

9  offense whereby the aggravating circumstance is merely 10:39:53

10 that a person was in detention.  The Court goes at     10:39:57

11 quite a length to describe how that is not enough in   10:40:02

12 and of itself just to say that the defendant was in    10:40:07

13 detention when he committed the murder.  So that is    10:40:12

14 what is puzzling me in the defense's motion here.  How 10:40:14

15 do you respond to Gumm, Wogenstahl and Newton?  How do 10:40:18

16 you respond to the clear wording of 2929.03 (D)(1)?    10:40:22

17 That is -- that is the problem that I have with         10:40:27

18 defense's position here.  Can you respond to that?     10:40:30

19     MS. COOK-REICH:  I respond exactly how I already   10:40:32

20 did.  The Ohio Supreme Court already said what is the  10:40:34

21 factor that can be considered in this case, and they   10:40:38

22 did that in the 1988 decision that I am assuming you   10:40:40

23 have a copy of in your trial notebook.                 10:40:43

24     JUDGE NASTOFF:  We do.                             10:40:46

25     JUDGE PATER:  But I think you are missing my       10:40:46

JILL M. CUTTER, RPR
(513) 785-6596

| | | |
|---|---|---|
| 1 | point. There is one aggravating circumstance. The one | 10:40:48 |
| 2 | aggravating circumstance is that the defendant here | 10:40:53 |
| 3 | committed a prior murder. Purposeful killing of | 10:40:57 |
| 4 | another human being, but the statute says that we are | 10:41:03 |
| 5 | to hear testimony and evidence concerning the nature | 10:41:07 |
| 6 | and circumstances of that aggravating circumstance. So | 10:41:14 |
| 7 | what -- I mean that seems to be clear. I guess it is | 10:41:25 |
| 8 | not to everybody, Mr. Porter. | 10:41:29 |
| 9 | MR. PORTER: If I could respond. | 10:41:32 |
| 10 | JUDGE PATER: Please, I am waiting for a response. | 10:41:33 |
| 11 | MR. PORTER: And I certainly don't mean to double | 10:41:36 |
| 12 | team you with -- | 10:41:38 |
| 13 | JUDGE PATER: No, no, feel free. | 10:41:38 |
| 14 | MR. PORTER: I think the aggravator in this case, | 10:41:40 |
| 15 | Your Honor, is the conviction. That is it. The | 10:41:42 |
| 16 | testimony you can take as to the conviction I think | 10:41:45 |
| 17 | you're limited as -- and since it has already been | 10:41:48 |
| 18 | stipulated so that this conviction has already been | 10:41:51 |
| 19 | proven, is the testimony I think are limited. If the | 10:41:54 |
| 20 | Court wants to take testimony and the prosecutor wants | 10:41:58 |
| 21 | to present testimony is bring in the clerk to show the | 10:42:00 |
| 22 | certified copy, to bring someone in to say, and we have | 10:42:04 |
| 23 | stipulated this so there is no necessity to do it, but | 10:42:06 |
| 24 | I think if the prosecutor wants to present testimony it | 10:42:09 |
| 25 | is that Von is, in fact, the one that was convicted. | 10:42:13 |

JILL M. CUTTER, RPR
(513) 785-6596

14

| | | |
|---|---|---|
| 1 | The -- and I am being repetitious and I don't mean to | 10:42:17 |
| 2 | be. | 10:42:22 |
| 3 | JUDGE PATER: Please do, because I need | 10:42:22 |
| 4 | clarification. | 10:42:25 |
| 5 | MR. PORTER: The specification is not that he | 10:42:26 |
| 6 | committed the murder. The specification is simply that | 10:42:28 |
| 7 | he was convicted of the murder. And the only testimony | 10:42:30 |
| 8 | you can take is with respect to the conviction and not | 10:42:33 |
| 9 | the commission of the murder, and the prosecutor, in | 10:42:37 |
| 10 | fact, wants to present evidence as to the commission | 10:42:40 |
| 11 | rather than the conviction. | 10:42:43 |
| 12 | JUDGE PATER: Okay. That helps me to see the | 10:42:46 |
| 13 | defense's position. So it is the conviction and not | 10:42:48 |
| 14 | the commission of the first murder? | 10:42:51 |
| 15 | MR. PORTER: Exactly, Your Honor. | 10:42:54 |
| 16 | JUDGE PATER: All right. Thank you. | 10:42:56 |
| 17 | JUDGE NASTOFF: Any response from the State? | 10:42:57 |
| 18 | MR. EICHEL: Your Honor, please, we again, not to | 10:42:58 |
| 19 | reiterate Judge Pater's argument, but we believe this | 10:43:04 |
| 20 | statute is clear. It was clear the first time this | 10:43:10 |
| 21 | case was tried. And that Court hearing testimony by an | 10:43:14 |
| 22 | officer involved in the first case in the 1971 | 10:43:20 |
| 23 | conviction, gave testimony over objection, this issue | 10:43:26 |
| 24 | could have been, but was not raised in the appeals that | 10:43:32 |
| 25 | followed. We basically have the law of the case | 10:43:36 |

JILL M. CUTTER, RPR
(513) 785-6596

15

1    applying here, not only that, it was clear language          10:43:41
2    that applied then and applies now.                          10:43:45
3         We are to consider the nature and circumstances of     10:43:47
4    the aggravating circumstance.  And the nature and           10:43:50
5    circumstances point not to a court proceeding in which      10:43:54
6    a person was convicted, they point to the aggravating       10:43:58
7    circumstance, the substance of which was the defendant      10:44:03
8    was convicted of causing the purposeful killing of          10:44:09
9    another, his wife Ernestine Davis.  We believe that in      10:44:12
10   the first trial, this was pointed out.  The panel          10:44:19
11   overruled that objection.  And the law was then as it      10:44:22
12   is now, it has been subsequently added, State Supreme       10:44:27
13   Court has decided Gumm and Wogenstahl and Nelson, among     10:44:33
14   many other cases to justify the position we take that       10:44:39
15   the nature and circum -- testimony and other evidence       10:44:44
16   pertaining to the nature and circumstances of the           10:44:49
17   aggravating circumstance is admissible, is literally        10:44:52
18   admissible under this statute.                              10:44:56
19        JUDGE NASTOFF:  Mr. Eichel, I think one thing that     10:45:00
20   -- and both of you feel free to address this, that          10:45:04
21   causes this Court to take some pause is that Gumm,          10:45:07
22   Wogenstahl, the Newton case, many of the cases that         10:45:15
23   address this issue are not (A)(5) specifications.  They     10:45:19
24   are felony murder.  They are murder while under            10:45:27
25   detention.  They are specifications that are fact          10:45:31

16

| | | |
|---|---|---|
| 1 | driven, that deal with facts that surround the | 10:45:36 |
| 2 | aggravated murder that the person is convicted of, that | 10:45:44 |
| 3 | it was during the commission of the kidnapping, for | 10:45:46 |
| 4 | example, or while under detention perhaps with Newton, | 10:45:49 |
| 5 | and there is at least an argument that in (A)(5) is a | 10:45:52 |
| 6 | different creature, arguably that is why I am asking | 10:46:00 |
| 7 | you to address this, and that it has nothing to do with | 10:46:04 |
| 8 | the -- it's not intertwined at all with the facts of | 10:46:07 |
| 9 | the murder that brings us to this proceeding. The '83 | 10:46:11 |
| 10 | killing. Okay. It describes something that occurred | 10:46:17 |
| 11 | well prior to that by its very definition, prior to the | 10:46:24 |
| 12 | offense at bar. And so I believe the defense is | 10:46:27 |
| 13 | arguing that it is different in its nature and so, you | 10:46:31 |
| 14 | know, the nature and circumstances that would describe | 10:46:34 |
| 15 | in (A)(5) are different than other nature and | 10:46:37 |
| 16 | circumstances types of cases. Can you address that | 10:46:40 |
| 17 | issue -- I mean, that is why I was asking, is there any | 10:46:43 |
| 18 | authority that deals with the type of evidence that | 10:46:49 |
| 19 | comes in on an (A)(5) specification? And I can tell | 10:46:53 |
| 20 | you that in my research I found very little that dealt | 10:46:59 |
| 21 | with (A)(5). I mean, there just aren't that many out | 10:47:02 |
| 22 | there and the ones that you find are usually course of | 10:47:05 |
| 23 | conduct cases not a prior conviction -- | 10:47:08 |
| 24 | MR. EICHEL: Exactly. | 10:47:10 |
| 25 | JUDGE NASTOFF: -- case, and so there appears to | 10:47:12 |

1    be a dearth of case law in this particular point and so    10:47:15

2    I was wondering if you could, either of you address    10:47:20

3    that argument.    10:47:23

4    MR. EICHEL:  The Court's research is equal to mine    10:47:26

5    and I have not found specific cases on this other than    10:47:30

6    the prior trial of Von Clark Davis.  And that is at    10:47:36

7    page 410 of the previous transcript in the mitigation    10:47:40

8    phase.    10:47:45

9    MR. PORTER:  Just two responses and I will be    10:47:52

10    brief.  First is I direct the Court to the version of    10:47:57

11    2929 -- and I am just sort of expanding upon the    10:48:03

12    argument in response to Judge -- my earlier response to    10:48:08

13    Judge Pater.  Is if you look at the (A)(5) language    10:48:13

14    itself, it talks about prior to the offense at bar the    10:48:17

15    offender was convicted of an offense an essential    10:48:22

16    element of which, so I think the way the statute lays    10:48:26

17    it out talks about the specification is the prior    10:48:31

18    conviction, as opposed to the facts of the prior    10:48:33

19    conviction.    10:48:36

20    Since it is clear I think the Court is bound by    10:48:39

21    that.  If there is any question as to the    10:48:43

22    interpretation, I believe the Court has to apply the    10:48:45

23    interpretation that is most favorable to the defendant,    10:48:51

24    and finally, and I have the most respect in the world    10:48:56

25    for Prosecutor Eichel, and I may have heard him wrong    10:48:59

| | | |
|---|---|---|
| 1 | and I apologize Mr. Eichel if I heard you wrong, but my | 10:49:05 |
| 2 | recollection is the prior trans -- of the prior 1984 | 10:49:08 |
| 3 | proceedings, and correct me if I am wrong, Your Honors, | 10:49:13 |
| 4 | is that there was no testimony other than the | 10:49:18 |
| 5 | stipulation as to the prior offense with respect to | 10:49:23 |
| 6 | proving the aggravating circumstance. And if there | 10:49:28 |
| 7 | was, I stand corrected, but I see no need to reopen the | 10:49:31 |
| 8 | issue if it, in fact, has been proven, and there was no | 10:49:36 |
| 9 | need to introduce the facts of the earlier offense at | 10:49:40 |
| 10 | that time, why is there a need to do so now? | 10:49:46 |
| 11 | JUDGE NASTOFF: To address that last issue, what I | 10:49:50 |
| 12 | can tell you is obviously, there -- and perhaps Judge | 10:49:53 |
| 13 | Pater and Judge Spaeth need to be brought up to speed | 10:49:59 |
| 14 | on some of the issues that transpired pretrial, but we | 10:50:01 |
| 15 | obviously had pretrial motions dealing with the extent | 10:50:05 |
| 16 | to which the Court should familiarize itself with the | 10:50:08 |
| 17 | transcript of the prior trial prior to today's hearing | 10:50:13 |
| 18 | and it has been the defense's position throughout that | 10:50:17 |
| 19 | the Court should not have reviewed it at all prior to | 10:50:20 |
| 20 | today's hearing. | 10:50:25 |
| 21 | This Court found that it was appropriate that | 10:50:26 |
| 22 | there was a statutory duty for the Court to | 10:50:30 |
| 23 | independently review the transcript, particularly the | 10:50:36 |
| 24 | trial phase transcript to determine whether there is | 10:50:41 |
| 25 | any mitigating issues or mitigating factors to be found | 10:50:44 |

19

| | | |
|---|---|---|
| 1 | pursuant, or regarding the nature and circumstances of | 10:50:51 |
| 2 | the offense. It appears that there was Supreme Court | 10:50:53 |
| 3 | case law that directed this Court, in fact, to conduct | 10:50:58 |
| 4 | such an inquiry. This Court did not. This Court | 10:51:02 |
| 5 | granted your motion to the extent that it dealt with | 10:51:06 |
| 6 | other portions of the transcript. So neither I nor the | 10:51:09 |
| 7 | other judges have reviewed the prior mitigation phase | 10:51:12 |
| 8 | testimony or that portion of the transcript. | 10:51:18 |
| 9 | What I can say is from my review of the trial | 10:51:21 |
| 10 | phase, I think Mr. Porter is correct. The only thing | 10:51:24 |
| 11 | presented at the trial phase was a stipulation | 10:51:26 |
| 12 | regarding the prior conviction and the judgment entry | 10:51:31 |
| 13 | of conviction was presented. There was no additional | 10:51:36 |
| 14 | testimony at the trial phase. So -- | 10:51:40 |
| 15 | MR. PORTER: And I have one additional point and I | 10:51:45 |
| 16 | am sorry to stand up again, Your Honors, my old age I | 10:51:48 |
| 17 | occasionally forget points, is I think, and we have | 10:51:52 |
| 18 | been discussing Gumm today, I think the Court needs to | 10:51:56 |
| 19 | be a little leery of Gumm. | 10:51:59 |
| 20 | JUDGE NASTOFF: It's been modified, we know. | 10:52:01 |
| 21 | MR. PORTER: Yes, and I think it is with respect | 10:52:03 |
| 22 | to the matter that we were discussing today. | 10:52:05 |
| 23 | JUDGE NASTOFF: And I believe it is Wogenstahl | 10:52:06 |
| 24 | that specifically modifies Gumm and so I -- all of us | 10:52:08 |
| 25 | are aware that we should read Gumm in light of the | 10:52:11 |

20

| | |
|---|---|
| 1 | subsequent modifications. | 10:52:18 |
| 2 | MR. PORTER: Thank you, Your Honor. | 10:52:20 |
| 3 | JUDGE NASTOFF: All right. | 10:52:21 |
| 4 | MR. OSTER: Your Honor, the only thing I may bring | 10:52:22 |
| 5 | up, when you are asking for case law and I have a | 10:52:26 |
| 6 | little snippet here I believe the case doesn't go into | 10:52:32 |
| 7 | it, just to try to possibly shed a little light and I | 10:52:34 |
| 8 | know there can be so much read from this but in the | 10:52:37 |
| 9 | case of State v. Lamar, L-A-M-A-R, it's 95 Ohio State | 10:52:37 |
| 10 | 3d. 181, it's also citation 2002 Ohio 2128, it was an | 10:52:43 |
| 11 | (A)(5) murder specification and therein the Court noted | 10:52:51 |
| 12 | that in this case the aggravating circumstances are | 10:52:55 |
| 13 | grievous; Lamar, already incarcerated as a convicted | 10:53:00 |
| 14 | murderer was a ring leader in a murder spree that | 10:53:01 |
| 15 | killed five victims. That doesn't seem to just be | 10:53:04 |
| 16 | noting his conviction that he was convicted of | 10:53:07 |
| 17 | something else. It talks about a murder spree. It | 10:53:12 |
| 18 | talks about he was already convicted, but it seems to | 10:53:15 |
| 19 | indicate that there may be some facts behind some of | 10:53:18 |
| 20 | it, but again, it doesn't go into a lot of it. It is | 10:53:21 |
| 21 | the only other case that I can think of to maybe cite | 10:53:24 |
| 22 | to the Court just as you are trying to make your | 10:53:26 |
| 23 | decision. | 10:53:27 |
| 24 | JUDGE NASTOFF: We can look at that, although it | 10:53:28 |
| 25 | occurs to me from the facts that you presented that | 10:53:28 |

21

1  that could be a course of conduct (A)(5) case as | 10:53:30

2  opposed to -- | 10:53:33

3  MS. COOK-REICH: Your Honor, I have a copy of the | 10:53:36

4  Rocky Barton transcript, which was the trial I spoke | 10:53:37

5  of. It's my only copy and I have some sticky notes on | 10:53:41

6  it. I'm willing to take those sticky notes off and | 10:53:43

7  direct you to the pages that speaks of. | 10:53:45

8  JUDGE NASTOFF: I believe that was attached to | 10:53:46

9  your motion. All right. | 10:53:48

10  MR. EICHEL: If Your Honor please, I may respond | 10:53:50

11  to Mr. Porter's comment? | 10:53:53

12  THE COURT: Sure. | 10:53:53

13  MR. EICHEL: I am well aware that the Court does | 10:53:53

14  not have and has not reviewed the mitigation phase of | 10:53:55

15  1984 trial and it should not. I would like to proffer | 10:53:59

16  though since my statement has been called into question | 10:54:03

17  by Mr. Porter, page 409, Sergeant Schmitz, Jim Schmitz | 10:54:08

18  was called to testify about the nature and | 10:54:14

19  circumstances of the 1970 murder of Ernestine Davis. | 10:54:19

20  He was allowed to testify, show photographs. we, in | 10:54:26

21  our work on this case, preparatory work, we found that | 10:54:32

22  Sergeant Schmitz at the early stage of preparation, was | 10:54:38

23  in no condition to testify. He has since passed away. | 10:54:42

24  He died in May of this year. At any rate, he also | 10:54:47

25  identified photographs which we discovered are no | 10:54:50

22

1  longer in existence regarding that case, so we                    10:54:54
2  deliberately realized we could not use Sergeant                   10:55:01
3  Schmitz. We found another means to present the nature             10:55:05
4  and circumstances of this aggravating circumstance to             10:55:08
5  the Court involving the elements of the offense,                  10:55:10
6  involving the purposeful killing of another person                10:55:15
7  Ernestine Davis.                                                  10:55:20
8      JUDGE NASTOFF: All right. Do you have questions?             10:55:20
9  (Judges confer with one another).                                 10:55:52
10     JUDGE NASTOFF: All right. I'm going to indicate              10:57:35
11 for the record that we have discussed the motion. We              10:59:21
12 have reviewed the written arguments and also considered           10:59:29
13 in light of the arguments presented today, and the                10:59:34
14 Court's concern is that the prior case law presented,             10:59:47
15 none of it is (A)(5). And the Court is concerned that             10:59:55
16 that is an important distinction to be made. The Court            10:59:59
17 is going to indicate that while the law requires us to            11:00:05
18 consider evidence and testimony about the nature and              11:00:12
19 circumstances of the aggravating circumstance that is             11:00:18
20 relevant to the aggravating circumstance, what the                11:00:22
21 State is going to be expected to present is evidence               11:00:25
22 that is relevant to the conviction, the nature and                11:00:29
23 circumstances relevant to the fact of the conviction so           11:00:40
24 that is what the State is going to be limited to as we             11:00:43
25 go forward. Does that fairly state our ruling?                    11:00:45

JILL M. CUTTER, RPR
(513) 785-6596

23

1    JUDGE SPAETH: I think it fairly states the

2  ruling. This is Judge Spaeth for the record. In terms

3  of (A)(5) is the only aggravating factor that deals

4  with and actually states was convicted of an offense,

5  none of the other aggravating factors deal with a prior

6  conviction. This would leave this Court to rule

7  otherwise, into going into the nature and circumstances

8  of a murder that occurred ten-plus years prior to the

9  1983 murder at the case at bar. I don't think that

10  that -- and none of the case law would permit it.

11  Newton doesn't deal with an (A)(5) as Judge Nastoff

12  indicated.

13    In reading the statute itself, that is

14  2929.04 (A)(5), we are dealing with conviction, I think

15  that is a valid distinction. And the Court, of course,

16  must comply with 2929.03(D)(1) which would require that

17  this Court hear evidence that is relevant to the nature

18  and circumstances of the aggravating circumstance

19  defendant was found guilty of committing, and I think

20  this Court, and Judge Nastoff I think has indicated, is

21  willing to entertain that evidence, but it's going to

22  have to be evidence as set forth in .04 (A)(5) evidence

23  of the nature and circumstances of the prior conviction

24  not of the underlying nature and circumstances of the

25  murder itself. So it is a rather narrow ruling. So,

JILL M. CUTTER, RPR
(513) 785-6596

24

1    that is my clarification.  I don't know whether Judge    11:03:01
2    Pater has anything.                                     11:03:05
3         JUDGE PATER:  Well, if I were alone I would have   11:03:06
4    ruled otherwise.  It is a majority rule up here,        11:03:09
5    obviously, and we all read the law and we try to apply  11:03:14
6    it as we deem best, and see it to be.  In my mind, the  11:03:18
7    Court's ruling is a little overly narrow.  I don't      11:03:25
8    believe the intent of the statute was to separate the   11:03:32
9    conviction of a previous murder from the commission of  11:03:37
10   the previous murder.  I would read that statute a       11:03:41
11   little more broadly.  I do think there is some reason   11:03:45
12   to do so as set forth in the Newton case, which was a   11:03:48
13   different setting of course, but in the description of  11:03:53
14   the detention, the Court in the Newton case did not     11:03:57
15   just state he was in detention; factor proven or        11:04:02
16   circumstance proven, that is all we need to get into.   11:04:07
17        The Court talked about the nature of the           11:04:11
18   detention, as if the nature of the detention had some   11:04:13
19   force, there was some reason for getting into that,     11:04:19
20   about where he was, and being switched from one type of 11:04:23
21   cell to another type of cell and all of that had        11:04:28
22   nothing to do with the murder itself, it has peripheral 11:04:31
23   things to do, but they seem to be getting into that     11:04:36
24   just to elaborate on the fact that is the aggravating   11:04:39
25   circumstance that he was in detention.                  11:04:42

25

1    I think for the (A)(5) section we are talking    11:04:45

2    about a previous conviction -- the conviction of or for    11:04:48

3    a previous murder, that the intent there was that the    11:04:53

4    murder itself was the fundamental thing, not merely the    11:04:58

5    conviction. So I would have ruled otherwise had it    11:05:03

6    been just me.    11:05:07

7         JUDGE NASTOFF: But for the record, we have    11:05:08

8    collaborated and considered the arguments of all of the    11:05:11

9    judges and our ruling is as was set forth by myself and    11:05:13

10    Judge Spaeth. So anything further we need to take up    11:05:17

11    on that issue or any other preliminary issue? And does    11:05:20

12    counsel contemplate opening statements in this matter    11:05:24

13    or do you wish to go directly to presentation of    11:05:28

14    evidence?    11:05:31

15         MR. OSTER: First, Your Honor, I would like our    11:05:32

16    objection to that ruling noted. Specification such as    11:05:33

17    child under 13, we don't think all you would be allowed    11:05:36

18    to do is put a birth certificate on if the child was    11:05:40

19    under 13. We don't think all you would be able to do    11:05:42

20    is say President Obama is the president of the United    11:05:44

21    States. We don't think all you would be able to do is    11:05:47

22    say a person is a police officer. All of those could    11:05:48

23    be under the same twisted logic the defense has put    11:05:50

24    forward, status offenses. No case in the Ohio Supreme    11:05:53

25    Court has ever read any of these specifications that    11:05:58

26

1    narrowly and so we would like our objection to be noted    11:06:00

2    for the record.    11:06:03

3        JUDGE NASTOFF:  It's noted, but --    11:06:04

4        JUDGE SPAETH:   Mr. Oster, under all of those    11:06:05

5    circumstances -- and it has been ruled upon, but I    11:06:07

6    would like to put on the record -- all of those    11:06:09

7    circumstances deal with the status of the victim in the    11:06:12

8    murder at bar.  Not -- none of those circumstances,    11:06:18

9    aggravated circumstances, that you have set forth deal    11:06:24

10   with a prior murder, or prior aggravating factor that    11:06:28

11   is completely divorced, completely separate from the    11:06:37

12   murder at bar.    11:06:40

13       So I just want to make it clear that that goes a    11:06:43

14   long ways towards the Court's -- well, that is a    11:06:48

15   consideration that the Court took under advisement when    11:06:51

16   making its ruling.    11:06:56

17       JUDGE NASTOFF:  Your objection is preserved.    11:06:57

18       MR. OSTER:  Thank you, Your Honor.    11:06:59

19       JUDGE NASTOFF:  All right.  Anything further?  Did    11:07:00

20   we want to go into opening statements at this point in    11:07:03

21   time?    11:07:06

22       MR. OSTER:  Your Honor, I would ask for maybe a    11:07:07

23   brief recess so we can call off witnesses we have    11:07:08

24   waiting currently outside the courtroom.    11:07:11

25       JUDGE NASTOFF:  All right.  Any objection?  What    11:07:13

27

| | | |
|---|---|---|
| 1 | do you need, ten minutes or so? | 11:07:15 |
| 2 | MR. OSTER: Yes, Your Honor. | 11:07:17 |
| 3 | MR. PORTER: We have not -- just for a | 11:07:18 |
| 4 | housekeeping matter for the Court is we do intend and | 11:07:19 |
| 5 | our prepared to make an opening statement. Because we | 11:07:24 |
| 6 | thought this morning's session was going to last a | 11:07:27 |
| 7 | little bit longer, assuming that the State of Ohio will | 11:07:31 |
| 8 | not be calling anyone, our first witness will not be | 11:07:34 |
| 9 | ready 'til 1:00, Your Honor. | 11:07:36 |
| 10 | JUDGE NASTOFF: All right. Well, we still, I | 11:07:39 |
| 11 | believe, need to go through evidence that the State may | 11:07:42 |
| 12 | wish to introduce from the prior trial. I don't know | 11:07:47 |
| 13 | if they are going to argue that any of that is relevant | 11:07:51 |
| 14 | for purposes of the sentencing hearing. We do need to | 11:07:55 |
| 15 | address that issue. We need to address any other | 11:07:58 |
| 16 | evidence that they would be offering, whether it is by | 11:08:01 |
| 17 | live testimony or by journal entry or whatever form it | 11:08:07 |
| 18 | may take. But prior to that, I would imagine that we | 11:08:09 |
| 19 | would hear opening statements from counsel. We could | 11:08:12 |
| 20 | address those issues and then take a break before your | 11:08:15 |
| 21 | witnesses are available. | 11:08:17 |
| 22 | MR. PORTER: Okay. Thank you very much, Your | 11:08:18 |
| 23 | Honors. | 11:08:21 |
| 24 | JUDGE NASTOFF: Thank you. We'll be in a recess. | 11:08:22 |
| 25 | (Recess taken at this time.) | 11:08:24 |

28

| | | |
|---|---|---|
| 1 | JUDGE NASTOFF: We are back on record in State of | 11:27:46 |
| 2 | Ohio vs. Von Clark Davis, CR1983-12-0614. All parties | 11:27:52 |
| 3 | and counsel present prior to our recess are again | 11:27:57 |
| 4 | present. And at this time are the -- is counsel ready | 11:28:01 |
| 5 | to proceed with any opening statement? | 11:28:10 |
| 6 | MR. EICHEL: We are, Your Honor. | 11:28:13 |
| 7 | JUDGE NASTOFF: All right. | 11:28:14 |
| 8 | MR. PORTER: We are prepared, Your Honor. | 11:28:17 |
| 9 | JUDGE NASTOFF: All right. Mr. Eichel, are you | 11:28:18 |
| 10 | going to be delivering the opening statement? | 11:28:22 |
| 11 | MR. EICHEL: Yes, sir. | 11:28:24 |
| 12 | JUDGE NASTOFF: You may proceed. | 11:28:25 |
| 13 | MR. EICHEL: Thank you, Your Honor. May it please | 11:28:26 |
| 14 | the Court, because this is a resentencing hearing, an | 11:28:31 |
| 15 | opening statement, I believe, is in order to begin it. | 11:28:38 |
| 16 | In the usual capital case, we have the trial last | 11:28:41 |
| 17 | week, or ending Friday maybe, with a verdict of guilty | 11:28:46 |
| 18 | with the aggravating circumstance and the crime | 11:28:51 |
| 19 | charged, the evidence just being heard about that by | 11:28:56 |
| 20 | the same panel. We don't have that in this case. In | 11:28:58 |
| 21 | that situation we would probably waive an opening | 11:29:05 |
| 22 | statement here and go directly to the evidence, but in | 11:29:08 |
| 23 | this case, we join the case 25 years in progress. And | 11:29:11 |
| 24 | if it is true that the purpose of an opening statement | 11:29:20 |
| 25 | is to state what the evidence will show, what the | 11:29:23 |

JILL M. CUTTER, RPR
(513) 785-6596

29

| | | |
|---|---|---|
| 1 | evidence will be considered in arriving at your | 11:29:26 |
| 2 | decision, that decision you will ultimately make in | 11:29:29 |
| 3 | this case, that is what I hope to do here.  That is the | 11:29:33 |
| 4 | only thing I intend to do. | 11:29:38 |
| 5 | The procedure I believe is that the State of Ohio | 11:29:41 |
| 6 | is permitted and will reintroduce from the trial any | 11:29:43 |
| 7 | evidence that is relevant to the aggravating | 11:29:48 |
| 8 | circumstance.  And also, the evidence under statute | 11:29:51 |
| 9 | 2929.04 (B) states that this Court, the trial jury, or | 11:29:59 |
| 10 | panel of three judges shall consider and weigh against | 11:30:09 |
| 11 | the aggravating circumstances proved beyond a | 11:30:15 |
| 12 | reasonable doubt the nature and circumstances of the | 11:30:18 |
| 13 | offense, the history, character and background of the | 11:30:21 |
| 14 | offender, and all of the following enumerated factors, | 11:30:27 |
| 15 | which go without saying, are mitigating factors. | 11:30:34 |
| 16 | We were put on notice last week that the defense | 11:30:42 |
| 17 | is relying on the (A)(7), any other factors that are | 11:30:47 |
| 18 | relevant to the issue to whether the offender should be | 11:30:52 |
| 19 | sentenced to death. | 11:30:55 |
| 20 | JUDGE NASTOFF:  That would be (B)(7). | 11:30:57 |
| 21 | MR. EICHEL:  Under (B)(7), yes.  It is my | 11:30:59 |
| 22 | understanding of the law -- Ohio law, that prosecutors | 11:31:04 |
| 23 | should not make any comment on the defense evidence | 11:31:08 |
| 24 | unless and until the defense introduces it.  So at this | 11:31:10 |
| 25 | point of the trial, I am expressly not making any | 11:31:15 |

