203



```
 1              COURT OF COMMON PLEAS

 2             BUTLER COUNTY, OHIO

 3        --------------------------------

 4   STATE OF OHIO,

 5        Plaintiff,           Case No. CR-1983-12-0614
                               CIA-09-10-263
 6
                              HONORABLE ANDREW NASTOFF
 7        vs.                 HONORABLE KEITH SPAETH
                              HONORABLE CHARLES PATER
 8   VON CLARK DAVIS,

 9        Defendant.            ORIGINAL

10        --------------------------------

11

12                                    IMAGED

13

14

15

16

17            MITIGATION HEARING

18        TRANSCRIPT OF PROCEEDINGS

19           September 10, 2009

20               VOLUME III

21

22

23

24

25
```

JILL M. CUTTER, RPR
(513) 785-6596



VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
STATE COURT TRANSCRIPTS - Page 1270

204

```
 1    APPEARANCES:

 2

 3         On behalf of the plaintiff:

 4              MICHAEL A. OSTER, JR., ESQ.
                Assistant Butler County Prosecuting Attorney
 5              11th Floor
                315 High Street
 6              Hamilton, Ohio 45011
                     and
 7              DANIEL G. EICHEL, ESQ.
                Assistant Butler County Prosecuting Attorney
 8              11th Floor
                315 High Street
 9              Hamilton, Ohio 45011

10         On behalf of the defendant:

11              MELYNDA COOK-REICH, ESQ.
                Repper, Pagan, Cook
12              1501 First Avenue
                Middletown, Ohio 45044
13                   and
                RANDALL PORTER, ESQ.
14              Assistant State Public Defender
                250 East Broad Street
15              Suite 1400
                Columbus, Ohio 43215

16

17

18

19

20

21

22

23

24

25
```

JILL M. CUTTER, RPR
(513) 785-6596

205

| | | |
|---|---|---|
| 1 | Transcript of Proceedings | |
| 2 | Morning Session | 10:14:19 |
| 3 | - - - - - - - - - - - | 10:14:19 |
| 4 | JUDGE NASTOFF:  We are back on record in State of | 10:14:20 |
| 5 | Ohio vs. Von Clark Davis, CR1983-12-0614.  The record | 10:14:23 |
| 6 | will reflect that the defendant, Von Clark Davis, | 10:14:30 |
| 7 | appears personally with his counsel, Randall Porter and | 10:14:33 |
| 8 | Melynda Cook-Reich.  Also present on behalf of the | 10:14:38 |
| 9 | State of Ohio are Assistant Prosecutors Dan Eichel and | 10:14:40 |
| 10 | Michael Oster and then all three members of the | 10:14:44 |
| 11 | three-judge panel are present, myself, Judges Pater and | 10:14:47 |
| 12 | Spaeth.  Good morning to everyone. | 10:14:52 |
| 13 | When we left off yesterday, we were still hearing | 10:14:57 |
| 14 | evidence from the defense and it was communicated to us | 10:15:00 |
| 15 | that you had additional testimony or evidence that you | 10:15:07 |
| 16 | wish to proceed with this morning.  And are you | 10:15:09 |
| 17 | prepared to do that at this time? | 10:15:11 |
| 18 | MR. PORTER:  We are, Your Honor.  We do have one | 10:15:13 |
| 19 | brief housekeeping matter if we could address up front. | 10:15:15 |
| 20 | JUDGE NASTOFF:  Yes, sir. | 10:15:19 |
| 21 | MR. PORTER:  And it is addressing mainly to you | 10:15:21 |
| 22 | Judge Nastoff since you were involved in the | 10:15:24 |
| 23 | preliminary proceedings in this matter.  The Court was | 10:15:26 |
| 24 | nice enough to approve an out-of-state subpoena for | 10:15:29 |
| 25 | Delbert Flowers, the Court last Thursday when we were | 10:15:33 |

JILL M. CUTTER, RPR
(513) 785-6596

| | |
|---|---|
| 1 | here also authorized the auditor's office to issue a | 10:15:37 |
| 2 | check, so it would be a valid subpoena.  We found out | 10:15:41 |
| 3 | at a very late time that on Tuesday morning that Mr. | 10:15:45 |
| 4 | Flowers was in the hospital and he is now home, but is | 10:15:49 |
| 5 | on IV permanently.  For that reason we will not be able | 10:15:53 |
| 6 | to call him.  I just wanted the record to be clear that | 10:15:57 |
| 7 | the Court didn't believe that there was some other | 10:16:00 |
| 8 | reason that we had you go through the formality of | 10:16:02 |
| 9 | issuing the subpoena, and then failed to bring the | 10:16:06 |
| 10 | person in. | 10:16:09 |
| 11 | JUDGE NASTOFF:  All right.  Well, I appreciate you | 10:16:10 |
| 12 | supplementing the record with that information. | 10:16:14 |
| 13 | Anything else we need to take up then at this time? | 10:16:17 |
| 14 | MS. COOK-REICH:  No, Your Honor. | 10:16:20 |
| 15 | JUDGE NASTOFF:  All right.  You may call your | 10:16:21 |
| 16 | first witness of the day. | 10:16:23 |
| 17 | MS. COOK-REICH:  Rick Rotundo. | 10:16:29 |
| 18 | RICK ROTUNDO | 10:16:31 |
| 19 | having been first duly sworn, was examined and testified under | 10:16:31 |
| 20 | oath as follows: | 10:16:59 |
| 21 | JUDGE PATER:  Before we go any further, let me put | 10:16:59 |
| 22 | on the record again as I did with Victor Davis | 10:17:01 |
| 23 | yesterday.  I don't know Rick Rotundo very well.  I | 10:17:04 |
| 24 | know his brother, Jerry and his little sister Debbie. | 10:17:09 |
| 25 | I know the two of them quite well and I know the | 10:17:15 |

JILL M. CUTTER, RPR
(513) 785-6596

207

| | | |
|---|---|---|
| 1 | Rotundo family, and I recall the Rotundo family and the | 10:17:17 |
| 2 | Davis family lived side by side on Ludlow I believe, | 10:17:21 |
| 3 | for at least some time in '60s. Once again, I don't | 10:17:24 |
| 4 | think that my somewhat distant knowledge of Mr. Rotundo | 10:17:27 |
| 5 | would have anything to do with my assessment of the | 10:17:32 |
| 6 | evidence here, my ability to rule on the case, my | 10:17:34 |
| 7 | ability to assess Mr. Rotundo's statements and | 10:17:39 |
| 8 | testimony today. Does anybody want to voir dire me | 10:17:43 |
| 9 | further on that? | 10:17:47 |
| 10 | MS. COOK-REICH: No, Your Honor. | 10:17:48 |
| 11 | MR. OSTER: No. | 10:17:50 |
| 12 | MR. EICHEL: No, Your Honor. | 10:17:51 |
| 13 | JUDGE NASTOFF: All right. Thank you. You may | 10:17:52 |
| 14 | proceed. | 10:17:54 |
| 15 | DIRECT EXAMINATION | 10:17:54 |
| 16 | BY MS. COOK-REICH: | 10:17:54 |
| 17 | Q.    For the record can you state your name, please? | 10:17:54 |
| 18 | A.    Patrick Michael Rotundo.  I go by the name of | 10:17:56 |
| 19 | Rick. | 10:18:00 |
| 20 | Q.    And your address? | 10:18:00 |
| 21 | A.    ███████████  Loveland, Ohio. | 10:18:02 |
| 22 | JUDGE NASTOFF: And sir, could you slide the | 10:18:06 |
| 23 | microphone just a little bit closer? | 10:18:08 |
| 24 | THE WITNESS: Sure. | 10:18:10 |
| 25 | Q.    (BY MS. COOK-REICH)  And what is your date of | 10:18:11 |

JILL M. CUTTER, RPR
(513) 785-6596

| | | |
|---|---|---|
| 1 | birth? | 10:18:12 |
| 2 | A.  ▮▮▮▮▮ | 10:18:13 |
| 3 | Q.  Do you know the gentleman seated here to the right | 10:18:17 |
| 4 | in the green plaid shirt? | 10:18:21 |
| 5 | A.  Yes, I do. | 10:18:23 |
| 6 | Q.  And who is he? | 10:18:24 |
| 7 | A.  Von Clark Davis.  We knew each other as -- I call | 10:18:26 |
| 8 | him Red. | 10:18:29 |
| 9 | Q.  He calls you Rick and you call him Red? | 10:18:30 |
| 10 | A.  Yes. | 10:18:32 |
| 11 | Q.  You have lived next to the Davis family at some | 10:18:32 |
| 12 | point in time in your life; is that correct? | 10:18:36 |
| 13 | A.  Yes, I would say from like '64 'til about 1970. | 10:18:37 |
| 14 | Q.  Okay.  So, if you moved, or you lived next to him | 10:18:41 |
| 15 | in 1964 how old would you have been? | 10:18:45 |
| 16 | A.  Sixteen. | 10:18:47 |
| 17 | Q.  Okay.  And Red would have been a couple of years | 10:18:48 |
| 18 | older than yourself? | 10:18:52 |
| 19 | A.  I would think so, yes. | 10:18:53 |
| 20 | Q.  You were familiar with the Davis family? | 10:18:55 |
| 21 | A.  Very much so. | 10:18:59 |
| 22 | Q.  Okay.  Were you present in the Davis household on | 10:19:00 |
| 23 | occasion? | 10:19:05 |
| 24 | A.  We were -- it was like my second family. | 10:19:05 |
| 25 | Q.  Okay.  Can you describe who was living in the | 10:19:09 |

JILL M. CUTTER, RPR
(513) 785-6596

| | |
|---|---|
| 1 | household at that point in time, I guess you are 16, Red is | 10:19:12 |
| 2 | 18, what other family members are present? | 10:19:15 |
| 3 |     A.   In their home? | 10:19:18 |
| 4 |     Q.   Yes. | 10:19:19 |
| 5 |     A.   Charles Tipton, who was the patriarch, I guess, | 10:19:20 |
| 6 | and Alluster Tipton was the mother, and there were several | 10:19:26 |
| 7 | offspring, Charles Davis, Victor Davis, Elliot Davis, and I | 10:19:31 |
| 8 | think we call Tip, Mr. Tipton, we called him Tip, he had a | 10:19:36 |
| 9 | couple biological children with Alluster, I don't remember | 10:19:41 |
| 10 | their names. And it was kind of an extended family. There | 10:19:45 |
| 11 | were always friends and relatives and there were always people | 10:19:49 |
| 12 | in the home. | 10:19:55 |
| 13 |     Q.   When did you move away from that area or stop | 10:19:57 |
| 14 | living in that area? | 10:20:02 |
| 15 |     A.   As I recall, I think it was in 1970 or -- 1970 | 10:20:03 |
| 16 | late 1970, my family moved to ████████ and I moved with | 10:20:09 |
| 17 | them. | 10:20:13 |
| 18 |     Q.   Okay. So for about six years you lived next to | 10:20:13 |
| 19 | the Davis family? | 10:20:16 |
| 20 |     A.   Yes. | 10:20:17 |
| 21 |     Q.   Can you give some insight into the usage of | 10:20:17 |
| 22 | alcohol in the home? | 10:20:23 |
| 23 |     A.   Well, I can say this: As a young man, I think | 10:20:24 |
| 24 | back then we were allowed to drink when we were 18. I was | 10:20:28 |
| 25 | raised Italian and I played by the rules, but there were | 10:20:33 |

210

| | | |
|---|---|---|
| 1 | always people there, elders whether they were aunts, uncles, | 10:20:35 |
| 2 | whatever, there was always beer, people would have drinks here | 10:20:41 |
| 3 | and there, but to me, considering the time particularly in the | 10:20:44 |
| 4 | late '60s, I would say that drinking was part of the culture. | 10:20:49 |
| 5 | It was never -- I never saw any severe excess, or I mean, | 10:20:56 |
| 6 | outside of New Year's Eve and things of that nature, but I | 10:20:59 |
| 7 | would consider by today's standards reasonable based on the | 10:21:03 |
| 8 | circumstances. | 10:21:06 |
| 9 | Q. Okay. Did you have an occasion to drink with Red? | 10:21:07 |
| 10 | A. Yes, absolutely. Particularly on New Year's Eve, | 10:21:11 |
| 11 | on special occasions, birthdays, but it was always in a social | 10:21:14 |
| 12 | context, and there was always some form of parental oversight. | 10:21:17 |
| 13 | It was all a very, I guess you would say civil, controlled | 10:21:24 |
| 14 | situation for the most part. | 10:21:29 |
| 15 | Q. Okay. Would you ever have characterized it | 10:21:30 |
| 16 | something similar to the Animal House? | 10:21:36 |
| 17 | A. From a social standpoint, no, because so many of | 10:21:38 |
| 18 | the people involved were either poverty stricken, very poor | 10:21:43 |
| 19 | education, low social status and there was always a sense of | 10:21:48 |
| 20 | being thankful for what you had. The drinking I think was as | 10:21:53 |
| 21 | much an escape. I never saw any violence or any kinds of | 10:21:55 |
| 22 | extreme behavior. And Charles Tipton, the patriarch, always | 10:21:59 |
| 23 | made sure that, particularly the males were well behaved and I | 10:22:03 |
| 24 | learned quite a bit as a result of his oversight, not quite | 10:22:07 |
| 25 | Animal House I don't think. | 10:22:10 |

JILL M. CUTTER, RPR
(513) 785-6596

1     Q.   Okay.  Do you recall a bar on the corner where 10:22:11

2 locals would go? 10:22:15

3     A.   Well, yes.  There was an Amvet on the corner that 10:22:16

4 the veterans would go to and then there was a tavern at the 10:22:19

5 end of the street at Maple Avenue which I think was Master's 10:22:24

6 Tavern that was open to everybody, and I guess it was Maple, 10:22:29

7 but we never ever frequented bars there in that vicinity. 10:22:35

8     Q.   Okay.  Do you recall the particular way that 10:22:39

9 people would fill up just of beer at one of those local 10:22:43

10 taverns? 10:22:47

11     A.   Yeah.  Yes.  The old Italians particularly, I can 10:22:47

12 remember as a child, I lived -- I was born on ███████ 10:22:51

13 In 1948 and we moved in '57 then we came back to ███████ 10:22:55

14 in '63, but even as the demographics changed in 1965, '66 it 10:23:02

15 was very common to see, there were a few, like, apartments 10:23:08

16 people would take the jug to the Amvets with the hose and they 10:23:12

17 would get their gallons of beer and that was a very common 10:23:16

18 sight, but it was never anything that I thought was abusive, 10:23:19

19 it was part of the culture at the time. 10:23:22

20     Q.   Okay.  And you used the word demographics.  When 10:23:23

21 you resided in ███████ next to the Davis family for that 10:23:27

22 six year time period, what could you tell me about the race 10:23:30

23 makeup of the neighborhood? 10:23:33

24     A.   Well, originally there were old Italian, German 10:23:35

25 traditional families, and then you had an influx of 10:23:40

212

| | | |
|---|---|---|
| 1 | Appalachian culture, then we saw an influx of, I would say you | 10:23:42 |
| 2 | know, sporadic situations where you had black families in the | 10:23:45 |
| 3 | mid-1960s, and for lack of a better word, I guess as the old | 10:23:49 |
| 4 | timers died off, their homes were sold and there was clearly a | 10:23:55 |
| 5 | shift demographically as far as the population was concerned | 10:24:00 |
| 6 | and for lack of a better word the neighborhood kind of went | 10:24:03 |
| 7 | downhill significantly as each year passed. | 10:24:06 |
| 8 | Q.  Could you tell me what that meant in regards to | 10:24:10 |
| 9 | race, residential area? | 10:24:14 |
| 10 | A.  Well, clearly there were pockets of racism, there | 10:24:15 |
| 11 | were pockets of anger and apathy just based on people being | 10:24:19 |
| 12 | uneducated, poor.  There were also a lot of transient families | 10:24:24 |
| 13 | in the apartments.  And as far as race relations, I personally | 10:24:27 |
| 14 | got along with everybody.  I never really saw any real hatred. | 10:24:32 |
| 15 | It was kind of the code of the road, people respected each | 10:24:35 |
| 16 | other, and for the most part back then, you don't see the -- I | 10:24:38 |
| 17 | didn't see the kinds of things then that I see now.  While the | 10:24:43 |
| 18 | neighborhood started to look scary, I always felt safe there. | 10:24:47 |
| 19 | Q.  Was your family the only white family? | 10:24:51 |
| 20 | A.  No.  No.  I would say -- | 10:24:54 |
| 21 | JUDGE NASTOFF:  Excuse me, I don't mean to | 10:24:55 |
| 22 | interrupt, can you slow down just a little bit for the | 10:24:57 |
| 23 | court reporter? | 10:25:01 |
| 24 | THE WITNESS:  I'm sorry. | 10:25:03 |
| 25 | JUDGE NASTOFF:  No, not at all.  Thank you. | 10:25:04 |

JILL M. CUTTER, RPR
(513) 785-6596

213

| | | |
|---|---|---|
| 1 | A.   Would you please ask that again? | 10:25:09 |
| 2 | Q.   Who knows what I asked.  The reason I asked you, | 10:25:09 |
| 3 | you said the neighborhood began to look scary, what do you | 10:25:11 |
| 4 | mean by that? | 10:25:13 |
| 5 | A.   People typically did not take care of their | 10:25:14 |
| 6 | property.  In many cases, you had single mothers, I would | 10:25:17 |
| 7 | guess who had multiple visitors, children ran around, they | 10:25:21 |
| 8 | didn't seem to be well cared for, and I do recall when I | 10:25:25 |
| 9 | started college I worked at Nicolette Industries and they had | 10:25:30 |
| 10 | brought in a lot of Hispanic families, who didn't even speak | 10:25:34 |
| 11 | English, so culturally the neighborhood in 1966, '67 changed | 10:25:37 |
| 12 | dramatically because you had the beginning of Hispanic | 10:25:42 |
| 13 | influence and I would say that for the most part the | 10:25:46 |
| 14 | neighborhood was white. | 10:25:49 |
| 15 | Q.   Okay.  Did -- do you recall a time when Von moved | 10:25:49 |
| 16 | away from the Ludlow area to be near his father? | 10:25:55 |
| 17 | A.   To be very honest, my relationship with Red at the | 10:25:57 |
| 18 | time was, you know, we were like brothers.  We didn't talk a | 10:26:03 |
| 19 | whole lot about family or extended family or I never heard | 10:26:08 |
| 20 | much about his father.  Just out of respect I didn't think it | 10:26:13 |
| 21 | was my business to delve into the those matters because in | 10:26:16 |
| 22 | many cases it was very common for the kids to have different | 10:26:20 |
| 23 | fathers with the same mother.  I do remember when he went to | 10:26:25 |
| 24 | the Navy, I think that would have been about 1967, and he came | 10:26:29 |
| 25 | back from the Navy about 18 months later.  And I mean, he was | 10:26:35 |

JILL M. CUTTER, RPR
(513) 785-6596

214

| | | |
|---|---|---|
| 1 | a little more articulate, a little brighter, had a lot of | 10:26:42 |
| 2 | hands-on experiences, but for the most part, he used to go | 10:26:45 |
| 3 | with me to the university -- I started at the University of | 10:26:49 |
| 4 | Cincinnati, he would spend the day with me down there, and | 10:26:51 |
| 5 | there would be times when he would go somewhere for a week or | 10:26:56 |
| 6 | so at a time, but I never saw that as anything out of the | 10:26:59 |
| 7 | ordinary. And his extended stay in the military was probably | 10:27:03 |
| 8 | the longest time that I saw him be gone. I think around 1969 | 10:27:07 |
| 9 | perhaps even early 1970, he had gone to Washington DC, as I | 10:27:13 |
| 10 | recall. I don't remember. He talked about working for waste | 10:27:19 |
| 11 | collection or he worked there for a while and then he came | 10:27:23 |
| 12 | back, but as the years progressed, our contact became a little | 10:27:26 |
| 13 | less continual. | 10:27:31 |
| 14 | Q. Okay. Do you recall anything about the trip or | 10:27:35 |
| 15 | the time that he spent in DC relative to his father? | 10:27:38 |
| 16 | A. Once again, not to sound stupid, I really didn't | 10:27:41 |
| 17 | think it was my job -- remember the late '60s -- | 10:27:46 |
| 18 | Q. No, I don't. | 10:27:51 |
| 19 | A. Okay. I'm sorry. This wasn't something that I | 10:27:52 |
| 20 | felt the need to kind of explore, because to me the family | 10:27:55 |
| 21 | that I knew there, were wonderful people, and you know, we all | 10:27:59 |
| 22 | have skeletons in our closet and I didn't know he was going to | 10:28:03 |
| 23 | see his dad, as a matter of fact, I don't think his father was | 10:28:07 |
| 24 | ever mentioned in our conversations. | 10:28:09 |
| 25 | MS. COOK-REICH: Okay. I have no further | 10:28:11 |

JILL M. CUTTER, RPR
(513) 785-6596

215

| | | |
|---|---|---|
| 1 | questions. Thank you. | 10:28:13 |
| 2 | JUDGE NASTOFF: Any cross-examination for this | 10:28:14 |
| 3 | witness? | 10:28:15 |
| 4 | MR. OSTER: Brief, Your Honor. | 10:28:15 |
| 5 | CROSS-EXAMINATION | 10:28:15 |
| 6 | BY MR. OSTER: | 10:28:19 |
| 7 | Q. Mr. Rotundo, my name is Michael Oster. I am | 10:28:19 |
| 8 | assistant prosecutor for the State of Ohio, I just want to ask | 10:28:31 |
| 9 | you a couple of questions. You referenced that yourself and | 10:28:33 |
| 10 | Von, you knew as Red, would drink sometimes together on New | 10:28:36 |
| 11 | Year's Eve, social occasions, correct? | 10:28:43 |
| 12 | A. Yes. | 10:28:45 |
| 13 | Q. Okay. And was he fun to be around at that point? | 10:28:45 |
| 14 | A. Absolutely. Back then we had a kind of code of | 10:28:49 |
| 15 | the road. We were men, we acted like men. We got respect | 10:28:53 |
| 16 | from others because we tried to stay in shape physically. | 10:28:59 |
| 17 | There was a pecking order in that culture, and the alcohol | 10:29:02 |
| 18 | pretty much when we would drink, you know, party, good times, | 10:29:07 |
| 19 | and there was never any escalation of anger or anything like | 10:29:14 |
| 20 | that. It was very social, very contained. | 10:29:20 |
| 21 | Q. Okay. | 10:29:22 |
| 22 | MR. OSTER: If I could have one moment. | 10:29:26 |
| 23 | JUDGE NASTOFF: Sure. | 10:29:28 |
| 24 | MR. OSTER: We have no further questions, Your | 10:29:32 |
| 25 | Honor. | 10:29:33 |

216

| | | |
|---|---|---|
| 1 | JUDGE NASTOFF:  All right.  Any redirect? | 10:29:33 |
| 2 | MS. COOK-REICH:  No, Your Honor. | 10:29:35 |
| 3 | JUDGE NASTOFF:  And again this witness can be | 10:29:36 |
| 4 | released permanently? | 10:29:38 |
| 5 | MS. COOK-REICH:  Yes, he may, Your Honor. | 10:29:39 |
| 6 | JUDGE NASTOFF:  All right.  Sir, your testimony is | 10:29:40 |
| 7 | complete, you are released from any subpoenas and you | 10:29:41 |
| 8 | are free to go about your business.  Thank you. | 10:29:46 |
| 9 | THE WITNESS:  Thank you. | 10:29:48 |
| 10 | JUDGE NASTOFF:  You may call your next witness. | 10:29:50 |
| 11 | MR. PORTER:  We call Scott Nowack, Your Honor. | 10:30:00 |
| 12 | SCOTT NOWACK | 10:30:02 |
| 13 | having been first duly sworn, was examined and testified under | 10:30:02 |
| 14 | oath as follows: | 10:30:57 |
| 15 | JUDGE NASTOFF:  You may proceed. | 10:30:57 |
| 16 | DIRECT EXAMINATION | 10:30:57 |
| 17 | BY MR. PORTER: | 10:30:58 |
| 18 | Q.  Could you please state your name for the Judges? | 10:30:58 |
| 19 | A.  Scott Nowack. | 10:31:02 |
| 20 | Q.  Would you please spell your last name for the | 10:31:04 |
| 21 | court reporter? | 10:31:07 |
| 22 | A.  N-O-W-A-K. | 10:31:07 |
| 23 | Q.  Your work address, Mr. Nowack? | 10:31:10 |
| 24 | A.  878 Hoytsville Hubbard Road, Youngstown, Ohio, | 10:31:13 |
| 25 | 44505. | 10:31:23 |

217

| | | |
|---|---|---|
| 1 | Q. Currently employed, Mr. Nowack? | 10:31:23 |
| 2 | A. Yes. | 10:31:26 |
| 3 | Q. Could you tell the Judges where you are employed? | 10:31:26 |
| 4 | A. I am employed at the Ohio State Penitentiary. | 10:31:28 |
| 5 | Q. Do you hold a specific position there? | 10:31:32 |
| 6 | A. Yes, I am employed as a correctional program | 10:31:35 |
| 7 | specialist. | 10:31:39 |
| 8 | Q. Could you tell the Judges, please, what a program | 10:31:40 |
| 9 | specialist director is? | 10:31:43 |
| 10 | A. We primarily perform daily case manager duties for | 10:31:44 |
| 11 | the inmates, includes visitation issues, daily issues the | 10:31:49 |
| 12 | inmates may have with the prison or their family, and in other | 10:31:54 |
| 13 | aspects preparing inmates for release and parole. | 10:31:59 |
| 14 | Q. Mr. Nowack, how long have you held this position? | 10:32:03 |
| 15 | A. I have been employed by the State for | 10:32:06 |
| 16 | approximately 13 years. And I have had this position about | 10:32:09 |
| 17 | ten years. | 10:32:14 |
| 18 | Q. Is there a particular portion of the institution | 10:32:14 |
| 19 | in which you perform your duties? | 10:32:20 |
| 20 | A. Half of my duties are with death row inmates, the | 10:32:22 |
| 21 | other half of my duties are with our Level 5 security inmates. | 10:32:26 |
| 22 | Q. For the purposes of the Judges, could you explain | 10:32:30 |
| 23 | Level 5, Level 4 and things of that nature? | 10:32:38 |
| 24 | A. Our State has a classification system. It's a | 10:32:42 |
| 25 | Level 1 through Level 5 classification system. One would be | 10:32:48 |

218

1   the lowest in a security level and 5 would be our highest.    10:32:53

2   Level 1 what was formally known as minimum security, and Level   10:32:59

3   5 being what was formally known as super max.  Our death row   10:33:05

4   doesn't really fall in a classification system.  We define our   10:33:10

5   death row more as a housing unit because inmates are not going   10:33:15

6   to change classification levels on death row, they will be on   10:33:18

7   death row.    10:33:23

8        Q.   Since they do not fit within Level 1 through 5,   10:33:24

9   could you compare their privileges, liberties with -- where   10:33:30

10  they would fit within the 1 through 5 system?    10:33:37

11       A.   If I had to compare -- if I had to make that   10:33:41

12  comparison, I would say closer to Level 3 inmates.   10:33:46

13       Q.   You have in front of you a notebook, sir.  Could   10:33:51

14  you please turn -- on the stand there, I'm sorry.  Could you   10:33:59

15  please turn to what would be Tab J in the notebook?  Could you   10:34:04

16  take a look for a minute and just study what is there in front   10:34:13

17  of Tab J?    10:34:17

18       A.   (Witness complies with request.)    10:34:19

19            MR. PORTER:  If I might ask, do the Judges still   10:34:25

20  have the exhibit notebooks?    10:34:26

21            JUDGE NASTOFF:  Yes, we all have them.    10:34:29

22       Q.   (BY MR. PORTER)  Are you able to identify, yes or   10:34:32

23  no, the document that is labeled Exhibit J in the notebook?   10:34:34

24       A.   Yes.    10:34:39

25       Q.   And could you tell the -- could you tell the   10:34:40

1  three-judge panel or the Judges, excuse me, Your Honors, could                    10:34:46
2  you tell them what Exhibit J is?                                                  10:34:50
3      A.  It is an Institutional Summary Report I completed                         10:34:52
4  for Inmate Davis.                                                                 10:34:56
5      Q.  I want to talk -- my next few questions are going                         10:34:58
6  to center just around the form itself.  Is this a form that                      10:35:04
7  you created?                                                                      10:35:07
8      A.  No, this is a common form that we use in the                              10:35:08
9  department, but I completed the information on the form.                          10:35:11
10     Q.  Do you know who created the form?                                         10:35:14
11     A.  No.  It's been around longer than me.                                     10:35:18
12     Q.  Have you completed this form for other cases?                             10:35:22
13     A.  Numerous times, yes.                                                      10:35:26
14     Q.  And this particular case, can you tell the Judges                         10:35:29
15  how you completed the form?  What the mechanics were of doing                    10:35:35
16  it?                                                                              10:35:40
17     A.  We gather most of the information from what is                            10:35:40
18  called the inmate's unit file and then we also interview the                     10:35:44
19  inmate for program participation.                                               10:35:47
20     Q.  In this particular case, was the interview done                           10:35:51
21  first of the inmate or was the review of the unit file done                      10:35:54
22  first?                                                                           10:35:59
23     A.  Generally I notify the inmate that there is a                             10:35:59
24  request, interview them and then verify the information                          10:36:03
25  through the file.                                                                10:36:06

JILL M. CUTTER, RPR
(513) 785-6596

220

| | | |
|---|---|---|
| 1 | Q. Could you explain to the Judges what a unit file | 10:36:06 |
| 2 | is? | 10:36:09 |
| 3 | A. A unit file primarily consists of some information | 10:36:09 |
| 4 | over the inmate's course of incarceration such as their | 10:36:16 |
| 5 | disciplinary record, visiting information, as well as program | 10:36:21 |
| 6 | participation, and any type of classification changes, like | 10:36:26 |
| 7 | security or job changes. | 10:36:32 |
| 8 | Q. Who maintains that file? | 10:36:34 |
| 9 | A. That file is maintained by unit staff which | 10:36:37 |
| 10 | includes myself. | 10:36:40 |
| 11 | Q. I'm sorry, I didn't hear the last answer. | 10:36:41 |
| 12 | A. Unit staff which includes myself. | 10:36:44 |
| 13 | Q. And in this case, did you interview Mr. Davis? | 10:36:46 |
| 14 | A. Yes, I did. | 10:36:51 |
| 15 | Q. And in this case, did you attempt to verify the | 10:36:53 |
| 16 | information that Mr. Davis gave you? | 10:36:59 |
| 17 | A. Yes, I did. | 10:37:01 |
| 18 | Q. Does your signature appear on the document itself? | 10:37:03 |
| 19 | A. Yes, on the second page. | 10:37:11 |
| 20 | Q. There are two signatures there. Could you help me | 10:37:13 |
| 21 | at least? I am having a hard time reading the signatures. | 10:37:18 |
| 22 | A. Actually the second signature would be my | 10:37:22 |
| 23 | supervisor Laura Johnson, but that is my signature because on | 10:37:23 |
| 24 | that timeframe, I was acting on her behalf. | 10:37:28 |
| 25 | Q. But you were the one that actually reviewed the | 10:37:31 |

JILL M. CUTTER, RPR
(513) 785-6596

221

| | | | |
|---|---|---|---|
| 1 | | unit file? | 10:37:35 |
| 2 | A. | That's correct. | 10:37:36 |
| 3 | Q. | The date you signed the document? | 10:37:36 |
| 4 | A. | April 27, 2009. | 10:37:40 |
| 5 | Q. | Do you have contact with Mr. Davis himself? | 10:37:46 |
| 6 | A. | Yes, I do. | 10:37:56 |
| 7 | Q. | Have there been any events that you are aware of | 10:37:57 |

8  since April 27 of 2009 that would cause this form to change?    10:38:01

```
 9        A.   No.                                              10:38:08
10        Q.   I'm going to ask you some questions as they relate   10:38:09
```

11  to a different issue now. The way I understand it, the Ohio    10:38:15

12  State Penitentiary at Youngstown really has two separate    10:38:23

13  components or institutions or whatever the correct terminology    10:38:26

14  is; is that correct?    10:38:29

```
15        A.   That is correct.                                 10:38:31
16        Q.   Could you tell the Judges very briefly what -- and   10:38:33
```

17  is components the right term? Or tell the Judges what the    10:38:37

18  correct term is.    10:38:40

```
19        A.   We have on our compound or our institution we    10:38:41
```

20  house primarily -- we have two separate main areas where we    10:38:45

21  house the inmates. One would be our Level 1 security    10:38:50

22  correctional camp, and then our other main building would    10:38:54

23  house Level 4, Level 5, and our death row population.    10:38:58

```
24        Q.   Could you compare for the Judges in just numbers   10:39:04
```

25  the staffing components from the camp itself to the, if I can    10:39:09

JILL M. CUTTER, RPR
(513) 785-6596

1    use the term, institution?

2         A.   In relation to our correctional officer to inmate

3    staff ratio, our correctional camp would have approximately

4    four correctional officers supervising 220 inmates.  Where the

5    death row housing unit where Inmate Davis would have

6    approximately six or seven correctional officers to 70

7    inmates.

8         Q.   Have you been involved with inmates that have been

9    on death row and then received a sentence of less than death?

10        A.   Yes, I have.

11        Q.   Do those -- have those individuals transferred

12   from an institution other than Ohio State Penitentiary at

13   Youngstown?

14        A.   Yes, they all have.

15        Q.   Is there a security level that they generally --

16   or that they have transferred to in the past?

17        A.   Yes, our department would classify them as a Level

18   3 security level.

19        Q.   Could you identify --

20        JUDGE NASTOFF:  Just hold on for a moment.  All

21   right, you may proceed, I just wanted to make sure

22   there wasn't going to be any further interruption.

23        Q.   (BY MR. PORTER)  Could you identify for the Judges

24   the Level 3 security institutions that those individuals have

25   transferred to?

