## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| **VON CLARK DAVIS,** | ) | **Case No. 2:16-cv-495** |
| | ) | |
| **Petitioner,** | ) | **Judge Susan J. Dlott** |
| | ) | **Magistrate Judge Michael R. Merz** |
| **v.** | ) | |
| | ) | |
| **CHARLOTTE JENKINS, Warden,** | ) | <u>**THIS IS A DEATH PENALTY CASE**</u> |
| **Chillicothe Correctional Institution,** | ) | |
| | ) | *No Execution Date Scheduled* |
| **Respondent.** | ) | |

---

## VON CLARK DAVIS'S PETITION
## FOR WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2254

---

Laurence E. Komp (0060142)
  *Lead/Trial counsel*
P.O. Box 1785
Manchester, MO 63011
Phone: (636) 207-7330
lekomp@swbell.net

Erin G. Barnhart (0079681)
  *Co-counsel*
Assistant Federal Public Defender
Federal Public Defender's Office
for the Southern District of Ohio
Capital Habeas Unit
10 W. Broad Street, Suite 1020
Columbus, Ohio 43215
Phone:  (614) 469-2999
Fax:  (614) 469-5999
erin_barnhart@fd.org

*Counsel for Petitioner Von Clark Davis*

## TABLE OF CONTENTS

PETITION FOR WRIT OF HABEAS CORPUS—28 U.S.C. § 2254 ......................................... 1

I.  STATEMENT OF FACTS ........................................................................... 5

    A.  Family Background ........................................................................... 6

    B.  Mr. Davis's Childhood ..................................................................... 6

    C.  Adolescence ...................................................................................... 7

    D.  Adulthood ......................................................................................... 8

    E.  December 12, 1983 ......................................................................... 10

    F.  Mitigation ....................................................................................... 11

    G.  Mr. Davis's exemplary prison record ............................................ 13

    H.  Victim Reconciliation .................................................................... 14

II.  DAVIS'S TRIAL .................................................................................... 15

III.  COUNSEL ............................................................................................ 16

IV.  POST-TRIAL STATE-COURT PROCEEDINGS ........................................ 18

    A.  Direct Appeal—Twelfth District Court of Appeals .................... 18

    B.  Direct Appeal—Supreme Court of Ohio ...................................... 19

    C.  First Resentencing .......................................................................... 22

    D.  Direct Appeal of First Resentencing—Twelfth District Court of Appeals ........................................................................................... 22

    E.  Direct Appeal of First Resentencing—Supreme Court of Ohio ............. 23

    F.  Post-Conviction Litigation ............................................................ 24

    G.  Application to Reopen ................................................................... 38

V.  FEDERAL-COURT PROCEEDINGS ........................................................ 45

    A.  Habeas Proceedings—Federal District Court .............................. 45

    B.  Habeas Proceedings—Sixth Circuit .............................................. 45

VI.  SECOND STATE-COURT PROCEEDINGS .............................................. 45

    A.  Second Resentencing ..................................................................... 45

    B.  Direct Appeal—Twelfth District Court of Appeals .................... 46

    C.  Direct Appeal—Supreme Court of Ohio ...................................... 46

    D.  Second Resentencing Post-Conviction Litigation ....................... 47

VII.  GROUNDS FOR RELIEF ...................................................................... 53

FIRST GROUND FOR RELIEF: ...................................................................... 53

Mr. Davis's waiver of his right to a jury trial was invalid because it was not knowing, intelligent and voluntary, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.............................. 53

    A.    Mr. Davis's jury waiver was not voluntary because the trial court's denial of his motion to sever forced him to waive jury. ......................... 54

    B.    Mr. Davis's jury waiver was not knowing and intelligent because he did not know at the time of the waiver that Ohio Supreme Court would refuse to apply the rule of *Penix* to his case and hold him eligible to be resentenced to death. ........................................... 55

    C.    Mr. Davis's jury waiver was not knowing and intelligent because he did not know when he waived his right to a jury trial in favor of being tried before three specifically identified judges that he was also waiving his jury-trial rights twenty-five years in the future to instead be tried before an entirely different panel of three unknown judges. ......................................................................................... 57

    D.    Mr. Davis's jury waiver was not knowing and intelligent because he did not know that two of the three judges on his panel represented a party adverse to him in a prior case. ................................. 61

    E.    Mr. Davis's jury waiver was not knowing and intelligent because he did not know that a different standard of proof would be applied to him on appeal from a decision by three-judge panel than would have been applied to an appeal from a jury verdict. ............................... 62

SECOND GROUND FOR RELIEF ....................................................................... 67

The trial court violated Mr. Davis's rights under the Sixth and Eighth Amendments and the Due Process Clause when it enforced his jury waiver at two subsequent resentencing hearings. ....................................................................... 67

    A.    The trial court violated Mr. Davis's rights under the Eighth and Sixth Amendments and the Due Process Clause by enforcing his prior jury waiver at his first resentencing when he had no knowledge at the time of the waiver that Ohio Supreme Court would refuse to apply the rule of *Penix* to his case and hold him eligible to be resentenced to death. ........................................... 67

    B.    The trial court violated Mr. Davis's rights under the Eighth and Sixth Amendments and the Due Process Clause by enforcing a stale jury waiver at a new penalty hearing twenty-five years later before an entirely different panel of judges. ........................... 68

THIRD GROUND FOR RELIEF: ........................................................................... 79

Mr. Davis's right to effective assistance of counsel under the Fifth, Sixth, Eighth and Fourteenth Amendments was violated when trial counsel failed to reasonably investigate and present mitigating *Skipper* evidence. ..................................... 79

FOURTH GROUND FOR RELIEF: ....................................................................... 86

Mr. Davis was denied the effective assistance of counsel in violation of his rights as guaranteed by the Fifth , Sixth, Eighth, and Fourteenth Amendments of the United States Constitution due to his counsel's failures in advising him regarding a jury waiver. ................................................................................................................... 86

    A.    Defense counsel were ineffective for failing to inform Mr. Davis about the negative impact a jury waiver would have on appellate review of his case. .................................................................................. 87

    B.    Defense counsel were ineffective for not explaining to Mr. Davis that he could not retract his jury waiver at a new trial and/or penalty phase, regardless of who the panel judges were at a retrial. ....... 89

    C.    Defense counsel were ineffective for not reserving Mr. Davis's right to withdraw his jury waiver. ........................................................... 90

    D.    Defense counsel were ineffective for advising Mr. Davis to waive jury when they knew that he was likely to be sentenced to death because his innocence defense would prevent him from accepting responsibility. ...................................................................................... 93

FIFTH GROUND FOR RELIEF: .............................................................................. 96

Mr. Davis's rights as guaranteed by the Fifth, Eighth and Fourteenth amendments to the United States Constitution were violated when the trial court failed to fully and fairly consider all mitigating evidence. ................................................................... 96

    A.    The trial court erred by unreasonably discounting and inadequately weighing mitigating evidence. .................................................................. 98

    B.    The trial court erred by failing to assign any weight to mitigating evidence. ............................................................................................... 100

    C.    Conclusion ......................................................................................... 101

SIXTH GROUND FOR RELIEF. ............................................................................ 103

The capital specification of a prior homicide that was used in Mr. Davis's case was too remote in time, in violation of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution. ......................................... 103

SEVENTH GROUND FOR RELIEF: ...................................................................... 105

Mr. Davis was denied effective assistance of counsel during his second resentencing hearing when counsel failed to reasonably investigate and present mitigation evidence in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. .......................................................... 105

    A.    Mr. Davis was denied effective assistance of counsel when counsel called Ms. Cynthia Mausser as a mitigating witness ............................ 105

    B.    Mr. Davis was denied effective assistance of counsel when counsel failed to adequately investigate and present Dr. Robert Smith's mitigating evidence. .............................................................................. 109

C.      Mr. Davis was denied effective assistance of counsel when counsel failed to call mitigation investigator John Lee ........................................ 112

D.      Mr. Davis was denied effective assistance of counsel when counsel failed to effectively investigate and present mitigating evidence from Mr. Davis's family ....................................................... 115

E.      Conclusion ........................................................ 119

EIGHTH GROUND FOR RELIEF: ..................................................... 120

Mr. Davis was denied effective assistance of counsel during his second resentencing when counsel failed investigate and seek recusal of biased judges in violation of Mr. Davis's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. ........................................... 120

A.      Mr. Davis was denied the effective assistance of counsel during his second resentencing when counsel failed to seek recusal of Judge Nastoff ....................................................... 120

B.      Mr. Davis was denied the effective assistance of counsel during his second resentencing when counsel failed to conduct *voir dire* of Judge Pater. ....................................................... 122

NINTH GROUND FOR RELIEF: ..................................................... 126

Executing Mr. Davis after more than thirty years on death row constitutes cruel and unusual punishment in violation of the Fifth, Eighth and Fourteenth Amendments to the United States Constitution. ........................................... 126

TENTH GROUND FOR RELIEF: ..................................................... 133

The State obtained Davis's conviction via unnecessarily suggestive procedures and unreliable identifications in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution ...................................... 133

ELEVENTH GROUND FOR RELIEF ..................................................... 137

The state courts violated Mr. Davis's rights under the Fifth, Eighth, and Fourteenth Amendments of the Federal and State Constitutions both times they resentenced him to death. ....................................................... 137

A.      The state courts violated the Fifth, Eighth, and Fourteenth Amendments of the Federal and State Constitutions in determining that Mr. Davis could be eligible for death and in resentencing him to death by departing from the law in effect under *Penix* at the time he was convicted. ....................................................... 137

B.      The trial court violated the Fifth, Eighth, and Fourteenth Amendments of the Federal and State Constitutions in not precluding the death penalty and enforcing the provisions of Ohio Revised Code 2929.03(C)(2)(a) in existence at the time of Mr. Davis's second resentencing in 2009. ....................................................... 139

TWELFTH GROUND FOR RELIEF: ..................................................... 142

iv

MR. Davis was not permitted to inspect the grand jury testimony in his case, in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. .................................................................................................. 142

THIRTEENTH GROUND FOR RELIEF: ........................................................................ 144

The selection of the grand jury foreperson in Mr. Davis's case violated the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution............. 144

FOURTEENTH GROUND FOR RELIEF: ...................................................................... 147

Mr. Davis was not able to introduce the testimony of defense witness Elbert Avery. The trial court's prohibition of this witness's testimony violated the Sixth, Eighth and Fourteenth Amendments to the United States Constitution. ...................... 147

FIFTEENTH GROUND FOR RELIEF. ........................................................................... 149

The specification used at Mr. Davis's capital trial to make him death-eligible was invalid, in violation of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. ........................................................... 149

SIXTEENTH GROUND FOR RELIEF: ........................................................................... 152

Mr. Davis's counsel were ineffective for failing to investigate the circumstances surrounding the prior homicide charged in the capital specification to the aggravated murder charge, in violation of his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.................................... 152

SEVENTEENTH GROUND FOR RELIEF: ..................................................................... 156

The trial court denied defense counsel's motion to sever the two charges contained in the indictment in violation of Davis's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution. ...................... 156

EIGHTEENTH GROUND FOR RELIEF: ........................................................................ 159

Mr. Davis's death sentence is disproportionate and inappropriate in violation of the Fifth and Fourteenth Amendments to the United States Constitution. .................... 159

NINETEENTH GROUND FOR RELIEF ......................................................................... 162

The evidence presented at Mr. Davis's capital trial was insufficient to support a conviction for aggravated murder in violation of Petitioner Davis's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution................................................................................................................... 162

TWENTIETH GROUND: .................................................................................................. 166

Ohio's proportionality review of Mr. Davis's sentence violated the fifth, sixth, Eighth and Fourteenth Amendments. ........................................................................... 166

    A.    Procedural history ................................................................................ 166

    B.    Ohio's flawed proportionality review scheme ...................................... 166

    C.    The Ohio courts fail to consider cases where the death penalty was not imposed when undertaking proportionality review. ........................ 168

D.      Ohio's proportionality review violated Mr. Davis's rights to due process and equal protection under the Fourteenth Amendment........... 171

E.      Conclusion ........................................................................... 172

TWENTY-FIRST GROUND FOR RELIEF: ......................................................... 174

Mr. Davis's constitutional rights to due process, equal protection, and a reliable sentencing were violated by Ohio's inadequate state post-conviction process that failed to provide a remedy for Mr. Davis to fully and fairly vindicate his federal constitutional claims in the state courts. ...................................................... 174

LETHAL-INJECTION GROUNDS FOR RELIEF: ............................................... 180

Factual and Procedural Background for Lethal-Injection Invalidity Claims................ 180

A.      Introduction................................................................................ 180

B.      Lethal injection in Ohio .......................................................... 181

1.      There is no sound medical or clinical basis for Ohio to select drugs to use to execute Mr. Davis. .................. 183

2.      Lethal-injection execution protocols using three drugs from 2004 to 2009................................................. 184

3.      Lethal-injection execution protocols and executions using one or two drugs from 2009 to present ............... 184

i.      November 30, 2009 Execution Protocol........... 184

ii.     March 9, 2011 Execution Protocol ................... 185

iii.    2013 Execution Protocol.................................... 186

iv.     Execution of Dennis McGuire ........................... 186

v.      2014 Execution Protocol.................................... 187

vi.     Execution of Joseph Wood ................................ 188

vii.    January 9, 2015 Execution Protocol ................. 189

viii.   June 29, 2015 Execution Protocol .................... 189

4.      Problems with the use of compounded drugs to carry out a lethal-injection execution of Mr. Davis ....... 190

i.      Compounded drugs are not as safe or effective as FDA-approved drugs. ..................... 190

ii.     Difficulties in obtaining compounded execution drugs .................................................. 194

5.      Importation of drugs to execute Mr. Davis would violate federal law.................................................... 194

6.      DRC has no remaining drug options............................. 196

C.      Von Clark Davis's individual characteristics preclude Ohio from carrying out a lethal injection execution on him without violating the law and his constitutional rights....................................................... 197

TWENTY-SECOND GROUND FOR RELIEF. ...................................................... 198

Ohio's statutory provisions governing the imposition of the death penalty do not meet the prescribed constitutional requirements and are unconstitutional, both on their face and as applied to Mr. Davis, in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution............. 198

TWENTY-THIRD GROUND FOR RELIEF: ........................................................ 209

The State of Ohio cannot constitutionally execute Mr. Davis because the only means available under the law to execution him violate his Eighth Amendment rights. .................................................................................................................... 209

A.      Any drug DRC can procure to use to execute Mr. Davis via lethal injection has a substantial, objectively intolerable risk of causing unnecessary, severe pain, suffering, degradation, humiliation, and/or disgrace in violation of the Eighth Amendment, and Ohio has no other means available to execute Mr. Davis that comply with the Constitution................................................................................. 209

B.      Any drug DRC can procure to use to execute Mr. Davis via lethal injection poses an objectively intolerable risk of causing a lingering and/or undignified death in violation of the Eighth Amendment, and Ohio has no other means available to execute Mr. Davis that comply with the Constitution. ............................................... 212

C.      The lack of legally available, effective drugs to conduct lethal-injection executions will result in the arbitrary and capricious imposition of the death penalty on Mr. Davis in violation of the Eighth Amendment, and Ohio has no other means available to execute Mr. Davis that comply with the Constitution. .......................... 215

D.      The lack of legally obtainable, effective drugs to conduct Mr. Davis's lethal-injection execution, and the reality that Ohio has no other means available to execute Mr. Davis that comply with the Constitution will cause Mr. Davis psychological torture, pain and suffering in violation of the Eighth Amendment. .......................... 217

E.      The unavoidable variations inherent in Ohio's lethal-injection system and DRC's continued and consistent inability to properly administer its execution protocols present a substantial, objectively intolerable risk of serious harm to Mr. Davis in violation of the Eighth Amendment, and Ohio has no other means available to execute Mr. Davis that comply with the Constitution. .......................... 219

F.      Mr. Davis's unique, individual physical and/or mental characteristics will cause any execution by lethal injection under Ohio law to violate the Eighth Amendment, and Ohio has no other means available to execute Mr. Davis that comply with the Constitution................................................................................ 223

TWENTY-FOURTH GROUND FOR RELIEF:.................................................... 225

The State of Ohio cannot constitutionally execute Mr. Davis because the only means available for execution violate the Fourteenth Amendment's Due Process and Privileges or Immunities Clauses.......................................................... 225

A.      Execution by lethal injection under Ohio law will deny Mr. Davis's interests in expecting and receiving a quick and painless death in violation of the Due Process Clause of the Fourteenth Amendment, and Ohio has no other means available to execute Mr. Davis that comply with the Constitution. ......................... 225

B.      Mr. Davis's execution by lethal-injection under Ohio law will be a human experiment on a non-consenting prisoner in violation of the Fourteenth Amendment's Due Process and Privileges or Immunities Clauses, and Ohio has no other means available to execute Mr. Davis that comply with the Constitution. ......................... 226

TWENTY-FIFTH GROUND FOR RELIEF:.......................................................... 231

The State of Ohio cannot constitutionally execute Mr. Davis because the only means available for execution violate the Equal Protection Clause of the Fourteenth Amendment. ................................................................................. 231

A.      Equal Protection – Fundamental Rights ................................................ 231

1.      Underlying constitutional violations in Ohio's lethal-injection system substantially burdens Mr. Davis's fundamental rights, and Ohio has no other means available to execute Mr. Davis that comply with the Constitution..................................................... 231

2.      Unavoidable variation inherent in Ohio's lethal-injection system substantially burdens Mr. Davis's fundamental rights, and Ohio has no other means available to execute Mr. Davis that comply with the Constitution................................................................. 234

B.      Equal Protection – "Class-of-One" Disparate Treatment ..................... 238

TWENTY-SIXTH GROUND FOR RELIEF: .......................................................... 241

The State of Ohio cannot constitutionally execute Mr. Davis because the only means available for execution depend on state execution laws that are preempted by federal law............................................................................................. 241

A.    DRC's actions in obtaining execution drugs, its import, purchase, possession, dispensing, distribution and/or administration (and any other terms of art under the CSA) of those drugs violate the CSA........ 244

    1.    The Ohio lethal-injection statute and DRC's execution protocols, as written and as implemented, purport to permit DRC to obtain controlled substances used in executions without a valid prescription, in violation of the CSA and DEA regulations. .................................................................... 245

        iii.    The Ohio lethal-injection statute and DRC's execution protocols, as written and as implemented, purport to authorize DRC, Central Pharmacy, and Southern Ohio Correctional Facility to provide controlled substances to Drug Administrators in contravention of the CSA and DEA regulations. ......................................................... 247

        iv.    DRC's execution protocols and the Ohio execution statute are preempted by the federal CSA ...................................................... 249

    2.    DRC's actions in obtaining execution drugs, its import, purchase, possession, dispensing, distribution and/or administration (and any other terms of art under the FDCA) of those drugs contravene the FDCA because those drugs used in an execution are unapproved drugs and/or misbranded drugs and/or constitute unapproved Investigational New Drugs. ........................................... 249

        i.    Thiopental sodium can never be used as an execution drug in compliance with the FDCA. ............................................................... 250

        ii.    Drugs that are considered Schedule I drugs can never be used as execution drugs in compliance with FDCA and/or the CSA. .......... 251

        iii.    No drug can ever be used to carry out a lethal-injection human execution because no drug has ever been approved by FDA for the specific purpose of causing death from lethal injection during a human execution or for the purpose of causing a quick and painless death in a human execution................................ 252

iv.    DRC's use of unapproved new drugs in a lethal-injection execution contravenes federal law because it is not subject to an Investigational New Drug Application. ............ 253

v.    DRC's execution protocols and the Ohio execution statute are preempted by the federal FDCA. ..................................................... 254

B.    DRC's actions in obtaining compounded controlled substances for use as execution drugs, its import, purchase, possession, dispensing, distribution and/or administrations (and any other terms of art under the CSA or FDCA) of those drugs violate federal law. ............................................................................................ 255

1.    DRC's actions in obtaining compounded execution drugs, its procurement, obtaining, importing, purchasing, dispensing, distributing, possessing and/or administration (and any other terms of art under the CSA or FDCA) of those drugs violates federal law because compounding drugs for use in an execution violates 21 U.S.C. § 353a and/or § 353b ......................................................................... 256

2.    DRC's actions in obtaining compounded execution drugs, its procuring, obtaining, importing, purchasing, dispensing, distributing, possessing and/or administering (and any other terms of art under the CSA or FDCA) of compounded controlled substances violate various other provisions of the federal drug laws. ............................... 259

3.    DRC's execution protocols and the Ohio execution statute are preempted by federal law. ............................ 261

C.    Conclusion ........................................................................... 261

PRAYER FOR RELIEF ................................................................................. 263

VERIFICATION ............................................................................................ 265

CERTIFICATE OF SERVICE ....................................................................... 266

x

## PETITION FOR WRIT OF HABEAS CORPUS—28 U.S.C. § 2254

Von Clark Davis has been on death row in Ohio since 1984.  He was originally convicted by a three-judge panel of the Butler County Court of Common Pleas for aggravated murder of Suzette Butler and sentenced to death via the electric chair in 1984.  Since then, he has been resentenced to death twice and faced no less than seven execution dates.  His prison record over the past three decades has been exemplary and, over time, convincingly demonstrates his ability to function in prison at a high and very safe level.  Yet each time he has faced a capital sentence, the state court has given this increasingly weighty mitigating factor less and less weight.  Further, the state courts have refused to allow Mr. Davis to withdraw the jury waiver he entered in 1984, even though it was involuntary, unintelligent and unknowing at the time he entered it, and became significantly more so over the next twenty-five years.

In 2007, the Sixth Circuit granted penalty phase relief to Mr. Davis because the state court had wrongly prevented him from introducing *Skipper* evidence of his good prison behavior at his first resentencing hearing.  By the time his second resentencing commenced in 2009 that powerful evidence had multiplied exponentially to constitute an extraordinary twenty-five year record of good behavior and contributions with only a single, minor write-up.  Yet inexplicably, counsel at his second resentencing introduced just a *single two-page summary* of Mr. Davis's extensive prison file and marked by consistent good conduct.  Counsel failed to introduce even all of the *Skipper* evidence proffered in 1989, not to mention any of the additional twenty years' worth of similarly powerful evidence.  The Sixth Circuit had found that the *Skipper* evidence from just the few years proffered in 1989 was powerful; undoubtedly two decades more worth of that evidence would have been even more compelling.

These and other errors by counsel and the state courts render Mr. Davis's conviction and death sentence constitutionally infirm. This court should therefore grant him a writ of habeas corpus.

* * *

Mr. Davis waived his rights to a jury trial in 1984 only because the trial court refused to try separately his charge for murder with his charge for having a weapon under disability. The weapon charge was based on his prior conviction for another murder. The prejudicial impact of a previous murder conviction during the trial of a subsequent murder charge is so obvious that the Ohio General Assembly crafted a procedure for a defendant standing trial for aggravated murder based on a prior murder to prevent the jury from hearing about the first murder conviction during the phase of a capital trial. Mr. Davis elected to exercise this procedure to keep the jury from hearing aggravating circumstance of his prior murder when determining whether to convict him with Ms. Butler's murder.

But Mr. Davis's election turned out to be meaningless because the Court refused to grant his motion to sever the two counts. This denial meant that at a joint trial of both counts, all the facts of his prior murder conviction would come in to prove the weapon-under-disability charge. Thus, although Mr. Davis did not wish to give up his rights to a jury trial, he was forced to do so when the court refused to sever Counts One and Two. Before waiving his jury-trial rights, Mr. Davis requested and obtained the identities of the judges who would make up his panel. Only after he was given this information did he waive jury, and his jury waiver specified that he was waiving to these three specific judges.

The three-judge panel convicted and sentenced Mr. Davis to death. On direct appeal, however, the Ohio Supreme Court reversed his death sentence and remanded for a new penalty

2

phase trial. It held that Mr. Davis would again be eligible for a death sentence upon remand, even though it had previously held that under Ohio law prevailing at the time that death could not be an option at a resentencing trial. *See State v. Penix*, 513 N.E.2d 744 (Ohio 1987). In Mr. Davis's case, the Ohio Supreme Court held the *Penix* rule did not apply to him because he was sentenced by a three-judge panel, not a jury like Mr. Penix.

On remand, Mr. Davis moved to withdraw his jury waiver on the basis that the Ohio Supreme Court's unanticipated ruling departing from *Penix* rendered his waiving unknowing and unintelligent. The panel denied Mr. Davis's request and enforced the previous waiver. In addition, the panel refused to allow Mr. Davis to introduce evidence of his good behavior in prison since his conviction under *Skipper v. South Carolina*, 476 U.S. 1 (1986). It again sentenced him to death.

In a second direct appeal and first post-conviction proceedings, the state courts affirmed Mr. Davis's conviction and sentence. But, Ohio Supreme Court Justice Wright expressed a concern, in the context of the appropriateness review, that the prior determination that death was appropriate would cause the panel at the subsequent resentencing hearing to believe that there was a presumption of validity to the original death sentence, which would inappropriately require Mr. Davis to overcome a presumption as opposed to a reweighing of the aggravating factor and the mitigation anew. *State v. Davis* (*Davis IV*), 584 N.E.2d 1192, 1199 (Ohio 1992) (Wright, J., dissenting) (ECF 4-15, PageID 1693).

In federal court, the Sixth Circuit ruled that Mr. Davis was entitled to habeas relief on his *Skipper* claim. *Davis v. Coyle* (*Davis X*), 475 F.3d 761 (6th Cir. 2007). The court explained that "the core of the analysis in *Skipper* reflects the Court's understanding that the right of a defendant to present evidence of good behavior in prison is particularly relevant when a

prediction of future dangerousness figures centrally in a prosecutor's plea for imposition of the death penalty." *Id*. at 771. After reviewing the evidence that could have been presented, *id*. at 773, the Sixth Circuit concluded that "[t]he *Skipper* error in this case is both indisputable and dispositive," *Id.* at 775.

Back in state court for a second sentencing hearing in 2009, none of the three judges from Mr. Davis's original panel were available. Mr. Davis moved to withdraw his twenty-five-year-old jury waiver for the reasons he had previously argued rendered it invalid at his first resentencing, and for the additional reason that the waiver he had made in 1984 with knowledge of the three specific judges who would constitute his panel now was especially unknowing because he faced a panel composed of three completely different judges. Nevertheless, the court denied his request and enforced this quarter-century old waiver against him.

By this time, defense counsel possessed more than twelve hundred pages of Department and Rehabilitation and Correction records of Mr. Davis's twenty-five years on death row since his conviction. Incredibly, trial counsel presented just few pages of *Skipper* evidence. This evidence failed to provide any anecdotal or corroborative aspects of twenty-five years of Mr. Davis's life. Moreover, without explanation, trial counsel reneged on their promise to present a mitigation specialist to testify to interviews and their substance due to the unavailability of several mitigation witnesses. Counsel also failed to, as promised, present evidence that Mr. Davis would never be paroled.

This Court should grant habeas relief to Von Clark Davis for these and the other constitutional violations alleged below.

4

## I.     Statement of Facts

Von Clark Davis has been an inmate on death row for more than three decades.  He functions extremely well in the structured environment of prison.  Since 1984, he has never been subject to disciplinary control.  He has completed a number of educational programs and has been permitted to work as a clerk and tour guide due to his outstanding conduct.

Outside of prison, Mr. Davis struggled.  Growing up in a dysfunctional household deprived him of the stability necessary to develop a sense of self.  His resulting tendency to idealize people he loves and then impulsively turn to anger in fear of their abandonment caused him to deal with his emotions through aggression.  He lacked the coping mechanisms and thoughtful decision-making of people with healthy personalities.

Between 1964 and 2009, Mr. Davis underwent several psychological evaluations that, taken together, led psychologist Dr. Robert Smith to diagnose him with both borderline personality disorder and alcohol dependence in 2009.  Even though psychologists would not have research-based objective criteria for diagnosing borderline personality disorder until 1987, Mr. Davis's evaluations preceding and following that date demonstrate that his disorder is longstanding and chronic.

During his thirty two years of incarceration, Mr. Davis has addressed the symptoms of his behavioral health problems and excelled living in the structured environment of prison.  His exemplary prison record and multiple reports of good behavior demonstrate that Mr. Davis finally received the help he needed to live a productive life within prison walls.

### A.  Family Background

Mr. Davis grew up in a dysfunctional household.  (2nd Resent'g Tr., Sept. 10, 2009, ECF 5-8, PageID 8458.)  His mother, Alluster, became pregnant with him at seventeen years old when his father, Nick, was sixteen.  (*Id.* at PageID 8460-61.)  His father was rarely home, and when he was, he was often drunk and verbally abusive.  (*Id.* at PageID 8461.)  Mr. Davis's father provided no financial support and no guidance.  (*Id.*)  He had only married Alluster because she was pregnant, and when they finally divorced, he disappeared from Mr. Davis's life entirely.  (*Id.* at PageID 8460-61.)

Mistreated and abandoned by her husband, Mr. Davis's mother began to abuse alcohol and became involved with various men.  (*Id.* at PageID 8462, 8465.)  The Davis household consisted of nine kids with four different fathers, and in the time that Mr. Davis was growing up, his mother was almost always pregnant or nursing.  (*Id.* at PageID 8463.)  One child passed away when he was three months old.  (2nd Resent'g Tr., Sept. 9, 2009,  ECF 5-7, PageID 8304.)  With the majority of her time spent involving herself with men and mothering infants, Alluster neglected to raise or guide Mr. Davis the way that most people's parents do.  (ECF 5-8, PageID 8462-63.)

### B.  Mr. Davis's Childhood

Family members noticed Mr. Davis's immaturity and impulsivity early on.  (*Id.* at PageID 8458.)  Instead of growing up with a supportive family, Mr. Davis cycled between care by members of his extended family, with no one in particular ever establishing themselves as a parental figure.  (*Id.*)  While his grandmother consistently cared for and favored his younger brother, Victor, (ECF 5-7, PageID 8284-85, 8317; ECF 5-8, PageID 8457), no one in his close or extended family provided that role for Mr. Davis.  (ECF 5-8, PageID 8466.)  Victor described his

6

relationship with Mr. Davis as merely "[a]verage." (ECF 5-7, PageID 8275.)  In speaking about Mr. Davis, sister, Carol, talked only about playing games and collecting worms for fishing while they were young.  (*Id.* at PageID 8317.)  His "family members acknowledge[d] that he [was] really not close to anyone.  They talked about him not confiding in them, not sharing with them[,] that he [was] really not emotionally close to any of them."  (ECF 5-8, PageID 8466.)

By the time Alluster married Charles Tipton, Mr. Davis was already fourteen years old and had developed to the point that Mr. Tipton's ability to guide or influence him as a father figure was extremely limited.  (*Id.* at PageID 8465.)  Thus, Mr. Davis's one hope for a supportive, nurturing caretaker arrived too late in his life to influence him.  At first, Mr. Tipton described his relationship with Mr. Davis as "very, very close," citing the example that they went fishing every Saturday.  (ECF 5-7, PageID 8297.)  When asked about what that entailed, however, he conceded that they "rarely shared anything personal," that such closeness "wasn't the type of relationship that they had."  (*Id.* at 8298, ECF 5-8, 8501.)  While Mr. Davis's family sincerely values him, Mr. Davis did not experience love, nurturing, intimacy or any emotional closeness with his family.  (ECF 5-8, PageID 8466.)

**C.**     Adolescence

Mr. Davis dropped out of school before completing ninth grade.  (*Id.* at PageID 8445.) Around age fifteen or sixteen, he began drinking alcohol, and he was drinking hard liquor daily and excessively by age seventeen.  (*Id.* at PageID 8477.)  "[A]ddiction is biological," not just behavioral, (ECF 5-8, PageID 8474), and genetics likely played a role in Mr. Davis's predisposition to alcoholism.  (*Id.*)  His father, mother, two brothers, half-brother, and several maternal uncles and aunts all displayed problematic drinking habits.  (ECF 5-7, PageID at 8273-74; ECF 5-8, PageID 8465, 8477.)

### D.     Adulthood

In 1964, Mr. Davis joined the Navy as a seventeen year old but was discharged just seven months later after impulsively leaving his station in search of his father.  (*Id.* at PageID 8441; PC Ex. E, ECF 4-46, PageID 6361.)  Since the age of twelve, Mr. Davis had not had any contact with his father.  (ECF 5-8, PageID 8441.)   Even though he did not have a bond or relationship with his father, Mr. Davis was still looking for some connection.  (*Id.* at PageID 8466.)  In spite of this, Mr. Davis felt compelled to seek him out, demonstrating the extent of his feelings of neglect and abandonment.  As a result of this incident, the Navy conducted Mr. Davis's first psychological evaluation and determined his emotional instability was "so severe that he [was] not suitable to be in the US Armed Forces."  (*Id.* at PageID 8442.)

After returning from the Navy, Mr. Davis married Ernestine in 1967.  Ernestine became pregnant with two children during the marriage:  Sherry, Mr. Davis's biological daughter, and Michelle, who was determined not to be Mr. Davis's biological child.  (ECF 5-7, PageID 8276.) Less than two years after getting married, the couple filed for divorce.  Despite separating, they remained in a tumultuous relationship and in 1969, Mr. Davis pled guilty to charges of shooting with the intent to wound his wife.  (Trial Tr., ECF 5-3, PageID 7641-42.)

One year later, when Mr. Davis was visiting the children at Ernestine's house, he and Ernestine began to argue.  At the time, Ernestine was living with another man, but a few weeks beforehand she had told Mr. Davis that she would like to get back together.  Mr. Davis also thought she was not taking proper care of the children.  (ECF 5-3, PageID 7647.)  The altercation escalated and ended with Mr. Davis stabbing and killing Ernestine.  (*Id.* at PageID 7645.)  Mr. Davis called 911 and remained at the house for the police to arrive.  (*Id.* at PageID 7646.)  An

investigating officer testified that Mr. Davis fully cooperated and gave two lengthy statements completely admitting his fault.  (*Id.*)

Subsequent mental health evaluations help shed light on Mr. Davis's inability to control his anger and aggression.  A desperate need for relationships triggers paranoia at the prospect of losing them, causing a sudden and dramatic vacillation from love and idealization to anger and hate.  (*Id.* at PageID 8447-48.)  This disposition made Mr. Davis prone to "angry outbursts with very little provocation."  (2nd Resent'g Tr., Sept. 10, 2009, ECF 5-7, PageID 8445.)  Outbursts occur because people like Mr. Davis "don't have good defenses.  They don't have coping strategies. . . . so they act out their emotions in very inappropriate ways."  (*Id.* at PageID 8445-46.)  Mr. Davis's 1971 psychological evaluation pointed to his "immature and impulsive" behavior, consistent with the 1964 evaluation conducted by the Navy.  (*Id.* at PageID 8444-45.)  This evaluation additionally described Mr. Davis as "unstable and hostile" and "afraid of his impulses."  (*Id.* at PageID 8445.)

During his incarceration following Ernestine's death, Mr. Davis maintained an outstanding prison record with no disciplinary problems.  (ECF 5-3, PageID 7614-15.)  In addition to exemplary behavior, he attained his GED, an Associate Degree in Business Administration, and certifications in Vocational Training for Auto School and Masonry.  (*Id.* at PageID 7613-14.)

After Mr. Davis's release from prison, he began dating and living with Suzette Butler in May of 1983.  (ECF 5-3, PageID 7518.)  Upon his release, he also resumed abusing alcohol and drugs.  (ECF 5-8, PageID 8477.)  A in his relationship with Ernestine, both Mr. Davis and Ms. Butler were involved with multiple partners during their relationship.  (*Id.* at PageID 8467.)  By December 1983, Mr. Davis had moved out.  (ECF 5-3, PageID 7519.)

### E.    December 12, 1983

On December 12, 1983, Mr. Davis, barred from possessing a weapon as a result of his prior conviction, asked two men, Mark Lovette and Wade Coleman, to purchase a gun and bullets for him.  (ECF 5-2, PageID 7289-7292, 7309-13.)  Prior to purchasing the gun, Mr. Davis and Mr. Coleman were driving around drinking.  (ECF 5-2, PageID 7310.)  The pair then decided to stop at Gabes, a local bar, to pick up Mr. Lovette.  (*Id.*)  The three men drove to two stores, where Mr. Lovette purchased a firearm and then Mr. Coleman purchased bullets for the gun.  (*Id.*)  Afterwards, they dropped Mr. Lovette back off at Gabes.  (*Id.* at PageID 7311.)  The men soon realized the bullets purchased did not fit the gun, so they drove back to Gabes to pick up Mr. Lovette again.  (*Id.*)  The men then drove to a different store to buy bullets that would fit the gun.  (*Id.* at PageID 7312.)

Sometime after 5:00 p.m., Mr. Davis arrived at the American Legion bar in Butler County after having already consuming alcohol throughout the day.  (*Id.* at PageID 7317, 7335-36.)  Mr. Davis first talked to Ms. Butler individually and then sat at a table with her and her friend, Mona Aldridge.  (*Id.* at PageID 7336-37.)  A few minutes later, Mr. Davis and Ms. Butler walked outside of the bar.  (*Id.* at PageID 7337.)  Shortly thereafter, Ms. Aldridge cracked the bar's door open to look outside for Ms. Butler and said she observed Mr. Davis standing three or four feet away from Ms. Butler pointing a gun at her.  (*Id.* at PageID 7338-39.)  Ms. Butler died as a result of four gunshot wounds to the head.  (*Id.* at PageID 7247.)  That night, Mr. Davis drove to Lexington, Kentucky and then called the police a few days later.  (ECF 5-3, PageID at 7450-51.)

On June 11, 1984, Mr. Davis was convicted of causing Ms. Butler's death with prior calculation and design.  (*Id.* at PageID 7607.)  Both at trial and in his interview with Dr. Fisher in

1984, Mr. Davis denied killing Butler and instead presented a story about a man named Silky

Carr who he says had the gun Mr. Davis obtained earlier that day and was taling with Ms. Butler

outsie the Legion after Mr. Davis left. (*Id.* at PageID 7634-35.) This behavior is consistent with

Mr. Davis's mental health diagnoses as it is "not unusual" for people with borderline

personalities to "make up stories to cover what they are doing" and to persistently restate it for a

period of time. (ECF 5-8, PageID 8501-02.) Despite this initial behavior, by his first

resentencing in 1989, Mr. Davis accepted full responsibility for Ms. Butler's death and admitted

his guilt. (1st Resent'g Tr., Aug. 4, 1989, ECF 5-4, PageID 7720-21.)

      **F.**    **Mitigation**

     In preparation for his second resentencing hearing in 2009, Dr. Robert Smith, a clinical

psychologist and addiction specialist, conducted interviews with Mr. Davis and his family

members. (2nd Resent'g Tr., Sept. 10, 2009, ECF 5-8, PageID 8430-32.) Dr. Smith also

reviewed all of Mr. Davis's past reports to assess the ways in which Mr. Davis's life experiences

influenced his social and emotional development. (*Id.* at PageID 8451-52.) Dr. Smith noted that

previous evaluations consistently traced Mr. Davis's impulsive behavior. (*Id.*) For example, in

1984 Dr. Fisher evaluated Mr. Davis and noted that Mr. Davis reported feeling "on fire inside"

and described his personality as "compulsive" and "explosive." (*Id.* at PageID 8450-51.)

Similarly, in 2002, Dr. Oden evaluated Mr. Davis and noted signs of depression and a

personality disorder. (*Id.* at PageID 8451-52.)

     Mr. Davis exhibits eight of nine symptoms of borderline personality disorder. (*Id.* at

PageID 8438, 8454-56.) These symptoms include: 1) frantic efforts to avoid real or imagined

abandonment, feeling a great need to be involved in a relationship and being afraid to be left

alone; 2) a pattern of unstable intense relationships that involves going from idealizing the

person to devaluing or being angry at the person, which Mr. Davis particularly exhibited with Ernestine and Suzette; 3) identity disturbance, which includes Mr. Davis's sexual identity issues, struggling with his sense of purpose and his inability to set future goals as seen by his work history; 4) impulsivity, as seen by Mr. Davis's substance abuse, decisions to quit his jobs, moving from one place to another and in committing his criminal offenses; 5) affective instability/episodic dysphoria or depression as seen both historically and in Mr. Davis's current interactions; 6) chronic feelings of emptiness, which includes Mr. Davis feeling like he did not have a sense of who he was or where he was going; 7) inappropriate and intense anger, where Mr. Davis overreacted to situations with minimal provocations, as seen with the two most significant situations with Ernestine and Suzette; and 8) transient stress-related paranoid ideation or an intense suspicion of others.  (*Id.* at PageID 8454-56.)  A strong correlation exists between people with borderline personality disorder and those with backgrounds characterized by inadequate parenting and nurturing.  (*Id.* at PageID 8457.)

In addition to borderline personality disorder, Dr. Smith also diagnosed Mr. Davis with alcohol dependence.  (*Id.* at PageID 8438.)  There was likely a biological component that predisposed Mr. Davis to both these conditions.  (*Id.* at PageID 8457, 8474.)  Alcohol abuse exacerbates the borderline personality disorder, "so you have an individual who now is more impaired than if they had the one disorder alone."  (*Id.* at PageID 8478.)  The effects of alcohol—such as unstable emotions, aggression, and poor judgment—mirror the symptoms of borderline personality disorder, creating a "synergy between the two disorders."  (*Id.*)

At one point, Mr. Davis received treatment for his alcoholism, but not for his personality disorder, so the treatment was incomplete and ineffective.  (*Id.* at PageID 8472-73.)  These co-occurring diagnoses help shed light on Mr. Davis's behavior and actions the night of the offense

particularly because Mr. Davis had been drinking prior to committing the offense.  (ECF 5-2, PageID 7310.)

Mr. Davis's impulsivity, in the context of his mental illness, is not necessarily spontaneous and can, instead, take several hours or days to act manifest.  (ECF 5-8, PageID 8494.)  "[I]f a person is responding to a misperception and [his or her] misperception is caused by [his or her] mental illness. . . . it may take [him or her] a period of time to act upon it. . . ." (*Id.*)  When a misperception takes hold, it is a "significant factor" in a person's decision-making. (*Id.* at PageID 8493-94.)

G.    **Mr. Davis's exemplary prison record**

During his time in prison, Mr. Davis has maintained an outstanding prison record with no disciplinary problems.  (ECF 5-3, PageID 7614-15.)  People with borderline personality disorder tend to do well in a structured environment such as prison.  (ECF 5-8, PageID 8448.)  Outside of a structured environment, however, people with borderline personality disorder are prone to reactionary and sometimes aggressive behavior.  (*Id.* at PageID 8448, 8453.)  Mr. Davis's actions fit these expected patterns as his behavior has been outstanding while incarcerated.

During his incarceration for his first conviction in 1971, he attained his GED, an Associate Degree in Business Administration, and certifications in Vocational Training for Auto School and Masonry.  (ECF 5-3, PageID 7613-14.)  Following his incarceration for the instant offense, Mr. Davis again showed excellent prison behavior.  At his first resentencing in 1989, defense counsel proffered this evidence of Mr. Davis's good behavior while on death row.  (1st Resent'g Tr., Aug. 4, 1989, ECF 5-4, PageID 7699-7700.)  Sergeant Pullman, the Assistant Unit Manager of death row at the time, would have testified to Davis's status as an "A" prisoner "permitted certain privileges that the other prisoners are not."  (*Id.* at PageID 7699.)  As the first

block clerk, he was trusted to spend the entire day in the office with documents and paperwork and was later promoted to unit manager clerk.  (*Id.* at PageID 7699-7700.)  He also helped to conduct tours when the warden brought in groups to see death row.  (*Id.* at PageID 7700.)  It was the first time the prison allowed an inmate to work outside of his or her cell, and had Mr. Davis presented problems, they may have discontinued the program altogether.  (*Id.* at PageID 7699-7700.)

Mr. Davis worked for Captain McGraw, who stated that he "has a positive attitude" and a "pleasant personality."  (*Id.* at PageID 7700.)  Both Captain McGraw and Herb Wendler, Mr. Davis's case manager, indicated that he had "no write-ups or conduct problems whatsoever." (*Id.* at PageID 7701.)  Wendler also described Mr. Davis as "cooperative and courteous" and said that he was "dependable and had presented no problems either to staff or the inmates."  (*Id.*)

As of his second resentencing in 2009, Mr. Davis had still never been subject to disciplinary control, had only received one conduct report since 1984, had continued to work as a porter, and had completed a number of programs and community service projects.  His job evaluations indicated that he is a good worker and "has demonstrated excellent adjustment." (DRC Records, PC Ex. E, ECF 4-46, PageID 6281-364.)  He also received a certificate for completing a twelve-week stress management seminar (*id.*), and in 2006 he was moved to the extended privilege unit.

### H.    Victim Reconciliation

Mr. Davis's daughter, Sherry Davis, has developed a "strong bond" with him over the last fifteen years.  (2nd Resent'g Tr., Sept. 9, 2009, ECF 5-7, PageID 8289.)  During this time, Sherry has also forgiven Mr. Davis for the murder of her mother, Ernestine.  (*Id.* at PageID

8290-91.)  Sherry testified that "I would not like to see my father taken away from me as well."
(*Id.* at PageID 8291.)

## II.     Davis's trial

The Honorable Henry J. Bruewer, Court of Common Pleas, originally presided over
Davis's case.

Prior to trial, Davis moved to sever Count One in the Indictment from Count Two so that
there would be separate trials on each count.  (Motion to Sever, Jan. 14, 1984, ECF 4-1, PageID
75.)  He argued that he would otherwise be prejudiced because Count Two required the
introduction of testimony and evidence of his prior murder conviction.  (*Id.*)  He also moved to
bifurcate the trial as to Counts One and Two.  (Motion to Bifurcate Trial / Motion in Limine,
Feb. 1, 1984, ECF 4-1, PageID 127.)  The court overruled both motions.  (Entry, May 4, 1984,
ECF 4-3, PageID 428-29.)

The Court overruled Davis's Motion for Change of Venue, with the caveat that it would
entertain the motion if a jury could not be seated during jury selection.  (Entry, May 4, 1984,
ECF 4-3, PageID 428.)

Davis moved to receive notice of the names of the three judges who would be appointed
to hear the case were he to waive jury.  (Motion for Notice of Prospective Three-Judge Panel,
Apr. 27, 1984, ECF 4-1, PageID 212.)  The defense desired to know what judges would be on a
three-judge panel if Mr. Davis were to waive jury to properly advise their client in making an
informed waiver decision.  (Pretrial Tr., ECF 5-1, PageID 7209.)  The court informed the defense
that the three judges would be Judge Stitsinger, Judge Moser, and Bruewer.  (*Id.*)

In accordance with § 2929.022 of the Ohio Revised Code, Davis elected to have the trial judge, rather than a jury, determine the existence of the aggravated specification. (Waiver and Election, May 4, 1984, ECF 4-3, PageID 432.)

On May 8, 1984, Davis waived his right to a trial by jury and elected to have his case heard by a three-judge panel. (ECF 4-3, PageID 433.) The Honorable William R. Stitsinger and the Honorable John R. Moser joined Judge Henry J. Bruewer to form the panel, with Judge Bruewer presiding. (ECF 4-3, PageID 440.)

Davis's jury waiver states that he "voluntarily waive[s] [his] right to trial by jury and elect[s] to be tried by a court to be composed of three judges, consisting of Judges Henry J. Bruewer, William R. Stitsinger, and John R. Moser. . . ." (Jury Waiver and Election of Three-Judge Panel, May 8, 1984, ECF 4-3, PageID 433.) He additionally stated that he waived jury with full knowledge of his basic right to a trial by jury and without being compelled or unduly influenced. (*Id.*)

From May 9, 1984 to May 11, 1984, the three-judge panel heard the guilt-phase of the trial. The panel found Davis guilty of all charges on May 16, 1984. The mitigation phase began on May 24, 1984. On June 4, 1984, the panel sentenced Davis to death. (Sent'g Op., June 11, 1984, ECF 4-3, PageID 487-89.)

### III. Counsel

Michael Shanks and John Garretson represented Davis at trial. (ECF 4-1, PageID 155.)

Timothy Evans represented Davis on his appeal of right to the Twelfth District Court of Appeals and the Supreme Court of Ohio. (ECF 4-4, PageID 545.)

Michael Shanks and John Garretson represented Davis for his first resentencing. (ECF 4-11, PageID 1116.)

16

Following Davis's first resentencing, Randall M. Dana, Joann Bour-Stokes, and Linda Prucha represented Davis on his appeal of right to the Twelfth District Court of Appeals and the Supreme Court of Ohio (ECF 4-12, PageID 1282; ECF 4-14, PageID 1489), and Tracey Leonard and Linda Prucha represented Davis on in his post-conviction litigation. (ECF 4-20, PageID 2167.)

In federal habeas before the United States District Court for the Southern District of Ohio, John Marshall and Lori Leon represented Davis.

While his federal habeas petition was pending, John Marshall, David Bodiker, and Lori Leon filed two delayed Applications to Reopen each of his direct appeals pursuant to Ohio R. App. P. 26(B) in the Twelfth District Court of Appeals. (ECF 4-25, PageID 2802; ECF 4-26, PageID 2864.) These counsel also represented Mr. Davis on an appeal as of right regarding these application to the Supreme Court of Ohio. (ECF 4-27, PageID 2942.)

Laurence Komp and Alan Freedman represented Davis on appeal to the United States Court of Appeals for the Sixth Circuit.

Following remand, Randall Porter and Melynda Cook-Reich represented Davis at his second resentencing. (ECF 4-29, PageID 3231.)

Following Davis's second resentencing, Laurence Komp, John Parker, and Alan Freedman represented him in his direct appeal to the Supreme Court of Ohio, (ECF 4-43, PageID 5848), and Kort Gatterdam and Erik Henry represented him in his post-conviction proceedings, (ECF 4-47, PageID 6651).

## IV. Post-Trial State-Court Proceedings

### A. Direct Appeal—Twelfth District Court of Appeals

Davis filed his Notice of Appeal to the Twelfth District Court of Appeals on June 18, 1984. (ECF 4-4, PageID 535.) He raised the following issues on direct appeal:

> **First Assignment of Error**
> The court erred in failing to dismiss the death penalty specifications against the defendant on the grounds that the death penalty is unconstitutional.
>
> **Second Assignment of Error**
> The court erred in failing to allow the defendant the right to inspect the grand jury transcript.
>
> **Third Assignment of Error**
> The court erred in denying defendant's motion to bifurcate the trial and to sever the charges.
>
> **Fourth Assignment of Error**
> The judgment was against the manifest weight of the evidence and contrary to law.
>
> **Fifth Assignment of Error**
> The court erred in not dismissing the specification of the indictment that the appellant had committed a prior homicide, on the basis that such specification was too remote in time to be used against appellant.
>
> **Sixth Assignment of Error**
> The court erred in imposing the death penalty as the court found as aggravating factors not listed in the Ohio revised code and factors which were improper for consideration under the Ohio revised code.
>
> **Seventh Assignment of Error**
> Under the proportionality review required to be done by this court, the penalty imposed upon Von Clark Davis is out of proportion to the other sentences given for similar crimes in this county.

(ECF 4-4, PageID 545 *et seq*.)

In an Opinion released May 27, 1986, the Court affirmed the convictions and sentence of

death. *State v. Davis* (*Davis I*), No. CA84-06-071, 1986 WL 5989 (Ohio Ct. App. 12th Dist.

May 27, 1986), (ECF 4-5, PageID 673).

## B.  Direct Appeal—Supreme Court of Ohio

Von Clark Davis filed his Notice of Appeal to the Supreme Court of Ohio on June 23,

1986.  (ECF 4-6, PageID 712.)  He raised the following issues on direct appeal:

> **Proposition of Law I**
> Where The Three Judge Panel Included Non-Statutory
> Aggravating Factors In Weighing The Mitigating Factors, The
> Death Penalty Is Invalid And Contrary To Law.
>
> **Proposition of Law II**
> Where The Trial Court Considered Nonstatutory Aggravating
> Circumstances In Sentencing Defendant To Death, The Court Of
> Appeals May Not Independently Weigh The Aggravating And
> Mitigating Factors But Must Require The Defendant Be
> Resentenced.
>
> **Proposition of Law III**
> Where The Trial Court Denied Defendant's Motion To Bifurcate
> The Trial, When The Defendant Is Charged With Aggravated
> Murder With A Specification That He Was Previously Convicted
> Of Homicide And Also With Having Weapons Under Disability,
> The Defendant's Right To A Trial By An Impartial Jury Is
> Violated And The Case Must Be Remanded For A New Trial.
>
> **Proposition of Law IV**
> Where The Defendant Moves To Dismiss And To Inspect The
> Grand Jury Transcript For Purposes Of Showing That The
> Indictment Against Him Was Not Based Upon Probable Cause
> And That The Indictment Was Founded On Illegal And
> Incompetent Evidence, The Defendant Has A Right To Inspect The
> Grand Jury Testimony, And The Court Errs In Failing To Allow
> The Defendant To Inspect The Grand Jury Transcript.
>
> **Proposition of Law V**
> Where Ohio Revised Code §2929.05 Requires The Court To
> Consider Whether The Sentence Is Excessive Or Disproportionate
> To The Penalty Imposed In Similar Cases, The Penalty Imposed

19

Upon The Appellant Is Out Of Proportion To The Other Sentences
Given In The County.

**Proposition of Law VI**
Where The Court Imposes A Death Sentence Upon The Defendant,
The Court Errs On The Grounds That The Death Penalty Is
Unconstitutional For The Following Reasons:

1. The death penalty as authorized by the Ohio Revised Code,
   deprives the Defendant of his life for that due process of
   law guaranteed in Article One, Section 16 of the Ohio
   Constitution and the Fourteenth Amendment to the United
   State Constitution.

2. Ohio's death penalty violates the Eighth Amendment of the
   United States Constitution and Ohio Constitution, Article
   One, Section 9 prohibiting the infliction of cruel and
   unusual punishment.

3. The death penalty is arbitrarily and capriciously inflicted,
   constituting a denial of equal protection of the laws under
   the Eighth and Fourteenth Amendments of the U.S.
   Constitution and Article One, Section 9 and 16 of the Ohio
   Constitution.

4. The death penalty sections of the Ohio Revised Code
   deprive the Defendant of due process of law under the
   Fourteenth Amendment and Article One, Section 16 of the
   Ohio Constitution and constitute cruel and unusual
   punishment under the Eighth Amendment and Article One,
   Section 9 of the Ohio Constitution as it permits imposition
   of the death penalty on a less than adequate showing of
   guilt. It is also unconstitutional because it requires proof of
   aggravating circumstances during the guilt determination
   state of death penalty deliberations.

5. The death penalty is unconstitutional because it denies the
   Defendant the right to a trial before an impartial jury as
   guaranteed by the Sixth and Fourteenth Amendment to the
   U.S. Constitution and Article 1, Section 10 of Ohio
   Constitution.

6. The death penalty is unconstitutional because it has a
   chilling effect on the Defendant's right to a jury trial
   guaranteed by the Sixth and Fourteenth Amendment to the

U.S. Constitution and Article 1, Section 10 of the Ohio
Constitution.

7. Section 2945.25(C) of the Ohio Revised Code violates the
Defendant's right to an impartial jury on the determination
of guilt.

8. The Ohio death penalty fails to provide a sentencing
authority with an option to choose a life sentence when
there are aggravating circumstances and no mitigating
circumstances and is, therefore, unconstitutional under the
Eighth and Fourteenth Amendments to the U.S.
Constitution and Article 1, Section 9 and 16 of the Ohio
Constitution.

9. The death penalty authorized by the Ohio Revised Code
violates the Eighth Amendment and the Fourteenth
Amendment clauses of the U.S. Constitution and the cruel
and unusual punishment provisions and due process clauses
of the State Constitution in that several of the aggravating
circumstances set forth in Ohio Revised Code 2929.04(A)
are overbroad and vague and fail to reasonably justify the
imposition of the ultimate sentence.

**Proposition of Law VII**
Where The Specification Of The Indictment Charged The
Appellant With A Prior Homicide That Occurred Thirteen Years
Prior To The Homicide In Question, Such Specification Was Too
Remote In Time To Be Used As An Aggravating Circumstance.

**Proposition of Law VIII**
Where The Testimony Of The State's Witnesses Is Contradictory
To The Point That Credibility Is Questionable And The State
Presents No Evidence Of Prior Calculation And Design, The
Conviction Of Aggravated Murder Was Against The Manifest
Weight Of The Evidence.

(ECF 4-6, PageID 732 *et seq.*)

In an Opinion released September 14, 1988, the Supreme Court of Ohio affirmed Davis's

convictions but vacated his sentence of death.  *State v. Davis* (*Davis II*), 528 N.E.2d 925 (Ohio

1988), (ECF 4-9, PageID 1013).

## C.  First Resentencing

In Mr. Davis first resentencing, he attempted withdraw his jury waiver.  (ECF 4-11, PageID 1117-18, 1121-22.)  The trial court denied Mr. Davis's request.  (*Id*. at PageID 1169 .)  Mr. Davis also attempted to present new mitigation.  (*Id*. at PageID 1146-47.)  He requested expert assistance, as well as the opportunity to retain a mitigation specialist.  (*Id*. at PageID 1123-24.)  The trial court denied each of these requests.  (*Id*. at PageID 1168-69.

At his resentencing, Mr. Davis again proffered the evidence related to his good behavior while incarcerated since his previous death sentence.  (ECF 5-4, PageID 7699-7701.)  The three-judge panel then imposed a death sentence upon Mr. Davis.  (*Id*. at PageID 7728; 1st Resent'g Op., Aug. 10, 1989, ECF 4-11, PageID 1176.)

## D.  Direct Appeal of First Resentencing—Twelfth District Court of Appeals

Von Clark Davis filed his Notice of Appeal to the Twelfth District Court of Appeals on September 6, 1989.  (ECF 4-11, PageID 1179.)  He raised the following issues on direct appeal:

**First Assignment of Error**
The Trial Court Erred To The Prejudice Of Appellant Davis By Failing To Allow Him To Present All Available, Relevant Mitigating Evidence At His Resentencing Rearing.

**Second Assignment of Error**
The Trial Court Erred To The Prejudice Of Appellant Davis By Separating During Its Sentencing Deliberations.

**Third Assignment of Error**
The Trial Court Erred To The Prejudice Of Appellant Davis In Overruling His Motion To Prohibit Three-Judge Panel From Resentencing To Death And His Motion To Withdraw Jury Waiver.

**Fourth Assignment of Error**
The Death Sentence Imposed In Defendant-Appellant's Case Was Inappropriate And Disproportionate And Violated The Eighth And

Fourteenth Amendments To The United States Constitution And
Sections 9 And 16, Article I Of The Ohio Constitution.

**Fifth Assignment of Error**
The Trial Court Erred In Imposing The Death Sentence On
Appellant Davis Because The Death Penalty Scheme In Ohio Is
Unconstitutional.

(ECF 4-12, PageID 1283 *et seq.*)

In an Opinion released October 29, 1990, the Court affirmed the convictions and sentence

of death. *State v. Davis* (*Davis III*), No. CA89-09-123, 1990 WL 165137 (Ohio Ct. App. 12th

Dist. Oct. 29, 1990), (ECF 4-13, PageID 1437).

## E. Direct Appeal of First Resentencing—Supreme Court of Ohio

Von Clark Davis filed his Notice of Appeal to the Supreme Court of Ohio on November

27, 1990. (ECF 4-14, PageID 1458.) He raised the following issues on direct appeal:

**Proposition of Law No. I**
A Capital Defendant, Facing The Possibility Of A Death Sentence,
Must Be Permitted To Introduce All Available Relevant Mitigating
Evidence At His Resentencing Hearing. To Not Allow Him To Do
So Violates The Fifth, Sixth, Eighth And Fourteenth Amendments
To The United States Constitution And Sections 9, 10 And 16,
Article I Of The Ohio Constitution.

**Proposition of Law No. II**
The Appropriateness Review Conducted By The Court Of Appeals
Of Appellant Davis's Death Sentence Failed To Comply With The
Requirements Of R.C. 2929.05 And The Fifth, Eighth And
Fourteenth Amendments To The United States Constitution And
Sections 2, 9 And 16, Article I Of The Ohio Constitution.

**Proposition Of Law No. III**
The Death Sentence Imposed In Appellant Davis's Case Was
Inappropriate Violating The Fifth, Eighth And Fourteenth
Amendments To The United States Constitution And Sections 9
And 16, Article I Of The Ohio Constitution.

**Proposition Of Law No. IV**
Appellant Davis's Rights Under The Fifth, Sixth, Eighth And
Fourteenth Amendments To The United States Constitution And
Sections 2, 9, 10 And 16, Article I Of The Ohio Constitution Were

Violated When The Three Judge Panel Separated During Its
Deliberations.

**Proposition Of Law No. V**
The Trial Court's Decision To Not Allow Appellant Davis To
Withdraw His Jury Waiver And To Subsequently Resentence Him
To Death Violated The Fifth, Sixth, Eighth And Fourteenth
Amendments To The United States Constitution And Sections 2, 9,
10 And 16, Article I Of The Ohio Constitution.

**Proposition Of Law No. VI**
The Fifth, Eighth And Fourteenth Amendments To The United
States Constitution, Sections 10 And 16, Article I Of The Ohio
Constitution And Ohio Revised Code Section 2929.05 Guarantee
A Convicted Capital Defendant A Fair And Impartial Review Of
His Death Sentence.  The Statutorily Mandated Proportionality
Process In Ohio Is Fatally Flawed Thereby Denying Appellant
Davis The Above Rights.

**Proposition Of Law No. VII**
The Fifth, Sixth, Eighth And Fourteenth Amendments To The
United States Constitution And Sections 2, 9, 10 And 16, Article I
Of The Ohio Constitution Establish The Requirements For A Valid
Death Penalty Scheme. Ohio Revised Code, Sections 2903.01,
2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 And
2929.05, Ohio's Statutory Provisions Governing The Imposition
Of The Death Penalty, Do Not Meet The Prescribed Constitutional
Requirements And Are Unconstitutional, Both On Their Face And
As Applied To Appellant Davis.

(ECF 4-14, PageID 1490 *et seq.*)

In an Opinion released February 19, 1992, the Supreme Court of Ohio affirmed Davis's

convictions but vacated his sentence of death.  *State v. Davis* (*Davis IV*), 584 N.E.2d 1192 (Ohio

1992), (ECF 4-15, PageID 1685).

## F.  Post-Conviction Litigation

Davis filed a timely post-conviction petition under Ohio Revised Code § 2953.21 *et seq.*

on October 8, 1993.  (ECF 4-17, PageID 1824.)

In his Petition, Davis raised the following issues:

**FIRST CAUSE OF ACTION**
The judgment against Petitioner Davis is void or voidable because
Petitioner Davis was not permitted to inspect the grand jury
testimony in his case, in violation of the Petitioner's rights under
the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United
States Constitution and Article I, Sections 2, 9, 10 and 16 of the
Ohio Constitution.

**SECOND CAUSE OF ACTION**
The judgment against Petitioner Davis is void or voidable because
the evidence presented at his capital trial was insufficient to
support a conviction for aggravated murder in violation of
Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth
Amendments of the United States Constitution and Article I,
Sections 10 and 16 of the Ohio Constitution and thereby Petitioner
was prejudiced.

**THIRD CAUSE OF ACTION**
The judgment against Petitioner Davis is void or voidable because
the trial court denied Petitioner's motion to sever the two charges
contained in the indictment, in violation of Petitioner's rights under
the Fifth, Sixth, Eighth and Fourteenth Amendments of the United
States Constitution and Article I, Sections 10 and 16 of the Ohio
Constitution and thereby Petitioner was prejudiced.

**FOURTH CAUSE OF ACTION**
The judgment against Petitioner Davis is void or voidable because
the capital specification of a prior homicide that was used in
Petitioner's case was too remote in time, in violation of Petitioner
Davis's rights under the Fifth, Sixth, Eighth and Fourteenth
Amendments of the United States Constitution and Article I,
Sections 10 and 16 of the Ohio Constitution and thereby Petitioner
was prejudiced.

**FIFIH CAUSE OF ACTION**
The judgment against Petitioner Davis is void or voidable because
he was denied the effective assistance of counsel in violation of his
constitutional rights as guaranteed by the Fifth, Sixth, Eighth, and
Fourteenth Amendments of the United States Constitution and
Article I, Sections 2, 9, 10, and 16 of the Ohio Constitution.

**SIXTH CAUSE OF ACTION**

The judgment against Petitioner Davis is void or voidable because
Petitioner Davis was not permitted to introduce relevant, available
mitigating evidence at his resentencing hearing in violation of the
Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth
Amendments of the United States Constitution and Article I,
Sections 2, 9, 10 and 16 of the Ohio Constitution.

**SEVENTH CAUSE OF ACTION**

The judgment against Petitioner Davis is void or voidable because
Petitioner Davis was not afforded a proper review in the Court of
Appeals of his death sentence, in violation of Petitioner's rights
under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the
United States Constitution and Article I, Sections 2, 9, 10 and 16
of the Ohio Constitution.

**EIGHTH CAUSE OF ACTION**

The judgment against Petitioner Davis is void or voidable because
the death sentence imposed on Petitioner was inappropriate, in
violation of Petitioner's rights under the Fifth, Sixth, Eighth, and
Fourteenth Amendments of the United States Constitution and
Article I, Sections 10 and 16 of the Ohio Constitution.

**NINTH CAUSE OF ACTION**

The judgment against Petitioner Davis is void or voidable because
at the resentencing hearing in Petitioner's case, the three-judge
panel separated during its deliberations in violation of Petitioner's
rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments
of the United States Constitution and Article I, Sections 2, 9, 10
and 16 of the Ohio Constitution.

**TENTH CAUSE OF ACTION**

The judgment against Petitioner Davis is void or voidable because
the trial court's decision to not allow Petitioner Davis to withdraw
his jury waiver was a violation of Petitioner's rights under the
Fifth, Sixth, Eighth, and Fourteenth Amendments of the United
States Constitution and Article I, Sections 10 and 16 of the Ohio
Constitution.

**ELEVENTH CAUSE OF ACTION**

The judgment against Petitioner Davis is void or voidable because
the statutorily mandated proportionality process in Ohio is fatally
flawed, in violation of the Petitioner's rights under the Fifth, Sixth,
Eighth, and Fourteenth Amendments of the United States

Constitution and Article I, Sections 10 and 16 of the Ohio Constitution and thereby Petitioner was prejudiced.

**TWELTH CAUSE OF ACTION**
The judgment against Petitioner Davis is void or voidable because Ohio's statutory provisions governing the imposition of the death penalty, do not meet the prescribed constitutional requirements and are unconstitutional, both on their face and as applied to Petitioner Davis in violation of Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution and thereby Petitioner was prejudiced.

**THIRTEENTH CAUSE OF ACTION**
The judgment against Petitioner Davis is void or voidable because of errors in the trial court's resentencing opinion of August 11, 1989 in violation of Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States and Article I, Sections 10 and 16 of the Ohio Constitution.

**FOURTEENTH CAUSE OF ACTION**
The judgment against Petitioner Davis is void or voidable because the state reviewing courts failed to conduct a meaningful and independent review of Petitioner's sentence, in violation of the Petitioner's right under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and Article I, Section 10 and 16 of the Ohio Constitution and thereby Petitioner was prejudiced.

**FIFTEENTH CAUSE OF ACTION**
The judgment against Petitioner Davis is void or voidable because the Ohio appellate courts used an unconstitutional standard of review in deciding his case, in violation of Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.

**SIXTEENTH CAUSE OF ACTION**
The judgment against Petitioner is void or voidable because his death sentence was secured through the use of a statutory scheme that violated his constitutional rights as guaranteed by the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Sections 2 and 9, Article I of the Ohio Constitution.

**SEVENTEENTH CAUSE OF ACTION**

The judgment against Petitioner Davis is void or voidable because he waived his right to trial by jury without being informed that by waiving a jury he subjected himself to an increased risk of death in violation of his constitutional rights as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Sections 5 and 16, Article I of the Ohio Constitution.

**EIGHTEENTH CAUSE OF ACTION**

The judgment and conviction against Petitioner Davis are void or voidable because his waiver of his right to a jury trial was invalid in violation of his constitutional rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 5, 9, 10 and 16, Article I of the Ohio Constitution thereby prejudicing Petitioner Davis.

**NINETEENTH CAUSE OF ACTION**

The judgment and conviction against Petitioner Davis are void or voidable because Petitioner did not make a knowing, intelligent and voluntary waiver of his right to trial by jury in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 5, 9 and 16, Article I of the Ohio Constitution and thereby Petitioner was prejudiced.

**TWENTIETH CAUSE OF ACTION**

The judgment against Petitioner is void or voidable because his waiver of his right to a jury trial was not voluntary and consequently was invalid in violation of his constitutional rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 5, 9, 10 and 16, Article I of the Ohio Constitution.

**TWENTY-FIRST CAUSE OF ACTION**

The judgment and conviction against Petitioner Davis are void or voidable because he was denied the effective assistance of counsel in violation of his constitutional rights as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10, and 16, Article I of the Ohio Constitution.

**TWENTY-SECOND CAUSE OF ACTION**

The judgment against Petitioner is void or voidable because his conviction was obtained through the use of an unnecessarily suggestive identification procedure in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States

Constitution and Sections 2, 9, 10 and 16, Article I of the Ohio
Constitution.

## TWENTY-THIRD CAUSE OF ACTION

The judgment against Petitioner is void or voidable because the
State introduced improper rebuttal evidence at the penalty phase of
Petitioner's capital trial in violation of the Eighth and Fourteenth
Amendments of the United States Constitution and Sections 9 and
16, Article I of the Ohio Constitution.

## TWENTY-FOURTH CAUSE OF ACTION

The judgment against Petitioner is void or voidable because
Petitioner was not able to introduce the testimony of defense
witness Elbert Avery. The trial court's prohibition of this
witness's testimony violated the Sixth, Eighth and Fourteenth
Amendments to the United States Constitution and Sections 9, 10
and 16, Article I of the Ohio Constitution.

## TWENTY-FIFTH CAUSE OF ACTION

The judgment against Petitioner is void or voidable because he was
deprived of his constitutional right to expert assistance at his
resentencing hearing in violation of the Sixth, Eighth and
Fourteenth Amendments to the United States Constitution, Section
10, Article I of the Ohio Constitution, Section 39, Article II of the
Ohio Constitution and O.R.C. 2929.024.

## TWENTY-SIXTH CAUSE OF ACTION

The judgment against Petitioner is void or voidable because the
specification used at Petitioner's capital trial to make him death
eligible was invalid, in violation of Petitioner's rights under the
Fifth, Sixth, Eighth and Fourteenth Amendments to the United
States Constitution and Sections 9 and 16, Article I of the Ohio
Constitution.

## TWENTY-SEVENTH CAUSE OF ACTION

The judgment against Petitioner is void or voidable because
Petitioner's counsel were ineffective for failing to investigate the
circumstances surrounding the prior homicide charged in the
specification to Petitioner's aggravated murder charge, in violation
of Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth
Amendments to the United States Constitution and Sections 9 and
16, Article I of the Ohio Constitution.

## TWENTY-EIGHTH CAUSE OF ACTION

Petitioner's death sentence is void or voidable because he was not
permitted to introduce all relevant mitigating evidence at his

> resentencing hearing.  This prohibition violated Petitioner's right
> to present a defense and his constitutional right to present all
> available, relevant mitigating evidence.  Further, the proscription
> resulted in a mandatory death sentence for Petitioner.  The trial
> court's actions violated the Fifth, Sixth, Eighth and Fourteenth
> Amendments to the United States Constitution and Article I,
> Sections 2, 9, 10 and 16 of the Ohio Constitution.

(*Id*. at PageID 1824 *et seq*., ECF 4-18, PageID 1865 *et seq*.)

In Findings of Fact, Conclusions of Law, and Entry filed June 30, 1995, the Court of

Common Pleas denied Davis's petition.   *State v. Davis* (*Davis V*), No. CR83-12-0614 (Butler Ct.

Com. Pl. June 30, 1995), (ECF 4-20, PageID 2158).

Davis timely appealed to the Ohio Twelfth District Court of Appeals.  (ECF 4-21, PageID

2171.)   He raised the following Assignments of Error:

> **Assignment Of Error No. I**
> The Trial Court Erred When It Denied Appellant Davis An
> Evidentiary Hearing Based On The Doctrine Of Res Judicata, Thus
> Violating His Rights Under The Fifth, Sixth, Eighth, Ninth And
> Fourteenth Amendments To The United States Constitution And
> Article I, Sections 1, 2, 9, 10, 16, And 20 Of The Ohio
> Constitution.
>
> **Assignment Of Error No. II**
> The Trial Court Erred When It Dismissed Appellant Davis's Third
> Cause Of Action.
>
> **Assignment Of Error No. III**
> The Trial Court Erred By Granting The Prosecutor's Motion To
> Dismiss As To Petitioner-Appellant's Fifth Cause Of Action.
>
> **Assignment Of Error No. IV**
> The Trial Court Erred By Granting The Prosecutor's Motion To
> Dismiss As To Petitioner-Appellant's Sixth Cause Of Action.
>
> **Assignment Of Error No. V**
> The Trial Court Erred By Granting The Prosecutor's Motion To
> Dismiss As To Petitioner-Appellant's Eighth Cause Of Action.

**Assignment of Error No. VI**
The Trial Court Erred When It Dismissed Appellant Davis's
Eleventh Cause Of Action.

**Assignment of Error No. VII**
The Court Erred In Dismissing Appellant Davis's Fifteenth Cause
Of Action.

**Assignment of Error No. VIII**
The Trial Court Erred In Dismissing Appellant's Sixteenth Cause
Of Action.

**Assignment of Error No. IX**
The Trial Court Erred In Dismissing Appellant Davis's
Seventeenth Cause Of Action.

**Assignment of Error No. X**
The Trial Court Erred By Granting The Prosecutor's Motion To
Dismiss As To Petitioner-Appellant's Eighteenth Cause Of Action.

**Assignment of Error No. XI**
The Trial Court Erred When It Dismissed Appellant Davis'
Nineteenth Cause Of Action, In Violation Of His Rights
Guaranteed By The Fifth, Sixth, Eighth And Fourteenth
Amendments To The United States Constitution And Sections 5, 9,
And 16 Of Article I Of The Ohio Constitution.

**Assignment of Error No. XII**
The Trial Court Erred By Granting The Prosecutor's Motion To
Dismiss As To Petitioner-Appellant's Twentieth Cause Of Action.

**Assignment of Error No. XIII**
The Trial Court Erred By Granting The Prosecutor's Motion To
Dismiss As To Petitioner-Appellant's Twenty-First Cause Of
Action.

**Assignment of Error No. XIV**
The Trial Court Erred By Granting The Prosecutor's Motion To
Dismiss As To Petitioner-Appellant's Twenty-Second Cause Of
Action.

**Assignment of Error No. XV**
The Trial Court Erred When It Dismissed Appellant Davis's
Twenty-Third Claim.

**Assignment of Error No. XVI**
The Trial Court Erred By Granting The Prosecutor's Motion To
Dismiss As To Petitioner-Appellant's Twenty-Fourth Cause Of
Action.

**Assignment of Error No. XVII**
The Trial Court Erred When It Dismissed Appellant Davis'
Twenty -Fifth Claim.

**Assignment of Error No. XVIII**
The Trial Court Erred By Granting The Prosecutor's Motion To
Dismiss As To Petitioner-Appellant's Twenty-Sixth Cause Of
Action.

**Assignment of Error No. XIX**
The Trial Court Erred By Granting The Prosecutor's Motion To
Dismiss As To Petitioner-Appellant's Twenty-Seventh Cause Of
Action.

**Assignment of Error No. XX**
The Trial Court Erred By Granting The Prosecutor's Motion To
Dismiss As To Petitioner-Appellant's Twenty-Eighth Cause Of
Action.

**Assignment of Error No. XXI**
Appellant Davis Has Been Denied The Opportunity For An
Adequate Appeal In Violation Of The Due Process Clause Of The
Fourteenth Amendment.

(ECF 4-21, PageID 2232 *et seq.*)

In an Opinion dated September 30, 1996, the Ohio Twelfth District Court of Appeals

affirmed the judgment of the trial court denying Davis's Petition for Post-Conviction Relief.

*State v. Davis* (*Davis VI*), No. CA95-07-124, 1996 WL 551432 (Ohio Ct. App. 12st Dist. Sept.

30, 1996) (ECF 4-23, PageID 2571).

Davis timely filed a Notice of Appeal and a Memorandum in Support of Jurisdiction in

the Supreme Court of Ohio.  (ECF 4-24, PageID 2610, 2613.)   He raised the following

Propositions of Law:

**Proposition Of Law No. I**
When A Death Penalty Is Affirmed By Denial Of A Petition For
Post-Conviction Relief, A Post-Conviction Petitioner Has An
Appeal As A Matter Of Right To The Supreme Court Of Ohio.

**Proposition Of Law No. II**
A Trial Court Cannot Deny An Evidentiary Hearing To A Post -
Conviction Petitioner When His Petition Is Sufficient On Its Face
To Raise Constitutional Claims Which Depend On Factual
Allegations That Cannot Be Determined From The Record. U.S.
Const., Amends. V, VI, VIII, IX, XIV; Ohio Const., Art. I, §§ 1, 2,
9, 10, 16, 20.

**Proposition Of Law No. III**
A Trial Court Cannot Summarily Dismiss A Postconviction
Petition Based On Res Judicata Without Affording The Petitioner
The Opportunity To Conduct Discovery Of Facts And Evidence
Necessary To Justify His Opposition To Summary Dismissal. U.S.
Const., Amends. V, VI, VIII, IX, XIV; Ohio Const., Art. I, §§ I, 2,
9, 10, 16 and 20.

**Proposition Of Law No. IV**
The Conviction And Sentences Of A Defendant Must Be Reversed
When He Is Denied The Effective Assistance Of Counsel At Both
The Guilt And Penalty Phases Of His Capital Trial. U.S Const.,
Amends. VI, VIII, XIV.

**Proposition Of Law No. V**
A Capital Defendant's Due Process Rights Are Violated When The
Trial Court Fails To Sever Charges In The Indictment When The
Defendant Demonstrates Prejudice Which Cannot Be Overcome
By The State's Demonstration That The Evidence Would Have
Come In Under Evid. R. 404(B) or§ 2945.59. U.S. Const.,
Amends. V, VI, VIII, IX, XIV; Ohio Const., Art. I, §§ 1, 2, 9, 10,
16, 20.

**Proposition Of Law No. VI**
A Trial Court Cannot Prevent A Capital Defendant From
Introducing Relevant, Available Mitigating Evidence At His
Resentencing Hearing. U.S. Const., Amends. V, VI, VIII, IX, XIV;
Ohio Const., Art. I, §§ 1, 2, 9, 10, 16, 20.

**Proposition Of Law No. VII**
A Capital Defendant's Death Sentence Must Be Vacated When It
Is Inappropriate. U.S. Const., Amends. V, VI, VIII, IX, XIV; Ohio
Const., Art. I, §§ 1, 2, 9, 10, 16, 20.

**Proposition Of Law No. VIII**
A Presumption That Errors Which Occurred At Appellant's
Capital Trial Before A Three Judge Panel Were Harmless Violates
Appellant's Equal Protection And Due Process Rights. U.S.
Const., Amends. V, VI, VIII, IX, XIV; Ohio Const., Art. I, §§ 1, 2,
9, 10, I6, 20.

**Proposition Of Law No. IX**
When An Appellant's Death Sentence Is Secured Through The
Use Of A Statutory Scheme That Violated His Constitutional
Rights As Guaranteed By The Fifth, Eighth, And Fourteenth
Amendments To The United States Constitution And Sections 2
And 9, Article I Of The Ohio Constitution, The Sentence Is
Arbitrary And Must Be Reversed.

**Proposition Of Law No. X**
When A Defendant Is Misinformed By The Court As To The
Standard Of Proof, A Waiver Of The Right To A Jury Trial Is
Invalid And A Violation Of Rights As Guaranteed By The Fifth,
Sixth, Eighth And Fourteenth Amendments To The United States
Constitution And Sections 2, 5, 9, 10 And 16, Article I Of The
Ohio Constitution.

**Proposition Of Law No. XI**
A Capital Defendant's Rights Guaranteed By The Fifth, Sixth,
Eighth And Fourteenth Amendments To The United States
Constitution And Sections 5, 9, And 16 Of Article I Of The Ohio
Constitution Are Violated When He Does Not Knowingly And
Intelligently Waive A Jury Trial.

**Proposition Of Law No. XII**
When A Defendant Is Forced To Waive His Right To A Jury Trial,
And The Waiver Is Obtained In Violation Of Constitutional Rights
As Guaranteed By The Fifth, Sixth, Eighth And Fourteenth
Amendments To The United States Constitution and Sections 2, 5,
9, 10 and 16, Article I Of The Ohio Constitution.

**Proposition Of Law No. XIII**
When a Defendant Does Not Know All The Circumstances
Relevant To A Jury Waiver, His Waiver Is Obtained
Unknowingly, In Violation Of His Constitutional Rights As
Guaranteed By The Fifth, Sixth, Eighth And Fourteenth
Amendments To The United States Constitution And Sections 2, 5,
9, 10 And 16, Article I Of The Ohio Constitution.

**Proposition Of Law No. XIV**
When A Defendant Is Denied The Effective Assistance Of Counsel
In Violation Of His Constitutional Rights As Guaranteed By The
Fifth, Sixth, Eighth, And Fourteenth Amendments To The United
States Constitution And Sections 2, 9, 10, And 16, Article I Of The
Ohio Constitution, The Resulting Conviction And Sentence Must
Be Reversed.

**Proposition Of Law No. XV**
When A Conviction Is Obtained Through The Use Of An
Unnecessarily Suggestive Identification Procedure, It Is A
Violation Of The Fifth, Sixth, Eighth And Fourteenth Amendments
To The United States Constitution And Sections 2, 9, 10 And 16,
Article I Of The Ohio Constitution, And Must Be Vacated.

**Proposition Of Law No. XIV**
Improper Rebuttal Evidence Introduced During The Penalty Phase
Of A Capital Trial Violates The Eighth Amendment Standards
Imposed In Capital Cases.

**Proposition Of Law No. XVII**
When The Trial Court Prohibits The Testimony Of A Crucial
Defense Witness, The Defendant's Rights Under The Sixth, Eighth
And Fourteenth Amendments To The United States Constitution
And Sections 9, 10 And 16, Article I Of The Ohio Constitution
Have Been Violated.

**Proposition Of Law No. XVIII**
Denial Of The Right To Present All Relevant Mitigation Evidence
During A Capital Resentencing Hearing Violated Appellant's
Statutory And Constitutional Rights. U.S. Const., Amends. V, VI,
Viii, IX, XIV; Ohio Const., Art. I, §§ 1, 2, 9, 10, 16, 20.

**Proposition Of Law No. XIX**
When The Specification Used At A Capital Trial To Make The
Defendant Death Eligible Is Invalid, It Is A Violation Of Rights
Under The Fifth, Sixth, Eighth And Fourteenth Amendments To
The United States Constitution And Sections 9 And 16, Article I
Of The Ohio Constitution.

**Proposition Of Law No. XX**
Where Counsel Failed To Investigate The Circumstances
Surrounding A Prior Homicide Charge In A Specification To
Defendant's Aggravated Murder Charge, Counsel Is Ineffective,
And The Appellant Has Been Denied Rights Under The Fifth,
Sixth, Eighth And Fourteenth Amendments To The United States

Constitution and Sections 9 And 16, Article I Of The Ohio
Constitution.

**Proposition Of Law No. XXI**
Where A Defendant Is Not Permitted To Introduce All Relevant
Mitigating Evidence At His Resentencing Hearing, The
Defendant's Right To Present A Defense And His Constitutional
Right To Present All Available, Relevant Mitigating Evidence Has
Been Violated. U.S. Const., Amends. V, VI, VIII, IX, XIV; Ohio
Const., Art. I, §§ I, 2, 9, 10, 16, 20.

**Proposition Of Law No. XXII**
When Ohio Court's Fail To Comply With Ohio Law Requiring
Life Verdicts To Be Written In Capital Cases, Proportionality
Review Of A Death Sentence Is Skewed In Favor Of Death In
Violation Of U.S. Const., Amends. V, VI, VIII, IX, XIV; Ohio
Const., Art. I, §§ 1, 2, 9, 10, 16, 20.

**Proposition Of Law No. XXIII**
Appellant Davis' Due Process Rights Were Violated When The
Trial Court Denied His Request To Examine The Grand Jury
Transcripts. U.S Const., Amends. V, VI, VIII, IX, XIV; Ohio
Const., Art. I, §§ 1, 2, 9, 10, 16, 20.

**Proposition Of Law No. XXIV**
Where Evidence Presented At A Capital Trial Is Insufficient To
Support A Conviction For Aggravated Murder, The Conviction Is
A Violation Of Appellant's Rights Under The Fifth, Sixth, Eighth,
And Fourteenth Amendments Of The United States Constitution
And Article I, Sections 10 And 16 Of The Ohio Constitution And
Cannot Stand.

**Proposition Of Law No. XXV**
Where A Capital Specification Of A Prior Homicide Used In A
Case Is Too Remote In Time, It Is A Violation Of Rights Under
The Fifth, Sixth, Eighth And Fourteenth Alv1endments Of The
United States Constitution And Article I, Sections 10 And 16 Of
The Ohio Constitution.

**Proposition Of Law No. XXVI**
When An Appellate Court Reiterates Its Previous Appropriateness
Opinion Which Was Invalidated By The Ohio Supreme Court, And
Fails To Acknowledge Appellant's New Arguments And Issues,
Its Review Falls Short Of The Constitutional Safeguards Required
In Capital Cases.

36

**Proposition Of Law No. XXVII**
Separation Of The Three Judge Panel During Deliberations
Deprives A Capital Defendant Of A Reliable Verdict In Violation
Of The Fifth, Sixth, Eighth And Fourteenth Amendments To The
United States Constitution And Article I, Sections 2, 9, 10 And 16
Of The Ohio Constitution.

**Proposition Of Law No. XXVIII**
Where A Trial Court Refuses To Allow A Defendant To Withdraw
His Jury Waiver, The Defendant's Rights Under The Fifth, Sixth,
Eighth, And Fourteenth Amendments Of The United States
Constitution And Article I, Sections 10 And 16 Of The Ohio
Constitution Have Been Violated.

**Proposition Of Law No. XXIX**
Ohio's Statutory Provisions Governing The Imposition Of The
Death Penalty, Do Not Meet The Prescribed Constitutional
Requirements And Are Unconstitutional, Both On Their Face And
As Applied To Appellant Davis In Violation Of Appellant's Rights
Under The Fifth, Sixth, Eighth, And Fourteenth Amendments Of
The United States Constitution And Article I, Sections 10 And 16
Of The Ohio Constitution

**Proposition Of Law No. XXX**
A Trial Court's Misapplication Of Ohio Rev. Code Ann. §
2929.04(B)(3) And Its Reliance On Effectively Unrebuttable
Evidence Deprived The Appellant Of His Constitutional Rights.

**Proposition Of Law No. XXXI**
Where The State Reviewing Courts Fail To Conduct A Meaningful
And Independent Review Of An Appellant's Sentence, The
Appellant's Rights Under The Fifth, Sixth, Eighth, And Fourteenth
Amendments Of The United States Constitution And Article I,
Section 10 And 16 Of The Ohio Constitution Have Been Violated.

(*Id*. at 2614 et seq.)

The Supreme Court of Ohio denied Davis's Memorandum in Support of Jurisdiction in

an Order dated January 15, 1997.  (ECF 4-24, PageID 2801.)

## G.  Application to Reopen

Davis filed two Applications to Reopen his Direct Appeals in the Twelfth District Court of Appeals on August 21, 1998.  (ECF 4-25, PageID 2802; ECF 4-26, PageID 2864.)  He raised the following Propositions of Law in the application to reopen his first direct appeal:

> **ASSIGNMENT OF ERROR I**
> Mr. Davis was denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution because: (A) the conviction of Mr. Davis was obtained through the use of unnecessarily suggestive identification procedures in violation of the United States Constitution; (B) the trial court erred in admitting into evidence the results of the unnecessarily suggestive identification procedures in violation of the United States Constitution; and (C) trial counsel was ineffective in violation of the United States Constitution because they failed to object to the results of the unnecessarily suggestive identification procedures.
>
> **ASSIGNMENT OF ERROR II**
> Mr. Davis was denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution because trial counsel was ineffective in violation of the United States Constitution because they called a prejudicial witness (who identified Mr. Davis) in order to impeach this witness with a second witness despite the fact that they had failed to satisfy the prerequisites for such impeachment.
>
> **ASSIGNMENT OF ERROR III**
> Mr. Davis was denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution because: (A) the trial court's denial of the motion to sever resulted in an involuntary jury waiver in violation of the United States Constitution; and (B) trial counsel was ineffective in violation of the United States Constitution because they failed to ensure that Mr. Davis' jury waiver was voluntary.
>
> **ASSIGNMENT OF ERROR IV**
> Mr. Davis was denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution because: (A) waiving a jury subjected Mr. Davis to an increased risk of a death sentence in violation of the United States Constitution; and (B) trial counsel was ineffective in violation of the United States Constitution because they failed to inform Mr. Davis that waiving

subjected him to an increased risk of a death sentence in violation of the United States Constitution.

**ASSIGNMENT OF ERROR V**
Mr. Davis was denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution because: (A) Mr. Davis' jury waiver was not valid; and (B) trial counsel was ineffective in violation of the United States Constitution because they failed to ensure that Mr. Davis' jury waiver was valid.

**ASSIGNMENT OF ERROR VI**
Mr. Davis was denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution because: trial counsel was ineffective in violation of the United States Constitution for failing to inform Mr. Davis that his case would be subjected to a lower standard of appellate review if tried to a three judge panel (rather than a jury).

**ASSIGNMENT OF ERROR VII**
Mr. Davis was denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution because: (A) the rebuttal evidence introduced by the prosecutor at the sentencing phase was improper and in violation of the United States Constitution; and (B) trial counsel was ineffective in violation of the United States Constitution because they failed to object to the rebuttal evidence introduced by the prosecutor at the sentencing phase.

**ASSIGNMENT OF ERROR VIII**
Mr. Davis was denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution because: (A) Ohio's death penalty scheme regarding the standard of proof of a mitigating factor in a case tried to a three-judge panel violates the United States Constitution; and (B) trial counsel was ineffective in violation of the United States Constitution because they failed to raise the issue that Ohio's death penalty scheme regarding the standard of proof of a mitigating factor in a case tried to a three-judge panel violates the United States Constitution.

**ASSIGNMENT OF ERROR IX**
Mr. Davis was denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution because: (A) racial discrimination exists in the selection of the grand jury foreperson, grand. jury, and petit jury in violation of the United States Constitution; (B) trial counsel failed to file a pretrial motion to dismiss or quash the indictment on the basis that racial

discrimination exists in the selection of the grand jury foreperson, grand jury, and petit jury in violation of the United States Constitution; (C) the selection of the grand jury foreperson is arbitrary and capricious in violation of the United States Constitution; and (D) trial counsel failed to file a pretrial motion to dismiss or quash the indictment on the basis that the selection of the grand jury foreperson is arbitrary and capricious in violation of the United States Constitution.

**ASSIGNMENT OF ERROR X**
Mr. Davis was denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution because: (A) the presiding trial judge's consideration of Mr. Davis' failure to take responsibility for the crime was improper and in violation of the United States Constitution; and (B) trial counsel was ineffective in violation of the United States Constitution because they failed to object to the presiding trial judge's consideration of Mr. Davis' failure to take responsibility for the crime as improper and in violation of the United States Constitution.

(ECF 4-25, PageID 2802 *et. seq.*)

He raised the following Propositions of Law in the application to reopen his second direct appeal:

**ASSIGNMENT OF ERROR I**
Mr. Davis was denied his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution because errors in the resentencing opinion violated the United States Constitution.

**ASSIGNMENT OF ERROR II**
Mr. Davis was denied his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution because: (A) prosecutorial misconduct occurred at the resentencing that violated his rights under the United States Constitution; and, (B) trial counsel in violation of the United States Constitution failed to object to the prosecutorial misconduct that occurred at the resentencing that violated his rights under the United States Constitution.

**ASSIGNMENT OF ERROR III**
Mr. Davis was denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution because: (A) the presiding trial judge's consideration of Mr. Davis' failure to take responsibility for the crime was improper and in violation of

the United States Constitution; and, (B) trial counsel was
ineffective in violation of the United States Constitution because
they failed to object to the presiding trial judge's consideration of
Mr. Davis' failure to take responsibility for the crime as improper
and in violation of the United States Constitution.

**ASSIGNMENT OF ERROR IV**
Mr. Davis was denied his rights under the Fifth, Sixth, Eighth and
Fourteenth Amendments of the United States Constitution because:
(A) the rebuttal evidence introduced by the prosecutor at the
sentencing phase was improper and in violation of the United
States Constitution; and, (B) trial counsel was ineffective in
violation of the United States Constitution because they failed to
object to the improper rebuttal evidence introduced by the
prosecutor at the sentencing phase.

**ASSIGNMENT OF ERROR V**
Mr. Davis was denied his constitutional rights under the Fifth,
Sixth, Eighth and Fourteenth Amendments of the United States
Constitution because: (A) Ohio's death penalty scheme regarding
the standard of proof of a mitigating factor in a case tried to a three
judge panel violates the United States Constitution; and, (B) trial
counsel was ineffective in violation of the United States
Constitution because they failed to raise the claim that Ohio's death
penalty scheme regarding the standard of proof of a mitigating
factor in a case tried to a three-judge panel violates the United
States Constitution.

**ASSIGNMENT OF ERROR VI**
Mr. Davis was denied his rights under the Fifth, Sixth, Eighth and
Fourteenth Amendments of the United States Constitution because
trial counsel was ineffective in violation of the United States
Constitution due to their failure to inform Mr. Davis that his case
would be subjected to a lower standard of appellate review if tried
to a three judge panel (rather than a jury).

(ECF 4-26, PageID 2864 *et seq.*)

The Twelfth District Court of Appeals denied Davis's Application to Reopen in an Order

dated January 13, 1999. (ECF 4-26, PageID 2895.)

Davis appealed to the Supreme Court of Ohio on February 1, 1999. (ECF 4-25, PageID

2861.) He raised the following Propositions of Law:

**Proposition of law No. I**
An appellate court commits constitutional error when it refuses to consider whether an application for reopening contains any genuine issue or colorable claim of ineffective assistance of appellate counsel.

**Proposition of law No. II**
An appellate court commits constitutional error when it holds that impossibility precluded a timely filing yet holds that appellant should have timely filed the applications.

**Proposition of Law No. III**
An appellate court commits constitutional error when it denies an application to reopen where the appellant has shown good cause for an untimely filing.

**Proposition of Law No. IV**
Appellant Davis was denied the effective assistance of counsel on his direct appeals in violation of the fifth, sixth, eighth, and fourteenth amendments to the federal constitution.

1. Appellant Davis was denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution because: (A) the conviction of Mr. Davis was obtained through the use of unnecessarily suggestive identification procedures in violation of the United States Constitution; (B) the trial court erred in admitting into evidence the results of the unnecessarily suggestive identification procedures in violation of the United States Constitution; and, (C) trial counsel was ineffective in violation of the United States Constitution because they failed to object to the results of the unnecessarily suggestive identification procedures.

2. Appellant Davis was denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution because trial counsel was ineffective in violation of the United States Constitution because they called a prejudicial witness (who identified Mr. Davis) in order to impeach this witness with a second witness despite the fact that they had failed to satisfy the prerequisites for such impeachment.

3. Appellant Davis was denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution because: (A) the trial court's denial of the motion to sever resulted in an involuntary jury waiver in violation of the United States Constitution; and, (B) trial counsel was

ineffective in violation of the United States Constitution because they failed to ensure that Mr. Davis' jury waiver was voluntary.

4. Appellant Davis was denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution because: (A) waiving a jury subjected Mr. Davis to an increased risk of a death sentence in violation of the United States Constitution; and, (B) trial counsel was ineffective in violation of the United States Constitution because they failed to inform Appellant Davis that waiving subjected him to an increased risk of a death sentence in violation of the United States Constitution.

5. Appellant Davis was denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution because: (A) Mr. Davis' jury waiver was not valid; and, (B) trial counsel was ineffective in violation of the United States Constitution because they failed to ensure that Mr. Davis' jury waiver was valid.

6. Appellant Davis was denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution because: trial counsel was ineffective in violation of the United States Constitution for failing to inform Appellant Davis that his case would be subjected to a lower standard of appellate review if tried to a three judge panel (rather than a jury).

7. Appellant Davis was denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution because: (A) the rebuttal evidence introduced by the prosecutor at the sentencing phase was improper and in violation of the United States Constitution; and, (B) trial counsel was ineffective in violation of the United States Constitution because they failed to object to the rebuttal evidence introduced by the prosecutor at the sentencing phase.

8. Appellant Davis was denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution because: (A) Ohio's death penalty scheme regarding the standard of proof of a mitigating factor in a case tried to a three-judge panel violates the United States Constitution; and, (B) trial counsel was ineffective in violation of the United States Constitution because they failed to raise the issue that Ohio's death penalty scheme regarding the standard of proof of a mitigating factor in a case tried to a three judge panel violates the United States Constitution.

9. Appellant Davis was denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution because:  (A) racial discrimination exists in the selection of the grand jury foreperson, grand jury, and petit jury in violation of the United States Constitution; (B) trial counsel failed to file a pretrial motion to dismiss or quash the indictment on the basis that racial discrimination exists in the selection of the grand jury foreperson, grand jury, and petit jury in violation of the United States Constitution; (C) the selection of the grand jury foreperson is arbitrary and capricious in violation of the United States Constitution; and, (D) trial counsel failed to file a pretrial motion to dismiss or quash the indictment on the basis that the selection of the grand jury foreperson is arbitrary and capricious in violation of the United States Constitution.

10. Appellant Davis was denied his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution because:  (A) the presiding trial judge's consideration of Mr. Davis' failure to take responsibility for the crime was improper and in violation of the United States Constitution; and, (B) trial counsel was ineffective in violation of the United States Constitution because they failed to object to the presiding trial judge's consideration of Appellant Davis' failure to take responsibility for the crime as improper and in violation of the United States Constitution.

11. Appellant Davis was denied his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution because errors in the resentencing opinion violated the United States Constitution.

12. Appellant Davis was denied his constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution because:  (A) prosecutorial misconduct occurred at the resentencing that violated his rights under the United States Constitution; and, (B) trial counsel in violation of the United States Constitution failed to object to the prosecutorial misconduct that occurred at the resentencing that violated his rights under the United States Constitution.

(ECF 4-27, PageID 2942 *et seq.*)[1]

_____

[1] The copy of Mr. Davis's Merit Brief contained in the Appendix to the Return of Writ filed by the Warden is missing several pages.

The Supreme Court of Ohio denied Davis's Application to Reopen in an Order dated January 13, 1999. *State v. Davis* (*Davis VIII*), 714 N.E.2d 384 (Ohio 1999), (ECF 4-27, PageID 3155).

## V.  Federal-Court Proceedings

### A.  Habeas Proceedings—Federal District Court

Mr. Davis filed a Petition for Writ of Habeas Corpus with the Southern District of Ohio in *Davis v. Coyle*, No. C-1-97-402.  Judge Graham denied relief.  *Davis v. Coyle* (*Davis* IX), No. C-1-97-402, 2002 WL 193579 (S.D. Ohio Jan. 17, 2002).

### B.  Habeas Proceedings—Sixth Circuit

After receiving a certificate of appealability, Mr. Davis appealed to the United States Court of Appeals for the Sixth Circuit.  The Sixth Circuit unanimously held that Mr. Davis was entitled to relief and reversed Mr. Davis's death sentence. *Davis v. Coyle* (*Davis* X), 475 F.3d 761 (6th Cir. 2007).  Two circuit judges indicated that in subsequent proceedings that Mr. Davis should be allowed to choose to proceed before a jury.  *Davis X*, 475 F.3d at 780.

## VI.  Second State-Court Proceedings

### A.  Second Resentencing

On September 10, 2009, a new three-judge panel presided over Davis's second resentencing hearing.  The panel consisted of the Honorable Charles L. Pater, the Honorable Keith M. Spaeth, and the Honorable Andrew Nastoff, presiding.  (ECF 4-39, PageID 4921.)

On September 21, 2009, the panel sentenced Davis to death.  (2nd Resent'g Op., Sept. 21, 2009, ECF 4-39, PageID 4924-34).

## B.  Direct Appeal—Twelfth District Court of Appeals

Von Clark Davis filed his Notice of Appeal to the Twelfth District Court of Appeals on

October 20, 2009.  (ECF 4-42, PageID 5343.)  He raised the following issues on direct appeal:

> **Assignment of Error I**
> The Trial Court Erred In Violation Of The Eighth And Sixth
> Amendment And Due Process To Allow A 25-Year Old, Stale Jury
> Waiver To Stand When There Was A New Penalty Hearing.
>
> **Assignment of Error II**
> The Three Judge Panel Erred In Not Considering And Giving
> Effect To Certain Mitigating Evidence.
>
> **Assignment of Error III**
> The Trial Court Erred In Not Precluding The Death Penalty And
> Enforcing The Then Existing Provisions Of O.R.C.
> 2929.03(C)(2)(A).
>
> **Assignment of Error IV**
> Appellant's Death Sentence Is Disproportionate And
> Inappropriate.
>
> **Assignment of Error V**
> Twenty-Six Years On Ohio's Death Row Constitutes Cruel And
> Unusual Punishment Under The State And Federal Constitution,
> And International Law.

(ECF 4-42, PageID 5486 *et seq.*)

In an Opinion released February 22, 2011, the Court affirmed the sentence of death.

*State v. Davis* (*Davis XI*), No. CA2009-10-263, 2011WL646404 (Ohio Ct. App. 12th Dist. Feb.

22, 2011), (ECF 4-42, PageID 5679).

## C.  Direct Appeal—Supreme Court of Ohio

Von Clark Davis filed his Notice of Appeal to the Supreme Court of Ohio on April 4,

2011.  (ECF 4-43, PageID 5756.)  He raised the following issues on direct appeal:

46

**Proposition of Law No. I**
The Trial Court Erred In Violation Of The Eighth Amendment
And Due Process To Allow A 25-Year Old, Stale Jury Waiver To
Stand When There Was A New Penalty Hearing.

**Proposition of Law No. II**
The Three Judge Panel Erred In Not Considering And Giving
Effect To Mitigating Evidence.

**Proposition of Law No. III**
The Trial Court Erred In Not Precluding The Death Penalty And
Enforcing The Then Existing Provisions Of O.R.C.
2929.03(C)(2)(a).

**Proposition of Law No. IV**
Appellant's Death Sentence Is Disproportionate And
Inappropriate.

**Proposition of Law No. V**
Twenty-Six Years On Ohio's Death Row Constitutes Cruel And
Unusual Punishment Under The State And Federal Constitution,
And International Law.

(ECF 4-43, PageID 5849 *et seq.*)

In an Opinion released April 22, 2014, the Supreme Court of Ohio affirmed Davis's

convictions and his sentence of death. *State v. Davis* (*Davis XIV*), 9 N.E.3d 1031 (Ohio 2014),

(ECF 4-44, PageID 6076).

### D. Second Resentencing Post-Conviction Litigation

Davis filed a timely post-conviction petition under Ohio Revised Code § 2953.21 *et seq.*

on October 21, 2011. (ECF 4-46, PageID 6236.)

In his Petition, Davis raised the following issues:

**FIRST GROUND FOR RELIEF**
Davis' sentence is void and/or voidable because defense counsel
provided ineffective assistance at the penalty phase and as a result,
Davis was sentenced to death. Due to the defense counsel's failure
to reasonably investigate and present available, mitigating
evidence regarding Davis' exemplary prison record, counsel did
not provide objectively reasonable assistance and Petitioner was

47

prejudiced as a result of this failure. *Strickland v. Washington*
(1984), 466 U.S. 668. Davis was denied his right to effective
assistance of counsel as guaranteed by the Fifth, Sixth, Eight, and
Fourteenth Amendments to the United States Constitution and
Article I,§§ 1, 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

**SECOND GROUND FOR RELIEF**
Davis' sentence is void and/or voidable because defense counsel
provided ineffective assistance at the penalty phase and as a result,
Davis was sentenced to death. Due to the defense counsel's failure
to reasonably investigate and present available, mitigating
evidence regarding Davis' exemplary prison record, counsel did
not provide objectively reasonable assistance and Petitioner was
prejudiced as a result of this failure. *Strickland v. Washington*
(1984), 466 U.S. 668. Davis was denied his right to effective
assistance of counsel as guaranteed by the Fifth, Sixth, Eight, and
Fourteenth Amendments to the United States Constitution and
Article I, §§ 1, 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

**THIRD GROUND FOR RELIEF**
Davis' sentence is void and/or voidable because defense counsel
provided ineffective assistance at the penalty phase and as a result,
Davis was sentenced to death. Counsel's preparation and strategy
to call Cynthia Mausser, the Chair of the Ohio Parole Board,
harmed Davis because Ms. Mausser testified Davis could be
paroled if he received a sentence less than death. Counsel did not
provide objectively reasonable assistance and Petitioner was
prejudiced as a result of this failure. *Strickland v. Washington*
(1984), 466 U.S. 668. Davis was denied his right to effective
assistance of counsel as guaranteed by the Fifth, Sixth, Eight, and
Fourteenth Amendments to the United States Constitution and
Article I, §§ 1, 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

**FOURTH GROUND FOR RELIEF**
Davis' sentence is void and/or voidable because defense counsel
provided ineffective assistance at the penalty phase and as a result,
Davis was sentenced to death. Counsel's preparation and strategy
to call psychologist, Dr. Robert Smith, harmed Davis because Dr.
Smith left the panel with the impression that due to Davis'
borderline personality disorder, if Davis were ever released from
prison, and no longer in a structured environment, he could kill
again. Counsel did not provide objectively reasonable assistance
and Petitioner was prejudiced as a result of this failure. *Strickland
v. Washington* (1984), 466 U.S. 668. Davis was denied his right to
effective assistance of counsel as guaranteed by the Fifth, Sixth,
Eight, and Fourteenth Amendments to the United States

Constitution and Article I, §§ 1, 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

**FIFTH GROUND FOR RELIEF**

Davis' sentence is void and/or voidable because defense counsel provided ineffective assistance at the penalty phase and as a result, Davis was sentenced to death. Counsel's decision not to call mitigation specialist/investigator, John Lee, to testify and/or to present exhibits regarding unavailable mitigation witnesses harmed Davis because the panel was not presented with relevant and compelling evidence of Davis' character, history and background. Counsel did not provide objectively reasonable assistance and Petitioner was prejudiced as a result of this failure. *Strickland v. Washington* (1984), 466 U.S. 668. Davis was denied his right to effective assistance of counsel as guaranteed by the Fifth, Sixth, Eight, and Fourteenth Amendments to the United States Constitution and Article I,§§ 1, 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

**SIXTH GROUND FOR RELIEF**

Davis' sentence is void and/or voidable because defense counsel provided ineffective assistance at the penalty phase and as a result, Davis was sentenced to death. Counsel knew that Judge Andrew Nastoff served as a prosecutor in the death penalty case of Davis' nephew, Lahray Thompson, and advocated for Mr. Thompson's death, yet counsel failed to seek the removal of Judge Nastoff. Counsel did not provide objectively reasonable assistance and Petitioner was prejudiced as a result of this failure. *Strickland v. Washington* (1984), 466 U.S. 668. Davis was denied his right to effective assistance of counsel as guaranteed by the Fifth, Sixth, Eight, and Fourteenth Amendments to the United States Constitution and Article I,§§ 1, 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

**SEVENTH GROUND FOR RELIEF**

Davis' sentence is void and/or voidable because defense counsel provided ineffective assistance at the penalty phase and as a result, Davis was sentenced to death. Counsel suggested to Davis that life without the possibility of parole was a sentencing option at his third sentencing hearing, but because the law in effect at the time of Davis' offense was being applied, life without the possibility of parole was not available. Counsel did not provide objectively reasonable assistance and Petitioner was prejudiced as a result of this failure. *Strickland v. Washington* (1984), 466 U.S. 668. Davis was denied his right to effective assistance of counsel as guaranteed by the Fifth, Sixth, Eight, and Fourteenth Amendments

to the United States Constitution and Article I,§§ 1, 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

**EIGHTH GROUND FOR RELIEF**
Davis' convictions and sentences are void or voidable because defense counsel provided ineffective assistance during his capital trial. Davis' original trial attorneys did not advise Davis of the collateral consequence of his waiver of a jury trial. Counsel did not provide objectively reasonable assistance and Petitioner was prejudiced as a result of this failure. *Strickland v. Washington* (1984), 466 U.S. 668. Davis was denied his right to effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article I,§§ 1, 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

**NINTH GROUND FOR RELIEF**
Davis' judgment and sentence are void or voidable because Ohio's post-conviction procedures do not provide an adequate corrective process, in violation of the constitution. Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution and Article I, §§ 1, 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

(*Id*. at 6236 *et seq*.)

In Findings of Fact, Conclusions of Law, and Entry dated November 26, 2012, the Court

of Common Pleas denied Davis's petition.   *State v. Davis* (*Davis XII*), No. CR83-12-0614

(Butler Ct. Com. Pl. Nov. 26, 2012), (ECF 4-47, PageID 6633).

Davis timely appealed to the Ohio Twelfth District Court of Appeals.  (ECF 4-48, PageID

6658.)  He raised the following Assignments of Error.

**First Assignment of Error:**
Trial Counsel Rendered Ineffective Assistance Of Counsel In Violation Of Appellant's Rights Under The Fifth, Sixth, Eighth, And Fourteenth Amendments To The United States Constitution, And Sections 1, 2, 5, 9, 10, 16, And 20, Article I Of The Ohio Constitution.

**Second Assignment of Error:**
Appellant's Judgment And Sentence Are Void Or Voidable Because Ohio's Post-Conviction Procedures Do Not Provide An Adequate Corrective Process, In Violation Of The Fifth, Sixth, Eighth, Ninth, And Fourteenth Amendments To The United States

Constitution And Article I, §§ 1, 2, 5, 9, 10, 16, And 20 Of The
Ohio Constitution.

**Third Assignment of Error:**
The Trial Court Erred When It Refused To Allow Appellant To
Conduct Discovery Or Grant An Evidentiary Hearing In Violation
Of Appellant's Rights Under R.C. 2953.21 And The Sixth, Eight,
And Fourteenth Amendments To The United States Constitution.

(ECF 4-48, PageID 6779 *et seq.*)

In an Opinion dated September 9, 2013, the Ohio Twelfth District Court of Appeals

affirmed the judgment of the trial court denying Davis's Petition for Post-Conviction Relief.

*State v. Davis* (*Davis XIII*), No. CA2012-12-258, 2013WL4806935 (Ohio Ct. App. 12th Dist.

Sept. 9, 2013), (ECF 4-48, PageID 6938).

Davis timely filed a Notice of Appeal and a Memorandum in Support of Jurisdiction in

the Supreme Court of Ohio.  (ECF 4-49, PageID 6957, 6959.)  He raised the following

Propositions of Law.

**Proposition of Law No. 1**
Trial Counsel Rendered Ineffective Assistance Of Counsel In
Violation Of Appellant's Rights Under The Fifth, Sixth, Eighth,
And Fourteenth Amendments To The United States Constitution,
And Sections 1, 2, 5, 9, 10, 16, And 20, Article I Of The Ohio
Constitution.

**Proposition of Law No. 2**
Appellant's Judgment And Sentence Are Void Or Voidable
Because Ohio's Post-Conviction Procedures Do Not Provide An
Adequate Corrective Process, In Violation Of The Fifth, Sixth,
Eighth, Ninth, And Fourteenth Amendments To The United States
Constitution And Article I, §§ 1, 2, 5, 9, 10, 16, And 20 Of The
Ohio Constitution.

**Proposition of Law No. 3**
The Trial Court Erred When It Refused To Allow Appellant To
Conduct Discovery Or Grant An Evidentiary Hearing In Violation
Of Appellant's Rights Under R.C. 2953.21 And The Sixth, Eighth,
And Fourteenth Amendments To The United States Constitution.

(*Id*. at 6960 *et seq*.)

The Supreme Court of Ohio denied Davis's Memorandum in Support of Jurisdiction in an Order dated August 26, 2015. (ECF 4-49, PageID 7087.)

## VII.   GROUNDS FOR RELIEF

FIRST GROUND FOR RELIEF:

MR. DAVIS'S WAIVER OF HIS RIGHT TO A JURY TRIAL WAS INVALID BECAUSE IT WAS NOT KNOWING, INTELLIGENT AND VOLUNTARY, IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

1.      A capital defendant has the right to a jury trial as guaranteed by Article III, § 2 of the United States Constitution and the Sixth and Fourteenth Amendments to the Constitution.  This right is fundamental.  *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968).

2.      Accordingly, a criminal defendant may not be deprived of this right without an intelligent, voluntary, and knowing waiver.  *See Brady v. United States*, 397 U.S. 742, 748 (1970); *Adams v. United States*, 317 U.S. 269, 275 (1942); *Patton v. United States*, 281 U.S. 276, 312 (1930).  "[W]hether or not there is an intelligent, competent, self-protecting waiver of jury trial by an accused must depend upon the unique circumstances of each case."  *Adams*, 317 U.S. at 278.  And "[t]he question of an effective waiver of a federal constitutional right in a proceeding is of course governed by federal standards."  *Boykin v. Alabama*, 395 U.S. 238, 243 (1969).

3.       "For a waiver to be voluntary, knowing and intelligent, the defendant must possess a minimum amount of knowledge concerning his jury trial right and the mental capacity to understand the implications of waiver of that right."  *Spytma v. Howes*, 313 F.3d 363, 370 (6th Cir. 2002).  Moreover, the jury waiver must also be "done with sufficient awareness of the relevant circumstances and likely consequences." *Brady*, 397 U.S. at 748.

4.      "Trial by jury is the normal and, with occasional exceptions, the preferable mode of disposing of issues of fact in criminal cases . . ."  *Patton*, 281 U.S. at 312; *see also Duncan*, 391 U.S. at 155 ("The guarantees of jury trial in the Federal and State Constitutions reflect a profound judgment about the way in which law should be enforced and justice administered.").

Indeed, "as the right of jury trial is fundamental, courts indulge every reasonable presumption against waiver." *Aetna Ins. Co. v. Kennedy to Use of Bogash*, 301 U.S. 389, 393 (1937). *See also Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

5.     Mr. Davis's jury waiver was involuntary, unknowing, and unintelligent at the time he entered in in 1984.  Subsequent events rendered it even more unknowing and unintelligent in additional ways.

6.     Mr. Davis was on trial for his life.  The decision whether to be tried by a jury was particularly crucial.  He had a constitutional right to have been knowledgeable of the consequences of his waiver.  Because he was not, he should have been permitted to withdraw that waiver in his first and second resentencings.

> **A.     Mr. Davis's jury waiver was not voluntary because the trial court's denial of his motion to sever forced him to waive jury.**

7.     The aggravated murder indictment charged Mr. Davis with a capital specification of a prior purposeful homicide under Ohio Revised Code § 2929.04(A)(5).  Mr. Davis was also indicted on one count of having a weapon under disability.  Ohio Rev. Code § 2923.13.

8.     Prior to the start of his capital trial, Mr. Davis elected under Ohio Revised Code 2929.022 to have his specification determined by the court.  (Mot. Hr'g., May 4, 1984, ECF 5-1, PageID 7222; Waiver and Election, 1st PC Ex. G, ECF 4-19, PageID 1963.)  He also requested by motion that the weapon-under-disability count be severed from the aggravated murder count and tried separately.  He made this request so the prior murder charge could not be introduced to the jury in the guilt-phase of his trial through this count.  (ECF 5-1, PageID 7212-15.)

9.     The trial court denied the motion to sever.  (*Id.* at PageID 7215-16.)  Following that denial, Mr. Davis waived his right to trial by jury.  Mr. Davis was forced to waive his right to

trial by jury because the trial court refused to sever the weapon-under-disability charge.  (Aff. of Von Clark Davis, 1st PC Ex. H, ECF 4-19, PageID 1964-65.)

10.     Accordingly, Mr. Davis's jury waiver was not valid because it was involuntary.  Thus it violated his constitutional rights and prejudiced him.  His convictions and sentences must be reversed.

11.     To the extent the Ohio courts ruled on the merits of this claim, those rulings were contrary to or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States, and resulted in a decision that was based on unreasonable determination of the facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

> **B.      Mr. Davis's jury waiver was not knowing and intelligent because he did not know at the time of the waiver that Ohio Supreme Court would refuse to apply the rule of *Penix* to his case and hold him eligible to be resentenced to death.**

12.     The Ohio Supreme Court concluded that error occurred in the sentencing phase of Mr. Davis's original trial, but held that Mr. Davis was eligible to receive the death penalty on remand.  *State v. Davis* (*Davis II*), 528 N.E.2d 925, 936 (Ohio 1988), (ECF 4-9, PageID 1022-23).  The Court arrived at that decision although it had previously ruled in *State v. Penix,* 513 N.E.2d 744, 748 (Ohio 1987), that a sentencing phase error rendered the defendant ineligible for the death penalty on remand.  The Court reached different conclusions in these cases only because Mr. Davis's trial occurred before a three-judge panel, while Mr. Penix's trial was before a jury.

13.     Mr. Davis was not and could not have been aware of all of the relevant circumstances and consequences of his waiver.  He could not have known that by waiving a jury he would again be subject to the death penalty if his death sentence was reversed while, by contrast, if he chose to have his case heard by a jury, he would have been insulated from the death penalty if a reversal

occurred. Given these facts, Mr. Davis was precluded from making an informed choice. Most specifically, his ability to make a knowing, intelligent, and voluntary waiver of his constitutional right to a trial by jury was impaired.

14.     Upon remand, with Mr. Davis facing the possibility of a death sentence, trial counsel alerted the trial court to the constitutional implications attendant to drawing a distinction between three-judge panel cases and jury cases in determining the appropriate penalty. Counsel filed a Motion to Prohibit Three-Judge Panel from Resentencing to Death And Motion to Disqualify Panel and argued that resentencing Mr. Davis to death would violate myriad constitutional protections. (ECF 4-11, PageID 1125-27.) Counsel also filed a Motion to Withdraw Jury Waiver. (ECF 4-11, PageID 1121-22.) This motion provided that Mr. Davis did not make a knowing, intelligent, and voluntary waiver of his right to a jury trial because of the divergent positions taken by the Ohio Supreme Court in *Penix* and in Davis's own case. (*Id*.)

15.     The trial court overruled both motions. Entry as to Motions Heard July 31, 1989 and Aug. 1, 1989, ECF 4-11, PageID 1169.) It proceeded to conduct the resentencing hearing, and ultimately resentenced Mr. Davis to death.

16.     Mr. Davis's jury waiver was unknowing and unintelligent because he could not have anticipated that the Ohio Supreme Court would hold that the *Penix* rule did not apply to him. That decision represented "an arbitrary disregard of [Mr. Davis's] right to liberty" and accordingly violated his due process rights. *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980).

17.     To the extent the Ohio courts ruled on the merits of this claim, those rulings were contrary to or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States, and resulted in a decision that was based on unreasonable determination of the facts in light of the evidence presented in state courts. 28 U.S.C. § 2254(d).

**C.    Mr. Davis's jury waiver was not knowing and intelligent because he did not know when he waived his right to a jury trial in favor of being tried before three specifically identified judges that he was also waiving his jury-trial rights twenty-five years in the future to instead be tried before an entirely different panel of three unknown judges.**

18.     Mr. Davis did not and could not knowingly and intelligently waive rights in 1984 concerning a 2009 trial with new evidence, new lawyers, new judges and new applicable statutory requirements that were not even envisioned by Ohio's legislature in 1984.

19.     Mr. Davis's waiver was enforced against him at a *third* sentencing hearing, twenty-five years later, after Ohio's Legislature had modified Ohio's death penalty statute *eight* times.

20.     As another federal court observed long ago, a "stipulation to waive a jury, and to try the case before the court, only had relation to the first trial." *Burnham v. North Chicago St. Ry. Co.*, 88 F. 627, 629 (7th Cir. 1898).  Because "[t]here could be no presumption then that there would ever be a second trial[,] . . . therefore it should not be presumed that the parties, in making the stipulation, had in mind any possible subsequent trial after the first, to which the stipulation could refer." *Id.*

21.     Indeed, in its previous review of Mr. Davis's case, the Sixth Circuit opined that he should not be held to his jury waiver in the second resentencing hearing that it decision mandated.  It recognized a "legitimate question as to whether a criminal defendant should be held to a jury waiver entered almost 25 years before his newly-mandated sentencing hearing." *Davis v. Coyle* (*Davis X*), 475 F.3d 761, 780 (6th Cir. 2007).  In federal cases in this circuit, "waiver of a jury trial does not bar a demand for a jury on retrial of the same case unless the original waiver explicitly covers this contingency." *United States v. Groth*, 682 F.2d 578, 580 (6th Cir. 1982). *See also Davis X*, 475 F.3d at 780-81 ("'when a reviewing court finds error in the conduct of a trial and reverses with directions for a new trial the general rule is that a litigant is not bound by

his prior waiver of a jury trial unless the language of a waiver unambiguously states that it will

apply in all retrials should they be ordered'") (quoting *United States v. Lee*, 539 F.2d 606, 608

(6th Cir. 1976) (brackets and ellipses omitted).  Because "[t]he right of a trial by jury in cases at

law, whether a civil or criminal case, is a high and sacred constitutional right in Anglo-Saxon

jurisprudence, and is expressly guarantied by the United States constitution," any "stipulation for

the waiver of such right should therefore be strictly construed in favor of the preservation of the

right." *Burnham*, 88 F. at 629.

22.     The Sixth Circuit noted that "under Ohio Revised Code § 2945.05, a waiver of jury trial

'may be withdrawn by the defendant at any time before the commencement of trial.'"  *Davis X*,

475 F.3d at 780.  It then speculated that "the resentencing hearing that we order today will not

constitute a 'trial' in the sense that the petitioner's guilt or innocence is again at issue," but

nevertheless concluded that, in Mr. Davis's case, "the proceeding can indeed be considered the

functional equivalent of 'trial' because, unlike sentencing in a non-capital case, it will take the

form of an evidentiary proceeding on the question of whether Davis should receive the death

penalty or some form of a life sentence." *Id*.

23.     Further, the court noted that "Ohio courts have held, in reversing a conviction 'on the

basis that the defendant was neither charged nor found guilty of an essential element of the

offense,' that the defendant's 'previous waiver of a jury trial is also inherently revoked by the

reversal of the conviction and the amended indictment.'"  *Id*. at 781 (quoting *State v. McGee*,

715 N.E.2d 1175, 1178 (Ohio Ct. App. 1998) (brackets removed).  The Sixth Circuit explained

that the *McGee* Court's "conclusion was based on the fact that on remand, additional evidence

would be introduced from both the prosecution and the defense, as is likely to occur on remand

of this case." *Id*.  The court then concluded, "[w]hile not directly on point, because Davis is not

58

facing a new indictment, the reasoning of the Ohio court in *McGee* should certainly inform the sentencing court's determination of the viability of Davis's jury waiver on remand." *Id.*

24.     As it turns out, the Sixth Circuit's observations about Ohio law were flawed in one respect. The court incorrectly assumed that the inherent jury-waiver revocation described by the *McGee* Court would not strictly apply to Mr. Davis. But, just like Ms. McGee, who was freed from her prior jury waiver by the "reversal of [her] conviction," *McGee*, 715 N.E.2d at 1718, Mr. Davis return to state court in an *unconvicted* status. Under Ohio law, "a judgment of conviction" contains four necessary components:

> (1) the guilty plea, the jury verdict, or the finding of the court upon which the conviction is based;
>
> (2) *the sentence*;
>
> (3) the signature of the judge; and
>
> (4) entry on the journal by the clerk of court.

*State v. Baker*, 893 N.E.2d 163, 167 (Ohio 2008) (emphasis added). Because Mr. Davis's *sentence* had been vacated by the Sixth Circuit, he no longer stood convicted under Ohio law; a final judgment of conviction no longer existed. Accordingly he was no longer bound by his prior jury waiver, which had been "inherently revoked" when the Sixth Circuit vacated his sentence, leaving him no longer convicted under Ohio law.

25.     Despite these provisions of Ohio law, the trial court held Mr. Davis to the terms of his twenty-five-year-old waiver at his second resentencing trial in 2009. Like the Ohio court's departure from *Penix*, their refusal to follow Ohio law in this regard also represented "an arbitrary disregard of [Mr. Davis's] right to liberty" and accordingly violated his due process rights. *Hicks*, 447 U.S. at 346. This violation also rendered Mr. Davis's jury waiver constitutionally invalid.

26.     Further, even if Ohio law did not outright provide that Mr. Davis's jury waiver was automatically revoked when the federal court ordered his sentenced vacated, it was still rendered invalid when it functioned to force Mr. Davis to be sentenced before three completely new judges twenty-five years after he entered it.  Mr. Davis specifically requested and obtained the identities of the judges in his original three-judge panel before deciding to waive his rights to a jury trial.  (Mot. Hr'g, May 2, 1984, ECF 5-1, PageID 7209.)  His written waiver also stated that he was forgoing his jury-trial rights in favor of be tried and sentenced by those three specific judges.  (Jury Waiver and Election of Three-Judge Panel, May 8, 1984, ECF 4-3, PageID 433.)  Yet in his second resentencing, none of these three judges was available, and he was sentenced by three different judges.

27.     At the time Mr. Davis entered his waiver, Ohio law did not allow a three-judge panel to change in composition.  By the time of his second resentencing, however, the law had changed, and the new statute permitted the change in composition.  *See* Ohio Rev. Code § 2929.03(C)(2)(a); *id*. at § (c)(2)(b)(i); *compare* Ohio Rev. Code § 2929.06 (1981) (providing sentence to be determined by "*the* panel of three judges *that tried the offense* upon his waiver of the right to trial by jury") (emphasis added) *with* Ohio Rev. Code § 2929.06(B) (2008) ("If the offender was tried by a panel of three judges, that panel *or, if necessary, a new panel of three judges* shall conduct the hearing.") (emphasis added).  At the time of his waiver, Mr. Davis could not have anticipated this change in the law and that it would apply to him twenty-five years in the future.

28.     Not only was Mr. Davis's waiver invalid as applied to three completely different judges than those of which he was aware at the time he waived his rights, he also did not and could not know at the time of his waiver that he would be sentenced by judges biased against him.

29.     In his second resentencing, Mr. Davis's panel contained Judges Nastoff and Patter.  As set forth in detail in the Eighth Ground for Relief, *infra*, Judge Nastoff had prosecuted Mr. Davis's relative and sought the death penalty against him, and Judge Patter had a relationship with Mr. Davis's brother and family.  Both of these sources of bias were detrimental to Mr. Davis, and because he did not know at the time he entered his jury wavier in 1984 that he could be sentenced by these two judges, these subsequent events rendered his waiver invalid.

30.     To the extent the Ohio courts ruled on the merits of this claim, those rulings were contrary to or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States, and resulted in a decision that was based on unreasonable determination of the facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

> **D.     Mr. Davis's jury waiver was not knowing and intelligent because he did not know that two of the three judges on his panel represented a party adverse to him in a prior case.**

31.      Three judges were assigned to preside over Mr. Davis's capital trial:  Judge Henry Bruewer, Judge William Stitsinger, and Judge John Moser.  (1st PC Ex. K, ECF 4-19, PageID 1970.)  Two of these three judges, Judges Stitsinger and Moser, had previously been involved in litigation against Mr. Davis.

32.     In 1970, the Federal National Mortgage Company instituted foreclosure proceedings on the house owned by Mr. Davis and his wife, Ernestine.  (1st PC Ex. L, ECF 4-19, PageID 1971-78).  The mortgage company was represented by then-attorneys John Moser and William Stitsinger.  (*Id*. at 1975-76.)  A judgment entry and decree of foreclosure concerning Mr. Davis's home was ultimately entered in the case.  (1st PC Ex. M, ECF 4-19, PageID 1979.)

33.     Judge Stitsinger and Moser did not disclose their involvement in these proceedings to Mr. Davis at the time of his waiver.  These facts were important to Mr. Davis in making his decision.

(1st PC Ex. N, ECF 4-19, PageID 1980-81.)  Had Mr. Davis known these facts about two of the

judges on his panel, he would not have waived his right to trial by jury since they were

"instrumental" in taking away his home.  (*Id*.)

34.     The trial court's failure to disclose these facts to Mr. Davis rendered his jury waiver in

1984 invalid, thus prejudicing him under the Fifth, Sixth, Eighth, and Fourteenth Amendments to

the United States Constitution.  Despite having an entirely different panel of judges at his penalty

phase retrial in 2009, the prejudice from 1984 remains, since the trial court improperly refused to

allow Mr. Davis to withdraw his original invalid waiver.  His convictions and sentences must be

reversed.

35.     To the extent the Ohio courts ruled on the merits of this claim, those rulings were

contrary to or an unreasonable application of clearly established federal law as stated by the

Supreme Court of the United States, and resulted in a decision that was based on unreasonable

determination of the facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

> **E.     Mr. Davis's jury waiver was not knowing and intelligent because he did not
> know that a different standard of proof would be applied to him on appeal
> from a decision by three-judge panel than would have been applied to an
> appeal from a jury verdict.**

36.      On the day Mr. Davis signed his jury waiver form, the following colloquy occurred:

> By the Court:  Mr. Davis, you're brought over here today because
> of some information that your attorneys passed on to the Court,
> wherein, you indicated to them and they indicated to me that you
> want to waive your right to have this matter tried by a jury of
> twelve people and submit it to a panel of three judges?
>
> Mr. Davis:  That is correct.
>
> By the Court:  Is that correct?
>
> Mr. Davis:  That is correct.
>
> By the Court:  And in that regard, did you execute this form . . . it
> seems to bear your signature?

Mr. Davis:  Yes it is.

By the Court:  And before you signed it, you read it?

Mr. Davis:  Read it, uh-uhm.

By the Court:  And your attorneys explained it to you?

Mr. Davis:  Yes, they did.

By the Court:  Now you understand that when you do this, that the panel of judges will hear the evidence and make a decision on the matter and you're giving up your right to have twelve people make that decision.  Now, all twelve of those people would have to be convinced of your guilt or not guilty [sic], either way, and all twelve of them would have to be convinced before they could sign a verdict one way or the other.  Do you want to give up your right to have twelve people make this decision?

Mr. Davis:  Yes I do.

By the Court:  Now, you know the same burden of proof is on the State whether you go to the jury or to the jury, I mean, or to the jury or to the Court, a panel of three judges.  I mean, the three judges would have to listen to the evidence and be convinced beyond a reasonable doubt of your guilt or innocence, before they could make a finding and all three of the Judges would have to be unanimous in that finding do you understand?

Mr. Davis:  Yes I do.

By the Court:  Is anybody forcing you to do what you're doing here today?

Mr. Davis:  No one.

By the Court:  You do this of your own free will?

Mr. Davis:  My own free will, yes I did.

By the Court:  You understand that this is a death penalty case and the same . . .  the Court . . . I mean, the three judge panel, have [sic] to make that same determination ah, in the event they get that far?

Mr. Davis:  Yes . . . yes I do.

63

By the Court:  Any reasons that you know of why you shouldn't . . . you don't want to do this, I mean, is there any reason that you . . .

Mr. Davis: No, I can't find any reason why [sic] wouldn't want to right now, no.

By the Court:  Does the Prosecution have anything you want to say here?

Mr. Sage: Your Honor, do you think you should . . . it'd be proper to go over, rather it's required for a Court to be unanimous in it's [sic] verdict?

By the Court:  I just indicated that to him.

Mr. Sage:  Oh, I'm . . . okay, I'm sorry.

Mr. Eichel:  Your Honor, it's our understanding that the Court must be unanimous in it's [sic] verdict as to guilt and punishment also and a majority of the panel can rule on all other matters pertaining to evidence as provided in the Statute.

By the Court:  Do you understand what he's saying?

Mr. Davis:  Yes, uh-uhm.

By the Court:  He's saying that the majority that [sic] the Court could rule on evidence and findings of fact, but the ultimate conclusion of your guilt or innocence would have to be determine [sic] by unanimous vote of all the three judges.

Mr. Garretson:  As well as the penalty phase obviously if it ever got to that.

By the Court:  And it goes to all phases except as to the rulings on the evidence and findings of fact.  Well, if nobody else has anything further to say we'll have three judges will [sic] be here tomorrow, you know who they are, and they're in this form here. It'll be myself and Judge Moser and Judge Stitsinger.

Mr. Davis:  Yes . . . .

By the Court:  So we'll see you then.

Mr. Davis:  Thank you.

(Trial Tr. ECF 5-1, PageID 7222-25.)

37.      In this colloquy, the trial court misadvised Mr. Davis as to the standard the jury must use in assessing his guilt.  Specifically, the trial court informed Mr. Davis that the twelve jurors simply had to be "convinced of [his] guilt or not guilty."  (*Id.* at PageID 7223.)  This standard is neither the constitutional requirement of "beyond a reasonable doubt," *In re Winship*, 397 U.S. 358, 362 (1970), nor the statutory requirement of "beyond a reasonable doubt," Ohio Rev. Code § 2901.05.  It is a significantly lower standard than that required by law.  By contrast, the trial court informed Mr. Davis if he chose to have his guilt determined by a three-judge panel, that panel would have to determine his guilt "beyond a reasonable doubt," a higher standard of proof. (Trial Tr., ECF 5-1, PageID 7223.)

38.      The trial court's misadvice on the standard of proof prevented Mr. Davis from making a knowing, intelligent and voluntary waiver of his right to a jury trial.  Mr. Davis was mistakenly forced to choose between a jury trial where the jury only had to be "convinced" of his guilt versus a three-judge panel that had to determine his guilt beyond a reasonable doubt.  This untenable position does not satisfy constitutional commands.  Further, Mr. Davis was prejudiced by this information because he relied on it in electing to be tried by a three-judge panel.  (Aff. of Von Clark Davis, 1st PC Ex. F, ECF 4-19, PageID 1961-62.)

39.      The trial court's misadvice at the colloquy was not limited to the burden of proof.  The trial court also informed Mr. Davis that the three-judge panel had to "be convinced beyond a reasonable doubt of your guilt or innocence."  (Trial Tr., ECF 5-1, PageID 7223.)  It is constitutionally inaccurate for the trial court to state that the trial court has to be convinced of a defendant's innocence beyond a reasonable doubt.  The burden is on the state to prove a defendant's guilt beyond a reasonable doubt.  *In re Winship*, 397 U.S. at 364.  There is no concomitant burden on a defendant to prove his innocence.  It is constitutionally inappropriate to

shift the burden on any element to the defendant. *Sandstrom v. Montana*, 442 U.S. 510, 524 (1979).

40.    Mr. Davis was prejudiced by the trial court's misadvice.  His jury waiver is invalid and his convictions and sentences must be reversed.

41.    To the extent the Ohio courts ruled on the merits of this claim, those rulings were contrary to or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States, and resulted in a decision that was based on unreasonable determination of the facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

SECOND GROUND FOR RELIEF

THE TRIAL COURT VIOLATED MR. DAVIS'S RIGHTS UNDER THE SIXTH AND EIGHTH AMENDMENTS AND THE DUE PROCESS CLAUSE WHEN IT ENFORCED HIS JURY WAIVER AT TWO SUBSEQUENT RESENTENCING HEARINGS.

> **A.** **The trial court violated Mr. Davis's rights under the Eighth and Sixth Amendments and the Due Process Clause by enforcing his prior jury waiver at his first resentencing when he had no knowledge at the time of the waiver that Ohio Supreme Court would refuse to apply the rule of *Penix* to his case and hold him eligible to be resentenced to death.**

42.     As explained in the First Ground for Relief, *supra* at §§ B and C, Mr. Davis's jury waiver was unknowing because at the time he waived his rights to a jury trial, he could not anticipate either that the Ohio Supreme Court would hold that *Penix* did not apply to him merely because he was tried before a three-judge panel and Mr. Penix was tried before a jury, or that he would be held to his waiver twenty-five years in the future when facing a panel of three entirely different judges from the ones before which he agreed to be tried and sentenced in 1984. In the interest of economy, Davis does not repeat those arguments again in this Ground for Relief.

43.     The unanticipated ruling of the Ohio Supreme Court made Mr. Davis's jury waiver unknowing and thus constitutionally invalid. Accordingly, the trial court's refusal to grant his motion to withdraw that jury waiver in his two subsequent resentencing violated his constitutional rights.

44.     To the extent the Ohio courts ruled on the merits of this claim, those rulings were contrary to, or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in state courts. 28 U.S.C. § 2254(d).

**B. The trial court violated Mr. Davis's rights under the Eighth and Sixth Amendments and the Due Process Clause by enforcing a stale jury waiver at a new penalty hearing twenty-five years later before an entirely different panel of judges.**

45.     It violates Due Process, the Eighth Amendment, and *Duncan v. Louisiana*, 391 U.S. 145, 156 (1968), to hold Mr. Davis to a twenty-five-year old jury waiver when state malfeasance vacated two earlier death sentences. In those circumstances, in no sense did Mr. Davis knowingly and intelligently waive his right to a jury.

46.     In *State v. Davis* (*Davis IV*), 584 N.E.2d 1192, 1195 (Ohio 1992), (ECF 4-15, PageID 1689-90), the Ohio Supreme Court held that Mr. Davis could not withdraw his earlier jury waiver. This ruling was made prior to a further remand caused by state malfeasance.

47.     The Constitution requires a criminal defendant to reasonable professional assistance from counsel in providing advice regarding of the consequences of a plea. *Padilla v. Kentucky*, 559 U.S. 3556, 364-65 (2010). Such consequences would include that Mr. Davis would be subject to unfavorable changes in the law that benefit the State, and that he could not take advantage of favorable changes of the law. As unfair as that practice seems, that is what happened to Mr. Davis, and he was never informed of those collateral consequences, in violation of his rights under *Padilla.*

48.     The Sixth Circuit correctly foreshadowed this issue and properly portended a constitutional (and reasonable under clearly existing federal law) resolution to the issue. In *Davis v. Coyle* (*Davis X*), 475 F.3d 761 (6th Cir. 2007), the Sixth Circuit stated:

> Nevertheless, we anticipate that Davis's counsel will renew his motion to withdraw the jury waiver upon remand to the state trial court for the new sentencing hearing necessitated by our finding of *Skipper* error. We note that under Ohio Revised Code § 2945.05, a waiver of jury trial 'may be withdrawn by the defendant at any time before the commencement of trial.' Granted, the resentencing hearing that we order today will not constitute a 'trial' in the sense

that the petitioner's guilt or innocence is again at issue.  However, in this case, the proceeding can indeed be considered the functional equivalent of 'trial' because, unlike sentencing in a non-capital case, it will take the form of an evidentiary proceeding on the question of whether Davis should receive the death penalty or some form of a life sentence.

Moreover, we think there is a legitimate question as to whether a criminal defendant should be held to a jury waiver entered almost 25 years before his newly-mandated sentencing hearing.  In the Sixth Circuit, at least, we have recognized that a defendant's jury waiver entered prior to the first trial of his case does not bar his right to a jury trial on the same case after remand from a reviewing court.  *See, e.g.*, *United States v. Groth*, 682 F.2d 578, 580 (6th Cir. 1982) ('waiver of a jury trial does not bar a demand for a jury on retrial of the same case unless the original waiver explicitly covers this contingency'); *United States v. Lee*, 539 F.2d 606, 608 (6th Cir. 1976) ('when a reviewing court finds error in the conduct of a trial and reverses with directions for a new trial . . . the general rule is that a litigant is not bound by his prior waiver of a jury trial . . . [u]nless the language of a waiver unambiguously states that it will apply in all retrials should they be ordered').  *Accord Sinistaj v. Burt*, 66 F.3d 804, 808 (6th Cir. 1995) (rule in *Groth* inapplicable when no event such as reversal and remand for a new trial intervenes between the waiver and the attempted withdrawal).  Likewise, the Ohio courts have held, in reversing a conviction 'on the basis that [the defendant] was neither charged nor found guilty of an essential element of the offense,' that the defendant's 'previous waiver of a jury trial is also inherently revoked by the reversal of the conviction and the [amended] indictment.'  *State v. McGee*, 128 Ohio App. 3d 541, 715 N.E.2d 1175, 1178 (Ohio Ct. App. 1998).  That conclusion was based on the fact that on remand, additional evidence would be introduced from both the prosecution and the defense, as is likely to occur on remand of this case.  While not directly on point, because Davis is not facing a new indictment, the reasoning of the Ohio court in *McGee* should certainly inform the sentencing court's determination of the viability of Davis's jury waiver on remand.

*Davis X*, 475 F.3d at 780-781.

49.    Ohio death penalty procedures are bifurcated hearings or phases.  Both phases place the

burden upon the State to prove its case beyond a reasonable doubt.  "The function of a standard

of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding,

is to instruct the factfinder concerning the degree of confidence our society thinks he should have

in the correctness of factual conclusions for a particular type of adjudication.  The standard

serves to allocate the risk of error between the litigants and to indicate the relative importance

attached to the ultimate decision." *Addington v. Texas*, 441 U.S. 418, 423 (1979) (internal

quotation marks and citation omitted).  "In a criminal case, [] the interests of the defendant are of

such magnitude that historically and without any explicit constitutional requirement they have

been protected by standards of proof designed to exclude as nearly as possible the likelihood of

an erroneous judgment." *Id.*

50.    The Supreme Court has recognized that mitigation phases are trial like and subject to

constitutional protections:

> The procedure that resulted in the imposition of the sentence of life
> imprisonment upon petitioner Bullington at his first trial, however,
> differs significantly from those employed in any of the Court's
> cases where the Double Jeopardy Clause has been held
> inapplicable to sentencing.  The jury in this case was not given
> unbounded discretion to select an appropriate punishment from a
> wide range authorized by statute.  Rather, a separate hearing was
> required and was held, and the jury was presented both a choice
> between two alternatives and standards to guide the making of that
> choice.  Nor did the prosecution simply recommend what it felt to
> be an appropriate punishment.  It undertook the burden of
> establishing certain facts beyond a reasonable doubt in its quest to
> obtain the harsher of the two alternative verdicts.  The presentence
> hearing resembled and, indeed, in all relevant respects was like the
> immediately preceding trial on the issue of guilt or innocence. It
> was itself a trial on the issue of punishment so precisely defined by
> the Missouri statutes.

*Bullington v. Missouri*, 451 U.S. 430, 438 (1981) (footnote omitted).

51.    The *Bullington* Court found that Double Jeopardy protections applied specifically

because penalty phase hearings bear a sharp resemblance to guilt phase trials:

> By enacting a capital sentencing procedure that resembles a trial on
> the issue of guilt or innocence. . . . The 'embarrassment, expense
> and ordeal' and the 'anxiety and insecurity' faced by a defendant at

> the penalty phase of a Missouri capital murder trial surely are at least equivalent to that faced by any defendant at the guilt phase of a criminal trial. . . .  Because the sentencing proceeding at petitioner's first trial was like the trial on the question of guilt or innocence, the protection afforded by the Double Jeopardy Clause to one acquitted by a jury also is available to him, with respect to the death penalty, at his retrial.

*Bullington*, 451 U.S. at 444-46.

52.     The harshness of the procedure herein required Mr. Davis to be subject to a jury waiver that is now more than three decades old.  This violates Due Process and the Eighth and Sixth Amendments because Mr. Davis is subject to a stale jury waiver from 1984 when there were different facts and equities involved in 2009.

53.     First, it is arbitrary and capricious to hold Mr. Davis to such a stale waiver when the law has changed and the facts have changed.  *Furman v. Georgia*, 408 U.S. 238, 256 (1972).  This is a case where the mitigating evidence presented in 2009 is substantially different than the mitigating evidence presented in 1984.

54.     Indeed, the trial court specifically excluded the consideration of the previous proceedings.  (*See* 2nd Resent'g Tr., Sept. 8, 2009, ECF 5-7, PageID 8208, 8211.)  This alone ensured that an entirely different factual predicate was to be considered by the new three-judge panel.  Second, Mr. Davis presented mitigation in 2009 that was substantially different in nature and kind than that considered in 1984.

55.     As noted by the trial court in 2009, Mr. Davis presented mitigation covering eleven different topical areas, which were:

- Borderline personality disorder;

- Alcohol abuse;

- Love and support of family members and friends;

71

- Testimony of Defendant's daughter, Sherry Davis, regarding her forgiveness of Defendant for the purposeful killing of her mother;

- Good behavior while in prison;

- Childhood and family experience, and the impact of each upon Defendant's personality development and mental health;

- Remorse and apology;

- Age (62 years old);

- Probability of no release from prison;

- Whether a sentence of life in prison would bring closure to the victim's family; and

- The savings to taxpayers should a life sentence be imposed.

(2nd Resent'g Op., Sept. 21, 2009, ECF 4-39, PageID 4927-28).  The trial court then briefly described the sources of the above information.  (*Id.* at 4928-31.)[2]

56.     The wealth of the above mitigation should be compared to dearth of mitigation presented in 1984.  As described (and presumed correct) by the Ohio Supreme Court, Mr. Davis presented as mitigation in 1984 the following

> In mitigation, appellant presented evidence concerning his
> academic accomplishments in prison while he was incarcerated for
> the murder of his wife. Specifically, during this period of
> incarceration, appellant attended the general education and
> development program for high school graduation and was awarded
> a high school "GED"; appellant worked for and obtained an
> Associate's Degree in Business Administration; appellant was
> awarded a certificate for vocational training; and appellant
> received on-the-job training as a dental technician. Appellant had

---

[2] For reasons that will be explained *infra*, the three-judge panel's review of the mitigation was not constitutionally sufficient.  *See* Fifth Ground for Relief.

> no significant disciplinary problems during this period of
> incarceration and, following his release from prison, appellant
> attended night classes at Urbana College, found a job, and was able
> to support himself. Additionally, appellant presented evidence that
> he has maintained a good relationship with the members of his
> family and that he has received an honorable discharge from the
> U.S. Navy. We conclude that the foregoing factors concerning
> appellant's nature and character are entitled to some, but very little,
> weight in mitigation.
>
> Appellant also introduced evidence on the mitigating factor that he
> lacked a substantial capacity to conform his conduct to the
> requirements of the law because of a mental disease or defect. We
> find that appellant did not establish the existence of this factor by a
> preponderance of the evidence. However, we do believe that
> appellant's personality disorder as testified to by Dr. Fisher (in the
> penalty phase of appellant's 1984 trial) is entitled to some weight
> in mitigation.
>
> We have also considered the probability that appellant would never
> be released from prison if he were to be sentenced to life
> imprisonment. This factor is entitled to some weight in mitigation
> as appellant has demonstrated (during his prior incarceration for
> causing the death of his wife) his ability to successfully adapt to
> prison life.

*State v. Davis* (*Davis IV*), 584 N.E.2d 1192, 1198 (Ohio 1992), (ECF 4-15, PageID 1691-92).

57.     A defendant should have the right to make a decision regarding a jury waiver based on

the evidence known to him that may be presented.  This is not some mere technical requirement;

it is the essence of a knowing, intelligent and voluntary waiver.  *Patton v. United States*, 281

U.S. 276, 312-13 (1930); *Adams v. United States ex rel McCann*, 317 U.S. 269, 275, 277-78

(1942).  The Constitution demands "the utmost solicitude of which courts are capable in

canvassing the matter with the accused to make sure he has a full understanding" of his waiver.

*Boykin v. Alabama*, 395 U.S. 238, 243-44 (1969).

58.     Everything changed in Mr. Davis's case from 1984 to 2009:  new trial attorneys

represented him, new mitigation existed and was to be presented, and three new and different

judges were to determine his fate.

59.     Under Ohio's statute, a defendant can withdraw his waiver prior to the commencement of proceedings when he learns of the composition of the three-judge panel. Ohio Rev. Code § 2945.05. Ohio was allowed to change its composition of the panel yet deprived Mr. Davis of that right to withdraw his waiver.

60.     Focusing on the new judges (none of whom who were judges in 1984), a determination whether to waive a jury requires knowledge of the judges who will ultimately weigh the mitigation evidence that is to be presented. In fact, when Mr. Davis waived his right to a jury for the first proceeding, he specifically waived his jury for a specific panel. The waiver signed by the defendant and accepted by the State of Ohio specifically states:

> I, Von Clark Davis, defendant in the above cause, appearing in open court this 8th day of May, 1984, with my attorneys, Michael D. Shanks and John A. Garretson, do hereby voluntarily waive my right to trial by jury and elect to be tried by a court *to be composed of three judges, consisting of Judges Henry J. Bruewer, William R. Stitsinger, and John R. Moser* . . .

(Jury Waiver and Election of Three-Judge Panel, ECF 4-3, PageID 433(emphasis added).)

61.     The trial court erred in denying Mr. Davis's Memorandum Concerning His Right to a Trial With Respect to Resentencing. (Mot Hr'g, Aug. 28, 2009, ECF 5-6, PageID 8066 ("[T]he proceeding can indeed be considered a functional equivalent of a trial because unlike sentencing in a non-capital case it will take the form of an evidentiary proceeding on the question whether Davis should receive the death penalty or some form of a life sentence. . . . [T]he Court I think used the term he is here on a de novo proceeding. And I would at least like to suggest we are really here on a new day, a new trial for purposes of these proceedings.").)

62.     Mr. Davis's attempts to withdraw his jury waiver were caused by state constitutional malfeasance that necessitated a new sentencing hearing. The State consistently failed to live up to its end of the bargain, then changed the bargain and the composition of the sentencer, it is

74

unconstitutional to deprive Mr. Davis the opportunity to withdraw his waiver. To hold otherwise ignores these pronounced differences from a waiver entered last millennium, almost three decades ago.

63.     The trial court erred in violation of the Eighth Amendment and Due Process to allow a 25-year old stale jury waiver to stand when there was a new penalty hearing. As the Supreme Court noted, depending on the facts of the case a criminal defendant may "prefer[] the common-sense judgment of a jury to the more tutored but perhaps less sympathetic reaction of the single judge. . . . Beyond this, the jury trial provisions in the Federal and State Constitutions reflect a fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges." *Duncan*, 391 U.S. at 156. In sum, *Duncan* recognizes that our founding fathers saw the need for jury trials even though there was an independent judiciary to protect against inherent prejudices and biases of judges.

64.     The deprivation of Mr. Davis's right to jury sentencing violates the principles of *Duncan* for a fair, *de novo* and independent sentencing hearing. Justice Wright sagely expressed a concern, in the context of the appropriateness review, that the prior determination that death was appropriate would cause the subsequent panel at the subsequent hearing to believe that there was a presumption of validity to the original death sentence, which would inappropriately require the Mr. Davis to overcome a presumption as opposed to a reweighing of the aggravating factor and the mitigation anew:

> I am also troubled by the court of appeals' treatment of its duty to
> independently review the sentence pursuant to R.C. 2929.05. The
> review it engaged in can be described as cursory at best. The
> independent weighing required by the statute consisted of merely a
> reaffirmation of the appellate court's original determination that
> the sentence of death was proper, because in its view, appellant

"presented no argument" to convince the court to the contrary. Implicit within the court of appeals' opinion in its review of the sentence was a belief that its prior determination was entitled to a presumption of validity that needed to be overcome by appellant's argument. Clearly it was improper for the court to rely upon its prior determination, which we vacated, to forgo its statutory duty to independently review the sentence of death.

It has been suggested that any error resulting from the failure of the court of appeals to perform its reviewing function can be cured by our own independent review of the sentence. I am troubled, however, by our continual reliance upon this court's independent review as a means to remedy errors below. The case at bar is an excellent example of how the system of checks envisioned by the General Assembly to ensure the proper application of the death penalty has so failed that our own independent review cannot possibly restore the system to its intended function.

In this case, the system failed first at the trial level, where the defendant was precluded from introducing mitigating evidence, and then at the appellate level, where the court failed to independently review the death sentence. If our multi-tiered system of review is to function to prevent the arbitrary imposition of the death penalty, *State v. Gillard* (1988), 40 Ohio St.3d 226, 235, 533 N.E.2d 272, 282, it is imperative that each court involved in the case fully assume its statutory responsibilities to the letter of the law. Anything less than a full commitment will result in a system that is constitutionally infirm and lacking in respect.

Appellant is entitled to have the trial court consider his evidence in mitigation and to have the court of appeals review that evidence in its independent review. Accord *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph four of the syllabus. For all the reasons set forth above, I would reverse the appellate court and remand the appellant to the trial court for resentencing.

*Davis IV*, 584 N.E.2d at 1199-1200, (ECF 4-15, PageID 1693-94).

65.    Mr. Davis was notified that the newest three-judge panel was going to sentence him to death within an hour of the completion of his most recent sentencing phase.  The trial court's *de minimis* review perpetrated the same error as forecasted by Justice Wright.

66.    Mr. Davis's case exemplifies this aspect of a valid waiver.  While he presented eleven different areas of mitigation, the trial court simply discounted it all as "little or no weight," "little weight," and "no weight."  While a three-judge panel may find remorse, forgiveness, mental health issues related to alcohol, good conduct in prison where Mr. Davis will remain for the rest of his life, etc., absolutely meaningless, this is the type of mitigation that can sway a single juror. *See, e.g.*, *Williams v. Taylor*, 529 U.S. 362, 394-95 (2000).

67.    As noted above, the Sixth Circuit similarly questioned the validity of an on-going waiver in Mr. Davis's circumstances, and portended a constitutional resolution to the issue.  The remedy imposed by the Sixth Circuit informs the jury waiver, in that Mr. Davis received a totally new independent and *de novo* sentencing hearing.  Indeed, the Sixth Circuit reversed the Ohio courts for simply rubber-stamping a previous re-sentencing remand when it granted Mr. Davis relief on his *Skipper* claim.

68.    In conclusion, the only way Mr. Davis's Due Process and Eighth Amendment rights can be protected, and ensure that he did not have to overcome a presumption of validity as to the first two death sentences, is to receive a jury.  The fact that a strict construction of Ohio's death penalty statute does not call for a jury sentencing does not subvert the constitutional mandate for jury sentencing.  In *Duncan*, the Louisiana Constitution did not provide for jury trials for serious misdemeanors.  However, the United States Supreme Court held that the United States Constitution provided the right to a jury trial and Louisiana's Constitution could not bar it.  Mr. Davis simply asks for the protections accorded by *Duncan* in his challenge to Ohio's death penalty statute.

69.    To the extent the Ohio courts ruled on the merits of this claim, those rulings were contrary to, or an unreasonable application of clearly established federal law as stated by the

Supreme Court of the United States and resulted in a decision that was based on an unreasonable

determination of facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

**THIRD GROUND FOR RELIEF:**

**MR. DAVIS'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS WAS VIOLATED WHEN TRIAL COUNSEL FAILED TO REASONABLY INVESTIGATE AND PRESENT MITIGATING *SKIPPER* EVIDENCE.**

70.     The Sixth Amendment guarantee of effective assistance of counsel is violated when counsel's performance falls below an objective standard of reasonableness and the accused is prejudiced by counsel's breach of duty. *Wiggins v. Smith*, 539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000); *Strickland v. Washington*, 466 U.S. 668 (1984).

71.     Mr. Davis was denied the effective assistance of counsel at his second resentencing hearing. Defense counsel failed to reasonably investigate and present mitigating evidence of Mr. Davis's good prison behavior even though this information was known, available and relevant. *See Skipper v. South Carolina,* 476 U.S. 1, 5 (1986).  Moreover, defense counsel failed to present this evidence of Mr. Davis's exemplary prison record despite the Sixth Circuit remanding the case for a new penalty phase in order to consider this very evidence.  *See Davis v. Coyle* (*Davis X*), 475 F.3d 761, 774-75 (6th Cir. 2007).  As a result of defense counsel's failure, the trial court, yet again, failed to consider and weigh relevant mitigating evidence.  The acts and omissions of counsel prejudiced Mr. Davis and denied him due process, a fair trial, and the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments. *See Wiggins*, 539 U.S. 510; *Williams*, 529 U.S. at 396-98; *Strickland*, 466 U.S. 668.

72.     The Eighth Amendment requires the sentencer to consider the circumstances of the crime and the defendant's character, history and background during the penalty phase of a capital trial. *Boyd v. California*, 494 U.S. 370, 377–78 (1990); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). The United States Supreme Court has provided specific guidance with respect to reasonable professional assistance during the sentencing phase of a capital case. *Rompilla v. Beard*, 545 U.S. 374, 381–90 (2005); *Wiggins*, 539 U.S. at 521–29; *Williams*, 529 U.S. at 395–97.  In

particular, the Court has recognized that counsel in a capital case has an "obligation to conduct a thorough investigation of the defendant's background" to determine the availability of mitigating evidence. *Williams*, 529 U.S. at 396; *see also Williams v. Anderson*, 460 F.3d 789, 802 (6th Cir. 2006) ("Defense counsel's complete failure to investigate before deciding not to present mitigating evidence is deficient performance as a matter of law under *Strickland*."). Moreover, pursuant to *Eddings v. Oklahoma*, 455 U.S. 104 (1982), relevant mitigating evidence may not be excluded from the sentencer's consideration.

73.    Counsel's "investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins*, 539 U.S. at 524 (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989)) (emphasis in original). The United States Supreme Court has unmistakably recognized the importance of permitting capital defendants to put forth evidence of the likelihood of future good conduct at sentencing. *Ayers v. Belmontes*, 549 U.S. 7, 15 (2006).

74.    In *Skipper,* the trial court found evidence of the defendant's good behavior during the period of his incarceration between arrest and trial to be irrelevant and excluded such evidence. 476 U.S. at 5. The Supreme Court reversed Skipper's death sentence, holding that evidence of good behavior was relevant to refute the state's allegations of future dangerousness, and noting that "any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose." *Id.* at 5 (quoting *Jurek v. Texas*, 428 U.S. 262, 275 (1976)). In the capital context, a sentencing authority may consider a defendant's past conduct as indicative of his probable future behavior. *Skipper*, 476 U.S. at 5

(finding that "evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating.").

75.     In *Davis X*, 475 F.3d at 770, the Sixth Circuit invoked both *Skipper* and *Eddings* in granting Mr. Davis habeas relief.  The Sixth Circuit found that during Mr. Davis's first resentencing hearing in 1989 the three-judge panel erroneously excluded testimony concerning Mr. Davis's exemplary behavior on death row in the time between the two sentencing hearings. *Id.*  Regarding the evidence, the Sixth Circuit stated:

> Such testimony would have established that Davis was classified as an "A" prisoner, indicating that he had no discipline or conduct problems; that he was the clerk on death row for the unit manager and helped conduct tours of death row; and that he had created no problems for other inmates or for security personnel and had no conduct write-ups.  Davis worked directly for Oscar McGraw, the unit manager for death row, who complimented Davis's positive attitude and pleasant personality.  Herb Wendler, Davis's case manager, observed that Davis was cooperative and courteous, that he had been given much more freedom than other inmates on death row, and that he had been placed in various positions of trust within the unit.

*Id.* at 773.  The Sixth Circuit determined that based on the record in the case, this evidence was "without doubt . . . highly relevant to the single aggravating factor relied upon by the state—that future dangerousness should keep Davis on death row."  *Id.*

76.     Despite the Sixth Circuit's recognition of this evidence's importance and the identification of two available witnesses, defense counsel called only one witness regarding Mr. Davis's prison record at the second resentencing hearing: Scott Nowak, Mr. Davis's case manager.  Mr. Nowak testified for a meager thirteen pages without offering any substantive or anecdotal evidence regarding his interactions with Mr. Davis. (Resent'g Tr., Sept. 10, 2009, ECF 5-8, PageID 8406-19.)  In addition, defense counsel introduced only a single exhibit, a two-page institutional summary prepared by Mr. Nowak.  (*Id.* at PageID 8409; ECF 4-50, PageID 7112-

13.)  The institutional summary stated that Mr. Davis had not been to disciplinary control, he had only received one conduct report since 1984, he currently worked as a porter, he had completed several programs and community service projects, and in 2006, Mr. Davis was moved to the extended privilege unit.  However, Mr. Nowak's testimony and the two-page exhibit failed to cover the full extent of information cited in the Sixth Circuit's opinion as "highly relevant" for consideration by the trial court.

77.    This "highly relevant" evidence that defense counsel failed to present was known and easily available to defense counsel at the time of the second resentencing.  At his first resentencing hearing in 1989, Mr. Davis's counsel proffered the evidence the Sixth Circuit would later recognize as compelling.  (1st Resent'g Tr., Aug. 4, 1989, ECF 5-4, PageID 7697-7702.)  The Sixth Circuit specifically ordered a new penalty phase hearing because the original panel did not allow the defense to present this evidence.  Despite this directive from the Sixth Circuit and the availability of the evidence as presented at the first resentencing hearing in 1989, defense counsel inexplicitly failed to consider or use this evidence at the second resentencing hearing in 2009.

78.    Moreover, Mr. Davis attested that he was never asked by his attorneys for names of other guards, caseworkers or other prison personnel.  (PC Ex. B, Aff. of Von Clark Davis, ECF 4-46, PageID 6270.)  Mr. Davis could have provided his attorneys with the names of favorable witnesses willing to testify had he been asked.  These witnesses, particularly those who knew Mr. Davis over the most recent four years, could have provided relevant and essential information on how Mr. Davis responded to authority over the years and whether he would be a risk if released.

79.     Neglecting to investigate and talk to favorable witnesses cannot be a reasonable trial strategy.  The Sixth Circuit reversed the case because this very evidence existed but had not been presented.  Despite the reversal, new counsel ignored the evidence.  Defense counsel could have tried to get a court order to interview the witnesses, or subpoenaed the witnesses to testify.  (*See* PC Ex. C, Aff. of Kort Gatterdam, ECF 4-46, PageID 6273.)  Instead, defense counsel did nothing to fully explore this compelling theory of mitigation – taking a minimalist approach.  Mr. Davis's post-conviction expert, Diane Menashe, an experienced criminal defense attorney in Ohio, opined that the failure to investigate and present this evidence constitutes ineffective assistance of counsel.  (PC Ex. D, ECF 4-46, PageID 6275-79.)

80.     Furthermore, the two-page institutional summary prepared by Mr. Nowak failed to provide the full picture of Mr. Davis's good behavior in prison.  The two-page exhibit improperly stood in place of Mr. Davis's actual prison record, which contained much more helpful and relevant mitigating information.  Mr. Nowak admitted to reviewing Mr. Davis's unit file, which contained Mr. Davis's disciplinary record, program participation, and any type of classification changes, like security or job changes.  (Resent'g Tr., Sept. 10, 2009, ECF 5-8, PageID 8410.)  All of these relevant prison records should have been presented to the three-judge panel for consideration.

81.     Included within Mr. Davis's full prison records are a certificate of completion for a twelve-week stress management seminar; job evaluations indicating Mr. Davis was "a real good worker" and "has demonstrated excellent adjustment"; classification forms dating back to 1986 showing Mr. Davis's responsibility and lack of disciplinary reports; school records which consist of records dating back to junior high school, Mr. Davis's GED certificate, the classes Mr. Davis

has enrolled in while incarcerated, including college courses; and Davis's application for members with the Vietnam Veterans of America. (*See* PC Ex. E, ECF 4-46, PageID 6281-364.)

82.     This mitigating evidence regarding good prison behavior and positive adjustment to prison life had already been found to be "highly relevant" by the Sixth Circuit.  *Davis V*, 475 F.3d at 773.  Defense counsel should have requested, reviewed, investigated and presented the evidence related to Mr. Davis's exemplary prison record as mitigating evidence.  Instead, the only evidence considered by the three-judge panel was Mr. Nowak's subjective two-page summary of Mr. Davis's time in prison.  Counsel's deficient performance precluded the sentencing panel from considering and giving weight and effect to available, compelling mitigation evidence in the determination of Mr. Davis's sentence.  As a result, Mr. Davis received a sentence of death.

83.     Reasonable strategic decisions cannot be made with a lack of information – counsel has a duty to investigate the facts, "to preserve options" before embarking on a course of mitigation.  *Powell v. Collins*, 332 F.3d 376, 399-400 (6th Cir. 2003).  Counsel's failure to reasonably investigate, prepare and present this mitigating evidence cannot be viewed as a reasonable strategic decision, but rather must be viewed as a dereliction of duty that prejudiced Mr. Davis.  *See Wiggins*, 539 U.S. at 525 (stating that a *Strickland* violation is established where the scope of an attorney's investigation into mitigating evidence prior to trial was "unreasonable in light of what" counsel knew about their client).

84.     Defense counsel failed to reasonably and competently investigate, prepare and present available *Skipper* evidence at the second resentencing hearing.  Counsel's deficient performance precluded the sentencing panel from considering and giving weight and effect to available, compelling mitigation evidence in the determination of Mr. Davis's sentence.  Counsel's failure

cannot be viewed as a reasonable strategic decision, but rather viewed as a dereliction of duty that prejudiced Mr. Davis. *See Wiggins*, 539 U.S. at 525 (stating that a *Strickland* violation is established where the scope of an attorney's investigation into mitigating evidence prior to trial was "unreasonable in light of what" counsel knew about their client).

85.     Counsel's performance fell well below an objective standard of reasonableness and the prevailing professional norms as articulated in the ABA Guidelines. *See Wiggins*, 539 U.S. 510. Absent counsel's deficient performance, there is a reasonable probability that Mr. Davis would not have been sentenced to death.  Accordingly, Mr. Davis received ineffective assistance of counsel, in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. *See Strickland*, 466 U.S. 668.

86.     To the extent the Ohio courts ruled on the merits of this claim, those rulings were contrary to or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

**FOURTH GROUND FOR RELIEF:**

**MR. DAVIS WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HIS RIGHTS AS GUARANTEED BY THE FIFTH , SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION DUE TO HIS COUNSEL'S FAILURES IN ADVISING HIM REGARDING A JURY WAIVER.**

87.    On May 8, 1984, Mr. Davis waived his right to trial by jury and elected to be tried by a three-judge panel consisting of Judges Henry J. Bruewer, William R. Stitsinger, and John R. Moser.  (Jury Waiver, 2nd PC Ex. O, ECF 4-46, PageID 6459.)

88.    Defense counsel must advise their clients of the collateral consequences of waiving a constitutional right.  *Padilla v. Kentucky*, 559 U.S. 356 (2009).  Mr. Davis's defense counsel fell below this standard.  Mr. Davis's convictions and sentences are constitutionally infirm because his original defense counsel did not advise him of the collateral consequence of his decision to waive his right to a jury trial.  Defense counsel did not provide objectively reasonable assistance and Mr. Davis was prejudiced as a result of this failure.  *Hill v. Lockhart*, 474 U.S. 52, 56-57 (1985); *Strickland v. Washington*, 466 U.S. 668 (1984).  Mr. Davis was denied his right to effective assistance of counsel as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution

89.    Since the reintroduction of capital punishment, in response to the United States Supreme Court's decision in *Furman v. Georgia*, 408 U.S. 238 (1972), the area of capital litigation has become a recognized specialty.  Numerous substantive and procedural areas have been carved out by the United States Supreme Court.  As a result, anyone who litigates in the area of capital punishment must be familiar with these issues to raise and preserve them for appellate and post-conviction review.  (Aff. of Harry Reinhart, 1st PC Ex. P, ECF 4-19, PageID 1987-91).

90.     Whether to waive a jury and try a capital case to a three-judge panel is a crucial decision. Ohio's three-judge panel provision in capital cases has no counterpart in other state statutes, and therefore the standards of practice relating to this technique are unique. (*Id.* at PageID 1990).

91.     Mr. Davis's trial counsel rendered constitutionally ineffective assistance in failing to properly advising Mr. Davis regarding all of the consequences of his jury waiver.

A.     **Defense counsel were ineffective for failing to inform Mr. Davis about the negative impact a jury waiver would have on appellate review of his case.**

92.     The Ohio Supreme Court has adopted a rule in capital cases that in a trial before a three-judge panel, the court will, in reviewing the case, presume that the panel considered only relevant, material, and competent evidence in reaching its decision unless the record affirmatively demonstrates otherwise. *State v. White*, 239 N.E.2d 65, 70 (Ohio 1968); *See also State v. Post*, 513 N.E.2d 754, 759 (Ohio 1987).

93.     The Ohio presumption is effectively non-rebuttable. Only if the record affirmatively shows that the trial court considered improper evidence will an appellate court find its admission to be error. The standard for an affirmative showing on the record is almost impossible to meet. The defendant has no way to create such a record because he cannot attend the court's deliberations. Only if the court happens to mention the particular evidence at issue in pronouncing sentence or in its opinion can the defendant make the required showing.

94.     Equal protection requires that all capital defendants be tried on the same quality of evidence. Due process requires that the rules of evidence be applied fairly and that capital defendants not be deprived of a fair determination of their cases. Capital defendants in Ohio are deprived of these rights when are tried and sentenced before a three-judge panel.

95.     These disparities represent significant consequences that must be considered when advising a client about his right to waive a jury and try a case to a three-judge panel. As a result

of these very practical considerations, a very specific standard of practice has developed in Ohio

with respect to jury waivers in capital cases. A capital defendant should always be advised prior

to waiving a jury trial that his case will be subject to a lesser standard of review on appeal if tried

before a three-judge panel. (Aff. of Harry Reinhart, 1st PC Ex. P, ECF 4-19, PageID 1987-91).

96.    Gerald Simmons is an attorney who has been practicing criminal law in Ohio since 1972.

(Ex. PP to Pet'r's Mot. to Alter or Amend ¶¶ 1-3, *Davis v. Coyle*, No. C-1-97-402 (S.D. Ohio

Sept. 18, 2001), ECF 141.) Mr. Simmons has represented several dozen people charged with

capital murder in Ohio and regularly teaches at death penalty seminars and advises defense

counsel on trial matters. (*Id.* at ¶¶2-8.) He has significant expertise regarding the standards of

practice in death penalty cases in Ohio. (*Id.*) In regards to a defendant waiving jury, Mr.

Simmons notes that if a defendant's case is tried to a three-judge panel, "the appellate courts will

presume that the panel followed the law and did not make any errors. This is a significant

consequence of a jury waiver." (*Id.* at ¶9.) Therefore, "defense counsel should advise their

client about this significant consequence. Any failure to so advise their client is unreasonable."

(*Id.* at ¶10.) In capital cases, "client[s] need to understand this presumption by the appellate

courts in order to make a knowing and meaningful decision whether to have his case tried to a

jury or a three-judge panel." (*Id.*)

97.    This facet of capital defense has been recognized in Ohio. It serves as a minimum

standard of practice for capital litigation in cases tried to a three-judge panel. Failure to meet this

standard evidences unreasonable professional judgment and heightens the probability that a

client's conviction and sentence of death will be affirmed on appeal regard less of errors

occurring at trial.

98.     Mr. Davis's trial counsel fell below this standard.  The jury waiver Mr. Davis signed did not include any information about the collateral consequences of waiving a jury and how that could impact his appeals.  (Jury Waiver, 2nd PC Ex. O, ECF 4-46, PageID 6459.)  His counsel also did not advise Mr. Davis of this consequence of waiving jury.  (Aff. of Von Clark Davis, 1st PC Ex. Q, ECF 4-19, PageID 1992-93).

99.     Because Mr. Davis was not made aware of all of the circumstances and consequences of his jury waiver, his waiver was not intelligent, knowing, and voluntary.  Had he been properly informed, Mr. Davis would not have elected to waive his jury.  (*Id.* at PageID 1993); (*see also* Ex. NN to Pet'r's Mot. to Alter or Amend ¶¶1-2, *Davis v. Coyle*, No. C-1-97-402 (S.D. Ohio Sept. 18, 2001), ECF 141.)

100.    Mr. Davis was prejudiced.  His conviction and death sentence must be reversed.

101.    To the extent the Ohio courts ruled on the merits of this claim, those rulings were contrary to or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on unreasonable determination of the facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

   **B.     Defense counsel were ineffective for not explaining to Mr. Davis that he could not retract his jury waiver at a new trial and/or penalty phase, regardless of who the panel judges were at a retrial.**

102.    The jury waiver Mr. Davis signed did not include any information about how it would impact Mr. Davis's subsequent trials in the event of a successful appeal.  (Jury Waiver, 2nd PC Ex. O, ECF 4-46, PageID 6459.)

103.    Before waiving his right to a jury, Mr. Davis was never advised by defense counsel that his waiver would be forever biding.

104.    For example, defense counsel never advised Mr. Davis that once he waived a jury, he would forever be locked into that waiver even if his case came back for retrial after appeal.  (Aff. of Von Clark Davis, 2nd PC Ex. B, ECF 4-46, PageID 6270-72.)

105.    Defense counsel also failed to advise Mr. Davis that his jury waiver applied not only to his original panel of judges, but also to any new panel of judges that might try his case later if his conviction and/or sentence was reversed on appeal.  (*Id.* at PageID 6271.)  As Mr. Davis stated, he was under the impression that "the jury waiver applied to this panel of judges only and for this trial only, not to any new panel of judges or even one different judge that might hear the case later if my case was reversed on appeal."  (*Id.*)

106.    Finally, defense counsel failed to advise Mr. Davis that if Ohio's death penalty law changed, he would not get the benefit of those changes because he had waived his right to a jury trial.  (*Id.*)

107.    If Mr. Davis had been properly advised about the collateral consequences of his waiver, he never would have gone to trial in front of a three-judge panel and would have exercised his right to trial by jury.  *Id*; *see also* Ex. NN to Pet'r's Mot. To Alter or Amend ¶¶1-2, Davis v. Coyle, No. C-1-97-402 (S.D. Ohio Sept. 18, 2001), ECF 141.)

108.    To the extent the Ohio courts ruled on the merits of this claim, those rulings were contrary to or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on unreasonable determination of the facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

C.    **Defense counsel were ineffective for not reserving Mr. Davis's right to withdraw his jury waiver.**

109.    Counsel must recognize that the same factors which affect jurors in a capital case also affect judges.  It is beyond dispute that judges require public recognition to be elected and that

the criminal docket is by far the most effective means of garnering publicity. The Code of

Judicial Conduct prohibits judges during campaigns from speaking about or commenting on any

issue which may come before them and thus further hinders any particular candidate or judge's

ability to communicate his/her position on various important social issues such as crime. Thus,

as a very practical matter, an Ohio trial court judge's conduct of a capital trial and, more

importantly, the result and sentence becomes an important tool in communicating with the

electorate. (*See* Aff. of Harry Reinhart, 1st PC Ex. O, ECF 4-19, PageID 1982.)

110.     These are realistic factors that must be taken into consideration when advising a client

about his right to waive a jury and try a case to a three-judge panel. As a result of these very

practical considerations, a very specific standard of practice has developed in Ohio with respect

to jury waivers in capital cases.

111.     Gerald Simmons is an attorney who has been practicing criminal law in Ohio since 1972.

(Ex. PP to Pet'r's Mot. To Alter or Amend ¶¶1-3, *Davis v. Coyle*, No. C-1-97-402 (S.D. Ohio

Sept. 18, 2001), ECF 141.)  He has represented several dozen people charged with capital

murder in Ohio and regularly teaches at death penalty seminars and advises defense counsel on

trial matters. (*Id.* at ¶¶2-8.)  Mr. Simmons has significant expertise regarding the standards of

practice in death penalty cases in Ohio. (*Id.*)  Mr. Simmons is aware that trying a case to a three-

judge panel "presents a significantly higher likelihood of a death sentence than trying it to a

jury." (*Id.* at ¶13.)  In regards to a defendant waiving jury, Mr. Simmons notes that defense

counsel "should only advise their client to waive a jury and have the case tried to a three-judge

panel if they have (a) received sufficient assurances that the panel will spare the client's life, and

(b) properly reserved the client's right to revoke the jury waiver in the event that the panel

decides to impose the death penalty." (*Id.* at ¶8.)

112.     Because of the extraordinary and unusual risks associated with waiving a jury trial right in favor of a three-judge panel, the jury trial right should never be waived without reservation of the option to withdraw the waiver in the event that the three-judge panel returns a death sentence. The reservation of this right should be made in open court and on the record. (*See* Aff. of Harry Reinhart, 1st PC Ex. O, ECF 4-19, PageID 1985.)

113.     To do otherwise would place a capital client such as Mr. Davis in far too much jeopardy and constitutes unacceptable practice in what clearly is the most serious of all cases. This facet of capital litigation has been recognized in Ohio. It serves as a minimum standard of practice for capital litigation in cases tried to a three-judge panel. Failure to meet this standard evidences unreasonable professional judgment and heightens the probability that a client will be sentenced to death with little or no hope of relief on the appellate or post-conviction levels.

114.     Counsel who represented Mr. Davis at trial fell below this standard. Defense counsel failed to take the necessary steps to ensure that Mr. Davis could withdraw his jury waiver if the three-judge panel elected to impose death. As a result, Mr. Davis had no recourse when the panel imposed a death sentence on him.

115.     Counsel's failure in this case exposed Mr. Davis to the death sentence both initially and on his two resentencings. Had counsel taken the necessary steps, Mr. Davis would not have been eligible for death on resentencing.

116.     Mr. Davis received the ineffective assistance of counsel which caused his jury waiver to be invalid. He was prejudiced and his convictions and sentences should be reversed.

117.     To the extent the Ohio courts ruled on the merits of this claim, those rulings were contrary to, or an unreasonable application of clearly established federal law as stated by the

Supreme Court of the United States and resulted in a decision that was based on an unreasonable

determination of facts in light of the evidence presented in state courts. 28 U.S.C. § 2254.

> **D.** **Defense counsel were ineffective for advising Mr. Davis to waive jury when they knew that he was likely to be sentenced to death because his innocence defense would prevent him from accepting responsibility.**

118.    Prior to Mr. Davis's capital trial, defense counsel Michael Shanks had several

conversations with Judge Henry J. Bruewer, who was the initial judge appointed to the case.

(Deposition of Michael D. Shanks, ECF 4-26, PageID 2885.)  During these conversations, Judge

Bruewer told Mr. Shanks that he "would be not likely to vote for death" where a defendant

accepted responsibility for the murder and showed remorse for his actions.  (*Id*. at PageID 2887.)

Conversely, Judge Bruewer told defense counsel that he would be "more inclined" to impose a

death sentence if Mr. Davis maintained his innocence and failed to accept responsibility.  (*Id*.)

119.    Mr. Shanks had a "good relationship" with Judge Bruewer and considered him to be a

"very straightforward and honest man."  (*Id*. at PageID 2885.)

120.    Prior to and during trial, Mr. Davis always insisted on his innocence, and he did not plead

guilty.  (*Id*. at PageID 2888.)  At trial, Mr. Davis testified that he "absolutely" did not shoot

Suzette Butler.  (Tr. Trans., ECF 5-3, PageID 7541.)

121.    Gerald Simmons is an attorney who has been practicing criminal law in Ohio since 1972.

(Ex. PP to Pet'r's Mot. To Alter or Amend at ¶¶1-3, *Davis v. Coyle*, No. C-1-97-402 (S.D. Ohio

Sept. 18, 2001), ECF 141.)   He has represented several dozen people charged with capital

murder in Ohio and regularly teaches at death penalty seminars and advises defense counsel on

trial matters.  (*Id*. at ¶¶2-8.)  Mr. Simmons has significant expertise regarding the standards of

practice in death penalty cases in Ohio.  (*Id.*)  Mr. Simmons is aware that trying a case to a three-

judge panel "presents a significantly higher likelihood of a death sentence than trying it to a

jury." (*Id*. at ¶13.)   In regards to a defendant waiving jury, Mr. Simmons notes that defense counsel should only advise their client to waive a jury and have the case tried to a three-judge panel if they have received sufficient assurances that the panel will spare the client's life.  (*Id*. at ¶8.)

122.    In Mr. Davis's case, defense counsel did receiving assurances from the panel that they would not impose death before advising him to waive jury.  Remarkably, they advised Mr. Davis to waive jury after being told that the absence of remorse and acceptance of responsibility would be a factor that weighed strongly in favor of a death sentence.  Yet despite being told this by a "straightforward" judge who became the lead judge on the panel, defense counsel had their client waive jury, proceeded with an innocence argument, and even called Mr. Davis to testify in ways sure to be damaging considering what they knew about Judge Bruewer's requirement of remorse and acceptance of responsibility to avoid a death sentence.  Collectively, these circumstances provided the perfect recipe for a death sentence.  Because defense counsel knew about Judge Bruewer's pre-trial opinions and Mr. Davis's claim of innocence, they were ineffective in advising Mr. Davis to waive a jury trial.

123.    Defense counsel had to know that Mr. Davis was likely to be sentenced to death because his innocence defense would prevent him from accepting responsibility, an essential mitigating factor in the eyes of Judge Bruewer, who took the role of lead judge after the three-judge panel was assembled. (Shanks Depo., ECF 4-26, PageID 2884).

124.    Mr. Davis's convictions and sentences are constitutionally infirm because his original defense counsel advised Mr. Davis to waive jury when they knew that he was likely to be sentenced to death because his innocence defense would prevent him from accepting responsibility.  Defense counsel did not provide objectively reasonable assistance and Mr. Davis

was prejudiced as a result of this failure. *Hill v. Lockhart*, 474 U.S. 52, 56-57 (1985); *Strickland v. Washington*, 466 U.S. 668 (1984). Mr. Davis was denied his right to effective assistance of counsel as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

125.    To the extent the Ohio courts ruled on the merits of this claim, those rulings were contrary to, or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in state courts. 28 U.S.C. § 2254(d).

## FIFTH GROUND FOR RELIEF:

MR. DAVIS'S RIGHTS AS GUARANTEED BY THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WERE VIOLATED WHEN THE TRIAL COURT FAILED TO FULLY AND FAIRLY CONSIDER ALL MITIGATING EVIDENCE.

126.     Mr. Davis has had three sentencing proceedings.  On each occasion, the mitigating evidence has become more developed, refined and plentiful, while simultaneously the state courts have accorded it less and less weight.  A state cannot bar consideration of evidence if the sentencer could reasonably find that it warrants a sentence of less than death.  A sentencer must not only consider, but also give effect to the mitigation.  *See Porter v. McCollum*, 558 U.S. 30, 43 (2009) (finding a state court's treatment of mitigation problematic when it was "unreasonable to discount" mitigation by "reduc[ing it] to inconsequential proportions.") (internal quotation marks omitted).

127.     The requirement of an individual determination of whether an individual should be sentenced to death is a fundamental prerequisite to a constitutionally valid death penalty.  The need for individualized treatment of each particular capital defendant has been repeatedly stressed since the Supreme Court approved capital punishment in *Gregg v. Georgia*, 428 U.S. 153 (1976).  In *Gregg*, the Court held that the sentencer must focus on "the particularized characteristics of the individual defendant."  *Id.* at 206.  In *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976), the Court explained:

> A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind.  It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death.

Accordingly, the focus of the mitigation phase of the trial should be on the circumstances of the offense and the character of the individual defendant. *See Profitt v. Florida*, 428 U.S. 242 (1976); *see also Lockett v. Ohio*, 438 U.S. 586 (1978) (holding that individualized consideration of mitigating factors is required).

128.    The Court later echoed this theme of individualized consideration:

> Given that the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases. The need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual is for more important than in non-capital cases . . . . The nonavailability of corrective or modifying mechanics with respect to an executed capital sentence underscores the need for individualized consideration as a constitutional requirement in imposing the death sentence.

*Lockett*, 438 U.S. at 605. The Court later again stressed the need for individualized treatment of each capital defendant: "The sentencer must…be able to consider and give effect to (mitigating) evidence in imposing sentence. . . . Only then can we be sure that the sentencer has treated the defendant as a uniquely individual human being and has made a reliable determination that death is the appropriate sentence." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (internal citation and quotation marks omitted).

129.    Moreover, the trier of fact may not disregard mitigating evidence by excluding it from consideration. *See Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982). In *Eddings*, the Supreme Court held that the sentencer "must consider all relevant mitigating evidence and weigh it against the evidence of the aggravating circumstances." *Id.* at 117; *see also Porter*, 558 U.S. at 42 (finding that the reviewing court erred because it "either did not consider or unreasonably discounted the mitigation evidence"). The Supreme Court specifically criticized the reviewing court for reducing mitigating evidence to "inconsequential proportions." *Porter*, 558 U.S. at 43.

130.    At the second resentencing hearing, the three-judge panel unreasonably discounted and failed to adequately weigh the mitigating factors presented.  (*See* 2nd Resent'g Op., Sept. 21, 2009, ECF 4-39, PageID 4932-34.)  The trial court's failure to adequately weigh all mitigating evidence deprived Mr. Davis of a fair and reliable sentencing hearing in violation of his rights under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

131.    Here, the three-judge panel rejected every mitigating factor presented by assigning it no "significant weight," "very little weight,"  "little or no weight," "little weight" or "no weight" at all.  (*See* Sent'g Op., Sept. 21, 2009, ECF 4-46, PageID 6375-77.)  Ignoring and impermissibly discounting all mitigating evidence prevented the sentencing panel from making an individualized determination of "the particularized characteristics" of Mr. Davis in violation of his rights under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution. *See Penry*, 492 U.S. 302; *Lockett*, 438 U.S. 586; *Woodson*, 428 U.S. 280; *Gregg*, 428 U.S. 153; *Profitt*, 428 U.S. 242.

## A.    The trial court erred by unreasonably discounting and inadequately weighing mitigating evidence.

132.    At the second resentencing, the three-judge panel erred when it "unreasonably discounted" and failed to weigh mitigating evidence that deserved a more comprehensive analysis.  *See Eddings*, 455 U.S. at 113-14; *Porter*, 558 U.S. at 43.

133.    First, the trial court impermissibly discounted mitigating evidence of Mr. Davis's good behavior while in prison.  The Ohio Supreme Court had previously assigned "some weight" to Mr. Davis's good behavior in prison, but the sentencing court assigned "little weight" years later to more of this mitigating evidence.  *Compare State v. Davis* (*Davis IV*), 584 N.E.2d 1192 (Ohio 1992), (ECF 4-15, PageID 1685) *with* (2nd Resent'g Op., Sept. 21, 2009, (ECF 4-39, PageID 4933).  The United States Supreme Court has recognized good behavior in prison as an important

mitigating factor that helps predict future behavior.  *See Skipper v. South Carolina*, 476 U.S. 1, 4

(1986).  By assigning little weight to this factor with no explanation, the trial court unreasonably

discounted relevant mitigating evidence.

134.    The three-judge panel also gave "little weight" to Mr. Davis's diagnosed personality

disorder and alcohol dependence.  (2nd Resent'g Op., Sept. 21, 2009, ECF 4-39, PageID 4931-

32).  The panel's reasoning is not supported by the record, particularly in light of the multiple

mental health evaluations of Mr. Davis that found similar symptoms and diagnoses.  Mr. Davis's

mental health diagnoses should have received more weight from the panel. particularly when

Ohio statute directs the sentencer to consider the existence of a "mental disease or defect" at the

time of the offense as a mitigating factor.  Ohio Rev. Code § 2929.04(B)(3).

135.    In addition, the trial court gave "little or no weight" to the evidence presented from Mr.

Davis's friends and family concerning his "dysfunctional family and childhood experiences."

(2nd Resent'g Op., Sept. 21, 2009, ECF 4-39, PageID 4931-32).  Once again, the sentencer "did

not consider or unreasonably discounted" accepted mitigation evidence.  *See Wiggins*, 539 U.S.

510; *Rompilla*, 545 U.S. 374.  The trial court failed to see this evidence as a tool to be used in

providing context for Mr. Davis's action and instead impermissibly discounted the evidence

without explanation.

136.    The trial court also neglected to fully evaluate and give weight to Mr. Davis's emotional

state and remorse.  The panel decided that love and support from family and friends "does not

deserve significant weight," (2nd Resent'g Op., Sept. 21, 2009, ECF 4-39, PageID 4947), despite

the Ohio Supreme Court specifically noting such evidence to be mitigating, *see State v. Smith*,

721 N.E.2d 93, 116 (Ohio 2000) ("Also mitigating is the love and support that appellant enjoys

from some family members.").  The panel similarly found that Mr. Davis's remorse and apology

should be given "little weight," (2nd Resent'g Op., Sept. 21, 2009, ECF 4-39, PageID 4933), even though the Supreme Court of Ohio has found remorse to be mitigating, *see State v. Rojas*, 592 N.E.2d 1376, 1387 (Ohio 1992). The panel even dismissed testimony that the victim's daughter had forgiven Mr. Davis by assigning it "very little weight." (2nd Resent'g Op., Sept. 21, 2009, ECF 4-39, PageID 4932).

137. The trial court failed to see this evidence as a tool to be used in providing context for Mr. Davis's actions or for assessing his individualized characteristics. The court reduced the mitigating evidence to "inconsequential proportions" and "unreasonab[ly] discount[ed]" each piece of mitigating evidence, *Porter*, 558 U.S. at 20, by assigning it no "significant weight," "very little weight," "little or no weight," or "little weight."

### B. The trial court erred by failing to assign any weight to mitigating evidence.

138. Additionally, the three-judge panel impermissibly assigned "no weight" to evidence that Mr. Davis would never be released from prison if given a life sentence, evidence of the economic benefit to tax payers if given a life sentence, and the closure a life sentence would bring to the victim's family. (2nd Resent'g Op., Sept. 21, 2009, ECF 4-39, PageID 4933). The sentencer may choose how much weight is to be given to mitigating evidence "[b]ut they may not give it no weight by excluding such evidence from their consideration." *Eddings*, 455 U.S. at 115.

139. Regarding evidence that Mr. Davis would never be released from prison, the panel reviewed testimony given by Cynthia Mausser, the Chair of the Ohio Parole Board, discussing the probability that Mr. Davis would never be released from prison if given a sentence less than death. (2nd Resent'g Op., Sept. 21, 2009, ECF 4-39, PageID 4933). The panel found these statements "highly speculative and unconvincing and entitled to no weight." (*Id.*) The trial court's reasoning for disregarding this mitigating evidence is not supported; the Ohio Supreme

Court specifically found that "[t]his factor is entitled to some weight in mitigation as appellant has demonstrated (during his prior incarceration for causing the death of his wife) his ability to successfully adapt to prison life." *Davis IV*, 584 N.E. at 1198.

140.    As for the benefit to taxpayers and closure to the victim's family, the panel merely stated they were "uncertain whether these factors are relevant mitigating factors" and then dismissed them.  (ECF 4-39, PageID 4933-34.)  However, the trial court provided no reasoning or explanation as to how these factors would not be relevant to their determination.

141.    By assigning "no weight" to this mitigating evidence, the trial court improperly excluded relevant mitigating evidence from their weighing determination. *See Eddings*, 455 U.S. at 115.

### C.  Conclusion

142.    The three-judge panel's unexplained dismissal of every mitigating factor prevented the trial court from properly weighing the mitigating evidence and considering Mr. Davis's individualized characteristics.  The panel unreasonably assigned very little or no weight to factors that could provide a context for Mr. Davis's actions and show that he can succeed in a structured environment without a death sentence.  The failure of the trial court to fairly and fully consider and weigh mitigating evidence violates Supreme Court precedent and Mr. Davis's rights to a fair trial and due process guaranteed by the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

143.    As Justice Wright pointed out in his dissent in 1994, the death sentence was a done deal for Mr. Davis. *See State v. Davis* (*Davis IV*), 584 N.E.2d 1192, 1198-99 (Ohio 1992), (ECF 4-15, PageID 1692-94) (Wright, J. dissenting).  The state courts started from a presumption of death and accordingly unreasonably discounted and ignored increasingly weighty mitigation to reimpose death.

144.    To the extent the Ohio courts ruled on the merits of this claim, those rulings were

contrary to or an unreasonable application of clearly established federal law as stated by the

Supreme Court of the United States, and resulted in a decision that was based on unreasonable

determination of the facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

## SIXTH GROUND FOR RELIEF.

**THE CAPITAL SPECIFICATION OF A PRIOR HOMICIDE THAT WAS USED IN MR. DAVIS'S CASE WAS TOO REMOTE IN TIME, IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.**

145.    Count one of the indictment carried a capital specification that prior to this offense, Mr. Davis had been convicted of an offense an essential element of which was the purposeful killing of, or attempt to kill, another.  Ohio Revised Code § 2929.04(A)(5).

146.    The prior homicide for which Mr. Davis was convicted occurred in 1971.  This predates *Furman v. Georgia*, 408 U.S. 238 (1972), *Lockett v. Ohio*, 438 U.S. 586 (1978), and Ohio's *Lockett*-compliant death penalty statute effective 1981, by two years, seven years and ten years, respectively.  This offense was too remote in time to be used as a specification for the death penalty.

147.    The use of a thirteen-year-old crime is unconstitutional.  A state's death penalty statutes must be drawn and applied in such a manner so as to avoid the arbitrary and capricious use of the death penalty.  *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980).  The primary purpose of a capital specification or an aggravating circumstance is to identify for the jury particular aspects of the course of conduct that made the offender eligible for death.  *Jurek v. Texas*, 428 U.S. 262, 271 (1976).  A thirteen-year-old crime has no relationship to the present offense.

148.    Rather, it acts as an *ex post facto* application of a sentencing enhancement provision that did not exist in 1971.  Article I, Section 10 of the United States Constitution provides:  "No State shall * * * pass any * * * ex post facto Law."  U.S. Supreme Court Justice Chase identified the four kinds of laws that come within the Ex Post Facto Clause:

> 1st. Every law that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action.

> 2d. Every law that *aggravates* a *crime*, or makes it *greater* than it was, when committed.
>
> 3d. Every law that *changes the punishment*, and inflicts a *greater punishment*, than the law annexed to the crime, when committed.
>
> 4th. Every law that alters the *legal* rules of *evidence*, and receives less, or different, testimony, than the law required at the time of the commission of the offence, *in order to convict the offender.*

*Calder v. Bull,* 3 U.S. (3 Dall.) 386, 390 (1798). The United States Supreme Court has adopted Justice Chase's definition of "ex post facto laws" as authoritative. *See, e.g., Stogner v. California,* 539 U.S. 607, 611-13 (2003); *Carmell v. Texas,* 529 U.S. 513, 521-25 (2000).

149. Further, using Mr. Davis's prior conviction in charging him regarding a subsequent crime subjects him to jeopardy twice for a single offense by the same jurisdiction. *See Blockburger v. United States*, 284 U.S. 299, 304 (1932).

150. Mr. Davis was prejudiced because the use of a murder too remote in time as a capital specification resulted in the imposition of the death penalty. As a result, his convictions and sentences must be reversed.

151. To the extent the Ohio courts ruled on the merits of this claim, those rulings were contrary to or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on unreasonable determination of the facts in light of the evidence presented in state courts. 28 U.S.C. § 2254(d).

**SEVENTH GROUND FOR RELIEF:**

MR. DAVIS WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL DURING HIS SECOND RESENTENCING HEARING WHEN COUNSEL FAILED TO REASONABLY INVESTIGATE AND PRESENT MITIGATION EVIDENCE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

152.    The Sixth Amendment guarantee of effective assistance of counsel is violated when counsel's performance falls below an objective standard of reasonableness and the client is prejudiced by counsel's breach of duty. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Williams v. Taylor*, 529 U.S. 362, 390-91 (2000); *Strickland v. Washington*, 466 U.S. 668 (1984).

153.    Mr. Davis was denied effective assistance of counsel at his second resentencing hearing when counsel called Cynthia Mausser as a witness, failed to prepare or revise Dr. Robert Smith's testimony in light of the evidence presented, failed to call mitigation investigator John Lee to testify to information on behalf of unavailable witnesses and failed to adequately prepare available mitigating witnesses for testifying.  The acts and omissions of counsel prejudiced Mr. Davis and denied him due process, a fair trial, and the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments.  *See Strickland*, 466 U.S. at 687-88.

### A.  Mr. Davis was denied effective assistance of counsel when counsel called Ms. Cynthia Mausser as a mitigating witness

154.    Mr. Davis was denied effective assistance of counsel at his second resentencing hearing. Counsel failed to reasonably investigate and prepare for mitigation by calling Cynthia Mausser, the chair of the Ohio Parole Board, as a mitigation witness without discussing her anticipated testimony and then failing to examine her on re-direct.

155.    At the opening of Mr. Davis's second resentencing hearing, defense counsel stated that based on the applicable law, if the panel sentenced Mr. Davis to a thirty-years-to-life sentence, he would be entitled to parole in six years.  (2nd Resent'g Tr., Sept. 8, 2009, ECF 5-7, PageID 8225.)  However, counsel promised that Ms. Mausser "will testify based upon his prior record,"

105

that even though "he committed the second murder, while he was still on parole from the first murder . . . he will not be paroled." (*Id.* at PageID 8225-26.) Counsel again promised that that if the panel "decide[d] to impose life with parole eligibility 'til he has served 30, we will note from Ms. Mausser's testimony that he will never be paroled." (*Id.* at PageID 8227.) Despite defense counsel's assertions, Ms. Mausser never made those statements to defense counsel prior to trial. (2nd PC Ex. F, ECF 4-46, PageID 6365.)

156.    Prior to Ms. Mausser taking the stand, the prosecution objected, arguing that Ms. Mausser should not testify because it would be irrelevant and speculative. (2nd Resent'g Tr., Sept. 9, 2009, ECF 5-7, PageID 8323-25.) The prosecutor stated that he spoke with Ms. Mausser prior to trial, and that Ms. Mausser told the prosecutor "that she would not be in a position to be able to testify whether or not she would vote for parole or not vote for parole, it would be improper for her to say that she could not say what a majority of the board would do as they are not here." (*Id.* at PageID 8323). In response, defense counsel claimed: "we will be in a position of surprise and affirmative damage if she testifies as the prosecution is suggesting because we, in fact, interviewed her four months ago and Ms. Cook will testify, if necessary, that that is not what we were told." (*Id.* at PageID 8327.) Defense counsel further stated: "It is my belief based upon our conversation with her through three or four months ago, is that she will say based upon similar factors, that she has seen in other cases, she would not anticipate that he would ever be paroled." (*Id.* at PageID 8330.) Based on these affirmations, the panel permitted Ms. Mausser to testify. (*Id.* at PageID 8333-35.) During Mr. Davis's post-conviction proceedings, Ms. Mausser indicated by affidavit that she did not tell defense counsel that Mr. Davis would never be paroled. (PC Ex. F, ECF 4-46, PageID 6365.)

157.    Ms. Mausser testified that the average amount of time served for an aggravated murder conviction is about twenty-seven years. (2nd Resent'g Tr., ECF 5-7, PageID 8361.) Ms. Mausser testified that once a person becomes parole-eligible, he would be considered for parole at intervals ranging from one to ten years for the rest of his life. (*Id.* at PageID 8359, 8370.) Ms. Mausser testified that she did not have all the information she needed to give an opinion about how she would vote on Mr. Davis's parole. (*Id.* at PageID 8371-72, 8374, 8378.) Additionally, she did not know how any other parole board member would vote on the Davis case when he came up for parole. (*Id.* at PageID 8374, 8378.)

158.    As the panel recognized, Ms. Mausser could not definitively state if or when Mr. Davis might be paroled if he received a sentence less than death. (2nd Resent'g Op., Sept. 21, 2009, ECF 4-39, PageID 4929-30). The panel deemed Ms. Mausser's testimony as "highly speculative and unconvincing and entitled to no weight." (*Id.* at PageID 4933.) Thus, the promises made by defense counsel in the opening statement and before Ms. Mausser's testimony regarding Mr. Davis's parole eligibility went unfulfilled, and the panel had no choice but to find no mitigation had been presented in this regard.

159.    Ms. Mausser's affidavit indicates that contrary to the record made by defense counsel, Mausser did not agree to testify that Mr. Davis would never be paroled. (2nd PC Ex. F, ECF 4-46, PageID 6365.) She would have been able to give a better opinion if she had the proper materials provided to her, but defense counsel did not provide her what she needed. (*Id.* at PageID 6366.) Despite the speculative and harmful nature of her testimony, defense counsel had her testify anyway.

160.    Prior to the sentencing hearing, Mr. Davis discussed the parole board testimony with his attorneys and mitigation specialist. (2nd PC Ex. B, Aff. of Von Clark Davis, ECF 4-46, PageID

6271; 2nd PC Ex. H, Redacted Mitigation Write-Up, July 7, 2009, ECF 4-46, PageID 6379.)  Mr. Davis indicated he did not want this testimony presented in his case.  *Id.*  His attorneys ignored his request.

161.    Mr. Davis's post-conviction expert, Diane Menashe, an experienced criminal defense attorney in Ohio, reviewed Ms. Mausser's affidavit and the record in this case.  (2nd PC Ex. D, ECF 4-46, PageID 6275-76.)  Ms. Menashe stated that promising the panel a witness who could guarantee no parole when no such witness existed was harmful to Mr. Davis and constitutes ineffective assistance of counsel.  (*Id.* at PageID 6277.)

162.    Furthermore, defense counsel was ineffective for failing to follow up during redirect on an obvious attempt by Ms. Mausser to correct her testimony.  At the end of her testimony, Ms. Mausser wanted to correct an answer she gave earlier and began to say: "I think it might be unusual" before being stopped by the panel because no question had been asked.  (2nd Resent'g Tr., ECF 5-7, PageID 8379.)  Counsel never requested permission to ask Ms. Mausser on redirect whether she had anything to add or correct to her previous testimony.  Had defense counsel done so, Ms. Mausser could have indicated she had actually voted on cases where a person with death specifications came up for parole.  (2nd PC Ex. F, ECF 4-46, PageID 6366.)  How and why she voted on those cases (particularly if she voted not to parole the inmate) would have been important information for the panel in evaluating the likelihood of Mr. Davis ever being paroled. Defense counsel's failure to follow up on this constitutes ineffective assistance of counsel. Counsel's mitigation-phase performance fell below an objective standard of reasonableness when counsel called Ms. Mausser as a mitigation witness without adequately preparing her or confirming whether she would testify that Mr. Davis would likely never be paroled.  If counsel would have conducted a reasonable investigation and effectively prepared for mitigation, the

harmful testimony of Ms. Mausser would not have been presented in the first place. Absent counsel's deficient performance, there is a reasonable probability that the outcome of the trial would have been different and the three-judge panel would not have convicted Mr. Davis. As a result, Mr. Davis was denied his right to effective assistance of counsel as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. *See Strickland,* 466 U.S. at 667-88.

### B. Mr. Davis was denied effective assistance of counsel when counsel failed to adequately investigate and present Dr. Robert Smith's mitigating evidence.

163.     Mr. Davis was denied effective assistance of counsel during his second resentencing hearing when defense counsel failed to adequately investigate the mitigating evidence prepared by Dr. Smith. In addition, counsel unreasonably called Dr. Smith as a mitigation witness after knowing his testimony would likely do more harm than good.

164.     Defense counsel's preparation for mitigation and ultimate decision to call psychologist, Dr. Robert Smith, harmed Mr. Davis because Dr. Smith left the panel with the impression that due to Mr. Davis's borderline personality disorder, if Mr. Davis were ever released from prison, and no longer in a structured environment, he could kill again. Defense counsel erred in preparing and presenting this information. A reasonable investigation and preparation for mitigation would have shown such information to be harmful and reasonable counsel would not have presented the testimony to the three-judge panel.

165.     Counsel's decision to present testimony may be considered a strategic one, but for the decision to be reasonable, it must be made after undertaking a full investigation. *Combs v. Coyle*, 205 F.3d 269, 288 (6th Cir. 2000); *see also Strickland*, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular

109

investigations unnecessary."); *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991) ("[O]ur case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them."). When calling an expert witness, counsel should know the expert's opinion on the ultimate issue and prepare accordingly. *Combs*, 204 F.3d at 288.

166.    At Mr. Davis's second resentencing hearing, defense counsel called Dr. Smith as an expert witness in the areas of clinical psychology and addiction. (2nd Resent'g Tr., Sept. 10, 2009, ECF 5-8, PageID 8419, 8429-30.) Dr. Smith opined, within a reasonable degree of psychological certainty, that Mr. Davis suffered from two psychological disorders at the time of the offense: alcohol dependence and borderline personality disorder. (*Id.* at PageID 8438.) Dr. Smith also testified regarding a previous evaluation conducted in 1984, where evidence was found of Mr. Davis having an explosive psychiatric disorder. (*Id.* at PageID 8450-51.) Dr. Smith stated that one of the characteristics of a borderline personality disorder is an "unwarranted aggressive behavior that comes about with minor provocation." (*Id.* at PageID 8451.) Regarding the borderline personality disorder, Dr. Smith opined:

> If you put me in a very structured environment, with clear-cut rules and people who enforce those rules every day, the same way, I will adapt and I will adjust. My problem with borderline personality disorder is if I am in the community where I have no clear structure and I am reacting to whatever is happening to me throughout the day.

(*Id.* at PageID 8448.) Dr. Smith further expounded:

> The way to understand borderline personality disorder is picture someone who truly in many ways does not develop a sense of self. They don't really have an identity. And so what they do is they go through life reacting rather than thinking and acting. . . . Up and down, sad, angry, frightened, reacting to what is in front of them at the present, really not any sustained emotion.

> Impulsivity that is severe, they act and then think about it
> afterwards. They are not really considering their actions and what
> the consequences will be, what the other options are, the pros and
> cons, they act out again based on what they are feeling.

(*Id.* at PageID 8453.) Dr. Smith testified that this is a chronic disorder, and is still present in Mr.

Davis. (*Id.* at PageID 8453, 8468.)

167. While Dr. Smith's mental status evaluation and professional diagnoses may be helpful for

mitigation purposes, defense counsel failed to adequately investigate and prepare Dr. Smith for

his testimony, specifically, for the fact that parole was going to be a critical issue. (PC Ex. I,

Aff. of Dr. Bob Smith, ECF 4-46, PageID 6382.) Defense counsel continued the same line of

questioning with Dr. Smith even after Cynthia Mausser, the chair of the Ohio Parole Authority,

could not guarantee that Mr. Davis would not be paroled if he received a non-death sentence.

168. By failing to prepare Dr. Smith and change their line of questioning, defense counsel left

the panel with the impression that if Mr. Davis were ever released from prison, and no longer in

a structured environment, he could kill again. Counsel failed to have Dr. Smith address how Mr.

Davis had changed over time and even with borderline personality disorder, he could adapt in

society. Instead, they focused on his psychological state of mind in 1984, which left the panel

with the impression that he was and still is dangerous. This only contributed to the panel

imposing a death sentence. (*See* 2nd Resent'g Op., Sept. 21, 2009, ECF 4-39, PageID 4930-31.)

Dr. Smith's affidavit demonstrates that had counsel discussed these topics with him and asked

him pertinent questions at the hearing, he would have been able to provide beneficial, instead of

harmful, information for Mr. Davis. (PC Ex. I, ECF 4-46, PageID 6380-82.)

169. Additionally, counsel failed to consider that psychological evidence was rejected in two

previous sentencing hearings involving Mr. Davis. (*See* Sent'g Op., June 11, 1984, ECF 4-3,

PageID 487-89; 1st Resent'g Op., Aug. 10, 1989, ECF 4-11, PageID 1176-78.) In fact, the

second panel actually used the psychological testimony to help bolster their decision to impose death. (Sent'g Op., Aug. 10, 1989, ECF 4-46, PageID 6386-88.) As part of a reasonable investigation, defense counsel should have reviewed prior sentencing opinions and strategized regarding the use of such harmful information. (*See* PC Ex. D, Aff. of Diane Menashe, ECF 4-46, PageID 6277-78.) Instead, defense counsel presented the same harmful information without tailoring their presentation to the new facts and testimony presented.

170. By failing to conduct a reasonable investigation and adequately prepare for mitigation, counsel left Dr. Smith unprepared for his testimony. Counsel's performance fell well below an objective standard of reasonableness and the prevailing professional norms as articulated in the ABA Guidelines. *See Wiggins*, 539 U.S. at 521. Absent counsel's deficient performance, there is a reasonable probability that Mr. Davis would not have been sentenced to death. Accordingly, Mr. Davis received ineffective assistance of counsel, in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. *Strickland*, 466 U.S. at 687-88.

### C. Mr. Davis was denied effective assistance of counsel when counsel failed to call mitigation investigator John Lee

171. Mr. Davis was denied effective assistance of counsel during his second resentencing hearing when counsel failed to call mitigation investigator, John Lee, to present summaries of interviews with witnesses who were unavailable for the second resentencing hearing. Counsel's decision not to call Mr. Lee to testify or to present exhibits regarding unavailable mitigation witnesses harmed Mr. Davis because the panel was not presented with relevant and compelling evidence of Mr. Davis's character, history and background.

172. Counsel must conduct a reasonable investigation and develop evidence that humanizes the client and explains the behavior for which he has been charged. To have a reliable sentencing determination, the Eighth Amendment requires the sentencer to consider the

circumstances of the crime and the defendant's character, history and background. *Boyd v. California*, 494 U.S. 370, 377–78 (1990); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). The United States Supreme Court has provided specific guidance with respect to reasonable professional assistance during the sentencing phase of a capital case. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 381-90 (2005); *Wiggins*, 539 U.S. at 521-29 (2003); *Williams*, 529 U.S. at 395-97; *see also* ABA Guidelines for the Appointment and Performance of Def. Counsel in Death Penalty Cases (2003).

173.    In particular, the Court has recognized that counsel in a capital case has an "obligation to conduct a thorough investigation of the defendant's background" to determine the availability of mitigating evidence. *Williams*, 529 U.S. at 396; *see also Williams v. Anderson*, 460 F.3d 789, 802 (6th Cir. 2006) ("Defense counsel's complete failure to investigate before deciding not to present mitigating evidence is deficient performance as a matter of law under Strickland . . .").

174.    Counsel's "investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins*, 539 U.S. at 524 (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989)) (emphasis in original). Not only must counsel investigate all reasonably available mitigating evidence, but counsel must then use that evidence to "to counter the State's evidence of aggravated culpability with evidence in mitigation." *Rompilla*, 545 U.S. at 380-81.

175.    Ohio Rev. Code § 2929.04(C) states: "The defendant shall be given great latitude in the presentation of evidence of the factors listed in division (B) of this section and of any other factors in mitigation of the imposition of the sentence of death." According to the United States Supreme Court, in capital cases, "the sentencer may not refuse to consider or be precluded from

113

considering any relevant mitigating evidence." *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986) (internal quotation marks omitted).

176.    In the exhibit book prepared by defense counsel for the second resentencing, trial exhibits B–I related to four witnesses: Elizabeth Crawford, Dr. Charles Flowers, Milton Flowers, and Fannie Whiteside. (*See* Resent'g Hrg. Ex. List, ECF 4-39, PageID 4917.) All four witnesses were unavailable to testify as two were deceased and the other two were incompetent. (*See* PC Ex. L, ECF 4-46, PageID 6389-402.) Defense counsel intended to call mitigation specialist/investigator, John Lee, as he had previously interviewed the four witnesses and could relate the information they conveyed regarding Mr. Davis's family history and background. (Resent'g Tr., Sept. 8, 2009, ECF 5-7, PageID 8254-60.) However, Mr. Lee was never called to testify and the exhibits at issue were never introduced.

177.    The four mitigating witnesses could have provided critical substantive information about Mr. Davis and his family upbringing. The information was not cumulative of other evidence and it was necessary to give the panel a complete picture of Mr. Davis's family history. Defense counsel recognized its importance by having a witness prepared to testify and the exhibits marked for introduction into evidence. For reasons unknown, when it came time to introducing the exhibits, defense counsel withdrew all of the exhibits. (Resent'g Tr., Sept. 10, 2009, ECF 5-8, PageID 8504.) As a result, this relevant and important mitigating evidence regarding Mr. Davis's family background was never presented to the trial court.

178.    Mr. Davis's post-conviction expert, Diane Menashe, an experienced criminal defense attorney in Ohio, reviewed the exhibits and the trial record and opined that Mr. Davis was deprived of effective assistance when counsel failed to present known, available and relevant

mitigating evidence at the second resentencing hearing. (*See* 2nd PC Ex. D, ECF 4-46, PageID 6278.)

Counsel's failure to present available and known mitigating evidence prevented the trial court from considering pertinent evidence regarding Mr. Davis's family history, character and background. Absent counsel's deficient performance, there is a reasonable probability that Mr. Davis would not have been sentenced to death. Accordingly, Mr. Davis received ineffective assistance of counsel, in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. *See Strickland*, 466 U.S. at 687-88.

### D. Mr. Davis was denied effective assistance of counsel when counsel failed to effectively investigate and present mitigating evidence from Mr. Davis's family

179.    Mr. Davis was denied effective assistance of counsel at his second resentencing hearing when counsel failed to adequately investigate and develop evidence from mitigation witnesses regarding Mr. Davis's character, background and mental health. As a result, the three-judge panel used Mr. Davis's family testimony against him rather than weighing it in support of mitigation. The acts and omissions of counsel prejudiced Mr. Davis and denied him due process, a fair trial, and the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments. *See id.*

180.    Counsel must conduct a reasonable investigation and develop evidence that humanizes the client and explains the behavior for which he has been charged. To have a reliable sentencing determination, the Eighth Amendment requires the sentencer to consider the circumstances of the crime and the defendant's character, history and background. *Boyd v. California*, 494 U.S. 370, 377-78 (1990); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). The United States Supreme Court has provided specific guidance with respect to reasonable professional

115

assistance during the sentencing phase of a capital case. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 381-90 (2005); *Wiggins*, 539 U.S. at 521-29 (2003); *Williams*, 529 U.S. at 395-97; *see also* ABA Guidelines for the Appointment and Performance of Def. Counsel in Death Penalty Cases (2003).

181.    In particular, the Court has recognized that counsel in a capital case has an "obligation to conduct a thorough investigation of the defendant's background" to determine the availability of mitigating evidence. *Williams*, 529 U.S. at 396; *see also Williams v. Anderson*, 460 F.3d 789, 802 (6th Cir. 2006) ("Defense counsel's complete failure to investigate before deciding not to present mitigating evidence is deficient performance as a matter of law under *Strickland* . . .").

182.    Counsel's "investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *Wiggins*, 539 U.S. at 524 (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989)) (emphasis in original). Not only must counsel investigate all reasonably available mitigating evidence, but counsel must then use that evidence to "to counter the State's evidence of aggravated culpability with evidence in mitigation." *Rompilla*, 545 U.S. at 380-81. "Thus, to provide professionally competent assistance in Ohio capital cases, defense counsel must conduct a reasonably thorough investigation into all possible mitigation evidence that would present a sympathetic picture of the defendant's family, social, and psychological background." *Jells v. Mitchell*, 538 F.3d 478, 495-96 (6th Cir. 2008).

183.    Merely presenting some investigation does not absolve defense counsel of their duty. "We certainly have never held that counsel's effort to present *some* mitigation evidence should foreclose an inquiry into whether a facially deficient mitigation investigation might have

prejudiced the defendant." *Sears v. Upton*, 561 U.S. 945, 955 (2010). Indeed, "an unreasonably truncated mitigation investigation is not cured simply because some steps were taken prior to the penalty-phase hearing and because some evidence was placed before the jury." *Johnson v. Bagley*, 544 F.3d 592, 602-03 (6th Cir. 2008) (citing *Rompilla*, 545 U.S. at 382-83 (holding an investigation objectively unreasonable even though the attorneys spoke to the defendant, five family members and three mental health witnesses).) The Sixth Circuit has followed these decisions in *Dickerson v. Bagley*, 453 F.3d 690, 695 (6th Cir. 2006) concluding that "a partial, but ultimately incomplete, mitigation investigation does not satisfy *Strickland*'s requirements" for effective counsel.

184.    In the present case, defense counsel failed to adequately investigate Mr. Davis's dysfunctional family and therefore presented an incomplete and inaccurate picture of Mr. Davis's family history, background and mental health symptoms. During the second resentencing hearing, the defense called Mr. Davis's younger brother, Victor Lee Davis, (2nd Resent'g Tr., Sept. 9, 2009, ECF 5-7, PageID 8268), his step-father, Charles Tipton, (*id.* at PageID 8294), his mother, Alluster Tipton, (*id.* at PageID 8303), his younger sister, Carol Smith, (*id.* at PageID 8312), and Patrick Michael Rotundo, a neighbor of the Davis family from approximately 1964 until 1970, (2nd Resent'g Tr., Sept. 10, 2009, ECF 5-8, PageID 8397-98). However, defense counsel's performance fell short because counsel did not adequately investigate the facts in order to present a full and accurate picture of Mr. Davis's character and background from these witnesses.

185.    Exploring Mr. Davis's background by thoroughly interviewing his family and family friends and finding pertinent information regarding Mr. Davis's borderline personality and alcohol dependence diagnoses as well as his psycho-social background, could only have aided

counsel's strategy of showing that Mr. Davis "was raised in a dysfunctional environment." (2nd Resent'g Tr., Sept. 8, 2009, ECF 5-7, PageID 8224.) However, defense counsel's investigation and presentation at mitigation failed to provide context for Mr. Davis's dysfunctional family life and instead painted a much different picture of his upbringing and family background.

186.    Mr. Davis's dysfunctional family history included an absent, abusive and alcoholic father, frequent separations and extramarital relationships by his parents, and ongoing repeated pregnancies by his mother. (ECF 5-8, PageID 8459-60.) However, counsel failed to elicit details regarding Mr. Davis's father and his drinking, any familial abuse, or the impact of the parents' tumultuous relationship on Mr. Davis and his siblings. Despite knowing about Mr. Davis's alcohol dependence, counsel failed to investigate and present evidence regarding alcoholism in the family or Mr. Davis's personal alcohol use. Even though Mr. Davis presents with multiple symptoms of borderline personality disorder, counsel failed to investigate or elicit details from mitigation witnesses regarding Mr. Davis's behavior as child, adolescent or adult.

187.    By failing to adequately investigate witnesses for mitigation, defense counsel presented multiple witnesses that contradicted known facts from previous and current psychological evaluations and reports that demonstrated a complex and dysfunctional family history. The panel used defense counsel's pithy mitigation presentation against Mr. Davis when finding that "the separate testimony of Defendant's family and friends does not support Dr. Smith's conclusion that Defendant suffered an extreme and dysfunctional upbringing." (2nd Resent'g Op., Sept. 21, 2009, ECF 4-39, PageID 4933.) Defense counsel's failure to prepare the family for their mitigation testimony directly harmed Mr. Davis by negatively influencing the three-judge panel's perspective of his childhood and family life as well as Dr. Smith's diagnoses.

188.    Counsel's mitigation-phase performance fell below an objective standard of reasonableness when counsel failed to adequately investigate and present mitigating evidence regarding Mr. Davis's character, background and family history.  If counsel would have adequately investigated, the stories and memories of Mr. Davis's dysfunctional family and childhood could have been presented for the panel's consideration.  Absent counsel's deficient performance, there is a reasonable probability that the outcome of the trial would have been different and the three-judge panel would not have sentenced Mr. Davis to death.  As a result, Mr. Davis was denied his right to effective assistance of counsel as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  *See Strickland,* 466 U.S. at 687-88.

### E.  Conclusion

189.    Defense counsel's performance in failing to adequately prepare for mitigation fell below an objective standard of reasonableness and the prevailing professional norms.  Absent counsel's deficient performance, there is a reasonable probability that Mr. Davis would not have been sentenced to death.  Accordingly, Mr. Davis received ineffective assistance of counsel, in violation of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights.  *See id.*

190.    To the extent the Ohio courts ruled on the merits of this claim, those rulings were contrary to, or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

### EIGHTH GROUND FOR RELIEF:

MR. DAVIS WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL DURING HIS SECOND RESENTENCING WHEN COUNSEL FAILED INVESTIGATE AND SEEK RECUSAL OF BIASED JUDGES IN VIOLATION OF MR. DAVIS'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

191.    The Sixth Amendment guarantee of effective assistance of counsel is violated when counsel's performance falls below an objective standard of reasonableness and the accused is prejudiced by counsel's breach of duty. *Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Williams v. Taylor*, 529 U.S. 362, 390 (2000); *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

192.    It is well settled that a criminal trial before a biased judge is fundamentally unfair and denies a defendant due process of law. *Rose v. Clark*, 478 U.S. 570, 577 (1986); *Tumey v. Ohio*, 273 U.S. 510, 534 (1927). Supreme Court precedent clearly establishes that the denial of the right to be tried by an impartial decisionmaker is an error that taints any resulting conviction with constitutional infirmity. *See, e.g.*, *Neder v. United States,* 527 U.S. 1, 8 (1999) (the presence of a biased decisionmaker is structural error "subject to automatic reversal"); *Edwards v. Balisok,* 520 U.S. 641, 647 (1997) ("A criminal defendant tried by a partial judge is entitled to have his conviction set aside, no matter how strong the evidence against him."); *Johnson v. United States*, 520 U.S. 461, 469 (1997); *Rose*, 478 U.S. at 577-78.

      **A.      Mr. Davis was denied the effective assistance of counsel during his second resentencing when counsel failed to seek recusal of Judge Nastoff.**

193.    Mr. Davis was denied effective assistance of counsel at his second resentencing hearing when counsel failed to seek the recusal of Judge Andrew Nastoff. Counsel failed to seek the recusal of Judge Nastoff even though counsel was aware that Judge Nastoff served as a prosecutor in the death penalty case of Mr. Davis's nephew, Lahray Thompson, and advocated for Mr. Thompson's death. The acts and omissions of counsel prejudiced Mr. Davis and resulted

in the denial of effective assistance of counsel in violation of Mr. Davis's rights under the Fifth,

Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

194.    During the second resentencing hearing, Mr. Davis's sister, Carol Smith, testified on his

behalf.  Ms. Smith revealed that she has a son by the name of Lahray Thompson, and he had

been convicted of aggravated murder in a capital case.  (2nd Resent'g Tr., Sept. 9, 2009, ECF 5-

7, PageID 8316.)

195.    Following Ms. Smith's testimony, Judge Nastoff disclosed that he was a member of the

prosecution team against Mr. Thompson and had argued to the jury that he should receive the

death sentence.  (*Id.* at PageID 8321.)  Indeed, the pretrial motions filed by the prosecutors in

Mr. Thompson's case confirm that Judge Nastoff was actively seeking the death penalty against

Mr. Thompson.  (PC Ex. M, ECF 4-46, PageID 6403-50.)  At Mr. Thompson's trial, Judge

Nastoff argued that Mr. Thompson was eligible for the death penalty.  (PC Ex. N, ECF 4-46,

PageID 6451-55.)  Further, as a prosecutor, Judge Nastoff called Mr. Thompson a liar.  (*Id.* at

PageID 6456.)

196.    At the time of the second resentencing hearing, Mr. Davis's counsel knew Judge Nastoff

had previously sought the death penalty against a member of Mr. Davis's family, yet counsel did

not seek to remove Judge Nastoff from the case.  (2nd Resent'g Tr., ECF 5-7, PageID 8322.)

197.    As a prosecutor in Mr. Thompson's case, Judge Nastoff obtained knowledge of Mr.

Thompson's family, which included Mr. Davis and some of his witnesses.  Further, Judge

Nastoff had already argued in favor of sentencing Mr. Davis's nephew to death, and believed

that Mr. Thompson was a liar.

198.    Judge Nastoff should have been recused from sentencing Mr. Davis.  The judicial bias

standard requires judges to avoid even the appearance of bias, prejudice, or impropriety, and

recusal in the cases of potential bias is necessary to ensure the unquestioned neutrality of an impartial judge to the parties, their counsel, and the public. Here, bias was not just potential, but actual. Judge Nastoff had personally pursued a death sentence for a member of Mr. Davis's family. He should not have been deciding Mr. Davis's fate. (PC Ex. D, Aff. of Diane Menashe, ECF 4-46, PageID 6278-79.)

199.    Mr. Davis's attorneys never discussed the conflict with Mr. Davis. (PC Ex. B, Aff. of Von Clark Davis, ECF 4-46, PageID 6271.) Had they done so, Mr. Davis would have requested that Judge Nastoff recuse himself. Mr. Davis did not find out about the issue until after his sister testified at the penalty phase hearing.

200.    By failing to seek the recusal of Judge Nastoff and to even discuss the Judge's bias with their client, counsel's mitigation-phase performance fell below an objective standard of reasonableness. Absent counsel's deficient performance, there is a reasonable probability that Mr. Davis would not have been sentenced to death by the three-judge panel.

201.    To the extent the Ohio courts ruled on the merits of Mr. Davis's claims, those rulings were contrary to or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in state courts. 28 U.S.C. § 2254(d).

### B. Mr. Davis was denied the effective assistance of counsel during his second resentencing when counsel failed to conduct *voir dire* of Judge Pater.

202.    Mr. Davis was also denied the effective assistance of counsel at his second resentencing hearing when counsel failed to conduct *voir dire* of Judge Pater after learning that the judge had a close personal relationship with one of the witnesses. These acts and omissions of counsel prejudiced Mr. Davis and denied him due process, a fair trial, and the effective assistance of

counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments. *See Strickland*, 466 U.S. 668.

203.    During the second resentencing hearing, the defense called Mr. Davis's younger brother, Victor Lee Davis, to testify in support of mitigation. (2nd Resent'g Tr., Sept. 9, 2009, ECF 5-7, PageID 8268.) After Victor Davis testified, Judge Pater noted that he had known him "for a long, long time." (*Id.* at PageID 8285.) He further commented: "He and I are friends. I would be so presumptuous as to say I think he would concur with that. I have known him since high school days and we are good friends." (*Id.*) Judge Pater stated: "I do think I can fairly and impartially decide this matter, so I just wanted to put that on the record." (*Id.* at PageID 8285-86.)

204.    Before calling the next witness, Judge Nastoff gave counsel the opportunity to conduct further *voir dire* of Judge Pater about his knowledge and relationship of Victor Davis. (*Id.* at PageID 8286.) The prosecutor declined. (*Id.* at PageID 8286-87.) Inexplicably, defense counsel also declined to question Judge Pater. (*Id.* at 8287.)

205.    A defendant must be given "an opportunity to comment on facts which may influence the sentencing decision in capital cases." *Gardner v. Florida*, 430 U.S. 349, 360 (1977). In *Gardner*, the Supreme Court found that the trial judge erred by considering factual information from a presentence report not presented during the guilt and penalty phases. *Id.* at 353, 362. The Court specifically rejected the State's argument that "trial judges can be trusted to exercise their discretion in a responsible manner, even though they may base their decisions on secret information." *Id.* at 360. The Court found that "the only explanation for the lack of disclosure is the failure of defense counsel to request access to the full report." *Id.* at 361. The Supreme Court held that the "petitioner was denied due process of law when the death sentence was

123

imposed, at least in part, on the basis of information which he had no opportunity to deny or explain." *Id.* at 362; *see also Simmons v. South Carolina*, 512 U.S. 154, 161 (1994).

206.    In the present case, Mr. Davis's death sentence was based, at least in part, on secret information known only to Judge Pater. Judge Pater acknowledged that he went to high school with Victor and that the two stayed "good friends," meaning their friendship extended for approximately forty years. Given the length and closeness of their friendship, defense counsel should have asked whether the judge knew other members of Victor's family, including Mr. Davis, whether the judge had learned specific facts about the witness's family history and how his relationship with Victor informed his knowledge of the Davis family. Judge Pater's personal knowledge of Mr. Davis's family was directly relevant to his consideration of mitigating evidence regarding the family's history and background.

207.    This independent knowledge of Mr. Davis's family prejudiced Mr. Davis. The panel specifically found that "the separate testimony of Defendant's family and friends does not support Dr. Smith's conclusion that Defendant suffered an extreme and dysfunctional upbringing." (2nd Resent'g Op., Sept. 21, 2009, ECF 4-39, PageID 4933). Judge Pater considered information not known to defense counsel and not admitted into evidence when weighing mitigating factors related to Mr. Davis's family history based on his own forty-year personal knowledge of Mr. Davis's family. Because defense counsel failed to *voir dire* Judge Pater, the judge's personal knowledge about the Davis family remained secret and Mr. Davis was never given an opportunity to deny or explain it.

208.    Counsel's mitigation-phase performance fell below an objective standard of reasonableness when counsel failed to question Judge Pater about his relationship with Mr. Davis's brother and his knowledge of the Davis family. If counsel would have conducted vo*ir*

*dire*, additional details regarding Judge Pater's relationship to and knowledge of Mr. Davis's family would have been exposed, providing a basis to seek Judge Pater's recusal. Absent counsel's deficient performance, there is a reasonable probability that the outcome of the trial would have been different and the three-judge panel would not have sentenced Mr. Davis to death.

209.    To the extent the Ohio courts ruled on the merits of Mr. Davis's claims, those rulings were contrary to or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in state courts. 28 U.S.C. § 2254(d).

## NINTH GROUND FOR RELIEF:

EXECUTING MR. DAVIS AFTER MORE THAN THIRTY YEARS ON DEATH ROW CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE FIFTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

210.     Mr. Davis's rights as guaranteed under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution are violated by pursuing his execution following thirty-two years and counting on death row.  The delay in Mr. Davis's execution is attributable to the multiple state-court errors resulting in two resentencing hearings thus far.  Accordingly, executing Mr. Davis after his lengthy stay on death row constitutes cruel and unusual punishment, and violates evolving standards of decency.  *See Lackey v. Texas*, 514 U.S. 1045 (1995) (Stevens, J., dissenting from denial of certiorari).

211.     After being indicted in 1983, Mr. Davis was originally convicted and sentenced to death in 1984.  He timely appealed his conviction and sentence, which the intermediate state appellate court initially affirmed.  *See State v. Davis* (*Davis I*), No. CA84-06-071, 1986 WL 5989 (Ohio Ct. App. 12th Dist. May 27, 1986).  However, four years later, the Ohio Supreme Court remanded the case, finding merit to Mr. Davis's claim and holding that the trial court committed constitutional error in premising its death sentence on improper non-statutory aggravating circumstances.  *See State v. Davis* (*Davis II*), 528 N.E.2d 925, 935-36 (1988). Therefore, any delay from 1984 through 1988 is not attributable to Mr. Davis; rather, it is solely attributable to the State.

212.     Mr. Davis was re-sentenced to death in 1989.  During the re-sentencing, Mr. Davis objected to the trial court's failure to consider new mitigating evidence.  (*See* Mot. to Permit Def. to Admit all Relevant Evid. at Sent'g Phase, July 24, 1989, ECF 4-11, PageID 1146, *overruled by* Entry as to Mots. Heard, Aug. 1, 1989, ECF 4-11, PageID 1168; *see also* 1st Resent'g Mot. Hr'g, July 31, 1989, ECF 5-4, PageID 7677-79.)  Mr. Davis immediately raised this obvious

violation of *Skipper v. South Carolina*, 476 U.S. 1 (1986), which was exacerbated by the trial

court allowing the State of Ohio to argue future dangerousness, but each of his state appeals were

denied. *See State v. Davis* (*Davis III*), No. CA89-09-123, 1990 WL 165137 (Ohio Ct. App. 12th

Dist. Oct. 29, 1990), (ECF 4-13, PageID 1437); *State v. Davis* (*Davis IV*), 584 N.E.2d 1192,

1194 (Ohio 1992), (ECF 4-15, PageID 1685). Mr. Davis timely raised his claims concerning his

conviction and sentence in federal court and ultimately prevailed in 2007 when the Sixth Circuit

Court of Appeals granted Mr. Davis a conditional writ of habeas corpus. *See Davis v. Coyle*

(*Davis X*), 475 F.3d 761, 764 (6th Cir. 2007). Accordingly, any delay from 1989 through 2007 is

also not attributable to Mr. Davis.

213.     Appellant cannot credibly be faulted for the more than three decades he has spent on

Death Row awaiting relief from state errors. The fault undeniably rests with the original three-

judge panel and the lengthy appeals process spawned by the trial court's errors in, first,

considering non-statutory aggravation, and, second, refusing to consider mitigation while

simultaneously allowing the State of Ohio to argue future dangerousness. Executing Mr. Davis

after such a lengthy stay on death row constitutes cruel and unusual punishment. *Lackey*, 514

U.S. 1045 (Stevens, J.).

214.     Justice Stevens noted in *Lackey*:

> In *Gregg v. Georgia*, 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct.
> 2909 (1976), this Court held that the Eighth Amendment does not
> prohibit capital punishment. Our decision rested in large part on
> the grounds that (1) the death penalty was considered permissible
> by the Framers, *see id.*, at 177 (opinion of Stewart, Powell, and
> STEVENS, JJ.), and (2) the death penalty might serve "two
> principal social purposes: retribution and deterrence," *id.*, at 183.
>
> It is arguable that neither ground retains any force for prisoners
> who have spent some 17 years under a sentence of death. Such a
> delay, if it ever occurred, certainly would have been rare in 1789,
> and thus the practice of the Framers would not justify a denial of
> petitioner's claim. Moreover, after such an extended time, the

acceptable state interest in retribution has arguably been satisfied by the severe punishment already inflicted. Over a century ago, this Court recognized that "when a prisoner sentenced by a court to death is confined in the penitentiary awaiting the execution of the sentence, one of the most horrible feelings to which he can be subjected during that time is the uncertainty during the whole of it." *In re Medley*, 134 U.S. 160, 172, 33 L. Ed. 835, 10 S. Ct. 384 (1890). If the Court accurately described the effect of uncertainty in *Medley*, which involved a period of four weeks, *see ibid.*, that description should apply with even greater force in the case of delays that last for many years. Finally, the additional deterrent effect from an actual execution now, on the one hand, as compared to 17 years on death row followed by the prisoner's continued incarceration for life, on the other, seems minimal. *See, e. g.*, *Coleman v. Balkcom*, 451 U.S. 949, 952, 68 L. Ed. 2d 334, 101 S. Ct. 2031 (1981) (STEVENS, J., respecting denial of certiorari) ("the deterrent value of incarceration during that period of uncertainty may well be comparable to the consequences of the ultimate step itself"). As Justice White noted, when the death penalty "ceases realistically to further these purposes, . . . its imposition would then be the pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes. A penalty with such negligible returns to the State would be patently excessive and cruel and unusual punishment violative of the Eighth Amendment." *Furman v. Georgia*, 408 U.S. 238, 312, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972) (opinion concurring in judgment); *see also Gregg v. Georgia*, 428 U.S. at 183 ("[T]he sanction imposed cannot be so totally without penological justification that it results in the gratuitous infliction of suffering").

*Id.* at 1045-46; *see also Thompson v. McNeil*, 556 U.S. 1114, 129 S. Ct. 1299 (2009). Since

*Lackey*, Justice Breyer has continued to assert the validity of this claim and the need to

definitively review this aspect of the Eighth Amendment. *See* Conner v. Sellers, 2016 U.S.

LEXIS 4315 (July 14, 2016) (Breyer, J., dissenting from denial of certiorari and stay); *Boyer* v.

*Davis*, 136 S. Ct. 1446 (2016) (Breyer, J., dissenting from denial of certiorari); *Valle v. Florida*,

564 U.S. 1067 (2011) (Breyer, J. dissenting from denial of stay and certiorari); *Smith v. Arizona*,

552 U.S. 985, 128 S. Ct. 2997, 169 L. Ed. 2d 326 (2007) (Breyer, J. dissenting); *Foster v.*

*Florida*, 537 U.S. 990, 991–93 (2002) (Breyer, J. dissenting from denial of certiorari); *Knight v. Florida*, 528 U.S. 990, 993–99 (1999) (same); *Elledge v. Florida*, 525 U.S. 944 (1998) (same).

215.    As the Supreme Court has noted, "when a prisoner sentenced by a court to death is confined in the penitentiary awaiting the execution of the sentence, one of the most horrible feelings to which he can be subjected during that time is the uncertainty during the whole of it." *In re Medley*, 134 U.S. 160, 172 (1890). During that time and since, Mr. Davis received approximately seven execution warrants for his death to occur on a date certain.[3] The cycle of preparing to die on a certain day, then receiving a reprieve, only to face yet another execution date is torturous.

216.    As a defendant's time on death row lengthens, the justification for the imposition of the death penalty weakens, and the Eighth Amendment concerns grow. *See Lackey,* 115 S. Ct. at 1421-22 (suggesting that a 17-year delay in execution would not have been acceptable to the Framers, nor would execution after such delay serve the societal purposes of retribution and deterrence); *see also Gregg v. Georgia,* 428 U.S. 153, 177, 182-83 (1976) (cautioning that any criminal sanction imposed "cannot be so totally without penological justification that it results in the gratuitous infliction of suffering"); *Furman v. Georgia,* 408 U.S. 238, 312 (1972) (White, J.,

---

[3] *State v. Davis*, No. CR83-12-0614, slip op. (June 4, 1984) (setting Oct. 1, 1985 as execution date) (*see also* ECF 4-3, PageID 483); *State v. Davis*, No. CR83-12-0614, slip op. (Aug. 10, 1989) (setting Dec. 4, 1989 as execution date) (*see also* ECF 4-11, PageID 1178); *State v. Davis*, 63 Ohio St. 3d 1444 (1992) (staying May 19, 1992 execution date) (*see also* ECF 4-16, PageID 1735); *State v. Davis*, 66 Ohio St. 3d 1453 (1993) (staying May 11, 1993 execution date) (ECF 4-16, PageID 1757); *State v. Davis*, 77 Ohio St. 3d 1553 (1997) (setting May 5, 1997 as execution date) (*see also* ECF 4-16, PageID 1795); *State v. Davis*, No. CR83-12-0614, slip op. (July 21, 2010) (setting Nov. 9, 2010 as execution date) (ECF 4-39, PageID 5004); *State v. Davis*, 139 Ohio St. 3d 1487 (2014) (staying August 17, 2016 execution date) (*see also* ECF 4-44, PageID 6163).

concurring) (noting that when the death penalty ceases to further the social purposes of retribution and deterrence, "its imposition would then be the pointless and needless extinction of life" and that the death penalty "would be patently excessive and unusual punishment violative of the Eighth Amendment").

217.    Further, execution after extraordinary delay is especially cruel when the cause of delay is a defendant's meritorious exercise of his constitutional rights.  *See Elledge,* 525 U.S. 944 (concluding that execution after imprisonment for 23 years under a sentence of death may be cruel in light of the fact that the delays were not because of defendant's frivolous appeals, but rather due in large part to his successful litigation).

218.    The Eighth Amendment prohibition on cruel and unusual punishment draws the constitutional line of acceptable punishments at "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958).  The death penalty cannot become "the pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes.  A penalty with such negligible returns to the State would be patently excessive and cruel and unusual punishment violative of the Eighth Amendment." *Furman*, 408 U.S. at 312.

219.    The evolving standards of decency of what constitutes cruel and unusual punishment are also informed by international norms. *See Roper v. Simmons*, 543 U.S. 551 (2005).  Article VII of the International Covenant on Civil and Political Rights ("ICCPR") provides that "[n]o one shall be subjected to torture or to cruel, inhuman, or degrading treatment or punishment."  Dec. 16, 1966, S. Treaty Doc. No. 95-20, 6 I.L.M. 368 (1967), 999 U.N.T.S. 171.  The norm against cruel, inhuman, or degrading treatment is now universally recognized as a violation of international law clearly distinguishable from torture.  *See e.g.* Universal Declaration of Human

Rights, G.A. Res. 217A (III), U.N. Doc. A/810, at 71 (1948) ("No one shall be subjected to torture or to cruel, inhuman, or degrading treatment or punishment."); *see also De Sanchez v. Banco Central de Nicaragua*, 770 F.2d 1385, 1397 (5th Cir. 1985) (noting that the right not to be subjected to cruel, inhuman, and degrading treatment constitutes universally accepted international law).

220.    International norms drawn from evolving standards of decency have condemned lengthy delays in carrying out a death sentence as inhumane.  *See Pratt and Morgan v. Attorney General of Jamaica*, 3 SLR 995, 2 AC 1, 4 All ER 769 (Privy Council 1993) (en banc) (holding that a delay of fourteen years between the time of conviction and the carrying out of a death sentence in the case of a Jamaican prisoner was "inhuman punishment."); *Soering v. United Kingdom,* 11 Eur.  Ct. H.R. 439 (1989) (refusing to extradite a German national to face capital murder charges because of anticipated time that he would have to spend on death row if sentenced to death). Executing Mr. Davis after such lengthy delays, which are not attributable to him but rather due to errors by the trial court, constitutes "cruel, inhuman or degrading treatment or punishment" violates these norms of international law and is contrary to evolving standards of decency.

221.    Mr. Davis's case is unusual in its length, now going on thirty-two years.  This unreasonable delay is the result of state-caused errors requiring the case to be remanded on two separate occasions.  Further, the clock is still running.  In these circumstances, Mr. Davis presents a *Lackey* claim that executing him after thirty-two years on death row would constitute cruel and unusual punishment and violate evolving standards of decency, contrary to his rights under the Fifth, Eighth and Fourteenth Amendments.  Thus, this Court should vacate Mr. Davis's death sentence and remand for an appropriate sentence under Ohio law not including death.

222.    To the extent the Ohio courts ruled on the merits of this claim, those rulings were

contrary to or an unreasonable application of clearly established federal law as stated by the

Supreme Court of the United States, and resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

## TENTH GROUND FOR RELIEF:

**THE STATE OBTAINED DAVIS'S CONVICTION VIA UNNECESSARILY SUGGESTIVE PROCEDURES AND UNRELIABLE IDENTIFICATIONS IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

223.    At trial, State's witness Cozette Massey identified Mr. Davis as the person who shot Ms. Butler.  (Trial Tr., ECF 5-2, PageID 7367.)

224.    Prior to Massey's in-court identification, police had shown her a single photograph picturing Mr. Davis together with the victim, Ms. Butler.  (Trial Tr., ECF 5-2, PageID 7385.) Ms. Massey saw this photograph approximately one to four weeks after the incident occurred. (*Id*.)  She identified Mr. Davis from this photograph.  (*Id*.)

225.    Before seeing this picture, Ms. Massey did not independently describe the shooter to the police.  (Trial Tr., ECF 5-2, PageID 7384.)

226.    Similarly, police showed witness Anthony Ferguson only one photograph of Mr. Davis. (Trial Tr., ECF 5-3, PageID 7507.)  He too identified Mr. Davis from that picture.  (*Id*.)

227.    Neither Ms. Massey nor Mr. Ferguson knew Mr. Davis prior to witnessing the shooting. Ms. Massey testified that she had seen Mr. Davis on three occasions:  the night of the shooting, in the photograph the police showed her, and in the courtroom.  (Tr. 161 ECF 5-2, PageID 7389.) Likewise, Ferguson testified that the night of the shooting was the first night he had seen Mr. Davis.  (Trial Tr., ECF 5-3, PageID 7507.)

228.    Under these circumstances, law enforcement's actions in showing these witnesses a highly suggestive photograph violated Mr. Davis's constitutional rights.  The identification procedure was unnecessarily suggestive, and under the totality of the circumstances, these identifications were too unreliable to be constitutionally permissible.

229.    Showing an eyewitness a single photograph of an alleged suspect, particularly when no emergency or exigent circumstances exist, is an unnecessarily suggestive confrontation.  *Manson*

*v. Brathwaite*, 432 U.S. 98, 109 (1977). In this case, this procedure significantly undermined the reliability of both Ms. Massey's and Ms. Ferguson's subsequent in-court testimony identifying Mr. Davis. Showing these witnesses just a single picture of a suspect would have been highly suggestive itself, but the risk of misidentification was especially grave here, when the picture the police showed to the witnesses was of Mr. Davis *with the victim*. (Trial Tr., ECF 5-2, PageID 7393.)

230. Inconsistencies in both witnesses testimony also demonstrated the unreliability of their identifications. Both Ms. Massey and Mr. Ferguson testified that they were standing on the street near the American Legion when Mr. Davis shot Ms. Butler. (Trial Tr., ECF 5-2, PageID 7369; Trial Tr., ECF 5-3, PageID 7495.) Yet both testified that neither saw the other on the street at the time of the shooting. (Trial Tr., ECF 5-2, PageID 7373-74; Trial Tr., ECF 5-3, PageID 7498-7499.)

231. Ms. Massey's boyfriend, Reginald Denmark, corroborated her testimony. He testified he was with Ms. Massey at the time of the shooting and did not see Mr. Ferguson on the street either. (Trial Tr., ECF 5-2, PageID 7399, 7423-7424.)

232. If these three eyewitnesses were on the street at the same time and witnessed the shooting, it is impossible to believe that they did not see each other. This discrepancy is critical in assessing the reliability of their testimony.

233. In addition, another disinterested witness, Ms. Shelba Robertson, was able to view the area around the shooting that evening, but did not see either Ms. Massy or Mr. Ferguson.

234. Ms. Robertson owned the Robertson Grocery on Fourth and Walnut streets nearby the American Legion and was working in her store the evening of Ms. Butler's death. (Trial Tr., ECF 5-3, PageID 7566.) Shortly before Ms. Butler was shot in front of the American Legion,

Ms. Robertson walked from her store to the nearby Legion to exchange some money for single bills to use in her store. (Trial Tr., ECF 5-3, PageID 7568.) Standing inside her store after returning with the singles, Ms. Robertson looked out the door and viewed the Legion. (*Id.*) She saw two flashes, and a few minutes later, 40 of 50 people were on the scene. (Trial Tr., ECF 5-3, PageID 7568-7570.) Before the large crowd of people appeared, Ms. Robertson did not see anyone standing in front of the laundry building, (Trial Tr., ECF 5-3, PageID 7569), where Ms. Masssey claimed to have been, (Tr. 161 ECF 5-2, PageID 7391). Moreover, on her trip to and returning from the Legion, she walked through the corner of Walnut and Central, and no one else was standing in the location, (Trial Tr., ECF 5-3, PageID 7569), as Ms. Massey claimed to have been, (Tr. 161 ECF 5-2, PageID 7391; Joint Ex. 3 at 1, ECF 4-28, PageID 3188).

235.    Ms. Massey did not go to the police for four days. (Joint Tr. Exhibit 3, ECF 4-28, PageID 3188-3189.) She did not describe the perpetrator's physical characteristics, such as height or weight, to the police. (Tr. 161 ECF 5-2, PageID 7384.) She told the police that the gunman was wearing a beige coat that evening, (*id.*), but Mr. Davis was wearing a dark coat that night, (Tr. 161 ECF 5-2, PageID 7351).

236.    Massey also told the police that Ms. Butler had a coat over her arm. (Tr. 161 ECF 5-2, PageID 7375.) In fact, Ms. Butler left her coat in the bar and took only her purse outside with her. (Tr. 161 ECF 5-2, PageID 7351.)

237.    The circumstances relevant to these witnesses' identification of Mr. Davis, including their lack of prior familiarity with Mr. Davis, their failure to describe almost any physical characteristics of the shooter and the inaccuracies in the few descriptions they did provide, and the highly suggestive photograph of Mr. Davis with the victim that police showed them proves that their identifications were constitutionally unreliable.

238.    Because Mr. Davis was prejudiced by the suggestive identification procedures used in his case, his conviction must be reversed.

239.    To the extent the Ohio courts ruled on the merits of this claim, those rulings were contrary to or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States, and resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

**ELEVENTH GROUND FOR RELIEF**

**THE STATE COURTS VIOLATED MR. DAVIS'S RIGHTS UNDER THE FIFTH, EIGHTH, AND FOURTEENTH AMENDMENTS OF THE FEDERAL AND STATE CONSTITUTIONS BOTH TIMES THEY RESENTENCED HIM TO DEATH.**

> **A.** **The state courts violated the Fifth, Eighth, and Fourteenth Amendments of the Federal and State Constitutions in determining that Mr. Davis could be eligible for death and in resentencing him to death by departing from the law in effect under *Penix* at the time he was convicted.**

240.    The Ohio Supreme Court's determination that Mr. Davis could be resentenced to death on remand hinged on the fact that he was convicted and sentenced by a three-judge panel rather than a jury.  The Court opined that "when a reviewing court vacates the death sentence of a defendant imposed by a three-judge panel due to an error occurring at the penalty phase, not otherwise covered by Ohio Revised Code § 2929.06, and the reviewing court does not find the evidence to be legally insufficient to justify imposition of the death sentence, such reviewing court may remand the action to that court for a resentencing hearing at which the State may seek whatever punishment is lawful, including but not limited to, the death sentence."  *State v. Davis*, 528 N.E.2d 925, 926 (Ohio 1988).

241.    The decision in Mr. Davis's case deviates from the Court's prior decision in *State v. Penix*, 32 Ohio St. 3d 369 (1987).  In *Penix*, the Court upheld the reversal of a death sentence where a jury had been improperly allowed to consider a nonstatutory aggravating circumstance in its penalty determination.  The Court concluded that the defendant could not be resentenced to death when his case was remanded to the trial court for resentencing.  The Ohio Revised Code required that a sentence of death can only be imposed by the same jury that determined guilt or innocence and Ohio Revised Code § 2929.03(C)(2)( b) did not authorize the re-empaneling of a new jury for a resentencing hearing. *Id*. at 372.  Under these circumstances, the Court reasoned

137

that resentencing can only occur pursuant to Ohio Revised Code § 2929.06, which authorizes the trial court to resentence the defendant to one of two alternative life sentences.

242.    As part of its analysis, the Penix Court concluded that the Ohio Revised Code provided no authorization for the reimposition of a death sentence that has been reversed due to an egregious error in the penalty phase.  The Court also recognized that the Ohio Revised Code did not cover the situation presented in Mr. Davis's case; yet, rather, than concluding that Mr. Davis could not be put to death, as it did in Penix, the Court reached an opposite conclusion and specifically authorized the death sentence on remand.

243.    The position occupied by Mr. Davis is indistinguishable from that of the defendant in *Penix*.  Both defendants were sentenced to death at trial.  Both had their convictions reversed based upon the same penalty phase error:  improper consideration of nonstatutory aggravating circumstances.  Both were tried under the same capital statutory scheme, as originally interpreted in *State v. Penix,*that provided no authorization for imposition of death at resentencing.  Following this mandate, Mr. Penix was sentenced to life.  Mr. Davis was sentenced to death.

244.    This result reflects the fact that capital defendants tried before three-judge panels in Ohio are treated differently and more severely than those tried before a jury.  This distinction denies those capital defendants tried by a three-judge panel their constitutional rights.  "A state's enforcement of its criminal laws must comply with the principles of substantial equality and fair procedure that are embodied in the Fourteenth Amendment."  *McCoy v. Court of Appeals,* 486 U.S. 429, 435 (1988).  The "constitutional guarantees of due process and equal protection both call for procedures in criminal trials which allow no invidious discriminations between persons and different groups of persons.''  *Griffin v. Illinois*, 351 U.S. 12, 17 (1956).  These well-settled principles were violated when the three-judge panel resentenced Mr. Davis to death.

245.     To the extent the Ohio courts ruled on the merits of this claim, those rulings were

contrary to, or an unreasonable application of clearly established federal law as stated by the

Supreme Court of the United States and resulted in a decision that was based on an unreasonable

determination of facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

> **B. The trial court violated the Fifth, Eighth, and Fourteenth**
> **Amendments of the Federal and State Constitutions in not precluding**
> **the death penalty and enforcing the provisions of Ohio Revised Code**
> **2929.03(C)(2)(a) in existence at the time of Mr. Davis's second**
> **resentencing in 2009.**

246.     The trial court violated the Constitution in applying a revised and amended Ohio Revised

Code 2929.03 to make death an available option.  On May 8, 1984, Mr. Davis waived his right to

a jury trial and elected to be tried to a specific three-judge panel.  The waiver was made under

Ohio Revised Code 2945.05.  Section 2945.06 governs jury waivers and provides in capital cases

the defendant "shall be tried by a court composed of three judges, consisting of the judge

presiding at the time in the trial of criminal cases and two other judges."  The phrase "presiding

at the time" references Mr. Davis's entrance of the jury waiver.  The judge must have been on

the bench when Mr. Davis waived his right to a jury trial.

247.     In this 1983 offense, Ohio Revised Code 2929.03 provided the procedure for imposing a

death sentence.  This section provided in part that the appropriate sentence was to be determined

by "the panel of three judges that tried the offense upon his waiver of the right to trial by jury."

(ECF 4-37, PageID 4655, n.5.)  Therefore, the only panel that could sentence the appellant to

death was the panel that found him guilty.

248.     In this case, the original three-judge panel sentenced Mr. Davis to death at his first

resentencing.  All three of the original judges were available and participated in the first

resentencing hearing. At the second resentencing hearing, none of the original three judges were available to participate.

249.    Ohio had no sentencing statute that applied to this scenario that allowed the State to seek death for a third time. Since none of the original three judges were available and since Ohio did not have a statutory scheme that allowed for the imposition of death in this rare fact pattern, the State was precluded from seeking the death penalty and the new panel was limited to one of the life options available at the time of the crime.

250.    At the time of the crime, there was no provision for re-sentencing in Ohio Revised Code 2929.06 for a "new" three-judge panel to conduct the re-sentencing hearing. Now, after many legislative amendments, the Ohio Revised Code provides for a new three-judge panel if necessary. But the state court was required to apply the statute as written at the time of Mr. Davis's crime. To do otherwise violates the Fifth, Eighth and Fourteenth Amendments. Retroactive legislation is prohibited under these Constitutional provisions. *See Landgraf v. U.S.I. Film Products*, 511 U.S. 244, 266 (1994).

251.    The amendments to Ohio Revised Code 2929.06 have significantly changed the death penalty in Ohio. Mr. Davis decided to waive jury based on the law at the time of his case. If he had known the law was going to change as it has, then he would not have made the decision to waive a jury. He cannot now be sentenced to death under the amended Ohio Revised Code 2929.06 that was changed years after his decision to waive a jury and years after his trial ended.

252.    The retroactive application of the changes made in Ohio Revised Code 2929.06 violated Due Process and Equal Protection under Fifth and Fourteenth Amendments of the federal Constitution and the analogous provisions of the Ohio Constitution.

253.     The Ex Post Facto Clauses also prohibit a sentence of death.  Article I Section 10 of the

federal Constitution prohibits any Bill of Attainder, ex post facto law, or law impairing the

obligations of contracts or grant any title of nobility. *See Calder v. Bull*, 3 U.S. 386 (1798); *In*

*Re Medley*, 134 U.S. 160 (1890); *Lindsey v. Washington*, 301 U.S. 397 (1937); *Carmell v. Texas*,

529 U.S. 513 (2000).

254.     The amendments to Ohio Revised Code 2929.06 have increased the severity of Mr.

Davis's sentence.  Under the law at the time of the crime he was entitled to life upon reversal of

his death sentence.  Now, he is sentenced to death.  This change in penalty was made by the State

after the crime in question was committed, after he chose to waive a jury, after he was convicted

and after he was sentenced.  Because the Ohio Legislature increased the potential punishment to

death, where it had not previously been available, it was a substantive change and therefore the

retroactive application is unconstitutional.

255.     To the extent the Ohio courts ruled on the merits of this claim, those rulings were

contrary to, or an unreasonable application of clearly established federal law as stated by the

Supreme Court of the United States and resulted in a decision that was based on an unreasonable

determination of facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

**TWELFTH GROUND FOR RELIEF:**

**MR. DAVIS WAS NOT PERMITTED TO INSPECT THE GRAND JURY TESTIMONY IN HIS CASE, IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.**

256.     "The Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984).  Defendants have "the right to put before a jury evidence that might influence the determination of guilt."  *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987). To exclude testimony relevant and vital to the defense is a violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

257.     In Ohio, a defendant may inspect grand jury transcripts when the ends of justice require it and he shows a particularized need for disclosure exists which outweighs the need for secrecy. *State v. Greer*, 420 N.E.2d 982 (1981).  A "particularized need" has been described as, "when the circumstances reveal a probability that the failure to provide the grand jury testimony will deny the defendant a fair trial ....."  *State v. Sellards*, 478 N.E.2d 781, 785 (1985).

258.     There were no compelling reasons for the trial court to refuse Mr. Davis's request for a transcript of the grand jury proceedings.  The witnesses had already testified before the grand jury would have known at the time they testified before the grand jury that whatever they said which was detrimental to Mr. Davis if he were indicted, could be used against him at trial.  If the prosecution had any concerns about shielding the identity of grand jury witnesses, due to safety concerns or any other reason, they could have sought a protective order prohibiting particular evidence from being disclosed.  Mr. Davis was incarcerated for the entire time leading up to his trial; therefore, there was no fear that he would flee.  Further, because the grand jury had already heard testimony, it would have been impossible for Mr. Davis to suborn perjury or tamper with the witnesses.

259.    Mr. Davis demonstrated a particularized need to access the grand jury testimony.

Excluding this evidence greatly harmed Mr. Davis's ability to present a complete defense.  The

trial court erred in failing to allow Mr. Davis to inspect the grand jury transcripts.  Mr. Davis's

convictions and sentences must be reversed.

260.    To the extent the Ohio courts ruled on the merits of this claim, those rulings were

contrary to or an unreasonable application of clearly established federal law as stated by the

Supreme Court of the United States and resulted in a decision that was based on an unreasonable

determination of facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

## THIRTEENTH GROUND FOR RELIEF:

### THE SELECTION OF THE GRAND JURY FOREPERSON IN MR. DAVIS'S CASE VIOLATED THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

261.    In Ohio, the common pleas court judge may select anyone to be the grand jury foreperson if that person satisfies the qualifications of a juror.  *See* Ohio Rev. Code § 2939.02.  This person's name need not be included in the grand jury venire.  Because this selection is arbitrary, it violated Mr. Davis's federal constitutional rights.

262.    Further, according to Hamilton County Common Pleas Judge Marsh, the common pleas judges in Hamilton County, which adjoins Butler County, regularly exercised their statutory prerogative to select grand jury forepersons.

263.    The Hamilton County Common pleas presiding criminal judge forwards the name of his selection for grand jury foreperson to the prosecutor's office to obtain that office's approval of that person.

264.    Hamilton County Common Pleas Judge Crush has conceded that the presiding criminal judges selected their friends to be grand jury forepersons and stated that:  "Maybe [judge's] friends are mostly white and that accounts for the white forepersons."

265.    Former Common Pleas Judge Winkler has chosen at least one grand jury foreperson as a result of knowing him from the Kiwanis Club.

266.    The Kiwanis Club excluded women as members until 1987.  In fact, in the 1980s, it successfully sued to maintain its right to exclude women.  *See Kiwanis Intern. v. Ridgewood Kiwanis Club*, 806 F.2d 468 (3rd Cir. 1986).

267.    Hamilton County's discrimination against African-Americans and women in its selection of grand jury forepersons from 1982 to 1998 has resulted in statistically significant underrepresentation of these classes of persons.

268.     Of the eighty-seven Hamilton County grand juries that returned capital indictments from 1982 through 1998, only four  African-American and only nineteen women who were grand jury forepersons.  Further, it appears that some people were selected to serve as forepersons more than once.  At least eight forepersons served multiple times on grand juries that returned capital indictments.  Some of these eight forepersons served on grand juries up to eight times.  This does not appear to have been by chance

269.     One of the three methods of analyzing such underrepresentation is the standard deviation method.  This method measures representativeness by calculating the probability of the disparity occurring by chance as the result of a random selection.

270.     As the Sixth Circuit has explained:

> Standard deviation is a measure of the extent to which an observed result is likely to vary from an expected result.  The larger the number of standard deviations an observed result is from an expected result, the lower the probability that the observed result is random.  More specifically, in the context of racial discrimination claims, the larger the number of standard deviations, the more likely the observed result is the product of discrimination rather than chance.

*Jefferson v. Morgan*, 962 F.2d 1185, 1189 (6th Cir. 1992).

271.     The underrepresentation of African Americans constituted 6.19 standard deviations; the underrepresentation of women constituted 6.99 standard deviations.  These standard deviations are sufficient to establish a prima facie case of discrimination.  *Id*.  *See Castaneda v. Partida*, 430 U.S. 482, 496 n.17 (1977) (discussing and relying upon standard deviation analysis for claim of racial discrimination in selection of grand jury members).

272.     Based upon the evidence regarding Hamilton County, counsel have reason to believe that the same improper procedures were used at the time of Mr. Davis's indictment in Butler County, an adjoining county.

273.     To the extent the Ohio courts ruled on the merits of this claim, those rulings were

contrary to or an unreasonable application of clearly established federal law as stated by the

Supreme Court of the United States, and resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

**FOURTEENTH GROUND FOR RELIEF:**

**MR. DAVIS WAS NOT ABLE TO INTRODUCE THE TESTIMONY OF DEFENSE WITNESS ELBERT AVERY. THE TRIAL COURT'S PROHIBITION OF THIS WITNESS'S TESTIMONY VIOLATED THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

274. During the trial phase, defense counsel called Anthony Ferguson to testify. Mr. Ferguson testified about what he witnessed on the night of the shooting. He testified that he witnessed Mr. Davis shoot the victim in this case. (Trial Tr., ECF 5-3, PageID 7495.)

275. Defense counsel then called Elbert Avery to the witness stand. The trial court would not permit Mr. Avery to testify, and defense counsel was forced to proffer the substance of Mr. Avery's testimony as follows:

> The Defense would have called Elbert Avery who would have testified that he was at the American Legion Cafe, which has been testified to in this trial at length, on the night in question, that he was one of the first two individuals to the body of Suzette Butler after the shooting, that he observed Mr. Tony Ferguson, outside the American Legion, near the body of Suzette Butler, in a very excited aggitated [sic] state that he asked Mr. Tony Ferguson, what Mr. Ferguson had observed oah [sic], in regard to the shooting and that Mr. Ferguson responded that he heard a shot and he immediately felt that someone was shooting at him, and that Mr. Ferguson then indicated to Mr. Avery [sic] ducked down between automobiles, which were parked near the front of the American Legion and that he did not see the individual doing the shooting, nor was he able to observe who that individual was. That he remained in between the cars until the whole matter was over, at which time he jumped up and ran away, returning to the scene of the shooting moments later.

(Trial Tr., ECF 5-3, PageID 7515-16.)

276. Through Mr. Avery's testimony, defense counsel was attempting to impeach Mr. Ferguson with the use of Mr. Ferguson's prior inconsistent statement. By prohibiting Mr. Avery's testimony, the trial court violated Mr. Davis's constitutional rights to confront witnesses against him, present a defense, and produce witnesses on his behalf.

277.     "The Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984).  In fact, "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) (citing *e.g.*, *Washington v. Texas*, 388 U.S. 14, 19 (1967)).  Defendants have "the right to put before a jury evidence that might influence the determination of guilt." *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987).  To exclude testimony relevant and vital to the defense is a violation of the Sixth and Fourteenth Amendments.  *See generally Washington v. Texas*, 388 U.S. 14 (1967). Mr. Davis was prejudiced and his convictions and sentences must be reversed.

278.     To the extent the Ohio courts ruled on the merits of this claim, those rulings were contrary to or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

**FIFTEENTH GROUND FOR RELIEF.**

**THE SPECIFICATION USED AT MR. DAVIS'S CAPITAL TRIAL TO MAKE HIM DEATH-ELIGIBLE WAS INVALID, IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

279.    Mr. Davis was charged in a two-count indictment.  The first count charged aggravated murder and carried one death penalty specification under Ohio Revised Code § 2929.04(A)(5), having been convicted of a prior purposeful murder.  The second count charged Mr. Davis with having a weapon under disability pursuant to Ohio Revised Code § 2923.13.

280.    The specification of a prior purposeful killing referred to the killing of Mr. Davis's wife, Ernestine, in 1970.  This killing was not purposeful.

281.    Mr. Davis was indicted in 1971 on one count of first degree murder in violation of Ohio Revised Code § 2901.01.  He pleaded guilty to second-degree murder under Ohio Revised Code § 2901 .05.  At that time, it was essential to a conviction for second-degree murder under Ohio Revised Code § 2901.05 that there be evidence beyond a reasonable doubt that the accused purposely killed another.  *State v. Creech*, 214 N.E.2d 675, 680 (Ohio App. 1964).

282.    Where circumstances surrounding the killing indicate that it is not intentional or purposeful, there is insufficient evidence to sustain a conviction for second degree murder.  *Id.* Here, the prior killing was not intentional or purposeful.

283.    Robert Jones Beard, a witness to the killing of Mrs. Davis, wrote a letter to Mr. Davis's attorney in 1978 describing what he had seen the day Ernestine was killed.  (1st PC Ex. CC, ECF 4-19, PageID 2028-29).

284.    This evidence demonstrated that:

- Beard was present in the house at the time Ernestine Davis was killed.

- Beard saw more than what he had previously told Mr. Davis's attorneys.

- Von had no intention of killing Ernestine Davis.

- At the time of the killing, Beard did not want to get involved.

- On the day of the killing, Ernestine and Beard were upstairs.

- Mr. Davis arrived at the back door of the house. Ernestine cursed and said she was "tired of that bastard and would stick him."

- Ernestine took a large knife from under the mattress and "swore she would use it".

- Beard heard Mr. Davis and Ernestine arguing in the kitchen. When he came down the stairs, he heard Mr. Davis ask Ernestine why she had a knife. Beard saw Ernestine strike at Mr. Davis with the knife and heard wrestling.

- Ernestine was the aggressor and Mr. Davis was trying to talk to her. He stated that he heard Ernestine yelling that she would kill Mr. Davis.

(*Id.*)

285. The above described circumstances demonstrate that Mr. Davis's actions towards Ernestine were a response to her aggressive and threatening behavior. Beard's evidence demonstrates that the killing of Ernestine was not "purposeful."

286. A defendant can only be eligible for imposition of the death penalty if one of the statutory specifications listed in Ohio Revised Code § 2929.04 is proved beyond a reasonable doubt. Under Ohio Revised Code § 2929.04(A)(5), an essential element of the prior homicide used for the specification must be that it was a purposeful killing. This essential element was lacking in the killing of Ernestine Davis. Therefore, this killing cannot be used as a specification to aggravated murder.

287. Mr. Davis's conviction on this aggravated specification and his death sentence are unconstitutional and must be vacated.

288.    To the extent the Ohio courts ruled on the merits of this claim, those rulings were contrary to or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on unreasonable determination of the facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

**SIXTEENTH GROUND FOR RELIEF:**

**MR. DAVIS'S COUNSEL WERE INEFFECTIVE FOR FAILING TO INVESTIGATE THE CIRCUMSTANCES SURROUNDING THE PRIOR HOMICIDE CHARGED IN THE CAPITAL SPECIFICATION TO THE AGGRAVATED MURDER CHARGE, IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

289.    Every defendant threatened with a loss of liberty in a criminal proceeding has a constitutional right to the assistance of counsel. *Powell v. Alabama*, 287 U.S. 45 (1932). The Sixth Amendment right to counsel, together with the due-process protections of the Fourteenth Amendment, establish the right to effective assistance of counsel. *Gideon v. Wainwright*, 372 U.S. 335 (1963). The failure to provide effective assistance of counsel is a constitutional error which undermines the entire adversary process. *Strickland v. Washington,* 466 U.S. 668 (1984). A capital sentencing trial is subject to the same standards and principles concerning ineffectiveness claims as is a guilt trial. *Id.* at 686.

290.    Because Mr. Davis's counsel failed to thoroughly investigate the circumstance of the prior homicide conviction, they failed to discover evidence demonstrating that that killing was not purposeful, as required by the statute. (First Post-Conviction Petition at Exhibit DD, ECF 4-19, PageID 2032.)

291.    Robert Jones Beard, who witnessed Ernestine Davis's death, wrote a letter to Mr. Davis's attorney is 1978 describing what he had seen the day Ernestine was killed. (Ex. CC 1st PC, ECF 4-19, PageID 2028-29).

292.    Mr. Beard's evidence demonstrated that:

- Beard was present in the house at the time Ernestine Davis was killed;

- Beard saw more than what he had previously told Mr. Davis's attorneys;

- Mr. Davis had no intention of killing Ernestine Davis;

- At the time of the killing, Beard did not want to get involved;

- On the day of the killing, Ernestine and Beard were upstairs;

- Mr. Davis arrived at the back door of the house. Ernestine cursed and said she was "tired of that bastard and would stick him";

- Ernestine took a large knife from under the mattress and "swore she would use it";

- Beard heard Mr. Davis and Ernestine arguing in the kitchen. When he came down the stairs, he heard Mr. Davis ask Ernestine why she had a knife. Beard saw Ernestine strike at Mr. Davis with the knife and heard wrestling;

- Ernestine was the aggressor and Mr. Davis was trying to talk to her. Beard heard Ernestine yelling that she would kill Mr. Davis.

(*Id*.)

293.    These circumstances demonstrate that Mr. Davis's actions towards Ernestine were a response to her aggressive and threatening behavior. Mr. Jones's evidence establishes that Mr. Davis did not did not act purposefully in killing Ernestine as required by the statute under which he was convicted.

294.    A defendant can be eligible for the death penalty only if the State proves one of the statutory specifications listed in Ohio Revised Code § 2929.04 beyond a reasonable doubt. Under § 2929.04(A)(5), an essential element of the prior homicide used for the specification is that the prior homicide must have been a purposeful killing. This essential element was lacking Ernestine Davis's homicide. Therefore, this killing was not a valid a specification to aggravated murder.

295. Defense counsel unreasonably failed to undertake investigation into Mr. Beard's evidence. Counsel did not make an informed decision to abandon an investigation or argument based on this evidence. Rather, counsel "felt that it probably wasn't going to be very helpful" merely because another attorney who had sought a new trial on the basis of Mr. Beard's evidence "didn't get very far" with that effort. Deposition of Michael D. Shanks, Esquire at 14, *Davis v. Coyle*, No. C-1-97-402 (S.D. Ohio June 23, 1998).

296. But counsel could not make an informed decision as to whether evidence could successfully be used in a capital trial to dispute the existence of aggravating circumstances based on a single unsuccessful effort to seek a new trial years after a conviction in another case. This is particularly true where counsel recognized that Beard's letter "was a significant piece of evidence and it would warrant a close look by a court" but at the same time anticipated that the new-trial effort would likely fail because courts "don't like to overturn convictions" in such circumstances. *Id*. at 16.

297. No strategic reason existed not to contest the existence of the aggravated circumstance based on a prior purposeful killing. But because defense counsel failed to investigate this issue, they did not even attempt to challenge the death penalty specification. Instead, they stipulated to the records showing Mr. Davis had been convicted of second degree murder and shooting with intent to wound without challenging in any way the facts of those convictions. (ECF 5-3, PageID 7437-40.) Counsel failed to use the available evidence to rebut the existence of the specification based on a purposeful killing.

298. Mr. Davis was denied the effective assistance of counsel at his capital trial and was prejudiced. Thus, his convictions and sentences must be reversed.

299.    To the extent the Ohio courts ruled on the merits of this claim, those rulings were

contrary to or an unreasonable application of clearly established federal law as stated by the

Supreme Court of the United States, and resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

**SEVENTEENTH GROUND FOR RELIEF:**

**THE TRIAL COURT DENIED DEFENSE COUNSEL'S MOTION TO SEVER THE TWO CHARGES CONTAINED IN THE INDICTMENT IN VIOLATION OF DAVIS'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.**

300.    The State charged Mr. Davis in a two-count indictment. The first count charged aggravated murder and carried one death penalty specification under Ohio Revised Code § 2929.04(A)(5): having been convicted of a prior purposeful murder. The second count charged Mr. Davis with having a weapon under disability under Ohio Revised Code § 2923.13.

301.    Before trial, Mr. Davis elected to have the trial judge determine the existence of the aggravating circumstance set forth in the specification, pursuant to Ohio Revised Code § 2929.022(A). (Mot. Hr'g., Apr. 19, 1984, ECF 5-1, PageID 7221; Waiver and Election, 1st PC Ex. G, ECF 4-19, PageID 1963.) At that time, Mr. Davis renewed his earlier motion to sever the counts of the indictment. (ECF 5-1, PageID 7211-15.)

302.    Following the trial court's decision to deny the motion to sever, (*id*. at PageID 7214-15), Mr. Davis waived his right to a jury trial and elected to have a three-judge panel hear his case, (Jury Waiver, 2nd PC Ex. O, ECF 4-46, PageID 6459). This was the primary and main reason his counsel advised Mr. Davis to waive his right to a jury. (1st PC Exs. I & J, ECF 4-19, PageID 1966-69.)

303.    Mr. Davis was forced to waive the jury trial because the denial of the motion to sever meant that a jury would be informed of his prior conviction of a homicide. (Aff. of Von Clark Davis, 1st PC Ex. H, ECF 4-19, PageID 1964-65). One of the elements of having a weapon while under a disability is that the defendant has been convicted of a felony of violence.

304.    Mr. Davis elected to have his prior murder specification determined by a judge as provided in Ohio Revised Code 2929.022 because he "did not want the jury to hear about [his] prior murder during the guilt phase" of his capital trial. (*Id*. at 1964.)

305.    All of the same prejudice that would have resulted if Mr. Davis did not elect to have a judge determine the element of his prior murder conviction would have resulted from having a jury hear his weapon-under-disability charge at the same time that it was deciding his guilt for Ms. Butler's death.  Accordingly, Mr. Davis moved to sever that count and have it tried separately.  (*Id.* at 1965.)

306.    The trial court's denial of his motion to sever meant to Mr. Davis that "the jury would hear about [his] prior murder."  (*Id.*)  Because Mr. Davis "felt the jury would not be able to separate [his] prior murder" from the charge related to Ms. Butler's death, he "had no choice but to waive [his] right to trial by jury."  (*Id.*)  Conversely, if the trial court had severed the charges, Mr. Davis would not have waived his right to a trial by jury.  (*Id.*)

307.    Mr. Davis's rights under § 2929.022(A) to elect to have evidence of the prior purposeful killing considered by the trial judge were violated by the trial court's refusal to sever the charges.  This refusal violated Mr. Davis's right to a jury trial because it forced him to choose a hearing by a three-judge panel.  Thus, Mr. Davis's jury waiver was not knowing, intelligent, and voluntary.  *See Adams v. United States*, 317 U.S. 269, 275 (1942).

308.    Acquiescence in the loss of fundamental rights may not be presumed, and courts are obliged to establish that waiver of fundamental rights are in fact made knowingly and voluntarily.  *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

309.    The trial court's error violated Mr. Davis's rights and prejudiced him; thus, his convictions and sentences must be reversed.

310.    To the extent the Ohio courts ruled on the merits of this claim, those rulings were contrary to or an unreasonable application of clearly established federal law as stated by the

Supreme Court of the United States, and resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

**EIGHTEENTH GROUND FOR RELIEF:**

MR. DAVIS'S DEATH SENTENCE IS DISPROPORTIONATE AND INAPPROPRIATE IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

311.    In Mr. Davis's case, a review of the relevant evidence indicates that the sole aggravating circumstance does not outweigh mitigating evidence presented. Accordingly, the death penalty is inappropriate and disproportionate because the government failed to meet its burden that the aggravating circumstance outweigh the mitigating factors. Imposing such an inappropriate and disproportionate death sentence on Mr. Davis violates his right to due process as guaranteed by the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

312.    The sole aggravating circumstance in this case is the repeat murder specification. The only evidence presented by the state at the second resentencing hearing was the judgment of conviction entry from April 20, 1971, indicating that Mr. Davis had been convicted of second degree murder. (2nd Resent'g Tr., Sept. 8, 2009, ECF 5-7, PageID 8228.) In closing, the prosecutor merely presented a conclusory argument that nothing mitigated the aggravating circumstance. (2nd Resent'g Tr., Sept. 10, 2009, ECF 5-8, PageID 8532, 8545.)

313.    In comparison, Mr. Davis presented extensive mitigating evidence for the trial court's consideration. Mr. Davis is loved by family and friends. (ECF 5-7, PageID 8240, 8277-78, 8299, 8310-11, 8319-20.) He grew up in an uneducated and poverty-stricken neighborhood in Appalachia. (ECF 5-8, PageID 8399-402.) He was raised in a dysfunctional family which impacted his personality development and mental health as testified to by Dr. Robert Smith. (*Id.* at PageID 8457-72.) Mr. Davis has a borderline personality disorder and alcohol dependence. (*Id.* at PageID 8438, 8448, 8453-56, 8472-78.) Given his criminal history, it is unlikely that he will ever be released from prison. (*Id.* at PageID 8534.) He has an unparalleled history of good behavior in prison. (*Id.* at PageID 8409-14; ECF 4-50, PageID 7112-13.) He is of an advanced

age for a prisoner. He apologized for his conduct and showed remorse. (ECF 5-7, PageID 8235.) In addition to the substantial mitigation presented, the victim's daughter from the murder has forgiven Mr. Davis and does not want to see him die. (2nd Resent'g Tr., Sept. 10, 2009, ECF 5-8, PageID 8289-91.) The sole aggravating circumstance does not outweigh this mitigation beyond a reasonable doubt.

314.    Other cases with the same aggravating circumstance and less mitigation or more egregious facts concerning the aggravating circumstance include the following: *See DePew v. Anderson*, 311 F.3d 742, 746-47 (6th Cir. 2002) (involving a triple homicide and only mitigating factors presented included peaceful persona and record of no prior criminal offenses); *Reynolds v. Bagley,* 498 F.3d 549, 560 (6th Cir. 2007) (involving an aggravated murder with alcoholism, mental disorders, and remorse as mitigating factors); *Baston v. Bagley*, 420 F.3d 632, 634-35 (6th Cir. 2005) (weighing a murder during robbery). Here, the conviction triggering the aggravating circumstance dated back to April 20, 1971, over ten years prior to the underlying homicide. In this circumstance, Mr. Davis's death sentence is disproportionate and inappropriate in comparison to others sentenced to death with this same, single aggravating circumstance.

315.    A review of the evidence shows that the State of Ohio failed to meet its burden because the sole aggravating circumstance cannot outweigh the mitigating factors present. As noted in his Fifth Ground for Relief, the only manner in which Mr. Davis could receive death was to improperly reduce his mitigation to inconsequential proportions. As such, Mr. Davis's death sentence is disproportionate and inappropriate in violation of his rights under the Fifth, Eighth and Fourteenth Amendments.

316.    To the extent the Ohio courts ruled on the merits of this claim, those rulings were contrary to or an unreasonable application of clearly established federal law as stated by the

Supreme Court of the United States, and resulted in a decision that was based on unreasonable

determination of the facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

**NINETEENTH GROUND FOR RELIEF**

**THE EVIDENCE PRESENTED AT MR. DAVIS'S CAPITAL TRIAL WAS INSUFFICIENT TO SUPPORT A CONVICTION FOR AGGRAVATED MURDER IN VIOLATION OF PETITIONER DAVIS'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.**

317.     The witnesses testifying against Mr. Davis at his capital trial lacked credibility and were wholly contradictory.  Further, the State failed to prove "prior calculation and design," a required element to sustain a conviction for aggravated murder.

318.     At the preliminary hearing, the State presented the testimony of Anthony Ferguson, the only civilian who testified.  (Preliminary Hearing Tr., ECF 5-1, PageID 7127-7152).  Mr. Ferguson did not testify that Reginald Denmark or Cozette Massey were at the scene.  However, the State did not call Mr. Ferguson to testify at trial, presumably because his testimony contained so many discrepancies.

319.     The eyewitnesses called by the State, Ms. Massey and Mr. Denmark, testified that they did not see Mr. Ferguson at the scene of the killing.  (Trial Tr., ECF 5-2, PageID 7373-7374, 7382-7383, 7424.)  Mr. Ferguson did not see anyone else out there, which would exclude the presence of Ms. Massey and Mr. Denmark from the scene.  (Trial Tr., ECF 5-3, PageID 7499.) This would be impossible because they would have had to have been standing at the same location according to their testimony.

320.     Ms. Shelba Robertson an employee from a business close to the American Legion did not see anyone out there at the scene.  (Trial Tr., ECF 5-3, PageID 7569.)

321.     Ms. Massey and Mr. Denmark are suspect witnesses.  They indicated that it took them 5-6 minutes to walk from their apartment to the location of the shooting and left at 7:15.  Trial counsel called this into question (*see* Trial Tr., ECF 5-3, PageID 7450) and this is confirmed by Google Earth that estimates it takes 10 minutes to get from 1266 South Second to 727 Central.

https://www.google.com/maps/dir (last visited 8/22/2016). Thus, they would not have been to the scene in time to witness the shooting.

322. Further, they testified that, in spite of telling the police that they eye-witnessed the event, the police did not take their statements that night and told them to go back into the crowd. (Trial Tr., ECF 5-2, PageID 7388, 7425-7426.)

323. After the shooting, Ms. Massey did not go to the police for four days. (Joint Tr. Exhibit 3, ECF 4-28, PageID 3188-3189.) She did not describe the perpetrator's physical characteristics, such as height or weight, to the police. (Tr. 161 ECF 5-2, PageID 7384.) She told the police that the gunman was wearing a beige coat that evening, (*id.*), but Mr. Davis was wearing a dark coat that night, (Tr. 161 ECF 5-2, PageID 7351).

324. Massey also told the police that Ms. Butler had a coat over her arm. (Tr. 161 ECF 5-2, PageID 7375.) In fact, Ms. Butler left her coat in the bar and took only her purse outside with her. (Tr. 161 ECF 5-2, PageID 7351.)

325. Prior to Massey's in-court identification, police had shown her a single photograph picturing Mr. Davis together with the victim, Ms. Butler. (Trial Tr., ECF 5-2, PageID 7385.) Ms. Massey saw this photograph approximately one to four weeks after the incident occurred. (*Id.*) She identified Mr. Davis from this photograph. (*Id.*) Before seeing this picture, Ms. Massey did not independently describe the shooter to the police. (Trial Tr., ECF 5-2, PageID 7384.)

326. Ms. Massey did not know Mr. Davis prior to witnessing the shooting. Ms. Massey testified that she had seen Mr. Davis on three occasions: the night of the shooting, in the photograph the police showed her, and in the courtroom. (Tr. 161 ECF 5-2, PageID 7389.)

327.    One witness called by the State, Wade Coleman, testified that Von had bought a gun for protection. There was no testimony indicating that he intended to kill Ms. Butler or that he had bought the gun for that reason.

328.    As noted in the State's Opening statement, witnesses stated there was an argument outside the American Legion Hall. (Trial Tr., ECF 5-2, PageID 7240.)

329.    In her statement to the police on the day it occurred, Ms. Mona Aldridge stated that Mr. Davis and Ms. Butler were arguing at the time the gun was fired, (Trial Tr., ECF 5-2, PageID 7360, 7361 ("I went to the front door and saw them arguing on the sidewalk;" "When Red was arguing with Suzette . . . ")); (*see also* Joint Trial Exhibit 2, ECF 4-28, PageID 3187), although she said she could not hear them in her trial testimony, (Trial Tr., ECF 5-2, PageID 7351).

330.    Ms. Aldridge then indicated that Mr. Davis possessed a "confused look on his face," "like he might have been arguing." (Trial Tr., ECF 5-2, PageID 7361.) Confronted with a previous statement he had made to Officer Shepherd, Mr. Ferguson had no recollection of saying previously that he saw Mr. Davis and Ms. Butler arguing. (Trial Tr., ECF 5-3, PageID 7503.)

331.    This argument led to the pulling out of a gun and an immediate discharge of the weapon. As noted by Mr. Denmark, the shooting happened quickly, Mr. Davis just pulled out the gun and shot. (Trial Tr., ECF 5-2, PageID 7417.)

332.    This does not establish prior calculation and design. The circumstances surrounding the homicide must show a scheme designed to implement the calculated decision to kill. State v. Robbins, 58 Ohio St.2d 74 (1979); State v. Cotton, 56 Ohio St.2d 8 (1978). There was no evidence presented that there was such a scheme in this case.

333.    The Constitution prohibits conviction of any person except upon proof of guilt beyond a reasonable doubt. *In re Winship*, 397 U.S. 358 (1970). A conviction based upon evidence which

is not sufficient to prove guilt beyond a reasonable doubt violates the Due Process Clause of the Fourteenth Amendment of the United States Constitution. *Jackson v. Virginia*, 443 U.S. 307 (1979).

334.    In examining claims based upon insufficient evidence, a reviewing court must ask whether after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt. *Id*. In Mr. Davis's case, there is not substantial evidence upon which a jury could reasonably conclude that all the elements of an offense have been proven beyond a reasonable doubt.

335.    Mr. Davis was prejudiced by the State's failure to prove prior calculation and design and his convictions and sentences must be reversed.

336.    To the extent the Ohio courts ruled on the merits of this claim, those rulings were contrary to, or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in state courts. 28 U.S.C. § 2254(d).

TWENTIETH GROUND:

OHIO'S PROPORTIONALITY REVIEW OF MR. DAVIS'S SENTENCE VIOLATED THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.

### A. Procedural history

337.    Ohio law required the Ohio Supreme Court, on direct appeal, to "consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases." Ohio Rev. Code § 2929.05(A). Mr. Davis received *no* meaningful consideration of "similar cases."

338.    The Ohio Supreme Court devoted just a single sentence to the proportionality requirement and ignored any comparison to cases with similar facts where the death penalty was not imposed. The Ohio Supreme Court provide no analysis other than a conclusory assertion that the sentence is not excessive or disproportionate. *State v. Davis* (*Davis XIV*), 9 N.E.3d 1031, 1057 (Ohio 2014), (ECF 4-44, PageID 6113). The Court cited *State v. Taylor*, 676 N.E.2d 82 (Ohio 1997), and *State v. Mapes*, 484 N.E.2d 140 (Ohio 1985), but engaged in no comparative analysis to point out how Mr. Davis's case was similar.

### B. Ohio's flawed proportionality review scheme

339.    The Ohio General Assembly enacted its proportionality review statute in 1981, three years after the U.S. Supreme Court declared Ohio's death penalty scheme unconstitutional in *Lockett v. Ohio*, 438 U.S. 586 (1978). *See* Am. Sub. S.B. 1 (Effective 10-19-81). The proportionality-review process that Senate Bill 1 codified in Ohio Revised Code § 2929.05(A) was among the "special new appellate standards" enacted. Ohio Legislative Service Comm., *Summary of Enactments*, 114th General Assembly (January, 1981-August, 1981), at 17. The drafters thus intended for proportionality review to help prevent arbitrary sentences and thereby rectify the constitutional shortcomings the U.S. Supreme Court had identified in Ohio's pre-*Lockett* scheme. In Mr. Davis's case and others, however, that meaning has been lost as courts

either dispense with proportionality review altogether, or wrongly limit the universe of "similar cases" to include only cases in which the death penalty was imposed.

340.    The most senior jurist on the Ohio Supreme Court, Justice Paul Pfeifer, has called Ohio's method of undertaking proportionality review "ethically indefensible." *E.g.*, *State v. Murphy*, 747 N.E.2d 765, 813 (Ohio 2001) (Pfeifer, J., dissenting). "When we compare a case in which the death penalty was imposed only to other cases in which the death penalty was imposed, we continually lower the bar of proportionality." *Id.* Justice Pfeifer's comments are notable, given that as a legislator he co-sponsored Senate Bill 1 and led the committee that reconciled competing House and Senate versions. *Summary of Enactments*, *supra*, at 16.

341.    Also notable is the fact that the Supreme Court of Ohio and the Ohio State Bar Association's Joint Task Force to Review the Administration of Ohio's Death Penalty ("Joint Task Force"), created by the Chief Justice of the Supreme Court of Ohio and the President of the Ohio State Bar Association to determine if the procedural mechanisms for the administration of the death penalty in Ohio are proper, released its Final Report and Recommendations.[4] The majority of the Joint Task Force recommended "that the legislature enact legislation to require prospective proportionality review in death penalty cases to include cases where the death penalty was charged in the indictment or information but was not imposed." *Id.* at 4.

---

[4] Available at:
http://www.supremecourt.ohio.gov/Boards/deathPenalty/resources/finalReport.pdf (last accessed August 22, 2016).

**C. The Ohio courts fail to consider cases where the death penalty was not imposed when undertaking proportionality review.**

342.    The U.S. Supreme Court has explained that "the Eighth Amendment's protection against excessive or cruel and unusual punishments flows from the basic precept of justice that punishment for [a] crime should be graduated and proportioned to [the] offense." *Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008).  The death penalty "must be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'" *Roper v. Simmons*, 543 U.S. 551, 568 (2005) (citing *Atkins v. Virginia*, 536 U.S. 304, 319 (2002)); *see also Kennedy*, 554 U.S. 407; *Thompson v. Oklahoma*, 487 U.S. 815 (1988); *Ford v. Wainwright*, 477 U.S. 399 (1986); *Enmund v. Florida*, 458 U.S. 782 (1982); *Coker v. Georgia*, 433 U.S. 584 (1977); *Weems v. United States*, 217 U.S. 349 (1910).

343.    In each of these cases, the Supreme Court applied proportionality principles and found a death sentence unconstitutional under the Eighth Amendment.  The rules announced in this line of cases "vindicate the underlying principle that the death penalty is reserved for a narrow category of crimes and offenders." *Simmons*, 543 U.S. at 568-69.  A state's scheme that fails to properly narrow the reach of its death penalty fails to pass constitutional muster because it will result in arbitrary, capricious, or discriminatory death sentences. *See Furman v. Georgia*, 408 U.S. 238 (1972).

344.    Appellate review plays an essential role in eliminating the arbitrariness and capriciousness that infected death penalty schemes invalidated by *Furman*.  *Furman* directs that a state may not leave the decision of whether a defendant lives or dies to the unfettered discretion of the jury because such a scheme inevitably results in death sentences that are "wantonly and . . . freakishly imposed" and "are cruel and unusual in the same way that being struck by

lightning is cruel and unusual." *Id.* at 309-10 (Stewart, J., concurring). Meaningful appellate review is required to assess the sentencer's imposition of the death penalty. *See, e.g.*, *Walker v. Georgia*, 555 U.S. 979, 980-984 (2008) (Stevens, J., commenting on the denial of writ of certiorari).

345. In *Furman*, the Court struck down Georgia's death penalty scheme because it allowed death sentences based upon arbitrary or discriminatory factors. Four years later, the Supreme Court in *Gregg v. Georgia*, 428 U.S. 153 (1976), upheld Georgia's <u>*modified*</u> death penalty statutory procedures, implemented in *Furman*'s wake. These modified procedures were the foundation for the Court's opinion in *Gregg* that Georgia's new capital scheme would prevent arbitrary or discriminatory death sentences. *Walker*, 555 U.S. at 980.

346. "Among the new procedures was a requirement that the Georgia Supreme Court 'compar[e] each death sentence with the sentences imposed on similarly situated defendants to ensure that the sentence of death in a particular case is not disproportionate.'" *Id.* (quoting *Gregg*, 428 U.S. at 198 (joint opinion of Stewart, Powell, and Stevens, JJ.)). Robust proportionality review would assure that "no death sentence is affirmed unless in similar cases throughout the State the death penalty has been imposed generally." *Gregg*, 428 U.S. at 205 (quoting *Moore v. State*, 233 Ga. 861, 864 (Ga. 1975)).

347. Notably, as Justice Stevens explained in *Walker*, the Court in deciding *Gregg* "assumed that the [state] court would consider whether there were 'similarly situated defendants' who had <u>*not*</u> been put to death <u>*because that inquiry is an essential part of any meaningful proportionality review*</u>." *Walker*, 555 U.S. at 980 (emphasis added). "This assumption was confirmed a few years later in *Zant v. Stephens*, 462 U.S. 862 (1983)." *Id.*

348.     In *Zant*, the Supreme Court confirmed that Georgia's "modified" proportionality review "'uses for comparison purposes not only similar cases in which death was imposed, *but similar cases in which death was not imposed*.'" *Zant,* 462 U.S. at 880, n.19. As Justice Stevens noted in *Walker*, this approach is "judicious" because "quite obviously, a significant number of similar cases in which death was not imposed might well provide the most relevant evidence of arbitrariness in the sentence before the court." *Walker*, 555 U.S. at 981.

349.     The Ohio Supreme Court, in its application of Ohio Revised Code § 2929.05(A), failed to provide Mr. Davis the statutory protections contemplated as fundamental in *Gregg* and *Zant*, or the individualized assessment of a death sentence as required in the *Penry* line of cases, resulting in the arbitrary or discriminatory imposition of Mr. Davis's death sentence in contravention of the Eighth Amendment.

350.     As noted above, the Ohio Supreme Court cited to *State v. Taylor*, 676 N.E.2d 82 (Ohio 1997) and *State v. Mapes*, 484 N.E.2d 140 (Ohio 1985) but engaged in no comparative analysis with the facts and circumstances of Mr. Davis's case. *State v. Davis* (*Davis XIV*), 9 N.E.3d 1031, 1057 (Ohio 2014), (ECF 4-44, PageID 6113.) The Supreme Court of Ohio simply asserted that it had approved death sentences in other cases in which the prior murder specification was the sole aggravating circumstance presented. (*Id.*) The Ohio Supreme Court's analysis *did not discuss whether other aggravating factors, mitigating circumstances, or factual differences existed in the other cases*. That perfunctory review failed to ensure that Mr. Davis's sentence was individualized, and not arbitrary as the Eighth Amendment requires.

351.     The Ohio Supreme Court also "fail[ed] to acknowledge . . . any cases outside the limited universe of cases in which the defendant was sentenced to death." *Walker*, 555 U.S. at 953. Cases involving similar offenses in which the jury imposed a sentence of life imprisonment, and

cases with similar offenses in which the State did not seek death, should be included in proportionality review. *Id.* "Cases in both of these categories are eminently relevant to the question whether a death sentence in a given case is proportionate to the offense." *Id.*

352.    Every criticism that Justice Stevens leveled at the Georgia Supreme Court's proportionality review in his *Walker* statement applies to the proportionality review conducted in Mr. Davis's case, because the Ohio Supreme Court did not undertake <u>any</u> comparison of offenders who were <u>not</u> sentenced to death in their proportionality review. Accordingly, Mr. Davis's sentence was not compared to the appropriate category of cases.

### D. Ohio's proportionality review violated Mr. Davis's rights to due process and equal protection under the Fourteenth Amendment.

353.    Ohio's proportionality review scheme, as implemented by the Ohio state courts, also violates Mr. Davis's rights to equal protection and due process under the Fourteenth Amendment. Regardless of whether proportionality review is constitutionally required under the Eighth Amendment, *see Walker*, 555 U.S. at 983, once a state chooses to include proportionality in the review of capital cases as an additional safeguard against the arbitrary imposition of the death penalty, the State cannot administer that safeguard in an unconstitutional manner. *See Evitts v. Lucey*, 469 U.S. 387 (1985). "Proportionality review is one of several respects in which we have held that 'death is different' and have imposed protections that the Constitution nowhere else provides." *Harmelin v. Michigan*, 501 U.S. 957, 994 (1991). Therefore, the components of the appellate review system created for final review of guilt or innocence and a defendant's sentence must comport with the demands of due process and equal protection. *See Evitts*, 469 U.S. at 403-04.

354.    After the U.S. Supreme Court declared Ohio's death penalty scheme unconstitutional in *Lockett*, the Ohio General Assembly required proportionality reviews in capital cases to render

the scheme constitutional again. Ohio Rev. Code § 2929.05(A) mandates that the appellate courts perform proportionality review to determine appropriateness and excessiveness in the sentence. Ohio's failure to provide this statutory protection, once granted to Mr. Davis and others similarly situated, violates due process and equal protection. The fact that Ohio explicitly granted Mr. Davis the right to robust proportionality review, and then failed to uphold that right, supports habeas relief.

355.    In Mr. Davis's direct appeal, the Ohio Supreme Court made no comparison of "similar cases" in their so-called proportionality review. In a single sentence, the Ohio Supreme Court cited two cases and engaged in no comparative analysis. *State v. Davis* (*Davis XIV*), 9 N.E.3d 1031, 1057 (Ohio 2014), (ECF 4-44, PageID 6113.)   The Ohio Supreme Court ignored any comparison to cases with similar facts where the death penalty was not imposed. The court provided no analysis other than conclusory assertions that the sentence is not excessive or disproportionate. This is not the "meaningful appellate review [that] ensure[s] that the death penalty is not imposed arbitrarily or irrationally." *Parker v. Dugger*, 498 U.S. 308, 321 (1991). *See also State v. Richey,* 64 N.E.2d 915, 933-934 (Ohio 1992) (Brown, J., dissenting in a case like Mr. Davis's, where the Ohio Supreme Court merely string-cited other cases, saying: "if one reads those cases (which are merely listed and not analyzed by the majority), it is obvious that not one is remotely similar to this one." . . . "Such a review deserves more than lip service and a listing of cases which are in no sense comparable to this one.")

### E.  Conclusion

356.    For these reasons, Mr. Davis is entitled to habeas relief.

357.    To the extent the Ohio courts ruled on the merits of this claim, those rulings were contrary to or an unreasonable application of clearly established federal law as stated by the

Supreme Court of the United States, and resulted in a decision that was based on unreasonable

determination of the facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

**TWENTY-FIRST GROUND FOR RELIEF:**

**MR. DAVIS'S CONSTITUTIONAL RIGHTS TO DUE PROCESS, EQUAL PROTECTION, AND A RELIABLE SENTENCING WERE VIOLATED BY OHIO'S INADEQUATE STATE POST-CONVICTION PROCESS THAT FAILED TO PROVIDE A REMEDY FOR MR. DAVIS TO FULLY AND FAIRLY VINDICATE HIS FEDERAL CONSTITUTIONAL CLAIMS IN THE STATE COURTS.**

358.    Mr. Davis was required to fairly present and exhaust his federal constitutional challenges to his conviction and sentence in the state courts through post-conviction proceedings prior to being able to litigate those claims in federal court.  Mr. Davis properly raised numerous issues on post-conviction in conformance with the Ohio post-conviction statute.  *See* Ohio Rev. Code Ann. §§ 2953.21 *et seq.*  These claims were supported by affidavits and other evidence *dehors* the record.  *See State v. Cole*, 443 N.E.2d 169 (Ohio 1982).  Yet, the Ohio courts effectively foreclosed Mr. Davis from having his legitimate claims reviewed.

359.    Ohio's post-conviction system embodied in Ohio Revised Code §§ 2953.21 *et seq.* did not provide Mr. Davis an adequate and independent means by which to vindicate his federal constitutional rights in the state court system.  As a result, Mr. Davis was denied his rights to due process, and equal protection, as well as a full and fair opportunity to present and litigate his federal constitutional claims in state post-conviction proceedings in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

360.    Under principles of comity and federalism, Mr. Davis was required to provide the Ohio courts the first opportunity to "address and resolve" his federal constitutional claims, and to fully litigate these claims in the state courts.  Denying Mr. Davis an opportunity to prove his federal constitutional claims in state courts has reduced the Ohio post-conviction procedure to merely a ritual which essentially renders a pursuit of post-conviction procedures in Ohio courts futile.

361.    In theory, post-conviction review offers an individual convicted of a criminal offense an opportunity to test the constitutional validity of his conviction and sentence.  An adequate

174

corrective process should be "swift and simple and easily invoked," should "eschew rigid and technical doctrines of forfeiture, waiver or default," and should "provide for full fact hearings to resolve disputed factual issues." *Case v. Nebraska*, 381 U.S. 336, 346–47 (1965) (Brennan, J., concurring); *see also Goldberg v. Kelly*, 397 U.S. 254, 267-71 (1970); *Evitts v. Lucey*, 469 U.S. 387, 400-05 (1985). This minimum standard for state post-conviction proceedings are not fulfilled by the cursory, inadequate, and ineffective process provided for in the relevant Ohio statutes, nor do the state courts, in practice, provide any meaningful review in these proceedings.

362. An Ohio trial court must consider the post-conviction petition and make a facial determination if a hearing is required. *State v. Cooperrider*, 448 N.E.2d 452, 454 (Ohio 1983). All this must be done without the benefit of the discovery processes available to every other civil litigant. Without this access, Ohio's post-conviction process imposes an impossible pleading standard on petitioners.

363. The text of the statute reads that an individual seeking post-conviction relief is not entitled to an evidentiary hearing until he produces sufficient documentation in the form of evidence outside the record to demonstrate that he is entitled to relief. Ohio Rev. Code § 2953.21(A)(1)(a); *see also State v. Kapper*, 448 N.E.2d 823, 826 (Ohio 1983); *State v. Cole*, 443 N.E.2d 169, 171 (Ohio 1982); *State v. Jackson,* 413 N.E.2d 819, 822-23 (Ohio 1980). However, a post-conviction petitioner is not entitled to conduct discovery to obtain the necessary documentation to warrant a hearing until such time as he demonstrates that a hearing is necessary. *State v. Smith,* 506 N.E.2d 1205 (Ohio 1986). The post-conviction petitioner is caught in the classic "Catch 22" situation. He cannot obtain a hearing until he demonstrates adequate proof of a constitutional violation, but he cannot utilize the means to gather his proof (discovery) until he submits sufficient proof of the constitutional violations to the court.

364.     Moreover, there is little opportunity for factual development in the post-conviction

process in the State of Ohio.  Inmates face the insurmountable burden of collecting evidence in

support of valid claims prior to filing a petition without the means to collect information critical

to their claims.  Absent funds for the reasonable and necessary expert and investigative

assistance to properly investigate, prepare, and litigate the post-conviction petition in the

abbreviated period of time provided by the statute of limitations, Ohio Rev. Code § 2953.21, it

was impossible for Mr. Davis to fully and fairly develop the factual bases for his claims and to

fully and fairly present those claims.

365.     The post-conviction process is further restrained by Rule 35 of the Ohio Rules of

Criminal Procedure.  Criminal Rule 35(A) demands that each cause of action contained in a post-

conviction petition not exceed three pages.  The Staff Notes to the amendment state the purpose

of this is to "introduce some uniformity in post-conviction relief proceedings and aid in the

administration of justice."  Uniformity in the post-conviction process may be a rational goal, but

it cannot be consistently achieved at the expense of criminal defendants who are now facing

death.  If the need for uniformity in post-conviction cases is balanced against the requirement

that capital cases be afforded the highest degree of due process, the only acceptable and

constitutionally sound resolution is to protect due process rights.

366.     Further, every aspect of post-conviction review is discretionary in Ohio.  The Ohio post-

conviction process does not require an evidentiary hearing, or any other form of discovery.  *See*

*State v. Conway*, No. 05AP-76, 2005 WL 3220243, at *2 (Ohio Ct. App. 10th Dist. Dec. 1, 2005)

("We also disagree with appellant's assertion that he is entitled to conduct discovery.  This court

has addressed this issue previously and determined that there 'is no requirement of civil

discovery in post-conviction proceedings.' . . . A petitioner seeking post-conviction relief is not automatically entitled to an evidentiary hearing.").

367.    An evidentiary hearing on the petition is not automatic; instead the trial court must first determine "whether there are substantive grounds for relief." Ohio Rev. Code § 2953.21(C). This requires the petitioner to "set forth sufficient operative facts to establish substantive grounds for relief." *State v. Calhoun*, 714 N.E.2d 905 (Ohio 1999), paragraph two of the syllabus. To determine if substantive grounds for relief exist, the statute requires the trial court to consider "supporting affidavits, and the documentary evidence, all the files and records pertaining to the proceedings against the petitioner, including, but not limited to, the indictment, the court's journal entries, the journalized records of the clerk of the court, and the court reporter's transcript." Ohio Rev. Code § 2953.21(C). The trial court can deny a petition without even holding an evidentiary hearing if the trial court does not find grounds for granting relief. *Id.* at § 2953.21(E). Thus, a petition could be dismissed based on the trial court's facial review of it, without the benefit of any discovery process, thereby imposing an impossible pleading standard on petitioners.

368.    Of further concern is the record of the Ohio appellate courts with respect to post-conviction review. Since 1982, there have been very few grants of relief at any level of review.

369.    The Sixth Circuit Court of Appeals has expressed concern regarding the State of Ohio's inadequate, excessively narrow, and ineffectual post-conviction scheme. *See Keener v. Ridenour*, 594 F.2d 581, 590 (6th Cir. 1979). The basis for the Sixth Circuit's dissatisfaction with Ohio's lack of process can be traced to *State v. Perry*, 226 N.E.2d 104 (Ohio 1967). After *Perry*, the Sixth Circuit recognized that "[b]ecause of the narrow limits placed on the Ohio post-conviction statute, there is no longer any effective State remedy open to the Appellant to exhaust.

177

The *Perry* decision has rendered such process ineffective to protect the rights of the Appellant."

*Coley v. Alvis*, 381 F.2d 870, 872 (6th Cir. 1967); *accord Allen v. Perini*, 424 F.2d 134, 139–40

(6th Cir. 1970).

370.     The Ohio Legislature established a post-conviction procedure to effectuate the

constitutional rights of those individuals convicted of criminal offenses.  Even if the availability

of post-conviction procedures does not emanate directly from clear constitutional provisions,

"when a State opts to act in a field where its action has significant discretionary elements, it must

nonetheless act in accord with the dictates of the Constitution—and, in particular, in accord with

the Due Process Clause."  *Evitts*, 469 U.S. at 401.

371.     The need for Mr. Davis to raise collateral challenges to his sentence is all the more

critical here because Mr. Davis's "life" interest (protected by the "life, liberty and property"

language in the Due Process Clause) is at stake in the proceeding.  *See Ohio Adult Parole Auth.

v. Woodard*, 523 U.S. 272 (1998).  Death is different; for that reason more process is due, not

less.  *See Lockett v. Ohio*, 438 U.S. 586 (1978); *Woodson v. North Carolina*, 428 U.S. 280

(1976).

372.     Mr. Davis is entitled to an adequate post-conviction remedy to vindicate his Ohio and

federal constitutional rights to effective assistance of counsel, due process of law, equal

protection of the law, confrontation of the State's evidence against him, and freedom from cruel

and unusual punishment pursuant to the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments

to the United States Constitution.

373.     Although, the State must provide Mr. Davis "with a constitutionally adequate opportunity

to be heard," Mr. Davis has been denied "even this rudimentary process."  *Panetti v.

Quarterman*, 551 U.S. 930, 952 (2007).  Absent a full and fair opportunity to present his claims

to the state courts, the federal courts are authorized to review those claims that Mr. Davis presented to the state court without any deference to state court fact findings or legal conclusions. Mr. Davis therefore requests a full and fair opportunity to present all of his claims to this court in habeas corpus and to have the opportunity to conduct discovery, the opportunity to amend the petition, the opportunity (and the ability) to fully investigate the claims, the opportunity to present evidence in support of his claims to this Court without any deference being given to the factual findings of the state courts, and to be afforded a state post-conviction process that is constitutionally adequate.

374. To the extent the Ohio courts ruled on the merits of this claim, those rulings were contrary to or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States, and resulted in a decision that was based on unreasonable determination of the facts in light of the evidence presented in state courts. 28 U.S.C. § 2254(d).

**LETHAL-INJECTION GROUNDS FOR RELIEF:**

**FACTUAL AND PROCEDURAL BACKGROUND FOR LETHAL-INJECTION INVALIDITY CLAIMS**

> ### A.    Introduction

375.    Ohio law requires all executions to be carried out through the use of lethal injection. Ohio Rev. Code § 2949.22(A), (C).

376.    Ohio law does not allow for any other method of execution other than lethal-injection to be used to carry out Davis's sentence of judgment.  *Id.*

377.    Ohio cannot carry out Davis's execution by lethal injection without violating his constitutional rights, regardless of the execution protocol in place, whether past, present or future.

378.    The allegations raised in Mr. Davis's lethal-injection grounds for relief are specific to Ohio and specific to Von Clark Davis.

379.    Other states may be capable of using lethal injection to execute somebody else in a constitutional manner.  Mr. Davis's lethal-injection invalidity claims, however, are specific to his execution at Ohio's hands in light of evidence related to Ohio's execution protocols and their implementation, along with Mr. Davis's individual physical and mental health characteristics, using the only method of execution that is permissible as to Mr. Davis under Ohio law.

380.    Therefore, the State is not capable of using lethal injection without violating federal law and committing a federal constitutional violation in executing Von Clark Davis.

381.    Ohio's history of botched executions and its repeated protocol changes are relevant to Mr. Davis's claims that Ohio cannot carry execute him in a legal or constitutional manner using lethal injection.  They also help demonstrate that Ohio will never be able to adopt a lethal injection protocol that will operate in a legal or constitutional manner.

382. It does not matter what protocol Ohio adopts, Mr. Davis's lethal-injection execution will always be in violation of federal law or unconstitutional.

383. Mr. Davis alleges that Ohio cannot legally or constitutionally carry out his death sentence using the only method of execution permissible as to Mr. Davis under Ohio law. Because these claims would invalidate Mr. Davis's sentence of death, they cannot be litigated under 42 U.S.C. § 1983. As a result they are necessarily cognizable under 28 U.S.C. § 2254.

384. If Mr. Davis raised these same claims under § 1983, the courts would re-characterize the complaint as a habeas corpus petition under § 2254 because the claims directly challenge his death sentence itself. The claims are therefore properly raised in habeas corpus instead of under § 1983.

385. Ohio does not provide a forum for litigating lethal-injection invalidity challenges. *See Scott v. Houk*, 760 F.3d 497, 511 n.2 (6th Cir. 2014) (noting "the Supreme Court of Ohio's own admission" in *Scott v. Houk*, 939 N.E.2d 835 (Ohio 2010), "that Scott could not pursue this claim in any state forum").

386. Because there is no state court forum for litigating such claims, Mr. Davis's claims are not procedurally defaulted, and "AEDPA deference does not apply because the state court did not consider this claim on the merits," *Scott*, 760 F.3d at 511 n.2.

387. Because there was no state court decision on the merits, 28 U.S.C. § 2254(d) is inapplicable. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1399-1400 (2011).

### B. Lethal injection in Ohio

388. Ohio first enacted lethal injection as a method of execution in 1993 giving prisoners a choice between electrocution and lethal injection, Ohio Rev. Code § 2949.22(B) (West 1993). Ohio eliminated electrocution entirely as a method of execution in 2001. Ohio Rev. Code

§ 2949.22(A), (C). Ohio Revised Code § 2949(A) requires that "a death sentence shall be executed by causing the application to the person . . . of a lethal injection of a drug or combination of drugs of sufficient dosage to quickly and painlessly cause death."

389. Ohio Revised Code § 2949.22(C) contemplates the possibility of some other prospectively adopted method of execution in certain circumstances, but those circumstances will never come to pass in Mr. Davis's case.

390. The Ohio statute contemplates that another method of execution, chosen by the General Assembly "subsequent to" the date on which lethal-injection was amended into § 2949.22, will only be potentially used if the courts declare "the execution of a death sentence by lethal injection . . . to be unconstitutional." *Id.*

391. Thus, under the plain language of § 2949.22(C), an inmate's death sentence may not be executed using some subsequently identified alternative method of execution unless lethal-injection as a method of execution has been declared *per se* unconstitutional, as a general matter. *See id.*

392. The Supreme Court has made clear that lethal-injection as a method of execution is not per se unconstitutional. *See Glossip*, 135 S. Ct. 2726 (2015); *Baze v. Rees*, 553 U.S. 35 (2008).

393. The Ohio General Assembly has not acted to authorize any other method of execution.

394. Mr. Davis's lethal-injection invalidity claims are not *per se* unconstitutionality challenges.

395. Thus, nothing in § 2949.22(C) applies to salvage the validity of Mr. Davis's death-sentence judgment once he demonstrates that Ohio cannot constitutionally execute him via lethal-injection, and Ohio has no alternative method of execution legally available under Ohio law to execute Mr. Davis other than lethal injection.

396.    Ohio's Department of Rehabilitation and Correction (DRC) has adopted specific administrative-law policies for carrying out lethal-injection executions.   Until 2004, those policies were identified as DRC Policy 001-09.  From 2004 to present, those policies are identified as DRC Policy 01-COM-11.

397.    Since 1993, DRC has had 19 versions of its execution protocols, with each subsequent policy superseding the previous policy.

398.    DRC's execution protocols are binding state administrative law and a mandatory part of the State of Ohio's lethal-injection executions.  *See Cooey v. Kasich*, Nos. 2:04-cv-1156, 2:09-cv-242, 2:09-cv-823, 2:10-cv-27, 2011 WL 5326141, at *5 (S.D. Ohio Nov. 4, 2011).

> **1.    There is no sound medical or clinical basis for Ohio to select drugs to use to execute Mr. Davis.**

399.    Because Ohio's lethal-injection statute does not mandate which drugs are to be used in an execution, DRC adopts execution protocols to define which drugs are to be used.

400.    There are no clinical data or studies that evaluate what combination and dosage of drugs can be used for a lethal-injection execution to cause death quickly and painlessly or that evaluate what pain or suffering a person may experience while receiving a lethal dose of any drug combination.  As a result, any lethal injection drugs DRC may use to carry out a lethal-injection execution of Mr. Davis are not scientifically proven to be quick or painless in causing death.

401.    The U.S. Food and Drug Administration (FDA) has never approved any drug to cause death through lethal injection in an execution.  Any drug that DRC may use to carry out Mr. Davis's lethal-injection execution has not been approved for the purpose of causing death, even if the drug itself is otherwise FDA-approved and has FDA-approved uses.

**2.      Lethal-injection execution protocols using three drugs from 2004 to 2009**

402.    The execution protocols dated January 8, 2004 through May 14, 2009 required the use of a three-drug lethal-injection method using successive injections of thiopental sodium (brand name: Pentothal), pancuronium bromide, and potassium chloride.

403.    Both pancuronium bromide and potassium chloride would cause an inmate who is aware on some level to suffer excruciating, unconstitutional levels of physical pain.

404.    Evidence shows that Ohio was unable to consistently carry out a constitutional execution using the three-drug lethal-injection combination, including multiple failures to ensure that sufficient anesthetic was administered during an execution before administering the indisputably torturous and horrifically painful second and third drugs.

405.    Accordingly, this evidence shows that Ohio is unable to lawfully execute Mr. Davis using a three-drug lethal-injection execution protocol.

**3.      Lethal-injection execution protocols and executions using one or two drugs from 2009 to present**

**i.      November 30, 2009 Execution Protocol**

406.    Ohio adopted the November 30, 2009 Execution Protocol that used only thiopental sodium, eliminating the second and third drugs in the previous three-drug protocol.

407.    Not long after Ohio changed its primary method to the one-drug procedure in late 2009, a nationwide shortage of thiopental developed.  To this day, no manufacturer holds a license from the FDA to manufacture and/or distribute thiopental, and thiopental sodium remains an unapproved drug under federal law.

408.    DRC's supply of thiopental expired on March 1, 2011.

409.    Evidence demonstrates that Ohio has no legal source of thiopental available, and thus Ohio is unable to lawfully execute Mr. Davis using a one-drug thiopental sodium execution protocol.

410.    The November 30, 2009 Execution Protocol also added a back-up, under which a mixture of 10 mg of midazolam and 40 mg of hydromorphone would be injected intramuscularly.  No jurisdiction in the world had ever used that method of execution, nor has any jurisdiction in the world ever used that method of execution at any since Ohio adopted it.

411.    Evidence from the horrific executions of Dennis McGuire and Joseph Wood using IV injections of these two drugs—which permits diffusion of the drugs significantly faster than intramuscular injection—now demonstrates that Ohio cannot constitutionally use intramuscular injection of any mixture of hydromorphone and midazolam to carry out a lethal-injection execution on Mr. Davis.

## ii.    March 9, 2011 Execution Protocol

412.    The March 9, 2011 Execution Protocol substituted pentobarbital for thiopental as the single drug in the primary method of execution.

413.    Shortly after this change, the sole licensed manufacturer of pentobarbitol (Nembutal®) ceased selling it to states for executions. Nembutal® remains available for purchase on the commercial market, even though it is not available to DRC for use in executions.

414.    DRC's supply of FDA-approved, manufactured pentobarbital expired September 30, 2013.

415.    DRC has not purchased and/or obtained FDA-approved, manufactured pentobarbital since the sole manufacturer banned the sale of pentobarbital for use in executions, and DRC is not able to lawfully do so, thus demonstrating that Ohio cannot lawfully carry out a lethal-injection execution of Mr. Davis using manufactured pentobarbital.

### iii.     2013 Execution Protocol

416.    The 2013 Execution Protocol kept pentobarbital as the primary drug to be used for executions but added, for the first time, that the execution drugs could be obtained "under whatever name it may be available from a manufacturer, distributor, *or compounding pharmacy*."  (emphasis added).

417.    Recent changes in federal and Ohio state statutory and regulatory laws related to compounding of sterile controlled substances, along with evidence that no compounder with an Ohio pharmacy license and the now-legally mandated ability to comply with the stringent commands of United States Pharmacopeia Chapter 797 will compound pentobarbital for Ohio to use in a lethal-injection execution, now demonstrates that Ohio cannot lawfully use pentobarbital, whether compounded or manufactured, to carry out a lethal-injection execution on Mr. Davis.

418.    Under the 2013 Execution Protocol, if the Warden determined that pentobarbital was unavailable in sufficient quantity or if later "the pentobarbital [was] deemed unusable," the 2013 Execution Protocol permitted a secondary intravenous method of lethal-injection:  the intravenous injection of 10 mg of midazolam, combined with 40 mg of hydromorphone.

419.    DRC did not make those changes on the basis of any alleged belief by DRC that the intravenous injection of either compounded pentobarbital or midazolam and hydromorphone are more humane, safer, or effective methods of execution than FDA-approved, manufactured pentobarbital, thiopental, or other similarly short-acting barbiturate.

### iv.     Execution of Dennis McGuire

420.    DRC conducted only one execution under the 2013 Execution Protocol, that of Dennis McGuire on January 16, 2014.  *See* Alan Johnson, *State will increase lethal dosages*, The Columbus Dispatch, Apr. 29, 2014, at 1B, *available at* 2014 WLNR 11478581.

421. According to eyewitness reports, three to four minutes after the execution began, McGuire suddenly began gasping audibly for air, snorting, gurgling, rattling, making guttural noises, choking, heaving his chest and stomach, arching his back, writhing against the restraints, appearing to writhe in pain, and clenching his fists. *See* Lawrence Hummer, *I witnessed Ohio's execution of Dennis McGuire. What I saw was inhumane*, theguardian.com, Jan. 22, 2014, http://www.theguardian.com/commentisfree/ 2014/jan/22/ohio-mcguire-execution-untested-lethal-injection-inhumane; Alan Johnson, *Inmate's death called 'horrific'*, The Columbus Dispatch, Jan. 17, 2014, *available at* 2014 WLNR 1476270; Andrew Welsh-Huggins (AP), *Family protests use of drugs in Ohio execution*, Boston Globe, Jan. 26, 2014, *available at* 2014 WLNR 2263256. This spectacle persisted for approximately ten or eleven minutes, and it took almost twenty-six minutes of that horrific scene between the injection of drugs and the point when the Warden announced McGuire's death. *Id.*

422. Thus, the facts related to the McGuire execution demonstrates that Ohio cannot lawfully execute Mr. Davis using IV lethal-injection of 10 mg. midazolam and 40 mg. hydromorphone.

### v. 2014 Execution Protocol

423. DRC issued a new execution protocol on April 28, 2014, superseding the 2013 Execution Protocol.

424. The revised protocol increased the IV-injected dosage of midazolam from 10 mg to 50 mg, and increased the dosage of hydromorphone from 40 mg to 50 mg

425. DRC had no medical basis to believe the increase in the dosages of midazolam and hydromorphone to a 50/50 combination would result in a death that was quick and painless.

426. The 2014 Execution Protocol, like all the previous protocols, did not allow for the dosage of any of the execution drugs to be adjusted based on the condemned inmate's physical or mental health characteristics.

427.     The 2014 Execution Protocol retained intramuscular injection of 10 mg. midazolam and 40 mg. hydromorphone as the back-up drugs and administration mechanism, despite the McGuire spectacle using the same dosages with an administration mechanism that is substantially faster than intramuscular injection.

### vi.     Execution of Joseph Wood

428.     On July 23, 2014, Arizona performed the first and only execution using the intravenously injected 50 mg. midazolam/50 mg. hydromorphone drug combination that Ohio had just adopted, when it executed inmate Joseph Wood.

429.     Wood's execution took nearly two hours, while he gasped and snorted over 600 times.

430.     Wood was given the 50/50 drug combination 15 times—a total of 750 mg of midazolam and 750 mg of hydromorphone—before he finally died.  *See* Fernanda Santos and John Schwartz, *Arizona Loose with Its Rules in Executions, Records Show*, New York Times A9, 2014 WLNR 22629162 (Aug. 18, 2014).

431.     The executions of McGuire and Wood are the only human executions that have ever been carried out using a mixture of midazolam and hydromorphone, and both executions were horrific, torturous, undignified spectacles.

432.     Thus the facts related to the Wood execution demonstrates that Ohio cannot lawfully execute Mr. Davis using IV lethal-injection of any volume of midazolam and hydromorphone mixture.

433.     No Ohio executions were conducted using the 2014 Execution Protocol.  On January 9, 2015, DRC adopted a revised Execution Protocol superseding the 2014 Execution Protocol.

### vii.      January 9, 2015 Execution Protocol

434.    The January 9, 2015 Execution Protocol abandoned the use of midazolam and

hydromorphone.  The January 9, 2015 Execution Protocol retained pentobarbital and added

thiopental sodium as the primary execution drugs, with either drug to be injected intravenously.

435.    The protocol allowed for either primary execution drug to be obtained "under whatever

name it may be available from a manufacturer, distributor or compounding pharmacy.

436.    No executions were carried out under the January 9, 2015 Execution Protocol.

### viii.      June 29, 2015 Execution Protocol

437.    On June 29, 2015, DRC adopted a revised version of the Execution Protocol superseding

the January 9, 2015 Execution Protocol.[5]

438.    The June 29, 2015 Execution Protocol retained sodium thiopental and pentobarbital as

the primary execution drugs.  The June 29, 2015 Execution Protocol increased the flexibility

given to DRC in choosing the origin and nature of execution drugs by providing that the

pentobarbital or thiopental sodium may be a drug "under whatever name it may be available

from a pharmacy, manufacturer, supplier, distributor, pharmacist, or compounding pharmacy;"

439.    The June 29, 2015 Execution Protocol also added a paragraph stating that analytical tests

for identity and potency "pursuant to the applicable USP/NF monograph" would be conducted

on a sample from the batch of any compounded drugs to be used for execution; that a batch of

compounded drugs will only be used if the sample "is properly identified as the intended drug

and its tested potency is within the applicable monograph standard"; and that a sample of non-

---

[5] Available at: http://www.drc.ohio.gov/web/drc_policies/documents/01-COM-11.pdf

compounded execution drugs may also be tested for identity and potency "pursuant to the

applicable monograph standard."

> **4.      Problems with the use of compounded drugs to carry out a lethal-injection execution of Mr. Davis**
>
>> **i.      Compounded drugs are not as safe or effective as FDA-approved drugs.**

440.    In general, compounding is a practice by which a pharmacist combines, mixes, or alters

Active Pharmaceutical Ingredients (APIs) in response to a patient-specific prescription to create

a medication tailored to the medical needs of an individual patient when that patient's individual

needs cannot be met with an FDA-approved product.

441.    The FDA sets the standard for identity, purity, potency, and efficacy of prescription

medications.  Compounded drugs are not FDA-approved.  The FDA does not verify the identity,

purity, potency, quality, safety, or effectiveness of compounded drugs.

442.    Drugs that have not have been manufactured in a FDA-registered facility under current

Good Manufacturing Practices have no assurance of consistent quality from lot to lot or from

container to container.

443.    Compounding pharmacies are substantially likely to obtain the API for pentobarbital,

thiopental sodium, or any other drug that DRC may use in lethal injections, from overseas

companies that are not registered with or inspected by the FDA.  The API provided by these

sources is suspect.  There is no practical method to verify their quality, constitution, or

uniformity in limited pharmacy settings such as retail compounding pharmacies.

444.    Testing drugs after they have been compounded does not compensate for the absence of

reliable, FDA-approved raw materials obtained from reputable, ethical, duly registered suppliers

because post-compounding testing alone is not designed to ensure sterility or purity.

445. Any analytical testing results are invalid without any accompanying information about the testing protocols the testing facility employed, as well as information about the testing facility itself.

446. The United States Pharmacopeia and The National Formulary (USP-NF) General Chapter 797 provides the standards that pharmacies compounding sterile dosage forms of drugs (also referred to as compounded sterile preparations or CSPs), such as injectables like any drugs Ohio would use to inject for a lethal-injection execution of Mr. Davis, are supposed to follow. *See* USP-NF Gen'l Ch. 797: Pharmaceutical Compounding—Sterile Preparations (June 2014)

447. Any compounded lethal-injection drug DRC would acquire to execute Mr. Davis via lethal-injection would be derived from nonsterile API, and thus under USP-NF General Chapter 797 would be high-risk-level CSPs. *See id.*

448. Although all pharmacies performing sterile compounding are supposed to follow USP-NF General Chapter 797, enforcement of these standards has historically been difficult, because the FDA defers enforcement of USP-NF General Chapter 797 to individual states.

449. The Ohio State Board of Pharmacy has only recently incorporated USP-NF General Chapter 797 fully into its regulations, effective on January 1, 2015. Ohio Admin. Code § 4729-9-21(C)(2) (eff. Jan. 1, 2015); *see also* Ohio Admin. Code § 4729-16-03(B) (eff. May 1, 2015).

450. The Board failed to provide any mechanism for ensuring regular inspection and enforcement of these standards. *See id.* Furthermore, if the pharmacy is a "non-resident" pharmacy—that is a pharmacy located outside of Ohio—then the Ohio State Board of Pharmacy relies on the other state's board of pharmacy to inspect and enforce regulations. *See* Ohio Admin. Code § 4729-10-04.

451.    If a compounding pharmacy fails to follow all the requirements of Ohio state law in the course of compounding execution drugs to be injected into Mr. Davis, including the stringent requirements of USP 797 which are mandatory under Ohio law as of January 1, 2015, then the resultant compounded drug product is not the drug required to be used under Ohio's execution protocols.

452.    Because USP 797's standards are so demanding, it is virtually a certainty that any compounder willing to compound any execution drugs for Ohio to use to execute Mr. Davis will not be fully compliant with state and federal law in their production of those execution drugs.

453.    Even if compounding pharmacies do actually follow USP-NF General Chapter 797 standards, those standards are less stringent, and produce less reliable drugs, than the FDA Good Manufacturing Practices.

454.    Specific harms that can result from the use of compounded drugs to execute Mr. Davis include lack of efficacy of an anesthetic drug, causing Mr. Davis to regain awareness while he unable to breathe and aware of his body systems shutting down.

455.    Compounded drugs can also cause serious harm and severe pain before Mr. Davis loses awareness, including painful pulmonary embolisms resulting from deviations in potency or formation of precipitates within Mr. Davis's body or from unanticipated drug incompatibilities; nausea and vomiting resulting from deviations in potency; suffocation and gasping for breath; immediate anaphylactic reactions or other excruciating effects resulting from contamination with dangerous allergens, bacteria, fungus, or other impurities; and serious burning pain on injection, as a result of incorrect pH or the drug precipitating inside Mr. Davis's veins.

456.    The use of compounded drugs to execute Mr. Davis creates a substantial, objectively intolerable risk that the drugs will be made using poor quality practices, and will be the wrong

identity or pH level, prone to falling out of solution/precipitating, ineffective, sub-potent, contaminated, unsterile, or otherwise adulterated.

457. There is a substantial risk of harm to Mr. Davis from DRC's use of unverified ingredients, including the administration of an entirely incorrect chemical or active ingredient, administration of sub- or super-potent execution drugs, contamination with dangerous allergens or substances that may cause immediate anaphylactic reactions, and/or contamination with bacteria or fungus with immediate excruciating effects before Mr. Davis is unaware, assuming it works even to that extent.

458. DRC's use of compounded drugs to execute Mr. Davis makes it highly likely that the State will deviate from the execution protocols, and will thus apply the law disparately to Mr. Davis as compared to others similarly situated, arbitrarily and recklessly, by failing to inject him with only the drugs that are required to be used for a lethal-injection execution in Ohio.

459. Testing a sample of one solution made of a compounded drug is not reliable as to the identity, sterility, potency, or efficacy of the solution as a whole. Similarly, testing one solution of several made of a compounded drug is not reliable as to the identity, sterility, potency, or efficacy of the other solutions made.

460. The risks to Mr. Davis from DRC using compounded execution drugs to carry out his lethal-injection execution are significantly increased by the risks associated with compounded execution drugs created by specific compounders whose drug production facilities and protocols, degree of skill, experience and training, and ethics are inadequate or unlawful for producing compounded injectable sterile drug products.

461. The recent change to Ohio statutory law to attempt to hide from disclosure the identities of any drug compounders who produce compounded execution drugs for Ohio only amplifies the

193

substantial level of risk to Mr. Davis presented by using compounded execution drugs to carry out his execution by lethal-injection.

### ii. Difficulties in obtaining compounded execution drugs

462. DRC will use Central Pharmacy-Inpatient, the institutional pharmacy of Ohio's Department of Mental Health and Addiction Services (DMHAS), pharmacist Richard Theodore, or a third party to purchase, obtain, and/or distribute drugs for use in Mr. Davis's execution.

463. Central Pharmacy is not a compounding pharmacy and will not compound drugs itself for Mr. Davis's execution.

464. Richard Theodore is not qualified to, is not equipped to, and does not engage in compounding sterile injectable controlled substances, and will not do so for Mr. Davis's execution.

465. Even if DRC can find sources for compounded execution drugs to use for other executions before Mr. Davis's, DRC will only be able to obtain enough compounded lethal-injection drugs for one execution at a time because of the limited shelf-life of compounded drugs as opposed to FDA-approved, manufactured drugs, thereby significantly increasing the risks regarding the drugs to be used to execute Mr. Davis.

466. High-risk-level CSPs such as any injectable drugs that could be used to execute Mr. Davis are assigned beyond-use dates (BUDs) to designate the date after which the compounded drug shall not be administered, stored, or transported.

467. Those BUDs are limited in duration such that DRC will need to obtain a new batch of execution drugs for each execution, including for Mr. Davis's.

### 5. Importation of drugs to execute Mr. Davis would violate federal law

468. Under the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 381(a), and the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), the FDA is required to refuse

admission to thiopental shipments. *See Cook v. Food & Drug Admin.*, 733 F.3d 1, 10-11 (D.C. Cir. 2013).

469.    After the 2012 *Cook* ruling, the illegal shipments of thiopental from overseas were to have ceased. But recently discovered evidence revealed that some states—perhaps including Ohio—have recently tried to obtain thiopental sodium from a source in India, Harris Pharma, LLP, that is almost certainly registered fraudulently with the FDA and the DEA. *See, e.g.*, Chris McDaniel, *This Is The Man In India Who Is Selling States Illegally Imported Execution Drugs*, BuzzFeed News (Oct. 20, 2015), available at http://www.buzzfeed.com/chrismcdaniel/this-is-the-man-in-india-who-is-selling-states-illegally-imp#.aqWYLNeWE .

470.    The FDA has recently reiterated that, under federal law and the federal court order in *Cook*, there is no thiopental sodium that may be legally imported into the United States to be used for an execution from anywhere in the world. *See* Chris McDaniel, *Ohio Intended To Illegally Import Execution Drugs, FDA Letter Says*, BuzzFeed News (Aug. 18, 2015), available at http://www.buzzfeed.com/chrismcdaniel/ohio-intended-to-illegally-import-execution-drugs-fda-letter#.iyEJXQjX2); Jeremy Pelzer, *FDA warns Ohio against illegally importing execution drug*, Northeast Ohio Media Group (Aug. 19, 2015), available at http://www.cleveland.com/open/index.ssf/2015/08/fda_warns_ohio_against_illegal.html;

471.    DRC cannot lawfully obtain or use any FDA-approved thiopental sodium domestically or by importation for use in executing Mr. Davis.

472.    DRC does not have the required DEA license to import pentobarbital to use for a lethal-injection execution of Mr. Davis.

473.    DRC does not have the required licenses and authorizations to import any other drugs to use for a lethal-injection execution of Mr. Davis.

### 6.    DRC has no remaining drug options

474.    Following the unconstitutional executions of Dennis McGuire and Joseph Wood using a combination of midazolam and hydromorphone, DRC cannot constitutionally carry out a lethal-injection execution of Mr. Davis using any dosage combination of those drugs.

475.    All of DRC's previous supply of midazolam and hydromorphone has long expired. Since the notorious debacles of the McGuire and Wood executions, the FDA-licensed manufacturers of midazolam and hydromorphone have instituted the same end-user restrictions that were previously placed on pentobarbital. Consequently, DRC is unable to obtain additional supplies of midazolam or hydromorphone to use in a lethal-injection execution of Davis.

476.    DRC can no longer lawfully obtain or use FDA-approved, manufactured thiopental or pentobarbital for a lethal-injection execution of Mr. Davis.

477.    DRC cannot obtain lawfully compounded sterile injectable drugs to use for a lethal-injection execution of Mr. Davis.

478.    Any drug that poses the risk of a paradoxical effect on Mr. Davis or that is so short-acting that Mr. Davis will regain awareness while his body is struggling to live—such as midazolam, pentobarbital or thiopental sodium—significantly increases the substantial risks of harm to which Mr. Davis is subject during a lethal-injection execution using such drug. Accordingly none of midazolam, pentobarbital or thiopental sodium can be constitutionally used to carry out a lethal-injection execution on Mr. Davis.

479.    Any other drug option that DRC might chose to carry out a lethal-injection execution on Mr. Davis presents one or both of the same problems that hydromorphone and midazolam or thiopental sodium or pentobarbital present, regarding the problematic effect on Mr. Davis or the non-availability of the drug.

480. Because DRC is unable to lawfully obtain drugs to inject during a lethal-injection execution of Mr. Davis, DRC is no longer able to execute Mr. Davis via lethal-injection.

> **C.** **Von Clark Davis's individual characteristics preclude Ohio from carrying out a lethal injection execution on him without violating the law and his constitutional rights.**

481. Mr. Davis's particular health characteristics increase the risk that he will experience severe, agonizing, horrific, and unnecessary pain and suffering as well as humiliation, degradation, and disgrace during a lethal-injection execution.

482. Mr. Davis's physical characteristics that increase the substantial risk of serious harm he will endure related to any attempt by Ohio DRC to execute him by lethal injection include, but are not limited to, a history of taking the medication Hytrin, which may interact with benzodiazepines, and breathing troubles. Mr. Davis also presents with several risk factors for the STOP-Bang test, including that he is male, older than age 50, and has obstructed airways and other breathing difficulties.

483. In addition, Mr. Davis has a history of alcohol abuse and dependence.

484. In addition to the specific characteristics enumerated above, Mr. Davis may develop or may currently have additional physical characteristics increasing the substantial risk of serious harm caused by effort by DRC to execute him via lethal injection that have not yet been identified or are documented in records which DRC has not yet produced to his counsel.

485. In addition to the specific characteristics enumerated above, Mr. Davis may develop or may currently have mental and psychological conditions that have not yet been identified or are documented in records which DRC has not yet produced to his counsel that would increase the substantial risk of serious harm to which he will be subjected if the State of Ohio attempts to execute him using lethal-injection.

**TWENTY-SECOND GROUND FOR RELIEF.**

**OHIO'S STATUTORY PROVISIONS GOVERNING THE IMPOSITION OF THE DEATH PENALTY DO NOT MEET THE PRESCRIBED CONSTITUTIONAL REQUIREMENTS AND ARE UNCONSTITUTIONAL, BOTH ON THEIR FACE AND AS APPLIED TO MR. DAVIS, IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.**

486.     The Eighth Amendment to the United States Constitution prohibits the infliction of cruel and unusual punishment.  The Eighth Amendment's protections are applicable to the states through the Fourteenth Amendment.  *Robinson v. California*, 370 U.S. 660, 667 (1962). Punishment that is "excessive" constitutes cruel and unusual punishment.  *Coker v. Georgia*, 433 U.S. 584, 591–92 (1977).  The underlying principle of governmental respect for human dignity is the guideline to determine whether this statute is constitutional.  *See Rhodes v. Chapman*, 452 U.S. 337, 361 (1981); *Furman v. Georgia*, 408 U.S. 238, 274 (1972) (Brennan, J., concurring); *Trop v. Dulles*, 356 U.S. 86, 100 (1958).  The Ohio death sentencing scheme violates this bedrock principle.

487.     The prohibition against cruel and unusual punishment promises to all that the State's power to punish will be exercised within the limits of civilized standards.  *Trop*, 356 U.S. at 100. What constitutes cruel and unusual punishment is not a static concept, but rather a concept which "must draw [its] meaning from the evolving standards of decency that mark the progress of a maturing society."  *Id.* at 101.  This concept must be interpreted in a flexible and dynamic manner.

488.     Punishment which is "excessive" constitutes cruel and unusual punishment.  *Coker v. Georgia*, 433 U.S. 584 (1977).  A punishment is excessive if it:  (1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering; or, (2) is grossly out of proportion to the gravity of the offense.  *Id.* at 592.  Thus, if the death penalty makes no measurable contribution to

acceptable goals of punishment or if it is disproportionate to the seriousness of the offense committed, it is excessive and therefore unconstitutional.

489.    Equal protection under the law, as guaranteed by the Fourteenth Amendment requires that similarly situated persons be treated similarly.  This right extends to the protection against cruel and unusual punishment.  *Furman*, 408 U.S. at 249 (Douglas, J., concurring).

> The high service rendered by the "cruel and unusual" punishment clause of the Eighth Amendment is to require legislature to write penal laws that are even handed, nonselective, and nonarbitrary, and to require judges to see to it that general laws are not applied sparsely, selectively, and spottily to unpopular groups.

*Id*. at 256 (Douglas, J., concurring).  A death penalty imposed in violation of the Equal Protection guarantee is a cruel and unusual punishment.

490.    Capital punishment, because it involves the taking of life, is qualitatively different from other punishments.  *Id.* at 287 (Brennan, J., concurring).  "The penalty of death differs from all other forms of criminal punishment, not in degree but in kind."  *Id.* at 306 (Stewart, J., concurring).  "[I]n assessing the cruelty of capital punishment ... we are not concerned only with the 'mere extinguishment of life' ... but with the total impact of capital punishment from the pronouncement of judgment of death through the execution itself, both on the individual and on the society which sanctions its use."  *People v. Anderson*, 493 P.2d 880, 892 (Cal. 1972).

491.    The Eighth Amendment concept of cruelty is not a prohibition against all suffering but it is a prohibition against inflicting suffering greater than is necessary to serve the legitimate needs underlying a compelling state interest of society.  Necessarily every punishment contains an element of cruelty.  A convicted defendant who is deprived of his freedom and imprisoned will feel society has been cruel.  Generally, society tolerates that degree of cruelty that is necessary to serve its legitimate needs.  However, when the level of cruelty is disproportionate to the crime, and consequently does not serve the needs of society, courts must find the punishment to be

"cruel" within the meaning of the cruel and unusual punishment clause. *Robinson*, 370 U.S. at 667.

492. The Ohio capital punishment scheme allows for imposition of the death penalty in an arbitrary and discriminatory manner, in violation of the protections mandated in *Furman* and its progeny. The virtually uncontrolled discretion of prosecutors in indictment decisions allows for arbitrary and discriminatory imposition of the death penalty.

493. The United States Supreme Court's decision in *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976), made it clear that the fatal flaw of mandatory death penalty statutes is that without specific standards the process of deciding who is to be sentenced to death is shielded from judicial review:

> [The] mandatory death penalty statute provides no standards to guide the jury in its inevitable exercise of the power to determine which first-degree murderers shall live and which shall die. And there is no way under the North Carolina law for the judiciary to check arbitrary and capricious exercise of that power[.]

Uncontrolled discretion of the prosecutor is one of Ohio's ways around this requirement.

494. Ohio's system imposes death in a racially discriminatory manner. Blacks and those who kill white victims are much more likely to be sentenced to death. While African-Americans constitute around twelve percent of Ohio's population,[6] over fifty-one percent of Ohio's death row inmates are African-American, *see* Ohio Pub. Defender Office, *Death Penalty Proportionality Statistics*, at 1 (May 14, 2010)[7]; *see also* Supreme Court of Ohio, *The Report of the Ohio Commission on Racial Fairness* at 37–38 (1999). While few Caucasians are sentenced

---

[6] Data *available at* http://factfinder2.census.gov/faces/nav/jsf/pages/index.xhtml.

[7] *available at* http://www.opd.ohio.gov/DP_ResidentInfo/dp_Proportionality.pdf.

to death for killing African-Americans, nearly forty African-Americans sit on Ohio's death row for killing a Caucasian. Ohio Pub. Defender Office, *Death Penalty Proportionality Statistics, supra*, at 1.

495.  Ohio courts have not evaluated the implications of these racial disparities. While the General Assembly created an appellate review process for post-conviction review of this disparity, this Court has never implemented a plan to track the race of the offender or the victims as is required by Ohio Revised Code § 2953.21(A)(2). In short, Ohio law provides no check against race discrimination in capital sentencing.

496.  Due process prohibits the taking of life unless the state can show a legitimate and compelling state interest. *State v. Pierre*, 572 P.2d 1338, 1357–58 (Utah 1977) (Maughan, J., concurring and dissenting); *Commonwealth v. O'Neal*, 339 N.E.2d 676, 678 (Mass. 1975) (Tauro, C.J., concurring). Where fundamental rights are involved, personal liberties cannot be broadly stifled "when the end can be more narrowly achieved." *Shelton v. Tucker*, 364 U.S. 479, 488 (1960). To take a life, the state must show that it is the "least restrictive means" to a "compelling governmental end." *O'Neal*, 339 N.E.2d at 678–79.

497.  The death penalty is neither the least restrictive nor an effective means of deterrence. Both isolation of the offender and retribution can be effectively served by less restrictive means. Society's interests do not justify the death penalty. Due process and equal protection rights require that states not impose a capital sentence through procedures that create a substantial risk of arbitrary and capricious application. *Gregg*, 428 U.S. at 188, 193-95; *Furman*, 408 U.S. at 255 (Douglas, J., concurring), 274 (Brennan, J., concurring), 309 (Stewart, J., concurring). The Ohio scheme does not meet these requirements. For example, by failing to require premeditation and deliberation as the culpable mental state, Ohio Revised Code §§ 2903.01(B) and

2929.04(A)(7) run afoul of the federal constitution. Nor does the Ohio code require that imposition of the death penalty only be allowed after proof beyond all doubt.

498. Another deficiency is that the statutes do not require the State to prove the absence of any mitigating factors and that death is the only appropriate penalty. The statutory scheme is also unconstitutionally vague which can lead to arbitrary imposition of the death penalty. Moreover, the statutes have impermissibly devalued the importance of mitigation because no method exists to ensure a proper "weighing and consideration" is accomplished. Because of these deficiencies, the Ohio statutory scheme does not meet the requirements of *Furman* and its progeny.

499. Also, the Ohio Supreme Court has interpreted the Ohio statutory scheme to require that capital defendants must prove the existence of a mitigating factor by a preponderance of the evidence. *State v. Jenkins*, 15 Ohio St.3d 164, 171-72 (1984). This standard is unconstitutional, violating the Fifth, Eighth and Fourteenth Amendments of the United States Constitution, because it prevents the sentencer from considering relevant mitigating evidence.

500. The Ohio statutes also violate the mandates of the constitutional protections by requiring proof of aggravating circumstances in the guilt phase of capital trials. The United States Supreme Court has approved schemes which separate the consideration of statutory aggravating circumstances from the determination of guilt because of their ability to provide an individualized determination and to narrow the category of defendants eligible for the death penalty. *See Zant v. Stephens*, 462 U.S. 862 (1983); *Barclay v. Florida*, 463 U.S. 939 (1983). Ohio's statutory scheme cannot provide for these constitutional safeguards.

501. By requiring proof of the aggravating specification simultaneously with proof of guilt, Ohio has effectively prohibited a sufficient individualized determination in sentencing as required by post-*Furman* cases. *See Woodson*, 428 U.S. at 301. The three-judge panel must be

free to determine whether death is the appropriate punishment for a defendant. By not requiring the state to establish guilt on the question of murder prior to the panel's consideration of the aggravating circumstances, the three-judge panel is unconstitutionally barred from making the necessary individualized determination of appropriateness. This is especially prejudicial where, as in Ohio, the consideration of aggravating circumstances is accomplished without consideration of any mitigating factors.

502.     Without strict adherence to the *Furman* constraints, the possibility of unbridled discriminatory application of the death penalty violates the constitutional provision under the Eighth and Fourteenth Amendments of the United States Constitution. Ohio's procedural system, by requiring proof of aggravating circumstances in the guilt-determining stage of a capital trial, precludes strict adherence to the *Furman* constraints. Without these safeguards, the risk of discriminatory and cruel punishment without application of due process or equal protection guarantees is unacceptably increased. Such a statutory scheme is unconstitutional and cannot be the basis for imposition of the death penalty.

503.     The Ohio capital statutes are also unconstitutional because they require submission of the presentence investigation report and the mental evaluation to the jury or judge once requested by a capital defendant. Ohio Revised Code § 2929.03(D)(1) provides:

> A pre-sentence investigation or mental examination shall not be made except upon request of the defendant. Copies of any reports prepared under this division shall be furnished to the court, to the trial jury if the offender was tried by a jury, to the prosecutor, and to the offender or his counsel for use under this division. (Emphasis added.)

504.     This mandatory submission prevents a capital defendant from effectively presenting his case in mitigation. This requirement of Ohio Revised Code § 2929.03(D)(1) violates the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Another aspect of

the unconstitutionality of Ohio's scheme concerns excessiveness and disproportionality issues. The Revised Code, through provisions in §§ 2929.02.l and 2929.03, requires reporting of some data to the Court of Appeals and the Ohio Supreme Court; although as discussed above, there is a critical omission of a written life recommendation report from the panel. There are also substantial doubts as to the adequacy of the information received after guilty pleas to lesser offenses, or after charge reductions at trial. Section 2929.02l of the Revised Code requires the reporting of only minimal information on these cases. There has been no determination by the Ohio Supreme Court that additional information will be required to be reported. Additional data is necessary to make an adequate comparison in these cases. There is no system of adequate tracking under the Ohio scheme. This prohibits adequate appellate review.

505.     Adequate appellate review is an important factor in finding that a state death penalty system is constitutional. *Zant*, 462 U.S at 879; *Pulley v. Harris*, 465 U .S. 37 (1984). The standard for review is one of careful scrutiny. *Zant* at 885. Review must be based on a comparison of similar cases and ultimately must focus on the character of the individual and the circumstances of the crime.

506.     Adequate appellate review is undercut by the failure of the Ohio statutes to require the jury or three-judge panel recommending life imprisonment to identify the mitigating factors. Without this information, no significant comparison of cases is possible since no written findings exist to serve as a basis for comparison. Without a significant comparison of cases, there can be no meaningful appellate review.

507.     Careful scrutiny in the comparison of cases is possible only if a sufficient data base and a standardized method of comparison exists. There must be as much information regarding as many cases as possible in order for a comparison to be accurate and significant, to provide a

relevant basis for distinguishing cases and appropriate penalties from each other.  A standardized method of comparison is necessary for a consistent process of comparison.  Yet Ohio's system provides for procedures which are incompatible with the meaningful comparison of cases.  These include accelerated review, the requirement that only mini mal information be included in written findings at sentencing, the use of an as-yet-undetermined method of comparison, and the gathering of incomplete and inadequate data.

508.    The proportionality system in Ohio is also constitutionally flawed because of the method used for case comparison.  The Ohio Supreme Court in *State v. Steffen*, 31 Ohio St.3d 111 (1987), at paragraph one of the syllabus held that "the proportionality review required by Ohio Revised Code § 2929.05(A) is satisfied by a review of those cases already decided by the reviewing Court in which the death penalty has been imposed."  By only reviewing those cases in which death is imposed, the capital defendant is prevented from receiving a fair proportionality review.  No meaningful manner exists in which to distinguish those capital defendants who are deserving of the death penalty, and those who are not.  This violates the Fifth, Eighth and Fourteenth Amendments of the United States Constitution.

509.    The appropriateness analysis used by the Ohio Courts of Appeal and the Ohio Supreme Court is also constitutionally infirm.  Section 2929.05(A) of the Revised Code requires the appellate courts of Ohio to determine the appropriateness of the death penalty in each capital case they review.  The statute directs the court to "affirm a sentence of death only if the particular court is persuaded from the record that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors present in the case and that the sentence of death is the appropriate sentence in the case."

510.    The Ohio Supreme Court and the Court of Appeals have failed to follow the dictates of the statute.  The appropriateness review ultimately conducted in each case is very cursory.  It does not "rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not." *Spaziano v. Florida,* 468 U.S. 447, 460 (1984), *Overruled on other grounds* in *Hurst v. Florida*, 136 S.Ct. 616 (2016).  Any death sentence upheld on appeal under these circumstances does not comport with the Fifth, Eighth and Fourteenth Amendments of the United States Constitution.

511.    The cursory appropriateness review also violates the capital defendant's due process rights as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution. The Ohio legislature has chosen to provide capital defendants with the statutory right in Ohio Revised Code § 2929.05.  When a state opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the constitution and the due process clause.  *Evitts. v. Lucey*, 469 U.S. 387, 401 (1985).  The § 2929.05 review currently employed by the Ohio courts violates this constitutional mandate.

512.    The Ohio scheme is also unconstitutional in that it fails to provide the sentencing authority with an option to choose a life sentence when there are only aggravating circumstances or when aggravation outweighs mitigation.  By foreclosing the jury or three-judge panel's ability to return a life sentence unless aggravating factors fail to outweigh mitigating factors, Ohio's statutes violate the Eighth and Fourteenth Amendments of the United States Constitution create a mandatory death penalty.  Merely concluding that the aggravating circumstances outweigh the mitigating factors may be inadequate, as a jury or three-judge panel may still conclude that "comparison of the aggravating factors with the totality of the mitigating factors leaves it in doubt as to the proper penalty." i.e., in doubt as to whether death is the <u>appropriate</u> punishment

in a specific case. *Smith v. North Carolina*, 459 U.S. 1056 (1982) (Stevens, J., dissenting from denial of certiorari).

513.    Under Ohio Revised Code § 2929.05, courts affirming a death sentence in Ohio are required to find that death is the only *appropriate* remedy, but the original sentencer has no such statutory requirement, and it must.  The jury or three-judge panel must make this decision and must make it in a fashion that will allow it to be reviewed objectively at the appellate level.  Due process requires that the same standards apply at both levels.  Arbitrary decisions are likely at the appellate level if courts make assumptions as to what the sentencer considered.

514.    The "fundamental issue" in a capital sentencing proceeding is this "determination of the appropriate punishment to be imposed on an individual." *Spaziano*, 468 U.S. at 459.  The sentencer must "rationally distinguish between those individuals for whom death is an *appropriate* sanction and those for whom it is not." *Id*. at 460.  Appropriateness of the penalty thus appears to be the core, an indispensable element of a constitutionally valid sentencing scheme.  Yet, Ohio's laws do not provide the jury or three-judge panel with an opportunity to consider this.

515.    The Eighth Amendment of the United States Constitution prohibits infliction of cruel and unusual punishment.  The meaning of the term "cruel and unusual" must be established based on the values and ideals of an enlightened society.  Current social values have progressed from those of the past where the "justice" system called for "an eye for an eye."  Contemporary societal values are inconsistent with the purposeless extinction of life.  The death penalty, by these standards, is cruel and unusual punishment.

516.    The Fifth and Fourteenth Amendments of the United States Constitution provide guarantees to equal protection of the law and due process.  These guarantees are further

safeguards against imposition of the death penalty, even if it is not found to be inherently cruel and unusual.

517.   Due process guarantees that, where fundamental rights are at risk, the life of the defendant may not be taken without substantive safeguards first being met.  Governmental action cannot be justified unless the interest to be served is a compelling governmental interest. Further, that interest must be promoted through use of the least restrictive means that can effectively serve the stated interest.  The State of Ohio has failed to establish a compelling state interest.  Moreover, the State has failed to show that a less restrictive means, such as life imprisonment, could not effectively serve the interests the State has asserted as justifying the death penalty.

518.   Due process also guarantees fair proceedings through which sentencing is accomplished. Where procedures implemented do not adequately ensure reliability in the guilt and sentencing determinations, there is an increased risk that the death penalty will be imposed arbitrarily and discriminatorily.  This violates Equal Protection guarantees.  Where this occurs, the death penalty, as applied, constitutes cruel and unusual punishment.

519.   Ohio's statutory scheme under which the death penalty is authorized fails to ensure that arbitrary and discriminatory imposition of the death penalty will not occur.  Ohio's death penalty violates the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution. Thus, Mr. Davis's death sentence must be reversed.

520.   To the extent the Ohio courts ruled on the merits of this claim, those rulings were contrary to, or an unreasonable application of clearly established federal law as stated by the Supreme Court of the United States and resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in state courts.  28 U.S.C. § 2254(d).

**TWENTY-THIRD GROUND FOR RELIEF:**

**THE STATE OF OHIO CANNOT CONSTITUTIONALLY EXECUTE MR. DAVIS BECAUSE THE ONLY MEANS AVAILABLE UNDER THE LAW TO EXECUTION HIM VIOLATE HIS EIGHTH AMENDMENT RIGHTS.**

521.    The State of Ohio has no means available to execute Mr. Davis that comply with the Constitution.  Any execution of Mr. Davis by the State would violate his Eighth Amendment rights in one or more of the following ways:

> **A.      Any drug DRC can procure to use to execute Mr. Davis via lethal injection has a substantial, objectively intolerable risk of causing unnecessary, severe pain, suffering, degradation, humiliation, and/or disgrace in violation of the Eighth Amendment, and Ohio has no other means available to execute Mr. Davis that comply with the Constitution.**

522.    DRC cannot lawfully procure, obtain, import, purchase, prescribe, possess, dispense, distribute, or administer (and/or any other terms of art under the CSA or FDCA) lethal-injection drugs for use in Mr. Davis's execution.

523.    If Mr. Davis is executed using unlawfully procured, obtained, imported, purchased, prescribed, possessed, dispensed, distributed, or administered (and/or any other terms of art under the CSA or FDCA) lethal-injection drugs, there is a substantial, objectively intolerable risk of severe, unnecessary pain, suffering, degradation, humiliation, and/or disgrace during the execution because of the lack of governmental oversight, regulation, and quality-control of illegally obtained drugs.  This risk constitutes a violation of the Eighth Amendment, and Ohio has no other means available to execute Mr. Davis that complies with the Constitution.

524.    Using pentobarbital or thiopental sodium, or midazolam and hydromorphone, or any other drug or combination of drugs that Ohio might select for a lethal-injection execution of Mr. Davis creates a substantial likelihood he will suffer a painful heart attack and/or suffocation while he is aware of what he is suffering.

525. DRC is unable to obtain FDA-approved, manufactured pentobarbital, thiopental sodium, midazolam, hydromorphone, or any other drug that might be used to execute Mr. Davis by lethal injection.

526. The use of compounded drug(s) to execute Mr. Davis greatly increases the likelihood that the execution drug(s) will not be safe and effective because the standards of compounding are less stringent than FDA-approved drugs and the new execution-secrecy statute combined with DRC's demonstrated unwillingness to provide for adequate analytical drug testing and other prophylactic measures along with the other risks created by using compounded execution drugs identified above likewise increase the risk to Mr. Davis posed by DRC's use of compounded execution drugs during his execution.

527. Using compounded drug(s) in Mr. Davis's execution creates substantial, objectively intolerable risk of severe, unnecessary pain, suffering, degradation, humiliation, and/or disgrace because of the lack of governmental oversight, regulation, and quality-control of compounded drugs.

528. Using imported drug(s) in Mr. Davis's execution greatly increases the chances that any such drug(s) not be safe and effective because: (1) the standards of manufacturing drugs in other countries, including thiopental sodium—which is no longer FDA-approved in any form—or pentobarbital or any other drug DRC might choose to inject into Mr. Davis, are less stringent than FDA and USP requirements; (2) any execution drug or drugs to be used for Mr. Davis's execution that are not illegally smuggled past FDA and DEA will be seized and refused entry to the United States; and (3) there is not adequate analytical drug testing and other prophylactic measures in DRC's execution protocols to ensure that execution drug or drugs successfully smuggled into Ohio to use for Mr. Davis's execution are safe and effective.

529.     Accordingly, and for all the reasons discussed in this petition, use of imported execution drug(s) to carry out Mr. Davis's execution creates substantial, objectively intolerable risk of severe, unnecessary pain, suffering, degradation, humiliation, and/or disgrace because of the illegal nature of the drug or the lack of governmental oversight, regulation and quality-control of such execution drug(s) imported from outside the United States.

530.     There is also a substantial risk of a paradoxical effect with the use of execution drugs on Mr. Davis including but not limited to pentobarbital, thiopental sodium, and midazolam, which creates a substantial risk that Mr. Davis will be aware to experience severe pain and needless suffering from a heart attack or other pain associated with the process as the lethal drug(s) do their job.

531.     There is also a substantial risk of a window of time after injection of the execution drug or drugs that Mr. Davis will be suffocating to death as his respiratory functions are depressed but yet become aware again or at least aware of noxious stimuli because Ohio's execution protocols do not mandate, and DRC executioners do not administer, additional injections of execution drugs within three or four minutes after the initial injection or any subsequent injections.  This constitutes a substantial risk of Mr. Davis becoming aware of being unable to breathe and aware of suffocating to death after the injection, but unable to do anything about it, causing Mr. Davis to experience severe mental and/or physical pain, suffering and trauma.

532.     DRC's use of lethal-injection to execute Mr. Davis, regardless of which execution protocol Ohio uses, therefore violates Mr. Davis's Eighth Amendment rights to be free from cruel and unusual punishment.  *See Baze*, 553 U.S. at 52.

533.     In sum, DRC cannot identify any drug or drugs it is able to lawfully purchase, obtain, or administer (and/or other such terms of art) in sufficient quantities to conduct a lethal-injection

execution of Mr. Davis that would cause his death without a substantial, objectively intolerable risk of him suffering severe, unnecessary pain, suffering, degradation, humiliation, and/or disgrace during the execution.

534.    Because of the lack of lawfully obtainable drugs to cause death without a substantial, objectively intolerable risk of severe, unnecessary pain, suffering, degradation, humiliation, and/or disgrace, DRC cannot constitutionally execute Mr. Davis by lethal injection.

535.    Because there is no possible DRC lethal-injection execution protocol that would prevent Mr. Davis from experiencing a substantial, objectively intolerable risk of severe, unnecessary pain, suffering, degradation, humiliation, and/or disgrace, the lethal-injection execution of Mr. Davis constitutes cruel and unusual punishment prohibited by the Eighth Amendment.

536.    Accordingly, Ohio may not constitutionally execute Mr. Davis using lethal injection.

537.    Because DRC may only execute Mr. Davis by lethal injection under Ohio law, his death sentence cannot be carried out, necessarily rendering it an invalid sentence.  Mr. Davis must therefore be granted habeas relief from his sentence of death.

       **B.**    **Any drug DRC can procure to use to execute Mr. Davis via lethal injection poses an objectively intolerable risk of causing a lingering and/or undignified death in violation of the Eighth Amendment, and Ohio has no other means available to execute Mr. Davis that comply with the Constitution.**

538.    Any drug or drugs that DRC uses to conduct a lethal-injection execution of Mr. Davis poses an objectively intolerable risk of causing a lingering death that is prohibited by the Eighth Amendment.  *See Baze*, 553 U.S. at 49 ("Punishments are cruel when they involve torture or a lingering death . . . .") (internal quotation marks omitted); *see also In re Kimmler*, 136 U.S. 436, 447 (1890); *Wilkerson v. State of Utah*, 99 U.S. 130, 135 (1878).

539.    There is a substantial risk under Ohio's execution laws, policies and procedures that Mr. Davis will remain alive for a significant period of time after his execution begins, constituting a lingering death prohibited by the Eighth Amendment.

540.    Barbiturates, such as pentobarbital or thiopental sodium, do not act directly to stop the heart, but rather, create a state known as hypoxia that, in turn, will eventually cause the irreversible cessation of rhythmic electrical activity in the heart, *i.e.*, death.

541.    Other drugs such as benzodiazepines like midazolam, or opioids like hydromorphone likewise suppress the respiratory response, eventually leading to death by hypoxia or heart attack.

542.    DRC's policy and practice, common to numerous versions of its execution protocol, is to have a Drug Administrator, following the administration of the lethal-injection drugs, determine if the inmate is dead by listening for "breathing and heart sounds."

543.    After the Drug Administrator's assessment, an unidentified appropriate medical professional evaluates the inmate to confirm death. After that, the Warden will announce the time of death to the witnesses.

544.    If after this assessment Mr. Davis has neither experienced hypoxia for a sufficient amount of time to cause the heart to stop beating, nor for a sufficient amount of time to cause the irreversible cessation of electrical activity in the heart (*i.e.*, death), the Drug Administrator or the "appropriate medical person" may detect Mr. Davis's heartbeat.

545.    Under these circumstances, DRC execution team personnel will conference to discuss what to do next. Additional syringes of execution drugs may be prepared and may be administered, or the team members may simply wait for a longer period of time.

546.    Under the execution protocols, the additional set(s) of execution-drug syringes will not be prepared before Mr. Davis's execution begins.

547.    There is a substantial risk that Mr. Davis, rendered hypoxic, will nevertheless regain awareness of the distress and horror to which his body and brain are being subjected during this period following the injection of the first set of syringes, including the physical pain and suffering related to suffocating and/or suffering a heart attack following injection of execution drugs.

548.    These risks are increased when using compounded or illegally imported execution drugs because there is a substantial, objectively intolerable risk that compounded or illegally imported drugs obtained by the State will be improperly packaged, shipped, stored, and/or prepared such that the data obtained in analytical testing approximately 30 days before Mr. Davis's execution will be incorrect, and the drugs injected into Mr. Davis will be sub-potent or adulterated or not precisely the drugs required by the operative execution protocol, therefore subjecting Mr. Davis to a risk of severe, torturous physical pain as he suffers a lingering death due to these ineffective drugs.

549.    Under the State's practices and execution protocols, DRC officials will use on Mr. Davis no more than 5 grams of an injection of execution drug(s) from an unknown source, and then they will wait until breathing and heart sounds are not discernable, without further administration of any additional doses of lethal drug, without using scientifically reliable methods to determine whether irreversible cessation of breathing and brain functions have occurred, and without administration of any resuscitation efforts if Mr. Davis is still alive after 10 minutes or more.

550.    Other than a change in the drugs used, the State will use the same or substantially similar procedures to execute Mr. Davis as were used to execute Dennis McGuire.

551.    There is a substantial risk that any procedures the State will use to execute Mr. Davis will produce a lingering death.  That risk is illustrated by the lingering death inflicted by using essentially identical procedures when executing McGuire.

552.    Because state officials believe that nothing unlawful or otherwise unconstitutional occurred during the McGuire execution, and that the process "worked well," there is a substantial risk that they will administer their operative execution protocol in a way that will cause Mr. Davis to suffer a lingering death.

553.    Because there is no possible DRC lethal-injection Execution Protocol that would prevent Mr. Davis from experiencing a death that violates the Eighth Amendment in ways alleged here, the lethal-injection execution of Mr. Davis constitutes cruel and unusual punishment prohibited by the Eighth Amendment.

554.    Accordingly, Ohio may not constitutionally execute Mr. Davis using lethal injection.

555.    Because DRC may only execute Mr. Davis by lethal injection under Ohio law, his death sentence cannot be carried out, necessarily rendering it an invalid sentence.  Mr. Davis must therefore be granted habeas relief from his sentence of death.

> **C.**    **The lack of legally available, effective drugs to conduct lethal-injection executions will result in the arbitrary and capricious imposition of the death penalty on Mr. Davis in violation of the Eighth Amendment, and Ohio has no other means available to execute Mr. Davis that comply with the Constitution.**

556.    Because of the absence of legally obtainable drugs for use in Ohio lethal-injection executions, when and whether DRC will carry out Mr. Davis's execution is a random, arbitrary, and capricious event.

557. DRC has no source of FDA-approved manufactured pentobarbital, thiopental sodium, hydromorphone, midazolam, or any other drug that could be used for Mr. Davis's lethal-injection execution.

558. DRC has no source of lawfully compounded drugs that could be used for Mr. Davis's lethal-injection execution.

559. Under the current and previous protocols, 14 days before Mr. Davis's execution, the Warden will determine whether particular drug(s) will be used based on availability.

560. If DRC intends to use compounded execution drugs on Mr. Davis, it will have to procure a different batch of execution drugs for each execution, given the limited shelf-life of compounded pentobarbital, thiopental sodium and any other drug DRC might try to use for an execution.

561. The execution drug(s) will be compounded separately for each individual execution and there is a substantial risk that compounded execution drugs will be made under different standards and conditions. As a result, no two batches of drugs will be the same and each lethal-injection execution using compounded drugs will be unlike any before or after, making the particular batch for Mr. Davis's execution arbitrary.

562. Because the compounded drugs will have to be made separately for each execution and for each inmate, including Mr. Davis, whether DRC will obtain a sub-potent, unsterile, adulterated, impure, or improperly buffered batch of compounded execution drug(s) to execute Mr. Davis is subject to chance, thereby creating a substantial risk that Mr. Davis will arbitrarily be subject to an execution that is more painful than others.

563. Mr. Davis's lethal-injection execution will be an individual experiment that subjects him to a substantial, objectively intolerable risk of severe, unnecessary pain.

564. The drugs used to conduct Mr. Davis's execution and the efficacy, potency, sterility, and other critical but variable characteristics of those drugs will be up to chance. It will be arbitrary.

565. Arbitrary imposition of the death penalty violates the Eighth Amendment.

566. A death sentence is cruel and unusual when the sentence of death has in fact been imposed upon a "capriciously selected, random handful." *Furman v. Georgia*, 408 U.S. 238, 309-10 (1972).

567. The infliction of a sentence of death must not be "so wantonly and so freakishly imposed." *Id.* at 310.

568. Because there is no possible DRC lethal-injection execution protocol that would prevent the death penalty by lethal-injection from being imposed against Mr. Davis in an arbitrary and capricious manner, the lethal-injection execution of Mr. Davis constitutes cruel and unusual punishment prohibited by the Eighth Amendment.

569. Accordingly, Ohio may not constitutionally execute Mr. Davis using lethal injection.

570. Because DRC may only execute Mr. Davis by lethal injection under Ohio law, Mr. Davis's death sentence cannot be carried out, necessarily rendering it an invalid sentence. Therefore, Mr. Davis must be granted habeas relief from his sentence of death.

> **D. The lack of legally obtainable, effective drugs to conduct Mr. Davis's lethal-injection execution, and the reality that Ohio has no other means available to execute Mr. Davis that comply with the Constitution will cause Mr. Davis psychological torture, pain and suffering in violation of the Eighth Amendment.**

571. The Supreme Court has held that under certain circumstances, punishments which involve no physical pain or suffering, are less severe than the punishment of death, and/or even the punishment of death itself—regardless of the infliction of physical pain—can violate the Eighth Amendment. *See Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455 (2012) (mandatory

217

imprisonment for life without parole for juveniles convicted of capital murder); *Brown v. Plata*, 131 S. Ct. 1910 (2011) (prison conditions that are "incompatible with the concept of human dignity . . . ha[ve] no place in civilized society"); *Graham v. Florida*, 560 U.S. 48 (2010) (life without parole for juveniles of non-capital crimes); *Roper v. Simmons*, 543 U.S. 551 (2005); *Atkins v. Virginia*, 536 U.S. 304, 311-12 (2002); *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (denationalization); *Weems v. United States*, 217 U.S. 349 (1910) (12-20 years at hard labor); *see also Davis v. Ayala*, 135 S. Ct. 2187, 2208-10 (2015) (Kennedy, J., concurring) (noting that long-term solitary confinement presents significant Eighth Amendment problems that the courts should consider); *Hudson v. McMillan*, 503 U.S. 1, 16-17 (1992) (Blackmun, J., concurring) (noting that Eighth Amendment-prohibited harms are not limited to physical injury; that it "is not hard to imagine inflictions of psychological harm—without corresponding physical harm—that might prove to be cruel and unusual punishment"; and that "'[p]ain' in its ordinary meaning surely includes a notion of psychological harm. I am unaware of any precedent of this Court to the effect that psychological pain is not cognizable for constitutional purposes. If anything, our precedent is to the contrary.").

572.     Mr. Davis has been and continues to be subject to the psychological torture of anticipating a horrific, painful death because of the lack of legally obtainable, effective drugs that will not cause severe, unnecessary pain, suffering, degradation, humiliation, and/or disgrace.

573.     Given the scarcity of lethal-injection drugs, there is a substantial, objectively intolerable risk of Mr. Davis being experimented on with drugs never used before in an execution, or being injected with sub-potent, ineffective or otherwise compromised drugs that will cause him severe, unnecessary pain, suffering, degradation, humiliation, and/or disgrace.

574.     Mr. Davis is aware of this risk and it causes him terrorizing anxiety and anguish.

575.    Mr. Davis is aware of what unfolded during the McGuire execution and of DRC's response to the warnings and in the aftermath of that execution, and it causes him terrorizing, anxiety and anguish.

576.    Because there is no possible DRC lethal-injection execution protocol that would not cause terrorizing, anxiety and anguish, the lethal-injection execution of Mr. Davis violates the Eighth Amendment.

577.    Because DRC may only execute Mr. Davis by lethal injection under Ohio law, his death sentence cannot be carried out, necessarily rendering it an invalid sentence.  Mr. Davis must therefore be granted habeas relief from his sentence of death.

> **E.     The unavoidable variations inherent in Ohio's lethal-injection system and DRC's continued and consistent inability to properly administer its execution protocols present a substantial,** objectively **intolerable risk of serious harm to Mr. Davis in violation of the Eighth Amendment, and Ohio has no other means available to execute Mr. Davis that comply with the Constitution.**

578.    Mr. Davis will be subject to a substantial risk of serious pain and an objectively intolerable risk of harm because the methods that must be used to produce the drugs the Ohio will use in his lethal-injection execution, the process of obtaining, storing, testing, and using these drugs, and the actions and decisions involved in carrying out his execution itself are incapable of producing consistent results, and because DRC is unable to properly administer its execution protocol, regardless of the specific execution protocol in effect at any given time. These variations in Ohio's lethal-injection system render Mr. Davis's execution unreliable in violation of his right under the Eighth Amendment.

579.    The risk of variations that produce unreliable results begins with the drugs that Ohio will obtain to execute Mr. Davis.  As detailed earlier in this petition, (*see supra* Factual and Procedural Background for Lethal-Injection Invalidity Claims at § B.4-6), compounded drugs,

which are not manufactured in an FDA-registered facility under current Good Manufacturing

Practices, have no assurance of consistent quality from lot to lot or from container to container.

Moreover, any API for drugs that Ohio will use in Mr. Davis's lethal-injection execution that is

obtained from unregistered and uninspected sources has no assurance of consistent quality,

constitution, or uniformity, and testing drugs after they have been compounded cannot reliably

detect such variations. Further, no enforcement mechanism exists to ensure that compounding

pharmacies are following any standards required to produce reliably consistent drugs. In

addition, a compounding pharmacy operating under 21 U.S.C. § 353a is prohibited from

compounding "regularly or in inordinate amounts . . . any drug products that are essentially

copies of a commercially available drug product." 21 U.S.C. § 353a(b)(1)(D).

580. In addition, the short shelf life of compounded execution drugs creates a substantial risk

that compounded execution drugs will be made under different standards and conditions. As a

result, no two batches of drugs will be the same and each lethal-injection execution using

compounded drugs, including Mr. Davis's, will be unlike any before or after.

581. The risk of variations is further increased because reputable pharmacies have been

unwilling to provide compounded execution drugs to Ohio, despite a secrecy law that the

legislature passed to encourage cooperation from pharmacists. *See* Alan Johnson, *Pharmacies

avoid execution trade*, The Columbus Dispatch, Oct. 16, 2015 ("It's no secret why a new state

law allowing prison officials to secretly buy lethal-injection drugs from compounding

pharmacies didn't work. Pharmacies didn't want the business.") The State's difficulty in

securing a reputable and reliable source for execution drugs introduces more variability into the

content of the drugs and the quality of the processes used to produce them. It creates a

substantial risk that compounded execution drugs will be made under different standards and

conditions meaning no two batches of drugs will be the same and each lethal-injection execution using compounded drugs will be unlike any before or after.

582.    These variations, which Ohio cannot control or eliminate, mean that the use of any compounded drugs that Ohio will obtain to execute Mr. Davis will create a substantial, objectively intolerable risk that the drug will be the wrong identity or pH level, prone to falling out of solution/precipitating, or ineffective, sub-potent, contaminated, unsterile, or otherwise adulterated.

583.    The procedures required to properly transport, store, test, and administer these drugs after the State obtains them introduce additional risks of variations that will produce inconsistent results.  Variations in how multiple people handle the drugs between when they leave the pharmacy and are used in Mr. Davis's execution will create a substantial, objectively intolerable risk that they will function differently in Mr. Davis's execution than in those executions of others with whom he is similarly situated.  This additional risk of unreliability violates the Eighth Amendment.

584.    In addition, the lack of legally available, safe and effective execution drugs forces DRC to change its execution protocols more frequently, thereby requiring DRC personnel charged with carrying out the execution protocol to learn new protocols, medications, and procedures more often, increasing the chances of DRC failing to adhere to the execution protocols.

585.    Further, DRC's execution protocols, as written and as administered, and regardless of the particular protocol in effect, present an objectively intolerable risk of the infliction of serious pain, as well as a torturous, lingering, or undignified, spectacle of death, resulting in an execution of Mr. Davis that violates the Eighth Amendment's ban on cruel and unusual punishment.

586.    Mr. Davis will not be provided the procedural protections necessary to prevent a substantial risk of serious harm because DRC's history of administering its execution protocols shows a long and ongoing pattern of intentional, reckless, or arbitrary deviation or variation from the execution protocols, and an inability to perform in the execution context, regardless of the execution protocol in effect at any given time.

587.    There is a substantial and documented pattern of repeated deviation from DRC's execution protocols in administering executions, regardless of the particular execution protocol in effect at the time.  These deviations include DRC's repeated disregard of written safeguards, its repeated inability to carry out an execution without encountering serious problems, and the unfettered discretion granted in the policy to several of the actors involved. DRC's repeated deviation from its execution protocols in administrating executions creates an objectively intolerable risk of harm to Mr. Davis, including the infliction of severe, unnecessary pain and a torturous, lingering, undignified spectacle of an execution.

588.    In addition, while making arbitrary and reckless deviations from the law in the form of its execution protocols and the Ohio execution statute that requires a "quick and painless" execution, DRC also fails to take into account Mr. Davis's physical health, mental health, and other individual characteristics that make him vulnerable to experiencing a substantial risk of serious pain or an objectively intolerable risk of harm under any lethal-injection execution protocol.  (*See* discussion of Mr. Davis's individual characteristics, *supra* Factual and Procedural Background for Lethal-Injection Invalidity Claims at § C.)

589.    Because there is no possible DRC lethal-injection execution protocol, as written or as administered, that would prevent Mr. Davis from experiencing a substantial risk of serious harm based on the unavoidable variations present in Ohio's lethal-injection system, and because of

DRC's maladministration of its execution protocol or Mr. Davis's individual characteristics or both, the lethal-injection execution of Mr. Davis constitutes cruel and unusual punishment prohibited by the Eighth Amendment.

590. Accordingly, Ohio may not constitutionally execute Mr. Davis using lethal injection.

591. Because DRC may only execute Mr. Davis by lethal injection under Ohio law, Mr. Davis's death sentence cannot be carried out, necessarily rendering it an invalid sentence. Mr. Davis must therefore be granted habeas relief from his sentence of death.

> **F. Mr. Davis's unique, individual physical and/or mental characteristics will cause any execution by lethal injection under Ohio law to violate the Eighth Amendment, and Ohio has no other means available to execute Mr. Davis that comply with the Constitution.**

592. Mr. Davis's individual physical and/or mental characteristics and conditions indicate that employing any Ohio lethal-injection execution protocol to execute him will subject him to a substantial risk of serious harm, such as physical and/or psychological pain, an undignified, lingering, and/or spectacle execution or attempted execution that is arbitrary and capricious, or an objectively intolerable risk of such harm that DRC ignores. (*See* discussion of Mr. Davis's individual characteristics, *supra* Factual and Procedural Background for Lethal-Injection Invalidity Claims at § C.)

593. In addition, Mr. Davis has a history of severe alcohol abuse and dependence; Mr. Davis may have damage to his liver, which could result in the execution drugs being metabolized in an irregular manner, resulting in a lingering death in violation of the Eighth Amendment.

594. Mr. Davis also takes Hytrin to treat a prostate condition, which may interact with benzodiazepines, and suffers from a variety of breathing problems. In addition, Mr. Davis may develop or may currently have additional physical characteristics increasing the substantial risk of serious harm caused by any of the State's execution methods before his execution date. These

conditions may increase the risk that Ohio will not be able to execute Mr. Davis in a constitutional manner using lethal injection.

595.   Further, Mr. Davis's history of substance abuse places him at greater risk of suffering a paradoxical reaction if he is executed using pentobarbital or thiopental sodium, thereby significantly increasing the risk that he will be aware of suffering severe pain and needless suffering as his execution proceeds.

596.   Mr. Davis's lethal-injection execution will violate the Eighth Amendment due to Mr. Davis's unique physical and mental characteristics, regardless of which execution protocol Ohio uses.

597.   Accordingly, Ohio may not constitutionally execute Mr. Davis using lethal injection.

598.   Because DRC may only execute Mr. Davis under Ohio law by lethal injection, his death sentence cannot be carried out, rendering it an invalid sentence. Mr. Davis must therefore be granted habeas corpus relief with respect to his death sentence.

<u>TWENTY-FOURTH GROUND FOR RELIEF:</u>

**THE STATE OF OHIO CANNOT CONSTITUTIONALLY EXECUTE MR. DAVIS BECAUSE THE ONLY MEANS AVAILABLE FOR EXECUTION VIOLATE THE FOURTEENTH AMENDMENT'S DUE PROCESS AND PRIVILEGES OR IMMUNITIES CLAUSES.**

> **A.      Execution by lethal injection under Ohio law will deny Mr. Davis's interests in expecting and receiving a quick and painless death in violation of the Due Process Clause of the Fourteenth Amendment, and Ohio has no other means available to execute Mr. Davis that comply with the Constitution.**

599.    Ohio's death-penalty statute, § 2949.22(A), unambiguously imposes on the relevant state actors a required duty under the law to "quickly and painlessly cause death."

600.    When the State of Ohio refuses or fails to follow the explicit requirements set out in § 2949.22(A), the State is necessarily acting in a manner that is clearly contrary to state law.

601.    Ohio's execution protocols, regardless of the particular protocol, do not provide a form of lethal-injection such that Mr. Davis will experience a quick or painless death upon execution.

602.    Mr. Davis has life, liberty, and property interests in expecting and receiving a quick and painless death created by Ohio law, in Ohio Revised Code § 2949.22(A).  These interests are vested in a narrow class of individuals that includes Mr. Davis, and are protected as rights under the Due Process Clause of the Fourteenth Amendment.

603.    Accordingly, denial of Mr. Davis's interests in expecting and receiving a quick and painless death violates his rights protected by the Due Process Clause of the Fourteenth Amendment.

604.    Because there is no possible DRC lethal-injection execution protocol that would prevent the denial of Mr. Davis's interests in expecting and receiving a quick and painless death, the lethal-injection execution of Mr. Davis constitutes a denial of Mr. Davis's rights to due process guaranteed by the Fourteenth Amendment.

605.    Accordingly, Ohio may not constitutionally execute Mr. Davis using lethal injection.

606.    Because DRC may only execute Mr. Davis under Ohio law by lethal injection, his death sentence cannot be carried out, rendering it an invalid sentence.  Mr. Davis must therefore be granted habeas relief from his sentence of death.

**B.      Mr. Davis's execution by lethal-injection under Ohio law will be a human experiment on a non-consenting prisoner in violation of the Fourteenth Amendment's Due Process and Privileges or Immunities Clauses, and Ohio has no other means available to execute Mr. Davis that comply with the Constitution.**

607.    The Fourteenth Amendment protects the liberty and privacy rights one has in the integrity of one's body.  *See Rochin v. California*, 342 U.S. 165, 169 (1952); *Hurtado v. People of California*, 110 U.S. 516, 536 (1884).

608.    "[N]eedlessly severe intrusions of an individual's body, even if that individual [i]s a felon and stripped of most of his liberty, [are] impermissible under the Due Process Clause of the Constitution."  *In re Cincinnati Radiation Litig.*, 874 F. Supp. 796, 818 (S.D. Ohio 1995).

609.    Within the basic protections of individual liberty encapsulated in the Fourteenth Amendment are also the principles established in the Nuremberg Code.  *Id.* at 819-22.

610.    Regarding standards for carrying out human experimentation, these principles explicitly include that "[t]he voluntary consent of the human subject is absolutely essential.  This means that the person involved should have legal capacity to give consent; should be so situated as to be able to exercise free power of choice . . . ."  *United States of America v. Brandt* (the Medical Case), II Trials of War Criminals Before the Nuremberg Military Tribunals Under Control Council Law No. 10, at 181 (1949).

611.    Additionally, the Privileges or Immunities Clause of the Fourteenth Amendment protects Mr. Davis against infringements of his fundamental, unenumerated rights.  Among those rights is the right to not be the unwilling subject of forced, involuntary human experimentation conducted

by the State of Ohio, which is a right secured for the citizens of the United States based on citizenship of the United States because it is a right secured by international treaties. *Slaughter-House Cases*, 83 U.S. 36, 80 (1873); *see also McDonald v. City of Chicago*, 561 U.S. 742, 851-855 (2010) (Thomas, J., concurring).

612.     The right against being subject to involuntary human experimentation is clear, established as it is in numerous international treaties to which the United States is a party, including the Universal Declaration of Human Rights, G.A. Res. 217A, U.N. Doc A/810, at 71 (1947); the International Covenant on Civil and Political Rights, G.A. Res. 2200A, 21 U.N. GAOR, Supp. (No. 16) 49, 52, U.N. Doc. A/6316 (1966); the Geneva Convention, 6 U.S.T. 3316, T.I.A.S. 3364, 75 U.N.T.S. 135, Aug. 12, 1949; the Declaration on the Protection of all Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452, Annex Art. 1 (Agenda Item 74), 30 U.N.GAOR, Supp. (No. 34) 91, U.N. Doc. A/10408 (1975); and the Nuremberg Code, G.A. Res. 161, U.N. Doc. A/PV55, at 2244 (1946).

613.     Ohio state administrative law prohibits administration of experimental or investigational drugs to an inmate unless that drug is the only option to treat a medical condition and written approval has been obtained from the DRC Bureau of Medical Services State Medical Director and the DRC Human Subjects Review Committee.

614.     The written application for approval to use experimental or investigational drugs must include the justification for use of the drug(s), as well as an informed consent statement signed by the inmate.

615.     No written approval to administer experimental or investigational drugs to an inmate in the context of an execution has ever been sought or obtained from the DRC Bureau of Medical Services State Medical Director and the DRC Human Subjects Review Committee.

616.     Mr. Davis has not signed an informed consent statement authorizing DRC to use investigational or experimental drug(s) on him during a lethal-injection execution, nor is carrying out his death sentence reasonably considered a "medical condition" for which use of experimental or investigational drug(s) might be permissibly considered.

617.     In fact, DRC has no intent to complete such an application, and even if it would attempt to do so, Mr. Davis would not sign an informed consent statement.

618.     Ohio state administrative law also prohibits participation of offenders in medical or pharmaceutical testing purely for experimental purposes.

619.     Ohio state administrative law also prohibits investigational or experimental projects "that represent a risk to offenders."

620.     Ohio state administrative law also prohibits experiments involving offenders as human subjects which will be conducted by those under DRC's jurisdiction, such as execution team personnel.

621.     Because of the lack of data, studies, and physician expertise, every lethal injection that DRC conducts is a human experiment.  *See In re: Ohio Execution Protocol Litig.*, 994 F. Supp. 2d 906, 913 (S.D. Ohio 2014).

622.     The experimental nature of each execution that DRC conducts, including Mr. Davis's, is amplified exponentially due to the element of variability added by use of compounded execution drugs.

623.     The compounded execution drugs are made by pharmacists who are, by definition, ethically compromised by virtue of being willing to violate their professional ethical standards to provide drugs to be used in a human execution. This further amplifies the experimental nature of Mr. Davis's execution.

624.    Any compounded execution drugs are also unapproved investigational new drugs prohibited by the federal FDCA and Ohio state law, and thus experimental by definition.

625.    Similarly, the experimental nature of Mr. Davis's execution is amplified exponentially due to the element of variability added by use of imported and/or misbranded execution drugs, and amplified even further because those imported and/or misbranded drugs were manufactured in facilities that do not comply with U.S. manufacturing standards. Additionally, these drugs are exported and imported by persons who are, by definition, ethically compromised by virtue of being willing to smuggle unapproved, misbranded drugs illegally into DRC's possession.

626.    Mr. Davis does not consent to being experimented on by DRC's use of lethal injection. His lethal-injection execution by the State of Ohio, regardless of the lethal-injection execution protocol used, will be a forced, involuntary human experimentation, because a "use" to cause a human execution will fall outside the FDA-approved purpose of that drug, and will fall outside the course of medical practice, and therefore constitute the use of unauthorized "New Drugs" under the FDCA.  *See* 21 U.S.C. § 321(p).

627.    DRC has no clinical basis for believing any drug combination that DRC uses to execute Mr. Davis will cause death without a substantial, objectively intolerable risk of severe, unnecessary pain or suffering.

628.    DRC has no clinical basis for believing any drug combination that DRC uses to execute Mr. Davis will not cause a lingering death.

629.    DRC has no clinical basis for believing any drug combination that DRC uses to execute Mr. Davis will not cause a humiliating, degrading spectacle.

630.    For all of these reasons, Mr. Davis's lethal-injection execution, regardless of which execution protocol Ohio uses, will violate Mr. Davis's fundamental rights protected by the Fourteenth Amendment's Due Process and Privileges or Immunities Clauses.

631.    Accordingly, Ohio may not constitutionally execute Mr. Davis using lethal injection.

632.    Because DRC may only execute Mr. Davis under Ohio law by lethal injection, his death sentence cannot be carried out, necessarily rendering it an invalid sentence.  Mr. Davis must therefore be granted habeas relief from his sentence of death.

**TWENTY-FIFTH GROUND FOR RELIEF:**

**THE STATE OF OHIO CANNOT CONSTITUTIONALLY EXECUTE MR. DAVIS BECAUSE THE ONLY MEANS AVAILABLE FOR EXECUTION VIOLATE THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT.**

### A. Equal Protection – Fundamental Rights

633. Ohio is incapable of executing Mr. Davis without violating his fundamental rights, as guaranteed by Equal Protection Clause of the Fourteenth Amendment.

634. Mr. Davis, individually and as a member of a class of persons subject to a death sentence under Ohio law, has the following fundamental rights:

a. to be free from cruel and unusual punishment under the Eighth Amendment;

b. to privacy, to personal dignity, to bodily integrity, and to not be the unwilling, non-consenting subject of forced, involuntary human experimentation conducted by DRC, under the principles of liberty or natural law or both, as protected by the Ninth Amendment;

c. to the liberty and privacy right one has in the integrity of one's body, to not be the unwilling, non-consenting subject of forced, involuntary human experimentation conducted by DRC, and to be free from government conduct that is shocking to the conscience under the Due Process and the Privileges or Immunities Clauses of the Fourteenth Amendment; and to expect and receive a quick and painless death under the Due Process Clause of the Fourteenth Amendment.

**1. Underlying constitutional violations in Ohio's lethal-injection system substantially burdens Mr. Davis's fundamental rights, and Ohio has no other means available to execute Mr. Davis that comply with the Constitution.**

635. As set forth in detail in Mr. Davis's Twenty-Third Ground for Relief, *supra*, DRC's disparate treatment of Mr. Davis substantially burdens his fundamental right against cruel and

231

unusual punishment. *See Baze*, 553 U.S. at 61 ("State efforts to implement capital punishment must certainly comply with the Eighth Amendment."). As outlined above, Mr. Davis's lethal-injection execution by Ohio will violate—and therefore, by definition, substantially burden—his right protected by the Eighth Amendment because: any drug DRC can procure for use in lethal injections has a substantial, objectively intolerable risk of causing unnecessary, severe pain, suffering, degradation, humiliation or disgrace; Mr. Davis's execution by lethal injection causes a lingering or undignified death; the lack of legally available, effective drugs to conduct lethal-injection executions will result in the arbitrary and capricious imposition of the death penalty; the lack of legally obtainable effective drugs to conduct lethal-injection executions will cause psychological torture, pain and suffering; there is a substantial, objectively intolerable risk of serious harm due to DRC's varied administration of Ohio's execution policies and written execution protocols; and because of Mr. Davis's unique, individual physical and mental characteristics.

636. Mr. Davis's execution will violate his fundamental rights to privacy, bodily integrity, personal dignity, and to not be the unwilling, non-consenting subject of forced involuntary human experimentation conducted by DRC, as protected by the Ninth Amendment and the Fourteenth Amendment's Due Process and Privileges and Immunities Clauses. The substantial burden on these rights was demonstrated during the botched executions of Joseph Clark, Christopher Newton, Dennis McGuire and others, as well as the failed execution of Romell Broom. As set forth in detail in Mr. Davis's Twenty-Fourth Ground for Relief, *supra*, Mr. Davis's fundamental rights to bodily integrity, dignity privacy, and not to be the subject of forced human experimentation is also burdened by the experimental—but secretive—approach to executions DRC now takes.

637. Mr. Davis's execution will force him to be an unwilling, non-consenting experimental subject and thus violate his fundamental rights under the Ninth Amendment and the Fourteenth Amendment's Due Process and Privileges or Immunities Clauses through experimenting with untested and unknown methods of lethal injection in the execution protocols, and DRC's manufacturing, compounding, dispensing, administration, or other related actions of obtaining drugs that are not approved drugs. Especially given the statutory efforts to cloak execution matters in secrecy that DRC aggressively advocated and sought, there is a substantial risk that the drugs to be used for an execution will not be the same from execution to execution, making each execution, including Mr. Davis's execution, an experiment on a non-consenting, unwilling human subject.

638. Mr. Davis's execution will substantially burden his fundamental right to be free from suffering conscience-shocking, arbitrary and lawless actions by DRC. DRC's varied approaches increase the harm to which he will be subjected, in violation of the Due Process Clause of the Fourteenth Amendment.

639. As set forth in detail in Mr. Davis's Twenty-Fourth Ground for Relief, *supra*, Mr. Davis's execution will deny him the right, protected by the Due Process Clause of the Fourteenth Amendment, to expect and receive a quick and painless execution.

640. For all of the aforementioned reasons, Ohio cannot and will not implement a lethal-injection execution of Mr. Davis, under any execution protocol, without disparately impacting Mr. Davis and impermissibly burdening his fundamental rights in violation of the Equal Protection Clause of the Fourteenth Amendment.

641. Accordingly, Ohio may not constitutionally execute Mr. Davis using lethal injection.

642.   Because DRC may only execute Mr. Davis by lethal injection under Ohio law, his death sentence cannot be carried out, necessarily rendering it an invalid sentence.  Mr. Davis must therefore be granted habeas relief from his sentence of death.

> **2.   Unavoidable variation inherent in Ohio's lethal-injection system substantially burdens Mr. Davis's fundamental rights, and Ohio has no other means available to execute Mr. Davis that comply with the Constitution.**

643.   Carrying out a constitutional execution is not a compelling state interest under controlling court precedent.

644.   There is no legitimate state interest in carrying out an unconstitutional execution.

645.   The methods that must be used to produce the drugs the Ohio will use in lethal injection, the process of obtaining, storing, testing, and using these drugs, and the actions and decisions involved in carrying out the execution itself are incapable of producing consistent results.  The variations inherent in these processes that are required to conduct a lethal injection execution in Ohio will render Mr. Davis's execution so unreliable that it will result in his disparate treatment compared to similarly situated individuals (*i.e.*, others subject to execution in the State of Ohio). This disparate treatment directly and substantially burdens Mr. Davis's fundamental rights listed above (hereinafter "fundamental rights") and is not narrowly tailored to achieve a compelling state interest.

646.   The risk of variations that produce unreliable results begins with the drugs that Ohio will obtain to execute Mr. Davis.  As detailed earlier in this petition, (*see supra* Factual and Procedural Background for Lethal-Injection Invalidity Claims at § B.4-6), compounded drugs, which are not manufactured in an FDA-registered facility under current Good Manufacturing Practices, have no assurance of consistent quality from lot to lot or from container to container. Moreover, the API for drugs that Ohio will use in lethal injections that is obtained from

unregistered and uninspected sources has no assurance of consistent quality, constitution, or uniformity, and testing drugs after they have been compounded cannot reliably detect such variations. Further, no enforcement mechanism exists to ensure that compounding pharmacies are following any standards required to produce reliably consistent drugs.

647. The risk of variations is further increased because reputable pharmacies have been unwilling to provide compounded execution drugs to Ohio, despite a secrecy law that the legislature passed to encourage cooperation from pharmacists. *See* Alan Johnson, *Pharmacies avoid execution trade*, The Columbus Dispatch, Oct. 16, 2015, available at http://www.dispatch.com/content/stories/local/2015/10/16/pharmacies-avoid-execution-trade.html ("It's no secret why a new state law allowing prison officials to secretly buy lethal-injection drugs from compounding pharmacies didn't work. Pharmacies didn't want the business."). The State's difficulty in securing a reputable and reliable source for execution drugs introduces more variability into the content of the drugs and the quality of the processes used to produce them. It creates a substantial risk that compounded execution drugs will be made under different standards and conditions meaning no two batches of drugs will be the same and each lethal-injection execution using compounded drugs, including Mr. Davis's, will be unlike any before or after.

648. These variations, which Ohio cannot control or eliminate, mean that the use of any compounded drugs that Ohio will obtain to execute Mr. Davis will create a substantial, objectively intolerable risk that the drug will be the wrong identity or pH level, prone to falling out of solution/precipitating, ineffective, sub-potent, contaminated, unsterile, or otherwise adulterated. This risk of unreliable drugs substantially burdens Mr. Davis's fundamental rights. Further, this burden is not narrowly tailored to achieve a compelling state interest.

235

649. The procedures required to properly transport, store, test, and administer these drugs after the State obtains them introduce additional risks of variations that will produce inconsistent results. Variations in how multiple people handle the drugs between when they leave the pharmacy and are used in an execution will create a substantial, objectively intolerable risk that they will function differently in Mr. Davis's execution than in those executions of others with whom he is similarly situated. This additional risk of unreliability substantially burdens Mr. Davis's fundamental rights and is not narrowly tailored to achieve a compelling state interest.

650. Finally, DRC's deviations from Ohio Revised Code § 2949.22, its execution policies, and written execution protocols introduce more variability into its lethal-injection system. The inconsistent results due to this variability will constitute disparate treatment of Mr. Davis during his execution compared to similarly situated individuals in a manner that substantially burdens Mr. Davis's fundamental rights and is not narrowly tailored to achieve a compelling state interest.

651. The lack of legally available, safe and effective execution drugs forces DRC to change its execution protocols more frequently, thereby requiring DRC personnel charged with carrying out the execution protocol to learn new protocols, medications, and procedures more often, increasing the chances of DRC failing to adhere to the execution protocols.

652. Additionally, by allowing for variations based on the subjective decisions and discretion of DRC actors, DRC will necessarily treat Mr. Davis differently than other similarly situated individuals in attempting to execute him by lethal-injection. DRC's execution policy and written execution protocols authorize DRC actors to approve variations from procedures stated within the policy. DRC also relies on Incident Command Systems ("ICS") principles to implement their execution protocols. DRC's application of ICS principles has been inconsistent over time and is

236

dependent on the subjective discretion of the Warden of SOCF, the Warden of CCI or the Director of DRC.

653. Moreover, the identities of the individuals who occupy those positions change regularly. Variations in the administration of the execution policy and protocols include DRC actors either intentionally or recklessly deviating from DRC's execution policy and written execution protocols, a subjective and discretionary understanding and application of the execution policy and written execution protocols, as well as substantial evidence of incompetence or inability to perform in the execution context. These variations resulting from the subjective decisions and discretion of DRC actors necessarily ensures that Mr. Davis will be treated differently than similarly situated individuals facing execution in Ohio. This disparate treatment substantially burdens Mr. Davis's fundamental rights and such variations based on DCR actors' discretion are not necessary to achieve a compelling government interest.

654. DRC's actions administering their execution policy and written execution protocols show a pattern of deviations or variations, in an intentional, reckless or arbitrary manner, such that the safeguards allegedly contained in DRC's execution policy and written execution protocols are disparately applied to a particular inmate. DRC's actions deny Mr. Davis the guarantee that he will receive the full panoply of procedural safeguards in the written execution protocol.

655. Because Ohio cannot avoid these variations inherent in the process of a lethal injection execution, and because such variations do not achieve a compelling State interest, any attempt to execute Mr. Davis under any Ohio lethal-injection execution protocol will result in disparate treatment that violates his fundamental rights under the Equal Protection Clause of the Fourteenth Amendment.

656.  Accordingly, Ohio may not constitutionally execute Mr. Davis using lethal injection as the.

657.  Because DRC may only execute Mr. Davis by lethal injection under Ohio law, his death sentence cannot be carried out, necessarily rendering it an invalid sentence.  Mr. Davis must therefore be granted habeas relief from his sentence of death.

### B.    Equal Protection – "Class-of-One" Disparate Treatment

658.  When an inmate does not allege that the government's actions in disparately carrying out a lethal-injection execution burden a fundamental right or target a suspect class, the inmate is said to proceed on a so-called "class of one" theory and must prove that the government's actions lacked any rational basis.  *See Cooey*, 801 F. Supp. 2d at 653.

659.  To succeed on a "class-of-one" equal protection claim, a plaintiff must allege either disparate treatment from similarly situated individuals and that the government actors had no rational basis for the difference, *Assocs. of Cleveland Fire Fighters v. City of  Cleveland, Ohio*, 502 F.3d 545, 549 (6th Cir. 2007), or that the 'challenged  government action was motivated by animus or ill-will,' *EJS Properties, LLC v. City  of Toledo*, 698 F.3d 845, 864 (6th Cir. 2012)." *Paterek v. Vill. of Armada*, No. 14-1894, 2015 U.S. App. LEXIS 15932, *43 (6th Cir. Sept. 8, 2015).

660.  Mr. Davis is a "class of one," similarly situated with any other condemned inmate who has been or will be subjected to execution in Ohio.

661.  The unavoidable variability inherent in Ohio's lethal-injection system, set out above in § I.B of this Ground for Relief, also violates the Equal Protection Clause because such deviation results in the disparate treatment of Mr. Davis as a "class of one."  DRC will intentionally treat Mr. Davis differently than similarly situated individuals by its use of a system so imbued with

risks of variation that it cannot produce reliable results. DRC has no rational basis for the

irrational and arbitrary difference in its treatment that Mr. Davis will suffer as a result, and Ohio

has no other means available to execute Mr. Davis that comply with the Constitution.

662.    In addition, DRC treats each similarly situated death-row inmate, including Mr. Davis,

disparately at the time of execution by experimenting with untested and unknown

execution protocols. Although the development of experimental execution protocols at a

minimum requires competent medical expertise, that expertise has not and has never been

available for DRC's executions. Thus DRC has intentionally implemented a try-and-see-what-

happens approach to each execution, resulting in a disparate level of experimentation and risk for

each inmate's execution. There is no relationship between these deviations or variations and any

legitimate state interest.

663.    Moreover, DRC's determination to execute Mr. Davis despite the lack of legally

available, safe and effective execution drugs further demonstrates their intent to treat Mr. Davis

differently than other similarly situated individuals by attempting to execute each inmate facing

execution in Ohio using different execution drugs.

664.    DRC's noncompliance with the law, including its execution policy and written execution

protocols, regardless of the protocol in place at the time, has no rational basis because DRC's

deviations are not based on any legitimate differences between condemned inmates. Any actual

physical or psychological differences that Mr. Davis possesses that may legitimately require

different treatment are intentionally ignored.

665.    DRC's execution policy and written execution protocols are considered binding state law,

and thus DRC violates state law when they fail to abide by the explicit mandates of their

execution policy or written execution protocols. DRC's noncompliance further violates state and

federal law to the extent that it involves illegally procured, distributed, dispensed or administered execution drugs. DRC's actions are irrational and arbitrary by definition because they are in contravention of the law, which negatives any conceivable basis that may support DRC's actions.

666.    Trying to carry out an execution under any procedure that might accomplish the task for administrative convenience is not a sufficient basis to rationally justify DRC's disparate treatment of Mr. Davis.

667.    In sum, Mr. Davis, as a "class of one," will be treated differently from other similarly situated individuals, namely others subject to execution in Ohio, irrationally and arbitrarily, without any rational basis for the difference in treatment. Such disparate treatment constitutes a violation of Mr. Davis's rights under the Equal Protection Clause of the Fourteenth Amendment.

668.    DRC is unable to execute Mr. Davis via lethal-injection without violating his constitutional rights.

669.    Accordingly, Ohio may not constitutionally execute Mr. Davis using lethal injection.

670.    Because DRC may only execute Mr. Davis by lethal injection under Ohio law, his death sentence cannot be carried out, necessarily rendering it an invalid sentence. Mr. Davis must therefore be granted habeas relief from his sentence of death.

**TWENTY-SIXTH GROUND FOR RELIEF:**

**THE STATE OF OHIO CANNOT CONSTITUTIONALLY EXECUTE MR. DAVIS BECAUSE THE ONLY MEANS AVAILABLE FOR EXECUTION DEPEND ON STATE EXECUTION LAWS THAT ARE PREEMPTED BY FEDERAL LAW.**

671.    Ohio's lethal-injection execution of Mr. Davis will be unconstitutional because Ohio statutory and administrative law governing executions, as written and as administered, are preempted by federal law, leaving Ohio with no valid lethal-injection statute and no valid lethal-injection protocol to apply to Mr. Davis, and thus no way to carry out his death sentence as mandated.

672.    State statutes and state administrative law and policies that conflict with federal statutory and regulatory law are preempted and must be declared without effect.  *See Mut. Pharm. Co. v. Bartlett*, 133 S. Ct. 2466, 2473 (2013).

673.    Furthermore, a violation of federal statutory law can provide a basis for habeas corpus relief if the violation amounts to a fundamental defect in the proceedings.  *Hill v. United States*, 368 U.S. 424, 428 (1962); *Reed v. Farley*, 512 U.S. 339, 353-54 (1994).  "A 'fundamental defect' is one 'which inherently results in a complete miscarriage of justice [or] an omission inconsistent with the rudimentary demands of fair procedure.'"  *Jimenez v. Colorado DOC*, No. 15–cv–01006–GPG, 2015 WL 4113771, at *8 (D. Colo. Jul. 8 2015) (quoting *Hill*, 368 U.S. at 428).  The federal statutory violations discussed below satisfy this standard and provide a basis for habeas corpus relief in Mr. Davis's case because, without any lawful way to carry out his execution by lethal-injection, Ohio is left with no lawful method in which to carry out Mr. Davis's execution.

674.    Ohio's lethal-injection statute and its execution protocols violate federal law.

675. Ohio's lethal-injection statute, Ohio Revised Code § 2949.22(A), is binding Ohio statutory law, including its mandate that DRC carry out via lethal injection an execution ordered by the Supreme Court of Ohio.

676. Ohio's execution protocol, DRC Policy 01-COM-11, is binding Ohio administrative law.

677. Every execution protocol that Ohio has used or could use to carry out a lethal-injection execution must include, pursuant to Ohio Revised Code § 2949.22(A), "a drug or combination of drugs."

678. The drug or combination of drugs used to carry out an Ohio lethal-injection execution will be controlled substances and/or compounded drugs.

679. Ohio's use of drugs, including controlled substances and/or compounded drugs, to execute Mr. Davis will result in violations of various provisions of the Controlled Substances Act (CSA), 21 U.S.C. §§ 801, *et seq.*, the Federal Food, Drug and Cosmetic Act (FDCA), 21 U.S.C. §§ 301 *et seq.*, and federal regulations issued by the Drug Enforcement Agency (DEA) and Food and Drug Administration (FDA).

680. Every lethal-injection execution protocol DRC could enact to execute Mr. Davis would conflict with federal law. It is impossible for Ohio to obtain, import, purchase, prescribe, possess, dispense, distribute, or administer (and any other terms of art under the CSA or FDCA) lethal-injection drugs without violating federal drug laws.

681. By failing to follow these extensive federal drug laws that were designed to regulate prescription drugs, controlled substances, any unapproved new drugs, and importation of unapproved new drugs or misbranded drugs in order to ensure the safety of the ultimate users and the efficacy of the drugs, DRC subjects Mr. Davis to a greater risk of harm and pain during executions.

682.    The Ohio lethal-injection statute, Ohio Revised Code § 2949.22(A), along with DRC's practices, policies and protocols used to carry out that statute, are preempted by the Controlled Substances Act (CSA), 21 U.S.C. §§ 801, *et seq.*, the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. §§ 301, *et seq.*, and federal regulations issued by the Drug Enforcement Agency (DEA) and Food and Drug Administration (FDA).

683.    Ohio's lethal-injection protocols and statute are expressly preempted because there is a direct and positive conflict between federal and state law such that the two cannot consistently stand together.

684.    Ohio's lethal-injection protocols and statute are impliedly preempted because carrying out Ohio's lethal-injection laws as to Mr. Davis stands as an obstacle to Congress's full purposes and objectives behind the CSA and/or the FDCA, and compliance with both Ohio law and federal law in this situation is impossible because compliance with Ohio law would breach federal law.

685.    Ohio's execution laws that contemplate inclusion of controlled substances in the course of carrying out a death sentence are expressly and impliedly preempted by the CSA and its implementing regulations.

686.    Ohio's execution laws that contemplate inclusion of what would be an unapproved and/or misbranded and/or Investigational New Drug that is not subject to an Investigational New Drug Application in the course of carrying out a death sentence as to Mr. Davis are impliedly preempted by the FDCA and its implementing regulations.

687.    Ohio's execution laws that contemplate inclusion of compounded controlled substances in the course of carrying out a death sentence as to Mr. Davis are expressly and/or impliedly preempted under the CSA, the FDCA and their respective implementing regulations.

688.    Under Ohio law, only lethal injection may be used to carry out Mr. Davis's death sentence. Under long-established precedent, "state law is naturally preempted to the extent of any conflict with a federal statute." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (citations omitted).

689.    Courts "may not 'give effect to state laws that conflict with federal laws.'" *Farm Mgmt. Co., LLC v. Rural Cmty. Ins. Agency, Inc.*, 2015 U.S. Dist. LEXIS 54754, *22 (E.D. Wash. Apr. 21, 2015) (quoting *Armstrong*, 135 S. Ct. 1378, 1383 (2015)). Any state law "which interferes with or is contrary to federal law, must yield." *Mutual Pharm. Co. v. Bartlett*, 133 S. Ct. 2466, 2473 (2013).

690.    Ohio's lethal-injection statute and execution protocols are preempted by federal law and therefore invalid and of no effect, leaving Ohio with no valid, legal statute or execution protocols by which Ohio can carry out a lethal-injection execution of Mr. Davis.

691.    Because there is no valid, legal way for Ohio to carry out Mr. Davis's death sentence, under the only method by which his sentence can be carried out under Ohio law, his death sentence cannot be carried out, necessarily rendering it an invalid sentence. Mr. Davis must therefore be granted habeas relief from his sentence of death.

> **A.    DRC's actions in obtaining execution drugs, its import, purchase, possession, dispensing, distribution and/or administration (and any other terms of art under the CSA) of those drugs violate the CSA.**

692.    Any lethal-injection execution that DRC has performed or will perform on Mr. Davis includes the administration of at least one controlled substance.

693.    Pentobarbital is a Schedule II controlled substance. 21 C.F.R. § 1308.12.

694.    Thiopental sodium is a Schedule III controlled substance. 21 C.F.R. § 1308.13(c)(3).

695.    Midazolam and hydromorphone are also controlled substances.

696.     "[T]he CSA creates a comprehensive, closed regulatory regime criminalizing the unauthorized manufacture, distribution, dispensing, and possession of substances."  *Gonzales v. Oregon*, 546 U.S. 243, 250 (2006).  "An essential component of that closed regulatory system requires any person who handles controlled substances to obtain a registration with the DEA."  *Wedgewood Vill. Pharmacy*, 71 Fed. Reg. 16,593-01 (DEA Apr. 3, 2006).

697.     "Every person who dispenses, or who proposes to dispense, any controlled substance, shall obtain from the [DEA] a registration issued in accordance with the rules and regulations promulgated by [the DEA]."  21 U.S.C. § 822.  "The term 'dispense' means to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner, including the prescribing and administering of a controlled substance and the packaging, labeling or compounding necessary to prepare the substance for such delivery."  21 U.S.C. § 802(10).

> **1.     The Ohio lethal-injection statute and DRC's execution protocols, as written and as implemented, purport to permit DRC to obtain controlled substances used in executions without a valid prescription, in violation of the CSA and DEA regulations.**

698.     The Ohio lethal-injection statute and DRC's execution protocols, as written and as implemented and regardless of the protocol in effect at a given time, purport to permit DRC to obtain (and other terms of art under the CSA) controlled substances used in executions without a valid prescription, in contravention of the CSA and DEA regulations.

699.     Controlled substances may not be dispensed without a valid prescription from a medical practitioner.  21 U.S.C. § 829(a)–(b); *see, e.g.*, *Gonzales*, 546 U.S. at 250 (explaining that Schedule II controlled substances are "generally available only pursuant to a written, non-refillable prescription by a physician").

700.    It is "unlawful for any person knowingly or intentionally to possess a controlled

substance unless such substance was obtained directly, or pursuant to a valid prescription or

order, from a practitioner, while acting in the course of his professional practice."

21 U.S.C. § 844.

701.    To be valid, a prescription for a controlled substance must be issued for a "legitimate

medical purpose" in the usual course of professional practice by an individual practitioner who is

licensed to prescribe controlled substances, such as a physician.  21 C.F.R. § 1306.03-04; *see*

*Gonzales*, 546 U.S. at 250 ("[E]very prescription for a controlled substance [must] 'be issued for

a legitimate medical purpose by an individual practitioner acting in the usual course of his

professional practice.'" (quoting 21 C.F.R. § 1306.04(a) (2005))).

702.    In addition, "[a]ll prescriptions for controlled substances shall be dated as of, and signed

on, the day when issued and shall bear the full name and address of the patient, the drug name,

strength, dosage form, quantity prescribed, directions for use, and the name, address and

registration number of the practitioner."  21 C.F.R. § 1306.05(a); *see also* 21 C.F.R. § 1306.11.

703.    When procuring controlled substances for use in lethal injections, it is the practice of

DRC (acting under the execution protocols and the authority granted to it by the Ohio lethal-

injection statute) <u>not</u> to provide in the course of that transaction a valid patient-specific

prescription issued for a legitimate medical purpose by a licensed health professional authorized

to prescribe drugs in the State of Ohio.  Instead, DRC provides only a certified copy of a Death

Warrant issued by the Supreme Court of Ohio for an inmate, not necessarily the same inmate

who will be executed with the particular drugs obtained and/or ordered.

704.    Furthermore, it is impossible for DRC to obtain a valid patient-specific prescription for

lethal-injection drugs from a licensed health professional authorized to prescribe such drugs in

246

the State of Ohio (*i.e.*, a legal prescriber) because there is no legitimate medical purpose for lethal-injection drugs and any licensed health professional would be ethically and legally prohibited from issuing a prescription under false pretenses. *See* 21 C.F.R. § 1306.04(b) ("A prescription may not be issued in order for an individual practitioner to obtain controlled substances for supplying the individual practitioner for the purpose of general dispensing to patients."); *United States v. Moore*, 423 U.S. 122 (1975) (holding that "[p]hysicians who stepped outside the bounds of professional practice" in prescribing controlled substances to a patient without an adequate physical examination could be prosecuted under the CSA).

705.    Additionally, it is impossible for DRC to obtain a valid patient-specific prescription for thiopental sodium or any other drug that is not approved by the FDA.

706.    Further, it is impossible for DRC to obtain a valid patient-specific prescription for any drug to be used to carry out a human execution, since there is no drug that has been approved by FDA for the purpose of carrying out a human execution.

707.    Accordingly, the Ohio lethal-injection statute and execution protocols, regardless of which version, directly conflict with the CSA and related regulations "so that the two cannot consistently stand together," 21 U.S.C. § 903, and are therefore preempted.

> iii.    **The Ohio lethal-injection statute and DRC's execution protocols, as written and as implemented, purport to authorize DRC, Central Pharmacy, and Southern Ohio Correctional Facility to provide controlled substances to Drug Administrators in contravention of the CSA and DEA regulations.**

708.    DRC's Drug Administrators are those "who administer[] any execution drug or witness[] the preparation and administration of any execution drug" to the condemned inmates but they are not individually registered with the DEA to do so.

709. Drug Administrators, even if licensed in Ohio as an EMT-paramedic, are not authorized to administer controlled substances without the direct authorization of a physician. *See, e.g.*, Ohio Rev. Code § 4765.39(C)(1). They are also not permitted to prescribe controlled substances. Ohio Rev. Code § 4729.01(I).

710. Because Drug Administrators will not have any authorization from any physician to administer controlled substances, nor will they have a valid prescription, Drug Administrators are prohibited from administering the lethal-injection drugs under the institutional DEA registration of the Southern Ohio Correctional Facility. *See* 21 C.F.R. § 1301.22(b).

711. Drug Administrators are also prohibited from administering controlled substances under Southern Ohio Correctional Facility's DEA registration because the facility does not authorize them to do so, or assign them specific internal codes that are made available to other registrants and law enforcement agencies upon request, as required by the DEA. *See* 21 C.F.R. § 1301.22(c).

712. Drug Administrators therefore cannot lawfully be in possession of or administer any controlled substances that DRC, Central Pharmacy, Richard Theodore, and Southern Ohio Correctional Facility may possess. *See* 21 C.F.R. § 1307.11 (prohibiting the distribution of controlled substances to a practitioner who is not "registered under the Act to dispense that controlled substance").

713. In the course of conducting lethal-injection executions, DRC, Central Pharmacy, Richard Theodore, and Southern Ohio Correctional Facility therefore unlawfully distribute controlled substances under 21 U.S.C. § 841(a) by transferring the controlled substances to Drug Administrators who are not authorized to dispense or prescribe controlled substances under any DEA registration.

iv.     **DRC's execution protocols and the Ohio execution statute are preempted by the federal CSA.**

714.    For each of the reasons stated in the preceding paragraphs, the Ohio lethal-injection statute and DRC's execution protocols, regardless of the particular protocol, directly conflict with the CSA and related regulations "so that the two cannot consistently stand together," 21 U.S.C. § 903.  The Ohio laws are therefore preempted and no longer operative.

2.      **DRC's actions in obtaining execution drugs, its import, purchase, possession, dispensing, distribution and/or administration (and any other terms of art under the FDCA) of those drugs contravene the FDCA because those drugs used in an execution are unapproved drugs and/or misbranded drugs and/or constitute unapproved Investigational New Drugs.**

715.    There are no drugs that can be used to carry out a lethal-injection human execution while still complying with the requirements of the federal FDCA.

716.    The Ohio lethal-injection statute and execution protocols purport to permit DRC to use drugs to execute condemned inmates, but in doing so, the statute and protocols conflict with federal drug laws because thiopental sodium is not an approved drug; because DRC may not legally import pentobarbital; because any imported thiopental sodium is likely to be misbranded; because any compounded drugs are likely to be misbranded; and because no drug DRC might use to carry out Mr. Davis's lethal-injection execution, including but not limited to thiopental sodium, pentobarbital, midazolam or hydromorphone, is approved by FDA for the purpose of causing death in a human execution.

717.    Ohio's lethal-injection statute requires that the inmate "shall be executed by causing the application to the person, upon whom the sentence was imposed, of a lethal injection of a drug or combination of drugs of sufficient dosage to quickly and painlessly cause death."  Ohio Rev. Code § 2949.22(A).

249

718.    One of the main purposes of the FDCA and the FDA's regulations is to ensure the safety and efficacy of all human drugs.  *See* 21 U.S.C. § 393(b)(2).

719.    The FDA must approve all new drugs before they are introduced into interstate commerce.  21 U.S.C. § 355(a).  Introducing into interstate commerce a misbranded drug is likewise prohibited.  21 U.S.C. § 331(a).  All the lethal-injection drugs that Ohio has ever obtained, and any that it may obtain in the future, contain interstate components and therefore must adhere to the FDCA and FDA regulations.

720.    Because Ohio's lethal-injection drugs are introduced or delivered for introduction into interstate commerce, they must not be misbranded drugs.

721.    A drug is misbranded if, among other things, it was "manufactured, prepared, propagated, compounded, or processed in an establishment not duly registered" with the FDA.  21 U.S.C. § 352(o).

722.    A product is also misbranded if, among other things, it is "health-endangering when used [as] . . . prescribed."  21 U.S.C. § 352(j).

723.    Additionally, any drug, to be an "approved drug," must "be approved by the FDA *for specific uses*.  To obtain FDA approval, drug manufacturers are required to demonstrate, through clinical trials, the safety and efficacy of a new drug *for each intended use or indication*."  *United States v. Caronia*, 703 F.3d 149, 152-53 (2d Cir. 2012) (emphasis added) (citation omitted)).

724.    A new drug will not be approved by the FDA if it is unsafe or ineffective or if there is insufficient information to determine its safety or effectiveness.  21 C.F.R. § 314.125(b)(3)–(5).

### i.    Thiopental sodium can never be used as an execution drug in compliance with the FDCA.

725.    Thiopental sodium has never been approved for any specific use by FDA.

726. Thus, as an unapproved "new drug," thiopental sodium may not legally be introduced into interstate commerce. 21 U.S.C. §§ 321(p), 355. Thus, thiopental sodium for DRC to use as an execution drug for Mr. Davis may not lawfully be imported or otherwise move in interstate commerce.

727. Any thiopental sodium that would be provided to DRC to be used for a lethal-injection execution of Mr. Davis must be imported, because there is no domestic manufacturer of thiopental sodium in the United States.

728. Any thiopental sodium that would be provided to DRC to be used for a lethal-injection execution will most likely be manufactured, prepared, propagated, compounded, or processed in an establishment not duly registered with the FDA.

729. Importing thiopental sodium that was manufactured, prepared, propagated, compounded, or processed in an establishment not duly registered with the FDA is prohibited under the FDCA, because such drugs are considered misbranded.

730. Importing thiopental sodium to be used as an execution drug for Mr. Davis renders the drug product "health-endangering" when used, even assuming for the sake of argument that there is a valid prescription for the drug to be used in a human execution. Thus, any such thiopental sodium is considered misbranded for that reason as well.

ii. **Drugs that are considered Schedule I drugs can never be used as execution drugs in compliance with FDCA and/or the CSA.**

731. Substances are designated as Schedule I substances because, among other reasons, they have no currently accepted medical use in treatment in the United States, and there is a lack of accepted safety for use of the drug under medical supervision. 21 U.S.C. § 812(b)(1).

732. Because Schedule I substances have no currently accepted medical use in treatment in the United States, they are not approved drugs under the FDCA, and thus cannot be used for carrying

out a lethal-injection execution of Mr. Davis while remaining in full compliance with the FDCA. *See* 21 U.S.C. §§ 321(p), 355.

733.    DRC is not registered to distribute Schedule I controlled substances and thus any use of any Schedule I controlled substance as an execution drug would contravene the CSA. *See* 21 U.S.C. § 823(b).

734.    Thus, Ohio can never permissibly use a Schedule I drug to carry out a lethal-injection execution of Mr. Davis.

> **iii.    No drug can ever be used to carry out a lethal-injection human execution because no drug has ever been approved by FDA for the specific purpose of causing death from lethal injection during a human execution or for the purpose of causing a quick and painless death in a human execution.**

735.    No drug is, or ever has been, approved by the FDA as safe and effective for the purpose of causing death from a lethal injection during a human execution.

736.    No drug is, or ever has been, approved by the FDA as safe and effective for the purpose of causing a quick and painless death in a human execution.

737.    While so-called "off-label" use of drugs for purposes other than the specific authorized purpose is permitted in some circumstances, all such off-label use may only lawfully occur in the course of a doctor-patient relationship in the practice of medicine, so using any drug to carry out a human execution can never be considered a lawful "off-label" use of such drug.

738.    DRC's execution protocols purport to authorize the administration drugs such as pentobarbital, thiopental sodium, midazolam, and hydromorphone to inmates to cause their death.

739.    Such administration, as well as the administration of any other drug to carry out a human execution that DRC might use in a lethal-injection execution of Mr. Davis, necessarily falls

outside those drugs' marketed, FDA-approved purpose and is outside the doctor-patient relationship in the course of medical practice.

740.    Therefore, when used for the purpose of causing death during a human execution, pentobarbital, thiopental sodium, midazolam, hydromorphone, or any other drug DRC might attempt to use for a lethal-injection execution, constitute unapproved "new drugs" under the FDCA, DRC's use of which is unlawful under federal law.  *See* 21 U.S.C. §§ 321(p), 355.

> ### iv.    DRC's use of unapproved new drugs in a lethal-injection execution contravenes federal law because it is not subject to an Investigational New Drug Application.

741.    Before "new drugs" can lawfully be administered to humans, an "investigational new drug application ('IND')" must be submitted by the entity administering the drug.  *Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 697-98 (D.C. Cir. 2007).

742.    Therefore in order for DRC to comply with federal law in administering lethal-injection drugs to inmates, it is required to submit an IND to the FDA and "shall not begin a clinical investigation . . . until the investigation is subject to an IND which is in effect."  21 C.F.R. § 312.20(a)-(b).

743.    DRC violates this federal law.  DRC has never submitted any IND to the FDA for use of any lethal-injection drugs in executions.   DRC has never taken steps to submit an IND for its use of drugs in executions or required such action in any of its execution protocols.

744.    DRC does not intend to submit an IND application for the lethal-injection drugs it intends to use to execute Mr. Davis.

745.    Ohio's lethal-injection statute and DRC's execution protocols, as written and as implemented, regardless of the particular version of the protocol, therefore purport to authorize

DRC's use of drugs in executions without requiring DRC to submit an IND, thereby contravening the FDCA and FDA regulations.

> **v.    DRC's execution protocols and the Ohio execution statute are preempted by the federal FDCA.**

746.    Ohio's lethal-injection execution statute and its execution protocols to the extent that they involve the use of thiopental sodium are implicitly preempted by the FDCA and FDA regulations because those federal laws and regulations require approval of any "new drug" such as thiopental sodium before that drug may be introduced into interstate commerce.  The FDA has not approved thiopental sodium for any use, so it is "impossible for [DRC] to comply with both its state-law duty . . . and its federal-law duty," and therefore the state law is impliedly preempted. *Mut. Pharm. Co. v. Bartlett*, 133 S. Ct. at 2473; *see also Zogenix, Inc. v. Patrick*, Civ. Act. No.14-11689-RWZ, 2014 WL 3339610, at *4 (D. Mass. July 8, 2014) (holding a state "may not exercise [its] powers [to regulate the administration of drugs by the health professions] in a way that is inconsistent with federal law").

747.    The foregoing paragraph is also true for any drug other than thiopental sodium, including any Schedule I drug.  *Id*.

748.    Furthermore, any drugs to be used to carry out an execution will be considered "health-endangering" and therefore misbranded under federal law, while any imported execution drugs are likely to be misbranded under federal law based on the facility in which they are manufactured, prepared, propagated, compounded, or processed.  Because the federal FDCA and FDA regulations prohibit introducing into interstate commerce misbranded drugs, Ohio's lethal-injection execution statute and its execution protocols are implicitly preempted by those federal laws.  *Id*.

254

749.     Ohio's lethal-injection execution statute and any of its execution protocols are also

implicitly preempted by the FDCA and FDA regulations because those federal laws and

regulations require approval of new drugs for the particular purpose they are used, in this case to

cause a quick and painless death during a human execution and/or to cause death from a lethal-

injection during a human execution.  The FDA has not approved a drug for the purpose of

quickly and painlessly causing death so it is "impossible for [DRC] to comply with both its state-

law duty . . . and its federal-law duty," and therefore the state law is impliedly preempted.  *Id.*

750.     In addition, DRC implements the execution statute and its execution protocols by using

unapproved new drugs on humans without filing an IND application with the FDA.  In that way

too, "'state and federal law directly conflict'" so "the state law must yield." *BellSouth*

*Telecomm., Inc. v. Ky. Pub. Serv. Comm'n*, 669 F.3d 704, 709 (6th Cir. 2012) (quoting *PLIVA,*

*Inc. v. Mensing*, 131 S. Ct. 2567, 2577 (2011)).

> **B.     DRC's actions in obtaining compounded controlled substances for use as
> execution drugs, its import, purchase, possession, dispensing, distribution
> and/or administrations (and any other terms of art under the CSA or FDCA)
> of those drugs violate federal law.**

751.     DRC's recent execution protocols purport to authorize DRC personnel to procure, obtain,

import, purchase, dispense, distribute, possess and/or administer (and any other terms of art

under the CSA or FDCA) compounded lethal-injection drugs.

752.     Those compounded lethal-injection drugs will be compounded controlled substances.

753.     The Ohio lethal-injection statute and DRC's execution protocols as written and as

implemented, regardless of the particular version, that purport to authorize DRC to procure,

obtain, import, purchase, dispense, distribute, possess and/or administer (and any other terms of

art under the CSA or FDCA) compounded drugs, including controlled substances, as lethal-

injection drugs, are in contravention of federal drug laws.

**1.  DRC's actions in obtaining compounded execution drugs, its procurement, obtaining, importing, purchasing, dispensing, distributing, possessing and/or administration (and any other terms of art under the CSA or FDCA) of those drugs violates federal law because compounding drugs for use in an execution violates 21 U.S.C. § 353a and/or § 353b.**

754.    Because a compounding pharmacy, in making any compounded lethal-injection drugs, would be making copies of commercially available products (*e.g.*, Nembutal®) without a valid prescription from a prescribing practitioner issued for a legitimate medical need of a particular patient, the compounded execution drugs are not exempt from the FDCA requirements for manufactured drugs.  *See* 21 U.S.C. §§ 353a, 353b.  Such drugs are therefore unapproved new drugs under federal law, and DRC's use of those unapproved new drugs is in violation of federal law.

755.    The compounding of any lethal-injection drugs that DRC procures will not be performed by Central Pharmacy or Richard Theodore.  If a compounded drug is to be used in an execution performed by DRC, then Central Pharmacy, Richard Theodore, or Southern Ohio Correctional Facility will have to procure the compounded drugs from an outside compounding pharmacy.

756.    Any pharmacy compounding execution drugs for DRC will not be following the FDCA requirements for manufactured drugs.  For DRC to legally procure compounded execution drugs, the pharmacy compounding those drugs and its operations must fall under one of the two categorical exemptions from manufacturing requirements: 21 U.S.C. § 353a (operate as a traditional, small-scale compounder) or 21 U.S.C. § 353b (operate as an outsourcing facility).

757.    DRC is unable to obtain compounded execution drugs that are not compounded in violation of federal law if the drugs are to be obtained from a pharmacy operating as a compounding pharmacy under 21 U.S.C. § 353a.

758.    For a pharmacy to legally compound or dispense under 21 U.S.C. § 353a, and thus remain exempt from the FDCA's manufacturing requirements, it must do so only pursuant to "a valid prescription order or a notation, approved by the prescribing practitioner, on the prescription order that a compounded product is *necessary for the identified patient*." 21 U.S.C. § 353a(a) (emphasis added). Thus, a pharmacy operating as a compounding pharmacy under § 353a may not compound or dispense a drug product unless pursuant to a prescription that is for a legitimate medical purpose.[8]

759.    DRC will not have a valid, patient-specific prescription for a legitimate medical need from a prescribing practitioner, and the execution of Mr. Davis is not necessary for medical purposes. Accordingly, a pharmacy compounding and dispensing execution drugs for DRC does not qualify for the exemption from the manufacturing requirements under 21 U.S.C. § 353a.

760.    Thus DRC can never obtain execution drugs that have been legally compounded under 21 U.S.C. § 353a.

---

[8] Ohio's pharmacy practice laws require that a valid prescription "must be issued for a *legitimate medical purpose* by an individual prescriber *acting in the usual course of his/her professional practice*," and that "[a]n order purporting to be a prescription issued *not in the usual course* of *bona fide treatment* of a patient is *not a prescription* and the person knowingly dispensing such a purported prescription, as well as the person issuing it, shall be subject to the penalties of law." Ohio Admin. Code § 4729-5-30 (emphases added). Other provisions of Ohio's pharmacy practice laws require a pharmacist to act "in a manner that is in the best interest of the patients served and to comply with all state and federal laws." Ohio Admin. Code § 4729-9-02(A)(2), (B). And another provision of Ohio's pharmacy practice laws requires pharmacists to do a "prospective drug utilization review" "prior to dispensing any prescription," which requires that "the pharmacist shall use professional judgment in determining whether it is appropriate and *in the patient's best interest* to dispense the prescription." Ohio Admin. Code § 4729-5-20. A pharmacy compounding under § 353a, and any pharmacist otherwise involved in actions related to Ohio's execution drugs, is violating these provisions of Ohio law, and thereby violates the federal law's prescription-related requirements.

761.    All compounded execution drugs that DRC might obtain will be illegally compounded under federal law, 21 U.S.C. § 353a, because no pharmacist may compound the execution drugs without violating § 353a.

762.    Any execution protocol DRC promulgates that uses compounded execution drugs, therefore, will violate federal law, and will subject Mr. Davis to illegal drugs that create a substantial risk of serious harm to Mr. Davis, compounded in violation of federal law, 21 U.S.C. § 353a.

763.    In order for a pharmacy to legally compound and dispense as an "outsourcing facility" under 21 U.S.C. § 353b, and thus remain exempt from otherwise-applicable manufacturing and FDA approval requirements, it may not ever compound any drug that is "essentially a copy of one or more approved drugs." 21 U.S.C. § 353b(a)(5). Pentobarbital, hydromorphone and midazolam and virtually any other drug DRC might try to use as an execution drug are commercially available as FDA-approved drugs. Therefore, a pharmacy compounding and dispensing such execution drugs for DRC as an outsourcing facility does not qualify for the exemption from the requirements under 21 U.S.C. § 353b.

764.    Thus DRC can never obtain execution drugs that are essentially copies of approved drugs that have been legally compounded under 21 U.S.C. § 353b.

765.    All compounded drugs that are essentially a copy of an approved drug that DRC might obtain from a § 353b outsourcing facility will be illegally compounded under federal law, 21 U.S.C. § 353b, because no outsourcing facility pharmacy may compound such execution drugs without violating § 353b.

766.    Any execution protocol DRC promulgates that uses compounded execution drugs, therefore, will violate federal law, and will subject Mr. Davis to illegal drugs that create a

substantial risk of serious harm to Mr. Davis, compounded in violation of federal law, 21 U.S.C. § 353b.

767.    Additionally, whether under § 353a or § 353b, any compounded execution drugs DRC obtains will not be exempt from the manufacturing requirements under the FDCA, and therefore DRC's knowing possession and use of these drugs violates the FDCA.

768.    Any execution protocol DRC promulgates that uses compounded execution drugs, therefore, will violate federal law, and will subject Mr. Davis to illegal drugs, compounded in violation of federal law, 21 U.S.C. § 353a, § 353b.

769.    Additionally, these compounded drugs are not only unapproved "new drugs," under 21 U.S.C. § 355(a), they are also "misbranded" under 21 U.S.C. § 352(o) because they are not manufactured in an establishment duly registered under 21 U.S.C. § 360.  They are also "adulterated" under 21 U.S.C. § 351(a)(2)(B) because the controls and procedures used in their manufacture, processing, packing, and holding have not been deemed to conform with Good Manufacturing Practices regulations (found in 21 C.F.R. Parts 210 and 211).

> **2.    DRC's actions in obtaining compounded execution drugs, its procuring, obtaining, importing, purchasing, dispensing, distributing, possessing and/or administering (and any other terms of art under the CSA or FDCA) of compounded controlled substances violate various other provisions of the federal drug laws.**

770.    Pharmacies lawfully registered with the DEA may only dispense, not manufacture or distribute, controlled substances.  *See* 21 U.S.C. § 822(a)(2); *see also Wedgewood Vill. Pharmacy*, 71 Fed. Reg. 16,593-01 (DEA Apr. 3, 2006).  To manufacture or distribute controlled substances, one must obtain a DEA registration with more stringent requirements than those of the DEA registration for dispensing.  *See* 21 U.S.C. § 823(d)–(f); *Wedgewood Vill. Pharmacy*, 71 Fed. Reg. at 16,594.

771.     When pharmacies provide controlled substances to anyone but the ultimate user (*i.e.*, the patient or a member of the patient's household), those pharmacies are distributing, not dispensing controlled substances.  *See Wedgewood Vill. Pharmacy*, 71 Fed. Reg. at 16,595 ("Sending controlled substances to another DEA practitioner for dispensing is distribution, not dispensing.").

772.     Pharmacies are prohibited from distributing any controlled substances under the CSA unless the amount of controlled substances distributed is strictly limited (5% or less of all units dispensed or distributed) and other specific criteria are met.  21 C.F.R. § 1307.11(a).  For example, the distribution must be "for the purpose of general dispensing by the practitioner to patients."  21 C.F.R. § 1307.11.

773.     If DRC, Central Pharmacy, Richard Theodore, and Southern Ohio Correctional Facility are not dispensing the compounded lethal-injection drugs to patients for treatment, but to Drug Administrators who do administer the drugs for non-medical use without a valid prescription, the procurement of compounded lethal-injection drugs is unlawful.  *See Wedgewood Vill. Pharmacy*, 71 Fed. Reg. at 16,595 (holding that, in order to "dispense," not distribute, a compounded controlled substance, "a pharmacy must receive a prescription for a specific patient from a physician or other individual practitioner and must deliver or dispense that medication to the patient").

774.     If DRC, Central Pharmacy, Richard Theodore, Southern Ohio Correctional Facility, or the Drug Administrators procure, possess, dispense and administer controlled substances from a compounding pharmacy as DRC's execution protocols purport to authorize, these entities would violate the CSA and related regulations.

260

775.    In fact, under any execution protocol DRC promulgates, it cannot procure, possess, dispense or administer any controlled substances for lethal injection without violating the CSA.

### 3.    DRC's execution protocols and the Ohio execution statute are preempted by federal law.

776.    As they purport to authorize the use of compounded lethal-injection drugs, Ohio's lethal-injection execution statute and its execution protocols are both impliedly preempted by the FDCA and FDA regulations because it is "impossible for [DRC] to comply with both its state-law duty . . . and its federal-law duty," *Mut. Pharm. Co. v. Bartlett*, 133 S. Ct. at 2473. Consistent with the other allegations throughout this Ground for Relief, DRC cannot comply with its duty to carry out executions under Ohio state law while also remaining in compliance with the various duties imposed under federal law.

777.    The execution protocols and the execution statute are also explicitly preempted under the CSA and DEA regulations because "the two cannot consistently stand together," 21 U.S.C. § 903.

### C.    Conclusion

778.    For all the above reasons, there are no lethal-injection execution laws, protocols or policies in Ohio that would not be expressly or implicitly preempted by federal law. Accordingly, such Ohio state laws, protocols, or policies are rendered invalid, leaving Ohio no valid state execution laws, protocols or policies with which to carry out Mr. Davis's execution.

779.    Putting Mr. Davis to death in while engaging in violations of federal statutory and regulatory law will result in a fundamental defect in the execution process.

780.    Accordingly, Ohio may not constitutionally execute Mr. Davis using lethal injection.

781.    Because DRC may only execute Mr. Davis under Ohio law by lethal injection, and because DRC cannot legally carry out a lethal-injection execution, his death sentence cannot be

carried out, necessarily rendering it an invalid sentence.  Mr. Davis must therefore be granted

habeas relief from his sentence of death.

## PRAYER FOR RELIEF

WHEREFORE, Von Clark Davis requests that this Court consider his Petition for Writ of

Habeas Corpus and grant the following remedies and such other relief as the Court deems

appropriate:

1.   That this Court declare that Mr. Davis's convictions and sentence of death under Ohio law violate the United States Constitution as well as the various treaties and charter obligations of the United States and grant him a writ of habeas corpus;

2.   That this Court grant Mr. Davis leave to amend his petition as necessary, including if and when the State of Ohio Department of Rehabilitation and Correction adopts an execution protocol, DRC Policy 01-COM-11, that supersedes the currently effective protocol;

3.   That this Court grant Mr. Davis leave to conduct discovery pursuant to Rule 6 of the Rules Governing 28 U.S.C. § 2254 Cases to more fully develop the factual bases demonstrating the constitutional infirmities in his convictions and sentence;

4.   That this Court grant Mr. Davis the authority to obtain subpoenas *in forma pauperis* for witnesses and documents necessary to prove the facts asserted in this amended petition;

5.   That this Court permit expansion of the Record with any documents and/or testimony necessary to resolution of this amended petition;

6.   That this Court order that the Warden provide and file a complete copy of the state court record pursuant to Rule 5 of the Rules Governing 28 U.S.C. § 2254 Cases;

7.   That this Court order that the Warden file an answer pursuant to Rule 5 of the Rules Governing 28 U.S.C. § 2254 Cases;

8.   That this Court grant Mr. Davis an evidentiary hearing pursuant to Rule 8 of the Rules Governing 28 U.S.C. § 2254 Cases;

9.   That this Court grant such other relief as law and justice require.

Respectfully submitted,

**_s/ Laurence E. Komp_**
**Laurence E. Komp (0060142)**
   _Lead/Trial counsel_
P.O. Box 1785
Manchester, MO 63011
Phone: (636) 207-7330
lekomp@swbell.net

Erin G. Barnhart (0079681)
   _Co-counsel_
Assistant Federal Public Defender
Federal Public Defender's Office
for the Southern District of Ohio
Capital Habeas Unit
10 W. Broad Street, Suite 1020
Columbus, Ohio 43215
Phone:  (614) 469-2999
Fax:  (614) 469-5999
erin_barnhart@fd.org

**Counsel for Petitioner**

## **VERIFICATION**

Pursuant to 28 U.S.C. § 2242, I, Erin Gallagher Barnhart, counsel for petitioner, hereby

verify that the allegations contained herein are true and accurate to the best of my knowledge.


*s/ Erin G. Barnhart*                    *August 25, 2016*
Counsel for Petitioner                            Date

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 25, 2016, I electronically filed the foregoing **Petitioner**

**Von Clark Davis's Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2254** with the

Clerk of Court using the CM/ECF system, which will provide notification to the following:

      Stephen E. Maher
      Assistant Attorney General
      Ohio Attorney General's Office
      Criminal Justice Section, Capital Crimes Unit
      150 East Gay Street, 16th Floor
      Columbus, Ohio 43215

                    *s/ Erin G. Barnhart*
                    **Erin G. Barnhart (0079681)**
                    Assistant Federal Public Defender