# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT CINCINNATI

VON CLARK DAVIS,

                    Petitioner,                :    Case No. 2:16-cv-495

    - vs -

                                      District Judge Susan J. Dlott
                                      Magistrate Judge Michael R. Merz

TIMOTHY SHOOP, Warden,
Chillicothe Correctional Institution

                                 :

                  Respondent.

---

# REPORT AND RECOMMENDATIONS

---

      This capital habeas corpus case is before the Court for decision on the merits on the Petitioner Von Clark Davis's Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 6). The case has been referred to the undersigned for a Report and Recommendations. 28 U.S.C. § 636(b).

      On May 16, 1984, Davis was convicted by a three-judge panel[1] of the Butler County, Ohio, Court of Common Pleas of one count of aggravated murder of his girlfriend, Suzette Butler, with a firearm specification, and one count of knowing use of a firearm while under a disability—having previously pled guilty to and been convicted of both shooting with the intent to wound his estranged wife, Ernestine, and later, second degree murder of Ernestine (Petition, ECF No. 6, PageID 8581-82, 8589, citing Trial Tr., ECF No. 5-3, PageID 7641-42, 7645-47, 2nd Resent'g Tr.,

---

[1] Judges Henry J. Bruewer, John R. Moser, and William R. Stitsinger.

ECF No. 5-8, PageID 8441-42, 8466). After a penalty phase, which began on May 24, 1984, the panel sentenced Davis to death. *Id.* at PageID 8589, citing State Court Record., ECF No. 4-3, PageID 487-89. In 1988 and 2007, the Supreme Court of Ohio and the United States Court for the Sixth Circuit, respectively, affirmed Davis's convictions, but vacated his death sentence and remanded the matter to the trial court for a new penalty phase. *Davis v. Coyle*, 475 F.3d 761 (6th Cir. 2007); *State v. Davis*, 38 Ohio St. 3d 361 (1988).[2] Twice, three-judge panels resentenced Davis to death (Petition, ECF No. 6, PageID 8595, 8618, citing State Court Record, ECF No. 4-39, PageID 4924-34; 1st Resent'g Tr., ECF No. 5-4, PageID 7728). The judgment from the Second

---

[2] Given the case's history and complexity, the parties and the Court have long taken to referring to cases in the following ordinal fashion:

1. *Davis I*: *State v. Davis*, 12th Dist. Butler No. CA84-06-071, 1986 WL 5989 (May 27, 1986); (**Appeal from conviction and first sentencing to death**)
2. *Davis II*: *State v. Davis*, 38 Ohio St. 3d 361 (1988) (**Appeal from conviction and first sentencing to death**);
3. *Davis III*: *State v. Davis*, 12th Dist. Butler No. CA89-09-123, 1990 WL 165137 (Oct. 29, 1990) (**Appeal from second sentencing to death**);
4. *Davis IV*: State v. *Davis*, 63 Ohio St. 3d 44 (1992) (**Appeal from second sentencing to death**);
5. *Davis V*: *State v. Davis*, No. CR83-12-0614 (Butler Cnty. C.P. Jun. 30, 1995) (State Court Record, ECF No. 4-20, PageID 2158) (**Postconviction petition**)
6. *Davis VI*: *State v. Davis*, 12th Dist. Butler No. CA95-07-124, 1996 WL 551432 (Sept. 30, 1996) (**Appeal from postconviction petition**)
7. *Davis VII*: *State v. Davis*, No. 96-2547, 77 Ohio St. 3d 1520, 674 N.E.2d 372 (TABLE) (Jan. 15, 1997) (**Appeal from postconviction petition**)
8. *Davis VIII*: *State v. Davis*, 86 Ohio St. 3d 212 (1999) (per curiam) (**Appeal from application to reopen direct appeal**)
9. *Davis IX*: *Davis v. Bagley*, No. C-1-97-402, unreported, included at ECF Nos. 16-1 and 16-2 (S.D. Ohio Jan. 17, 2002) (Graham, J.) (**Habeas petition**)
10. *Davis X*: *Davis v. Coyle*, 475 F.3d 761 (6th Cir. 2007) (**Appeal from habeas petition**)
11. *Davis XI*: *State v. Davis*, 12th Dist. Butler No. CA2009-10-263, 2011-Ohio-787 (Feb. 22, 2011) (**Direct appeal from second resentencing**);
12. *Davis XII*: *State v. Davis*, No. CR83-12-0614 (Butler Cnty. C.P. Nov. 26,2012), unreported, included at State Court Record, ECF No. 4-47, PageID 6633 *et seq.* (**Second postconviction petition**);
13. *Davis XIII*: *State v. Davis*, 12th Dist. Butler, No. CA2012-12-258, 2013-Ohio-3878 (Sept. 9, 2013) (**Appeal from second postconviction petition**);
14. *Davis XIV*: *State v. Davis*, 139 Ohio St. 3d 122, 2014-Ohio-1615 (**Direct appeal from second resentencing**);
15. *Davis XV*: *State v. Davis*, 143 Ohio St. 3d 1441, 2015-Ohio-3427 (**Appeal from second postconviction petition**); and
16. *Davis XVI*: *Davis v. Ohio*, 135 S.Ct. 1494 (Mem) (2015) (**Petition for certiorari from direct appeal from second resentencing**).

Resentencing became final upon the United States Supreme Court's denying Davis's petition for writ of *certiorari* on March 2, 2015. *Davis XVI*, 135 S.Ct. 1494.[3] Davis first filed a petition for writ of *habeas corpus* in this Court on April 28, 1997, which was denied by Judge James L. Graham in Orders dated December 23, 1997, and September 4, 2001. *Davis IX*, ECF Nos. 16-1, 16-2. Those orders were overturned by the Sixth Circuit's decision to vacate Davis's death sentence and remand for resentencing. *Davis X*, 475 F.3d 761. Davis filed the instant Petition on August 25, 2016 (ECF No. 6). For the reasons set forth below, it is recommended that the Petition be DENIED.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The factual background has been extensively set forth in previous opinions listed *supra*. The discussion below is limited to those facts germane to the Grounds for Relief in the instant Petition.

Davis, after dropping out of school in the ninth grade, enlisted in the Navy in 1964 when he was seventeen years old, but was discharged seven months later after he went Absent Without Leave and the Navy "determined his emotional instability was 'so severe that he [was] not suitable to be in the US Armed Forces.'" (Petition, ECF No. 6, PageID 8581 (brackets in original, quoting 2nd Resent'g Tr., ECF No. 5-8, PageID 8442; citing 2nd Resent'g Tr., ECF No. 5-8, PageID 8441-42, 8466)). He married Ernestine in 1967, but the couple separated in 1969. *Id*. On September 16, 1969, while they were separated, Davis fired four shots at Ernestine, causing her to "suffer[] a bullet wounds (sic) in the right upper arm and in the left hand." (Trial Tr., ECF No. 5-3, PageID

---

[3] Justice Breyer dissented from the denial of certiorari without opinion. 135 S.Ct. at 1494.

7642).  Davis was subsequently charged with and pled guilty to one count of discharging a firearm with the intent to wound Ernestine.  *Id*.  On December 30, 1970, during an altercation, Davis, by his own admission to law enforcement officers, stabbed and killed Ernestine.  *Id*. at PageID 7645-47.  In 1971, a mental evaluation was conducted on Davis, in which the psychologist concluded that Davis's "desperate need for relationships triggers paranoia at the prospect of losing them, causing a sudden and dramatic vacillation from love and idealization to anger and hate.  This disposition made Mr. Davis prone to 'angry outbursts with very little provocation.'"  (Petition, ECF No. 6, PageID 8582, quoting 2nd Resent'g Tr., ECF No. 5-7, PageID 8445).  "This evaluation additionally described Mr. Davis as 'unstable and hostile' and 'afraid of his impulses.'"  *Id*., quoting 2nd Resent'g Tr., ECF No. 5-7, PageID 8445.  Davis pled guilty to one count of second-degree murder of Ernestine and served ten years in prison from 1971 until 1981.  While incarcerated, Davis exhibited exemplary behavior and obtained numerous educational degrees and certifications.  *Id*., citing Trial Tr., ECF No. 5-3, PageID 7613-15.

Upon his release, Davis began a tumultuous live-in relationship with Suzette Butler.  On December 12, 1983, while separated from Butler, Davis asked Wade Coleman and Mark Lovette, his cousin and acquaintance, respectively, to buy a gun and bullets for him.  Coleman testified that Davis wanted the gun for protection, but gave no specifics and never mentioned Butler with respect to acquiring the weapon (Trial Tr., ECF No. 5-2, PageID 7313-15).  Armed and heavily intoxicated, he entered an American Legion bar in Hamilton, Ohio, where Butler was eating dinner with a friend, Mona Aldridge (Petition, ECF No. 6, PageID 8583, citing Trial Tr., ECF No. 5-2, PageID 7289-92, 7309-13, 7317, 7335-37).  Butler and Davis talked privately (and, by outward appearances, calmly) before Aldridge joined them (Trial Tr., ECF No. 5-2, PageID 7348-49).  Aldridge testified that at some point, Butler asked her to watch her personal belongings while she

4

went outside with Davis. Several minutes after Butler and Davis stepped outside, Aldridge reportedly opened the door to the bar, "peeked out[,]" and saw "Davis with a gun pointed towards [Butler's] head." (Trial Tr., ECF No. 5-2, PageID 7338, 7353-54). While the police record of Aldridge's statement immediately after the shooting included a statement that she heard Butler and Davis arguing when she peeked outside, she testified at trial that they were not arguing and that she never told the police that. *Id.* at PageID 7358-60. Aldridge further testified that, even though she did not hear gunshots, she ran back inside the American Legion because she was scared, and approximately 90 seconds later, people entered the bar and reported that someone had been shot. *Id.* at PageID 7338-39, 7355.

Sometime between 7:00 and 7:30 that evening, an Anthony Ferguson observed Butler and Davis outside the bar as Ferguson was standing on the corner diagonally across from the American Legion. Ferguson testified that "as soon as [Butler and Davis] walked out the door he turned around and he shot her. And as she fell on the ground he shot her some more . . . about three or four times." (Grand Jury Tr., ECF No. 5-1, PageID 7128). Ferguson did not call the police but spoke with law enforcement after the crime scene was roped off. *Id.* at PageID 7147-48. However, Ferguson did not testify at trial, and two of the State's trial witnesses, Reginald Denmark and Cozette Massey, who testified that they were near the scene of the crime, testified that they had not seen Ferguson. (Petition, ECF No. 6, PageID 8735, citing Trial Tr., ECF No. 5-2, PageID 7373-74, 7382-83, 7424). Denmark and Massey, who were in a romantic relationship at the time of the murder, indicated that they had left Massey's apartment between 7:15 and 7:30 p.m. and observed Butler and Davis outside the American Legion from across the street; Massey testified that she heard gunfire and saw Davis shoot Butler in the head three times after the initial two gunshots (which she did not witness) sent Butler to the ground (Trial Tr., ECF No. 5-2, PageID

5

7366-68).  Massey further testified that she spoke to the police anonymously immediately after the shooting occurred, and also spoke to the police approximately four days later.  During the latter interview, police showed Massey a photograph of Butler (in isolation, rather than an array of photographs including others), and a photograph of Davis with Butler (again, in isolation).  From those photos, Massey identified Butler as the victim and Davis as the man who shot her.  *Id.* at PageID 7385-89.  When Massey identified Davis in court as the perpetrator, trial counsel moved to strike the identification, arguing that it was the fruit of the photograph shown Massey by the police, which was itself an impermissibly suggestive process.  However, the three-judge panel collectively overruled the motion.  *Id.* at PageID 7393-94.

Denmark testified that, from across the street next to Massey, he saw Davis quickly take out a gun and fire two shots; at that point, Denmark testified, Butler attempted to say something but fell to the ground, at which point Davis quickly shot her again (Trial Tr., ECF No. 5-2, PageID 7397-98, 7417).  Denmark identified Davis while under oath, saying that he had known of Davis at the time of the shooting, having seen him around town, and that there was "never any doubt" that Davis was the man he had seen shooting Butler.  *Id.* at PageID 7399-400.  At the end of the State's case-in-chief, Davis's counsel moved for acquittal on the charge of aggravated murder, citing the inconsistent testimony of the above eyewitnesses and arguing that, even if true, there was no "prior calculation or design" by Davis to kill Butler, which was required under the statute to sustain a conviction for aggravated murder (Trial Tr., ECF No. 5-3, PageID 7445-53, citing Ohio R.Crim.P. 29).  The three-judge panel overruled the motion, finding "that there is sufficient evidence here on each element in the crimes charged in the indictment[.]"  *Id.* at PageID 7461.

After the Rule 29 Motion was denied, Davis's counsel, John Garretson, set forth Davis' defense with his opening statement.  Counsel argued that the evidence would show that Davis had

procured the gun and ammunition not for a purpose of violence, but to trade those items to a man named Silky Carr in exchange for dental equipment, as "his trade so to speak that he learned in prison was to be a dental technician." (Trial Tr., ECF No. 5-3, PageID 7463). He also claimed that Carr showed up at the American Legion looking for Butler, who allegedly owed Carr money from drug transactions, and that Davis had left the American Legion while Carr and Butler were talking. *Id*. at 7464. Davis, testifying on his own behalf, stated that after hearing that Butler had been shot, he went to Lexington, Kentucky, where Carr was living, in an unsuccessful attempt to track the latter down. He testified that, after three days, he turned himself into Lexington police and arranged to have the Hamilton, Ohio, Police Department pick him up and return him to Hamilton. *Id*. at PageID 7539-41. Davis adamantly denied shooting Butler. *Id*. at PageID 7541.

On cross-examination, Davis conceded that he and Butler had separated only five days before the murder (Trial Tr., ECF No. 5-3, PageID 7542-43). He further conceded that he did not have the bullets to make the firearm functional, such that he could give the gun to Carr, until approximately three hours prior to Butler's being killed, and that nobody else besides Davis was responsible for the gun and bullets prior to that time. Further, he stated that despite giving the gun to Carr in the late afternoon in Hamilton, he and Carr had agreed that Carr would not give him the dental equipment until between 8:30 and 9:30 that evening in Middletown, Ohio. *Id*. at PageID 7556-58.

Davis was indicted by a Butler County, Ohio, grand jury, with a Caucasian foreperson, on January 6, 1984, the aforementioned charges of aggravated murder with a capital specification and use of a firearm after having been convicted of a violent felony (State Court Record, ECF No. 4-1, PageID 72). On January 17, 1984, Davis, via his attorney Michael Shanks, filed a Motion to Sever the charged counts and a Motion to Dismiss and to Inspect the Grand Jury Transcript. *Id*. at

7

PageID 75-76, 82-102.  On February 1, 1984, Davis filed a Motion to Bifurcate the Trial/Motion *in Limine* to separate the trials for Count One (aggravated murder) and Count Two (unlawful use of firearm) or, in the alternative, to prevent the introduction of evidence as to the reason he was under a firearm restriction (*i.e.*, the murder of Ernestine) "only after a finding of guilty is returned on the charge of aggravated murder[.]"  *Id*. at PageID 127.  On May 4, 1984, Judge Bruewer overruled all the above motions (State Court Record, ECF No. 4-3, PageID 428-31).  Subsequently, on advice of counsel, Davis waived his right to a jury trial in favor of being tried before the three-judge panel of Judges Bruewer (acting as Presiding Judge), Moser, and Stitsinger.  *Id*. at 432-33, citing Ohio Rev. Code § 2945.06.  On May 16, 1984, having heard the testimony detailed above, the panel, after approximately ninety minutes of deliberations, found Davis guilty on both counts. *Id*. at PageID 473; Trial Tr., ECF No. 5-3, PageID 7607.

On May 29, 1984, the panel convened a sentencing hearing, at which John Bohlen, Chief of the Adult Probation Department, testified as a defense witness (Trial Tr., ECF No. 5-3, PageID 7610).  Bohlen, in preparing the presentence report, also reviewed records from Davis's previous incarceration and the pre-parole psychological evaluation conducted in December 1980.  In that evaluation, Davis was classified as having "Compulsive Personality Disorder," but that classification was qualified by the evaluator's conclusion that "the results of personality testing are not indicative of serious personality disorientation."  *Id*. at PageID 7610-12.  He testified that Davis, despite having only an eighth grade education upon incarceration at London Correctional Institution ("LCI"), went through dental technician training and obtained a General Equivalency Diploma ("GED") by March 1973, Associate's Degree in Business Administration, and vocational training in masonry and as an automobile mechanic.  *Id*. at PageID 7612-14.  Bohlen concluded by stating that Davis had no instances of discipline or misconduct while incarcerated.  *Id*. at PageID

8

7614-15.  Charles and Alluster Tipton, Davis's stepfather and mother respectively, testified to Davis's good character both while incarcerated and when he lived with them upon release.  *Id*. at PageID 7615-25.

Roger Fisher, Ph.D., director of the Butler County Center for Forensic Psychiatry, testified as to his May 21, 1984, evaluation of Davis and his review of previous psychological and psychiatric records (Trial Tr., ECF No. 5-3, PageID 7625, 7627-28).  Among those records was an April 27, 1978, evaluation done by LCI Psychological Services, in which the psychologist stated that his "basic impression of Davis is largely that of active-detached individual with schizoid trends[.]" *Id*. at PageID 7630.  Dr. Fisher also reviewed a 1980 evaluation conducted by LCI Psychological Services, which "indicated that the over all (sic) impression is that of an individual who is best classified under the heading of Compulsive Personality Disorder[.]" *Id*.  Dr. Fisher indicated that he agreed with both assessments, "even as we see Mr. Davis today." *Id*. at PageID 7631.  However, on cross-examination, Dr. Fisher admitted that both reports termed Davis a "minimal risk" to persons and property[.]" *Id*. at PageID 7632.  Importantly, Dr. Fisher opined that, at the time when Davis allegedly murdered "Butler, he was free of . . . mental disease or defect which would have impaired his capacity to appreciate the criminality of any conduct in which he engaged or to have conformed his conduct to the requirement of the law[,]" and that Davis "was then and is now, free of any emotional disease or defect, of the mind[.]" *Id*. at PageID 7633-34, 7635.  The State used this conclusion to support its argument that the "mental disease or defect" mitigation factor was not applicable; nor, for that matter, were any other mitigation factors.  *Id*. at PageID 7650.

Shanks, in his closing argument on behalf of Davis, noted the contradictory eyewitness testimony and argued that, even if Davis had killed Butler, the evidence suggested that it was a

crime of passion, lacking the prior calculation or design of an intentional killing (Trial Tr., ECF No. 5-3, PageID 7653-55). He also argued that Davis's past and present mental illness were significant mitigating factors, and that if the panel chose "not to impose the ultimate punishment, . . . then Mr. Davis, in all honesty, as this panel well knows[,] is going to die in prison in any event." *Id*. at PageID 7655-57. The panel imposed a death sentence on May 19, 1984. *Id*. at PageID 7672.

## II.    POST-SENTENCING PROCEDURAL HISTORY

### A.    Initial Direct Appeal

#### 1.    Twelfth District Court of Appeals

As Butler's murder occurred before January 1, 1995, Petitioner first appealed to the Twelfth District Court of Appeals, rather than directly to the Supreme Court of Ohio. *Davis I*, 1986 WL 5989. On November 13, Attorney Timothy Evans filed Petitioner's initial brief, (State Court Record, ECF No. 4-4, PageID 546), raising seven assignments of error, with numerous sub-assignments:

FIRST ASSIGNMENT OF ERROR:  The trial court erred in failing to dismiss the death penalty specifications against the Defendant because the death penalty is unconstitutional.

1.  The death penalty as authorized by the Ohio Revised Code, deprives the Defendant of his life for that [sic] due process of law guaranteed in Article One, Section 16 of the Ohio Constitition (sic) and the Fourteenth Amendment to the United States Constitution.;

2.  Ohio's death penalty violates the Eighth Amendment of the United States Constitution and Ohio Constitution, Article One Section 9 prohibiting the infliction of cruel and unusual punishment.;

3.  The death penalty is arbitrarily and capriciously inflicted, constituting a denial of equal protection of the laws under the Eighth and Fourteenth Amendments of the U.S. Constitution and Article One, Section 9 and 16 of the Ohio Constitution;

10

4. The death penalty sections of the Ohio Revised Code deprive the Defendant of due process of law under the Fourteenth Amendment and Article One, Section 16 of the Ohio Constitution and constitute cruel and unusual punishment under the Eighth Amendment and Article One, Section 9 of the Ohio Constitution as it permits imposition of the death penalty on a less than adequate showing of guilt. It is also unconstitutional because it requires proof of aggravating circumstances during the guilt determination state of death penalty deliberations;

5. The death penalty is unconstitutional because it denies the Defendant the right to a trial before an impartial jury as guaranteed by the Sixth and Fourteenth Amendment to the U.S. Constitution and Article 1, Section 10 of Ohio Constitution;

6. The death penalty is unconstitutional because it has a chilling effect on the Defendant's right to a jury trial guaranteed by the Sixth and Fourteenth Amendment to the U.S. Constitution and Article 1, Section 10 of the Ohio Constitution;

7. Section 2945.25(c) of the Ohio Revised Code violates the Defendant's right to an impartial jury on the determination of guilt;

8. The Ohio death penalty fails to provide a sentencing authority with an option to choose a life sentence when there are aggravating circumstances and no mitigating circumstances and is, therefore, unconstitutional under the Eighth and Fourteenth Amendments to the U.S. Constitution and Article 1, Section 9 and 16 of the Ohio Constitution; and

9. The death penalty authorized by the Ohio Revised [Code] violates the Eight Amendment and the Fourteenth Amendment clauses of the U.S. Constitution and the cruel and unusual punishment provisions and due process clauses of the State Constitution in that several of the aggravating circumstances set forth in Ohio Revised Code 2929.04 (a) are overbroad and vague and fail to reasonably justify the imposition of the ultimate sentence.

SECOND ASSIGNMENT OF ERROR:  The court erred in failing to allow the Defendant to inspect the grand jury transcript.

1. Where the Defendant moves to dismiss and to inspect the grand jury transcript for purposes of showing that the indictment against him was not based upon probable cause and that the indictment was

founded on illegal and incompetent evidence, the Defendant has a
right to inspect the Grand Jury Testimony.

THIRD ASSIGNMENT OF ERROR:  The court erred in denying Defendant's motion to

bifurcate the trial and sever the charges.

1. Where a defendant is charged with aggravated murder with a
   specification that he had previously been convicted of murder and
   further in the second count of the indictment charged with having
   firearms while under disability, is it improper for the Court to try all
   charges together and to refuse to bifurcate the trial and to have the
   proof of specification at the sentencing hearing if the defendant is
   found guilty and further to refuse to sever the charge of having
   weapons while under disability so that no evidence would be
   introduced as to defendant's prior crimes.

2. Where the Defendant is charged with aggravated murder with a
   specification that he has previously committed a homicide and also
   while having weapons while under a disability, Defendant's right to
   a trial by an impartial jury is violated by requiring all charges to be
   tried at once, in violation of the Ohio Revised Code, so as to allow
   the prosecution to introduce by way of evidence on having weapons
   while under disability, evidence which could not otherwise be
   introduced at the trial in chief.

FOURTH ASSIGNMENT OF ERROR:  The judgment was against the manifest weight of

evidence and contrary to law.

1. Where the Defendant, in an aggravated murder case is bound over
   to the grand jury and indicted on the testimony of one witness and
   the State then fails to present that witness at Trial, but instead
   presents other witnesses who contradict the fact that that witness
   was even at the scene , the judgment is against the manifest weight
   of the evidence and the credibility of the State's case fails entirely;
   and

2. Where the State presents no evidence that the Defendant in any way
   plotted, schemed or planned to kill the deceased, and there is no
   evidence of prior calculation and design the Defendant may only be
   convicted of murder and not aggravated murder.

FIFTH ASSIGNMENT OF ERROR:  The court erred in not dismissing the specification

of the indictment that the Appellant had committed a prior homicide, on the basis that such

12

specification was too remote in time to be used against Appellant.

> 1. Where the prior murder conviction of the Defendant occurred thirteen (13) years prior to the homicide in question, to allow such homicide to be used as a basis of an aggravating circumstance is improper and should have been stricken from the indictment.

SIXTH ASSIGNMENT OF ERROR: The court erred in imposing the death penalty as the court found as aggravating factors not listed in the Ohio Revised Code and factors which were improper for consideration under the Ohio Revised Code.

> 1. Where the court finds as aggravating circumstances four factors which are not listed in the Ohio Revised Code as aggravating circumstances, and not charged in the indictment as specifications, and considers these circumstances in imposing death, the Court errs in imposing the death penalty and the death penalty must be reversed.

SEVENTH ASSIGNMENT OF ERROR: Under the proportionality review required by this court, the penalty imposed upon Von Clark Davis is out of proportion to the other sentences given for similar crimes in this court.

> 1. Under ORC 2929.05, where this Court is required to consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases, the penalty imposed upon Von Clark Davis is excessive.

(State Court Record, ECF No. 4-4, PageID 546-53).

The Twelfth District rejected all seven Assignments of Error and affirmed the trial court's death sentence. *Davis I*, 1986 WL 5989. The panel noted that Ohio's death penalty scheme had been generally upheld as constitutional, and thus the First Assignment and each of its sub-assignments were without merit. *Id*. at *2-5 (citations omitted). As to the Second Assignment, the panel concluded that Davis had not demonstrated a particularized need that outweighed the general need for grand jury secrecy. *Id*. at *5-6, citing Ohio R.Crim.P. 6(e); *United States v. Calandra*, 414 U.S. 338, 344-45 (1974); *State v. Greer*, 66 Ohio St. 2d 139 (1981). The Appellate

court found that the Third Assignment (failure to sever) was without merit; as the charges arose out of the same transaction, joinder was proper, and joinder raised only a risk of prejudice, one which never materialized: "The evidence of the prior convictions was simple and distinct; there was no elaboration as to the details of appellant's prior second degree murder conviction." *Id*. at *7-8, citing Ohio Rev. Code § 2941.04; Ohio R.Crim.P. 8(a), 14. Similarly, the panel concluded that, because "evidence of appellant's 1971 second degree murder conviction was here offered, in connection with R.C. 2929.04(A)(5), simply to demonstrate that appellant had, in fact, previously been convicted of an offense an essential element of which was the purposeful killing of another[,]" Davis's Fifth Assignment (not dismissing the specification in the indictment that he had committed a prior homicide) was unavailing *Id*. at *10. The Twelfth District found, contrary to Davis's Fourth Assignment, that there was sufficient evidence that his murder of Butler was the product of prior calculation and design, despite Davis's state of mind at the time not being established. *Id*. at *9, quoting *State v. Davis*, 8 Ohio App. 3d 205, 206-07 (8th Dist. 1982); citing *State v. Robbins*, 58 Ohio St. 2d 74 (1979).

On Davis's Sixth Assignment, the appellate panel concluded that the three-judge panel's findings of five aggravated circumstances was improper because they were not strictly confined to the eight statutorily permitted aggravating factors. *Davis I*, 1986 WL 5989 at *5, 10-11, citing *Godfrey v. Georgia*, 446 U.S. 420, 428-29 (1980); Ohio Rev. Code §§ 2929.03(F), 2929.04(A). Nonetheless, the Twelfth District concluded that "although the trial court improperly considered non-statutory aggravating circumstances, this does not require that appellant's sentence be set aside[,]" as there was sufficient evidence that the validly considered aggravating circumstances outweighed the mitigating factors. *Id*. at *12, quoting *State v. Jenkins*, 15 Ohio St. 3d 164, 199-200 (1984); citing *Zant v. Stephens*, 462 U.S. 862 (1983). The panel also overruled his Seventh

14

Assignment, conducting its statutorily mandated proportionality analysis under Ohio Rev. Code §
2929.05(A) and opining "that the death penalty is appropriate in this case *sub judice* and is not
excessive or disproportionate to the penalty imposed in similar cases." *Id.* (citations omitted).

### 2.      Supreme Court of Ohio

Davis then appealed to the Supreme Court of Ohio, raising as propositions of law the same
seven assignments of error raised with the Twelfth District, and added Proposition of Law VIII:
"Where the testimony of the State's Witness is contradictory to the point that credibility is
questionable and the state presents no evidence of prior calculation and design, the conviction of
aggravated murder was against the manifest weight of the evidence."  (State Court Record, ECF
No. 4-6, PageID 740).  The Supreme Court of Ohio sustained Davis's Seventh Proposition of Law,
noting that "[t]he trial essentially made 'prior calculation and design' an aggravating circumstance.
It is an element of aggravated murder, but it is not an aggravating circumstance listed in R.C.
2929.04(A)." *Davis II*, 38 Ohio St. 3d at 372.  The panel also rejected the State's contention "that
consideration of nonstatutory aggravating circumstances does not constitute reversible error." *Id.*
at 369, citing *Barclay v. Florida*, 463 U.S. 939 (1983); *Zant*, 462 U.S. 862.  In both *Barclay* and
*Zant*, the United States Supreme Court "held that review of such a defect required an inquiry into
'the function of the finding of aggravating circumstances under [state] law and the reason why this
aggravating circumstance is invalid.'" *Id.* at 370, quoting *Barclay*, 463 U.S. at 951; citing *Zant*,
462 U.S. at 884.  The Supreme Court of Ohio noted that "Florida's statutory framework for
implementation of capital punishment is similar to Ohio's[,]" *id.*, citing *Jenkins*, 15 Ohio St. 3d at
207, and that, in *Barclay*, the death sentence was upheld despite the consideration of improper
aggravating circumstances, as "the [United States] Supreme Court was persuaded by the fact that

15

the evidence of the defendant's record was otherwise admissible, and that in reviewing similar errors, the Florida Supreme Court did not mechanically apply a harmless error analysis." *Id*., citing *Barclay*, 463 U.S. at 956-58.