JILL M. CUTTER, RPR
(513) 785-6596

30

1    anticipatory statement about what the evidence will be        11:31:19

2    in regard to the defense evidence in this case.  We          11:31:23

3    will reserve our comments on that until such time that       11:31:25

4    it is appropriate.                                           11:31:30

5         But as I state, the Court is charged under (B) --       11:31:34

6    Section B of 2929.04 to consider and weigh against the       11:31:38

7    aggravating circumstance in this case, quote -- I lost       11:31:45

8    my place -- the nature and circumstances of the             11:31:54

9    offense; that being the offense at bar.                      11:31:58

10        In that regard, the State will seek to reintroduce      11:32:03

11   relevant portions of the trial that was heard in 1984       11:32:08

12   for this Court to consider under this statute, whether      11:32:16

13   any mitigating factors lies within those nature and        11:32:19

14   circumstances of the offense that occurred in 1983.  In    11:32:25

15   that regard, the State will argue and we will state for    11:32:32

16   an opening statement, that the evidence has shown and      11:32:37

17   you will consider the evidence at trial that             11:32:40

18   established that approximately 7:40 p.m. on December      11:32:44

19   12, 1983 --                                              11:32:49

20        JUDGE PATER:  Before you go further, I would like    11:32:52

21   to confer with the other judges briefly about the        11:32:54

22   opening statement, where the State intends to go.        11:32:57

23             (Judges confer off the record.)               11:33:01

24        JUDGE NASTOFF:  Mr. Eichel, before you proceed, I   11:35:34

25   just wanted to make sure that the record is clear that   11:35:37

JILL M. CUTTER, RPR
(513) 785-6596

31

1   we understand the statute and what you're indicating.     11:35:40

2   We understand that the only purpose for the panel of      11:35:44

3   judges to consider the nature and circumstances of the    11:35:50

4   offense is to the extent that they may be mitigating,     11:35:52

5   and only to weigh against the aggravating circumstance.   11:35:58

6   We understand that the nature and circumstances of the    11:36:03

7   offense are not an aggravating circumstance in this       11:36:05

8   case, and are not to be weighed or considered as an       11:36:09

9   aggravating circumstance in this case, only as            11:36:11

10  mitigation.  So with that being said, you may proceed.    11:36:15

11      MR. PORTER: At this point, Mr. Davis is going to      11:36:19

12  interpose an objection.  We do not plan on citing the     11:36:23

13  nature and circumstances as a mitigating factor, just     11:36:26

14  throwing it out there, doesn't make it an aggravating     11:36:32

15  circumstance.  Prosecution can't go forward and present   11:36:35

16  evidence of mitigating factors we aren't going forward    11:36:39

17  on and at that point we would ask the Court to preclude   11:36:42

18  any testimony regarding the facts and circumstances,      11:36:46

19  Your Honor.                                               11:36:49

20      (Judges confer off the record.)                       11:36:57

21      JUDGE NASTOFF: All right.  After conferring, the      11:37:12

22  Court is aware of case law that would indicate that the   11:37:29

23  absence of mitigating factors is not to be considered     11:37:32

24  an aggravating circumstance.  At this point in time,      11:37:36

25  the Court is inclined to grant or to sustain the          11:37:40

JILL M. CUTTER, RPR
(513) 785-6596

32

1   objection of defense counsel, and Mr. Eichel, if --    11:37:44

2   obviously if there are mitigating factors that are    11:37:51

3   raised during the hearing of which the State has    11:37:54

4   rebuttal evidence and would wish to comment at the    11:37:57

5   appropriate time on that, you may reserve your right to    11:38:00

6   do so, but at this point in time, we are going to    11:38:02

7   sustain the objection because of the defense.    11:38:06

8        MR. EICHEL: With that said, may it please the    11:38:13

9   Court, the State intends to reintroduce the judgment    11:38:20

10   of conviction entry. I believe it was jointly    11:38:26

11   stipulated at the trial --    11:38:30

12        JUDGE NASTOFF: Do you have a page number, by    11:38:33

13   chance?    11:38:36

14        MR. OSTER: 207 through 209.    11:38:36

15        MR. EICHEL: There were three exhibits identified.    11:38:40

16   Only one of which is the conviction entry, and the    11:38:42

17   record is rather confused as to which number. I    11:38:46

18   believe it was number 30 actually, the way I read the    11:38:50

19   record. There were two others, 23 and 24, State's    11:38:54

20   Exhibits, all of which were jointly -- were stipulated    11:38:59

21   in the trial for purposes of this hearing. Only the    11:39:03

22   judgment of conviction as to second degree murder,    11:39:11

23   April 20, 1971, was relevant.    11:39:17

24        THE COURT: All right. So you are offering the    11:39:22

25   judgment entry of conviction pertaining to the finding    11:39:25

1   of guilty of murder in the second degree, I believe   11:39:31

2   that that is dated April 20, 1971, and any testimony in   11:39:34

3   the transcript from the trial that is relevant or   11:39:40

4   pertains to that judgment entry; is that correct?   11:39:43

5       MR. EICHEL: That is correct. And the stipulation   11:39:46

6   by the parties at trial, not in the mitigation phase,   11:39:48

7   but at trial phase upon which the conviction for the   11:39:53

8   specification was rendered by the three-judge panel in   11:39:59

9   1984.   11:40:02

10       JUDGE NASTOFF: All right.   11:40:05

11       MR. EICHEL: We would also add that there was   11:40:05

12   further --   11:40:09

13       JUDGE NASTOFF: Are you offering that now or are   11:40:10

14   you simply indicating that that is what you are going   11:40:11

15   to be doing?   11:40:13

16       MR. EICHEL: For an opening statement we are   11:40:14

17   indicating that would be the case. We will also   11:40:15

18   indicate that we will offer the same request for the   11:40:18

19   Court to take judicial notice as was done at the trial   11:40:22

20   in regard to former Revised Code Section 2901.05, the   11:40:27

21   elements of which set forth clearly no person shall   11:40:34

22   purposely and maliciously kill another, the basis for   11:40:37

23   the judgment of conviction entry.   11:40:41

24       I believe the Court then took judicial notice and   11:40:46

25   this Court should also take judicial notice in   11:40:51

34

1    considering those facts.  And considering the fact that    11:40:55

2    I believe I should not comment on mitigating evidence    11:41:00

3    yet to be introduced, the State would ask this Court to    11:41:07

4    proceed.  Thank you.    11:41:10

5    JUDGE NASTOFF:  Thank you, Mr. Eichel.  Mr.    11:41:12

6    Porter?    11:41:14

7    MR. PORTER:  May it please the Court, Judge    11:41:15

8    Nastoff, Judge Pater and Judge Spaeth.  I have not had    11:41:35

9    the privilege of appearing before Judge Pater before    11:41:39

10   and Judge Spaeth.  Let me introduce myself.  I am    11:41:42

11   Randall Porter.  I am an assistant state public    11:41:47

12   defender.  I have been with the state public defender's    11:41:50

13   office since 1985 trying or litigating capital cases on    11:41:52

14   some level, and prior to that I was an assistant    11:41:57

15   prosecutor for five years in a rural Ohio county.    11:42:01

16   I need to do a housekeeping up front, and I need    11:42:05

17   to apologize to Judge Pater.  Ms. Cook-Reich made sure    11:42:09

18   that I took the blame for it.  Being out-of-town    11:42:14

19   counsel, I have repeatedly misspelled your name on the    11:42:17

20   pleadings on the caption of the pleading.    11:42:22

21   JUDGE PATER:  I never even noticed it, but your    11:42:25

22   apology is accepted.    11:42:30

23   MR. PORTER:  No disrespect meant to you, Your    11:42:30

24   Honor.  There is nothing worse than spelling someone's    11:42:32

25   name wrong.  I hate it when people spell Randall wrong,    11:42:35

1    so I apologize to you.                                          11:42:39

2        JUDGE PATER:  I have been called Porter many times          11:42:40

3    and Peter, all kinds of things, Prator.  That is fine.         11:42:44

4    Thank you.                                                      11:42:46

5        MR. PORTER:  Thank you for your understanding,             11:42:47

6    Your Honor.  I am going to be brief today.  The                 11:42:48

7    three-judge panel will hear over the next three days           11:42:51

8    that Von was raised in a dysfunctional environment.            11:42:56

9    Over the next three days, the three-judge panel will           11:43:02

10   hear from a mental health expert, Dr. Robert Smith, the        11:43:05

11   impact that had upon Von.  During the next three days,         11:43:11

12   the panel will hear that Von is indeed sorry and               11:43:15

13   remorseful.                                                     11:43:20

14       During the next three days, the panel will hear            11:43:22

15   that Von has been of good behavior.  That is not the           11:43:26

16   issue I want to address with you in opening statement,         11:43:31

17   though that gives you a brief background.                       11:43:35

18       The theme that will go through our presentation of         11:43:38

19   the evidence for the next three days is that, and I            11:43:42

20   want to choose the correct terminology and sometimes           11:43:47

21   I'm guilty of not choosing the correct terminology, is         11:43:50

22   that the impact that this Court makes with respect to a        11:43:54

23   life or death decision may really have very little             11:44:01

24   impact in this case.                                            11:44:05

25       The evidence will show that Von's 62 years of age.         11:44:08

36

```
 1   If I do my math correctly, and if we give him credit        11:44:13
 2   from the time of the offense in December 12 of this         11:44:19
 3   year, he will have served 25 years.  If the Court           11:44:24
 4   determines to impose a sentence of less than death,         11:44:30
 5   because it's under the old law, the maximum sentence        11:44:35
 6   that the Court can impose is 30 years to life.  You all     11:44:39
 7   are well aware that is 30 actual years plus the offense     11:44:44
 8   of weapons under disability, which would be an              11:44:47
 9   additional year-and-a-half.  He would be credited for      11:44:50
10   good --                                                     11:44:55
11       MR. EICHEL:  Your Honor, that sentence was not          11:44:57
12   reversed and is not part of the consideration here.        11:45:00
13       JUDGE NASTOFF:  On the weapons under disability?       11:45:03
14       MR. EICHEL:  That's correct.                            11:45:04
15       MR. PORTER:  Then he looks at a sentence for a          11:45:05
16   year-and-a-half that the Court can run consecutive to      11:45:07
17   the 30 years to life if the Court determines to impose     11:45:10
18   a 30-to-life sentence.  He would be entitled to good       11:45:14
19   time credit, so if my math is correct, he would be         11:45:18
20   eligible for parole in six years.  However, that is        11:45:21
21   really not accurate.  We have subpoenaed, and you will     11:45:26
22   hear from Cynthia Mausser, who is the head of the Ohio     11:45:32
23   Parole Board, who will testify based upon his prior        11:45:40
24   record, the fact that he committed the second murder,      11:45:45
25   while he was still on parole from the first murder is      11:45:50
```

1    that he will not be paroled.                              11:45:53

2        So while ELWOP is not available to you, it is a,     11:45:56

3    for lack of a better term, a very de facto possibility   11:46:05

4    in this case when you compare that to if the Court       11:46:09

5    imposes a sentence of death. We already have litigated   11:46:15

6    this case for I think 25 years. We will be asking the    11:46:21

7    Court to take judicial notice of some statutes. The      11:46:25

8    State of Ohio has chosen to expedite the appeal          11:46:30

9    process. Those appeals will not -- the expedited         11:46:34

10   direct appeal process will not apply to Von. He will     11:46:39

11   have two rights of appeal, one to the Court of Appeals,  11:46:43

12   and one to the Ohio Supreme Court.                       11:46:47

13       Furthermore, the State of Ohio in 1996, expedited    11:46:50

14   the post-conviction process, so you file your            11:46:57

15   post-conviction petition while your first -- well,       11:47:01

16   wouldn't be the only direct appeal. We will be asking    11:47:06

17   the Court to take judicial notice of the fact that       11:47:09

18   Von's post-conviction, if the Court imposes death, will  11:47:16

19   not be due until after he is pursuing his appeal in the  11:47:20

20   Ohio Supreme Court. We will be asking the Court to       11:47:25

21   take judicial notice of 2953.21.                         11:47:28

22       While it is doubtful that if the Court imposes       11:47:34

23   death again his appeal will run 25 years, it will run    11:47:40

24   for a significantly long period of time, meaning that    11:47:45

25   he most likely will die of natural death prior to his    11:47:48

38

| | | |
|---|---|---|
| 1 | appeals ending from any death sentence. What the Court | 11:47:54 |
| 2 | does vote, and I only have one of two minutes left on | 11:47:59 |
| 3 | the promise to the Court I would be brief, is the | 11:48:04 |
| 4 | Court's decision very much impacts other than Von in | 11:48:07 |
| 5 | this case. | 11:48:14 |
| 6 | The Court's decision will give some chance for | 11:48:15 |
| 7 | closure for the victim's family. The Court's decision, | 11:48:21 |
| 8 | if they decide to impose life with parole eligibility | 11:48:24 |
| 9 | 'til he has served 30, we will note from Ms. Mausser's | 11:48:32 |
| 10 | testimony that he will never be paroled. It will also | 11:48:36 |
| 11 | bring closure to Von's family, and they are also a | 11:48:40 |
| 12 | victim in this process. | 11:48:43 |
| 13 | Third, if the Court imposes a sentence of less | 11:48:45 |
| 14 | than death and Von is asking for 30 to life, it will | 11:48:48 |
| 15 | end the litigation that has gone on for 25 years. I | 11:48:52 |
| 16 | counted last night, and if my number is correct, this | 11:48:56 |
| 17 | case has already seen 18 courts. When I got the case | 11:49:00 |
| 18 | back from previous counsel, just putting the pleadings | 11:49:06 |
| 19 | from the 25 years filled 29 of these volumes. | 11:49:16 |
| 20 | MR. EICHEL: If Your Honor please, this has gone | 11:49:21 |
| 21 | way beyond what the evidence will show. And into, very | 11:49:23 |
| 22 | deeply into argument. It's not the purpose of opening | 11:49:27 |
| 23 | statement. | 11:49:30 |
| 24 | JUDGE NASTOFF: All right. Well, I think he is | 11:49:31 |
| 25 | asking that we would take judicial notice of certain | 11:49:33 |

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
STATE COURT TRANSCRIPTS - Page 1104

39

| 1 | aspects and to that extent, we will overrule the | 11:49:36 |

1  aspects and to that extent, we will overrule the   11:49:36

2  objection, but yes, this is to be opening statement not   11:49:39

3  argument at this time.   11:49:42

4  MR. PORTER:  And I just have one additional point   11:49:45

5  and finally, if the Court, and we are planning on   11:49:46

6  introducing evidence, if the Court determines that a   11:49:51

7  sentence of 30 to life is appropriate, it will bring   11:49:56

8  some closure for the taxpayers.  We plan on introducing   11:50:02

9  evidence that it's much more costly to house Von on   11:50:06

10  death row than it is in general population.   11:50:15

11  Finally, it is some closure for the tax payer who   11:50:22

12  will not have to pay for 18 rounds of appeals.  Thank   11:50:25

13  you very much, Your Honors.   11:50:29

14  JUDGE NASTOFF:  Thank you, Mr. Porter.  Mr.   11:50:40

15  Eichel, it is about six or seven minutes to 12:00, did   11:50:43

16  you wish to present your evidence at this time?   11:50:47

17  MR. EICHEL:  Yes, Your Honor.  We have a duplicate   11:50:50

18  copy of what was introduced at trial, State's Exhibit,   11:50:54

19  I believe it was 30, judgment of conviction entry.  It   11:50:58

20  was stipulated to.  Case number 21655.  21655 State of   11:51:03

21  Ohio vs. Von C. Davis.  Conviction entry dated April   11:51:12

22  20, 1971, file stamped by Clerk of Common Pleas Court   11:51:16

23  Edward S. Robb, Junior, at that time.  Journal 231 page   11:51:23

24  21 and page 22.   11:51:28

25  JUDGE NASTOFF:  All right.  Defense wish to be   11:51:31

40

1    heard on that?    11:51:32

2         MS. COOK-REICH:  We stipulate to that Exhibit.    11:51:33

3         THE COURT:  Is it marked?    11:51:33

4         MS. COOK-REICH:  I will not stipulate to what    11:51:35

5    number it was in the trial court because the transcript    11:51:36

6    is kind of unclear as to which specific exhibit it was.    11:51:39

7         JUDGE NASTOFF:  Why don't we have it marked as a    11:51:42

8    new exhibit for purposes of this new sentencing    11:51:44

9    hearing?    11:51:46

10        MR. EICHEL:  State's Exhibit 1 for purposes of    11:51:47

11   this hearing.    11:51:48

12        JUDGE NASTOFF:  All right.    11:51:49

13        MR. PORTER:  Just so we keep the record clear,    11:51:50

14   could defense counsel review the exhibit prior to    11:51:54

15   stipulating, Your Honor?    11:51:58

16        JUDGE NASTOFF:  Certainly.    11:52:00

17        MR. EICHEL:  Absolutely.    11:52:01

18        MR. PORTER:  And that's not meant for Mr. Eichel.    11:52:02

19   That was meant for the reviewing court later on.    11:52:05

20        JUDGE NASTOFF:  Certainly appropriate.    11:52:08

21        MS. COOK-REICH:  Thank you, Your Honor.    11:52:20

22        MR. EICHEL:  Subject to the Court's ruling earlier    11:52:42

23   today, we have no other evidence at this time, at this    11:52:46

24   point in the case to present.    11:52:52

25        JUDGE NASTOFF:  All right.  And you've had a    11:52:54

JILL M. CUTTER, RPR
(513) 785-6596

41

| | | |
|---|---|---|
| 1 | chance to review State's Exhibit 1 and is it stipulated | 11:52:56 |
| 2 | to? | 11:52:59 |
| 3 | MS. COOK-REICH: Yes, Your Honor. | 11:52:59 |
| 4 | JUDGE NASTOFF: All right. State's Exhibit 1 will | 11:53:00 |
| 5 | be admitted into evidence for purposes of this | 11:53:01 |
| 6 | sentencing hearing. With that, at this time the State | 11:53:03 |
| 7 | rests; is that correct? | 11:53:07 |
| 8 | MR. EICHEL: Yes, Your Honor. | 11:53:08 |
| 9 | JUDGE NASTOFF: All right. Then, you indicated | 11:53:09 |
| 10 | you had a witness available at 1:00. It's approaching | 11:53:12 |
| 11 | the lunch hour, so what I would suggest is that we go | 11:53:15 |
| 12 | ahead and recess for the lunch hour. When we come | 11:53:18 |
| 13 | back, the defense can proceed with their evidence. One | 11:53:20 |
| 14 | thing that I do just want to note for the record before | 11:53:25 |
| 15 | we recess, is that even though we don't have a jury | 11:53:29 |
| 16 | here, this is a three-judge panel, that Mr. Davis does | 11:53:33 |
| 17 | appear dressed out today. He is not in jail garb and | 11:53:36 |
| 18 | he is in court free of any shackles or restraints. I | 11:53:40 |
| 19 | did want the record to reflect that being the case. So | 11:53:46 |
| 20 | anything further before we recess for lunch? | 11:53:50 |
| 21 | MR. PORTER: We have nothing. Thank you, Your | 11:53:53 |
| 22 | Honor, for asking. | 11:53:55 |
| 23 | MR. OSTER: No, Your Honor. | 11:53:56 |
| 24 | JUDGE NASTOFF: If counsel could be back here | 11:53:57 |
| 25 | about five minutes to 1:00. | 11:54:00 |

JILL M. CUTTER, RPR
(513) 785-6596

42

| | | |
|---|---|---|
| 1 | (Recess taken at this time.) | 11:54:04 |
| 2 | JUDGE NASTOFF: We are back on record in State of | 01:04:26 |
| 3 | Ohio vs. Von Clark Davis, CR83-12-0614. Mr. Davis is | 01:04:31 |
| 4 | again present with his counsel, the State's | 01:04:38 |
| 5 | representatives are present, and all three members of | 01:04:41 |
| 6 | the panel are present. | 01:04:44 |
| 7 | The State has introduced its evidence and has | 01:04:46 |
| 8 | rested, so at this time we would turn to the defense. | 01:04:49 |
| 9 | Do you have any evidence that you wish to present in | 01:04:54 |
| 10 | mitigation? | 01:04:57 |
| 11 | MR. PORTER: We do, a housekeeping matter up front | 01:04:58 |
| 12 | if we could, Your Honor. | 01:05:03 |
| 13 | JUDGE NASTOFF: Sure. | 01:05:04 |
| 14 | MR. PORTER: During the lunch hour we filed a | 01:05:04 |
| 15 | witness list with the clerk. I believe that the | 01:05:07 |
| 16 | bailiff put a copy for each of you before you, exhibit | 01:05:10 |
| 17 | list, an exhibit list, excuse me, Your Honor, that was | 01:05:16 |
| 18 | my mistake. And we also filed with the Court a | 01:05:21 |
| 19 | notebook that has all of the proposed exhibits in it, | 01:05:24 |
| 20 | thought that would make it easier for purposes of the | 01:05:27 |
| 21 | Court reviewing exhibits. I appear in some courts | 01:05:30 |
| 22 | where the judge actually requires it and I hope that | 01:05:33 |
| 23 | that was okay with the Court. | 01:05:36 |
| 24 | JUDGE NASTOFF: We appreciate it. Has a copy been | 01:05:37 |
| 25 | given to the State as well? | 01:05:41 |

JILL M. CUTTER, RPR
(513) 785-6596

43

1     MR. OSTER: It was provided to us as we came in
2  this morning.

3     JUDGE NASTOFF: Thank you, Mr. Porter.

4     MR. PORTER: And then we have a legal issue that
5  we would like to raise with the Court. It is -- as the
6  Court is well aware, Mr. Davis has the right to make an
7  unsworn statement. It is our intent that he will make
8  it now. We have prepared a pleading for the Court's
9  review, which we have not filed, which we will provide
10  the Court and the prosecutor now. It is very brief
11  asking the Court's permission to use a question and
12  answer format for purposes of the unsworn statement.
13  So with the Court's permission, would approach it for
14  the purposes of providing it with a copy of the
15  pleading?

16     JUDGE NASTOFF: You may.

17     MR. PORTER: Would the Court want the original to
18  go to the court reporter or to go to you, the presiding
19  judge?

20     JUDGE NASTOFF: Court reporter is fine.

21     MR. PORTER: Thank you. And I apologize again to
22  Judge Pater for spelling his name wrong. I promise it
23  will be done correctly in the future pleadings.

24     JUDGE PATER: No problem. I appreciate your
25  sensitivity to it.

44

1    JUDGE NASTOFF:  I'm reading this and then we will        01:07:41
2  elicit any response from the State.  Does the State        01:07:43
3  wish to be heard on the motion?                            01:08:11
4    MR. EICHEL:  Two points, Your Honor:  The State          01:08:15
5  has no general objection to this, being that it is a       01:08:20
6  three-judge panel and we're well aware that the Court      01:08:26
7  is familiar with the difference between sworn testimony    01:08:29
8  and unsworn statement.  If it were a jury, we would        01:08:33
9  argue otherwise, and the Court, of course, has             01:08:37
10  discretion to allow it in this fashion.  I would agree    01:08:38
11  to this with the caveat that this still is the            01:08:44
12  defendant's unsworn statement, not the counsel's         01:08:52
13  statement so we would object in advance to any leading   01:08:57
14  questions that would be sustainable.                      01:09:00
15    JUDGE NASTOFF:  All right.  Any last word on it        01:09:05
16  before we confer?                                         01:09:08
17    MR. PORTER:  We have nothing.  We think that Mr.       01:09:10
18  Davis has a right if counsel asks questions, if not we   01:09:13
19  think under Ohio law the Court has the discretion and    01:09:17
20  we would ask the Court to exercise its discretion and    01:09:20
21  let Ms. Cook-Reich ask what questions she believes       01:09:23
22  would be appropriate, and they would not be leading      01:09:26
23  questions.                                                01:09:29
24    JUDGE NASTOFF:  All right.                             01:09:30
25        (Judges confer off the record.)                    01:09:31

JILL M. CUTTER, RPR
(513) 785-6596

| | | |
|---|---|---|
| 1 | JUDGE NASTOFF: All right. The Court will | 01:10:14 |
| 2 | unanimously approve the motion and permit the unsworn | 01:10:16 |
| 3 | statement to be given in question and answer format. | 01:10:20 |
| 4 | MS. COOK-REICH: Von, if you would take the stand. | 01:10:32 |
| 5 | JUDGE NASTOFF: Mr. Davis, what I would advise | 01:10:49 |
| 6 | before you begin your statement, the microphone that | 01:10:51 |
| 7 | you have there moves, so if you could move it over so | 01:10:54 |
| 8 | that it will pick up your voice, it will make it easier | 01:10:57 |
| 9 | for all of us to hear it. | 01:11:00 |
| 10 | THE WITNESS: Okay. | 01:11:02 |
| 11 | JUDGE NASTOFF: You may proceed. | 01:11:03 |
| 12 | DIRECT EXAMINATION | 01:11:03 |
| 13 | BY MS. COOK-REICH: | 01:11:03 |
| 14 | Q. Von, you realize this is your unsworn statement. | 01:11:06 |
| 15 | You don't need to be sworn in. Can you state your name for | 01:11:07 |
| 16 | the record, please? | 01:11:10 |
| 17 | A. Von Clark Davis. | 01:11:10 |
| 18 | Q. Make sure you speak up just like Judge Nastoff | 01:11:12 |
| 19 | told you. | 01:11:15 |
| 20 | A. Okay. | 01:11:15 |
| 21 | Q. Your address, please? | 01:11:16 |
| 22 | A. ██████████ Forest Park. | 01:11:17 |
| 23 | Q. Where do you currently reside? | 01:11:21 |
| 24 | A. Ohio State Penitentiary, Youngstown, Ohio. | 01:11:23 |
| 25 | Q. Von, is there anything you would like to say to | 01:11:29 |

46

```
 1    this Court or family members?                              01:11:30

 2         A.   Yes, there is.                                   01:11:32

 3         Q.   Go ahead.                                        01:11:32

 4         A.   I can't begin to imagine -- first of all, thank  01:11:33

 5    you for this time.  I can't begin to imagine the pain and  01:11:40

 6    grief I have caused the Butler family with the horrendous loss  01:11:45

 7    of their loved one.  It was a senseless act, so callous, so  01:11:53

 8    cowardly, so unforgiveable and was perpetrated by me, me  01:12:04

 9    alone.  Truthfully, how does one ask for forgiveness when  01:12:10

10    you've done something so unforgivable, not once, but twice?  01:12:17

11    The answer actually eludes me as well as the courage.  But  01:12:23

12    through this Court I would sincerely like to express my  01:12:29

13    deepest sincere regrets, prayers and apologies to the Butler  01:12:35

14    family, especially Fransia Butler, who her mother I snatched  01:12:41

15    from her heart.  With that, I will repeat this was nothing but  01:12:48

16    an evil act by me.                                         01:12:52

17              I would also like to apologize to my family who  01:12:54

18    has been loving, has always cared for me, supported me, but I  01:12:58

19    shamed and embarrassed them as well.  I would like to  01:13:03

20    apologize to Mr. Shanks, and Mr. Garretson, who I made it so  01:13:08

21    difficult for them to defend me.  And to the City, where I  01:13:14

22    grew up, I wanted to give something back, but I gave back only  01:13:20

23    a terrible black mark.  To the Franklin family, I offer my  01:13:26

24    deepest and sincere prayers, regrets and apologies.  And I  01:13:33

25    thank you for listening.                                   01:13:40
```

1    Q.   Von, at some time -- point in time, as you said in    01:13:44

2    your statement there to the Judges, you take responsibility    01:13:50

3    for this?    01:13:55

4    A.   Absolutely.    01:13:55

5    Q.   Okay.  You had asked for some persons to try to    01:13:56

6    mediate the situation?    01:14:01

7    A.   Yes, I have.    01:14:02

8    Q.   Do you recall when you first tried to do that?    01:14:03

9    A.   Pardon me?    01:14:06

10    Q.   Do you recall when you first tried to have another    01:14:07

11    party mediate this situation?    01:14:10

12    A.   Years ago.    01:14:12

13    Q.   Do you want to be put to death in the prison?    01:14:14

14    A.   No.    01:14:20

15    Q.   Are you asking the Court for something other than    01:14:21

16    death?    01:14:24

17    A.   Yes.  Yes, I am.    01:14:28

18    Q.   No further questions.  Anything else you want to    01:14:30

19    say?  This is your last chance.    01:14:34

20    A.   No, I am fine.    01:14:38

21    JUDGE NASTOFF:  Thank you.  Mr. Davis, you can    01:14:40

22    return to your seat at counsel table.  Do you have any    01:14:41

23    further evidence or testimony?    01:14:55

24    MR. PORTER:  We do.  We would call Fran Welland.    01:14:56

25    She is in the attorney conference room.    01:15:03

JILL M. CUTTER, RPR
(513) 785-6596

| | |
|---|---|
| 1 | MS. COOK-REICH:  It's the room on the side. | 01:15:08 |
| 2 | FRAN WELLAND | 01:15:37 |
| 3 | having been first duly sworn, was examined and testified under | 01:15:37 |
| 4 | oath as follows: | 01:15:49 |
| 5 | JUDGE NASTOFF:  Mr. Porter, before you begin, | 01:15:49 |
| 6 | ma'am, I also want to advise you that the microphone | 01:15:51 |
| 7 | before you, the base can move, so if you feel the need | 01:15:52 |
| 8 | to move that around so that it picks up your voice | 01:15:57 |
| 9 | appropriately feel free to do that.  And please keep | 01:16:00 |
| 10 | your voice up.  Mr. Porter, you may proceed. | 01:16:02 |
| 11 | DIRECT EXAMINATION | 01:16:02 |
| 12 | BY MR. PORTER: | 01:16:06 |
| 13 | Q.  Can you state your name for the three-judge panel, | 01:16:06 |
| 14 | please? | 01:16:08 |
| 15 | A.  Surely, it's Francis Welland. | 01:16:08 |
| 16 | MR. PORTER:  Is the Court able to hear her okay? | 01:16:11 |
| 17 | JUDGE NASTOFF:  Yes. | 01:16:13 |
| 18 | JUDGE PATER:  Yes. | 01:16:15 |
| 19 | JUDGE SPAETH: Yes. | 01:16:16 |
| 20 | Q.  (BY MR. PORTER)  And could you please spell your | 01:16:17 |
| 21 | later name for the court reporter? | 01:16:18 |
| 22 | A.  W-E-L-L-A-N-D. | 01:16:19 |
| 23 | Q.  Your address? | 01:16:21 |
| 24 | A. | 01:16:23 |
| 25 | Q.  And are you currently employed? | 01:16:33 |