223

| | | |
|---|---|---|
| 1 | A. There are approximately five institutions, those | 10:40:49 |
| 2 | being Toledo Correctional Institution, Torrumble Correctional | 10:40:54 |
| 3 | Institution, Warren Correctional Institution, Mansfield | 10:41:00 |
| 4 | Correctional Institution, and Ross Correctional Institution. | 10:41:06 |
| 5 | MR. OSTER: Your Honor, I think at this point I am | 10:41:11 |
| 6 | going to object, I don't see what the relevance is to | 10:41:13 |
| 7 | where they transfer or what that has to do with the | 10:41:14 |
| 8 | individual nature and circumstances of Mr. Davis | 10:41:18 |
| 9 | himself. So I would object to that and ask that to be | 10:41:20 |
| 10 | stricken. | 10:41:24 |
| 11 | JUDGE NASTOFF: Relevance is, Mr. Porter? | 10:41:24 |
| 12 | MR. PORTER: I just have one additional question I | 10:41:27 |
| 13 | could ask and I think that will tie it up, Your Honor. | 10:41:29 |
| 14 | JUDGE NASTOFF: All right. We will withhold | 10:41:31 |
| 15 | ruling until you ask your question, go ahead. | 10:41:33 |
| 16 | Q. (BY MR. PORTER) Are you able to tell the Judges | 10:41:37 |
| 17 | the general staffing levels of those Level 3 institutions? | 10:41:41 |
| 18 | A. They would have a -- you would have less officers | 10:41:47 |
| 19 | watching more inmates, but I couldn't give you an exact | 10:41:56 |
| 20 | number. | 10:41:58 |
| 21 | MR. PORTER: If I can respond to the objection | 10:42:00 |
| 22 | now, Your Honor? | 10:42:02 |
| 23 | JUDGE NASTOFF: Sure. | 10:42:02 |
| 24 | MR. PORTER: As we laid out for the Court in | 10:42:03 |
| 25 | opening statement, it is one of the mitigating factors | 10:42:07 |

224

1    that we have argued that it will be less costly for the    10:42:10

2    State of Ohio to house Mr. Davis if he is given a    10:42:16

3    sentence of less than death and for that purpose,    10:42:19

4    correctional staffing levels are relevant.    10:42:23

5        MR. OSTER:  Your Honor, we would object to the    10:42:27

6    cost of housing inmates as being irrelevant as well.    10:42:29

7    So, if that is a support for this line of questioning,    10:43:33

8    we would stand by our first objection and support it    10:42:36

9    with that a cost per inmate if ever being paroled would    10:42:38

10   be irrelevant to what the Judges should consider in    10:42:43

11   this case as well.    10:42:45

12       MR. PORTER:  I don't think we are arguing staffing    10:42:46

13   levels for parole.  I think our argument is staffing    10:42:48

14   levels because he is never going to get out.    10:42:52

15       JUDGE PATER:  Does the State object or take    10:42:55

16   exception to the reference made by Mr. Porter that it    10:43:00

17   is a mitigating factor, the expense of supervising    10:43:04

18   inmates?    10:43:08

19       MR. OSTER:  I don't think the expense itself is a    10:43:09

20   mitigating factor to this individual that can be    10:43:11

21   considered by this Court, even under the (B)(7)    10:43:14

22   catchall.    10:43:17

23       JUDGE PATER:  Is there any case law, Mr. Porter,    10:43:17

24   that would support that assertion that this has been    10:43:20

25   determined by any court to be a mitigating factor?    10:43:23

225

| | | |
|---|---|---|
| 1 | MR. PORTER: I know of none, Your Honor. | 10:43:28 |
| 2 | JUDGE PATER: Thank you. | 10:43:30 |
| 3 | (Judges confer off the record.) | 10:43:32 |
| 4 | JUDGE NASTOFF: All right. We are going to allow | 10:44:03 |
| 5 | it, but the issues that you raise will be considered in | 10:44:05 |
| 6 | the weight to be given. | 10:44:09 |
| 7 | MR. OSTER: Thank you, Your Honor. | 10:44:12 |
| 8 | MR. PORTER: I have no further questions. Thank | 10:44:13 |
| 9 | you very much, Your Honor. | 10:44:15 |
| 10 | JUDGE NASTOFF: All right. Mr. Oster? | 10:44:15 |
| 11 | CROSS-EXAMINATION | 10:44:16 |
| 12 | BY MR. OSTER: | 10:44:18 |
| 13 | Q. Good morning, Mr. Nowack. Did I say that | 10:44:18 |
| 14 | correctly? | 10:44:33 |
| 15 | A. Yes. | 10:44:33 |
| 16 | Q. My name is Michael Oster. I work for the State of | 10:44:34 |
| 17 | Ohio assistant prosecutor. I believe we spoke on the phone a | 10:44:36 |
| 18 | little while ago? | 10:44:39 |
| 19 | A. That's correct. | 10:44:40 |
| 20 | Q. Okay. Mr. Nowack, what is the population itself | 10:44:40 |
| 21 | at the Ohio State Penitentiary as a whole? | 10:44:44 |
| 22 | A. As a whole, it is roughly between 500 and 600 | 10:44:47 |
| 23 | inmates, closer to 500. | 10:44:57 |
| 24 | Q. Okay. So the number 549 would be -- sound about | 10:44:58 |
| 25 | correct to you? | 10:45:03 |

JILL M. CUTTER, RPR
(513) 785-6596

226

1     A.    That would sound correct, yes.                    10:45:03

2     Q.    And that is actually one of the smaller facilities    10:45:06

3  run by the Department of Corrections throughout the State; is    10:45:09

4  that correct?                                                   10:45:11

5     A.    That is correct.                                    10:45:11

6     Q.    And the -- in your summary report that Mr. Porter    10:45:12

7  discussed with you from April of this year, there was one       10:45:16

8  incident that was marked in I believe January of 1990 and that   10:45:19

9  incident was where Mr. Davis was ordered to do something and     10:45:26

10 refused, correct?                                              10:45:29

11    A.    That is what is in my report, correct.             10:45:30

12    Q.    And the Ohio State Penitentiary I believe you said   10:45:33

13 has two kind of separate -- there is a camp and then a          10:45:38

14 separate institution, is that roughly correct?                 10:45:41

15    A.    That's correct.                                     10:45:44

16    Q.    And Mr. Davis would be in the, what you said Level    10:45:44

17 4, 5 and death row, correct?                                   10:45:48

18    A.    To kind of clarify that, within our main building,   10:45:51

19 we have what are called blocks, and we separate our inmates     10:45:54

20 one block would be for Level 4 inmates, one block would be for   10:45:58

21 Level 5 and two blocks would be for death row, so he would be   10:46:04

22 within the block of death row inmates.                         10:46:07

23    Q.    Okay.  So he's solely in a death row block          10:46:10

24 currently, would that be correct then?                         10:46:13

25    A.    That's correct, yes.                                10:46:15

JILL M. CUTTER, RPR
(513) 785-6596

227

|    |    |    |    |
|----|----|----|----|

1      Q.   And that death row block, as you have just    10:46:16

2  described it, there are no female inmates in that block,    10:46:19

3  correct?    10:46:23

4      A.   No, there are not.    10:46:23

5      Q.   And you said you have worked in total for the    10:46:24

6  department for, let's see if I get it straight, 13 total    10:46:27

7  years; is that correct?    10:46:30

8      A.   Approximately, yes.    10:46:31

9      Q.   And in your 13 years' experience, it would be    10:46:32

10  correct, wouldn't it, that death row inmates get fewer    10:46:35

11  write-ups than the general population inmates?    10:46:38

12      A.   Through my experience, that would be correct.    10:46:41

13      JUDGE NASTOFF: Didn't hear the answer.    10:46:44

14      THE WITNESS: Yes, correct.  Sorry.    10:46:47

15      MR. OSTER:  That's all the questions I have, Your    10:46:52

16  Honor.  Thank you.    10:46:53

17      MR. PORTER:  We do have two or three questions    10:46:54

18  based upon his questions, Your Honor.    10:46:56

19      JUDGE NASTOFF:  You may proceed.    10:46:57

20              REDIRECT EXAMINATION    10:46:57

21  BY MR. PORTER:    10:46:59

22      Q.   Mr. Nowack, are you familiar with the term, honor    10:46:59

23  dorm or honor block?    10:47:11

24      A.   Yes, I am.    10:47:13

25      Q.   And could you please tell the Judges as that    10:47:14

JILL M. CUTTER, RPR
(513) 785-6596

1  relates to death row?

2      A.   Death row has what we refer to as an extended

3  privilege unit. The extended privilege unit serves as an

4  incentive for inmates to have good conduct.

5      Q.   Do you know if Mr. Davis is located in the honor

6  block?

7      A.   Yes, he is.

8      Q.   What -- how is it determined -- I assume not all

9  of death row is in the honor block?

10     A.   No, they are not.

11     Q.   How is it determined who is placed in the honor

12 block?

13     A.   Inmates who go a minimum of 36 months without any

14 major rule violations, will be placed on a waiting list for

15 that block.

16     Q.   How long, if you know, presently is the waiting

17 list?

18     A.   The majority of inmates who are in the honor block

19 have not received any rule violations in well over six years.

20     Q.   If an individual is placed in the honor block and

21 they are found guilty, for lack of a better term, of

22 misconduct, can they be removed from the honor block?

23     A.   They will be removed, correct.

24     Q.   And do you know how long Mr. Davis has been in the

25 honor block?

229

| | | |
|---|---|---|
| 1 | A.   Since May of 2006. | 10:48:40 |
| 2 | MR. PORTER:  I have no further questions.  Thank | 10:48:57 |
| 3 | you. | 10:48:58 |
| 4 | JUDGE NASTOFF:  Any recross? | 10:48:58 |
| 5 | MR. OSTER:  If I could have just one minute. | 10:49:00 |
| 6 | JUDGE NASTOFF:  You may. | 10:49:02 |
| 7 | MR. OSTER:  No, Your Honor.  Thank you. | 10:49:10 |
| 8 | JUDGE NASTOFF:  All right.  And again, may this | 10:49:12 |
| 9 | witness be permanently released from his subpoena? | 10:49:13 |
| 10 | MS. COOK-REICH:  Yes, Your Honor. | 10:49:16 |
| 11 | JUDGE NASTOFF:  All right.  Mr. Nowack, your | 10:49:17 |
| 12 | testimony is complete and you are released from your | 10:49:19 |
| 13 | subpoena and you are free to return to your duties. | 10:49:21 |
| 14 | Thank you. | 10:49:23 |
| 15 | THE WITNESS:  Thank you. | 10:49:24 |
| 16 | MS. COOK-REICH:  We would call Dr. Robert Smith. | 10:49:30 |
| 17 | DR. ROBERT SMITH | 10:49:34 |
| 18 | having been first duly sworn, was examined and testified under | 10:49:34 |
| 19 | oath as follows: | 10:49:52 |
| 20 | MS. COOK-REICH:  Your Honor, just so that you | 10:49:52 |
| 21 | know, there is a female going to take my place at the | 10:49:53 |
| 22 | table neither Randall nor I are technologically savvy, | 10:49:55 |
| 23 | someone else will be touching the computer. | 10:50:00 |
| 24 | JUDGE NASTOFF:  All right.  No objection to the | 10:50:01 |
| 25 | technological assistance. | 10:50:06 |

230

| | | |
|---|---|---|
| 1 | MR. OSTER: I guess the only thing I would just | 10:50:10 |
| 2 | add, is she from one of the offices? I just wanted to | 10:50:11 |
| 3 | know who was sitting next to me as well, Your Honor. | 10:50:18 |
| 4 | Thank you. | 10:50:21 |
| 5 | MS. COOK-REICH: She is from the Ohio Public | 10:50:21 |
| 6 | Defender's office. | 10:50:24 |
| 7 | DIRECT EXAMINATION | 10:50:24 |
| 8 | BY MS. COOK-REICH: | 10:50:27 |
| 9 | Q. Can you state your name for the record, please? | 10:50:27 |
| 10 | A. Dr. Robert Smith. | 10:50:46 |
| 11 | Q. Okay. And Dr. Smith, are you employed anywhere? | 10:50:48 |
| 12 | A. Yes, I am a clinical psychologist. I am also a | 10:50:50 |
| 13 | certified addiction specialist. I am in private practice in | 10:50:54 |
| 14 | West Lake, Ohio. Well, actually it's Rocky River, Ohio is | 10:50:58 |
| 15 | where my office is located. And then I consult with a number | 10:51:01 |
| 16 | of various agencies within the community. I work with Metro | 10:51:05 |
| 17 | Health Medical Center with their employee assistance program. | 10:51:08 |
| 18 | I teach at Case Western Reserve University with the department | 10:51:11 |
| 19 | of psychology. I do lectures for the law school and medical | 10:51:14 |
| 20 | school. I work with two treatment programs. One is a | 10:51:18 |
| 21 | treatment program for homeless, chemically dependent, mentally | 10:51:20 |
| 22 | ill women and their children. It's a unique treatment model | 10:51:26 |
| 23 | that we have developed to treat the mother and the child, and | 10:51:28 |
| 24 | then I also work with a program that has both a detoxification | 10:51:31 |
| 25 | unit, outpatient services, and a men's program for homeless, | 10:51:36 |

231

1    chemically dependent, mentally ill men. And then I have a          10:51:41
2    small private practice and then I also do forensic psychology.     10:51:45
3            Q.    And what is your business address?                   10:51:49
4            A.    20525 Center Ridge Road, Rocky River, Ohio.          10:51:50
5            Q.    You have stated that you are both a clinical         10:51:55
6    psychologist and certified addiction specialist. Can you          10:51:59
7    relate for me or -- well, let me first, there should be an         10:52:02
8    exhibit notebook in front of you.                                  10:52:06
9            A.    Yes.                                                  10:52:08
10           Q.    L as in Lorena. Can you turn to that in your         10:52:08
11   notebook? Do you recognize the document contained there?          10:52:24
12           A.    Yes, I do.                                           10:52:27
13           Q.    And what is that?                                    10:52:27
14           A.    That is my curriculum vitae.                         10:52:28
15           Q.    Okay. Can you tell this Court your educational       10:52:31
16   background?                                                        10:52:35
17           A.    I am trained as a clinical psychologist. I did my   10:52:35
18   Bachelor's degree, Master's degree, and Doctorate at Kent         10:52:39
19   State University. As part of that training you have to do an      10:52:44
20   internship. I did a full year of internship at Cleveland         10:52:46
21   Metropolitan General Hospital. The focus was on adolescents,     10:52:50
22   children and adults, both inpatient and outpatient. When I       10:52:54
23   finished that, I obtained my license as a psychologist, and      10:52:57
24   did what is called a post-doctoral psychology trainee            10:53:02
25   internship. Also did that at Cleveland Metropolitan General      10:53:06

232

| | | |
|---|---|---|
| 1 | Hospital. That time I focused on the diagnosis and treatment | 10:53:12 |
| 2 | of addictions so I became both a clinical psychologist and | 10:53:14 |
| 3 | then became a certified addiction specialist. | 10:53:18 |
| 4 | Q. Did you go beyond Post-Doctoral? | 10:53:20 |
| 5 | A. Basically what I did is I ended up working at | 10:53:26 |
| 6 | Metro Health Medical Center. They hired me once I completed | 10:53:28 |
| 7 | my internship. Initially, I was just a staff psychologist and | 10:53:31 |
| 8 | then I became director of their alcohol and drug treatment | 10:53:35 |
| 9 | program and served as the director there for approximately ten | 10:53:38 |
| 10 | years. | 10:53:42 |
| 11 | Q. When did you first hold that position? | 10:53:42 |
| 12 | A. Let me make sure I have the right date. 1984. | 10:53:46 |
| 13 | Q. Okay. And would it be fair to say that you have | 10:53:56 |
| 14 | been working in that profession since that time? | 10:53:59 |
| 15 | A. That's correct. | 10:54:01 |
| 16 | Q. Are you licensed by the State of Ohio? | 10:54:02 |
| 17 | A. Yes, I am. | 10:54:03 |
| 18 | Q. In what field? | 10:54:03 |
| 19 | A. Clinical psychology. | 10:54:05 |
| 20 | Q. Is there a license for addiction specialists? | 10:54:06 |
| 21 | A. There is a certification. I have a national | 10:54:09 |
| 22 | certification as an addiction specialist. | 10:54:11 |
| 23 | Q. And who does that certification? Is there that -- | 10:54:13 |
| 24 | A. Yes, I will give you the full title of it. The | 10:54:18 |
| 25 | American Academy of Healthcare Providers and addictive | 10:54:21 |

233

| | | |
|---|---|---|
| 1 | disorders. | 10:54:25 |
| 2 | Q. And what did you have to do for that | 10:54:25 |
| 3 | certification? | 10:54:27 |
| 4 | A. You have to demonstrate that you have had adequate | 10:54:28 |
| 5 | training. You then have to have a certain number of hours of | 10:54:31 |
| 6 | experience, or years of experience. You then have to take a | 10:54:34 |
| 7 | written exam and oral exam and then have to maintain ongoing | 10:54:38 |
| 8 | continuing education to renew your certification. | 10:54:43 |
| 9 | Q. And how -- when was the first year you had such | 10:54:46 |
| 10 | certification? | 10:54:49 |
| 11 | A. Oh, golly, it would probably be around 1984, '85. | 10:54:50 |
| 12 | Q. Okay. And have you continued to have that | 10:54:55 |
| 13 | certification recertified for each time up until this year? | 10:54:58 |
| 14 | A. That's correct. | 10:55:02 |
| 15 | Q. You have never lost your certification? | 10:55:02 |
| 16 | A. No, I have not. | 10:55:05 |
| 17 | Q. And when did you first become licensed as a | 10:55:06 |
| 18 | clinical psychologist? | 10:55:11 |
| 19 | A. 1983. | 10:55:11 |
| 20 | Q. Other than what you have already related as your | 10:55:13 |
| 21 | professional background, can you go forward from there in | 10:55:18 |
| 22 | regards to where you have worked after Cleveland Medical | 10:55:20 |
| 23 | Center? | 10:55:22 |
| 24 | A. Basically what I have done is my career has been | 10:55:23 |
| 25 | focused on what's called co-occurring disorders. My interest | 10:55:25 |

234

1   has been on individuals who have more than one psychological

2   condition. So I work with individuals who have both

3   depression or anxiety, or personality disorder, and also maybe

4   abusing alcohol and drugs, and may also have some type of

5   medical condition like HIV or STDs, sexually transmitted

6   diseases, individuals who are homeless. So that my career has

7   been interested in individuals who have multiple problems and

8   how, as a treatment community, can we address those needs and

9   help people re-establish themselves.

10          And so I have had a number of research grants, one

11  of them was through the substance abuse and mental health

12  services administration. The acronym is SAMSA. Basically

13  what we did was received a grant to treat homeless chemically

14  dependent women and their children. It was one of the first

15  times --

16          COURT REPORTER: I'm sorry?

17          JUDGE NASTOFF: You have to slow down for our

18      court reporter.

19      A.  Yes, I start talking about my research, I get

20  excited. It was a treatment program specifically designed to

21  treat women and their children. The women were homeless,

22  chemically dependent and mentally ill, and this was the first

23  time in the United States that we had ever done that. So

24  there were 50 sites funded nationwide and we developed these

25  treatment models and I worked with that project for about

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
STATE COURT TRANSCRIPTS - Page 1301

235

1　seven years.　Once I completed that, I now work at an agency　10:56:49

2　called Hitchcock Center which is based on that model.　10:56:52

3　　　　　　Another research project which I had was for　10:56:57

4　homeless, chemically dependent, mentally ill men who were　10:57:00

5　offenders.　So they were either on probation or parole, and　10:57:04

6　this was sort of a community re-entry program or a diversion　10:57:07

7　program depending upon their status.　And we were developing　10:57:11

8　what we call wrap around services.　Full range of services　10:57:14

9　both psychiatric, psychological chemical dependency, case　10:57:19

10　management, vocational, did all of these services with these　10:57:24

11　men, to see if we could prevent them from relapsing to alcohol　10:57:28

12　and drugs, avoid them being re-incarcerated, and to assist　10:57:33

13　them in re-establishing themselves in the community in a　10:57:37

14　positive and healthy way.　10:57:40

15　　　　Q.　Other than the two grants that you have discussed,　10:57:43

16　are there other grants that you are involved with?　10:57:46

17　　　　A.　Currently we have a grant that we have just　10:57:49

18　written it is Stella Maris, the intent is to again be able to　10:57:52

19　work with this male population.　We have a housing unit at 40　10:57:57

20　beds and we have men there, but we don't have the full wrap　10:58:01

21　around services because we don't have funds.　Unfortunately　10:58:06

22　the State has had to cut a lot of the funding for various　10:58:08

23　programs.　So we have a grant that is pending.　But we also　10:58:12

24　have a program that is with the federal government, we have a　10:58:14

25　federal pretrial and probation program with Stella Maris, so　10:58:19

JILL M. CUTTER, RPR
(513) 785-6596

236

| | | |
|---|---|---|
| 1 | what we do is we work with individuals who are on re-entry or | 10:58:24 |
| 2 | again diversion, and we work with them to deal with their | 10:58:29 |
| 3 | addiction, to deal with their mental health issues and to | 10:58:32 |
| 4 | re-integrate into the community, so those are the primary | 10:58:36 |
| 5 | projects right now. | 10:58:38 |
| 6 | Q. Okay. Are there facilities or places that you | 10:58:39 |
| 7 | work at besides your own clinical persons that you see? | 10:58:43 |
| 8 | A. I do the forensic psychology. | 10:58:48 |
| 9 | Q. Okay. Do you teach? | 10:58:52 |
| 10 | A. Yes, I do. | 10:58:54 |
| 11 | Q. Where at? | 10:58:55 |
| 12 | A. Case Western Reserve. The most recent course I | 10:58:56 |
| 13 | taught was in the spring. It was cognitive behavioral therapy | 10:59:00 |
| 14 | and I worked with graduate students and taught them how to use | 10:59:04 |
| 15 | specific psychological techniques in working with various | 10:59:07 |
| 16 | kinds of disorders. And right now I have an intern from | 10:59:10 |
| 17 | Case's graduate program who is going to be spending a year | 10:59:15 |
| 18 | with me at Stella Maris. | 10:59:19 |
| 19 | Q. You keep saying Stella Maris, can you spell that? | 10:59:20 |
| 20 | A. Sure. S-T-E-L-L-A, M-A-R-I-S. Like Star of the | 10:59:23 |
| 21 | Sea. | 10:59:30 |
| 22 | Q. Okay. Are you currently scheduled to hold any | 10:59:30 |
| 23 | additional lectures or teaching positions? | 10:59:36 |
| 24 | A. I do a lot of teaching both at the university but | 10:59:40 |
| 25 | also for the community. Also for, as I said, the legal system | 10:59:44 |

```
 1  I often do continuing legal education.  I did a recent thing    10:59:49
 2  in April in Phoenix, they were interested in recent research    10:59:52
 3  developments in alcohol and drug abuse, both the etiology, the  10:59:58
 4  causes and then also the treatment.  So I presented for the     11:00:03
 5  court out there, it involved the magistrates, lawyers, anyone   11:00:05
 6  involved with the Court in Maracopa County was invited.  So I   11:00:10
 7  presented there recently.  Coming up I will be doing the        11:00:15
 8  continuing legal education for the Ohio Supreme Court           11:00:18
 9  magistrates.  This will be my first time to do that for them.  11:00:20
10        Q.    what will your topic be for the Ohio Supreme Court  11:00:24
11  magistrates?                                                    11:00:28
12        A.    I'm going to do alcohol and drug abuse.             11:00:28
13        Q.    You indicated that you had forensic psychology      11:00:30
14  work, could you explain what that is?                           11:00:33
15        A.    Probably about fifteen years ago, I -- well, it     11:00:36
16  goes all the way back to my dissertation.  My dissertation is   11:00:39
17  not guilty by reason of insanity, and so I was doing an         11:00:43
18  examination of how psychologists approach that question and     11:00:46
19  whether or not training and experience, how much of that you    11:00:49
20  need in order to be able to make an accurate determination.     11:00:53
21  So that was my first interest.  I also did a rotation during    11:00:56
22  one of my internships that was a forensic psychology rotation.  11:00:59
23  Then I began doing work, probably about fifteen years ago,      11:01:04
24  both for the court and for both legal, I should say capital     11:01:08
25  cases, but then also non-capital cases.  Doing evaluations of   11:01:12
```

1    competency, NGRI, and then looking at cases in which there had    11:01:16

2    been a charge of murder.    11:01:20

3         Q.    Do you also have a private practice?    11:01:22

4         A.    Yes, I do.    11:01:24

5         Q.    And what do you do in that private practice?    11:01:24

6         A.    I have this private practice in Rocky River where    11:01:27

7    I see somewhere between ten and twelve clients a week    11:01:31

8    basically with a variety of different issues.  Basically    11:01:36

9    adolescents and adults.  I don't work with children in my    11:01:39

10   private practice.  And they are individuals who present either    11:01:42

11   with depression, anxiety, post-traumatic stress disorder,    11:01:47

12   something of that nature and I work with them individually.    11:01:52

13        Q.    Have you ever testified in court before?    11:01:54

14        A.    Yes, I have.    11:01:56

15        Q.    Can you relate to the Court where you have?    11:01:56

16        A.    Probably around fifteen to twenty different states    11:01:59

17   now, Indiana, Illinois, Mississippi, Phoenix, South Carolina,    11:02:07

18   Florida, Connecticut, I don't know.    11:02:14

19        Q.    Have you testified in both state and federal    11:02:19

20   courts?    11:02:20

21        A.    Yes, I have.    11:02:21

22        Q.    In regards to the State of Ohio, have you ever    11:02:22

23   testified and been qualified as an expert of addiction?    11:02:25

24        A.    Yes, I have.    11:02:29

25        Q.    Can you relate for the Court where that has been?    11:02:29

JILL M. CUTTER, RPR
(513) 785-6596

239

| | | | |
|---|---|---|---|
| 1 | A. | It's been Dayton, Cincinnati, Cleveland. | 11:02:31 |
| 2 | Q. | Cuyahoga County, Hamilton County, Montgomery | 11:02:39 |
| 3 | County? | | 11:02:44 |
| 4 | A. | Yes, I believe so. | 11:02:44 |
| 5 | Q. | Have you ever testified in Butler County? | 11:02:45 |
| 6 | A. | Not that I recall. | 11:02:46 |
| 7 | Q. | The same question relative to clinical psychology, | 11:02:47 |
| 8 | have you testified and been qualified as an expert in any | | 11:02:50 |
| 9 | State of Ohio court under that expertise? | | 11:02:53 |
| 10 | A. | Yes. | 11:02:57 |
| 11 | Q. | And can you relate to the Court where? | 11:02:57 |
| 12 | A. | The same ones. | 11:02:58 |
| 13 | Q. | And can you give me a timeframe? | 11:02:59 |
| 14 | A. | It's been over the last fifteen years. I have | 11:03:01 |
| 15 | been doing forensic work. | | 11:03:05 |
| 16 | Q. | And other than what I have already asked you | 11:03:06 |
| 17 | relative to certificates and education, have we left any of | | 11:03:12 |
| 18 | your experience out? | | 11:03:19 |
| 19 | COURT REPORTER: I'm sorry? | | 11:03:19 |
| 20 | Q. | Certificates, training, education, have we left | 11:03:19 |
| 21 | any of your experience out? | | 11:03:21 |
| 22 | A. | No, I think that was a good review. | 11:03:21 |
| 23 | MS. COOK-REICH: Okay. Your Honor, I would ask | | 11:03:23 |
| 24 | then that the Court allow Dr. Smith to be qualified as | | 11:03:26 |
| 25 | an expert in the area of clinical psychologist and | | 11:03:30 |

JILL M. CUTTER, RPR
(513) 785-6596

240

| | | |
|---|---|---|
| 1 | addiction specialist. | 11:03:33 |
| 2 | JUDGE NASTOFF:  All right.  Does counsel for the | 11:03:33 |
| 3 | State wish to voir dire the witness on his | 11:03:35 |
| 4 | qualifications? | 11:03:37 |
| 5 | MR. EICHEL:  No, Your Honor. | 11:03:38 |
| 6 | JUDGE NASTOFF:  All right.  He will be so | 11:03:39 |
| 7 | admitted. | 11:03:40 |
| 8 | MS. COOK-REICH:  Thank you, Your Honor. | 11:03:41 |
| 9 | Q.    (BY MS. COOK-REICH)  Dr. Smith, you have been | 11:03:42 |
| 10 | retained in this case by court appointed funds to give an | 11:03:44 |
| 11 | opinion, do some reviews; is that correct? | 11:03:48 |
| 12 | A.    That's correct. | 11:03:50 |
| 13 | Q.    Okay.  You have interviewed specifically Von Clark | 11:03:50 |
| 14 | Davis; is that correct? | 11:03:55 |
| 15 | A.    That is correct. | 11:03:55 |
| 16 | Q.    And do you see him seated in the courtroom? | 11:03:56 |
| 17 | A.    Yes, I do. | 11:03:58 |
| 18 | Q.    And is he seated over here to the right of me in | 11:03:59 |
| 19 | the olive colored shirt? | 11:04:02 |
| 20 | A.    He is in the middle, yes. | 11:04:04 |
| 21 | Q.    And is that the person that you, in fact, | 11:04:04 |
| 22 | evaluated? | 11:04:06 |
| 23 | A.    Yes, it is. | 11:04:07 |
| 24 | Q.    To perform this evaluation, what are the things -- | 11:04:07 |
| 25 | some of the things you did in order to complete the | 11:04:11 |

JILL M. CUTTER, RPR
(513) 785-6596

241

| | |
|---|---|
| 1 | evaluation? | 11:04:14 |
| 2 | A. My approach is pretty standard. I typically want | 11:04:14 |
| 3 | to see the defendant at least two times, if possible. I like | 11:04:17 |
| 4 | to do collateral interviews with family or friends who would | 11:04:21 |
| 5 | be aware of the individual's functioning, their history, | 11:04:25 |
| 6 | background. I like to do a review of records that are | 11:04:29 |
| 7 | appropriate or relevant, and then when I meet with the | 11:04:33 |
| 8 | defendant I do what is called a structured psychosocial | 11:04:35 |
| 9 | history, reviewing their background, both in terms of | 11:04:39 |
| 10 | development as a child, school, work, legal history, | 11:04:42 |
| 11 | employment, military history, any treatment for alcohol and | 11:04:45 |
| 12 | drug addiction, their use of alcohol and drugs, any mental | 11:04:50 |
| 13 | health history, their family background, relationships, so | 11:04:54 |
| 14 | that I have, hopefully, a very rounded picture of the | 11:04:59 |
| 15 | individual's background, their development and any | 11:05:03 |
| 16 | psychological disorders or addiction that they might have. | 11:05:06 |
| 17 | Q. Do you also commonly review their criminal | 11:05:09 |
| 18 | history? | 11:05:12 |
| 19 | A. Yes. | 11:05:12 |
| 20 | Q. In this particular case, in the case of Von Clark | 11:05:13 |
| 21 | Davis, did you do so, all of those things that you just said | 11:05:16 |
| 22 | in regards to reviewing items, documents and interviews? | 11:05:18 |
| 23 | A. Yes, I did. | 11:05:22 |
| 24 | Q. You have prepared a PowerPoint presentation | 11:05:22 |
| 25 | listing what those are? | 11:05:25 |

JILL M. CUTTER, RPR
(513) 785-6596

242

| | | |
|---|---|---|
| 1 | A.    Yes, I have. | 11:05:26 |
| 2 | Q.    And the female seated over here, is there a | 11:05:27 |
| 3 | clicker for that? | 11:05:30 |
| 4 | SPEAKER:  No. | 11:05:33 |
| 5 | Q.    (MS. COOK-REICH)  Specifically in regards to this | 11:05:41 |
| 6 | case, in your evaluation of Mr. Davis, can you relate to the | 11:05:42 |
| 7 | Court the specific interviews, documents, information that you | 11:05:42 |
| 8 | have reviewed? | 11:05:45 |
| 9 | A.    Yes.  I have to think of how I want to do this | 11:05:46 |
| 10 | here.  Let me go to the first slide.  Basically what I did is | 11:05:50 |
| 11 | I met with Von on two separate occasions at the Ohio State | 11:06:01 |
| 12 | Penitentiary; March 23, 2009, April 7, 2009.  Each of those | 11:06:06 |
| 13 | interviews were for five to six hours and during that time I | 11:06:11 |
| 14 | was able to do the comprehensive psychosocial history that we | 11:06:15 |
| 15 | described, a diagnostic workup and a mental status | 11:06:20 |
| 16 | examination. | 11:06:23 |
| 17 | Q.    Okay.  And you do a comprehensive what? | 11:06:23 |
| 18 | A.    Psychosocial history. | 11:06:26 |
| 19 | Q.    Psychosocial history? | 11:06:30 |
| 20 | A.    Yes. | 11:06:30 |
| 21 | Q.    What, other than seeing and interviewing and | 11:06:31 |
| 22 | evaluating Mr. Davis, did you interview or evaluate, interview | 11:06:35 |
| 23 | other members of his family? | 11:06:38 |
| 24 | A.    Yes, I did. | 11:06:40 |
| 25 | Q.    And who did you see? | 11:06:40 |

| | | |
|---|---|---|
| 1 | A. I had the opportunity to, in May, meet with | 11:06:42 |
| 2 | Alluster Tipton, which is his mother, Charles Tipton, his | 11:06:45 |
| 3 | stepfather, Elliot Davis, his brother, Carol Davis -- I'm | 11:06:50 |
| 4 | sorry, Carol Smith, his sister, Victor Davis, his brother, and | 11:06:54 |
| 5 | Patrick Michael Rotundo, his life-long friend. | 11:06:58 |
| 6 | Q. Okay. And were there any -- well, let me step | 11:07:02 |
| 7 | back to that interview. Did you do all of those persons on | 11:07:06 |
| 8 | one particular day? | 11:07:09 |
| 9 | A. Yes, I had an opportunity to meet with each of | 11:07:10 |
| 10 | them individually in a private setting so that I could find | 11:07:12 |
| 11 | out about their relationship with Von, and also then ask | 11:07:15 |
| 12 | specific questions about observations they had about his | 11:07:20 |
| 13 | development, his personality, his relationships. | 11:07:24 |
| 14 | Q. Okay. Is part of what your evaluation is | 11:07:27 |
| 15 | performed to do is get a forensic or social history of a | 11:07:32 |
| 16 | family and a person? | 11:07:36 |
| 17 | A. Yes. | 11:07:37 |
| 18 | Q. And did you do so in this case? | 11:07:37 |
| 19 | A. Right. The key here is to get corroborating data. | 11:07:38 |
| 20 | Certainly you talk to the defendant and you get firsthand | 11:07:44 |
| 21 | information from him, but what you are also looking for is | 11:07:47 |
| 22 | what other sources of data do you have that can confirm what | 11:07:49 |
| 23 | he is saying, so that you can have some degree of confidence | 11:07:53 |
| 24 | that what you are hearing and understanding is valid and true. | 11:07:56 |
| 25 | Q. Did you have an opportunity to review any other | 11:07:59 |

```
 1   documents other than your interviews?                      11:08:02

 2        A.   Yes.                                              11:08:04

 3        Q.   And what did you review?                         11:08:05

 4        A.   There is a number of them.  We started out we had 11:08:06

 5   the Ohio Supreme Court opinion, there was a social history  11:08:10

 6   that had been established that I had an opportunity to review 11:08:14

 7   and a timeline of Von's life with key events that had       11:08:17

 8   occurred, and then interview summaries of individuals who   11:08:21

 9   investigators who had met with the family and gathered      11:08:27

10   information prior to my meeting with them.  So they had talked 11:08:30

11   with Alluster Tipton, Charles Tipton, Fannie Whiteside,     11:08:33

12   Elizabeth Crawford, Elliot Davis, next slide.              11:08:36

13        There were interview summaries for Victor Davis,       11:08:42

14   Von, Joanne Ferguson, Roger Fisher, Charles Flowers, Delbert 11:08:45

15   Flowers, Delane Hudson, Delores Stokes, so those were, again, 11:08:51

16   social data sources, other people who knew Von, who had been 11:08:57

17   interviewed, and so I was able to compare what was in these  11:09:02

18   interviews with my own interview with them okay, because I   11:09:06

19   interviewed many of those people.  Then there were also      11:09:08

20   records that are relevant to Von's background, there were    11:09:16

21   school records and military records.                        11:09:16

22        Next.  Police reports, from the shooting of            11:09:18

23   Ernestine Davis, police reports from the murder of Ernestine 11:09:22

24   Davis, and then evaluations by other experts.  An evaluation 11:09:25

25   by Dr. Schweikert, an evaluation by Dr. Stevens, an evaluation 11:09:29
```