"However," the court continued, "it is significant to note that in *Barclay,* unlike the case at bar, the trial court did *not* find any mitigating factors to be present[,]" *Davis II*, 38 Ohio St. 3d at 370 (emphasis in original), and that when there are mitigating factors found, "the case will generally be remanded for resentencing." *Id*., citing *Elledge v. State*, 346 So.2d 998, 1002-03 (Fla. 1977). Remand was necessary, the court concluded, because the aggravating circumstances in Ohio Rev. Code §2929.04(A) were meant to guide the *sentencing* court; accordingly, the statutorily-mandated independent review conducted by the *appellate* court, even if accurate, cannot function as a "cure-all" for an improper trial court analysis. *Id*. at 372. However, the court affirmed Davis's conviction, and stated that "[w]e have *not* found the evidence in the instant action to be legally insufficient to justify imposition of the death penalty." *Id*. at 373 (emphasis in original). Accordingly, the court remanded the case for a "resentencing hearing at which the state may seek whatever punishment is lawful, *including, but not limited to, the death sentence*." *Id*. (emphasis added). Finally, the court found that, because Davis was sentenced initially by a three-judge panel, and would be resentenced by a three-judge panel, the court's holding in *State v. Penix*, 32 Ohio St. 3d 369, 371 (1987), which barred reimposition of the death penalty when the initial sentencing and resentencing both proceeded before a jury, did not apply to Davis. *Id*.; *see also id*. at 374 (Holmes, J., concurring in part and dissenting in part):

> The sole concern of the majority in *Penix* was that Ohio's death penalty statute did not expressly provide for either re-impaneling the original sentencing jury or impaneling a new jury upon remand from an appellate court, coupled with the realization of the practical difficulties inherent in such an undertaking. Such practical concerns are obviously not present in trials held before a three-judge panel.

### B.    First Resentencing

On remand, Davis was represented by Timothy Evans, Garretson, and Michael Shanks, and promptly moved to withdraw his jury waiver and to be resentenced to life imprisonment (State Court Record, ECF No. 4-11, PageID 1119-22). Davis moved to disqualify the three-judge panel and, in the alternative, prohibit any such panel from imposing a death sentence in light of *Penix*. *Id*. at PageID 1125-26, citing 32 Ohio St. 3d 369. Davis argued that, were he to be resentenced by a three-judge panel, he would be disadvantaged vis-à-vis an inmate for whom a jury would consider the imposition of the death penalty upon resentencing, as the panel would "not come to this resentencing with the same state of mind, knowledge of this case, nor disposition to hear this matter as when the case was originally heard." *Id*. at PageID 1126. However, in a July 25, 1989, affidavit, Daniel G. Eichel, the First Assistant Prosecuting Attorney for Butler County, averred that during the March 2, 1988, oral argument for *Davis II*, Evans, representing Davis, "was asked by one of the Justices whether the death penalty could again be sought on remand; Mr. Evans replied in the affirmative, and agreed with the Justice's comment that *Penix* would not apply because this was a three-judge panel rather than a jury trial." *Id*. at PageID 1149.

Judges Bruewer, Moser, and Stitsinger were again empaneled to conduct the resentencing, and on July 31, 1989, the panel overruled all of Davis's motions (State Court Record, ECF No. 4-11, PageID 1168-69). The first resentencing of Davis began with the resumption of deliberations on August 4, 1989, and on August 7, the panel resentenced Davis to death, finding the following mitigating factors to be "of slight weight":

> l) The Defendant adjusted well to prison routine and during his stay in prison, obtained a high school GED and an associate degree in Business Administration, and studied for and worked as a dental technician.

2 ) There has always been a good family relationship between the Defendant and all members of his family, including his stepfather.

3 ) Since his release on parole, he has maintained at least partial employment.

4) As testified by the psychologist, Defendant has a compulsory (sic) personality disorder or explosive disorder which may have contributed to the violence in this case.

*Id*. at PageID 1176-77. The panel found that those mitigating factors "were overwhelmingly counterbalanced and outweighed by the aggravating circumstance of his prior conviction for purposeful killing, demonstrating rather convincingly that a prior life sentence was no deterrent at all for this Defendant." *Id*. at PageID 1177.

### 1.    Twelfth District Court of Appeals

On appeal from the sentence on remand, Davis was represented by Randall M. Dana of the Ohio Public Defender (State Court Record, ECF No. 4-12, PageID 1227), and raised the following Assignments of Error:

FIRST ASSIGNMENT OF ERROR:  The trial court erred to the prejudice of Appellant Davis by failing to allow him to present all available, relevant mitigating evidence at his resentencing hearing.

1. A capital defendant, facing the possibility of a death sentence, must be entitled to introduce all available relevant mitigating evidence at a resentencing hearing.

SECOND ASSIGMENT OF ERROR:  The trial court erred to the prejudice of Appellant Davis by separating during its sentencing deliberations.

1. A sentence which is determined by a three-judge panel, where the panel conducted part of their deliberations individually and separate from one another, is a violation of due process of law as guaranteed

by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Sections 9 and 16, Article I of the Ohio Constitution.

THIRD ASSIGNMENT OF ERROR:  The trial court erred to the prejudice of Appellant Davis in overruling his motion to prohibit three-judge panel from resentencing to death and his motion to withdraw jury waiver.

1. The fact that a capital defendant tried before a three judge panel is eligible for the death penalty at a resentencing hearing, while a capital defendant tried before a jury is not, violates the principles of the due process and equal protection clauses; and

2. The jury waiver executed by Appellant Davis was not knowing, intelligent, and voluntary...

FOURTH ASSIGNMENT OF ERROR:  The death sentence imposed in Defendant-Appellant (sic) case was inappropriate and disproportionate and violated the Eighth and Fourteenth Amendments to the United States Constitution and Sections 9 and 16, Article I of the Ohio Constitution.

1. The imposition of a death sentence is inappropriate and a violation of Appellant's rights as guaranteed by the Eighth and Fourteenth Amendments and Sections 9 and 16, Article I of the Ohio Constitution where the sentencer does not consider all of the relevant mitigating evidence and accord each mitigating factor its proper weight; and

2. A sentence of death is disproportionate and a violation of Appellant's rights under the Eighth and Fourteenth Amendments to the United States Constitution and Sections 9 and 16, Article I of the Ohio Constitution where it is shown to be excessive when compared to cases already decided by the court in which the death penalty has been imposed.

FIFTH ASSIGNMENT OF ERROR:  The trial court erred in imposing the death sentence on Appellant Davis because the death penalty scheme in Ohio is unconstitutional.

1. The death penalty constitutes cruel and unusual punishment;

2. Ohio's capital punishment scheme allows for imposition of the death penalty in an arbitrary and discriminatory manner;

3. The death penalty violates due process;

4. Ohio's capital punishment scheme is unconstitutional because it requires proof of mitigating factors by a preponderance of evidence;

5. Ohio's death penalty does not ensure a sufficiently individualized determination in sentencing;

6. Ohio's capital felony murder scheme fails to narrow those offenders eligible for the death penalty;

7. The death penalty scheme imposes an impermissible risk of death on capital defendant's (sic) who choose to exercise their right to a jury trial;

8. Adequate appellate review of death sentences is precluded because trial courts do not file life [sentence] opinions;

9. Ohio courts' proportionality review fails to meaningfully distinguish between those capital defendants for whom death is appropriate, and those who are not; and

10. Ohio's capital statutes are mandatory in nature.

(State Court Record, ECF No. 4-12, PageID 1283-93).

The Twelfth District overruled all five Assignments on October 29, 1990. *Davis III*, 1990 WL 165137. As to the First Assignment, the panel held that "upon remand the lower court is required to proceed from the point at which the error occurred." *Id.* at *2, citing *State ex rel. Stevenson v. Murray*, 69 Ohio St. 2d 112, 113 (1982). As the reversible error (improper weighing of evidence) occurred *after* the submission of evidence, the procedural posture on remand was for the trial court to weigh properly the evidence *already submitted in the first sentencing phase*. "As the supreme court expressly held, a mere reweighing was all that was required." *Id.*, citing *Davis II*, 38 Ohio St. 3d at 373. Moreover, and contrary to the Second Assignment, as the "three-judge panel . . . is presumed to consider only the relevant material and competent evidence in arriving at

20

a judgment, unless the contrary appears from the record[,]" it was not error for the panel not to remain sequestered during the deliberative period between August 4 and August 7, 1989. *Id*. at *3, citing *State v. White*, 15 Ohio St. 2d 146, 151 (1968); Ohio Rev. Code § 2945.33.

The panel also overruled both sub-assignments in Davis's Third Assignment, holding that his initial jury waiver was knowing, intelligent, voluntary, and not the result of misinformation, and "[t]he fact that subsequent decisional law may or may not have affected the tactical decision to waive the right to trial by jury provides no avenue of relief for appellant at this stage of the proceedings." *Davis III*, 1990 WL 165137, at *3. "With respect to the ability of the three-judge panel to reimpose the death penalty, . . . the supreme court ruled that on remand 'the state may seek whatever punishment is lawful, including, but not limited to, the death sentence.' We have no discretion to disregard this mandate." *Id*., quoting *Davis II*, 38 Ohio St. 3d at 373; citing *Nickell v. Gonzales*, 34 Ohio *Nolan v. Nolan*, 11 Ohio St. 3d 1, syllabus (1984). In rejecting Davis's Fourth Assignment that the sentence imposed was disproportionate, the panel evaluated three other, purportedly similar, cases in which death sentences were imposed, and "[i]n comparing the facts and circumstances . . . with the instant case, we cannot say that the sentence of death is excessive." *Id*. at *4, citing *State v. Lawson*, No. CA8-05-044, unreported (Ohio App. 12th Dist. Jun. 4, 1990); *State v. Watson*, No. CA88-02-014, 1989 WL 30739 (Ohio App. 12th Dist. Mar. 31, 1989), *aff'd in part and rev'd in part*, *State v. Watson*, 61 Ohio St. 3d 1 (1991); *State v. DePew*, No. CA85-07-075, unreported (Ohio App. 12th Dist. Jun. 29, 1987), *aff'd, State v. DePew*, 38 Ohio St. 3d 275 (1988). In so holding, the panel also purported to discharge its statutorily-mandated independent review obligation. *Id*., citing Ohio Rev. Code § 2929.05(A); *State v. Steffen*, 31 Ohio St. 3d 111 (1987). The panel summarily dismissed Davis's Fifth Assignment and arguments that Ohio's death penalty scheme is unconstitutional, noting that "[e]ach of the . . . arguments was

21

considered and rejected" by the Supreme Court of Ohio. *Id*. at *5 (citations omitted).


### 2.      Supreme Court of Ohio


In his appeal to the Supreme Court, Davis was represented by Dana, Joann Bour-Stokes, and Linda Prucha (State Court Record, ECF No. 4-14, PageID 1489), and raised as Propositions of Law the Assignments of Error he had raised to the Twelfth District. *Id*. at PageID 1490-97. The Supreme Court of Ohio rejected all of Davis's Propositions and, in its own independent review, found the death sentence to be proportionate and appropriate. *Davis IV*, 63 Ohio St. 3d at 50-51, citing Ohio Rev. Code § 2929.04(A)(5); *State v. Mapes*, 19 Ohio St. 3d 108 (1985), *overruled on other grounds in State v. DePew*, 38 Ohio St. 3d 275, 285 (1988), *and vacated in part on other grounds by Mapes v. Coyle*, 171 F.3d 408 (6th Cir. 1999), and *Mapes v. Tate*, 388 F.3d 187 (6th Cir. 2004).


### C.      First Post-Conviction Petition

### 1.      Application and Denial at Trial Court


On October 8, 1993, Davis, represented by Bour-Stokes, James Kura, and Prucha, filed a Petition to Vacate or Set Aside Sentence pursuant to Ohio Revised Code § 2953.21 ("Initial Petition"), raising twenty-eight causes of action (State Court Record, ECF No. 4-17, Page ID 1824-64, ECF No. 4-18, PageID 1865-1934.). On October 18, 1993, the State filed an Answer and Motion to Dismiss, arguing that twenty-seven of the causes were barred by *res judicata*, as they were raised on direct appeal and adjudicated on the merits against Davis, or they were issues that could and should have been raised on direct appeal but were not (State Court Record, ECF No. 4-

20, PageID 2037-39, citing Ohio Rev. Code § 2953.21; *Greer*, 39 Ohio St. 3d at 244; *State v. Perry*, 10 Ohio St. 2d 175, 179-80 and syllabus (1967).  The State claimed that the following causes of action were barred by *res judicata* and otherwise were foreclosed as a matter of law by *Davis IV*:

1.  First:  Trial court overruling request for inspection of grand jury transcript;

2.  Second:  Insufficiency of evidence to support conviction;

3.  Third:  Refusal to sever charges in the indictment;

4.  Fourth:  Capital specification was too remote in time;

5.  Sixth:  Refusal to allow introduction of additional mitigation evidence in first resentencing;

6.  Seventh:  Improper review as to the propriety of the death sentence by the Twelfth District;

7.  Eighth:  Impropriety of death sentence;

8.  Ninth:  Failure by three-judge panel to sequester during deliberations in first resentencing;

9.  Tenth:  Failure to allow Davis to withdraw his jury waiver prior to first resentencing;

10.  Eleventh:  The statutorily-mandated appellate review for proportionality is "fatally flawed," as the comparators are only those cases in which a death sentence was also imposed[4];

11.  Twelfth:  Ohio's death penalty legislation is unconstitutional;

12.  Fourteenth:  No meaningful independent appellate review;

13.  Twenty-Second:  Conviction "was obtained through the use of an unnecessarily suggestive identification procedure";

---

[4] The State also argued that the Eleventh, Fourteenth, and Fifteenth Causes were "claim[s] relating to the validity of a judgment rendered in the Court of Appeals and is [sic] not cognizable by this court upon postconviction proceedings pursuant to R.C. 2953.21" (State Court Record, ECF No. 4-20, PageID 2043-45, citing *State v. Murnahan*, 63 Ohio St. 3d 60 (1992), *superseded by* Ohio R.App.P. 26(B)).

14. Twenty-Third: Death sentence is defective due to introduction of improper rebuttal testimony at sentencing phase in first sentencing;

15. Twenty-Sixth: Davis's prior conviction in 1971 for purposeful killing, was an improper death specification;

16. Twenty-Seventh: IATC for failure to investigate the validity of the death specification; and

17. Twenty-Eighth: Failure to allow Davis to introduce additional mitigation evidence at first resentencing.

*Id*. at PageID 2039-54.

Additionally, the State argued that the following claims were waived for failure to raise on direct appeal:

1. Fifth: Ineffective assistance of trial counsel ("IATC") in advising Davis to waive his right to a jury trial;

2. Ninth: *See infra*;

3. Thirteenth: Improper weighing of mitigation evidence in first resentencing[5];

4. Fifteenth: Appellate presumption that a three-judge panel considers "only relevant, material and admissible evidence," and that they need not worry about joinder of offenses or sequestration during deliberations as would a jury, constituted unconstitutional deference;

5. Sixteenth: Ohio Revised Code § "2929.03(D)(3) is unconstitutional in failing to prescribe a standard of proof for three-judge panels"[6];

6. Seventeenth: Original jury waiver was ineffective because "he was not informed that by waiving a jury he subjected himself to a greater risk of being sentenced to death";

---

[5] The State also argued that Davis had failed to state a claim upon which relief could be granted, because "the trial court is not required to accept as mitigating everything offered by the defendant and accepted into evidence," and "such error, if any, by the trial court in its sentencing decision may be cured by the independent sentence assessments in the Court of Appeals and Ohio Supreme Court." (State Court Record, ECF No. 4-20, PageID 2044).

[6] The State also noted that the statute at issue *does* set forth a burden of proof (State Court Record, ECF No. 4-20, PageID 2046, citing Ohio Rev. Code §2929.03(D)(2-3)).

7. Eighteenth: Original jury waiver was ineffective because he was misinformed of the respective burdens of proof by which the State would have to prove Davis's guilt to a jury versus a three-judge panel;

8. Twentieth: Original jury waiver was ineffective because Davis only made waiver after the improper denial of his motion to sever; and

9. Twenty-First: IATC in connection by failing to preserve an option for Davis to withdraw his jury waiver.

(State Court Record, ECF No. 4-20 PageID 2040-54).

The State did not argue waiver or *res judicata* as to Davis's Nineteenth Cause of Action—that his jury waiver was ineffective because "he was not informed that Judges Stitsinger and Moser, as attorneys[,] prior to their election to office as judges of the Butler County Common Pleas Court, had represented the Federal National Mortgage Company in a 1970 foreclosure action against defendant and his then-wife, Ernestine Davis[.]" (State Court Record, ECF No. 4-20, PageID 2049). Nonetheless, the State claimed that the claim failed as a matter of law because: (i) the Judges' past work was not material to their adjudication of Davis's criminal charges; (ii) Davis had not alleged prejudice; (iii) there is no evidence in the record that his waiver was not informed, knowing, and voluntary; and (iv) his "self-serving affidavit, that he would not have waived a jury had he been informed of such facts, is insufficient to warrant an evidentiary hearing." *Id*. The State did not expressly address Davis's Twenty-Fourth and Twenty-Fifth Causes of Action which were, respectively, his inability to introduce the testimony of lay witness Elbert Avery, and the panel's denial of his request for expert assistance at the first resentencing (State Court Record, ECF No. 4-18, PageID 1919-22).

On June 28, 1994, Judge Matthew J. Crehan of the Butler County, Ohio, Court of Common Pleas conducted a hearing on the State's Motion to Dismiss and, and on November 1, 1994, issued an order dismissing all claims except for the Nineteenth Cause of Action (State Court Record, ECF

25

No. 4-20, PageID 2093, 2099-2100). Judge Crehan rejected Davis's argument that "the defense of *res judicata* is invalid in a post-conviction action due to the classification of the action as a civil proceeding governed by Civ. R. 12(B)[,]" noting that ""[t]he law in Ohio as to the defense of *res judicata* in a post-conviction action has a long history." *Id*. at PageID 2095-96, citing *State v. Sentz* 70 Ohio St. 3d 527, 529 (1994); *Perry*, 10 Ohio St. 2d 175. He then concluded "that each of the petitioner's enumerated Causes of Action, except the Nineteenth Cause of Action, were raised or could have been raised at trial or on direct appeal, and were adjudicated against the defendant, hence res *judicata* bars Von Clark Davis's petition for postconviction relief" on all causes of action except the Nineteenth, which required evidence *dehors* the record to adjudicate. *Id*. at PageID 2096, 2098.

Judge Crehan conducted an evidentiary hearing on the Nineteenth Cause of Action on January 11, 1995 (State Court Record, ECF No. 4-20, PageID 2121). During the hearing, Judges Moser and Stitsinger testified that they were involved more than 250 foreclosure actions in the years 1969 and 1970 and did not recall the proceedings against Davis and Ernestine, even after the action was brought to their attention in 1984. *Id*. at PageID 2159-60. Judge Crehan concluded that, because there was no indication that Judges Moser and Stitsinger's involvement affected the proceedings or the judgment in the 1984 trial and sentencing and 1989 first resentencing, they did not exhibit the "bias, prejudice, or other disqualifying factors" that would have made their presence on the panel improper. *Id*. at PageID 2161. Further, as Judges Moser and Stitsinger were unaware of their past litigation against Davis at the time of Davis's jury waiver, their failure to inform Davis did not negate the validity of his jury waiver. *Id*. at PageID 2161-62, citing *Adams v. United States ex rel. McCann*, 317 U.S. 269, 281 (1942); *State v. Jells*, 53 Ohio St. 3d 22, 26 (1990). Concluding "that there was no infringement of Petitioner's Constitutional rights so as to render the judgements

in this case to be void or voidable[,]" Judge Crehan dismissed the Nineteenth Cause of Action and, consequently, his Petition as a whole. *Id*. at PageID 2162.

### 2. Twelfth District Court of Appeals

Davis appealed the trial court's denial of his Petition to the Twelfth District and raised twenty-one Assignments of Error. *First*, he claimed that "the trial court erred when it denied Appellant Davis an evidentiary hearing based on the doctrine of *res judcata*." (State Court Record, ECF No. 4-21, PageID 2232). The Second through Twentieth Assignments of Error concerned the trial court's dismissal of the various causes of action in his Petition. *Id*. at PageID 2234-49. Finally, he claimed that the fifty-page briefing limit in a complex capital case meant that his postconviction remedy was so inadequate as to constitute a denial of due process. *Id*. at PageID 2249.

On September 30, 1996, the Twelfth District rejected all three Assignments of Error, and affirmed the trial court's denial of the petition. As to the issue of *res judicata*, the Twelfth District noted that "[t]he [trial] court may refuse to grant a hearing . . . if a constitutional claim is advanced but the issue was or could have been raised at trial or on direct appeal." *Davis VI*, 1996 WL 551432, at \*2, citing Ohio Rev. Code § 2953.21(E); *Perry*, 10 Ohio St. 2d at 175, paragraph nine of the syllabus; *State v. Combs*, 100 Ohio App. 3d 90, 97 (Ohio App. 1st Dist. 1994). The court rejected Davis's arguments that *res judicata* is not a defense that may be raised in a motion to dismiss, and "that *res judicata* cannot bar a post-conviction relief claim supported by evidence outside the record." *Id*., citing Ohio Civ.R. 12(B)(6). The court noted that a postconviction petition, although civil in nature, is a creature of statute, meaning that Ohio Revised Code §2953.21 *et seq*. governed, not the Ohio Rules of Civil Procedure, and the statutory provisions had been

27

consistently interpreted to allow for summary dismissal of a petition if it "does not allege facts which, if proved, would entitle the prisoner to relief." *Id*., citing *Perry*, 10 Ohio St. 2d at 175, paragraph two of the syllabus. The court also noted that the Supreme Court of Ohio had upheld the use of *res judicata* to summarily dismiss those claims brought in postconviction that were or could have been raised at trial or on direct appeal. *Id*., citing *State v. Lester*, 41 Ohio St. 2d 51, 54-55 (1975). Adhering to that precedent, the Twelfth District summarily concluded that the trial court did not err in dismissing without a hearing those claims that were barred by *res judicata*, and overruled Davis's First Assignment of Error, and also analyzed and overruled Assignments of Error Nos. 2-6, 8-14, and 16-20 (the dismissals of Davis's specific causes of action as barred by *res judicata*) on that basis. *Id*. at*3-9.

The appellate panel considered and overruled the Seventh Assignment—the presumption that a three-judge panel only considers "proper and competent evidence"—as procedurally defaulted and improperly raised in a postconviction petition, as that presumption is applied at the appellate, rather than trial, level. *Davis VI*, 1996 WL 551432, at *5, citing *State v. Murnahan*, 63 Ohio St. 3d 60, 63 (1992); *Combs*, 100 Ohio App. 3d at 97. The court held that Davis's Fifteenth Assignment—that improper evidence regarding his prior homicide conviction was introduced in rebuttal in the penalty phase—was a constitutional issue available to him on direct appeal, and thus, could not be raised in postconviction. *Id*., citing *Perry*, 10 Ohio St. 2d at 175, paragraph seven of the syllabus. Finally, the panel concluded that Davis's Twenty-First Assignment failed on its merits, as the trial court did not abuse its discretion in denying Davis's motion to file an oversized brief. *Id*., citing *State v. Bonnell*, 61 Ohio St. 3d 179, 185-86 (1991); *State v. Powell*, 90 Ohio App. 3d 260, 271-72 (Ohio App. 1st Dist. 1993). Overruling all Twenty-One Assignments

of Error, the Twelfth District affirmed the denial of Davis's post-conviction petition. *Id*. at *10.[7] The Supreme Court of Ohio declined jurisdiction over Petitioner's appeal. *Davis VII*, 77 Ohio St. 3d 1520.

### D.     Application to Reopen Direct Appeal

On August 21, 1998, Davis, represented by Lori Leon and John Marshall, filed Applications to Reopen his Direct Appeals from both his original trial and sentencing and first resentencing under Ohio R.App.P. 26(B) and *Murnahan*, claiming ineffective assistance of appellate counsel ("IAAC"). *Davis VIII*, 86 Ohio St. 3d at 213. Therein, Davis argued that "[a] reasonable probability exists that, but for such ineffective assistance, Mr. Davis' aggravated murder conviction would have been reversed and his death sentence would have been vacated." (State Court Record, ECF No.4-25, PageID 2802). Davis claimed that he should be excused from the time limitations in Rule 26(B) and *Murnahan*, as the alleged ineffective assistance pertained to a judgment filed by the Twelfth District in 1986, long before the *Murnahan* decision or Rule 26(B) was issued. *Id*. at PageID 2804. He argued that the inexperience of his appellate counsel, who had never represented a capital defendant on appeal before, resulted in his failing to raise the following Assignments of Error:

> 1.  His conviction resulted from supposed eyewitnesses being subjected to unnecessarily and unconstitutionally suggestive identification procedures by police;
>
> 2.  IATC due to the decision to call a prejudicial witness, who identified Davis as the killer, as an adverse witness for the purposes of

---

[7] Davis, in the appendix to his appellant brief, raised nine additional assignments of error, none of which differed substantively from the twenty-one raised in his appellant brief (State Court Record, ECF No. 4-21, PageID 2321-53). The panel "reviewed the nine assignments of error raised in the appendix to appellant's brief and conclude[d] that each was properly dismissed by the trial court on *res judicata* grounds." *Davis VI*, 1996 WL 551432, at *9 n.3.

impeaching him;

3. The trial court erred in denying his motion to sever the charges, which led to his jury waiver, and IATC in failing to ensure waiver was voluntary;

4. IATC in failing to inform him of the consequences of his waiver, which gave rise to a greater possibility of a death sentence;

5. The jury waiver was invalid;

6. IATC in failing to inform Davis that decision of three judge panel would be subject to more deferential review on appeal than jury verdict;

7. Rebuttal evidence introduced by the state in the sentencing phase was improper, and IATC in failing to object to the introduction of said evidence;

8. Ohio's death penalty scheme regarding proof of mitigating factors is unconstitutional, and IATC was ineffective in failing to object to same;

9. Racial discrimination exists in the selection of the grand jury foreperson, grand jury members, and petit jury members, and IATC in failing to file motions to quash or dismiss the indictment on that ground; and

10. Presiding judge erred in considering Davis's failure to take responsibility for the crimes, and trial counsel was ineffective in failing to object to same.

*Id*. at PageID 2804-10.

On January 13, 1999, the Twelfth District denied reopening (Entry, unreported, copy at State Court Record, ECF No. 4-25, PageID 2855 *et seq.*). The panel noted the Supreme Court of Ohio's holding that:

> [A]n applicant who seeks to reopen an appellate judgment journalized before July 1, 1993 may not simply rely on the fact that App.R. 26(B) did not exist within the ninety days following journalization of the appellate judgment, but must show good cause why he or she did not attempt to invoke the procedures available under former App.R. 26 and 14(B).

*Id*. at PageID 2858, quoting *State v. Reddick*, 72 Ohio St. 3d 88, 90 (1995). The Twelfth District

also noted that, when Rule 26(B) was amended in light of *Murnahan*, the amended rule provided

for newly viable applications to reopen to be filed no later than September 30, 1993; yet, Davis's

"applications were filed . . .  nearly five years after the effective date of App.R. 26(B)."  *Id* at

PageID 2858-59.  As Davis had not even attempted to demonstrate good cause as to why he did

not file a timely application with respect to his original trial and sentencing, the application was

now improper.  The Twelfth District also held that the recent withdrawal of his appellate attorney

from his first resentencing (who could not, of course, raise an IAAC claim against himself) was

not, without more, good cause to excuse his late filing as to the direct appeal from that latter

resentencing.  *Id*. at PageID 2859-60.  Absent any good cause, the panel denied the applications as

untimely.  *Id*. at PageID 2860.

The Supreme Court of Ohio affirmed the Twelfth District's ruling that the applications

were untimely, noting that:

> Admittedly, counsel cannot be expected to argue their own
> ineffectiveness. However, Davis has gone through several different
> sets of appellate lawyers since his initial appeal in 1986. Moreover,
> Lori Leon has represented him since at least March 1997, and Davis
> has not explained his failure to file between March 1997 and August
> 1998. Even if we were to find good cause for earlier failures to file,
> any such good cause "has long since evaporated. Good cause can
> excuse the lack of a filing only while it exists, not for an indefinite
> period."

*Davis VIII*, 86 Ohio St. 3d at 214, quoting *State v. Fox*, 83 Ohio St. 3d 514, 516 (1998) (*per*

*curiam*); citing *State v. Lentz*, 70 Ohio St. 3d 527, 529-30 (1994).


### E.    First Federal Court Petition

#### 1.    Initial Proceedings


On April 28, 1997, Davis filed his Petition for Writ of Habeas Corpus ("First Petition") in

this Court, raising twenty-eight claims for relief (*Davis IX*, No. C-1-97-402, ECF No. 1). On December 23, 1997, Judge James L. Graham concluded that ten of the claims in the First Petition were procedurally barred and allowed the remaining eighteen to proceed (Opinion and Order, ECF No. 29, docketed in the instant case at ECF No. 16-1). On March 31, 2000, Judge Graham denied Davis's motion for an evidentiary hearing (Order, ECF No. 130). While on October 5, 2000, Davis filed an Amended Petition for Writ of Habeas Corpus (ECF No. 132), the Court "later concluded that the additional [fourteen] issues" raised therein "were also procedurally barred." *Davis X*, 475 F.3d at 766. On September 4, 2001, Judge Graham entered an Order dismissing the First Petition, without an evidentiary hearing, and directing final judgment to be entered (*Davis IX*, ECF No. 139, docketed in the instant case at ECF No. 16-2), but also issuing a certificate of appealability as to the eighteen non-defaulted issues. *Davis X*, 475 F.3d at 766. Judgment was entered the same day (*Davis v. Coyle*, ECF No. 140).