JILL M. CUTTER, RPR
(513) 785-6596

```
 1        A.   I am.                                          01:16:36

 2        Q.   Could you please tell the Court what you do?   01:16:37

 3        A.   I am self-employed and I am a subtitler.  I    01:16:39

 4   subtitle television programs for the deaf.               01:16:45

 5        Q.   Do you know an individual by the name of Von Clark  01:16:48

 6   Davis?                                                   01:16:53

 7        A.   I do.                                          01:16:53

 8        Q.   And for the record, what name do you know him by?  01:16:54

 9        A.   I have always known him by Clark.              01:16:57

10        Q.   Could you tell the Judges how you originally had  01:17:02

11   contact with Clark?                                      01:17:05

12        A.   I was -- a long time ago, about 17 years ago or 18  01:17:07

13   years ago I was watching a TV documentary about life on death  01:17:15

14   row.  It struck me I couldn't imagine a lonelier place.  And I  01:17:19

15   got in contact with an organization that puts people in  01:17:26

16   contact to become pen-pals.  They sent me away for a year to  01:17:29

17   think about it.  I went back to them and they sent me Clark's  01:17:33

18   address, name and address and we have been writing ever since.  01:17:38

19        Q.   Could you tell the Judges the first year that you  01:17:43

20   were communicating with him?                             01:17:47

21        A.   It was '92, 1992.                              01:17:48

22        Q.   With what regularity, have you communicated with  01:17:54

23   him since that time?                                     01:17:59

24        A.   I would say monthly I have got -- I must have a  01:18:00

25   stack of two hundred, three hundred letters from him.  We --  01:18:08
```

JILL M. CUTTER, RPR
(513) 785-6596

50

| | | |
|---|---|---|
| 1 | he writes me, and I write back. Very often he writes me more | 01:18:12 |
| 2 | than I write him. I have a busy life. Sorry, very often he | 01:18:18 |
| 3 | writes me more than I write him, I have a busy life, and time | 01:18:25 |
| 4 | passes. But it's normally every month or every two months I | 01:18:29 |
| 5 | would say. | 01:18:33 |
| 6 | Q. Have you ever had an opportunity to visit with him | 01:18:33 |
| 7 | face to face? | 01:18:37 |
| 8 | A. Yes, I have. Twice now. I think it was in '96, I | 01:18:38 |
| 9 | was on vacation with my husband in Florida and I took -- I | 01:18:50 |
| 10 | visited him in Ohio then. I took an internal flight and came | 01:18:56 |
| 11 | up and saw him then. And then another year I think it was | 01:19:02 |
| 12 | about 2000, I took a vacation in the States and did the same | 01:19:06 |
| 13 | thing and visited with him then. | 01:19:10 |
| 14 | Q. Just so the record is clear, did you have an | 01:19:12 |
| 15 | opportunity to visit with him this year also? | 01:19:16 |
| 16 | A. Sorry. Yes. Yes, by video when I came. I came | 01:19:18 |
| 17 | over before when the hearing was scheduled originally and | 01:19:24 |
| 18 | people were kind enough to allow us a visit at the local jail | 01:19:29 |
| 19 | there. | 01:19:34 |
| 20 | Q. Do you see the individual in the courtroom that | 01:19:34 |
| 21 | you know as Clark Davis? | 01:19:36 |
| 22 | A. Yes, I do. | 01:19:38 |
| 23 | Q. Could you please point him out and identify his | 01:19:39 |
| 24 | clothing? | 01:19:42 |
| 25 | A. Yes, he is over here with a beige shirt. | 01:19:43 |

JILL M. CUTTER, RPR
(513) 785-6596

51

| | | |
|---|---|---|
| 1 | MR. PORTER: Your Honor, could the record reflect | 01:19:48 |
| 2 | that she has identified Mr. Davis? | 01:19:50 |
| 3 | JUDGE NASTOFF: So ordered. | 01:19:52 |
| 4 | Q. (BY MR. PORTER) You said you had mainly been in | 01:19:53 |
| 5 | contact with him through writing; is that correct? | 01:20:01 |
| 6 | A. Yes, it is. | 01:20:03 |
| 7 | Q. Could you describe for the Judges your | 01:20:04 |
| 8 | relationship with Clark? | 01:20:07 |
| 9 | A. He is my friend. What started out as, I don't | 01:20:08 |
| 10 | know, a humanitarian gesture, I never dreamt that I would ever | 01:20:17 |
| 11 | get a genuine friendship, we get on, he is my mate. We get | 01:20:21 |
| 12 | on. We talk about the world and that, and he is my friend. | 01:20:25 |
| 13 | Q. Are you currently writing any other individuals on | 01:20:33 |
| 14 | death row here in this country or any other country? | 01:20:37 |
| 15 | A. No. No. | 01:20:39 |
| 16 | Q. Have you at any other point in time written any | 01:20:41 |
| 17 | other individuals on death row in this country? | 01:20:44 |
| 18 | A. No, I haven't. No, just Clark. | 01:20:46 |
| 19 | Q. Through your communication with Clark, has he | 01:20:50 |
| 20 | provided you with anything? | 01:20:59 |
| 21 | A. Friendship. It's great to get his letters through | 01:21:03 |
| 22 | the post. It's always a big treat. I sit down and make a | 01:21:09 |
| 23 | little occasion of reading his letters, finding out what he | 01:21:15 |
| 24 | has been thinking about and doing recently. He makes me | 01:21:18 |
| 25 | laugh. Nothing of monetary value, but he is an incredible | 01:21:22 |

JILL M. CUTTER, RPR
(513) 785-6596

| | |
|---|---|
| 1 | artist, he has made me little gifts, little craft works that | 01:21:29 |
| 2 | over the years I have got a few. | 01:21:36 |
| 3 | Q. Could you tell the Judges some of the topics of | 01:21:39 |
| 4 | which you have communicated with him? | 01:21:44 |
| 5 | A. It's a long time and we talk about -- we talk | 01:21:45 |
| 6 | about the world, what is going on. We talk about current | 01:21:52 |
| 7 | affairs. He is very interested in what is going on in the | 01:21:55 |
| 8 | world. We talk about our feelings about what is going on in | 01:21:59 |
| 9 | our lives. He tells me his moods over the years, his moods | 01:22:04 |
| 10 | obviously have been up and down, he tells me what he has been | 01:22:14 |
| 11 | thinking about, what he thinks about when he is lying awake at | 01:22:16 |
| 12 | 3:00 a.m. He has been very open and generous with his | 01:22:24 |
| 13 | feelings to me. | 01:22:30 |
| 14 | Q. Are you aware of the term, manipulative? | 01:22:31 |
| 15 | A. Yes. Yes. | 01:22:36 |
| 16 | Q. And could you define that term as you understand | 01:22:37 |
| 17 | for the Judges, please? | 01:22:40 |
| 18 | JUDGE PATER: I didn't hear that word. | 01:22:42 |
| 19 | MR. PORTER: Manipulative. | 01:22:45 |
| 20 | JUDGE PATER: Thank you. | 01:22:46 |
| 21 | A. It is somebody who would offer things for self | 01:22:51 |
| 22 | personal gain, I suppose. | 01:22:58 |
| 23 | Q. Have you found Clark to be manipulative in his | 01:22:59 |
| 24 | interactions with you? | 01:23:05 |
| 25 | A. Far from it. Far from it. No. | 01:23:07 |

JILL M. CUTTER, RPR
(513) 785-6596

53

```
 1        Q.   Has he asked you for money?                      01:23:11

 2        A.   Over the years maybe four or five times and a few  01:23:17

 3   dollars, but no, no.  I mean, that is not -- that never comes  01:23:25

 4   into it.  He spends a lot on postage and I am always amazed  01:23:29

 5   that he -- he has never asked me for -- to help him out at all  01:23:35

 6   more than a few times in 17 years.                         01:23:40

 7        Q.   Have you found any of his letters to you to be   01:23:44

 8   inappropriate?                                             01:23:47

 9        A.   No.  No.  He is my friend.  It might be -- from   01:23:48

10   the outside it might seem odd, female writing to a male on   01:23:56

11   death row from so far away, but apart from the fact of him   01:24:03

12   being on death row, it is a normal -- a normal friendship.  I  01:24:07

13   value him amongst my friends and he has never been         01:24:12

14   inappropriate in the manner I think you are talking about.  01:24:16

15        Q.   Has he raised any sexual issues with you in his   01:24:20

16   letters?                                                   01:24:28

17        A.   No.  No.  He knows that -- no.  He wouldn't do   01:24:29

18   that.                                                      01:24:33

19        Q.   We talked last night, didn't we?                01:24:33

20        A.   Yes, of course.                                 01:24:36

21        Q.   And I think you told me some of his letters have  01:24:37

22   been cheeky?                                               01:24:42

23        A.   Yes, yes.                                       01:24:43

24        Q.   Can you tell the Judges what you mean by cheeky?  01:24:44

25        A.   I will just think.  He makes me laugh.  He talks  01:24:48
```

JILL M. CUTTER, RPR
(513) 785-6596

54

| | | |
|---|---|---|
| 1 | about, I don't know, previous -- his previous life of being a | 01:25:01 |
| 2 | young man when he was in the Navy, for example, and he makes | 01:25:06 |
| 3 | me laugh. He has got a good humor. | 01:25:13 |
| 4 | Q. I think you mentioned earlier in one of your | 01:25:17 |
| 5 | visits to the States you were with your husband? | 01:25:20 |
| 6 | A. Yes, that's right. | 01:25:22 |
| 7 | Q. Are you still with that husband? | 01:25:25 |
| 8 | A. I am, yes. | 01:25:26 |
| 9 | Q. And does he approve of your interaction with | 01:25:27 |
| 10 | Clark? | 01:25:30 |
| 11 | A. He supports me a hundred percent. | 01:25:30 |
| 12 | Q. When you initially had contact with Clark, were | 01:25:34 |
| 13 | you aware of the facts of his crime? | 01:25:39 |
| 14 | A. No. No. For a very long time I just didn't want | 01:25:42 |
| 15 | -- I didn't want to know. That wasn't what the relationship | 01:25:48 |
| 16 | was about. I am no lawyer. It was a friendship. | 01:25:51 |
| 17 | Q. At some point, did you become aware of the facts | 01:25:56 |
| 18 | of the crime? | 01:25:59 |
| 19 | A. Yes. But it was only three or four years ago, two | 01:26:00 |
| 20 | or three years ago. | 01:26:05 |
| 21 | Q. Could you tell the Judges how you became aware? | 01:26:06 |
| 22 | A. I was sat at the computer with nothing to do, and | 01:26:11 |
| 23 | curiosity got the better of me. I put in his name and it came | 01:26:17 |
| 24 | out. Yeah. We have never talked about it at all in all of | 01:26:20 |
| 25 | those years. | 01:26:26 |

1    Q.   Are you aware that there are really two murders in

2  this case?

3    A.   I am.

4    Q.   And based upon however you came aware, are you

5  aware that both of the victims were women?

6    A.   Yes, I am.

7    Q.   After you learned that information, did that

8  impact upon your relationship with Clark?

9    A.   It floored me, of course.  It didn't impact on the

10  relationship.  I thought about it long and hard and I thought

11  about the person I knew and why I originally started writing

12  to him.  It didn't -- nothing changed.  He was the same.  He

13  responds to my letters and, his responses to my letters and

14  his letters were just the same.  He didn't know.  I didn't

15  tell him at the time that I had found out.

16    Q.   Since you have become aware of the facts of the

17  case, have you discussed the case with him?

18    A.   Yes.  Very recently, this year because I agreed to

19  come over and speak on his behalf.

20    Q.   And what did he tell you about the facts of the

21  case?

22    A.   He -- I'm sorry, we haven't actually talked about

23  the facts of the case even now.  He has talked -- I have told

24  him that I knew what had happened and I have seen all of the

25  reports and I have read previous court reports.  He -- and

1    that was the first time we broached the subject. When he      01:28:11

2    replied, he expressed unremitting remorse and sorrow. I think  01:28:15

3    he said embarrassment, shame, I have it in the letter.         01:28:24

4        Q.  Can you -- have you brought the letter with you?      01:28:32

5        A.  I do have the letter if that's... (witness            01:28:35

6    retrieves letter) do you want me to read it?                   01:28:44

7        Q.  What you believe to be the relevant portion and       01:28:49

8    then we will share the rest with the prosecutor.               01:28:52

9        MR. OSTER:  Your Honor, I would like to state that         01:28:55

10       we have never seen this letter or got it in discovery      01:28:57

11       or anything.                                               01:29:01

12       MR. PORTER:  We aren't planning on introducing it          01:29:01

13       and I don't think we have to turn it over unless we're     01:29:03

14       introducing it.                                            01:29:06

15       JUDGE NASTOFF:  Well, before cross-examination             01:29:06

16       they can have an opportunity to review it and if they      01:29:07

17       have any cross questions on it they can do that and if     01:29:09

18       you need a moment to do that, obviously we will give       01:29:11

19       you time to do that.                                       01:29:13

20       MR. OSTER:  Thank you, Your Honor.                         01:29:14

21       A.  Okay.  (Reading) "I have never had any intent to       01:29:17

22   conceal facts from you. Please believe that. The truth is,     01:29:23

23   it's all shameful, embarrassing, unforgivable, regrettable.    01:29:27

24   No one hurts more than myself for the women and their          01:29:31

25   families. For years I have wanted to face them and             01:29:35

apologize." And then he talks about how -- how that he hopes that that might be achieved. 01:29:37 01:29:43

Q. Can you give -- do you have a date for that letter? 01:29:47 01:29:50

A. Yes. That was March this year. It was just dated -- 01:29:51 01:29:55

Q. Is that the date on the letter or is that the post mark date? 01:29:57 01:30:01

A. I'm sorry, this is the date on the letter. I don't keep all of the envelopes, post marks. 01:30:02 01:30:06

Q. If the Judges were to determine that death was the appropriate sentence, could you tell the Judges what impact that would have upon you? 01:30:08 01:30:19 01:30:22

A. It would tear me apart. I can't -- can't imagine being so far away, some thousands of miles away knowing that a friend who I've, over the years have -- I have come to really enjoy his company through letters, but I care about him and the thought that if he has to go through that, if there is any way to avoid that, any way to avoid his death. It would tear me apart. I can't imagine life without seeing his letters arrive. 01:30:26 01:30:34 01:30:40 01:30:44 01:30:50 01:30:58 01:31:03 01:31:07

Q. If -- I think we have discussed that if the Judges do decide death is the appropriate sentence that he will have a number of appeals. Will that impact upon the communications you have with him now? 01:31:11 01:31:15 01:31:18 01:31:23

```
1      A.   Sorry, in what way?                         01:31:25

2      Q.   If the Judges impose a sentence of death, will   01:31:29

3  that cause you to change your communications?          01:31:32

4      A.   No.  No.  He is my friend.  Why would it?    01:31:35

5      Q.   If on the other hand the Judges choose to impose a   01:31:40

6  sentence of life, will that impact your communications with   01:31:43

7  him?                                                  01:31:49

8      A.   No.  I think I might be a bit happy.  No.  We   01:31:50

9  would still write.  I can't imagine us ever losing contact.   01:31:55

10     Q.   You have mentioned Clark over time has provided   01:32:03

11 you with physical objects, for lack of a better term?   01:32:06

12     A.   That's right, yes, he makes -- he spends a lot of   01:32:12

13 time making craft works.  I have brought a piece of craft work   01:32:18

14 with me.  A box I cherish and I've had and I use at home every   01:32:22

15 day.  I don't know if you would -- I can show you that.   01:32:27

16     Q.   Do you actually have that with you now?       01:32:29

17     A.   I do, yes.                                    01:32:31

18     Q.   Could you show that to the Judges?           01:32:33

19          MR. PORTER:  And I understand the prosecution has   01:32:35

20 not seen the needle work, we don't plan on introducing   01:32:39

21 it as evidence.                                        01:32:42

22          MR. OSTER:  I'm just curious, it's being shown all   01:32:43

23 over and we never even heard anything about a lot of   01:32:45

24 this stuff.  At some point I think we need to have    01:32:47

25 knowledge that this is going happen.                  01:32:49
```

JILL M. CUTTER, RPR
(513) 785-6596

59

| | | |
|---|---|---|
| 1 | JUDGE NASTOFF: I understand. If that is an | 01:32:51 |
| 2 | objection it will be overruled at this point in time, | 01:32:55 |
| 3 | but noted. | 01:32:58 |
| 4 | MR. OSTER: Yes. | 01:32:58 |
| 5 | A. Thank you, sir. | 01:32:59 |
| 6 | Q. Can you show it to the Judges so they can -- | 01:33:03 |
| 7 | A. I can. I'm sorry, one of the hinges got broken in | 01:33:09 |
| 8 | transit. It is made out of match sticks, it's got a little | 01:33:13 |
| 9 | drawer, I think it's beautiful and I keep trinkets, earrings | 01:33:17 |
| 10 | in it and it is just one of the mementos he sent me. He's | 01:33:21 |
| 11 | never -- there has never been anything of large monetary value | 01:33:24 |
| 12 | between us, I have never given him lots of money and he has | 01:33:28 |
| 13 | never sent me anything of monetary value, but this really | 01:33:31 |
| 14 | means a lot to me. | 01:33:34 |
| 15 | Q. Fran, do you have an opinion about the death | 01:33:39 |
| 16 | penalty? | 01:33:42 |
| 17 | A. Yes, I do. | 01:33:42 |
| 18 | Q. And in three words or less, I don't want you to -- | 01:33:44 |
| 19 | but can you just tell the Judges just very briefly what it is? | 01:33:47 |
| 20 | A. I'm against the death penalty. That's it. | 01:33:51 |
| 21 | Q. Does that impact your -- in your opinion, does | 01:33:56 |
| 22 | that impact your testimony today? | 01:34:00 |
| 23 | A. No. No. Of course, no. I would tell the truth | 01:34:03 |
| 24 | no matter -- I would just explain what is what, no matter | 01:34:08 |
| 25 | what. | 01:34:12 |

| | | |
|---|---|---|
| 1 | MR. PORTER: If I could just have one minute, Your | 01:34:29 |
| 2 | Honor. | 01:34:32 |
| 3 | JUDGE NASTOFF: You may. | 01:34:32 |
| 4 | Q. (BY MR. PORTER) I just have one question left, | 01:34:37 |
| 5 | Your Honors. Do you have any statement you would like to make | 01:34:39 |
| 6 | to the Judges with respect to sentencing? | 01:34:48 |
| 7 | A. If there is any way -- if there is any way | 01:34:56 |
| 8 | legally, any legal means that you can find in your books or | 01:35:01 |
| 9 | your hearts, to turn the sentence into -- not to impose the | 01:35:06 |
| 10 | death penalty again, I would be extremely grateful. I don't | 01:35:12 |
| 11 | know what else to say. It means an awful lot. | 01:35:20 |
| 12 | MR. PORTER: Thank you, Your Honors, I have no | 01:35:29 |
| 13 | further questions. | 01:35:31 |
| 14 | JUDGE NASTOFF: Who will be conducting cross? | 01:35:32 |
| 15 | MR. OSTER: I will, Your Honor, but I would prefer | 01:35:35 |
| 16 | to be able to look at the letter before. | 01:35:36 |
| 17 | JUDGE NASTOFF: And if you need to look at the box | 01:35:38 |
| 18 | as well, you can. | 01:35:40 |
| 19 | MR. OSTER: That's fine. | 01:35:43 |
| 20 | JUDGE NASTOFF: What I would indicate -- | 01:35:44 |
| 21 | MR. OSTER: May I approach? | 01:35:45 |
| 22 | JUDGE NASTOFF: You may. And retrieve that if you | 01:35:46 |
| 23 | need a moment to look that over. If you are indeed | 01:35:52 |
| 24 | going to engage in cross-examination, what I would | 01:35:53 |
| 25 | recommend is that we make a photocopy of that, mark the | 01:35:56 |

JILL M. CUTTER, RPR
(513) 785-6596

61

1   photocopy as an exhibit and then you can cross.

2       MR. OSTER: Yes, Your Honor, thank you. Your

3   Honor, I don't think I will ask a question verbatim as

4   what is in the letter, I may cross-examination in

5   general.

6       JUDGE NASTOFF: Do you think -- I don't think it's

7   necessary that we mark it then. If you were going to

8   ask her, as you would, like cross-examination on a

9   statement type of thing we would mark it, otherwise I

10  think you can just return it to her.

11      MR. OSTER: It may be general, but nothing

12  verbatim or anything like a statement would be.

13                      CROSS-EXAMINATION

14  BY MR. OSTER:

15      Q.  My name is Michael Oster. I work for the State of

16  Ohio in this matter. I'm just going to ask you a few

17  questions.

18      A.  Of course.

19      Q.  First, in your research on this case, were you

20  aware that Mr. Davis had never admitted to this crime before?

21      A.  I was aware of various legal arguments. I'm not a

22  lawyer. When I started reading through the Court reports, I

23  have to say that I didn't understand an awful lot of them.

24      Q.  But in your letter, he does admit to the crimes to

25  you, correct?

JILL M. CUTTER, RPR
(513) 785-6596

62

```
1        A.   He says that he has never tried to hide anything      01:38:47
2   from me. We just haven't spoken about it. It has not been a     01:38:56
3   topic of conversation.                                          01:39:00
4        Q.   And you said one topic of conversation you spoke,     01:39:01
5   I believe you referenced in the word cheeky and having          01:39:06
6   conversations about the Navy; is that correct?                  01:39:09
7        A.   That's right.                                         01:39:11
8        Q.   What did he tell you about his time in the Navy?      01:39:12
9        A.   How he traveled, he traveled the world. He never     01:39:14
10  got to London, that was the start of the conversation. He       01:39:17
11  went to -- he went to Barcelona, and I think he and his         01:39:22
12  friends had went out and enjoyed the town. I think they         01:39:29
13  probably maybe had a few beers, but just telling me about his   01:39:34
14  life.                                                           01:39:39
15       Q.   Did he tell you why he left the Navy?                 01:39:40
16       A.   No.                                                   01:39:42
17       Q.   Would it surprise you to know that he was            01:39:42
18  discharged for being not fit for duty from the Navy?            01:39:46
19       A.   Surprise me? If that is the facts, that is the        01:39:49
20  facts.                                                          01:39:55
21       Q.   And you are a citizen of England; is that correct?   01:39:56
22       A.   I am, yes.                                            01:40:00
23       Q.   I know this is a question you are not supposed to     01:40:01
24  ask a lady but what year you were born?                         01:40:04
25       A.   1964.                                                 01:40:06
```

JILL M. CUTTER, RPR
(513) 785-6596

63

| | | |
|---|---|---|
| 1 | Q. And 1964, in fact, was the last year there was | 01:40:08 |
| 2 | ever an execution in England, was it not? | 01:40:15 |
| 3 | A. I believe so. My whole life I haven't known the | 01:40:18 |
| 4 | death penalty. | 01:40:21 |
| 5 | Q. Your whole life you have never seen the death | 01:40:22 |
| 6 | penalty or its inner workings in England itself? | 01:40:24 |
| 7 | A. In my country, no. No, I am aware of the world. | 01:40:28 |
| 8 | I keep abreast of the world. | 01:40:31 |
| 9 | Q. And you're against the death penalty? | 01:40:33 |
| 10 | A. Yes, I am. | 01:40:37 |
| 11 | Q. And you are friends with Mr. Davis? | 01:40:38 |
| 12 | A. Yes, I am. | 01:40:40 |
| 13 | Q. And your entire country is against the death | 01:40:41 |
| 14 | penalty? | 01:40:45 |
| 15 | A. Oh, no. | 01:40:45 |
| 16 | Q. Your government has outlawed the death penalty, | 01:40:46 |
| 17 | correct? | 01:40:49 |
| 18 | A. There has been several votes throughout my life. | 01:40:49 |
| 19 | Q. Is it currently -- | 01:40:52 |
| 20 | A. It is currently not on the statute books. | 01:40:53 |
| 21 | MR. OSTER: Thank you. That is all of the | 01:40:56 |
| 22 | questions I have, Your Honor. | 01:40:58 |
| 23 | JUDGE NASTOFF: Any further questions? | 01:40:59 |
| 24 | MR. PORTER: We have no additional questions. | 01:41:01 |
| 25 | Thank you for asking, Your Honor. | 01:41:03 |

JILL M. CUTTER, RPR
(513) 785-6596

1    JUDGE NASTOFF: All right. Any reason that she

2  shouldn't be released permanently from any subpoena or

3  do you anticipate any recall?

4    MR. PORTER: We don't anticipate recalling her.

5  We will, in fact, not be recalling her and we would,

6  since she has come a long way, ask the Court's

7  permission for her to remain in the courtroom.

8    JUDGE NASTOFF: Wish to be heard on that matter?

9  If she is released from her subpoena, I don't see any

10  reason to prohibit that.

11    MR. OSTER: Then we have no objection, Your Honor.

12    JUDGE NASTOFF: All right. You are released from

13  your subpoena. You are free to go about your business.

14  If you desire to stay in the courtroom, that is up to

15  you.

16    THE WITNESS: Thank you very much.

17    MR. PORTER: At this point we would like to

18  address the Court with respect to some evidentiary

19  matters with regard to some of the exhibits that are in

20  the notebook that the Judges have, Your Honors.

21    JUDGE NASTOFF: Okay.

22    MR. PORTER: Would first direct the Court's

23  attention to what would be Exhibit B in your notebook,

24  Your Honors.

25    JUDGE NASTOFF: Exhibit B.

65

1      MR. PORTER: B as in boy. I'm sorry, Your Honor.    01:42:27

2 Okay.    01:42:38

3      JUDGE NASTOFF: Okay.    01:42:40

4      MR. PORTER: That is the death certificate of    01:42:41

5 Charles Flowers. The Court has and the prosecutor has    01:42:43

6 a copy. The original is on the bench before the Court    01:42:47

7 in front of Judge Spaeth. For purposes of some    01:42:52

8 admissibility issues that we anticipate coming up, we    01:42:57

9 would ask the Court to admit Exhibit B, which would be    01:43:00

10 the death certificate of Charles Flowers, Your Honor.    01:43:05

11      JUDGE NASTOFF: Okay. What is the purported    01:43:10

12 relevance of Exhibit B?    01:43:13

13      MR. PORTER: We -- Mr. Lee, John Lee will be the    01:43:15

14 next witness in this matter. Mr. Flowers is obviously    01:43:20

15 unable to testify since he is deceased. We are going    01:43:23

16 to be asking the Court, Mr. Lee, excuse me, Your Honor    01:43:26

17 had previously interviewed Mr. Flowers. It is our    01:43:33

18 intent to have Mr. Lee relate the interview he had with    01:43:37

19 Mr. Flowers. And Mr. Flowers' interview for the    01:43:41

20 Court's record would Exhibit G in the notebook before    01:43:48

21 the Court currently, Your Honors.    01:43:50

22      Your Honors, I may be going at this backwards so    01:44:19

23 let me try going at it a different way. Mr. Davis has    01:44:22

24 prepared a trial memorandum with respect to the    01:44:26

25 admissibility issue. I would ask the Court permission    01:44:30

66

| | | |
|---|---|---|
| 1 | to then distribute the trial memorandum we prepared | 01:44:34 |
| 2 | since it is actually tied into the death certificate | 01:44:37 |
| 3 | issue. | 01:44:40 |
| 4 | JUDGE NASTOFF: Sure, if it its relevant to your | 01:44:41 |
| 5 | motion to have Exhibit B admitted into evidence. | 01:44:44 |
| 6 | MR. PORTER: Court's permission to approach the | 01:44:58 |
| 7 | bench, give the original to the court reporter. | 01:45:01 |
| 8 | JUDGE NASTOFF: That's fine. | 01:45:04 |
| 9 | JUDGE PATER: Is there any object -- has defense, | 01:45:18 |
| 10 | or excuse me, has the State seen this material already? | 01:45:19 |
| 11 | Is there any objection from the State? | 01:45:23 |
| 12 | MR. EICHEL: Yes, Your Honor. It is hearsay and | 01:45:27 |
| 13 | unsworn, out-of-court statement, not subject to any | 01:45:31 |
| 14 | cross-examination, if offered for the truth of the | 01:45:36 |
| 15 | matter asserted. | 01:45:39 |
| 16 | JUDGE NASTOFF: Okay. Well, B is a certified copy | 01:45:40 |
| 17 | of a public record, if we're talking about B. | 01:45:42 |
| 18 | MR. EICHEL: No, I am talking about -- its only | 01:45:43 |
| 19 | purpose in being admitted as a death certificate is to | 01:45:45 |
| 20 | get in Exhibit G which is hearsay. | 01:45:49 |
| 21 | JUDGE NASTOFF: All right. Let me read what's... | 01:45:54 |
| 22 | all right. Did you have more that you wish to offer | 01:49:36 |
| 23 | me? I imagine you've had time to read it. | 01:49:47 |
| 24 | MR. EICHEL: After reading the memorandum, it | 01:49:51 |
| 25 | occurs to me that it depends on what the defense is | 01:49:52 |