1    by Dr. McDevit, CDR, or I'm sorry, ODRC, psychological    11:09:33

2    records, police reports from the murder of Suzette Butler and    11:09:38

3    testimony from the trial regarding the murder of Suzette    11:09:42

4    Butler.    11:09:46

5        Then if we go on, there are additional documents,    11:09:48

6    an evaluation by Dr. Fisher, the sentencing opinion, an    11:09:50

7    affidavit of Dr. Schmitgossling, and affidavit of Dr. Ort what    12:09:56

8    I am looking for, is this range of sources which are from    11:10:03

9    different periods of time by various persons so that I have    11:10:05

10    not just a snapshot, but an overview of Von's functioning and    11:10:09

11    his behavior over years and years from various sources.    11:10:15

12        So I am not relying upon just my impression of him    11:10:20

13    at the time that I meet with him, but rather I have lots of    11:10:23

14    persons' impressions of him so that I can see sort of again    11:10:27

15    the big picture and not a snapshot.    11:10:30

16      Q.    And in regards to the interview summaries that you    11:10:33

17    reviewed, I think you indicated that these were summaries with    11:10:35

18    dates on them prior to you becoming involved in this case; is    11:10:39

19    that correct?    11:10:41

20      A.    That's correct.    11:10:41

21      Q.    Do you recall the round about dates that you saw    11:10:41

22    on some of these summaries?    11:10:44

23      A.    No, I do not.    11:10:46

24      Q.    Of the persons that you did see, yourself, like    11:10:46

25    his mother, his stepfather and some of his brothers and    11:10:51

246

| | | |
|---|---|---|
| 1 | sister, do you recall whether those summaries were close in | 11:10:53 |
| 2 | time to the time that you saw them individually? | 11:10:57 |
| 3 | A. Some of them may have been close, others were | 11:10:59 |
| 4 | further away in time. | 11:11:02 |
| 5 | Q. Is there a reason why you did not interview, let's | 11:11:03 |
| 6 | say Joanne Ferguson who you reviewed an interview summary of? | 11:11:08 |
| 7 | A. The key people who I wanted to talk with, so that | 11:11:13 |
| 8 | I was efficient were the people who had the most contact with | 11:11:15 |
| 9 | Von and would have the most information regarding his early | 11:11:19 |
| 10 | childhood development and his life functioning over the years, | 11:11:23 |
| 11 | so I was looking at people who knew him over time. | 11:11:27 |
| 12 | Q. And if the Flowers family and those persons who | 11:11:10 |
| 13 | were deceased or not available you wouldn't have obviously | 11:11:33 |
| 14 | interviewed them in 2009? | 11:11:35 |
| 15 | A. Absolutely. | 11:11:37 |
| 16 | Q. That would be accurate? Okay. Relative to the | 11:11:38 |
| 17 | prior psychological evaluations that you reviewed, on your | 11:11:42 |
| 18 | slide placed some dates, specific dates next to those reports. | 11:11:47 |
| 19 | Those span a multiple number of years; is that correct? | 11:11:50 |
| 20 | A. Yeah, they start in 1971, and go up through '98. | 11:11:54 |
| 21 | So we have got a significant period of time covered by various | 11:12:02 |
| 22 | professionals who saw Von and expressed their professional | 11:12:06 |
| 23 | opinion about his functioning. | 11:12:10 |
| 24 | Q. Relative to your review, did you also review a | 11:12:12 |
| 25 | psychological report relative to his leaving the Navy? | 11:12:14 |

247

| | | |
|---|---|---|
| 1 | A. Yes, I did. | 11:12:18 |
| 2 | Q. And that would have pre-dated 1971; is that | 11:12:19 |
| 3 | correct? | 11:12:22 |
| 4 | A. That's correct. | 11:12:22 |
| 5 | Q. Do you recall when that was? | 11:12:23 |
| 6 | A. I don't recall the exact date. Wait, here it is, | 11:12:25 |
| 7 | 1964. | 11:12:40 |
| 8 | Q. Okay. That would involve the whole snapshot that | 11:12:41 |
| 9 | you are looking at, you are looking at the whole picture? | 11:12:45 |
| 10 | A. That's right, so we have an evaluation that is | 11:12:48 |
| 11 | done in 1964 but then we have evaluations that are done in | 11:12:51 |
| 12 | '71, '78, '80, '84, 2002, so we have got, again, this | 11:12:54 |
| 13 | longitudinal source of data regarding Von rather than just one | 11:13:01 |
| 14 | person's opinion at one time in one contact. | 11:13:07 |
| 15 | Q. The social history and forensic history that you | 11:13:11 |
| 16 | took from many of the family members and summaries that you | 11:13:15 |
| 17 | had, does that help you make diagnosis in this case? | 11:13:17 |
| 18 | A. Definitely. Again, because what I am looking at | 11:13:21 |
| 19 | is not just my impression when I meet with Von, but does my | 11:13:25 |
| 20 | impression have support from prior interviews by persons in | 11:13:31 |
| 21 | the past. Particularly if I am looking at a chronic disorder, | 11:13:35 |
| 22 | a disorder that I believe is life-long, well then it should be | 11:13:39 |
| 23 | pervasive and it should be present at various points, not just | 11:13:42 |
| 24 | when I see Von. And that also helps me to establish whether | 11:13:46 |
| 25 | or not there is malingering, because if he is presenting a | 11:13:50 |

248

| 1 | particular symptom just with me and then there is never any | 11:13:53 |

1  particular symptom just with me and then there is never any

2  symptom any other time, well then that would make me

3  suspicious that this is someone who is attempting to fake a

4  problem to serve their purposes.

5      Q.  Based upon the history that you took from the

6  client, the social forensic history that you obtained from the

7  family and friends, and your review of the psychological --

8  prior psychological reports, and your own evaluation, do you

9  have, based on your training, experience, education, an

10  opinion as to -- within a reasonable degree of psychological

11  certainty, as to whether Von Clark Davis at the time of the

12  offense in 1983 suffered from a mental disease or defect?

13      A.  Yes.

14      Q.  And what is that opinion?

15      A.  Next slide.  Basically it is my opinion that at

16  the time of the offense Von was suffering from two

17  psychological disorders.  One would be alcohol dependence and

18  the other would be borderline personality disorder.  And that

19  both of these disorders were present and that they interfered

20  with his cognitive functioning, that they impaired or

21  diminished his ability at the time of the offense.

22      Q.  And can you give a definition of what either

23  personality disorders are or borderline personality disorder?

24      A.  Sure, if we go to the next slide.  If we start,

25  the whole idea of personality, personality is a pattern of

249

1    thinking and behavior and it is pervasive. It affects the way     11:15:30
2    that we feel, it affects our perceptions and it affects our      11:15:35
3    decisions and our behaviors. And when we look at a person's      11:15:40
4    personality we know they have that style of approaching life.    11:15:44
5    And each of us has a unique personality that is ours. And it     11:15:49
6    is based upon our background, our life experiences, what we      11:15:52
7    learned growing up, and so, we incorporate these life            11:15:56
8    experiences and then we develop a pattern, and each of us has    11:16:01
9    some of our own patterns, beliefs that we have about life, our   11:16:04
10   likes and dislikes. And the way that we approach problems and    11:16:08
11   situations is basically our personality style. And for most      11:16:12
12   of us, our personality style is successful. It works. It is      11:16:17
13   our way of adapting to life.                                     11:16:22
14          We go through our day, we are faced with problems,        11:16:24
15   we deal with them, we work them through, and we are              11:16:27
16   successful. That is a healthy normal personality. Go to the      11:16:30
17   next slide. What we have established in our field of             11:16:36
18   psychology and psychiatry is that there are individuals who      11:16:41
19   have personality disorders. In other words, the personality     11:16:45
20   style that they develop is self-defeating, it actually doesn't   11:16:49
21   work. And even though they continually fail, they don't          11:16:52
22   change their style. They have this way of thinking about         11:16:57
23   themselves and about life that repeatedly causes them to act     11:17:03
24   in ways that are self-defeating.                                 11:17:08
25          So if you notice here what we have got is they            11:17:11

JILL M. CUTTER, RPR
(513) 785-6596

1   have distorted perceptions, they interpret situations in the          11:17:13

2   wrong way, their emotions are labile, meaning that they go up         11:17:17

3   and down very rapidly, with minor provocation, they have             11:17:22

4   impaired impulse control, they overreact to situations without       11:17:28

5   thinking about the consequences, their options and weighing          11:17:33

6   the pros and cons.  They have ongoing and constant                   11:17:37

7   difficulties in their relationships because of their                 11:17:43

8   misperceptions.  They're interpreting situations in the wrong        11:17:47

9   way, their labile emotions and their impulsivity.  People who        11:17:51

10  are healthy find it very difficult to be around and interact        11:17:55

11  with someone with a personality disorder.                           11:17:59

12      Q.   You have given the opinion that Von suffers from a          11:18:03

13  borderline personality disorder.  Is that just one of the many      11:18:09

14  personality disorders?                                              11:18:12

15      A.   That is correct.  Currently, we have ten different          11:18:14

16  personality disorders that an individual might have.  The one        11:18:18

17  that I believe is appropriate for Von is borderline                 11:18:22

18  personality disorder.  If we go to the next slide, what I am        11:18:26

19  going to be describing as we go through is the data that comes       11:18:30

20  from prior evaluations and then my own evaluation about Von.        11:18:35

21  And the things that I'm going to focus on are thoughts,             11:18:40

22  emotions and behavior, again, because that is really what           11:18:43

23  defines someone's personality style.  And so, I am going to be      11:18:45

24  looking at how does he think, his perceptions, his ability to       11:18:50

25  control his emotions, his social relationships, and we are          11:18:56

251

1  going to establish that this is of long standing. That this      11:19:01
2  is not just something that occurred recently, but that in fact    11:19:03
3  goes all the way back to when he was evaluated in the Navy.       11:19:08
4      Q.  When he was evaluated in the Navy, what can you          11:19:14
5  tell me about the report that you did review that was helpful     11:19:19
6  for this diagnosis that you are giving today?                     11:19:21
7      A.  Go to the next slide. There was an evaluation by         11:19:25
8  JJ Cavanaugh with the United States Navy, who was chief of        11:19:28
9  neuropsychiatry. What had occurred is that Von was absent         11:19:33
10 without permission for five days, visiting his father in          11:19:38
11 Washington DC. This is significant because as we got more         11:19:41
12 history about Von's father, what we discovered is his father      11:19:45
13 had been absent for many years, his father was an alcoholic,      11:19:50
14 his parents had divorced and Von had had no contact with his      11:19:53
15 father since about age 12.                                        11:19:57
16      And so, this leaving the Navy and going to find             11:20:00
17 his father, first of all it is a very impulsive thing,            11:20:04
18 certainly not approved of by the Navy, and reflects his desire    11:20:08
19 to have relationships with people, and we will come back to       11:20:13
20 that a little bit. But the evaluation identifies him as           11:20:16
21 depressed, hopeless, borderline intelligence, an emotionally      11:20:20
22 unstable personality. Now, what is significant is this is         11:20:27
23 1964. In 1964, we did not have research based criteria for        11:20:31
24 borderline personality disorder. We had lots of sort of          11:20:38
25 theories about personality, but no real research.                 11:20:42

252

1    So what we've got is an individual who is saying, 11:20:47

2  I know something is wrong with this individual's personality, 11:20:47

3  I can see it, he is emotionally unstable. And he is not 11:20:50

4  suitable, this is so severe that he is not suitable to be in 11:20:55

5  the US Armed Forces. And so he is given a discharge. So what 11:20:59

6  we are seeing is in 1964, impulsive behavior, inappropriate 11:21:04

7  behavior, behavior related to a relationship that is 11:21:10

8  dysfunctional relationship and we have got a diagnosis already 11:21:13

9  of there is something wrong with this individual's 11:21:16

10 personality. 11:21:19

11    Q.   And let me just ask a couple of questions before 11:21:19

12 we go on.  You're not giving an opinion that Von in 1984, I'm 11:21:24

13 sorry, 1983, was mentally insane to meet not guilty by reason 11:21:28

14 of insanity standards? 11:21:34

15    A.   No. 11:21:35

16    Q.   Okay.  That's not what are you saying at all? 11:21:35

17    A.   No, I'm not saying that he's hallucinating or 11:21:37

18 delusional.  I am not saying that he was totally unable to 11:21:40

19 appreciate that his behavior was wrong.  I'm not saying that. 11:21:43

20    MS. COOK-REICH:  Just a second, we are having a 11:21:48

21 technical difficulty.  We may need a few moments, Your 11:21:53

22 Honor. 11:22:24

23    JUDGE PATER:  Well, if it's all right, we are able 11:22:28

24 to see it on this monitor. 11:22:29

25    JUDGE NASTOFF:  I think we may have blown out a 11:22:34

253

1       bulb.                                                    11:22:37

2           MR. OSTER: Your Honors, I guess the only thing we    11:22:46

3       would say is that means every party can see a slide      11:22:48

4       except for us.                                           11:22:51

5           SPEAKER: We have another laptop.                     11:22:52

6           JUDGE NASTOFF: Do you have a photocopy or a hard     11:22:54

7       copy of the slides that we can make a copy of for the    11:22:57

8       State?                                                   11:23:00

9           MS. COOK-REICH: I have one, I started marking on     11:23:00

10      it.                                                      11:23:02

11          THE WITNESS: This one is not marked on.              11:23:04

12          MR. OSTER: We don't mind how it is given to us.      11:23:07

13      We would appreciate being able to see it.                11:23:10

14          JUDGE NASTOFF: Joe, why don't we go ahead and        11:23:14

15      make two copies of what the doctor has there. One for    11:23:15

16      Mr. Oster and one for Mr. Eichel.                        11:23:19

17          MS. COOK-REICH: Thank you, Your Honors.              11:23:22

18          JUDGE NASTOFF: Why don't we take -- can you          11:23:24

19      continue with the testimony or are we going to be        11:23:26

20      moving through several pages pretty quickly?             11:23:30

21          THE WITNESS: Unfortunately, I don't have mine        11:23:30

22      now.                                                     11:23:33

23          JUDGE NASTOFF: Why don't we take five minutes.       11:23:33

24      And when we have got everybody ready to go we will come  11:23:35

25      back out. We will be in recess and hopefully back in     11:23:39

JILL M. CUTTER, RPR
(513) 785-6596

254

| | | |
|---|---|---|
| 1 | session shortly. | 11:23:45 |
| 2 | MR. OSTER: Thank you, Your Honor. | 11:23:46 |
| 3 | (Recess taken at this time.) | 11:37:56 |
| 4 | JUDGE NASTOFF: We're on record in State of Ohio | 11:41:00 |
| 5 | vs. Von Clark Davis, CR1983-12-0614. I will indicate | 11:41:02 |
| 6 | for the record that all parties and counsel present | 11:41:05 |
| 7 | prior to the recess are again present. The witness | 11:41:08 |
| 8 | remains on the stand. Sir, I will remind you that you | 11:41:12 |
| 9 | remain under oath from prior to our recess. Also | 11:41:18 |
| 10 | indicate that all three members of the panel are | 11:41:19 |
| 11 | present as well, and ready to hear the continuation of | 11:41:21 |
| 12 | the testimony. | 11:41:24 |
| 13 | MS. COOK-REICH: Thank you, Your Honor. | 11:41:24 |
| 14 | JUDGE NASTOFF: You may proceed. | 11:41:25 |
| 15 | Q. (BY MS. COOK-REICH) We were speaking of prior | 11:41:27 |
| 16 | psychological evaluations that you reviewed prior to that | 11:41:29 |
| 17 | short break there and we discussed the Navy evaluation. Were | 11:41:32 |
| 18 | there additional psychological evaluations that you reviewed | 11:41:35 |
| 19 | that had some bearing upon your current diagnosis? | 11:41:39 |
| 20 | A. Yes. | 11:41:41 |
| 21 | Q. And what were those? | 11:41:41 |
| 22 | A. The next slide is an evaluation by Dr. McDevit. | 11:41:43 |
| 23 | Again this is in March of 1971. And he again finds Von to be | 11:41:46 |
| 24 | immature and impulsive. It is interesting that there is this | 11:41:51 |
| 25 | ongoing note also throughout the evaluations of general fund | 11:41:56 |

JILL M. CUTTER, RPR
(513) 785-6596

255

| | |
|---|---|
| 1 | of information is poor, poor arithmetic skills, what we know | 11:42:02 |
| 2 | from the school records is that Von only went so far in | 11:42:06 |
| 3 | school, basically the 9th grade and then dropped out at the | 11:42:10 |
| 4 | age of 17. So he had difficulties in school and it is | 11:42:13 |
| 5 | reflected in these evaluations. So again, we are seeing some | 11:42:16 |
| 6 | consistency in the evaluations, we are seeing this problem | 11:42:19 |
| 7 | with immature and impulsive. If we go onto the next slide. | 11:42:22 |
| 8 | Dr. McKeen, a psychologist at the Ohio State Penitentiary also | 11:42:30 |
| 9 | does an evaluation of Von. He finds him to be rigid, unstable | 11:42:35 |
| 10 | and hostile, who is actually afraid of his impulses. | 11:42:40 |
| 11 | Compulsive defenses break down under pressure and when | 11:42:44 |
| 12 | pressured tends to act out aggressively and he again sees a | 11:42:48 |
| 13 | personality disorder, diagnosed him with hysterical | 11:42:52 |
| 14 | personality combined with dissocial features. Now, what is | 11:42:56 |
| 15 | important here again is we are beginning to see this repeated | 11:43:01 |
| 16 | statement about immaturity, impulsivity, personality problems. | 11:43:03 |
| 17 | Borderlines and we will talk about this specifically in a | 11:43:10 |
| 18 | little bit, have difficulty with their impulses and they are | 11:43:12 |
| 19 | actually somewhat concerned about their own impulses. | 11:43:17 |
| 20 | They can have angry outbursts with very little | 11:43:20 |
| 21 | provocation and this sort of shows that they are aware of | 11:43:23 |
| 22 | this. Borderlines don't have good defenses. They don't have | 11:43:27 |
| 23 | coping strategies. We have coping strategies. When we are | 11:43:31 |
| 24 | stressed and overwhelmed we do constructive things. We might | 11:43:34 |
| 25 | play a sport or swim or exercise or talk to a family member or | 11:43:38 |

256

1   a good friend.  Borderlines don't have those coping strategies                  11:43:42
2   and so they act out their emotions in very inappropriate ways.                  11:43:46
3       Q.   The diagnosis by Dr. McKeen in '71 of hysterical                        11:43:52
4   personality combined with dissocial features, is that a                         11:43:58
5   current diagnosis available as a personality disorder?                          11:44:02
6       A.   No.  Again, what we are looking at is a time when                       11:44:04
7   psychologists and psychiatrists had theories about diagnoses,                   11:44:08
8   but did not have research based criteria for diagnoses.  So                     11:44:12
9   again, what we have is a person who is aware that there is a                     11:44:18
10  personality problem, but he does not have the criteria for                      11:44:20
11  borderline personality disorder in 1971, those didn't exist.                    11:44:25
12      Q.   Do you know when those became a criteria?                              11:44:29
13      A.   Basically, what we have is about 1980, we had the                       11:44:32
14  first significant objective criteria for personality disorder.                 11:44:36
15  In 1987 those were revised because we now had research so we                    11:44:43
16  started out with some objective criteria, then we tested them.                 11:44:48
17  In '87, we had some, you know, real data, and then in 1994, we                  11:44:52
18  have the most current criteria that we use today.  So the                       11:44:57
19  criteria I am using for borderline personality disorder are                    11:45:01
20  based upon the research and sort of consensus of the                           11:45:06
21  professional field in 1994.                                                     11:45:08
22      Q.   Is that contained in any of the DSM books?                            11:45:11
23      A.   That's what I am referring to.  The Diagnostic                         11:45:15
24  Statistical Manual 4th Edition was published in 1994.                          11:45:17
25      Q.   Thank you.  The Dr. Rains' evaluation from the                         11:45:22

257

1    London Correctional Institution in 1978, do you see in          11:45:26

2    reviewing his records, things that jump out at you relative to   11:45:29

3    Von and borderline personality disorder?                        11:45:34

4         A.   Yes, that is on the next slide.  It is -- Dr. Ron     11:45:36

5    is a supervisor of psychological services at London             11:45:40

6    Correctional Institute.  He identified that Von had active      11:45:44

7    detached -- he was active detached individual with schizoid     11:45:48

8    trends.  Now, interesting about the word schizoid is that       11:45:55

9    actually is a personality disorder today.  We have schizoid     11:45:56

10   personality disorder.  And what it means is that an individual  11:46:01

11   who has severe problems with relationships, and in fact, has    11:46:02

12   only a few relationships but they are dysfunctional, needs      11:46:06

13   other people, their contact and support, but is suspicious of   11:46:11

14   their motives.                                                  11:46:14

15          Again, classic borderline symptom.  Borderlines         11:46:16

16   need relationships.  They want them desperately and in fact    11:46:20

17   are very frightened of losing what relationships they have.     11:46:25

18   The problem is, is they have this vacillation between I love,   11:46:29

19   you are wonderful, you are great, to then if you do just some   11:46:34

20   minor thing that I don't like, I now am angry at you, you have  11:46:38

21   hurt me, I hate you, I don't ever want to be around you any     11:46:44

22   more, and that may happen within a couple of hours, and then    11:46:47

23   back to, I love you, you are wonderful, you are the best thing  11:46:52

24   in my life.  Borderlines have very, very dramatic mood swings.  11:46:55

25   And in their relationships they vacillate between this          11:47:00

258

1    idealizing you to then wanting to push you away and reject        11:47:03

2    you. So this is really describing that. Needs other people,       11:47:07

3    their contact and support, but is suspicious of their motives.    11:47:10

4         I'm fearful of being hurt, I'm fearful of you              11:47:14

5    abandoning me, leaving me. Lacks ego strength, frightened of      11:47:15

6    his impulses again, difficulty coping with his feelings. So       11:47:21

7    we are seeing a lot of consistency here. And within the           11:47:25

8    institution he does well, which we would expect with someone      11:47:28

9    with a personality disorder. Think about it. I am saying          11:47:32

10   that you have got this dysfunctional style. If you put me in      11:47:35

11   a very structured environment, with clear-cut rules and people    11:47:38

12   who enforce those rules every day, the same way, I will adapt     11:47:43

13   and I will adjust. My problem with borderline personality         11:47:48

14   disorder is if I am in the community where I have no clear         11:47:51

15   structure and I am reacting to whatever is happening to me        11:47:54

16   throughout the day.                                               11:47:58

17        Q.   The schizoid trends, I probably just killed that       11:48:01

18   word. Schizoid trends?                                            11:48:01

19        A.   Schizoid, yes.                                          11:48:08

20        Q.   You said that that is a current diagnosis in           11:48:08

21   DSM-IV, how would you say that you don't make that diagnosis      11:48:10

22   when you see this in 1978?                                        11:48:14

23        A.   Well, again, they are saying trends, they are not      11:48:16

24   making a diagnosis. They are saying that it is one                11:48:20

25   characteristic of the individual, and I am considering that       11:48:22

JILL M. CUTTER, RPR
(513) 785-6596

259

| | | |
|---|---|---|
| 1 | characteristic in my diagnosis.  So what I am trying to do is | 11:48:25 |
| 2 | to take all of the data across time and come up with a | 11:48:30 |
| 3 | diagnosis that incorporates that and is consistent rather than | 11:48:33 |
| 4 | taking just one symptom and making the diagnosis based on | 11:48:37 |
| 5 | that. | 11:48:41 |
| 6 | Q.    Okay.  Are there other evaluations you have | 11:48:42 |
| 7 | reviewed? | 11:48:45 |
| 8 | A.    Yes. | 11:48:45 |
| 9 | Q.    And what are they? | 11:48:46 |
| 10 | A.    The next slide shows an evaluation by Dr. Jones, | 11:48:47 |
| 11 | Psychological Services London Correctional Institution.  This | 11:48:52 |
| 12 | is in 1980.  He now has decided that Von has compulsive | 11:48:56 |
| 13 | personality disorder.  Difficulty with perfectionism, fear of | 11:49:03 |
| 14 | failure, expects too much of others, and is viewed as a | 11:49:07 |
| 15 | minimal risk to others at this point during the evaluation in | 11:49:12 |
| 16 | London Correctional Institute.  So what we have is again is | 11:49:16 |
| 17 | another person doing an independent evaluation who is saying, | 11:49:20 |
| 18 | I think there is a personality disorder going on here.  I see | 11:49:23 |
| 19 | something about this individual's style, the way they think, | 11:49:26 |
| 20 | the way they interact with others that is dysfunctional. | 11:49:28 |
| 21 | And they are seeing him as expecting too much of | 11:49:31 |
| 22 | others, which is a classic symptom of borderlines.  Again, I | 11:49:32 |
| 23 | idealize you, so now I think that you can do anything and | 11:49:37 |
| 24 | everything to meet my needs.  You are going to be my quote, | 11:49:41 |
| 25 | savior and the minute that you fall short, the minute that you | 11:49:44 |

1    show any dissatisfaction with me, or suggest that you might        11:49:47

2    leave me, then I react in a very inappropriate way, very          11:49:51

3    emotional, very upset, very angry.  So again, another             11:49:55

4    evaluation independent that shows that.                           12:50:01

5         Q.   Dr. Fisher's report evaluation in 1984, closer in       11:50:06

6    time to this offense did not determine that he had a              11:50:11

7    borderline personality disorder.  Was borderline personality      11:50:14

8    disorder available in 1984?                                       11:50:18

9         A.   In '84 it was described, there was no research          11:50:19

10   data to support it at that point.  It was not until 1987 that     11:50:23

11   the actual diagnosis was available with research criteria to      11:50:27

12   support it.  So it was not available in '84.                      11:50:33

13        Q.   Was there something from Dr. Fisher's report that       11:50:34

14   you found to be applicable to Von in your diagnosis today?        11:50:37

15        A.   Yes.                                                    11:50:40

16        Q.   What is that?                                           11:50:40

17        A.   If we go to the next slide it shows the evaluation      11:50:41

18   by Dr. Fisher, he noted and then thought it was significant       11:50:43

19   that Von described himself as on fire inside.  Again, the         11:50:48

20   sense of the emotions are out of control, they are very          11:50:54

21   labile, very intense.  At this point he denies use of alcohol     11:50:57

22   or drugs.  Dr. Fisher concluded that Von was free of mental       11:51:02

23   disease or defect that would have impaired his capacity to        11:51:08

24   appreciate the criminality of any conduct, okay?  So he's         11:51:13

25   basically saying that he is not NGRI.  That he could              11:51:15

261

1    appreciate that his behavior was wrong.                    11:51:20

2         But he did indicate during his testimony that         11:51:24

3    there was evidence of an explosive psychiatric disorder.  Now   11:51:26

4    this becomes important again because when we think about   11:51:30

5    borderlines one of their characteristics is this sort of   11:51:34

6    unwarranted aggressive behavior that comes about with minor 11:51:38

7    provocation.  It is out of proportion.  What the individual 11:51:43

8    has experienced does not warrant the kind of aggression and 11:51:49

9    anger that they display.  And that is characteristic of     11:51:54

10   borderline personality disorder.  Now, he diagnoses it as   11:51:57

11   explosive psychiatric disorder which is very similar but it is 11:52:01

12   just one symptom.  So again, if Von didn't have the other   11:52:06

13   symptoms of impulsivity, immaturity, he had problems with   11:52:11

14   relationships and all of the other stuff I may go along with 11:52:11

15   that.  But we have to incorporate all of the information that 11:52:15

16   we have from all of the other evaluations and his history.   11:52:17

17        Q.   After 1984 you have had occasion to review        11:52:21

18   additional reports that have been prepared after 1994, which 11:52:24

19   means after the DSM-IV came out, can you explain the first one 11:52:28

20   that you reviewed in 2002?                                  11:52:32

21        A.   Yes.  Miles Oden did an evaluation at the         11:52:34

22   Mansfield Correctional Institute.  He identifies that Von had 11:52:38

23   a problem with alcohol in the past.  He also identifies      11:52:42

24   depressive symptoms that have been chronic and he gives a    11:52:45

25   diagnosis of mood disorder and mixed personality disorder with 11:52:49

1    anti-social traits.  So again, what we have got is another    11:52:55

2    person saying there is a personality disorder, identifying the    11:52:59

3    alcohol abuse, identifying the depression.  Well, borderlines    11:53:02

4    have bouts with depression, they have bouts of anger and    11:53:06

5    aggression, they have definitely times where they act out in    11:53:12

6    anti-social ways, anti-social behavior okay.  So again, this    11:53:16

7    is not inconsistent with borderline.  It is just based upon    11:53:20

8    his snapshot.  I don't know to what extent he was able to    11:53:25

9    consider all of the other evaluations, how much time he spent    11:53:29

10   with Von, or if he had any opportunity to do collateral    11:53:32

11   interviews.  So, again, this is, I think, an accurate    11:53:35

12   depiction of symptoms that Von had at that time, but I don't    11:53:40

13   think that the diagnosis is as descriptive as borderline is    11:53:43

14   and as accurate.    11:53:47

15         Q.   Did you review any other psychological evaluations    11:53:48

16   after that?    11:53:52

17         A.   No, I did not.    11:53:52

18         Q.   You have talked about it in depth as you read    11:53:53

19   through the particular evaluations you have reviewed.    11:54:00

20   Borderline personality traits, there are certain things that    11:54:03

21   you have seen in Von clearly.  Can you go through what the    11:54:06

22   traits are, what the symptoms are that you believe Von has, as    11:54:10

23   well as the ones that you have not seen either yourself or in    11:54:14

24   your evaluations?    11:54:17

25         A.   Yes.  If we go to the next slide what it does is    11:54:18

1   it give us an overview of what borderline is. The way to                11:54:21

2   understand borderline personality disorder is picture someone           11:54:26

3   who truly in many ways does not develop a sense of self. They           11:54:31

4   don't really have an identity. And so what they do is they go           11:54:36

5   through life reacting rather than thinking and acting. And              11:54:40

6   again, we have beliefs that influence our actions. We have              11:54:46

7   likes and dislikes, we have values, based upon our growing up           11:54:52

8   and what we have learned, those sort of guide us as we make             11:54:56

9   determinations. Borderlines have an unstable self-image, they           11:55:00

10  really don't know who they are. Oftentimes they are unclear            11:55:06

11  about sexual identity, they are unclear about any future of             11:55:08

12  what they want to accomplish, what they want to do with their          11:55:11

13  lives. Their emotions again labile. Up and down, sad, angry,           11:55:14

14  frightened, reacting to what is in front of them at the                 11:55:19

15  present, really not any sustained emotion.                              11:55:25

16          Impulsivity that is severe, they act and then                  11:55:27

17  think about it afterwards. They are not really considering             11:55:32

18  their actions and what the consequences will be, what the               11:55:35

19  other options are, the pros and cons, they act out again based        11:55:39

20  on what they are feeling. Relationships are disasters, just            11:55:43

21  train wrecks. They rarely have long standing healthy                    11:55:48

22  relationships where there is intimacy and love and caring.             11:55:53

23  And again, this all begins late adolescents, early adulthood          11:55:56

24  and then continues on. It is a chronic disorder.                        11:56:02

25      Q.   There are symptoms of borderline personality?                  11:56:06

JILL M. CUTTER, RPR
(513) 785-6596

1     A.   Specific objective criteria that are used based on   11:56:09

2  the research, the first one is frantic efforts to avoid real   11:56:12

3  or imagined abandonment. Borderlines, again, feel great need   11:56:17

4  to be involved in a relationship. They are afraid of being   11:56:21

5  alone and when they feel that they are going to be left alone,   11:56:24

6  they act out. Even the clients that I work with who have   11:56:28

7  borderline personality disorder if I tell them I am going to   11:56:32

8  be going on vacation, that will be a major issue in our   11:56:35

9  treatment. Because now they are afraid that I am going leave   11:56:40

10  them, that I am not going to come back, that I don't care   11:56:44

11  about them, that I don't think that their problems are   11:56:46

12  important, and it becomes a significant part of our therapy   11:56:49

13  oftentimes for weeks prior to my vacation. So these   11:56:53

14  individuals have a real hard time when they think someone is   11:56:56

15  going to leave them or abandon them.   11:57:00

16     Pattern of unstable intense relationships. Again,   11:57:02

17  going from idealizing the person to then devaluing the person   11:57:05

18  and being angry at the person. And we see both of these in   11:57:11

19  Von. We see him not wanting to be alone and not wanting to be   11:57:14

20  abandoned. In particular we see this with Ernestine and with   11:57:18

21  Suzette, and we see these very unstable, unhealthy   11:57:21

22  relationships. He's had lots of sexual relationships, almost   11:57:26

23  always with women who abuse alcohol and drugs, almost always   11:57:29

24  with women who have multiple sexual partners, women who are   11:57:33

25  unlikely to form a commitment to him and be faithful in a   11:57:39

JILL M. CUTTER, RPR
(513) 785-6596

1  relationship with him, but yet he thinks somehow that is going  11:57:42
2  happen.  11:57:46
3        Identity disturbance again, Von has some sexual  11:57:48
4  identity issues. He is not sure if he is heterosexual,  11:57:52
5  homosexual, bisexual, he struggles with that. His sense of  11:57:56
6  purpose and future, what are his goals. If we take a look at  11:58:01
7  his work history, just his life pattern, there is no sense of  11:58:05
8  direction, or planning for the future. And that was reflected  11:58:09
9  by the collateral interviews as well. Impulsivity, we have  11:58:13
10 ongoing impulsivity. The one most characteristic one is the  11:58:17
11 substance abuse. But also we see it in his decisions to quit  11:58:23
12 his jobs, to go from one place to another, there is no sense  11:58:25
13 again of thinking through what is going to happen including  11:58:28
14 the offenses.  11:58:32
15       There can be recurrent suicidal behavior, gestures  11:58:36
16 or threats, I did not find any of that evident for Von either  11:58:41
17 in his history or in my evaluation of him. Affective  11:58:45
18 instability again, episodic dysphoria. Dysphoria is  11:58:48
19 depression, and what we have got as evidence, both  11:58:51
20 historically and from Von's interactions with me that he has  11:58:54
21 had bouts of depression that have been significant, but again,  11:58:57
22 they don't last. We don't see them showing up every time he's  11:59:01
23 evaluated, we see them at various points along the way.  11:59:03
24       Chronic feelings of emptiness, in talking with Von  11:59:07
25 and talking with others, there was this sense that he did not  11:59:10

| | |
|---|---|
| 1 | have a sense of who he was and where he was going. And what | 11:59:13 |
| 2 | his life was going to be. Inappropriate and intense anger, we | 11:59:16 |
| 3 | certainly have that present for Von. Where at times he has | 11:59:21 |
| 4 | overreacted to situations with minimal provocation, the two | 11:59:25 |
| 5 | most significant situations involved Ernestine and Suzette. | 11:59:30 |
| 6 | Transient stress related paranoid ideation, that's | 11:59:34 |
| 7 | a mouthful. Basically what we are saying there, is this | 11:59:44 |
| 8 | temporary, not long lasting, but intense suspicion of others. | 11:59:46 |
| 9 | Paranoia, fear that the person is either acting to hurt me or | 11:59:52 |
| 10 | doing something that will hurt me, planning to leave me, so | 11:59:55 |
| 11 | that I now am suspicious of this other person that they are | 12:00:01 |
| 12 | doing something, planning to hurt me. And again, if it was | 12:00:05 |
| 13 | ongoing that would not be this. This is transient. And | 12:00:09 |
| 14 | again, if we take a look at Von's history we see that there | 12:00:13 |
| 15 | are bouts of this where he becomes suspicious of others. | 12:00:18 |
| 16 | Q. So of the nine factors or symptoms I guess he has | 12:00:21 |
| 17 | eight of them? | 12:00:26 |
| 18 | A. Yes. | 12:00:28 |
| 19 | Q. And there are causes, I am assuming, of borderline | 12:00:29 |
| 20 | personality disorder. They don't just pop up in people? | 12:00:34 |
| 21 | A. Yes. | 12:00:37 |
| 22 | Q. What are they? | 12:00:38 |
| 23 | A. At this point what we believe is there probably is | 12:00:39 |
| 24 | some biological component that plays a role but we don't know | 12:00:41 |
| 25 | what it is. We just don't have enough understanding of the | 12:00:45 |

1  brain's functioning, but what we do know is if we look at the
2  research, people who have borderline personality disorder they
3  are correlated with really very extreme backgrounds.
4  Background in which there was no adequate parenting and
5  supervision and nurturing growing up, so that these
6  individuals, because of their predisposition of their
7  biological makeup and because of their environment, don't
8  develop a sense of themselves, and end up developing this
9  personality disorder.