On September 18, 2001, Davis filed a timely Motion to Alter or Amend the Judgment ("Motion to Amend," ECF No. 141). On January 17, 2002, Judge Graham issued an Opinion and Order denying the Motion to Amend. *Davis v. Coyle*, No. C-1-97-402, 2002 WL 193579. Judge Graham noted that Davis had relied upon *Greer v. Mitchell*, 264 F.3d 663 (6th Cir. 2001), and *Mapes v. Coyle*, 171 F.3d at 429, "for the proposition that an evaluation of all of the circumstances, especially on issues of attorney ineffectiveness, can only be accomplished with full and fair discovery and a full and fair evidentiary hearing." *Id*. at *1. Judge Graham noted that, unlike in *Greer* and *Mapes*, Davis's IAAC claims were procedurally defaulted, and concluded that Davis had not established the cause and prejudice necessary to excuse the procedural default. *Id*. at *2. Moreover, an evidentiary hearing was not necessary, because the Court's enforcement of procedural default and denials on the merits of Davis's claims for relief were based on "undisputed

principles of constitutional law and essentially assumed as true the facts alleged by petitioner." *Id*. Accordingly, the Court held, Davis had not demonstrated "a clear error of law or manifest injustice[,]" such that would justify granting his Motion to Amend and convening an evidentiary hearing. *Id*. at *3.

The Court also rejected Davis's argument that statements from then-Supreme Court of Ohio Associate Justice Paul Pfeifer that "the Ohio Supreme Court's statutorily-mandated proportionality review under O.R.C. 2929.05 is little more than lip service[,]" *Davis IX*, 2002 WL 193579, at *3 (internal quotation marks and citation omitted), constituted newly discovered evidence "that the Ohio Supreme Court does not conduct appellate review in good faith, thereby violating petitioner's due process rights." *Id*. The Court found that, because the statements were made prior to the Entry of Judgment, they could have been discovered with reasonable diligence by Petitioner prior to the Initial Petition's dismissal, and thus were not "newly discovered," such that relief under Rule 59(e) was warranted. *Id*. at *4. Also, the lack of any constitutional guarantee of proportionality review, along with Sixth Circuit precedent rejecting a challenge to Ohio's proportionality analysis, meant that Justice Pfeifer's statements were not a viable basis upon which to alter judgment. *Id*., citing *Pulley v. Harris*, 465 U.S. 37 (1984); *Greer*, 254 F.3d at 691. Finally, Judge Graham rejected Davis's argument that Dr. Fisher's appointment not as a defense expert, but as a neutral presentence investigation "expert pursuant to O.R.C. § 2929.03(D)(1), who was obligated to report his findings to the prosecution and the trial court[,]" was a viable basis upon which to alter or amend the judgment. *Id*. at *5. The Court noted that Davis was raising this argument for the first time, despite the argument's not being based on newly-discovered evidence; consequently, Davis was "not entitled to Rule 59 relief based on [that] argument[.]" *Id*., citing *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998).

### 2.        Sixth Circuit

Davis timely appealed the denial of his *habeas corpus* petition to the Sixth Circuit, raising the eighteen issues certified by Judge Graham, and a nineteenth issue certified by the Sixth Circuit panel.  *Davis X*, 475 F.3d at 766.  However, Davis subsequently" abandoned several of those certified questions."  *Id.*

> Most of the remaining issues present challenges to the process of the petitioner's resentencing, including his contentions that he should have been allowed to withdraw his jury waiver prior to resentencing because it had been involuntarily entered at the time of his original trial, that it was error to deny his requests both for the appointment of additional experts and to introduce new mitigation evidence, that the three-judge panel should not have separated during deliberations, and that the Ohio Court of Appeals did not review adequately on direct appeal either his original sentence or the reimposed sentence. Davis also challenges the district court's determination that several of the issues in his habeas petition were procedurally defaulted either because they were not raised on direct appeal in the state courts or because they were raised in an untimely motion to reopen his appeal in state court.

*Id.*  The appellate panel noted that, despite the Supreme Court of Ohio's order remanding the case "'for *a new sentencing trial* at which the [improper factors] shall not be considered as aggravating circumstances in the weighing process[,]' . . . the reconstituted three-judge panel declined to interpret the ruling to require a full sentencing trial, or even an evidentiary hearing."  *Id.* at PageID 769 (emphasis and brackets in original), quoting *Davis II*, 38 Ohio St. 3d at 372.  The trial court panel heard argument from Davis and the State and allowed Davis to make a proffer as to certain additional mitigating evidence he would have presented.  However, the panel also set forth its belief that its job, on remand, was to weigh the sole aggravating factor—the killing of Ernestine Davis—against the mitigation factors as they existed at the time of Butler's killing, and its opinion

34

consisted of little more than a recitation of the statutory mitigation factors and a conclusion the aggravating circumstance outweighed those mitigating factors. *Id*. at 769-70.

The Sixth Circuit held that the failure by the trial court to allow Davis to present evidence of "his exemplary behavior on death row in the time between the two sentencing hearings violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments[,]" as "the right of a defendant to present evidence of good behavior in prison is particularly relevant when a prediction of future dangerousness figures centrally in a prosecutor's plea for imposition of the death penalty." *Davis X*, 475 F.3d at 770-71, citing *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986); *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982); *Lockett v. Ohio*, 438 U.S. 586, 597, 604 n.12 (1978). This was of concern in Davis's case, as the State argued during resentencing "that Davis's status as a repeat offender rendered him too dangerous for anything other than a death sentence[.]" *Id*. at 772. In light of the above consideration, the Ohio appellate courts' conclusions that *Lockett* and its progeny are satisfied if a defendant can introduce evidence of good behavior between arrest and trial "w[ere] 'contrary to' United States Supreme Court decisions[,]" *id*., citing *Williams (Terry) v. Taylor*, 529 U.S. 362, 413 (2000), and thus, not subject to deference under the AEDPA. 28 U.S.C. § 2254(d)(1). "[B]ecause the improperly-excluded mitigation evidence was never put into the record[,] . . . the case must be remanded for a new sentencing hearing." *Id*. at 774-75, citing *Skipper*, 476 U.S. at 8.

The Sixth Circuit rejected Davis's argument that the denial of his motion to sever, and his consequent decision to waive his right to a jury trial, were grounds for federal habeas relief; *i.e.*, "that misjoinder of the counts 'resulted in prejudice so great as to deny [a defendant] . . . his right to a fair trial.'" *Davis X*, 475 F.3d at 777 (alteration in original), quoting *United States v. Lane*, 474 U.S. 438, 446 n.8 (1986). The court noted that the Ohio appellate courts' upholding of the

trial court's decision, as state court interpretations of state law, "and, as a result, we must accept as binding the state supreme court's interpretation of the interaction between the capital specification-election provision, and the rules for joinder and severance of criminal charges." *Id.*, citing Ohio Rev. Code § 2929.022(A); *Davis II*, 38 Ohio St. 3d at 364; *Davis I*, 1986 WL 5989 at *8. The panel concluded that that, while "[w]ithout question, a risk of undue prejudice exists whenever joinder of counts permits introduction of evidence of other crimes that would otherwise be inadmissible[,]" the Supreme Court had previously held in a similar case "that the prejudice suffered by a defendant in such a case does not rise to the level of a violation of due process." *Id.* at 777-78, citing *Spencer v. Texas*, 385 U.S. 554, 560-62 (1967).

The Sixth Circuit also rejected Davis's argument that the trial court violated his equal protection rights in denying his motion to withdraw his jury waiver before resentencing in light of the Supreme Court of Ohio's intervening holding "that a capital defendant who is sentenced by a jury in the first instance becomes ineligible for the death penalty following reversal of that sentence." *Davis X*, 475 F.3d at 779, citing *Penix*, 32 Ohio St. 3d at 373, *abrogated by* Ohio Rev. Code § 2929.06(B). The court noted that, while in *Ring v. Arizona*, the Supreme Court

> [D]id recognize that Sixth Amendment jurisprudence now requires that *a jury* find, beyond a reasonable doubt, any fact necessary to increase a defendant's authorized punishment. *Ring*, however, post-dates not only the petitioner's sentencing and resentencing, but also the denial of habeas relief by the district court. Consequently, the state courts cannot be faulted for failing to analyze Davis's motion to withdraw his jury waiver under a fundamental-rights-analysis when the right in question had yet to be recognized by the Supreme Court in the context raised by the petitioner.

*Id.* at 780, citing *Ring*, 536 U.S. 584, 602 (2002). The panel also found that the statute did not lack any conceivable reasonable basis, such that it would violate the "rational basis prong of an equal protection analysis." *Id.* Thus, the panel concluded, Davis's resentencing by a three-judge panel

did not entitle him to federal habeas relief. *Id*.

Nonetheless, the Sixth Circuit expressed, in *dicta*, concerns about the continued validity of the jury trial waiver on remand for resentencing:

> We note that under Ohio Revised Code § 2945.05, a waiver of jury trial "may be withdrawn by the defendant at any time before the commencement of trial." Granted, the resentencing hearing that we order today will not constitute a "trial" in the sense that the petitioner's guilt or innocence is again at issue. However, in this case, the proceeding can indeed be considered the functional equivalent of "trial" because, unlike sentencing in a non-capital case, it will take the form of an evidentiary proceeding on the question of whether Davis should receive the death penalty or some form of a life sentence.
>
> Moreover, we think there is a legitimate question as to whether a criminal defendant should be held to a jury waiver entered almost 25 years before his newly-mandated sentencing hearing. In the Sixth Circuit, at least, we have recognized that a defendant's jury waiver entered prior to the first trial of his case does not bar his right to a jury trial on the same case after remand from a reviewing court.

*Id*. at 780, quoting Ohio Rev. Code § 2945.05, citing *United States v. Groth*, 682 F.2d 578, 580 (6th Cir. 1982).

### F. Second Resentencing

On remand, Davis was represented by Randall Porter and Melynda Cook-Reich (State Court Record, ECF No. 4-29, PageID 3231). On May 26, 2008, they filed a Motion to Preclude Imposition of the Death Penalty on the basis that Ohio's lethal injection protocol constituted cruel and unusual punishment. *Id*. at PageID 3329-52. They also moved to dismiss the capital specification in the indictment (State Court Record, ECF No. 4-34, PageID 4053-97), to suppress pretrial and trial eyewitness identifications, *id*. at PageID 4102-07, and for limited discovery. *Id*. at PageID 4108-12. Davis filed a memorandum setting forth his argument that he was "entitled to

have a jury for purposes of his re-sentencing hearing[,]" *id*. at PageID 4155, and filed a Motion to

Preclude the State from Seeking the Death Penalty (State Court Record, ECF No. 4-35, PageID

4218-36). On May 11, 2009, a three-judge panel of Judges Andrew Nastoff (Presiding), Charles

L. Pater, and Keith M. Spaeth was appointed to hear testimony in the second resentencing (State

Court Record, ECF No. 4-38, PageID 4837).

The resentencing hearing took place from September 8-10, 2009, "to determine whether

the single aggravating circumstance in this case outweighed the mitigating factors beyond a

reasonable doubt." (State Court Record, ECF No. 4-39, PageID 4926; *see also* 2nd Resent'g Tr.,

ECF No. 5-7, PageID 8199 (statement of Judge Pater that "we are not going to take into

consideration any other aggravating circumstance other than" the 1971 conviction.)). During oral

argument, Judge Pater termed "ludicrous" Davis's argument that the panel, in its consideration of

the aggravating circumstance, could "only take cognizance of the fact that there was a previous

conviction . . . when the person committed the murder at question in the current case[,]" rather

than the fact that Davis's previous conviction was for the purposeful killing of his significant other

(2nd Resent'g Tr., ECF No. 5-7, PageID 8201). The State argued that testimony regarding the prior

killing—not merely the fact of conviction—was allowed at the original trial, and that the law of

the case dictated that such evidence could be considered in the panel's weighing of the aggravating

circumstance. *Id*. at PageID 8203-04. The court ruled that:

> [W]hile the law requires us to consider evidence and testimony
> about the nature and circumstances of the aggravating circumstance
> that is relevant to the aggravating circumstance, what the state is
> going to be expected to present is evidence that is re1evant to the
> conviction, the nature and circumstances relevant to the fact of the
> conviction so that is what the State is going to be limited to as we
> go forward.

*Id*. at PageID 8211. Counsel for the State, in opening statements, stated that Davis would be

sentenced under the statute as it was written at the time of the murder, which meant that he was

ineligible for life without parole.  Rather, if the panel decided not to sentence Davis to death, the maximum sentence that could be imposed was thirty years to life for murder, with eighteen months of his sentence for having a weapon to be served consecutively.  As Davis had already been incarcerated for twenty-five years, Randall Porter, counsel for Davis, conceded that Davis would be eligible for parole within six years.  *Id.* at PageID 8227.  However, Porter argued that, while life without parole was not a possible *de jure* sentence, it was almost certain to be the *de facto* sentence, as "Cynthia Mausser, who is the head of the Ohio Parole Board, who will testify [that] based upon his prior record, [and] the fact that he committed the second murder, while he was still on parole from the first murder . . . he will not be paroled."  *Id.* at PageID 8225-26.  Prior to the beginning of live testimony, Davis gave an unsworn statement, in which he apologized for "the pain and grief I have caused the Butler family with the horrendous loss of their loved one . . . I will repeat[: T]his was nothing but any evil act by me."  *Id.* at PageID 8235.  Upon questioning by Cook-Reich, Davis expressly affirmed that his statement constituted him taking responsibility for Butler's murder.  *Id.* at PageID 8235-36.

The three-judge panel then heard testimony from Frances[8] Welland, Davis's prison pen pal, who described Davis's good character in their correspondence and face-to-face meetings, and Davis's true remorse over what he had done (2nd Resent'g Tr., ECF No. 5-7, PageID 8236-52).  Victor Davis, Davis's younger brother, testified regarding their father's abandoning the family when he and Davis were young, *id.* at PageID 8270-71, and that Davis expressed true remorse while incarcerated.  *Id.* at PageID 8278.  After his testimony, Judge Pater stated that he "didn't know who the witnesses were going to be at the trial today[,]" but that he had known Victor "since high school days and we are good friends, but I do think I can fairly and impartially decide this

---

[8] Erroneously transcribed as "Francis."  (2nd Resent'g Tr., ECF No. 5-7, PageID 8237).

matter, so I just wanted to put that on record." *Id*. at PageID 8285-86.  Subsequently, counsel for the State informed the Court that he had gone to high school with Judge Pater's wife, and Judge Nastoff stated that, while he did not know Victor personally, he knew of Victor's (seemingly positive) reputation in the community.  *Id*. at PageID 8286-87.

Sherry Davis, daughter of Davis and Ernestine, testified that she and Davis "have a strong bond[,]" despite Davis having been incarcerated for almost her entire life (2ⁿᵈ Resent'g Tr., ECF No. 5-7, PageID 8289).  She stated she had forgiven Davis for killing Ernestine, continuing that "I have had my mother taken away from me.  I would not like to see my father taken away from me as well." *Id*. at PageID 8290-91.  Charles Tipton, Davis's stepfather, testified that he and Davis had been "very, very close" when Davis was a child, never missing a weekly fishing trip. *Id*. at PageID 8297.  Alluster Tipton, Davis's mother, testified that Nicholas Davis, her ex-husband and Davis's father, was in and out of their lives before he left for good, and had a drinking problem that affected their household.  She also stated that Davis would still be a part of her life, even if he were incarcerated for the rest of his life. *Id*. at PageID 8307-08, 8310-11.  Carol Smith, Davis's sister, testified that Davis was still "a good person deep inside[,]" and that even though "he has taken [lives], but the part that he does is good right now, and I would like to see it continued." *Id*. at PageID 8319, 8320.  After her testimony, Judge Mastoff stated on the record that, prior to becoming a judge, he had prosecuted Smith's son, *i.e.*, Davis's nephew, in a capital murder case, although the death penalty was not imposed. *Id*. at PageID 8321.  Porter responded that, "we were aware that your Honor, that you were involved in the prosecution, and we made a decision long ago not to challenge you on that." *Id*. at PageID 8322.

Cynthia Mausser testified as the chair of the Adult Parole Board of the Ohio Department of Rehabilitation and Corrections ("ODRC"), having previously worked at the office of the Ohio

Public Defender (2nd Resent'g Tr., ECF No. 5-7, PageID 8335-38). She explained that, if a board member is "leaning towards" releasing an offender, a psychological assessment will be conducted on the inmate, and the examining psychologist will submit a report evaluating the inmate, which will be part of the board's evaluation of specified risk factors and its general assessment of risk. *Id*. at PageID 8340-42. Mausser testified that as to one of the seventeen statutorily mandated factors, the seriousness of the previous offense on a scale from one to thirteen, aggravated murder would be rated a thirteen. *Id.* at PageID 8344. She also stated that factors present with Davis— seriousness of the offense, that he committed the offense while on parole—would increase his "criminal history risk" score. *Id*. at PageID 8344-46. More importantly, Davis would require a full board hearing and a majority of board members voting for release before parole could be granted. *Id*. at PageID 8346-47.

Mausser testified that repeat criminal behavior and a recommendation by the court against release would be considered "negative factors" by the board (2nd Resent'g Tr., ECF No. 5-7, PageID 8348-49). She concluded her direct testimony by stating that it was highly unlikely that an inmate with Davis's circumstances would be granted parole at his first hearing, and that "that person would have to -- would likely spend a large portion of the remainder of their life in prison." *Id*. at PageID 8365. However, she conceded on cross-examination that her testimony was based on her years of service on the board, and that she could not reasonably predict how a particular board member might vote—indeed, she testified, it would be inappropriate for her even to guess as to how she or other board members might vote if Davis's case were to come before the board. *Id*. at PageID 8378-79.

Jerome Steinman, an attorney who volunteered at an Alcoholics Anonymous ("AA") group where Davis was incarcerated, testified that he and Davis participated in approximately 48 AA

meetings per year between 1990 and 1993 (2nd Resent'g Tr., ECF No. 5-7, PageID 8382-83). Steinman stated that in those meetings, Davis disclosed that he was "in blackout" when he killed Butler. *Id*. at PageID 8383. On cross-examination, Steinman testified that Davis's statements that he drank only a little was not inconsistent with him being an alcoholic, as many alcoholics understate the amount of their drinking. *Id*. at PageID 8385. Steinman also said that only drinking one beer, eating food, and driving a car the night of the murder (as Davis had indicated in previous statements to law enforcement) were not necessarily inconsistent with Davis's statement to Steinman that Davis was in a blackout state when he killed Butler. *Id*. at PageID 8386.

Prior to Patrick Michael ("Rick") Rotundo testifying, Judge Pater indicated that, while he did not "know Rick Rotundo very well[,] I know his brother, Jerry and his little sister Debbie. I know the two of them quite well and I know the Rotundo family[.]" (2nd Resent'g Tr., ECF No. 5-8, PageID 8396-97). Counsel for Davis declined to *voir dire* Judge Pater on the issue. *Id*. at PageID 8397. Rotundo testified that he lived next door to Davis for approximately six years, and that Charles and Alluster Tipton and their children were "like my second family[,]" *id*. at PageID 8398, and that he and Davis "were like brothers." *Id*. at PageID 8403. He testified that they drank together sporadically, but that the environment was "not similar to the Animal House." *Id*. at PageID 8400. Scott Nowak, the Program Specialist Director for the Ohio State Penitentiary at Youngstown, *id*. at PageID 8406-07, testified that Davis had been housed in the "extended privilege unit" of death row since May 2006, meaning he had had no behavior violations since at least May 2003. *Id*. at PageID 8417-19.

Robert Smith, Ph.D., testified as an expert psychologist and certified addiction specialist, (2nd Resent'g Tr., ECF No. 5-8, PageID 8420-22). He conducted two interviews with Davis in 2009, doing a "comprehensive psychosocial history . . . , a diagnostic workup and a mental status

42

examination." *Id.* at PageID 8432. Dr. Smith also interviewed Charles and Alluster Tipton, Elliot

Davis (Davis's brother), Victor Davis, Carol Smith, and Rick Rotundo, in an attempt "to get

corroborating data[,]" *id.* at PageID 8433, for the statements made to him by Davis, voluminous

documents relating to Davis and the case, and psychological evaluations from 1971 through 2002.

*Id.* at PageID 8434-37. From the review and evaluation, he opined:

> [T]hat at the time of the offense[,] Von was suffering from two
> psychological disorders. One would be alcohol dependence and the
> other would be borderline personality disorder. And that both of
> these disorders were present and that they interfered with his
> cognitive functioning, that they impaired or diminished his ability at
> the time of the offense.

*Id.* at PageID 8438.

Dr. Smith described how borderline personality disorder is characterized by poor impulse

control, and that lack of control manifested itself early in Davis's life, when he went absent without

leave ("AWOL") from the Navy in an attempt to reconnect with his biological father, with whom

he had not been in contact for several years (2nd Resent'g Tr., ECF No. 5-8, PageID 8440-41). As

borderline personality disorder was not an accepted diagnosis until 1987, it could not have been

evaluated by the trial court as a mitigating factor during his initial sentencing. *Id.* at PageID 8450.

Dr. Smith testified that the borderline personality disorder and alcohol dependence did not render

Davis "totally unable to appreciate that his behavior was wrong[,]" *id.* at PageID 8442, and that

the original examining psychologist was correct to conclude that Davis's capacity was not so

severely diminished that he would have a colorable defense of not guilty by reason of insanity. *Id.*

at PageID 8450-51. "But [the original examining psychologist] did indicate during his testimony

that there was evidence of an explosive psychiatric disorder." *Id.* at PageID 8451. Dr. Smith also

testified that the 1994 psychological evaluation of Davis, in which he was diagnosed with "mood

disorder and mixed personality disorder with anti-social traits . . . is not inconsistent with

borderline." *Id*. at PageID 8451-52. Dr. Smith stated that Davis's home life, in which his mother and birth father, Nicholas Davis, were "dysfunctional" and "had significant problems that prevented them from being able to be there for him." *Id*. at PageID 8458-59. While Charles Tipton tried to be a more stabilizing influence on Davis, he and Alluster did not get married until "Von is 14[,] and by that point Von's use of alcohol, his investment in school, his other problems" had taken over. "He is running the streets, he is with his peers, . . . [s]o although I think Charles would have been well intentioned, he couldn't have that impact." *Id*. at PageID 8465. Davis increasingly used alcohol to deal with his emotional discomfort and jealousy over Ernestine and Butler becoming involved with other men. *Id*. at PageID 8467. His borderline personality disorder caused him to overreact to stress, in a manner that is "very aggressive and very angry." *Id*. at PageID 8469. While Davis had had treatment for his alcohol abuse, a condition he had had since the age of seventeen, *id*. at PageID 8477, he had not been treated simultaneously for BPD. Dr. Davis stated that: "If you treat just one disorder and not the other, the individual will not be successful in their recovery. . . . [S]o as a result, he continued to abuse alcohol[,]" in addition to continuing to suffer from BPD. *Id*. at PageID 8473.

Nonetheless, Dr. Smith testified, people with borderline personality disorder and "with alcohol dependence do very well in a structured environment . . . like prison," because "first of all, what you've done is you've greatly reduced the likelihood that they can access alcohol and drugs." (2nd Resent'g Tr., ECF No. 5-8, PageID 8473). "The second thing is, if I have . . .poor decision making and difficulty with relationships, in a prison setting, I don't have a lot of decisions to make, I don't have lots of opportunities to act out and I also don't form lots of relationships." *Id*.

On cross-examination, Dr. Smith conceded that he did not prepare a written report on

Davis, as he had not been asked to by counsel; rather, the PowerPoint slides he created were "a summary of my findings and of my opinion . . . contain[ing] everything that would be in a report[.]" (2nd Resent'g Tr., ECF No. 5-8, PageID 8485-86). Dr. Smith also stated that, in their meetings Davis was not "all that motivated to helping himself[,]" *id.* at PageID 8488; rather, he minimized the extent of his substance abuse issues and denied that he had any personality disorder. *Id.* Dr. Smith acknowledged that Davis's statements to him, in which he accepted responsibility as the sole person responsible for Butler's murder, were inconsistent with his testimony during the guilt phase of the initial trial, in which he averred that it was Silkey Carr who killed Butler. *Id.* at PageID 8489-90. He also opined that Davis's borderline personality disorder and alcohol dependence, while serious, did not rise to the level of psychosis, legal insanity, or other inability to discern right from wrong. *Id.* at PageID 8492-93.

In closing arguments, Cook-Reich reiterated that Davis was asking the panel to reject the sentences of death or twenty years to life imprisonment, and impose a sentence of thirty years to life, because based on "the evidence presented[,] 30 to life is in essence . . . life without the possible (sic) of parole. And it is LWOP, because of his history, no parole board I submit to you is going to by majority vote release Von Clark Davis[.]" (2nd Resent'g Tr., ECF No. 5-8, PageID 8533). Cook-Reich referenced Mausser's testimony that "she has never seen an aggravated murder defendant come up for parole, let alone an aggravated murder with death specifications . . . . What are the chances that the first one that comes before them, Von Clark Davis, that they are going to let that person out?" *Id.* at PageID 8537. She also pointed to Davis's troubled family history as a significant one of the mitigating factors, which "are explanations, not excuses or justifications." *Id.* at PageID 8538. She emphasized Davis's flawless behavioral record while incarcerated and his reestablishment of a relationship with his daughter. *Id.* at PageID 8542-43.

45

Upon the completion of closing arguments, the panel queried whether the eighteen month sentence for having a weapon under disability would necessarily be served consecutively to any sentence less than death (2nd Resent'g Tr., ECF No. 5-8, PageID 8554-56).  The parties agreed that it was within the trial court's discretion to impose the sentences consecutively, although if the panel did not specify that the sentences were to run consecutively, then they would run concurrently.  *Id*. at PageID 8556-58.  After deliberating for approximately one hour, *id*. at PageID 8558, 8560, the panel found that "the aggravating circumstance that the defendant was found guilty of committing outweighs the mitigating factors presented in this case by proof beyond a reasonable doubt and hereby imposes on the defendant, Von Clark Davis, the sentence of death."  *Id*. at PageID 8558-59.  Davis's counsel asked "that new counsel be appointed so the ineffectiveness challenge can be made on direct appeal as appropriate[,]" *id*. at PageID 8560; the panel indicated they would grant that request upon the filing of notice of appeal.  *Id*.

In its written opinion filed September 21, 2009, the panel summarized and evaluated the aggravating circumstance, the statutory mitigation factors, and the mitigation evidence presented by Davis (State Court Record, ECF No. 4-39, PageID 4926-31, citing Ohio Rev. Code § 2929.04(B)).  The panel found that, in accordance with their statutory duty under section 2929.04(B), the aggravating circumstance—Davis's conviction for purposefully killing Ernestine—"deserves great weight."  *Id*. at PageID 4932.  The judges concluded that there was "nothing mitigating about the nature and circumstances of the [capital] offense itself[,]" and that the love of his family and the forgiveness by his daughter were entitled to very little weight.  *Id*. The panel also concluded that Davis's dysfunctional upbringing was entitled to little weight, and that "the separate testimony of Defendant's family and friends does not support Dr. Smith's conclusion that Defendant suffered an extreme and dysfunctional upbringing. . . . Dr. Smith's

46

diagnos[e]s" of borderline personality disorder and alcohol dependence "even if valid, [are] entitled to little weight in mitigation." *Id*. at PageID 4932, 4933.  The judges gave no weight to Mausser's testimony as to "the probability that Defendant would never be released from prison if given a sentence less than death[,]" finding it "highly speculative." *Id*. at PageID 4933.  "The panel considered the Defendant's good behavior while in prison, the Defendant's advanced age, and the Defendant's remorse and apology during his unsworn statement.  The panel attributes little weight to each factor." *Id*.  The court gave no weight to Davis's arguments that a life sentence would be cheaper than execution and would bring closure to the victim's family. *Id*. at PageID 4933-34.

### 1. Twelfth District Court of Appeals

Davis was represented on appeal by Alan Freedman, Laurence Komp, and John Parker (State Court Record, ECF No. 4-42, PageID 5485), and raised the following assignments of error:

FIRST ASSIGNMENT OF ERROR:  The trial court erred in violation of the Eighth Amendment and Due Process to allow a 25-year old, stale jury waiver to stand when there was a new penalty hearing.

1. The trial court erred in violation of the Eighth Amendment and Due Process to allow a 25-year old, stale jury waiver to stand when there was a new penalty hearing; and

2. Appellant did not knowingly, intelligently and validly waive his jury in 1984 for a sentencing hearing in 2009.

SECOND ASSIGNMENT OF ERROR:  The three-judge panel erred in not considering and giving effect to mitigating evidence.

1. Whether the trial court in giving no weight to mitigation; and

47

2.  Whether the trial court listened to mitigation.

THIRD ASSIGNMENT OF ERROR:  The trial court erred in not precluding the death penalty and enforcing the then-existing provisions of Ohio Revised Code § 2929.03(C)(2)(a).

1.  Whether the trial court violated the constitution in applying a revised and amended O.R.C. 2929.03 in order to make death an available option.

FOURTH ASSIGNMENT OF ERROR:  Appellant's death sentence is disproportionate and inappropriate, in violation of the Eighth and Fourteenth Amendments of the United States Constitution and Sections 9 and 16 of the Ohio Constitution.