JILL M. CUTTER, RPR
(513) 785-6596

1  offering this for.  If it is offered as a social  `01:49:55`

2  history that is going to come in and it forms a  `01:49:59`

3  rational basis for the doctor's opinion, and that may  `01:50:04`

4  be happening tomorrow or whenever, things like this are  `01:50:10`

5  admitted all the time for that purpose, but what I  `01:50:16`

6  object to is their stand alone being offered for the  `01:50:18`

7  truth of the matter asserted as stand alone evidence.  `01:50:21`

8  If it is social history upon which a doctor relied,  `01:50:25`

9  there is no problem with it.  `01:50:29`

10  JUDGE NASTOFF:  Okay.  `01:50:31`

11  MS. COOK-REICH:  Your Honor, we would be  `01:50:34`

12  presenting it for social history purpose.  I believe  `01:50:35`

13  Mr. Eichel is properly understanding that when our  `01:50:38`

14  doctor testifies he will be going through this  `01:50:40`

15  information and these people obviously were  `01:50:43`

16  unavailable.  The first one we discussed is dead, so we  `01:50:45`

17  have obtained a certified copy of his death  `01:50:48`

18  certificate.  `01:50:52`

19  JUDGE NASTOFF:  All right.  Well, is there any  `01:50:52`

20  reason in particular to address this now then as  `01:50:53`

21  opposed to in conjunction with the testimony of the  `01:50:56`

22  doctor, or --  `01:51:00`

23  MR. PORTER:  Could we have ten seconds to confer  `01:51:02`

24  please, Your Honor?  `01:51:06`

25  JUDGE NASTOFF:  Sure.  We probably need ten  `01:51:07`

68

| | | |
|---|---|---|
| 1 | seconds, too, so -- | 01:51:09 |
| 2 | MR. PORTER:  I'm sorry, Your Honor.  I don't mean | 01:51:22 |
| 3 | to hold things up. | 01:51:24 |
| 4 | (Judges confer off the record.) | 01:51:44 |
| 5 | JUDGE PATER:  Let me make just sure I understand, | 01:51:53 |
| 6 | and perhaps that we understand, defense's statement, | 01:51:55 |
| 7 | defense counsel's statement just a minute ago.  Are you | 01:52:00 |
| 8 | saying that you are willing for this to come in and for | 01:52:02 |
| 9 | us to accept it, but not for the truth of the matter | 01:52:06 |
| 10 | asserted, only for background to explain why the | 01:52:10 |
| 11 | doctors have the opinions that the doctors have? | 01:52:15 |
| 12 | MR. PORTER:  That is correct, Your Honor. | 01:52:19 |
| 13 | JUDGE PATER:  Okay. | 01:52:29 |
| 14 | (Judges confer off the record.) | 01:52:34 |
| 15 | JUDGE NASTOFF:  Was there something else? | 01:52:56 |
| 16 | MR. OSTER:  Would it not be more proper then to | 01:52:57 |
| 17 | wait and reserve ruling until the doctor stated that he | 01:53:00 |
| 18 | used it in some form of social summary as opposed to | 01:53:03 |
| 19 | now if the doctor is not here to testify anyway? | 01:53:08 |
| 20 | JUDGE NASTOFF:  That is probably appropriate.  We | 01:53:10 |
| 21 | will take it under advisement, withhold ruling until | 01:53:11 |
| 22 | the doctor testifies and subject to a tying in as | 01:53:16 |
| 23 | indicated.  We don't anticipate there being an issue | 01:53:20 |
| 24 | for the purposes that have been stated, but we do want | 01:53:23 |
| 25 | to, I guess, make sure that the doctor has, in fact, | 01:53:28 |

1     properly relied on these in forming his opinion.    01:53:33

2         JUDGE SPAETH: Is it going to be the same issue for   01:53:37

3     Elizabeth Crawford, Fannie Whiteside?     01:53:40

4         JUDGE NASTOFF: Yeah, and does that apply to every   01:53:41

5     one of these witnesses?     01:53:42

6         MR. PORTER: It does, Your Honor.     01:53:45

7         JUDGE NASTOFF: All right.     01:53:47

8         JUDGE SPAETH: Some of these witnesses -- I'm   01:53:47

9     sorry to interrupt --     01:53:50

10         JUDGE NASTOFF: Go ahead.     01:53:50

11         JUDGE SPAETH: Did some of these witnesses testify   01:53:51

12     at a prior mitigation hearing?     01:53:53

13         MR. PORTER: They have not, and let me clarify so   01:53:56

14     that the Judges do not believe that I misstated the   01:53:59

15     facts. We -- there are four witnesses involved here.   01:54:02

16     Two have died and the other two are incompetent, I'm   01:54:07

17     not too sure -- at least in our perception we have   01:54:12

18     submitted affidavits that we believe they are   01:54:16

19     incompetent. I didn't want the Court to believe all   01:54:20

20     four of them were deceased.     01:54:22

21         JUDGE PATER: And what we would be getting   01:54:25

22     testimony concerning would be Mr. Lee would be taking   01:54:25

23     the stand, and in essence saying, you know, I had this   01:54:26

24     conversation with Dr. Flowers. Did he have    01:54:29

25     conversations with the other three as well?    01:54:32

1    MR. PORTER: He did, Your Honor.                    01:54:33

2    JUDGE PATER: So he will be testifying as to all    01:54:35

3    four of these people saying I had these conversations,  01:54:37

4    these people did relate to me what I have set forth in  01:54:39

5    my affidavit, or whatever this summary sheet of and  01:54:42

6    then they are either dead or incompetent at this time,  01:54:46

7    that would be the thrust of his testimony.          01:54:49

8    MR. PORTER: That would be, Your Honor.              01:54:53

9    JUDGE NASTOFF: All right. Thank you. We will        01:54:53

10   have the matter under advisement until Dr. Lee's    01:54:55

11   testimony with that understanding as to the purpose for  01:54:59

12   which it has been proffered.                        01:55:04

13   MR. OSTER: Let me just clarify, it's Dr. Smith.     01:55:05

14   I believe Lee, with the last time is an Ohio Public  01:55:07

15   defender investigator.                              01:55:12

16   JUDGE PATER: Is he one of your staff guys?          01:55:13

17   MR. PORTER: Yes.                                    01:55:15

18   JUDGE PATER: So is he here now? Do you want him     01:55:16

19   to be able to testify now and get out of here and then  01:55:17

20   we will have the doctor later at some other day or  01:55:18

21   something?                                          01:55:21

22   MR. PORTER: We have been advised we have another   01:55:22

23   issue so we have no problem bringing him back if the  01:55:23

24   Court needs to hear from him after Dr. Smith testifies.  01:55:26

25   So rather than put the Court through testimony they may  01:55:29

| | | |
|---|---|---|
| 1 | not need to hear, we would just reserve the right to | 01:55:34 |
| 2 | call him on Thursday if that would be acceptable to | 01:55:37 |
| 3 | Your Honors. | 01:55:41 |
| 4 | JUDGE NASTOFF: All right. Do you have anything | 01:55:42 |
| 5 | else to present at this time then? | 01:55:46 |
| 6 | MS. COOK-REICH: No, Your Honor that would | 01:55:48 |
| 7 | conclude what we have today ready. | 01:55:49 |
| 8 | JUDGE NASTOFF: All right. Can you give us just | 01:55:51 |
| 9 | as a -- for scheduling purposes, an idea as to how many | 01:55:53 |
| 10 | more witnesses and perhaps when they would be | 01:56:02 |
| 11 | available? | 01:56:06 |
| 12 | MS. COOK-REICH: We have six witnesses, although | 01:56:06 |
| 13 | we believe we have seven tomorrow, but at this point in | 01:56:09 |
| 14 | time we have six and on Thursday, excluding Mr. Lee, we | 01:56:12 |
| 15 | have four, that is when the doctor would be testifying. | 01:56:19 |
| 16 | JUDGE NASTOFF: Six witnesses tomorrow? | 01:56:23 |
| 17 | MS. COOK-REICH: Yes. | 01:56:25 |
| 18 | JUDGE NASTOFF: Four on Thursday? | 01:56:26 |
| 19 | MS. COOK-REICH: Yes, Your Honor. Dr. Smith | 01:56:28 |
| 20 | couldn't come until Thursday. | 01:56:31 |
| 21 | JUDGE NASTOFF: All right. And would that | 01:56:33 |
| 22 | conclude the evidence? | 01:56:35 |
| 23 | MS. COOK-REICH: I anticipate that concluding that | 01:56:38 |
| 24 | day, yes. | 01:56:42 |
| 25 | JUDGE NASTOFF: And again for scheduling purposes, | 01:56:42 |

72

1    what times are these witnesses scheduled to be here?    01:56:44

2         MS. COOK-REICH: I have the persons coming    01:56:47

3    tomorrow all scheduled to be here in the morning.    01:56:49

4    Assuming no one has a problem with 9:00.    01:56:52

5         JUDGE NASTOFF: All right. And what about    01:56:59

6    Thursday?    01:57:00

7         MS. COOK-REICH: I know at least two of the    01:57:01

8    gentlemen will be here first thing in the morning at    01:57:03

9    9:00.    01:57:06

10         JUDGE NASTOFF: All right. Due to Judge Spaeth's    01:57:13

11    docket, we are going to -- if possible -- get started    01:57:18

12    at 10:00 a.m. on Thursday, so that you can warn those    01:57:24

13    witnesses.    01:57:27

14         MS. COOK-REICH: I might be able to move a couple    01:57:30

15    of them to Wednesday.    01:57:32

16         JUDGE NASTOFF: If you can do that, that would be    01:57:33

17    fine. All right. And then we can address any rebuttal    01:57:35

18    the State might have at the appropriate time. For now,    01:57:42

19    if there is no further evidence or testimony that you    01:57:46

20    wish to present today --    01:57:49

21         MS. COOK-REICH: No, Your Honor, we don't have any    01:57:50

22    additional.    01:57:53

23         JUDGE NASTOFF: All right. Then any objection to    01:57:53

24    recessing on this matter until 9:00 a.m. tomorrow    01:57:56

25    morning?    01:57:59

JILL M. CUTTER, RPR
(513) 785-6596

73

1     MR. OSTER:  Not from the State, Your Honor.                    01:58:00

2     MR. PORTER:  Nothing on behalf of Mr. Davis, Your             01:58:01

3  Honor.  Thank you for asking.                                    01:58:04

4     JUDGE NASTOFF:  All right.  That will be the                  01:58:05

5  order.                                                           01:58:07

6     (Hearing concluded at this time to be reconvened              01:58:08

7  the following morning, September 9, 2009.)                       01:58:17

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JILL M. CUTTER, RPR
(513) 785-6596

```
1    STATE OF OHIO          )

2                           )  SS.   REPORTER'S CERTIFICATE

3    COUNTY OF BUTLER       )

4            I, JILL M. CUTTER, RPR, an Official Court Reporter

5    and Notary Public within the State of Ohio do hereby certify

6    that the foregoing proceedings were taken in stenotype by me

7    at the time and place herein set forth and thereafter reduced

8    to typewritten form;

9            That the foregoing 73 pages constitutes a true and

10   accurate transcript of the proceedings held, all done to the

11   best of my skill and ability.

12           I further certify that I am not related to any of

13   the parties hereto, nor am I in any way interested in the

14   result of the action hereof.

15           IN WITNESS WHEREOF, I have hereunto set my hand at

16   Hamilton, Ohio, this 22ND day of December, 2009.

17

18

19

20                        JILL M. CUTTER, RPR
                          Official Court Reporter
21                        Butler County Common Pleas
                          Hamilton, Ohio  45011
22

23

24

25
```

JILL M. CUTTER, RPR
(513) 785-6596

IMAGED 74



COURT OF COMMON PLEAS

BUTLER COUNTY, OHIO

------------------------------

STATE OF OHIO,

    Plaintiff,       Case No. CR-1983-12-0614

                CA-09-10-263

    vs.        HONORABLE ANDREW NASTOFF
               HONORABLE KEITH SPAETH
               HONORABLE CHARLES PATER

VON CLARK DAVIS,

    Defendant.

------------------------------

- - -

MITIGATION HEARING

TRANSCRIPT OF PROCEEDINGS

September 9, 2009

VOLUME II

- - -

JILL M. CUTTER, RPR
(513) 785-6596

75

```
 1    APPEARANCES:

 2

 3          On behalf of the plaintiff:

 4              MICHAEL A. OSTER, JR., ESQ.
               Assistant Butler County Prosecuting Attorney
 5             11th Floor
               315 High Street
 6             Hamilton, Ohio 45011
                   and
 7             DANIEL G. EICHEL, ESQ.
               Assistant Butler County Prosecuting Attorney
 8             11th Floor
               315 High Street
 9             Hamilton, Ohio 45011

10          On behalf of the defendant:

11              MELYNDA COOK-REICH, ESQ.
               Repper, Pagan, Cook
12             1501 First Avenue
               Middletown, Ohio 45044
13                 and
               RANDALL PORTER, ESQ.
14             Assistant State Public Defender
               250 East Broad Street
15             Suite 1400
               Columbus, Ohio 43215

16

17

18

19

20

21

22

23

24

25
```

76

1        I N D E X

2

3        DEFENSE WITNESSES

|                                              | Page | Line |
|----------------------------------------------|------|------|
| **Victor Davis**                             |      |      |
| Direct Examination by Ms. Cook-Reich         | 78   | 9    |
| Cross-Examination by Mr. Eichel              | 89   | 5    |
| Redirect Examination by Ms. Cook-Reich       | 94   | 7    |
| **Sherry Davis**                             |      |      |
| Direct Examination by Ms. Cook-Reich         | 98   | 14   |
| Cross-Examination by Mr. Oster               | 101  | 20   |
| **Charles Tipton**                           |      |      |
| Direct Examination by Ms. Cook-Reich         | 104  | 4    |
| Cross-Examination by Mr. Eichel              | 110  | 2    |
| Redirect Examination by Ms. Cook-Reich       | 111  | 24   |
| **Alluster Tipton**                          |      |      |
| Direct Examination by Ms. Cook-Reich         | 113  | 8    |
| **Carol Smith**                              |      |      |
| Direct Examination by Ms. Cook-Reich         | 122  | 20   |
| **Cynthia Mausser**                          |      |      |
| Direct Examination by Mr. Porter             | 145  | 24   |
| Cross-Examination by Mr. Oster               | 177  | 8    |
| **Jerome Stineman**                          |      |      |
| Direct Examination by Ms. Cook-Reich         | 190  | 12   |
| Cross-Examination by Mr. Oster               | 194  | 25   |

JILL M. CUTTER, RPR
(513) 785-6596

1             Transcript of Proceedings

2               Morning Session

3            * * * * * * * * *

4      JUDGE NASTOFF: All right. We're again on record

5  in State of Ohio vs. Von Clark Davis, CR1983-12-0614.

6  The defendant, Von Clark Davis, is personally present

7  again, accompanied by counsel, Randall Porter, Melynda

8  Cook-Reich. Assistant prosecutors Dan Eichel and

9  Michael Oster are present. The members of our panel

10  present today are myself, and Judges Pater and Spaeth   09:26AM

11  as well.

12      When we left off yesterday, we had concluded

13  discussing the offer of admission of statements of

14  Elizabeth Crawford, Charles Flowers, Milton Flowers and

15  Fannie Whiteside. The Court had taken that under

16  advisement, reserved ruling on that until further

17  testimony was presented from the doctor I believe. And

18  I believe that is where we left off. So at this time I

19  would turn to the defense and ask if you have any

20  further evidence or testimony that you would wish to   09:26AM

21  present at this time?

22      MS. COOK-REICH: Yes, Your Honor, we would call

23  Victor Davis to the stand.

24      JUDGE NASTOFF: All right. You may proceed.

25

78

```
 1                          VICTOR DAVIS
 2   having been first duly sworn, was examined and testified under
 3   oath as follows:
 4             JUDGE NASTOFF:  You may proceed.
 5             MS. COOK-REICH:  Victor, make sure you sit close
 6        enough or pull the microphone closer to you.
 7             JUDGE NASTOFF:  That entire microphone can move so
 8        you can slide that over closer.
 9                        DIRECT EXAMINATION
10   BY MS. COOK-REICH:                                          09:27AM
11        Q.   For the record, can you state your name, please?
12        A.   Victor Lee Davis.
13        Q.   Okay.  And Victor, where do you reside?
14        A.   █████████████   Hamilton, Ohio.
15        Q.   And Victor, you are one of Von Clark Davis'
16   brothers; is that correct?
17        A.   Yes, I am.
18        Q.   Is he your older brother or younger brother?
19        A.   He is an older brother.
20        Q.   Older brother?  And what year were you born?       09:28AM
21        A.   1950.
22        Q.   And do you know what year Victor -- I'm sorry, Von
23   was born?
24        A.   '46.
25        Q.   So he is four years older than you are?
```

79

```
 1        A.   Yeah.

 2        Q.   Okay.  Can you name your siblings in order of

 3   birth?

 4        A.   Yeah.  Elliot, Von, Carol, Charles, and myself,

 5   and then Gregory, then Joanne, Michael, Lavonne, and Carlos.

 6        Q.   Okay.  So Gregory died as an infant?

 7        A.   As an infant, that's correct.

 8        Q.   And he was born after you?

 9        A.   Yes.

10        Q.   And you named Michael and Lavonne and Carlos also?    09:28AM

11        A.   That's correct.

12        Q.   And total there would have been ten children born

13   to your mother; is that correct?

14        A.   That's correct.

15        Q.   Okay.  Three of those children are the children of

16   Charles Tipton and your mother, Alluster; is that correct?

17        A.   That's correct.

18        Q.   And Charles is your stepfather?

19        A.   That's correct.

20        Q.   Do you view him as a stepfather?                      09:29AM

21        A.   No.

22        Q.   How do you view him?

23        A.   I view him as a father.

24        Q.   Okay.  Of your mother's ten children, obviously we

25   know Gregory is deceased, are there other children that aren't
```

JILL M. CUTTER, RPR
(513) 785-6596

80

1  deceased?

2      A.  Charles and Lavonne.

3      Q.  Michael, Lavonne and Carlos all have Charles as a

4  father, the other seven children of your mother's, are those

5  all having the same father?

6      A.  No.

7      Q.  And who is your father?

8      A.  My father is Nicholas Davis.

9      Q.  Okay.  That is Von's father also?

10     A.  Yes, it is.                                    09:30AM

11     Q.  Other than yourself and Von, are there -- which

12  children have other fathers other than Charles and Nick?

13     A.  Elliot and Carol.

14     Q.  So Nick fathered Elliot, yourself, Von, Carol,

15  what about Gregory?

16     A.  And Gregory.

17     Q.  Okay.  So Charles Davis and Joanne have different

18  fathers?

19     A.  Yes.

20     Q.  Do they have the same father?                 09:30AM

21     A.  No.

22     Q.  Your biological father, do you recall how old you

23  were when he left your household?

24     A.  I was -- I -- it was prior to five years of age,

25  and I would think it was probably three to four years of age

JILL M. CUTTER, RPR
(513) 785-6596

81

```
 1   when he left.
 2          Q.   After he left your household, do you recall, do
 3   you have any memories of him?
 4          A.   Vague.
 5          Q.   Vague memories?
 6          A.   And I saw him one other time after he left.
 7          Q.   And what was that occasion for?
 8          A.   He had returned to Hamilton, Ohio and was at my
 9   great grandmother's home.  I don't know the reason he was
10   there.
11          Q.   And you visited with him at that time?
12          A.   Briefly.
13          Q.   Did the rest of Nick's children visit him at that
14   time?
15          A.   At the time I visited him, it was only Elliot, my
16   oldest brother and my brother Von.
17          Q.   Do you know what year your mother and Charles were
18   married?
19          A.   I couldn't give you the exact date, it was
20   approximately 50 years ago.
21          Q.   Okay.  Do you know how old you were?
22          A.   That would make me approximately nine.
23          Q.   Okay.  Before your mother and Charles met, do you
24   know where your family lived and who they lived with?
25          A.   Absolutely.
```

09:31AM

09:31AM

JILL M. CUTTER, RPR
(513) 785-6596

1    Q.   Who?

2    A.   I can tell you my whole family history.   We lived

3    prior to their meeting?

4    Q.   Yes.

5    A.   We lived on ▮▮▮▮▮▮▮▮▮ and we moved to

6    ▮▮▮▮▮▮▮▮▮

7    Q.   All within the City of Hamilton?

8    A.   That's correct.

9    Q.   Would you say that up until the time that your

10   mother and step-father moved to the Forest Park area that your

11   family primarily lived in Hamilton?

12   A.   That's correct.

13   Q.   Okay.   Who did you live with as a family prior to

14   Charles?

15   A.   Who did I live with?

16   Q.   Yes, who did you live with?

17   A.   I lived with my mother, and my siblings and it was

18   an extended family.   My grandmother, her sister, my great

19   aunt, her eldest sister, my grandmother's eldest brother, and

20   his wife, we had a large home on ▮▮▮▮▮▮▮

21   Q.   Okay.   At some point in time your mother and the

22   other children moved from the residence of your grandmother;

23   is that correct?

24   A.   That's correct.

25   Q.   Did you remain in the home of your grandmother?

09:32AM
09:32AM

JILL M. CUTTER, RPR
(513) 785-6596

1    A.    Yes.

2    Q.    How long did you live with your grandmother?

3    A.    Until she died.

4    Q.    And when was that?

5    A.    '86.  Well, in '86 she passed.  She had been in

6    the nursing home several years prior to her passing.

7    Q.    Are you the only Davis or Tipton child that

8    resided with your grandmother for that extended period of

9    time?

10    A.    Yes, on a permanent basis.  I shouldn't even say    09:33AM

11    that.  I was between -- I was mostly with my grandmother.  I

12    guess you could say I was the favorite or the spoiled.

13    Q.    Okay.  Could you describe the type of income areas

14    that your family lived while you were growing up?

15    A.    Working class.

16    Q.    Okay.  Were any of your family members drinkers?

17    A.    Sure.

18    Q.    Would you describe them as social or otherwise?

19    A.    Which family are you talking about?  Extended or

20    immediate?    09:33AM

21    Q.    Extended family?

22    A.    Out of my extended family, I had some uncles that,

23    some folk may classify alcoholics, but functional.  They

24    worked every day.

25    Q.    Okay.  And what about your immediate family?

1      A.   Immediate family, there was some drinking, but not

2 excessive.

3      Q.   And by not excessive, it is less than drinking

4 every day?

5      A.   Oh, yes.

6      Q.   Enough to go to work.  Victor, what is your

7 education level?

8      A.   I have a -- graduated from the Hamilton Public

9 Schools.  I have a Bachelor's degree from Central State

10 University.  I have a Master's degree from Miami University.      09:34AM

11 I have extended studies from Cincinnati Seminary, which is now

12 Cincinnati Christian College.  And I have hundreds and

13 hundreds of continuing education hours at several universities

14 and grants through the State.

15      Q.   And how are you employed?

16      A.   I am currently have, well, three jobs.  Full-time

17 job as a mental health therapist at Children's Home of

18 Cincinnati.  I am a pastor of St. Paul AMA Church, and I am

19 visiting teacher at Miami University.  I am an instructor,

20 spring course at Miami University, Hamilton.      09:35AM

21      Q.   Are you the only Davis sibling that went onto

22 higher education to the extent that you have?

23      A.   To the extent that I have, yes.

24      Q.   Do you have any memories of, significant memories

25 of Von growing up?

85

1    A.    Yes.

2    Q.    Okay.  Even though you lived with your grandmother

3    primarily?

4    A.    Well, that is combined.  The first, roughly nine

5    years we were all together.  And then my mother and my father,

6    Charles Tipton, moved out into an apartment.  And I was back

7    and forth, but yes I have extensive memory.

8    Q.    What type of relationship would you say that you

9    and Von had growing up?

10   A.    Average.  And that you would with the difference        09:36AM

11   in age.  I got on his nerves, he got on mine.  I was the

12   little brother trying to tag behind him.

13   Q.    Okay.  How would you have described Von growing

14   up, standoffish or close or someone who was gregarious?

15   A.    To the public?

16   Q.    To his family?

17   A.    Oh, very outgoing.  Very gregarious.

18   Q.    What about to the public?

19   A.    Same.

20   Q.    Did he seem to be close with any particular family    09:36AM

21   member?

22   A.    No more than, I think -- because he was older

23   probably, he and my oldest brother and my oldest sister.

24   Q.    Carol and Elliot?

25   A.    Yes, Carol and Elliot.

86

1      Q.    Do you know the family name of Ernestine, her

2  maiden name?

3      A.    Franklin.

4      Q.    Okay.  Von had two children with Ernestine or two

5  children that were born during his marriage with Ernestine; is

6  that correct?

7      A.    Yes.

8      Q.    And their names are?

9      A.    Sherry and Michelle.

10     Q.    Are you aware whether Von is the biological father       09:37AM

11 of those two children?

12     A.    I didn't take the DNA test.  I can only go by what

13 she said and what he said.

14     Q.    Okay.  And what is that?

15     A.    That Sherry is his biological daughter, and

16 Michelle was not.

17     Q.    Von has been in prison for a large amount of his

18 life?

19     A.    That's correct.

20     Q.    Have you kept up a relationship with Von at all         09:37AM

21 during those years?

22     A.    Yes.

23     Q.    How have you kept up that relationship, writing,

24 talking, visiting?

25     A.    Telephone calls and letters.

JILL M. CUTTER, RPR
(513) 785-6596

87

1     Q.   Is he meaningful to you?

2     A.   And visits initially.

3     Q.   And visits initially?

4     A.   Yes.

5     Q.   Is he meaningful to you?

6     A.   Is he meaningful?

7     Q.   Meaningful to you.  As a brother, is he meaningful

8     to you?

9     A.   Absolutely.

10    Q.   You're obviously aware that we are here on a third     09:38AM

11    resentencing of Von to determine whether these three Judges

12    will impose death?

13    A.   I understand that.

14    Q.   What can you tell these three Judges that is

15    important about Von that might make them choose a decision

16    other than death?

17    A.   Well, that is important about him.  Should I

18    address the Judges?

19    Q.   Yes.

20    A.   Pardon me, I am not trying to be casual, I have     09:39AM

21    some pain.  He is important first because he is my brother.

22    Spiritually or religiously I would say he is a child of God.

23    He has always, to me, accepted the responsibility of his

24    actions.  Never denied them to me.  Has expressed to me that

25    he has been hurt and remorseful from the time of his actions.

JILL M. CUTTER, RPR
(513) 785-6596

88

1   That he has always attempted to right himself in the face of

2   those who would accept it, and to God. Has always expressed

3   to me that how hurt he was that he brought hurt upon two

4   families, excluding his own; three including his own, the

5   family of victims and his own family. And to me, that is the

6   sign of a man or a person who has come to grips with the

7   reality of his actions. Has never attempted to put the blame

8   on anyone other than himself. And I believe that he is worthy

9   of consideration. Has, over the years, been active and

10  creative in what was allowed through the penal institutions.      09:41AM

11  Has rather than waste time by simply being incarcerated, has

12  tried to make the most of it through maintaining family

13  contacts, social contacts, and contacts with those who have

14  played a major part in his life outside of the immediate

15  family. And shared a spiritual awakening that took place over

16  the time that he has been incarcerated. And I think that is

17  worthy of consideration.

18          Has never tried to convince me of anything other

19  than the fact that he was man enough to know that he was

20  wrong, but to accept the consequences without trying to place   09:42AM

21  blame or redirect it. That is the best that I can do.

22      Q.   And you phrased, you used a specific phrase about

23  Von expressing his guilt and his remorse to you?

24      A.   Yes.

25      Q.   That is between two brothers; is that correct?

JILL M. CUTTER, RPR
(513) 785-6596

89

```
 1        A.    Yes.
 2              MS. COOK-REICH:  I have no further questions for
 3        you.  Thank you.
 4              JUDGE NASTOFF:  Cross-examination?
 5                      CROSS-EXAMINATION
 6  BY MR. EICHEL:
 7        Q.    Good morning, Mr. Davis.
 8        A.    Good morning.
 9        Q.    I believe you said you were born in 1950; is that
10  correct?
11        A.    That's correct.
12        Q.    You would be age 59 today?
13        A.    Fifty-nine in July.
14        Q.    July, a year or so you are contemporary of mine.
15        A.    Okay.
16        Q.    And you have lived in Hamilton virtually your
17  whole life?
18        A.    That is correct.
19        Q.    In this area.  And you're known as a community
20  leader; is that correct?
21        A.    Yes.
22        Q.    And could you tell us, what have you been -- what
23  titles or positions have you held as a community leader here,
24  employment?  I believe there was a community center that you
25  were head of; is that correct?
```

09:43AM

09:44AM

JILL M. CUTTER, RPR
(513) 785-6596

90

```
1        A.    Uh-huh.

2        Q.    Booker T. Washington Community Center?

3        A.    Uh-huh.

4        Q.    How long did you do that?

5        A.    You want a list of positions I've held in the city

6    and titles, is that what I understand you to say?

7        Q.    Yeah, just briefly.  We don't need to list

8    everything.

9        A.    Well, I have been executive director of Butler

10   County Head Start as well as assistant director of Butler     09:44AM

11   County Community Action Commission.  I was second and fourth

12   ward, I was co-creator of second and fourth ward outreach

13   program, and most recent position here was executive director

14   of Booker T. Washington Community Center.  And as far as

15   social organizations or civil rights organizations, I've been

16   the director or president of several, including the NAACP, I

17   have been on a merits task force for racism, the vice mayor's

18   task force and I have held many, many positions through

19   organizations.

20       Q.    And as a family I believe you testified that you     09:45AM

21   are supportive of your brother?

22       A.    Yes.

23       Q.    All of the members of your family are like

24   yourself, supportive of Mr. Davis?

25       A.    Well, I can only speak for me.
```

91

1     Q.   Okay.

2     A.   I assume -- I would like to think my whole family

3 is supportive, but I am supportive.

4     Q.   Okay.  And you were in Hamilton during the 1984

5 trial, were you not?

6     A.   Yes, I was.

7     Q.   And supportive of Mr. Davis at that time?

8     A.   Yes.

9     Q.   Now, I noticed in your direct testimony you said

10 he never put blame on anyone else.  Quote, never put blame on   09:46AM

11 anybody else.  Are you aware that --

12     A.   I said to me.  Directly to me.

13     Q.   You said it two different ways in your direct

14 testimony, sir.

15     A.   Well, if you could have it read back I will be

16 glad to listen.

17     Q.   If that is possible.  I would like to find the

18 place where he said he never put blame on anybody else.

19          (Pending question was read by court reporter.)

20     Q.   Sir, is that correct?   09:47AM

21     A.   When he was talking to me.  That is what I was

22 addressing the judges.  Ms. Cook asked me our relationship.

23 Now, we had, so that I can clear it up.  He had placed blame,

24 he had mentioned someone else, but when I talked to him -- she

25 was asking our relationship.

JILL M. CUTTER, RPR
(513) 785-6596

92

1     Q.  Okay.  But you are aware, are you not, that in the

2  trial in 1984, he --

3     A.  He mentioned someone, yes.

4     Q.  He laid out a story that he gave that gun in

5  exchange for, supposed exchange for dental equipment to a

6  Silkey Carr, and that man was last seen with Suzette Butler

7  outside the American Legion where she ended up dead and he

8  walked to his car, he didn't even stop walking from the

9  Legion, he walked to his car, got in his car and drove to

10  Middletown?

11     A.  I can only share what he said to me.  I was not

12  present, if you look at any records, I was not present at that

13  entire trial, so I cannot tell you what he said at that trial.

14     Q.  So --

15     A.  I do know --

16     Q.  You are not aware --

17     A.  I do know of that name, yes.

18     Q.  You do know -- you are aware that he said that?

19     A.  Yes, I am.

20     Q.  Did he explain to you?

21     A.  No.

22     Q.  Never gave an explanation to you as to why he

23  would say that?

24     A.  No.

25     Q.  As far as living together, you and he are -- have

09:48AM

09:48AM

93

1   the same father and same mother?