10      Q.   Are there impacts of, doing that social history,
11  forensic history, are there life events of Von's that have
12  impacted his makeup and his ability to, strike that word
13  ability, your diagnosis of borderline personality disorder?

14      A.   Yes.  If we think about this, everyone is not
15  affected the same.  We can grow up in the same household and
16  still end up with very different personalities and styles.
17  And that is based upon our unique experience.  First of all,
18  what birth order am I, life is different for me than it may be
19  for my brother who was born five years later.  My parents'
20  relationship may be different.  Who is in the home may effect
21  it.  My individual characteristics affect what impacts me.
22  When we take a look at Von, many of Von's issues begin early
23  in life.  At a point where he is too young and too immature to
24  be able to do anything about it himself.

25      And so as I talk about Von's family, and the

268

1  characteristics of his home, most of this is occurring before                12:02:31

2  the age of 12 or 14. At a time when he doesn't have any                      12:02:34

3  control over his life to make choices, to fix it or make it                  12:02:38

4  better. We need to keep in mind he is the second oldest of                   12:02:41

5  nine -- well, there is ten children one has died okay. So                    12:02:48

6  that becomes important as we take a look at that.                            12:02:51

7          Q.    And at age 12 or 13 there are those nine living                12:02:54

8  children; is that correct?                                                   12:02:58

9          A.    Well, I think there is eight at that point, yes.               12:02:59

10         Q.    Okay. What can you tell me about the impact of                 12:03:01

11 his life events in regards to this?                                          12:03:03

12         A.    If we take a look at the next one, it says impact             12:03:05

13 of life events, predisposition and early personality style.                 12:03:08

14 We know that, again, from family members and from Von, that                 12:03:12

15 early along, he had immaturity and impulsivity. He didn't                    12:03:17

16 have good coping strategies and he didn't have a lot of close                12:03:22

17 relationships, so this is when he is a child growing up. So                  12:03:26

18 we have already got now this predisposition, this style that                 12:03:29

19 he has developed.                                                            12:03:33

20         The mother and father are dysfunctional and that                    12:03:34

21 becomes an important theme because the most significant                      12:03:37

22 persons in our life as young children of course are our                      12:03:41

23 parents. We rely upon them for so many things to teach us, to                12:03:44

24 mentor us, to set boundaries, to teach us values, right,                     12:03:48

25 wrong, to guide us. With Von, as we will take a look as we go                12:03:52

| | |
|---|---|
| 1 | along, both his mother and his father had significant problems | 12:03:56 |
| 2 | that prevented them from being able to be there for him. | 12:04:01 |
| 3 |     Q.   And when you speak of his father in these terms | 12:04:04 |
| 4 | you are speaking of Nicholas Davis not Charles Tipton? | 12:04:07 |
| 5 |     A.   That's correct. | 12:04:10 |
| 6 |     Q.   Because you are speaking before the age of 12 or | 12:04:11 |
| 7 | 13 before his mother married Charles; is that correct? | 12:04:13 |
| 8 |     A.   That's correct. | 12:04:16 |
| 9 |     Q.   Okay. You have given a history of the birth order | 12:04:17 |
| 10 | of the children and have produced a slide for that? | 12:04:21 |
| 11 |     A.   Yes. If you take a look at the slide that says | 12:04:26 |
| 12 | Von's siblings, and it lists Elliot and Carol and Charles and | 12:04:30 |
| 13 | Victor and Joanne and Michael and Lavonne and Carlos. So we | 12:04:34 |
| 14 | have got a significant number of siblings and what I have done | 12:04:37 |
| 15 | is I've indicated when they were born, who their fathers were | 12:04:42 |
| 16 | and the age of Von as he continues to have more and more | 12:04:46 |
| 17 | siblings within the home. | 12:04:51 |
| 18 |     Q.   Why is that important? | 12:04:53 |
| 19 |     A.   If we want to think about being cared for, | 12:04:54 |
| 20 | nurtured and supported, the more children, obviously the more | 12:05:01 |
| 21 | the parent has to share their time and energy with the other | 12:05:04 |
| 22 | siblings. In a healthy home, that is difficult for a mother | 12:05:09 |
| 23 | and father. But if we have a dysfunctional home, where the | 12:05:13 |
| 24 | father is alcoholic, where he is abusive to the mother, where | 12:05:17 |
| 25 | they separate repeatedly, where the father is involved with | 12:05:21 |

270

| | | |
|---|---|---|
| 1 | other women, the mother is involved with other women -- I | 12:05:25 |
| 2 | mean, other men, and we have this ongoing repeated pregnancy | 12:05:27 |
| 3 | for the mom, there is just not any time and energy to be given | 12:05:33 |
| 4 | to Von by a parental figure. | 12:05:40 |
| 5 | Q. Dr. Smith, there are many families, my grandmother | 12:05:43 |
| 6 | included, that came from large families, families of 13. Can | 12:05:47 |
| 7 | you explain the distinction here when you are just talking | 12:05:50 |
| 8 | about a family of ten? | 12:05:54 |
| 9 | A. Again, we are not talking about a specific number, | 12:05:56 |
| 10 | what we are talking about, is what is the likelihood that Von | 12:05:57 |
| 11 | can get his needs met. What we have already established is he | 12:06:01 |
| 12 | has this predisposition to be immature, to not have good | 12:06:03 |
| 13 | coping strategies, he doesn't have a lot of connections and | 12:06:07 |
| 14 | now we put him in this family environment where mom and dad | 12:06:10 |
| 15 | are dysfunctional and there are many other siblings competing | 12:06:14 |
| 16 | with him to get their needs met. And I think as we go along | 12:06:17 |
| 17 | and we describe the dysfunction of the parents we will see why | 12:06:20 |
| 18 | for Von it is just not possible for him to get his needs met. | 12:06:23 |
| 19 | Q. Can you move onto the issue of the parents' | 12:06:27 |
| 20 | issues? | 12:06:30 |
| 21 | A. Sure. We take a look at the next slide it says, | 12:06:30 |
| 22 | parents' issues. First thing is Alluster, the mother, is only | 12:06:33 |
| 23 | 17 years old when she's pregnant with her first child, and | 12:06:38 |
| 24 | Nick who is Von's father is only 16. And right from the | 12:06:40 |
| 25 | start, they have got problems. They are arguing, they are | 12:06:46 |

(513) 785-6596

VON CLARK DAVIS v. WARDEN
CASE NO. 2:16-cv-00495
STATE COURT TRANSCRIPTS - Page 1337

1   fighting, Nick doesn't even know that Alluster is pregnant          12:06:50

2   with the first child. He is going off to the Navy and ends up       12:06:54

3   having to come back after he discovers that she is pregnant,        12:06:57

4   that is in the next slide where it says Von's father.               12:07:01

5           They get married not because they have this                 12:07:06

6   loving, caring relationship, but because Nick thinks it is the      12:07:08

7   thing you are supposed to do. Alluster is pregnant, he should       12:07:13

8   marry her. But he is a chronic abuser of alcohol, he is             12:07:16

9   verbally abusive to both Alluster and the children, he              12:07:20

10  disappears for significant periods of time, providing no            12:07:24

11  financial support to the family, and he is involved with            12:07:28

12  numerous other women. So what we have got now is a dad who          12:07:31

13  basically is absent. Absent either because he is intoxicated        12:07:36

14  or because he is away from the home or because he is involved       12:07:40

15  with other women. So we don't have a father figure who is          12:07:44

16  consistent, who is supporting the family, and who is assisting      12:07:48

17  with parenting.                                                     12:07:51

18      Q.    Okay.  The problems of Von's mother?                      12:07:53

19      A.    If we go to the next slide it talks about Von's          12:07:57

20  mother. Alluster is immature in her own way. She keeps              12:08:01

21  taking Nick back, even though she knows he is abusing alcohol,      12:08:07

22  he's mistreating her and he's involved with other women. Some       12:08:10

23  of that I think is because she is not faithful. She is              12:08:15

24  involved with other men, that becomes clear as we go along          12:08:18

25  because she ends up having children with other men. She is          12:08:22

272

1   often away from the home. She is leaving the child-care to   12:08:27

2   her mother and her aunt who they already have ten or twelve   12:08:30

3   people in their home, all extended family living together.   12:08:37

4           So now we have Alluster who is disappearing for   12:08:43

5   periods of time, she is running around with other men and we   12:08:46

6   have the children being left with relatives.   12:08:48

7       Q.   If you have those extended family relatives why is   12:08:51

8   it not possible that one of those persons stepped in and   12:08:55

9   became Nick, the father?   12:08:58

10       A.   That could work if there was a father figure,   12:09:01

11   there was not a father figure. They could serve as a maternal   12:09:04

12   figure, the problem is things aren't consistent. What we have   12:09:08

13   is Alluster comes, she is there for a little bit, then she   12:09:11

14   goes. We have Nick who is there, and then he goes. And so   12:09:14

15   there is no consistency for Von as he is growing up. And for   12:09:18

16   children, the only way that we learn anything is consistency.   12:09:23

17   Two plus two is four only because every time you have ever   12:09:27

18   heard it, two plus two is four. If half of the time you heard   12:09:30

19   two plus two was seven, or twelve, or five, you would have no   12:09:35

20   clue what two plus two is.   12:09:40

21           For a child, when the parental role is being   12:09:43

22   passed back and forth between different people and there is no   12:09:48

23   consistency, children have a very hard time sort of learning   12:09:51

24   so then what is true, what is real? What is right, what is   12:09:54

25   wrong? I think it is significant. Alluster was pregnant six   12:09:57

273

1   years while Von was growing up. So she was carrying a child          12:10:07
2   six years out of his early childhood years. She had eight           12:10:12
3   newborns that she had to take care of while Von was growing          12:10:15
4   up. So again, we have to put this all in context. She is            12:10:19
5   coming and going. She is involved with different men. Von is        12:10:25
6   passed among relatives and she is pregnant most of the time,        12:10:26
7   and she has a newborn with her most of the time. So it is not       12:10:34
8   just that she is pregnant, she has got a newborn and she has        12:10:38
9   her other children.                                                 12:10:41

10          Again, it is just not for her something that she            12:10:42
11  could manage and she acknowledged that. And again, I am not         12:10:45
12  making a judgment about her that she doesn't know about. As         12:10:49
13  we talked she shared that this was what it was like as she was      12:10:52
14  growing up. She was too young, as she said, to get married,         12:10:56
15  she was too young to have children, but once the pattern            12:10:59
16  started she didn't know how to stop it, and now being a mature      12:11:03
17  woman, it is easy to look back and say gee, why did I do that?      12:11:07
18  But she was caught in that cycle at that time.                      12:11:10

19          Q.   And she had multiple relationships and some of the     12:11:14
20  children that she has have other fathers. Those were                12:11:17
21  relationships that she had with other men during her marriage       12:11:20
22  with Nick; is that correct?                                         12:11:23

23          A.   That is correct.                                       12:11:24

24          Q.   And specifically, obviously Nick Davis fathered        12:11:25
25  four of the children?                                               12:11:28

274

1      A.   Yes, if we go to the next slide, I have listed

2   each of the relationships.  She is with Nick Davis off and on

3   for ten years and has four children, but has other children

4   sprinkled in between.  She has a child with Ralph Bud Green,

5   she is with him for a year.  So while she is married to Nick,

6   she is involved with him for a year.  Then there is AW Woods,

7   she is with him for about a year and has a child, then James

8   Curly, she is with him off and on for about three years and

9   has a child, and then finally she is with Charles Tipton and

10  she has three children with him.

11     Q.   And if Mr. Tipton testified earlier that they

12  married in 1962, this would be after they have had a couple of

13  children; is that correct?

14     A.   That's correct, if you notice I have 1960 to the

15  present they had their first child before they were married

16  and it is also important that, you know, Alluster acknowledged

17  that these were not the only men she had relationships with,

18  these were the only men she had children with.  She had many

19  other sexual partners in-between.

20     Q.   Was there anything else about his parents that you

21  thought was important to the diagnosis of borderline

22  personality disorder?

23     A.   I think it's just important to summarize that they

24  both had extramarital relationships, they were both volatile

25  and angry with one another and had lots of fights and

275

1  arguments. They had numerous separations, the father abused    12:12:53
2  alcohol every day, the mother abused alcohol occasionally, and  12:12:56
3  they just were not there for the children.                      12:12:59

4      Q.  Charles Tipton, he came into the family before         13:13:05
5  1962 about 1960. Did he have impact upon this borderline        12:13:10
6  personality disorder diagnosis that you made?                   12:13:17

7      A.  Unfortunately I think Charles was the one hope          12:13:19
8  that Von had, but it came too late. So much of our              12:13:23
9  personality is formed early in life. And so unfortunately he    12:13:28
10 comes when really Von is 12 years old and there is infrequent   12:13:33
11 contact, they finally get married when Von is 14 and by that    12:13:38
12 point Von's use of alcohol, his investment in school, his       12:13:42
13 other problems, he is not around home a lot. He is now away     12:13:47
14 from home. He is running the streets, he is with his peers,     12:13:51
15 and there is not the type of relationship that he needed to     12:13:54
16 really sort of turn this around.                                12:13:58

17         So although I think Charles would have been well        12:14:00
18 intentioned, he couldn't have that impact. Also Charles has     12:14:02
19 his other obligations, he has another family, he is divorced,   12:14:08
20 he has two other children from that relationship. He is         12:14:11
21 working oftentimes two jobs and so there is not a lot of time    12:14:14
22 to invest in Von at this point.                                 12:14:18

23     Q.  Okay. Is there any other impact on Von that you         12:14:22
24 found from the family, the parents I'm going to start with?     12:14:26

25     A.  Yeah, if we take all of this environment and then       12:14:30

276

1  couple that with Von's sort of predisposition, his individual    12:14:35

2  makeup, and we think about so then what does that do to him?      12:14:41

3  How does that impact him? Well, what we find is that there is     12:14:45

4  this lack of nurturing from the parents. So what happens is       12:14:48

5  Von doesn't have a bond with his mother and father. What is       12:14:51

6  interesting is I mentioned earlier that the one point Von left    12:14:56

7  the Navy to go connect with his father, that is Von's attempt     12:14:59

8  to try to find his dad. There is not really a bond, there is      12:15:03

9  no relationship, there is no connection. He is still looking      12:15:06

10 for that even when he is, you know, in the Navy. There is         12:15:10

11 ongoing neglect, there is abandonment. The father literally       12:15:16

12 disappears after their divorce. There is no contact with Von.     12:15:19

13       He has no consistent father figure from birth to            12:15:22

14 14. There is not a male figure within the family to serve as      12:15:25

15 a role model. The mother is promiscuous and preoccupied with      12:15:29

16 men, I think that becomes important for Von because he picks      12:15:34

17 up on that. His own promiscuity, his own involvement with         12:15:37

18 many women, he has confusion of sex with love. He does not        12:15:42

19 develop a healthy identity or sense of himself.                   12:15:47

20       If we go to the next slide I talk about Von                 12:15:51

21 doesn't experience love, nurturing or intimacy. There is just     12:15:54

22 not that relationship in his life to provide that. His family     12:15:58

23 members acknowledge that he is really not close to anyone.        12:16:04

24 They talked about him not confiding in them, not sharing with     12:16:07

25 them that he is really not emotionally close to any of them.      12:16:12

JILL M. CUTTER, RPR
(513) 785-6596

| | | |
|---|---|---|
| 1 | He engages in dysfunctional sexual relationships. As I talked | 12:16:15 |
| 2 | about he has some sexual role confusion in terms of whether he | 12:16:21 |
| 3 | is heterosexual or homosexual. He confuses sex with | 12:16:24 |
| 4 | infatuation and love. | 12:16:31 |
| 5 | He's suspicious and untrusting of others, always | 12:16:33 |
| 6 | concerned that people are going to hurt him, leave him or | 12:16:36 |
| 7 | abandon him. If we look at the next slide he becomes sexually | 12:16:39 |
| 8 | promiscuous. He is involved with multiple sexual partners | 12:16:44 |
| 9 | even when he is in a relationship. So while he is with | 12:16:48 |
| 10 | Ernestine, and while he's with Suzette he is involved with | 12:16:52 |
| 11 | other women. And again, the personality disorder really comes | 12:16:56 |
| 12 | through because he doesn't see anything wrong with that for | 12:16:59 |
| 13 | him, but he becomes upset with Ernestine and Suzette that they | 12:17:01 |
| 14 | are involved with other men. | 12:17:06 |
| 15 | He uses alcohol beginning in adolescence and | 12:17:10 |
| 16 | begins to use it more and more, and it becomes one of his ways | 12:17:14 |
| 17 | of dealing with emotional discomfort. Alcohol is a central | 12:17:18 |
| 18 | nervous system depressant, it's a wonderful way to | 12:17:24 |
| 19 | self-medicate. I don't like how I feel. I drink. I get an | 12:17:25 |
| 20 | artificial feeling of being relaxed, of not being upset or | 12:17:28 |
| 21 | worried about my problems. He has no clear plans for his life | 12:17:33 |
| 22 | or his future. He never really picks any type of career path. | 12:17:36 |
| 23 | Doesn't really show any consistent likes or dislikes for | 12:17:41 |
| 24 | anything. Seems to really be sort of vacillating, wandering | 12:17:45 |
| 25 | through life. | 12:17:50 |

278

1         Reacts to his environment and to those around him,   12:17:51

2  doesn't consider the consequences of his actions, and   12:17:54

3  basically, my opinion is that he develops borderline   12:17:57

4  personality disorder, which is present by late adolescence and   12:18:02

5  then present throughout his adult life and is present today.   12:18:06

6      Q.   Is there ongoing trauma because of the borderline   12:18:11

7  personality disorder?   12:18:16

8      A.   The borderlines they go through life as young   12:18:17

9  children, not having any intimacy, not having any close   12:18:20

10  relationships, not being able to have any consistency.  Well,   12:18:23

11  because of their impulsivity and because of their poor   12:18:26

12  decision making, as they become adults they perpetuate that.   12:18:31

13  They pick the wrong people.  But in many ways they pick the   12:18:35

14  people who will tolerate them.   12:18:40

15        You have to think about this, if I am borderline   12:18:41

16  and I have all of these characteristics of impulsivity, labile   12:18:42

17  emotions and poor decision making, and I'm suspicious and I   12:18:46

18  idealize you one minute and then I reject you the next minute,   12:18:49

19  who is going to want to be with me?  Well, the persons who   12:18:52

20  chose to be with borderlines tend to have their own issues.   12:18:56

21  Oftentimes issues with alcohol and drugs, often issues with   12:19:00

22  dependency, often their own issues with relationships.  And so   12:19:03

23  what they do is borderlines end up being in dysfunctional   12:19:05

24  relationships with persons who they end up hurting each other.   12:19:09

25      Q.   Does, because of this personality borderline   12:19:14

279

1    personality disorder, he have a reaction to stress?    12:19:18

2         A.    Borderlines have a predictable reaction.  If you    12:19:20

3    look at the slide that says Von's reaction to stress.  First    12:19:24

4    of all they overreact.  Minor provocation, results in a big    12:19:27

5    response.  Which goes back to the early description of    12:19:32

6    histrionic in the one evaluation.  They exaggerate.  Their    12:19:35

7    response is bigger than it should be.  Their emotions are    12:19:41

8    labile.  They swing suddenly and dramatically and that occurs    12:19:44

9    for Von and they describe it.    12:19:48

10         Suspicious of others, fearful that they are either    12:19:51

11   going to hurt me or they are going to leave me.  And then    12:19:53

12   intense anger and aggression when they perceive that they have    12:19:56

13   been wronged.  And that is a clear thing about personality    12:20:00

14   disorders, it's not about what is true, it is about    12:20:05

15   perceptions.  Borderlines frequently misperceive a    12:20:08

16   relationship.  They think that someone is more invested in    12:20:12

17   them than they really are.  They think that someone has made a    12:20:16

18   commitment that they have not made and then when they perceive    12:20:20

19   that they have been mistreated, they overreact and their    12:20:23

20   response can be very aggressive and very angry.    12:20:27

21         Q.    The female relationships that we have talked    12:20:33

22   about, how is that important to Von, the diagnosis you have    12:20:36

23   made?    12:20:42

24         A.    If we take a look at the slide that begins with    12:20:42

25   female relationships, borderlines look for validation through    12:20:46

JILL M. CUTTER, RPR
(513) 785-6596

1　their relationships, if I don't feel that I have a sense of　12:20:53

2　self, and I don't feel, quote, real, then what I do is a latch　12:20:56

3　onto you with the hope that you can make me feel real; that　12:21:02

4　you can give me a sense of identity. The problem is I don't　12:21:05

5　know how to do that. I don't know how to connect. I don't　12:21:11

6　know how to communicate and form intimacy and so, even though　12:21:14

7　I want that, my relationships end up being superficial, most　12:21:18

8　often they are short duration. It's hard for me to have long　12:21:23

9　relationships if I am borderline because of my behavior.　12:21:27

10　Because the minute that I think that you are doing something I　12:21:30

11　reject you. But then the minute you go away I want you back.　12:21:33

12　And so there is just like yo-yo relationship. I love you, you　12:21:38

13　are great, go away, I don't want you. Come back. Come back.　12:21:41

14　And back and forth.　12:21:45

15　　　　And again, most people, even dysfunctional people,　12:21:46

16　after a while get tired of it. And say, yeah, I can't deal　12:21:49

17　with this. I don't want to be a relationship with you　12:21:51

18　anymore. The sexual relationship for borderlines, again, it's　12:21:54

19　a sense of connection. Even if there is no emotional intimacy　12:21:59

20　related it, they confuse the sex with love. And so they will　12:22:04

21　pursue sexual relationships, again, to reinforce that I'm　12:22:08

22　okay, I am a good person, I'm attractive, there is something　12:22:12

23　good about me.　12:22:15

24　　　　Q.　Can you explain how some of the same children in　12:22:17

25　the household, with experiencing the same persons, Alluster　12:22:21

281

1    and Nick being there, not there, don't have this borderline                12:22:25
2    personality disorder to our knowledge, such as Elliot who is               12:22:29
3    the oldest child, Carol who is the child after Von, and then               12:22:30
4    Victor who is two children later?                                          12:22:36
5         A.   Again, what we want to keep in mind is each                      12:22:37
6    person's life experience is different.  If I am the first                  12:22:41
7    child, my life experience is different.  For the first child               12:22:43
8    Elliot, dad is around for first six years of Von's life, so                12:22:47
9    they are around for a while with Elliot.  Then Nick is gone,               12:22:51
10   but again, Nick is not a great dad even when he is present,                12:22:55
11   but he is at least around somewhat.  Von experiences the true              12:22:58
12   abandon by dad.  But then, you know, again, it has to do with              12:23:04
13   what is going on and the individual makeup.  Von has problems              12:23:08
14   in school, some of the others do not have problems in school.              12:23:12
15        Von has difficulties with closeness and                              12:23:15
16   relationships early along, many of the others might not have.             12:23:19
17   Victor told me that he was very close with his grandmother and            12:23:23
18   really formed a connection and stayed with her.  Von didn't do            12:23:27
19   that.  That didn't happen for him.  So again, there are                    12:23:31
20   specific events that can occur which can dramatically change              12:23:34
21   one person's life experience versus another.  And so for Von,             12:23:39
22   his particular makeup, and the particular things that happened            12:23:43
23   to him, add up to his having borderline.                                   12:23:48
24        I mean, we see this at times.  You will have three                   12:23:52
25   children in a family, one goes to college, one doesn't.  One              12:23:56

282

1   gets married and has children, another one doesn't, they grew          12:23:59
2   up in the same home, had the same parents but they developed          12:24:04
3   different likes, dislikes, values, and directions for their           12:24:07
4   life. We expect that. And that is all that has happened               12:24:10
5   here. Von is a unique individual, he happened to be the               12:24:15
6   second oldest in this family and the events that occurred             12:24:17
7   affected him in a unique way based upon his position in the           12:24:21
8   family and his resources that were available to him as he was         12:24:24
9   growing up.                                                           12:24:28
10          Q.   You have diagnosed him with co-occurring disorder        12:24:29
11  of the alcohol issue, can you explain how that is impacting on        12:24:34
12  the borderline personality disorder?                                  12:24:39
13          A.   Yes, if we move ahead, it says co-occurring             12:24:41
14  disorders, substance abuse and dependence. The fact that you          12:24:45
15  have borderline personality disorder doesn't mean that you            12:24:47
16  can't have another disorder. You can have more than one               12:24:51
17  disorder at a time. And so, that is what I talked about               12:24:55
18  earlier, this co-occurring happening at the same time one             12:24:56
19  impacts or interacts with the other. If we go to the next             12:24:59
20  slide it says substance abuse and mental illness. This is not         12:25:02
21  as rare as you might think. Seven to ten million individuals          12:25:06
22  in the United States have both a mental disorder and abuse            12:25:11
23  alcohol or other drugs.                                               12:25:15
24          The issue here is in treating people who have both            12:25:16
25  disorders, you have to have very specially designed treatment         12:25:19

JILL M. CUTTER, RPR
(513) 785-6596

1   programs. If you treat just one disorder and not the other,                     12:25:23

2   the individual will not be successful in their recovery. At                     12:25:27

3   one point Von had some treatment for his abuse of alcohol, but                  12:25:31

4   there was not a recognition of him having a mental illness, so                  12:25:36

5   as a result, he continued to abuse alcohol.                                     12:25:39

6        Q.   Can you explain if he is not receiving treatment,                     12:25:45

7   it's 2009, and you are making this diagnosis of these                           12:25:48

8   co-occurring disorders, how he has been able to live on death                   12:25:52

9   row and only have one incident since 1990?                                      12:25:57

10       A.   Borderlines and people with alcohol dependence do                     12:26:01

11  very well in a structured environment. If you take an                           12:26:05

12  individual who has a longstanding history of abusing alcohol                    12:26:09

13  and a personality sort of like borderline, and you put them in                  12:26:14

14  a structured environment like prison, well first of all, what                   12:26:18

15  you've done is you've greatly reduced the likelihood that they                  12:26:18

16  can access alcohol and drugs. I am not saying completely, but                   12:26:21

17  you have really reduced it. So now we have taken away one of                    12:26:25

18  the risk factors for them getting into trouble.                                 12:26:28

19       You have taken away alcohol, you have taken away                           12:26:29

20  drugs. The second thing is, is if I have borderline                             12:26:32

21  personality disorder and my problem is impulsivity, poor                        12:26:35

22  decision making and difficulty with relationships, in a prison                  12:26:39

23  setting, I don't have a lot of decisions to make, I don't have                  12:26:45

24  lots of opportunities to act out and I also don't form lots of                  12:26:45

25  relationships. I am pretty much restricted in what I get to                     12:26:49

1    do, when I get to do it, and I have supervision at all times    12:26:53

2    regarding what I am doing. Individuals with borderline    12:26:58

3    personality disorder do very well in that kind of environment.    12:27:01

4       Q. Okay. The borderline personality disorder and    12:27:04

5    substance abuse issues they affect what part -- do they affect    12:27:09

6    a specific part of the brain?    12:27:13

7       A. I am trying to think if we can get to a slide that    12:27:17

8    will sort of help show. If we go ahead, there is a picture of    12:27:24

9    the brain, it is called drug addiction is a complex illness.    12:27:26

10    The reason I put that there is that the research has now shown    13:27:31

11    us that addiction is biological rather than just a behavior.    12:27:37

12    And if you go to the next slide, it shows various parts of the    12:27:43

13    brain and the area I would like you to focus in, I believe it    12:27:47

14    is an orange band in the center of the brain, it is called    12:27:50

15    reward, if you see that label.    12:27:53

16       The reward center of the brain is responsible for    12:27:56

17    a number of very important behaviors for human beings. If we    12:28:00

18    go to the next slide what you will see is that part of the    12:28:06

19    brain is responsible for hunger, thirst, and sexual drive.    12:28:10

20    Okay. The reward center of the brain is activated and we feel    12:28:15

21    thirsty, it's activated we feel hungry, it's activated and we    12:28:20

22    feel that we would like to have a sexual relationship with    12:28:23

23    someone. All of those are basic parts of human behavior for    12:28:26

24    survival. We don't eat, we don't drink, we don't have sex, we    12:28:30

25    die, the human race goes away. Okay. So these are hard wired    12:28:35

1    drives.  These are cravings which we have, which are very,                12:28:39
2    very intense.  It's not just I want or I would like, but I                 12:28:43
3    need.                                                                      12:28:47
4              Okay.  I need food, I need water.  We are wired                  12:28:47
5    that way.  And if we go for an extended period without water               12:28:51
6    or food we will become very desperate to meet that need.  What             12:28:56
7    becomes important about addiction, is we have now been able to             12:29:01
8    demonstrate, if you go to the next slide, that the reward                  12:29:04
9    center is what is activated when an individual develops an                 12:29:08
10   addiction to alcohol or drugs.  So rather than an alcoholic                12:29:11
11   wanting or liking alcohol, that in fact their perception is                12:29:17
12   that they need alcohol.  That they must have it.  That they                12:29:23
13   crave it like a person craves food and water.  So if we begin              12:29:29
14   to look at it that way and understand the research, it makes               12:29:33
15   it clearer why people drink even though it will destroy their              12:29:36
16   relationships, may cause them to lose their job, may cause                 12:29:41
17   them to have multiple legal involvement, it gives us a better              12:29:44
18   understanding.  Still can be treated, but what we are                      12:29:48
19   recognizing is that this is not just a behavior that someone               12:29:50
20   is choosing to repeatedly get into trouble with their use of               12:29:55
21   alcohol and drugs.                                                         12:29:58
22             If you take a look at the next slide, there is                   12:29:59
23   actually a picture of a rat, what they are showing here is a               12:30:02
24   study which was done in which they gave the rat an opportunity             12:30:08
25   to press a bar, and that is sort of standard study that we do              12:30:09