FIFTH ASSIGNMENT OF ERROR:  Twenty-six years on Ohio's death row constitutes cruel and unusual punishment under the state and federal constitution, and international law.

1.  Executing Appellant after such a lengthy stay on death row constitutes cruel and unusual punishment.  *Lackey v. Texas*, 514 U.S. 1045, 115 S.Ct. 1421 (1995) (Stevens, J., dissenting from denial of certiorari); and

2.  Executing Appellant after such a lengthy stay on death row violates international law.

(State Court Record, ECF No. 4-42, PageID 5486-90).

On February 11, 2011, the Twelfth District rejected each of his five assignments.  The appellate court found that challenges to the validity of his jury waiver were barred by *res judicata* and law of the case, as it had been repeatedly challenged in prior litigation, and upheld as knowing, intelligent, and voluntary each time.  *Davis XI*, 2011-Ohio-787, ¶ 16.  The court "reiterate[d] that the trial court, before accepting Davis' waiver, performed a colloquy advising Davis of his rights and what he was giving up by executing his waiver."  *Id*. at ¶ 29.  The panel also rejected Davis's argument that "should this court apply the current version of R.C. 2929.06(B), such application would violate the Ohio Constitution's prohibition against retroactive laws, as well as the ex post facto clause of the federal constitution."  *Id*. at ¶ 44.  The appellate court concluded that the

48

amended statute, which dropped the requirement that a defendant waiving his right to a jury must have his guilt and sentence determined by the original three-judge panel, is remedial, rather than substantive, in nature, and thus, its application was not impermissibly retroactive or otherwise an *ex post facto* law. *Id*. at ¶¶ 45, 47, citing OHIO CONST., art. II, § 28; *State v. Walls*, 96 Ohio St. 3d 437, 2002-Ohio-5059, ¶¶ 9-10. The panel so concluded because the amended law "affects only the methods or procedures by which the Butler County Court of Common Pleas implemented Davis' jury waiver. . . . The amendment did not, however, change the fact that Davis had the right to avoid a jury and have his guilt and penalty determined by a panel of judges." *Id*. at ¶ 49. Finally, the appellate court "also f[ou]nd that the amendment is not violation of the ex post facto clause of the federal constitution." *Id*. at ¶ 57, citing *Collins v. Youngblood*, 497 U.S. 37, 41 (1990). The panel noted "there is no language in the previous version [of the statute] that directed a court to enter a life sentence if the panel could not perform its duties[,]" *id*. at ¶ 59, that the Supreme Court of Ohio opted not to extend the holding of *Penix* (which forbade the imposition of a death sentence on remand when the original sentence was imposed by a jury that could not be reassembled) to Davis's situation, leaving it open to the trial court panel's discretion as to the appropriate sentence on remand. *Id*. at ¶ 60, citing *Penix*, 32 Ohio St. 3d at 369. As "Davis was subject to either life imprisonment or death" under the former and amended versions of the statute, *id*. at ¶ 62, "Davis' jury waiver is still valid, and . . . R.C. 2929.06(B) is not unlawfully retroactive or does not otherwise violate the ex post facto clause of the United States Constitution[.]" *Id*. at ¶ 63.

The Twelfth District also found meritless Davis's Second and Fourth Assignments of Error, "that the New Panel erred by not considering or giving the proper effect to his mitigation evidence, and that the panel's sentence was improper[,]" respectively. *Davis XI*, 2011-Ohio-787, ¶ 68. The appellate court contrasted the original and first resentencing panel's refusal to consider all relevant

mitigating evidence, in violation of *Skipper*, *id*. at ¶73, citing 476 U.S. at 4, with the second panel

hearing evidence and considering:

> Davis' borderline personality disorder, alcohol abuse, love and
> support of family members and friends, the testimony of Davis'
> daughter that she has forgiven her father for killing her mother,
> Davis' good behavior in prison, childhood and family experience,
> and the impact of each upon Davis' personality development and
> mental health, remorse and apology, age (62), probability of no
> release from prison, whether a sentence of life in prison would bring
> closure to the victim's family, and the savings to taxpayers should a
> life sentence be imposed.

*Id*. at ¶ 75.  "While Davis disagrees with the amount of weight . . . the panel assigned to each

factor, the fact that the panel assigned less weight to the factors than he believes they deserve is

not the same as the panel failing to consider the evidence." *Id*. at ¶ 84, citing *State v. Newton*, 108

Ohio St. 3d 13, 2006-Ohio-81, ¶ 60.  The appellate court found that the trial court had not abused

its discretion in its evaluation of the mitigation factors, and in its statutorily-mandated independent

review of Davis's death sentence, found "that the penalty imposed in the case at bar is not excessive

or disproportionate." *Id*. at ¶ 105.

Finally, the Twelfth District overruled Davis's Fifth Assignment—that the imposition of

the death penalty after twenty-six years on death row was unconstitutional—noting that Justice

Stevens's dissent from denial of certiorari in *Lackey* "is not binding on this, or any, court.  It merely

expressed Justice Steven's [*sic*] desire to have the court address at what point the state's desire for

retribution is satisfied by imprisonment as opposed to execution." *Davis XI*, 2011-Ohio-787, ¶

119, citing 514 U.S. 1045.  The panel also noted that other states had upheld as constitutional

execution after similarly lengthy stays on death row, *id*. at ¶ 122 (citations omitted), and that

"recently, the Supreme Court was again offered the opportunity to address whether a lengthy stay

of 32 years on death row constitutes cruel and unusual punishment, and declined to do so." *Id*. at

¶ 123, citing *Thompson v. McNeil*, 556 U.S. 1114 (2009).  Finally, the court rejected Davis's

argument "that his time on death row, as well as the death penalty in general, violates international law specific to Article VII of the International Covenant on Civil and Political Rights[,]" holding that, because the United States specifically reserved certain rights when it ratified the Covenant, "United States courts are not bound by international law on the issue of capital punishment where the death penalty is upheld as constitutional." *Id*. at ¶ 124, citing *Buell v. Mitchell*, 274 F.3d 337, 371 (6th Cir. 2001).

### 2.      Supreme Court of Ohio

On June 22, 2011, Davis filed his merit brief with the Supreme Court of Ohio, raising as his five Propositions of Law the same Assignments of Error he had raised in the Twelfth District (State Court Record, ECF No. 4-43, PageID 5849-52).  On April 22, 2014, the Supreme Court of Ohio overruled the propositions and affirmed the death sentence.  *Davis XIV*, 2014-Ohio-1615. The court held that Davis's request for reconsideration of *Davis II*, in light of *Padilla v. Kentucky*, was barred by *res judicata*.  *Id*. at ¶ 31, citing 559 U.S. 356, 374 (2010).  The court concluded that *res judicata* and the law of the case doctrine did not foreclose adjudication on the merits as to his first proposition—that the trial court erred in not allowing him to withdraw his jury waiver.  *Id*. at ¶ 32.  However, the court again distinguished cases in which "a conviction was either reversed on appeal or was set aside, necessitating a retrial on the issue of guilt or innocence[,]" *id*. at ¶¶ 33-34 (citations omitted), in which the original jury waiver is voided, and that of Davis, whose case was remanded solely for purpose of sentencing, in which the waiver is not voided.  *Id*. at ¶ 34.  The court further noted that because Davis had had his original guilt and sentencing phases tried before a three-judge panel, under Ohio law, a jury *could not be* impaneled for the purpose of resentencing. *Id*., citing Ohio Rev. Code § 2929.06(B).  As the Sixth and Eighth Amendments do not guarantee

a jury determination of a death sentence, *id*. at ¶ 39, citing *Harris v. Alabama*, 513 U.S. 504, 515 (1995), *overruled on other grounds by Alleyne v. United States*, 570 U.S. 99 (2013); *Spaziano v. Florida*, 468 U.S. 447, 459 (1984), *overruled by Hurst v. Florida*, 577 U.S. ___, 136 S.Ct. 616 (2016), "even were we to hold the 1984 jury waiver insufficient or inapplicable as to the 2009 resentencing hearing, we would find no constitutional bar to conducting that hearing without a jury pursuant to R.C. 2929.06(B)." *Id*. at ¶ 40. "Therefore, we overrule Davis's first proposition of law." *Id*. at ¶ 43.

The court, in rejecting Davis's Third Proposition, concluded that Ohio Rev. Code § 2929.06(B) was remedial, not substantive, in nature, and thus, did not violate the Ohio Constitution's retroactivity clause. *Davis XIV*, 2014-Ohio-1615, ¶ 47, citing OHIO CONST., art. II, § 28; *Van Fossen v. Babcock & Wilcox Co.*, 36 Ohio St. 3d 100, paragraph one of the syllabus, 107 (1988), *superseded on other grounds by* Ohio Rev. Code § 2745.01. The court noted that it had recently held that the statute did not violate the retroactivity clause with respect to a capital defendant who was "sentenced to death after a jury trial . . . , [but] he obtained habeas corpus relief from his death sentence, obliging the trial court to resentence him[,]" *id*. at ¶ 49, citing *State v. White*, 132 Ohio St. 3d 344, 2012-Ohio-2583, ¶¶ 1-2, 48, and while "Davis was sentenced by a three-judge panel, . . . in all relevant respects his situation is indistinguishable from White's for the purposes of the inquiry here." *Id*. at ¶ 50. The court similarly concluded that the statute did not violate the Ex Post Facto Clause of the United States Constitution, as it "does not fall within any of the four categories of *ex post facto* laws identified in *Calder* [*v. Bull*, 3 U.S. (3 Dall.) 386, 390 (1798)]." *Id*. at ¶ 55, quoting *White*, 2012-Ohio-2583, ¶ 64.

The court similarly found unavailing Davis's Second Proposition, "that [the] three-judge panel violated the Eighth Amendment . . . by giving either insufficient weight or no weight at all

to his mitigating evidence." *Davis XIV*, 2014-Ohio-1615, ¶ 56, citing *Eddings*, 455 U.S. 104.  The court noted that the second resentencing panel heard extensive mitigation testimony and assigned weight to that testimony.  *Id*. at ¶¶ 57-58.  That is all the panel was required to do under *Eddings*; consequently, any failure to assign particular weight or reach any particular conclusion was an insufficient basis for an Eighth Amendment claim.  *Id*. at ¶¶ 59-68 (citations omitted).  Moreover, in its statutorily-mandated independent review of the death sentence, the court affirmed the lower courts' conclusions that the aggravating circumstance outweighed the several mitigating factors.  *Id*. at ¶¶ 80-116.  The court concluded that "[t]he mitigating factors are not strong[,]" and noted that "[t]he aggravating circumstance here, the prior conviction of murder, is one that this court has described as 'very strong,' and 'significant[,]'" *id*. at ¶ 116, and that the court "ha[d] approved death sentences in which the prior-murder-conviction specification . . . was the sole aggravating circumstance presented."  In so doing, the court rejected Davis's Fourth Proposition.  *Id*. at ¶¶ 116-17, quoting *State v. Taylor*, 78 Ohio St. 3d 15, 34 (1997); *State v. Carter*, 64 Ohio St. 3d 218, 228 (1992); citing Ohio Rev. Code §§ 2929.04(A)(4-5); *Mapes*, 19 Ohio St. 3d 108 (1985).

The court also rejected Davis's Fifth Proposition, that to execute Davis almost thirty years after initially being sentenced to death would violate the Eighth Amendment, noting that "[n]umerous courts have rejected claims that delays between the imposition and the execution of a death sentence constitute cruel and unusual punishment."  *Davis XIV*, 2014-Ohio-1615, ¶ 71 (citations omitted).  The court rejected Davis's argument that the three-judge panel's improper sentencing procedures being the cause of the delay, rather than frivolous appeals by Davis, constituted an Eighth Amendment violation, noting that "[d]elay, in large part, is a function of the desire of our courts to get it right, to explore exhaustively, or at least sufficiently, any argument that might save someone's life[,]" and that "even if it were held that delay . . . constitutes cruel and

unusual punishment," it is by no means clear that "commutation of the death penalty will turn out to be the appropriate remedy." *Id*. at ¶ 72, quoting *Chambers v. Bowersox*, 157 F.3d 560, 570 (8th Cir. 1998); *McKenzie v. Day*, 57 F.3d 1461, 1467 (9th Cir. 1995); citing *Elledge v. Florida*, 525 U.S. 944, 945 (1998) (Breyer, J., dissenting from the denial of certiorari).  Further, while the court acknowledged the decisions cited by Davis from foreign courts "that, in his view, establish an international norm recognizing that long postsentencing delays of execution are cruel[,]" *id*. at ¶ 74 (citations omitted), the court rejected his argument that "lengthy waits between sentencing and execution contravene 'our society's evolving standards of decency.'  Absent some such showing, the foreign cases Davis cites cannot advance his Eighth Amendment claim." *Id*. at ¶ 77, quoting *Roper v. Simmons*, 543 U.S. 551, 563 (2005).  Having rejected all five Propositions of Law, the court "affirm[ed] the judgment of the court of appeals, affirming Davis's sentence of death." *Id*. at ¶ 118.

### G.      Second Post-Conviction Petition

On October 21, 2011, Davis, represented by Kort Gatterdam and Erik P. Henry, filed a Second Post-Conviction Petition with the trial court (State Court Record, ECF No. 4-46, PageID 6236 *et seq.*), claiming that his counsel was ineffective at his 2009 resentencing (First through Seventh Grounds for Relief) and in his initial 1984 trial (Eighth Ground) by the following acts or omissions:

1.  Failure to investigate fully mitigation evidence;

2.  Failure to present adequately mitigation evidence;

3.  Decision to call Cynthia Mausser in mitigation;

4.  Decision to call Dr. Smith in mitigation;

54

5. Decision not to call John Lee in mitigation;

6. Decision not to seek recusal of Judge Mastoff from resentencing panel;

7. Informing Davis, contrary to the controlling statutory language, that a sentence of life without parole was an option; and

8. Advising Davis to waive his right to a jury trial.

*Id*. at PageID 6242-59. In his Ninth Ground, Davis argued that "Ohio's post-conviction procedures do not provide an adequate corrective process," and are thus violative of the United States and Ohio Constitutions. *Id*. at PageID 6260-62.

The State moved to dismiss the "petition for failure to state a claim upon which relief can be granted. In the alternative, the State request[ed] that summary judgment be granted in favor of the State." (State Court Record, ECF No. 4-47, PageID 6461). The State claimed that most of the alleged instances of deficient performance in Grounds One through Seven were nothing more than judgment calls "not outside the norms of professional practice" that did not produce the results desired by Davis. As a matter of law, the State argued, such judgment calls cannot form the basis of a viable claim under *Strickland v. Washington*, 466 U.S. 668 (1984). Moreover, the State claimed that, even if the judgment calls had fallen outside the norms of professional practice, the purported errors were not so egregious as to change the outcome of the initial trial or second resentencing, as is required under *Strickland*. *Id*. at PageID 6471-84. As to Davis's Eighth Ground, the State noted that the amendments to Ohio Rev. Code §§ 2953.21 that took effect on September 21, 1995, imposed a time restriction on postconviction petitions for claims that were already ripe—no later than one year after the enactment of the amendments. *Id*. at PageID 6484, citing Ohio Rev. Code § 2953.21(A)(2); 1995 S.B. 4; *State v. Freeman*, Nos. 73784-87, 1998 WL 855613, at * 1 (Ohio App. 8th Dist. Dec. 10, 1998). As the claim regarding advice to Davis as to his initial jury waiver was ripe at the time of the amendments, the State argued, his failure to bring

the claim by September 21, 1996 rendered the Eighth Ground time-barred. *Id*. at PageID 6484-85. Finally, the State argued that Davis's Ninth Ground was barred by *res judciata* for failure to raise the claim on direct appeal, and was also meritless. *Id*. at PageID 6485-86, citing *State v. Ketterer*, 126 Ohio St. 3d 448, 2010-Ohio-3831, ¶ 59.

On November 26, 2012, the trial court issued an Entry and Order dismissing the petition and denying Davis's motion to conduct discovery (State Court Record, ECF No. 4-47, PageID 6633). The trial court noted that the *Strickland* test had been adopted by the Supreme Court of Ohio to evaluate ineffective assistance of counsel claims, and that trial courts are permitted to evaluate the "deficient performance" and "prejudice" prongs in either order. *Id*. at PageID 6636, quoting *State v. Bradley*, 42 Ohio St. 3d 136, 143 (1989); *Strickland*, 466 U.S. at 697. As to the First Ground, the court concluded that the evidence that Davis claimed had not been presented had actually been presented by counsel in a different form; thus, "[t]rial counsel's performance was not deficient for failing to [investigate and] call these additional witnesses. For the same reasons, Davis has failed to establish that he was prejudiced[.]" *Id*. at PageID 6638. The court concluded that the gravamen of Davis's Second Ground—counsel's "presenting a summary of his prison unit file to the three-judge panel instead of the entire unit file"—was a "strategic decision" that was comfortably within the realm of trial strategy. *Id*. at PageID 6638-39. The court found his Third Ground—decision to call Cynthia Mausser—could have been raised on direct appeal and thus was barred by *res judicata*. Also, because her testimony could have just as easily been helpful as harmful, the Third Ground also failed on its merits. *Id*. at PageID 6640-41. The court found that Dr. Smith's focus during his testimony on Davis's borderline personality disorder and substance abuse problems was proper, as the evidence underlying his opinions was relevant and well-supported, and "[h]indsight cannot affect the evaluation of trial counsels' performance." *Id*. at

56

PageID 6644. "Furthermore, had trial counsel asked Dr. Smith to provide an opinion as to Davis's ability to adapt to society, his testimony would have been largely cumulative. The panel heard testimony from Scott Nowak, Jerome Stineman, and pen pal Franc[e]s Welland and admitted the aforementioned institutional summary as an exhibit." *Id*. Thus, Davis's Fourth Ground was not viable. Similarly, the trial court rejected Davis's Fifth Ground, failure to call investigator John Lee as a mitigation witness to present interview summaries, because the panel heard direct testimony from many of Lee's interview subjects (e.g., members of Davis's extended family), such that his testimony would have been cumulative. *Id*. at PageID 6646.

The court concluded that Davis's Sixth and Eighth Grounds—failing to seek recusal of Judge Nastoff and original counsel's failure to advise Davis of all consequences of a jury waiver— were barred by *res judicata* (State Court Record, ECF No. 4-47, PageID 6647, 6648). Finally, the court found that Davis's Seventh Ground, that trial counsel erroneously advised Davis that the panel could impose a sentence of life without parole, was factually baseless (supported by nothing more than Davis's self-serving affidavit) and, even if true, did not prejudice Davis. *Id*. at PageID 6647-48. In rejecting Davis's Ninth Ground—that Ohio's postconviction relief procedure is a constitutionally inadequate corrective process—the court noted that the Third District Court of Appeals had rejected an argument that courts are constitutionally required to allow postconviction petitioners to take discovery, and concluded that "[b]ecause Davis' argument attacking the constitutionality of R.C. 2953.21 is in no way related to the events of his re-sentencing hearing, it is not appropriate for the Court to consider" in his postconviction petition, as any constitutional deprivation did not occur "during the proceedings resulting in the petitioner's conviction." *Id*. at PageID 6649-50, citing *State v. Fitzpatrick*, No. C-030804, 2004-Ohio-5615 (Ohio App. 1st Dist. Oct. 22, 2004); *State v. Yarbrough*, No. 17-2000-10, 2001 WL 454683, *11 (Ohio App. 3rd Dist.

Apr. 30, 2001). Having rejected all of Davis's Grounds for Relief, the trial court dismissed his Second Post-Conviction Petition and deemed the dismissal a final appealable order. *Id*. at PageID 6650, citing Ohio Civ.R. 54(B).

On appeal to the Twelfth District, Davis raised three Assignments of Error. For the First Assignment, ineffective assistance of trial counsel, he raised as issues for review the First through Eighth Grounds for Relief in his Second Post-Conviction Petition. For the Second Assignment, Davis raised his Ninth Ground for Relief below—that "Ohio's post-conviction procedures do not provide an adequate corrective process, in violation of the" United States and Ohio constitutions. In his Third Assignment, Davis claimed that "the trial court erred when it refused to allow appellant to conduct discovery or grant an evidentiary hearing, in violation of appellant's rights under R.C. 2953.21 and the Sixth, Eight, and Fourteenth Amendments to the United States Constitution." (State Court Record, ECF No. 4-48, PageID 6779-80).

On September 9, 2013, the Twelfth District overruled all three assignments, concluding that the trial court did not abuse its discretion in finding that the alleged instances of ineffective assistance did not form the basis of a viable *Strickland* claim. *Davis XIII*, 2013-Ohio-3878, ¶¶ 9-31. The panel summarily dispensed with Davis's Second Assignment, noting that the Twelfth District and its sister districts "already determined that 'the statutory procedure for postconviction relief constitutes an adequate corrective process[,]" and that the panel saw "no reason to deviate from this prior precedent." *Id*. at ¶ 34, quoting *State v. Lindsey*, No. CA2002-02-002, 2003-Ohio-811, ¶ 13 (Ohio App. 12th Dist. Feb. 24, 2003). The appellate court overruled Davis's Third Assignment on similar grounds, reiterating the well-established precedent that a postconviction petitioner has no right to discovery or an evidentiary hearing absent a showing of good cause, *id*. at ¶¶ 38-39 (citations omitted), and that:

> [T]he trial court properly determined that Davis' claims alleging
> ineffective assistance of counsel lacked merit and were otherwise
> barred by res judicata. Therefore, we likewise find no abuse of
> discretion in the trial court's decision not to hold an evidentiary
> hearing and to deny Davis' request to conduct discovery in this
> matter.

*Id*. at ¶ 40.  The Supreme Court of Ohio declined to consider Davis's appeal, *Davis XV*, 143 Ohio

St. 3d 1441, 2015-Ohio-3427, and the United States Supreme Court denied Davis's petition for

certiorari on January 25, 2016.  *Davis v. Ohio*, 136 S.Ct. 988, 989 (Mem.) (2016).


## III.    LEGAL STANDARDS

### A.    28 U.S.C. § 2254

As Davis is imprisoned based on a state court judgment, he may petition for a writ of habeas

corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties

of the United States."  28 U.S.C. § 2254(a).  A petition "shall not be granted with respect to any

claim" that:

> [W]as adjudicated on the merits in State court proceedings unless
> the adjudication of the claim—(1) resulted in a decision that was
> contrary to, or involved an unreasonable application of, clearly
> established Federal law, as determined by the Supreme Court of the
> United States; or (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light of the evidence
> presented[.]

28 U.S.C. § 2254(d).  A habeas corpus petitioner must also satisfy additional procedural

requirements, including but not limited to exhaustion of State court judicial remedies.

28 U.S.C. § 2254(b).  Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), Pub. L. 104-132, 110 Stat. 1214, this Court's review of any claim adjudicated on its

merits in a State court proceeding is sharply circumscribed; "a determination of a factual issue

made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

A state court may be found to have acted "contrary to" federal law in two ways: (1) if the state court's decision is "substantially different from the relevant precedent" of the U.S. Supreme Court; or (2) if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the U.S. Supreme] Court and nevertheless arrives at a result different from [U.S. Supreme Court] precedent." *Williams (Terry)*, 529 U.S. 362 at 405, 406. A state court does not act contrary to federal law simply because its application of federal law was incorrect. Rather, the decision must have been "mutually opposed[,]" *id*. at 406, to "clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1), which encompasses only the holdings of Supreme Court decisions, and not their dicta. *Williams (Terry)*, 529 U.S. at 412.

The "unreasonable application" standard is distinct from and more deferential than that of "clear error." "It is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court decision was erroneous. . . . Rather, that application must be objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75, 76 (2003) (internal quotation marks omitted). "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). However, this deferential standard applies only when the state court has addressed the merits of a claim raised on appeal; "[w]here a state court has not adjudicated a claim on the merits, the issue is reviewed *de novo* by a federal court on collateral review." *Trimble v. Bobby*, 804 F.3d 767, 777 (6th Cir. 2015).

**B.      Exhaustion, Procedural Default, and *Res Judicata***

A federal habeas corpus petitioner must exhaust his claims in the state court before he may bring those claims before this Court. 28 U.S.C. § 2254(b)(2). This can be shown by demonstrating that: (1) the highest court of a state has adjudicated the merits of the claim; or (2) under state law, the claims are procedurally barred. *Gray v. Netherland*, 518 U.S. 152, 161-62 (1996). "[T]he doctrine of exhaustion requires that a claim be presented to the state courts under the same theory on which it is later presented in federal court." *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998). However, if a claim is procedurally barred under state law because "a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, [then] federal habeas review of the claims is barred." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

Under Ohio law, failure to make timely objections at trial or to raise the issue on direct appeal from the trial court, if possible, bars a petitioner from raising that claim in a federal habeas corpus petition. *Seymour v. Walker*, 224 F.3d 542, 555 (6th Cir. 2000), citing *Perry*, 10 Ohio St. 2d 175, paragraphs eight and nine of the syllabus; *Leroy v. Marshall*, 757 F.2d 94, 97-99 (6th Cir. 1985); *see also*, *e.g.*, *Coleman v. Mitchell*, 244 F.3d 533, 538-39 (6th Cir. 2001) (holding that the "*Perry* rule" regarding *res judicata* was an adequate and independent state law ground upon which to find a claim procedurally defaulted, and thus, bar its consideration of claims in district courts); *Wong*, 142 F.3d at 322 ("Under Ohio law, the failure to raise on appeal a claim that appears on the face of the record constitutes a procedural default under the State's doctrine of *res judicata*.") A claim of ineffective assistance of counsel—*i.e.*, an argument that failure to make timely objections at trial should be excused—normally must "be presented to the state courts as an independent claim

before it may be used to establish cause for a procedural default." *Murray v. Carrier*, 477 U.S. 478, 489 (1986).

Further, in raising the claims in the state court, a petitioner must set out why he believes his federal constitutional rights have been violated to avoid procedural default. 28 U.S.C. § 2254; *Gray*, 518 U.S. at 162-63. The procedural default analysis focuses on the "last explained state court judgment." A decision by a state supreme court in which the court declines to exercise jurisdiction over an appeal from an intermediate appellate court, but that does not provide reasons for its declination, does not constitute the "state judgment" upon which this Court resolves the procedural default question. *Munson v. Kapture*, 384 F.3d 310, 314 (6th Cir. 2004), citing *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991). However, the threshold for what constitutes an "explained state court judgment" is modest—the Sixth Circuit has held that an order from a state supreme court stating nothing more than "that the petitioner had failed to meet the burden of establishing entitlement to relief under [Michigan Rule of Criminal Procedure] 6.508(D) – though brief – constituted the last explained state court decision in the case." *Id.* (internal quotation marks omitted), quoting *Simpson v. Jones*, 238 F.3d 399, 407-08 (6th Cir. 2000). A decision by a state court to review the merits of an otherwise-defaulted claim, as an act of grace to an appellant, does not save that claim from being procedurally defaulted in the federal district court. *Coleman v. Mitchell*, 268 F.3d 417, 429 (6th Cir. 2001); *Amos v. Scott*, 61 F.3d 333, 342 (5th Cir. 1995). Finally, a District Court may not consider claims raised collaterally in a habeas corpus petition that are not supported by substantial evidence from outside the trial or appellate record. *Mapes v. Coyle*, 171 F.3d at 421-22.

Nonetheless, there are certain requirements that the State must prove by a preponderance of the evidence before the procedural default rule bars claims in this Court. *First*, a petitioner must

have actually violated the state procedural rule; a state court's mistaken interpretation of a rule, or mistaken finding that the petitioner violated that rule, will not suffice. *Lee v. Kemna*, 534 U.S. 362, 376-77, 387 (2002); *Trevino v. Texas*, 503 U.S. 562, 567 (1992). *Second*, the case must not fall within an exception to the state procedural rule which the petitioner is alleged to have violated; *e.g.*, if the gravamen of a petitioner's ineffective assistance of counsel claim is based on evidence outside the trial court record, then failure to raise that claim on direct appeal does not constitute a procedural default. *Morales v. Mitchell*, 507 F.3d 916, 937 (6th Cir. 2007). *Third*, the state court, in its last explained decision, must expressly state that a claim has been procedurally defaulted by failing to comply with a procedural rule; otherwise, "[w]hen a federal claim has been presented to a state court[,] and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication [of such a holding] or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Finally, the state procedural rule must be "adequate"—that is, it must have been "clearly announced, firmly established[,] and regularly and consistently applied by the state[]." (Traverse, ECF No. 234, Page ID 16253, citing *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991); *James v. Kentucky*, 466 U.S. 341, 348-49 (1984); *Hathorn v. Lovorn*, 457 U.S. 255, 262-63 (1983); *Davis v. Wechsler*, 263 U.S. 22, 24 (1923)).

A petitioner may circumvent the procedural default bar by "demonstrat[ing] cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750; *McCleskey v. Zant*, 499 U.S. 467, 494-95 (1991). The Sixth Circuit has adopted a four-part test in *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986), under which this Court must examine whether: (1) a petitioner failed to comply with a procedural rule; (2) the state court

enforced the procedural rule; (3) the state procedural bar is "an adequate and independent ground" upon which the state can foreclose federal review; and (4) a petitioner can demonstrate good cause for not complying with the procedural rule, and actual prejudice from enforcement of the default. *Id.* at 138. A petitioner must show that an objective factor, external to petitioner, prevented him from complying with the procedural rule, *Murray*, 477 U.S. at 488; and that his trial was "infected with error so 'plain' that the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it." *United States v. Frady*, 456 U.S. 152, 163 (1982), citing FED.R.CRIM.P. 52(b).