2       A.   Correct.

3       Q.   Lived in the same house growing up?

4       A.   Part of the time.

5       Q.   Part of the time.  Well, let's take it from the

6   time of his birth you were -- the time of your birth, as far

7   as you know, as a child, you grew up and he was in your house

8   until at least by the time your mother and Mr. Tipton married?

9       A.   Yes.

10      Q.   All those --                                    09:49AM

11      A.   And even further, we still lived together.  When

12  my mother moved.  My mother and my father moved into their own

13  home, yes.

14      Q.   And after that marriage, did you and Mr. Tipton

15  have a good relationship?

16      A.   Did me and Mr. Tipton have a good relationship?

17      Q.   Yes.

18      A.   Absolutely.

19      Q.   And to your knowledge, was it the same with Von?

20      A.   To my knowledge, yes.                           09:50AM

21      Q.   Okay.  To your witness as to being in that same

22  household, the best of your ability, it was the same?

23      A.   Yes.

24      Q.   Okay.  And as I said you were a working class

25  family?

JILL M. CUTTER, RPR
(513) 785-6596

94

1    A.    That's correct.

2    Q.    And basically made the best way you could?

3    A.    Yes.

4          MR. EICHEL:  All right.  Thank you very much, sir.

5          JUDGE NASTOFF:  Any redirect?

6          MS. COOK-REICH:  Yes.

7                    REDIRECT EXAMINATION

8    BY MS. COOK-REICH:

9    Q.    Victor, Mr. Eichel was asking you some questions

10   about having lived in the same home with Von.  I believe you        09:50AM

11   phrased it that you were the family favorite?

12   A.    Well, I like to think that.  My grandmother -- I

13   stayed with my grandmother and great aunt.  My mother did not

14   relinquish custody with -- no legal issues.  I just stayed

15   with them and when my mother wanted me to come home to be with

16   the brothers and sisters, I had to go.

17   Q.    Okay.  Did you call your grandmother, grandmother?

18   A.    I called her mamma.  In fact, her name was mamma,

19   we called her Mamma Vic.  Her name was Victoria.

20   Q.    Did there ever come a time when -- you just talked        09:51AM

21   about if your mom said you were going to come home and stay

22   with the rest of the siblings, you did so?

23   A.    Oh, absolutely.

24   Q.    Were there times that that was used as more of a

25   if you don't keep in line you are going to come stay with us?

1    A.    Absolutely.

2    Q.    Could you give a percentage amount of time that

3    you lived with your grandmother versus your mother and the

4    rest of the siblings?

5    A.    I lived with my grandmother, I would say, it is a

6    rough estimate, 75 percent of the time.

7         MR. EICHEL:  No further questions.  Thank you.

8         JUDGE NASTOFF:  Anything further?

9         MR. EICHEL:  No other questions.

10        JUDGE PATER:  Before Mr. Davis stands down, let me    09:52AM

11        put something on the record.  I know when we judges

12        conduct jury trials, we are having the voir dire

13        process, we typically I think all of us probably

14        typically ask the prospective jurors that is the fact

15        finders, we are the fact finders now, we ask them if

16        they know any of the witnesses or the attorneys will

17        ask them those questions to see if there is any reason

18        that a juror, potential fact finder, might be swayed by

19        one witness or another witness, or a party or an

20        attorney or whatever.  I didn't know who the witnesses    09:52AM

21        were going to be at the trial today and I have known

22        Victor Davis for a long, long time.  He and I are

23        friends, I would be so presumptuous as to say I think

24        he would concur with that.  I have known him since high

25        school days and we are good friends, but I do think I

96

1  can fairly and impartially decide this matter, so I

2  just wanted to put that on the record.

3      JUDGE NASTOFF:  Does anyone want -- well, we don't

4  need Mr. Davis up here for that.  Is there any further

5  testimony needed from Mr. Davis then?

6      MS. COOK-REICH:  No, Your Honor.

7      JUDGE NASTOFF:  May he be permanently released

8  from any subpoenas?

9      MS. COOK-REICH:  Yes, Your Honor.

10     JUDGE NASTOFF:  All right.  Mr. Davis, you are      09:53AM

11  released from any subpoenas.  Your testimony is

12  complete.  You are free to go about your business.

13  Thank you.

14     THE WITNESS:  Thank you very much.

15     JUDGE NASTOFF:  All right.  And then before you

16  call your next witness, I just want to address...

17  before the next witness is called, I just wanted to

18  invite either counsel if you feel any further voir dire

19  of Judge Pater, regarding his knowledge of Mr. Davis is

20  necessary or warranted, I think now would probably be a  09:53AM

21  good time to do that.  Anything from the State?

22     MR. EICHEL:  No, Your Honor.  I appreciate knowing

23  a little bit personally about Judge Pater's went to

24  school with my wife.  So I sort of knew that he went to

25  Garfield High School same time, same age as the

97

1    witness, so I appreciate the Judge making the comment

2    and I have no question about it.

3        JUDGE NASTOFF: All right. Any questions from the

4    defense, do you wish to voir dire Judge Pater further

5    on that issue?

6        MR. PORTER: Mr. Davis has none and we thank the

7    Judge for his candor.

8        JUDGE NASTOFF: All right. Just equally, I will

9    indicate that I am not familiar with Mr. Davis and I am

10    not sure if you are.           09:54AM

11        JUDGE SPAETH: Well, I have heard his name over

12    the years. I am not personally familiar with him, but

13    I know that he was involved in various community

14    organizations. This is Judge Spaeth for the record.

15    And so outside of that. I have had no personal

16    dealings with the witness, Mr. Davis.

17        JUDGE NASTOFF: All right. And I would make the

18    same caveats, I am obviously familiar with his

19    reputation in the community but I just don't know him

20    personally. And just so the record is clear, Judge    09:55AM

21    Pater, you believe that you can weigh the testimony of

22    the last witness by the same rules that you would apply

23    to any other witness who testified in this proceeding?

24        JUDGE PATER: Yes, I do.

25        JUDGE NASTOFF: All right. And the same for you,

98

1      Judge Spaeth?

2           JUDGE SPAETH:  Absolutely.

3           JUDGE NASTOFF:  And myself as well.  All right.

4      You may proceed.

5           MS. COOK-REICH:  Next call Sherry Davis.

6                    SHERRY DAVIS

7  having been first duly sworn, was examined and testified under

8  oath as follows:

9           JUDGE NASTOFF:  Ma'am, if you could just make sure

10    as you testify that you speak into the microphone and    09:56AM

11    you can move it around if need be.  It slides.  We just

12    need to make sure that we are able to hear you as you

13    speak.  You may proceed.

14              DIRECT EXAMINATION

15  BY MS. COOK-REICH:

16      Q.    For the record, please state your name, please?

17      A.    Sherry Davis.

18      Q.    And Sherry, where do you reside?  Where do you

19  live?

20      A.    Cincinnati, Ohio.    09:56AM

21      Q.    Okay.  Do you know the man seated over here to my

22  right in the tan shirt?

23      A.    Yes, I do.

24      Q.    And who is he?

25      A.    He is my father.

99

1      Q.   I hate to ask this, how old are you?

2      A.   I am 41.

3      Q.   Would it be fair to say, Sherry, that most of your

4 life, your father has been incarcerated?

5      A.   That's correct.

6      Q.   Okay.  And how would you describe your

7 communication with Von?

8      A.   We have a strong bond.

9      Q.   Okay.  Do you visit him?

10     A.   I do.           09:57AM

11     Q.   Do you write with him?

12     A.   I am sorry?

13     Q.   Do you write with him?

14     A.   Yes, I do.

15     Q.   Do you talk to him on the phone?

16     A.   I do.

17     Q.   Sherry, do you have children?

18     A.   Yes, I do.

19     Q.   How many?

20     A.   I have two.        09:57AM

21     Q.   Boys or girls?

22     A.   Two boys.

23     Q.   Sherry, your mother was Ernestine Davis; is that

24 correct?

25     A.   That's correct.

100

1      Q.   You have had limited contact with your father

2  because he has been in prison these many years.  Is he

3  meaningful to you despite that limited contact?

4      A.   Meaningful as in?

5      Q.   Does he have meaning to you?

6      A.   Yes, he does.

7      Q.   Can you tell me what that is?

8      A.   He is my father.

9      Q.   He killed your mother?

10     A.   Yes.                                09:58AM

11     Q.   For some that would be a hard hill to overcome?

12     A.   It was very hard.  It was very hard.  It was a

13  burden that I carried for a long time.

14     Q.   You are aware that this three-judge panel is going

15  to determine whether the sentence of death is an appropriate

16  sentence again for your father?

17     A.   I am aware of that.

18     Q.   All right.  Is there anything you would like to

19  tell the three-judge panel that might encourage them not to

20  impose that death sentence?                    09:58AM

21     A.   Over the years, growing up, I have held -- it was

22  almost like a grudge, you know, I want to say it was a little

23  hatred, you know, a lot of grievance there, but I have

24  forgiven him even though this was my mother.  I have forgiven

25  him, that is just something I don't want to carry that

1    anymore. And it has drawn the two of us together. We do, you

2    know, again, have a strong bond. And I have had my mother

3    taken away from me. I would not like to see my father taken

4    away from me as well.

5         Q.   If he were given one of the life sentences and

6    never got out of prison, would you continue to have a

7    relationship with him?

8         A.   Yes, I would.

9         Q.   Continue to write him?

10        A.   Yes, I would.

11        Q.   Talk with him?

12        A.   That's correct.

13             MS. COOK-REICH: No further questions.

14             JUDGE NASTOFF: All right. Any cross-examination?

15             MR. OSTER: If we may have just one second, Your

16    Honor.

17             JUDGE NASTOFF: Sure.

18             MR. OSTER: Thank you, Your Honor.

19             JUDGE NASTOFF: You may proceed

20                        CROSS-EXAMINATION

21    BY MR. OSTER:

22        Q.   My name is Michael Oster, I'm an assistant

23    prosecutor here in Butler County. I just wanted to ask you a

24    couple of questions. How many siblings do you have?

25        A.   I have two.

JILL M. CUTTER, RPR
(513) 785-6596

1      Q.  You have two?

2      A.  That's correct.

3      Q.  Okay.  So there is more than just you and

4  Michelle, correct?

5      A.  Well, there were three of us.  And one of them has

6  passed away.

7      Q.  You had a brother his name was Tony; is that

8  correct?

9      A.  That's correct.

10      Q.  Okay.  So if someone said there was only you and

11  Michelle that would be an incorrect family history?

12      A.  Yes.

13      Q.  Okay.  And when did you first start having contact

14  with your father, Mr. Davis?

15      A.  I was a young teenager I was actually in junior

16  high school when I first started communicating with him, so I

17  would say I was about 13.

18      Q.  Do you remember what years that was?

19      A.  '81, somewhere around there, maybe.  '80.

20      Q.  Okay.  And was that limited contact at that point?

21      A.  Yes, it was.

22      Q.  Okay.  And when would you say you first started

23  having an expanded relationship with him, was that recently?

24      A.  No.  I would say it's over the past fifteen years.

25      Q.  And so when was the first time you had visited him

10:00AM

10:01AM

1  face-to-face?

2        A.  I don't remember when it was.  It's been quite a

3  while.

4        MR. OSTER:  That's all the questions we have, Your

5  Honor.

6        JUDGE NASTOFF:  Any further direct examination, or

7  redirect I should say?

8        MS. COOK-REICH:  No, Your Honor.

9        JUDGE NASTOFF:  All right.  And again, this

10  witness can be permanently released?                    10:02AM

11        MS. COOK-REICH:  Yes.

12        JUDGE NASTOFF:  All right.  Ma'am, your testimony

13  is complete, you are released from any subpoenas and

14  are you free to go about your business, thank you.

15        THE WITNESS:  Thank you.

16        MS. COOK-REICH:  If I could have a second to make

17  sure another witness is out here.

18        JUDGE NASTOFF:  That's fine.

19        MS. COOK-REICH:  Your Honor, we call Charles

20  Tipton.                                                 10:03AM

21                    CHARLES TIPTON

22  having been first duly sworn, was examined and testified under

23  oath as follows:

24        JUDGE NASTOFF:  Sir, as you testify, if you could

25  just make sure that that microphone is reasonably close

JILL M. CUTTER, RPR
(513) 785-6596

104

1          and you can move it around, you can move the base.

2                    THE WITNESS:  Thank you.

3                    JUDGE NASTOFF:  All right.  You may proceed.

4                         DIRECT EXAMINATION

5     BY MS. COOK-REICH:

6          Q.    State your name for the record, please?

7          A.    Charles Tipton.

8          Q.    And Mr. Tipton, where do you live?

9          A.    I live in Forest Park.

10         Q.    And who lives there with you?                    10:04AM

11         A.    My wife, and daughter.

12         Q.    Okay.  Which daughter?

13         A.    Carol.

14         Q.    Okay.  And that is actually your stepdaughter?

15         A.    That is my stepdaughter also, yes.

16         Q.    You previously testified at Von's mitigation in

17    1984; is that correct?

18         A.    Yes, I did for a few seconds.

19         Q.    And just for the record, the man seated over here

20    to the right in the tan shirt is?                          10:04AM

21         A.    That is Von, Red Davis.

22         Q.    Red is a nickname of his?

23         A.    Yes, it is.

24         Q.    Do you call him by Red?

25         A.    I call him by Red.

105

```
 1        Q.   Okay.  I will try to do that so that I don't
 2  confuse you.
 3        A.   Thank you.
 4        Q.   How old are you?
 5        A.   I am 77.
 6        Q.   And are you married to Von's mother?
 7        A.   I am.
 8        Q.   And her name is?
 9        A.   Alluster Tipton.
10        Q.   And I am going to ask you how old is she?      10:05AM
11        A.   She is 83.
12        Q.   Because I don't want to ask her.
13        A.   Thank you.
14        Q.   When did you get married to Alluster?
15        A.   We got married August 5th, 1962.
16        Q.   And I would tell her you were very quick with that
17  answer, you knew the date and the year.
18        A.   Thank you.
19        Q.   If Von was born in 1950 how old would he have been
20  when you and his mother married?                          10:05AM
21        A.   Well, I can only guess that Von was about nine or
22  ten, somewhere along in that age.
23        Q.   Before you and your wife married, did Alluster
24  live with her mother?
25        A.   Yes, she did.
```

1     Q.   Okay.  With the other siblings, with her other

2  children?

3     A.   Yes, she did.

4     Q.   Do you know who else lived in that household?

5     A.   No, I really don't.

6     Q.   Okay.  You are familiar with the name Nick Davis?

7     A.   Yes, I am.

8     Q.   Okay.  Who is that, or who was that?

9     A.   That is the father of Von and his siblings.

10     Q.   Okay.  And did you know Nick Davis?       10:06AM

11     A.   I knew him per se as a person in the neighborhood

12  when they were all -- we were all growing up, I knew him.

13     Q.   Okay.  Did you know Nick to be a drinker?

14     A.   No, not really.  I didn't associate with him to

15  that extent.

16     Q.   After -- you and Alluster have three children

17  together; is that correct?

18     A.   That is correct.

19     Q.   Okay.  So Alluster, including her son Gregory who

20  died as an infant, has ten children?       10:06AM

21     A.   That's correct.

22     Q.   The three children that you have together, Michael

23  is the oldest; is that correct?

24     A.   Michael is the oldest.

25     Q.   Where does he reside?

1    A.  Michael now is in a halfway house somewhere in

2  Cincinnati.

3    Q.  He had previously been to prison?

4    A.  Yes, he has.

5    Q.  And your second child, or your middle child,

6  Lavonne?

7    A.  She was killed in a train accident.

8    Q.  And what about Carlos, the third child?

9    A.  Carlos is now working for the State in Kentucky.

10    Q.  Is there any activity -- let me rephrase.  Von has    10:07AM

11  been in prison a large number of years; is that correct?

12    A.  That is correct.

13    Q.  Okay.  Prior to him going to prison, did you and

14  Von share any particular activity that you liked to do

15  together?

16    A.  Oh, yes, we were fishermen.

17    Q.  You were fishermen?

18    A.  We were fishermen.

19    Q.  Would you say that that brought you closer?

20    A.  Yes, we were very close.  We were very, very close    10:07AM

21  and we'd go fishing every Saturday.  We never missed a

22  Saturday.

23    Q.  And what would you guys talk about when you went

24  fishing?

25    A.  Oh, the one that got away.

1    Q.   Fishermen talk?

2    A.   And hurry up and come on.  Just little things,

3  nothing much, nothing personal.  Just we'll be glad when we

4  get a bite.

5    Q.   Did you guys talk about fishing topics, but not

6  personal issues?

7    A.   No, we never talked personal issues.

8    Q.   Okay.  You're obviously aware that these three

9  Judges seated here are going to decide whether to impose the

10  death sentence on Von?                                    10:08AM

11    A.   Yes, I am.

12    Q.   Is Von meaningful to you?

13    A.   Von is very meaningful to me:  Growing up, he was

14  a child that every parent would want to have.  Never a day in

15  trouble.  He would clean every Saturday.  The house, the

16  windows, but on the end was a reward, can I use the car.

17  Other than that, he was a very good child growing up.

18    Q.   While Von has been on death row for 25 years, have

19  you visited with him or exchanged mail or calls?

20    A.   I visited him when I was able to.  When I got to I    10:09AM

21  am not able to travel any distance over thirty minutes.

22    Q.   He is much farther than thirty minutes away?

23    A.   That is correct.

24    Q.   His mother Alluster has some health issues also?

25    A.   Very.

1      Q.   Does she have health issues that do not allow her

2  to go visit him?

3      A.   No, it is not that they don't allow her.  But she

4  has emphysema, asthma, she is on oxygen 24/7, so she can't

5  make them long journeys.

6      Q.   Despite not visiting with him, do you exchange

7  mail, do you write to him?

8      A.   Yes, I write to him, he writes to me, and we cover

9  all kind of little topics and subjects, and fishing is among

10  that group I guarantee you.           10:10AM

11      Q.   Would you ask this Court to impose the death

12  sentence or one of the life sentences?

13      A.   My own feeling I would love to see the life

14  sentence.  I am like every parent, I love my children.  They

15  do bad, they have to pay the penalty and the consequences, but

16  other than that, I still want to see him living.

17      Q.   Even though you -- even if a life sentence is

18  imposed he is probably never going to get out of prison?

19      A.   Yes.

20      Q.   You will never be able to fish together?     10:10AM

21      A.   No, we won't, but we can still talk and

22  communicate.

23         MS. COOK-REICH:  I have no further questions.

24  Thank you.

25         JUDGE NASTOFF:  Any cross-examination?

110

1          MR. EICHEL: Just a few things.

2                    CROSS-EXAMINATION

3     BY MR. EICHEL:

4          Q.   One follow-up on one thing, Mr. Davis, good

5     morning.

6          A.   Tipton.

7          Q.   When you said he would clean the house every

8     Saturday at the end of it his question was always can I use

9     the car?

10         A.   Well, most likely that was a reward, yes.          10:11AM

11         Q.   And most likely or was it always, if he -- if it

12    pleased you gave him the car?

13         A.   Yeah, I gave him the car for a few hours.  He

14    would bring it back.

15         Q.   He was a close son, he considers you dad and you

16    consider him son?

17         A.   That is correct.  Even though they were my

18    stepchildren, I didn't utilize that word when we were

19    together, it was always son and daughter.

20         Q.   Right.                                              10:11AM

21         A.   Family.

22         Q.   And like you feel with any of your children,

23    stepchildren or otherwise, they are your children?

24         A.   They are my children.

25         Q.   Right.  Now, Nick Davis was moved and out of the

JILL M. CUTTER, RPR
(513) 785-6596

1    picture years before you came into the picture; is that

2    correct?

3           A.    That is correct.

4           Q.    And if your -- are you saying Von was about nine

5    or ten when you came into the picture?

6           A.    Well, he was about nine or ten when I came into

7    the picture.  We didn't get married right away.  We dated for

8    a few years.

9           Q.    Mr. Tipton, I am assuming you're retired today?

10          A.    No.  I am working in security, I still have plans,    10:12AM

11   children went to college, I try to help with their expenses so

12   I went back to work, retired in 1990.

13          Q.    And in the 1960's, '70's, what was your occupation

14   then?

15          A.    I was an employee of the General Electric Company

16   in the industrial division, I was in customer service.

17          Q.    And you're basically a working man?

18          A.    Yes, sir, I surely am.

19          Q.    Okay.  All right.  No other questions I have.

20   Thank you, sir.                                                    10:13AM

21               THE WITNESS:  Thank you, sir.

22               MS. COOK-REICH:  Couple of follow-up questions.

23               JUDGE NASTOFF:  Sure.

24                        REDIRECT EXAMINATION

25   BY MS. COOK-REICH:

1          Q.    Before you and your wife married, you were married

2    before; is that correct?

3          A.    Yes, I was married for a few years before.

4          Q.    And you had children of that prior marriage?

5          A.    I had two children.

6          Q.    And you supported them with your income?

7          A.    Yes, I did.

8          Q.    And before you and Alluster were married, did she

9    live in what was called the Barricks?

10         A.    No.  Before we married, it wasn't the Barricks, it      10:14AM

11   was in the housing units in Hamilton, Ohio.  Right there on

12   Front Street.

13         Q.    And I must have written it down wrong.  What year

14   did you and Alluster get married?

15         A.    1962.

16               MS. COOK-REICH:  Thank you.

17               JUDGE NASTOFF:  Any further cross?

18               MR. EICHEL:  No, Your Honor.

19               JUDGE NASTOFF:  And again, this witness may be

20   permanently released?                                                10:14AM

21               MS. COOK-REICH:  Yes, Your Honor.

22               JUDGE NASTOFF:  All right.  Sir, your testimony is

23   complete.  You are released from any subpoenas and you

24   are free to go about your business.  Thank you.

25               THE WITNESS:  Thank you very much, Judges.

113

```
 1            MS. COOK-REICH:  I next call Alluster Tipton.
 2                   ALLUSTER TIPTON
 3   having been first duly sworn, was examined and testified under
 4   oath as follows:
 5            JUDGE NASTOFF:  Ma'am, if you would do your best
 6        to try to keep your voice up.
 7            THE WITNESS:  I will try, okay.
 8                   DIRECT EXAMINATION
 9   BY MS. COOK-REICH:
10        Q.   Can you state your name for the record, please?      10:16AM
11        A.   Alluster Tipton.
12        Q.   Alluster?
13        A.   Alluster Tipton.
14        Q.   Alluster, where do you live?
15        A.   ████████████  Forest Park, Ohio.
16        Q.   And who do you live there with?
17        A.   My husband and daughter.
18        Q.   Okay.  And your daughter is Carol?
19        A.   My daughter is Carol.
20        Q.   And your husband is Charles?                          10:17AM
21        A.   Yes.
22        Q.   And do you know the gentleman seated over here to
23   the right in the tan shirt?
24        A.   Yes, I do.
25        Q.   And who is that?
```

JILL M. CUTTER, RPR
(513) 785-6596

114

| | | |
|---|---|---|
| 1 | A. | That is my son.  Von. |
| 2 | Q. | And you call him by Von? |
| 3 | A. | I usually call him Red. |
| 4 | Q. | Okay.  Alluster, how many children have you had? |
| 5 | A. | Ten. |
| 6 | Q. | Ten children.  Okay.  And can you tell me in order |

of children?

A.    Well --

Q.    I know it is not a test, but --

A.    Well, let's see.  There is Elliot, Von, Carol, I                          10:17AM
might not get them in order here.  Elliot, Von, Carol,
Charles, Victor, Joanne, Lavonne, had one that passed that was
Gregory.  Did I get them all?

Q.    You missed Michael and Carlos?

A.    Pardon.

Q.    Michael and Carlos?

A.    Oh, Michael and Carlos.

Q.    Gregory, do you remember between which children he
was born?

A.    Pardon?                                                                          10:18AM

Q.    Gregory, your child that died, do you recall --

A.    That is the one that died, yes.

Q.    Do you recall which children he was born between?

A.    Greg was born in '56, I think it was, he was three
months old when he passed.

115

```
 1        Q.   So he was after Joanne?

 2        A.   No, before Joanne.

 3        Q.   It was before Joanne?  Okay.  Elliot and Von are

 4    your two first children; is that correct?

 5        A.   Yes.

 6        Q.   And they were born a year apart?

 7        A.   Yes.

 8        Q.   And then there is another year between Von and his

 9    sister Carol?

10        A.   Yeah, Elliot was born in '45.                        10:19AM

11        Q.   And what year was Von born?

12        A.   Von was born in '46 and Carol was born in '47.

13        Q.   And what year was Charles born?

14        A.   Charles was born in '49 I think it was.

15        Q.   And Victor has already testified he said he was

16    born in '50; is that right?

17        A.   Was that Victor?  I think he was born in, oh,

18    yeah, '50.

19        Q.   And Joanne was born in what year?

20        A.   Joanne was born in, let's see she is 51.  She is   10:19AM

21    50, so let's see.  50 from -- I am sorry, right now I can't --

22        Q.   '59, does that sound right, if she is 50 this

23    year?

24        A.   '59, she must have been born about -- I don't

25    know.
```

JILL M. CUTTER, RPR
(513) 785-6596

116

1      Q.   Okay.  Well, I will stop testing you on your kids.

2      A.   I know her birthday is ████████.

3      Q.   I will ask you about your upbringing.

4      A.   All right.

5      Q.   How many siblings do you have yourself?

6      A.   How many siblings do I have?

7      Q.   Yes.

8      A.   I am an only child.

9      Q.   Okay.

10     A.   I had a half-brother, I mean, but my mother, I am        10:20AM

11   only one through her.

12     Q.   Okay.  Alluster, you testified in Von's previous

13   1984 mitigation trial; is that correct?

14     A.   Yes.

15     Q.   You came, well, not to this courtroom, but to the

16   old courthouse and testified; is that correct?

17     A.   Yes.

18     Q.   Do you have some health problems?

19     A.   Do I have health problems?  Yes, I do.

20     Q.   What are they?                                          10:20AM

21     A.   Bronchitis, emphysema.

22     Q.   You were first married to Nick Davis; is that

23   correct?

24     A.   Yeah.

25     Q.   And do you remember what year you married him?

117

```
 1        A.    '45.

 2        Q.    Okay.  And how old were you when you got married

 3   to Nick?

 4        A.    Eighteen.

 5        Q.    And were you pregnant at the time when you and

 6   Nick married?

 7        A.    Yes.

 8        Q.    Okay.  You were pregnant with Elliot?

 9        A.    With Elliot.

10        Q.    How long were you married to Nick Davis?          10:21AM

11        A.    Oh, on average about a little over nine years.

12        Q.    Okay.  During that nine year marriage, was Nick

13   present in the household the whole time?

14        A.    No.

15        Q.    Okay.  How would you describe when Nick was there

16   or when Nick wasn't there?

17        A.    How would I describe?  I'm sorry, I have a hearing

18   problem.

19        Q.    We forgot that one, I'll try to speak up.  Could

20   you give me an indication of how often Nick was in the       10:21AM

21   household?

22        A.    Well, when we first got married Nick was in the

23   service when we first got married, then after he got out and

24   got a job, he was in and out, really.

25        Q.    He would come live with the family?
```

JILL M. CUTTER, RPR
(513) 785-6596

118

1     A.  He would come in and he would go out. For the

2  first six months it was okay, I guess, and then after that he

3  got a job and, you know, he was in and out.

4     Q.  Okay. Two of your children who have the Davis

5  name, don't have Nick as their father, is that correct,

6  biologically?

7     A.  Yes.

8     Q.  And they have two different fathers; is that

9  correct?

10     A.  Yes.           10:22AM

11     Q.  Would that be indicative of Nick being in and out

12  of the household, in and out of your family's life?

13     A.  Yes.

14     Q.  If Nick wasn't there to support the family,

15  financially or emotionally, who provided you the emotional or

16  financial support during those nine years that you were

17  married?

18     A.  When Nick wasn't there? My mother and my family.

19     Q.  Your family?

20     A.  Yes.           10:23AM

21     Q.  Would it be fair to say that you and your kids

22  stayed with your family a lot?

23     A.  Yes, we did.

24     Q.  Okay. And what are their names, your family?

25     A.  My family, I stayed with my mother.

JILL M. CUTTER, RPR
(513) 785-6596

119

1    Q.    Okay.  And your great aunt?

2    A.    Pardon?

3    Q.    And your aunt?

4    A.    Yes, my mother and my aunt.

5    Q.    Okay.  And very early on you stayed with your

6    grandmother, your mom and your aunt; is that correct?

7    A.    Yes, early, yeah, early.

8    Q.    Okay.  Do you recall how old Von was when you and

9    Charles Tipton got married?

10   A.    When Charles and I got married?  We got married --    10:23AM

11   I think he was a teenager.

12   Q.    Okay.  Would you say that while living with your

13   mother and aunt, they helped raise the children in the

14   household?

15   A.    Yes.

16   Q.    Okay.  It was kind of like a family effort?

17   A.    Yes.

18   Q.    Okay.  Von has been in prison a significant amount

19   of his life; is that correct?

20   A.    Yes.                                                  10:24AM

21   Q.    Okay.  While he has been in prison, have you had

22   contact with him?

23   A.    Yes.

24   Q.    While he has been in prison on death row for the

25   last 25 years have you had contact with him?

120

```
 1           A.    Yes, through letters, yes.

 2           Q.    Have you visited with him?

 3           A.    No, I haven't been able to visit.

 4           Q.    Is your health and the distance a difficulty for

 5      you?

 6           A.    Yeah, my health has been bad.

 7           Q.    You are aware that these three Judges are going to

 8      decide whether to impose the death sentence?

 9           A.    Yes.

10           Q.    You are aware that they have another option to       10:24AM

11      impose a life sentence?

12           A.    Yes.

13           Q.    Are you asking the Court, these three Judges to

14      impose a death sentence or a life sentence on your son?

15           A.    Pardon?

16           Q.    Are you asking these three judges to impose a

17      death sentence on your son or a life sentence?

18           A.    Not to death, for sure.

19           Q.    If Von was given a life sentence, do you feel he

20      could still play a part in your life?                          10:25AM

21           A.    What?

22           Q.    If Von is given a life sentence, do you believe

23      your son could still play a part in your live, even from

24      prison?

25           A.    Yes.  Yes.
```

121

1     Q.  Can you tell me how your son is meaningful to you?

2     A.  Von?

3     Q.  Uh-huh.

4     A.  I keep in touch with Von as long as I can through

5 letters, telephone calls if possible, but I wouldn't be able

6 to visit.  He will always be a part of my life.