286

1   with rats. We teach them to press a bar and they get a food          12:30:13
2   pellet. Press the bar they get a food pellet. And then we            12:30:13
3   can also teach them to press another bar and they get an             12:30:19
4   amount of water. And so there is a little water tube and they        12:30:21
5   get to lick and get some water, they can eat a food pellet and       12:30:24
6   it's a happy rat. Food and water any time they want, all they        12:30:27
7   have to do is press the bar. Then what they did is they took         12:30:30
8   and they put in a third bar. The third bar, would administer         12:30:32
9   alcohol directly to the reward center of the brain. So now           12:30:36
10  the rat can get a little food, a little water and a little            12:30:40
11  alcohol; a little food, a little water and a little alcohol.          12:30:44

12          In the beginning, that is exactly what the rat            12:30:46
13  does, samples all three. As the rat develops an addiction to         12:30:48
14  the alcohol, he will use less food and less water up to the          12:30:52
15  point in which in the end the rat will die from dehydration          12:30:58
16  and starvation when all he has to do is press the bar to get         12:31:02
17  food and water, but he won't, he just keeps                          12:31:06
18  self-administrating the alcohol.                                     12:31:11

19          Again, demonstrating the control of this reward         12:31:13
20  center and how alcohol and drugs affect the choices that are         12:31:16
21  made once that area is activated.                                    12:31:19

22      Q.   One of your specialties is addiction, I had a           12:31:22
23  slide on and I skipped ahead. Is there anything about                12:31:26
24  addiction in regards to Von that is important for this Court         12:31:28
25  to understand from back in 1983?                                     12:31:31

1       A.   I think what is important regarding Von's use of   `12:31:35`

2 alcohol is that he starts around age 15.   `12:31:38`

3       MR. OSTER: Your Honor, he said we skipped around,   `12:31:42`

4 can I just ask what the title of this slide is?   `12:31:44`

5       A.   Okay. I was just going to summarize it, we can go   `12:31:47`

6 to one of the slides. Let's go to the one that says Von's   `12:31:52`

7 alcohol use. He begins using alcohol around age 16, abusing   `12:31:52`

8 by age 17. He demonstrates an increase in tolerance while he   `12:32:02`

9 is in the Navy, he shifts from beer to beer and hard liquor as   `12:32:07`

10 he gets older. He progresses to points in which it is near   `12:32:11`

11 daily consumption of alcohol. He drank during incarceration   `12:32:15`

12 at various points when there was the hootch made inside the   `12:32:22`

13 prison.   `12:32:23`

14       And upon release, he resumed his use of alcohol   `12:32:24`

15 and drugs. He has no significant treatment for his addiction   `12:32:28`

16 to alcohol. If we go to the next slide what we show is   `12:32:31`

17 because this is a biological condition, we know that genetics   `12:32:36`

18 plays a role, and what we know in Von's history is that his   `12:32:41`

19 father, his two brothers, his half-brother and several   `12:32:44`

20 maternal uncles and aunts all had problems with their use of   `12:32:49`

21 alcohol. And so again, it shows a family genetic influence or   `12:32:54`

22 predisposition to developing a problem with alcohol.   `12:32:59`

23       If we go back to the slide following the rat, I   `12:33:05`

24 just wanted to emphasize that alcohol is a central nervous   `12:33:11`

25 system depressant. It changes the functions of the brain so   `12:33:16`

288

| | | |
|---|---|---|
| 1 | there is a distortion of our senses. Individuals when they | 12:33:20 |
| 2 | are intoxicated can misperceive things, they may have impaired | 12:33:26 |
| 3 | memory for the events that occurred. They may have severe | 12:33:30 |
| 4 | mood swings or labile emotion. They can become irritable and | 12:33:34 |
| 5 | aggressive, they can have difficulty concentrating and | 12:33:38 |
| 6 | attending. Oftentimes they are impulsive and they react to | 12:33:44 |
| 7 | situations in unpredictable ways, and they demonstrate poor | 12:33:48 |
| 8 | judgment and poor decision making. | 12:33:52 |
| 9 | If we go to the next slide, the key here is again | 12:33:58 |
| 10 | the co-occurring disorders. As I was going through the | 12:34:02 |
| 11 | impairments related to alcohol, many of those impairments are | 12:34:06 |
| 12 | identical to the impairments that a borderline personality | 12:34:10 |
| 13 | disorder experiences without any use of alcohol. So now, if | 12:34:13 |
| 14 | we combine those two, both alcohol and borderline personality | 12:34:16 |
| 15 | disorder, the impairments are exacerbated and there is a | 12:34:19 |
| 16 | synergy between the two disorders. And so you have an | 12:34:23 |
| 17 | individual who now is more impaired than if they had the one | 12:34:27 |
| 18 | disorder alone. | 12:34:31 |
| 19 | Q. Okay. Couple of follow up questions relative to | 12:34:34 |
| 20 | your education and then two more questions and I will be done. | 12:34:38 |
| 21 | You gave us a description of what your current employment | 12:34:41 |
| 22 | background is, you also do some work with the Ohio Department | 12:34:45 |
| 23 | of Rehabilitations and Corrections; is that correct? | 12:34:49 |
| 24 | A. That's correct. | 12:34:50 |
| 25 | Q. And what is that? | 12:34:50 |

289

1     A.   I have worked with ODRC in several capacities.                    12:34:51

2  Picaway Prison has a therapeutic community as part of the                 12:34:56

3  prison.  And so what I did is I worked with the clinical staff            12:35:01

4  as a consultant to help them install a therapeutic community             12:35:05

5  within the prison.  I have also done training for staff with             12:35:09

6  ODRC regarding cognitive behavioral therapy and criminogenic            12:35:14

7  thinking, so that, again, I have had an ongoing relationship            12:35:19

8  with them.                                                               12:35:23

9     Q.   Okay.  Sometimes you are asked by prosecutors that              12:35:23

10 you are simply a hired gun, what is your response to that?               12:35:27

11    A.   My opinion is my opinion based upon the                          12:35:31

12 information that I have.  There is no amount of money that                12:35:37

13 will influence what my opinion is.  This is only one part of             12:35:39

14 what I do.  It's part of my career.  It is a small part of               12:35:43

15 what I do.  But I think it's an important part.  Everything              12:35:46

16 that I do is a reflection upon my character and my profession           12:35:50

17 and so what I offer today is based upon the information I had            12:35:53

18 available to me from Von, from his family, the records, and I            12:35:57

19 feel is a reflection of the information, not a reflection of             12:36:02

20 how much I am getting paid or why I am here.                             12:36:07

21    Q.   And my last question revolves around the issue of               12:36:10

22 blame game.  Lots of times people say in psychology and                  12:36:15

23 psychiatry you are just simply blaming someone else for                  12:36:18

24 someone's actions.  Is that what you are doing here with your           12:36:20

25 diagnosis?                                                               12:36:23

JILL M. CUTTER, RPR<br>
(513) 785-6596

1    A.    No, this is not an excuse for Von.  This is an    12:36:23

2  explanation and understanding.  In fact, I suppose it is    12:36:27

3  important to note that Von made it very clear to me the very    12:36:33

4  first time that I met him that he had no indication or desire    12:36:36

5  to excuse what he did.  That he was going to acknowledge that    12:36:39

6  and own that completely.  This does not excuse.  This is an    12:36:43

7  explanation.  This is an understanding of how this could    12:36:49

8  happen.  Why it might have happened.  But again, we are not    12:36:52

9  trying to blame Alluster or Nick but they play a role, just as    12:36:56

10  they play a role in all of our lives.  Our parents are    12:37:01

11  influences.  And someone who has a mental disorder, if we are    12:37:0A

12  going to understand their choices and their behavior, we have    12:37:10

13  to understand what that disorder is and how it played a role.    12:37:13

14        MS. COOK-REICH:  I have no further questions.    12:37:16

15        JUDGE NASTOFF:  All right.  Thank you.  Given the    12:37:19

16    hour, it is 12:37, by my clock, by the Court clock.    12:37:24

17    Briefly conferring with the other Judges, why don't we    12:37:32

18    take approximately a 45 minute lunch break.  Is there    12:37:35

19    anyone from that side that can't live with a 15 minute    12:37:39

20    shorter lunch today?    12:37:43

21        MS. COOK-REICH:  I could live with a five minute    12:37:45

22    lunch.    12:37:48

23        MR. OSTER:  I couldn't live with a five minute    12:37:48

24    lunch, Your Honor.    12:37:50

25        JUDGE NASTOFF:  It's that whole reward center    12:37:50

291

| | | |
|---|---|---|
| 1 | thing. All right. So let's call it 45 minutes. That | 12:37:53 |
| 2 | would bring us back, well, do the math, I'm showing | 12:37:57 |
| 3 | about 25 after. We will be in recess until that time. | 12:38:01 |
| 4 | Doctor, I want to remind you that since you are in | 12:38:07 |
| 5 | midstream of your testimony, you are not to discuss | 12:38:10 |
| 6 | your testimony with any other person until your | 12:38:13 |
| 7 | testimony is completed, and then I will -- we will | 12:38:14 |
| 8 | either re-swear you or remind you that you are still | 12:38:18 |
| 9 | under oath when we return. | 12:38:22 |
| 10 | THE WITNESS: That's fine, Your Honor. | 12:38:23 |
| 11 | JUDGE NASTOFF: All right. We are in recess. | 12:38:25 |
| 12 | (Recess taken at this time.) | 12:38:31 |
| 13 | JUDGE NASTOFF: We are back on record. State of | 01:34:02 |
| 14 | Ohio vs. Von Clark Davis, CR1983-12-0614. Again | 01:34:08 |
| 15 | present in person is the defendant, Von Clark Davis, | 01:34:13 |
| 16 | with his counsel, Randall Porter, Melynda Cook-Reich. | 01:34:15 |
| 17 | They also have a technological assistant present at | 01:34:20 |
| 18 | counsel table, sorry I don't know your name. | 01:34:23 |
| 19 | MS. RECTOR-COWSER: Nancy Rector-Cowser. | 01:34:29 |
| 20 | JUDGE NASTOFF: All right. And with the public | 01:34:29 |
| 21 | defender's office. And then also present for the State | 01:34:30 |
| 22 | are assistant prosecutors Dan Eichel, Mr. Oster. Our | 01:34:32 |
| 23 | witness, Dr. Smith is on the stand, all members of the | 01:34:38 |
| 24 | three-judge panel are present. | 01:34:40 |
| 25 | Dr. Smith, before we pick up with | 01:34:42 |

JILL M. CUTTER, RPR
(513) 785-6596

292

| | |
|---|---|
| 1 | cross-examination, I would simply remind you that you | 01:34:43 |
| 2 | remain under oath from your earlier testimony. | 01:34:47 |
| 3 | THE WITNESS: Yes. | 01:34:50 |
| 4 | JUDGE NASTOFF: Thank you. Does the State have | 01:34:50 |
| 5 | cross-examination? | 01:34:53 |
| 6 | MR. EICHEL: Yes, Your Honor. | 01:34:55 |
| 7 | JUDGE NASTOFF: You may proceed. | 01:34:57 |
| 8 | CROSS-EXAMINATION | 01:34:57 |
| 9 | BY MR. EICHEL: | 01:34:59 |
| 10 | Q. Dr. Smith, good afternoon. | 01:34:59 |
| 11 | A. Good afternoon, sir. | 01:35:03 |
| 12 | Q. My name is Dan Eichel. I'm assistant prosecuting | 01:35:04 |
| 13 | attorney here in Butler County. | 01:35:08 |
| 14 | A. Nice to meet you, Mr. Eichel. | 01:35:09 |
| 15 | Q. Sir, you stated you are in private practice as a | 01:35:12 |
| 16 | licensed clinical psychologist and a certified -- let me make | 01:35:15 |
| 17 | sure I have the title correct, I thought it was certified | 01:35:20 |
| 18 | chemical dependency consultant? | 01:35:23 |
| 19 | A. Certified addiction specialist, very similar. | 01:35:25 |
| 20 | Q. Certified addiction specialist, okay. And you | 01:35:28 |
| 21 | have been a licensed clinical psychologist since 1983? | 01:35:31 |
| 22 | A. That's correct. | 01:35:36 |
| 23 | Q. Private practice since 1993? | 01:35:37 |
| 24 | A. No, before that. | 01:35:41 |
| 25 | Q. Before that? Okay. And it's generally in the | 01:35:43 |

JILL M. CUTTER, RPR
(513) 785-6596

293

| | | |
|---|---|---|
| 1 | Cleveland area? | 01:35:49 |
| 2 | A. Yes. | 01:35:50 |
| 3 | Q. All right. Sir, you have had occasion to testify | 01:35:51 |
| 4 | how many times in capital cases in Ohio or anywhere for that | 01:35:57 |
| 5 | matter? | 01:36:03 |
| 6 | A. I was going to say overall I think over the last | 01:36:04 |
| 7 | 15 years it's been maybe 40 times, something like that. | 01:36:08 |
| 8 | Q. Okay. In the -- it's four years ago, but in 2005, | 01:36:11 |
| 9 | do you remember testifying in the Trumbull case? | 01:36:16 |
| 10 | A. I remember the name, yes. | 01:36:18 |
| 11 | Q. And in that case, you testified that you had | 01:36:20 |
| 12 | occasion to testify 20 to 25 times as a defense witness in | 01:36:25 |
| 13 | capital cases. | 01:36:30 |
| 14 | A. That may be. | 01:36:32 |
| 15 | Q. And so you have testified more in the past four | 01:36:33 |
| 16 | years; is that correct? | 02:36:41 |
| 17 | A. I testified in the last four years, that's | 01:36:41 |
| 18 | correct. | 01:36:43 |
| 19 | Q. Is it true now as it was then that you have never | 01:36:43 |
| 20 | been asked to testify as a prosecution witness? | 01:36:49 |
| 21 | A. That is correct. | 01:36:51 |
| 22 | Q. And you have testified in approximately 15 to 20 | 01:36:53 |
| 23 | states you said? | 01:36:59 |
| 24 | A. Yes, I believe that is true. | 01:37:01 |
| 25 | Q. All for the defense? | 01:37:01 |

JILL M. CUTTER, RPR
(513) 785-6596

294

| | |
|---|---|
| 1 | A.   That is correct. | 01:37:03 |
| 2 | Q.   Sir, I am sure -- well, strike that.  Have you had | 01:37:04 |
| 3 | prior case assignments where you have been retained to | 01:37:14 |
| 4 | evaluate an individual for the Ohio Public Defender's staff? | 01:37:20 |
| 5 | A.   I have worked on cases with the Ohio Public | 01:37:25 |
| 6 | Defender before; that is correct. | 01:37:28 |
| 7 | Q.   Okay.  And how about Mr. Porter in this case, any | 01:37:30 |
| 8 | prior contact? | 01:37:33 |
| 9 | A.   I don't believe we have ever worked on a case | 01:37:35 |
| 10 | before. | 01:37:38 |
| 11 | Q.   Okay.  Fair enough.  In this case you began your | 01:37:38 |
| 12 | work when? | 01:37:42 |
| 13 | A.   I think I was contacted the last part of 2008.  So | 01:37:42 |
| 14 | I may have received materials in early 2009. | 01:37:49 |
| 15 | Q.   And according to your previous testimony, your | 01:37:53 |
| 16 | purpose -- well, one thing you did, you did it twice, you | 01:37:57 |
| 17 | interviewed the defendant twice in March, I believe and then | 01:38:04 |
| 18 | April, I believe you listed the dates in the outline? | 01:38:08 |
| 19 | A.   That's correct, yes. | 01:38:15 |
| 20 | Q.   Okay.  And in this case, you were subpoenaed to | 01:38:16 |
| 21 | complete and your work was done in April; is that correct? | 01:38:24 |
| 22 | A.   No.  I did the collateral interviews, the family | 01:38:28 |
| 23 | members in May. | 01:38:32 |
| 24 | Q.   In May.  Were you -- you were subpoenaed and ready | 01:38:33 |
| 25 | to testify at an earlier date; is that correct? | 01:38:39 |

JILL M. CUTTER, RPR
(513) 785-6596

295

| | | | |
|---|---|---|---|
| 1 | A. | Yes. | 01:38:43 |
| 2 | Q. | Which didn't happen? | 01:38:44 |
| 3 | A. | That is correct. | 01:38:45 |
| 4 | Q. | Curious when did you put together the PowerPoint? | 01:38:47 |
| 5 | A. | You know, I don't know the date of that. | 01:38:54 |
| 6 | Q. | Okay. Certainly something you don't do overnight? | 01:38:56 |
| 7 | A. | No. No, I took time to put that together; is that | 01:39:01 |
| 8 | correct. | | 01:39:03 |
| 9 | Q. | Okay. Did you otherwise author a written report | 01:39:04 |
| 10 | in this case? | | 01:39:12 |
| 11 | A. | No, I did not. | 01:39:12 |
| 12 | Q. | And why is that? | 01:39:13 |
| 13 | A. | I wasn't requested to do a written report. | 01:39:15 |
| 14 | Q. | You have authored reports in other cases? | 01:39:18 |
| 15 | A. | When it has been requested I have always provided | 01:39:22 |
| 16 | that, that is correct. | | 01:39:24 |
| 17 | Q. | And for instance, in Trumbull, there's reference | 01:39:25 |
| 18 | that you did author a written report in that case, it just | | 01:39:29 |
| 19 | wasn't offered into evidence? | | 01:39:33 |
| 20 | A. | I believe that is true, yes. | 01:39:34 |
| 21 | Q. | Okay. And you stated you worked in Montgomery | 01:39:36 |
| 22 | County, testified in Montgomery County, was that on the | | 01:39:44 |
| 23 | Singleton case? | | 01:39:44 |
| 24 | A. | I believe so. | 01:39:45 |
| 25 | Q. | And you authored no report in that one? | 01:39:46 |

296

```
1        A.    I don't recall, to be honest with you.        01:39:50

2        Q.    And State vs. Morales, I'm not sure the first  01:39:52

3   name, do you recall Morales?                             01:39:59

4        A.    That was a long time ago, yes.                01:40:01

5        Q.    Long time ago. No report in that case?        01:40:03

6        A.    I don't recall. Don't recall.                 01:40:06

7        Q.    Fair enough. But you wouldn't call the PowerPoint 01:40:07

8   a report?                                                01:40:13

9        A.    It's a summary of my findings and of my opinion. 01:40:14

10       Q.    It contains everything that would be in a report, 01:40:18

11  does it not?                                             01:40:20

12       A.    Basically, yes.                               01:40:21

13       Q.    Now, I gather from your previous testimony, to the 01:40:23

14  best of your knowledge, your training, and your ability, to do 01:40:29

15  the best job possible in your line of endeavor, you need to 01:40:33

16  collect all information available to you as to Mr. Davis? 01:40:38

17       A.    You want to be as -- you know, review as much 01:40:43

18  material as you can get your hands on, yeah.             01:40:46

19       Q.    And put it in your words, a rounded picture?  01:40:48

20       A.    Yeah, I wanted to see a longitudinal picture not 01:40:51

21  just a snapshot.                                         01:40:54

22       Q.    And that you said included review of the trial 01:40:55

23  testimony in this case?                                  01:41:01

24       A.    Yes.                                          01:41:02

25       Q.    That included the trial testimony of the      01:41:03
```

297

| | |
|---|---|
| 1 | defendant, himself, as to his conduct on December 12, 1983? | 01:41:05 |
| 2 | A. Yes. | 01:41:10 |
| 3 | Q. That included reviewing the trial testimony of | 01:41:11 |
| 4 | those who testified at that trial in 1984 and observed what | 01:41:14 |
| 5 | they testified to be defendant's conduct on the night in | 01:41:20 |
| 6 | question? | 01:41:24 |
| 7 | A. Yeah, I reviewed that, that is correct. | 01:41:24 |
| 8 | Q. And on the day in question for that matter, | 01:41:26 |
| 9 | talking about two witnesses, Mark Lovette and Wade Coleman; is | 01:41:28 |
| 10 | that correct? | 01:41:34 |
| 11 | A. That is correct. | 01:41:34 |
| 12 | Q. And you have reviewed those things? | 01:41:35 |
| 13 | A. I have. | 01:41:36 |
| 14 | Q. The testimony of Reginald Denmark, Hosette Massie | 01:41:37 |
| 15 | and Mona Aldridge on that evening? | 01:41:44 |
| 16 | A. Again, I reviewed those documents, I don't | 01:41:47 |
| 17 | remember the specifics of the entire document. | 01:41:49 |
| 18 | Q. Okay. A gentleman who testified that he saw the | 01:41:51 |
| 19 | actual murder take place on the street? | 01:41:55 |
| 20 | A. Again, I remember reviewing the document, I don't | 01:41:58 |
| 21 | remember all of the specifics. | 01:42:02 |
| 22 | Q. Okay. And of course all of the documentary file | 01:42:03 |
| 23 | of the correctional institution on Mr. Davis? | 01:42:14 |
| 24 | A. Yes. | 01:42:19 |
| 25 | Q. Every page of it? | 01:42:20 |

JILL M. CUTTER, RPR
(513) 785-6596

1      A.    What I was provided I reviewed.                    01:42:22

2      Q.    You interviewed some family members that -- in     01:42:24

3  May; is that correct?                                        01:42:34

4      A.    That is correct.                                   01:42:35

5      Q.    And you have listed those.  Others you listed the  01:42:35

6  statements that you reviewed?                                01:42:39

7      A.    That is correct.                                   01:42:41

8      Q.    Is it fair to say that other than Mr. Davis        01:42:42

9  himself, everyone you talked to was a supportive, indeed a   01:42:46

10  loving family member of Mr. Davis motivated to give you a   01:42:49

11  history that would help, rather than hurt his cause in      01:42:54

12  mitigation?                                                 01:42:57

13      A.    I know that they appeared to be open, honest,     01:42:59

14  direct, they responded to my questions in what seemed to be a  01:43:04

15  spontaneous and genuine manner.  I think at different points  01:43:09

16  some of them expressed concern and caring for him.          01:43:18

17      Q.    And Mr. Davis as a capitally charged individual,  01:43:22

18  is it fair to say that he is motivated to help himself?     01:43:29

19      A.    That was the part that I was talking about        01:43:33

20  earlier.  I'm not so sure that when I met with him he was all  01:43:36

21  that motivated to helping himself.  Certainly he did not view  01:43:40

22  his alcohol use as much as a problem as I did.  He certainly  01:43:46

23  didn't think that he had any type of personality disorder nor  01:43:51

24  did he suggest that at any point.  Nor did he emphasize any  01:43:55

25  kind of problems or symptoms.  The key thing that he        01:43:58

299

1    emphasized was that he did not want this trial to cause pain
2    for himself, for his family and for the victim's family.
3        Q.    Now, it's fair to say in the testimony you
4    reviewed of the family members, they painted a picture in 1984
5    of a caring family, a close family, a supportive family; is
6    that correct?
7        A.    I think there was some characterizations that
8    would fit that, yes.
9        Q.    And would it surprise you that they testified
10   exactly that same way here in court this year?
11       A.    No.  It would not surprise me.
12       Q.    How did the history of the offense that Mr. -- you
13   did take a history of the actual offense from Mr. Davis, did
14   you not?
15       A.    That is correct.
16       Q.    How did it square with his testimony back in 1984?
17       A.    What he told me when I interviewed him was that he
18   committed the murder.
19       Q.    So that is absolutely altogether different than
20   his testimony where he was asked, did you commit this murder
21   and he said absolutely not?
22       A.    That's correct.
23       Q.    He didn't tell you about the coincidence that he
24   purchased the murder weapon for a Silkey Carr?
25       A.    No, he never indicated that Silkey Carr was a part

JILL M. CUTTER, RPR
(513) 785-6596

1    of this offense.

2         Q.   Didn't tell you the dental equipment, a deal for

3    dental equipment with Silkey Carr was the reason he purchased

4    the gun and went out and got the ammunition too?

5         A.   He described getting the gun and having a friend

6    purchase the gun and the ammunition with him.  But again, no

7    in reference to Silkey Carr.

8         Q.   And he did not tell you that he left that same

9    man, Silkey Carr, at the door with Suzette Butler, a woman who

10   he said he loved, at the door of the American Legion, got into

11   his car and drove to Middletown?

12        A.   No, he never said those things at all.

13        Q.   I guess he did not tell you as he told Dr. Fisher

14   that the witnesses who testified against him testified falsely

15   because they wanted the limelight?

16        A.   No.  He specifically said that he was the person

17   who killed Suzette.

18        Q.   Did he tell you as he did in the 1984 trial he

19   drank beer in the car three to four hours before the shooting,

20   had another beer when he was walking around town, strolling

21   around town, I believe he said, had normal conversation with

22   people, bought them drinks at the American Legion, and had a

23   sip of his drink at the Legion just before he went outside

24   with Suzette Butler?

25        A.   That is a fair description.  He indicated that he

1    consumed some amount of beer and hard liquor prior.                01:47:41

2         Q.   Did you question him as to why he would make up          01:47:45

3    the story he did in 1984?                                          01:47:50

4         A.   He was open about that, said that he was being           01:47:53

5    dishonest.                                                         01:47:57

6         Q.   And he obviously, from Dr. Fisher's report, he           01:47:58

7    told the same story to Dr. Fisher after he was found guilty;       01:48:09

8    is that correct?                                                   01:48:13

9         A.   That's my understanding.                                 01:48:13

10        Q.   And in that not only once, but twice he denied           01:48:15

11   alcohol or drug use, even after the verdict of guilty to Dr.       01:48:20

12   Fisher?                                                            01:48:24

13        A.   I believe that is correct.                               01:48:24

14        Q.   Dr. Smith, your conclusion that this is a                01:48:26

15   borderline personality disorder, is that what back in the old     01:48:37

16   days, maybe back before there was a DSM-I, personality            01:48:45

17   disorder was called a neurosis?                                    01:48:51

18        A.   No.                                                      01:48:54

19        Q.   No?                                                      01:48:55

20        A.   No.  Most of the neuroses were based upon anxiety        01:48:56

21   disorders.  Personality disorders were in separate -- those       01:49:01

22   actually were identified during World War I, where they began     01:49:04

23   to recognize that individuals had personality styles that         01:49:09

24   repeatedly caused them difficulties in all areas of their         01:49:12

25   life.  Personality disorder is much more severe disorder than     01:49:16

302

| | | |
|---|---|---|
| 1 | a neurosis. | 01:49:22 |
| 2 | Q.   But not so severe that it is a psychosis; is that | 01:49:22 |
| 3 | correct? | 01:49:28 |
| 4 | A.   Yes, you would not say that they are hallucinating | 01:49:28 |
| 5 | or delusional but they have misperception of reality though. | 01:49:33 |
| 6 | Q.   And you get psychosis, that severity with organic | 01:49:38 |
| 7 | brain syndrome, one example of it? | 01:49:42 |
| 8 | A.   You can in schizophrenia which is a biological | 01:49:45 |
| 9 | disorder, you have both hallucinations and delusions. | 01:49:50 |
| 10 | Q.   Paranoid state, that is a major mental illness, | 01:49:53 |
| 11 | psychosis? | 01:49:56 |
| 12 | A.   Well, paranoia is a symptom and a schizophrenic | 01:49:57 |
| 13 | could have a paranoid delusion. | 01:50:01 |
| 14 | Q.   Other affective psychoses, such as, what are they? | 01:50:04 |
| 15 | A.   The -- there are some affective disorders that can | 01:50:10 |
| 16 | have a psychotic feature so that you could have a bi-polar | 01:50:14 |
| 17 | disorder with psychotic features. | 01:50:18 |
| 18 | Q.   And psychotic features -- well, what we are | 01:50:21 |
| 19 | talking about is a major mental illness such as to invoke the | 01:50:24 |
| 20 | legal definition of insanity; is that correct? | 01:50:32 |
| 21 | A.   Well, not necessarily.  Again, if we get to the | 01:50:35 |
| 22 | legal definition of insanity, a person could actually be | 01:50:38 |
| 23 | psychotic and still appreciate what they are doing is wrong, | 01:50:42 |
| 24 | so I mean it really depends upon the circumstances and the | 01:50:46 |
| 25 | specific facts of that case whether or not at the time of the | 01:50:49 |

1  offense their mental disorder was so severe that they could            01:50:51

2  not appreciate that what they were doing was wrong.                    01:50:56

3         Q.   So you concluded in your direct testimony, I              01:50:58

4  believe, by saying you are not saying that Von Clark Davis on         01:51:07

5  December 12, 1983 was suffering from such a mental disease or         01:51:11

6  defect that he could not know the difference between right and        01:51:17

7  wrong?                                                                 01:51:21

8         A.   That is correct.  I'm not saying that he was             01:51:21

9  legally insane.                                                        01:51:24

10        Q.   Nor are you saying that he on that date, December        01:51:25

11 12, 1983 was suffering from such a mental disease or defect          01:51:30

12 that rendered him incapable of refraining from the commission        01:51:34

13 of the wrongful act?                                                   01:51:38

14        A.   No, I am saying that it was diminished capacity          01:51:40

15 and impairment.                                                        01:51:44

16        Q.   And basically it is the facts of this case that         01:51:44

17 you have to rule out irresistible impulse because it is not          01:51:50

18 there; isn't that correct?                                            01:51:55

19        A.   I would need you to define what you mean by             01:51:56

20 irresistible impulse.                                                  01:52:00

21        Q.   Well, he was not impelled by the mental disease to      01:52:02

22 do this?                                                               01:52:08

23        A.   It played a role.  It is my belief that              01:52:09

24 borderlines act out based upon circumstances and at those           01:52:15

25 moments their perception or misperception of the situation is       01:52:19

1    a significant factor leading them to decide to act out.    01:52:22

2         Q.    Well, if a person takes four hours or so to    01:52:27

3    develop prior calculation and design to kill someone, that is    01:52:34

4    not what we understand to be an irresistible impulse?    01:52:39

5         A.    Again, I am not sure I understand exactly the    01:52:47

6    definition of irresistible impulse.  What I am saying is that    01:52:52

7    a mental illness can certainly take several hours or days of    01:52:53

8    planning if a person is responding to a misperception and    01:52:58

9    their misperception is caused by their mental illness.  They    01:53:02

10   are acting based on what they believe to be true, so it may    01:53:07

11   take them a period of time to act upon it, but they are still    01:53:10

12   acting on something that is a result of their mental illness.    01:53:13

13        Q.    Well, what you are talking about it sounds to me    01:53:15

14   like, correct me if I am wrong, you are talking about a    01:53:19

15   hypothetical situation where a person believes something not    01:53:23

16   to be true, such as the president of the United States is out    01:53:29

17   to get me, therefore, I have to get him first?    01:53:33

18        A.    That would be an example of that, yes.    01:53:36

19        Q.    And then you could plan out to kill that person?    01:53:39

20        A.    That's correct.    01:53:42

21        Q.    Now, your answer to the blame game question is    01:53:42

22   that this is not an excuse, but an explanation and    01:53:51

23   understanding; is that correct?    01:53:56

24        A.    That's correct.    01:53:57

25        Q.    Your scenario, your testimony, explains the    01:53:58

| | | |
|---|---|---|
| 1 | evidence of prior calculation and design? | 01:54:05 |
| 2 | A.  I think it explains the motive, the rationale, the | 01:54:08 |
| 3 | reasoning, the thought process behind the behavior, yes. | 01:54:13 |
| 4 | Q.  Now, you are not saying he had no choice, are you? | 01:54:17 |
| 5 | A.  No. | 01:54:20 |
| 6 | Q.  He had a choice and he made that choice; is that | 01:54:23 |
| 7 | correct? | 01:54:27 |
| 8 | A.  He made choices based upon his perceptions and his | 01:54:27 |
| 9 | beliefs, that's correct. | 01:54:31 |
| 10 | Q.  And to be fair, what you are truly saying is your | 01:54:31 |
| 11 | testimony explains why he was at risk to make a bad choice? | 01:54:35 |
| 12 | A.  well, why he would make those kinds of choices | 01:54:41 |
| 13 | given those circumstances, that's correct. | 01:54:44 |
| 14 | MR. EICHEL:  I believe that's all I have. | 01:54:57 |
| 15 | JUDGE NASTOFF:  Any redirect for Dr. Smith? | 01:54:58 |
| 16 | MR. PORTER:  We have a matter we need to approach | 01:55:09 |
| 17 | the Court with and we ask that Dr. Smith be excused | 01:55:11 |
| 18 | while we approach the Court. | 01:55:14 |
| 19 | JUDGE NASTOFF:  Temporarily? | 01:55:16 |
| 20 | MR. PORTER:  Temporarily. | 01:55:19 |
| 21 | JUDGE NASTOFF:  Doctor, your testimony is complete | 01:55:20 |
| 22 | for the time being, but apparently there may be some | 01:55:22 |
| 23 | further need.  So at this time you are excused, but I | 01:55:24 |
| 24 | just -- | 01:55:28 |
| 25 | MS. COOK-REICH:  I do have questions for him. | 01:55:28 |

JILL M. CUTTER, RPR
(513) 785-6596

1   There is something we need to discuss outside of his          01:55:31
2   presence to the Court.                                        01:55:32
3       JUDGE NASTOFF:  You remain under subpoena, so just        01:55:32
4   wait outside, thank you.                                      01:55:33
5       MS. COOK-REICH:  Sorry, that wasn't clear.                01:55:34
6       (Witness left the courtroom.)                             01:55:39
7       JUDGE NASTOFF:  Yes, Mr. Porter.                          01:55:47
8       MR. PORTER:  I believe ethically I have an                01:55:48
9   obligation as a member of the Court, Dr. Smith                01:55:50
10  testified in one question, I believe I have a duty,           01:55:55
11  since I have personal knowledge to notify the Court at        01:55:59
12  this time so the prosecution can, in fact,                    01:56:04
13  cross-examine the doctor if they want.  Approx -- and I       01:56:06
14  cannot remember the exact phrasing of the prosecutor's        01:56:09
15  question, it was with respect to if Dr. Smith and I had       01:56:12
16  ever worked together on a case previously.  This is, I        01:56:17
17  don't know, I can't remember how the question was             01:56:22
18  phrased, I did not retain the doctor on the case.  I          01:56:24
19  became involved about 12 or 14 years later.  There was        01:56:28
20  a hearing in the federal court before Chief Magistrate        01:56:33
21  Judge Mers, and I was not the one that direct examined        01:56:36
22  him, but I was one of the two counsel of record.  And I       01:56:41
23  did help prepare him for his testimony.                       01:56:45
24      JUDGE NASTOFF:  What case was that?                       01:56:47
25      MR. PORTER:  It would be *Landrum vs. Anderson*,          01:56:48

JILL M. CUTTER, RPR
(513) 785-6596

307

1  which currently was argued in the 6th Circuit in late    01:56:54

2  April.    01:56:59

3      JUDGE NASTOFF: All right. Okay. So what you are    01:56:59

4  indicating is that him testifying that he did not    01:57:01

5  recall working with you, or whatever his testimony was,    01:57:04

6  is incorrect because there was one instance of you    01:57:08

7  working together on a case?    01:57:11

8      MR. PORTER: Yes, and I believe I have an ethical    01:57:13

9  duty to so inform the Court, Your Honor, and that would    01:57:15

10  also, calling it to the Court's attention at this time    01:57:17

11  certainly would give the prosecution time to    01:57:20

12  cross-examine him with respect to his answer.    01:57:25

13      JUDGE NASTOFF: Fair enough. All right. And    01:57:29

14  independent of what he has raised, you have some    01:57:31

15  redirect examination questions?    01:57:33

16      MS. COOK-REICH: I just have a few.    01:57:35

17      JUDGE NASTOFF: Before she gets to her redirect    01:57:36

18  then I guess what Mr. Porter is indicating and where I    01:57:38

19  think we are is that if you wish to cross-examine the    01:57:41

20  doctor about his recall of having worked with Mr.    01:57:45

21  Porter, then you have an opportunity to do that and    01:57:48

22  that is up to you.    01:57:51

23      MR. EICHEL: Your Honor, please, I appreciate the    01:57:53

24  disclosure, and I have no problem with it.    01:57:55

25      JUDGE NASTOFF: All right.    01:57:58

| | |
|---|---|
| 1 | MR. EICHEL:  I have no further questions. | 01:57:58 |
| 2 | JUDGE NASTOFF:  Fair enough. | 01:58:00 |
| 3 | MR. PORTER:  I just didn't want anyone to believe | 01:58:02 |
| 4 | that I had sat here in silence and mislead the Court or | 01:58:04 |
| 5 | misled the prosecutor's office by my silence. | 01:58:08 |
| 6 | MR. EICHEL:  We are good with that. | 01:58:10 |
| 7 | JUDGE NASTOFF:  No one believes that.  Thank you. | 01:58:12 |
| 8 | JUDGE PATER:  Thank you, Mr. Porter. | 01:58:13 |
| 9 | JUDGE NASTOFF:  All right.  Let's go ahead and | 01:58:15 |
| 10 | bring Dr. Smith back in.  And it's my understanding | 01:58:16 |
| 11 | that cross is concluded and we are in redirect. | 01:58:19 |
| 12 | (Witness returned to the witness stand.) | 01:58:46 |
| 13 | JUDGE NASTOFF:  Again, I will remind you that you | 01:58:46 |
| 14 | remain under oath.  Cross-examination is complete, but | 01:58:47 |
| 15 | I believe there is some redirect examination for you. | 01:58:50 |
| 16 | THE WITNESS:  Very good. | 01:58:53 |

REDIRECT EXAMINATION

BY MS. COOK-REICH:

Q.   Dr. Smith, do you recall a case called *Landrum vs. Anderson*?

A.   I remember the name a little bit, yes.

Q.   Do you recall whether you worked with Randall Porter on that particular case from the Ohio Public Defender's office?