Procedural default may also be excused if a petitioner can show, by a preponderance of the evidence, that he is "actually innocent," such that "a court cannot have confidence in the outcome of the trial[,]" *Lott v. Coyle*, 261 F.3d 594, 602 (6th Cir. 2001), quoting *Schlup v. Delo*, 513 U.S. 298, 316 (1995), and thus, his conviction constitutes a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750; *Murray*, 477 U. S. at 515. Finally, as a procedural default is not an adjudication on the merits, if a petitioner can successfully set aside such a default, then this Court must review the claim *de novo*. *Harrington*, 562 U.S. at 99.

## IV.     ANALYSIS

### A.     Jury Waiver Grounds for Relief

#### 1.     Claim One: Jury Waiver not Knowing, Intelligent, and Voluntary

Davis sets forth five reasons as to why his conviction and death sentence are void due to the impermissible waiver of his fundamental right to a jury trial:

> a.     Mr. Davis's jury waiver was not voluntary because the trial court's denial of his motion to sever forced him to waive jury.

64

      b.      Mr. Davis's jury waiver was not knowing and intelligent because he did not know at the time of the waiver that Ohio Supreme Court would refuse to apply the rule of *Penix* to his case and hold him eligible to be resentenced to death.

      c.      Mr. Davis's jury waiver was not knowing and intelligent because he did not know when he waived his right to a jury trial in favor of being tried before three specifically identified judges that he was also waiving his jury-trial rights twenty-five years in the future to instead be tried before an entirely different panel of three unknown judges.

      d.      Mr. Davis's jury waiver was not knowing and intelligent because he did not know that two of the three judges on his panel represented a party adverse to him in a prior case.

      e.      Mr. Davis's jury waiver was not knowing and intelligent because he did not know that a different standard of proof would be applied to him on appeal from a decision by three-judge panel than would have been applied to an appeal from a jury verdict.

(Petition, ECF No. 6, PageID 8565, 8626, citing U.S. CONST. ART. III § 2, 5th Am., 6th Am., 8th Am., 14th Am.; *Brady v. United States*, 397 U.S. 742, 748 (1970); *Adams v. United States ex rel. McCann*, 317 U.S. 269, 275 (1942); *Patton v. United States*, 281 U.S. 276, 312 (1930), *abrogated on other grounds by Williams v. Florida*, 399 U.S. 78 (1970)).

### a.     **Sub-Claim 1(C) is not Cognizable**

In the Return of Writ, the Warden argues that sub-claim 1(C)—the continuing validity of a jury waiver—is non-cognizable, on the basis that "although the Sixth Amendment guarantees the right to trial by jury, neither the Sixth nor the Eighth Amendment creates a constitutional right to be sentenced by a jury, even in a capital case."  (Return of Writ, ECF 17, PageID 9043-44 (emphasis removed), quoting *Davis XIV*, 2014-Ohio-1615 at ¶ 39).  In his Traverse, Davis notes that the quoted portion of *Davis XIV* relies on the Supreme Court's holdings in *Spaziano v. Florida*,

which, along with *Hildwin v. Florida*, was expressly overruled by *Hurst v. Florida* in 2016 (ECF No. 29, PageID 9173-74, citing *Hurst*, 577 U.S. ____, 136 S.Ct. 616, 619, 623-24 (2016); *Spaziano*, 468 U.S. 447 (1984); *Davis XIV*, 2014-Ohio-1615 at ¶ 39; see also *Hildwin*, 490 U.S. 638 (1989)).  Davis is correct that *Hurst* overruled *Spaziano* and *Hildwin*'s upholding of the constitutionality of Florida's capital sentencing scheme, in which a judge made the critical findings, as "wrong, and irreconcilable with *Apprendi*."  136 S.Ct. at 624, citing *Apprendi*, 530 U.S. 466 (2000).  "In *Ring* [*v. Arizona*], we held that another pre-*Apprendi* decision—*Walton* [*v. Arizona*]—could not 'survive the reasoning of *Apprendi*.'  *Walton*, for its part, was a mere application of *Hildwin*'s holding to Arizona's capital sentencing scheme." *Id*., quoting *Ring*, 536 U.S. 584, 603 (2002); citing *Walton*, 497 U.S. 639 (1990); *Hildwin*, 490 U.S. 638.  Yet, the Supreme Court recently reaffirmed that *Ring* is retroactive only on direct appeal, not on collateral review.  *McKinley v. Arizona*, 140 S.Ct. 702, 709 (2020) (Ginsburg, J., dissenting), citing *Schiro v. Summerlin*, 542 U.S. 348, 358 (2004); *Teague v. Lane*, 489 U.S. 288, 310 (1989) (plurality opinion).  Given the Supreme Court's identical treatment of Florida and Arizona's capital sentencing regimes and refusal to apply *Ring* retroactively on collateral review, the undersigned cannot reasonably conclude that *Hurst* would apply retroactively, either.  Accordingly, sub-claim 1(C), failure to be sentenced by a jury on remand, is not cognizable and should be dismissed.

b.     **Remainder of Claim Reviewed *De Novo***

The Warden argues that the other four sub-claims are barred "for failure to present the claims for state court adjudication in respect to the state court judgment currently under attack that was final on March 2, 2015."  (Return of Writ, ECF No. No. 17, PageID 9039, citing *Davis v. Ohio*, 135 S.Ct. 1494 (2015)).  "Under these circumstances, it is of no legal import that the trial

66

phase jury waiver claims in habeas claims 1, 2 and 4, except 1(C) and 2(B), were earlier presented to the state courts in respect to a state court judgment that no longer exists[.]" *Id*. at PageID 9039-40, citing *Davis X*, 464 F.3d 761. Alternatively, he claims that, because the claims were previously raised and rejected by this Court in *Davis IX* and the Sixth Circuit did not disturb those rulings in *Davis X*, the Court should summarily adjudicate those claims based on the same reasoning as in *Davis IX*. To do otherwise the Warden argues, would give Davis an improper "do over" on those claims. *Id*. at PageID 9040-43, citing *King v. Morgan*, 807 F.3d 154, 159 (6th Cir .2015); *Davis X*, 475 F.3d at 779-80 (Claims 1(A-B)); *Davis IX*, ECF No. 16-2, PageID 8980-93 (Claim 1(D)), and ECF No. 16-1, PageID 8927-28, 8937, ECF No. 16-2, Page 8950 n.1 (Claim 1(E)).

Yet, Davis argues correctly that, contrary to the Warden's argument as to Ground One—and fifteen of his grounds for relief—*King* does not create a procedural bar for "identical claims [which] have already been denied in prior federal habeas proceedings." (Traverse, ECF No. 29, PageID 9152 (internal quotation marks omitted), citing *King*, 807 F.3d at 159; Return of Writ, ECF No. 17, PageID 9039-43, 9065, 9067-71, 9073). Davis claims that a petitioner obtains habeas relief and is resentenced via a new judgment, a subsequent habeas petition is not "second or successive" one "even if the claimant previously filed petitions that challenged the original sentence and *even if he raised or could have raised the same claims in those earlier petitions*." *Id*. (emphasis in original), quoting *King*, 807 F.3d at 159; citing *Magwood v. Patterson*, 561 U.S. 320 (2010). Davis claims that, pursuant to *King*, his claims are not second or successive even though the "new judgment" is only a new sentence, rather than the underlying conviction. *Id*. at PageID 9152-53, citing *Magwood*, 561 U.S. at 328-29, 331, 349-50 (Kennedy, J., dissenting at 349-50); *In re Stansell*, 828 F.3d 412, 416 (6th Cir. 2016); *King*, 807 F.3d at 157.

Davis's interpretation of *King* is correct. That Davis raised and was unsuccessful with

these claims previously is irrelevant; he is challenging the most recent death sentence. "Accordingly, while this Court is free to review its prior rulings on the same claims, there is no procedural bar to this Court's ability to again address those claims on the merits." (Traverse, ECF No. 29, PageID 9155). Moreover, upon resentencing, the statute of limitations clock reset, and the law-of-the-case doctrine does not apply. Thus, the sub-claims are properly before this Court. *Arizona v. California*, 460 U.S. 605, 618 (1983); *King*, 807 F.3d at 159-60; *Scott v. Churchill*, 377 F.3d 565, 569 (6th Cir. 2004).

### c. **Procedural Default**

### d.

As discussed above, the Warden argues that the sub-claims are procedurally defaulted because Davis failed to raise them in the state courts after his second resentencing. There is no dispute that: Davis did not raise these sub-claims in state court after his 2009 resentencing; they relate to his original conviction, rather than the resentencing; and that they are substantively identical to the claims that were presented to and rejected by this Court in *Davis IX*. Davis presents two arguments as to why the sub-claims are not procedurally defaulted. *First*, Davis argues that the claims have already been fairly presented in the state courts, and that because the factual bases and legal claims contained in the sub-claims are identical to those previously presented, including to this Court in *Davis IX*, they are not "new claims" and, thus, are not procedurally defaulted (Traverse, ECF No. 29, PageID 9156-57, citing *Gray v. Netherlands,* 518 U.S. 152, 162-63 (1996); *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986); *Anderson v. Heirless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971); *Richey v. Bradshaw*, 498 F.3d 344, 352 (6th Cir. 2007); *Pillette v. Foltz*, 824 F.2d 494,496 (6th Cir. 1987)).

*Second*, Davis argues that, because the sub-claims were adjudicated on their merits previously, and pertain to his original trial and conviction, rather than his second resentencing, it would have been futile for him to raise them again.  Thus, he claims, this Court should find that "there is an absence of available State corrective process" for those sub-claims, and, consequently, there was no procedural default (Traverse, ECF No. 29, PageID 9159, quoting 28 U.S.C. § 2254(b)(1)(B)(i); *Turner v. Bagley*, 401 F.3d 718, 724 (6th Cir. 2005); *Sherley v. Parker*, No. 99-5535, 2000 WL 1141425, *5, 229 F.3d 1153 (TABLE) (6th Cir. 2000)).[9]

Davis's first argument—that the Court should treat the sub-claims as identical to those in *Davis IX*—is inconsistent with his argument elsewhere—that the Court should review these sub-claims *de novo*, as if they had *not* been raised in this Court before.  Nonetheless, the Court need not address whether the sub-claims are procedurally defaulted, because they are without merit.

e.        **Davis has not met his Burden Under 28 U.S.C. § 2254(d)**

The Sixth Circuit, in *Davis X*, considered and addressed sub-claim 1(A):  that the trial court's denial of his motion to sever the charges of aggravated murder and possessing a firearm under a disability (his prior murder conviction) rendered his jury waiver involuntary.  475 F.3d at 775-79.  The panel noted that "[i]n denying Davis's motion for severance, the Ohio courts applied state law and, as a result, we must accept as binding the state supreme court's interpretation of the interaction between the capital specification-election provision, and the rules for joinder and severance of criminal charges."  *Id*. at 777, citing Ohio Rev. Code § 2929.022(A).  Moreover, the *Davis X* court noted, the Supreme Court has repeatedly held that when prior felony convictions are

---

[9] Davis's citation of *Sherley* was merely "229 F.3d 1153," leading the Court to believe that it was a published, precedential opinion, when in fact it is not.  Unpublished opinions must be cited properly.  COLUMBIA LAW REVIEW ASS'N ET AL. EDS., THE BLUEBOOK:  A UNIFORM SYSTEM OF CITATION, Rule 10.8.1 (20th ed. 2015).

introduced to the jury for sentencing purposes, "the conceded possibility of prejudice is believed to be outweighed by the validity of the State's purpose in permitting introduction of the evidence." *Id*. at 777-78 (internal quotation marks omitted), quoting *Spencer*, 385 U.S. at 561; citing *Marshall v. Lonberger*, 459 U.S. 422 (1983). Consequently, "the prejudice suffered by a defendant in such a case does not rise to the level of a violation of due process[.]" *id*., quoting *Spencer*, 385 U.S. at 562, and "[b]ecause the denial of Davis's motion for severance did not constitute a denial of the petitioner's due process right to a fair trial, that ruling cannot be said to have rendered his waiver of a jury trial involuntary." *Id*. at 778-79. Davis does not argue that the legal holdings of the published decision in *Davis X* are not binding upon this Court, just as they would be in a factually unrelated case. Further, Davis concedes that there are no facts regarding the trial court's decision to sever that were not before the Sixth Circuit in *Davis X*. Hence, the Court concludes that sub-claim 1(A) is no more meritorious now than it was in 2007.

Sub-claim 1(B)—that the waiver was not knowing and intelligent because Davis could not have known that the Supreme Court of Ohio would refuse to extend *Penix* as to him, and thus leave him eligible for a death sentence upon resentencing—was considered *de novo* by the Sixth Circuit. *Davis X*, 475 F.3d at 779. The panel held that, even in light of *Ring*, "the state courts cannot be faulted for failing to analyze Davis's motion to withdraw his jury waiver under a fundamental-rights-analysis when the right in question had yet to be recognized by the Supreme Court in the context raised by the petitioner." *Id*. at 780. The appellate court reiterated the well-settled precedent that prisoners and capital defendants are not "suspect classes" that would subject the waiver statute to strict scrutiny. *Id*. at 779, citing *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 312 (1976); *Tigner v. Cockrell*, 264 F.3d 521, 526 (5th Cir. 2001); *Hadix v. Johnson*, 230 F.3d 840, 843 (6th Cir. 2000). Finally, the panel affirmed this Court's ruling:

> [T]hat a sound, rational basis did indeed exist in this case for the
> different treatment of defendants resentenced after jury trials and
> those resentenced after trials before three-judge panels. According
> to the district court, there are obvious difficulties presented in trying
> to reassemble the original trial jury to participate in a resentencing
> hearing. By contrast, the three judges who comprised the original
> panel in the petitioner's case were still available to resentence the
> petitioner. Because such a distinction is arguably rational, we must
> conclude that Davis's equal protection challenge to the original
> denial of his motion to withdraw his jury waiver is without merit.

*Id.* at 780 (internal quotation marks and citation omitted).

Davis, in arguing that sub-claim 1(B) is viable (Traverse, ECF No. 29, PageID 9166),

emphasizes language in *Davis X*, in which the panel stated that the second resentencing:

> [C]an indeed be considered the functional equivalent of 'trial'
> because, unlike sentencing in a non-capital case, it will take the form
> of an evidentiary proceeding on the question of whether Davis
> should receive the death penalty or some form of a life sentence.
>
> Moreover, we think there is a legitimate question as to whether a
> criminal defendant should be held to a jury waiver entered almost
> 25 years before his newly-mandated sentencing hearing. In the Sixth
> Circuit, at least, we have recognized that a defendant's jury waiver
> entered prior to the first trial of his case does not bar his right to a
> jury trial on the same case after remand from a reviewing court. . . .
> Likewise, the Ohio courts have held, in reversing a conviction "on
> the basis that [the defendant] was neither charged [with] nor found
> guilty of an essential element of the offense," that the defendant's
> "previous waiver of a jury trial is also inherently revoked by the
> reversal of the conviction and the [amended] indictment."

*Davis X*, 475 F.3d at 780-81, quoting *State v. McGee*, 128 Ohio App. 3d 541, 545 (Ohio App. 3rd

Dist. 1998); citing *Sinistaj v. Burt,* 66 F.3d 804, 808 (6th Cir.1995); *United States v. Groth,* 682

F.2d 578, 580 (6th Cir.1982); *United States v. Lee*, 539 F.2d 606, 608 (6th Cir. 1976). Yet, the

panel concedes that *McGee* is "not directly on point, because Davis is not facing a new indictment,"

*id.* at 781, and while the panel stated that "the reasoning of the Ohio court in *McGee* should

certainly inform the sentencing court's determination of the viability of Davis's jury waiver on

remand[,]" *id.*, any failure to do so by the trial court cannot constitute a violation of "clearly

established federal law," and thus cannot form the basis of a viable habeas claim. 28 U.S.C. § 2254(d)(1). Sub-claim 1(B) should accordingly be denied.

Davis argues that the last reasoned state court decision as to sub-claim 1(D)—that Davis could not have made a knowing, intelligent, and voluntary jury waiver because he did not know that two of the judges on the panel had prosecuted a foreclosure case against him more than a decade prior to his trial—was *Davis VI* (Traverse, ECF No. 29, PageID 9171, citing 1996 WL 551432). In that case, the Twelfth District relied on *State v. D'Ambrosio*, in which the Supreme Court of Ohio "held that D'Ambrosio's waiver was not retroactively rendered invalid by the judge's involvement in the other defendant's case. The court found no evidence that because of the prior proceeding, the judge had 'formed an opinion as to the facts at issue in [the] subsequent proceeding.'" *Davis VI*, 1996 WL 551432, at * 8 (alterations added), quoting 67 Ohio St. 3d 185, 188-89 (1993). The panel concluded that because, "at the time of the appellant's trial, neither the two judges in question nor appellant had any recollection of the judges' involvement in the 1970 foreclosure action[,]| *id*., there could not have been any bias (and hence, actual prejudice) to Davis as a result of them adjudicating his case. Further, the court that "the trial court['s] conclu[sion] that as a factual matter it did not believe appellant's claim that had he been aware of the foreclosure information, he would not have waived a jury trial" was not clearly erroneous. *Id.* Consequently, the court was "not persuaded that appellant's postwaiver awareness of the judges' foreclosure involvement rendered appellant's jury waiver unknowing or unintelligent so as to implicate appellant's constitutional rights." *Id*., citing *D'Ambrosio*, 67 Ohio St. 3d at 189; *State v. Dickerson* 45 Ohio St. 3d 206, 209-10 (1989).

In *Davis IX*, this Court considered and rejected this sub-claim because "[a] valid jury waiver does not require that the defendant be fully aware at the time of the waiver of all the

circumstances which may arise during his trial. . . . The burden rests upon the petitioner to demonstrate that the waiver was *prima facie* invalid." (ECF No. 16-2, PageID 8981, citing *Sinistaj*, 66 F.3d at 808; *Milone v. Camp*, 22 F.3d 693, 704 (7th Cir. 1994)). The Court noted that "[m]ost questions concerning a judge's qualifications to hear a case are not of a constitutional nature," *id*. at PageID 8982, citing *Bracv. Gramley*, 520 U.S. 899, 904 (1997); *Tumey v. Ohio*, 273 U.S. 510, 523 (1927), and concluded that the trial judges' mere involvement in a civil action against Davis fourteen years prior to the trial—a point not remembered by anyone prior to or during the trial— did not constitutionally preclude them from adjudicating Davis's guilt and sentence. Accordingly, Davis's inability to show evidence of bias on the part of the judges or prejudice resulting therefrom meant that their involvement did not render his waiver constitutionally invalid. *Id*. at PageID 8984.

*Bracy*, *Tumey*, and *Sinistaj* are still binding precedent upon this Court, and Davis does not present any new evidence of bias on the part of the judges that could reasonably be said to have resulted from their prosecuting a foreclosure action against Davis and Ernestine in 1970. Accordingly, this Court's analysis in *Davis IX* remains sound, and sub-claim 1(D) should be dismissed.

Davis claims that *Davis VI* was the last reasoned state court decision on sub-claim 1(E)— that his waiver was not knowing and voluntary because of the greater standard of proof imposed upon him in the penalty phase proceedings before a three-judge panel rather than a jury (Traverse, ECF No. 29, PageID 9172-73, citing 1996 WL 551432, at *7-8). Davis argues that there was no adjudication on the merits in that decision because he "fairly presented to the state courts his claim that he was misinformed by the trial court as to the proper standard of proof[,]" *id*. at PageID 9173, yet, the Twelfth District held that "[t]his is an issue that could have been raised on direct appeal, however, and is barred from post-conviction consideration on *res judicata* grounds." *Davis VI*,

1996 WL 551432 at * 7, citing *Combs*, 100 Ohio App. 3d at 97. This argument ignores the immediately preceding sentence in the opinion: "The Ohio Supreme Court held in *Dickerson* that the standard of proof is the same before a three-judge panel and a jury." *Id.*, citing 45 Ohio St.3d at 208-209. Thus, *Davis VI* could reasonably be read as an adjudication on the merits (albeit brief), an adjudication entitled to deference under 28 U.S.C. § 2254(d). *Harrington*, 562 U.S. at 100-01. Yet, even if the above decision was based solely on Ohio's *res judicata* rule, that rule has been upheld repeatedly as an adequate and independent state ground of decision under *Maupin*. *See, e.g., Williams v. Bagley*, 380 F.3d 932, 967 (6th Cir. 2000); ); *Coleman v. Mitchell*, 268 F.3d 417, 428-29 (6th Cir. 2001); *Bonnell v. Mitchell*, 212 F. App'x 517, 529 (6th Cir. 2007). Finally, Davis does not attempt to explain why he did not raise this sub-claim until postconviction, even though all the relevant facts underpinning the sub-claim were available to Davis on direct appeal. Accordingly, sub-claim 1(E) should be denied as procedurally defaulted.

**2.    Claim Two: Court Violated Davis's Sixth, Eighth, and Fourteenth Amendment Rights by Enforcing Jury Waiver in Resentencings**

Davis sets forth two reasons why the continued enforcement of his jury waiver upon resentencing was unconstitutional

> a.    The trial court violated Mr. Davis's rights under the Eighth and Sixth Amendments and the Due Process Clause by enforcing his prior jury waiver at his first resentencing when he had no knowledge at the time of the waiver that Ohio Supreme Court would refuse to apply the rule of *Penix* to his case and hold him eligible to be resentenced to death; and
>
> b.    The trial court violated Mr. Davis's rights under the Eighth and Sixth Amendments and the Due Process Clause by enforcing a stale jury waiver at a new penalty hearing twenty-five years later before an entirely different panel of judges.

(Petition, ECF No. 6, PageID 8565).

a. **Sub-claim 2(B) is not Cognizable**

The Warden argues that sub-claim 2(B) must be dismissed because, as with sub-claim 1(C), the right to be sentenced by a jury in a capital case, established by *Ring* and *Hurst*, is not retroactive on collateral review, only on direct appeal (Return of Writ, ECF No. 17, PageID 9043-44, citing *Hurst*, 136 S.Ct. at 624 (Breyer, J., concurring in the judgment). The undersigned agrees. Justice Ginsburg's dissent in *McKinley* reaffirmed the well-settled precedent that any claim of violation of right to a jury trial under *Hurst* is not cognizable in habeas; at the very least, the continued enforcement of the waiver by the trial court is not a violation of clearly established federal law required for habeas relief. *See Williams (Terry)*, 529 U.S. at 379-80, citing *Teague*, 489 U.S. 288 ("It is perfectly clear that AEDPA codifies *Teague* to the extent that *Teague* requires federal habeas courts to deny relief that is contingent upon a rule of law not clearly established at the time the state conviction became final.") Accordingly, sub-claim 2(B) should be dismissed.

b. **Petitioner has not met his burden under 28 U.S.C. § 2254(d) as to Sub-Claim 2(A)**

The gravamen of sub-claim 2(A)—that the state courts violated Davis's constitutional rights by not applying *Penix* to him on remand—is virtually identical to sub-claim 1(B)—that his waiver was not knowing, voluntary, and intelligent because he could not have foreseen the refusal to apply *Penix*. For the same reasons that sub-claim 1(B) was unavailing, sub-claim 2(A) is as well. When a state court decides on the merits a federal constitutional claim later presented to a federal habeas court, the federal court must defer to the state court decision unless that decision is contrary to or an objectively unreasonable application of clearly established precedent of the

75

United States Supreme Court. 28 U.S.C. § 2254(d)(1); *Harrington*, 562 U.S. at 100; *Brown v. Payton,* 544 U.S. 133, 140 (2005); *Bell v. Cone*, 535 U.S. 685, 693-94 (2002); *Williams (Terry)*, 529 U.S. at 379. Deference is also due under 28 U.S.C. § 2254(d)(2) unless the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. The state courts' interpretations of state law are entitled to deference under the AEDPA, and because a fair-minded jurist could differentiate the factual and procedural circumstances in *Penix* and those in *Davis*, and do so in a manner not inconsistent with Supreme Court precedent. *Harrington*, 562 U.S. at 102. For those reasons, that sub-claim 2(A) should be dismissed.

### B. Mitigation Evidence Claims for Relief

#### 1. Claim Five: Court failed to Consider all Mitigating Evidence

Davis argues that the second resentencing panel failed to give the particularized, individualized consideration of mitigating evidence has been "repeatedly stressed" since capital punishment was reinstated, by ignoring or inappropriately discounting mitigation evidence presented (Petition, ECF No. 6, PageID 8669-70, citing *Porter v. McCollum*, 558 U.S. 30, 42-43 (2009) (*per curiam*); *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002); *Eddings*, 455 U.S. at 113-14, 117; *Lockett*, 438 U.S. at 605; *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976); *Gregg v. Georgia*, 428 U.S. 153, 206 (1976)). He claims that the second resentencing panel violated his constitutional rights in the following ways:

76

- Failing to assign any specific weight to certain mitigation evidence, which is a due process violation;

- Assigning "little weight" to Davis's good behavior in prison; even though Supreme Court of Ohio had previously assigned it "some weight";

- Giving little weight to his personality disorder and alcohol dependence, despite being required to consider existence of mental illness or defect by statute;

- Giving little or no weight to Davis's family background and childhood experiences, and discounting it without explanation;

- Giving insufficient weight to the remorse shown by Davis and the love he received from family and friends, despite the Supreme Court of Ohio stating that that was a mitigating factor;

- Giving no weight "to evidence that Mr. Davis would never be released from prison if given a life sentence, evidence of the economic benefit to tax payers (sic) if given a life sentence, and the closure a life sentence would bring to the victim's family"; and

- Starting with a desire to put Davis to death, and worked backwards from there.  Impermissibly discounting this evidence is further proof thereof.

*Id*. at PageID 8671-74, citing *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Eddings*, 455 U.S. at 115; *State v. Smith*, 87 Ohio St. 3d 424, 447 (2000); *Davis IV*, 63 Ohio St. 3d at 52 (Wright, J., dissenting); State Court Record, ECF No. 4-39 PageID 4931-34, 4947, ECF No. 4-46, PageID 6375-77.

Davis's argument finds little, if any, support in the actual opinion from the resentencing panel.  The opinion stated that the panel considered each of the factors listed by Davis (State Court Record, ECF No. 4-39, PageID 4927-28) and summarized the testimony of Davis's family and friends, prison personnel, Mausser, and Dr. Smith.  *Id*. at PageID 4928-31.  That the trial court appeared to give less weight to his good behavior than did the Supreme Court of Ohio is immaterial.

Similarly, the panel summarized and considered the testimony regarding Davis's borderline personality disorder and alcohol dependence, along with the testimony of the love that his family and friends have for him—specifically, that Davis's daughter had forgiven him for murdering her mother—prior to giving little weight to those mitigating factors (2nd Resent'g Op., ECF No. 4-39, PageID 4932-33). Contrary to Davis's argument, the trial court stated that it considered "[c]hildhood and family experience, and the impact of each upon Defendant's personality development and mental health;" *id.* at PageID 4928, and the opinion summarized the relevant testimony. Importantly, the panel "noted that Defendant did not request a pre-sentence investigation or mental examination pursuant to R.C. 2929.03(D)(1)[.]" *Id.* Thus, Davis's case is not one in which his due process rights were violated because he was prevented from introducing certain evidence. Rather, he disagrees with the weight afforded to that evidence by the trial court, which is not a constitutional violation.

Contrary to Davis's argument, there was no evidence presented that he would never be released from prison if he was not sentenced to death. Indeed, Mausser testified that she could *not* promise that Davis would never be paroled, and that it would be inappropriate for her to guess how a parole board member might vote (2nd Resent'g Tr., ECF No. 5-7, PageID 8378-79). Finally, Davis's argument that the resentencing panel had decided before the hearing to sentence Davis to death, and thus did not give a fair and meaningful review to his mitigation evidence (Petition, ECF No. 6, PageID 8674), quotes *Davis IV*, which was the Supreme Court of Ohio's review of Davis's *first* resentencing. In that proceeding, the three-judge panel was identical to the one that conducted the original trial, and did not entertain any new evidence. The panel for the *second* resentencing was completely different from the one for the original and first resentencing, and did hear additional evidence. Thus, Justice Wright's statement in dissent is immaterial and does not form

the basis for habeas corpus relief. Claim Five is unavailing and should be dismissed.

### 2.     Claim Six:  Capital Specification Was Too Remote in Time

Davis argues that the use of his 1971 murder conviction as the capital specification in Count One of the Indictment, which ultimately resulted in his 1984 death sentence, was unconstitutional for two reasons (Petition, ECF No. 6, PageID 8676, citing Ohio Rev. Code § 2929.04(A)(5)). *First*, he notes that during the thirteen-year gap between the homicides, the Supreme Court invalidated the death penalty and allowed it anew, and Ohio enacted a new statutory scheme for capital punishment. *Id*., citing *Lockett*, 438 U.S. 586; *Furman v. Georgia*, 408 U.S. 238 (1972). Davis claims that "[t]his offense was too remote in time to be used as a specification for the death penalty" and "has no relationship to the present offense. Rather, § 2929.04(A)(5) "acts as an *ex post facto* application of a sentencing enhancement provision that did not exist in 1971[,]" in violation of Article 1, Section 10 of the United States Constitution. *Id*. at PageID 8676-77, citing *Stogner v. California,* 539 U.S. 607, 611-13 (2003); *Carmell v. Texas,* 529 U.S. 513, 521-25 (2000); *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 390 (1798). *Second*, Davis claims that using his "prior conviction in charging him regarding a subsequent crime subjects him to jeopardy twice for a single offense by the same jurisdiction." *Id*. at PageID 8677, citing *Blockburger v. United States*, 284 U.S. 299, 304 (1932).