7     Q.  You have had contact with Fran Welland; is that

8 correct?  Fran?

9     A.  Yes.

10    Q.  Fran has visited with you?        10:26AM

11    A.  Pardon?

12    Q.  Fran has visited with you?

13    A.  Yes, she has.

14    Q.  And your family and the rest of your family?

15    A.  Yes.

16    MS. COOK-REICH:  If I may have just a second,

17 Judge.

18    Q.  (BY MS. COOK-REICH)  Did you know Nick Davis to

19 drink, to be a drinker?

20    A.  Pardon?                   10:27AM

21    Q.  Nick Davis?

22    A.  Nick Davis?

23    Q.  Uh-huh, do you recall him to be a drinker?

24    A.  Yes.

25    Q.  Was that part of a problem in your marriage?

122

```
 1        A.   Yes.

 2        Q.   And the family life?

 3        A.   Yes, it was.

 4             MS. COOK-REICH:  If I could have one second,

 5   Judge.  Alluster, that is all of the questions I have

 6   for you, one of these gentlemen might have a question.

 7   Thank you very much.

 8             JUDGE NASTOFF:  Cross-examination.

 9             MR. EICHEL:  May it please the Court, we have no

10   questions of this lady.                                      10:28AM

11             JUDGE NASTOFF:  All right.  Ma'am, your testimony

12   is complete, so they will go ahead and escort you out

13   at this time.

14             THE WITNESS:  Thank you.

15             MS. COOK-REICH:  The defense would call Carol

16   Smith, Your Honor.

17                        CAROL SMITH

18   having been first duly sworn, was examined and testified under

19   oath as follows:

20                     DIRECT EXAMINATION                         10:28AM

21   BY MS. COOK-REICH:

22        Q.   Can you state your name for the record, please?

23        A.   Carol Smith.

24        Q.   Carol, where do you live?

25        A.   ██████████   Forest Park, Ohio.
```

JILL M. CUTTER, RPR
(513) 785-6596

1        Q.   You live with your mother and stepfather?

2        A.   Yes.

3        Q.   Do you know the man seated over here to the right

4 in the tan shirt?

5        A.   Yes.

6        Q.   Who is that?

7        A.   My brother, Von Davis.

8        Q.   Carol, there has been some testimony that you are

9 the third of ten total children born to Alluster; is that

10 correct?                                                10:29AM

11        A.   Yes.

12        Q.   And you, Elliot and Von are a year apart?

13        A.   Yes.

14        Q.   Okay.  So that makes him just a year older than

15 you are?

16        A.   Yes.

17        Q.   And you are the -- apparently the second -- I'm

18 sorry, you are first daughter born?

19        A.   First oldest daughter, yeah.

20        Q.   Who is your father?                         10:30AM

21        A.   Nicholas Davis, deceased.

22        Q.   Deceased.  Do you consider him to be a father?

23        A.   No.  Charles Tipton is my father.

24        Q.   Was Nick Davis around while you were growing up?

25        A.   No.

1     Q.   Okay.  Do you have any memories of him while you

2 were younger?

3     A.   Vague.  Seeing him, I guess, I can remember seeing

4 him maybe twice as a very young child.

5     Q.   And do you recall how old you were when Charles,

6 your father, and Alluster, your mother, married?

7     A.   I was about ten.

8     Q.   Do you recall your biological father being in and

9 out of the house at all or do you just have vague

10 recollections of him?                            10:31AM

11     A.   In and out of the house, no.

12     Q.   Which one of those two words do you agree with?

13     A.   Out of the house.

14     Q.   Out of the house.  Prior to your mother marrying

15 Charles, do you recall where you lived?

16     A.   On ███████████, Hamilton.

17     Q.   Do you remember who you lived there with?

18     A.   There was a large family, my grandmother, my great

19 aunt, my great uncle, my great uncle's wife, my brothers.

20     Q.   Okay.  Did your mother work?             10:31AM

21     A.   Yes.

22     Q.   Okay.  Did your grandmother work?

23     A.   Yes.

24     Q.   Did your great aunt work?

25     A.   Yes, everybody in the household worked.

125

1       Q.   Okay.  Could you tell us which one of those three

2   females was the head of the household?

3       A.   There was no single head of household.  Every

4   grown up in that family was a parent and told us exactly what

5   to do and they all raised us as equals.

6       Q.   Are you employed, Carol?

7       A.   Yes.

8       Q.   Where at?

9       A.   I work for Interim Home Healthcare.

10       Q.   And how far did you go in school?          10:32AM

11       A.   I graduated from high school, I took some side

12   courses just for what, better improvement.  Like, I took a

13   partial -- I took a real estate course, I took nursing

14   courses.  I have taken a few other courses just to be taking

15   them.

16       Q.   Okay.  Of the Davis children, you were the first

17   to graduate from high school; is that correct?

18       A.   Yes.

19       Q.   Von did not graduate from high school?

20       A.   No.          10:33AM

21       Q.   Elliot did not graduate from high school?

22       A.   No.

23       Q.   Elliot still lives in town?

24       A.   Yes.

25       Q.   He is ill currently?

1      A.    Yes.

2      Q.    Where did you go to high school at?

3      A.    Garfield.

4      Q.    Do you know where your brothers Elliot and Von

5   went to?

6      A.    Garfield.

7      Q.    You have two children yourself?

8      A.    Yes.

9      Q.    And their names?

10      A.    Duane Davis and Loray Thompson.                    10:33AM

11      Q.    And Loray Thompson, has actually been charged,

12   convicted of an aggravated murder; is that correct?

13      A.    True.

14      Q.    And he, in fact, faced the death penalty at one

15   time; is that correct?

16      A.    I don't remember nothing about a death penalty.

17      Q.    Did he have a capital case where he had two

18   attorneys?

19      A.    Yes.

20      Q.    Do you recall that case?                           10:33AM

21      A.    Yes.

22      Q.    You didn't testify at his mitigation trial?

23      A.    No, I did not.

24      Q.    Are there any special or significant memories you

25   have of your brother, Von, that you remember from growing up

JILL M. CUTTER, RPR
(513) 785-6596

1   together?

2        A.   Childhood memories that I don't think kids will

3   have nowadays, but we was -- we all got along great.  We

4   played a lot of childhood games.  I was the Tom boy because

5   all of the elder brothers and all of the other boys in the

6   neighborhood, I was the Tom boy.  We played sports together

7   baseball, basketball, football, we played tag, hide and go

8   seek, all of the childhood games that kids don't know anything

9   about now.  We built our own go carts and skate mobiles and

10   you name it, we did it.  I went night crawler hunting with my   10:34AM

11   brother to go get the worms for my father and my brother and

12   them to go fishing all of the time.

13        We played at the community center because kids

14   actually could go there and enjoy theirselves and it was just

15   fun growing up, then.

16        Q.   Victor has already testified this morning and I

17   want to see if you agree with the statement he made.  He said

18   that he was the favorite of the family, would that be an

19   accurate?

20        A.   The favorite?  What you do mean by favorite?   10:35AM

21        Q.   Your grandmother's favorite?

22        A.   My grandmother's favorite, yes.  You have to

23   understand why.  We picked on Victor.  So somebody had to

24   protect him.

25        Q.   Is your brother Von important to you even if he is

128

1    serving a life sentence?

2         A.   Yes.  Very much so.

3         Q.   He has been on death row 25 years.  How have you

4    kept in touch with him?

5         A.   Through letters and phone calls.

6         Q.   Okay.  You know that these three Judges are going

7    to decide whether to impose the death sentence?

8         A.   Yes.

9         Q.   You are aware that they have a life sentence

10   option, two life sentence options?                    10:36AM

11        A.   Yes.

12        Q.   Which of those two choices, life or death, are you

13   asking these Judges to impose?

14        A.   A life.  Life.  Life.

15        Q.   Do you think that even while in prison forever,

16   for the rest of his life, you could still have a relationship

17   with your brother Von?

18        A.   Yes.

19        Q.   You would still write to him?

20        A.   Yes.                                         10:36AM

21        Q.   You still call and talk?

22        A.   Yes.

23        Q.   Okay.  You have a big family?

24        A.   Yes.

25        Q.   You come from siblings of ten?

JILL M. CUTTER, RPR
(513) 785-6596

129

1      A.   Yes.

2      Q.   Are you close with Von's daughter Sherry?

3      A.   Yes.

4      Q.   Have had family gatherings?

5      A.   Yes.

6      Q.   Von has not been able to be there?

7      A.   True, yes.

8      Q.   Fran Welland has attended a family gathering?

9      A.   Yes.

10     Q.   Do you ever receive any mail from Von with          10:37AM

11   trinkets?

12     A.   Yes.  He is good for sending articles and trinkets

13   to pass around to everybody.

14     Q.   Are you aware where Sherry Davis works?

15     A.   Yes.

16     Q.   Where does she work?

17     A.   Hamilton -- Butler County Sheriff's Department.

18     Q.   What do you want these three judges to know about

19   your brother Von that might encourage them to give a sentence

20   of life, one of the life sentences versus death?              10:37AM

21     A.   Even though things have gone the way that they

22   have, you still have a good person deep inside.  And I know it

23   is hard on everybody, the Butlers and my family, and I don't

24   see where it will serve any purpose with a death sentence.

25   It's, some people say it is closure, but it is not closure.

JILL M. CUTTER, RPR
(513) 785-6596

130

1    Then you running out to the cemetery looking at a stone and

2    crying over it.  And I know it is not going to help my mother

3    and my father to know that he is locked up for life, but it is

4    a life, and I would rather see him -- I don't know how he

5    feels about it, but I would rather see him or know that he is

6    still living out his life the best he can behind those bars.

7    And I just hope that the Butlers can understand that we are

8    suffering, right along with them.  And -- I'm sorry.  But it

9    is a life.  And I know he has taken them, but the part that he

10   does that is good right now, I would like to see it continued.    10:39AM

11   And I know that he's going to deal with whatever the decision

12   is, and I know we all have to, I just hope that it is the

13   right decision.

14        Q.   Thank you.  One of the gentlemen might have a

15   question for you.

16             MR. EICHEL:  Your Honor, no questions.

17             JUDGE NASTOFF:  Ma'am, your testimony is complete

18        you can take a few of those with you if you need to but

19        your testimony is complete and you go about your

20        business.                                                    10:39AM

21             THE WITNESS:  Thank you.

22             JUDGE NASTOFF:  Can we have one moment?

23             MS. COOK-REICH:  Yes, we need check to see if

24        there is another witness.

25             (Judges confer off the record.)

1    JUDGE NASTOFF:  When Mr. Porter returns I want to

2 put something on the record.  The record will reflect

3 that both Mr. Davis' attorneys are present as well as

4 he is, and representatives from the State are present.

5 During the testimony of the last witness, Carol Smith,

6 she indicated that she was the mother of Loray Thompson

7 and I just felt that it is necessary to disclose on the

8 record that I was a member of the prosecution team

9 against Loray Thompson, in fact, I argued to the jury

10 that he should receive the death sentence.  It was not  10:41AM

11 imposed, he received one of the life sentences in that

12 case.  I can tell you that it has no impact on the way

13 that I would weigh her testimony, but again, in the

14 interest of full disclosure I do feel that I should

15 make that known to everyone.  I had no knowledge I

16 mean, Smith, Thompson, Davis there was no notice to me

17 that that would come up at all.  But I did want to

18 indicate that for the record, and if either side has

19 any questions for me, about that issue feel free to ask

20 those.  Is there anything from the State?  10:42AM

21    MR. EICHEL:  Your Honor, please, it slipped my

22 mind that you were on that prosecution team, so I was

23 going to object to relevancy, but then I thought I

24 chose not to, matter of strategy.

25    JUDGE NASTOFF:  Go ahead.

132

1    MR. PORTER:  In interest of full candor, we were

2    aware that Your Honor, that you were involved in the

3    prosecution, and we made a decision long ago not to

4    challenge you on that.

5    JUDGE NASTOFF:  All right.  Okay.  Well, I just

6    again, in the interest of wanting everything out there,

7    I thought that I should state that.  Are you prepared

8    to proceed then with your next witness?

9    MR. PORTER:  We are, Your Honor.  Cynthia Mausser.

10   MR. OSTER:  Your Honor, before the witness comes            10:43AM

11   in, I would object to this witness being called.

12   JUDGE NASTOFF:  Okay.  All right.  Well, why don't

13   we go ahead and be heard on that matter first.

14   MR. OSTER:  Your Honor, Ms. Mausser is the chair

15   of the Adult Parole Authority.

16   JUDGE NASTOFF:  Yeah, in fact, I should also

17   mention I guess, since we are doing all of this, that I

18   serve on the Ohio Criminal Sentencing Commission,

19   Cynthia Mausser, if she is not a member, she certainly

20   is present at a large number of those meetings, I know      10:43AM

21   her, but only professionally through those meetings.

22   Other than contact in those meeting, the only other

23   contact I had is that she had invited me at one point

24   to attend a parole hearing to observe.  Of course my

25   schedule, her schedule never allowed that to take place

133

1    at least as of yet, but I do want to indicate that I do

2    -- I am familiar with Ms. Mausser as well, but again, I

3    only know her professionally and I can judge her

4    credibility the same as any other witness but if she

5    were to testify.

6        MR. OSTER:  Your Honor, a couple of reasons, first

7    1992 case of *State v. Mills*, M-I-L-L-S, 62 Ohio State

8    3rd 357, I believe the pinpoint cite would be 374, in

9    discussing whether or not a trial Judge erred in

10   failing to instruct in the possibility of parole, the          10:44AM

11   Court stated that release on parole other than

12   specified after a minimum of 20 or 30 years and a life

13   sentence does not relate to the specified statutory

14   factors and is a nebulous area which the trial court

15   may legitimately avoid.  Further, we would state and I

16   would proffer to this Court, I have spoken to Ms.

17   Mausser, Ms. Mausser is a member of a board, one

18   person, statutorily that board has to have between

19   seven to twelve people on that board.  Ms. Mausser

20   herself could not testify and has told me that she          10:45AM

21   would not be in a position to be able to testify

22   whether or not she would vote for parole or not vote

23   for parole, it would be improper for her to say that

24   she could not say what a majority of the board would do

25   as they are not here.  None of the board members, even

134

1    if all seven or twelve were present would be able to

2    say how they would vote because this case is not in

3    front of them.  It has not been presented to them.  The

4    entire thing would be speculation in which they could

5    not be able to adequately express an opinion.  It would

6    be similar, I think the case of *State v. Jenkins*, the

7    1984 case where they first tried testimony of social

8    scientists and statistics, possibilities, that was an

9    Ohio Supreme Court case for the record, 15 Ohio State

10   3rd, 164, it failed to show a number of things as to          10:46AM

11   deterrents and murder.

12       There has been cases that have talked about how

13   much something costs and that is not relevant to the

14   specifics of this individual and his factors.  And it

15   cannot be forgotten that that is what the Court is here

16   to weigh, is the specifics to this individual.  Ms.

17   Mausser, as the head of this board cannot discuss what

18   the board would do on a case that is not before her.

19   Going outside the touch of Ohio, I know the Supreme

20   Court of Missouri has looked at this issue in the case         10:46AM

21   of W-I-L-C-H-E-R, *Wilcher vs. State*, 1997, 697, SO.2D

22   1087, and they found that because parole is not

23   automatic, that no person has a right to it, allowing

24   argument or testimony regarding a possibility of the

25   defendant some day being paroled is in effect inviting

135

1    the jury, in this case the three-judge panel, to

2    speculate how ten years in the future the parole board

3    may exercise its legislatively granted discretionary

4    authority.  This would introduce into the sentencing

5    proceedings an arbitrary fact, while obviously not the

6    Court, the State of Ohio court, the wording, the

7    reasoning, falls perfectly in line with Ohio statutes

8    and is something that Ms. Mausser simply cannot do.

9    Ms. Mausser could not promise you that she would be on

10   the parole board when Mr. Davis' case is heard if it          10:47AM

11   ever is heard.

12        And so, Your Honor, because it is not A, relevant

13   because it is not specific to this defendant, it would

14   be entire speculation because she is only a member of

15   one of seven to twelve persons on a board that does not

16   even have this case in front of it.  She cannot promise

17   us that she would be on the board at the time it came

18   in front of it, and she could not give an opinion as to

19   how she, herself, would even vote.  This is entirely

20   irrelevant and speculative and should not be in front          10:48AM

21   of this three-judge panel for this matter.

22        JUDGE NASTOFF:  Thank you, Mr. Oster.  Mr. Porter,

23   Ms. Cook-Reich, do you wish to respond?

24        MR. PORTER:  I do, Your Honor.  I first direct

25   Court to *State vs. Bradley*, 42 Ohio State 3rd, 136.

1    Pinpoint cite 149.  The Court held, quoting now from

2    the Court, the Ohio Supreme Court, similar

3    consideration should be given under RC 2929.04(D)(7) to

4    the probability that appellate will never be released

5    from prison, if sentenced to life in prison, the weight

6    of this consideration is minimal substantially however

7    by the fact that appellate was in the penal institution

8    when the attack occurred.  Obviously, the second

9    sentence doesn't apply.  The first sentence does apply.

10   Going ahead and looking at the case of *State vs.*    10:49AM

11   *Campbell*, C-A-M-P-B-E-L-L, 90 Ohio State 3rd, 320

12   pinpoint cite on this would be 327, quote, and this is

13   in parens, although the State contends that this is not

14   a mitigating factor at all, with respect to whether he

15   will ever be released, we have -- and we have

16   recognized that consideration shall be given under

17   2929.04(D)(7) to the probability that appellate will

18   never be released from prison if sentenced to a life in

19   prison.

20       There is a unique situation in this case.  And I    10:49AM

21   know, Judge Nastoff, we have been before you for two

22   years and every time we said there is a unique

23   situation in this case.  We could have probably pulled

24   (inaudible), there is in this case a very, with respect

25   to this issue, a very unique thing, because Von is

JILL M. CUTTER, RPR
(513) 785-6596

1    going to be parole eligible in six years, so normally

2    if this Court was deciding on a -- to impose thirty to

3    life or death, the Court would actually be looking at

4    him having to serve thirty years.  It becomes a much

5    different equation in this case because he is parole

6    eligible in six years and I think that issue has to be

7    addressed.

8         We have, and again with all due respect to the

9    prosecutor, we will be in a position of surprise and

10   affirmative damage if she testifies as the prosecution          10:50AM

11   is suggesting because we, in fact, interviewed her four

12   months ago and Ms. Cook will testify, if necessary,

13   that that is not what we were told.

14        JUDGE NASTOFF:  All right.  One thing that I will

15   indicate before we go forward and I think probably what

16   would be -- what I would recommend is that we take a

17   brief break, it's probably a good time to take a brief

18   break anyway, provide us with copies of Mills,

19   Campbell, Bradley for us to review.  But what I am

20   going to indicate is the materials that are put out by          10:51AM

21   the Ohio Judicial College on capital cases, it's

22   something that I have used as a resource in preparing

23   for the capital cases that have been before this Court.

24   On the outline they list mitigating factors and it's

25   under 7, any other factor that is relevant to the issue

1  of whether the offender should be sentenced to death,

2  subsection P, probability if not released from prison,

3  and the citation is to the Campbell case.  I can

4  indicate that this Court relied on Campbell in citing

5  that as a mitigating factor in the Geldridge case and I

6  think that was included in the sentencing opinion of

7  the Court that that was one of the factors.

8  I can't remember as I sit here now how much weight

9  was given to it, but it was a factor that existed and

10  was considered by the panel in that case.  But, in all          10:52AM

11  fairness, I think that I -- that was a case of life

12  without parole.  This is not, so I would be willing to

13  read those cases before we rule and I think that -- I

14  don't think that either of you are familiar with

15  Bradley, Campbell or Mills off the top of your heads,

16  are you?

17  JUDGE SPAETH: Sure.

18  JUDGE NASTOFF:  Are you?

19  JUDGE SPAETH: Absolutely.

20  JUDGE NASTOFF:  So any objection to my proposal          10:53AM

21  that we take a brief break?

22  JUDGE PATER:  Let me ask a follow-up question or

23  two before we do that.  The response given by defense

24  counsel to what was raised by the State's counsel, I

25  think to not address the primary objection, and the

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
STATE COURT TRANSCRIPTS - Page 1205

1   primary objection seemed to be that we are looking at

2   speculation here. I don't know that the State was

3   unaware of the case law that Judge Nastoff cited here

4   and was cited by defense counsel in the Campbell case,

5   that the likelihood of there not being parole is a

6   mitigating factor. That is the case law. We are all

7   bound by that, I believe.

8       But the fundamental question here seems to me is,

9   how can that, if there is such evidence as there is

10  likelihood that there will not be parole, how can such   10:53AM

11  evidence be introduced? And what was alleged by the

12  State's attorney here by the prosecutor, is that you

13  have a seven to twelve member board; that the board, in

14  fact, is the entity that would make any such decision;

15  that that decision would have to be made and by

16  concession of defense counsel, could only be made at

17  some point at least six years from now; that at that

18  time, there is no assurance whatsoever that Ms. Mausser

19  would be on the board. There is no knowledge

20  whatsoever of who else would be on the board. There is   10:54AM

21  no way to determine how those seven to twelve members

22  would vote. Therefore, anything that Ms. Mausser would

23  say, would have to be speculation. That is the thrust

24  of the State's position it seems to me. And I don't

25  think defense has addressed that at all.

140

1    MR. PORTER: Certainly her past experience is
2    relevant experience, she can speak to that.
3    JUDGE PATER: Can you proffer? Are you willing to
4    proffer at this point -- are you saying that Ms.
5    Mausser has experience? Is she going to get on the
6    stand and say, you know, in my experience we have had
7    ten cases where a person has been convicted of a first
8    murder, he was convicted of a second murder, he was
9    eligible for parole after 30 years, 25 years, 20 years,
10   and in all of those cases, the parole -- the request     10:55AM
11   for parole was rejected, is that the kind of specific
12   testimony that we are going to hear or are we just
13   going to hear I think? What can you proffer?
14   MR. PORTER: It is my belief based upon our
15   conversation with her through three or four months ago,
16   is that she will say based upon similar factors, that
17   she has seen in other cases, she would not anticipate
18   that he would ever be paroled.
19   JUDGE NASTOFF: All right. I think we know what
20   we are dealing with.                                       10:55AM
21   MR. OSTER: If I may, the only thing I would say
22   is looking at Bradley and Campbell, they talk about
23   consideration being given. Your Honor, citing the
24   Geldridge case, talked about consideration, we are
25   talking about testimony. Testimony still has to meet

JILL M. CUTTER, RPR
(513) 785-6596

1   Rules of Evidence.  You can give consideration in

2   closing argument when they argue that parole is, as

3   they have been stating an option.  You can give a

4   consideration as a catch all based upon that, but the

5   Rules of Evidence and testimony can't just be

6   eviscerated because there is a quote, unquote, unique

7   situation.  Statutes, Rules of Evidence, still must be

8   followed whether a situation is as ordinary and as

9   plain as day or as unique as there can be.  There still

10  are guidelines that we must follow even in the most          10:56AM

11  unique of situations.

12      MR. PORTER:  If I can respond twofold to that,

13  first is, as the Court well knows, the Court is not

14  locked into the Rules of Evidence in a mitigation

15  capital hearing, and secondly, what I think I hear the

16  prosecutor arguing is, yeah, you can consider this as a

17  mitigating factor, they just can't introduce any

18  evidence on it.  I mean, you know, at that point, how

19  can we get up, how can Von get up and argue something

20  as a mitigating factor that you have precluded us from     10:56AM

21  producing testimony?  You know, maybe we can do that.

22  I guess I would, if I was the prosecutor, I would

23  object.  There would be no evidence.  And secondly, if

24  I was a three-judge panel, and I am certainly not

25  trying to put myself in your position, but would I go,

142

1   well, I am not going to give that any weight because

2   Porter didn't introduced any testimony.

3          JUDGE NASTOFF:  All right.

4          JUDGE SPAETH: Can I interject, please?  The

5   defense team is suggesting that the witness is going to

6   testify as to a probability, that sounds like an

7   opinion to me.  It seems to me that we just simply put

8   the witness on the stand, allow the witness to be voir

9   dired before the witness states an opinion, then we

10  will argue whether or not the witness has the proper          10:57AM

11  basis under Rule 702 to the extent it is applicable to

12  this case and that Rule is applicable to this case

13  whether or not that witness has sufficient background,

14  knowledge, experience, that she would be in a position

15  to give this opinion.

16         And instead of speculating as to what the witness'

17  knowledge, experience, may be of this topic, let's hear

18  from the witness and allow the State to voir dire and

19  then we will determine whether or not she is going to

20  be able to give us an opinion.  It sounds like all          10:58AM

21  three of the Judges, myself included, are in agreement

22  that this testimony has some relevance and it is proper

23  in a mitigation hearing, this type of evidence, maybe

24  not this particular testimony or this particular

25  witness, but evidence of the probability of release,

143

1  and the likelihood of parole is relevant. So that

2  would be my suggestion for the record as to how we

3  should proceed at this juncture.

4      JUDGE NASTOFF: All right. With that being said,

5  why don't we take a brief break. Provide those cases.

6  We will discuss the matter further and we will come out

7  and be able to proceed in the appropriate matter.

8      MR. PORTER: I just have a housekeeping matter.

9      JUDGE NASTOFF: Can it wait until we get back?

10     MR. PORTER: It's just a minor -- I am willing to        10:59AM

11  provide the Court with copies of the cases. I just

12  have mine highlighted and starred at the relevant

13  paragraph. I didn't want to be accused of leading the

14  Court.

15     JUDGE NASTOFF: Well, hopefully you would draw our

16  attentions to the portions that you thought were

17  relevant. I don't think that there is anything wrong

18  with that. All right.

19             (Recess taken at this time.)

20     JUDGE NASTOFF: We're back on record in State of     11:37AM

21  Ohio vs. Von Clark Davis, CR1983-12-0614. All parties

22  and counsel present prior to our recess again are

23  present including all three members of the panel.

24     During the recess, we reviewed the cases that were

25  cited by counsel. And discussing the issue, the

144

1  testimony of Cynthia Mausser at this time, I think it

2  would be appropriate to proceed in the manner that was

3  referenced by Judge Spaeth in his comments before we

4  left the bench.  Let's start to hear the testimony, and

5  if you think that it's appropriate to object at a given

6  point in time we will address the objection.

7  　　　MR. OSTER:  Just so I am clear, Your Honor, this

8  is actual testimony, it's not proffered as a Dauber.  I

9  just want to make sure I understand how we are

10 proceeding.                                        11:38AM

11 　　　JUDGE SPAETH:  I didn't hear Dauber or 702 as the

12 basis of your objection until just a moment ago.

13 　　　MR. OSTER:  It wasn't, Your Honor.  I believe Your

14 Honor said 702 when you were referencing your

15 suggestion as to how to proceed.

16 　　　JUDGE SPAETH:  I think the witness can testify,

17 counsel, to facts as her knowledge, her experience.

18 None of that is in the form of an opinion.  If at some

19 point in time the defense wishes to qualify her as an

20 expert, have her state an expert opinion, then to the   11:39AM

21 extent that Rule 702 applies in a capital sentencing

22 proceeding such as this, the Court will take a look at

23 her background, knowledge, information, the factors set

24 forth in Rule 702 and opinions similar to Dauber under

25 Ohio law, and make a determination as to whether or not

1  that opinion will or will not be admitted.

2      I would suggest that if prior to her stating an

3  opinion if the State team wishes to voir dire the

4  witness as to her knowledge, experience, background and

5  basis to form such an opinion that the State be

6  permitted to do so.  But in the meantime, the witness

7  can testify as any other witness to information that

8  she has firsthand knowledge of that is not otherwise

9  objectionable under the Rules of Evidence.

10      MR. OSTER:  I apologize, I must have been                    11:40AM

11  inarticulate in my question.  I was just asking whether

12  it was actually going to be direct testimony or

13  proffered because I was not sure what we were

14  discussing.  I am clear on what we are doing now.

15      JUDGE SPAETH:  I think it is direct testimony.  I

16  wasn't -- probably wasn't very clear in my response.

17      MR. OSTER:  Thank you, Your Honor.

18      JUDGE NASTOFF:  I would concur.

19      JUDGE PATER:  I concur as well.

20      JUDGE NASTOFF:  All right.  Call the witness.               11:40AM

21                 CYNTHIA MAUSSER

22  having been first duly sworn, was examined and testified under

23  oath as follows:

24

25                 DIRECT EXAMINATION

                 JILL M. CUTTER, RPR
                   (513) 785-6596

1    BY MR. PORTER:

2         Q.   Can you state your name for the record, please?

3         A.   Cynthia Mausser.

4         Q.   Could you spell your last name for Jill, the court

5    reporter?

6         A.   M-A-U-S-S-E-R.

7         Q.   And your work address?

8         A.   770 West Broad Street in Columbus.

9         Q.   Are you currently employed, Ms. Mausser?

10        A.   Yes.                                                    11:41AM

11        Q.   And for whom are you employed?

12        A.   I am employed with the Department of

13   Rehabilitations and Correction.

14        Q.   And your current title in that position?

15        A.   I am the parole board chair.

16        Q.   What does that entitle?

17        A.   The chair, well, I am a member of the board and

18   then the chair is responsible for the overall management of

19   the duties of the board members, hearing officers, and other

20   staff, administrative staff that work for the board.          11:41AM

21        Q.   Do you also sit on the parole board itself in

22   that -- in your duties as head of the parole board?

23        A.   Yes, I do.

24        Q.   How long have you held that job?

25        A.   As chair since October, 2005.

147

1      Q.   Prior to that, did you work for the same employer?

2      A.   Yes.

3      Q.   And your role then was?

4      A.   I was a board member since 2001.

5      Q.   How does one become a member of the parole board?

6      A.   You are appointed by the director of the

7 department.

8      Q.   How does one become head of the parole board?

9      A.   It's the same appointment.  It's appointed by the

10 director.                                    11:42AM

11      Q.   It's my understanding that you are also a licensed

12 attorney?

13      A.   Yes.

14      Q.   And what year were you licensed?

15      A.   1991.

16      Q.   And we have spoken once previously regarding your

17 testimony?