A.   It could be.

JILL M. CUTTER, RPR
(513) 785-6596

| | | | |
|---|---|---|---|
| 1 | Q. | Might have slipped your mind? | 01:59:09 |

1    Q.   Might have slipped your mind?   01:59:09

2    A.   Yes.   01:59:11

3    Q.   Mr. Eichel asked you some questions about never   01:59:11

4 been -- never having testified for a prosecutor before?   01:59:16

5    A.   That is correct.   01:59:19

6    Q.   Have you ever been asked by a prosecutor to   01:59:19

7 consult on a case?   01:59:23

8    A.   No, I have not.   01:59:23

9    Q.   Have you ever been asked then to testify?   01:59:23

10    A.   No.   01:59:26

11    Q.   Okay.  Mr. Eichel asked you questions relative to   01:59:26

12 the -- I believe the first setting of this trial, which was in   01:59:31

13 May of 2009.  Have you had any contact from the prosecutor at   01:59:35

14 all except for standing here in court?   01:59:42

15    A.   No, I have not had any contact with them.   01:59:43

16    Q.   So if they were disclosed your phone number on   01:59:45

17 your curriculum vitae, which is an exhibit here in this case   01:59:48

18 as discovery, they had your exact phone number?   01:59:52

19    A.   Yes, that is my address and phone number, all of   01:59:55

20 that is accurate.   01:59:57

21    Q.   And I assume have you ever Googled your name and   01:59:58

22 found yourself on the internet?   02:00:01

23    A.   Yeah, I have done that, I have to admit.   02:00:03

24    Q.   Mr. Eichel was asking you questions relative to   02:00:05

25 family members wanting to provide assistance and help Von out   02:00:15

JILL M. CUTTER, RPR
(513) 785-6596

| | | |
|---|---|---|
| 1 | in this case? | 02:00:20 |
| 2 | A.   Yes. | 02:00:21 |
| 3 | Q.   When you interviewed the family, were they | 02:00:22 |
| 4 | forthcoming with all of their faults and problems in their | 02:00:25 |
| 5 | lives? | 02:00:30 |
| 6 | A.   No.  I mean, again, you have to understand there | 02:00:30 |
| 7 | is a certain amount of gathering information, and families | 02:00:33 |
| 8 | don't know what is dysfunctional and what is not oftentimes. | 02:00:39 |
| 9 | They don't know what behaviors were, you know, destructive to | 02:00:42 |
| 10 | children growing up.  What they were able to do is answer my | 02:00:46 |
| 11 | questions, so if I asked how many, you know, partners did your | 02:00:49 |
| 12 | mother have, were their times when you were with other family | 02:00:52 |
| 13 | members because your mother was away, they answered those | 02:00:56 |
| 14 | clearly and directly, but they weren't necessarily painting | 02:00:59 |
| 15 | that as a negative thing. | 02:01:02 |
| 16 | Q.   Did you ever discuss your diagnosis of borderline | 02:01:04 |
| 17 | personality disorder with any of the family members when you | 02:01:08 |
| 18 | had their interviews? | 02:01:11 |
| 19 | A.   No. | 02:01:11 |
| 20 | Q.   Did any of them bring that up to you, oh, I think | 02:01:12 |
| 21 | Von, my brother, suffers from borderline personality disorder? | 02:01:14 |
| 22 | A.   No, they didn't mention anything relating to a | 02:01:18 |
| 23 | mental disorder or to addiction for that matter. | 02:01:20 |
| 24 | Q.   I believe Mr. Eichel asked you about would it | 02:01:23 |
| 25 | surprise you if the family testified that in 1984, they | 02:01:28 |

JILL M. CUTTER, RPR
(513) 785-6596

1    testified that they had a close and caring family, is that how    02:01:33
2    they portrayed themselves when you interviewed them?    02:01:36
3        A.   Yes.    02:01:39
4        Q.   Would it surprise you that -- strike that.   What    02:01:40
5    was their definition of close?    02:01:46
6        A.   Well, I mean, again, it was sort of interesting,    02:01:48
7    because I remember particularly talking with the stepfather    02:01:51
8    asking him if he felt that he and Von had developed a close    02:01:54
9    relationship and he said, oh, yes.  I said, well, tell me    02:01:58
10   about that.  And he said, well, there were a couple of times    02:02:00
11   we went fishing.  And I said, well, that is really neat, tell    02:02:03
12   me about that.  And he goes, well, we went out.  And I said,    02:02:05
13   well, what did you do?  Well, I stood on the bank fishing and    02:02:08
14   he stood on the bank fishing.  I said, well, did you talk or    02:02:11
15   spend any time together?  He goes, well, no, just about, you    02:02:13
16   know, the ones that got away, that kind of thing.  And then he    02:02:16
17   said that Von very rarely shared anything personal.  That    02:02:20
18   wasn't the type of relationship that they had.    03:02:24
19       Q.   Can you explain in terms of your diagnosis of    02:02:26
20   borderline, why Von Clark Davis would make up the outlandish    02:02:31
21   story of Silkey Carr in 1983 and persist with it in 1984 at    02:02:37
22   trial?    02:02:42
23       A.   Borderlines do all kinds of really    02:02:42
24   self-destructive things and self-defeating things.  Probably    02:02:47
25   the best example would be a psychiatric unit.  I have worked    02:02:52

1    with the hospital for a number of years and now have                   02:02:55

2    consulting relationships with several hospitals.  Borderline           02:02:59

3    comes on to an inpatient psychiatric unit.  They are very,             02:03:01

4    very disruptive, again because they are impulsive.  They have          02:03:05

5    mood swings.  They are -- they have problems.  And the thing           02:03:08

6    becomes is, they will make up stories to cover what they are           02:03:12

7    doing.  And that is not unusual for them to do that.  It is            02:03:17

8    not unusual for them to hold to that story for a period of             02:03:22

9    time.  What is different is oftentimes if you confront them            02:03:24

10   with very, very clear facts and clear consequences that they           02:03:30

11   will then at that point sort of come clean with what the truth         02:03:33

12   is.                                                                    02:03:37

13        Q.   Okay.  Mr. Eichel also asked you about his denial            02:03:38

14   of alcohol and drug usage to Dr. Fisher after the verdict, but         02:03:42

15   before the mitigation phase of that case.  Is it unusual for           02:03:46

16   someone with borderline to deny the use of alcohol?                    02:03:50

17        A.   It's not unusual for borderlines, but it is also             02:03:53

18   not unusual for alcohol and drug abusers to minimize their             02:03:56

19   use, particularly if they think it is going to get them in             02:04:01

20   trouble.  They may not disclose, or maybe, you know, again             02:04:03

21   minimize the extent of their use.                                      02:04:06

22        Q.   Okay.  The use of alcohol in prison would be not a           02:04:08

23   good thing; is that correct?                                           02:04:13

24        A.   That's correct.                                              02:04:14

25        Q.   Did you -- you talked about it in regards to use             02:04:15

1   of alcohol in prison in your direct testimony. Did you mean

2   while he was on death row?

3       A.   No. This would be while he was incarcerated with

4   the offense of Ernestine.

5           MS. COOK-REICH: I have no further questions.

6           JUDGE NASTOFF: Any recross?

7       MR. EICHEL: No, Your Honor.

8           JUDGE NASTOFF: All right. Any reason why Dr.

9   Smith cannot be released permanently from his subpoena

10  at this point?

11      MS. COOK-REICH: We would like to hold him in the

12  event that there is additional testimony, Your Honor.

13          JUDGE NASTOFF: Fair enough. Doctor, your

14  testimony is complete for the time being, but there may

15  be cause for you to be recalled, so you are not

16  released from your subpoena at this time. However, you

17  are excused, check with the party that subpoenaed you

18  before you leave the area, please.

19          THE WITNESS: Okay.

20          JUDGE NASTOFF: Thank you. All right. Any

21  further evidence or testimony that you wish to present

22  on behalf of Mr. Davis?

23      MR. PORTER: Your Honor, at this point we believe

24  we have no testimony, but we would like to move for

25  admission of exhibits first.

JILL M. CUTTER, RPR
(513) 785-6596

314

1    JUDGE NASTOFF:  Sure.  And I do believe we have          02:05:53

2    under advisement the statements of Elizabeth Crawford,     02:05:54

3    Charles Flowers, Milton Flowers, and Fannie Whiteside;     02:06:01

4    is that correct?                                           02:06:05

5        MS. COOK-REICH:  We will withdraw those, Your          02:06:05

6    Honor.                                                     02:06:07

7        THE COURT:  You are withdrawing those?                 02:06:07

8        MS. COOK-REICH:  Yes.                                  02:06:08

9        JUDGE NASTOFF:  Fair enough.  All right.  What         02:06:09

10   exhibits -- are these exhibits from your exhibit list      02:06:11

11   that was provided to the Court earlier?                    02:06:13

12       MR. PORTER:  They are, correct, Your Honor.  We        02:06:14

13   are going to be substituting one of the exhibits           02:06:16

14   because we have an update from -- or actually it's a       02:06:18

15   back date from the Ohio Department of Corrections, but     02:06:21

16   we would be moving the Court for admission of three        02:06:23

17   exhibits.  I assume it would help the Court if we did      02:06:35

18   them individually.                                         02:06:29

19       JUDGE NASTOFF:  Sure, just identify them, please.      02:06:29

20       MR. PORTER:  The first one would be Exhibit J,         02:06:32

21   Your Honor, which was the Institutional Summary Report.    02:06:34

22   It was identified by Mr. Nowack today, that he             02:06:38

23   completed it and that it is accurate.                      02:06:43

24       JUDGE NASTOFF:  All right.  Any objection?             02:06:46

25       MR. OSTER:  No, Your Honor.                            02:06:48

315

| | |
|---|---|
| 1 | JUDGE NASTOFF:  J will be admitted. | 02:06:49 |
| 2 | MR. PORTER:  The next is what is marked K in the | 02:06:51 |
| 3 | notebook.  I gave the prosecution a revised version, if | 02:06:54 |
| 4 | that would be correct, and with the Court's permission | 02:07:01 |
| 5 | would be approaching the Court for permission to give | 02:07:03 |
| 6 | them a revised Exhibit J and at that point giving -- K | 02:07:06 |
| 7 | rather, and giving the Court an explanation with the | 02:07:11 |
| 8 | Court's permission to approach. | 02:07:14 |
| 9 | JUDGE NASTOFF:  Sure, you can certainly | 02:07:16 |
| 10 | substitute.  Do you have three copies of it? | 02:07:18 |
| 11 | MR. PORTER:  I do, Your Honor.  I have been | 02:07:27 |
| 12 | passing them to you and you have been passing them to | 02:07:28 |
| 13 | your colleagues. | 02:07:32 |
| 14 | JUDGE NASTOFF:  So this will now be Exhibit K? | 02:07:38 |
| 15 | MR. PORTER:  That would be correct.  And first and | 02:07:40 |
| 16 | slightly different, so let me deal with the difference | 02:07:47 |
| 17 | in the exhibit first and then argue its admissibility. | 02:07:50 |
| 18 | K, as the Court has in its notebook, is for a different | 02:07:55 |
| 19 | date.  The K that we proffered to the Court a minute | 02:08:01 |
| 20 | ago is dated as of 7/8/04, the original one in the | 02:08:09 |
| 21 | Court's notebook, the original one provided to the | 02:08:15 |
| 22 | prosecution is 5/04/29.  First if I could explain to | 02:08:19 |
| 23 | the Court, both documents were provided to us by Ohio | 02:08:25 |
| 24 | Department of Rehabilitation and Correction.  The first | 02:08:32 |
| 25 | document was provided prior to when this was originally | 02:08:36 |

JILL M. CUTTER, RPR
(513) 785-6596

1    scheduled for trial in May.  We did not have a

2    certification which the Court now has with respect to

3    the revised certification.  There was a problem with

4    the Ohio Department of Rehabilitation and Correction.

5    I was not the one that communicated with them this week

6    on finding the original document they provided us.

7    That is the reason for the substitution.

8         I believe the Court has already heard argument, K

9    itself goes to the cost issue that has already been

10   argued before the Court.  And would just rely upon the

11   argument that we have already made with respect to the

12   cost issue that was made with respect to Mr. Nowack's

13   testimony, Your Honor.

14        JUDGE NASTOFF:  All right.  State wish to be

15   heard?

16        MR. OSTER:  Your Honor, again, we would object to

17   the cost estimate.  The purpose here is to show and to

18   look at things especially under the (B)(7) section of

19   things that bear on a defendant's character, prior

20   record, circumstances of the offense, anything that can

21   mitigate.  The cost of an inmate per day, the cost of

22   the yearly inmate cost does not bear upon even the

23   latitude that is found in a catchall factor of (B)(7).

24   And we believe that to still be similar to statistics

25   which have been kept out properly in these cases, and I

JILL M. CUTTER, RPR
(513) 785-6596

1    don't believe that it is a characteristic of this          02:10:09
2    individual or something the Court should consider so we     02:10:13
3    will renew our objection for those reasons.                 02:10:17
4         JUDGE NASTOFF: All right. One distinction that         02:10:19
5    comes to mind, I know when the cases where there has        02:10:23
6    been statistical evidence that has been offered, it has     02:10:25
7    been offered with the intent that or the belief that        02:10:30
8    the trial court should engage in proportionality            02:10:34
9    analysis, in past cases that's why it has been offered      02:10:38
10   and I know there is case law that expressly reserves        02:10:43
11   that function for the appellate courts in Ohio and          02:10:45
12   subsequent courts; that it is not a trial function. It      02:10:48
13   is an appellate function. Are you aware of any cases        02:10:51
14   that specifically -- I understand the nature of your        02:10:53
15   argument with regard to cost, but are there any cases       02:10:57
16   that specifically address this?                             02:11:01
17        MR. OSTER: Your Honor, there is one case,              02:11:03
18   however, you know, I shouldn't say in full disclosure       02:11:04
19   because it's going to be obvious, but it is not an Ohio     02:11:06
20   case. In looking at the I believe it is *Warner v.*         02:11:09
21   *State*, 144 P 3d 838, 2006 case, they looked through a     02:11:15
22   bunch of different things and in paragraph 163, their       02:11:24
23   exact line is evidence of the cost effectiveness of the     02:11:28
24   death sentence does not bear upon a defendant's             02:11:37
25   character, prior record or the circumstances of the        02:11:39

318

1    offense.

2         This issue, I did not find a lot of case law on,

3    especially obviously in Ohio, I did not find really any

4    on it. This was the most on point that I could find

5    where a Court had a similar evaluation of a prior

6    record, the character and individual circumstances of

7    it, so in talking about case law I cannot cite anything

8    from the State of Ohio. That is the closest I can find

9    and present to this Court in support of that argument.

10        JUDGE NASTOFF: Thank you, Mr. Oster.

11        MR. PORTER: If I could respond very briefly.

12   First is (B)(7) factor is not limited to character

13   evidence. It is any other factors that are relevant to

14   the issue to whether the offender should be sentenced

15   to death. It has been a long time since I did a

16   non-capital case. It's my recollection at least in

17   non-capital cases the Court is at least required to

18   give consideration to economics and my recollection

19   could be wrong, if it is, it is.

20        JUDGE NASTOFF: Under Senate Bill 2 you're saying

21   in non-capital cases?

22        MR. PORTER: Yes. And there is some focus now on

23   putting offenders in least restrictive environments.

24   We believe nothing else, it goes to that factor.

25        JUDGE NASTOFF: All right.

JILL M. CUTTER, RPR
(513) 785-6596

319

| | | |
|---|---|---|
| 1 | (Judges confer off the record.) | 02:13:11 |
| 2 | MR. OSTER: Your Honor, I apologize to interrupt, | 02:16:04 |
| 3 | but in discussing with co-counsel while in a lot of | 02:16:08 |
| 4 | other cases maybe we would continue our objection, | 02:16:10 |
| 5 | giving the unusual posture of this case, I will | 02:16:12 |
| 6 | withdraw the objection and I apologize to the Court for | 02:16:16 |
| 7 | going through it, but in evaluation with the, I believe | 02:16:23 |
| 8 | the word uniqueness has been used before, I will | 02:16:26 |
| 9 | withdraw the objection on behalf of the State. | 02:16:30 |
| 10 | JUDGE NASTOFF: Objection withdrawn, K admitted. | 02:16:32 |
| 11 | MR. PORTER: At this point we would move for one | 02:16:36 |
| 12 | final exhibit, which is Exhibit L, Your Honor, which is | 02:16:39 |
| 13 | the resume of Dr. Smith, which I believe he identified | 02:16:41 |
| 14 | while he was testifying. | 02:16:44 |
| 15 | JUDGE NASTOFF: Any objection? | 02:16:45 |
| 16 | MR. OSTER: No, Your Honor. | 02:16:49 |
| 17 | JUDGE NASTOFF: L will be admitted without | 02:16:53 |
| 18 | objection. | 02:16:55 |
| 19 | MR. PORTER: At this point, we would rest, Your | 02:16:57 |
| 20 | Honor. With one additional housekeeping matter if I | 02:17:00 |
| 21 | could ask Court about it. I just do not know its | 02:17:04 |
| 22 | procedure. There was some, at least some argument | 02:17:09 |
| 23 | previously with respect to Exhibits B through, at least | 02:17:11 |
| 24 | they were referenced in a pleading if nothing else, B | 02:17:15 |
| 25 | through I, I don't know the Court wants those kept | 02:17:19 |

JILL M. CUTTER, RPR
(513) 785-6596

1    separately for purposes of any appeal in this matter.    02:17:22

2        JUDGE NASTOFF: Well, they were included in your    02:17:26

3    notebook, but I don't know that they were -- any of    02:17:29

4    them were ever identified by any witness that testified    02:17:31

5    during the hearing, were they?    02:17:33

6        MR. PORTER: I believe they were not, Your Honor.    02:17:35

7    I just didn't know if the Court wanted for purposes of    02:17:38

8    completeness of the record.    02:17:40

9        JUDGE NASTOFF: Well, I don't see a problem with    02:17:42

10    having them preserved, I assume. I think typically,    02:17:44

11    you know, obviously, things that are admitted into    02:17:49

12    evidence need to be preserved and items that were    02:17:52

13    identified as an exhibit, and even if not admitted need    02:17:56

14    to be preserved, I don't know if other things that were    02:17:59

15    thought about need to be but I don't see the harm in    02:18:02

16    preserving it.    02:18:04

17        MR. PORTER: And it makes no difference to the    02:18:06

18    defense I just wanted --    02:18:07

19        JUDGE NASTOFF: I would recommend that those be    02:18:08

20    taken out of our notebooks and we can allow you to do    02:18:10

21    that so that when we retire to deliberate at the    02:18:13

22    appropriate time, those items are not before us.    02:18:16

23        MR. PORTER: Okay. Thank you, Your Honor.    02:18:19

24        JUDGE NASTOFF: Anyone disagree?    02:18:21

25        JUDGE SPAETH: No, but I just wanted to make    02:18:22

JILL M. CUTTER, RPR
(513) 785-6596

| | | |
|---|---|---|
| 1 | certain that the record is clear that these exhibits, | 02:18:24 |
| 2 | is it A through J that we're referring to now? | 02:18:28 |
| 3 | JUDGE NASTOFF:  A through I. | 02:18:30 |
| 4 | JUDGE SPAETH: A through I have never been | 02:18:32 |
| 5 | identified by a witness, have never been moved into | 02:18:34 |
| 6 | evidence, and this Court has never taken any action to | 02:18:37 |
| 7 | impede the defendant from attempting to identify, | 02:18:43 |
| 8 | introduce these exhibits.  I just want to make certain | 02:18:49 |
| 9 | that we are clear that this Court has not made a ruling | 02:18:55 |
| 10 | that would have, that in any way negatively impacted on | 02:18:57 |
| 11 | of the defendant's ability to admit A through I, and I | 02:19:01 |
| 12 | want to make certain I wasn't misinterpreting your | 02:19:06 |
| 13 | request to preserve these for the record.  It almost | 02:19:11 |
| 14 | implied that you are preserving your objection to a | 02:19:14 |
| 15 | Court's ruling or perceived ruling with respect to | 02:19:17 |
| 16 | Exhibits A through I. | 02:19:20 |
| 17 | MR. PORTER:  First, is Exhibit A was never | 02:19:22 |
| 18 | mentioned.  And we aren't asking for the Court to put | 02:19:24 |
| 19 | that in the record.  My only request, and I was just | 02:19:27 |
| 20 | looking for the court's guidance, having done a number | 02:19:32 |
| 21 | of the direct appeals in these cases, and the direct | 02:19:35 |
| 22 | appeal counsel has -- isn't here sometimes you sort of | 02:19:40 |
| 23 | wonder what the heck was it counsel was doing, it is | 02:19:44 |
| 24 | nice if they are there, if the Court doesn't want them | 02:19:50 |
| 25 | there, that is fine, too. | 02:19:51 |

JILL M. CUTTER, RPR
(513) 785-6596

1    JUDGE NASTOFF:  That's fine.  What we want and I    02:19:53

2    believe what Judge Spaeth's comments were directed    02:19:55

3    towards, I think it was very clear, is simply that this    02:19:58

4    is a decision that you are making as attorneys for Mr.    02:20:00

5    Davis, with consultation with Mr. Davis not to offer    02:20:05

6    these exhibits.  It is not that you have been    02:20:10

7    prohibited by the Court from introducing --    02:20:13

8        MR. PORTER:  And I never meant to suggest that.    02:20:15

9        JUDGE NASTOFF:  And we are all in agreement that    02:20:17

10   that is the case, correct?    02:20:18

11       JUDGE PATER:  Just to put it more bluntly, is    02:20:20

12   defense conceding that it has no -- and it never has    02:20:23

13   had and does not have now any interest in identifying    02:20:27

14   or admitting Exhibits A through I?    02:20:31

15       MR. PORTER:  No.  I think that was clear when we    02:20:35

16   said we withdrew the exhibits.    02:20:37

17       JUDGE PATER:  Thank you.    02:20:40

18       JUDGE NASTOFF:  All right.  Now that we cleared    02:20:42

19   that up, is there anything further that the defense    02:20:43

20   wishes to offer on behalf of Mr. Davis?    02:20:48

21       MR. PORTER:  The defense rests.    02:20:52

22       JUDGE NASTOFF:  All right.  Does the State have    02:20:54

23   rebuttal?    02:20:58

24       MR. OSTER:  Your Honor, based upon what has    02:21:04

25   occurred during the defense's case, especially with the    02:21:11

1    members of the defendant's family being asked the

2    specific question, I believe to all of them, is he

3    meaningful to you, in talking about the impact on their

4    lives, the United States Supreme Court case of *Payne*

5    *vs. Tennessee*, states that the victim, surviving

6    victim's family member would have an opportunity during

7    a sentencing phase to be able to say the meaningfulness

8    or what they have lost from their lives by the victim

9    not being here, that has been followed in the State of

10   Ohio, *State v. Fautenberry*.  F-A-U-T-E-N-B-E-R-R-Y,

11   1995 case, 72, Ohio State 3d., 435, as well as *State v.*

12   *McNeill*, M-C-N-E-I-L-L, 1998 case, Ohio State 3d, 438,

13   I think importantly in McNeill, the victim impact

14   testimony by a murder victim's son during a penalty

15   phase of a capital murder trial indicating that the

16   defendant had brought sadness to the victim's son was

17   admissible pursuant to Ohio Revised Code 2929.03

18   (D)(2), to rebut mitigating testimony that the

19   defendant had brought much joy to others and that is

20   what the Court held in *State v. McNeill*.

21           We would want to offer Consia Butler, who is not

22   -- in McNeill the difference would be this is the

23   daughter, not the son -- to simply answer one question

24   which would be and could be phrased very openly and we

25   wouldn't ask to go into too much other than just the

JILL M. CUTTER, RPR
(513) 785-6596

1   impact of not having her mother has had upon her.  And          02:23:08

2   that --                                                          02:23:14

3       JUDGE SPAETH:  How does that rebut the State's              02:23:15

4   point --                                                        02:23:18

5       JUDGE NASTOFF:  The defendant's.                            02:23:18

6       JUDGE SPAETH:  I'm sorry, the defendant's point            02:23:20

7   that to lose through execution of the defendant, would          02:23:24

8   be a loss to the various witnesses?  In other words,            02:23:29

9   you have the right to rebut, but this doesn't sound             02:23:34

10  like it is rebuttal nor does it on its face sound like          02:23:37

11  it goes to the aggravating factor at issue in this              02:23:42

12  case.                                                           02:23:46

13      MR. OSTER:  Your Honor, I think that a reading of          02:23:46

14  the United States Supreme Court case of Tennessee vs.           02:23:48

15  Payne says that this is, first of all admissible, to            02:23:50

16  the purpose of putting a face on the victim, and there          02:23:53

17  is no 8th Amendment bar to that.  It is not necessarily         02:23:57

18  an aggravating circumstance and it will not be                  02:24:01

19  considered and we would agree it should not be                  02:24:04

20  considered as an aggravating circumstance in this case          02:24:07

21  only, the (A)(5) factor is, but both United States              02:24:09

22  Supreme Court and the Ohio Supreme Court have been very         02:24:12

23  clear that this can be presented and used in this               02:24:15

24  manner.                                                         02:24:19

25      What they have been clear about is that the                02:24:19

JILL M. CUTTER, RPR
(513) 785-6596

| | | |
|---|---|---|
| 1 | victim's surviving relative can make no mention about | 02:24:21 |
| 2 | what sentence to impose or anything else, which is why | 02:24:25 |
| 3 | the State would say we would want to ask one simple | 02:24:28 |
| 4 | question about the impact to be had. And if you look | 02:24:32 |
| 5 | at the McNeill case, specifically I think very much | 02:24:35 |
| 6 | they say to rebut mitigation testimony that the | 02:24:39 |
| 7 | defendant had brought much joy to others, in this case, | 02:24:43 |
| 8 | we had a mother, a father, I'm sorry, a mother, a | 02:24:45 |
| 9 | stepfather, a brother, a daughter, a sister, a pen pal | 02:24:51 |
| 10 | who have all discussed their relationship, the good | 02:24:57 |
| 11 | parts of it, the joy that Mr. Davis has brought to | 02:25:01 |
| 12 | them, and the reason that the United States Supreme | 02:25:03 |
| 13 | Court decided Tennessee vs. Payne and overruled the | 02:25:06 |
| 14 | Booth case, which it previously kept this type of | 02:25:09 |
| 15 | material out, is because they thought that the | 02:25:14 |
| 16 | character and the emotional impact of the murder on the | 02:25:17 |
| 17 | victim's family should not be precluded in a sentencing | 02:25:21 |
| 18 | hearing. And while it may not in every case come up, I | 02:25:24 |
| 19 | think that in this case especially, due to the fact | 02:25:29 |
| 20 | that we have heard from so many of those witnesses | 02:25:31 |
| 21 | about the impact Mr. Davis has had on their life, and | 02:25:34 |
| 22 | especially looking at the Fautenberry case, and McNeill | 02:25:38 |
| 23 | case, I think that it is appropriate to allow Ms. | 02:25:42 |
| 24 | Butler who was on our witness list to be able to answer | 02:25:48 |
| 25 | and very frankly with the Court to answer one question. | 02:25:52 |

326

| | | |
|---|---|---|
| 1 | I expect not to ask her anything else.  I have copies | 02:25:55 |
| 2 | of the relevant cases if Your Honors would like to look | 02:26:00 |
| 3 | at it but we would make that request as a piece of | 02:26:03 |
| 4 | rebuttal evidence. | 02:26:06 |
| 5 | JUDGE NASTOFF:  All right.  One thing I will | 02:26:07 |
| 6 | indicate is first of all <u>Payne vs. Tennessee</u> is not a | 02:26:08 |
| 7 | new case.  I mean it is a 1991 case.  It has been | 02:26:11 |
| 8 | around for quite a while. | 02:26:15 |
| 9 | MR. OSTER:  Correct, Your Honor. | 02:26:16 |
| 10 | JUDGE NASTOFF:  And it has been a few months since | 02:26:16 |
| 11 | I've read it, but my recollection of <u>Payne vs.</u> | 02:26:19 |
| 12 | <u>Tennessee</u> spoke more to the statutory scheme adopted by | 02:26:23 |
| 13 | a particular state for addressing capital murder cases. | 02:26:27 |
| 14 | And if my recollection is that what Payne says is that | 02:26:35 |
| 15 | if a state chooses to permit victim impact evidence as | 02:26:39 |
| 16 | a part of its statutory scheme, that the 8th amendment | 02:26:46 |
| 17 | doesn't erect a per se bar to that.  I don't think that | 02:26:51 |
| 18 | it addresses in an individual case specifically that | 02:26:55 |
| 19 | victim impact evidence, particularly in Ohio, is or is | 02:26:58 |
| 20 | not admissible. | 02:27:04 |
| 21 | I think what the fall out of Payne in my | 02:27:05 |
| 22 | understanding is after Payne, if a state wishes to set | 02:27:08 |
| 23 | up a statutory scheme whereby victim impact evidence | 02:27:11 |
| 24 | could be considered, and argued, that the 8th Amendment | 02:27:15 |
| 25 | doesn't bar that.  What I can tell you is that I could | 02:27:20 |

JILL M. CUTTER, RPR
(513) 785-6596

| | |
|---|---|
| 1 | cite to at least one, two, three, four, five, six, | 02:27:23 |
| 2 | seven, eight, double digits certainly more than ten, | 02:27:33 |
| 3 | Ohio Supreme Court cases since Payne that have | 02:27:41 |
| 4 | addressed the issue of whether victim impact evidence | 02:27:44 |
| 5 | that was heard in a case was reversible error. | 02:27:48 |
| 6 | Sometimes it is, sometimes it isn't. So but that is my | 02:27:53 |
| 7 | understanding of where it is. It is always an issue. | 02:27:59 |
| 8 | MR. OSTER: I fully agree, Your Honor, but in my | 02:28:01 |
| 9 | research those cases where it has been an issue is | 02:28:04 |
| 10 | where the person gets up and testifies as to what | 02:28:07 |
| 11 | sentence they believe that the defendant should receive | 02:28:11 |
| 12 | and it is reversible error for that person to say what | 02:28:15 |
| 13 | sentence, be it death, life in this case, life with | 02:28:21 |
| 14 | thirty, what sentence that would be reversible error. | 02:28:26 |
| 15 | We do not intend, we are well aware of that with, would | 02:28:31 |
| 16 | be happy for the Court giving instruction to the | 02:28:35 |
| 17 | witness before testifying that they are in no way to | 02:28:36 |
| 18 | ever state that, which is why the State would ask | 02:28:39 |
| 19 | simply for one question and we believe that with the | 02:28:43 |
| 20 | Ohio Supreme Court looking at 2929.03 (D)(2), in the | 02:28:46 |
| 21 | McNeill case, however in this case it would be (D)(3) I | 02:28:51 |
| 22 | believe (D)(2) deals with juries, (D)(3) would deal | 02:28:55 |
| 23 | with a three-judge panel. The Ohio Supreme Court has | 02:28:59 |
| 24 | taken Payne, has taken an Ohio statute, and if the | 02:29:00 |
| 25 | procedure is done properly has found that it is | 02:29:05 |

JILL M. CUTTER, RPR
(513) 785-6596

1    admissible, and especially McNeill is admissible as
2    rebuttal evidence.
3        That would be our simple request, Your Honor, and
4    I understand it may not be a simple legal issue but
5    that would be our request is to ask that one question
6    pursuant to those cases and that statute.
7        JUDGE NASTOFF:  Fair enough.
8        MR. PORTER:  Number of issues, first I believe
9    Judge Nastoff is correct, Payne only deals with the 8th
10   Amendment issue not statutory issue.  Secondly, is
11   agreeing with Judge Spaeth on this issue is I am unsure
12   what it rebuts.  I thought the testimony in this case
13   was from several family members that they understood
14   that Von had caused great harm to the family, and I
15   thought he mentioned that repeatedly in his statement.
16   So again, I don't know what that rebuts.  And third is,
17   I think Ohio has changed the statute since Payne and I
18   am unsure on this, so I put an unsure out there when I
19   make this argument is having made it recently in a
20   non-capital case, and that there was, at the time of
21   Mr. Davis' sentencing in '84 I'm not too sure there was
22   any statutory authority for the Court to permit any
23   victim impact statement.
24       JUDGE NASTOFF:  All right.  Judges, if you want
25   to...