The last reasoned state court opinion on the issue is *Davis II*, in which the Supreme Court of Ohio held that the prior conviction was not too remote in time to serve as the capital specification, noting that "[t]he General Assembly has placed no time limits on the use of the prior conviction and it is not required to do so[,]" and that it had previously upheld a death sentence "which involved the aggravating circumstance of an eleven-year-old prior conviction." 38 Ohio

St. 3d at 369 n.9, citing *State v. Mapes*, 19 Ohio St. 3d 108 (1985), *conditional writ of habeas corpus on other grounds aff'd in Mapes v. Tate*, 388 F.3d 187. Davis argues that *Davis II* was "contrary to the clear holdings of the [United States] Supreme Court[,]" which requires a trial court to use aggravating and mitigating factors to distinguish who is truly deserving of the death penalty (Traverse, ECF No. 29, PageID 9226-27, citing *Lewis v. Jeffers*, 497 U.S. 764, 776 (1990); *Zant v. Stephens*, 462 U.S. 862, 877 (1983)). He also claims that "use of this offense as an aggravating circumstance was unconstitutionally retroactive because it attached new legal consequences to events completed before enactment of Ohio's current death penalty scheme . . . in 1981." *Id.* at PageID 9227, citing *Landgraf v. U.S.I. Film Prods.*, 511 U.S. 244, 265 (1994); Ohio Rev. Code § 2929.04(A)(5).

Neither argument is persuasive. In *Mapes*, the homicide conviction that served as the capital specification also predated the reenactment of Ohio's capital punishment regime in 1981. 19 Ohio St. 3d at 119. Yet, the death sentence in *Mapes* was not vacated because of the year in which the defendant was sentenced for the prior homicide or the length of time between the first conviction and the second homicide. Accordingly, the *Davis II* decision did not run afoul of clearly established precedent with respect to Davis's *ex post facto* argument.

Davis's focus on the time in between his sentence for killing Ernestine and his death sentence ignores the similarities between the two crimes: murder of a significant other during an argument, and the remoteness in time can be explained almost completely by the time Davis spent incarcerated for killing Ernestine. Moreover, Davis does not cite any caselaw—and the undersigned is unaware of any—in which a court held that use of a prior conviction as an aggravating circumstance violated *Blockburger* and thus constituted a Double Jeopardy violation. The specification does not attach a new consequence to the prior conviction. Rather, it serve the

80

same purpose as recidivism statutes generally:  it attaches a potentially more severe consequence to the later conviction in the hopes of dissuading persons from committing the second offense. Accordingly, Claim Six should be dismissed.

### C.    Ineffective Assistance of Counsel Claims for Relief

Davis raises several claims of ineffective assistance of trial and appellate counsel.  The Court examines them in turn, noting that when the issue is ineffective assistance of counsel, the federal court is required to be doubly deferential.  *Harrington*, 562 U.S. at 100.

### 1.    Claim Three:  Failure to Effectively Investigate and Present Character Evidence

Davis argues that he was denied effective assistance of trial counsel in violation of *Strickland* at his first and second resentencing hearingsw.  "Defense counsel failed to reasonably investigate and present mitigating evidence of Mr. Davis's good prison behavior even though this information was known, available and relevant" and "despite the Sixth Circuit remanding the case for a new penalty phase in order to consider this very evidence."  (Petition, ECF No. 6, PageID 8652, citing *Skipper,* 476 U.S. at 5; *Davis X*, 475 F.3d at 774-75).  Noting that the Eighth Amendment requires a sentencing court to consider a defendant's character, background, and history, Davis claims that counsel, in failing to investigate and present evidence that he would not be a harm to the community if he were released, fell below the standard of competent representation.  *Id*. at 8652-53, citing *Boyde v. California*, 494 U.S. 370, 377-78 (1990); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978).  Davis argues that counsel's inadequate representation

prejudiced him, as the first resentencing court found that his continued danger to the community was an aggravating circumstance in reimposing a death sentence.  *Id*. at PageID 8654, citing *Davis X*, 475 F.3d at 770, 773. The trial court in the first resentencing did not consider any new evidence, and there is no indication in the record that the panel was willing to entertain new evidence.  Thus, any failure to adequately investigate mitigation evidence was necessarily irrelevant; even if an exhaustive investigation unearthed myriad mitigation evidence, said evidence would not have been considered by the first resentencing panel.  Moreover, the panel's failure to consider new evidence was one of the reasons the Sixth Circuit vacated the death sentence and remanded for a second resentencing.  Davis has not explained how deficient performance by counsel with respect to the first resentencing could have prejudiced him.  Therefore, he does not have a viable *Strickland* claim with respect to the first resentencing.

Davis claims that this incompetent representation continued in the second resentencing, when counsel called only one witness, Nowak, to discuss Davis's exemplary prison record, and Nowak "testified for a meager thirteen pages without offering any substantive or anecdotal evidence regarding his interactions with Mr. Davis.  In addition, defense counsel introduced only a single exhibit, a two-page institutional summary prepared by Mr. Nowak."  (Petition, ECF No. 6, PageID 8654-55, citing State Court Record, ECF No. 4-50, PageID 7112-13; 2nd Resent'g Tr., ECF No. 5-8, PageID 8406-19).  Davis claims that he was not even "asked by his attorneys for names of other guards, caseworkers or other prison personnel."  *Id*. at PageID 8655, citing State Court Record, ECF 4-46, PageID 6270.  "Neglecting to investigate and talk to favorable witnesses cannot be a reasonable trial strategy. The Sixth Circuit reversed the case because this very evidence existed but had not been presented."  *Id*. at PageID 8656.  Further, despite Davis having a prison record replete with evidence of ambition (e.g., completion of his General Equivalency Diploma)

and good behavior, Nowak's testimony failed to cover and highlight the "highly relevant" mitigating evidence contained in the institutional summary. *Id*. at PageID 8655-57, citing State Court Record, ECF No. 4-46, PageID 6281-6364. Consequently, Davis argues, "[c]ounsel's performance" at the second resentencing "fell well below an objective standard of reasonableness and the prevailing professional norms as articulated in the ABA Guidelines[,]" and counsel's failure to present all the mitigating evidence prejudiced Davis by ensuring that the single aggravating circumstance—his prior homicide conviction—outweighed the mitigating factors. *Id*. at PageID 8658, citing *Wiggins v. Smith*, 539 U.S. at 525; *Strickland*, 466 U.S. 668.

The parties agree that the last reasoned state court opinion is *Davis XIII* (Return of Writ, ECF No. 17, PageID 9045-46; Traverse, ECF No. 29, PageID 9200-01). Therein, the Twelfth District panel noted that "contrary to his claims otherwise, Davis explicitly states as part of his submitted affidavit that he 'discussed with my attorneys all my certificates, job evaluations, good conduct as well as guards and case managers that have seen me in prison since 1984.'" 2013-Ohio-3878 at ¶ 16 (citation omitted). Davis also conceded that, in addition to Nowak, counsel also called Stineman, "who testified that Davis regularly attended Alcoholics Anonymous meetings where he was an active participant. Nowak also specifically testified as to Davis' good behavior and noted Davis' position in the 'extended privilege unit' or 'honor block.'" *Id*. After noting Davis's comprehensive work history summary, *id*. at ¶ 17, the panel concluded that "the evidence presented at Davis' third sentencing hearing demonstrates his strong work ethic, good behavior, and trustworthiness while in prison. In turn, we agree with the trial court's decision finding any additional testimony regarding his 'exemplary prison record' would have been cumulative." *Id*. at ¶ 18. Consequently, the panel held, Davis's claim that providing additional evidence "would have saved his life . . .is purely speculative and is otherwise not supported by the record." *Id*.

(internal quotations marks and citation omitted).

Davis claims that "[t]here is no reasonable strategy that would including [sic] leaving out evidence that the federal court held was compelling enough to support a grant of habeas relief. Therefore, counsel's failure cannot be viewed as a reasonable strategic decision, but rather viewed as a dereliction of duty that prejudiced Mr. Davis." (Traverse, ECF No. 29, PageID 9202, citing *Wiggins*, 539 U.S. at 525, *Davis X*, 475 F.3d at 773). Thus, he argues that *Davis XIII* is not entitled to AEDPA deference, as its holding contradicts clearly established Supreme Court precedent. *Id.* at PageID 9201-02, citing *Rompilla*, 545 U.S. at 381–90; *Wiggins*, 539 U.S. at 521–29; *Williams*, 529 U.S. at 395–97; *Boyd*, 494 U.S. at 377-78; *Lockett*, 438 U.S. at 604.

This argument is not persuasive. An attorney need not present every piece of evidence to satisfy the constitutional requirement of constitutional, meaningful representation. Indeed, in *Strickland*, the Supreme Court held that, in the face of overwhelming aggravating circumstances, "[t]rial counsel could reasonably surmise . . . that character and psychological evidence would be of little help. . . . On these facts, there can be little question, . . . that trial counsel's defense, though unsuccessful, was the result of reasonable professional judgment." 466 U.S. at 699.

Davis's barebones allegation that trial counsel failed to investigate and present certain mitigation evidence is not supported by the record, including the affidavits of Davis and his post-conviction counsel. As the *Davis XIII* court correctly explained, the evidence that Davis claims should reasonably have been discovered and presented covered the same topics and mitigation factors on which counsel had already put forth evidence. Such cumulative evidence is unlikely to have changed Davis's sentence when the aggravating circumstance could be reasonably interpreted as "overwhelming." As fair-minded jurists could agree that the *Davis XIII* decision was a reasonable application of *Strickland* and its progeny, AEDPA deference must be accorded, and

Claim Three should be dismissed.

### 2. Claim Four: Failure to Advise of More Deferential Appellate Review of Verdicts of Three-Judge Panels vis-à-vis Jury Verdicts

Davis alleges that Ohio has an effectively non-rebuttable presumption that a three-judge panel "considered only relevant, material, and competent evidence in reaching its decision unless the record affirmatively demonstrates otherwise[,]" and that his trial counsel was ineffective in failing to advise him on the different standards of review prior to Davis making his jury waiver (Traverse, ECF No. 29, PageID 9204, citing *State v. Post*, 32 Ohio St. 3d 380, 384 (1987); *White*, 15 Ohio St. 2d at 151). As discussed above, Ohio courts have consistently held that the standard of review on appeals from jury verdicts versus verdicts from three-judge panels is identical; as such an interpretation is not clearly erroneous, this Court is bound by the Ohio courts' decisions on matters of state law. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005). As there is no legally-recognized difference between the standards of review, it could not have been error for trial counsel to have failed to advise him of such, and Claim Four should be dismissed.

### 3. Claim Seven: Failure to Represent Davis Adequately at Second Resentencing Hearing

Davis claims that counsel was deficient in arguing during opening statements at the second resentencing that Davis, if sentenced to life in prison, would never be paroled. He claims that counsel was further deficient in calling Mausser to testify in support of that statement, even though she did not testify that he would never be paroled, and Mausser, in a subsequent affidavit, averred "that she did not tell defense counsel that Mr. Davis would never be paroled." (Petition, ECF No. 6, PageID 8678-79, citing State Court Record, ECF No. 4-46, PageID 6365; 2nd Resent'g Tr., ECF

No. 5-7, PageID 8225-27 8323-25, 8327, 8330, 8333-35).  Davis alleges that after discussing

Mausser's proposed testimony with the mitigation expert, he indicated to his counsel that he did

not wish for Mausser to testify, but that his counsel nonetheless called her.  *Id*. at PageID 8680-

81, citing State Court Record, ECF No. 4-46, PageID 6271, 6275-77).  Counsel compounded his

mistake by not asking Mausser on redirect examination to clarify her view that "it might be

unusual" for someone in Davis's situation to be paroled, or to ask her how she voted, as a member

of the Parole Board, when a convict with death specifications came up for parole.  *Id*. at PageID

8681, citing State Court Record, ECF No. 4-46, PageID 6366; 2nd Resnt'g Tr., ECF No. 5-7,

PageID 8379.  In sum, Davis argues:

> If counsel would have conducted a reasonable investigation and
> effectively prepared for mitigation, the harmful testimony of Ms.
> Mausser would not have been presented in the first place. Absent
> counsel's deficient performance, there is a reasonable probability
> that the outcome of the trial would have been different and the three-
> judge panel would not have convicted Mr. Davis.

*Id*. at PageID 8681-82.

Davis argues further that counsel did not adequately prepare Dr. Smith to testify, and as a

result, "Dr. Smith left the panel with the impression that due to Mr. Davis's borderline personality

disorder, if Mr. Davis were ever released from prison, and no longer in a structured environment,

he could kill again."  (Petition, ECF No. 6, PageID 8682).  Dr. Smith averred that he was not

informed by Davis's counsel that parole might be an issue, and Davis argues that counsel's

decision to present Dr. Smith's testimony that Davis was unlikely to do well in an environment

without strict limitations, "after Cynthia Mausser, the chair of the Ohio Parole Authority, could

not guarantee that Mr. Davis would not be paroled if he received a non-death sentence[,]"

constituted deficient performance under *Strickland*.  *Id*. at PageID 8684, citing State Court Record,

ECF No. 4-46, PageID 6382.  Further, the testimony that Dr. Smith and others gave in mitigation

failed "to present a full and accurate picture of Mr. Davis's character and background," because counsel failed to adequately investigate and prepare witnesses to discuss issues such as Davis's family history, mental health, or alcohol dependence. *Id*. at PageID 8690-91. Finally, Davis argues that counsel was ineffective in failing to call mitigation investigator John Lee, who Davis claims would have presented "relevant and compelling evidence of Mr. Davis's character, history and background." *Id*. at PageID 8685. Davis claims that, had the evidence been presented properly and completely, there is a reasonable probability that he would not have been sentenced to death. *Id*. at PageID 8688, citing *Strickland*, 466 U.S. at 687-88.

The last reasoned state court decision on the issue was *Davis XIII*, in which the appellate panel held that the decisions to call Lee, Mausser, and Dr. Smith were "within the rubric of trial strategy and will not be second-guessed by a reviewing court." 2013-Ohio-3878 at ¶¶ 24-25, quoting *State v. Hanna*, 95 Ohio St. 3d 285, 304, 2002-Ohio-2221. The court did not engage in any analysis of the factual substance of Davis's claims, and Davis argues that the dearth of analysis means that *Davis XIII* is not entitled to deference. Further, Davis claims, relief is warranted because the decisions as to calling witnesses and the testimony they elicited form them were not within the ambit of "sound trial strategy." (Traverse, ECF No. 29, PageID 9238-40, quoting *Davis XIII*, 2013-Ohio-3878 at ¶ 25; citing *Wiggins*, 539 U.S. at 523-24; *Strickland*, 466 U.S. at 688-91).

In *Wiggins*, no mitigation evidence was presented at all, and "[c]ounsel's decision not to expand their investigation beyond the PSI and [Department of Social Services] records" prior to deciding not to present mitigation evidence "fell short of the professional standards that prevailed in Maryland in 1989." 539 U.S. at 524. Indeed, Wiggins's attorney conceded that, despite it being standard practice for counsel representing capital defendants to prepare "a social history report[,]" and "[d]espite the fact that the Public Defender's office made funds available for the retention of

a forensic social worker, counsel chose not to commission such a report." *Id.* Counsel for Wiggins also violated the American Bar Association Guidelines by not discovering "all reasonably available mitigating evidence[,]" and not conducting any more than a rudimentary investigation into potential mitigating evidence. *Id.* (emphasis removed). In sum, Davis argues, counsel's performance was so patently deficient that the presumption of competent representation and heavy deference to trial strategy set forth in *Strickland* and its progeny do not apply.

*Wiggins* is a much higher bar to relief than Davis wishes it to be. Even though Davis did not request a presentence investigation, his attorneys retained a mitigation expert and called witnesses to testify as to the full range of mitigation factors, including but not limited to his childhood, substance abuse, and borderline personality disorder. Moreover, counsel faced a more daunting challenge in crafting trial strategy than most attorneys representing capital defendants— the fact that, despite the hearing occurring in 2009, Davis could not be sentenced to life without possibility of parole, because such a sentence did not exist under the law at the time Davis murdered Butler. As discussed above, it was apparent from the State's opening statement that they intended to rely heavily upon the fact that Davis would be eligible for parole six-and-a-half years after resentencing if he were not sentenced to death. Even though Mausser could not testify that Davis would never be paroled, she did testify that it was unlikely. Importantly, Davis does not argue that he could have gotten evidence as to the unlikelihood of parole from another source. Counsel's decision to call Mausser and elicit certain testimony fell within the broad ambit of sound trial strategy and did not prejudice Davis.

Moreover, the testimony by Dr. Smith adequately discussed Davis's history of alcohol dependence and borderline personality disorder, and Davis's argument that Dr. Smith would have provided more persuasive testimony had he been fully informed of Davis's family history is purely

speculative. While Dr. Smith avers that he was unaware of parole's being a possibility for Davis, his testimony regarding the possibility of Davis's becoming violent upon release was immaterial to Davis's defense, which was premised in part on his never being released. Moreover, there was no indication in the trial court opinion that the possibility of Davis's becoming violent upon release influenced the panel's decision to sentence him to death. Accordingly, any deficient performance in calling Dr. Smith did not prejudice Davis, and thus cannot be the basis of a viable *Strickland* claim. Finally, as Defendants point out, Lee "would be purely a fact witness. As a fact witness, elementary rules of hearsay would preclude Lee from parroting out-of-court statements from others to prove that Davis supposedly is a great guy who deserves a lenient sentence." (Return, ECF No. 17, PageID 9054). Moreover, even if Lee were allowed to testify as to Davis's family background and history and his personal character, such testimony would have been cumulative of the testimony offered by other fact witnesses. Decisions not to present cumulative testimony—or even attempt to do so—are generally considered sound trial strategy. As counsel's decision not to call Lee was not a *Strickland* violation, the Court should dismiss the Seventh Claim.

### 4.  Claim Eight:  Failure to Seek Recusal of Biased Judges

Davis claims that his attorneys were ineffective in failing to *voir dire* Judge Pater after the Judge revealed that was a longtime friend of Victor Davis. Davis claims his attorneys were further ineffective in failing to discover that Judge Nastoff, prior to going on the bench, had prosecuted Lahray Thompson, Davis's nephew, for capital murder and that Judge Nastoff had referred to Thompson as "a liar" during the proceedings. Finally, Davis argues that counsel were ineffective in failing to seek recusal of Judges Nastoff and Pater after becoming aware of their alleged bias. Their failures to conduct *voir dire* and seek recusal deprived Davis of his Sixth Amendment right

to "an opportunity to comment on facts which may influence the sentencing decision in capital cases." Had counsel done so, Davis argues, he would not have received a death sentence because the panel would have concluded that Davis had an extremely dysfunctional upbringing (a factor in mitigation) (Petition, ECF No. 6, PageID 8693-98, quoting *Gardner v. Florida*, 430 U.S. 349, 360, 362 (1977); citing *Simmons v. South Carolina*, 512 U.S. 154, 161 (1994); *Strickland*, 466 U.S. at 668; *Gardner*, 430 U.S. at 353, 360-62; State Court Record, ECF No. 4-39, PageID 4933; State Court Record, ECF No. 4-46, PageID 6278-79, 6451-55, 6457; 2nd Resnt'g Tr., ECF No. 5-7, PageID 8268, 8285-87).

As the Warden notes, Davis never presented his claim regarding Judge Pater to the state courts (Return of Writ, ECF No.17, PageID 9059, citing 28 U.S.C. § 2254(b)(1)(A); State Court Record, ECF No. 4-46, PageID 6255-56; ECF No. 4-48, PageID 6809-11), and in the last reasoned state court decision, his claim as it pertains to Judge Pater was not discussed. *See Davis XIII*, 2013-Ohio-3878, at ¶ 26 (discussing only counsel's failure to seek recusal as to Judge Nastoff). Thus, the claim is procedurally defaulted. *Wong*, 142 F.3d at 322. Davis does not contest that the claim is defaulted, but "specifically asserts ineffectiveness of trial counsel, his direct appeal counsel, and his post-conviction counsel for failing to properly present this claim to the state courts as cause for any default." (Traverse, ECF No. 29, PageID 9251, citing *Carrier*, 477 U.S. 478). Yet, in *Carrier*, the Supreme Court held that "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." 477 U.S. at 488. Moreover, principles of comity dictate that a federal court is normally not the proper venue to vacate a state court conviction or sentence without first giving the state the chance to cure any constitutional violation. "That holds true whether an ineffective assistance claim is asserted as cause for a

90

procedural default or denominated as an independent ground for habeas relief." *Id.*, citing *Darr v. Buford*, 339 U.S. 200, 204 (1950), *overruled in part on other grounds by Fay v. Noia*, 372 U.S. 391 (1963).  Davis does not dispute that the ineffective assistance of trial counsel claim was available to him on direct appeal.  Consequently, Davis's ineffective assistance claim should be dismissed as procedurally defaulted unless Davis could show good cause to excuse appellate counsel's failure to raise the issue, or good cause to excuse postconviction counsel's failure to seek to reopen Davis's direct appeal or raise it in Davis's state court postconviction petition.  *Edwards v. Carpenter*, 529 U.S. 446, 449-50, 452-53 (2000).  Davis does not allege facts that would constitute such good cause.  Accordingly, Claim Eight is procedurally defaulted as it pertains to any failure to *voir dire* or seek recusal of Judge Pater.

In *Davis XIII*, the Twelfth District noted that "counsel explicitly stated that they were aware of Judge Nastoff's prior participation in Thompson's prosecution, but chose not to seek recusal." 2013-Ohio-3878, ¶ 26.  The panel concluded that Davis's claim failed as a matter of law, as "the decision not to seek recusal of the judge can only be viewed as strategic and will not form the basis of an ineffective counsel claim." *Id.*, quoting *State v. Nuhfer,* No. L–07–1125, 2009–Ohio–1474, ¶ 22 (Ohio App. 6th Dist. Mar. 20, 2009).  The appellate court noted that the Tenth District had not found ineffective assistance in failing to seek recusal of a judge who was involved in a previous prosecution of the defendant himself.  *Id.*, citing *State v. Morgan*, No. 12AP-241, 2012-Ohio-5773, ¶ 24 (Ohio App. 10th Dist. Dec. 6, 2012), *appeal not allowed at* 134 Ohio St. 3d 1488, 2013-Ohio-902.  But see *Williams v. Pennsylvania*, 579 U.S. ___, 136 S. Ct. 1899, 195 L. Ed. 2d 132 (2016).

The Warden argues that the decision, as a state court decision on a question of constitutional law, is entitled to double deference under AEDPA, and that the claim fails even under a *de novo* standard (Return of Writ, ECF No. 17, PageID 9058).  In support, he notes that

when postconviction counsel moved to disqualify Judge Nastoff from adjudicating Davis's petition, based on the judge's prior work as a prosecutor, the Supreme Court of Ohio denied the motion because "[n]o factual basis for disqualification has been presented in the instant affidavit" of his postconviction attorney. *Id*. at PageID 9058-59, quoting *In re Disqualification of Nastoff*, 134 Ohio St. 3d 1232, 2012-Ohio-6339, ¶ 10. In other words, Judge Nastoff's prosecution of Davis's nephew was not *per se* grounds for disqualification; rather, there had to be some showing that that prior involvement engendered "bias, prejudice, or a disqualifying interest" on the part of the judge. *In re Nastoff*, 2012-Ohio-6339, ¶ 9.

Davis argues that: *In re Nastoff* is immaterial because it pertained to a motion to disqualify due to bias, rather than a claim of ineffective assistance of counsel; *Davis XIII* was contrary to clearly established Supreme Court precedent, such that it should not be accorded deference; and the presence of Judge Nastoff tainted the death sentence "with constitutional infirmity." (Traverse, ECF No. 29, PageID 9247-48, quoting *Strickland*, 466 U.S. at 688; citing *Neder v. United States*, 527 U.S. 1, 8 (1999); *Edwards v. Balisok*, 520 U.S. 641, 647 (1997); *Johnson v. United States*, 520 U.S. 461, 469 (1997); *Rose*, 478 U.S. at 577-78; State Court Record, ECF No. 4-46, PageID 6271).

Contrary to Davis's argument, trial before a judge with *potential* bias has not been held by the Supreme Court to be structural error. *See Johnson*, 520 U.S. at 469 (citations omitted) ("We have found structural errors in only a limited class of cases[.] . . . It is by no means clear that the error here [trial judge determining a question properly reserved to the jury] fits within this limited class of cases."); *Rose*, 478 U.S. at 577-78, citing *Tumey v. Ohio*, 273 U.S. 510 (1927) (*actual* bias on the part of the judge is structural error); *Smith v. Warden*, 780 F. App'x 208, 230 (6th Cir. 2019), citing *Rose*, 478 U.S. at 577, *Tumey*, 273 U.S. at 514-15 (distinguishing from the trial judge's actual bias via pecuniary interest in the outcome in *Tumey*, which was structural error, and the trial

judge's alleged *potential* bias from an alleged "fixed anticipatory judgment" against the defendant, which was not). *In re Nastoff*, while not binding on this court, is instructive—the court found no allegations of actual bias or prejudice on the part of Judge Nastoff. Thus, even if counsel was deficient in not failing to seek Judge Nastoff's recusal, there is no evidence that the deficient performance prejudiced Davis, and it cannot serve as the basis of a *Strickland* claim.

As to Davis's argument that counsel deprived him of his right to participate in decisions affecting his possible sentence (Traverse, ECF No. 29, PageID 9249, citing *Gardner*, 430 U.S. at 353, 360-62), Judge Nastoff held that the claim was available to him on direct appeal but was not presented, and thus, was barred by *res judicata* (State Court Record, ECF No. 4-47, citing *State v. Lawson*, 103 Ohio App. 3d 307, 315 (Ohio App. 12th Dist. 1995). As Ohio's *res judicata* law is an adequate and independent state ground to find this portion of the claim procedurally defaulted, *Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007), Claim Eight should be dismissed in its entirety.

### 5. Claim Sixteen: Failure to Investigate Circumstances Surrounding Prior Killing

Davis argues that his trial counsel failed to thoroughly investigate the circumstances of the prior homicide conviction[;] consequently, Davis claims, "they failed to discover evidence demonstrating that that killing was not purposeful, as required by the statute." (Petition, ECF No. 6, PageID 8725, citing State Court Record, ECF No. 4-19, PageID 2032). He argues that Robert Jones Beard's letter was evidence that Davis did not act purposefully in killing Ernestine, and that, had counsel discovered that letter or other evidence, Davis's prior murder conviction could not have been used as a capital specification and he could not have been sentenced to death. *Id.* at PageID 8725-26. As with Claim Fifteen (the capital specification's supposedly being improper),

the Twelfth District held that the claim was barred by *res judicata*, *Davis VI*, 1996 WL 551432 at

* 4, and as with Claim Fifteen, the claim also fails on its merits. The letter from Beard could not,

by itself, have overcome the uncontested finding that Davis had purposely killed Ernestine. Davis

cites no other evidence that, had it been discovered and presented by counsel, would have rendered

his prior conviction unconstitutional. Any failure to investigate the circumstances surrounding

Davis's killing of Ernestine did not prejudice Davis, and cannot be the basis of a viable *Strickland*

claim. Thus, Claim Sixteen should be dismissed.


### D.    Execution Claims


#### 1.    Claim Nine:  Execution after Thirty-Six Years on Death Row is Cruel and Unusual Punishment


Davis argues that, because the punitive justification for a death sentence weakens with

time, carrying out a death sentence after he has been on death row for more than thirty years is

gratuitous, thus constituting cruel and unusual punishment that has no place within "the evolving

standards of decency that mark the progress of a maturing society." (Traverse, ECF No. 29, PageID

9252, 9255, 9259, quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958); citing *Roper*, 543 U.S. at 578;

*Lackey*, 514 U.S. 1045 (Stevens, J., respecting the denial of certiorari); *Gregg v. Georgia,* 428 U.S.

153, 177, 182-83 (1976)).[10]  However, as the Warden correctly points out, there is not a clearly

---

[10] In his Petition, Davis also notes that Justice Breyer has consistently, in his dissents from denials of certiorari, inveighed against the lengthy delays between sentences and executions (Petition, ECF No. 6, PageID 8701-02, citing *Conner v. Sellers*, 136 S.Ct. 2440, 2441 (Mem) (2016) (Breyer, J., dissenting from denial of certiorari and stay); *Boyer* v. *Davis*, 136 S. Ct. 1446, 1446-47 (Mem) (2016) (Breyer, J., dissenting from denial of certiorari); *Valle v. Florida*, 564 U.S. 1067 (2011) (Breyer, J. dissenting from denial of stay and certiorari); *Smith v. Arizona*, 552 U.S. 985 (2007) (Breyer, J. dissenting); *Foster v. Florida*, 537 U.S. 990 (2002) (Breyer, J. dissenting from denial of certiorari); *Knight v. Florida*, 528 U.S. 990 (1999) (same); and *Elledge v. Florida,* 525 U.S. 944 (1998) (same).

established federal legal principle that delay in carrying out death sentence is cruel and unusual under the Eighth Amendment. Dissents, no matter how eloquent and continuous, do not create constitutional law. Accordingly, habeas relief not available for this claim (Return of Writ, ECF No. 17, PageID 9060, citing 28 U.S.C. § 2254(d)(1); *Wright v. Van Patten*, 552 U.S. 120, 126 (2008); *Carey v. Musladin*, 549 U.S. 70, 77 (2006)). Davis's arguments that that he should not be penalized for the State's faulty sentencing procedures, which caused the delay between 1984 (initial sentence) and 2007 (*Davis X*), are ultimately irrelevant. Even if the wait is "horrible," as the Supreme Court remarked more than 100 years ago, *In re Medley*, 134 U.S. 160, 172 (1890), that horribleness does not by itself violate the Eighth Amendment. Nor does Davis cite any caselaw for the proposition that the admirable work by his attorneys to twice vacate his death sentence renders the carrying out of a new death sentence a violation of clearly established federal law. Accordingly, Claim Nine should be dismissed.