18      A.   Yes.

19      Q.   And several times about serving the subpoena; is

20 that correct?                                 11:43AM

21      A.   Yes.

22      Q.   And I did not know when I spoke to you, but is it

23 my understanding you used to work for the office of the Ohio

24 Public Defender?

25      A.   I did.

148

1    Q.   And in what capacity?

2    A.   I was assistant public defender.  I worked at

3    prison legal services at Lorraine Correctional representing

4    technical parole violators in front of the parole board.  I

5    was an assistant state public defender and I worked at

6    Lorraine Correctional Institution in prison legal services.

7    Essentially representing parole violators in front of the

8    parole board.

9    Q.   I am going to ask you just some general questions

10   first on how the parole board operates.                    11:43AM

11   A.   Okay.

12   Q.   And then focus your attention.  How does a case

13   come before the parole board?

14   A.   Are you talking about a case for release onto

15   parole?

16   Q.   Yes.

17   A.   That type of case?  When an offender serves their

18   minimum sentence, that month that they are eligible for parole

19   consideration is calculated by the Bureau of Sentence

20   Computations.  And they are put on what we call a call sheet   11:44AM

21   or it is a list of that month's hearings through the various

22   institutions in the department.  And then once an offender is

23   seen after their statutory first hearing, any subsequent

24   release consideration hearing is determined by the board at

25   that first hearing.

149

1  Q.  Is any sort of investigation conducted with

2  respect to a parole hearing?

3  A.  We review whether it is either a presentence

4  investigation that the Court may have ordered, or an offender

5  background investigation or post-sentence investigation.

6  Those reports that are prepared by parole officers or

7  probation officers are reviewed by us.  They are our primary

8  source of information.

9  Q.  And I probably didn't articulate my question very

10 well.  If someone is on the list, and I forget your          11:45AM

11 terminology already, to have a parole board hearing, is there

12 a separate investigation conducted at that time?

13 A.  No.

14 Q.  Is there some procedure for soliciting input from

15 individuals with respect to a parole board hearing?

16 A.  We are mandated by statute to send out notice to

17 the sentencing judge, the county prosecutor, and any victim

18 that might be registered with the office of victim's services

19 advising.  Right now the requirement is 21 days in advance of

20 the hearing that this hearing is going to be conducted.  And   11:45AM

21 then any information that we receive based on those notices,

22 is reviewed as well as a result of Laura's law we have to post

23 hearing dates on the DRC website.  So sometimes we get in just

24 general comments from the public and that information is

25 considered as well.

JILL M. CUTTER, RPR
(513) 785-6596

1    Q.   In a case such as this where there is a presiding

2   Judge and two other Judges involved, will the parole board

3   seek input from just a presiding judge or do they seek it from

4   all three Judges?

5    A.   The statutory requirement is that notice is sent

6   to the presiding judge and I believe that is still -- there

7   was a minor change to that statute as a result of House Bill

8   130, but I don't believe that that particular language was

9   changed.  So it is sent to the presiding judge.

10    Q.   Is there any psychological testing done with

11   respect to an individual prior to a parole board hearing?

12    A.   If we are considering release of an offender, we

13   will order what is called a clinical risk assessment.  It is

14   not a full psychological evaluation, but current practice is

15   for this document to be requested through the mental health

16   division or department in that particular prison where the

17   offender is incarcerated, and they will interview the

18   offender, review file material, and then submit a report to us

19   assessing 24 established risk factors and whether or not they

20   are present or not present in this particular individual's

21   case and they make sort of a general conclusion about the

22   level of risk.

23    Q.   And you use the term, they conduct, would you tell

24   the Judges when you use the term they, who we are talking

25   about?

11:46AM

11:47AM

1     A.   It is somebody in the mental health department in

2    the institutions, and they are usually, I can't remember the

3    exact title, I think psychology assistant actually conducts

4    the interview and then that is signed off on by the

5    supervising psychologist in the individual prisons.  That may

6    have changed a little bit due to some -- that is generally the

7    way it is in the institutions, who actually conducts the

8    interview and then who signs -- a supervisor signs off on the

9    report.

10     Q.   And help me here because I am a little bit

11    confused.  Is that done in all cases that are coming before

12    the --

13     A.   No.

14     Q.   -- parole board?  What is the criteria for --

15     A.   We usually request that when we are somewhat

16    considering whether release is appropriate -- let me restate

17    that.  We usually order that when we are actually considering

18    releasing someone.  So if someone is coming out for a first

19    hearing its not an automatic thing that is ordered.  It is at

20    the discretion of the board member, you know.  I might be

21    leaning towards release on this person, so I am going to go

22    ahead and ask for this report to further aid in that decision

23    making.

24     Q.   And I think, and I am not trying to put words in

25    your mouth, so please don't take it that way.  I thought you

11:49AM

11:49AM

1    said there were 24 factors to be considered; am I correct

2    there?

3        A.    Correct.

4        Q.    And do you have a list or can you tell the Judges

5    what those factors are?

6        A.    I do not have the 24 memorized, but it's prior

7    criminal history. There is elementary school maladjustment.

8    I think they review programming. They review prior probation

9    or parole violations, how much the level of violence or if you

10   have hurt people previously. And I know they categorize that    11:49AM

11   as something that I am not stating correctly now, but that is

12   one of the risk factors. I am trying to think of what some of

13   the other ones are, but they are based on the history of the

14   individual. Did I say prison adjustment? I know that is one

15   of them. If there is a mental health diagnosis -- I'm not

16   sure how many I just named, but there are 24 that are

17   established and this is a policy of the mental health section,

18   those risk factors they utilize based on research and their

19   policies.

20       Q.    Is there a scoring system that you all use with    11:50AM

21   respect to or a score sheet with respect to individuals that

22   are appearing before a parole board?

23       A.    Yes.

24       Q.    And could you explain that to the Judges?

25       A.    We use a guideline system to assist us in making

JILL M. CUTTER, RPR
(513) 785-6596

153

1    these decisions on who is suitable for release.  And part of

2    the guidelines is a matrix, and it is a chart essentially that

3    has a score of the offense that they are convicted of rated

4    from one to 13, one being the least serious and 13 being the

5    most serious offense, and then their prior history is given

6    a -- a criminal history risk score which goes from zero to

7    eight, zero being no prior criminal history, eight being a

8    significant prior criminal history, and where these two

9    numbers meet on the grid, gives us a general range of months

10   where that is sort of a starting point, one of the factors          11:51AM

11   that we consider where release may be considered appropriate

12   or that time served is considered about standard or

13   appropriate for sort of the average heartland case, but that

14   chart is just one of the factors in the guidelines that we

15   utilize.

16        Q.   Are you able to identify for the Judges today

17   other factors that are in the guidelines or is that the same

18   as the 24 you mentioned previously?

19        A.   No.  We have by administrative rule, there is, I

20   think there are 17 mandatory considerations, and those are        11:52AM

21   much of the information I -- I referred to earlier, the PSI or

22   OVI, whatever, investigation report that we have, any

23   responses that we have gotten from our statutory notices, the

24   prisoner's adjustment both in programming and conduct, their

25   release plan, their support in the community, I know I am

154

1 missing a few, but there are certain factors that designated.

2 Senate Bill 2, parity, and those are things that we have to

3 consider. And then we have sort of taken some of the

4 sentencing guidelines from Senate Bill 2 and incorporated that

5 into our manual as well in terms of aggravating and mitigating

6 factors that relate to the offense and the offender and we

7 balance of that out and weigh all that out when we make our

8 determinations.

9      Q. You say, or you testified, excuse me, that you

10 rate the seriousness of the offense which they are currently

11 serving; is that correct?

12      A. Yes.

13      Q. And if you know, a life sentence for an individual

14 that was convicted of aggravated murder with capital

15 specifications, where would that fit on the guidelines? There

16 is a one to 13 rating, I'm sorry.

17      A. Right, somebody who was convicted of capital

18 specifications I don't know that they would be in front of us,

19 though. But an aggravated murder who is parole eligible would

20 be a 13.

21      Q. And you also testified that you would look at a

22 rate the prior offenses that the individual has committed?

23      A. We have what is called a criminal history risk

24 score and it goes from zero to eight, and includes factors

25 about their prior criminal history. That gives them this

11:53AM

11:54AM

JILL M. CUTTER, RPR
(513) 785-6596

1    score.

2       Q.    And if an individual was convicted per the time

3    that you were practicing law of what was then second degree

4    murder, are you able to put that where that would fit on a

5    score of one to eight?

6       A.    Well, it is not just convictions though, it is

7    also -- it is juvenile adjudications, it is commitments into

8    -- of more than 60 days or commitments into an institution of

9    more than a year, it is prior and current parole and/or

10   probation violations, and then those are all the things that    11:55AM

11   give you points and then you get a point taken away if you

12   were over 40 when you committed the offense, so it is not just

13   based on what you were convicted of previously, but as well as

14   whether or not you were committed to prison, served jail time

15   of a significant amount and then whether or not you had a

16   previous history of violating some sort of supervision.

17      Q.    And am I correct and I don't want to lead you,

18   does it detract from your score or increase your score if you

19   have a prior parole violation?

20      A.    It increases your score.                              11:56AM

21      Q.    If you have served a prior term of incarceration

22   for approximately ten years, would that increase or decrease

23   your score?

24      A.    That would increase your score.

25      Q.    You used the term when we spoke -- and I don't

1     have the background and the Judges maybe probably are more

2     familiar than I am of the phrase, full board.

3        A.   Okay.  Yes, I am familiar with that.

4        Q.   Could you explain that for the record?

5        A.   It is actually meant two different things at two

6     different points in -- along the way.  Prior to Senate Bill 2

7     full board meant case consideration by a majority of the board

8     members.  Now, we call that Central Office Board Review.  And

9     certain offenses require a majority of the board members to

10    say yes to that person in order for them to be released.       11:57AM

11    Certain other offenses don't.  Now -- I'm sorry.

12        Q.   Sorry, I cut you off.  Please continue, I

13    apologize for cutting you off.

14        A.   In 1996 along with Senate Bill 2 part of the code,

15    the process was enacted called full board open hearing and

16    when we propose parole on someone, the office of victim

17    services at the request of a victim or victim survivor can

18    request that we hold what is called a full board open hearing

19    and it is a more open hearing that we conduct at central

20    office where the victim, prosecutor, sentencing judge, law      11:57AM

21    enforcement, as well as an inmate representative come in and

22    present arguments to us for and against release.

23        Q.   With respect to an individual that has been

24    convicted of aggravated murder, would that be an offense that

25    would have required a full board hearing?

157

```
1        A.   It is an offense that would require a majority of

2   the board members to say yes.  To vote for parole.

3        Q.   And how many members are there on the parole board

4   when -- I understand two have recently resigned; is that

5   correct?

6        A.   Retired.

7        Q.   Retired, excuse me.

8        A.   Yes.  We have seven today.

9        Q.   When you have a complete complement of board

10  members, how many are there?                              11:58AM

11       A.   Statutorily it says up to twelve, but since about

12  -- since I was appointed in 2001 -- I'm sorry, since about

13  2002, we have been operating at nine.

14       Q.   When you say a full board hearing, are you saying

15  that actually -- this -- let me back up for minute.

16       A.   Okay.

17       Q.   Sorry.  Does the nine include yourself?

18       A.   Yes.

19       Q.   When you use the term full board hearing, does

20  that mean actually that all nine members appear or that it   11:59AM

21  just -- for the hearing itself or just it takes the vote of

22  five members whether they are present or not.

23       A.   It takes the vote of the majority whether or not

24  they are all present at the same time, that is not what I mean

25  by full board.  Full board now is the open hearing that takes
```

1    place. That is what we now call central office board review.

2          Q. If it is not a full board hearing then I assume it

3    is less than all -- or less than a majority of all nine; is

4    that correct?

5          A. If the case doesn't require a majority of the

6    board member's vote then it can be as few as one person, one

7    board member, I'm sorry I should say that.

8          Q. Am I gathering from your testimony that if it is a

9    full board, that there is more opportunity for the various

10    individuals that have opinions to appear and voice their      12:00PM

11    opinions?

12          A. When we have those votes, when the majority of the

13    board members have to vote on the case it is still a closed

14    proceeding, but it is subsequent generally to the institution

15    hearing. So there is some lapse in time that if someone

16    wanted to present additional information or send in additional

17    information, or contact us with additional information, we

18    would receive it, but we are also moving towards trying to

19    conduct the institutional hearings through video conference

20    with a majority of the board members participating at that      12:01PM

21    same time.

22          Q. For the individuals that you are required by

23    statute to seek input, can they -- do they have the option of

24    actually appearing before the board to present their opinion

25    or evidence?

1    A.   Yes.  We have a practice where generally the month

2  prior to the scheduled hearing date we hold a day of

3  conferences for victims, and a day of conferences for

4  offender's supporters and we meet with them to exchange

5  information.  Oftentimes with the victims, prosecutors or law

6  enforcement will attend with them.  There have been occasions

7  where we have held separate conferences, but usually they are

8  together.

9    Q.   I want to ask you a series of questions with

10  respect to whether particular facts are positive or negative    12:02PM

11  or neutral or it depends upon the case with respect to

12  consideration for parole.

13    A.   Okay.

14    Q.   And I -- if an individual has committed a similar

15  offense prior to the offense he is going to appear before the

16  board on, is that a negative, positive or --

17    A.   I would say that tends to be a negative factor.

18    Q.   And that is because?

19    A.   They are repeating criminal behavior.

20    Q.   If the Judge, prosecutor and victim oppose parole,    12:03PM

21  will that be a negative or positive or neutral factor?

22    A.   That tends to be a negative factor.

23    Q.   If a local, and I am getting away from my question

24  for a minute, so bear with me.  Is a local law enforcement

25  agency able to submit information and material to you separate

160

1   and apart from the prosecutor?

2        A.   Yes.

3        Q.   Is the local law enforcement agency one that you

4   are required to contact or would they have to do that on their

5   own?

6        A.   No, we are not required currently by statute to

7   contact them.

8        Q.   If an individual had previously been of good

9   behavior, and released, and later committed another offense of

10  similar offense, and then resumed his or her good behavior      12:04PM

11  again in the institution, would the fact that once again the

12  individual has been of good behavior, how would that -- would

13  that be a neutral, positive or negative factor?

14       A.   You are talking about somebody that was released

15  and recommitted?

16       Q.   Recommitted, had previously, let me clarify my

17  question.  Had previously been of good behavior, released,

18  recommitted on a separate offense, resumed good behavior while

19  in the institution, how would the board view that good

20  behavior, as neutral, good or bad?                              12:05PM

21       A.   The current good behavior within our guidelines we

22  rate both conduct and programming, so it is a factor that is

23  taken into consideration, but when you are considering

24  subsequent parole, the fact that they behaved and got out and

25  recommitted and then behaved again in prison I think would

JILL M. CUTTER, RPR
(513) 785-6596

1    probably tend to be more of a neutral factor, at least that

2    combination of facts that they were good then and they are

3    good now.

4              JUDGE PATER:  Before you proceed let me interject

5         with a question.

6         A.   Okay.

7              JUDGE PATER:  In the last several questions that

8         have been asked, the answers generally have been this

9         factor would tend to be what if.  I am confused about

10        what that means.  On some earlier questions we talked          12:06PM

11        about a scale of one to 13, a scale of one to eight, we

12        talked about a form that was, I think if I understood

13        the answers correctly, a form that all of the board

14        members use, a standard form, but on these questions,

15        the recent questions the answers have been well this

16        would tend to be.  What does that -- what do those

17        answers mean?  I mean, is there -- with these kinds of

18        factors that Mr. Porter is asking about, is there a

19        form that this goes onto?  Is there a set numbering

20        system or is this just an individual subjective          12:06PM

21        assessment or what?

22             THE WITNESS:  In terms of their behavior, is that

23        what you are --

24             JUDGE PATER:  Well, in terms of the last three

25        questions probably the hypotheticals that have been

1   presented.  In other words, when you are giving your

2   answer, it would tend to be this or that, what is your

3   frame of reference is what I am asking.

4       THE WITNESS:  My frame of reference is in the

5   general way that we apply the aggravating and

6   mitigating factors and all of the factors surrounding

7   somebody who is incarcerated and who are considering

8   for release.  There are so many individual

9   considerations and we are given the discretion to weigh

10  all of those individually that it is hard to say, you      12:07PM

11  know, absolutely this will happen if this person has

12  scored here or has committed these kinds of infractions

13  or has completed this kind of programming, because

14  there's, you know, you are dealing with people and

15  there is a lot of individual factors that go into that.

16  So I think the last question was about behavior or

17  institutional conduct is how we refer to it and on the

18  guidelines that we are utilizing currently this third

19  edition, we rate their institutional conduct as

20  superior, good, or fair.  And we have definitions of     12:08PM

21  those categories, so if you have never been written up,

22  and you have never been in the hole, your conduct is

23  going to be superior.  If you have, you know, if you

24  are currently in segregation appearing in front of the

25  board, obviously it is going to have -- you are going

1    to be placed in that rating of probably poor.  Fair

2    might be you have had some tickets but are you starting

3    to improve, and then good would be, you know, maybe you

4    had one when you first came in and you have gone

5    several years without having any placements in

6    segregation.  And the tickets, the behavior that the

7    board views as the most serious, is generally the

8    behavior that results in a placement in segregation.

9    So there is a lot of tickets that we -- that is how

10   they are referred to, of infractions that are written          12:09PM

11   up and guys get put, called tickets, they are responded

12   to in ways other than being placed in segregation.  And

13   that we don't necessarily consider serious or

14   significant in terms of conduct.

15        JUDGE PATER:  You may proceed.

16        MR. PORTER:  And I don't know whether it is

17   appropriate or not, and I certainly do not mean to be

18   inappropriate, the panel has not asked a lot of

19   questions and, please, and I know you know your

20   discretion and I don't mean to step on that, but please    12:09PM

21   feel free to raise any questions you have.  Thank you.

22        JUDGE PATER:  Thank you, Mr. Porter.

23        JUDGE NASTOFF:  Before you get restarted just an

24   administrative issue real quick.  This is obviously not

25   intended to affect the length of anything you do.  You

JILL M. CUTTER, RPR
(513) 785-6596

1    can obviously proceed as long as you feel appropriate.

2    We do have a judge's meeting that was previously

3    scheduled over the lunch hour, our Common Pleas Judges

4    meet on administrative matters.  I was just trying to

5    determine how much longer you anticipated the direct

6    examination going so that we may take a break at that

7    point or we may take a break now, or we may take a

8    break after the completion of the witness depending

9    on --

10        MR. PORTER:  I am at a position to break whenever    12:10PM

11   the Court does, I do not want the Judges to miss the

12   conference.  My only concern is that we do need to get

13   this -- I don't anticipate it's going to be a real long

14   witness we are working around her schedule, she needs

15   to be done by 4:00 today just because she has a

16   clemency hearing in a death penalty case tomorrow, so

17   if it would help the Court we are certainly willing to

18   accommodate and break now.

19        JUDGE NASTOFF:  Why don't we go ahead and break

20   for that meeting then at this point in time.  Would all    12:11PM

21   counsel be able to resume at 1:00?

22        MR. EICHEL:  Yes.

23        MS. COOK-REICH:  Yes, Your Honor.

24        JUDGE NASTOFF:  All right.  Ms. Mausser, would you

25   be able to be back at 1:00?

JILL M. CUTTER, RPR
(513) 785-6596

165

1    THE WITNESS: Yes, I can.

2    JUDGE NASTOFF: Ma'am, I am going to indicate that

3    since you are in the course of your testimony, I would

4    ask that you not discuss your testimony with any other

5    witnesses, and then when we come back, of course, we

6    will remind you that you are still under oath at that

7    point in time.

8    THE WITNESS: Thank you.

9    (Recess taken at this time.)

10    JUDGE NASTOFF: You may recall your witness. The      01:05PM

11    record -- before we do that the record will reflect

12    that the defendant is again present, Mr. Davis with his

13    counsel, both Mr. Porter and Ms. Cook-Reich. State's

14    representatives are present, as are all three members

15    of the panel. You may recall Cynthia Mausser.

16    MR. PORTER: Thank you, Your Honor.

17    JUDGE NASTOFF: Before we pick up. Ms. Mausser, I

18    want to remind you that you are still under oath from

19    your testimony prior to our break.

20    THE WITNESS: Yes, thank you.      01:10PM

21    Q.    (BY MR. PORTER) When we left off, Ms. Mausser, if

22    I remember correctly I was asking you whether the parole board

23    would treat certain factors either negatively, positively or

24    neutrally regarding parole and I think I have two or three

25    other factors to ask you about.

 1    A.   Okay.

 2    Q.   If an individual was on parole at the time he

 3  committed the offense that he was appearing before the board,

 4  would the board view that as a negative, positive or neutral

 5  factor?

 6    A.   That would be a negative factor.

 7    Q.   If the individual had committed a similar offense

 8  prior to committing the similar offense to the offense that he

 9  was appearing before the board, would that be viewed as a

10  negative, positive or neutral factor?                          01:11PM

11    A.   Most times I think it would be a negative factor.

12    Q.   I am going to shift gears on you, Ms. Mausser.

13    A.   Okay.

14    Q.   You said you had been on the parole board since

15  what year was it again, I'm sorry?

16    A.   I have been a member since 2001.  But with the

17  board in some capacity since '94.

18    Q.   What was -- what capacity did you serve with the

19  board prior to 2001?

20    A.   I was a hearing officer and I conducted revocation   01:12PM

21  hearings.

22    Q.   And for purposes of the Judges or the record,

23  could you tell the Court what that entailed?

24    A.   When an offender on either initially parole and

25  then post-release control after Senate Bill 2 violated

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
STATE COURT TRANSCRIPTS - Page 1233

1    conditions of their release, and the field officers were

2    seeking a return to prison, an administrative hearing had to

3    be conducted and that is, I conducted the hearing and made the

4    decision whether or not to return the person to prison.

5         Q.   All right.  Would that be the final decision or --

6    would that be a final decision or a preliminary decision?

7         A.   It was a final decision.

8         Q.   So that would be different, for those of us who

9    are old school, it would be an onsite hearing?

10        A.   Yes, it is different than an onsite hearing.          01:12PM

11        Q.   Since 2001, when you became a member of the parole

12   board, do have an estimate of how many hearings you have sat

13   on?

14        A.   No, I don't.

15        Q.   Are you able to approximate it?

16        A.   Oh, gosh, no.  Well, until I became chair in '05,

17   I was, you know, my full-time job five days a week traveling

18   to mostly the institutions in the northeast portion of the

19   State.  And any given institution you probably conducted

20   between, oh, I would say six to eight hearings a day           01:13PM

21   individually, so times five times 52, I guess would be my best

22   estimation so, a lot.  I said a lot.

23        Q.   Did you sit on hearings involving all types of

24   offenses?

25        A.   Yes.

168

1      Q.    Did you -- would that include the offenses of

2   murder and aggravated murder?

3      A.    Yes.

4      Q.    And just a little bit of background, how do the

5   board members vote on those sort of things?  Is there a

6   procedure, do they use ballots?

7      A.    In particular to aggravated murder and murder or

8   just in general?

9      Q.    Just in general first.

10     A.    Well, the institutional hearing is generally                   01:14PM

11  conducted and if it isn't a case that requires a majority vote

12  to be released, there is what we call a decision sheet that is

13  filled out and the recommendation is -- now it is typewritten

14  on there we use laptops and then that decision has to be

15  reviewed.  We have a quality assurance section that reviews it

16  just to make sure that the guidelines were applied properly,

17  and you know, calculations were done correctly.  And then they

18  ultimately have to be approved by the chair.  And then in

19  those cases, where there is a majority vote, when we conduct

20  the central office board review, those closed meetings of the                01:15PM

21  board where those cases are discussed, we have a board

22  member's complete individual vote sheets with their written

23  vote on it and then there is a record kept of the individual

24  votes as well.

25     Q.    And that is for --

169

1        A.    Not in terms of the rational, but just in terms of

2    what the actual recommendation is either parole or

3    continuance, generally.

4        Q.    And you mentioned this previously, if the board --

5    one of their options is to deny the parole, and then continue

6    it; is that correct?

7        A.    Right.

8        Q.    And what options do they have with respect to

9    continuing it?

10       A.    You set a subsequent hearing date and we can only      01:16PM

11   go ten years out.  Or that is as far as we can set a date out,

12   within ten years you have to again consider the person for

13   release.

14       Q.    Is that the same thing as what is known as a flop,

15   for lack of a better --

16       A.    I believe that is the slang term that is generally

17   used in the institutions, yes.

18       Q.    What factors does the board look at when they are

19   determining how long to schedule the next hearing for?

20       A.    The same factors that are considered in             01:17PM

21   suitability, I think probably in the length of the

22   continuance, the seriousness of the offense, probably factors

23   most significantly into the length, and one of the other

24   factors that is really important too is the sentence imposed

25   by the Court.  And we will see, you know -- under old law

JILL M. CUTTER, RPR
(513) 785-6596

1   offenders became parole eligible much sooner than the actual

2   sentence was imposed, so that weighs significantly into our

3   determinations.  So you may have a sentence of 150 years to

4   300 years, but no, for those of us working in this, they

5   became parole eligible much sooner than that, but that

6   obviously sends us or is significant in what the sentencing

7   judge was thinking about the offense when they imposed that

8   sentence.

9       Q.   Is that still a factor that you look at?

10      A.   Yes.                                                        01:18PM

11      Q.   Is it just the raw sentence, the 150 to 300 or do

12  you, in those cases where the Judge offers some rationale, do

13  you also look at the rationale?

14      A.   We look at -- if we have that information we

15  consider it.

16      Q.   In the time you have been on the parole board both

17  as a member and as the chairman of the parole board, I believe

18  you have testified that you have sat on cases involving

19  sentences for aggravated murder?

20      A.   Yes.                                                        01:18PM

21      Q.   In those cases that you have sat on, is it -- I'm

22  sorry.  Strike that.  Let me rephrase my question.  In those

23  cases that you have sat on involving aggravated murder, how

24  common is it that an individual receives parole on his first

25  board hearing?

1    A.   Well, our -- the time served reports, which are

2  what our department, their research section of our department

3  publishes yearly, suggests or shows that the average amount of

4  time served for an aggravated murder conviction right now is

5  about 27 years.  So for those folks that we still see or we

6  see as parole eligible under old law, you know, generally

7  became parole eligible at I think it was between ten and

8  fifteen years, so that would suggest that they generally do

9  not get released at that first hearing.

10    Q.   Have you sat on a parole board hearing when an                01:20PM

11  individual was convicted both of aggravated murder, and death

12  penalty specifications and got a sentence of less than death?

13    A.   I'm sorry, can you repeat that?  I'm not sure I

14  understand it.

15    Q.   It's probably because my question was

16  inarticulate.  Have you sat on a parole board hearing when the

17  individual was not only convicted of aggravated murder, but

18  was convicted of death penalty or capital specifications, but

19  the individual received a sentence of less than death?

20    A.   I don't believe so.                                           01:21PM

21    MR. PORTER:  May I have just a minute, please,

22  Your Honor?  Thank you very much for the courtesy.  I

23  have two questions left and I thank the Court for being

24  patient with me.

25    Q.   (BY MR. PORTER) And I forgot the term already.

172

1   You referred to some sort of report or something --

2       A.   A decision sheet?

3       Q.   No, I am not even good at phrasing my question

4   there. You refer to when you are talking about people serving

5   time for aggravated murder, and you said, you referred to a

6   report or a document, report is probably the wrong term,

7   document that reflects that they spend on the average 26 or 27

8   years, what is that document again, please?

9       A.   It is -- they are yearly reports that are

10  published by the Department of Rehabilitation and Corrections   01:22PM

11  research section and they are called time served reports.

12      Q.   And are those public reports?

13      A.   Yes, they are on the website.

14      Q.   Do those reflect just the past year or do they

15  reflect --

16      A.   No, I think right now they are into calendar year

17  '08.

18      Q.   And if you are aware since you were able to cite

19  to the figure today, has that figure changed dramatically over

20  the seven years have been on the parole board?   01:23PM

21      A.   It is increased by about a year over I think from

22  the calendar year -- I can't say for sure, but there was about

23  a year increase between reports.

24      Q.   Between 2001 and 2008?

25      A.   No, I think it was between 2000 -- whatever is

173

1    currently on there, and I could be mistaken that it is

2    calendar year 2008. It could be 2007 so I am not for certain.

3    But between the most recent report and I believe the previous

4    year to that I believe there has been an increase in a year.

5         Q.   And I thought of a related question so I'm going

6    to ask you a couple more than what I promised.

7         A.   Okay.

8         Q.   Is -- you talked about sitting on aggravated

9    murder cases, and as you have educated me today, an aggravated

10   murder case there is always going to be a full board case, am        01:24 PM

11   I correct in that?

12        A.   I wouldn't use the term full board because when

13   you say full board I think of the current process where we

14   have the open hearing, and that only occurs when one, we are

15   proposing parole, so the person has actually gotten a majority

16   vote, for, potentially for release, and then there is an

17   objection to that, through the office of victim services on

18   behalf of the victim to hold that hearing. All aggravated

19   murder convictions in order to be paroled, need a majority

20   vote, so all of those have to be discussed and voted on by a      01:24 PM

21   majority, at least the majority of the members in order to get

22   that vote. And we call that now Central Office Board Review.

23   It used to before 1996, it used to be called full board

24   reviews.

25        Q.   So because of that rule where everyone has to vote

JILL M. CUTTER, RPR
(513) 785-6596

1  or at least they have to get a majority, then you have at

2  least been in the position to vote on all aggravated murder

3  cases for parole purposes since you have been on the board

4  since 2001, am I correct?

5      A.   That would be accurate, yes, those that are parole

6  eligible.

7      Q.   And there would be no reason if they weren't

8  parole eligible for you to --

9      A.   No.  Correct.

10     Q.   I am now down to what I think is my final          01:25PM

11  question.

12     A.   Okay.

13     Q.   What I am going to do is ask you a hypothetical,

14  and please let me get through all of the facts before you

15  answer it if you can, in fact, answer it, okay?

16     A.   Okay.

17     Q.   Assuming that an individual has been previously

18  convicted of second degree murder, and that individual is

19  released, further assuming -- let me step back for a minute

20  and add an additional fact -- convicted of second degree    01:26PM

21  murder and I understand that no longer exists, was convicted

22  of killing his wife, and assuming that individual is paroled

23  after about a decade, and assuming that individual, while

24  still on parole, commits a second murder, and this time is

25  convicted of aggravated murder with death penalty, or capital

175

1    specifications, however you refer to it as, and that

2    individual is sentenced to death, and at some point that

3    individual is awarded a new sentencing hearing, with respect

4    to just the second murder and at the new sentencing hearing he

5    is awarded a sentence of 30 to life, based upon your

6    experience, training and work on the parole board, do you have

7    an opinion of whether that individual is likely to be paroled

8    in the future?