1    (Judges confer off the record.)                    02:30:36

2    JUDGE NASTOFF:  All right.  The three judges have   02:32:07

3    discussed the issue, and it is the -- our opinion that  02:32:09

4    it is not appropriate rebuttal evidence in this case   02:32:15

5    and we are not going to allow the State to proceed with  02:32:19

6    that.  Is there any other rebuttal evidence that you   02:32:22

7    would wish to offer?                                 02:32:25

8    MR. EICHEL:  Your Honor, please, I would move in    02:32:28

9    light of the doctor's testimony bringing out a factor  02:32:30

10   in mitigation dealing with the conduct of the defendant  02:32:39

11   on the night in question.  I think it has value as    02:32:41

12   mitigating evidence can only be considered in light of  02:32:46

13   part of the trial testimony in this case.  So I would  02:32:51

14   move for the admission at this time, the readmission of  02:32:55

15   trial testimony of Reginald Denmark, Hosette Massie,   02:33:00

16   Mona Aldridge, Wade Coleman, and Mark Lovette.  These  02:33:06

17   are witnesses who observed the defendant's conduct on  02:33:20

18   the night in question.                               02:33:23

19   Dr. Smith's testimony goes to the defendant's       02:33:25

20   conduct on the night in question whether it has       02:33:28

21   mitigating value.  *State vs. Stump*, the lead case, the  02:33:32

22   original case that has been reaffirmed many times, this  02:33:36

23   Court cannot consider the case in a vacuum.          02:33:40

24   JUDGE NASTOFF:  Well, we have already ruled on      02:33:46

25   having reviewed the transcript prior to coming in here,  02:33:49

JILL M. CUTTER, RPR
(513) 785-6596

| | | |
|---|---|---|
| 1 | number one, so that we are not considering the case in | 02:33:51 |
| 2 | a factual vacuum, number two so that we would be in a | 02:33:55 |
| 3 | position to be able to rule on offers of evidence so we | 02:33:58 |
| 4 | would understand if you are offering a certain witness' | 02:34:03 |
| 5 | testimony so we would know who in the world we were | 02:34:06 |
| 6 | talking about, and third, because we believe that we | 02:34:09 |
| 7 | have a separate independent statutory duty to review | 02:34:12 |
| 8 | the trial phase evidence to determine whether there was | 02:34:18 |
| 9 | anything mitigating about the nature and circumstance | 02:34:23 |
| 10 | of the offense.  So we have done that. | 02:34:26 |
| 11 | Now, you are saying that you want to offer those | 02:34:29 |
| 12 | portions of testimony into evidence to rebut Dr. Smith; | 02:34:32 |
| 13 | is that correct? | 02:34:36 |
| 14 | MR. EICHEL:  It's not in rebuttal to Dr. Smith. | 02:34:38 |
| 15 | It is to allow the Court to consider it as under | 02:34:39 |
| 16 | statute the Court is entitled to consider, nature and | 02:34:43 |
| 17 | circumstances in relation to whether there is | 02:34:46 |
| 18 | mitigating evidence in it.  The doctor has testified | 02:34:50 |
| 19 | the defendant's conduct has some mitigating value.  The | 02:34:53 |
| 20 | Court can only consider whether it has mitigating value | 02:34:58 |
| 21 | in relation to the nature and circumstances of the | 02:35:01 |
| 22 | offense committed. | 02:35:04 |
| 23 | JUDGE NASTOFF:  Well, and again, I will seek some | 02:35:05 |
| 24 | input here in a moment, but we have already reviewed | 02:35:07 |
| 25 | the transcript to determine whether -- or so that we | 02:35:12 |

| | | |
|---|---|---|
| 1 | can weigh whether there is anything mitigating arising | 02:35:15 |
| 2 | out of the nature and circumstances of the offense. | 02:35:20 |
| 3 | So, I mean, that is a continuing duty that we would | 02:35:22 |
| 4 | have until we retire to deliberate and we would | 02:35:25 |
| 5 | certainly consider that in light of the testimony | 02:35:28 |
| 6 | presented by Dr. Smith, but I don't know that, for | 02:35:31 |
| 7 | example, everything that Dr. Smith relied upon in his | 02:35:35 |
| 8 | testimony would then become something that has to be | 02:35:39 |
| 9 | admitted into evidence separately for us to consider. | 02:35:42 |
| 10 | MR. EICHEL: Okay. With that clarification, Your | 02:35:46 |
| 11 | Honor, I understand the Court's ruling. The Court is | 02:35:48 |
| 12 | considering for it's mitigating -- to give the Court an | 02:35:52 |
| 13 | ability to assess the mitigating value of the evidence, | 02:35:58 |
| 14 | so if I understand correctly then I will withdraw the | 02:36:03 |
| 15 | offer. | 02:36:06 |
| 16 | JUDGE NASTOFF: All right. And do you wish to be | 02:36:07 |
| 17 | heard on the matter? I mean, I understand you disagree | 02:36:09 |
| 18 | with the pretrial ruling regarding reviewing the | 02:36:13 |
| 19 | transcript. I have made that ruling prior to us | 02:36:16 |
| 20 | impaneling the three-judge panel separate and apart | 02:36:20 |
| 21 | from that objection, is there anything else to be -- | 02:36:23 |
| 22 | MR. PORTER: Other than renewing our prior | 02:36:27 |
| 23 | objection, no, we have nothing else to say, thank you, | 02:36:29 |
| 24 | Your Honor, for asking. | 02:36:31 |
| 25 | JUDGE NASTOFF: All right. All right. Anything | 02:36:32 |

332

| | | |
|---|---|---|
| 1 | else from the State? | 02:36:34 |
| 2 | MR. EICHEL: No, Your Honor, I apologize for my | 02:36:35 |
| 3 | lack of clarity on the issue. | 02:36:37 |
| 4 | JUDGE NASTOFF: Not at all. All right. So there | 02:36:40 |
| 5 | is no rebuttal other than what we have discussed? | 02:36:44 |
| 6 | MR. EICHEL: No, Your Honor. | 02:36:47 |
| 7 | JUDGE NASTOFF: The evidence in the case is | 02:36:48 |
| 8 | closed then at this point in time? | 02:36:49 |
| 9 | MS. COOK-REICH: Yes, Your Honor. | 02:36:51 |
| 10 | JUDGE NASTOFF: One thing, two things that I want | 02:36:52 |
| 11 | to address, number one, do you need a few moments to | 02:36:56 |
| 12 | collect your thoughts for closing? | 02:36:59 |
| 13 | MS. COOK-REICH: Just a few. | 02:37:00 |
| 14 | JUDGE NASTOFF: Okay. And then number two, I know | 02:37:01 |
| 15 | that Mr. Davis has a separate right of allocution under | 02:37:06 |
| 16 | the Criminal Rules that has to be addressed. And I | 02:37:11 |
| 17 | know I have seen it raised at different times in | 02:37:17 |
| 18 | different cases, but it appears to me that to ask after | 02:37:20 |
| 19 | we have completed our deliberations on the case, and we | 02:37:25 |
| 20 | come back out to ask for it at that point in time, | 02:37:29 |
| 21 | would seem to have little utility or purpose since we | 02:37:32 |
| 22 | would be coming out ostensibly with a decision on the | 02:37:37 |
| 23 | case, so what I would ask is, I mean if you think it is | 02:37:42 |
| 24 | more appropriate that we inquire at that time, we can, | 02:37:46 |
| 25 | but I think that it would be more appropriate to | 02:37:49 |

| | |
|---|---|
| 1 | inquire whether he wishes to exercise any allocution | 02:37:51 |
| 2 | rights prior to us engaging in deliberations. | 02:37:54 |
| 3 | MR. PORTER: Mr. Davis does not wish to make | 02:38:05 |
| 4 | another statement, Your Honors. | 02:38:08 |
| 5 | JUDGE NASTOFF: So you would waive any further | 02:38:10 |
| 6 | allocution? | 02:38:13 |
| 7 | THE DEFENDANT: Yes. | 02:38:15 |
| 8 | MR. PORTER: Yes. | 02:38:16 |
| 9 | JUDGE NASTOFF: All right. With that, then State | 02:38:17 |
| 10 | ten minutes, longer than that, shorter than that? | 02:38:21 |
| 11 | JUDGE PATER: One thing we should do in the | 02:38:27 |
| 12 | interim, we should give our notebooks, I think, back to | 02:38:29 |
| 13 | the defense counsel and then defense counsel will just | 02:38:31 |
| 14 | maybe insert the new K and leave the other two that are | 02:38:34 |
| 15 | being admitted and then delete everything else, that | 02:38:37 |
| 16 | would be great. | 02:38:41 |
| 17 | MR. OSTER: Can we ask for fifteen minutes? | 02:38:45 |
| 18 | JUDGE NASTOFF: Certainly. Why don't we call it | 02:38:47 |
| 19 | 3:00, okay. So, we will reconvene at 3:00 for closing | 02:38:51 |
| 20 | argument. We will be in recess until that time and our | 02:38:55 |
| 21 | notebooks are up here. | 02:38:58 |
| 22 | (Recess taken the this time.) | 02:39:03 |
| 23 | JUDGE NASTOFF: We're back on record in State of | 03:09:18 |
| 24 | Ohio vs. Von Clark Davis, CR1983-12-0614. Record will | 03:09:24 |
| 25 | again reflect that Mr. Davis is present with his | 03:09:27 |

JILL M. CUTTER, RPR
(513) 785-6596

334

1    counsel, Randall Porter, Ms. Cook-Reich, State's                03:09:30

2    representatives Dan Eichel and Michael Oster, assistant          03:09:33

3    prosecutors are present, all three members of the                03:09:37

4    three-judge panel are present.  And the evidence in the          03:09:39

5    case is closed.  Defendant has waived allocution and I           03:09:42

6    believe we are prepared to hear closing arguments at             03:09:48

7    this time.                                                       03:09:48

8         Since the State has the burden of proof, it's my            03:09:51

9    understanding in these proceedings that the State               03:09:54

10   proceeds first and last with the argument from the              03:09:56

11   defense sandwiched between those.  So are you ready to          03:10:00

12   proceed with closing argument at this time?                     03:10:03

13        MR. EICHEL:  Yes, Your Honor.                              03:10:06

14        JUDGE NASTOFF:  Will you be addressing the Court,          03:10:07

15   I assume?                                                        03:10:10

16        MR. EICHEL:  That's correct, yes.                          03:10:10

17        JUDGE NASTOFF:  All right.  You may proceed.              03:10:12

18        MR. EICHEL:  May it please this Honorable Court,          03:10:13

19   Mr. Oster, Mr. Porter, Ms. Cook-Reich, Your Honors, I          03:10:21

20   want to begin by thanking you for the kind and close           03:10:29

21   attention that you have paid to the details of this            03:10:33

22   case.  We are asking under the facts of this case that         03:10:37

23   you apply the law as it is written, and that you               03:10:40

24   determine that the weighing process requires that the          03:10:43

25   sentence of death be imposed on Von Clark Davis.               03:10:48

1    I appreciate the difficulty, the awesome
2    responsibility that a judge always undertakes in -- on
3    a daily basis in applying the sentencing laws even in a
4    regular non-capital case, other than capital felony
5    cases the Court practices every day, and you apply the
6    sentence that fits both the crime and the offender. It
7    is really a lot of complicated rules, but it comes down
8    to that simple. That is what the 8th Amendment
9    requires here.

10    In this case, capital case. And when it is a
11    panel of three judges in a capital case, I appreciate
12    the fact that this difficulty, this responsibility to
13    apply the law and find the facts more than triples.
14    It's not mathematical. You don't assign it numbers and
15    then count them up. It is a discretion that we see
16    exercised on the bench that is beyond the ability of
17    the words we say here today to add or detract. And
18    that last thing being said, I ask myself, how do I
19    argue this case for resentencing? I have to be guided
20    by the statute in place, the statute under which we
21    proceed. We all have to do that, taking no pleasure in
22    it. We all have to do that.

23    In some respects I find myself thinking of you as
24    I would a three-judge appellate court, Court of
25    Appeals, falling in my mindset of an appellate

336

1    prosecutor, which is what I have been for the last 12

2    years personally, I don't set foot here on the third

3    floor very often, do I?  Here you are working on a case

4    that you didn't try the trial, but are working on that

5    case, but by the same token, I have to remind myself

6    that in this sentencing hearing where the evidence is

7    received firsthand by you, the penalty phase, it isn't

8    the Court of Appeals level, you are the primary fact

9    finders, you have the discretion to find the facts, to

10   find out -- to find the fact as to what is credible,

11   what is not credible.  You don't have to accept

12   testimony or other evidence simply because it was

13   presented, you can find what is worthy of belief and

14   what is not worthy of belief, but most importantly it

15   is your call as to how much weight you give to any item

16   or any factor at issue.

17       We are resentencing Von Clark Davis in a hearing

18   before this three-judge panel which did not hear the

19   trial in which he stands convicted of Count One of

20   aggravated murder of Suzette Butler in violation of

21   Revised Code 2903.08 on or about the 12th day of

22   December 1983 and in Butler County, Ohio, Von Clark

23   Davis did purposely and with prior calculation and

24   design cause the death of Suzette Butler.  And he also

25   stands convicted of a single specification of

JILL M. CUTTER, RPR
(513) 785-6596

1    aggravating circumstance 2929.04(A)(5) that prior to

2    the aggravated murder of Suzette Butler the defendant

3    had been convicted of one count of second degree murder

4    in violation of former Revised Code 2901.05 for

5    purposely causing the death of his wife.

6         The evidence at trial upon which the three-judge

7    panel has found that the aggravating specification was

8    proven beyond a reasonable doubt, was a stipulated

9    judgment of conviction entry dated April 20, 1971, case

10   number 21655, indicating that the defendant was

11   previously convicted of murder in the second degree, in

12   violation of Revised Code 2901.05 as then existed.

13        This aggravating circumstance you will weigh

14   against the defense presented mitigating evidence,

15   presented as to the defendant's history, character, and

16   background, his unsworn statement and the other factors

17   brought forward and argued as mitigating.  Under the

18   statute there is one and only one deciding question to

19   be answered.  Quoting Revised Code 2903, quote, if the

20   panel of three judges unanimously find by proof beyond

21   a reasonable doubt that the aggravating circumstance

22   the offender was found guilty of committing outweighs

23   the mitigating factors, it shall impose the sentence of

24   death on the offender.

25        Absent such a finding by the panel the panel shall

1    impose one of the following sentences on the offender,   03:16:32

2    life imprisonment with parole eligibility after serving   03:16:36

3    20 full years of imprisonment, or life imprisonment   03:16:40

4    with parole eligible after serving 30 full years of   03:16:43

5    imprisonment. I have to ask: How can anything   03:16:47

6    mitigate a repeat convicted murderer, a killer who has   03:16:55

7    purposely killed not once, but twice? What does it   03:17:01

8    mean to outweigh? Here I have to be guided by a jury   03:17:09

9    instruction defining that term as approved in *State vs.*   03:17:13

10    *Sperco* in point citation page 3459 Ohio State 3d.1.   03:17:17

11      To outweigh means way more than to be more   03:17:23

12    important than, and the standard instruction continues   03:17:28

13    it is the quality of the evidence regarding the   03:17:33

14    aggravating circumstance and mitigating factors that   03:17:36

15    must be given primary consideration by you. The   03:17:40

16    quality of the evidence may or may not be the same as   03:17:43

17    the quantity of the evidence; that is, the number of   03:17:46

18    witnesses or exhibits presented in this case.   03:17:49

19      Here, I am reminded of a mountain of vertical rock   03:17:54

20    that juts out of the planes of Wyoming, it was formed   03:18:02

21    by a volcanic process of lava flowing many millions of   03:18:06

22    years ago, it is called Devil's Tower. It was declared   03:18:11

23    a national monument over a hundred years ago, maybe you   03:18:16

24    recall it from the Spielberg movie, it was the focus of   03:18:20

25    the movie Close Encounters of the Third Kind about   03:18:24

339

thirty years ago. It juts up almost out of nowhere 03:18:28
towers over the landscape and as you drive on the 03:18:36
roads, mostly flat rolling terrain, leaning forward you 03:18:39
can see it for miles in the distance. 03:18:46

As you travel the rolling hills and creeks and 03:18:49
farms and villages of prairie dogs it looms large, 03:18:52
looms large over everything else. It is the most 03:18:57
significant important thing there. Your Honors, there 03:18:59
is a mountain, there is a rock in this courtroom. It 03:19:06
is the most significant thing here. It is more 03:19:10
important than anything else in this case. It is the 03:19:14
most important thing in this defendant's life history, 03:19:18
it is the only significant thing about him in relation 03:19:23
to the sentencing criteria in this case. Nothing else 03:19:25
is shown to be deserving very much weight. It 03:19:31
outweighs everything else by proof beyond a reasonable 03:19:36
doubt. 03:19:45

Von Clark Davis is convicted in April 1971 03:19:45
purposely killing his wife, thereafter 13 years later, 03:19:48
he purposely kills again, Suzette Butler. Not once, 03:19:52
but twice, one after the other. When you weigh that, 03:19:58
it outweighs all of the things that are considered by 03:20:04
you as mitigating, all of the ideas set forth why he 03:20:07
should be spared, forgiven, given a lesser penalty, 03:20:11
they don't combine in their totality. All else is just 03:20:16

1   rolling hills and valleys, creeks under the massive
2   mountain.
3       Dr. Smith, he tried to set forth a reason why this
4   defendant was at risk to do these crimes. When you
5   look at what he said, he more or less explains why this
6   man commits the crimes. That is what he said. This
7   explains and let's you understand it, but it doesn't
8   reduce blame. He's kind of telling you it is the road
9   leading to the mountain, doesn't outweigh the mountain.
10      MR. PORTER: Objection. He seems to be misstating
11  the law of a mitigation -- weigh aggravation --
12      MR. EICHEL: Let me --
13      JUDGE NASTOFF: Sustained.
14      MR. EICHEL: I agree, I should not have phrased it
15  that way. I got off of my page.
16      JUDGE NASTOFF: We're not going to consider that
17  argument, you can rephrase.
18      MR. EICHEL: I will leave it. It is kind of like
19  telling you the road that leads to the mountain and I
20  suggest to you Dr. Smith's opinion is based on
21  extrapolation something of an exaggeration of witness'
22  testimony that we heard from the people he said he
23  talked about with all of the social history, based on
24  what defendant told him, the defendant who keeps
25  telling different stories.

JILL M. CUTTER, RPR
(513) 785-6596

1  And then there is yet another story about how he

2  executed Suzette Butler in some kind of alcoholic fog,

3  Jerry Stineman which didn't even make in it to Dr.

4  Smith's opinion like we all expected but it didn't

5  happen because he didn't even talk to him.  That is not

6  part of the social history that Dr. Smith -- where was

7  that coming from?  That is a third thing here in this

8  case besides Silkey Carr and besides what he told Dr.

9  Smith.  How does the alcoholic fog, Jerry Stineman's

10  testimony fit the eyewitness accounts of how the

11  witnesses saw him that night?  Or what he told Dr.

12  Fisher way back when.  Or what he stated at trial in

13  the first phase.

14  Going back to Dr. Smith, if you accept it, Dr.

15  Smith, his opinion may explain it but it does not

16  justify or mitigate the aggravated murder that was

17  horrible, callous, evil, unforgiveable, unmitigated.

18  Dr. Smith said he was at risk to make a bad choice.

19  Twice he made the bad choice.  Twice.

20  When you decide this case I trust that your

21  verdict should not be swayed or influenced by any

22  consideration, sympathy, bias, prejudice.  It is your

23  duty to carefully weigh this evidence.  Decide all

24  disputed questions of fact, to apply the rule of law to

25  your findings.  To render your verdict accordingly.  In

JILL M. CUTTER, RPR
(513) 785-6596

1     fulfilling your duty your efforts will most certainly     03:23:59
2     arrive at a just verdict.  You will consider all of the     03:24:02
3     evidence and make your finding with intelligence     03:24:07
4     impartiality, without bias sympathy or prejudice,     03:24:11
5     giving this defendant a fair trial.     03:24:14
6          In conclusion, may I say that the evidence has     03:24:19
7     shown, the evidence to be considered by you under     03:24:21
8     2929.03 has shown that the aggravating circumstance in     03:24:26
9     this case outweighs the mitigating factors presented in     03:24:35
10    this case by proof beyond a reasonable doubt and upon     03:25:02
11    such finding, the sentence of death will be imposed,     03:25:02
12    the facts and the law require it.  Thank you.     03:25:02
13         JUDGE NASTOFF:  Thank you, Mr. Eichel.  Ms.     03:25:02
14    Cook-Reich, are you going to be arguing for the     03:25:02
15    defense?     03:25:02
16         MS. COOK-REICH:  I am, Your Honor.     03:25:02
17         JUDGE NASTOFF:  You may proceed when you are     03:25:02
18    ready.     03:25:02
19         MS. COOK-REICH:  Mr. Oster, Mr. Davis, Mr. Porter,     03:25:02
20    Judges, I want to thank you for your patience and time     03:25:11
21    in this unique case as we have phrased it many times.     03:25:15
22    As you know, this case is about punishment, I am not     03:25:17
23    going to lecture on the law because I am going to     03:25:20
24    assume you know the law and you read and you are ready     03:25:22
25    to prepare on this case.  It is our contention     03:25:26

```
1    aggravating proven in this case does not outweigh the    03:25:28
2    mitigating factors presented by proof beyond a           03:25:31
3    reasonable doubt.                                        03:25:33
4          The mitigating factors are not excuses, they are   03:25:35
5    not reasons, they are not justifications.  If those are  03:25:37
6    what they were, I submit the law of Ohio wouldn't have   03:25:40
7    them in there.  Because there aren't reasons or          03:25:44
8    justifications or excuses.  That is not what this is     03:25:47
9    about.  We did not present Dr. Smith as an excuse.  We   03:25:50
10   presented him to explain and that is what he did.  It    03:25:54
11   was lengthy but he did give an explanation.  He gave a   03:25:57
12   complete social forensic history of everyone he spoke    03:26:02
13   to, everyone he interviewed, all of the documents he     03:26:05
14   reviewed.  Every psychological evaluation that has ever  03:26:08
15   been done of Von, he was complete and thorough in that.  03:26:12
16         In this case, it is about the three options, 20 to 03:26:16
17   life, 30 to  life, or death.  20 to life is not what we  03:26:20
18   are asking you to impose.  We are asking that you        03:26:24
19   determine the proper sentence is 30 to life because in   03:26:28
20   our opinion, and our belief that the evidence presented  03:26:31
21   30 to life is in essence what LWOP is today, life        03:26:36
22   without the possible of parole.  And it is LWOP,         03:26:41
23   because of his history, no parole board I submit to you  03:26:45
24   is going to by majority vote release Von Clark Davis     03:26:48
25   with his criminal history.  And therefore, this is in    03:26:52
```

JILL M. CUTTER, RPR
(513) 785-6596

| | |
|---|---|
| 1 | essence 30 to life is death by natural causes in prison | 03:26:57 |
| 2 | rather than death by legal injection. | 03:27:01 |
| 3 | Cynthia Mausser told you when Mr. Porter asked her | 03:27:06 |
| 4 | questions specifically about it, he gave her the | 03:27:10 |
| 5 | hypothetical fact scenario, for those hypotheticals, | 03:27:13 |
| 6 | all except for the last one are exactly what sits | 03:27:20 |
| 7 | before you. First conviction of killing his wife, | 03:27:21 |
| 8 | second degree murder. Paroled after a decade. While | 03:27:24 |
| 9 | on parole, he commits another murder by killing his | 03:27:26 |
| 10 | girlfriend. He is convicted of aggravated murder with | 03:27:30 |
| 11 | a capital specification. He gets a sentence of death | 03:27:33 |
| 12 | imposed by three judges, but then after 25 years, he | 03:27:36 |
| 13 | gets a new sentencing hearing. And this is where the | 03:27:40 |
| 14 | hypothetical ended. It began with what we are asking | 03:27:43 |
| 15 | you to do, to impose the 30 to life. That added to | 03:27:47 |
| 16 | that hypothetical, Mr. Porter asked Ms. Mausser, in | 03:27:51 |
| 17 | your experience, training and work on the parole board | 03:27:56 |
| 18 | after all of these years, is it your opinion that a | 03:27:59 |
| 19 | person, Von Clark Davis in this case, is ever going to | 03:28:03 |
| 20 | be paroled, and her words and this is what I wrote down | 03:28:07 |
| 21 | in my quotes, you take what you remember. This person | 03:28:11 |
| 22 | is quote, likely to spend a large portion of his adult | 03:28:14 |
| 23 | life in prison, and then he is unlikely to get parole | 03:28:18 |
| 24 | at the first hearing. | 03:28:22 |
| 25 | We extrapolated for you when that first hearing | 03:28:25 |

1    would be which I believe is in six years with the                    03:28:28
2    consecutive sentence for the weapons under disability                03:28:32
3    which is attached to this particular offense. She                    03:28:35
4    can't tell for a fact that Von Clark Davis will not get               03:28:39
5    out. She can't tell you that. And the reasons for                    03:28:42
6    that are, one, it's against the law to judge that                    03:28:45
7    without all of the information, and Mr. Oster brought                03:28:48
8    out the fact that she doesn't have the plethora of                   03:26:50
9    information a board would have before them. Secondly,                03:28:54
10   she is one person of a majority of a board.                         03:28:57

11       If in six years he had a parole board hearing a                 03:39:05
12   majority would have to decide this case. Assuming you               03:29:07
13   are the parole board just like every day you do as a                03:29:13
14   judge, sitting here for Judge Nastoff on this bench and             03:29:16
15   the other judges on your own benches, you hear a                    03:29:21
16   defense attorney standing next to their client asking              03:29:24
17   for probation. Judge, my client has changed his life,              03:29:26
18   Judge, he has the family support, Judge, he has beaten             03:29:29
19   his addiction, he has gone to AA, he has done                       03:29:33
20   everything he can. Just like that, that is what a                   03:29:36
21   parole board is going to have before them, but a                    03:29:40
22   majority decides that.                                              03:29:43

23       And the response to that in a parole board setting             03:29:44
24   is the prosecutor is standing there saying no, way do I            03:29:48
25   ever want this person out, I don't agree to probation.             03:29:51

| | | |
|---|---|---|
| 1 | You have the PSI, which would tell you the client's | 03:29:56 |
| 2 | complete criminal history; you have the victims and | 03:30:00 |
| 3 | their families standing there, it is exactly what a | 03:30:03 |
| 4 | parole board would have before them.  It is just like | 03:30:06 |
| 5 | every day when you sentence someone.  So in the defense | 03:30:09 |
| 6 | attorney stands here next to the two-time killer and | 03:30:12 |
| 7 | says, Judge, he has had 25, 35, 45 years of good | 03:30:16 |
| 8 | behavior, will you let him out now?  You consider all | 03:30:21 |
| 9 | of those factors, just as the parole board would.  And | 03:30:23 |
| 10 | you make that decision and you use your discretion. | 03:30:27 |
| 11 | Mr. Oster wanted to make the word discretion for | 03:30:30 |
| 12 | the parole board seem like an evil or dirty word, but | 03:30:33 |
| 13 | you use it every day in every one of your sentencing | 03:30:37 |
| 14 | decisions, and I submit to you that just like when a | 03:30:39 |
| 15 | defense attorney stands here and asks for you to give | 03:30:42 |
| 16 | their client another chance, and in this case it would | 03:30:45 |
| 17 | be parole for Mr. Davis.  In that case it would be | 03:30:49 |
| 18 | probation for Mr. Davis, you would say no way am I | 03:30:52 |
| 19 | going to let him out on the streets.  Just like the | 03:30:55 |
| 20 | parole board is going to say that when they look at his | 03:30:57 |
| 21 | history. | 03:31:01 |
| 22 | Life, 30 to life is life without the possibility | 03:31:06 |
| 23 | of parole for Von Clark Davis with his history.  Mrs. | 03:31:09 |
| 24 | Mausser gave you the matrix chart score information she | 03:31:14 |
| 25 | provided.  The offense score, she gave him a 13, which | 03:31:19 |

JILL M. CUTTER, RPR
(513) 785-6596

1    is the highest of that score he could get based upon          03:31:22

2    his criminal history.  She could not give us a criminal        03:31:25

3    history risk score because there are many other things         03:31:28

4    that go in it that she doesn't have available to her to        03:31:31

5    make today or yesterday when she did testify.  But she         03:31:35

6    did say a couple of interesting things.                        03:31:37

7        She said that while she has been on the board she          03:31:40

8    has never seen an aggravated murder defendant come up          03:31:42

9    for parole, let alone an aggravated murder with death          03:31:47

10   specifications or capital specifications come before           03:31:53

11   the parole board.  So a person of that like has never          03:31:55

12   even appeared before the parole board for parole.  What        03:31:58

13   are the chances that the first one that comes before           03:32:02

14   them, Von Clark Davis, that they are going to let that         03:32:03

15   person out?  With his criminal history, we know he has         03:32:06

16   a 13 offense score, let alone what she said about the          03:32:10

17   fact that they have a full hearing, the victim and the         03:32:15

18   victim's family is present, the prosecutor is present,         03:32:19

19   the police are present, or at least have the ability to        03:32:22

20   be there.  And they put it on their website to allow           03:32:25

21   additional information as to why they should or should         03:32:29

22   not let someone out.                                           03:32:34

23       And let me submit to you something else that Mr.           03:32:35

24   Oster asked Ms. Mausser about.  He kept asking her --          03:32:38

25   let me rephrase that, he said to her, something about          03:32:42

JILL M. CUTTER, RPR
(513) 785-6596

1    the recession, I hope you don't lose your job, but can
2    you imagine the parole board who let Von Clark Davis
3    out on the first parole?  They serve at the discretion
4    of the director.  The day they let Von Clark Davis out
5    as a majority board, is the day a clean slate of parole
6    board members come in.  That is not going happen.  30
7    to life for Von Clark Davis is life without the
8    possibility of parole.  It is a natural death in
9    prison.
10        Dr. Smith didn't provide you mumbo jumbo.  He gave
11   you the specifics as to why he came up with the
12   borderline disorder diagnosis, why he came up with the
13   substance abuse, alcoholic dependence disorder, and it
14   is laid out for him in the records.  He didn't have to
15   believe Mr. Davis.  He didn't have to believe any of
16   the family members or any of the summaries he reviewed
17   of people who were no longer available, it is in the
18   records, all the way back to the Navy, and every record
19   thereafter.  It is in the records.  So he didn't make
20   something up.  He is not hired gun, who didn't just
21   come up with some excuse.  He gave an explanation.
22        Mitigating factors are explanations, not excuses
23   or justifications.  Every one has a history that molds
24   them.  I'm here because of my life experiences.  You
25   are in those black robes because of your life

| | | |
|---|---|---|
| 1 | experiences. Von Clark Davis became the man he did | 03:34:08 |
| 2 | before Charles Tipton came into that family. Dr. Smith | 03:34:12 |
| 3 | phrased it something like, that was his one last hope, | 03:34:21 |
| 4 | but he came too late. And I asked him, but how do you | 03:34:22 |
| 5 | differentiate the other kids in this family? Elliot, | 03:34:28 |
| 6 | the oldest brother, Carol is the child after Victor, | 03:34:32 |
| 7 | I'm sorry, after Von, and then you have Charles who is | 03:34:36 |
| 8 | deceased, but then you have Victor. And I covered | 03:34:40 |
| 9 | this. Victor you heard and some of you knew him. You | 03:34:44 |
| 10 | must have been thinking to yourself, Victor Davis made | 03:34:48 |
| 11 | it, he made something great out of himself. He is an | 03:34:52 |
| 12 | activist in the community. He's done very well. He | 03:34:56 |
| 13 | has gone onto school. What differentiates him from the | 03:34:58 |
| 14 | man who has killed two women? The difference was very | 03:35:03 |
| 15 | clear and Victor covered it, he was our first witness. | 03:35:06 |
| 16 | He spent 75 percent of his time with his grandmother. | 03:35:09 |
| 17 | That was a big part. Grandmother provided that | 03:35:14 |
| 18 | stability that Von Clark didn't have. He was the | 03:35:18 |
| 19 | favorite. Now, I know Carol, the sister said, well, | 03:35:22 |
| 20 | you know, everybody thinks they are the favorite. But | 03:35:25 |
| 21 | Victor told you that his mother would sometimes use as | 03:35:29 |
| 22 | a warning that if he acted up, she was going to bring | 03:35:34 |
| 23 | him back to live with her and the rest of the kids | 03:35:37 |
| 24 | rather than staying with grandma. Grandma was the best | 03:35:40 |
| 25 | possible place to be apparently because why would it be | 03:35:43 |