### 2. Claim Ten: Conviction Product of Unnecessarily Suggestive Police Procedures and Unreliable Eyewitness Testimony

The evidence upon which the State relied to convict Davis was almost exclusively the eyewitness testimony of Anthony Ferguson (before the grand jury), Reginald Denmark, Cozette Massey, and Shelba Robertson, recapitulated in detail above. Davis notes that Ferguson and Massey did not know Davis, and they had not seen him prior to the night of the murder. Moreover, Ferguson and Massey did not recall seeing each other, Denmark (Massey's girlfriend) did not see Ferguson, and Robertson (Butler's friend) did not see Denmark or Massey. Finally, Massey did not go to the police until four days after the murder, and her description of Davis to investigators was incomplete and inaccurate. Despite this, Ferguson and Massey's identifications of Davis did

not come from a photo array or live lineup. Rather, investigators showed them a single photo of Davis with Butler, a process Davis argues is unconstitutionally suggestive (Petition, ECF No. 6, PageID 8706-08, citing *Manson v. Brathwaite*, 432 U.S. 98, 109 (1977); State Court Record, ECF No. 4-28, PageID 3188-89, Trial Tr., ECF No. 5-2, PageID 7351, 7367, 7369, 7373-75, 7382-85, 7389, 7391, 7393, 7399, 7423-24; ECF No. 5-3, PageID 7495, 7498-99, 7507, 7566, 7568-70). Consequently, Davis argues, his conviction was the product of unreliable and inadmissible evidence, and his conviction must be vacated and reversed. *Id*. at PageID 8708-09.

Davis's conviction has been upheld repeatedly by state and federal courts, even when his death sentence was vacated. *Davis X*, 475 F.3d 761; *Davis II*, 38 Ohio St. 3d at 366. Yet, Davis argues that the last reasoned state court decision was *Davis VI*, in which the Twelfth District held that, because the claim did not require evidence *dehors* the record, Davis's failure to raise it on initial direct appeal meant that it was barred by *res judicata* on postconviction. 1996 WL 551432 at * 9, citing *Combs*, 100 Ohio App. 3d at 97. Davis argues: the lack of adjudication on the merits means that AEDPA deference does not apply; Ohio courts have not consistently applied *res judicata* as a procedural bar; and ineffective assistance of appellate counsel excuses any procedural default (Traverse, ECF No. 29, PageID 9264-65, citing *Johnson v. Williams*, 568 U.S. 289, 302 (2013); *James v. Kentucky*, 466 U.S. 341, 348 (1984); *Post v. Bradshaw*, 621 F.3d 406, 424 (6th Cir. 2010); *Franklin v. Anderson*, 434 F.3d 412, 420-21 (6th Cir. 2006)).

Davis's argument is unavailing for at least three reasons. *First*, as discussed above, *res judicata* is an adequate and independent state ground upon which to find a claim procedurally defaulted and precluded from federal habeas review. *Durr*, 487 F.3d 423 at 431-32. *Second*, even if *Davis VI* did not address the merits of this particular claim, the Supreme Court of Ohio, in *Davis II*, in discussing Massey's identification of Davis to police and Denmark and Massey's testimony

regarding the night of the killing, "conclude[d] that there is sufficient evidence in the record to support the conviction." 38 Ohio St. 3d at 366.

Third, as the Warden notes, an identical claim was presented and rejected in his first habeas corpus petition before this Court (Return of Writ, ECF No. 17, PageID 9061, citing *Davis IX*, ECF No. 16-1, PageID 8914-22). Therein, Judge Graham followed Sixth Circuit precedent that, when a state appellate court summarily dismisses a claim that a lower court has ruled to be procedurally defaulted, the federal habeas court must presume that the appellate court relied upon and affirmed the procedural default decision. *Davis IX*, ECF No. 16-1, PageID 8915-16, citing *Rust v. Zent*, 17 F.3d 155, 161 (6th Cir. 1994). Moreover, Judge Graham found there was not the requisite cause to excuse the default, both because Davis failed to present an ineffective assistance of appellate counsel claim on direct appeal, and because Davis failed to articulate what objective external factor impeded appellate counsel from raising it on direct appeal (as is required to excuse the procedural default of the underlying claim). *Id*. at PageID 8917-20. Further, Davis was unable to demonstrate prejudice, as the allegedly inaccurate or inconsistent testimony by Ferguson and Massey "does not at all undermine the credibility of the other two eyewitnesses who identified the petitioner as the person who shot Suzette Butler." *Id*. at PageID 8920. Finally, the substantial evidence of Davis's guilt meant that a reasonable factfinder could have imposed the death penalty, even absent the testimony of Ferguson and Massey. Thus, it was not a miscarriage of justice for Judge Graham to refuse to set aside the procedural default—indeed, based on the evidence before him, the refusal was proper. *Id*. at PageID 8921-22, quoting *Schlup v. Delo*, 513 U.S. 298, 315, 329 (1995); *McCleskey*, 499 U.S. at 494; citing *Sawyer v. Whitley*, 505 U.S. 333, 350 (1992). Davis has not argued that there is new evidence that constitutes cause and prejudice to set aside the default. For all these reasons, Claim Ten is not viable and should be dismissed.

### 3. Claim Twenty-One:  Ohio's Postconviction Scheme Inadequate to Address Constitutional Claims in State Courts

Davis argues that he fairly presented his federal constitutional claims to the Ohio courts under the state's postconviction relief proceedings, and supported those claims with "affidavits and other evidence *dehors* the record."  (Petition, ECF No. 6, PageID 8747, citing Ohio Rev. Code §§ 2953.21 *et seq.*; *State v. Cole*, 2 Ohio St. 3d 112 (1982)).  Nonetheless, Davis claims, the Ohio courts "effectively foreclosed Mr. Davis from having his legitimate claims reviewed[,]" denying him discovery or an evidentiary hearing during either postconviction proceeding.  *Id.*  This is because Ohio law requires a postconviction court to examine the petition "and make a facial determination if a hearing is required.  All this must be done without the benefit of the discovery processes available to every other civil litigant."  Essentially, Davis argues, Ohio's postconviction regime is a circular logic that "imposes an impossible pleading standard on petitioners."  *Id.* at PageID 8748.

> [A]n individual seeking post-conviction relief is not entitled to an evidentiary hearing until he produces sufficient documentation in the form of evidence outside the record to demonstrate that he is entitled to relief.  However, a post-conviction petitioner is not entitled to conduct discovery to obtain the necessary documentation to warrant a hearing until such time as he demonstrates that a hearing is necessary.

*Id.*, citing Ohio Rev. Code § 2953.21(A)(1)(a); *Cole*, 2 Ohio St. 3d at 114.  Making matters worse, Davis claims, is that "each cause of action in a postconviction petition [may] not exceed three pages[,]" meaning that death row petitioners with complex claims are not able to fact plead extensively in an attempt to meet their initial burden to obtain a hearing.  *Id.* at PageID 8749, citing Ohio Crim.R. 35.  In sum, "[a]lthough, the State must provide Mr. Davis 'with a constitutionally

98

adequate opportunity to be heard,' Mr. Davis has been denied 'even this rudimentary process.'"
*Id*. at PageID 8751, quoting *Panetti v. Quarterman*, 551 U.S. 930, 952 (2007). Davis argues that
"[d]eath is different. For that reason more process is due, not less." *Id*., citing *Ohio Adult Parole
Auth. v. Woodard*, 523 U.S. 272 (1998); *Lockett*, 438 U.S. 586; *Woodson*, 428 U.S. 280. However,
there is no provision in the statute, Criminal Rule 35, or anywhere else allowing more flexibility
for death row petitioners to present their constitutional claims.

Finally, Davis argues, even if the process is adequate in theory, in practice the granting of
postconviction relief by Ohio courts is so rare that it fails to provide the meaningful opportunity
for relief required by the Fifth and Fourteenth Amendments (Petition, ECF No. 6, PageID 8750,
citing *Keener v. Ridenour*, 594 F.2d 581, 590 (6th Cir. 1979); *Allen v. Perini*, 424 F.3d 134, 139-
40 (6th Cir. 1970); *Coley v. Alvis*, 381 F.2d 870, 872 (6th Cir. 1967)).

Davis raised a nearly identical claim in his first habeas petition, which was rejected because
"the Sixth Circuit has held that alleged errors in state collateral proceedings cannot form the basis
for habeas corpus relief." (*Davis IX*, ECF No. 16-2, PageID 9030, citing *Kirby v. Dutton*, 794 F.2d
245, 247 (6th Cir. 1986)). *Kirby* has never been called into question, much less overruled, as to
alleged errors arising solely out of postconviction. Thus, Claim Twenty-One should be dismissed
as not cognizable.

### 4.    Claims Twenty-Two through Twenty-Six:  Method of Execution and Legal Injection is Unconstitutional

Davis raises the following claims with respect to the constitutionality of Ohio's execution
statute and protocol:

> **Twenty-Two:** Ohio's statutory provisions governing the imposition of
> the death penalty do not meet the prescribed constitutional

requirements and are unconstitutional, both on their face and as applied to Mr. Davis, in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution;

**Twenty-Three:**  The State of Ohio cannot constitutionally execute Mr. Davis because the only means available under the law to execution him violate his Eighth Amendment rights;

**Twenty-Four:**  The State of Ohio cannot constitutionally execute Mr. Davis because the only means available for execution violate the Fourteenth Amendment's Due Process and Privileges or Immunities Clauses;

**Twenty-Five:**  The State of Ohio cannot constitutionally execute Mr. Davis because the only means available for execution violate the Equal Protection Clause of the Fourteenth Amendment; and

**Twenty-Six:**  The State of Ohio cannot constitutionally execute Mr. Davis because the only means available for execution depend on state execution laws that are preempted by federal law.

(Petition, ECF No. 6, PageID 8753-8835).

At the outset, the Court notes the Warden's uncontradicted assertion that Davis failed to present these claims in either of his state court postconviction petitions (Return of Writ, ECF No. 17, PageID 9073, 9076-77).  Davis's failure to present the claims renders them procedurally defaulted.

Moreover, they are barred as a matter of law.  When Davis filed his Petition and the Warden filed the Return of Writ, the authoritative case on the cognizability of method of execution claims in habeas corpus was *Adams v. Bradshaw ("Adams III")*, in which the Sixth Circuit held that "to the extent that Adams challenges the constitutionality of lethal injection in general and not a particular lethal-injection protocol, his claim is cognizable in habeas."  826 F.3d 306, 318-21 (6th Cir. 2016).  However, shortly after *Adams III* was handed down, the Sixth Circuit began to alter its jurisprudence.  In *In re Tibbetts*, the appellate panel, while acknowledging that it could not overturn *Adams III*, emphasized that any challenge to a particular method of lethal injection was properly brought under 42 U.S.C. § 1983, rather than in habeas.  869 F.3d 403, 406 (6th Cir. 2017).

100

In *(Roland) Davis v. Jenkins*, a capital habeas case, the Warden asked this Court to dismiss the petitioner's method of execution claim in light of *In re Tibbetts*.  Chief Judge Sargus refused, noting that "[t]he Sixth Circuit has consistently held that 'the prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision.'" *(Roland) Davis v. Jenkins*, No. 2:10-cv-107, 2017 U.S. Dist. LEXIS 161152, *4 (S.D. Ohio Sept. 29, 2017) (Sargus, C.J.), quoting *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985). Nonetheless, the Court acknowledged that *Adams III* and *Tibbetts* could be read as contradictory, and expressed its hope "that further authority from the Sixth Circuit or Supreme Court will answer the question of whether *Tibbetts* and *Adams III* are inconsistent and, if so, resolve that conflict." *Id*. at *5.

On October 25, 2017, the Sixth Circuit provided precisely such guidance:

> A prisoner who challenges a method of execution as unconstitutionally painful *must* identify an alternative means by which he may be executed.  *Glossip*[*v. Gross*] makes clear that a prisoner cannot invalidate his death sentence simply by asserting that *every* method offered by state statute will be unconstitutionally painful.  And as we explained above, the Court's decision to preclude this argument effectively divests us of habeas jurisdiction over such a claim. . . . The proper method for Campbell to bring these claims is in a § 1983 action[.]

*In re Campbell*, 874 F.3d 454, 465-66 (6th Cir. 2017) (emphasis in original), citing *Glossip*, 135 S.Ct. 2726, 2739 (2015).  Crucially, the *Campbell* panel also stated that the language in *Adams III* suggesting that a claim challenging the general constitutionality of lethal injection was cognizable in habeas was "dictum [that] mischaracterizes both *Adams II*[11] and *Glossip*.  And, of course, dictum in a prior decision—as opposed to a *holding*—does not bind future panels, including this one." *Id*.

---

[11] *Adams v. Bradshaw*, 644 F.3d 481 (6th Cir. 2011).

at 464 (emphasis in original), citing 6 Cir.R. 32.1(b).

Davis argues that, because *In re Campbell* was neither a Supreme Court nor an *en banc* decision, it could not overrule *Adams III*, and thus, may not alter, much less overrule, the holding set forth in *Adams III* (Traverse, ECF No. 29, PageID 9380). He claims that "[t]he *Campbell* panel asserted that the language in *Adams III* supporting Mr. Davis's claims is dicta, but *Campbell* relied on language in *Glossip* . . . that was itself dicta." *Id.*, citing *Glossip*, 135 S.Ct. at 2738-39; *In re Campbell*, 874 F.3d at 463-64. Further, Davis claims that the *In re Campbell* panel's reading of *Glossip* was "also highly questionable[,]" as "[c]ognizability of lethal injection claims in habeas corpus proceedings was not an issue before the Court in *Glossip*." *Id.*

This Court is bound by *In re Campbell*'s characterization of the relevant language in *Adams III* as dicta and its holding that *Glossip* forecloses any challenge to method of execution in habeas. More importantly, the Sixth Circuit, in *In re Smith*, addressed the issue of whether *In re Campbell* was still good law or if it had been abrogated by the Supreme Court's decision in *Bucklew v. Precythe*. The panel acknowledged the parenthetical in *Bucklew* that "(if the relief sought in a 42 U.S.C. § 1983 action would foreclose the State from implementing the [inmate's] sentence under present law, then recharacterizing a complaint as an action for habeas corpus might be proper)." *In re Smith*, No. 17-4090, ___ F. App'x ____, 2020 U.S. App. LEXIS 16768, 2020 WL 2732228, *2 (6th Cir. May 26, 2020) (*per curiam*) (alterations in original), quoting *Bucklew*, ___ U.S. ____, 139 S.Ct. 1112, 1128 (2019) (internal quotation marks and citation omitted). However, the panel held that:

> Smith stretches *Bucklew* too far. Whether an as-applied method-of-execution claim may be brought in habeas is not implicated by the question presented in *Bucklew*, its holding, or its primary legal reasoning. The Court in *Bucklew* held that prisoners bringing as-applied method-of-execution challenges under § 1983 must satisfy the *Baze-Glossip* test, and the Court's analysis of the Eighth

> Amendment, *Baze*, and *Glossip* reflects this focus. Furthermore, *Hill v. McDonough* was decided before and extensively discussed in *Campbell*, 874 F.3d at 460–63, meaning that the new law to implicitly overrule *Campbell* would have to come from *Bucklew* itself. And we cannot say that the parenthetical, combined with the Court's statement that the question of state law "*might* be relevant to determining the proper procedural vehicle for the inmate's claim," meaningfully alters the analysis in *Campbell*.

*Id.*, quoting *Bucklew*, 139 S.Ct. at 1128 (emphasis added) citing *In re Campbell*, 874 F.3d at 460-63 "For this reason, we must once again conclude that Smith's proposed amendment presents claims that are not cognizable in habeas in light of *Campbell*." *Id*. at *3.

*In re Smith* put to rest any ambiguity regarding the non-cognizability of method of execution claims in *habeas corpus*. Consequently, Claims Twenty-Two through Twenty-Five should be dismissed without prejudice. The Magistrate Judge notes that Davis is a plaintiff in the consolidated § 1983 method of execution case pending in this Court, In re Ohio Lethal Injection Protocol, Case No 2:11-cv-1016.

As to Claim Twenty-Six, Davis argues that:

> In relying on *Glossip*, the court in *Campbell* appears to have overlooked any statutory claims in conducting its analysis. Thus, even if this Court finds that *Campbell* forecloses certain constitutional claims, Mr. Davis should be permitted to proceed on the statutory "fundamental defect" claim set out in his Twenty-Sixth Ground for Relief.

(Traverse, ECF No. 29, PageID 8931, citing Petition, ECF No. 6, PageID 8814). Even if Davis's "statutory defect" Claim Twenty-Six were not foreclosed by *Glossip* and *In re Campbell*, which it is, it would fail on its merits. Davis argues that

> Ohio's use of drugs, including controlled substances and/or compounded drugs, to execute Mr. Davis will result in violations of various provisions of the Controlled Substances Act (CSA), 21 U.S.C. §§ 801, *et seq.*, the Federal Food, Drug and Cosmetic Act (FDCA), 21 U.S.C. §§ 301 *et seq.*, and federal regulations issued by the Drug Enforcement Agency (DEA) and Food and Drug Administration (FDA).

. . .

> The Ohio lethal-injection statute, Ohio Revised Code § 2949.22(A),
> along with DRC's practices, policies and protocols used to carry out
> that statute, are preempted by the Controlled Substances Act (CSA),
> 21 U.S.C. §§ 801, *et seq.*, the Federal Food, Drug, and Cosmetic Act
> (FDCA), 21 U.S.C. §§ 301, *et seq.*, and federal regulations issued
> by the Drug Enforcement Agency (DEA) and Food and Drug
> Administration (FDA).

(Petition, ECF No. 6, PageID 8815-16).

Davis makes conclusory statements that "carrying out Ohio's lethal-injection laws as to

Mr. Davis stands as an obstacle to Congress's full purposes and objectives behind the CSA and/or

the FDCA, and compliance with both Ohio law and federal law in this situation is impossible

because compliance with Ohio law would breach federal law" and that "Ohio's execution laws

that contemplate inclusion of controlled substances in the course of carrying out a death sentence

are expressly and impliedly preempted by the CSA and its implementing regulations."  (Petition,

ECF No. 6, PageID 8816; *see also Mut. Pharm. Co., Inc., v. Bartlett*, 570 U.S. 472-73, 480 (2013),

quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) ("a state law may be impliedly pre-

empted where it is 'impossible for a private party to comply with both state and federal

requirements'")).  Yet, formalistic recitations of the elements of a claim are insufficient to survive

a motion to dismiss under Fed.R.Civ.P. 12(b)(6), much less state a plausible claim in habeas.

Davis claims that the Ohio Department of Rehabilitation and Correction ("ODRC") cannot

procure any drugs permitted in its execution protocol without violating the CSA and its regulations

(Petition, ECF No. 6, PageID 8818-19, citing 21 U.S.C. § 844; 21 C.F.R. §§ 1306.03-05, 1306.11).

Specifically, he claims that ODRC's standard practice is:

> [N]ot to provide in the course of that transaction a valid patient-
> specific prescription issued for a legitimate medical purpose by a
> licensed health professional authorized to prescribe drugs in the
> State of Ohio. Instead, DRC provides only a certified copy of a
> Death Warrant issued by the Supreme Court of Ohio for an inmate,

104

> not necessarily the same inmate who will be executed with the
> particular drugs obtained and/or ordered.

*Id*. at PageID 8819 (emphasis in original).  "Further, it is impossible for DRC to obtain a valid

patient-specific prescription for any drug to be used to carry out a human execution, since there is

no drug that has been approved by FDA for the purpose of carrying out a human execution."  *Id*.

at PageID 8820.  Moreover, Davis argues, the DRC employees cannot lawfully procure, possess,

and dispense the execution drugs, because they are not being procured, possessed, and dispensed

in compliance with FDA and Drug Enforcement Agency ("DEA") regulations when used for

executions.  *Id*. at PageID 8821-23, citing 21 U.S.C. §§ 331(a), 355(a), 393(b)(2), 841(a); 21

C.F.R. §§ 1301.22, 1307.11; Ohio Rev. Code §§ 4729.01(I), 4765.39(C)(1).  Davis claims that

human execution is not, and can never be, a valid "off-label" use of the execution drugs, because

they are dangerous when used as directed in executions.  For those reasons, Davis argues, the

State's use of the protocol drugs in executions violates the FDCA.  *Id*. at PageID 8823, citing 21

U.S.C. § 352.  Moreover, he argues that, because thiopental sodium has never been approved by

the FDA, and none of the drugs in the protocol has been the subject of an investigative new drug

application, much less approved for use in execution, the State's use of the drugs violates the

FDCA and FDA regulations for those reasons, too.  *Id*. at PageID 8823-26, citing 21 U.S.C. §§

321(p), 355, 812; 21 C.F.R. § 312.20(a-b); *Abigail Alliance for Better Devel. of Experimental*

*Drugs v. von Eschenbach*, 495 F.3d 695, 697-98 (D.C. Cir. 1997).

Finally, Davis claims that the lethal injection statute and protocol that purport to enable

ODRC "to procure, obtain, import, purchase, dispense, distribute, possess and/or administer (and

any other terms of art under the CSA or FDCA) compounded drugs, including controlled

substances, as lethal-injection drugs, are in contravention of federal drug laws."  (Petition, ECF

No. 6, PageID 8828).  Davis asserts that any compounding of drugs for purposes of executions

violates the CSA, because there is no legitimate medical purpose for an execution.  *Id.* at PageID 8829-33, citing 21 U.S.C. §§ 353a, 353b, 21 C.F.R. § 1307.11.  As adherence to state law and federal law is impossible, Davis argues, Ohio's lethal injection statute, regulations, and protocol are preempted.  *Id.* at PageID 8820, 8834, quoting 21 U.S.C. § 903; citing *Bartlett*, 570 U.S. at 479-80.

For two reasons, any habeas claim based on statutory preemption faces a heavy burden. *First*, it is well-established that a "claim of a federal statutory violation will not be reviewed [in habeas corpus] unless it alleges 'a fundamental defect which inherently results in a complete miscarriage of justice [o]r an omission inconsistent with the rudimentary demands of fair procedure.'"  *Reed v. Farley*, 512 U.S. 339, 356 (1994) (Scalia, J., concurring in part), quoting *Hill v. United States*, 363 U.S. 424, 428 (1962).  *Second*, except as to the Medical Device Amendments (inapposite here), "[t]he FDCA contains no preemption clause," *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 339 (2008) (Ginsburg, J., dissenting), and the express preemption provision in the CSA is narrow:

> No provision of this subchapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which that provision operates . . . to the exclusion of any State law on the same subject matter which would otherwise be within the authority of the State, unless there is a positive conflict between that provision of this subchapter and that State law so that the two cannot consistently stand together.

21 U.S.C. § 903.  Moreover, implied preemption exists only under two circumstances:

> "Even without an express provision for preemption, we have found that state law must yield to a congressional Act in at least two circumstances."  First, "state law is naturally preempted to the extent of any conflict with a federal statute."  Second, we have deemed state law pre-empted "when the scope of a [federal] statute indicates that Congress intended federal law to occupy a field exclusively."

*Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 630 (2012), quoting *Crosby v. Nat'l Foreign*

*Trade Council*, 530 U.S. 362, 372 (2000); *Freightliner Corp. v. Myrick*, 514 U.S. 280 287 (1995).

In support of his implied preemption argument, Davis cites *Gonzales v. Oregon*, wherein the Supreme Court reiterated that "the CSA creates a comprehensive, closed regulatory regime criminalizing the unauthorized manufacture, distribution, dispensing, and possession of substances." (Petition, ECF No. 6, PageID 8818, quoting 546 U.S. 243, 250 (2006)). Davis's reliance on *Gonzales* is curious, since in that case, the Supreme Court held that CSA's preemption did *not* extend to empowering the Attorney General to promulgating rules and regulations prohibiting doctors from prescribing controlled substances under Oregon's Death With Dignity Act (known as "Medical Aid in Dying," or "MAID"). 546 U.S. at 248-49, 274-75. In that case, the Attorney General was acting under his uncontroverted rulemaking authority with respect to the relatively novel practice of legal MAiD. Davis, on the other hand, does not identify any instance in which the Attorney General or Secretary of Health and Human Services attempted to regulate the use of controlled substances in lethal injection. Moreover, the constitutionality of lethal injection in general has been upheld repeatedly. *See, e.g.*, *Glossip*, 135 S.Ct. at 2732-33; *Baze v. Rees*, 553 U.S. 35, 63 (2008) (Alito, J., concurring), citing *Gregg v. Georgia*, 428 U.S. 153, 175 (1976) (opinion of Stewart, Powell, and Stevens, JJ.); *Hill v. McDonough*, 547 U.S. 573, 580-81 (2006). In sum, preemption was not a persuasive argument in *Gonzales v. Oregon*, and it is even less persuasive here.

Moreover, Ohio's lethal injection statute, regulations, and protocol cannot be said to conflict with federal law. The undersigned agrees with Davis that, if his preemption argument were accepted, it would be impossible to implement the lethal injection protocol of Ohio and every other state that uses the method. Yet, not only has States' use of lethal injection been upheld repeatedly, the federal government has evinced its intent to resume executions via lethal injection.

*In re: Federal Bureau of Prisons' Execution Protocol Litig.*, 955 F.3d 106 (D.C. Cir. 2020).  Thus, Davis's argument, if accepted, compels the conclusion that the federal government is implicitly preempting state lethal injection laws to make lethal injection—the federal government's intended method of execution—impossible.  Such an outcome is dubious, if not absurd, and Davis offers no caselaw in support.  In light of the above, and the strong interests in comity and federalism that compel this Court to be cautious when determining preemption, Claim Twenty-Six is without merit, and should be dismissed.

### E.       Pretrial, Trial, and Sentencing Claims for Relief

#### 1.       Claim Eleven:   Resentencing Procedures Violated Federal and State Constitutions

Davis argues that the first resentencing violated his Fourteenth Amendment right to equal protection because, in light of *Penix*, defendants sentenced to death by a three-judge panel were treated unfairly vis-à-vis those sentenced to death by a jury, because only defendants in the former group could be sentenced to death upon resentencing (Petition, ECF No. 6, PageID 8710-11, citing *McCoy v. Court of Appeals of Wisc., Dist. 1*, 486 U.S. 429, 435 (1988); *Griffin v. Illinois*, 351 U.S. 12, 17 (1956); Ohio Rev. Code § 2929.06; *Penix*, 32 Ohio St. 3d at 372)).  Davis claims that the second resentencing violated his Due Process rights, because under the law in effect, he could only be resentenced to death by the original three-judge panel; yet, even though the original panel could not be re-assembled, the new panel rejected Davis's motion to withdraw his jury waiver, and resentenced him to death.  *Id*. at PageID 8712-13, citing *Landgraf.*, 511 U.S. at 266; Ohio Rev. Code §§ 2929.03, 2929.06, 2945.05, 2945.06.  He concludes by arguing that both the first and second resentencings violated the *Ex Post Facto* clause of the federal constitution; "the state court was required to apply the statute as written at the time of Mr. Davis's crime.  To do otherwise

violates the Fifth, Eighth and Fourteenth Amendments.  Retroactive legislation is prohibited under these Constitutional provisions." *Id.* at PageID 8714, citing U.S. CONST. ART. I, § 10, amend. V, VIII, XIV; *Carmell v. Texas*, 529 U.S. 513 (2000); *Landgraf.*, 511 U.S. at 266; *Lindsey v. Washington*, 301 U.S. 397 (1937); *In re Medley*, 134 U.S. 160 (1890), *abrogated on other grounds as discussed in Hilton v. Braunskill*, 481 U.S. 770, 775 (1987); *Calder*, 3 U.S. 386.

As the Warden notes, this Court previously rejected Davis's arguments that the different panel for resentencing constituted an *ex post facto* violation, and held that the differentiation of Davis from Penix did not constitute an equal protection violation (Return of Writ, ECF No. 17, PageID 9062, citing *Davis IX*, ECF No. 16-2, PageID 8992).  Judge Graham noted that the difficulty in reassembling the jury for resentencing was not an issue with a three-judge panel, which was a rational basis upon which the State could differentiate Davis from Penix.  Thus, any equal protection claim was not viable.  Judge Graham continued by explaining that the change in the statute to allow for a different three-judge panel was procedural, rather than substantive, in nature, and a procedural change, no matter how significant, cannot form the basis of an *ex post facto* claim.  *Davis IX*, ECF No. 16-2, PageID 8991-93, quoting *Corbitt v. New Jersey*, 439 U.S. 212, 226 (1978); *Dobbert v. Florida*, 432 U.S. 282, 292-97 (1977).  Moreover, since the statute allowed for a death sentence upon resentencing, just as in the original trial, there was no greater punishment possible, and thus was procedural in nature.  Accordingly, the Twelfth District found that there was no *ex post facto* violation *and* that applying the amended Ohio Revised Code § 2929.06(B) retroactively did not violate the Ohio or federal constitution.  *Davis XI*, 2011-Ohio-787, at ¶ 62, *aff'd Davis XIV*, 2014-Ohio-1615, ¶¶ 44-55.