9         A.   Ever?

10        Q.   Ever?                                                    01:28PM

11        A.   I think that person would have to -- would likely

12   spend a large portion of the remainder of their life in

13   prison.

14        Q.   Do you have an opinion of whether that individual

15   would be likely to be granted parole in his first hearing?

16        A.   I think that would be unlikely.

17        Q.   And I just think -- I have one additional question

18   and it is just background, I am sorry, Your Honors, I know I

19   keep saying --

20             JUDGE NASTOFF:  You might want to just stop saying    01:28PM

21        that.

22        Q.   (BY MR. PORTER)  In this case, Von had his parole

23   revoked after he committed the second murder.  How does the

24   parole board -- how will the parole board, assuming -- this

25   all assumes the Court gives a sentence less than death, treat

1  the two murders? Will they be treated separately for purposes

2  of parole, or will they be grouped together and you have a

3  long look like my question is a little unclear?

4          A.   No, I think I understand what you are saying.  In

5  terms of when they become then parole eligible on that new

6  conviction, the --

7          Q.   If?

8          A.   Recommitment on the new conviction, the prior

9  murder would be considered as part of the criminal history but

10  factored into the decision making nonetheless.                    01:30PM

11         Q.   This wouldn't be a situation of occasionally --

12  it's my understanding when someone violates the parole they

13  have to, like, because they are convicted of the second

14  offense that they have to serve the remainder or at least a

15  portion of their first sentence before they start serving the

16  second sentence.  That would not be a situation in this case;

17  is that correct?  And I could have a misunderstanding of the

18  process to begin with.

19         A.   Yeah.  No, I think -- I'm not certain, but with

20  someone who is recommitted, paroled on a life sentence and     01:30PM

21  recommitted on a new life sentence you begin the new sentence

22  and then become parole eligible -- it is hard to aggregate

23  life sentences because they are the maximum sentences life

24  regardless.

25         Q.   So this wouldn't be --

1      A.   The scenario that are you suggesting I think it is

2  actually the opposite.

3      Q.   All right.

4           MR. PORTER:  I believe I don't have any more

5      questions unless my co-counsel sees otherwise.  Thank

6      you very much for your patience, Your Honor.

7           JUDGE NASTOFF:  Mr. Oster or Mr. Eichel?

8                    CROSS-EXAMINATION

9  BY MR. OSTER:

10     Q.   Good afternoon, Ms. Mausser.  Michael Oster, I am      01:31PM

11 assistant prosecuting attorney for the State of Ohio.  I

12 believe we spoke on the phone the other day.

13     A.   Yes.

14     Q.   Now, before you began working at the parole board,

15 you were assistant public defender working with parolees; is

16 that correct?

17     A.   Right.

18     Q.   And you stated that your current position is an

19 appointment.  How long are you appointed for?

20     A.   At the pleasure of the director.                        01:32PM

21     Q.   Okay.  So at any time, you could get a phone call

22 currently saying, sorry, you are no longer on the parole

23 board; is that correct?

24     A.   Yes.

25     Q.   Okay.  And is that true for -- currently there are

JILL M. CUTTER, RPR
(513) 785-6596

1  seven members, but statutorily there could be twelve, any of

2  those members could receive that same phone call as I speak

3  right now, correct?

4       A.   Correct.

5       Q.   And your title as the chair of the parole board,

6  you don't necessarily get, and I am going to use a bad term of

7  art, probably, but you don't have any special powers at the

8  hearings or during a vote or anything like that, do you?

9       A.   My vote doesn't weigh any -- isn't weighted any

10  heavier than any other board member's vote.                    01:32PM

11       Q.   And you don't get to be the first one to vote all

12  the time or anything like that, correct?

13       A.   No.

14       Q.   And the title, I think you described it before is

15  it is more of as an overall administration of the board; is

16  that correct?

17       A.   Correct.

18       Q.   And in fact, when a case is to be presented, there

19  is a primary panel member that is tasked with the

20  responsibility of actually putting on the presentation to the   01:33PM

21  board; is that correct?

22       A.   That's correct.

23       Q.   And that is not always you, correct?

24       A.   Most of the time it is not me.

25       Q.   Most of the time it is not you?

JILL M. CUTTER, RPR
(513) 785-6596

179

1   A. Right.

2   Q. So it would be one of the other currently six

3 members of the parole board would be that primary panel

4 member?

5   A. That's correct.

6   Q. Okay.  And the questions were asked of you earlier

7 and I guess for clarification let me see if maybe this

8 phraseology either makes it more confusing or less, but if

9 someone becomes parole eligible on a first offense, then they

10 have a second offense, does it matter to the parole board 01:33PM

11 whether that offense is stated as being served consecutively

12 or concurrently by the trial judge at that time?

13   A. It is a factor that we would consider, but we

14 wouldn't see that person until they become parole eligible

15 whether or not it is run consecutively or concurrently, but

16 the fact that that was part of the sentence, that that is what

17 the sentencing judge chose to do, you know, is a

18 consideration, it is a factor that we consider.

19   Q. It is a consideration in one of the multitude of

20 what we heard today in which the board has wide discretion? 01:34PM

21   A. Yes.

22   Q. And it is every, at a minimum, every ten years

23 that someone becomes eligible for a parole hearing; is that

24 accurately stated?

25   A. After first eligibility.

180

1    Q.    After first eligibility it is at least within ten

2    years?

3    A.    Correct.

4    Q.    Now, could that be one year they could have a new

5    hearing?

6    A.    Yes.

7    Q.    Two years?

8    A.    Yes.

9    Q.    So it could be every year after the first hearing,

10   correct?                                                           01:34PM

11   A.    Yes.

12   Q.    Okay.  The defendant in this case, Von Clark

13   Davis, you don't know him at all, do you?

14   A.    No, I don't.

15   Q.    Never spoken to him, correct?

16   A.    No.

17   Q.    You have reviewed a file on him, though, haven't

18   you?

19   A.    Yes.

20   Q.    And is that a parole board file that you have       01:35PM

21   reviewed on him?

22   A.    I reviewed his, I think it was the initial journal

23   entry on the second degree murder, and then there were some

24   violation reports that the initial parole officer or the

25   initial -- the first parole officer had written after the

1  current offense was committed.

2      Q.   So in your possession you had the second degree

3  murder conviction and some reports from the original parole

4  officer, did you say violations?

5      A.   Right.

6      Q.   Okay.  And is that all you've reviewed?

7      A.   No.

8      Q.   What else have you reviewed?

9      A.   I reviewed -- Mr. Porter sent me his institutional

10  summary report, and the two Supreme Court decisions that

11  overturned the previous death sentence.

12      Q.   Okay.

13      A.   No, I am sorry, one overturned and one affirmed,

14  the 1988 and the 1992 decisions, and I reviewed my previous

15  testimony that Mr. Porter sent me in that packet.

16      Q.   Your previous testimony from this case?

17      A.   Not from this case from a different death penalty

18  case.

19      Q.   Okay.  But none of those materials you've reviewed

20  would be the entire packet or a lot of the things that we have

21  talked about here today that the parole board would actually

22  review come the time of a hearing, correct?

23      A.   Correct.

24      Q.   You don't have your 24 risk factors, you don't

25  have a lot of the sheets, the reports, that would be --

01:36PM

01:36PM

182

1   wouldn't you consider that to be a very small amount of

2   information as opposed to what you would have when you go to

3   conduct a hearing?

4        A.   Yes.

5        Q.   And you said statutorily that the board can

6   consist of anywhere between seven and twelve members; is that

7   correct?

8        A.   Up to twelve is what it said statutorily.

9        Q.   Up to twelve, is there a minimum statutorily?

10        A.   Well, I think that is kind of debatable because

11   our -- in the full board statute it requires seven board -- it

12   actually says seven board members have to conduct the full

13   board hearings, so I would say that, you know, you can imply

14   that seven are at least required to conduct those.

15        Q.   Okay.  And in a situation where a person is facing

16   a life sentence, there has to be a majority of those members

17   that vote in favor of parole; is that correct?

18        A.   Correct.

19        Q.   Currently as the board stands there has to be at

20   least four members that vote for parole of someone with a life

21   sentence, correct?

22        A.   That's correct.

23        Q.   And excuse me if I misunderstood and some of the

24   terminologies were a little difficult, but in doing that, not

25   all seven members of the board have to be present though to

JILL M. CUTTER, RPR
(513) 785-6596

183

1    have that vote; is that correct?

2         A.   Right.

3         Q.   Could that vote be without your presence?

4         A.   Yes.

5         Q.   So you would not even have to be included as one

6    of the four members who would vote on that issue?

7         A.   Correct.

8         Q.   You could be one of the three that was either

9    excluded entirely?

10        A.   Yes.                                              01:38PM

11        Q.   And per statute as we spoke of, you know, you

12   could get a phone call right now, I don't wish that on you in

13   a bad economy, obviously.

14        A.   Thank you.

15        Q.   You could get a phone call right now, five other

16   board members could be appointed today, is that possible, or

17   in the near future?

18        A.   Yes.  Yes.

19        Q.   Okay.  Which would then mean that there would have

20   to be a total of seven to vote for that parole eligibility?   01:39PM

21        A.   That's correct.

22        Q.   And again, you wouldn't even have to have taken

23   part in that?

24        A.   Right.

25        Q.   And you can't, as you sit here today, tell us how

184

1    any other member of the board would ever vote on a case, could

2    you?

3         A.    No.

4         Q.    And it would actually be a bit, I don't know if

5    unethical is the word, improper for you to even assume you

6    could say how a certain person would vote, correct?

7         A.    Well, after you work with people for a certain

8    amount of time, you get a sense of how they may decide that --

9         Q.    You could not --

10        A.    But I couldn't say for certainty that someone -- I          01:39PM

11    think I could form an opinion and --

12        Q.    Could you form that opinion without having all of

13    that information in front of you to see the risk factors, all

14    of the things we have said you just had a very small portion,

15    without all of the other things could you form that opinion?

16        A.    No.

17        Q.    And as you go into a vote on a case, you don't

18    actually know for certain how any of the members is going to

19    vote, correct?

20        A.    No, I don't.                                                 01:40PM

21        Q.    And I think we -- you said this before but I want

22    to make sure, your vote as the chair is just a single vote?

23        A.    That's correct.

24        Q.    And without all of the information that we have

25    spoke about, phrase it in terms of other members of the board,

JILL M. CUTTER, RPR
(513) 785-6596

1    you, yourself, don't know how you would vote in any future

2    case without all of the information, correct?

3         A.    That's correct.

4         Q.    And when you were discussing, I believe it was

5    termed in terms of positive, negative, neutral, questions do

6    you understand what I am saying?

7         A.    Yes.

8         Q.    And Judge Pater had a couple of follow-ups to

9    that?

10        A.    Yes.                                              01:40PM

11        Q.    As you are saying tends to, or I think another

12   time you said, most times, and I understand you have a law

13   degree, so I understand as lawyers we don't like to be pinned

14   in, but essentially, is it what you are trying to say that you

15   can't know something for sure without all that information,

16   those files being properly presented to you, so you have to in

17   some way take a step back from what your true position would

18   be because it would be improper; is that correct?

19        A.    I think that is fair to say.

20        Q.    Okay.                                             01:41PM

21        A.    Yes.

22        Q.    And so for all of the different hypotheticals, the

23   four, I think four of the positive, negative, neutral, the

24   final hypothetical that was asked to you, you are trying to

25   give somewhat of a speculative answer based on a hypothetical

JILL M. CUTTER, RPR
(513) 785-6596

1    but in no way would relate to in the real world what you would

2    actually have in front of you in giving that opinion, correct?

3        A.   Correct, and I wouldn't make a predetermination of

4    someone who is not yet in front of, parole eligible.

5        Q.   Okay.  And one of the things by the statute that

6    you said, I believe you are supposed to consider is the

7    opinion of Judges or prosecutors or victims; is that correct?

8        A.   Yes.

9        Q.   But you don't necessarily have to give that a lot

10   of weight, do you?                                              01:42PM

11       A.   None of the factors that we consider are we

12   required to give a certain amount of weight to, that is all

13   within the discretion of the individual board members how much

14   weight any of us want to give to any particular factor.

15       Q.   Okay.  So again, that is something that could vary

16   across the spectrum by different board members?

17       A.   That's correct.

18       Q.   And board members sometimes will look at

19   statements from prosecutors and view that a prosecutor doesn't

20   actually see the person the way you see them now, because you   01:42PM

21   view a prosecutor as you think they see them more just at a

22   time of conviction and we never see a change, and so sometimes

23   prosecutor's opinion can be discounted a bit, would you agree

24   with that?

25       A.   I don't know that it is discounted, but I think

1  that we look at it in the context of generally the information

2  that we receive from prosecutors is that which occurred at

3  trial.

4      Q.  And, in fact, you stated you think oftentimes

5  prosecutors see the person that they did at the time of the

6  conviction, they are not, they don't see -- I'm sorry.  They

7  don't have the benefit of the information we have many years

8  after the fact, you have actually said that before, correct?

9      A.  I may.  I don't recall saying that, but I may

10  have.                                                                    01:43PM

11      Q.  Do you remember saying it to NBC News 4, April 24

12  of this year?

13      A.  Probably.  I mean -- April 24 I recall being

14  interviewed, I think that...

15      Q.  Okay.  And this same -- I can understand, but this

16  same not having the benefit of information, that would also

17  apply to the original trial judge as well, correct?

18      A.  Yes.

19      Q.  And it would apply to the victims of the crime,

20  correct?                                                                 01:44PM

21      A.  Absolutely.

22      Q.  So all of them in coming before the board, in your

23  mind -- I'm sorry.  All of them in coming in front of the

24  board, they -- I'm sorry.  Are they allowed to give testimony

25  to the board or statement to the board?

188

1      A.    Yes.

2      Q.    Okay.  So, all of them as they come before the

3  board to give their testimony, the board has much more

4  information about the person and the board believes themselves

5  to be in a better position to view a case than a prosecutor,

6  judge or victim; is that fair?

7      A.    I don't know that we feel like we are in a better

8  position.  And it is not just about the information that we

9  have about the defendant.  There is oftentimes that, you know,

10  typically like in child sexual abuse cases, you see continued          01:44PM

11  victimization over the years well into adulthood how people

12  have suffered, that it could not have been known at the time

13  of sentencing, so it is not just information about -- positive

14  information about the offender.  It is just information about

15  the effect of the offense as well to all parties involved,

16  that just because of time passing, we have the ability to

17  review and consider.

18      Q.    And so then it would be up to the discretion of

19  each individual member how much weight to give any of those

20  testimonial offerings, correct?                                        01:45PM

21      A.    Correct.

22      Q.    And as you sit here today, you cannot say how you

23  would vote if the defendant here would ever become eligible

24  for parole, can you?

25      A.    No, I can't.

189

1    Q.   And as you sit here today, you cannot say with any

2  level of certainty, how the entire board would vote if this

3  defendant ever became eligible for parole, could you?

4    A.   No, I cannot.

5    MR. OSTER:  If I could have just one moment, Your

6  Honor.

7    JUDGE NASTOFF:  You may.

8    MR. OSTER:  I would like to thank you for your

9  time, Ms. Mausser.  I don't have any further questions.

10    JUDGE NASTOFF:  See if there is any redirect.  Any    01:46PM

11  redirect examination?

12    MR. PORTER:  Thank you.  We do not have any

13  redirect.

14    THE WITNESS:  Can I correct an answer I gave

15  earlier?  I think it might be unusual --

16    JUDGE SPAETH:  Unsolicited.

17    JUDGE NASTOFF:  Yeah, there is no question before

18  you at this time.

19    THE WITNESS:  Okay.

20    JUDGE NASTOFF:  All right.  May she be released    01:47PM

21  permanently from any subpoenas or subject to recall?

22    MR. PORTER:  She can be released from our

23  subpoena, Your Honor.

24    JUDGE NASTOFF:  Thank you, Ms. Mausser.  Your

25  testimony is complete and you are released from your

190

1    subpoena and you can return to your duties.

2         THE WITNESS:  Thank you.

3         MS. COOK-REICH:  Last witness will be fairly short

4    and he is outside.

5         JUDGE NASTOFF:  Last witness or last witness

6    for --

7         MS. COOK-REICH:  For the day.

8         JUDGE NASTOFF:  Okay.

9                    JEROME STINEMAN

10   having been first duly sworn, was examined and testified under    01:47PM

11   oath as follows:

12                   DIRECT EXAMINATION

13   BY MS. COOK-REICH:

14        Q.   Can you state your name for the record, please?

15        A.   Jerome Stineman.

16        Q.   Mr. Stineman, how are you employed?

17        A.   I am self-employed, I am an attorney practicing in

18   the State of Ohio.

19        Q.   And what is your business address?

20        A.   2101 Grandin Road, Suite 601, Cincinnati, Ohio.    01:48PM

21        Q.   Have you had occasion to come to know the man

22   seated over here to the right in the tan shirt?

23        A.   Yes, I know Von Davis.

24        Q.   Okay.  How do you know Von Davis?

25        A.   I met him a number of years ago, at Southern Ohio

JILL M. CUTTER, RPR
(513) 785-6596

191

1    Correctional Facility in Lucasville.

2         Q.   And in what capacity did you come to know Von?

3         A.   I was a volunteer in the AA program that was had

4    in the general population for a number of years.  And some of

5    the inmates who were members of what was called the survivor

6    group of Alcoholics Anonymous wanted to take the message of

7    Alcoholics Anonymous to other alcoholics and they asked for

8    permission to conduct a meeting on death row and as an outside

9    visitor, volunteer as they called us, but as a member of

10   Alcoholics Anonymous, I also participated in those meetings          01:49PM

11   that Mr. Davis attended.

12        Q.   And do you remember about what year you came to

13   know Von?

14        A.   I have searched my memory, it had to be starting

15   some place around late 1989 or beginning of 1990.  Somewhere

16   in there.

17        Q.   And these were conducted at Lucasville?

18        A.   Yes, we would actually, myself and sometimes two

19   or three other volunteers, as we were called, would meet up

20   with two inmates and we conducted back to the death row, it         01:50PM

21   was L block.  I can't remember.  We go back into the prison to

22   the block where death row was, and into their general room or

23   day room whatever, where the meeting would be conducted.

24        Q.   Okay.  And was there any special standards that

25   you are aware of that a death row inmate would be able to

192

1    participate in these AA groups?

2        A.   They had to be in the highest classification, I

3    believe it was called A classification having merited the

4    right to whatever benefits were available for good behavior,

5    plus a willingness and desire to participate.

6        Q.   And could you give an estimation of how many times

7    that you met with Von for these AA meetings?

8        A.   I am pretty sure that Von was there from the

9    beginning.  The meetings went on until about four days before

10   the riots in April of '93.  And they were weekly except for          01:51PM

11   unless it was, like, Thanksgiving, Christmas weeks, and I know

12   as long as there was a meeting, Von was there.  I have to say

13   there were probably 40, maybe like 48 meetings a year.  There

14   were sometimes, you know, for holidays when meetings didn't

15   occur.

16       Q.   So for, from at least '90 I think you said, until

17   the time right before the riots occurred, which would be, you

18   said '93?

19       A.   It was April 11 of '93, I was there four days

20   before that for a meeting on death row.                              01:51PM

21       Q.   Forty-eight meetings a year you saw Von each of

22   those occasions?

23       A.   I believe he was always there unless he was sick,

24   but I don't, you know, my memory is not that good.

25       Q.   Did you, never having been to an AA meeting, I am

193

1   assuming you discussed usage of alcohol and how it affects

2   your life?

3        A.   That meeting was specifically where we read from

4   the book Alcoholics Anonymous and discussed what we read and

5   how it related to our individual lives and talked about

6   recovery from alcoholism.

7        Q.   Okay.  Did Von Clark Davis ever discuss his

8   alcohol use?

9            MR. EICHEL:  Object.  Hearsay.

10           (Judges confer off the record.)        01:52PM

11           JUDGE NASTOFF:  Establish the relevance of the

12           topic and we will decide how we want to apply the

13           hearsay rules based on the proposed relevance.

14           MS. COOK-REICH:  Dr. Smith will talk about this as

15           part of the social history also in addition to it, but

16           we had Mr. Stineman here also.

17           JUDGE NASTOFF:  Overruled.

18        Q.   (BY MS. COOK-REICH)  Did he ever discuss his

19   alcohol use?

20        A.   I am sure on many occasions he did.  Specifically,    01:53PM

21   I came to understand that crime for which he was currently

22   incarcerated had to do with an event which took place when he

23   was under the influence of alcohol to the extent that he was

24   in a blackout being, based on my experience and what he talked

25   about, was that he was able to function without recognizing

1    what he was doing at the time.

2        Q.  Okay.  Did you have contact with Von Clark Davis

3    after he -- after the death row moved from Lucasville to

4    Mansfield?

5        A.  Only by mail and we corresponded, we have

6    continued to correspond probably three or four times a year on

7    average.

8        Q.  And you have continued that to this day?

9        A.  Yes.

10       Q.  How many members of -- if you recall, because it     01:54PM

11   has been a while -- from death row would attend these

12   meetings?

13       A.  I think it may have been limited to ten.  I don't

14   think there was -- that seems to be what I recall.

15           MS. COOK-REICH:  Nothing further, thank you.  One

16       of the gentlemen here might have a question for you.

17           JUDGE NASTOFF:  Cross-examination?

18           MR. OSTER:  If we could have just a minute, Your

19       Honor.

20           JUDGE NASTOFF:  You may.                             01:55PM

21           MR. OSTER:  I'm sorry, Your Honor, just one more

22       second.

23           JUDGE NASTOFF:  That's fine.  You may proceed with

24       cross.

25                         CROSS-EXAMINATION

195

1  BY MR. OSTER:

2      Q.  My name is Michael Oster.  I'm an assistant

3  prosecutor for the State of Ohio.  I want to ask you a couple

4  questions.  Mr. Stineman, would it surprise you to know that a

5  lot of his entry records Mr. Davis said he had no problem with

6  alcohol, was not a drinker?

7      A.  Probably wouldn't surprise me.  I find that many

8  people who drink a lot consider they don't drink -- they drink

9  very little or they don't seem to think they drink at all.

10     Q.  And your testimony was that Mr. Davis said to you,        01:56PM

11 he didn't remember the events because he was in an alcoholic

12 blackout?

13     A.  Well, I am not sure.  It's been a long time --

14     Q.  That was your testimony --

15     A.  I said to my recollection that is what I

16 understood had occurred.  I am not sure how he said that or

17 exactly -- having met with him a number of times and discussed

18 various things such as -- effects of alcohol, that was my

19 understanding.

20     Q.  That was your understanding.  Okay.  Thank you.        01:57PM

21 So if he said he only had a little bit of beer on the night in

22 question, that would be inconsistent with what you remember

23 him telling you, correct?

24     A.  Well, my personal experience in having talked to

25 other alcoholics is that they --

196

1    Q.   Please, sir --

2    A.   -- the number of drinks is not --

3    Q.   Please just answer my question.

4    A.   Okay.

5    Q.   If he had said on the night in question he only

6    had a little bit of beer, that would be inconsistent with your

7    recollection of what he had told you about this blackout type

8    nature, correct?

9    A.   Not necessarily.  He could have a blackout from a

10   very small amount of alcohol.                                01:57PM

11   Q.   Are you a doctor to be able to make that

12   statement, sir?

13   A.   I am talking about it from my own experience.  I

14   drank for 26 years, I have been sober for 24.

15   Q.   Would that or would that not be inconsistent for a

16   person to blackout based on a little bit of beer?

17   A.   Maybe unusual.  I wouldn't say inconsistent.

18   MR. OSTER:  If I could have just a minute, Your

19   Honor.

20   Q.   (BY MR. OSTER) Mr. Stineman, if a person said    01:58PM

21   they had been driving a car, that is not consistent with a

22   blackout statement, is it?

23   A.   Driving a car while in a blackout?  That is not

24   inconsistent?

25   Q.   That is not -- that wouldn't be consistent being

JILL M. CUTTER, RPR
(513) 785-6596

1    able to do those two things at one time, is it?

2        A.   The things I can tell you which would be hearsay,

3    you wouldn't believe what people have done in blackouts, but

4    in my own experience I have driven numerous times in

5    blackouts.  So I would have to say it is possible, yes.

6        Q.   And you wouldn't expect someone who is in a

7    blackout to be walking around, talking to people, eating food,

8    driving, and capable of cognitive reasoning, would you?

9        A.   The actions are consistent with being in a

10   blackout.  What do you mean by cognitive reasoning?  I don't    01:59PM

11   know --

12       Q.   You are basing this solely on your experience,

13   correct?  You have no expertise whatsoever in the subject,

14   correct?

15       A.   Personal experience plus instances of other people

16   who I have encountered in blackouts --

17       Q.   I prefer if you answer my question, sir.

18       A.   Repeat the question, I'm sorry.

19       Q.   My question was, are you basing this on your

20   experience, correct?                                           01:59PM

21       A.   Yes, that's correct.

22       Q.   And you don't have a doctorate in dealing with

23   blood alcohol levels, you don't have toxicology experience as

24   far as education, do you?

25       A.   Only what I have done through defense, criminal

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
STATE COURT TRANSCRIPTS - Page 1264

198

1  defense work.

2  Q.  So that is a no; is that correct, sir?

3  A.  The answer would be I am not trained in that, no,

4  I'm not.

5  Q.  But you are trained in the art of

6  cross-examination as a defense attorney, correct?

7  A.  I was a prosecutor once.  I have been a defense

8  attorney, yeah.

9  MR. OSTER:  One moment, please, Your Honor.  We

10  have no further questions.                                    02:00PM

11  The Court:  Any redirect?

12  MS. COOK-REICH:  No, Your Honor, thank you.

13  JUDGE NASTOFF:  All right.  May this witness be

14  permanently excused?

15  MS. COOK-REICH:  Yes.

16  JUDGE NASTOFF:  Sir, you are released from your

17  subpoena and can go about your business.  Thank you.

18  THE WITNESS:  Thank you.

19  MS. COOK-REICH:  That concludes our witnesses for

20  today, Your Honor.  I wasn't able to get the third one       02:00PM

21  to come today.

22  JUDGE NASTOFF:  All right.  For planning purposes,

23  I believe that yesterday you had indicated that you

24  thought you would have four witnesses on Thursday and

25  that is what you are indicating you still believe --

JILL M. CUTTER, RPR
(513) 785-6596

199

1　　　MS. COOK-REICH: Mr. Stineman was able to come

2　today. We have asked Mr. Lee who we had here yesterday

3　to come back tomorrow just in case we needed him after

4　Dr. Smith. We have two short witnesses. And Dr. Smith

5　-- we may have to call one of those short witnesses

6　after Dr. Smith. He is traveling from Mansfield. That

7　is quite a distance.

8　　　JUDGE NASTOFF: You lost me on the math. Three?

9　　　MS. COOK-REICH: Three.

10　　　JUDGE NASTOFF: Okay. And I believe that　　02:01PM

11　yesterday we had indicated that we would begin at 10:00

12　so you will be able to have witnesses here ready to

13　proceed at 10:00?

14　　　MS. COOK-REICH: Yes, we will.

15　　　JUDGE NASTOFF: All right. And again, I'm not

16　asking the State to divulge any national security

17　secrets or anything of that nature, but based on what

18　we have heard to this point, do you have an estimate

19　for our planning purposes as to the length of any

20　rebuttal that you may be presenting?　　　　　02:01PM

21　　　MR. OSTER: I don't know if we can say without

22　hearing some of the testimony tomorrow.

23　　　JUDGE NASTOFF: I said just based on what we have

24　so far.

25　　　MR. OSTER: Certainly is a possibility. We would

200

1    attempt to put on some rebuttal in the case. I don't

2    -- right now feet to the fire, I wouldn't anticipate it

3    being extensive.

4         JUDGE NASTOFF: All right. And if so, you

5    anticipating being able to go forward with those

6    witnesses tomorrow as well if that becomes relevant?

7         MR. OSTER: Yes, Your Honor.

8         JUDGE NASTOFF: All right. Do the Judges have any

9    questions administrative or otherwise?

10        JUDGE PATER: No.                                         02:02PM

11        JUDGE SPAETH: No.

12        MR. OSTER: I guess the only question in preparing

13   tonight would be based upon what has been said, I guess

14   again, we are forecasting to try to close tomorrow?

15        JUDGE NASTOFF: It sounds to me like the evidence

16   very well may be closed tomorrow. I don't know on the

17   time, but I would anticipate that you should be in a

18   position to -- we will try to, if we're able to, to

19   give you some time to collect your thoughts before you

20   go into close, but I would have, I would certainly have   02:03PM

21   your thoughts organized to the extent that you can,

22   before you come here tomorrow.

23        MR. OSTER: Thank you, Your Honor.

24        MS. COOK-REICH: Thank you, Your Honor.

25        JUDGE NASTOFF: All right. So if there is nothing

201

1    further then at this time, we will stand in recess

2    until 10:00 a.m. tomorrow morning at which time we will

3    pick up with the rest of the defense's mitigation case.

4    If there is nothing further, we are in recess.

5              (Proceeding concluded to be reconvened the

6    following morning Thursday, September 10, 2009 at 10:00

7    a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JILL M. CUTTER, RPR
(513) 785-6596

202

1    STATE OF OHIO         )

2                        )   SS.   REPORTER'S CERTIFICATE

3    COUNTY OF BUTLER    )

4           I, JILL M. CUTTER, RPR, an Official Court Reporter

5    and Notary Public within the State of Ohio do hereby certify

6    that the foregoing proceedings were taken in stenotype by me

7    at the time and place herein set forth and thereafter reduced

8    to typewritten form;

9          That the foregoing 201 pages constitutes a true

10    and accurate transcript of the proceedings held, all done to

11    the best of my skill and ability.

12          I further certify that I am not related to any of

13    the parties hereto, nor am I in any way interested in the

14    result of the action hereof.

15          IN WITNESS WHEREOF, I have hereunto set my hand at

16    Hamilton, Ohio, this 22 day of December, 2009.

17

18

19

20                         JILL M. CUTTER   RPR
                           Official Court Reporter

21                         Butler County Common Pleas
                           Hamilton, Ohio   45011

22

23

24

25

JILL M. CUTTER, RPR
(513) 785-6596