JILL M. CUTTER, RPR
(513) 785-6596

1    a threat to bring him back home to live with the rest    03:35:47

2    of the family?    03:35:50

3         The order of birth is really important, too,    03:35:53

4    because Nick Davis isn't really in the picture when    03:35:55

5    Victor, yes, he is born because he is Nick Davis'    03:36:00

6    child, but the siblings after him, one of them is not    03:36:04

7    Nick's child.  The mom is not with Nick, he is in and    03:36:08

8    out of the family, but he was already gone basically by    03:36:15

9    the time Victor was born, so he really doesn't know him    03:36:19

10   at all versus Von who seeks out his father.  A man who    03:36:23

11   you would wonder why you would seek out when you never    03:36:27

12   had a relationship with him before but because he had    03:36:30

13   some vague memories of him.  More so even Carol said    03:36:32

14   she had some vague memories, versus Victor whose    03:36:35

15   younger than Carol said I don't really remember my dad    03:36:38

16   except for the one time they made me go see him.  It's    03:36:42

17   a case like this that makes me realize in my own    03:36:46

18   personal life that every day is a chance to mold a    03:36:51

19   child's life.  Every day.  Everything I do with my own    03:36:56

20   child and everything that all of my client's, domestic    03:36:59

21   relations and criminal clients do with their children    03:37:04

22   is a chance to mold that child, to be the child that    03:37:07

23   stands next to me as my next criminal client or the    03:37:10

24   client that I never see, ever.    03:37:13

25        Age of abandonment, encouragement support that you    03:37:22

| | | |
|---|---|---|
| 1 | received, birth order, those are some really important | 03:37:25 |
| 2 | things that Dr. Smith talked about. I don't think it | 03:37:29 |
| 3 | is disputed but maybe it is, but bipolar disorder | 03:37:42 |
| 4 | that -- I'm sorry. Borderline personality disorder | 03:37:48 |
| 5 | that Dr. Smith testified to, he said that Von meets | 03:37:50 |
| 6 | eight of those nine factors, symptoms. You only needed | 03:37:56 |
| 7 | five of them to meet borderline personality disorder, | 03:38:01 |
| 8 | but he has eight of them. And these aren't things that | 03:38:06 |
| 9 | Von threw out at him, and said, oh, this is what I | 03:38:09 |
| 10 | have. This is what I have. These are things he | 03:38:11 |
| 11 | gleaned from records, interviews and pulling it from | 03:38:13 |
| 12 | Von. Von did not want to cooperate; there is nothing | 03:38:16 |
| 13 | wrong with me, I don't have any problems. | 03:38:19 |
| 14 | One of the things that I thought was very | 03:38:26 |
| 15 | interesting, and it kind of goes along with Victor is | 03:38:29 |
| 16 | that Victor apparently had a very close relationship | 03:38:31 |
| 17 | with his grandmother. I believe he said he lived with | 03:38:34 |
| 18 | her until her death until 1986. The family all | 03:38:37 |
| 19 | testified that they were close. They did. But then | 03:38:43 |
| 20 | when you delved into it deeper, what does close mean to | 03:38:46 |
| 21 | you? Well, we went fishing together. Great. You had | 03:38:52 |
| 22 | fishing experiences, you know, you talked about your | 03:38:57 |
| 23 | life and your feelings and things going on. Remember | 03:38:59 |
| 24 | Charles Tipton's testimony when I asked him about that? | 03:39:02 |
| 25 | I said, well, what did you guys talk about? Did you | 03:39:06 |

1  talk about personal things?  He almost seemed offended,  03:39:08

2  oh, we wouldn't talk about anything personal, we just  03:39:12

3  talked about fishing.  That was it.  That is not a  03:39:15

4  close family.  That is a family that has put up  03:39:18

5  borders.  That is a family that just on the surface is  03:39:21

6  close and they may have a big extended family, but it  03:39:25

7  doesn't mean that you develop an attachment to people,  03:39:28

8  that you develop well as a child.  And exhibit A in  03:39:30

9  that is Von Clark Davis.  That didn't happen in this  03:39:34

10  particular child.  03:39:39

11  We submit to you that the mitigating factors  03:39:42

12  include his family and his friends, the people that  03:39:45

13  testified to you.  Victor Davis, Carol Davis, Charles  03:39:46

14  Tipton, Alluster Tipton, Fran Welland, friends Jerome  03:39:53

15  Stineman, Rick Rotundo they gave you some snapshots  03:40:00

16  into him.  He has not been idle in 25 years while he  03:40:04

17  sat on death row.  He has also been good as the report  03:40:07

18  -- as the exhibit, Mr. Nowack testified to.  03:40:11

19  It would be very common on a capital case to bring  03:40:19

20  in your family members to show the love and support.  03:40:23

21  That would be common.  What I think is extraordinary is  03:40:25

22  that his daughter, Sherry Davis, a victim in this case,  03:40:32

23  because she is the daughter of Ernestine Davis, in  03:40:36

24  those 25 years that Von has fought this death penalty  03:40:40

25  previously imposed, the last 15 years he has had a  03:40:46

relationship with Sherry Davis.  That is extraordinary   03:40:48
that she could forgive and mount that hill of hope and   03:40:55
despair and grief.   03:40:59

Von gave you his unsworn statement.  I am not   03:41:07
going to paraphrase it because he gave it best to you   03:41:11
and that is why he came first.  Summary is he is an   03:41:14
awful person, he put grief in the lives of three   03:41:21
families, and he can't change his actions.  He is not   03:41:26
asking that this Court let him go.  He is taking full   03:41:28
responsibility for his actions.  And yes, it may seem   03:41:34
late because this isn't the trial of 1984, but he is   03:41:37
asking and we are asking that you impose a sentence of   03:41:42
30 to life.  He does not want to die nor does hardly   03:41:48
any other person I have ever represented.  But he does   03:41:55
not want to die and he asks and I can ask you to   03:41:55
consider that as a mitigating factor.   03:41:59

We submit that the aggravating circumstances in   03:42:07
this case do not outweigh the mitigating factors   03:42:10
presented by proof beyond a reasonable doubt.  We   03:42:14
submit that the proper sentence to impose in this case   03:42:16
is 30 to life, because that is life without the   03:42:20
possibility of parole for this defendant sitting before   03:42:24
you.  Thank you.   03:42:28

JUDGE NASTOFF:  Thank you, Ms. Cook-Reich.  Before   03:42:30
you sit down and before I hear from the defense, I   03:42:33

| | | |
|---|---|---|
| 1 | would just like to insure that I have the -- an | 03:42:35 |
| 2 | accurate list of the specific mitigating factors that | 03:42:43 |
| 3 | you are asking the Court to consider. And what I have | 03:42:47 |
| 4 | are support and love of family and friends, his being | 03:42:50 |
| 5 | raised in a dysfunctional environment, which I believe | 03:42:59 |
| 6 | is the term that was used in opening by Mr. Porter, the | 03:43:02 |
| 7 | testimony from Dr. Smith about the mental health impact | 03:43:06 |
| 8 | that that had upon him, specifically the borderline | 03:43:10 |
| 9 | personality disorder and the substance abuse disorder, | 03:43:15 |
| 10 | correct? | 03:43:19 |
| 11 | MS. COOK-REICH: Yes, Your Honor. | 03:43:19 |
| 12 | JUDGE NASTOFF: Is remorse or apology that he | 03:43:21 |
| 13 | offered in his unsworn statement that was communicated | 03:43:26 |
| 14 | through other witnesses, his good behavior in prison, | 03:43:29 |
| 15 | his age of 62, the likelihood that he would not be | 03:43:34 |
| 16 | released on parole, there was some representation in | 03:43:44 |
| 17 | the opening statement that a life sentence would give | 03:43:56 |
| 18 | closure to the victim's family, I believe that was | 03:44:01 |
| 19 | offered, and essentially I believe there was an | 03:44:03 |
| 20 | argument on a cost savings to taxpayers to end the | 03:44:06 |
| 21 | litigation, and I just want to make sure that I haven't | 03:44:11 |
| 22 | missed any. | 03:44:16 |
| 23 | I understand that the Court is not limited to the | 03:44:18 |
| 24 | specific mitigating factors that have been described, | 03:44:25 |
| 25 | that the Court can consider any other mitigating | 03:44:28 |

JILL M. CUTTER, RPR
(513) 785-6596

1    factors.  I am reading that from jury instructions that    03:44:31

2    I have used in capital cases that I would instruct a    03:44:32

3    jury, but at a minimum I want to make sure that I have    03:44:35

4    an accurate list of the specific mitigating factors    03:44:39

5    that you are presenting.  Is my list comprehensive, or    03:44:42

6    am I missing anything?    03:44:45

7        MS. COOK-REICH:  We would ask for one more, Your    03:45:19

8    Honor, that the daughter of the aggravated circumstance    03:45:20

9    in this case, has formed a bond with Mr. Davis and asks    03:45:23

10   this Court for a life sentence.    03:45:29

11       JUDGE NASTOFF:  So the testimony of Sherry Davis?    03:45:31

12       MS. COOK-REICH:  Yes, Your Honor.    03:45:33

13       JUDGE NASTOFF:  Thank you, counsel.    03:45:41

14       MS. COOK-REICH:  Thank you, Your Honor.    03:45:42

15       JUDGE NASTOFF:  State's rebuttal?    03:45:44

16       MR. OSTER:  May it please the Court, Mr. Eichel,    03:45:46

17   Ms. Cook-Reich, Mr. Porter, Mr. Davis, Your Honors, the    03:46:07

18   simple and undeniable fact of this case is that the    03:46:12

19   aggravating circumstance outweighs the mitigating    03:46:16

20   factors beyond a reasonable doubt.  Period.  Simple.    03:46:21

21       I would like to start by addressing some things    03:46:29

22   that were just said by defense counsel before going    03:46:33

23   into my full summation.  I would like to address a    03:46:35

24   couple of things.  The first is in 1983, 1984, there is    03:46:39

25   no such thing as life without the possibility of    03:46:45

JILL M. CUTTER, RPR
(513) 785-6596

1  parole.  Defense counsel wanted to make an analogy, but          03:46:48

2  there simply is no such sentencing option as life               03:46:53

3  without the possible of parole.  Life to 30 is not,             03:46:57

4  cannot be, was never stated to this Court that it could         03:47:04

5  be guaranteed, and is not an option as life without the         03:47:08

6  opportunity of parole.                                          03:47:13

7       Ms. Cook-Reich discussed my cross-examination of          03:47:17

8  Ms. Mausser from the parole board.  Ms. Mausser said           03:47:21

9  that no parole board member could make that statement.          03:47:26

10 She said she could not make a statement of when, if,            03:47:29

11 how Mr. Davis could be paroled.  She said that -- and           03:47:32

12 Ms. Cook-Reich brought up to this Court that he would          03:47:42

13 spend a large portion of his adult life in prison.             03:47:45

14 That has been done, Your Honors.  That has been done.          03:47:48

15 He is not likely on the first opportunity I believe was        03:47:52

16 what Ms. Cook-Reich said, but when I asked Ms. Mausser         03:47:56

17 when is the next opportunity?  She said it could be in         03:48:01

18 a year.  I said, so what about the next?  A year after        03:48:03

19 that?  Yes.  A year after?  Yes.  So not the first, but        03:48:05

20 a year later?  Possible.  The next year?  Possible.           03:48:11

21      Ms. Cook-Reich said and made an analogy to the           03:48:18

22 prosecutor standing in front of you in a normal case          03:48:22

23 telling you about what the defendant has done, if you         03:48:25

24 were going to impose sentence and contrasted that with        03:48:29

25 the parole board.  Except there is a problem with that.       03:48:31

1   And the problem is in Ms. Mausser's own words that she

2   admitted to me during cross-examination when I asked

3   her about a quote that she gave, her words are that it

4   is her belief that due to the benefit of the

5   information and we went through all of the different

6   information the parole board gets, that they are in a

7   better position then, and I asked her prosecutor's?

8   Yes. Judges? Yes. Family members of the victim?

9   Yes. That they believe they are in a better position

10  because of that information than a prosecutor standing

11  there, a victim's family member standing there, or a

12  judge who would come in front of them and say this

13  person should not be paroled. She stated that clearly

14  to us. So the analogy, the analogy has the bottom fall

15  out of it because that is not the truth of what a

16  parole board would be like and that analogy cannot hold

17  water.

18      She also in that quote said that the prosecutors

19  often times see the person as they did at the time of

20  conviction. That is not, I don't believe a reason why

21  a statement should not be taken for its meaning. And I

22  think maybe it should be taken for its meaning.

23      Ms. Cook-Reich also discussed Victor Davis. I

24  believe she asked the question, what differentiates him

25  from the man that killed two women? I would say the

| | | |
|---|---|---|
| 1 | last six words; the man that killed two women.  And | 03:50:19 |
| 2 | cannot forgotten.  The man that killed two women. | 03:50:24 |
| 3 | Those six words, that answers that question. | 03:50:30 |
| 4 | In discussing Dr. Smith, borderline personality | 03:50:36 |
| 5 | disorder, couple of the things Dr. Smith discussed, a | 03:50:42 |
| 6 | person can be immature, lack of impulse control, | 03:50:46 |
| 7 | inappropriate and intense anger, recurrent physical | 03:50:50 |
| 8 | fights.  Your Honors, that is a person who is a danger. | 03:50:56 |
| 9 | Who is a danger.  There is no such vehicle as life | 03:51:03 |
| 10 | without the possibility of parole in 1984. | 03:51:11 |
| 11 | Your Honors, the law will be the guide here today. | 03:51:21 |
| 12 | The law is simply a system of rules enforced through | 03:51:25 |
| 13 | the institutions, such as we have here that are used to | 03:51:30 |
| 14 | underpin civil obedience in society.  In 350 BC | 03:51:33 |
| 15 | Aristotle said that the law and the rule of law is | 03:51:41 |
| 16 | better than any one individual.  That is an important | 03:51:45 |
| 17 | statement.  The law, as we have it here, to weigh those | 03:51:45 |
| 18 | circumstances and determine that (A)(5) aggravated | 03:51:48 |
| 19 | circumstance outweighs is more important and must be | 03:51:52 |
| 20 | given weight, instead of just swept under a rug because | 03:51:58 |
| 21 | of convenience or any other factor; comfort, ease of | 03:52:03 |
| 22 | decision.  The rule of law is better than the rule of | 03:52:07 |
| 23 | any individual. | 03:52:10 |
| 24 | Now, oftentimes, it is thought of that the law may | 03:52:15 |
| 25 | have an ill-will toward a person, may disfavor, but as | 03:52:24 |

1    the rule of law is stated in black and white, the rule        03:52:29

2    of law has no ill-will toward any person.  It is              03:52:33

3    applied of equal force to those people who come in            03:52:37

4    conflict with it, and if it is done that way, justice         03:52:42

5    can be found.                                                 03:52:46

6        I have heard the analogy a couple of times that if        03:52:49

7    you imagine that there is a locomotive and it is called       03:52:53

8    the law, it rides itself down the tracks, the tracks of       03:52:56

9    truth.  It goes to a small town.  What is important is        03:53:04

10   that that small town shouldn't be called compromise,         03:53:09

11   the small town shouldn't be called convenience, the          03:53:13

12   small town shouldn't be called comfort.  That small          03:53:17

13   town must be justice where that locomotive arrives.          03:53:21

14       In searching for that justice, I call upon this          03:53:28

15   panel for justice in the fullest measure.  Justice is        03:53:31

16   more than a heart-lead compromise.  It is the                03:53:36

17   ascertain, and declaration of the truth.  This decision     03:53:39

18   is not an easy decision to be made, but I suggest to         03:53:48

19   use the law and justice as a shield in this case, to         03:53:56

20   find what the truth is, the defendant's statement and        03:54:03

21   Ms. Cook-Reich brought it up, very simply all I want to      03:54:07

22   say about the defendant's statement is it was not made       03:54:14

23   under oath to you.                                           03:54:16

24       Ms. Cook-Reich mentioned a lot of different things       03:54:21

25   to you and we have talked about the weighing process        03:54:28

1  and I don't want to go over law that this Court is       03:54:35

2  fully aware of, but it is worth mentioning, I believe,    03:54:39

3  that in that weighing process, the aggravating           03:54:42

4  circumstance must outweigh beyond a reasonable doubt     03:54:46

5  the mitigating factor, but not by a great amount.  Can   03:54:50

6  it be a small amount?  Can it be very slight?  Yes.  As  03:54:55

7  long as that aggravating circumstance outweighs beyond   03:55:01

8  a reasonable doubt the mitigating factors, it can be     03:55:06

9  slight, that outweigh beyond a reasonable doubt.  That   03:55:11

10  is enough.                                               03:55:14

11       In looking at the evidence of mitigation that is   03:55:19

12  before this Court, I think that an interesting way to    03:55:24

13  look at this and partly in rebuttal of what the defense  03:55:29

14  is argued is, looking at the typical version of the      03:55:34

15  atypical.  We talk about support and love from family    03:55:39

16  members.  Your Honors, that is typical.  Being typical,  03:55:43

17  the State would argue it deserves very little weight in  03:55:50

18  mitigation.  Support from a pen pal who you have been    03:55:55

19  writing to is typical, deserves very little weight.      03:55:58

20  Testimony by, I believe it is fair to characterize an   03:56:03

21  admitted alcoholic who is leading AA groups, who takes   03:56:11

22  a liking to one of his students, is typical.  Typical    03:56:15

23  should be given little weight.  A good prison record on  03:56:20

24  death row, Scott Nowack testified death row inmates      03:56:25

25  receive fewer write-ups than the general population.     03:56:29

JILL M. CUTTER, RPR
(513) 785-6596

He testified in his experience that is typically what he sees. Good behavior on death row through Mr. Nowack's testimony is typical. Again, entitled to little weight. What I believe and I would argue to this Court -- I strike that I believe -- I would argue to this Court what is atypical is for a person during their lifetime to have purposely killed two women. That is atypical. The atypical in this case, that aggravating circumstance, outweighs all of the typical things that you would expect that have been presented to us in mitigation.

In discussion a couple of minutes ago, there was 11 items I believe that the defense has stated we should look at in mitigation. And we are dealing with a weighing process, but I am struck by a kid's game. I am struck by a kid's game where they come up to you and they offer you let's say 11 nickels. I will give you these 11 nickels, and there is 11, and I will give you these 11 nickels. You give me that one $10.00 bill. I will give you these 11 nickels, just that one $10.00 bill. And the reason we know it is a kid's game is because when reason, logic, the truth of the value, the quality of those items is weighed, a $10.00 bill is much greater than those 11 nickels.

Mr. Porter, during opening comment, opening

| | |
|---|---|
| 1 | statement, said that his theme throughout these | 03:59:00 |
| 2 | proceedings would be that there is no real impact in | 03:59:05 |
| 3 | this case. And I think that that theme is continued by | 03:59:12 |
| 4 | Ms. Cook-Reich continuing to argue to the Court that | 03:59:16 |
| 5 | there is life without the possibility of parole in this | 03:59:21 |
| 6 | case. But respectfully have to disagree that there is | 03:59:25 |
| 7 | no real impact. Respectfully argue that doing the | 03:59:33 |
| 8 | right thing has an impact. Following the law has an | 03:59:41 |
| 9 | impact. Chasing down justice over years and years to | 03:59:46 |
| 10 | making sure that justice prevails has an impact. It | 03:59:54 |
| 11 | must. And justice may be slow. It may appear to grind | 04:00:01 |
| 12 | to a halt at times. It may be elusive. It may be | 04:00:08 |
| 13 | frustrating. It may even appear easier at times to | 04:00:12 |
| 14 | sweep justice under a rug. But Your Honors, justice is | 04:00:17 |
| 15 | what we must aspire to. Justice is that mountain top | 04:00:24 |
| 16 | of human existence that we must get to. Once on the | 04:00:30 |
| 17 | top of that, is only when we can truly see, no matter | 04:00:35 |
| 18 | how slow, no matter how difficult, no matter how | 04:00:39 |
| 19 | painful, justice must be found. Because justice, Your | 04:00:43 |
| 20 | Honors, has an impact. | 04:00:51 |
| 21 | In this case, there is only one verdict that is | 04:00:56 |
| 22 | just. The lives of two women outweigh beyond a | 04:01:02 |
| 23 | reasonable doubt under the (A)(5) factor all mitigation | 04:01:11 |
| 24 | that has been brought before this Court. And for that | 04:01:17 |
| 25 | reason, the law and justice require that the penalty of | 04:01:22 |

JILL M. CUTTER, RPR
(513) 785-6596

1    death be imposed.  Thank you.                          04:01:31

2        JUDGE NASTOFF:  Thank you, Mr. Oster.  All right.  04:01:34

3    Counsel.  We are going to retire to begin our          04:01:40

4    deliberations in this matter.                          04:01:45

5        (Judges confer off the record.)                    04:01:52

6        JUDGE NASTOFF:  All right.  Judge Spaeth raises an  04:02:10

7    issue, which I think is something that we would seek    04:02:12

8    some clarification on first.  Early on in the case, the 04:02:15

9    defense requested that we not review certain portions   04:02:22

10   of the previous transcripts and part of that was the    04:02:24

11   sentencing that originally transpired in the case.      04:02:27

12   There have been some representations that have been      04:02:30

13   made about how the weapons under disability charge was   04:02:34

14   dealt with, but none of that is before us.  We are       04:02:37

15   seeking some clarification.                             04:02:40

16       My understanding based on the order from the        04:02:43

17   District Court and from the decision of the 6th Circuit  04:02:46

18   is that the only matter before us is the resentencing   04:02:51

19   on the aggravated murder with the (A)(5) spec; is that   04:02:57

20   everyone's understanding?                               04:03:04

21       MR. EICHEL:  Yes, Your Honor, that is our           04:03:06

22   position.  No --                                        04:03:08

23       JUDGE NASTOFF:  I saw no reference to it in the     04:03:12

24   order from the District Court.                          04:03:17

25       MR. EICHEL:  All of the Court's decisions had       04:03:18

364

| | | |
|---|---|---|
| 1 | nothing to do with the conviction for the other offense | 04:03:21 |
| 2 | stated in this indictment.  And it is not before the | 04:03:24 |
| 3 | Court. | 04:03:26 |
| 4 | JUDGE NASTOFF:  And has that sentence been served? | 04:03:27 |
| 5 | MR. EICHEL:  To the extent that it is there, I | 04:03:31 |
| 6 | suppose, yes. | 04:03:35 |
| 7 | JUDGE NASTOFF:  Was it imposed consecutively | 04:03:37 |
| 8 | originally? | 04:03:40 |
| 9 | MS. COOK-REICH:  Yes. | 04:03:41 |
| 10 | MR. PORTER:  Yes. | 04:03:42 |
| 11 | MR. EICHEL:  Well, I disagree with that, because | 04:03:43 |
| 12 | there is no possibility of running a term sentence | 04:03:45 |
| 13 | consecutive to a sentence of death.  It is not | 04:03:47 |
| 14 | consecutive to anything right now. | 04:03:51 |
| 15 | JUDGE NASTOFF:  Okay. | 04:03:53 |
| 16 | MR. EICHEL:  It is there.  It is a year and a half | 04:03:55 |
| 17 | and it is there. | 04:03:58 |
| 18 | JUDGE NASTOFF:  All right. | 04:03:59 |
| 19 | JUDGE PATER:  I guess the question behind that | 04:04:00 |
| 20 | question, maybe the State wants to respond to it.  It | 04:04:02 |
| 21 | seems that the defense has proposed an interpretation | 04:04:05 |
| 22 | that if this sentence is changed -- or not changed.  It | 04:04:08 |
| 23 | is a resentencing, so we are starting from scratch | 04:04:13 |
| 24 | basically.  If we determine that the proper sentence is | 04:04:17 |
| 25 | life with the possibility of parole after 30 years, | 04:04:18 |

JILL M. CUTTER, RPR
(513) 785-6596

| | |
|---|---|
| 1 | then does the State concur with what seems to be | 04:04:20 |
| 2 | defense's position that at that point, if the murder | 04:04:24 |
| 3 | sentence was 30 to life, that the other sentence would | 04:04:31 |
| 4 | necessarily run consecutive to the new sentence, if you | 04:04:35 |
| 5 | will?  And have I understood defense correctly?  Is | 04:04:40 |
| 6 | that your position? | 04:04:44 |
| 7 | MR. PORTER:  Could I just confer with counsel for | 04:04:46 |
| 8 | a minute?  I don't mean any disrespect, Your Honor. | 04:04:48 |
| 9 | JUDGE NASTOFF:  We are looking for some direction | 04:04:50 |
| 10 | since that has not been something -- information that | 04:04:52 |
| 11 | has been provided to us. | 04:04:53 |
| 12 | (Defense counsel confer off the record.) | 04:04:58 |
| 13 | JUDGE PATER:  Did I state defense's position | 04:05:05 |
| 14 | correctly? | 04:05:07 |
| 15 | MR. PORTER:  I think that has been our position, | 04:05:08 |
| 16 | yes.  I think -- and I may have overstated it slightly, | 04:05:10 |
| 17 | so I am trying to correct myself and certainly did not | 04:05:14 |
| 18 | mean to mislead the Court.  I think if the Court | 04:05:18 |
| 19 | imposes a sentence of less than death, it has the | 04:05:21 |
| 20 | ability to impose a consecutive sentence, and that is | 04:05:26 |
| 21 | somewhat what we have argued and I guess I made that | 04:05:30 |
| 22 | assumption. | 04:05:33 |
| 23 | JUDGE PATER:  Your position is that we would have | 04:05:33 |
| 24 | to get to that other charge as well, that other count? | 04:05:36 |
| 25 | MS. COOK-REICH:  I believe it is our position that | 04:05:41 |

366

```
1    as the last sentencing court, just like if you had      04:05:43
2    two --                                                   04:05:46
3         JUDGE NASTOFF:  We could run this sentence          04:05:46
4    consecutive to that?                                     04:05:49
5         MS. COOK-REICH:  -- consecutive that, yes.          04:05:49
6         MR. PORTER:  And the only -- and again, I don't do  04:05:52
7    any capital work, so I am probably putting my foot in    04:05:56
8    my mouth.  I am wondering given the law in effect then   04:05:59
9    of whether that sentence would have to be served as a    04:06:04
10   matter of law consecutively or not.                      04:06:05
11        MR. EICHEL:  Your Honors, the answer to that        04:06:09
12   question is no, it is not required to be consecutive.    04:06:10
13   However, and I have case citation, *State vs. Watson*, a 04:06:15
14   Butler County decision, was reversed by the Supreme      04:06:19
15   Court, sent back for resentencing on the capital         04:06:23
16   offense and under that circumstance it was a jury trial  04:06:26
17   so it had to be heard by a single judge and it had to    04:06:29
18   be a life sentence.                                      04:06:34
19        The question raised on the appeal from that         04:06:36
20   sentence whether the Judge could impose the life         04:06:39
21   sentence consecutive to an already existing undisturbed  04:06:43
22   sentence of some years on an aggravated robbery          04:06:50
23   involved in that case, which was undisturbed by the      04:06:57
24   overturning of the death sentence.                       04:07:01
25        JUDGE NASTOFF:  The answer was?                     04:07:02
```

JILL M. CUTTER, RPR
(513) 785-6596

367

1    MR. EICHEL: It was ruled that the Court impose    04:07:04
2    consecutive. They had that discretion.    04:07:07
3        JUDGE PATER: Let me clarify for myself. Is this    04:07:11
4    where we are: Do we have agreement between the two    04:07:15
5    sides that if the sentence we were to come up with for    04:07:18
6    the aggravated murder charge was to be life with the    04:07:22
7    possibility of parole after 30 years, if we did that,    04:07:28
8    then if that is all we stated, that the other -- is it    04:07:31
9    a one year sentence?    04:07:35
10        JUDGE NASTOFF: One and a half.    04:07:36
11        JUDGE PATER: That that would automatically run    04:07:39
12    concurrently if we were mute, but that would have the    04:07:42
13    discretion to go forward and to bring that back up    04:07:46
14    again and to address that?    04:07:49
15        JUDGE NASTOFF: No. We could impose our sentence    04:07:51
16    either concurrent or consecutive to the already imposed    04:07:54
17    sentence.    04:07:56
18        JUDGE PATER: I didn't mean readdress as to the    04:07:57
19    one and a half. I meant readdress as to whether it    04:07:59
20    would be consecutive or concurrent.    04:08:02
21        MS. COOK-REICH: I believe if you are mute, it    04:08:05
22    would be concurrent, but if you were vocal and you say    04:08:06
23    the word consecutive, it runs consecutive.    04:08:08
24        JUDGE PATER: And defense agrees that we could be    04:08:12
25    vocal, but we are not precluded from doing that?    04:08:15

JILL M. CUTTER, RPR
(513) 785-6596

1     MS. COOK-REICH:  Yes, Your Honor.  You are the     04:08:16

2  last sentencing court.     04:08:17

3     MR. EICHEL:  Precisely.     04:08:20

4     JUDGE NASTOFF:  Thank you.  We will be retiring to     04:08:20

5  deliberate, and we will summon you with any updates as     04:08:23

6  to whether we have either reached a decision or if we     04:08:27

7  are going to retire for the evening if we haven't     04:08:30

8  reached a decision yet.     04:08:31

9     (Three-judge panel retired for deliberations at     04:08:34

10  4:08 p.m.)     04:08:45

11     THE COURT:  All right.  We are back on record in

12  State of Ohio vs. Von Clark Davis, CR83-12-0614.  The

13  defendant is present with counsel, Randall Porter and

14  Melynda Cook-Reich.  The State's representatives, Dan

15  Eichel and Mike Oster are also present as are all three

16  members of the panel.  The panel has deliberated and

17  has reached a verdict in this matter and have reduced

18  that to writing.  At this time, will the defendant and

19  counsel please rise?

20     We, the panel of Judges, having been duly

21  impaneled to hear this case, do hereby find the

22  aggravating circumstance that the defendant was found

23  guilty of committing outweighs the mitigating factors

24  presented in this case by proof beyond a reasonable

25  doubt and hereby imposes on the defendant, Von Clark

369

1    Davis, the sentence of death.  Judge Pater, do you

2    concur in this opinion?

3          JUDGE PATER:  I concur.

4          JUDGE NASTOFF:  Judge Spaeth, do you concur in

5    this opinion?

6          JUDGE SPAETH:  I do.

7          JUDGE NASTOFF:  And I concur as well.  You may be

8    seated.  Mr. Davis, you have a right of appeal.  You

9    have a right to have transcripts prepared of these

10   proceedings and if you are indigent, and you cannot pay

11   for them yourself, the Court can provide them at no

12   cost to you.  You have a right to have counsel to

13   represent you in your appeal and if you cannot afford

14   counsel, this Court can appoint counsel at no cost to

15   you as well.

16         A sentencing opinion reflecting this Court's

17   findings will be prepared and filed in accordance with

18   Ohio Revised Code Section 2929.03(F).  I believe the

19   statute calls for an opinion to be filed with the Court

20   of Appeals and the Supreme Court with 15 days and the

21   Court will comply with that statutory provision.

22   Counsel, is there anything further that we need to take

23   up at this time before we adjourn?  From the State?

24         MR. OSTER:  Your Honor, some members of the family

25   are present and we would ask -- they have indicated to

JILL M. CUTTER, RPR
(513) 785-6596

370

1    us they would like to address the Court. We would ask

2    for them to be given that opportunity.

3        JUDGE NASTOFF: Well, a sentence has been

4    rendered. I'm not sure...the sentence has been

5    rendered in the case reflecting the Court's findings.

6    I don't think that we are going to honor that request

7    at this time. Anything further from the defense?

8        MS. COOK-REICH: Your Honor, we would ask that the

9    Court appoint counsel for Mr. Von Clark Davis.

10   Obviously, he is indigent. He has been on death row

11   for 25 years. Whether the Court appoints from our own

12   county or not, he does need that counsel appointment.

13       JUDGE NASTOFF: All right. Do either of you

14   anticipate being counsel for purposes of the appeal?

15       MR. PORTER: We ask that new counsel be appointed

16   so the ineffectiveness challenge can be made on direct

17   appeal as appropriate.

18       JUDGE NASTOFF: All right. Upon the filing of the

19   notice of appeal, the Court will address that matter

20   forthwith. If there is nothing further, then, we are

21   adjourned.

22       (Proceedings adjourned in this matter at 5:10

23   p.m.)

24

25

371

1

2   STATE OF OHIO       )

3                        ) SS.  REPORTER'S CERTIFICATE

4   COUNTY OF BUTLER )

5            I Jill M. Cutter, RPR, do hereby certify that I am

6   a Registered Professional Reporter and Notary Public within

7   the State of Ohio.

8            I further certify that these proceedings were

9   taken in shorthand by me and by electronic means at the time

10   and place herein set forth and was thereafter reduced to

11   typewritten form, and that the foregoing constitutes a true

12   and accurate transcript, all done to the best of my skill and

13   ability.

14            I further certify that I am not related to any of

15   the parties hereto, nor am I in any way interested in the

16   result of the action hereof.

17            Dated at Hamilton, Ohio, this 22 day of December,

18   2009.

19

20                     Jill M. Cutter, RPR

21                     Official Court Reporter

22                     Butler County Common Pleas
                      Hamilton, Ohio  45011

23

24

25

JILL M. CUTTER, RPR
(513) 785-6596

FILED

2010 JAN -8 PM 2:38

FILED BUTLER CO.
COURT OF APPEALS

JAN 06 2010

CINDY CARPENTER
CLERK OF COURT

**IN THE COURT OF COMMON PLEAS**
**BUTLER COUNTY, OHIO**

BUTLER COUNTY
CLERK OF COURTS

STATE OF OHIO,                          *    CASE NO:    CA09-10-0263
                                        *                CR83-12-0614
        Plaintiff,                      *

        vs.                             *

VON CLARK DAVIS,                        *    **NOTICE OF FILING OF**
                                             **COMPLETE TRANSCRIPTION**
Defendant.                                   **OF ALL PROCEEDINGS**

FILED BUTLER CO.
COURT OF APPEALS

JAN 06 2010

CINDY CARPENTER
CLERK OF COURTS

_____

The Clerk of this Court is hereby notified of the filing of

transcripts of all proceedings.  Please cause issuance of

notice of complete record to all parties, pursuant to App.

R. 11(B), Filing of the Record.

Notice from Mary L. Swain
Butler County Official Court Reporter