In his Traverse, Davis concedes that the gravamen of his Due Process and Equal Protection claims are identical (ECF No. 29, PageID 9270).  He also argues that *Davis XIV* did not reach the

merits on his claim, despite his fairly presenting it. *Id.* at PageID 9271, citing *Davis XIV*, 2014-Ohio-1615; State Court Record, ECF No. 4-43, PageID 5884). He claims that the Supreme Court's discussion in *Davis XIV* of its holding in *Davis II* that *Penix* did not apply to Davis was not an adjudication on the merits by the *Davis XIV* court, because it was contained in the background, rather than analysis, section of the opinion. *Id.*, citing 2014-Ohio-1615 at ¶¶ 22-26. Davis notes that, in his appeal from the first resentencing, the Supreme Court of Ohio in *Davis IV* refused to revisit its holding in *Davis II*, and the Sixth Circuit held that *Davis IX*'s implicit affirmation of *Davis II* was not an adjudication on the merits. Therefore, Davis claims, AEDPA deference did not apply (Traverse, ECF No. 29, PageID 9272, citing *Davis X*, 475 F.3d at 779).

Further, while the *Davis X* court held that the denial of his waiver withdrawal at the first resentencing did not constitute an equal protection violation, 475 F.3d at 779-80, Davis argues that the rational basis identified by the Sixth Circuit—the possibility that the original three-judge panel could be reassembled, whereas the original jury could not—did not apply to his second resentencing (Traverse, ECF No. 29, PageID 9274, citing Ohio Rev. Code § 2929.06(B); *Davis X*, 475 F.3d at 779-80). Given that *Davis X*, in dicta, cast doubt on the continued validity of a jury waiver twenty-five years after the initial trial, Davis argues that the enforcement of his jury waiver in the second resentencing violated his right to equal protection. *Id.* at PageID 9274-75, citing 475 F.3d at 780-81.

However, portion of *Davis X* not discussed by Davis is fatal to his equal protection claim. The opinion noted the longstanding Sixth Circuit and Ohio precedent that a jury waiver in the initial trial will not be valid in the event of a retrial or if the conviction is reversed. *Davis X*, 475 F.3d at 780-81, citing *Sinistaj v. Burt*, 66 F.3d 804, 808 (6th Cir.1995); *United States v. Groth*, 682 F.2d 578, 580 (6th Cir. 1982); *United States v. Lee*, 539 F.2d 602, 606 (6th Cir. 1976); *State v.*

*McGee*, 128 Ohio App. 3d 541, 545 (Ohio App. 3rd Dist. 1998). However, the opinion continued that *McGee* was "not directly on point, because *Davis is not facing a new indictment*[.]" *Id.* at 781 (emphasis added). That Davis was being resentenced with his underlying conviction intact, as opposed to a completely new determination of guilt, is a rational basis for treating Davis differently than McGee. It is reasonable to infer from *Davis X* that the Sixth Circuit was dubious of the State's argument that a jury waiver made in 1984 would be valid almost twenty-five years hence. However, mere uncertainty is not itself grounds for an equal protection claim, and because there is no independent basis upon which this court could find a due process violation, both the Equal Protection and Due Process claims fail, even assuming *de novo* review is proper.

It is undisputed that the Supreme Court of Ohio examined and rejected Davis's claim that the second resentencing violated the federal constitution's *Ex Post Facto* Clause and the Ohio constitution's Retroactivity Clause. *Davis XIV*, 2014-Ohio-1615 at ¶¶ 44-55. The court reiterated: "The General Assembly has clearly expressed its intent that R.C. 2929.06(B) apply retroactively." *Id.* at ¶ 48 (internal quotation marks omitted), quoting *State v. White*, 2012-Ohio-2583 at ¶ 30. The court further explained that:

> (1) a defendant does not face greater potential sentence on resentencing than in the original sentencing;
>
> (2) the defendant does not have a vested or accrued right to be sentenced by a jury;
>
> (3) the defendant does not face any greater burden on resentencing;
>
> (4) the defendant is not being deprived of a reliance or vested interest in finality, and
>
> (5) the State does not obtain a new right at the expense of the defendant, the statute is remedial, rather than substantive in nature, and its application did not violate the Retroactivity Clause.

*Id.* at ¶¶ 48-53, citing *White*, 2012-Ohio-2583 at ¶¶ 1-2, 12-14, 34-37, 41, 43-44. Similarly, the

court applied its holding in *White* to Davis as to the *Ex Post Facto* Clause, finding that it did not fit into any of the categories of *ex post facto* laws set forth in *Calder* and its progeny. Specifically, the revision to Ohio Rev. Code § 2929.06(B) did not: (1) transform his murder and firearms specification from innocent to criminally culpable conduct; (2) make the crimes greater in degree than when they were committed; (3) inflict a greater punishment upon resentencing; or (4) lessen the evidentiary burden required to convict a defendant of the crimes. *Id.* at ¶ 54, quoting *Calder*, 3 U.S. at 390; *White*, 2012-Ohio-2583, at ¶ 64.

Davis argues that *Davis XIV* was contrary to clearly established federal law, and thus, AEDPA deference should not be accorded the decision. Specifically, he argues that his potential sentence was enhanced upon resentencing; in support, he argues that, because the original three-judge panel could not be reconstituted, a death sentence would not have been possible under the old version of the statute, but would be possible under the revised statute (Traverse, ECF No. 29, PageID 9273, citing *Dobbert v. Florida*, 432 U.S. 282, 300 (1977); Ohio Rev. Code § 2929.06(B)). Yet, Davis ignores the conclusion in *White* that "[a]pplying R.C. 2929.06(B) to a defendant whose case was remanded for resentencing after that provision became law is analogous to extending an unexpired statute of limitations." 2012-Ohio-2583, at ¶ 62, citing *Stogner*, 539 U.S. at 618. As *White* was not reversed or modified by the United States Supreme Court in any case, the decision in *Davis XIV* could not have been "clearly established federal law." Also, because the retroactivity of Ohio Rev. Code § 2929.06(B) is a question of law, the decision could not have been "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1-2). Thus, Claim Eleven should be denied.

### 2. Claim Twelve: Inability to Inspect Grand Jury Transcripts

Davis argues that he had a particularized need to see the grand jury transcripts, specifically,

the need to prepare and present a complete defense, and that his need outweighed the State's presumptive need to keep the testimony secret (Petition, ECF No. 6, PageID 8715, citing *Crane v. Kentucky*, 476 U.S. 683, 690 (1986); *California v. Trombetta*, 467 U.S. 479, 485 (1984); *State v. Sellards*, 17 Ohio St. 3d 169, 172-73 (1985); *State v. Greer*, 66 Ohio St. 2d 139 (1981)). He claims that there was no need for secrecy at the time he was preparing for trial, since "[t]he witnesses had already testified before the grand jury . . . If the prosecution had any concerns about shielding the identity of grand jury witnesses, due to safety concerns or any other reason, they could have sought a protective order prohibiting particular evidence from being disclosed." *Id*.

Davis argues that, despite fairly presenting the claim on direct appeal, the Supreme Court of Ohio violated clearly established federal law in its conclusory holding that "nothing in the record indicates that appellant failed to receive a fair trial because he was not provided with the grand jury testimony[,]" and thus, AEDPA deference is not appropriate (Traverse, ECF No. 29, PageID 9280, quoting *Davis II*, 38 Ohio St. 3d at 365). The Court need not address this argument, however, because Davis's overarching claim—that his inability to access the grand jury transcripts denied him full knowledge of the evidence that might be used against him, and thus, deprived him of his constitutional right to present a complete defense—is speculative. Nowhere in the Petition or Traverse does Davis identify what evidence he thinks is contained in the transcripts, much less how the outcome of his trial and sentencings would have been different if he had had access to the transcripts. Rather, Davis is asking, more than thirty years after the grand jury issued the indictment against him, for a grant of discovery to see the transcripts so that he might formulate a theory based on what might be contained in there (Traverse, ECF No. 29, PageID 9279, citing *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997)). Such speculation is not even sufficient under Fed.R.Civ.P. 8, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) ("Rule 8 . . . does not unlock

the doors of discovery for a plaintiff armed with nothing more than conclusions"), much less the Rules Governing § 2254 Cases; consequently, Claim Twelve should be dismissed.

### 3. Claim Thirteen: Discriminatory Selection of Grand Jury Foreperson in Violation of Fifth, Sixth, Eighth, and Fourteenth Amendments

Davis claims that the Presiding Judge of the Court of Common Pleas selecting the grand jury foreperson, who need not be part of the venire, is arbitrary and the resulting selection process is racially discriminatory, and thus, unconstitutional (Petition, ECF No. 6, PageID 8717, citing Ohio Rev. Code § 2939.02). "Further, according to Hamilton County[,Ohio] Common Pleas Judge [Melba] Marsh, the common pleas judges in Hamilton County, which adjoins Butler County, regularly exercised their statutory prerogative to select grand jury forepersons." *Id*. "Based upon the evidence regarding Hamilton County, counsel have reason to believe that the same improper procedures were used at the time of Mr. Davis's indictment in Butler County, an adjoining county." *Id*. at PageID 8718.

In *Hughbanks v. Hudson*, Petitioner Gary L. Hughbanks, Jr. was indicted by a Hamilton County grand jury with a Caucasian forewoman chosen by Judge Marsh, who also presided over Hughbanks's trial. The undersigned examined and rejected a claim based on racially discriminatory grand jury foreperson selection, finding that the "Supreme Court of Ohio's adjudication [against Hughbanks] was not 'decision that was contrary to, or involved an unreasonable application of, clearly established federal law.'" No. 1:07-cv-111, 2018 WL 9597457, *35-36, quoting 28 U.S.C. § 2254(d)(1) (S.D. Ohio Sept. 7, 2018) (Merz, Mag. J.). In other words, Hughbanks actually had a basis for his claim, and it was still unavailing. Davis, on the other hand, seems to allege that Butler County's geographic proximity to Hamilton County caused it to adopt the latter's supposedly discriminatory grand jury foreperson selection policy.

Yet, he offers no facts in support thereof.  As speculation, without more, cannot serve as the basis for a viable habeas claim, Claim Thirteen should be dismissed.

### 4.     Claim Fourteen:  Trial Court Prohibiting Elbert Avery from Testifying During Guilt Phase

In Davis's case-in-chief, his counsel attempted to call Elbert Avery as a live witness to rebut Anthony Ferguson's testimony that Ferguson had seen Davis shoot Butler.  Specifically, Avery was prepared to testify that Ferguson had told him that Ferguson had not seen Davis shoot Butler (Petition, ECF No. 6, PageID 8720).  The panel refused to allow Avery to testify, and instead allowed counsel to introduce a proffer of Avery's anticipated testimony.  *Id.*, quoting Trial Tr., ECF No. 5-3, PageID 7515-16; citing Trial Tr., ECF No. 5-3, PageID 7495.  Davis argues that the proffer carried less weight than if Avery had testified, and that the lack of live testimony deprived him of his fundamental right to present a complete defense.  *Id.* at PageID 8720-21, quoting *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *Washington v. Texas*, 388 U.S. 14, 19 (1967).

Despite the claim being available to Davis on direct appeal, he did not raise the issue until his first postconviction petition in state court.  Consequently, the Twelfth District found that the claim was barred by *res judicata* and did not address its merits (Traverse, ECF No. 29, PageID 9287, citing *Davis VI*, 1996 WL 551432, *9).  This adequate and independent state ground forecloses habeas relief.  As to Davis's alternative argument that appellate counsel provided ineffective assistance for failing to raise the issue on direct appeal, Davis notes the Sixth Circuit opinion in *Hoffner v. Bradshaw*.  *Id.* at Page ID 9288, citing 622 F.3d 487 (6th Cir. 2010).  The *Hoffner* court held that "since at least 1996, Ohio law has provided sufficient guidance on what constitutes a 'good cause' for a late filing under Rule 26(B).  Furthermore, as of January 1996,

'the time constraints of Rule 26(B) were firmly established and regularly followed.'"  622 F.3d at 504-05, quoting *Parker v. Bagley,* 543 F.3d 859, 861 (6th Cir.2008); *Monzo v. Edwards*, 281 F.3d 568, 578 (6th Cir. 2002).  Moreover, the court held that while it had, "in prior cases, found Rule 26(B) not to be an adequate and independent ground on which to find procedural default, those precedents are not applicable here because Rule 26(B) was firmly established and regularly followed by June 2006."  *Id*. at 505, citing *Parker*, 543 F.3d at 862.

Davis's direct appeals from his conviction and first resentencing occurred before Rule 26(B) was enacted, but his direct appeal from his second resentencing happened well after its enactment.  Also, Davis moved under Rule 26(B) to reopen his direct appeal in 1998, but did not raise this claim in the application.  Thus, procedural default is an adequate and independent ground upon which to find the ineffective assistance of appellate counsel claim procedurally defaulted.

Moreover, the claim fails on its merits.  As discussed above, there was more than sufficient evidence to convict Davis for the murder of Butler, even if Ferguson's testimony were to be discounted.  Further, while the reduction of Avery's testimony to a proffer may have prevented Davis from defending himself in his preferred manner, that reduction was not completely prejudicial.  Davis was able to introduce Avery's statement impeaching Ferguson without Avery being subject to cross-examination that could have damaged *Avery's* credibility.  This falls well short of the prejudice required for a *Strickland* claim, and Claim Fourteen should be dismissed.

### 5.        Claim Fifteen:  Capital Specification was Invalid

Davis argues that the sole specification allowing prosecutors to seek the death penalty was Davis's 1971 conviction for second-degree murder, arising from killing his estranged wife, Ernestine (Petition, ECF No. 6, PageID 8722).  The death penalty specification was under Ohio

Rev. Code §2929.04(A)(5), which is a prior purposeful killing.  *Id*.  Davis argues that he killed Ernestine in a heat of passion and without any premeditation or purpose, and thus, lacked the requisite *mens rea* for the specified prior offense.  *Id*. at PageID 8722-23, citing State Court Record, ECF No. 4-19, PageID 2028-29.  Absent a proper death specification or other aggravating circumstance, Davis argues, his "conviction on this aggravated specification and his death sentence are unconstitutional and must be vacated."  *Id*. at PageID 8723.  The parties agree that the last reasoned court decision was *Davis VI*, in which the Twelfth District found the claim procedurally barred by failing to raise it on direct appeal.  1996 WL 551432 at *4, citing *State v. Lentz*, 70 Ohio St. 3d 527, 527-28, paragraph one of the syllabus (1994).  Judge Graham relied in part on the Twelfth District's *res judicata* ruling to deny the claim in Davis's first habeas petition.  *Davis IX*, ECF No. 16-2, PageID 8967-74.

Davis argues that *Davis VI* was not an adjudication on the merits of his claim.  Yet, even if *res judicata* were not an adequate and independent state ground, Davis's claim is meritless.  As Judge Graham noted, "Where a defendant seeks to attack a prior conviction used to enhance the penalty for a later conviction, the defendant must show that . . . the prior conviction was infected with constitutional error."  *Davis IX*, ECF No. 16-2, PageID 8969, citing *Parke v. Raley*, 506 U.S. 20, 29 (1992); *Johnson v. Zerbst*, 304 U.S. 458, 468 (1938); *Cuppett v. Duckworth*, 8 F.3d 1132, 1136 (7th Cir. 1993).  At the time Davis was convicted of second-degree murder, the statute pertaining to that offense required a finding of purposeful killing.  Davis's guilty plea was, at the very least, a decision not to contest the finding that he purposefully killed Ernestine.  Against that uncontested finding, the letter from Davis's neighbor cannot, by itself, render the conviction for second degree murder unconstitutional.  Thus, using Davis's 1971 conviction as the capital specification was not constitutionally improper, and Claim Fifteen should be dismissed.

### 6.     Claim Seventeen:  Denial of Motion to Sever

Davis claims that the trial court's denial of his motion to sever Counts One (aggravated murder) and Two (possessing a weapon under a disability) caused him to waive his right to a jury trial and proceed before a three-judge panel.  Davis, on advice of trial counsel, believed that the introduction of his prior murder conviction, the reason for the "disability," would have so prejudiced the jury that he could have never gotten a fair hearing on the aggravated murder count (Petition, ECF No. 6, PageID 8729, citing State Court Record, ECF No. 4-19, PageID 1963-69; ECF No. 4-46, PageID 6459; Trial Tr., ECF No. 5-1, PageID 7211-15, 7221).  Consequently, Davis argues, his waiver was not knowing, intelligent, and voluntary.  *Id*. at PageID 8730.  Davis claims that the unconstitutional waiver of his jury right was a structural error, for which no showing of prejudice is required.  Nonetheless, he argues, he was prejudiced because, had the motion to sever been granted, his prior conviction would have been excluded from trial of the aggravated murder count under Ohio R.Evid. 403.  Thus, there is a reasonable probability that the jury would not have voted in favor of conviction and death sentence, and the lack of a jury verdict undermined confidence in the outcome, as evidenced by remand for resentencing twice (Traverse, ECF No. 29, PageID 9304-06, citing *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007); *Sullivan v. Louisiana,* 508 U.S. 275, 280-82 (1993); *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980); *Adams v. United States*, 317 U.S. 269, 275 (1942)).

Davis argues that he fairly presented his federal constitutional claim to the Supreme Court of Ohio on direct appeal, but that court only evaluated his Ohio statutory claim; thus, no AEDPA deference applies (Traverse, ECF No. 29, PageID 9306-07, citing *Davis II*, 38 Ohio St. 3d at 364; Ohio Rev. Code § 2929.022(A)).  Yet, as Judge Graham noted, *Davis IX*, ECF No. 16-2, PageID

118

8975, the Supreme Court of Ohio went into much greater detail than suggested by Davis.  The court held that Davis's:

> [F]urther contention that he was "forced" into waiving his right to a jury trial because of the *possibility* that the jury would not follow a curative instruction raises a mere risk of prejudice that can be best described as speculative. . . . A jury is believed capable of segregating the proof on multiple charges when the evidence as to each of the charges is uncomplicated.

38 Ohio St. 3d at 364 (emphasis in original), citing *Spencer*, 387 U.S. at 562; *State v. Torres*, 66 Ohio St. 2d 340, 343-44 (1981).  As the Supreme Court discussed in *Spencer*, there is no constitutional bar against prior crimes being mentioned.  387 U.S. at 562.  Moreover, Davis's argument that, but for the joinder of the counts, the prior murder conviction would have been excluded, is speculative at best.  The prior murder conviction was the basis upon which he was charged with *aggravated* murder and a capital specification; it is reasonable to conclude that the conviction would have been introduced to prove the capital specification, and it is well-established that a prior conviction may be introduced to prove, among other things, a necessary element of a crime.  *See, e.g.*, *id*. at 560; Fed.R.Evid. 404(b)(2); Ohio R.Evid. 404(B); *see also State v. Allen*, 29 Ohio St. 3d 53, 54 (1987) (when a prior conviction "transform[s] the crime itself by increasing its degree[,]" it becomes "an essential element . . . and must be demonstrated beyond a reasonable doubt.").  The Supreme Court of Ohio's rejection of Davis's argument that a jury would not adhere to a limiting instruction as speculative was well-reasoned and should not be disturbed by this Court.

As the trial court's denial of Davis's motion to sever was not unconstitutional, that denial cannot serve to render his waiver less than knowing, voluntary, intelligent.  Claim Seventeen should be dismissed.

7.      **Claims Eighteen and Twenty:  Death Sentence is Disproportionate, and the Product of a Constitutionally Inadequate Proportionality Review**

In Claim Eighteen, Davis argues that the trial court panel's conclusion that the sole aggravating factor, his 1971 homicide conviction, outweighed the extensive mitigation evidence presented resulted in a death sentence that was disproportionate, in violation of the Fifth and Fourteenth Amendments (Petition, ECF No. 6, PageID 8732; Traverse, ECF No. 29, PageID 9313, citing Ohio Rev. Code § 2929.05; *Evitts v. Lucey*, 469 U.S. 387, 401 (1985); *United States v. Hopper*, 941 F.2d 419, 422 (6th Cir. 1991).  Davis cites several Sixth Circuit decisions in which death sentences were upheld only after much greater aggravating circumstances and/or much less mitigation evidence.  *Id.* at PageID 8733, citing *Reynolds v. Bagley*, 498 F.3d 549, 560 (6th Cir. 2007); *Baston v. Bagley*, 420 F.3d 632, 634-35 (6th Cir. 2005); *DePew v. Anderson*, 311 F.3d 742, 746-47 (6th Cir. 2002).  Davis claims that there was no adjudication on the merits of his constitutional claim, as the Supreme Court of Ohio only analyzed the appropriateness of the sentence under the state statute as follows:  "We have approved death sentences in cases in which the prior-murder-conviction specification under R.C. 2929.04(A)(5) was the sole aggravating circumstance presented."  (Traverse, ECF No. 29, PageID 9315-16, quoting *Davis XIV*, 2014-Ohio-1615, at ¶ 117).  Davis claims that even if this analysis were to have reached the constitutional issue, it would have been an unreasonable determination, as the death sentences in both cases cited by the *Davis XIV* court were later vacated in federal habeas proceedings.  *Id.* at 9316-17, citing *Taylor*, 78 Ohio St. 3d 15 *writ of habeas corpus granted at Taylor v. Mitchell*, 296 F. Supp. 2d 784 (N.D. Ohio 2003); *State v. Mapes*, 19 Ohio St. 3d 108 (1985), *conditional writ of habeas corpus aff'd at Mapes v. Tate*, 388 F.3d 187).

In Claim Twenty, which is closely related, Davis argues that the Supreme Court of Ohio's

proportionality review, by comparing Davis only with cases in which a death sentence was imposed, did not comport with due process (Petition, ECF No. 6, PageID 8739, citing *Taylor*, 78 Ohio St. 3d 15; *Mapes*, 19 Ohio St. 3d 108). Davis claims that the proportionality review scheme is "ethically indefensible," because it does not consider similarities between the capital defendant and defendants in cases where the death penalty was *not* imposed. *Id.* at PageID 8740, quoting *State v. Murphy*, 91 Ohio St. 3d 516, 562 (2001) (Pfeifer, J., dissenting).

This review process presents three constitutional problems, Davis argues. *First*, by only evaluating against cases in which the death penalty is imposed, the death penalty is no longer "limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'" *Id.* at PageID 8741, quoting *Kennedy v. Louisiana*, 554 U.S. 407, 420 (2008); *Roper*, 543 U.S. at 568; *Atkins v. Virginia*, 536 U.S. 304, 319 (2002). *Second*, each time the death penalty is imposed in a less serious case, the bar for what crimes are sufficiently heinous to impose the death penalty diminishes, leading to an ever-greater number of circumstances in which the death penalty could be applied. *Id.* at PageID 8743. *Third*, Davis claims, the analysis contravenes *Gregg*, which, according to Davis, held that, if a state conducts a proportionality review, then that review is constitutional only if cases in which the death penalty was not imposed are also considered. *Id.* at PageID 8742, citing *Zant v. Stephens*, 462 U.S. 862 (1983); *Gregg*, 428 U.S. at 205. Specifically, the proportionality review scheme's "fail[ure] to properly narrow the reach of its death penalty fails to pass constitutional muster because it will result in arbitrary, capricious, or discriminatory death sentences." (Traverse, ECF No. 29, PageID 9328, citing *Walker v. Georgia*, 555 U.S. 979 (2008) (statement of Stevens, J., respecting the denial of writ of certiorari); *Furman v. Georgia*, 408 U.S. 238, 309-10 (1972)).

As to Claim Eighteen, Davis cites no caselaw, and the Court is not aware of any, in which

the Supreme Court has held that a death sentence was unconstitutional despite there being substantial mitigating evidence and a prior murder being the sole aggravating circumstance. Moreover, while the sentences in *Taylor* and *Mapes* were vacated in habeas, neither sentence was voided for lack of proportionality.  Indeed, in *Taylor*, Judge James Carr noted that:

> [W]hen the state courts have engaged in a proportionality review, the district court's review is limited.  The district court is to examine the state's proportionality review only to determine whether the imposition of death on the petitioner is patently unjust or "shocks the conscience; the court is not to second-guess the state court's comparison of other cases in which the death penalty was imposed."  Moreover, the Sixth Circuit in a recent opinion stated that because "proportionality review is not required by the Constitution, states have great latitude in defining the pool of cases used for comparison."

296 F. Supp. 2d at 839-40, quoting *Buell v. Mitchell*, 274 F.3d 337, 369 (6th Cir. 2001); *Kordenbrock v. Scroggy*, 680 F. Supp. 867, 899 (E.D. Ky. 1988).  Accordingly, the trial court's proportionality review was not a violation of clearly established federal law.  28 U.S.C. § 2254(d)(1).  Even considering all the mitigating evidence, the trial court finding that the single aggravating circumstance—previously killing an estranged significant other, the exact crime for which the original three-judge panel convicted him and sentenced him to death in 1984— outweighed those mitigating factors does not "shock the conscience."  Thus, the undersigned cannot find that the state courts' proportionality review violated due process or constituted cruel and unusual punishment, and Claims Eighteen and Twenty should be dismissed.

### 8.    Claim Nineteen:  Insufficient Evidence to Support a Conviction for Aggravated Murder

Davis argues that the testimony and evidence introduced against him at trial were insufficient to support a conviction for aggravated murder. In support, Davis emphasizes that:

122

The testimonies of Denmark, Massey, and Robertson at trial were inconsistent and often contradictory both with each other and with the testimony of Ferguson before the grand jury;

Massey's identification of Davis did not occur until four days after the killing, and was the product of unconstitutionally suggestive police procedures;

Coleman's testimony that Davis had acquired the gun for the purpose of protection, rather than to kill Butler; and

Aldridge's testimony that Davis appeared irate at the time of the killing (which Davis argues shows he lacked the requisite *mens rea* for aggravated murder).

(Petition, ECF No. 6, PageID 8735-37, citing State Court Record, ECF No. 4-28, PageID 3188-89; Grand Jury Tr., ECF No. 5-1, PageID 7127-52; Trial Tr., ECF No. 5-2, PageID 7240, 7351, 7360-61, 7373-75, 7382-85, 7417, 7424-26; Trial Tr., ECF No. 5-3, PageID 7450, 7499, 7503, 7569).   Given this inadequate evidence, and the lack of deoxyribonucleic acid or other circumstantial evidence tying Davis to the murder, he argues that the State could not prove the "prior calculation and design" element of aggravated murder beyond a reasonable doubt, and thus, his conviction and death sentence were unconstitutional.  *Id*. at PageID 8737-38, citing *Jackson v. Virginia*, 443 U.S. 307 (1979); *In re Winship*, 397 U.S. 358 (1970); *State v. Robbins*, 58 Ohio St. 2d 74 (1979); *State v. Cotton*, 56 Ohio St. 2d 8 (1978).

Davis claims that the last reasoned state court opinion was *Davis II*, in which the Supreme Court of Ohio did not address whether Davis acted with prior calculation and design; Davis argues that the state court's failure to do so means that "the state court's adjudication in this case was based on an unreasonable determination of the facts in light of the evidence presented in state court."  (Traverse, ECF No. 29, PageID 9322-23, citing *State v. Walker*, 150 Ohio St. 3d 1509, 2016-Ohio-8295, ¶¶ 17-19; *State v. Braden*, 98 Ohio St. 3d 354, 2003-Ohio-1325, ¶¶ 62-65; *State v. Keenan*, 81 Ohio St. 3d 133, 156-58 (1998) (Moyer, C.J., dissenting in part), *writ of habeas*

*corpus granted in part by Keenan v. Bagley*, No. 1:01-cv-2139, 2012 WL 1424751 (N.D. Ohio Apr. 24, 2012); *Davis II*, 38 Ohio St. 3d at 366).

"The General Assembly has determined that it is a greater offense to premeditate or to plan ahead to purposely kill someone. All prior-calculation-and-design offenses will necessarily include purposeful homicides; not all purposeful homicides have an element of prior calculation and design." *Walker*, 2016-Ohio-8295, at ¶ 18. Nonetheless, the Supreme Court of Ohio has repeatedly rejected any "bright-line test that emphatically distinguishes between presence and absence of prior calculation and design. Instead, each case turns on the particular facts and evidence presented at trial." *Id*. at ¶ 19 (internal quotation marks and citations omitted). Ohio courts have traditionally considered three factors: "(1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? and (3) Was the act drawn out or 'an almost instantaneous eruption of events?'" *Id*. at ¶ 20, quoting *Taylor*, 78 Ohio St. 3d at 19. Factor one weighs heavily in favor of finding prior calculation and design; Butler had been Davis's live-in girlfriend prior to separating less than a week before the murder. Factor two has evidence in support of and against a finding of prior calculation. As discussed above, Coleman testified that Davis asked him to buy the firearm and ammunition for self-defense; yet, Davis had the loaded firearm on his person when he approached Butler at the American Legion, and continued to have it as he and Butler went outside to talk, despite there being no evidence that Butler posed any type of threat to Davis. As to factor three, the circumstances surrounding Davis's killing of Butler do not neatly fall into either category. While there was no evidence that Davis went to the American Legion intending to kill Butler, Davis and Butler were together for more than half an hour prior to the killing. In light of the evidence presented, a finding of prior calculation and design is not

unreasonable, and Claim Nineteen should be dismissed.

## V.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that Davis's Petition (ECF No. 6) be DISMISSED, and that judgment should be entered in favor of the Warden and against Davis.  The undersigned concludes that no reasonable jurist would find that Davis "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), or would disagree with this conclusion with respect to any of the claims, and recommends that Petitioner be denied a certificate of appealability and that this Court certify to the Sixth Circuit that any appeal would be objectively frivolous and therefore should not be permitted to proceed *in forma pauperis*.

June 16, 2020.

s/ *Michael R. Merz*
United States Magistrate Judge

### NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.